EXECUTION COPY

# ASSET PURCHASE AGREEMENT

Dated as of December 30, 2008

BY AND BETWEEN

AVCO CORPORATION,

AS PURCHASER,

TEXTRON INC.,

AS GUARANTOR,

AND

SUPERIOR AIR PARTS, INC.,

AS SELLER

# TABLE OF CONTENTS

Page

ARTICLE I Definitions and Interpretations ................................................................. 2

    1.1    Definitions ................................................................................................. 2

    1.2    Interpretation ............................................................................................. 8

ARTICLE II Purchase and Sale of Assets ................................................................... 9

    2.1    Purchased Assets ........................................................................................ 9

    2.2    Excluded Assets ......................................................................................... 9

    2.3    Retained Liabilities; No Assumption of Retained Liabilities. ................... 9

    2.4    Purchase Price. .......................................................................................... 9

    2.5    Delivery of Purchase Price ....................................................................... 10

    2.6    Allocation of Purchase Price .................................................................... 11

ARTICLE III Adjustments to Purchase Price ............................................................. 11

    3.1    Purchase Price Adjustment ...................................................................... 11

    3.2    Resolution of Disputes Regarding Closing Date Inventory Value ........... 12

    3.3    Cooperation ............................................................................................. 12

ARTICLE IV Closing Matters ................................................................................... 12

    4.1    Closing ..................................................................................................... 12

    4.2    Items to be Delivered at Closing .............................................................. 12

    4.3    Further Obligations of Seller ................................................................... 14

ARTICLE V Actions Before Closing .......................................................................... 15

    5.1    Examinations and Investigations .............................................................. 15

    5.2    Consents ................................................................................................... 15

    5.3    Actions of Seller and Conduct of Business ............................................... 15

    5.4    Preservation of Purchased Assets ............................................................ 17

    5.5    Litigation ................................................................................................. 17

    5.6    Supplements to Schedules ........................................................................ 17

    5.7    Public Announcements; Communications to Suppliers and Customers ..... 18

    5.8    Negotiation With Others .......................................................................... 18

    5.9    Efforts to Consummate ............................................................................ 18

ARTICLE VI Representations and Warranties of Seller .............................................. 18

    6.1    Organization; Qualification ...................................................................... 19

| | | |
|---|---|---|
| 6.2 | Subsidiaries | 19 |
| 6.3 | Corporate Action and Authority; No Conflict | 19 |
| 6.4 | Certain Notice Parties | 20 |
| 6.5 | Assets | 20 |
| 6.6 | Scheduled Contracts | 20 |
| 6.7 | Litigation | 20 |
| 6.8 | Compliance with Laws | 21 |
| 6.9 | Permits; Regulatory Approvals | 21 |
| 6.10 | Consents | 21 |
| 6.11 | Related Interests; Distributions; Transactions with Affiliates | 21 |
| 6.12 | Suppliers | 21 |
| 6.13 | Insurance | 21 |
| 6.14 | Intellectual Property | 22 |
| 6.15 | No Material Adverse Change | 23 |
| 6.16 | Inventory | 23 |
| 6.17 | Tax Matters | 23 |
| 6.18 | Product Warranties; Regulatory Compliance Regarding Products | 23 |
| 6.19 | Brokers | 24 |
| 6.20 | Condition of Seller | 24 |
| 6.21 | Full Disclosure; Accuracy of Statements | 24 |
| ARTICLE VII | Representations and Warranties of Purchaser | 24 |
| 7.1 | Organization and Authority | 25 |
| 7.2 | Corporate Action; No Conflict | 25 |
| 7.3 | Brokers | 25 |
| 7.4 | Financing | 25 |
| ARTICLE VIII | Conditions to Obligations of Purchaser | 25 |
| 8.1 | Bankruptcy Court Orders | 25 |
| 8.2 | Performance of Covenants | 26 |
| 8.3 | Delivery of Documents | 26 |
| 8.4 | Representations and Warranties | 26 |
| 8.5 | Seller Authorization | 26 |
| 8.6 | No Proceedings | 27 |
| 8.7 | Disclosure of Claims | 27 |

| | | |
|---|---|---|
| 8.8 | Absence of Changes | 27 |
| 8.9 | Bankruptcy Events | 27 |
| 8.10 | Required Actions | 27 |
| 8.11 | Purchase Price Adjustments | 27 |
| 8.12 | Delivery of Purchased Assets. | 28 |
| 8.13 | 8130 Tagging. | 28 |
| 8.14 | Data Packs | 28 |
| 8.15 | Supplier Tooling. | 28 |
| 8.16 | Release from Parent. | 28 |
| 8.17 | Bankruptcy Schedules. | 28 |
| 8.18 | Notice. | 28 |
| 8.19 | Parent Approvals. | 28 |
| ARTICLE IX Conditions to Obligations of Seller | | 28 |
| 9.1 | Performance of Covenants | 28 |
| 9.2 | Delivery of Documents | 29 |
| 9.3 | Representations and Warranties | 29 |
| 9.4 | No Proceedings | 29 |
| 9.5 | Authorization | 29 |
| 9.6 | Required Actions | 29 |
| ARTICLE X Employee Matters | | 29 |
| 10.1 | No Assumption of Employee-Related Liabilities | 29 |
| 10.2 | Employees | 29 |
| ARTICLE XI Additional Agreements | | 30 |
| 11.1 | Disclosure of Information | 30 |
| 11.2 | Further Assurances; Removal of Purchased Assets | 30 |
| 11.3 | Access to Books and Records | 30 |
| 11.4 | Data Packs; Tooling; 8130 Tagging. | 31 |
| 11.5 | Inventory; Engines. | 31 |
| 11.6 | Review and Disposal of Assets. | 31 |
| 11.7 | Notices. | 32 |
| 11.8 | Guaranty | 32 |
| ARTICLE XII Survival and Indemnification | | 33 |
| 12.1 | Survival | 33 |

12.2    Indemnification ................................................................................................ 33

12.3    Limitations ...................................................................................................... 34

12.4    Holdback Period............................................................................................. 34

12.5    Indemnification Procedure ............................................................................ 34

12.6    Objections to Claims; Resolution of Conflicts ............................................. 35

12.7    Third-Party Claims......................................................................................... 36

12.8    Adjustment to Purchase Price ....................................................................... 36

ARTICLE XIII Tax Matters ...................................................................................... 36

13.1    Allocation of Taxes ........................................................................................ 36

13.2    Preparation of Tax Returns; Payment of Taxes ............................................ 37

13.3    Cooperation on Tax Matters .......................................................................... 37

ARTICLE XIV Termination ...................................................................................... 38

14.1    Termination..................................................................................................... 38

14.2    Effect of Termination ..................................................................................... 38

14.3    Purchaser Liability ......................................................................................... 39

ARTICLE XV Post-Closing Covenants .................................................................... 39

15.1    Third Party Consents, etc .............................................................................. 39

ARTICLE XVI General Provisions ........................................................................... 39

16.1    Entire Agreement ........................................................................................... 39

16.2    Expenses ......................................................................................................... 39

16.3    Waiver............................................................................................................. 39

16.4    Amendment ..................................................................................................... 40

16.5    No Third Party Beneficiary............................................................................ 40

16.6    No Assignment: Binding Effect ..................................................................... 40

16.7    Headings ......................................................................................................... 40

16.8    Invalid Provisions .......................................................................................... 40

16.9    Governing Law ............................................................................................... 40

16.10   Counterparts ................................................................................................... 40

16.11   Notices ........................................................................................................... 41

EXHIBIT A    Acquired Assets
EXHIBIT B    Excluded Assets
EXHIBIT C    Initial Purchased Inventory Value
EXHIBIT D    Certain Contracts

EXECUTION COPY

<u>Schedules</u>

| Schedule 2.6 | Purchase Price Allocation |
|---|---|
| Schedule 5.3 | Certain Employees and Contractors |
| Schedule 6.3 | Notices to, and Filings, Authorizations, Consents or Approvals of, any Governmental Authority |
| Schedule 6.4 | Liabilities |
| Schedule 6.5(a) | Encumbrances |
| Schedule 6.5(b) | Assets |
| Schedule 6.6 | Contracts, Defaults and Related Matters |
| Schedule 6.7 | Litigation |
| Schedule 6.8 | Compliance with Laws |
| Schedule 6.9 | Regulatory Approvals (PMAs, Type Certificates, Etc.) |
| Schedule 6.11 | Related Party Transactions |
| Schedule 6.12 | Suppliers |
| Schedule 6.14(a) | Exceptions to Ownership of Intellectual Property |
| Schedule 6.15(b) | Certain Matters Affecting Intellectual Property |
| Schedule 6.18(a) | Product Warranty |
| Schedule 6.18(b) | Regulatory Compliance Regarding Products |

EXECUTION COPY

# ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT is dated as of December 30, 2008, (this "Agreement") and is by and between Superior Air Parts, Inc., a Texas corporation (the "Seller"), Avco Corporation, a Delaware corporation and wholly owned subsidiary of Guarantor (the "Purchaser"), and solely with respect to Section 11.8, Textron Inc., a Delaware corporation (the "Guarantor").

# RECITALS

WHEREAS, Seller intends to promptly following the date hereof file a voluntary petition under Chapter 11 of the United States Bankruptcy Code commencing a case (the "Chapter 11 Case") in the United States Bankruptcy Court for the Northern District of Texas and will continue in possession of its assets and in the management of the Business (defined below) pursuant to Sections 1107 and 1108 of the Bankruptcy Code;

WHEREAS, Seller is engaged in the business of developing, manufacturing, assembling and selling (a) United States Federal Aviation Administration ("FAA") approved replacement parts for Continental, Lycoming and other aircraft engines and (b) FAA certified and experimental aircraft engines (collectively, the "Business");

WHEREAS, subject to the approval of the Bankruptcy Court and other conditions set forth below, Seller wishes to sell to Purchaser, and Purchaser wishes to purchase from Seller, the Purchased Assets on the terms and subject to the conditions set forth herein;

WHEREAS, the Board of Directors of each of Seller and Purchaser has duly authorized and approved the execution and delivery of this Agreement, consummation of the transactions contemplated hereby and performance by Seller and Purchaser, as applicable, of its respective obligations hereunder;

WHEREAS, Thielert AG, a company organized under the laws of Germany ("Parent"), is the sole stockholder of Seller;

WHEREAS, Parent has initiated insolvency proceedings under the laws of Germany (the "German Proceedings") and in accordance therewith, has appointed Dr. Achim Ahrendt as its insolvency administrator (the "Administrator"); and

WHEREAS, both the Administrator, as authorized by applicable German law and the creditors' committee of Parent appointed in the German Proceedings on behalf of and for Parent, and the creditors' committee of Parent appointed in the German Proceedings have each duly authorized and approved the execution and delivery of this Agreement by Seller, the consummation of the transactions contemplated hereby and the performance by Seller of its obligations hereunder (collectively, the "Parent Approvals").

NOW, THEREFORE, in consideration of the premises and of the mutual agreements herein made, and the representations, warranties and covenants herein contained, and for other good and valuable consideration, the sufficiency of which are hereby acknowledged, the parties

hereto agree as follows:

## ARTICLE I
## Definitions and Interpretations

   1.1  <u>Definitions</u>.  As used herein, the following defined terms have the meanings indicated below:

  "Administrator" has the meaning set forth in the <u>Sixth Recital</u>.

  "Affiliate" means any Person that, directly or indirectly, through one or more intermediaries, controls, is controlled by or is under common control with such Person.

  "Agreement" has the meaning set forth in the <u>Preamble</u>.

  "October 2008 Balance Sheet" means the unaudited balance sheet of Seller for the ten months ended October 31, 2008.

  "Bankruptcy Code" means Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101 <u>et seq</u>.

  "Bankruptcy Court" means the United States Bankruptcy Court for the Northern District of Texas.

  "Bidding Procedures Order" has the meaning set forth in <u>Section 8.1(b)</u>.

  "Break-Up Fee" has the meaning set forth in <u>Section 14.2</u>.

  "Business" has the meaning set forth in the <u>Second Recital</u>.

  "Business Day" means any day that banks are open for business in New York.

  "CAA" means the Canadian Aviation Authority (Transport Canada).

  "Certified Engines and Parts" means any and all aircraft engines (including the Vantage Engine) and aircraft engine parts (including those for use on Lycoming engine products, Seller engine products and TCM engine products) for which one or more Regulatory Approvals has been granted or issued at any time.

  "Chapter 11 Case" has the meaning set forth in the <u>First Recital</u>.

  "Claim" means any claim, demand, assessment, action, suit, proceeding, investigation, cause of action, litigation, judgment, order or decree, and includes "claims" as defined in Chapter 11 of Title 11 of the United States Code, 11 U.S.C. § 101(5).

  "Closing" has the meaning set forth in <u>Section 4.1</u>.

  "Closing Amount" has the meaning set forth in <u>Section 2.4(a)</u>.

"Closing Date" has the meaning set forth in <u>Section 4.1</u>.

"Closing Date Purchased Inventory Value" has the meaning set forth in <u>Section 3.1</u>.

"COBRA" means the continuation coverage requirements imposed by Section 4980B of the Code and the Treasury Regulations thereunder and corresponding provisions of state law ("COBRA").

"Code" means the Internal Revenue Code of 1986, as amended.

"Committee" means the official unsecured creditors' committee in the Chapter 11 Case, if any.

"Consents" has the meaning set forth in <u>Section 5.2</u>.

"Creditor" means any holder of a Liability.

"Data Packs" mean the complete set of engineering drawings, technical data, designs, drawings, specifications, testing specifications and results and other data and information submitted to the FAA in connection with a Regulatory Approval.

"Data Room" means Seller's repository of information made available to potential purchasers for purposes of due diligence.

"Deposit Account" has the meaning set forth in <u>Section 2.4(a)(i)</u>.

"Deposit Amount" has the meaning set forth in <u>Section 2.4(a)</u>.

"Disclosure Schedule" has the meaning set forth in the preamble to <u>Article VI</u>.

"EASA" means the European Aviation Safety Agency.

"Employees" has the meaning set forth in <u>Section 10.1</u>.

"Encumbrances" means, collectively, all security interests, judgments, liens, pledges, charges, escrows, Claims, options, rights of first refusal, rights of first offer, mortgages, indentures, security agreements and other agreements, arrangements, contracts, commitments, understandings or obligations, deed of trust, right-of-way, encroachment, building or use restriction, encumbrances or other rights of third parties, whether voluntary or incurred or arising by operation of law and whether written or oral and whether or not relating in any way to credit or the borrowing of money, including any agreement to give any of the foregoing in the future, and any contingent sale or other title retention agreement or lease in the nature thereof.

"Excluded Assets" has the meaning set forth in <u>Section 2.2</u>.

"FAA" means the U.S. Federal Aviation Administration.

"Final Determination" has the meaning set forth in <u>Section 12.6(b)</u>

"Final Order" means an order or judgment of the Bankruptcy Court or any other court of competent jurisdiction that has not been reversed, stayed, modified or amended; and for which the applicable time period for an appeal has elapsed.

"GAAP" means U.S. generally accepted accounting principles.

"German Proceedings" has the meaning set forth in the Sixth Recital.

"Governmental Authority" means any court, tribunal, arbitrator, authority, agency, commission, official or other instrumentality of the United States, or any foreign country or any domestic or foreign state, county, city or other political subdivision.

"Guarantor" has the meaning set forth in the Preamble.

"Holdback Amount" has the meaning set forth in Section 2.4(a).

"Holdback Period" has the meaning set forth in Section 12.4.

"Income Tax" or "Income Taxes" means United States and non-United States national, federal, state or local tax measured by or otherwise based on net income, including franchise taxes based on net income, together with any interest and any penalties, additions to tax or additional amounts imposed by any Tax Authority; provided, however, that the term "Income Tax" or "Income Taxes" shall not include any value added or similar tax or any tax determined under any circumstances in whole or in part by reference to net worth or value of capital stock.

