```
 1            IN THE UNITED STATES BANKRUPTCY COURT
             FOR THE NORTHERN DISTRICT OF TEXAS
 2                      DALLAS DIVISION

 3
     IN RE:                     Case No. 08-36705-bjh11
 4
     Superior Parts, Inc.     Chapter 11
 5
      V.                      Date: 1/9/2009
 6

 7   (DEBTOR)                  TIME:  9:50 A.M.

 8
                     VOLUME 1 OF VOLUME 1
 9   HEARING BEFORE THE HONORABLE HARLIN DEWAYNE HALE,
              UNITED STATES BANKRUPTCY JUDGE
10

11   A P P E A R A N C E S :

12

13     Stephen A. Roberts
       Strasburger & Price, LLP
14     600 Congress Ave., Ste. 1600
       Austin, TX 78701
15     (512)499-3600
       (512)499-3660 (fax)
16
              -AND-
17
       Duane J. Brescia
18     Strasburger & Price LLP
       600 Congress Ave., Ste. 1600
19     Austin, TX 78701
       (512)499-3600
20
       (telephonically present)
21

22
                  representing Superior Air Parts, Inc.
23                          621 S. Royal Lane,
                            Suite 100
24                          Coppell, TX 75019-3805
                               (Debtor)
25
```

```
 1

 2
        Deirdre B. Ruckman
 3      Gardere,Wynne & Sewell
        1601 Elm St., Suite 3000
 4      Dallas, TX 75201
        214-999-4250
 5      214-999-3250 (fax)
        druckman@gardere.com
 6
             -AND-
 7
        William B. Freeman
 8      Pillsbury Winthrop LLP
        725 S. Figueroa St.
 9      Ste. 2800
        Los Angeles, CA 90017-5406
10

11
                representing Textron, Inc.,
12                          Avco Corporation
                            (Creditors)
13

14

15

16

17     MS. MARY FRANCIS DUNHAM
       U.S. Trustee
18     UST U.S. Trustee
       1100 Commerce Street
19     Room 976
       Dallas, TX 75242-1496
20     214-767-8967

21              representing U.S. TRUSTEE

22

23

24

25
```

```
1
        Billy G. Leonard, Jr.
2       Attorney at Law
        1650 W. Virginia Street
3       Suite 211
        McKinney, TX 75069
4       469-742-0855
        bleonard@billyleonardlaw.com
5
             -AND-
6

7       Kevin Good
        Conner & Winters, LLP
8       Carillon Towers East
        13601 Preston Rd., Ste. 940E
9       Dallas, TX  75240
        214-446-1003
10

11
                     representing Aviation Parts Supply,
12                   Inc.
                     511 E. John Carpenter Freeway
13                   Suite 440
                     Irving, TX 75062
14                               (Creditor)

15

16

17

18

19

20

21

22

23

24

25
```

```
 1

 2

 3                           INDEX

 4   OPENING STATEMENTS:

 5                                           Page

 6   On behalf of Debtor

 7           By:  Mr. Roberts                  6

 8   On behalf of  AVCO/TEXTRON               32

 9           By:   Ms. Ruckman

10   On behalf of U.S. TRUSTEE                32

11

12   WITNESSES:               DIRECT  CROSS REDIRECT

13    Kent Ambercrombie          34     54

14   Stipulation:

15     By Ms. Ruckman recited            54

16     By Mr. Leonard                    57

17

18                          EXHIBITS

19   DEBTOR'S EXHIBITS                    MARKED

20   RECEIVED

21   1-11                       29          26

22

23

24

25
```

DARLA M. CHAVEZ, CSR (972) 296-7800

```
 1          COURT CLERK:  All rise.

 2          THE COURT:  Please be seated.  Take

 3  appearances in -- please be seated, please.

 4  Thank you.  Take appearances in Superior Air

 5  Parts, Inc.

 6          MR. ROBERTS:  Your Honor, Steve Roberts

 7  representing the Debtor.  Ms. Mary Frances Dunham

 8  said she was going to be right back, but she's

 9  here for the U.S. Trustee, so  --

10          THE COURT:  Okay.  Thank you.

11          MS. RUCKMAN:  Good morning, Your Honor.

12  Deirdre Ruckman representing Textron, Inc., and

13  Avco Corporation, and also if I may this morning,

14  Your Honor, I'd like to introduce Mr. William

15  Freeman.  He is a member of the California Bar.

16  Also representing Textron and Avco Corporation.

17  We've filed a Motion for Pro Hoc admission in

18  this case.

19          THE COURT: Welcome to our Court, and you

20  can participate this morning if you want to.

21          MR. FREEMAN:  Thank you, Your Honor.

22          MR. LEONARD:  Your Honor, Billy Leonard,

23  and then Kevin Good with Conner and Winters on

24  behalf of Aviation Parts Supply, Inc.

25          THE COURT:  Welcome.
```

```
 1              MR. LEONARD:  Thank you.

 2              THE COURT:  And then, Mr. Brescia, are

 3    you on the phone?

 4              MR. BRESCIA:  I am on the line again,

 5    Your Honor.  Thank you.  Duane Brescia also for

 6    the Debtor.

 7              THE COURT:  Welcome.  Mr. Roberts.

 8              MR. ROBERTS:  Your Honor, we've resolved

 9    the objection on the bidding procedure  --

10              THE COURT:  Well, good.

11              MR. ROBERTS:  --  during our break.

12    We're moving fairly fast in this case

13              THE COURT: I gathered that from my

14    discussions with Judge Houser.

15              MR. ROBERTS:  And because of that, I

16    would like to give the Court an overview and put

17    on some testimony to support the motions to make

18    a record.

19              THE COURT:  Sounds good.  I have read

20    all your motions too.

21              MR. ROBERTS: Oh, all right.  Start with

22    the relief requested.  Well, no, I think I'll

23    start, kind of give you an overview of who

24    Superior Air Parts is.

25         Superior Air Parts sells parts for small
```

1   aircraft engines, piston-powered aircraft

2   engines.  It's a very small market.  You have a

3   Textron affiliate, Teledyne affiliate or

4   manufacturers, and then you have Superior.  It's

5   like an after-market, like an independent car

6   parts-type of business, and then you have a

7   fourth seller in the market, and that basically

8   consists of the market for selling parts for

9   airplane engines for piston-powered small

10  aircraft.

11      Superior's been in business for forty years,

12  been in bankruptcy before in 1997.  And they were

13  acquired  --  oh, and they have their facility

14  here in Coppell, Texas, and they don't truly

15  manufacture, they're more like a Dell computers,

16  they assemble.  They farm out the manufacturing,

17  they have tools all over the world that are in

18  the hands of other parties to make specialty

19  parts.

20      A unique part of this business is that in

21  order to manufacture and sell and put into the

22  stream of commerce an airplane engine part, you

23  have to have a parts manufacturing authorization

24  from the FAA.  To get that, you have to do

25  testing, engineering, submit an approval for

1  parts, and get that approval to put that part

2  into the stream of commerce.  PMAs are not

3  transferrable; however, if you took all the

4  intellectual property behind that PMA, you would

5  enable a buyer to go to the FAA with that

6  package, and say, "This has already been

7  approved, we would like approval to sell.  So,

8  that's one component of this business.

9      We also have inventory and accounts

10  receivables.  The company -- I'm going to

11  apologize for my voice and my coughing.  It's a

12  balance between trying to stay clear-headed and

13  trying to stay medicated.  I apologize for that.

14      A little more background.  The Debtor was

15  acquired by Pulert AG (phonetic spelling) in

16  2006.  That's a German company.  Paid $1 for the

17  stock and basically bought off, took assignments

18  of $10 million in senior and unsecured debt.  So,

19  it is technically a sole shareholder and the

20  secured creditor to the tune of $10 million;

21  however, it doesn't appear they ever filed a UCC,

22  the UCC for the prior bank expired in 2007, so it

23  appears that is an unprotected $10-million-dollar

24  lien.

25      If you'll notice, Pulert AG's counsel is not

1    here today.  They don't have any objections to

2    our motions.  Also in the record we have a letter

3    consenting to the use of cash collateral in this

4    case, so we don't need to get an order.

5             THE COURT: No, they're in their

6    insolvency proceeding; is that right?

