Stephen Roberts
Texas Bar No. 17019200
Robert P. Franke
Texas Bar No. 07371200
Duane J. Brescia
Texas Bar No. 240252650
**STRASBURGER & PRICE, LLP**
600 Congress, Suite 1600
Austin, Texas 78701
(512) 499-3600 / (512) 499-3660 Fax

**ATTORNEYS FOR DEBTOR SUPERIOR AIR PARTS, INC.**

## IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| **IN RE:** | § | **Case No. 08-36705** |
| | § | |
| **SUPERIOR AIR PARTS, INC.,** | § | **Chapter 11** |
| | § | |
| **Debtor.** | § | |
| | § | |

### DISCLOSURE STATEMENT OF
### SUPERIOR AIR PARTS, INC.

**MAY 15, 2009**

*THIS DISCLOSURE STATEMENT HAS BEEN FILED WITH THE BANKRUPTCY COURT, BUT HAS NOT YET BEEN APPROVED OR DISAPPROVED BY THE COURT.*

Table of Contents

Page

I.    INTRODUCTION...................................................................................................1
      A.    DISCLAIMERS ...........................................................................................1
      B.    BRIEF EXPLANATION OF CHAPTER 11........................................................1
      C.    THIS DISCLOSURE STATEMENT ...............................................................1
      D.    HISTORY OF THE DEBTOR .......................................................................3
      E.    EVENTS LEADING TO THE FILING............................................................5

II.   ASSETS AND LIABILITIES AT THE TIME OF FILING ...............................6

III.  SIGNIFICANT EVENTS IN CHAPTER 11 ....................................................6
      A.    OPERATIONS OF THE DEBTOR IN CHAPTER 11 ...........................................9

IV.   CURRENT ANALYSIS AND VALUATION OF DEBTOR'S PROPERTY ......9
      A.    REAL PROPERTY.......................................................................................9
      B.    PERSONAL PROPERTY................................................................................9
      C.    CAUSES OF ACTION..................................................................................9

V.    SUMMARY OF DEBTOR'S PLAN.................................................................10
      A.    SALE OF THE DEBTOR'S ASSETS ............................................................10
      B.    DISTRIBUTION OF PROCEEDS..................................................................11
      C.    TREATMENT OF ADMINISTRATIVE CLAIMS ...........................................12
      D.    CLASSIFICATION OF CLAIMS AND INTERESTS ........................................13
      E.    TREATMENT OF CLAIMS AND INTERESTS................................................13
      F.    IMPLEMENTATION OF THE PLAN .............................................................18
      G.    PROVISIONS GOVERNING DISTRIBUTION.................................................19
      H.    DISPOSITION OF CAUSES OF ACTION .....................................................20
      I.     EXECUTORY CONTRACTS AND LEASES ...................................................21
      J.     RESOLUTION OF DISPUTED CLAIMS........................................................21

VI.   MODIFICATION OF DEBTOR'S PLAN ........................................................21

VII.  RETENTION OF JURISDICTION.................................................................22

VIII. DISCHARGE....................................................................................................22

IX.   EXCULPATION AND RELEASE ..................................................................23

X.    MISCELLANEOUS PROVISIONS ...............................................................23

XI.   FEASIBILITY OF THE PLAN.......................................................................24

XII.  OTHER CONSIDERATIONS IN VOTING ON THE PLAN...........................24
      A.    ALTERNATIVES TO DEBTOR'S PLAN .......................................................24
      B.    TAX CONSEQUENCES................................................................................25
      C.    CONFIRMATION OF THE DEBTOR'S PLAN, VOTING PROCEDURES, AND
             REQUIREMENTS FOR CONFIRMATION OF A PLAN ....................................28

XIII. CONCLUSION ................................................................................................31

## I.    INTRODUCTION

Superior Air Parts, Inc. ("Debtor" or "Superior"), Debtor-in-possession in the above-styled case under Chapter 11 of the Bankruptcy Code, is proposing its Plan of Reorganization ("Plan") to the Court, the creditors, and all other parties-in-interest under which it will propose to sell its property under a proposed sale or sealed bidding process, if necessary, and use the proceeds to pay creditors according to the priorities set forth in the Plan.

DEFINITIONS: Capitalized terms used but not defined in this Disclosure Statement are defined in Article I of the Plan Statement.

## A.    DISCLAIMERS

NO REPRESENTATIONS CONCERNING THE DEBTOR PARTICULARLY AS TO ITS FUTURE INCOME, VALUE OF CURRENT ASSETS, OR THE VALUE OF ANY OTHER ASSETS TO BE CONSIDERED UNDER THE PLAN, ARE AUTHORIZED BY THE DEBTOR OTHER THAN AS SET FORTH IN THIS STATEMENT. ANY REPRESENTATIONS OR INDUCEMENTS MADE TO SECURE YOUR ACCEPTANCE WHICH ARE OTHER THAN AS SET FORTH IN THIS STATEMENT, SHOULD NOT BE RELIED UPON IN ARRIVING AT YOUR DECISION.

THE INFORMATION CONTAINED HEREIN HAS NOT BEEN INDEPENDENTLY AUDITED FOR INCLUSION HEREIN.

THIS DISCLOSURE STATEMENT IS INTENDED FOR THE SOLE USE OF CREDITORS AND OTHER PARTIES-IN-INTEREST OF THE DEBTOR TO ENABLE SUCH CREDITORS AND OTHER PARTIES-IN-INTEREST TO MAKE AN INFORMED DECISION ABOUT THE PLAN.

IF ANY IMPAIRED CLASS VOTES TO REJECT THE PLAN, THE DEBTOR MAY SEEK CONFIRMATION UNDER THE CRAM DOWN PROVISIONS OF § 1129(B) OF THE BANKRUPTCY CODE AND HEREBY GIVES NOTICE OF INTENT TO INVOKE THE CRAM DOWN PROVISIONS OF § 1129(B) IN THAT EVENT.

## B.    BRIEF EXPLANATION OF CHAPTER 11

Chapter 11 is the principal reorganization chapter of the Bankruptcy Code.  Upon the commencement of a Chapter 11 case, § 362 of the Bankruptcy Code provides for an automatic stay of all attempts to collect from the Debtor any claims which arose prior to bankruptcy filing or otherwise to interfere with a Debtor's property or business.  Under Chapter 11, a Debtor attempts to reorganize its business for the benefit of the Debtor, its creditors, and equity security holders in the formulation of a plan of reorganization.  In some instances, liquidation in Chapter 11 is preferable to liquidation in Chapter 7 because the rights and duties of the Debtor-in-possession in Chapter 11 can be utilized to greater maximize the value of the assets of the estate and increase the return to creditors. The legal requirements for Court approval, called "confirmation", of a plan are discussed in Article XII. A., Requirements for Confirmation of a Plan, of this Disclosure Statement.

## C.    THIS DISCLOSURE STATEMENT

Why You Have Received This Disclosure Statement.  You have received this Disclosure Statement ("Disclosure Statement") because the Debtor filed a Plan of Reorganization (the "Plan") with the Bankruptcy Court.  The Bankruptcy Court will hold a hearing on the adequacy of this Disclosure Statement on _____, 2009 at __:00 _.m. in the United States Bankruptcy Court, Northern District, 1100 Commerce Street, Dallas, TX  75242.  A copy of the Plan is enclosed with the materials that you have received.  This Disclosure Statement is provided pursuant to § 1125 of the Bankruptcy Code to all of the Debtor's known Creditors and other parties-in-interest whose claims are impaired in connection with the solicitation of acceptance of the Plan proposed by the Debtor.

Purpose of this Disclosure Statement.  The purpose of this Disclosure Statement is to provide such information as will enable a hypothetical, reasonable investor typical of the holders of Claims against the Debtor to make an informed judgment in exercising its right either to accept or reject the Plan.  The definitions in the Plan should be referred to in reading and analyzing the Plan and this Disclosure Statement.

Purpose of the Plan.  The purpose of the Plan is to provide a mechanism for the reorganization of the Debtor's assets and for the payment of Creditors. The Plan was developed by the Debtor after consulting with its respective financial and legal advisers, certain Creditors and other interested parties.  The Debtor believes that the Plan is more attractive than other alternatives, such as conversion to Chapter 7 liquidation or dismissal of the Chapter 11 Case. **EACH CREDITOR IS URGED TO READ THE PLAN.**

Bankruptcy Court Approval of this Disclosure Statement.  The Bankruptcy Court conducted a hearing on this Disclosure Statement and determined that it contains information of a kind in sufficient detail, adequate to enable a hypothetical, reasonable investor typical of the Classes being solicited to make an informed judgment about the Plan.

Sources of Information.  The information contained in this Disclosure Statement has been submitted by the Debtor unless specifically stated to be from other sources.

This Disclosure Statement contains only a summary of the Plan.  The Plan, which accompanies this Disclosure Statement, is an integral part of this Disclosure Statement, and each creditor is urged to read the Plan prior to voting.  In the event of any conflict between the information set forth in this Disclosure Statement and the Plan, the Plan language shall control.

The Debtor makes no representations with respect to the effects of taxation (state or federal) on the Creditors, and no such representations are authorized.  The Debtor' Creditors are encouraged to seek the advice of their own professional tax advisor(s) if they have any such questions.

Only Authorized Disclosure.  No party is authorized to give any information with respect to the Plan, other than what is contained in this Disclosure Statement or any other Disclosure Statement approved by the Court.  No representations concerning the Debtor, its business, or the value of its property have been authorized by the Bankruptcy Court, other than as set forth in this Disclosure Statement.  Any information, representations, or inducements made to obtain acceptance or rejection of the Plan other than, or inconsistent with, the information contained herein and in the Plan should not be relied upon by any entity in voting on the Plan.

Any representation or inducement made to you not contained in this Disclosure Statement or a Supplemental Disclosure Statement should be reported to the Debtor's attorney,

who shall deliver such information to the Bankruptcy Court for such action as may be appropriate.

This Disclosure Statement and accompanying exhibits will be transmitted by First-class Mail to all creditors who have either been scheduled by the Debtor, have filed a proof of claim, or properly requested notice under Bankruptcy Rule 2002.

## D.   HISTORY OF THE DEBTOR

History and Overview of the Debtor's Business.  Superior Air Parts, Inc. ("Debtor" or "Superior") is a Texas corporation located in Coppell, Dallas County, Texas which was formed in 1967 with the primary goal of supplying replacement parts for piston powered aircraft engines used by the United States Air Force and marketing such products commercially.  Superior became one of the largest suppliers of parts under Federal Aviation Administration's ("FAA") Parts Manufacturer Approval ("PMA") regulations for piston engines.  It provides Superior-brand parts for engines created by two primary original equipment manufacturers ("OEMs"), the Continental division of Teledyne Industries, Inc. and the Lycoming division of Textron, Inc. Superior is also an OEM for the (i) 180-horsepower Vantage Engine and (ii) Superior or owner-built XP-360 experimental engine.

Superior's customers generally are companies which perform maintenance and overhaul work in the general aviation industry.  The vast majority of these customers and engine shops are fully equipped facilities that are dedicated to major engine repairs and overhauls.  A number of these customers are also "Fixed Base Operators," which are companies that maintain facilities at airports to provide numerous aircraft services to the general aviation market including fuel sales, aircraft maintenance and repairs, parking, rentals, and pilot training.