"Indebtedness" of any Person means all obligations of such Person (i) for borrowed money, including any interest thereon, (ii) evidenced by notes, bonds, debentures or similar instruments, (iii) for the deferred purchase price of goods or services, (iv) for debt-like items, including overpayments received subject to refund (including any governmental overpayments), (v) for unfunded pension or other post retirement benefit plans, (vi) for unpaid dividends, (vii) under capital leases,  (viii) for warranty credits, (ix) for outstanding checks, or (x) in the nature of guarantees of the obligations described in clauses (i) through (ix) above of any other Person.

"Indemnified Person" has the meaning set forth in Section 12.2(a).

"Initial Purchased Inventory Value" has the meaning set forth in Section 3.1.

"Intellectual Property" means any or all of the following and all rights in, arising out of or associated therewith:  (i) all United States, international and foreign patents and applications therefore and all reissues, divisions, divisionals, renewals, extensions, provisionals, continuations and continuations-in-part thereof, and all patents, applications, documents and filings claiming priority to or serving as a basis for priority thereof; (ii) all inventions (whether or not patentable and whether or not reduced to practice), invention disclosures, improvements, trade secrets, proprietary information, know how, ideas, research and development, discoveries, concepts, formulas, processes and designs, computer software programs (in both source code and object code form), technology, manufacturing and production processes, development tools, techniques, methods and procedures, and all other processes, techniques, methods and procedures, technical

data, designs, drawings, specifications, business methods, technical data, tangible or intangible proprietary information, and all documentation relating to any of the foregoing; (iii) all copyrights, copyrights registrations and applications therefor and works of authorship and all other rights corresponding thereto throughout the world; (iv) all industrial designs and any registration and applications therefor throughout the world; (v) all databases and data collections and all rights therein throughout the world; (vi) all moral and economic rights of authors and inventors, however denominated, throughout the world; (vii) all documentation and media constituting, describing or relating to any of the foregoing, including manuals, memoranda, records, engineering reports, FAA Data Packs, field reliability reports ("Pit Crew" meeting minutes), designated engineering representative approved designs and repairs, copies and other tangible embodiments thereof (in whatever form, format or medium, and however fixed, including the Regulatory Approvals); and (ix) any similar or equivalent rights to any of the foregoing anywhere in the world, *excluding, in each case,* Trademarks and Domains.

"IRS" means the U.S. Internal Revenue Service.

"JAA" means the Joint Aviation Authorities.

"Knowledge" (including any derivation thereof) shall mean (i) the actual knowledge of any of the directors and officers of Seller and employees of Seller listed in Schedule 5.3 except employees designated as Warehouse Clerks, CAD Draftsman, and Sales and (ii) any facts or circumstances that would be known after due inquiry by a Person holding a comparable office or job with comparable responsibility of any of the foregoing persons.

"Laws" means any foreign, federal, state or local law (including common law), statute, regulation, ordinance, rule, order, decree, judgment, consent decree, writ, settlement agreement or governmental requirement enacted, promulgated, entered into, agreed or imposed by any Governmental Authority or Taxing Authority.

"Liabilities" means all Indebtedness, Claims, obligations, commitments, guarantees, endorsements, and other direct or indirect liabilities of a Person (whether known or unknown, asserted or unasserted, whether matured, fixed, absolute or contingent, disputed or undisputed, whether accrued or unaccrued, whether liquidated or unliquidated, and whether due or to become due), including any Liability for Taxes.

"Loss" or "Losses" means any and all Claims, Liabilities, obligations, losses, costs, expenses (including reasonable legal, accounting and similar expenses), litigation, proceedings, fines, Taxes, levies, imposts, duties, deficiencies, assessments, charges, penalties, allegations, demands, damages (including actual, punitive or consequential, foreseen or unforeseen, known or unknown, fixed or contingent, and matured or unmatured), civil and criminal violations of law and settlements and judgments of any kind or nature whatsoever.

"Non-Certified Engines and Parts" means any and all (a) aircraft engines (including the XP-Series Experimental Engines) and (b) aircraft engine parts, including those for use on Lycoming engine products, Seller engine products and TCM engine products, for which no Regulatory Approval has been granted or issued at any time.

"Officer's Certificate" has the meaning set forth in Section 12.5(a)

"Ordinary Course" means the ordinary course of business consistent with past custom and practice prior to November 1, 2008 or consistent with acting as a debtor-in-possession in a Chapter 11 bankruptcy case.

"Parent" has the meaning set forth in the <u>Fifth Recital</u>.

"Parent Approvals" has the meaning set forth in the <u>Seventh Recital</u>.

"Parts Manufacturing Approvals" means approvals issued by the FAA, EASA or similar foreign Governmental Authority to manufacture aircraft engine parts.

"Permits" means permits, tariffs, authorizations, licenses, certificates, orders, filings, variances, interim permits, approvals, franchises and rights under any Laws or otherwise required or issued by any Governmental Authority and any applications for the foregoing.

"Person" means any individual, partnership, corporation, limited liability company, limited liability partnership, trust or similar entity.

"Production Certificates" means approvals issued by the FAA, EASA or similar foreign Governmental Authority to manufacture aircraft pursuant to a Type Certificate.

"Purchase Price" has the meaning set forth in <u>Section 2.4(a)</u>.

"Purchased Assets" has the meaning set forth in <u>Section 2.1</u>.

"Purchased Intellectual Property" has the meaning set forth in Exhibit A, Section 6.

"Purchased Inventory" has the meaning set forth in Exhibit A, Section 3.

"Purchased Regulatory Approvals" has the meaning set forth in Exhibit A, Section1.

"Purchaser" has the meaning set forth in the <u>Preamble</u>.

"Purchaser Assignee" means one or more Affiliates of Purchaser to which Purchaser assigns its rights under this Agreement prior to the Closing by written notice to Seller to purchase any of the Purchased Assets in accordance with <u>Section 16.6</u>.

"Registered Intellectual Property" means Intellectual Property that is the subject of an application, certificate, filing, registration or other document issued, filed with, or recorded by any Governmental Authority.

"Regulatory Approvals" has the meaning set forth in Exhibit A, Section 1.

"Related Documents" means all other agreements, instruments and documents to be delivered hereunder (other than this Agreement), including all such documents to be delivered by Seller at the Closing.

"Rejected Contracts" means all executory contracts and unexpired leases to which Seller is a party, excluding those executory contracts and unexpired leases listed in Exhibit D.

EXECUTION COPY

"Retained Liabilities" has the meaning set forth in <u>Section 2.3</u>.

"Return" means any return, declaration of estimated Tax, Tax report, information return or other statement required to be filed with any Tax Authority, including any schedule or attachment thereto, and including any amendment thereof.

"Sale Hearing" means the final hearing of the Bankruptcy Court for the Chapter 11 Case to approve the Agreement pursuant to Sections 363 and 365 of the Bankruptcy Code.

"Sale Order" means a Final Order entered by the Bankruptcy Court, together with findings of fact, in form and substance satisfactory to Purchaser in its sole and absolute discretion: (i) approving the transactions contemplated in this Agreement; (ii) including provisions that the Purchased Assets are being transferred free and clear of all Encumbrances, including all Claims; (iii) including findings that Purchaser is a "good faith purchaser" entitled to all of the protections contained in Sections 363(m) of the Bankruptcy Code; (iv) requiring satisfactory lien releases or terminations from parties claiming a lien on any of the Purchased Assets; and (v) containing such other terms as Purchaser or its counsel may require with respect to the Purchased Assets or the Assumed Liabilities.

"Scheduled Contracts" or "Contracts" has the meaning set forth in <u>Section 6.6</u>.

"Seller" has the meaning set forth in the <u>Preamble</u>.

"Straddle Period" has the meaning set forth in <u>Section 13.1(a)</u>.

"Subsequent Holdback Period" has the meaning set forth in <u>Section 12.4</u>.

"Survival Period" has the meaning set forth in <u>Section 12.1(a)</u>.

"Taxes" (and individually, "Tax") means (i) all Income Taxes, Transfer Taxes and all gross income, gross receipts, ad valorem, capital, franchise, license, withholding, payroll, employment, excise, severance, stamp, occupation, premium, property or windfall profits taxes, real property tax, personal property tax, inventory, alternative or add-on minimum tax, value added tax, goods and services taxes, customs duties or other taxes, fees, assessments or charges of any kind whatsoever, together with any interest and any penalties, additions to tax or additional amounts imposed by any Tax Authority, and (ii) any liability for the payment of any amount of the type described in the immediately preceding clause (i) as a result of being a "transferee" of another person (by contract or application of law) or being a member of an affiliated or combined group for tax purposes.

"Tax Records" mean all Returns filed by the Seller relating to the Business or the Purchased Assets, and all supporting workpapers and schedules thereto.

"Taxing Authority" means any U.S., federal, state or local governmental or quasi-governmental authority or entity, or any foreign governmental or quasi-governmental authority or entity that is authorized to levy and/or collect Taxes.

"TCM" means Teledyne Continental Motors.

"Third Party Claim" has the meaning set forth in <u>Section 12.7</u>.

"Trademarks and Domains" shall mean all trade names, logos, common law trademarks and service marks, trademark and service mark registrations and applications therefor throughout the world and all Web addresses, sites and domain names and numbers.

"Transaction Notice" has the meaning set forth in <u>Section 11.7</u>.

"Transfer Taxes" means all sales, use, transfer, filing, conveyance, recording, stamp, registration and other similar Taxes and fees.

"Treasury Regulations" means the final regulations and, while effective, any temporary regulations, promulgated under the Code, as the same may be amended from time to time, including the corresponding provisions of any succeeding regulations.

"Type Certificates" means approvals issued by the FAA, EASA or similar foreign Governmental Authority in regards to the design of aircraft engines, including any supplemental Type Certificates or amended Type Certificates or supplemental Type Certificates.

"WARN Act" means the Worker Adjustment and Retraining Notification Act, 29 U.S.C. Section 2102 *et. seq.* and/or any similar applicable state or local law.

1.2    <u>Interpretation</u>.  When a reference is made in this Agreement to a section or article, such reference shall be to a section or article of this Agreement unless otherwise clearly indicated to the contrary.

(a)    Whenever the words "include," "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation."

(b)    The words "hereof," "herein" and "herewith" and words of similar import shall, unless otherwise stated, be construed to refer to this Agreement, including any exhibits or schedules hereto, as a whole and not to any particular provision of this Agreement, and article, section, paragraph, exhibit and schedule references are to the articles, sections, paragraphs, exhibits and schedules of this Agreement unless otherwise specified.

(c)    The plural of any defined term shall have a meaning correlative to such defined term, and words denoting any gender shall include all genders.  Where a word or phrase is defined herein, each of its other grammatical forms shall have a corresponding meaning.

(d)    A reference to any party to this Agreement or any other agreement or document shall include such party's successors and permitted assigns.

(e)    A reference to any legislation or to any provision of any legislation shall include any amendment, modification or re-enactment thereof, any legislative provision substituted therefor and all regulations and statutory instruments issued thereunder or pursuant thereto.

EXECUTION COPY

## ARTICLE II
## Purchase and Sale of Assets

2.1     Purchased Assets.  On the terms and subject to the conditions set forth in this Agreement, at the Closing, Seller will sell, assign, transfer, convey and deliver to Purchaser or a Purchaser Assignee, and Purchaser or a Purchaser Assignee will purchase and accept from Seller, free and clear of all Encumbrances (including all Claims) and in accordance with, and with all of the protections afforded by Section 363 of the Bankruptcy Code, all of Seller's right, title and interest in, to and under the assets, property, rights and Claims set forth in Exhibit A hereto (excluding, in each case, the Excluded Assets identified in Exhibit B hereto), wherever located, as the same shall exist immediately before the Closing (collectively, the "Purchased Assets").

2.2     Excluded Assets:  Notwithstanding anything in this Agreement to the contrary, Seller and Parent understand and agree that Purchaser is not purchasing any assets other than the Purchased Assets.  Accordingly, for the avoidance of doubt, the assets, properties, rights and claims set forth in Exhibit B (collectively, the "Excluded Assets") are excluded from the assets, properties, rights and claims being purchased by Purchaser and the term "Purchased Assets" expressly excludes such assets.

2.3     Retained Liabilities; No Assumption of Retained Liabilities.  Purchaser will not assume (and nothing in this Agreement shall be construed as causing or requiring Purchaser to assume), and will have no liability whatsoever for any debts, liabilities, payables, contracts, commitments, and/or obligations of any kind or nature whatsoever of the Seller or its Affiliates, whether absolute or contingent, liquidated or unliquidated, secured or unsecured, and whether or not accrued, matured, known or suspected or unknown, or related to or arising from the operation of the Business or the Purchased Assets, and whether existing on or arising after the Closing Date or, regardless of when asserted, related to periods prior to the Closing Date (all of such liabilities, the "Retained Liabilities").  For the avoidance of doubt, Retained Liabilities include any and all direct and indirect Tax liabilities of Seller and its Affiliates, whether arising before, as a result of or after the Closing.  As between the parties hereto, Seller shall remain fully and solely liable with respect to all of the Retained Liabilities.

2.4     Purchase Price.

(a)     The purchase price for the Purchased Assets (and the sale, assignment, conveyance and delivery thereof) shall be Eleven Million Five Hundred Thousand Dollars ($11,500,000.00), subject to adjustment pursuant to Section 3.1 (the "Purchase Price"), which shall consist of:

(i)     an amount equal to Three Hundred Fifty Thousand Dollars ($350,000.00) (the "Deposit Amount") that will be paid by Purchaser and deposited in a segregated interest bearing "Debtor-in-Possession" account of SAP at J.P. Morgan Chase (the "Deposit Account") not later than three (3) Business Days following written notification from Seller to Purchaser that such segregated account has been opened, which written notification shall include the wire transfer instructions therefor;

(ii)    Ten Million Six Hundred Fifty Thousand Dollars ($10,650,000.00) (the "Closing Amount"), which shall be subject to adjustment as set forth in Section 3.1 and shall be payable by Purchaser to Seller at the Closing; and

(iii)    an additional amount equal to Five Hundred Thousand Dollars ($500,000.00) (the "Holdback Amount"), which shall be payable to Seller in accordance with Section 2.5(c).

(b)    The Deposit Amount shall constitute a super-priority administrative claim in the Chapter 11 Case pursuant to Bankruptcy Code Sections 503(b) and 507(a).  Subject to Section 2.4(c), the Deposit Amount shall be released to Seller at Closing in accordance with Section 2.5 unless (A) Purchaser has terminated this Agreement pursuant to Section 14.1; or (B) a condition precedent set forth in Article VIII herein is not timely satisfied in either of which case the Deposit Amount (including any amounts expended by Seller pursuant to Section 2.4(c)) shall promptly, and in any event, within three (3) Business Days, be returned to Purchaser.

(c)    Subject to (i) the satisfaction of the condition set forth in Section 8.16 and (ii) the entry of a court order by the Bankruptcy Court (which order must be binding upon any Chapter 7 or Chapter 11 trustee) that such amount constitutes a super-priority administrative claim in the Chapter 11 Case pursuant to Bankruptcy Code Sections 503(b) and 507(a), Seller shall be permitted to use a portion of the Deposit Amount to pay independent third party fees and expenses incurred by Seller in connection with the provision of the Transaction Notice pursuant to Sections 11.7(a)(v) and 11.7(b), provided, that such fees and expenses shall be pre-approved, in writing, by Purchaser.  Seller shall provide Purchaser with written notice of such fees and expenses which such notice shall be accompanied by quotes, invoices or receipts from such third parties evidencing the expenses incurred or to be incurred by Seller.

2.5    Delivery of Purchase Price.

(a)    Purchaser shall deliver to Seller the Closing Amount, as adjusted pursuant to Section 3.1, on the Closing Date by wire transfer of immediately available funds in United States currency to the account specified by Seller in writing at least three (3) business days before the Closing Date.

(b)    The Deposit Amount shall be delivered to Seller on the Closing Date upon its release from the Deposit Account in accordance with the escrow instructions applicable thereto.

(c)    If, upon expiration of Holdback Period, no claims for Losses specified in any Officer's Certificate theretofore delivered to Seller have been made, then, not later than three (3) Business days following the expiration of the Holdback Period, Purchaser shall pay to seller an amount in cash equal to the Holdback Amount, less any amounts offset by Purchaser to compensate Indemnified Persons for Losses as provided in article XII and less any amount that is held back by Purchaser to satisfy unresolved claims for the Subsequent Holdback Period, if any, pursuant to Section 12.4.