7             MR. ROBERTS:  They are in their own

8    insolvency proceeding in Germany.  They also have

9    two to three board seats, the third board seat is

10   owned by Mr. Kent Ambercrombie, the President of

11   the company who sits in the courtroom who's not

12   connected with the German insolvency

13   Administrator.

14        So, $10 million of our debt is Thielert AG.

15   We have 12 to $15-million-dollar, depending on

16   offsets, of debts to Thielert Aircraft Engines, a

17   sister company in Germany.  It's also in its own

18   insolvency.  And that's all trade debt.  So,

19   essentially, Thielert AE has been financing, if

20   you will, the Debtor, since 2006 by providing a

21   net 12 to $15 million in parts on credit.

22        This company in 2008 on $22.4 million in

23   sales through November lost 4.7 million.  In

24   2007, on $30 million in sales, it lost $5.6

25   million.  This company has nowhere to go as far

1   as being able to internally reorganize.

2       The company set out  --  Thielert AG set out

3   to sell either the stock or find a purchaser for

4   assets of this company as early as last Spring,

5   2008.  This process we're asking the Court to

6   approve is not the beginning of the sales

7   process; we view it as the end of a sales

8   process.  We're going to ask the Court for a

9   bidding procedure.  We're going to ask the Court

10  --  and let me restate it this way.  We filed a

11  motion to sell substantially all of the assets to

12  Avco Corporation, a Textron affiliate, for $11.5

13  million.  We've already set that hearing, have

14  that hearing set for February 24th.  We're going

15  to ask today for a bidding procedure so if there

16  are bids, we will be showing up on the 24th

17  either for motion to sell to Avco or to the

18  highest bidder under the bidding procedure.

19      So, our proposal is basically to give parties

20  who may have shown an interest, who may show an

21  interest one more chance to step forward, and

22  that is the gist of the basic relief we're

23  requesting today.  We had some other collateral

24  motions I'll discuss in a minute.

25      The financial picture of the company, while

 1  we're in a hurry, the company had 35 employees up

 2  until December 30th.  On that date or the day

 3  after, we signed the Asset Purchase Agreement

 4  with Textron and immediately reduced our staff to

 5  15 key employees that we deemed to be necessary

 6  to preserve the assets of the company and to

 7  follow through and effectuate any sale of the

 8  company.  As a matter of fact, under the Asset

 9  Purchase Agreement of Textron, Textron agrees

10  with that assessment because we have agreed not

11  to terminate those employees without cause until

12  the closing.  So, we're basically living off of

13  collections of Accounts Receivables.  There are

14  still some sales.  Obviously, our problem is, we

15  don't want to  --  I mean, we can't sell parts

16  with warranties knowing we're not going to be

17  around to honor those warranties.

18      We have in evidence cash flows which show

19  that end of March, if our assessments are

20  optimistic, we may have $600,000 cash yet left.

21  We have no idea what we're going to be collect in

22  accounts receivables.  So, we also have about

23  $450,000 insurance payment in March.  So,

24  essentially, the longer we operate, the less

25  there's going to be to pay to the unsecured

1  creditors.

2      Now, I've told you about Thielert AG at 10

3  million.  And Thielert AE at 12 to 15 million.

4  Let's call it 15 for sake of argument.  That's

5  $25 million in debt.  Our trade debt is about

6  $1.2 million.  Our list of top 20 creditors drops

7  down to 20 creditors at $16,000.  I think we have

8  three or four creditors over $100,000.

9      Now, we also have executory supply contracts

10 which haven't been rejected, so that number will

11 go up.  We also may have warranty claims comes

12 in, so that may go up, but as you can see from

13 the dynamics of this case, you've got over 95

14 percent of this debt to these two entities.

15     You also, if you kind of move the numbers

16 around and make some assumptions, you've got a

17 potential pay-out of somewhere around $.30 on the

18 dollar, but the numbers don't move around with

19 contingent claims and other contingencies.  So,

20 that's why we're asking for things to be

21 expedited.

22     And with that as background, we have a motion

23 for approval of a bidding procedure by which

24 qualified bidders will bid, we're asking for a

25 deadline of February 19th for qualified bids. The

1   bidder must put up $350,000 in cash.

2       The bidder must exceed the Textron bid.  The

3   Textron bid we view as $11.5 million subject to

4   inventory adjustments.  Obviously, if inventory

5   is reduced, that price is reduced.  But 11.5

6   subject to adjustments.  Any other bidder has to

7   come in and do an overbid of $500,000 and also

8   cover a breakup fee of $350,000.

9       Now, we're asking for the breakup fee of

10  $350,000 based upon the fact is that we have

11  affidavits and representations from Textron, they

12  have already spent over $400,000 in this process.

13  And what has happened is, last June the corporate

14  finance partners, the investment bankers running

15  this sales process, as early as then, they were

16  talking to Textron.  There's a considerable

17  amount of due diligence when you're going under

18  these PMAs to look at how good the engineering is

19  behind it to determine whether or not they have

20  value or not.  And there's a couple of thousand

21  of those PMAs, I believe, if I'm not mistaken.

22      There's a considerable amount of due

23  diligence because we're in the aviation industry

24  with a considerable amount of risk, as you might

25  imagine, attached to it.

1        We've reached an informal understanding with

2    Textron in early December, and it took from early

3    December to December 30th to reduce that to a

4    written Asset Purchase Agreement with about 20

5    schedules which took hundreds of man hours to put

6    this together.  So, Textron, when we're asked for

7    the breakup fee, is actually less coming into

8    this courtroom today than their expenditures.

9        Also, we believe that by giving qualified

10   bidders all of the information on those

11   schedules, they will have a big jump and a big

12   cost savings on their due diligence.  It would be

13   like taking information from another law firm,

14   you might have to look at it yourself but at

15   least you have information put together for you

16   and a structure of a deal put together for you

17   ahead of time.  There have been no objections to

18   the breakup fee.  I will let Mr. Leonard or

19   Ms. Ruckman explain the agreement on the cash

20   purchase price, the bidding procedures.  Let me

21   restate that.

22       The bidding procedures say the bid has to be

23   cash.  The objection was there should be more

24   flexibility.  They have worked out language.  The

25   Debtors' obligation under the Asset Purchase

1   Agreement are it's up to Textron to approve that

2   agreement or Textron can back out of the deal.

3   So, rather than me trying to paraphrase what they

4   have agreed to, I'll leave that up to them.

5       I will tell you as part of this bid

6   procedure, they're asking for bids on February

7   19th.  This is a sell hearing on February 24th.

8   We propose to conduct an auction the morning of

9   February 24th, go to Court on the afternoon of

10  February 24th if they're qualified bidders.

11  Those are the keys dates.

12          THE COURT:  Where are you going to do

13  your auction, your law firm?

14          MR. ROBERTS:  We're going to do it our

15  office across the street from the courthouse at 9

16  o'clock on the 24th, and Judge Houser set a

17  hearing at 3 or 3:15 that afternoon on the sale.

18  And what we're asking for today is that the bid

19  procedures have the same date and time.

20      I want to also focus a little bit on notice

21  for the Court so you know what we're doing, and

22  that will get into our post-petition financing.

23      We sell primarily to distributors, not to

24  end-users, so there may be a couple hundred

25  thousand people flying around in airplanes that

1    have our parts that we don't know about, or they

2    may be flying in airplanes that have parts that

3    they don't know about, and so, obviously, because

4    this is a proposed sale free and clear of liens,

5    claims and encumbrances, and barring any claims

6    against the successor  --  the purchaser as a

7    successor in interest, this is the notice that we

8    have agreed to give and we're going to give.

9        First of all, we have our mailing matrix, the

10   typical all creditors we know about.

11       We also have a list of every customer we've

12   done work with in the last five years.  They've

13   received notice of this hearing.

14       We have every vendor we've done business with

15   in the last five years.  They've received notice

16   of the hearing.

17       Those three groups will get notice of the

18   whole procedure.

19       In addition, the FFA web site has all

20   registered engine owners  --  or plane owners by,

21   as I understand, tail number on its web site, and

22   we have agreed to go to that web site, pull down

23   the mailing list and give written notice to

24   perhaps a little over-statement but not much, to

25   every owner of a piston-fired aircraft in the

1  United States, about 200,000.  That comes at

2  considerable expense.

3      We have  --  if I may, Your Honor, give you a

4  set of exhibits.

5          THE COURT:  Now, I have a set that was

6  delivered earlier.