Debtor's previous Chapter 11 bankruptcy.  In 1989 Superior was acquired by SP Acquisitions Corp. with financing and investment capital from GE Capital.  In 1994, Superior entered into a recapitalization transaction with Rice Mezzanine for the purpose of redeeming GE Capital's equity position and reduced its debt.  By 1995, Superior's interest expense and product liability insurance expenses and warranty expenses increased by $1.35 million while net sales decreased from $36.9 to $36.1 million. The mezzanine lenders loaned and invested an additional $2.0 million and senior management was replaced.  In 1996, Superior raised $4.0 million by selling its turbine engine line and used the funds to reduce its debt. Superior achieved its budgeted revenue and profit levels in the first two quarters of 1997 but suffered a lack of liquidity due to the recall of its 540 cylinder line and the refusal of certain key vendors' to extend credit.  As a result, Superior defaulted on its interest payment to its mezzanine lender and retained turnaround consultants.

Superior filed for protection under Chapter 11 on July 14, 1997 in the Bankruptcy Court for the District of Delaware.  On or about November 24, 1997 Superior confirmed a plan pursuant to which RSTW acquired the company.

In 2001 Superior, which had a number of parts distribution facilities across the country, decided to outsource the marketing and parts distribution to Aerospace Products International (API), an unrelated company and focus on developing engines and engine programs.  Within months, API closed all of the distribution centers and substantially reduced its efforts to market Superior parts.  Superior's efforts to develop engines and engine programs were not as successful as hoped due to limited financial resources and market conditions.

Purchase of Debtor by TAG.  In 2006, Thielert, AG ("TAG"), a German corporation, acquired 100% of the ownership interests of Superior and purchased the $10 million debt of Superior's senior secured lender and subordinated lenders which were secured by substantially all of the Debtor's assets.

TAG acquired Superior as part of a strategic plan to enter the North American market and expand engine offerings.  After the TAG acquisition, Superior was able to increase and maintain liquidity through 2008 because TAG continued to allow Superior to forebear from making any principal payments and Thielert Aircraft Engines GmbH ("TAE"), a German subsidiary of TAG, shipped substantial quantities of parts on credit and deferred payment indefinitely. By the time the case was commenced, TAE had shipped over $13 million in parts for which it had not been paid.

Superior's Financial Performance Since 2005.  Since 2005, Superior has experienced EBITDA loss and a total net loss each year.  A breakdown of Debtor's performance is as follows:

|  | Gross Sales | EBITDA | Net Income |
|---|---|---|---|
| 2005 | $25,714.775 | ($2,443,665) | ($5,171,469) |
| 2006 | $31,348,956 | ($2,879,352) | ($451,364) (Result of Thielert transaction and treatment of outstanding loans and interest) |
| 2007 | $31,140,083 | ($4,209,928) | ($5,635,053) |
| 2008 | $23,007,415 | ($3,576,304) | ($5,071,081) |

There are two separable components to the company: the PMA aftermarket parts business (the "Piece Parts Business"), and the Vantage and experimental engine lines (the "Engine Program").  The Piece Parts Business has experienced annual sales over the last few years of $12 to $15 million with margins over 40%.  Superior has F.A.A. Parts Manufacturing Certificates ("PMAs") for over 2000 parts. While the PMAs themselves are not transferable, the data packs, engineering, testing and intellectual property supporting those PMAs are, providing an opportunity to a buyer to obtain its own PMAs. Superior does not manufacture these parts; they are manufactured to Superior's specifications by a number of worldwide suppliers and Superior's supply chain remains virtually intact.

Superior also has a line of Millennium cylinders for Lycoming and TCM engines in the 115 hp to 330 hp range.  Sales in 2006 were $12.2 million at margins of 16%. In 2007, sales declined to $10 million due a cylinder redesign that stopped sales of certain cylinders for 6 months and also due to the lack of capacity of key suppliers at the time, including Superior's

German affiliate, TAE.   The capacity problem continued through 2008 as TAE's financial problems led it into a German insolvency proceeding, as described herein.

The certified Vantage and experimental engine programs comprising the Engine Program are an alternative to Lycoming engines in the 160 hp to 180 hp range. Only about 65 Vantage engines have been sold since they were certificated, but the purchase of the Vantage engine line is an opportunity for a buyer to enter the engine market now or in the future and at a price substantially less than the investment costs, delay, and risk in developing its own engine line.

Further information about the Debtor and its products can be found at http://www.superiorairparts.com.

## E.    EVENTS LEADING TO THE FILING

<u>Thielert AG Insolvency</u>.   On April 30, 2008, TAG filed an insolvency proceeding in Hamburg, Germany and Dr. Achim Ahrendt was appointed as the preliminary Insolvency Administrator.   TAE, which had been providing engine parts to Superior on credit, also filed an insolvency proceeding in Germany.   Dr. Ahrendt determined that it was in the best interest of TAG and Superior to sell Superior or its assets.   In June 2008, Superior hired Corporate Finance Partners Midcap GmbH ("CFP"), a German investment company based in Berlin, Germany to serve as its investment advisor and to seek possible suitors for Superior.

<u>Efforts to Sell Pre-Petition</u>.   CFP canvassed the market, negotiated with numerous potential purchasers, and enabled interested parties to conduct substantial due diligence. Specifically, CFP identified 76 potential investors (from Superior's industry, adjacent industries, as well as financial investors) world-wide, approached those investors, provided initial information about Superior as well as discussed with the investors their potential interest in acquiring Superior.   Eleven investors showed an initial interest and entered into Confidentiality Agreements with CFP.   To those investors, a detailed information package was made available and CFP requested those investors to submit an offer.   Four offers were received and due diligence was awarded to those investors, including access to a data room, containing detailed financial, operating and legal information and discussion with Superior management.

The two most interested and serious parties both required Superior to file for Chapter 11. The criteria of selection were the purchase price being offered as well as having the financial wherewithal to consummate a transaction such as Superior without a financing contingency (i.e. to provide maximum closing certainty).   Parallel negotiations and confirmatory due diligence was pursued. CFP handled this stage of the transaction process and the confirmatory due diligence phase, for which substantial additional information had to be prepared. Consequently, with two investors interested and being handled in parallel through CFP, a competitive bidding scenario was created.

<u>Purchase Agreement with Avco Corporation</u>.   As a result of those efforts, Superior entered into an asset purchase agreement on December 30, 2008 with Avco Corporation ("Avco"), a wholly-owned subsidiary of Textron Inc., the highest bidder to date, pursuant to which Avco agreed to buy substantially all of Superior's assets for $11.5 million, subject to adjustments for inventory reductions after October 31, 2008.

One of the conditions of the purchase agreement was that the purchase be consummated through a Chapter 11 bankruptcy proceeding.   This Chapter 11 case was filed to

liquidate the assets of Superior and to obtain the highest and best price for creditors, either through the purchase agreement with Avco or at a public auction.

## II.  ASSETS AND LIABILITIES AT THE TIME OF FILING

On December 31, 2008, the Debtor filed its schedules of assets and liabilities and a Statement of Financial Affairs required by the Bankruptcy Code.  Bankruptcy Schedule A lists ownership of real property.  Bankruptcy Schedule B lists personal property.  Amended schedules for certain categories are expected to be filed on or about May 18, 2009.

Real Property.  The Debtor did not own any real property.

Personal Property.  The Debtor's personal property consists primarily of cash on hand, inventory, accounts receivable, equipment, machinery, and tooling.  As of the date of filing, scheduled personal property was estimated to total $18,139,685.16 including approximately $412,000 in cash, $11,158,744 in inventory, $5,392,055 in accounts receivable, $156,287 in equipment and aircraft accessories, $116,870 in machinery and $779,408 in tooling The Debtor also owns Intellectual Property related to its PMAs, Type Certificates and Supplemental Type Certificates of undetermined value.  The Debtor has an $81,000 security deposit with its landlord, Texas Duggan Limited Partnership.

Liabilities.  The Debtor has conducted a claims analysis of potential allowed claims.  The Debtor calculated the claims listed as undisputed on its schedules, superseded by proofs of claims and any court orders adjudicating or affecting claims. The Debtor also reduced the potential allowed claims to the extent the Debtor has insurance to cover such claims. The Debtor's claims analysis is as follows:

Secured Tax Claims $74,617.82 (due in 2009)

Priority Employee Claims $56,144.43

Secured Claims (excluding Insiders) $227,620.42

General Unsecured Claims (excluding Insiders) $11,035,314

Insider Claims $28,354,871.28.

The Debtor estimates the valid amount of General Unsecured Claims is substantially less than these amounts and intends to file objections to disputed claims.  The amount of General Unsecured Claims may also increase due to claims arising out of the rejection of unsecured contracts.

## III.  SIGNIFICANT EVENTS IN CHAPTER 11

Superior's Efforts to Sell Substantially All of Debtor's Assets Free and Clear of Liens and Establish Auction Procedures:  On December 30, 2008, just prior to the commencement of this case, Superior entered into an asset purchase agreement with Avco Corporation ("Avco"), an affiliate of Textron Inc., wherein Avco agreed to buy substantially all of the Debtor's assets for $11 million, subject to adjustments for inventory reductions.

Superior filed a motion for approval of a bid procedure which was approved by this Court, and an accelerated bar date for claims was established.  Notice was given to all known creditors, and all owners of piston powered aircraft engines registered with the Federal Aviation Administration, and by publication in several industry publications.

The auction was conducted on February 25, 2009. The two bidders were Avco and TCM, an affiliate of Teledyne Industries, Inc.  The bidders were the manufacturers of piston powered aircraft engines in which many of the parts sold by Superior are installed and are competitors with Superior in the small aircraft parts business.  A sale to either of these purchasers raised anti-trust concerns with the United States Department of Justice and the state attorney general who initiated investigations to determine whether a sale would violate anti-trust laws. The parties were unable to reach an agreement on how to address these concerns and so the Debtor chose to decline their bids.

Since that time, Superior has continued to operate and sell parts and has continued its efforts to sell the company. While the Debtor has been in contact with several parties who have expressed an interest, no parties have come forward with a firm purchase offer, so Superior is proposing a plan to sell the company through a sealed bid process or, in the alternative, to liquidate.

Motion to Pay Prepetition Wages and Benefits.  The Debtor sought Court authority to pay certain pre-petition obligations to the Debtor's fifteen full-time employees and one independent contractor the Debtor retained after the filing, who were necessary to the consummation of a sale.  The pre-petition obligations included (1) amounts owed to the employees for wages, salaries, vacation pay, sick leave pay, holiday pay, jury duty pay, federal, state and local payroll related taxes, deductions and withholdings, payroll deductions in respect of various benefits, and reimbursement for business expenses; and (2) benefit claims of employees.  The Debtor sought authority to pay such expenses in accordance with existing Company policies and practices.

The Court approved the Motion to Pay Prepetition Wages and Benefits on January 9, 2009.

Employment of Professionals. On January 2, 2009, the Debtor sought to employ Stephen A. Roberts, Duane J. Brescia, and the law firm of Strasburger & Price, LLP ("Strasburger"), 600 Congress Ave., Suite 1600, Austin, Texas 78701 as counsel for Debtor. The employment was approved by the Court on February 20, 2009.