– 10 –

2.6     Allocation of Purchase Price.

(a)     Purchaser and Seller shall allocate the Purchase Price among the Purchased Assets in accordance with Schedule 2.6 attached hereto.  Purchaser and Seller shall hereafter amend Schedule 2.6 to reflect the adjustment to the Purchase Price, as finally determined in accordance with Section 3.1.  Any such amendments to Schedule 2.6 shall be completed in accordance with such Treasury Regulations Sections and in a manner consistent with the allocation methodology used in determining the initial allocation of the Purchase Price.  In the event of any disagreement between the parties regarding any amendments to Schedule 2.6 pursuant to this Section 2.6(a), the parties shall make reasonable efforts to resolve such disagreement within ten (10) Business Days, and if they are unable to resolve such disagreement within such ten (10) Business Day period, the disagreement shall be fully and finally resolved by the Bankruptcy Court.

(b)     Purchaser and Seller agree to use the allocation set forth in Schedule 2.6, as the same may be amended in accordance with Section 2.6(a), in all applicable Returns, including without limitation (i) the preparation of United States Internal Revenue Service ("IRS") Form 8594, as required by Section 1060 of the Code, (ii) the determination by the Seller of taxable gain or loss on the sale of the Purchased Assets, (iii) the determination by Purchaser of its tax basis with respect to the Purchased Assets, and (iv) the filing of any applicable sales or Transfer Tax returns related to the sale of the Purchased Assets.  Neither party shall take a position on any Return, before any Taxing Authority, or in any judicial proceeding that is in any manner inconsistent with the allocation set forth in Schedule 2.6 without the consent of the other party, unless such party is required to do so by applicable Laws and has provided the other party with appropriate notice thereof in accordance with Section 16.11.

## ARTICLE III
## Adjustments to Purchase Price

3.1     Purchase Price Adjustment.  Purchaser shall calculate the value of the Purchased Inventory on the Closing Date based on a physical inventory to be conducted by Purchaser fifteen (15) Business Days prior to the Closing Date (the "Closing Date Purchased Inventory Value").  The Closing Date Purchased Inventory shall not include any partially assembled aircraft engines.  Purchaser shall provide Seller with written notice of the Closing Date Purchased Inventory Value based upon its calculations on the second Business Day following the date the physical inventory is conducted.  In the event that the Closing Date Purchased Inventory Value is less than Eleven Million Six Hundred Forty Thousand Dollars ($11,640,000.00) (the "Initial Purchased Inventory Value"), the Cash Purchase Price shall be reduced by Fifty-Six Cents ($.56) for each Dollar that the Closing Date Purchased Inventory Value is less than the Initial Purchased Inventory Value.  Exhibit C hereto sets forth the calculation of the Initial Purchased Inventory Value, as agreed to by the parties hereto, including a description of the accounting principles applied in calculating the same.  Purchaser's physical inventory that is conducted pursuant to this Section 3.1 may be observed by Seller and its representatives and Seller and its representatives shall have the right to inspect all supporting materials relating to Purchaser's calculation of the Closing Date Purchased Inventory Value.  Purchaser shall calculate the Closing Date Purchased Inventory Value using consistent application of those accounting principles set forth in Exhibit C hereto and in accordance with

GAAP, consistently applied, *provided, however,* that in no event shall the Closing Date Purchased Inventory include any partially assembled aircraft engines.  Seller shall make no sales, leases, deliveries or other dispositions of any Purchased Inventory subsequent to the physical inventory conducted by Purchaser pursuant to this Section 3.1 without Purchaser's prior written consent.

3.2     Resolution of Disputes Regarding Closing Date Inventory Value.  Seller shall have the right to review, and Purchaser shall provide Seller with reasonable access to, all materials used by Purchaser in calculating the Closing Date Purchased Inventory Value pursuant to Section 3.1.  If Seller does not notify Purchaser of its objection to the Closing Date Purchased Inventory Value within three (3) Business Days after the date it receives Purchaser's written notice of the Closing Date Purchased Inventory Value, then the Closing Date Purchased Inventory Value calculated by Purchaser shall be deemed to be final, conclusive and binding on the parties.  Seller may notify Purchaser in writing within such period that it disagrees with Purchaser's calculation of the Closing Date Purchased Inventory Value only if, as required by Section 3.1, Purchaser's calculation of the Closing Date Purchased Inventory Value was not in accordance with GAAP, consistently applied, including the consistent application of those accounting principles set forth in Exhibit C hereto.  In such event, Seller's written notice of dispute must specify (i) the detailed reasons for its disagreement with Purchaser's method of calculation, and (b) the amount of the adjustment it proposes with respect to the Closing Date Purchased Inventory Value.  The parties will attempt to resolve their differences with respect thereto within ten (10) Business Days.  If the parties are unable to resolve their dispute within such ten (10) Business Day period, the disputed items shall be fully and finally resolved by the Bankruptcy Court.

3.3     Cooperation.  Seller shall give representatives of Purchaser access to all books and records, premises and facilities of the Business as may be reasonably required by Purchaser in connection with the calculation or review of the Closing Date Purchased Inventory Value.  Personnel of the parties hereto may be consulted from time to time by representatives of the other party with respect to the Closing Date Purchased Inventory Value, and the parties and their respective representatives may confer with the representatives of the other party as to their examination and determination procedures hereunder.

## ARTICLE IV
## Closing Matters

4.1     Closing.  The closing of the purchase and sale (the "Closing") contemplated under this Agreement shall take place at 10:00 am Eastern Time not more than three (3) Business Days after all conditions precedent are satisfied or waived as provided in this Agreement, or at such other time and place as Purchaser and Seller shall mutually agree.  The Closing shall take place remotely by the exchange of electronic documents and signatures.  The date the Closing takes place is herein referred to as the "Closing Date."  The Closing shall be effective as of the close of business on the Closing Date.

4.2     Items to be Delivered at Closing.

(a)     Seller Deliveries.  On or before the Closing and effective on the Closing

Date, Seller shall execute and deliver, or cause to be delivered, as appropriate, to Purchaser:

        (i)      a copy of Seller's Articles of Incorporation, as amended, certified as of the Business Day prior to the Closing Date by the Secretary of State of the State of Texas;

        (ii)     a certificate of good standing of Seller issued as of the Business Day prior to the Closing Date by the Secretary of State of the State of Texas;

        (iii)    a certificate of the secretary of Seller dated as of the Closing Date, in form and substance reasonably satisfactory to Purchaser, as to the (i) Articles of Incorporation of Seller, as in effect on the Closing Date, (ii) by-laws of Seller, as in effect on the Closing Date, (iii) resolutions of the Board of Directors of Seller authorizing the execution, delivery and performance of this Agreement and the Related Documents and the transactions contemplated hereby and thereby, (iv) written authorization of the Administrator and the creditors' committee of Parent appointed in the German Proceedings authorizing the execution, delivery and performance of this Agreement and the Related Documents and the transactions contemplated hereby and thereby and (v) incumbency and signatures of the officers of Seller executing this Agreement and the Related Documents;

        (iv)    a General Assignment and Bill of Sale and Assignment of Intellectual Property Rights, each in form and substance acceptable to Purchaser, and such other bills of sale, endorsements, assignments and other good and sufficient instruments of sale, transfer conveyance and assignment, in form satisfactory to Purchaser, as shall be effective to vest in Purchaser good and marketable title, free and clear of all Encumbrances, to the Purchased Assets, in each case, duly executed by Seller;

        (v)     a Sale Order from the Bankruptcy Court, which, among other things shall contain findings of fact and which: (1) approves the transactions contemplated by this Agreement; (2) confirms the vesting in the Purchaser of good and marketable title, free and clear of all Encumbrances of every kind and nature whatsoever, to the Purchased Assets, (3) provides that any and all Encumbrances on the Purchased Assets shall be transferred from the Purchased Assets and shall instead attach to the proceeds of the sale of the Purchased Assets, (4) confirms that Purchaser shall have no obligation to pay any obligations, liabilities, indebtedness, duties, responsibility or commitment of Seller of any nature whatsoever, whether known or unknown, absolute or contingent, due or to become due, (5) confirms that Purchaser shall not have any liability or obligation for or with respect to or arising out of any Retained Liability, (6) confirms that no creditor of Seller shall commence a successor liability action against Purchaser as a result of the sale of the Purchased Assets, (7) provides that all entities holding claims or liens against or interest in Seller or the Purchased Assets are forever barred and enjoined from asserting such claims or liens against Purchaser, its affiliates, successors or assigns, or the Purchased Assets, (8) provides that all entities that are in possession of any portion of the Purchased Assets will be directed to surrender possession of such Purchased Assets to Purchaser or its designee as of the Closing Date, (9) confirms that Seller would be unable to meet its financial obligations in the near future, (10) confirms that Seller would not be able to reorganize successfully under Chapter 11 of the Bankruptcy Code and/or, as applicable, under Chapter 11 of the Bankruptcy Code, (11) confirms that Seller has made unsuccessful good-faith efforts to elicit reasonable alternative offers of acquisition of the Purchased Assets and (12) confirms that absent

the acquisition contemplated hereby, the Purchased Assets would exit the relevant market;

(vi)     a Final Order rejecting all Rejected Contracts in accordance with Section 365 of the Bankruptcy Code;

(vii)    all consents, waivers and novations required from third parties as required by Section 5.2;

(viii)   any updated Schedules required to be delivered by Seller pursuant to Section 5.6 (which Schedules shall be provided to Purchaser for its review and approval at least 2 Business days prior to the Closing Date);

(ix)     the power of attorney contemplated in Section 4.3;

(x)      a certificate of Tax good standing, clearance certificate or similar document, to the extent required by any Governmental Authority in order to relieve Purchaser of (A) any obligation to withhold any portion of the Purchase Price, and (B) any liability for Taxes (determined without regard to the provisions of this Agreement assigning responsibility therefor) for which Tax relief is available by reason of the filing or receipt of an appropriate certificate;

(xi)     all other certificates and instruments described in Article VIII hereof in a form satisfactory to Purchaser; and

(xii)    all other documents, instruments, certificates, documents and writings reasonably required to be delivered to Purchaser on or before the Closing under this Agreement in the form satisfactory to Purchaser.

Simultaneously therewith, Seller shall relinquish to Purchaser possession and control of the Purchased Assets and shall take all other steps that may be required to pass title to the Purchased Assets to Purchaser.

(b)      Purchaser Delivery.  At the Closing and effective on the Closing Date, Purchaser shall deliver the Closing Amount to Seller.

4.3      Further Obligations of Seller.  Without limiting any provisions hereof, Seller agrees that, effective as of the Closing Date, it will execute the power of attorney contemplated in Section 4.2(a)  and constitute and appoint Purchaser, its successors and assigns, the true and lawful attorney of Seller with full power of substitution in the name of Purchaser or in the name of Seller but for the benefit and at the expense of Purchaser to institute and prosecute all proceedings that Purchaser may deem proper in order to collect, assert or enforce any right or title of any kind in or to the Purchased Assets, to defend or compromise any and all actions, suits or proceedings in respect of any of the Purchased Assets and to do all such acts and things in relation thereto as Purchaser shall deem advisable.  Purchaser shall be entitled to retain for its own account any amounts collected pursuant to the foregoing powers including any amounts payable as interest in respect thereof.

EXECUTION COPY

## ARTICLE V
## Actions Before Closing

5.1    <u>Examinations and Investigations</u>.  From the date hereof through the Closing Date, Seller shall provide Purchaser, its employees, consultants and representatives, including its attorneys, accountants and financial advisors, access to the premises and facilities of Seller to make such investigations of the Purchased Assets and such examination of the books and records (including Returns filed and those in preparation) relating to the Purchased Assets as Purchaser may reasonably request, and cause its officers, employees, consultants, agents, accountants and attorneys to cooperate fully with Purchaser and its representatives in connection with such review and examination and to make full disclosure to Purchaser of all facts affecting the financial condition and operations of Seller to the extent such facts are reasonably likely to impact the existence or condition of the Purchased Assets or Seller's ability to fully perform its obligations hereunder; *provided, however*, that any such investigation or examination shall not unreasonably interfere with the operation of the Business.

5.2    <u>Consents</u>.  As promptly as practicable after the date of this Agreement, Seller shall provide formal notice and take all actions necessary to obtain any and all consents and/ or approvals required from any Governmental Authority, if any, for the sale of any Purchased Asset (collectively, the "Consents"). Seller shall be responsible for the cost of obtaining and complying with such Consents.  All such Consents shall be: (i) in form and substance reasonably satisfactory to Purchaser, (ii) shall not be subject to the satisfaction of any condition that has not been satisfied or waived and (iii) shall be in full force and effect as of the Closing.

5.3    <u>Actions of Seller and Conduct of Business</u>.

(a)    From the date hereof through the Closing Date, Seller will not take any action, and will cause its officers, employees or other representatives not to take any action, that shall cause Seller to be in breach of any representations, warranties, covenants or agreements contained in this Agreement.  Seller shall perform and satisfy all conditions to Closing to be performed or satisfied by Seller under this Agreement as soon as possible.

(b)    From the date hereof through the Closing Date, unless otherwise agreed in writing by Purchaser, Seller shall use commercially reasonable efforts to preserve intact its relationship with the  third parties who have possession or control over any of the Purchased Assets and otherwise maintain the Purchased Assets in their current condition, ordinary wear and tear excepted with respect to tangible personal property. Before the Closing, Seller shall confer with Purchaser, to the extent reasonably practicable, on a regular basis as Purchaser may request, and report on operational matters and decisions that are reasonably likely to affect the existence or condition of the Purchased Assets or Seller's ability to fully perform its obligations hereunder.

(c)    Without limiting the generality of the foregoing, from the date hereof through the Closing Date, unless contemplated as a condition to Closing by this Agreement, otherwise agreed in writing by Purchaser or approved by the Bankruptcy Court, Seller shall not:

(i)    incur any obligations or Liabilities (fixed or contingent), except

– 15 –

EXECUTION COPY

obligations or liabilities incurred in the Ordinary Course;

(ii)    pay any obligation or Liability (fixed or contingent), other than current liabilities incurred in the Ordinary Course, payments approved by Purchaser and the Bankruptcy Court to the employees listed in <u>Schedule 5.3</u> and payments to independent contractors, professionals or service providers whose fees are approved by the Bankruptcy Court, to the extent the Business continues to operate after the date hereof;

(iii)    borrow funds from any Person or make cash advances to any Person;

(iv)    take or agree to take any action that would make any representation or warranty of Seller hereunder inaccurate in any material respect at, or as of any time prior to, the Closing Date;

(v)    mortgage, pledge or subject to any Encumbrance, any of its assets, tangible or intangible except for possible liens for current state and local property taxes not in default;

(vi)    sell or transfer any of its assets or cancel any debts or Claims, except in each case in the Ordinary Course (including any non-cash sales of Inventory), to the extent the Business continues to operate after the date hereof, or sell, transfer, or grant any license with respect to any Purchased Intellectual Property;

(vii)    make changes in the Tax or accounting methods or practices followed by Seller with respect to the Purchased Inventory;

(viii)    to the extent the Business continues to operate after the date hereof, enter into any purchase commitments in excess of normal operating inventories or at prices higher than current market prices;

(ix)    to the extent the Business continues to operate after the date hereof, enter into any contract or lease outside of the Ordinary Course;

(x)    purchase, redeem or make any dividend or other distributions with respect to any shares of Seller's capital stock;

(xi)    except as set forth in <u>Section 5.9</u>, amend Seller's certificate of incorporation or by-laws; enter into any agreement of merger, consolidation, or reorganization; dissolve or enter into any plan of liquidation or dissolution; purchase or issue any shares or other securities; or enter into any commitments or arrangement for the purchase, redemption or issuance of shares of capital stock or other securities; make any change in the number of issued and outstanding shares of its capital stock; grant any right or option or make any commitment or agreement relating to its capital stock; or acquire or create any subsidiary;

(xii)    cancel or modify any existing insurance policies;

(xiii)    terminate any of the employees or contractors listed in <u>Schedule</u>

5.3, except for cause, until such Person has completed all of his duties in connection with the consummation of the transactions contemplated by this Agreement in the reasonable discretion of Purchaser, and in either case, only after twenty-four hours' prior written notice to Purchaser of Seller's intent to terminate any such Person; and

(xiv)    authorize or agree or otherwise become committed to do any of the foregoing.