7          MR. ROBERTS:  We have also three

8  proposed notices by publication if you'd turn to

9  Tab No. 9.  Tab No. 9 is the first notice we're

10  asking for approval of.

11      Now, this magazine that we've asked for this

12  one I believe it's EAs Sports Aviation, their

13  deadline for publication for February was

14  yesterday, so we have sent this to the publisher,

15  and our firm has used our credit card to pay the

16  several thousand dollar full-page ad, so this

17  notice is unique in that we can't tell them the

18  deadlines because we don't know what they are;

19  however, we have set up an extra net where all

20  this information is available.  So, we've steered

21  them to the Court for some information or extra

22  net where they can contact my secretary, and

23  she's very grateful that I've done this to her.

24          THE COURT:  I'm sure she is.

25          MR. ROBERTS:  And we give them notice,

1   that if you're a creditor  --  we tell them who

2   Superior is, what we sell.  We tell them what the

3   effect of the auction is, we tell them what the

4   proposed purchase price is, and we also have told

5   them that we've asked for a bar date for filing

6   proofs of claims for February 21st.  I'll go back

7   to the request for the bar dates in a moment.

8        The second proposed notice would go in to

9   other publications.  It's the same as the first.

10  It's under Tab 10, except here, since we don't

11  have to do it until we have dates, we'll be able

12  to actually put dates in the notice.

13       All right.  This is not testimony, but I

14  believe the magazine we just advertised in has a

15  circulation of over a million people. I don't

16  know what the circulation of the others is but

17  they're the ones selected by Textron who, of

18  course, has interest in making sure, as we do,

19  that due process is given to parties to the

20  extent possible.

21       The third notice under Tab 11 is a what I

22  call a "far more elaborate version" of the first

23  two.  It's got dates, it doesn't refer you back

24  to -- it's more self-contained instead of

25  referring you to information on a web site.

1  That's what we would propose to send out to the

2  FFA registered owners.  As well, I believe this

3  is what we would be sending out to our mailing

4  list as well.

5      So, my purpose in goinb through that in

6  detail is to show the Court the Notice we're

7  asking you to approve and also to show the Court

8  we're taking extraordinary efforts to notify

9  anyone that may be affected by this process.

10     Now, there's a cost to that, and the lawyers

11 in their infinite wisdom and with the help of

12 some operations people estimated that cost may be

13 as much as $150,000 based on the first bid I've

14 got, we may be a little conservative on that, but

15 we're not sure we're going to have the 350,000,

16 so another motion we filed today is the Motion

17 for Post-Petition Financing.  And that financing

18 is really pretty straightforward.

19     Textron is paying us $350,000 down on the

20 contract.  Textron will allow us to spend that

21 money on the third-party expenses for that

22 Notice.  If they're the approved seller, it

23 basically comes out of the purchase price; if

24 they're not, they have a super priority unsecured

25 administrative claim, and there's no interest on

1   it.   It's basically they're fronting us the money

2   to do the Notice, and that's the financing we're

3   asking for, and you will hear testimony that

4   frankly, we haven't gone out to banks to try and

5   get better financing than no-interest financing.

6   I think the Court can probably take judicial

7   notice that that's extraordinary and unusual.

8        We are also asking to set the bar date for

9   proofs of claims.   Since we're sending this

10  Notice out as I've explained, I think we're in a

11  position to give parties notice.   Our concern is

12  we're going to be filing a plan in short order

13  that contemplates that the distributions from the

14  sale will be paid to creditors in accordance with

15  their priorities.

16       We have about $75,000 in priority employee

17  claims, have about 150,000 estate claims, and the

18  rest appears to be unsecured claims  We don't

19  want to wait around consuming our cash operating

20  instead of paying it out to the unsecured

21  creditors.

22       So, since the sale process is moving toward

23  the end of February, it's our intention to file a

24  plan very soon that can follow up soon after that

25  sale procedure and make distributions to

1   creditors so we can shut the costs of this case

2   down and so that we can distribute money to

3   creditors, and we have to that end, I believe

4   I've stated it earlier, but we've asked for a bar

5   date for filing proofs of claims for February

6   21st.  The reason why we asked for that date is

7   if we know what the proof of claims are, we're

8   looking at competing bids.  When we're coming to

9   Court, we will know and have some idea what the

10  universe of the claims are, what the universe of

11  the issues are and how that might impact the

12  sale.  So, we're asking for the bar dates to be

13  shortened.

14      We have two other motions.  As I have

15  previously advised the Court, we laid off  --  we

16  had 35 employees, now we're down to 15.  We laid

17  off 20.  Those 20 were paid their payroll through

18  the date of termination which was a date with

19  filing.

20      One thing that just came to my attention we

21  haven't asked in our motion.  I'm going to ask

22  the Court to consider approving is the payroll

23  taxes would normally be paid a week later.  They

24  were not paid.  So, the payroll taxes of that

25  payroll need to be paid.  When I find my notes, I

1  can give the Court how much that is, but we would

2  ask the Court to allow us as part of this relief

3  I'm going to be asking for to also be able to pay

4  the payroll taxes that are related to that last

5  payroll for all of the employees, both the

6  terminated and the retained employees.

7      We are also asking for permission to pay some

8  pre-petition wages, salary and employee benefits.

9  Now, the only pre-petition wages we have are for

10  the retained employees because there's a gap of

11  three or four days that they weren't paid for.

12  Now, these employees are critical to us.  We have

13  engineers and experts of various types and people

14  just have a lot of key information in their head.

15  And we're going to be asking for severance for

16  them by a separate motion, but under this motion

17  we certainly want to catch them up on their

18  pre-petition  --  our pre-petition payroll

19  obligation which would be a priority claim in any

20  event.

21      The Debtor also has certain benefits it's

22  asking to continue, and one example is a

23  cafeteria plan.  The Court may be familiar with

24  how they operate, but these employees have been

25  at the beginning of the year they choose to have

1   the company withhold, say, $2,000 and which is

2   withheld all of their paychecks all the way

3   through the year through December 31, and then

4   when they incur a medical bill, they submit that

5   bill to the company for reimbursement  --  well,

6   the company pays the medical bill so it is

7   tax-free to the employee.  If the employee

8   doesn't use the money, it's lost.  So, the

9   employees have paid all their money in.  They

10  have until February 28th to submit their medical

11  expenses.  We're asking the Court to allow us to

12  honor those obligations.  Again, I think that

13  would be part of a priority claim perhaps since

14  it went over a year instead of six months,

15  perhaps not, but again, we're talking about 35

16  total employees, we're talking about 15 critical

17  employees.

18      We also provide health insurance and we also

19  provided 401(k) matching which has straddled the

20  filing period.

21      So, we're asking and we think in the scheme

22  of this case it's a fairly immaterial amount of

23  money, and we think it is pretty much governed by

24  priority claims or necessity of keeping key

25  employees.

1      In these motions there's only one insider

2  among all these employees, and that's

3  Mr. Ambercrombie who is a President and a

4  Director.  We're going to ask for -- we're also

5  asking the Court to honor the vacation policy

6  that we have.

7      In addition to that, for the 15 key

8  employees, by separate motion, we are asking to

9  give them severance equal to one month's of

10 wages.  That total would be $7,855.  The accrued

11 vacation costs would be about $65,000, so all

12 we're asking to retain our employees is allow us

13 to pay them or allow them to take their paid

14 vacation which is more likely and allow us to pay

15 them one month's salary as severance provided

16 they stay as long as we need them and they're not

17 terminated for cause.

18     Under the Bankruptcy Code there are

19 limitations, as the Court knows, on severance for

20 insiders, and the severance for Mr. Ambercrombie

21 would be $1,000 if you looked at the exhibit to

22 -- Exhibit A to our Motion for -- excuse me.

23 The exhibit's actually attached to our Motion to

24 Pay Pre-Petition Employees.  That would show the

25 severance.  It shows that the severance for the

 1  insiders is within the parameters of severance to

 2  insiders under the Bankruptcy Code.  The Code

 3  Section has escaped me, but my recollection is

 4  it's ten times the median of a company-wide

 5  severance program in the calendar year.  Calendar

 6  year 2009, Mr. Ambercrombie is certainly well

 7  within the percentage of the median.  He's not

 8  getting any special treatment because he's an

 9  insider.