On January 7, 2009, the Debtor sought to employ Daniel Schenk and Capital Financial Partners, Midcap GmbH ("CFP"), as investment consultants.  The employment was approved by the Court on February 20, 2009.

Formation of Creditors' Committee and Employment of Committee Professionals. On January 29, 2009, the United States Trustee appointed an official committee of unsecured creditors (the "Committee"), which was amended on January 30, 2009.  The committee consists of the following creditors: Avstar, KSPG Automotive Brazil LTDA, Eck Industries, Inc., Hartford Aircraft Products, Seal Science, Inc., and Zanzi, S.p.A.

Baker & McKenzie, LLP was employed as counsel to the Committee by Order dated April 8, 2009.

Lain Faulkner & Co. was employed as financial adviser to the Committee by Order dated April 8, 2009.

Debtor's Adversary Proceeding to Avoid Lien of Thielert AG (Adv. Proc. No. 09-3052). TAG filed its proof of claim on February 11, 2009, asserting a secured claim in the amount of $10,146,611.11. The Debtor filed Adversary Proceeding No. 09-3052 on or about February 17, 2009 seeking to avoid the liens and security interests of TAG on the grounds that TAG failed to perfect its asserted lien against the Debtor's assets. There has been no resolution to this case as of the date of the filing of this Disclosure Statement, but a hearing on Debtor's Motion for Summary Judgment is set for June 22, 2009 at 9:00 a.m.

The Wrongful Death and Personal Injury Claims and Lawsuits. At the time the bankruptcy case was filed, there were numerous personal injury and wrongful death claims and lawsuits on file against the Debtor. These claims and lawsuits were disclosed in Debtor's schedules and statement of financial affairs. Although the Debtor believes that each of these claims and lawsuits, and the expenses associated therewith, including local counsel and expert witness fees, are covered by insurance, there have been no assurances made by the insurance carriers that issued the applicable polices that the insurers will assume, or have assumed, financial responsibility for defending the lawsuits.

Some of the underlying insurance policies provide for deductibles, self insured retentions, reimbursement obligations, fees and expenses and related costs that the insurance carriers have stated are the responsibility of the Debtor. Further, the insurance carriers have expressed the opinion that the Debtor's failure to assume responsibility for the payment of those items is a condition of the carrier's obligation to continue to provide a defense on behalf of the Debtor. Several claimants filed Motions for Relief from Stay, to which the Debtor objected. Orders were entered maintaining the stay if it would benefit the estate by preserving insurance costs or lifting the stay if it reduced claims or did not harm the estate.

Motion to Return Reclaimed Goods. The Debtor received written reclamation demands from four suppliers: Availl, Inc., Mahle Engine Components USA, Inc., Seal Science, Inc., and Emag Ignitions (TM) that all goods received by the Debtor within 45 days prior to the bankruptcy filing be returned.

Reclamation is limited to goods delivered 45 days prior to the bankruptcy filing. Reclaiming creditors must demand reclamation no later than 20 days after the date of commencement of the case. All of the demands were received by Superior on or before 20 days after the commencement of this case and the inventory items at issue were received by Superior within 45 days of the filing of this case and were delivered in the ordinary course of business. Upon receipt of each demand, Superior identified and segregated the remaining inventory on hand subject to the particular reclamation claim.

On or about March 5, 2009, Debtor filed its motion to return the reclaimed goods and agreed orders for the return of the remaining inventory and resolution of any residual claims have been submitted on the claims of Mahle, Availl, and Emag. An agreement with Seal Science has been reached and the Debtor expects a proposed agreed order to be submitted during the week of May 18 -22, 2009.

Application for allowance of 503(b)(9) Administrative Expense Claims. Creditors Combustion Technologies, Inc. and Ace Grinding & Machine, filed motions for allowance and payment of administrative expense claims pursuant to 11 U.S.C. § 503(b)(9) for goods delivered

within 20 days preceding the filing of the Chapter 11 bankruptcy case.  Agreed orders were entered on both motions allowing the administrative expense claims but denying immediate payment.  Payment to these creditors will be made in accordance with the confirmed Plan.

Two additional creditors, Helio Precision Products and Alcoa Fastening Systems, filed proofs of claim asserting claims under § 503(b)(9), which will be paid in accordance with the confirmed plan.

## A.    OPERATIONS OF THE DEBTOR IN CHAPTER 11

Since filing, the Debtor has operated as Debtor-in-Possession on a very limited basis. Superior stopped assembling cylinders and engines, eliminated its sales and marketing staff, reduced its employees from 25 to 15, and virtually ceased acquiring parts from its vendors in anticipation of the sale of its assets to Avco Corporation.  Now that this sale will not be consummated, Superior has recommenced acquiring parts to fill out its inventory and continue the Piece Parts Business in a limited capacity to serve its customers.  It has sufficient cash reserves to meet its ongoing obligations under the Bankruptcy Code.

The Debtor has filed monthly operating reports which provide detailed information regarding the financial condition and operations of the Debtor. To view the monthly operating reports, go to http://www.strasburger.com/SAPMORs or contact Ms. Angela J. Dunn, PLS Legal Administrative Assistant, Strasburger & Price, LLP at angela.dunn@strasburger.com or 512-499-3643.

## IV.    CURRENT ANALYSIS AND VALUATION OF DEBTOR'S PROPERTY

## A.    REAL PROPERTY

The Debtor does not own any real property.

## B.    PERSONAL PROPERTY

The Debtor's personal property consists primarily of cash on hand, inventory, accounts receivable, equipment, machinery, and tooling totaling $17,172,437.  The Debtor had approximately $3,748,686 in cash as of May 14, 2009.  The current value of the inventory is $7,736,090; accounts receivable $5,066,852; equipment $29,324.37; machinery $116,869.81; and tooling $474,616.83.  The Debtor also owns Intellectual Property related to its PMAs, Type Certificates and Supplemental Type Certificates of undetermined value.

## C.    CAUSES OF ACTION

Fraudulent Transfer and Voidable Preference Claims.  Fraudulent Transfer and Voidable Preference Claims.  Under Chapter 5 of the Bankruptcy Code, the bankruptcy estate has the right to recover property of the Debtor which was conveyed fraudulently or for less than reasonably equivalent value while the Debtor was insolvent ("Fraudulent Transfers").  The bankruptcy estate is also entitled to recover payments made to creditors on existing, legitimate debts where such payments were to insiders within one year of the bankruptcy filing or to anyone else, including vendors, within 90 days of the bankruptcy filing ("Voidable Preferences"). There are certain defenses that payees may assert to defeat Voidable Preference claims, the most common one being that the payment was made timely, in the ordinary course of business and according to ordinary business terms.  Moreover, for a payment to be a Voidable

Preference, it must enable the payee to receive more than the payee would have received in a Chapter 7 liquidation had the payment not been made. Accordingly, a payment to a fully secured creditor would not be a Voidable Preference. Similarly, payments to employees, whose claims have priority over the claims of general unsecured creditors in Chapter 7 liquidation, are rarely Voidable Preferences.

In the 90-days preceding the chapter 11 filing, Debtor made $3,079,674 in payments to creditors. See attached *Exhibit A.*

In the 12-months preceding the chapter 11 filing, Debtor made $1,338,954 in payments to insiders. See attached *Exhibit B.*

Cause of Action Against Thielert AG: TAG is the owner of all of Superior's outstanding shares, and claims a security interest in substantially all of Superior's assets, which consist solely of personal property. TAG filed a Proof of Claim in this case asserting a secured claim in the amount of $10,146,611.11. Debtor filed its adversary proceeding against TAG pursuant to its "Avoidance Powers" under 11 U.S.C. § 544. The lawsuit seeks to avoid the lien and security interest of TAG because TAG failed to maintain perfection of its security interest in Superior's assets.

**V.**      **SUMMARY OF DEBTOR'S PLAN**

THE FOLLOWING DISCUSSION IS A GENERAL OVERVIEW OF THE PLAN ONLY. IT IS NOT INTENDED TO MODIFY THE TERMS OF THE PLAN IN ANY WAY. THE PLAN IS ENCLOSED WITH THIS DISCLOSURE STATEMENT. CREDITORS ARE URGED TO READ THE PLAN IN ITS ENTIRETY.

**A.     SALE OF THE DEBTOR'S ASSETS**

The Debtor will sell its assets to the highest bidder under a Sealed Bid Sales Procedure to be approved by the Court and the sale ("Sale") will be approved in the Order confirming this Plan. If the bids are not acceptable, the Debtor will liquidate its assets. In either case, all remaining existing assets and the proceeds ("Proceeds") of the Sale will be distributed to the creditors as provided in the Plan.

Prior to approval of the Disclosure Statement, the Debtor will file a Motion for Approval of Sealed Bid Procedures and will propose to sell its assets as follows:

Bidders may submit a Sealed Bid on the Bid Date on any of the following:

(1) All of the Debtor's assets (except the Debtor's cash and cash equivalents) or the cancellation of existing Equity Interests and the issuance of New Equity under the Plan; or

(2) The Debtor's Piece Parts Business; or

(3) The Debtor's Engine Program.

A Bidder may submit a bid for the issuance of New Equity under the Plan and provide for the spinoff of the Debtor's Engine Program to an entity for the benefit of creditors, rather than bidding to acquire the Piece Parts Business in an asset purchase.

The Sealed Bid must be in substantially the same form as provided by the Debtor under the Sealed Bid Sales Procedure and shall not have any conditions to closing except for the entry of an unstayed Order confirming the Plan containing terms authorizing and approving the sale free and clear of all claims and interests or creditors and equity security holders pursuant to § 1141 of the Code. Cash and cash equivalents will be excluded. PMAs are not transferable as a matter of law and so they will not be transferred. Any Bid may exclude any assets, in the discretion of the Bidder, and shall provide for the assumption or rejection of executory contracts, and may provide for the assumption of specified liabilities provided that such assumption does not violate the absolute priority rule under § 1129(b) of the Code.

If the Bid on all of the Debtor's Assets exceeds the aggregate bids on the Piece Parts Business and the Engine Program, then such Bid shall be the High Bid. The High Bid will be incorporated in the Plan if it is accepted by the Creditors' Committee and by TAG.  If it is not so accepted, it will be rejected and not incorporated in the Plan.  If the aggregate bids on the Piece Parts Business and the Engine Program are higher than the highest bid on all of the Debtor's Assets, then those Bids shall be the High Bids.  The High Bid on the Piece Parts Business will be incorporated in the Plan if it is accepted by the Creditors' Committee and TAG.  The High Bid on the Engine Program will be incorporated in the Plan if it is accepted by the Creditors Committee and TAG.

If the High Bid on the Piece Parts Business is not accepted, then the Piece Parts Business will be liquidated pursuant to the Plan.  If the High Bid on the Engine Program is not accepted, then the Engine Program will be liquidated pursuant to the Plan.

All assets conveyed under the Plan, whether through sale or liquidation, will be conveyed without warranty and will be conveyed free and clear of all claims and interests or creditors and equity security holders pursuant to § 1141 of the Code.