5.4    Preservation of Purchased Assets.  From the date hereof through the Closing Date, Seller shall maintain its assets and properties, including the Purchased Assets, in substantially the same manner in which they have been maintained before the date hereof. Without limiting the generality of the foregoing, from the date hereof through the Closing Date, Seller shall:

(a)    continue to meet its contractual obligations and to pay its obligations as they mature in the Ordinary Course from and after the filing of the Chapter 11 Case;

(b)    use its best efforts to retain the employees and contractors listed in Schedule 5.3;

(c)    maintain the Purchased Assets in good working order and repair, reasonable wear and tear excepted with respect to tangible personal property;

(d)    maintain its books and records in the usual, regular and ordinary manner, consistent with past practice;

(e)    acquire Purchased Inventory, unless the Business continues to operate in the Ordinary Course, in which case such acquisitions must be in the Ordinary Course;

(f)    maintain its current insurance policies, including its aviation liability insurance policy insuring all aviation-related risks and perils; and

(g)    pay all Taxes that shall become due and payable on or before the Closing Date, except for the payment of ad valorem claims secured by liens which shall attach to the proceeds of the sale contemplated hereby, and prepare and duly file all Returns (and amendments thereto) required to be filed on or before the Closing Date.

5.5    Litigation.  From the date hereof through the Closing Date, Seller shall promptly notify Purchaser of (a) any damage or destruction of any Purchased Assets (other than damage to Purchased Inventory occurring in the Ordinary Course) and (b) any lawsuits, claims, proceedings or investigations of which Seller has Knowledge or which after the date hereof are threatened or commenced against Seller or with respect to the Business, the Purchased Assets or the transactions contemplated hereby.

5.6    Supplements to Schedules.  Seller shall promptly supplement or amend any Schedule, including the Disclosure Schedule, with respect to any matter arising after the date hereof, which, if existing or occurring on the date of this Agreement, would have been required to be set forth or described in such Schedule.  No supplement or amendment of a Schedule made

pursuant to this Section 5.6 shall be deemed to constitute a cure of any breach of any
representation or warranty made by Seller pursuant to this Agreement unless such supplement or
amendment is delivered at least 2 days prior to the Closing Date and consented to in writing by
Purchaser, which consent may be withheld by Purchaser in its sole discretion for any reason.

           5.7        Public Announcements; Communications to Suppliers and Customers.

           (a)      From the date hereof through the Closing Date, except in pleadings filed
or statements made by Seller or its representatives in connection with the Chapter 11 Case, Seller
and Purchaser shall consult with each other before issuing or causing any press releases or
otherwise making or causing any public statements with respect to this Agreement and the
transactions contemplated hereby.  Neither Seller nor Purchaser shall issue any press release or
make any public statement before obtaining the other party's approval, except that no such
approval shall be necessary to the extent any such release or disclosure may be required by law,
including the rules of any stock exchange and/or similar quasi-governmental body.

           (b)      From and after the date hereof through the Closing, Seller shall afford
Purchaser a reasonable opportunity to review communications from Seller to its suppliers and
customers and shall use all commercially reasonable efforts to consider and take into account
Purchasers comments with respect thereto.

           5.8        Negotiation With Others.  Seller hereby consents to Purchaser entering
into confidential discussions and negotiations with any third parties that Purchaser, in its sole and
absolute discretion, deems appropriate regarding this Agreement and the transactions
contemplated hereby, including any of Seller's suppliers, creditors, lenders, representatives or
other parties; provided, however, that any such discussions or negotiations shall not
unreasonably interfere with the operations of the Business.  Seller further agrees that Purchaser
may exclude representatives of Seller from any of Purchaser's discussions with such third
parties, in Purchaser's sole and absolute discretion.

           5.9        Efforts to Consummate.  Subject to the terms and conditions of this
Agreement, the parties hereto shall take or cause to be taken all reasonable action and do or
cause to be done all things reasonably necessary, proper or advisable under all applicable legal
requirements to consummate, as soon as reasonably practicable, the transactions contemplated
hereby.

## ARTICLE VI
## Representations and Warranties of Seller

        Seller hereby represents and warrants that the statements contained in this Article VI are
correct and complete as of the date of this Agreement and will be correct and complete as of the
Closing Date (as though made then and as though the Closing Date were substituted for the date
of this Agreement throughout this Article VI), except and to the extent set forth in the schedules
delivered by Seller to Purchaser on the date hereof and attached to this Agreement (collectively
such schedules are referred to as the "Disclosure Schedule") and updated prior to the Closing
Date pursuant to Section 5.6.  Nothing in the Disclosure Schedule will be deemed adequate to
disclose an exception to a representation or warranty made herein unless the Disclosure Schedule

identifies the exception with particularity and describes the relevant facts in detail.  Without limiting the generality of the foregoing, the mere listing (or inclusion of a copy) of a document or other item will not be deemed adequate to disclose an exception to a representation or warranty made herein (unless the representation or warranty relates to the existence of the document or other item itself).  The Disclosure Schedule will be arranged in paragraphs corresponding to the lettered and numbered paragraphs set forth in this Article VI.

6.1     Organization; Qualification.

(a)     Seller is a corporation duly organized, validly existing and in good standing under the laws of the State of Texas.  Seller has full corporate power and authority and all licenses, Permits and authorizations necessary to carry on the Business as currently conducted, and to own, lease and operate the properties and assets used by it, including the Purchased Assets.

(b)     None of the activities of Seller causes Seller to have a taxable or permanent establishment in any country other than the United States.

(c)     The copies of the articles of incorporation and by-laws of Seller in the Data Room are complete and correct as of the Closing Date.  To Seller's Knowledge, Seller is not in default under or in violation of any provision of its articles of incorporation or by-laws.

6.2     Subsidiaries.  Seller does not own or control, and never has owned or controlled, directly or indirectly, any capital stock or any other equity or long-term debt securities of, or equity, ownership, partnership or membership interest in, any other Person.

6.3     Corporate Action and Authority; No Conflict.

(a)     Subject to the approval by the Bankruptcy Court and the Parent Approvals, Seller has full power and authority to execute and deliver this Agreement and each of the Related Documents to which Seller is a party, and to consummate the transactions contemplated hereby and thereby.  This Agreement and the Related Documents to which Seller is a party have been duly executed and delivered by Seller and each of the other parties thereto (not including Purchaser, as applicable), and are legal, valid and legally binding obligations of Seller and each of such other parties, enforceable against Seller and each of such other parties, in accordance with their respective terms and conditions (except as and to the extent enforcement may be limited under applicable law).  Except as listed on Schedule 6.3, Seller is not required to give any notice to, make any filing with, or obtain any authorization, consent or approval of any Governmental Authority in order to consummate the transactions contemplated by this Agreement.

(b)     Neither the execution, delivery or performance by Seller of this Agreement or any of the Related Documents, nor the consummation by Seller of the transactions contemplated hereby or thereby, nor compliance by Seller with any provision hereof or thereof will (i) violate any provision of law, constitution, statute, rule or regulation, or any order, writ, injunction, permit, charge, judgment, decree or other restriction of any court or other Governmental Authority to which Seller is subject, or (ii) violate or result in a breach of or constitute (with due notice or lapse of time or both) a default under, or result in acceleration of,

create in any party the right to accelerate, terminate, modify or cancel, or require any notice under any agreement, contract, commitment, lease, agreement, mortgage, note indenture or other instrument or obligation to which Seller is a party or by which it is bound or to which any of the properties or assets of Seller is subject.

6.4     Certain Notice Parties.  Schedule 6.4 sets forth a true, complete and correct list of (i) all suppliers of the Business at any time during the last five years, (ii) all customers of the Business since January 1, 2003, (iii) all distributors of the Business who served as such at any time during the last five years, (iv) all parties (other than Seller) to any contract listed in Schedule 6.6 or other executory contract or unexpired lease and (v) all plaintiffs in the litigation identified in Schedule 6.7.  Timely, due and proper actual notice of the Chapter 11 Case and the transactions contemplated hereby shall have been served, at least twenty days prior to the Sale Hearing, upon each of the parties referenced above and all other Creditors of Seller.

6.5     Assets.

(a)     Subject to the Encumbrances referred to on Schedule 6.5(a) and the licenses described in Schedule 6.14(a), Seller has good, valid and marketable title to all of the Purchased Assets, and no Person, other than Seller, has any right, title or interest in or to any of the Purchased Assets.  No condition exists that materially interferes or is reasonably likely to materially interfere with the use by Purchaser of any of the Purchased Assets.  Each of the Purchased Assets is free from defects (patent and latent), has been maintained in accordance with normal industry practice, is in good operating condition (subject to normal wear and tear) and is suitable for the purposes for which it presently is used and presently is proposed to be used. Immediately following the Closing, Purchaser will have good, valid and marketable title to all of the Purchased Assets, free and clear of all Encumbrances.

(b)     Schedule 6.5(b) sets forth a true, correct and complete list of all locations (by street address) at which the tangible Purchased Assets (including books and records relating to the Purchased Assets, "data-packs" and other tangible embodiments of Purchased Intellectual Property and machinery, equipment, personal property and tooling) are located, together with (i) a description of the Purchased Asset(s) located at such location (including serial numbers of fixed assets and personal property, as applicable) and (ii) the name, telephone number and email address of one individual at each location (other than those locations occupied solely by Seller) whom Purchaser can contact in order to inspect the Purchased Assets prior to the Closing Date and take possession of the Purchased Assets following the Closing Date.

6.6     Scheduled Contracts.  Schedule 6.6 sets forth all executory contracts, agreements and other instruments to which Seller is a party and which relate to the Business or the Purchased Assets (collectively, the "Scheduled Contracts").  Except as set forth on Schedule 6.6, there exists no event, condition or occurrence that, with the giving of notice or lapse of time, or both, would constitute a default by Seller under any Scheduled Contract that is reasonably likely to have an adverse effect on the Purchased Assets in excess of $10,000, individually or in the aggregate.

6.7     Litigation.  Schedule 6.7 sets forth all Claims, actions, suits, proceedings, or investigations pending, or to the Knowledge of Seller, threatened or contemplated, against

EXECUTION COPY

Seller affecting the Business or assets of Seller as presently conducted or proposed to be conducted), or against the transactions contemplated by this Agreement, at law or in equity or before or by any Governmental Authority.  Other than the Chapter 11 Case, Seller is not subject to or in default with respect to any court or administrative order, writ, judgment, injunction, decree, determination or other award against Seller or affecting the Business or assets of Seller. Seller has provided timely and effective notice of each Claim to all applicable insurers.

6.8     Compliance with Laws.  Except as set forth on Schedule 6.8, Seller has not been and currently is not in default under and has not been or currently is not in violation of any Laws applicable to operation of the Business or the Purchased Assets (including export or import Laws), nor has Seller received notice alleging any such defaults or violations or has Knowledge of any Basis that may result in or constitute potential defaults or violations.

6.9     Permits; Regulatory Approvals.  Schedule 6.9 sets forth a true, accurate and complete list of all Permits, including all Regulatory Approvals, held by Seller with respect to the Purchased Assets.  All such Permits are in full force and effect.  Except for the Permits set forth on Schedule 6.9: (a) there are no Permits, whether federal, state, local or foreign, that are necessary for the lawful ownership or use of the Purchased Assets; (b) no violations are or have been recorded with respect to any such Permit; and (c) no proceeding is pending or, to the Knowledge of Seller, threatened to revoke or limit any such Permit.

6.10    Consents.  Except as provided in Section 5.2 and other than orders, consents, approvals, waivers or authorizations of, or declarations or filings with, the Bankruptcy Court and the Parent Approvals, no action, approval, consent or authorization of or by, filing or registration with, waiver of any right of first refusal or first offer from, or cooperation from, any Governmental Authority or any other Person not a party to this Agreement is necessary in connection with the execution, delivery and performance by Seller of this Agreement and the Related Documents or the consummation by Seller of the transactions contemplated hereby or thereby, or to make this Agreement or any Related Documents the valid and binding obligations of Seller.

6.11    Related Interests; Distributions; Transactions with Affiliates.  Except as set forth in Schedule 6.11, no Affiliate, nor any director, officer or employee of Seller or any Affiliate, is a landlord, supplier, distributor, customer, or competitor of Seller or is otherwise involved or engaged in activities relating to the Business or assets of Seller.  Except as set forth in Schedule 6.11, Seller is not a party to any agreement or arrangement with (i) any Affiliate, or any officer, director, employee of Seller or any Affiliate, or any family member of such individual, or (ii) any Person in which any individual identified above in clause (i) of this Section 6.11 has any interest.

6.12    Suppliers. Schedule 6.12 sets forth a true, accurate and complete summary of all suppliers of the business during the 60 months prior to the date hereof.

6.13    Insurance.  Schedule 6.13 sets forth a true, correct and complete list of the insurance policies covering the Business or Purchased Assets.  Such insurance policies are in full force and effect.  All premiums with respect thereto currently due have been paid.  No notice of cancellation or termination has been received with respect to any such policy.  Such policies are

sufficient for compliance with all requirements of Laws and all Scheduled Contracts. Such policies provide adequate insurance coverage for the assets and operations of the Business, and for all known and reasonably anticipated insurance Claims.

6.14    <u>Intellectual Property</u>.

(a)    Except as identified in <u>Schedule 6.14(a)</u>, Seller is the sole and exclusive owner of all Purchased Intellectual Property free and clear of any Encumbrances. Seller does not have any right, title or interest in or to any Registered Intellectual Property. No Person, other than Seller, has any right, title or interest in or to any Purchased Intellectual Property. Immediately following the Closing, Purchaser will have good, valid and marketable title to all of the Purchased Intellectual Property, free and clear of all Encumbrances.

(b)    Seller has used its reasonable best efforts to maintain and protect its ownership rights in all of the Purchased Intellectual Property. Seller is not a party to, and the ownership, use, manufacture, sale and distribution of the Purchased Assets do not require, any licenses, sublicenses, agreements or permissions relating to the Intellectual Property rights of any third party.

(c)    The use of the Purchased Intellectual Property by Seller as previously used and as currently used has not infringed and does not infringe any other Person's intellectual property right(s), or give rise to any claim of unfair competition under any applicable Law. Seller has not received any written or, to the Knowledge of Seller, any oral charge, complaint, claim, demand or notice alleging any such infringement, violation, interference, misuse, or misappropriation. To the Knowledge of the Seller, no third party has infringed upon, violated, interfered with, misused, or misappropriated any Purchased Intellectual Property.

(d)    Except as identified in <u>Schedule 6.14(d)</u>, with respect to all items comprising the Purchased Intellectual Property:

(i)    the item is not subject to any outstanding injunction, judgment, order, decree, or ruling of infringement, violation, interference, misuse, or misappropriation;

(ii)    no action, suit, proceeding, hearing, investigation, charge of infringement, violation, interference, misuse, or misappropriation, complaint, claim, or demand is currently pending or has been settled or otherwise closed in the last five years and, to the Knowledge of the Seller, no action, suit, proceeding, hearing, investigation, charge, complaint, claim or demand has been threatened, which challenges the legality, validity, enforceability, use, or ownership of the item;

(iii)    no royalties, honorariums or fees are payable by the Seller to any other Person by reason of the ownership, sale, license or use of the item; and

(iv)    execution, delivery and performance of this Agreement will not breach, violate or conflict with any instrument or agreement governing any Purchased Intellectual Property, and will not cause the forfeiture or termination or give rise to a right of forfeiture or termination of any Purchased Intellectual Property or in any way impair the right of Purchaser to use, sell, license or dispose of or to bring any action for the infringement, violation,

interference, misuse, or misappropriation of any such Purchased Intellectual Property or any portion thereof.