10        THE COURT:  My Trustee law clerk looked

11  it up yesterday, and we agree with you.

12        MR. ROBERTS:  I'm sorry, Judge, I have

13  the Code Section in my notes, and I'm not finding

14  it at the moment.

15        THE COURT:  That's okay.  That's all

16  right.

17        MR. ROBERTS:  So, that's a whole lot of

18  background, but we're asking for several types of

19  relief here today.  The witness we have is

20  Mr. Kent Ambercrombie.  It is my practice when we

21  first appear in a bankruptcy court at the

22  beginning of a case to put a witness on live for

23  direct examination for the benefit of the Court.

24  We have a rather unique situation, and I

25  understand you're hearing this case for Judge

1 | Houser, I don't know if you're keeping this case
2 | or Judge Houser is keeping the case  --
3 |         THE COURT:  She'll keep it.
4 |         MR. ROBERTS:  --  so I don't want to
5 | waste the Court's time by giving you a lot of
6 | background.  I could proffer the testimony as
7 | well.
8 |         THE COURT:  I think under our rules,
9 | we're going to need to put on a little bit of
10 | testimony on the breakup fee for sure.
11 |         MR. ROBERTS:  Okay.  Your Honor, I would
12 | also at this time, I would ask for the Court, I
13 | would ask to admit all of our exhibits.  I will
14 | point out to the Court that two of our exhibits,
15 | Exhibits 7 and 8 are Affidavits.  One's an
16 | Affidavit of Daniel Shank of Corporate Finance
17 | Partners who led these sales efforts.  Mr. Shank
18 | is in the Dominican Republic and he has been ill
19 | for about four weeks, about the time we were
20 | getting down to signing this deal.  It's
21 | difficult for him to be here.
22 |     In Paragraph 8 we also have  --  and what he
23 | is doing is describing the Debtor's sales efforts
24 | to basically back up what I have explained to the
25 | Court is this is not the beginning of the sales

1  procedure, it is the end of the sales procedure.

2  After Mr. Ambercrombie will testify, I could take

3  you through some of that, but for the purposes of

4  admissibility, I'd like to point that Affidavit

5  out to you.  And the other Affidavit is the

6  Affidavit of Avco and Textron as to their costs

7  incurred to-date in terms of attorneys' fees and

8  internal costs.

9       Now, these witnesses are not in the courtroom

10 and not available for cross-examination.  We'd

11 ask the Court to consider them under Federal Rule

12 43(c) which allows the use of affidavits in the

13 discretion of the Court in motion practice in

14 Federal Courts and ask for the Court to

15 incorporate Federal Rule 43(c) under its power in

16 contested matters under Rule 9014.  I don't

17 believe there's any objections to that request

18 given the nature of these affidavits.

19       THE COURT:  Does anybody object to our

20 using these affidavits given that

21 Mr. Ambercrombie is also going to testify?  All

22 right.

23       MR. LEONARD:  Your Honor, I don't have

24 an objection for the use of those affidavits for

25 today's motions.  I think Mr. Shanks also  --

```
 1  there's an application employing him, and there

 2  may indeed be questions we have we'd like to ask

 3  him that are different than what's in that

 4  Affidavit, but I don't want that to be used in a

 5  subsequent hearing just because we've allowed

 6  them to be admitted.  I think it's appropriate

 7  for what Mr. Roberts going to admit it to show

 8  that we're at the end of the process, same with

 9  the Affidavits supporting them, the breakup.  I

10  don't have a problem with those additions as to

11  how the breakup is constituted, but not as to any

12  of the other factual statements in those

13  Affidavits.

14          THE COURT:  Any problem with that --

15          MR. ROBERTS:  No problem with that at

16  all.  We'd introduce them for the purposes of

17  this hearing only.

18          THE COURT:  Okay.  This morning only

19  then, Mr. Leonard.

20          MR. LEONARD: Thank you.

21          MR. ROBERTS:  Okay, Your Honor, before

22  putting on Mr. Ambercrombie, since the exhibits

23  are admitted, I would direct you first for the

24  purpose of the breakup fee, to the Affidavits

25  under Tab 8.
```

```
 1            THE COURT:  Let me say for the record,

 2   1-11 are admitted.  All right. 8 you say?

 3   (Exhibits 1 through 11 identified, offered and

 4   admitted.)

 5            MR. ROBERTS:  Yes, Your Honor.

 6            THE COURT:  Okay.  Thank you.

 7            MR. ROBERTS:  Rather than reading the

 8   entire thing for you, this is the Affidavit of

 9   Vice President Deputy General Counsel of Textron.

10   Now, Avco Corporation is the purchaser.  It was

11   designated to be the purchaser and put in the

12   a/b/a, but Textron was involved for a great

13   period of time in the negotiations, so we have

14   affidavits from both Textron and Avco as to their

15   costs, and they go through and explain how they

16   have been involved in talking to Corporate

17   Finance Partners since the Spring of 2008.  They

18   describe their due diligence, including preparing

19   various internal business models, attacking (sic)

20   substantial business and legal due diligence,

21   that they, for example, in Paragraph 5 in July

22   2008, they brought 12 of their employees to

23   Coppell, Texas for a management presentation.

24       We have a virtual data room that was opened

25   up which they have gone through.  They spent four
```

1  months using themselves and independent

2  consultants to evaluate the sufficiency of the

3  intellectual property and tangible embodiments

4  thereof and engineering data.

5      Then we also had substantial negotiations

6  over nonbinding letters of credit  --  letters of

7  intent which were actually never signed.  We

8  decided rather than to go to nonbinding letter of

9  intent, we'd go to a binding contract.

10      Then you have the negotiations for the Asset

11  Purchase Agreement which is in the evidence and

12  which is offering the highest and best price

13  to-date.

14      Starting with Exhibit 11, they refer to their

15  fees and costs and point out they spent $231,000

16  in outside legal fees as of December 31 and

17  internal costs, internal labor costs of 47,000,

18  and then you've also got what appear to me to be

19  out-of-pocket expenses of 24,000.  That is just

20  Textron, and they have exhibits attached to there

21  showing their legal costs, break down of their

22  labor costs, and their actual costs incurred as

23  exhibits to that first Affidavit.

24      The second Affidavit in Tab 9 basically

25  echoes the first Affidavit on behalf of Avco, and

1   again, you have an Exhibit A breaking down costs.

2   And you will see  --  did we get it backwards?

3   No, that's right. You'll see their showing costs

4   under Exhibit A of $122,000 in out-of-pocket

5   costs, $87,000 in labor costs, 24,000 in expense,

6   an additional $364 hours employees. Now, I'm sure

7   Ms. Ruckman who represents them can add all those

8   numbers up, but they're over $400,000, so we have

9   someone that spent that time and effort to come

10  in and give us an opportunity to sell at 11.5

11  million and also to give us the opportunity to

12  obtain higher bidders, and if they lose in this

13  auction, they recoup less than the resources they

14  have expended.  I believe based upon the sale of

15  11.5 and the $350,000 breakup fee, we're

16  somewhere around 3 percent.  So, that is our

17  evidence to support the breakup fee.

18          THE COURT:  Thank you.

19          MR. ROBERTS:  I'm ready to proceed with

20  Mr. Ambercrombie.  I haven't given anybody else

21  to talk.

22          THE COURT:  Let's hear if anyone else

23  wants to make brief opening statement, and then

24  we can put Mr. Ambercrombie on.  Anybody else

25  want to be heard?

 1          MS. RUCKMAN:  Your Honor, Mr. Stephens

 2   has raised a couple of the issues.  I think it

 3   might be more appropriate for him to go ahead and

 4   just put his witness on and then if we could take

 5   up a couple of questions that he had addressed to

 6   Textron to speak to the Court about and to the

 7   Air Parts objector.  That makes sense to me so

 8   --

 9          THE COURT:  Okay.

10          MS. DURHAM: Good morning, Your Honor.

11   Mary Frances Durham for the U.S. Trustee, and the

12   U.S. Trustee really has two very small but

13   probably annoying comments regarding all of these

14   matters, and one goes to the Motion to Pay the

15   Pre-Petition wages, salary, employee benefits.

16   Mr. Ambercrombie who will be testifying is the

17   only person over the $10,950 limit, and so the

18   U.S. Trustee would object to the payments over

19   that amount.  Everyone else it seems when you add

20   up all of the different kinds of wages and

21   benefits they want to pay them fall within that

22   limit.