## B.    DISTRIBUTION OF PROCEEDS

Distributions under the Plan will first be made to holders of Administrative Claims, then holders of Priority Claims. Then, a preferential distribution of $500,000 will be paid to TAE in full settlement of its claim.  The remaining assets, whether they are cash or cash equivalents or Proceeds of the Sale, shall be distributed to the General Unsecured Creditors and TAG as follows:  the first $3.0 million will be distributed 2/3 to the General Unsecured Creditors on a pro-rata basis, and 1/3 shall be distributed to TAG.  Any existing assets and Proceeds of the Sale in excess of $3.0 million will be distributed 20% to the General Unsecured Creditors on a pro-rata basis, and 80% to TAG.

Notwithstanding the foregoing distribution Plan, if the Piece Parts Business is not sold to a Bidder under the Plan, then the IP Assets related to the Piece Parts Business will be retained by the Debtor free and clear of any claims of creditors or conveyed to TAG or its designee, at its option, in partial satisfaction of its claims. If the Engine Program is not sold to a Bidder under the Plan, then the Engine Program will be retained by the Debtor free and clear of any claims, or assigned to TAG or its designee, at its option, in partial satisfaction of its claims.  Any proceeds from the liquidation of any IP Assets retained by the Debtor will be paid to TAG.

In consideration for TAE's and TAG's agreement to receive less favorable treatment than the General Unsecured Creditors, the claims of TAE and TAG will be deemed to be Allowed Claims and TAE and TAG will be released from of any all claims and causes of action by or through the Estate and the Debtor .

After the Plan is confirmed, TAG will retain 100% of the outstanding shares of the Debtor, unless New Equity is issued to a Bidder under the Plan.  Any remaining Property of the Estate will revert to the Debtor, and the Debtor will liquidate any unsold assets in accordance with the Liquidation Procedures under the Plan, pursue any causes of action not conveyed under the Plan, except any cause of action under Chapter 5 of the Code, and make the distributions required by the Plan. If New Equity is issued to a purchaser under the Plan, then all assets not conveyed to the holder of the New Equity will be conveyed to an entity to be owned by TAG which shall be assigned all rights and perform all of the post-confirmation duties of the Debtor.

The existing Creditors Committee may select a Post-Confirmation Committee consisting of up to 5 members having Allowed Claims in excess of $10,000 each, which will have the authority to pursue any Chapter 5 causes of action, monitor the Debtor's compliance with the Plan, and object to any claims.  Any fees and expenses of the Post-Confirmation Committee and its professionals will be deducted from the payments to the General Unsecured Creditors.  The Committee will be terminated upon the completion of payments to the General Unsecured Creditors under the Plan.

All costs of any Sale shall be paid at closing in accordance with the sales contract approved by the Court prior to payment to any Class of Claims under the Plan.

The Effective Date of the Plan shall be the date of closing of the Sale contemplated by the Plan and approved by the Court. If no Sale is contemplated by the plan, then the Effective Date will be 11 days after the Confirmation Date.

Upon closing, the Debtor will pay the post-petition expenses it has incurred pursuant to its authority under §363 of the Code and the Allowed Administrative Claims of professionals. The Debtor will establish a reserve for estimated Administrative Claims of professionals which have not been allowed as of the Closing Date, estimated costs and professional fees of the Debtor to be incurred in connection with the implementation of the Plan and the resolution of pending objections to claims by the Debtor and counterclaims by the Debtor which must be resolved to effectuate the terms of the Plan and the distributions to creditors.  The size of this reserve depends upon whether parties accept the compromises offered to them under this Plan and the objections and counterclaims that are not resolved by the Closing.  The Debtor will also establish a reserve for disputed claims that are not Allowed Claims as of the Closing.

## C.    TREATMENT OF ADMINISTRATIVE CLAIMS

As provided in § 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims are not classified for purposes of voting or receiving distributions under the Plan; rather, such Claims shall be treated on the terms set forth in Article II of the Plan.

Except to the extent that the holder of an Administrative Expense Claim may otherwise agree in writing, Administrative Expense Claims which are Allowed Claims prior to the Effective Date of the Plan shall be paid in full on or before the Effective Date of the Plan.  The Distributor Agent (the Post-Confirmation Debtor, unless the Court names another party) must pay in full all Allowed Administrative Expense Claims at closing on the Closing Date and such payment shall be a condition of closing.  Administrative Expense Claims which become Allowed Claims after the Closing Date shall be paid by the Distributor Agent within ten (10) business days after the Distribution Agent is served with an order of the Bankruptcy Court allowing such fees.  The Bankruptcy Court shall retain jurisdiction to compel such payment and any action to compel

such payment shall be initiated by motion of a party and be treated as a contested matter under Bankruptcy Rule 9014. Administrative claims are estimated to total approximately $750,992.82. This is made up of approximately $650,000 in professional fees and expenses and $100,992.82 for administrative claims allowed under 11 U.S.C. § 503(b)(9), claims for goods delivered and received within 20 days prior to the Petition Date. This number may change if the Debtor has any unpaid expenses at the Effective Date from operations.

The deadline to file an application for allowance and payment of an administrative expense claim is 30 days after the Effective Date. Failure to file such a request shall constitute waiver of such claim.

**D.    CLASSIFICATION OF CLAIMS AND INTERESTS**

| Class | Description |
|---|---|
| 1 | Secured Tax Claims |
| 2 | Priority Tax Claims |
| 3 | Priority Non-Tax Claims |
| 4 | AICCO, Inc. |
| 5 | Earvin Leasing Company |
| 6 | Great America Leasing Corporation |
| 7 | Tigris Vendor Finance, Inc. f/k/a US Express Leasing |
| 8 | Secured Claim of National City Commercial Capital |
| 9 | General Unsecured Creditors |
| 10 | Unsecured Claim of TAE |
| 11 | Unsecured Claim of TAG |
| 12 | Interests |

**E.    TREATMENT OF CLAIMS AND INTERESTS**

CLASS 1:  SECURED TAX CLAIMS

Class 1 Secured Tax Claims consist of the claims of all taxing authorities, if any, whose claims are secured by assets of the estate. The total filed proofs of claim in Class 1 are approximately $87,418.51. However, several proofs of claim filed by taxing authorities have already been paid, and are thus objectionable. The remaining claims are actually for 2009 taxes, which are not yet due, but certain taxing authorities have a current lien as of January 1, 2009. The Debtor estimates that this class totals $70,617.82.

Class 1 Claims will have their liens reinstated in the same validity, priority and extent to its pre-petition lien until such claim is paid in full. Secured Tax Claims will receive cash payments equal to 100% of their Allowed Claims when they become due. If assets are sold to any buyer according to the Plan, the balance of any Class 1 claims, not paid prior to Closing, will be paid at Closing.

The Class 1 Claims are Unimpaired under the Plan and, accordingly, are not entitled to vote on the Plan.

For convenience of identification, the Plan describes the Allowed Secured Tax Claims in Class 1 as a single Class. Class 1 Claims actually consist of separate subclasses, each based on the underlying property securing such Claim, and each subclass is treated hereunder as a distinct Class for treatment and distribution purposes and for all other purposes under the Bankruptcy Code.

CLASS 2:  PRIORITY TAX CLAIMS

Class 2 Priority Tax Claims consist of any Claim entitled to priority in payment under § 507(a)(8) of the Bankruptcy Code. The Debtor does not believe that any claims in this class exist. However, filed proofs of claim in this Class total approximately $23,936.37, which the Debtor disputes, and objections to these claims are anticipated to be filed.

Allowed Class 2 Claimants will receive a distribution in cash on the Effective Date of the Plan from all of the remaining existing assets and Proceeds of the Sale, after payment of Administrative Claims, until paid in full. Class 2 Claims will be paid in *pari-passu* with the Class 3 Claims.

The Class 2 Claims are Unimpaired under the Plan and, accordingly, are not entitled to vote on the Plan.

CLASS 3:  PRIORITY NON-TAX CLAIMS

Class 3 Priority Non-Tax Claims consist of all Allowed Priority Claims given priority payment status pursuant to § 507(a) of the Bankruptcy Code except Administrative Claims under § 507(a)(1) and Priority Tax Claims under § 507(a)(8). The Class 3 Claims are estimated to total $56,144.43. These claims include all accrued vacation and other benefit pay of employees of the Debtor.

Allowed Class 3 Claimants will receive a distribution in cash on account of their Allowed Claims on the Effective Date of the Plan from all of the remaining existing assets and Proceeds of the Sale until paid in full. Class 3 Claims will be paid in *pari-passu* with the Class 2 Claims. *Provided*, however, if a Buyer decides to continue to operate the business of the Debtor after Closing, and any employee holding an Allowed Class 3 Claim is offered employment with the Buyer and accepts such employment, the Buyer will assume the liability for such Class 3 Claim and such employee will be deemed to have waived any payment on account of their Class 3 Claim.

The Class 3 Claims are Unimpaired under the Plan and, accordingly, are not entitled to vote on the Plan.

CLASS 4:  SECURED CLAIM OF AICCO, INC.

The Class 4 Claim of AICCO, Inc. consists of the finance charges for the insurance premiums paid pursuant to Debtor's product liability insurance with several carriers for pistons only. The collateral for this claim is any refund upon cancellation. The Class 4 Claim was filed in the amount of $41,797.70, but through monthly post-petition payments permitted by an agreed order approved by the Court, this claim will have been completely satisfied by July 1, 2009. Therefore, the Debtor intends to object to this claim to reduce it to the proper amount. The value of the collateral securing such Claim is equal to that amount.

The Allowed Class 4 Claim will retain its lien on the collateral and will be paid in full out of any refund due upon cancellation of the policy with the carriers; provided, however, that if the Closing of any sale occurs after July 1, 2009, the claim will have already been satisfied in full and no further treatment is required.

The Class 4 Claim is Unimpaired under the Plan and, accordingly, is not entitled to vote on the Plan.

CLASS 5:  SECURED CLAIM OF ERVIN LEASING COMPANY

The Class 5 Claim consists of the secured claim of Erving Leasing Company, the collateral for which is an oil machine to clean parts.  The Class 5 Claim is estimated to be $3,959.06 and the value of the collateral securing such Claim is estimated to be equal to that amount.

The Allowed Class 5 Claim shall receive one of the following two treatments on the Effective Date, depending upon whether a Buyer chooses to take an assumption and assignment of the contract comprising this claim: (1) return of the collateral in full satisfaction of the Claim or (2) if a Buyer elects to purchase the collateral, then this Claim shall retain its lien on the collateral in the same validity, priority and extent as it was pre-petition and the Buyer will assume all future payments on the same terms and conditions until paid in full.

The Class 5 Claim is Impaired under the Plan and is entitled to vote on the Plan unless a Buyer elects to purchase the collateral, in which case, the Claim is Unimpaired and is not entitled to vote on the Plan.

CLASS 6:  SECURED CLAIM OF GREAT AMERICAN LEASING CORPORATION

The Class 6 Claim consists of the secured claim of Great American Leasing Corporation, the collateral for which is the Debtor's phone system.  The Class 6 Claim is estimated to be $13,524.47 and the value of the collateral securing such Claim is estimated to be equal to that amount.

The Allowed Class 6 Claim shall receive one of the following two treatments, depending upon whether any Buyer chooses to take an assumption and assignment of the contract comprising this claim: (1) return of the collateral in full satisfaction of the Claim or (2) if a Buyer elects to purchase the collateral, then this Claim shall retain its lien on the collateral in the same validity, priority and extent as it was pre-petition and the Buyer will assume all future payments on the same terms and conditions until paid in full.