6.15     No Material Adverse Change.  Subject to any adjustments to the value of the Purchased Inventory made pursuant to Section 3.1 and the sale of Inventory in the Ordinary Course, there has been no adverse change in the existence or value of the Purchased Assets since October 31, 2008 and Seller has not leased, licensed, sold or otherwise transferred or disposed of any Purchased Asset.

6.16     Inventory.  All Purchased Inventory, whether or not included in the October 2008 Balance Sheet, consists of a quality and quantity usable and salable in the Ordinary Course at normal selling prices, except for obsolete, below-standard quality and slow-moving items, all of which have been written off or written down to the net realizable value in the October 2008 Balance Sheet or on the accounting records of Seller as of the Closing Date, as the case may be, in accordance with the principles stated in Exhibit C.  All Purchased Inventory is valued on the October 2008 Balance Sheet and Initial Purchased Inventory Value in the manner set forth in Exhibit C, and since October 31, 2008, has been maintained, and orders for inventory items have been made, only in the Ordinary Course. All reserves for any obsolete and slow moving items are adequate as of the date hereof, and there has been no material adverse change in such reserves or the valuation of said inventories since October 31, 2008.  None of the Purchased Inventory is held by Seller on assignment or consignment.

6.17     Tax Matters.

(a)     Seller has timely filed or caused to be filed all Returns that are required to be filed on or before the date hereof with respect to the Purchased Assets.  All such Returns were correct and complete in all respects.  Seller has paid all Taxes owed by Seller (whether or not shown on any Return) that are or became due and payable on or before the date hereof, or that are or may become payable by Seller or chargeable as a lien upon any of Seller's assets or properties.  Seller is not currently the beneficiary of any extension of time within which to file any Return or make any Tax payments.

(b)     No Claim for assessment or collection of Taxes relating to the Business or assets of Seller and that is or may become payable by Seller or chargeable as a lien upon Seller's assets or properties has been asserted in writing by the IRS or any other Taxing Authority, except for 2008 ad valorem taxes of the State of Texas.  There are no Encumbrances for any Taxes on any Purchased Assets, except for the 2008 ad valorem taxes of the State of Texas which will attach to the proceeds of the sale contemplated hereby.

6.18     Product Warranties; Regulatory Compliance Regarding Products.

(a)     Except as set forth in Schedule 6.18(a), there is no Claim against or Liability of Seller on account of any product warranties or with respect to the manufacture, sale, delivery, lease, distribution or rental of defective products (including claims for rescission) and there is no basis for any such Claim or Liability on account of product warranties or with respect to defective products heretofore manufactured, sold, distributed, leased, rented or delivered by Seller.

(b)     Except as set forth in <u>Schedule 6.18(b)</u>, no Governmental Authority regulating the design, manufacture, marketing, testing or advertising of any of the products manufactured, sold, serviced, leased, distributed or used by Seller has requested that any such product be recalled or removed from the market, that substantial new testing be undertaken as a condition to the continued manufacturing, selling, leasing, distribution or use of any such product or that such product be modified.

6.19    <u>Brokers</u>.  With the exception of Corporate Finance Partners, neither Seller nor any of its Affiliates has used, or engaged the services of, any broker, finder or agent in connection with the transactions contemplated hereby, and neither Purchaser nor any Affiliate of Purchaser has or shall have any Liability or obligation or otherwise suffer or incur any Losses as a result of or in connection with any fees or commissions payable or owed (or that may be payable or owed) to any broker, finder, agent or other Person retained by Seller or any of its Affiliates, with respect to any of the transactions contemplated by this Agreement or the Related Documents.

6.20    <u>Condition of Seller</u>.  Seller:

(a)     is not reasonably likely to meet its financial obligations in the near future;

(b)     would not be reasonably likely to reorganize successfully under Chapter 11 of the Bankruptcy Code; and

(c)     has made unsuccessful good-faith efforts to elicit reasonable alternative officers of acquisition of the Purchased Assets.

6.21    <u>Full Disclosure; Accuracy of Statements</u>.  Neither this Agreement nor any Related Documents nor any schedule, exhibit, representation, warranty, statement, list, document, certificate or other information made, given or furnished or to be furnished by or on behalf of Seller, to Purchaser or any representative or Affiliate of Purchaser under or in connection with this Agreement, any Related Documents or any of the transactions contemplated hereby or thereby, contains or will contain any untrue statement of a material fact or omits or will omit to state a material fact necessary to make the statements contained herein or therein, in light of the circumstances in which they are made, not misleading.

## <u>ARTICLE VII</u>
## <u>Representations and Warranties of Purchaser</u>

Purchaser represents and warrants to Seller that the statements contained in this <u>Article VII</u> are correct and complete as of the date of this Agreement and will be correct and complete as of the Closing Date (as though made then and as though the Closing Date were substituted for the date of this Agreement throughout this <u>Article VII</u>; provided that if Purchaser assigns its rights to acquire any of the Purchased Assets to a Purchaser Assignee, the Purchaser Assignee shall make the applicable representations set forth in this <u>Article VII</u> as of the Closing Date and Purchaser shall remain liable for any representations and warranties hereunder as of the date of this Agreement).

7.1     Organization and Authority.  Purchaser is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware and Purchaser has all requisite corporate power and authority to own, lease and operate its properties and to carry on its business as now being conducted, to execute and deliver this Agreement and the Related Documents to which it is a party and to perform the obligations to be performed by it hereunder and thereunder, and to consummate the transactions contemplated hereby and thereby.

7.2     Corporate Action; No Conflict.  The execution, delivery and performance by Purchaser of this Agreement and the Related Documents to be delivered by Purchaser and the consummation of the transactions contemplated hereby and thereby have been duly and validly authorized by all necessary corporate action on the part of Purchaser.  This Agreement has been duly and validly executed and delivered by Purchaser and is, and each of the Related Documents when executed and delivered by Purchaser in accordance with its terms will be, the valid and binding obligation of Purchaser, enforceable in accordance with the terms thereof.  Neither the execution, delivery or performance by Purchaser of this Agreement or any Related Document, nor the consummation by Purchaser of the transactions contemplated hereby or thereby, nor compliance by Purchaser with any provision hereof or thereof will (i) conflict with or result in a breach of any provision of the charter or by-laws of Purchaser or, (ii) violate any provision of law, statute, rule or regulation or any order, writ, injunction, permit, judgment or decree of any court or other governmental or regulatory authority applicable to Purchaser.

7.3     Brokers.  Neither Purchaser nor any of its Affiliates has used, or engaged the services of, any broker, finder or agent in connection with the transactions contemplated hereby, and neither Seller, nor any Affiliate of Seller has or shall have any Liability or obligation or otherwise suffer or incur any Losses as a result of or in connection with any fees or commissions payable or owed (or that may be payable or owed) to any broker, finder, agent or other Person retained by Purchaser, or any of its Affiliates, with respect to any of the transactions contemplated by this Agreement or the Related Documents.

7.4     Financing.  Purchaser has adequate funds and financing available to it to pay the Purchase Price in accordance with the terms of this Agreement.

### ARTICLE VIII
### Conditions to Obligations of Purchaser

The obligations of Purchaser under this Agreement are, at its option, subject to the fulfillment, on or before the Closing Date, of each of the following conditions precedent (any of which may be waived by Purchaser if Purchaser executes a writing so stating at or before the Closing):

8.1     Bankruptcy Court Orders.

(a)     On or before January 5, 2009, Seller shall have filed a motion to approve the bidding procedures for the sale of the Purchased Assets in form and substance acceptable to Purchaser in its sole and absolute discretion.

(b)     By no later than February 15, 2009, the Bankruptcy Court shall have entered an order approving the bidding procedures motion (the "Bidding Procedures Order"),

which order shall be in form and substance acceptable to Purchaser in its sole and absolute discretion.  The Bidding Procedures Order shall be acceptable to Purchaser in its sole and absolute discretion, and shall include: (i) the approval by the Bankruptcy Court of the execution by Seller of this Agreement and of Purchaser as a "Stalking Horse" bidder and "Qualified Bidder" in the Chapter 11 Case; (ii) the establishment of a date, on or before March 20, 2009, for qualified over-bids to be received by the Seller; (iii) the establishment of over-bid procedures, including the Break-Up Fee; (iv) the establishment of a date, on or before March 31, 2009, that Purchaser and any other qualified overbidders shall participate in an auction of the Purchased Assets in the Bankruptcy Court and the rules and procedures for such auction; (v) the establishment of a date, on or before March 31, 2009, for the Sale Hearing; and (vi) confirmation by the Bankruptcy Court that the notices that have been provided pursuant to Section 11.7 constitute reasonable and appropriate notice under the Bankruptcy Code.

(c)     On or before March 31, 2009, the Bankruptcy Court shall have held the Sale Hearing and entered a Sale Order approving this Agreement and the transactions contemplated hereby.  The Sale Order, which shall be in form and substance acceptable to Purchaser in its sole and absolute discretion, shall, among other things, include the findings of fact and the provisions identified in Section 4.2(a)(v), and shall provide that Purchaser has all rights and protections of a good-faith purchaser pursuant to Section 363(m) of the Bankruptcy Code.  The Sale Order shall be in full force and effect and shall have become a Final Order on or before April 30, 2009.  Seller shall have delivered to Purchaser: (a) a certified copy of the Sale Order; and (b) copies of all affidavits, certificates of service or notices required to be filed, served or published in connection with the approval of the Sale Order.

(d)     On or before April 30, 2009, the Bankruptcy Court shall have entered a Final Order rejecting all Rejected Contracts in accordance with Section 365 of the Bankruptcy Code.

8.2     <u>Performance of Covenants</u>.  Seller shall have performed and complied with all terms, covenants and conditions required by this Agreement to be performed or complied with by Seller on or before the Closing Date, and Purchaser shall have received a certificate from Seller, dated as of the Closing Date, to such effect.

8.3     <u>Delivery of Documents</u>.  Purchaser shall have received all of the documents, instruments, and other closing deliveries specified in <u>Section 4.2(a)</u>.

8.4     <u>Representations and Warranties</u>.  The representations and warranties of Seller contained in this Agreement shall be true and correct at and as of the Closing Date with the same force and effect as though such representations and warranties had been made as of the Closing Date, and Purchaser shall have received at the Closing a certificate from Seller, dated as of the Closing Date, to such effect.

8.5     <u>Seller Authorization</u>.  All action necessary to authorize the execution, delivery and performance by Seller of this Agreement and each of the Related Documents to which Seller is a party and the consummation of the transactions contemplated hereby and thereby shall have been duly and validly taken by Seller, including the approval of Seller's board of directors and sole stockholder, and Seller shall have full power and right to consummate the

transactions contemplated hereby and thereby.

8.6     No Proceedings.  Except for the Chapter 11 Case, no action, claim, suit or other proceeding shall be pending or threatened by or before any Governmental Authority that would (a) prevent consummation of any of the transactions contemplated by this Agreement, (b) cause any of the transactions contemplated by this Agreement to be rescinded following consummation or (c) affect adversely the right of Purchaser to own and use the Purchased Assets in any manner.

8.7     Disclosure of Claims.  Purchaser shall have obtained full disclosure and information regarding all known and potential Claims, except for information that is protected by the attorney-client or work-product privileges.  The Claims include any Claims for alleged design defects, intellectual property infringement, product liability, legal or regulatory non-compliance, or any Claims that may possibly be asserted against Purchaser or the Purchased Assets after the Closing Date.

8.8     Absence of Changes.  Subject to any adjustments to the value of the Purchased Inventory made pursuant to Section 3.1, no material adverse change shall have occurred in the value of the Purchased Assets.

8.9     Bankruptcy Events.  None of the following shall have occurred in the Chapter 11 Case:

(a)     the entry of an order lifting the automatic stay imposed by Bankruptcy Code Section 362 to permit either foreclosure or the pursuit of remedies by a Debtor-in-Possession lender or any other secured lender outside the ordinary course of business with respect to any claimed security interest, mortgage, or Encumbrance of any Person affecting any of the Purchased Assets;

(b)     the entry of an order approving debtor in possession financing pursuant to Section 364 of the Bankruptcy Code, unless Purchaser approves of said order in its reasonable discretion;

(c)     the dismissal of the Chapter 11 Case or conversion of the Chapter 11 Case to a Chapter 7 case or the appointment of a Chapter 11 trustee or examiner in the Chapter 11 Case; or

(d)     the filing of an application for an order converting the Chapter 11 Case to a Chapter 7 case.

8.10     Required Actions.  All actions to be taken by Seller in connection with consummation of the transactions contemplated hereby and all certificates, opinions, instruments and other documents required to effect the transactions contemplated hereby shall be reasonably satisfactory in form and substance to Purchaser.

8.11     Purchase Price Adjustments.  Any adjustments to the Purchase Price pursuant to Article III shall have been agreed to by Purchaser and Seller or fully and finally resolved and approved by the Bankruptcy Court.

– 27 –

8.12    Delivery of Purchased Assets.  Not later than the Business Day prior to Closing, Seller shall make the tangible Purchased Assets (including the "data-packs" relating to the Purchased Regulatory Approvals and other tangible embodiments of the Purchased Intellectual Property) available to Purchaser for the purpose of confirming the existence and satisfactory condition of the same.

8.13    8130 Tagging.  All Purchased Inventory shall bear or be accompanied by the FAA-approved 8130 form/tag, which 8130 form(s)/tag(s) shall (a) be physically affixed to each individual part, or where applicable, lot container and (b) be completed in accordance with all applicable Laws and duly executed by an authorized officer of Seller.  The 8130 Tagging Process shall have been completed reasonable satisfaction of Purchaser.

8.14    Data Packs. Seller shall have complied with Section 11.4, and Purchaser shall be satisfied in its sole discretion that all Data Packs exist and are in satisfactory form, *provided, that* the nonexistence of certain Data Packs relating to certain parts first certified by the FAA before 1991 shall not cause this condition to fail to be satisfied.

8.15    Supplier Tooling.  Each supplier of the Business who possesses tooling of Seller or any other Purchased Asset shall have confirmed, or the Bankruptcy Court shall have entered an order confirming, that all tooling or other Purchased Assets in such supplier's possession are owned by Seller and may be removed by Purchaser following the Closing.

8.16    Release from Parent.  Parent shall have released any and all Encumbrances in its or any of its Affiliates favor, in writing, and in a form and substance reasonably satisfactory to Purchaser.

8.17    Bankruptcy Schedules.  Seller shall have provided Purchaser with a complete copy of all schedules filed by it in connection with the Chapter 11 Case, and such schedules shall be satisfactory to Purchaser in its sole discretion.

8.18    Notice.  Notwithstanding any other provision hereof, Seller shall have complied with Section 11.7 in all respects and the Transaction Notice shall be in a form and substance acceptable to Purchaser in its sole discretion.

8.19    Parent Approvals.  The Parent Approvals shall remain in full force and affect and shall not have been revoked, modified, qualified or altered in any manner.

## ARTICLE IX
## Conditions to Obligations of Seller

The obligations of Seller under this Agreement are, at its option, subject to the fulfillment, on or before the Closing Date, of each of the following conditions precedent (which Seller may waive if Seller executes a writing so stating at or before the Closing):

9.1    Performance of Covenants.  Purchaser shall have performed and complied with all terms, covenants and conditions required by this Agreement to be performed or complied with by Purchaser on or before the Closing Date.

9.2      Delivery of Documents.  Seller shall have received all of the documents, instruments, and other closing deliveries specified in Section 4.2(b).

9.3      Representations and Warranties.  The representations and warranties of Purchaser (or Purchaser's Assignee as applicable), contained in this Agreement shall be true and correct as of the Closing Date with the same force and effect as though such representations and warranties had been made as of the Closing Date, and Seller shall have received at the Closing a certificate of an officer of Purchaser, dated as of the Closing Date, to such effect.

9.4      No Proceedings.  No action, claim, suit or other proceeding shall be pending or threatened before any court or quasi-judicial or administrative agency of any federal, state, local or foreign jurisdiction, or before any arbitrator, wherein an unfavorable injunction, judgment, order, decree, ruling or charge would (a) prevent consummation of any of the transactions contemplated by this Agreement, (b) cause any of the transactions contemplated by this Agreement to be rescinded following consummation (and no such injunction, judgment, order, decree, ruling or charge shall be in affect).