23          The other one is on the Proof of Claim

24   limitation.  I just don't know how that's done

25   under Rule 9006(c).  There's no reduction in

1   filing in the time.  Now, maybe the Court's

2   probably had this more often, and under I think

3   it's 3002, the time for filing a Proof of Claim

4   is 90 days after the 341 which puts it at the end

5   of April, and of course, the Government agencies

6   have --

7           THE COURT:  Even longer.

8           MS. DURHAM:  -- but I just throw those

9   out.

10          THE COURT:  Uh-huh.  When is the  --

11  did you say when the 341 is set?

12          MS. DURHAM:  It's like  --  I believe

13  it's January 30th.  It's at the end of this

14  month.

15          MS. DURHAM:  The 29th.

16          THE COURT:  Yeah, thank you.  Those

17  weren't too annoying.

18      Mr. Roberts, you may call your first witness.

19          MR. ROBERTS:  Yes, sir.  Your Honor,

20  we'd call Mr. Kent Ambercrombie.

21          THE COURT:  Mr. Ambercrombie, it's over

22  here, sir.  Would you raise your right hand, sir.

23          (Witness duly sworn by the Court.)

24          You may proceed.

25

```
 1                    KENT AMBERCROMBIE,

 2    Having been duly sworn by the Court to tell the

 3    truth, the whole truth and nothing but the truth,

 4    testified under oath as follows:

 5                    DIRECT EXAMINATION

 6    BY MR. ROBERTS:

 7        Q.      Mr. Ambercrombie, you are the

 8    President of Superior Air Parts, the Debtor?

 9        A.      Yes, sir.

10        Q.      And you are also one of three members

11    of the Board of Directors?

12        A.      Yes, sir.

13        Q.      Could you briefly describe for us your

14    business background.

15        A.      I attended the University of North

16    Texas and graduated from there in 1992 with a BA

17    in Finance, Administration of Finance degree.

18        I joined a company called Avial (phonetically

19    spelled) which is in the aviation parts

20    distribution business, began there in core

21    processing and warranty processing.  I moved into

22    the accounting area and worked within the

23    accounting and finance departments for various

24    divisions within Avial, their domestic

25    distribution line as well as a smaller division
```

1  of their aerospace hardware.  That division was

2  sold off to a private firm.

3       I went to work there as Director of Just In

4  Time Management (phonetic spelling) contracts

5  which was inventory management processing with

6  customers such as McDonald Douglas, Bell

7  Helicopter and others.

8       That company went public and then was

9  acquired by Honeywell.  I moved back into

10  accounting at that point in time to assist with

11  the transition of the activities of the company

12  from Tri-Star into Honeywell.  The opportunity

13  came up to join Superior Air Parts in December of

14  2000 where I joined Superior Parts as Director of

15  Finance and Accounting in December of 2000.  I

16  have worked there ever since.

17       In 2006 I was brought into the VP of Finance

18  in accounting and in the middle of 2006 took on

19  the operational aspects, including purchasing and

20  warehouse operations.

21       In January of 2007 I was promoted to the

22  office of President of Superior Air Parts, and

23  everything in that sense.

24       Q.    Thank you.  Would you briefly describe

25  to the Court what Superior is.  How long has it

1   been in business, what it does and how it fits

2   into its market.

3        A.     Superior Air Parts is a company that's

4   been in existence since 1967 and operates under a

5   section of the FFA Code referred to as Parts

6   Manufacturer Approval that allows us to

7   manufacture replacement components for Textron

8   and Textron (unintelligible at 10:34:03) and

9   Teledyne Continental Motors varying engines

10  within the piston-engine aviation market.

11       We've been in business since 1967 and have

12  grown our product line since through the efforts

13  of achieving additional PMAs.  We also began our

14  own branded engine program in the early 2000s for

15  a segment of the market called "experimental

16  aviation" but also into the certified engine

17  markets for original in-manufacturing of air

18  frames.

19       The company has been privately held for most

20  of its existence but was acquired by Thielert AG

21  in March of 2006.

22       Q.     Now, you heard me in my opening

23  statement state that Thielert AG acquired the

24  company for  --  the stock for $1 and paid $10

25  million and bought the senior and subordinated

1   debt and stepped in their shoes.  Did you hear me

2   say that?

3        A.      Yes.

4        Q.      Is that an accurate statement?

5        A.      Yes, sir.

6        Q.      You also may heard me in my opening

7   statement talk about the performance and

8   consistent with your schedules that on $30.1

9   million of sales in 2007, the company suffered

10  losses of 5.6 million, and on 22.4 million

11  dollars of sales in November of 2008, it lost

12  $4.7 million.  Do you agree with those numbers?

13       A.      Yes.

14       Q.      In fact, you signed schedules,

15  Statements of Affairs attesting to those numbers,

16  right?

17       A.      Yes.

18       Q.      Why is this company losing money?

19       A.      There are numerous factors involved in

20  the financial distress the company's found itself

21  in, some dating back into the late '90s,

22  including decisions made at those times that

23  fostered more competitive forces in the market

24  that resulted in some degradation of margins.

25  September 11th, 2001, as everybody is well aware,

1    had a very significant impact on general

2    aviation.  At the same time that was happening,

3    the company sold off one of its revenue streams

4    to a company called "Aeorspace Products

5    International."  Just prior to September 11th,

6    the company relinquished the rights to that

7    revenue stream.  September 11th then impacted the

8    general aviation markets significantly causing

9    then some additional distress to the company, and

10   that coincided with product liability insurance

11   premiums almost quadrupling over the couple of

12   years within the industry as well causing an

13   expense impacted the company, and unfortunately,

14   the company exhausted its cash reserves, spent

15   the cash associated with its revolver and became

16   significantly financially distressed in late 2005

17   which necessitated the desire of the owners at

18   the time to sell the company.

19        Q.     The fact that 2005 there were several

20   forbearance agreements entered into with the then

21   existing bank, correct?

22        A.     Yes.  The company bank defaulting on

23   several loan covenants in 2005.

24        Q.     Other than an accounting of profit in

25   2006 related to the forgiveness of debt in the

1    2006 transaction, has this company made a profit

2    in the last five years?

3        A.      No.

4        Q.      Now, also Thielert AG is 100 percent

5    shareholder?

6        A.      Yes.

7        Q.      And it filed a German insolvency

8    proceeding in March?

9        A.      I believe that's correct.

10       Q.      And Thielert Aircraft Engines is a

11   sister company based in Germany?

12       A.      Yes.

13       Q.      And what do they do?

14       A.      Thielert Aircraft Engines primarily is

15   a diesel engine manufacturer for the general

16   aviation market.  The relationship with Superior

17   is based upon their machining operations where

18   they do manufacture certain components of

19   Superior Air Parts, a critical component such as

20   our crankshaft, camshaft connecting rods and

21   solenoids (spelling?)

22       Q.      And what's the basis of their claims?

23   I understand the claim's somewhere around 15

24   million but there may be an account receivable of

25   how much offsetting that?

1      A.     Roughly two and a half to 3 million.

2      Q.     Okay.  So, let's say roughly $12

3    million in net debt.  How was that incurred?

4      A.     That was incurred through the

5    acquisition of the components that they

6    manufactured under a supplier agreement and the

7    Thielert Aircraft Engines agreed to continue

8    supplying the components to Superior Air Parts

9    knowing that Superior Air Parts could not pay

10   those debts.

11     Q.     And Superior, since the acquisition of

12   Thielert, hasn't had any other financing from any

13   other sources?

14     A.     The $2 million loan outstanding to

15   Thielert AG is the only other financing.

16     Q.     And Thielert AE Aircraft Engines is

17   also in an insolvency proceeding in Germany as

18   well, right?

19     A.     Yes, sir.

20     Q.     And is Thielert AE willing to continue

21   to provide this quantity of parts and credit for

22   the indefinite future to continue operating?

23     A.     Once they file for insolvency

24   proceedings, we began paying for all components

25   received from Thielert Aircraft.

1      Q.     So, essentially, your financing source

2   dried up?

3      A.     Yes.

4      Q.     Now, Mr. Ambercrombie, the efforts to

5   sell this company were led by Mr. Daniel Shank

6   (phonetically spelled), CFP Midcap (phonetically

7   spelled), an investment group of Germany,

8   correct?