The Class 6 Claim is Impaired under the Plan and is entitled to vote on the Plan unless a Buyer elects to purchase the collateral, in which case, the Claim is Unimpaired and is not entitled to vote on the Plan.

CLASS 7:  SECURED CLAIM OF TIGRIS VENDOR FINANCE, INC., F/K/A US EXPRESS LEASING

The Class 7 Claim consists of the secured claim of Tigris Vendor Finance, Inc. f/k/a US Express Leasing, the collateral for which is all of the debtor's printers, copiers and fax machines.  The Class 7 Claim is estimated to be $67,329.40 and the value of the collateral securing such Claim is estimated to be equal to that amount.

The Allowed Class 7 Claim shall receive one of the following two treatments, depending upon whether any Buyer chooses to take an assumption and assignment of the contract comprising this claim: (1) return of the collateral in full satisfaction of the Claim or (2) if a Buyer elects to purchase the collateral, then this Claim shall retain its lien on the collateral in the same validity, priority and extent as it was pre-petition and the Buyer will assume all future payments on the same terms and conditions until paid in full.

The Class 7 Claim is Impaired under the Plan and is entitled to vote on the Plan unless a Buyer elects to purchase the collateral, in which case, the Claim is Unimpaired and is not entitled to vote on the Plan.

CLASS 8:  SECURED CLAIM OF NATIONAL CITY COMMERCIAL CAPITAL COMPANY

The Class 8 Claim consists of the secured claim of National City Commercial Capital Company, the collateral for which is a CMM parts measuring machine used for quality assurance.  The Class 8 Claim is estimated to be $123,839.19 and the value of the collateral securing such Claim is estimated to be equal to that amount.

The Allowed Class 8 Claim shall receive one of the following two treatments, depending upon whether any Buyer chooses to take an assumption and assignment of the contract comprising this claim: (1) return of the collateral in full satisfaction of the Claim or (2) if a Buyer elects to purchase the collateral, then this Claim shall retain its lien on the collateral in the same validity, priority and extent as it was pre-petition and the Buyer will assume all future payments on the same terms and conditions until paid in full.

The Class 8 Claim is Impaired under the Plan and is entitled to vote on the Plan unless a Buyer elects to purchase the collateral, in which case, the Claim is Unimpaired and is not entitled to vote on the Plan.

CLASS 9:  GENERAL UNSECURED CLAIMS

Class 9 General Unsecured Claims consist of all other Allowed Claims against the Debtor not placed in any other Class.  This class includes all trade creditors, claims based upon open purchase orders to be rejected, claims for rejected executory contracts, warranty claims, loss of warranty claims (where no actual loss has yet been identified), and injury claims subject to insurance.  The total filed claims in Class 9 are approximately $11,035,314.  However, the Debtor disputes a significant number of these claims and may, with the consultation and participation of the Committee, object to many of them if the potential savings can justify the cost of pursuing the objections.  The Debtor estimates that the total value of valid claims is no greater than $8,817,905 and could be considerably less.

After payment of the Administrative Claims, Classes 2 and 3 described above, and the Class 10 Unsecured Claim of TAE, Allowed Class 9 Claims will receive a pro-rata distribution in cash of two-thirds (2/3) of the first $3.0 million in remaining existing assets and Proceeds of the Sale.  Allowed Class 9 Claims shall also receive a pro rata distribution in cash of 20% of the remaining Proceeds of the Sale in excess of $3.0 million.

The Class 9 Claims are Impaired under the Plan and, accordingly, are entitled to vote for or against the Plan.

CLASS 10:  UNSECURED CLAIM THIELERT AIRCRAFT ENGINES GmbH (TAE)

Class 10 Claim consists of the unsecured claim of TAE, an affiliate of the Debtor.  TAE filed a proof of claim in the amount of $18,208,260.17.  The Committee contends that TAE's claim should either be subordinated or re-characterized as equity.

The Class 10 Claim will be Allowed in the amount of $500,000; and, after payment of the Administrative Claims, and Classes 2 and 3 described above, will receive in cash on the Effective Date the next $500,000 in existing assets and Proceeds of the Sale in full satisfaction of the claim and will be released from any and all claims or causes of action by or through the Debtor or the bankruptcy estate.

The Class 10 Claim is Impaired under the Plan and, accordingly, is entitled to vote for or against the Plan.

<u>CLASS 11:  UNSECURED CLAIM OF THIELERT AG (TAG)</u>

The Class 11 Claim consists of the unsecured claim of TAG, the parent company of the Debtor, who purchased the existing secured debt of the Debtor when it acquired the Debtor's stock.   TAG filed a proof of claim in the amount of $10,146,611.11 as a secured claim.  However, the Debtor has filed an Adversary Proceeding to avoid the lien of TAG, asserting that it is unperfected and thus, avoidable under 11 U.S.C. § 546.  No resolution has been reached in the Adversary Proceeding.  In addition, the Committee contends that TAG's claim should either be subordinated or re-characterized as equity.

After payment of the Administrative Claims, Classes 2, 3, and 10 described above, the Class 11 Unsecured Claim of TAG will receive a distribution in cash of one-third (1/3) of the first $3.0 million in remaining existing assets and Proceeds of the Sale.  The Allowed Class 10 Claims shall also receive 80% of the remaining Proceeds of the Sale in excess of $3.0 million; provided, however, that if the Debtor cannot sell its Engine Program either through an asset sale or a stock sale, then all assets comprising the Debtor's Engine Program shall revest in the Debtor free and clear of any claims, or assigned to TAG or its designee, at its option in partial satisfaction of its claims.  In addition, if the Debtor cannot sell its Piece Parts Business through an asset sale or stock sale, then all IP Assets comprising the Piece Parts Business shall revest in the Debtor free and clear of any claims, or assigned to TAG or its designee, at its option in partial satisfaction of its claims.

The Class 11 Claim is Impaired under the Plan and, accordingly, is entitled to vote for or against the Plan.

<u>CLASS 12:  INTERESTS IN THE DEBTOR</u>.

The Class 12 Interests consists of 100% of equity interests of the Debtor, which is held by TAG.

It is not anticipated that there will be any remaining Proceeds to pay the Allowed Class 12 Interests.  To the extent remaining Proceeds are available, then the Class 12 Interests shall retain all Proceeds of Sale and the Debtor's Available Cash after all other classes are paid in full as provided above.

The Class 12 Interests are comprised of the 100% shareholder of the Debtor and, accordingly, is not entitled to vote for or against the Plan.

## F.      IMPLEMENTATION OF THE PLAN

Effective Date.  If the Plan is approved by the Court, an Order Confirming the Plan will be signed.  The Effective Date of the Plan shall be the date the Sale contemplated under the Plan closes.   If no assets are sold under the Plan, then the Effective Date shall be eleven (11) days after the Order confirming the Plan is entered.

Notice of the Effective Date.  The Debtor shall file and serve a Notice of Occurrence of the Effective Date to all Creditors on the last-filed matrix and on all parties requesting notice.

Vesting of Assets.  Upon the Effective Date of the Plan, all Assets of the bankruptcy estate not otherwise transferred in accordance with the Plan shall vest in the Debtor.  If New Equity is issued to a purchaser under the Plan, then all assets not conveyed to the holder of the New Equity will be conveyed to an entity to be owned by TAG which shall be assigned all rights and perform all of the post-confirmation duties of the Debtor.

Sale of Substantially All Assets.  The Debtor will sell its Assets to the highest bidder(s) under a Sealed Bid Sales Procedure to be approved by the Court and the sale ("Sale") will be approved in the Order confirming this Plan.  The terms and conditions of the sale are as follows:

*Sealed Bid Procedure*:   The Sealed Bid Procedure was approved by the Bankruptcy Court on _____, 2009, and can be accessed at http://www.strasburger.com/SAPMORs or by contacting Ms. Angela J. Dunn, PLS Legal Administrative Assistant, Strasburger & Price, LLP at angela.dunn@strasburger.com or 512-499-3643.  The Sealed Bid Procedure shall result in a Sale of the Assets to the Successful Bidder(s), as more fully described in the Sealed Bid Procedure.

*Assets to Be Purchased*.  The assets ("Assets") to be purchased consist of all of the Debtor's assets comprising the Piece Parts Business and the Engine Program, as defined in the Plan.  Subject to full payment of the Purchase Price and all other conditions in the Sealed Bid Procedure, the included Assets will be sold free and clear of all liens, claims, and encumbrances to the fullest extent allowed under § 363(f) of the Bankruptcy Code, with certain exceptions, as provided for in the Bidding Procedure.

*Excluded Assets*.  Excluded Assets, as described in this Plan, shall consist of the Debtor's cash and cash equivalents, non-transferable PMAs and Chapter 5 Causes of Action.

*Sale Hearing*.  A sale hearing shall be conducted as part of the Confirmation Hearing.  The order approving the Sale(s) to the Successful Bidder(s) shall be the Confirmation Order.  Prior to the Confirmation Hearing, the Debtor shall file a Notice of Proposed Sale to be served upon the approved Service List in the Sealed Bid Procedure.  The Notice of Proposed Sale shall identify the Successful Bidder(s), the Assets proposed to be sold to each Bidder, an Allocation of the Purchase Price for each Asset, and a proposed Distribution of the Sale Proceeds under the Plan, as may be amended prior to the Confirmation Hearing.

*Closing Date*.  The Closing Date shall be set by the Court as soon as practicable at the Confirmation Hearing approving the Sale to the Successful Bidder(s) pursuant to the Sealed Bidding Procedures.

Distribution of Existing Assets and Sale Proceeds.  The Debtor (or the entity designated by TAG) will be the Distribution Agent and shall distribute the balance of its existing assets (e.g, cash and cash equivalents) not otherwise transferred by the Plan and Sale Proceeds to the creditors in the amounts and order established by the Plan.  After the Debtor (or the entity designated by TAG) has completed winding up its affairs, the Debtor will make a supplemental distribution or distributions of any remaining cash in the same manner until all of the Debtor's available cash has been distributed.

Motion to Approve Claims Reserve.  The Debtor and the Post-Confirmation Committee shall agree on the appropriate claims reserve to satisfy payment of all Claims treated under the Plan.  If an agreement cannot be reached, then the Debtor shall file a Motion to Approve Claims Reserve, which shall govern the reserves and order further distribution requirements in addition to the distribution scheme contemplated by the Plan.

Post-Confirmation Committee.  The existing Creditors Committee may select a Post-Confirmation Committee consisting of up to 5 members having Allowed Claims in excess of $10,000 each, which will have the authority to pursue any Chapter 5 causes of action, monitor the Debtor's compliance with the Plan, and object to any claims.  Any fees and expenses of the Post-Confirmation Committee and its professionals are deducted from the payments to the General Unsecured Creditors. The Committee will be terminated upon the completion of payments to the Class 9 General Unsecured Creditors under the Plan.

Transfer of Assets to Post-Confirmation Committee.  The Post-Confirmation Committee shall receive assignment under the Confirmation Order of all Chapter 5 Causes of Action, to be held in trust for all Class 9 General Unsecured Claims.  If the Post-Confirmation Committee chooses to create a formal trust document to govern their affairs, which is not required, they may do so and submit such document for approval by the Court.