9.5      Authorization.  All action necessary to authorize the execution, delivery and performance of this Agreement and each of the Related Documents, and the consummation of the transactions contemplated hereby and thereby shall have been duly and validly taken by Purchaser, including the approval of Purchaser's board of directors, and Purchaser shall have full power and right to consummate the transactions contemplated hereby and thereby.

9.6      Required Actions.  All actions to be taken by Purchaser in connection with consummation of the transactions contemplated hereby and all certificates, opinions, instruments and other documents required to effect the transactions contemplated hereby shall be reasonably satisfactory in form and substance to Seller.

## ARTICLE X
## Employee Matters

10.1      No Assumption of Employee-Related Liabilities.  Purchaser is not assuming any Liabilities relating in any manner to any employee of Seller employed in the Business at the time of the sale of Purchased Assets to Purchaser hereunder or former employee of Seller (collectively, the "Employees"), and all such Liabilities, including salary, severance pay, accrued but unused vacation, sick and personal days, Liabilities relating to or arising under employee benefit plans, workers' compensation, the WARN Act, COBRA or other Law and similar employment-related Liabilities, constitute Retained Liabilities hereunder. Nothing herein expressed or implied confers upon any Employee any rights or remedies of any nature or kind whatsoever under or by reason of this Agreement rights under or with respect to any benefit plans or policies of Purchaser.  Seller shall comply in all respects with the WARN Act and any other notice requirements with respect to the termination of any Employee of Seller before or after the Closing and shall comply with all COBRA obligations relating to Employees, whether such Employees are terminated before or after the Closing.

10.2      Employees.  Prior to the Closing Date, Purchaser may, but is not required to, interview certain of Seller's current employees with a view of identifying employees that

– 29 –

Purchaser may offer employment, if any.  Purchaser shall have access to the facilities and personnel records (including performance appraisals, disciplinary actions and grievances) of consenting employees for the purpose of preparing for and conducting such interviews. No provision in this Agreement shall constitute any commitment, agreement or understanding (expressed or implied) of any nature on the part of Purchaser (or any designated Purchaser Assignee) to any post-Closing employment relationship with any Employee.

## ARTICLE XI
### Additional Agreements

11.1    <u>Disclosure of Information</u>.  From and after the Closing Date, Seller shall not use or disclose to any Person, except as required by order or decree of any Governmental Authority, any Confidential Information, for any reason or purpose whatsoever, nor shall Seller make use of any of the Confidential Information for Seller's purposes or for the benefit of any Person except Purchaser or any of its Affiliates.

11.2    <u>Further Assurances; Removal of Purchased Assets</u>.

(a)    From time to time after the Closing Date, upon request of Purchaser, Seller, without further consideration, shall cooperate with Purchaser and shall duly execute, acknowledge and deliver all such further deeds, assignments, transfers, conveyances and powers of attorney and take such other actions and give such assurances as may be reasonably required to convey to and vest in Purchaser and to protect its right, title and interest in and enjoyment of all the Purchased Assets and as may be appropriate otherwise to carry out the transactions contemplated by this Agreement.  Without limiting the foregoing, Seller shall (i) provide Purchaser and its affiliates and its and their employees, agents and representatives with access to the premises and facilities of Seller during normal business hours following the Closing for the purpose of identifying, packing, shipping and otherwise removing the Purchased Assets from the Seller's premises and facilities, (ii) use all commercially reasonable efforts to provide Purchaser and its affiliates and its and their employees, agents and representatives with access to any and all storage or other premises, facilities or locations of third parties at which the Purchased Assets are located and (iii) shall use all commercially reasonable efforts to assist Purchaser in identifying, packing, shipping and otherwise removing the Purchased Assets from Seller's premises and facilities.

(b)    Seller shall promptly pay or deliver to Purchaser any amounts or items that may be received by Seller after the Closing which constitute Purchased Assets. If any monies or other assets are received by Purchaser to which Seller is entitled and that are not included in the Purchased Assets, Purchaser shall hold such monies and assets in trust for Seller and shall promptly pay the same to Seller.

11.3    <u>Access to Books and Records</u>.

(a)    If Seller is required to defend against, or desires to prosecute, any action, suit or proceeding arising out of a Claim pertaining to the Purchased Assets, Purchaser shall use its reasonable efforts to cause its employees to provide access to any books and records acquired by Purchaser as may reasonably be requested by Seller in connection with such defense.

(b)     If Purchaser is required to defend against, or desires to prosecute, any action, suit or proceeding arising out of a Claim pertaining to the Purchased Assets, Seller shall provide such access to any books and records of Seller as may reasonably be requested by Purchaser in connection with such defense.

11.4     Data Packs; Tooling; 8130 Tagging.

(a)     Not later than twenty (20) Business Days following the date hereof, Seller shall, at its sole cost and expense, collect all Data Packs relating to the Purchased Regulatory Approvals (including all Regulatory Approvals set forth in Schedule 6.9)  and deposit them at Seller's offices in Coppell, Texas or at such other location as the parties agree.  Seller shall provide Purchaser with access to such "data-packs" (in original form) upon reasonable prior notice from Purchaser, during normal business hours at the agreed upon location, from time to time after the date hereof, for the purpose of confirming the satisfactory existence of the same.

(b)     Not later than fifteen (15) Business Days following the date hereof, Seller shall send a notice, in a form satisfactory to Purchaser, to each supplier of the Business who possesses tooling of Seller or any other Purchased Asset, which notice shall notify such supplier of the transactions contemplated hereby and request such supplier's confirmation that all tooling or other Purchased Assets in such supplier's possession are owned by Seller and may be removed by Purchaser following the Closing.

(c)     Not later than fifteen (15) Business Days prior to the Closing Date, Seller shall undertake to tag all Purchased Inventory with the FAA-approved 8130 form/tag, which 8130 form(s)/tag(s) shall (a) be physically affixed to each individual part, or where applicable, lot container and (b) be completed in accordance with all applicable Laws and duly executed by an authorized officer of Seller (the "8130 Tagging Process").  Seller shall permit Purchaser and its employees, agents and representatives to be present during the 8130 Tagging Process and Seller shall comply with the reasonable suggestions made with respect to such process by Purchaser.

11.5     Inventory; Engines.

(a)     Seller shall deliver to Purchaser weekly written reports of inventory on hand (in a form and substance reasonably satisfactory to Purchaser) and shall make its employees available to discuss the same with Purchaser from time to time.

(b)     Any partially assembled aircraft engines in Seller's possession as of the date hereof shall be fully disassembled and the component parts returned to inventory (and tagged in accordance with the 8130 Tagging Process) prior to the Closing.

11.6     Review and Disposal of Assets.  Seller shall permit Purchaser to enter Seller's premises and facilities from time to time within fourteen (14) days prior to the Closing Date to enable Purchaser to assess the existence and condition of the tangible Purchased Assets and make a determination as to whether there are any Purchased Assets that Purchaser does not desire to take possession of at and after the Closing.  Purchaser may, in its sole discretion, elect not to take possession of certain tangible Purchased Assets. Purchaser will identify those tangible Purchased Assets that it does not desire to take possession of by placing a red (or other mutually

– 31 –

agreed upon color) tag on such assets.  If Purchaser so "tags" any such tangible Purchased Assets, Purchaser shall, promptly following the Close, execute a bill of sale (not containing any representations, warranties, indemnity or other continuing covenants) selling and assigning such "tagged" tangible Purchased Assets back to Seller for One Dollar ($1.00).  Purchaser is not responsible for the removal or disposition of any such "tagged" tangible Purchased Assets.

   11.7 <u>Notices</u>.

   (a) Due and proper actual written notice (as opposed to notice by publication) of the Chapter 11 Case and the transactions contemplated hereby (the "Transaction Notice") shall be given to (i) all suppliers of the Business at any time during the last five years, (ii) all customers of the Business since January 1, 2003, (iii) all distributors of the Business who served as such at any time during the last five years, (iv) all parties (other than Seller) to any contract listed in <u>Schedule 6.6</u> or other executory contract or unexpired lease, (v) all owners of piston-powered aircraft registered with the FAA as such, (vi) all plaintiffs in the litigation identified in <u>Schedule 6.7</u> and (vii) all other Creditors of Seller, in each case as of a date not more than ten (10) Business Days following the date Seller files the Chapter 11 Case.  The Transaction Notice shall be in form and substance satisfactory to Purchaser in its sole discretion.

   (b) Seller shall have published the Transaction Notice or a substantially similar notice in form and substance acceptable to Purchaser, in its sole discretion, on its website and in the following publications:  Aircraft Owners and Pilot Association Magazine; EAA – Sport Aviation Magazine; and Trade-a-Plane Magazine.

   (c) Seller shall provide notice of the transactions contemplated hereby to the Federal Trade Commission, which notice shall be in form and substance satisfactory to Purchaser in its sole discretion.

   11.8 <u>Guaranty</u>. As a material inducement to Seller to enter into this Agreement and perform its obligations hereunder, Guarantor hereby:

   (a) represents and warrants to Seller that the statements contained in Article VII are true and correct as of the date hereof and will be true and correct as of the Closing Date (as though made then and as though the Closing Date were substituted for the date of the Agreement throughout Article VII); and

   (b) unconditionally and irrevocably guaranties in favor of Seller the due and punctual payment by Purchaser to Seller of the Purchase Price as set forth herein.

   (c) This Section 11.8, and all of Guarantor's representations, warranties, covenants and agreements hereunder, shall terminate in their entirety as of and by virtue of the Closing, or upon the earlier termination of this Agreement in accordance with the terms hereof. The representations, warranties, and obligations of Guarantor hereunder are independent of the obligations of Purchaser, and a separate action or actions may be brought and prosecuted against Guarantor whether or not an action is brought against Purchaser or whether or not Purchaser is joined in any such action or actions.  Subject to the termination of this Section 11.8 as aforesaid, Guarantor agrees that any circumstance which operates to toll the statute of limitations as to

Purchaser shall also operate to toll the statute of limitations as to Guarantor.  Guarantor shall have the right to assert any and all defenses available to purchaser under the Agreement.

## ARTICLE XII
## Survival and Indemnification

12.1    Survival

(a)    Representations and Warranties by Seller.  All representations and warranties made by Seller herein, or in any Related Document delivered by or on behalf of Seller pursuant to or in connection herewith or any other Related Document, shall survive the execution and delivery of this Agreement (or such other Related Document, as applicable), any investigation by or on behalf of Purchaser and the Closing, and shall continue in full force and effect through 11:59 pm Eastern Time on the sixtieth (60th) day following the Closing Date (the "Survival Period").  Notwithstanding the foregoing, (a) with respect to any claim for breach of representation or warranty for which written notice has been given to Seller during the Survival Period, the applicable representations and warranties relating to such Claim shall survive until such Claim is resolved by Final Determination in accordance with the provisions of this Agreement and (b) to the extent any such breach or misrepresentation is the result of fraud, intentional misconduct or breach or intentional misrepresentation, the representations and warranties that have been so breached shall survive indefinitely.

(b)    Representations and Warranties by Purchaser.  All representations and warranties made by Purchaser herein shall terminate as of the Closing.

(c)    Covenants and Agreements.  All covenants and agreements of the parties set forth in this Agreement or any Related Document that, by their terms, are to be performed prior to the Closing, shall terminate as of the Closing, except to the extent any breach of such covenant or agreement is the result of fraud, intentional misconduct or breach or intentional misrepresentation.

12.2    Indemnification

(a)    Subject to the limitations set forth in this Article XII, Seller shall indemnify, defend and hold harmless Purchaser and its affiliates and their respective officers, directors, agents and employees (hereinafter referred to individually as an "Indemnified Person" and collectively as "Indemnified Persons"), from and against any and all Losses incurred or suffered by any Indemnified Person directly or indirectly arising out of or relating to:

(i)    any failure of any representation or warranty of Seller set forth in this Agreement, as modified by the Disclosure Schedule, or any other Related Document to be true and correct in all respects;

(ii)    any failure by Seller to fully perform, fulfill or comply with any covenant or agreement set forth in this Agreement or in any other Related Document; and

(iii)    any and all Excluded Assets or Retained Liabilities.

– 33 –

(b)        Notwithstanding any right of Purchaser (whether or not exercised) to investigate the Purchased Assets or the accuracy of the representations and warranties of Seller contained in this Agreement, Purchaser shall have the right to rely fully upon the representations and warranties of Seller contained in this Agreement. Purchaser's right to indemnification, payment of Losses or other remedies will not be affected by any investigation conducted with respect to, or any knowledge acquired (or capable of being acquired) at any time, whether before or after the execution and delivery of this Agreement or the Closing Date, with respect to the accuracy or inaccuracy of or compliance with, any representation, warranty, covenant or agreement made by Seller or any other matter.  The waiver of any condition based on the accuracy of any such representation or warranty, or on the performance of or compliance with any such covenant or agreement, will not affect the right to indemnification, payment of Losses, or any other remedy based on any such representation, warranty, covenant or agreement. For the purposes of calculating Losses attributable to any breach of any representation, warranty, covenant or agreement in this Agreement, any "material," "in all material respects" or similar qualifications contained herein shall be disregarded in their entirety.

12.3        Limitations

Subject to, and except as set forth in this Section 12.3, the Indemnified Persons shall not be entitled to claim monetary Losses pursuant to Section 12.2(a)(i), and Seller shall have no obligation to indemnify the Indemnified Persons for monetary Losses pursuant to Section 12.2(a)(i),  in excess of the Holdback Amount.  Indemnification pursuant to this Article XII shall be Purchaser's sole and exclusive remedy with respect to the matters identified in Section 12.2(a).  Notwithstanding the foregoing, the limitations set forth in this Section 12.3 shall not apply in the event of or with respect to (i) actions for any equitable remedy, including a preliminary or permanent injunction or specific performance and (ii) Losses arising out of or relating to fraud, intentional misconduct or breach or intentional misrepresentation of Seller.

12.4        Holdback Period

The holdback period (the "Holdback Period") shall terminate at the expiration of the Survival Period; *provided*, *however*, a portion of the Holdback Amount that is necessary to satisfy any unsatisfied or unresolved claims specified in any Officer's Certificate theretofore delivered to Seller prior to termination of the Holdback Period, shall not be payable to Seller pursuant to Section 2.5(c) until such claims have been resolved (the "Subsequent Holdback Period").  The Subsequent Holdback Period shall terminate when all claims giving rise to such Subsequent Holdback Period have been resolved.

12.5        Indemnification Procedure

(a)        In the event that an Indemnified Person seeks to exercise its rights to obtain indemnification for Losses pursuant to this Article XII, subject to the provisions of Section 12.1(a) and Section 12.1(c), Purchaser shall deliver to Seller a certificate signed by any officer of Purchaser (an "Officer's Certificate") specifying in reasonable detail the nature of the claim for which indemnification is being sought and the amount of actual or anticipated Losses.

(b)        In the event the claim set forth in the Officer's Certificate is uncontested

by Seller as of the close of business on the tenth (10th) Business Day following receipt by Seller of the Officer's Certificate (in which case Seller shall be deemed to have accepted and agreed to the claim set forth in such Officer's Certificate, and shall be precluded from raising any objection thereto following such date), the Holdback Amount, if any remains, shall be offset by the amount of Losses set forth in such Officer's Certificate that have become payable effective as of the next Business Day.

(c)     In the event the claim set forth in the Officer's Certificate is contested by Seller solely on the grounds that liability has not been finally determined, then such claim shall be treated as an unresolved claim only with respect to the amount of Losses and not with respect to whether an Indemnified Person is entitled to indemnification, and there shall be no offset from the Holdback Amount for amounts incurred in connection with investigating or defending such claim until such claim is finally determined.

12.6     Objections to Claims; Resolution of Conflicts

(a)     Seller shall have the right to object to one or more of the claims set forth in any Officer's Certificate delivered by Purchaser by serving written notice thereof within ten (10) Business Days following the delivery of such Officer's Certificate, which notice shall specify in reasonable detail the basis for such objection.  In the event that Seller does not object to a claim in accordance with the preceding sentence by the close of business on the tenth (10th) Business Day following such receipt of the Officer's Certificate, Seller shall be deemed to have accepted and agreed to the claim set forth in such Officer's Certificate, and shall be precluded from raising any objection thereto following such date.