9      A.     Yes, sir.

10     Q.     You had some involvement in the

11  process, but it was primarily led by him

12  answering to the Board of Directors, correct?

13     A.     Yes, sir.

14     Q.     Okay.  You may have also heard me

15  refer to an Affidavit where Textron had I believe

16  13, 15 people come meet at a management meeting

17  this summer.  Were you in that meeting?

18     A.     Yes, sir.

19     Q.     So, are you also aware of what  --

20  can you describe what due diligence you know of

21  that Textron went through in order to reach the

22  Asset Purchase Agreement?

23     A.     I'm specifically aware of the

24  management meetings that were incurred and

25  requests made for documentation and the access

1    granted to them for the data room activities, so

2    I'm aware of those.

3        Q.    Now, you also assisted us when we put

4    together schedules of PMA's tooling locations,

5    vendors for the last five years, customers, and

6    all the schedules attached to the APA, you were

7    involved in that as well, correct?

8        A.    Yes, sir.

9        Q.    And would you agree that took a

10    substantial amount of our time?

11        A.    Yes, sir.

12        Q.    And the negotiations with the APA took

13    over three weeks during the month of December,

14    did it not?

15        A.    Yes, sir.

16        Q.    And you incurred substantial

17    attorneys' fees in doing our side of

18    negotiations, correct?

19        A.    Yes.

20        Q.    And it appears like we had fewer

21    lawyers on it than they did.

22        A.    A few.

23        Q.    But they did a whole lot more writing.

24    In Mr. Shank's Affidavit, he testifies that he

25    contacted 76 petition inquirers, that 11 calls

1  them "investors" parties inquiring, that on

2  behalf of Superior he entered into 11

3  confidentiality agreements so people could

4  receive a due diligence starting in the Spring or

5  Summer of 2008 and that there were four

6  nonbinding offers received and there were

7  substantial negotiations with two to three

8  parties.

9       A.    Yes.

10      Q.    Do you have any information that

11  contradicts that representation with you today?

12      A.    No, sir.

13      Q.    For the purpose of disclosure, you

14  were a part of a group that also wanted to

15  acquire this company, correct?

16      A.    Yes, sir.

17      Q.    In fact, I've forgotten the name of

18  your client.  Mr. Leonard?

19            MR. LEONARD:  Aviation Parts Supply.

20      Q.    Okay.  Aviation Parts Supply.  Were

21  you at one point involved with a group called

22  "Aviation Parts Supply" trying to make proposals

23  to this company?

24      A.    Yes, sir.

25      Q.    At the same time you served as

1  President, correct?

2      A.    Yes, sir.

3      Q.    And did the company instill some

4  protections to protect you from information from

5  any allegations that you may be operating under a

6  conflict of interest?

7      A.    Yes, sir.

8      Q.    And, in fact, you didn't even know

9  what the Textron offer was for some time after it

10 was made?

11     A.    That is correct.

12     Q.    And even after you knew it was made,

13 you did not disclose that Textron offer to

14 anybody, did you?

15     A.    That is correct.

16     Q.    As you sit here today in your

17 fiduciary capacity as an officer and director

18 looking at how to get the most money for

19 creditors, is the Textron offer the highest and

20 best binding offer that we've received?

21     A.    Yes, it is.

22     Q.    Let's talk about your employees a

23 minute.  Is it true before the filing you had

24 about 35 employees?  Did I get that right?

25     A.    31 right before the filing.

 1      Q.      Well, a month before the filing, how

 2  many did you have?

 3      A.      41.

 4      Q.      And now you have approximately 15 key

 5  employees, including yourself?

 6      A.      Correct.

 7      Q.      And to reach those key employees, did

 8  you identify the people you thought would be

 9  necessary to protect the assets and to help

10  complete and consummate any sale transaction and

11  to assist in any due diligence efforts?

12      A.      Key employees identified for those

13  reasons, as well as our obligation to the FAA to

14  maintain our production certificates and

15  operations.

16      Q.      And along those lines, let me digress

17  a minute.  If a party complains of a part being

18  defective and notifies you of that, do you have

19  some continuing obligation to do some kind of

20  inquiry or investigation into that part?

21      A.      Yes, we're still required to report to

22  the FAA any part failings under FAA Part 21(3)

23  and we have an obligation to analyze, inspect and

24  investigate any such claim.

25      Q.      In fact, even this week you had a

1  mechanic advise you of a  --  had advised you of

2  a failure of a customer's airplane and you did a

3  determination, your staff did and it appeared

4  that the engine had run out of oil.

5      A.    Yes.

6      Q.    That would be an example of your

7  obligation to report back of any product failure?

8      A.    Yes, sir.

9      Q.    Thank you.  And that obligation is

10 continuing, is it not?

11     A.    Yes, sir.

12     Q.    You also have a IT person on staff, or

13 general contractor?

14     A.    On staff.

15     Q.    You also have people that have a lot

16 of the information, for example, the PMAs and the

17 background in their head?

18     A.    Yes, we have several staff in the

19 engineering in qualities area.

20     Q.    And what would be the impact on the

21 ability of us to have a successful sale and

22 distribution to creditors if these key employees

23 left?

24     A.    It would be very difficult to

25 consummate this  --  any sale without certain

1  employees within the positions that we've

2  identified.

3      Q.     I noticed you had a couple of

4  warehouse clerks on there.  Where would they be

5  critical?

6      A.     The warehouse clerks know where the

7  parts are, maintaining any type level of sales

8  and conduct any type of inventory, their

9  knowledge would be necessary to make any type of

10  transition easier.

11      Q.     In fact, the sale we have contemplated

12  with Textron requires an analysis of inventory

13  after the sale is approve to compare with the

14  beginning inventory, correct?

15      A.     Yes, sir.

16      Q.     So, in fact, they may be some of the

17  most critical employees?

18      A.     Yes, sir.

19      Q.     All right.  You're included as a

20  critical employee?

21      A.     Yes.

22      Q.     How did you arrive at our request of

23  essentially honoring vacation benefits and then

24  for the retained employees, paying them one

25  month's severance, how did you arrive at that in

1  trying to determine what it would take to retain

2  those employees?

3      A.     The company's policy has always been

4  to honor any vacation approved.  Without that,

5  since some of the employees had some significant

6  amounts of time accrued, any loss in that

7  approved vacation benefit would give them reason

8  to consider discontinuing their relationship with

9  Superior Air Parts, and also we felt the

10 severance, while modest, was necessary to try to

11 encourage individuals to maintain their

12 employment through any type of transition.

13     Q.     One other obligation you have in

14 closing, at least with Textron, and you can

15 expect with others is to do tagging of parts?

16     A.     8130 tagging.

17     Q.     What's 8130 tagging?

18     A.     8130 tag is an FAA document that can

19 be filled out by FAA-approved individuals.  We

20 have one within our company that authorizes the

21 shipment of those goods internationally, and for

22 critical components, it's required for the

23 shipments of serial number critical components

24 such as crankshafts and cylinders.

25     Q.     And you have one particular employee

1  that you believe would be critical for that

2  process?

3       A.     Yes.

4       Q.     Why is one particular person critical?

5       A.     They have the only designee from the

6  FAA.

7       Q.     So, they have to be a designated FAA

8  person?

9       A.     Yes, they have to be approved by the

10  FAA.

11       Q.     Now, if that person quit, you could go

12  find somebody with that designation, right?

13       A.     Yes, you can get contractors.

14       Q.     And would you expect it to cost more

15  than it's costing your employee even given it may

16  take giving an extra month's vacation to get a

17  third party?

18       A.     Significantly.

19       Q.     Do you have  --  let me give you a set

20  of exhibits.

21            MR. ROBERTS:  Your Honor, do you have

22  a set?

23            THE COURT:  I have one.

24            MR. ROBERTS:  Does the Court need

25  another one.

```
1              THE COURT:  You might give one to my
2   law clerk, Mr. Roberts.
3              MR. ROBERTS:  Okay.
4       Q.     (By Mr. Roberts)  Mr. Ambercrombie, I
5   would like you to turn to Number 5, the Debtor's
6   Cash Flow Projections.
7       Now, these are projections you put together
8   yesterday in preparation for today's hearing; is
9   that right?
10      A.     Yes, sir.
11      Q.     What is Week 2?  What -- on the
12  calendar, what week are we talking about?
13      A.     That's this week.
14      Q.     So, you're starting with this week and
15  you're doing forecasts going forward, correct?
16      A.     Yes, sir.
17      Q.     Now, if I'm reading this, and I go
18  down and look down "Cash balance in interim
19  period (sic), I will see what cash you have spent
20  through Week 14 and would see that if everything
21  goes as assumed on here, the company would have
22  about $659,000 in cash, correct?
23      A.     That's correct.
24      Q.     And that's without paying the $150,000
25  or so in state property taxes due in January,
```

1  right?