Liquidation of All Assets Not Sold or Transferred.  The Assets not sold under the Sealed Bid Procedure or transferred to TAG under the Plan in the event no Sale occurs shall be sold through a Liquidation Process with a reputable asset liquidation company ("Liquidator").  Proceeds from the Liquidation Process shall be applied towards the distribution scheme contemplated under the Plan.  The Liquidation Process shall be conducted by the Debtor (or the entity designated by TAG) and monitored by the Post-Confirmation Committee.  If the Debtor and the Post-Confirmation Committee cannot agree on the Liquidator or the terms of the Liquidation Process, then the Debtor shall file a Motion with the Court to seek approval of the Liquidation Process on terms as are fair and reasonable to all parties-in-interest.

Application to Close Case.  As soon as practicable after the Confirmation Order, the Debtor (or the entity designated by TAG) shall file an application to close the Case.

## G.   PROVISIONS GOVERNING DISTRIBUTION

Claims.  Claims are defined in the Plan.  The Plan is intended to deal with all Claims against the Debtor of whatever character, whether or not contingent or liquidated, and whether or not allowed by the Bankruptcy Court pursuant to § 502(a) of the Bankruptcy Code; however, only those Claims Allowed pursuant to § 502(a) of the Bankruptcy Code will be entitled to and receive payment under the Plan.

Compliance with Plan.  Any Person, including a Creditor, which has not, within the time provided in the Plan, performed any act required in the Plan or in the Confirmation Order, shall not be entitled to participate in any distribution under the Plan.

Provisions Covering Distributions.

*Disbursement of Sales Proceeds Under the Plan.*  The Debtor shall disburse all proceeds of the Sale according to the Plan.  All costs of the Sale shall be deducted from the proceeds before any distributions under the Plan are made.

*Disbursements of Debtor's Available Cash.* Upon closing, the Debtor will pay the post-petition expenses the Debtor has incurred pursuant to its authority under §363 of the Code and the Allowed Administrative Claims. The Debtor will propose a reserve for estimated Administrative Claims which have not been allowed as of the Closing Date, estimated costs and professional fees of the Debtor to be incurred in connection with the implementation of the Plan and the resolution of pending objections to claims by the Debtor and counterclaims by the Debtor which must be resolved to effectuate the terms of the plan and the distributions to creditors.  The Committee and the Debtor may agree to the amount of such reserve and to subsequent partial distributions and reserves and, if no agreement can be reached, either party may file a motion with the court proposing the amount of funds to be held in reserve.

*Method of Payment.*  Payments to be made in cash pursuant to the Plan shall be made by check drawn on a domestic bank or by wire transfer from a domestic bank, such mode of payment to be at the sole discretion of the Distribution Agent.

*Delivery of Distributions.*  Distributions and deliveries to holders of an Allowed Claim shall be made to the holder at the address set forth on the latest-filed proof of claim filed by such holder or at the last known address of such holder if no proof of claim is filed.  If any holder's distribution is returned as undeliverable, the Distribution Agent shall hold the distribution until notified of such holder's new address or the first anniversary of the Effective Date occurs, at which time the undelivered distribution shall revert and become the property of the Debtor and the Claim shall be discharged and forever barred.

*Time Bar to Cash Payments.*  Checks issued in respect of Allowed Claims shall be null and void if not cashed within ninety (90) days of the date of issuance thereof.  Requests for re-issuance of any checks shall be made directly to the Debtor and Distribution Agent by the holder of the Allowed Claim with respect to which such check originally was issued.  Any Claim in respect of such a voided check shall be made on or before the later of the first anniversary of the Effective Date or ninety (90) days after the date of issuance of such check.  After such date, all Claims in respect of such checks shall be discharged and forever barred.

## H.    DISPOSITION OF CAUSES OF ACTION

Chapter 5 Causes of Action Preserved.  Any and all causes of action or claims which the Debtor may have that arise under Chapter 5 of the Bankruptcy Code ("Chapter 5 Causes of Action") against any third party shall be transferred to the Post-Confirmation Committee for the benefit of the General Unsecured Creditors (Class 9).

Non-Chapter 5 Causes of Action Preserved.  Filing and prosecuting Non-Chapter 5 Causes of Action shall be at the sole discretion of the Debtor (or the entity designated by TAG),

and may be pursued to the extent any potential recovery would justify the costs and time associated with pursuing such actions.

## I.      EXECUTORY CONTRACTS AND LEASES

Assumption or Rejection of Executory Contracts and Unexpired Leases.  All identified executory contracts and leases will be rejected unless specifically assumed by the Debtor and assigned to the Successful Bidder(s) under the Sale process, which will be subject to final adjustment at the Confirmation Hearing.  The Debtor reserves the right to file an exhibit with the Court prior to the Confirmation Date identifying any contract or lease to be assumed and assigned, along with any proposed cure amount, prior to confirmation of the Plan.

The Confirmation Order shall constitute an order of the Bankruptcy Court approving the rejection or assumption and assignment pursuant to § 365 of the Bankruptcy Code, as of the Effective Date.

Bar Date for Rejection Damages.  If the rejection of an executory contract or unexpired lease gives rise to a Claim by the other party or parties to such contract or lease, such Claim shall be forever barred and shall not be enforceable against the Debtor, or their successors or properties, unless a proof of claim is filed and served on the Debtor and their counsel within thirty (30) days after rejection.

Claims Arising from Rejection.  All Allowed Claims arising from the rejection of an executory contract or unexpired lease shall be treated as Class 9 General Unsecured Claims, and all other Allowed Claims relating to an executory contract or unexpired lease shall have such status as they may be entitled to under the Bankruptcy Code as determined by Final Order of the Bankruptcy Court.

## J.      RESOLUTION OF DISPUTED CLAIMS

Allowed Claims.  Only "Allowed Claims" will be paid by the Distribution Agent according to the Plan.  An Allowed Claim is any claim against the Debtor for which a proof of claim was timely and properly filed or is deemed to have been timely and properly filed because the Debtor has or hereafter does list such claim on its schedules as liquidated and not disputed or contingent.  If the Debtor or Purchaser files an objection to a proof of claim, then an Allowed Claim shall be the amount of the claim allowed by order of the Court.

The Debtor has not declared an intention to object to any or all claims scheduled as contingent or disputed.  If an objection is filed, then to the extent that such claims are unsecured claims, Proceeds of the Sale sufficient to pay the disputed claims shall be reserved and paid if and when they become Allowed Claims.  To the extent that an objection to a secured claim is filed, if any,  the Debtor shall deposit such payments as would be made if the claim were allowed in full into a claims escrow account, unless and until the claim becomes an Allowed Secured Claim.  The Committee or any party in interest may also object to any claim.

Bar Date For Objecting To Claims.  The Bar Date for objecting to claims shall be sixty (60) days after the Effective Date.

## VI.     MODIFICATION OF DEBTOR'S PLAN

Section 1127(a) of the Bankruptcy Code permits the Debtor to amend or modify a plan at any time prior to confirmation. Post-confirmation modifications of a plan are allowed under § 1127(b), if the proposed modification is offered before a plan has been substantially consummated or pursuant to an article of the confirmed plan authorizing the intended modification. The Debtor reserves the right to amend or modify the Plan at any time at which such modification is permitted under the Bankruptcy Code.

In the event the Debtor proposes to modify the Plan prior to the Confirmation Order, further disclosures pertaining to the proposed modification will be required only if the Bankruptcy Court finds, after a hearing, that the pre-confirmation modifications adversely change the treatment of any creditor or equity security interest holder who has previously accepted the Plan. If the proposed pre-confirmation modification is material and adverse, or if a post-confirmation modification is sought, the Debtor intends to supplement this Disclosure Statement as necessary to describe the changes made in the Plan and the reasons for any proposed modifications.

## VII.    RETENTION OF JURISDICTION

The Court shall retain jurisdiction in the following matters after confirmation of the Plan until all payments and distributions called for under this Plan have been made:

(a)    To enable any party-in-interest to consummate any and all proceedings that it may bring to set aside liens or to recover preferences, fraudulent transfers, assets or damages to which it may be entitled under applicable bankruptcy, federal or state law;

(b)    To classify, allow or disallow claims and to direct distributions of funds under the Plan and to hear and determine all controversies pertaining thereto;

(c)    To determine and adjudicate all causes of action, controversies, disputes, arising either before or after the entry of the order for relief herein between the Debtor and any other party;

(d)    To correct any defect, cure any omission or reconcile any inconsistency in this Plan or in the order of confirmation of the Plan as may be necessary to carry out the purposes and intent of the Plan;

(e)    To modify this Plan after Confirmation of the Plan in accordance with applicable bankruptcy law;

(f)    To enforce and interpret the terms and conditions of the Plan;

(g)    To liquidate, estimate or determine the manner for such liquidation or estimation of any contingent or unliquidated claim;

(h)    Conduct the Sale hearing and enter the Sale Order, as well as hear any disputes concerning the sale process; and

(i)    To make such orders as are necessary or appropriate to carry out the provisions of the Plan.

## VIII.    DISCHARGE

Except as otherwise provided herein, the rights afforded in this Plan shall be in exchange for and in complete satisfaction, discharge and release of all claims of any nature whatsoever, including any interest accrued thereon, against the Debtor, or any of its assets or property.  Except as otherwise provided herein, on the Effective Date, in accordance with 11 U.S.C. § 1141, all such claims against the Debtor shall be satisfied, discharged, and released in full.  Except as otherwise provided herein, any Creditor or interest holder shall be precluded from asserting against the Debtor or their assets or properties any other or further claim based upon any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date; provided, however, that nothing contained in this Plan shall alter the legal, equitable, and contractual right of the holder of any claim specifically designated as being unimpaired in the Plan, it being intended that such rights, if any exist, are to remain unaltered by the Plan.

## IX.    EXCULPATION AND RELEASE

Neither the Debtor, nor its officers, directors, responsible parties, attorneys or agents shall have or incur any liability to any holder of a Claim or Interest for any act, event, or omission in connection with, or arising out of, the Bankruptcy Case, the Confirmation of the Plan, the consummation of the Plan, or the administration of the Plan or property to be distributed under the Plan, except for willful misconduct or gross negligence.

## X.    MISCELLANEOUS PROVISIONS

Payment of Statutory Fees.  All fees payable pursuant to § 1930 of Title 28 of the United States Code, as determined by the Bankruptcy Court at the Confirmation Hearing, shall be paid on or before the Effective Date.

Binding Effect.  As of the Effective Date, this Plan shall be binding upon and inure to the benefit of the Debtor, the holders of Claims, and their respective successors and assigns.

Revocation of this Plan.  The Debtor reserves the right to revoke and/or withdraw this Plan prior to entry of the Confirmation Order.  If the Debtor revokes and/or withdraws this Plan, or if confirmation of this Plan does not occur, then this Plan shall be deemed null and void and nothing contained herein shall be deemed (a) to constitute a waiver or release of any Claims by the Debtor, (b) to prejudice in any manner the rights of the Debtor, or (c) to constitute any omission by the Debtor.

Effectuating Documents; Further Transactions.  The Debtor shall be authorized to execute, deliver, file or record such contracts, instruments, releases, indentures and other agreements or documents to take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of this Plan.