(b)     In case Seller shall so object in writing to any claim or claims by Purchaser made in any Officer's Certificate, Purchaser shall have ten (10) Business Days after receipt of an objection by Seller to respond thereto in a written statement.  If after such ten (10) Business Day period there remains a dispute as to any claims, Seller and Purchaser shall for a period of at least thirty (30) days make reasonable efforts to agree upon the rights of the respective parties with respect to each of such claims.  If Purchaser and Seller do not resolve the dispute during such thirty (30) day period, such dispute shall be fully and finally resolved by the Bankruptcy Court.  During any dispute relating to a claim for indemnification hereunder, Seller and Purchaser shall provide each other with such information, records and material kept in the ordinary course of business in such party's possession that relate to the dispute and which such party may disclose without violating confidentiality obligations to third Persons or any privilege, as is reasonably necessary and appropriate in attempting to resolve such dispute, subject to execution of a confidentiality agreement in form and substance reasonably satisfactory to the delivering party.  In the event that the Final Determination (as defined below) is in favor of an Indemnified Person with respect to all or a portion of a dispute hereunder, the claims set forth in the applicable Officer's Certificate shall be modified as necessary to reflect such Final Determination, and any offset against the Holdback Amount shall be effective as of such time. For purposes of this Agreement, the term "Final Determination" means either (i) the written agreement of Purchaser and Seller or their respective legal representatives, or (ii) an order of the Bankruptcy Court.

12.7    Third-Party Claims

        In the event that Purchaser becomes aware of a third-party claim which Purchaser believes gives rise to indemnification under this Article XII (a "Third Party Claim"), Purchaser shall promptly notify Seller of such Third Party Claim; *provided*, *however*, that the failure to give prompt notice shall not affect the indemnification provided hereunder except to the extent Seller has been actually prejudiced as a result of such failure.  The notice of Third Party Claim shall include, based on the information then available to Purchaser, a summary in reasonable detail of the basis for the claim and a reasonable estimate of the Losses.  Seller shall be entitled, at its own expense and not with recourse to the Holdback Amount, to participate therein; *provided*, *however*, that Purchaser shall have full control over the litigation, including settlement and compromise thereof; *provided*, *further* that any such settlement shall not be determinative of the existence of or amount of Losses relating to such claim, except with the consent of Seller, which consent shall not be unreasonably withheld, conditioned or delayed and which consent shall be deemed to have been given unless Seller shall have objected within ten (10) Business Days after a written request for such consent by Purchaser.  In the event that Seller has consented to any settlement of a Third Party Claim, Seller shall not have any power or authority to object under any provision of this Article XII, or otherwise, to any claim by an Indemnified Person for offset against the Holdback Amount.

        12.8    Adjustment to Purchase Price

        Any indemnification payment paid pursuant to this Article XII shall be treated as an adjustment to the Purchase Price.

**ARTICLE XIII**
**Tax Matters**

        13.1    Allocation of Taxes.

        (a)    Seller shall pay all Transfer Taxes incurred by reason of the transfer of the Purchased Assets by Seller to Purchaser hereunder.  All Taxes attributable to the Purchased Assets and accrued or accruable with respect to events occurring prior to the close of business on the Closing Date shall be borne by Seller.  All Taxes attributable to the Purchased Assets and accrued or accruable with respect to events occurring after the close of business on the Closing Date shall be borne by Purchaser.  For this purpose, with respect to any Tax period that includes, but does not end on, the Closing Date (a "Straddle Period"), the Closing Date shall be treated as the last day of such Period.

        (b)    For purposes of determining the portion of any Straddle Period Taxes for which Seller shall be responsible under Section 13.1(a):

        (i)    Property Taxes with respect to any Purchased Assets shall be prorated based on the number of days in the Straddle Period with respect to which such Property Taxes are assessed, irrespective of when such Taxes are actually due, become a lien or are assessed.  Seller shall be responsible for that portion of such Straddle Period Property Taxes equal to the ratio of the number of days in the Straddle Period that precede the Closing (up to and including the Closing Date) to the total number of days in such Straddle Period.

(ii)     Sales and use Taxes shall be deemed to accrue as property is purchased, sold, used or transferred.

(iii)     All other Taxes shall accrue in accordance with GAAP.

13.2     Preparation of Tax Returns; Payment of Taxes.

(a)     Seller shall timely file all Returns with respect to the Purchased Assets that are required to be filed on or before the Closing Date and shall pay any and all Taxes due with respect to such Returns, including any Returns required to be filed with respect to Transfer Taxes payable by Seller under Section 13.1(a). All Returns described in this Section 13.2(a) shall be prepared in compliance with applicable Law and in a manner consistent with prior practice.

(b)     Purchaser shall file all Returns with respect to the Purchased Assets that are required to be filed after the Closing Date, including any Returns governing Straddle Periods. Purchaser shall notify Seller of the amount of Taxes payable by Seller with respect to any such Straddle Period in accordance with Sections 13.1(a) and 13.1(b), and shall provide Seller with workpapers supporting the determination of such amounts. Seller shall ensure that Seller's share of any such Straddle Period Tax amounts shall be promptly paid as priority Tax claims in the Seller's Chapter 11 Case or other bankruptcy proceedings.

13.3     Cooperation on Tax Matters. Purchaser and Seller agree to cooperate on Tax Matters as follows:

(a)     Purchaser and Seller shall furnish or cause to be furnished to each other, upon request, as promptly as practicable, such Tax Records and other documentation relating to the Purchased Assets as are reasonably necessary for the preparation and filing of any Return; provided, however, that such assistance and cooperation shall not unreasonably interfere with the operations of the party providing such assistance.

(b)     Purchaser and Seller shall retain or cause to be retained all documentation pertinent to the Tax history of the Purchased Assets until ninety (90) days following the expiration of the later of (i) all statutes of limitations governing Tax periods to which such documentation relates (after giving effect to any and all properly claimed and valid extensions or waivers thereof), or (ii) any record retention agreements entered into with any Taxing Authority governing such documentation.

(c)     Seller shall notify Purchaser before disposing of or destroying any Tax Records, and if upon such notice Purchaser so requests, Seller shall allow Purchaser, at its expense, to take possession of the Tax Records identified in such notice.

(d)     Purchaser and Seller shall cooperate with each other in the preparation and defense of any Tax audit, and for the prosecution or defense of any Claim relating to any proposed Tax adjustment, and shall execute and deliver such powers of attorney and other documents as are necessary to carry out the intent of this Section 13.3(d). Such cooperation shall include providing all relevant information available to Seller or Purchaser, as the case may be, with respect to any such audit or proceeding and making personnel available at and for

reasonable times, including to prepare responses to requests for information; provided, however, that the foregoing shall be done in a manner so as not to unreasonably interfere with the conduct of the operations and business of the party providing such assistance.

## ARTICLE XIV
### Termination

14.1    Termination.  This Agreement may be terminated and abandoned at any time before the Closing Date (a) by the written agreement of Purchaser and Seller, (b) by Purchaser in its sole discretion, if (i) a Sale Order is not entered before March 31, 2009 or if the Sale Order does not become a Final Order on or before April 30, 2009, or (ii) if the Closing shall not have occurred on or before fifteen (15) days following the date that the Sale Order becomes a Final Order and provided, that Purchaser is not in material breach of any of its representations and warranties contained in this Agreement and has not failed in any material respect to perform any of its obligations hereunder; or (c) by Purchaser, if there has been a default, misrepresentation or breach on the part of Seller in Seller's representations and warranties set forth herein or the due and timely performance of any of Seller's covenants and agreements contained herein, *provided, that,* Purchaser shall not be permitted to terminate the Agreement pursuant to Section 14.1(c) on account of the Seller's failure to give notice to a Creditor in the manner required by Section 11.7, if, and only if, prior to the entry of the Sale Order, the Bankruptcy Court determines that such Creditor has nonetheless received sufficient notice and is legally bound by the Sale Order.

14.2    Effect of Termination.  If this Agreement is validly terminated pursuant to this Article XIV, all further obligations of the parties hereunder shall terminate, provided that the obligations set forth in this Article XIV shall survive and each party shall retain any rights it may have against the other as a result of the other party's failure to comply with any other provision of this Agreement before such termination.  If this Agreement is terminated pursuant to Section 14.1, Seller and Purchaser shall, in accordance with the escrow instructions applicable thereto, arrange for the immediate return of the Deposit Amount to Purchaser. If Purchaser is not approved by the Bankruptcy Court as the purchaser of the Purchased Assets by reason of the acceptance by Seller of an overbid, and all or substantially all of the Purchased Assets are thereafter sold to an overbidder for consideration in excess of the Purchase Price and other consideration provided for herein, then (a) Seller and Purchaser shall, in accordance with the escrow instructions applicable thereto, arrange for the immediate return of the Deposit Amount to Purchaser and (b) Purchaser will be entitled to receive from Seller a payment in the amount of Three Hundred Fifty Thousand Dollars ($350,000.00) (the "Break-Up Fee"), in cash payable upon the consummation of the sale of the Purchased Assets to the overbidder.  Such Break-Up Fee is based upon Seller's and Purchaser's acknowledgment and agreement that Purchaser has expended substantial funds and other resources in connection with the transactions contemplated by this Agreement and Purchaser will suffer material harm if such transactions are not consummated (because it will then be impossible for Purchaser to realize any benefits therefrom), that the precise amount of such harm is difficult to determine, that it would be unfair for Purchaser to bear such harm in view of the fact that both Purchaser and Seller hoped to benefit from the transactions contemplated by this Agreement and to reimburse Purchaser for the fees and expenses paid to Purchaser's attorneys, accountants, consultants and other advisors in connection with the actions taken by Purchaser in its due diligence of the Purchased Assets and

the negotiation and documentation of this Agreement and other actions taken in contemplation of the transactions contemplated hereby.  The Break-Up Fee shall constitute an administrative claim in the Chapter 11 Case pursuant to Bankruptcy Code Sections 503(b) and 507(a).

14.3     Purchaser Liability.  In no event shall Purchaser's liability to Seller under this Agreement for any reason whatsoever, including breach of any of its representations, warranties, covenants or agreements or for fraud or intentional misrepresentation, exceed the amount of the Deposit Amount and the Deposit Amount shall be Seller's sole and exclusive remedy therefor.

## ARTICLE XV
## Post-Closing Covenants

15.1     Third Party Consents, etc.  In the event any consent of a third party legally required for the sale, assignment or transfer to Purchaser of any Purchased Asset has not been obtained by the Closing Date, and Purchaser nevertheless proceeds with the Closing despite any rights it may have not to close under Article VIII of this Agreement, then such Purchased Asset shall not be deemed to be sold or transferred to Purchaser at the Closing, but:

(a)     Seller shall cooperate with Purchaser in entering into any reasonable arrangement designed to provide Purchaser with the benefit of Seller's rights under or pursuant to such Purchased Asset;

(b)     Seller shall cooperate at its own expense with Purchaser in obtaining any such required consent or waiver after the Closing; and

(c)     upon obtaining all required consents or waivers for such Purchased Asset, such Purchased Asset shall be deemed to be sold or transferred to Purchaser as of the receipt of such consents or waivers and Seller shall execute, without further consideration from Purchaser, any documents reasonably requested by Purchaser to confirm that such Purchased Asset has been assigned to Purchaser.

## ARTICLE XVI
## General Provisions

16.1     Entire Agreement.  This Agreement and the Related Documents supersede all prior discussions and agreements between the parties with respect to the subject matter hereof and thereto and contain the sole and entire agreement between the parties hereto with respect to the subject matter hereof and thereof.

16.2     Expenses.  Except as otherwise expressly provided in this Agreement whether or not the transactions contemplated hereby are consummated, each party will pay its own costs and expenses incurred in connection with the negotiation, execution and closing of this Agreement and the Related Documents and the transactions contemplated hereby and thereby.

16.3     Waiver.  Any term or condition of this Agreement may be waived at any time by the party that is entitled to the benefit thereof, but no such waiver shall be effective

unless set forth in a written instrument duly executed by or on behalf of the party waiving such term or condition.  No waiver by any party of any term or condition of this Agreement, in any one or more instances, shall be deemed to be or construed as a waiver of the same or any other term or condition of this Agreement on any future occasion.  All remedies, either under this Agreement or by law or otherwise afforded, will be cumulative and not alternative.

16.4    Amendment.  This Agreement may be amended, supplemented or modified only by a written instrument duly executed by or on behalf of each party hereto.

16.5    No Third Party Beneficiary.  The terms and provisions of this Agreement are intended solely for the benefit of each party hereto and their respective successors or permitted assigns, and it is not the intention of the parties to confer third party beneficiary rights upon any other Person other than any Person entitled to indemnity under Article XII.

16.6    No Assignment: Binding Effect.  Neither this Agreement nor any right, interest or obligation hereunder may be assigned by any party hereto without the prior written consent of the other party hereto and any attempt to do so will be void, except (a) for assignments and transfers by operation of law and (b) that Purchaser may assign any or all of its rights, interests and obligations hereunder (including its rights under Article XII) to an Affiliate, provided that any such Affiliate agrees in writing to be bound by all of the terms, conditions and provisions contained herein and Purchaser remains liable for any breach of this Agreement. Subject to the preceding sentence, this Agreement is binding upon, inures to the benefit of and is enforceable by the parties hereto and their respective successors and assigns.

16.7    Headings.  The headings used in this Agreement have been inserted for convenience of reference only and do not define or limit the provisions hereof.

16.8    Invalid Provisions.  If any provision of this Agreement is held to be illegal, invalid or unenforceable under any present or future law, and if the rights or obligations of any party hereto under this Agreement will not be materially and adversely affected thereby, (a) such provision will be fully severable, (b) this Agreement will be construed and enforced as if such illegal, invalid or unenforceable provision had never comprised a part hereof, (c) the remaining provisions of this Agreement will remain in full force and effect and will not be affected by the illegal, invalid or unenforceable provision or by its severance herefrom and (d) in lieu of such illegal, invalid or unenforceable provision, there will be added automatically as a part of this Agreement a legal, valid and enforceable provision as similar in terms to such illegal, invalid or unenforceable provision as may be possible.

16.9    Governing Law.  This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware applicable to a contract executed and performed in such State, without giving effect to the conflicts of laws principles thereof, except as superseded by the Bankruptcy Code.

16.10    Counterparts.  This Agreement may be executed in any number of counterparts, each of which will be deemed an original, but all of which together will constitute one and the same instrument.

EXECUTION COPY

16.11    <u>Notices</u>.  All notices, requests and other communications hereunder must be in writing and will be deemed to have been duly given only if delivered personally or mailed (first class postage prepaid, return receipt requested) to the parties at the following addresses:

    (a)    If to Seller

        Superior Air Parts, Inc.
        621 South Royal Lane, Suite 100
        Coppell, TX  75019-3805
        Phone: 972.829.4600
        Fax:   972.829.4648
        Attention: Kent Abercrombie, President

    (b)    With a copy to:

        Strasburger & Price, LLP
        600 Congress, Suite 1600,
        Austin, TX 78701
        Phone:  512.499.3624
        Fax:  512.536.5723
        Attention:  Stephen A. Roberts

    (c)    If to Purchaser:

        Avco Corporation
        c/o Textron Inc.
        40 Westminster St.
        Providence, Rhode Island 02903
        Attention:  Executive Vice President & General Counsel

    With a copy to:

        Textron Systems Corporation
        201 Lowell Street
        Wilmington, Massachusetts 01887
        Attention:  General Counsel

All such notices, consents, approvals or other notifications required of the parties under this Agreement shall be in writing and shall be deemed properly served if delivered personally or sent by registered or certified mail (return receipt requested) or nationally-recognized courier or overnight delivery service addressed to such other party at the address set forth above, or at such other address as may hereafter be designated by either party in writing, and shall be deemed delivered (i) five business days after being sent by mail or (ii) when actually delivered if sent by courier or overnight delivery service (or the next business day if delivered after regular business hours or on a Saturday, Sunday or holiday) (in each case regardless of whether such notice,

EXECUTION COPY

request or other communication is received by any other Person to whom a copy of such notice, request or other communication is to be delivered pursuant to this <u>Article XVI</u>).  Any party from time to time may change its address or other information for the purpose of notices to that party by giving notice specifying such change to the other party hereto.