2      A.     I believe that's included in Week 5.

3      Q.     Or is that in there?  Where is that?

4      A.     Week 5.

5      Q.     Okay.  So, Week 2  --  can you tell me

6  off the top of your head what Week 14 is?

7      A.     End of March, I believe.

8      Q.     Now, what assumptions  --  now, let's

9  go at your cash inflow from customers.  What

10 assumptions did you make in reaching this

11 forecast?

12     A.     Our existing receivables as of the

13 beginning of this week would be collected at

14 approximately 70 percent.

15     Q.     Approximately how much are your

16 receivables?

17     A.     Approximately, excluding the two

18 aircraft engines, the portion of the receivable,

19 approximately $2 million.

20     Q.     Do you have any way of knowing having

21 been in a Chapter 11 in this company before what

22 our ability to collect accounts receivable will

23 actually be?

24     A.     No, sir.

25     Q.     Do you expect some parties to refuse

1   to pay accounts receivables based upon alleged

2   warranty claims?

3        A.     Yes, sir.

4        Q.     So, I understand that's your best

5   estimate on your collections?

6        A.     Yes, sir.

7        Q.     You didn't include any sales in this

8   projection, correct?

9        A.     Correct.

10       Q.     And you actually are making some sales

11  by buyers who still want to buy your parts; is

12  that right?

13       A.     Yes.

14       Q.     Why wouldn't you include sales in your

15  projection?

16       A.     In experience in knowing how long that

17  will continue as we're operating without a

18  warranty and the warranty is a desirable thing to

19  have within the aviation market.  We also don't

20  have any significant unforeseen activities or

21  payments to suppliers in here, and we view that

22  as potentially offsetting, some of those

23  unforeseen, and potential supplier activities.

24       Q.     You're also aware that creditors under

25  certain circumstances that delivered goods to the

1  Debtor within 20 days of the filing of the

2  ordinary course of business would have a right of

3  reclamation?

4      A.    Yes, sir.

5      Q.    Excuse me, would have an

6  administrative claim to be paid in full?  You

7  understand that?

8      A.    Yes, sir.

9      Q.    And that's not taking into account in

10 here?

11     A.    Correct.

12     Q.    You also are aware that creditors who

13 provide goods within 45 days and file a

14 reclamation claim may have a right to reclaim

15 their goods?

16     A.    Yes, sir.

17     Q.    And you've actually gotten one notice

18 of reclamation, have you not?

19     A.    Yes, we received one this month.

20     Q.    Any kind of impact from that is not

21 included in this?

22     A.    Correct.

23     Q.    In Week 10 you have a 477,000-dollar

24 operating expense which is significantly higher

25 than your operating expenses for other months.

1    Why is that?

2        A.    That also includes the product

3    liability insurance premium due March 1st.

4            MR. ROBERTS:  Your Honor, I'll pass

5    the witness.

6            THE COURT:  Does anyone else have any

7    questions for Mr. Ambercrombie?

8            MS. RUCKMAN:  Thank you, Your Honor.

9    Dee Ruckman on behalf of Textron and Avco

10   Corporation.  I just have a couple of questions.

11           THE COURT:  Okay.

12

13              CROSS-EXAMINATION

14   BY MS. RUCKMAN:

15       Q.    Mr. Kent (sic)  -- are you or does

16   Superior Air Parts have a current relationship

17   with Aviation Parts Supply, Inc.?

18       A.    I'm sorry?

19       Q.    Do you currently have any type of

20   relationship with Aviation Parts Supply, Inc.?

21       A.    I have not been in direct contact with

22   them and have no financial interest in that

23   organization at this time.

24       Q.    So, you have no relationship with them

25   personally?

```
 1        A.      Correct.

 2        Q.      Now, Avco Corporation was in

 3   negotiations with the Debtor in connection with

 4   this asset purchase.  And do you, sir, have a

 5   belief as to whether or not Avco Corporation is a

 6   viable corporation that will be able to close the

 7   Asset Purchase Agreement that it signed?

 8        A.      I'm not as familiar with the workings

 9   of Avco, but their parent company Textron, yes.

10        Q.      And Textron Corporation guaranteed all

11   the obligations of Avco Corporation under the

12   Asset Purchase Agreement, correct?

13        A.      Yes.

14        Q.      So, you believe these entities will be

15   able to perform and close on the Asset Purchase

16   Agreement; is that correct?

17        A.      Yes, I do.

18        Q.      Now, having this Asset Purchase

19   Agreement completed and having the Schedules

20   done, do you believe that that is helpful and

21   facilitates other bidders in making these bids

22   for these assets?

23        A.      Yes.

24        Q.      And is there also  --  and that is

25   also helpful to the creditors of this estate; is
```

1  that right?

2      A.     Yes.

3      Q.     Okay.  Thank you.

4          MS. RUCKMAN:  I Have no further

5  questions.

6          THE COURT:  Thank you.  Mr. Leonard,

7  do you have any questions?

8          MR. LEONARD:  Just one moment.  No,

9  Your Honor.

10         THE COURT:  Mr. Roberts, anything else

11 of the witness?

12         MR. ROBERTS:  No, Your Honor.

13         THE COURT:  You may step down,

14 Mr. Ambercrombie.

15         MR. ROBERTS:  Your Honor, that

16 concludes my presentation of evidence.

17         THE COURT:  Let's hear then the

18 stipulation between the parties regarding the

19 objections.

20         MS. RUCKMAN:  You want me to give it a

21 try?

22         MR. ROBERTS:  Sure.

23         MS. RUCKMAN:  Okay.  Your Honor, what

24 the parties have stipulated with respect to what

25 constitutes a qualified bid is that a qualified

1  initial bid shall be in the amount of

2  $12,350,000.  That's the 11,500,000-dollar cash

3  bid, plus the 500,000 topping and the 350,000

4  breakup fee, so the initial qualifying bid would

5  be $12,350,000.

6      Now, of that qualifying bid, only 4 million

7  of the bid need be a cash bid, and the balance

8  can be an assumption of debt that has been

9  released.

10     With respect to that assumption of debt

11  that's been released, the claim that was released

12  actually has to have been a claim; it can't be

13  manufactured claims here, so we'd be thinking in

14  terms of allowed claims, and that there has to be

15  evidence that the claim truly is released.  There

16  has to be some written documentation showing that

17  it's released or releases as of closing date.

18     We understand that this type of alternative

19  consideration may be difficult and cumbersome,

20  but from Textron and Avco Corporation's point of

21  view, we're willing to work with this process.

22          THE COURT:  Okay.  Mr. Leonard, does

23  that state your agreement?

24          MR. LEONARD:  Your Honor, Billy

25  Leonard.  Ms. Ruckman clearly she did state the

1  agreement.

2     Mr. Roberts, did you indicate what the

3  deadlines we agreed to were?  I don't recall.

4  The bids were due Thursday the 19th?

5          THE COURT:  The 19th I think was the

6  announcement.

7          MR. ROBERTS:  Presently February 19th.

8          MR. LEONARD:  And then the auction's

9  on the 24th.  And that satisfies our objection,

10  Your Honor.

11          THE COURT:  Thank you, Mr. Leonard.

12  Mr. Roberts, anything else?  Would you mind

13  before I stop for a minute just to address the

14  two concerns the U.S. Trustee has raised because

15  I think -- I tell you, I have a little issue on

16  the paying of more than the priority claim.  I

17  don't think I've ever done that, for one thing.

18          MR. ROBERTS:  Your Honor, I would like

19  to address that.  You've heard Mr. Ambercrombie

20  testify.  You've heard his experience and

21  background, and he is a key person to keep in

22  place throughout this process.  He is our source

23  of all information on this company on top of

24  running the company.