Cramdown.  In the event that any class rejects the Plan, the Debtor reserves the right to modify this Plan and may seek to invoke the provisions of § 1129(b) of the Bankruptcy Code and confirm the Plan notwithstanding the rejection of the Plan by any class of Claims.  In the event that confirmation is requested under § 1129(b) of the Bankruptcy Code, the Debtor reserves the right to amend or otherwise modify the Plan to eliminate distributions to holders of any Claims junior to any Class of Claims that is impaired under, and has not accepted, the Plan in accordance with § 1129(b)(2) of the Bankruptcy Code.

Governing Law, Forum Selections.  Except to the extent that the Bankruptcy Code is applicable, the rights and obligations arising under this Plan shall be governed by, and construed and enforced in accordance with, the internal laws of the State of Texas.

Notices.  All notices, requests or demands in connection with this Plan shall be in writing and shall be deemed to have been given when received or, if mailed, five (5) days after the date of mailing, provided such writing shall have been sent by registered or certified mail, postage prepaid, return receipt requested, and sent to the following parties, addressed to:

**Debtor:**
Kent Abercrombie
621 S. Royal Lane, Ste. 100
Coppell, TX 75019-3805

**Debtor's counsel:**
Stephen Roberts
Robert P. Franke
Duane J. Brescia
STRASBURGER & PRICE, LLP
600 Congress, Suite 1600
Austin, Texas 78701
512) 499-3600 / (512) 499-3660 Fax

All notices and requests to holders of Claims and Interests shall be sent to them at the address listed on the last-filed proof of claim and if no proof of claim is filed, at the last known address.

Successors and Assigns.  The rights and obligations of any person named or referred to in this Plan shall be binding upon, and shall inure to the benefit of, the successors and assigns of such person.

Severability.  Wherever possible, each provision of this Plan shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Plan shall be prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Plan.  Furthermore, if the Bankruptcy Court will not confirm this Plan because one or more provisions hereof are determined to be prohibited or invalid under applicable law, the Debtor may seek permission of the Bankruptcy Court to amend this Plan by deleting the offending provision.

## XI.    FEASIBILITY OF THE PLAN

Because this Plan is essentially a liquidation plan, and creditors are to be paid their allowed claims (unless alternate treatment is consented to by certain creditors) the Plan is feasible by its nature.  All Allowed Claims will be paid in their order of priority out of the proceeds of the proposed sale and the Debtor's remaining cash assets.

## XII.    OTHER CONSIDERATIONS IN VOTING ON THE PLAN

## A.    ALTERNATIVES TO DEBTOR'S PLAN

Since this is a liquidation plan, the Debtor believes that the only alternative to the Debtor's Plan is a conversion to Chapter 7. The Debtor believes that a liquidation in Chapter 7 will reduce the projected sales price and incur substantial trustee's fees, thereby resulting in lower distribution to creditors.

Liquidation Analysis. The Debtor believes that, if the case were converted to a Chapter 7 liquidation, the property could not be sold at a higher price than that which the Debtor can sell the property for under the Sealed Bid Sales Procedure approved by the Court and that the Proceeds of Sale paid to creditors would be reduced by the substantial cost of trustee's fees and that of the trustee's attorneys and professionals, resulting in a lower distribution to creditors than as provided under the Plan. The Debtor has performed a Chapter 7 liquidation analysis and estimates that the distribution to unsecured creditors would be approximately $4,382.710 or 11.8% of claims. The Debtor's analysis is attached hereto as *Exhibit* C:

## B.    TAX CONSEQUENCES

THE FOLLOWING DISCUSSION IS A SUMMARY OF SOME OF THE MAJOR FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN TO THE DEBTOR AND THE CREDITORS. SOME CONSEQUENCES OF THE PLAN ARE DIFFICULT TO EVALUATE BECAUSE OF THE LACK OF INFORMATION, LACK OF CONTROLLING LEGAL PRECEDENT AND THE POSSIBILITY OF CHANGES IN LAW. THE DEBTOR HAS NOT APPLIED FOR RULINGS FROM THE IRS ON ANY OF THE TAX ASPECTS OF THE PLAN AND NO OPINIONS OF COUNSEL HAVE BEEN OBTAINED. EACH HOLDER OF A CLAIM SHOULD CONSULT WITH SUCH HOLDER'S TAX ADVISOR REGARDING THE FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES OF THE PLANS.

No representation is made with respect to the tax effects of the Plan upon the Debtor or any creditor. Each holder of a Claim is strongly urged to consult with such holder's tax advisor regarding the federal, state, local and foreign tax (if any) consequences of the Plan. The following general information is provided by Counsel to the Debtor:

Certain Tax Aspects Of Distributions Under The Plan. The following summary is a discussion of certain federal income tax consequences of the implementation of the Plan to creditors and to the Debtor. This summary is based on the Internal Revenue Code of 1986, as amended (the "Code"), the Treasury Regulations promulgated and proposed thereunder (the "Regulations"), and judicial decisions and published administrative rulings and pronouncements of the Internal Revenue Service (the "Service") as in effect on the date hereof. Legislative or administrative changes in such rules or new interpretations thereof may have retroactive effect and could significantly alter the federal income tax consequences discussed below.

The federal income tax consequences of the Plan are subject to significant uncertainties. Debtor urges creditors to seek independent professional tax advice on the issues related to the Plan. This summary addresses only those federal income tax consequences relating to the implementation of the Plan and does not address the federal income tax consequences of the transactions, distributions and exchanges occurring prior to and leading up to the Petition Date. This summary does not address foreign, state or local tax consequences of the Plan or any estate or gift tax consequences of the Plan, nor does it purport to address all the significant federal income tax consequences of the Plan. This summary also does not purport to address the federal income tax consequences of the Plan to special classes of taxpayers (such as S corporations, banks, mutual funds, insurance companies, financial institutions, business

investment companies, regulated investment companies, broker-dealers, employees and tax-exempt organizations).

Federal Income Tax Consequences to Debtor.  The Debtor will realize cancellation of indebtedness ("COI") income in respect of each Claim generally in an amount equal to the excess, if any, of (i) the portion of the Claim (including accrued and previously deducted but unpaid interest) from which the Debtor are (or are deemed to be) discharged over; and (ii) the sum of any cash or the "issue price" under Code §§ 1273(b) and 1274 of any debt obligations distributed under the Plan in discharge of such Claims.  The exact amount of COI income realized upon consummation of the Plan has not been finally determined.

Under the Code, a taxpayer is generally required to include COI income in gross income. COI income is not includable in gross income; however, if it occurs in a case under the Bankruptcy Code, provided the taxpayer is under the jurisdiction of a Court in such case and the cancellation of indebtedness is granted by the Court or is pursuant to a plan approved by the Court, the Debtor's COI income, if any, resulting from the Plan should satisfy these requirements, and, therefore, should not result in recognition of gross income to the Debtor. COI income that is excluded from gross income will reduce certain tax attributes of the taxpayer, including net operating loss (hereinafter "NOLs") carryovers, capital loss carryovers and the tax basis of assets, in a specified order of priority beginning with the NOLs and NOL carryovers, unless the taxpayer elects to have the reduction applied first to the tax basis of depreciable assets.  The reduction of tax basis is limited to the excess of (i) the aggregate of the tax bases of the taxpayer's property (determined immediately after the discharge) over; and (ii) the aggregate liabilities of the taxpayer (determined immediately after the discharge).

Federal Income Tax Consequences to Creditors.

Generally.  The federal income tax consequences of the Plan to a creditor will depend upon numerous factors, including but not limited to: (i) whether the Creditor's Claim (or portion thereof) constitutes a Claim for principal or interest; (ii) the type of consideration received by the Creditor in exchange for the Claim; and (iii) whether the Creditor is a resident of the United States for tax purposes (or falls into any of the special classes of taxpayers excluded from this discussion as noted above); and (iv) whether the Creditor has taken a bad debt deduction with respect to its Claim.  CREDITORS ARE STRONGLY ADVISED TO CONSULT THEIR TAX ADVISORS WITH RESPECT TO THE TAX TREATMENT UNDER THE PLAN OF THEIR PARTICULAR CLAIMS.

Creditors Holding Claims.  The federal tax consequences to Creditors will depend, initially, on the Creditors' tax basis in their Claims.  A loss generally is treated as sustained in the taxable year for which there has been a closed and completed transaction, and no portion of a loss with respect to which there is a reasonable prospect of reimbursement may be deducted until it can be ascertained with reasonable certainty whether or not such reimbursement will be recovered.  The time as to when a debt becomes wholly worthless for federal income tax purposes is a factual determination based on all relevant facts.

The fact that a Debtor has filed for bankruptcy protection may be an indication that a debt is worthless, but the IRS and Courts have held that bankruptcy does not conclusively establish worthlessness, especially where it appears that creditors will still receive some payments on the debt.  The IRS has ruled, however, that where it appears a creditor will receive only a de minimis recovery on its debt, such debt may be treated as wholly worthless.  Even if a debt is not wholly worthless, if the debt is partially worthless and the creditor can establish with

reasonable certainty the portion of the debt that is worthless and charges that portion off of its books of account, the creditor may deduct the portion becoming worthless that tax year. Creditors may already have made their own determinations as to the portion of their claims which are worthless and deducted such amounts.  In such cases, the deductions would reduce the Creditors' basis in their claims.

Creditors receiving cash, notes or other assets in exchange for their Claims will generally recognize taxable gain or loss in an amount equal to the difference between the amount realized and each such Creditor's adjusted tax basis in the Claim, to the extent that such consideration is not allocable to any portion of the Claim representing accrued and unpaid interest (see "Receipt of Interest", below) or to market discount, discussed below.   The character of any recognized gain or loss (i.e., ordinary income, or short-term or long-term capital gain or loss) will depend upon the status of the Creditor, the nature of the Claim in the Creditor's hands, the purpose and circumstances of its acquisition, the Creditor's holding period of the Claim, and the extent to which the Creditor previously claimed a deduction for the worthlessness of all or a portion of the Claim.

A Creditor may receive a note or other evidence of indebtedness in exchange for part of its entire Claim, or may be deemed to have exchanged its note or other evidence of indebtedness if the terms of such note or other evidence of indebtedness are significantly modified under the provisions of Treasury Regulations § 1.1001-3.  If terms of the note received differ materially in kind or extent from the note or evidence of indebtedness exchanged (or deemed exchanged), the exchange of the Claim for the note will be a taxable event.  The amount realized in such circumstances will be the "issue price" of the note or debt obligation received pursuant to Reg. Sec. 1.1001-1(g).  Depending on the Creditor's circumstances, if it has a gain on the receipt of the note, the Creditor may be eligible to report the gain on the installment method as amounts are paid on the note, unless the Creditor chooses to elect out of the installment method of reporting.  In addition, such notes may carry "original issue discount," requiring the holder thereof to accrue and report interest income over the term of the note.

Generally, a debt instrument will have a "market discount" for federal income tax purposes if the debt instrument is acquired after its original issuance for less than the issue price of such instrument plus the aggregate amount, if any, of original issue discount includable in the income of all holders of such instrument prior to such acquisition.  A Creditor holding a Claim with market discount must treat as ordinary income any gain recognized on the satisfaction of such Claim pursuant to the Plan, to the extent that such gain does not exceed the accrued but previously unrecognized market discount on such Claim in the hands of the Creditor.