[*REMAINDER OF PAGE INTENTIONALLY LEFT BLANK*]

EXECUTION COPY

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the day and year first above written.

ATTEST:

**SELLER:**

SUPERIOR AIR PARTS, INC.

By:_____

By:_____

Name:_____

Name:_____

Title:_____

ATTEST:

**PURCHASER:**

AVCO CORPORATION·

By: *Brandi White*

By: *Robert Kemp*

Name: *Brandi White*

Name:  Robert Kemp

Title:  Secretary

ATTEST:

**Solely with respect to Section 11.8:**

**GUARANTOR:**

By:_____

TEXTRON INC.

Name:_____

By:_____

Name:  John R. Curran

Title:   Vice President – Mergers and Acquisitions

EXECUTION COPY

     IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the day and year first above written.

ATTEST:

By: _Jan L Clemens_

Name: _Jan L Clemens_

(Notary stamp: JAN L. CLEMENS, Notary Public, State of Texas, My Comm. Expires 05/07/2011)

ATTEST:

By: _____

Name: _____

ATTEST:

By: _____

Name: _____

**SELLER:**

SUPERIOR AIR PARTS, INC.

By: _____

Name: _Kent Abercrombie_

Title: _President_

**PURCHASER:**

AVCO CORPORATION

By: _____

Name:  Robert Kemp

Title:  Secretary

**Solely with respect to Section 11.8:**

**GUARANTOR:**

TEXTRON INC.

By: _____

Name:  John R. Curran

Title:   Vice President – Mergers and Acquisitions

EXECUTION COPY

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the day and year first above written.

ATTEST:                                     **SELLER:**

                                            SUPERIOR AIR PARTS, INC.

By:_____                  By:_____

Name:_____                   Name:_____

                                            Title:_____

ATTEST:                                     **PURCHASER:**

                                            AVCO CORPORATION

By:_____                  By:_____

Name:_____                   Name:  Robert Kemp

                                            Title:  Secretary

ATTEST:                                     **Solely with respect to Section 11.8:**

                                            **GUARANTOR:**

By: _Donnie Braunstein_                     TEXTRON INC.

Name: _Donnie Braunstein_                   By:_____

                                            Name:  John R. Curran

                                            Title:  Vice President – Mergers and
                                                    Acquisitions

EXECUTION COPY

EXHIBIT A

Purchased Assets

1.      Regulatory Approvals.  All Parts Manufacturing Approvals, Type Certificates,
        Supplemental Type Certificates, Production Certificates and all other certificates or
        certifications issued by the FAA, EASA, JAA, CAA or any other Governmental
        Authority or aviation authority issuing certifications for the design, manufacture,
        modification and repair of aviation products, and all documentation relating to the same,
        and all applications for or work-in-progress relating to FAA, EASA, JAA, CAA and
        similar foreign Governmental Authorities' certifications, and all documentation relating
        to the same (the "Regulatory Approvals"), in each case, for or relating to the
        manufacture, sale and repair of (a) aircraft engines (including the Vantage Engine) and
        (b) aircraft engine parts, including those for use on or in connection with Lycoming brand
        engine products, Seller engine products and Teledyne Continental Motor ("TCM")
        engine products (the "Purchased Regulatory Approvals").  For the avoidance of doubt,
        the Regulatory Approvals identified in Schedule 6.9 are Purchased Regulatory
        Approvals.

2.      Design and Manufacturing Rights.  All design and manufacturing rights, design
        documentation, information and systems, including data files, Data Packs and any
        supporting specifications, test articles and the like relating to any Non-Certified Engines
        and Parts.

3.      Inventory.  All inventories of raw materials, work-in-process, finished goods,
        demonstration equipment, parts, shipping containers, packaging materials, and other
        accessories related thereto and other materials that are used or held for use in connection
        with the manufacture, sale and repair of aircraft engines and aircraft engine parts,
        including the Certified Engines and Parts and Non-Certified Engines and Parts,
        excluding, for the avoidance of doubt, any inventory disposed of in the Ordinary Course
        before the Closing Date in accordance with Section 5.3 and Section 5.4, together with all
        rights against suppliers of such inventories (collectively, the "Purchased Inventory").

4.      Manufacturing Equipment and Tooling.  All machinery, equipment and tooling used or
        held for use in connection with or necessary for the manufacture and repair of aircraft
        engines and aircraft engine parts (including Certified Engines and Parts and Non-
        Certified Engines and Parts) including all manufacturing, production, maintenance,
        packaging, gages, testing and other machinery, tooling (including dies, jigs, patterns,
        molds, prototypes and the like) and equipment, spare or replacement parts, computer
        equipment incidental to the development, design, manufacture, testing and inspection of
        parts (including all computer equipment, storage media, CAD work stations, servers, hard
        drives and the like that contain or store Purchased Intellectual Property), engine test cell
        equipment, specialized inspection and quality control equipment, and plant equipment,
        and including, for the avoidance of doubt, all such assets identified in Schedule 6.5(b).

EXECUTION COPY

5.      <u>Other Tangible Personal Property</u>. All other tangible personal property of Seller that is used or held for use in connection with the manufacture, repair and sale of aircraft engines and aircraft engine parts, including  Certified Engines and Parts and Non-Certified Engines and Parts.

6.      <u>Intellectual Property</u>.  Any and all Intellectual Property relating to Seller's past, present and anticipated design, development, manufacture, assembly, repair, testing, sale, distribution and use of aircraft engines and aircraft engine parts, including Certified Engines and Parts and Non-Certified Engines and Parts (the "Purchased Intellectual Property").

7.      <u>Claims</u>.  All rights, recoveries, refunds, counterclaims, rights of set-off and other rights, choses in action and Claims arising at any time (including any Claims that may exist against suppliers arising from the sale of products or services to Seller) against third parties, including warranty and other contractual rights and Claims (express, implied or otherwise), to the extent related to the Purchased Assets.

EXECUTION COPY

EXHIBIT B

Excluded Assets

1.    Excluded Cylinder Assembly Assets. all Regulatory Approvals relating to Seller's
cylinder assemblies for TCM IO-520, TSIO-520, and IO-550 reciprocating engines
covered by a proposed FAA Airworthiness Directive ("AD"), Docket No. FAA-2007-
0051, including the following part numbers: SA52000-A1, SA52000-A20P, SA52000-
A21P, SA52000-A22P, SA52000-A23P, SA55000-A1 and SA55000-A20P, and any
other assets, including (a) inventory, raw materials, work-in-process, finished goods,
demonstration equipment, parts, shipping containers, packaging materials, and other
accessories related thereto and other materials that are used exclusively for or held for use
exclusively for the manufacture, sale and repair of such cylinder assemblies and (b) all
Intellectual Property used exclusively for or held for use exclusively for the manufacture,
sale and repair of such cylinder assemblies.

2.    Cash, Cash Equivalents, Securities and Accounts Receivable.  All cash, cash equivalents,
securities, deposit and other bank accounts, trade accounts receivable and all notes, bonds
and other evidences of Indebtedness pursuant to which Seller shall have the right to
receive payments (in each case, of any nature whatsoever, whether recorded or
unrecorded) arising out of sales of products delivered by Seller and any related security
arrangements and collateral securing the repayment or other satisfaction thereof,
including any rights with respect to any third party collection procedures or any other
Claims that have been commenced in connection therewith.

3.    Trademarks, etc.  All Trademarks and Domains, including the "Superior" trade names,
trademarks, service names, service marks, logos, brand names, and corporate names, and
all applications, registrations, and renewals in connection therewith.

4.    Claims.  Any rights (including indemnification), Claims and recoveries under litigation
involving Seller: (i) commenced against third parties arising under Sections 544, 547,
548, 550 and similar "avoidance action statutes" of the Bankruptcy Code; or (ii) that may
exist against any third party relating to the Excluded Assets or Retained Liabilities.

EXECUTION COPY

EXHIBIT C

Initial Purchased Inventory Value

Standards for Calculating Inventory

Inventory is maintained at average cost with the average cost being updated upon each receipt of goods.

Excess inventory is defined as any quantity on hand in excess of the last 3 years total usage. Items awaiting PMA, product development related items, and new items with limited history are excluded from this calculation and not considered to be excess.

Excess items are reserved at 40% of the calculated value in excess of the last 3 years usage.

Inventory associated with Airworthiness Directives or recalls are written off. These items will be scrapped upon completion of investigation and review.

Items are considered to be useable and good if they can be sold as PMA goods or used to assemble PMA goods, used within the experimental market, or if they are first article items.

Items that are non-useable items are contained within the TX2 warehouse.

Physical inventory counts are conducted annually with any necessary adjustments being made at that time. Item counts can also be adjusted during pick/pack/ship process if the system availability will not satisfy the demand.

Inventory as of October 31, 2008

| Whse | Warehouse Name | Ext Cost | Comment |
|------|----------------|----------|---------|
| CS1 | CUSTOMER SERVICE WAREHOUSE | 2,519,792.97 | Finished Goods |
| FA1 | FIRST ARTICLE WAREHOUSE | 37,895.15 | First Article |
| PD1 | PRODUCT DEVELOPMENT WAREHOUSE | 649,687.68 | Product Development |
| RS1 | REPAIR STATION WAREHOUSE | 16,933.09 | Repair Station |
| TA1 | THIELERT CENTURION INVENTORY | 0.85 | TAE Consignment Inventory |
| TX1 | TEXAS MAIN WAREHOUSE | 8,420,948.61 | Production, Packaging, WIP, Finished Goods, Quality in Inspection |
| TX2 | MRB/REJECT WAREHOUSE | 113,437.98 | Reject |
| TX9 | TOOLING | 7.95 | |
| | | 11,758,704.28 | |
| | | | |
| | Carton Inventory | 20,734.63 | |
| | Capitalized Freight | 313,630.39 | |
| | Inventory Reserve | (424,814.79) | |
| | Core | 300.00 | |
| | Adjustments | (32,815.56) | |
| | | | |
| | Net Inventory | 11,635,738.95 | |

The parties have agreed to round the $11,635,738.95 to $11,640,000.00, the Initial Net Inventory Value. The Closing Net Inventory Value will not be rounded.

EXECUTION COPY

## EXHIBIT D

### Certain Contracts

| Name and Address | DESCRIPTION OF CONTRACT OR LEASE |
|---|---|
| **Aramark Uniform Services**<br>1900 Empire Central<br>PO Box 36028<br>Dallas, TX 75235 | Uniform and Apparel Rental Program |
| **Cebos, Ltd.**<br>7600 Grand River, Ste. 200<br>Brighton, MI 48114 | Enterprise Agreement Addendum. Contract to purchase professional service time. |
| **Citrix Systems, Inc.**<br>851 West Cypress Creek Rd.<br>Fort Lauderdale, FL 33309 | Citrix Presentation Server Advanced software. |
| **City Water International, Ltd.**<br>PO Box 319<br>Elma, NY 14059-0319 | Equipment Rental and Service Agreement |
| **Comfort Technologies, LLC**<br>PO Box 150434<br>Arlington, TX 76015 | Preventative Maintenance Contract for HVAC Equipment |
| **Corporate Finance Partners**<br>MidCap GmbH<br>Torstr. 33-35<br>10119 Berlin, Germany | Consulting Agreement |
| **Dallas Waste disposal and Recycling, Inc.**<br>3303 Pluto St.<br>Dallas, TX 75212 | Solid Waste Collection and Disposal Services and/or Equipment |
| **Easylink Services**<br>33 Knightsbridge Rd.<br>Piscataway, NJ 08854-3925 | Fax Service |
| **Ervin Leasing Company**<br>3893 Research Park Drive<br>Ann Arbor, MI 48108 | JRI FL-500 Oil Skimmer |
| **First Data Corporation**<br>6201 Powers Ferry Road<br>ATS-75<br>Atlanta, GA 30339-5401 | Merchant Processing Agreement |
| **GreatAmerica Leasing Corporation**<br>P.O. Box 609<br>Cedar Rapids, IA 52406-0609 | Telephone system including voicemail |
| **Intellipak, Inc.**<br>12322 E. 55th Street<br>Tulsa, OK 74146 | Smart AIM System |
| **International Business Systems**<br>90 Blue Ravine Road<br>Folsum, CA 95630 | Software and Equipment License, primary AS400 software |

EXECUTION COPY

| Name and Address | DESCRIPTION OF CONTRACT OR LEASE |
|---|---|
| **Interwest Communications Corp.**<br>2152 W. Northwest Hwy, Ste 122<br>Dallas, TX 75220 | Equipment Maintenance Agreement |
| **IWATSU Voice Networks**<br>8001 Jetstar Dr.<br>Irving, TX 75063 | Telephone System |
| **L.E. Clark**<br>10109 Clark Airfield Road<br>Clark Airport<br>Clark, TX 76247 | Hangar rental for Justin Airport |
| **LaBrie Commercial Cleaning**<br>P.O. Box 833778<br>Richardson, TX 75083-3778 | Commercial Cleaning Services Agreement |
| **National City Commercial Capital Company**<br>995 Dalton Ave.<br>Cincinnati, OH 45203 | All equipment under Lease #107603000 |
| **Pitney Bowes Credit Corporation**<br>2225 American Drive<br>Neehah, WI 54956 | Leased equipment subject to leases #3064458-002 and 003 |
| **Print, Inc.**<br>11265 Kirkland Way, Ste 3000<br>Kirkland, PA 98033 | Cost per copy rental agreement |
| **Suez Energy Resources, NA**<br>1990 Post Oak Dr., Suite 1900<br>Houston, TX 77056 | Energy Sales Agreement |
| **Technifax Office Solutions**<br>3220 Keller Springs, Ste 118<br>Carrollton, TX 75006 | Equipment Lease (printers) and Maintenance Agreement |
| **Texas Dugan Limited Partnership**<br>c/o Duke Realty Limited Partnership<br>5495 Belt Line Road, Suite 360<br>Dallas, Texas 75240 | Leased Premises: 621 South Royal Lane, Suite 100, Coppell, Texas 75062 |
| **Time Warner Telecom of Texas, L.P.**<br>15303 Dallas Parkway, Ste 610<br>Addison, TX 75001 | Local service |
| **TriStar, Inc.**<br>3740 E. LaSalle St.<br>Phoenix, AZ 85040 | Software maintenance and service contract |
| **US Express Leasing, Inc.**<br>10 Waterview Blvd.<br>Parsippany, NJ 07054 | Lease on HP Laserjet printers, with software |

EXECUTION COPY

### Schedule 2.6

Allocation of Purchase Price

**Value in USD [1]**

| | |
|---|---|
| Class I  (Cash & Cash Equivalents) | 0 [2] |
| Class II  (IRC §1092(d) property, CDs, etc.) | 0 [3] |
| Class III (Accounts Receivable) | 0 [4] |
| Class IV (Inventory) | 11,500,000 |
| **Total** | $11,500,000 |

---

[1] Values have been determined by reference to the Business' October 2008 Balance Sheet.

[2] Class I Assets of the Business are to be left with creditors.

[3] Class II Assets of the Business are to be left with creditors.

[4] Class III Assets of the Business are to be left with creditors.

EXECUTION COPY

<u>Schedule 5.3</u>

Certain Employees

<u>Name</u>:                                            <u>Title</u>:


Kent Abercrombie                          Chief Executive Officer

Jeff Paust                                        Director of Metallurgy and Quality
Jim Whitley                                     Engineering Document Control
Jim Everett                                      CAD Draftsman
Carl Johnson                                   (Independent Contractor -- Engineering)

Allen Lasky

Pat Benoit - IT
Brent Henman                                 Sales
Bill Blackwood                               Warehouse Manager
Juan Ruiz                                         Warehouse Clerk
Elvis Lacayo                                   Warehouse Clerk
Chenda Reach                                 Warehouse Clerk

Jan Clemens                                    AP and Human Resources
Mary Renfro                                    Accounts Receivable collections

Jeff Lochridge                                 Director or Purchasing