25     The fact that we go slightly over the $10,000

DARLA M. CHAVEZ, CSR (972) 296-7800

1   or go over the $10,000, I would ask the Court to

2   approve for the purposes of retaining him.  I,

3   again, don't think it goes over the severance

4   limits to do so.  And we have had no objections

5   from any other creditors, even though  --  or

6   customers or vendors for the last five years to

7   providing that to Mr. Ambercrombie.

8        I think the Court can probably tell, he has

9   an outstanding reputation by not drawing any

10  objections in this in time where people are

11  concerned about executive compensation, and I

12  would ask the Court to approve it, not because

13  it's all within the parameters of the priority,

14  but because it's within the parameters of

15  maintaining the most critical employee of this

16  process.

17            THE COURT:  And then the U.S. Trustee

18  seemed to object to the fixing of the bar date.

19            MR. ROBERTS:  Your Honor, I understand

20  we're asking for a very short bar date.

21            THE COURT:  Wouldn't it be about 50

22  days or so, is that about right?  Doing that in

23  my head.

24            MR. ROBERTS:  Well, we had asked for

25  --

```
 1            THE COURT:  Or even less than that
 2    maybe.  I was trying to look at a calendar at the
 3    same time that you were saying the dates.
 4            MR. ROBERTS:  Yes, Your Honor, I'm
 5    going to rather than testify from memory, I'm
 6    going to go back and look.
 7            THE COURT:  Yeah, slightly more than a
 8    month, right?
 9            MR. ROBERTS:  Yes, Your Honor.  I --
10    you know, we're trying to move as fast as we can.
11    If the Court has some concerns, we could move it
12    back some.  The thing is we're giving notice by
13    publication to people.  I think right now the
14    Clerk has set a bar date for last April just
15    automatically, April 29th or something like that.
16            THE COURT:  Yeah, and I was looking on
17    that.  It's set, you know, with that form that I
18    assume has probably already gone out to the  --
19    no, has not been mailed.
20            MR. ROBERTS:  Yes, and if you notice,
21    our notice is on the top, saying, notice of bar
22    date for filing of proof of claim, whatever
23    notice is sent, the Court set the date but we're
24    asking for an earlier date.  I don't have
25    particular concern one way or another over
```

1    government entities because we're not going to

2    have to worry about the IRS, and we know what our

3    tax claims are.  So, to the extent the U.S.

4    Trustee's concerned about government entities,

5    that's not the concern of  --  we're concerned if

6    we wait until the end of April, we're going to be

7    delaying for the purpose of  --  not for any

8    purpose, but to end up paying creditors less.

9         THE COURT:  Now, are you saying  --

10   as I heard you, one of the reasons that you want

11   to know your non-insiders claims is to help you

12   in the auction process; is that right?

13         MR. ROBERTS:  Yes, we have a bidder

14   here that's trying to get some flexibility in how

15   to bid, and we have the strange circumstance of

16   having no secured creditors, so you can't do a

17   bid where they can come in and say, "I'm going to

18   buy the lien and do a deal with the secured

19   lender and come in and give you a release of

20   secured lender and pay off all the unsecured

21   creditors."

22      If they're going to go in and buy clients or

23   make deals with particular creditors, the only

24   way I can avoid the absolute priority rule is by

25   making sure there's enough money in the deal to

1  pay the other creditors.  And that is our

2  concern.

3      And while they're in Court, they're not the

4  only person has made inquiries to us since this

5  filing about interest.  Now, who knows where

6  interest goes, but we have packaged this in a way

7  that others I think have moved quickly to express

8  interest.

9      So that when  --  our thinking was when we

10  filed this is, unless we know what that outside

11  number is  --  we don't have to know whether

12  they're valid  --  we got to know what that

13  outside number is, we may not know how to compare

14  competing offers, and that's why we asked for

15  that.

16          THE COURT:  Okay.  Mr. Leonard.

17          MR. LEONARD:  Your Honor, if I may

18  comment.  I think it's to our benefit to have it

19  be heard earlier because we'd love to be able to

20  know what the claims are prior to having to

21  submit an initial qualifying bid under the bid

22  process.

23          THE COURT:  So, you're thinking it

24  would help you in the process too; is that right?

25          MR. LEONARD:  Certainly.  In fact, the

1   bar date as it's being requested now is actually

2   two days after the  --

3          MR. ROBERTS:  I didn't see the date in

4   there.  What date  --  I'm sorry.  What date was

5   it?

6          MR. LEONARD:  The 21st, so that's

7   really --

8          MS. RUCKMAN:  The bid's due the 19th.

9          MR. LEONARD:  Bid's due the 19th, the

10  bar date's the 21st, so --

11         MR. ROBERTS:  I have a paralegal

12  that's outstanding that can put together a claims

13  analysis in short order, but she's not -- can't

14  do it today.  I know dates have been moving

15  around.  If the Court's inclined to shorten the

16  bar date, our bid deadline's the 19th, we'd

17  really need to have something by the 17th to be

18  able to just add the numbers I think.

19         THE COURT: Okay.  Anything else from

20  anybody?  We'll be recess for just a few minutes.

21  I'll come back and rule.

22         COURT CLERK:  All rise.

23              (Short recess)

24

25

```
 1                    (COURT'S RULING)

 2              THE COURT:  Mr. Roberts, it seems like

 3    you've got this case off to a good start.  I'm

 4    just going to go on my paper docket.

 5              The 364(c) Motion is granted. It's

 6    very simple, two-age Order, looks to me to be

 7    very clear.

 8              On the Motion for Order Authorizing

 9    the Debtor to Pay Pre-Petition wages, I'm

10    granting it in substantial part to allow

11    Mr. Ambercrombie the priority amount, but this

12    ruling is without prejudice to reurging the

13    request for the additional amount before Judge

14    Houser.

15              Let me just tell you my thinking on

16    that so you'll understand.  When I hear something

17    for another Judge, I'm very reluctant to go out

18    on a limb, but it makes me uncomfortable to begin

19    with, but certainly I think she would rather hear

20    something like that.

21              On the key employee severance that

22    seems to me to be reasonable and fair, granted.

23              On the bid procedures with the

24    agreement that's been reached, that's granted.

25              And the Motion for Order Setting Bar
```

```
 1   Date is granted except as to governmental

 2   entities.  Just so you know my thinking on that,

 3   my experience, including my employer,

 4   governmental entities simply don't work that

 5   fast, and they'll never be able to file a Proof

 6   of Claim by February is my experience.

 7              Anything further?

 8              MR. LEONARD:  Sir, what date is the

 9   bar date?

10              THE COURT:  It's the one that was

11   requested in Motion.

12              MR. ROBERTS:  Well, could we  --

13              THE COURT:  If you want to move it up

14   a day or so?

15              MR. ROBERTS:  Yes, if we could move it

16   to the 17th.

17              THE COURT:  That'd be fine, yeah, 17th

18   would be fine.

19              MR. LEONARD:  Thank you, Your Honor.

20              THE COURT:  Yeah, thank you for

21   bringing it to my attention.

22              MR. ROBERTS:  We'll submit the Orders

23   with revision.

24              THE COURT: Yeah, if you would, since I

25   heard this, you can just  --  you going to get it
```

P-R-O-C-E-E-D-I-N-G-S

1    done today you think, the Order?

2              MR. ROBERTS:  Yes.

3              THE COURT:  Okay.  If you could just

4    get them to route them to me, I'll sign them and

5    give them back to you this afternoon, all right?

6              MR. ROBERTS:  Would you like them

7    uploaded?

8              THE COURT:  They need to be uploaded.

9    They'll automatically come to Judge Houser

10   because they're a Houser case.  You can just tell

11   someone that they need to be sent over to me,

12   they'll route them to me once they get them.

13

14

15

16              (END OF PROCEEDINGS AT 11:13 A.M.)

17

18

19

20

21

22

23

24

25

P-R-O-C-E-E-D-I-N-G-S

```
 1

 2

 3                          CERTIFICATE

 4          I certify that the foregoing is a

 5   correct transcript from the electronic sound

 6   recording of the proceedings in the above-

 7   entitled matter.

 8

 9

10   _____

11    Darla M. Chavez, Transcriber

12        Dated:_____

13   **Note:  Any spellings not available to

14   transcriber are indicated with (phonetically

15   spelled)

16   **Note:  Areas not understood by transcriber are

17   marked by (unintelligible at* and then the number

18   corresponding to digital recording)

19

20

21

22

23

24

25
```