Creditors should consult with their own tax advisors as to the matters discussed in this section concerning character and timing of recognition of gain or loss.  Because a loss will be allowed as a deduction only for the taxable year in which the loss was sustained, a Creditor that claims a loss in the wrong taxable year risks denial of such loss altogether.  In the case of certain categories of Claims, consideration should be given to the possible availability of a bad debt deduction under § 166 of the Code for a period prior to the Effective Date.  In addition, a portion of any distributions received after the Effective Date may be taxed as ordinary income under the imputed interest rules.

*Receipt of Interest.*  If any portion of the distribution is allocated to accrued but unpaid interest, such portion would be taxable to the Creditor as interest income, except to the extent the Creditor has previously reported such interest as income.  In the event that a Creditor has

previously reported the interest income, only the balance of the distribution after the allocation of proceeds to accrued interest would be considered received by the Creditor in respect of the principal amount of the Claim.  Such an allocation to accrued but unpaid interest would reduce the amount of the gain, or increase the amount of loss, realized by the Creditor with respect to the Claim.  If such loss were a capital loss, it would not offset any amount of the distribution that was treated as ordinary interest income (except, in the case of individuals, to the limited extent that capital losses may be deducted against ordinary income).

Tax Reporting and Backup Withholding.  The payment to creditors may be subject to applicable withholding.  For example, under federal income tax law, interest, dividends and other reportable payments may, under certain circumstances, be subject to backup withholding.  Backup withholding generally applies only if the holder (i) fails to furnish its social security number or other taxpayer identification number ("TIN"); (ii) furnishes an incorrect TIN; (iii) fails to properly report interest or dividends; or (iv) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the TIN provided is its correct number and that it is not subject to backup withholding.  Backup withholding is not an additional tax but merely an advance payment, which may be refunded to the extent it results in an overpayment of tax.  Certain persons are exempt from backup withholding, including corporations and financial institutions.

Importance of obtaining professional tax advice.  The foregoing is intended to be a summary only and not a substitute for consultation with a tax professional.  The federal, state, local and foreign tax consequences of the Plan are complex and, in some respects, uncertain.  Such consequences may also vary based upon the individual circumstances of each holder of a Claim.  Accordingly, each holder of a Claim is strongly urged to consult with its own tax advisor regarding the federal, state, local and foreign tax consequences of the Plan.

THE FOREGOING DESCRIPTION OF FEDERAL INCOME TAX CONSEQUENCES IS INTENDED MERELY AS AN AID FOR CREDITORS, AND NEITHER THE DEBTOR NOR THEIR COUNSEL ASSUME ANY RESPONSIBILITY IN CONNECTION WITH THE INCOME TAX LIABILITY OF ANY CREDITOR.

THE FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES OF THE PLAN ARE COMPLEX AND, IN MANY RESPECTS, UNCERTAIN.  THE FOREGOING IS INTENDED TO BE A SUMMARY ONLY AND, AS SUCH, DOES NOT DISCUSS ALL ASPECTS OF FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR CREDITOR.  ALL CREDITORS ARE STRONGLY URGED TO CONSULT WITH THEIR OWN TAX ADVISORS REGARDING THE TAX CONSEQUENCES OF THE PLAN THAT ARE RELEVANT TO THEIR PARTICULAR CIRCUMSTANCES.

## C.    CONFIRMATION OF THE DEBTOR'S PLAN, VOTING PROCEDURES, AND REQUIREMENTS FOR CONFIRMATION OF A PLAN

At the confirmation hearing, the Bankruptcy Court will determine whether the requirements of § 1129 of the Bankruptcy Code have been satisfied, in which event the Bankruptcy Court will enter an order confirming the Plan.  Those requirements include:

Best Interest Test and Liquidation Analysis.  Confirmation of a plan requires that, with respect to each impaired class of creditors, each holder of an allowed claim in the class has either accepted the plan or will receive under the plan property of a value, as of the Effective

Date, that is not less than the amount the holder would receive if the Debtor was liquidated under Chapter 7 of the Bankruptcy Code.

To determine if a plan is in the best interests of each class, the probable results of Chapter 7 liquidation must be compared with the results reasonably to be obtained under the Plan. The Debtor has applied the rule of absolute priority of distributions in the Plan. Under that rule no junior class of creditors may receive any distribution until all senior classes of creditors are paid in full and no holder of an equity interest may receive any distribution until all creditors are paid in full.

Feasibility. In order for a plan to be confirmed, the Bankruptcy Court must determine that a further reorganization or subsequent liquidation is not likely to result following confirmation of the Plan unless such further reorganization or liquidation is contemplated by the Plan.

Acceptance by Impaired Classes. Section 1129(a)(8) of the Bankruptcy Code generally requires that each impaired class must accept a plan by the requisite votes for confirmation to occur. A class of impaired claims will have accepted a plan if, of the holders in the class actually voting, at least two-thirds (2/3) in amount and more than one-half (1/2) in number of allowed claims, excluding the claims of insiders, cast an affirmative vote. A class of equity interests will have accepted a plan if the holders in the class actually voting at last two-thirds in number cast an affirmative vote. The vote of any person or entity can be disqualified pursuant to § 1126(e) of the Bankruptcy Code.

Fair and Equitable Test  If any impaired class of claims does not accept a plan, the Bankruptcy Court may confirm a plan pursuant to its "cram down" powers under § 1129(b) of the Bankruptcy Code, if a plan "does not discriminate unfairly" and is "fair and equitable." The Bankruptcy Court must determine at the confirmation hearing whether a plan is fair and equitable and does not discriminate unfairly against any impaired, dissenting class of claims. A plan will not discriminate unfairly if no class receives more than it is legally entitled to receive for its claims. The meaning of the phrase "fair and equitable" is different when applied to secured claims and unsecured claims.

With respect to a secured claim, the requirement that a plan be "fair and equitable" includes: (1) the impaired secured creditor retains its liens to the extent of its allowed secured claim and receives deferred cash payments at least equal to the allowed amount of its claim with a present value as of the effective date of the plan at least equal to the value of its interest in the Debtor's interest in the property securing its liens, (2) if property subject to the lien of the impaired secured creditor is sold free and clear of its lien the impaired secured creditor receives a lien attaching to the Proceeds of the Sale, or (3) the impaired secured creditor realizes the "indubitable equivalent" of its claim under the plan.

If a holder of a claim which is at least in part secured makes a valid and timely election under § 1111(b)(2) of the Bankruptcy Code, its Allowed Secured Claim will be deemed equal to its Allowed Claim, regardless of whether the value of its collateral on the effective date is in fact less than its Allowed Claim. In such a case a plan will be fair and equitable if: (1) the secured creditor receives deferred cash payments that both equal the allowed amount of its claim and have a present value equal to the value of the claimant's interest in Debtor's interest in the collateral on the effective date and (2) the secured creditor retains a lien on its collateral securing its entire allowed claim. A secured creditor that elects treatment under § 1111(b)

waives its right to have a portion of its claim included as an unsecured or deficiency claim for purposes of voting.

With respect to an unsecured claim, "fair and equitable" includes the requirements that either:  (1) the impaired unsecured creditor receives property of a value equal to the amount of its allowed claim or (2) the holders of claims and equity interests that are junior to the claims of the dissenting impaired unsecured creditor class will not receive any property under the plan until the claims of the dissenting impaired unsecured creditor class are paid in full.

If creditors do not vote in numbers and amounts sufficient to accept the Plan as proposed, the Debtor nevertheless will seek confirmation of the Plan pursuant to § 1129(b) of the Bankruptcy Code, sometimes referred to as the "cram down" provision.

In addition to the above requirements, the Plan cannot be confirmed unless all quarterly United States Trustee fees payable under 28 U.S.C. § 1930 have been paid or unless the Plan provides for their payment on the Effective Date of the Plan.  Under the Plan, all fees due and owing will be paid on the Effective Date of the Plan.

Creditors Typically Entitled to Vote.  Generally, any Creditor whose Claim is Impaired under the Plan is entitled to vote if either (i) its Claim has been scheduled by the Debtor (and such Claim is not scheduled as disputed, contingent, or unliquidated), or (ii) it has filed a proof of claim on or before the last date set by the Bankruptcy Court for such filings and no objection to the claim has been filed.  Any Claim as to which an objection has been filed (and such objection is still pending) is not entitled to vote, unless the Bankruptcy Court temporarily allowed the Claim in an amount which it deems proper for the purpose of accepting or rejecting the Plan upon application by the Creditor.  Such application must be heard and determined by the Bankruptcy Court at such time as specified by the Bankruptcy Court.  A Creditor's vote may be disregarded if the Bankruptcy Court determines that the Creditor's acceptance or rejection was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

Definition of Impairment.  Under § 1124 of the Bankruptcy Code, a class of Claims or Interests is "Impaired" under a Chapter 11 plan unless, with respect to each Claim or Interest of such class, the Plan:

(1) leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder of such claim or interest; or

(2) notwithstanding any contractual provision or applicable law that entitles the holder of such claim or interest to demand or receive accelerated payment of such claim or interest after the occurrence of a default

(A) cures any such default that occurred before or after the commencement of the case under this title, other than a default of a kind specified in section 365(b)(2) of this title;

(B) reinstates the maturity of such claim or interest as such maturity existed before such default;

(C) compensates the holder of such claim or interest for any damages incurred as a result of any reasonable reliance by such holder on such contractual provision or such applicable law; and

(D) does not otherwise alter the legal, equitable, or contractual rights to which such claim or interest entitles the holder of such claim or interest.

Classes Under Debtor's Plan.  The Impaired Classes entitled to vote on the Plan are Classes 5, 6, 7, 8, 9, 10, and 11.

Vote Required for Class Acceptance  The Bankruptcy Code defines acceptance of a Plan by a class of Creditors or Interest holders as acceptance by holders of two-thirds (2/3) in dollar amount and a majority in number of the Claims or Interests of that class which actually cast ballots for acceptance or rejection of the Plan; i.e., acceptance takes place only if sixty-six and two-thirds percent (66-2/3%) in amount of Claims and Interests in each class and more than fifty percent (50%) of Claims or Interests voting in each class cast their ballots in favor of acceptance.

## XIII.    CONCLUSION

Debtor respectfully submits that the Plan satisfies all of the statutory requirements of Chapter 11 of the Bankruptcy Code, including the "best interest" and "feasibility" requirements and that it should be confirmed even in the event a class of claims does not vote for acceptance of the Plan.  The Debtor believes that the Plan is "fair and equitable" and "does not discriminate unfairly."  Additionally, the Debtor believes that the Plan has been proposed in good faith.

Debtor respectfully submits that this Disclosure Statement is approved for circulation to its creditors and that it is permitted to solicit votes for acceptance of the Plan.

DATED: May 15, 2009.

**DEBTOR:  SUPERIOR AIR PARTS, INC.**

__*/s/ Kent Abercrombie*_____
**Kent Abercrombie, President**

**APPROVED AS TO FORM:**

*/s/  Stephen A. Roberts*____
Stephen Roberts
Texas Bar No. 17019200
Robert P. Franke
Texas Bar No. 07371200
Duane J. Brescia
Texas Bar No. 240252650
**STRASBURGER & PRICE, LLP**
600 Congress Ave., Ste. 1600
Austin, Texas  78701
Tel: 512.499.3600 | Fax: 512.499.3660

**COUNSEL FOR DEBTOR-IN-POSSESSION**