Stephen Roberts
Robert P. Franke
Duane J. Brescia
**STRASBURGER & PRICE, LLP**
600 Congress, Suite 1600
Austin, Texas 78701
(512) 499-3600 / (512) 499-3660 Fax
**ATTORNEYS FOR DEBTOR**
**SUPERIOR AIR PARTS, INC.**

David W. Parham
**BAKER & McKENZIE**
Elliot D. Schuler
R. Adam Swick
2300 Trammell Crow Center
2001 Ross Avenue
Dallas, Texas 75201
Telephone: (214) 978-3000
Facsimile: (214) 978-3099
**ATTORNEYS FOR THE OFFICIAL**
**COMMITTEE OF UNSECURED CREDITORS**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| **IN RE:** | § | |
| | § | |
| **SUPERIOR AIR PARTS, INC.** | § | **CASE NO. 08-36705-BJH-11** |
| | § | |
| | § | |
| **DEBTOR** | § | |

## AMENDED PLAN OF REORGANIZATION

### (Dated June 23, 2009)

Comes now, Superior Air Parts, Inc. (the "Debtor") and the Official Committee of Unsecured Creditors (the "Committee"), and jointly propose the following Amended Plan of Reorganization (the "Plan") pursuant to 11 U.S.C. §1121.

## ARTICLE I
## SUMMARY OF PLAN

Capitalized terms used in the following summary are as defined in Article II, Definitions. The following summary is included for convenience of the reader and shall not modify the specific terms of this Plan:

This Plan provides for the treatment of all Claims in a manner that is in the best interests of Creditors and is fair and equitable. It calls for the continued operation of the

Debtor, the establishment of a creditors' trust for the benefit of unsecured creditors, the cancellation of existing equity and the issuance of new equity in the Reorganized Debtor to Brantly International, Inc. ("Brantly"). Brantly intends to retain Kent Abercrombie, the current President of the Debtor, to continue as President and for Superior to generally continue selling its existing parts, cylinder assemblies and engine lines.

In consideration for the issuance of shares, Brantly will pay the Cash Contribution of $7 million, subject to certain adjustments, into a Creditors Trust for payment of Allowed Claims, as more particularly described in the Plan. The Cash Contribution will be decreased pursuant to the Purchase Price Adjustment if, at closing, Superior has less than $2 million in cash and less than $9.14 million in gross inventory and accounts receivable (excluding the account receivable from Thielert AE) and will be increased if gross inventory and accounts receivable (excluding the account receivable from Thielert AE) exceed that amount. Any cash in excess of $2 million will be transferred to the Creditors' Trust.

The Brantly offer is subject to higher and better offers under a Bid Procedures Order and Auction. On July 6, 2009 the Court approved Bid Procedures to sell the equity or assets. Brantly has agreed to serve as the "stalking horse" for the Bid Procedures Order. The assets for sale consist of two pools: (1) the Piece Parts Business and (2) the Vantage Engine Program. Potential purchasers may bid on one or both of these asset pools as a stock purchase or asset purchase. If any Qualified Bids (as defined by the Bid Procedures) are received by the Bid Deadline, then an Auction will be held prior to confirmation of the Plan. The Debtor, in consultation with TAG and the Committee, may ask the Court to switch the Buyer from Brantly to the entity who extends the highest, best and most confirmable offer under the Bid Procedures.

Under the sale to Brantly, the Debtor projects that there will be $7 million available to distribute to all Creditors after payment of its professional fees and the professional fees of the Committee, and the § 503(b)(9) administrative claims due to vendors who shipped goods to the Debtor within twenty days of the Petition. These projections are Debtor's best estimates. The Cash Contribution could be more or less after Adjustments to the Purchase Price due to factors beyond Debtor's control, and so, there could be more or less cash available to pay unsecured creditors.

Secured Claims which consist of claims secured by liens on Debtor's testing equipment, office equipment and telephone system will either be assumed by Brantly and paid in accordance with their terms or the Debtor will return the collateral to the holder of the Secured Claim in satisfaction of the Secured Claim. The 2009 taxes will be paid by the Reorganized Superior when due.

The Creditors' Trust will distribute $500,000 to TAE, an affiliate of Debtor, in full satisfaction of its proof of claim filed in the amount of $18,208,260 and the Creditors' Trust will distribute approximately $3,905,000 subject to adjustments as provided in the Plan, to TAG, Debtor's parent, in full satisfaction of it proof of claim filed in the amount of $10,146,611. In consideration for the concessions made by TAE and TAG, they will

be released from any and all claims and causes of action by anyone in connection with the Debtor or this case.

The Debtor estimates that the Creditors' Trust will have approximately $2,595,000 to pay the non-insider unsecured creditors, provided that the Confirmation Date of this Plan occurs on or before July 31, 2009.

In addition to the Cash Contribution, Brantly has agreed to take certain actions to reduce the pool of claims of unsecured creditors including the following:

1.      The Reorganized Debtor will assume all outstanding purchase orders provided that vendors agree to delay delivery for up to eighteen months if requested by the Reorganized Debtor in exchange for the release of any claims of vendors against the Debtor arising out of such purchase orders.

2.      The Reorganized Debtor will assume the Debtor's obligations under its liability insurance policies. All known claims by Plaintiffs covered by the Debtor's policies, except one, have agreed to look only to the Debtor's insurers for recovery and have waived their claims to collect any judgments from the Debtor. The Debtor believes the one remaining claim is without merit. Accordingly, the cost of such assumption primarily consists of funding the costs of defense arising out of claims arising under policy periods after July 2005. For the policy periods August 1, 2004 through July 31, 2005, Superior is obligated to pay 10% of the costs of defense for claims arising out of occurrences during the policy period up to $375,000 per occurrence up to a maximum of $875,000 for the policy year. For the policy periods after July 31, 2005, Superior is obligated to pay 100% of the costs of defense for claims arising out of occurrences during the policy period up to $375,000 per occurrence up to a maximum of $875,000 for the policy year.

3.      Brantly will negotiate with Superior's landlord leasing Debtor's facilities space in Coppell, Texas to modify the existing lease in an effort reduce or eliminate the landlord's potential $450,000 claim for the rejection of the existing lease. If the negotiations are unsuccessful, the Debtor will move its operations and reject the lease.

4.      The Reorganized Debtor will honor all warranty claims arising after the Effective Date of the Plan arising out of the Debtor's existing warranties, which will reduce contingent warranty claims against the Debtor.

The provisions of this Plan shall bind any holder of a Claim against, or Interest in, the Debtor and its respective successors and assigns, whether or not the Claim or Interest of such holder is impaired under this Plan and whether or not such Holder has accepted this Plan.

Upon the Effective Date, all debts of, Claims against, and Interests in the Debtor or its assets of any nature whatsoever, shall be completely satisfied, discharged and released to the full extent provided by § 1141(d)(1) of the Bankruptcy Code except as otherwise provided in this Plan or the Confirmation Order. The discharge of the Debtor

shall be effective as to each debt, Claim or Interest, regardless of whether a proof of Claim or proof of Interest therefore was filed, whether the Claim or Interest is allowed, or whether the holder thereof votes to accept this Plan.  On the Effective Date, as to every discharged debt, Claim and Interest, all persons, entities and governmental units (including, without limitation, any holder of a debt, Claim or Interest) shall be precluded from asserting against the Debtor or Reorganized Debtor or against such Debtor's or Reorganized Debtor's assets or properties, or the Creditors' Trust or its assets any other or further debt, Claim or Interest based upon any document, instrument, act, omission, transaction, or other activity of any kind or nature that occurred before the Effective Date.

## ARTICLE II
## DEFINITIONS

As used in the Plan, the following terms shall have the meanings specified below.

*"Administrative Claim"* shall mean any administrative cost or expense incurred on or before the Confirmation Date entitled to priority under section 507(a)(2) and allowed under section 503(b) of the Bankruptcy Code, including any actual and necessary expenses of preserving the Debtor's estate, including wages, salaries or commissions for services rendered after the commencement of the Chapter 11 Case, claims entitled to administrative expense priority under section 503(b)(9) for goods received by the Debtor in the ordinary course of the Debtor's business within twenty days before the Petition Date, certain taxes, fines and penalties, any actual and necessary expenses of operating the business of the Debtor, any indebtedness or obligations incurred by or assessed against the Debtor in connection with the conduct of its business, or for the acquisition or lease of property or for provision of services to the Debtor, including all allowances of compensation or reimbursement of expenses to the extent allowed by the Bankruptcy Court under the Bankruptcy Code, and any fees or charges assessed against the Debtor's Estate under Chapter 123, title 28, United States Code, and shall include all fees due to the Office of the United States Trustee both pre- and post-confirmation.

*"Allowed"* shall mean any Claim against the Debtor (a) for which a Proof of Claim has been timely filed with the Court by the Bar Date and as to which no objection to the allowance thereof, or action to equitably subordinate or otherwise limit recovery with respect thereto has been filed, or which Claim is allowed by Final Order of the Court, (b) for which a Proof of Claim has been filed after the Bar Date and (i) as to which no objection to the allowance thereof, or action to equitably subordinate or otherwise limit recovery with respect thereto has been filed, or (ii) as to which the Claim is allowed by Final Order of the Court, (c) scheduled in the Debtor's Schedule of Assets and Liabilities, as may be amended, prepared and filed with the Court and not listed as disputed, contingent or unliquidated as to amount, as to which no objection to the allowance thereof, or action to equitably subordinate or otherwise limit recovery with respect thereto has been interposed through closing of this case, or as to which any such objection or action has been determined by an order or judgment which is no longer subject to appeal to certiorari proceeding and as to which no appeal or certiorari

proceeding is pending.  This category includes all Claims deemed unsecured pursuant to section 506 of the  Bankruptcy Code and excludes any portion of any claim for fine or penalty.

*"Brantly"* shall mean Brantly International, Inc., a Texas corporation, and as contemplated by this Plan, the 100% owner of the Reorganized Debtor.

*"Bankruptcy Case"* shall mean this Case No. 08-36705-BJH-11, filed under Chapter 11 of the Bankruptcy Code in which Superior Air Parts, Inc. is the Debtor.

*"Bankruptcy Code"* shall mean the Bankruptcy Reform Act of 1978, as amended, title 11, United States Code, as applicable to this Chapter 11 case.

*"Bankruptcy Court"* shall mean the United States Bankruptcy Court for the Northern District of Texas, Dallas Division, having jurisdiction over the Chapter 11 Case, or in the event such court ceases to exercise jurisdiction over the Chapter 11 Case, such court or adjunct thereof that exercises jurisdiction over the Chapter 11 Case in lieu of the United States Bankruptcy Court for the Northern District of Texas, Dallas Division.

*"Bar Date"* shall mean the date fixed by the Bankruptcy Court as the last date for filing all Claims in this Case, February 17, 2009.

*"Business Day"* shall mean a day that is not a Saturday, Sunday, or legal holiday as those terms are used and defined in Bankruptcy Rule 9006(a).

*"Case"* shall mean this Bankruptcy Case**.**

"Cash Contribution" shall mean the cash payment in the amount of $7,000,000, as such may be adjusted pursuant to section 11.2(d) hereof, to be made by Brantly to the Creditors' Trust on the Effective Date.

*"Causes of Action"* shall mean *a*ny and all claims, rights and causes of action that have been or could have been brought by or on behalf of the Debtor arising before, on or after the Petition Date, known or unknown, in contract or in tort, at law or in equity or under any theory of law, including, but not limited to any and all claims, rights and causes of action of the Debtor or the Estate may have against any Person arising under chapter 5 of the Bankruptcy Code, or any similar provision of state law or any other law, rule, regulation, decree, order, statute or otherwise, including but not limited to any claim or cause of action described in the Disclosure Statement, avoidance actions under the Bankruptcy Code, or state law and any other causes of action belonging to the Debtor or the Estate.

*"Claim"* shall mean *a*ny right to payment from the Debtor arising at any time before the Effective Date, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured; or any right to any equitable remedy for future performance if the applicable breach gives rise to a right of payment from the Debtor,

whether or not the right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured.

*"Class or Classes"* shall mean all of the holders of Claims against or Interest with respect to the Debtor that have been designated as a class in this Plan.

*"Committee"* shall mean the Official Committee of Unsecured Creditors appointed by the United States Trustee in this Bankruptcy Case on January 29, 2009.

*"Confirmation"* shall mean the entry of the Confirmation Order on the docket of the Bankruptcy Court in the Bankruptcy Case.

*"Confirmation Date"* shall mean the date on which the Bankruptcy Court enters the Confirmation Order.

*"Confirmation Hearing"* shall mean the hearing or hearings to be held before the Bankruptcy Court in which the Confirmation of this Plan will be sought.

*"Confirmation Order"* shall mean the order of the Bankruptcy Court, in form and substance reasonable acceptable to the Committee and Brantly, confirming this Plan in accordance with the provisions of Chapter 11 of the Bankruptcy Code.

*"Creditor"* shall mean any person that holds a Claim against the Debtor that arose on or before the Effective Date, or a Claim against the Debtor of any kind specified in Sections 502(f), 502(g), 502(h) or 502(i) of the Bankruptcy Code.

*"Creditors' Trust* shall mean the trust established pursuant to this Plan for the benefit of Creditors.

*"Creditors' Trust Agreement´* shall mean that certain agreement attached as *Exhibit 3*, establishing and creating the Creditors' Trust in accordance with the provisions of section 6.7 of this Plan.

*"Creditors' Trustee"* shall mean the Trustee of the Creditors' Trust who shall be appointed in the Confirmation Order.

*"Debtor*" shall mean Superior Air Parts, Inc., the Debtor herein.

*"Disclosure Statement* shall mean the Disclosure Statement under section 1125 of the Bankruptcy Code filed by the Debtor and the Committee in connection with this Plan, and as thereafter amended.

*"Disputed Claim"* shall mean a Claim against the Debtor (a) as to which an objection to the allowance thereof, an action to equitably subordinate or otherwise limit recovery, or a request for estimation has been filed on or before the deadline for objecting to a Claim by any party in interest and which objection has not been withdrawn or resolved by entry of a Final Order, (b) a Claim that has been asserted in an amount greater than that set forth in the Schedules listed as contingent, unliquidated

or disputed.   A claim shall not be considered a Disputed Claim if such claim has previously been Allowed by order of the Bankruptcy Court.

*"Disputed Claims Reserve"* shall mean a segregated account to be held in trust by the Creditors Trustee for the benefit of holders of Disputed Claims in accordance with the provisions of the Plan or Creditors Trust Agreement.

"*Distributable Cash" shall mean cash remaining in the Creditors' Trust after payment of all claims other than the claims of TAG and the Class 7 General Unsecured Creditors.*

*"Distribution"* shall mean the property required by the plan to be distributed to the holders of Allowed Claims.

*"Effective Date"* shall mean the first Business Day after the expiration of the tenth (10th) day after entry of the Confirmation Order, unless the effectiveness of the Confirmation Order has been stayed or vacated by a court of appropriate jurisdiction, in which case the Effective Date shall be the later of the first Business Day after expiration of the tenth (10th) day after entry of the Confirmation Order or such date thereafter when any stay of the effectiveness of the Confirmation Order has expired or otherwise terminated.

*"Estate*" shall mean the bankruptcy estate of the Debtor created by Section 541 of the Bankruptcy Code.

*"Excess Cash"* shall mean subject to the Purchase Price Adjustment cash in the Debtors' possession on the Effective Date in excess of $2,000,000, excluding the Cash Contribution.

*"Executory Contract or Unexpired Lease"* shall mean any pre-petition executory contract or lease agreement with the Debtor governed by section 365 of the Bankruptcy Code.

*"Final Order"* shall mean an order of the Bankruptcy Court that has not been reversed, modified, amended or stayed, and as to which the time for appeal, review, certiorari proceeding, or other proceeding for review or rehearing has expired, and as to which no appeal, review or rehearing is pending, and such order has become conclusive of all matters adjudicated thereby, and is in full force and effect.

*"General Unsecured Claim"* shall mean a Claim not secured by a charge against or interest in property in which the Debtor's Estate has an interest, any unsecured deficiency claim as hereinafter defined, Claims which are not entitled to priority pursuant to section 507 of the Bankruptcy Code, and any Claims arising from the Debtor's rejection of Executory Contracts.

*"Interests"* shall mean any "equity security" in the Debtor (as defined by section 101(16) of the Bankruptcy Code.

*"Other Priority Claim"* shall mean any Claim accorded priority and right of payment under section 507(a) of the Bankruptcy Code other than a Priority Tax Claim or an Administrative Claim.

*"Person"* shall mean individual, corporation, a limited liability company, a partnership, an association, a joint stock company, a joint venture, an estate, a trust, an unincorporated association or organization, a government or any agency or subdivision thereof or any other entity.

*"Petition Date"* shall mean the date on which the Debtor filed its voluntary Chapter 11 petition, being December 31, 2008.

"*Piece Parts Business*" shall mean:

> 1.    Inventory.  All inventories of raw materials, work-in-process, finished goods, demonstration equipment, parts, shipping containers, packaging materials, and other accessories related thereto and other materials that are used or held for use in connection with the manufacture, sale and repair of aircraft engine parts as of the Effective Date of the Plan.

> 2.    Manufacturing Equipment and Tooling.   All machinery, equipment and tooling used or held for use in connection with or necessary for the manufacture and repair of aircraft engines and aircraft engine parts including all manufacturing, production, maintenance, packaging, gages, testing and other machinery, tooling (including dies, jigs, patterns, molds, prototypes and the like) and equipment, spare or replacement parts, computer equipment incidental to the development, design, manufacture, testing and inspection of parts, engine test cell equipment, specialized inspection and quality control equipment, and plant equipment and the like.

> 3.    Selected IP Assets.  All IP Assets supporting and otherwise underlying all replacement parts for which Seller has obtained from the FAA Parts Manufacturer Approval ("PMA"), including replacement parts for Lycoming and TCM engines as listed on as well as engineering specimens and masters related to such parts; and all electronic as well as paper copies of documents related to the foregoing, including all documentation submitted to and correspondence with the FAA relating to such engines and replacement parts identified above, as well as engineering data, legacy data, inspection processes and the quality manual.

> 4.    Trademarks, Trade dress and Trade Names and Domains. All Trademarks and Domains, including the "Superior" trade names, trademarks, service names, service marks, logos, brand

names, and corporate names, and all applications, registrations, and renewals in connection therewith but excluding trademarks, trade names and trade dress relating to the engines in the Engine Program.

5.    <u>Other Tangible Personal Property</u>.    All other tangible personal property of Seller that is used or held for use in connection with the manufacture, repair and sale of aircraft engines and aircraft engine parts except Excluded Assets.

6.    <u>Accounts Receivable</u>.    Trade accounts receivable and all notes, bonds and other evidences of Indebtedness pursuant to which Seller shall have the right to receive payments (in each case, of any nature whatsoever, whether recorded or unrecorded) arising out of sales of products delivered by Seller and any related security arrangements and collateral securing the repayment or other satisfaction thereof, including any rights with respect to any third party collection procedures or any other Claims that have been commenced in connection therewith.

7.    <u>Experimental Engines</u>.    Those experimental engines currently undergoing testing, as well as prototype, engineering specimens and masters related to such engines, including without limitation, the Model 400 Engine and related prototype(s).    All Intellectual Property, know-how, designs, drawings, specifications, data and documentation supporting and otherwise underlying all of Seller's XP-Series Engines;

*"Plan"* shall mean this Plan of Reorganization under Chapter 11 of the United States Bankruptcy Code, either in its present form, including exhibits, or as it may be altered, amended, or modified from time to time.

*"Plan Rate"* shall mean the prime rate of Bank of America, N.A., in effect at Confirmation, or such other rate of interest as is determined by the Bankruptcy Court.

*"Priority Claim" shall mean a*ny Claim (other than an Administrative Claim) to the extent entitled to priority in payment under section 507(a) of the Bankruptcy Code, which arose prior to the Petition Date, except for Priority Tax Claims.

*"Priority Tax Claim"* shall mean any Claim entitled to priority under Section 507(a)(8) of the Bankruptcy Code and filed as a priority tax claim on or before the Bar Date and shall include the claims of taxing authorities for taxes owed on the property retained by the Debtor under this Plan.

*"Pro Rata"* shall mean proportionately, based on the percentage amount of the distribution made on account of a particular Allowed Claim and the distributions made on account of all Allowed Claims of the class in which the particular Allowed Claim is made.

"*Purchase Price Adjustment*" shall mean to the extent the Debtors' inventory and accounts receivable excluding any account receivable due from Thielert AE ("Current Assets"), exceed $9,140,000 on the Effective Date, without deduction for any reason, including slow moving or obsolete inventory or old or uncollectible accounts, the amount of Unrestricted Cash to be retained by the Reorganized Debtor shall be reduced.  To the extent Current Assets are less than $9,140,000 using the same calculation methodology, the amount of Excess Cash payable to the Creditors' Trust shall be reduced.

"*Reorganized Debtor*" shall mean the Debtor, from and after the Confirmation Date, which shall assume title to and control of the Debtor's assets and liabilities upon confirmation as provided herein.

"*Secured Claim*" shall mean a Claim to the extent of the value, as determined by the Bankruptcy Court pursuant to section 506(a) of the Bankruptcy Code, of any interest in property of the Debtor's estate securing such Claim.  To the extent that the value of such interest is less than the amount of the Claim which has the benefit of such security, such Claim is an unsecured deficiency claim unless, in any such case, the class of which such Claim is a part makes a valid and timely election under section 1111(b) of the Bankruptcy Code to have such Claim treated as a Secured Claim to the extent allowed.

"*TAG*" shall mean Thielert, AG, the parent of the Debtor.

"*Thielert AE*" shall mean Thielert Aircraft Engines, GmbH, an affiliate of the Debtor.

"*Trust Advisors*" shall mean the oversight committee appointed by the Committee, and established by the Creditors' Trust Agreement.

"*Trust Assets*" *shall mean* the (i) Cash Contribution, (ii) all avoidance actions under Chapter 5 of the Bankruptcy Code and state law, (iv) all claims and Causes of Action which are property of the Debtor's bankruptcy estate, including, without limitation, claims for equitable subordination or to recharacterize a claim as equity, but excluding claims or causes of action relating to assets which remain in the Reorganized Debtor, and (vi) the Excess Cash.

"*Unrestricted Cash*" shall mean $2,000,000.00, excluding the Cash Contribution as such amount may be adjusted by the Purchase Price Adjustment.

"*Vantage Engines*" shall mean all existing inventory of "SV" parts for the Vantage O-360 and IO-360 Engine.

"*Vantage Engine Program*" shall mean all documentation from Vantage Engines already shipped or sold to any customer for the purpose of use, test or evaluation, and all intellectual property, components and parts related to the design, development, testing, and FAA approval of the Vantage Engines, FAA Type Certificate No. E00001SC, (and related approvals Transport Canada Type Certificate IE-58, European

Aviation Safety Agency Type Certificate EASA.(IM).E.024, and any other certifications) including but not limited to, drawings, research, all test reports and data, engineering change requests, engineering change notices, build sheets, bill of materials, (including current and historical bill of materials, all assembly and test instructions and all continued airworthiness documentation), parts catalog and supporting data, overhaul manual and supporting data, operator and maintenance manual and supporting data, installation manual and supporting data, service letters and service bulletins (including all quality documentation, all product integrity team meeting minutes and documentation, all warranty claims and/or customer feedback, trademarks and logos, and all marketing material, including market studies, photographs, artwork, brochures, models and fliers, all sales information, customer inquiries and anything else related to the Vantage Engines

## ARTICLE III
## ADMINISTRATIVE CLAIMS AGAINST THE DEBTOR

3.1   **Administrative Claims**:

(a)   <u>In General</u>.  Subject to the provisions of sections 330(a) and 331 of the Bankruptcy Code, each holder of an Allowed Administrative Claim shall be paid by the Creditors Trust the full unpaid amount of such Allowed Administrative Claim in cash on the Effective Date or as soon as practicable thereafter, or on such other terms as may be agreed upon by such holder of such Administrative Claim and the Creditors' Trust or otherwise upon order of the Bankruptcy Court; provided, however, that allowed Administrative Claims representing obligations incurred in the ordinary course of business or otherwise assumed by the Debtor pursuant to this Plan and unpaid as of the Effective Date, shall be assumed on the Effective Date and paid or performed by the Reorganized Debtor when due in accordance with the terms and conditions of the particular agreements governing such obligations.  All requests for payment of Administrative Claims (other than Professional Fees and claims arising in the ordinary course of business) arising on or before the Effective Date must be filed by the first Business Day after the 30th day after the Effective Date or the holders thereof shall be forever barred from asserting such Administrative Claims against the debtor or the Reorganized Debtor.

(b)   <u>Professional Fee Claims</u>.  All final applications for fees for Persons whose retention with respect to the Case has been approved by the Bankruptcy Court or who holds, or asserts, an Administrative Claim shall be filed not less than sixty (60) days after the Effective Date. Fees for services rendered, and disbursements incurred, on behalf of the Reorganized Debtor, by professionals retained by the Reorganized Debtor, from and after the Effective Date shall be paid by the Reorganized Debtor in the ordinary course.  Fees for

services rendered and expenses incurred on behalf of the Creditors' Trust, by professionals retained by the Creditors' Trustee, shall be paid by the Creditors' Trust.

## ARTICLE IV
## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

4.1    **Summary:**    Pursuant to Section 1123(a)(1) of the Bankruptcy Code this Plan designates the following classes of Claims and Interests. A Claim or Interest is included in a particular class only to the extent that the Claim or Interest fits within the description of that class and, unless otherwise herein provided, is included in a different class to the extent that any remainder of the Claim or Interest fits within the description of such different class. A Claim or Interest is included in a particular class only to the extent that the Claim is an Allowed Claim in that class and has not been paid prior to the Effective Date, and, in the case of an Interest evidenced by certificated or uncertificated shares of preferred or common stock, only to the extent that such stock is outstanding immediately prior to the Effective Date. The treatment afforded to the creditors' Claims or Interests as set forth hereunder shall be in full satisfaction, settlement, release, and discharge for and in exchange for such Claim or Interest, respectively. The Claims (except for the Administrative Claims which are described above and which are not required to be classified pursuant to section 1123(a)(i) of the Bankruptcy Code) and Interests against the Debtor are classified as follows:

| Class | Description |
|-------|-------------|
| 1 | Priority Tax Claims |
| 2 | Priority Employee Claims |
| 3 | Secured Claim of Ervin Leasing Company |
| 4 | Secured Claim of Great American Leasing Corporation |
| 5 | Secured Claim of Tigris Vendor Finance, Inc. f/k/a US Express Leasing |
| 6 | Secured Claim of National City Commercial Capital |
| 7 | General Unsecured Creditors |
| 8 | Unsecured Claim of Thielert AE |
| 9 | Unsecured Claim of TAG |
| 10 | Interests |

4.2    **Classification and Treatment of Claims Against and Interests in the Debtor:**

(a)    CLASS 1 - PRIORITY TAX CLAIMS.

Class 1 Priority Tax Claims consist of any Claim entitled to priority in payment under § 507(a)(8) of the Bankruptcy Code. The Debtor does not believe that any claims in this class exist. However, filed proofs of claim in this Class total approximately

$23,936.37, which the Debtor disputes, and objections to these claims are anticipated to be filed.

Unless a Creditor holding a Priority Tax Claim and the Reorganized Debtor agree to a different treatment, each Allowed Class 1 Priority Tax Claim shall receive payment in full from the Creditors Trust on the Effective Date of the Plan or as soon thereafter as practicable.

Class 1 is Unimpaired.   Creditors holding a Class 1 Priority Tax Claim are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code, and Creditors holding Claims in Class 1 are not entitled to vote to accept or reject this Plan.

(b)     CLASS 2 - PRIORITY EMPLOYEE CLAIMS.

Class 2 Priority Employee Claims consist of all Allowed Priority Claims given priority payment status pursuant to § 507(a) of the Bankruptcy Code except Administrative Claims under § 507(a)(1) and Priority Tax Claims under § 507(a)(8). The Class 2 Claims are estimated to total $56,144.43. These claims include all accrued vacation and other benefit pay of employees of the Debtor.

Unless a Creditor holding a Class 2 claim agrees to a different treatment, each Allowed Class 2 claim shall receive to the extent due and owing on the Effective Date, such Claim shall be paid in full in cash by the Reorganized Debtor on the Effective Date, or as soon thereafter as is practicable; or to the extent not due and owing on the Effective Date, such Claim shall be paid in full in cash by the Reorganized Debtor when and as such Claim becomes due and owing in the ordinary course of business.

The Class 2 Claims are Unimpaired under the Plan and, accordingly, are not entitled to vote on the Plan.

(c)     CLASS 3 - SECURED CLAIM OF ERVIN LEASING COMPANY.

The Class 3 Claim consists of the secured claim of Ervin Leasing Company, the collateral for which is an oil machine to clean parts. The contract with Ervin Leasing Company is denominated as a lease; however, the Debtor believes it is properly characterized as a financing agreement. The Class 3 Claim is estimated to be $3,959.06 or less depending on the value of the collateral securing such Claim.

At the election of Brantly, Reorganized Debtor will retain the collateral, the holder of the Class 3 Claim will retain its lien on its collateral, the Debtor will cure any payment defaults as of the Effective Date, and the Reorganized Debtor will continue paying the Class 3 Claim in accordance with the terms of the written agreement without acceleration, or the Debtor will surrender to the holder of the Class 3 Claim all collateral securing such Claim in full satisfaction of its Secured Claim. Any deficiency claim shall be treated as a Class 7 General Unsecured Claim.

Brantly shall notify Ervin Leasing Company of its election in writing at least five (5) business days before the Voting Deadline.

The Class 3 Claim is Impaired under the Plan if the Debtor chooses to surrender the collateral and is entitled to vote on the Plan; otherwise, the Claim is Unimpaired and is not entitled to vote on the Plan.

   (d) <u>CLASS 4 - SECURED CLAIM OF GREAT AMERICAN LEASING CORPORATION</u>.

The Class 4 Claim consists of the secured claim of Great American Leasing Corporation, the collateral for which is the Debtor's phone system. The contract with Great American Leasing Company is denominated as a lease; however, the Debtor believes it is properly characterized as a financing agreement. The Class 4 Claim is estimated to be $13,524.47 or less depending on the value of the collateral securing such Claim.

At the election of Brantly, Reorganized Debtor will retain the collateral, the holder of the Class 4 Claim will retain its lien on its collateral, the Debtor will cure any payment defaults as of the Effective Date, and the Reorganized Debtor will continue paying the Class 4 Claim in accordance with the terms of the written agreement without acceleration, or the Debtor will surrender to the holder of the Class 4 Claim all collateral securing such Claim in full satisfaction of its Secured Claim. Any deficiency claim shall be treated as a Class 7 General Unsecured Claim.

Brantly shall notify the Great American Leasing Company of its election in writing at least five (5) business days before the Voting Deadline.

The Class 4 Claim is Impaired under the Plan if Brantly chooses to surrender the collateral and is entitled to vote on the Plan; otherwise, the Claim is Unimpaired and is not entitled to vote on the Plan.

   (e) <u>CLASS 5 - SECURED CLAIM OF TIGRIS VENDOR FINANCE, INC., F/K/A US EXPRESS LEASING</u>.

The Class 5 Claim consists of the secured claim of Tigris Vendor Finance, Inc. f/k/a US Express Leasing, the collateral for which is all of the debtor's printers, copiers and fax machines. The contract with Tigris Vendor Finance, Inc is denominated as a lease; however, the Debtor believes it is properly characterized as a financing agreement. The Class 5 Claim is estimated to be $67,329.40 or less depending on the value of the collateral securing such Claim.

At the election of Brantly, Reorganized Debtor will retain the collateral, the holder of the Class 5 Claim will retain its lien on its collateral, the Debtor will cure any payment defaults as of the Effective Date, and the Reorganized Debtor will continue paying the Class 5 Claim in accordance with the terms of the written agreement without acceleration, or the Debtor will surrender to the holder of the Class 5 Claim all collateral

securing such Claim in full satisfaction of its Secured Claim. Any deficiency claim shall be treated as a Class 7 General Unsecured Claim.

Brantly shall notify the Tigris Vendor Finance of its election in writing at least five (5) business days before the Voting Deadline.

The Class 5 Claim is Impaired under the Plan if the Debtor chooses to surrender the collateral and is entitled to vote on the Plan; otherwise, the Claim is Unimpaired and is not entitled to vote on the Plan.

(f)   <u>CLASS 6 SECURED CLAIM OF NATIONAL CITY COMMERCIAL CAPITAL COMPANY</u>.

The Class 6 Claim consists of the secured claim of National City Commercial Capital Company, the collateral for which is a CMM parts measuring machine used for quality assurance.  The contract with National City Commercial Capital Company may be denominated as a lease; however, the Debtor believes it is properly characterized as a financing agreement.  The Class 6 Claim is estimated to be $123,839 or less depending on the value of the collateral securing such Claim.

At the election of Brantly, Reorganized Debtor will retain the collateral, the holder of the Class 6 Claim will retain its lien on its collateral, the Debtor will cure any payment defaults as of the Effective Date, and the Reorganized Debtor will continue paying the Class 6 Claim in accordance with the terms of the written agreement without acceleration, or the Debtor will surrender to the holder of the Class 6 Claim all collateral securing such Claim in full satisfaction of its Secured Claim. Any deficiency claim shall be treated as a Class 7 General Unsecured Claim.

Brantly shall notify the National City Commercial Capital Company of its election in writing at least five (5) business days before the Voting Deadline.

The Class 6 Claim is Impaired under the Plan if the Debtor chooses to surrender the collateral and is entitled to vote on the Plan; otherwise, the Claim is Unimpaired and is not entitled to vote on the Plan.

(g)   <u>CLASS 7 - GENERAL UNSECURED CLAIMS</u>.

Class 7 consists of the Claims of Creditors holding an Allowed General Unsecured Claim against the Debtor other than TAG and Thielert AE.

Each Creditor holding an Allowed Class 7 Claim shall receive in full satisfaction of all of its Allowed Class 7 Claim cash in the amount of its Pro Rata Share of Distributable Cash.

Class 7 is impaired.  Creditors holding Claims in Class 7 are entitled to vote to accept or reject this Plan.

(h)   <u>CLASS 8 - CLAIM OF THIELERT AE</u>

The Class 8 Claim consists of the unsecured claim of Thielert AE, an affiliate of the Debtor.  Thielert AE filed a proof of claim in the amount of $18,208,260.17.  The Committee contends that Thielert AE's claim should either be subordinated or re-characterized as equity.

In lieu of prolonged litigation, the Debtor, the Committee and Thielert AE have agreed to the classification and treatment of its Claim in this Class 8.  Pursuant to this Agreement, the Claim of Thielert AE shall receive a cash payment by the Creditors' Trust on the Effective Date, or as soon thereafter as is practicable, in the amount of $500,000 in full and final satisfaction of its any and all Claims which Thielert AE holds or may hold against the Debtor or the Reorganized Debtor.  In consideration for Thielert AE's acceptance of this treatment, Thielert AE shall be released from any and all claims or Causes of Action the Debtor may have against it as of the Confirmation Date.

Class 8 is impaired.  The holder of the Class 8 Claim is entitled to vote to accept or reject this Plan.

(i)     CLASS 9 - CLAIM OF TAG

The Class 9 Claim consists of the claim of TAG, the sole shareholder of the Debtor. TAG filed a proof of claim in the amount of $10,146,611.11 as a secured claim. However, the Debtor has filed an Adversary Proceeding to avoid the lien of TAG, asserting that it is unperfected and, thus, avoidable under 11 U.S.C. § 544.  In addition, the Committee contends that TAG's claim should either be subordinated or re-characterized as equity.

In lieu of prolonged litigation, the Debtor, the Committee and TAG have agreed to the classification and treatment of its Claim in this Class 9.  The Claim of TAG shall receive a cash payment by the Creditors' Trust on the Effective Date, or as soon thereafter as is practicable, in accordance with the following formula: Unsecured Creditors and TAG will share the first $5 million of distributable cash 58% to TAG and 42% to the Class 7 General Unsecured Creditors, and distributable cash above $5 million will be shared 67% to TAG and 33% to the Class 7 General Unsecured Creditors.

In exchange for TAG's consent to the Plan and the reduction of its distribution if its claim were allowed in full, TAG shall be released and discharged from any and all claims of the Debtor and the estate, including but not limited to (a) claims for subordination or recharacterization of its claim or (b) on account of any avoidance claims arising under Chapter 5 of the Bankruptcy Code.

TAG's rights and claims against third parties relating to the perfection of its security interest in property of the Estate shall be and are reserved and preserved.

The Class 9 Claim is Impaired under the Plan and, accordingly, is entitled to vote for or against the Plan.

(j)     CLASS 10 - INTERESTS IN THE DEBTOR.

The Class 10 Interests consists of 100% of equity interests of the Debtor, which is held by TAG.

On the Effective Date, all Interests in Debtor automatically, and without any action on the part of the holders thereof, the Debtor, or the Reorganized Debtor, shall be cancelled and extinguished.

The Class 10 Interests are deemed to have rejected the Plan, accordingly, is not entitled to vote for or against the Plan.

**ARTICLE V**
**ACCEPTANCE OR REJECTION OF THE PLAN**

5.1     **Classes Entitled to Vote**:

   (a)     Classes 1 and 2 are Unimpaired Classes under this Plan and are conclusively presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.

   (b)     Classes 3, 4, 5, and 6 are Impaired Classes (unless Brantly elects to retain the collateral) and are entitled to vote to accept or reject this Plan. Classes 7, 8, and 9 are Impaired Classes and are entitled to vote to accept or reject this Plan.   Class 10 will not receive or retain any distributions or property under this Plan, and, accordingly, under 1126(g) of the Bankruptcy Code is presumed to have rejected the Plan.

5.2     **Cram Down:**   If a Class fails to accept this Plan by the statutory majorities provided in section 1126(c) of the Bankruptcy Code, the Debtor reserves the right to request the Bankruptcy Court to confirm this Plan as to such rejecting Class.

## ARTICLE VI
## MEANS FOR IMPLEMENTATION OF THIS PLAN

6.1    **Sale of Stock to Brantly Subject to Bid Procedures.**    The sale to Brantly under this Plan is subject to higher and better offers as determined by the Bid Procedures approved by the Court.  Brantly has agreed to serve as the "stalking horse" bidder for the Bid Procedures.  If a different Buyer is chosen by the Debtor, TAG and the Committee as the highest and best offer at the Auction, and approved by the Court at Confirmation, then the Buyer, as approved, will be substituted to Brantly in the Plan. In the Plan, Article VI, Means for Implementation of this Plan, and Article VII, Treatment of Executory Contracts and Unexpired Leases, may be amended by the ultimate Buyer and approved by the Court.   The Order Confirming Plan will state which terms and conditions of this Plan will be altered by the existence of a higher and better offer approved by the Court.  If no Qualified Bids are received under the Bid Procedures, or if Brantly is still determined to be the highest and best offer at Auction, then the Debtor will proceed to seek confirmation of this Plan and sell its stock to Brantly as described herein, or as amended.

6.2    **Reorganized Debtor:**

(a)    Cancellation of Interests:  At the close of business on the Effective Date of the Plan, all of the existing ownership interests in Debtor will be canceled without any further action by the Debtor.  The obligations of the Debtor in respect of the Interests and under the Debtor's certificate of incorporation, and under any other agreements or instruments governing the Interests, including but not limited to any shareholders rights plan shall be discharged and extinguished.

(b)    Continued Corporate Existence:  The Reorganized Debtor shall continue its corporate existence on and after the Effective Date, with all express, incidental and attendant powers granted to it under its certificate of incorporation, as amended pursuant to the provisions of this Plan, and the laws of the state of its organization and without prejudice to any right hereafter to alter or terminate such existence (whether by contract, operation of law or otherwise) under such applicable state law. The Reorganized Debtor will continue to engage in the business of owning and operating the business of the Debtor.

(c)    Issuance of New Interests:   On or immediately after the Effective Date, new ownership interests, representing 100% ownership in the Reorganized Debtor, will be issued to Brantly either directly or to such entity as it may designate.   The issuance of the new ownership interests hereunder shall be exempt from the registration requirements of the Securities Act pursuant to section 1145(a) of the Bankruptcy Code.

(d)     <u>Amended Certificate of Incorporation</u>:  Not later than the Effective Date, the Reorganized Debtor shall file an Amended Certificate of Incorporation with the applicable state agency.   The Amended Certificate of Incorporation shall, among other things, prohibit the issuance of nonvoting equity securities to the extent required by section 1123(a) of the Bankruptcy Code, subject to further amendment as permitted by applicable law, and the Amended Certificate of Incorporation shall change, if required, the authorized number of shares of stock to implement this Plan.

(e)     <u>Directors and Officers of Reorganized Debtor</u>:  As of the Effective Date, and without further action of the Debtor or the Bankruptcy Court, all Persons then serving as officers or directors of the Debtor shall cease to be officers or directors of the Debtor.  Immediately as of the Effective Date, Brantly, without further action of the Debtor or the Bankruptcy Court shall select directors of the Reorganized Debtor and hire officers of the Reorganized Debtor.  The initial director and officer of the Reorganized Debtor shall be Kent Abercrombie, President and Chief Executive Officer.

6.3     **Brantly Contribution:**  Brantly or its designee will acquire all of the new ownership interests in Debtor, free and clear of any and all liens, claims and encumbrances to the fullest extent authorized under § 1141.  In consideration for the issuance of the new ownership interests to Brantly, Brantly or its designee will fund the Cash Contribution to the Creditors' Trust on the Effective Date.

6.4     **Brantly Deposit and Due Diligence Period:**  By July 1, 2009, Brantly or its designee shall have deposited the sum of $700,000, in a segregated Debtor-in-Possession account, which amount shall be refundable only if (a) this Plan is not Confirmed by July 31, 2009, (b) Confirmation of the Plan is denied, (c) any of the conditions precedent set forth in section 11.2 of this Plan are not satisfied or waived by Brantly as provided therein.  Brantly shall have until the earlier of 20 days from the dated of this Plan or five (5) days prior to the Bid Deadline to conduct due diligence (the "Due Diligence Period").  After the Due Diligence Period expires the $700,000 deposit shall not be refundable.

6.5     **Funding of Payments to Creditors:**  Payments to be made to creditors under this Plan will come from the Cash Contribution, Excess Cash and litigation recoveries.  On the Effective Date, the Reorganized Debtor shall fund the Creditor's Trust by making the Cash Contribution.

6.6     **Purchase Price Adjustment:**   On the Effective Date, Brantly and the Creditors' Trustee shall calculate the Purchase Price Adjustment and all funds payable to the Creditors' Trust pursuant to the Purchase Price Adjustment, the Excess Cash, shall be paid to the Creditors' Trust by Brantly.

6.7   **Facility Lease:**  Brantly will attempt to negotiate a new facility lease with Texas Duggan Limited Partnership ("Texas Duggan") in exchange for a release of its claim, but failing agreement satisfactory to Brantly, the facility lease will be rejected and treated as a Claim under Class 7.  Brantly shall advise the Creditors Trustee of any agreements reached with Texas Duggan.  Brantly shall advise the Debtor and the Creditors' Committee of any agreement reached with Texas Duggan and shall provide copies of the agreement to the Debtor and the Creditors' Committee by the earlier of the bid deadline, set by separate order, or three days prior to Confirmation.

6.8   **Reorganized Debtor to Honor Warranties:**  The Reorganized Debtor will honor all warranties made by the Debtor provided that any Allowed Claims under such warranties will be treated as Class 7 Claims.

6.9   **Plan Documents:**  Implementation of the Plan requires the execution of certain documents by the Debtor and other parties.  No further Court order must be obtained prior to execution of such documentation.  In the event any party does not agree to execution of such documentation, Brantly may appoint a party to execute it on such party's behalf.

6.10   **Creditors' Trust:**

(a)   Creditors' Trust:  Prior to the Effective Date, the Creditors' Trust shall be established pursuant to the Creditors' Trust Agreement, for the purpose of liquidating the Trust Assets, resolving all Disputed Claims and making distributions to Creditors holding Allowed Claims as provided in this Plan.  On the Effective Date, the Trust Assets shall be transferred to and vest in the Creditors' Trust. Subject to and to the extent set forth in any other applicable provision of the Plan, the Confirmation Order, the Trust Agreement or other agreement (or any other order of the Bankruptcy Court entered pursuant to or in furtherance hereof), the Creditors' Trust shall be empowered to:  (i) effect all actions and execute all agreements, instruments and other documents necessary to implement the Plan; (ii) make Distributions contemplated hereby; (iii) establish and administer any reserves with respect to Disputed Claims; (iv) comply herewith and with its obligations hereunder; (v) object to Claims and resolve such objections; (vi) employ professionals to represent it with respect to its responsibilities; and (vii) exercise such other powers as may be vested in it or as deemed by it to be necessary and proper to implement the provisions thereof.

(b)   Trust Governance:  The Creditors' Trust Agreement shall provide for an advisory committee which may include members of the Committee.  The Creditors' Trustee shall be appointed by the Committee.  Powers, rights and responsibilities of the  Creditors' Trustee shall be specified in the Creditors' Trust Agreement and

Case 08-36705-bjh11   Doc 240   Filed 06/23/09   Entered 06/23/09 16:33:01   Desc
Main Document    Page 21 of 45

shall include the authority and responsibility to: (i) receive, manage, invest, supervise and protect the Trust Assets; (ii) pay taxes or other obligations incurred by the Creditors' Trust (iii) retain and compensate, without further order of the Bankruptcy Court, the services of professionals to advise and assist in the administration, prosecution and distribution of the Trust Assets; and (iv) prosecute, compromise and settle in accordance with the specified terms of the Plan and the Trust Agreement all Disputed Claims. Other rights and duties of the Creditors' Trustee and the Trust beneficiaries shall be as set forth in the Creditors' Trust Agreement.

(c)    <u>Fees and Expenses of the Creditors' Trust</u>:  The Creditors' Trust expenses shall be paid from the Trust Assets in accordance with the Creditors' Trust Agreement.  In no event shall the Debtor or Reorganized Debtor be responsible for any such fees or expenses.

(d)    <u>Reports to be Filed by the Creditors' Trustee</u>:  The Creditors' Trustee, shall file quarterly reports with the Court regarding the administration of property subject to its ownership and control pursuant to the Plan, distributions made by it and other matters required to be included in such report.

(e)    <u>Expenses for Professionals of the Creditors' Trust</u>:  The Creditors' Trustee may employ, without further order of the Court, professionals to assist in carrying out its duties hereunder and may, after review by the Trust Advisors, compensate and reimburse the expenses of these professionals without further order of the Court from the Trust Assets in accordance with the Creditors' Trust Agreement.

(f)    <u>Excess Funds in Creditors' Trust</u>:  To the extent funds (from any source including, but not limited to, the Creditors' Trust's share of the Vantage Engine Program sales proceeds) remain in the Creditors' Trust after payment in full of all Allowed Claims required to be paid by the Creditors' Trust, with interest at the Plan Rate, such surplus shall be paid to the Reorganized Debtor.

(g)    <u>Indemnification</u>:  The Creditors' Trust Agreement may include reasonable and customary indemnification provisions that are acceptable to the Trust Advisors and Creditors' Trustee.  Any such indemnification shall be the sole responsibility of the Creditors' Trust.

(h)    <u>Vesting of Chapter 5 and State Law Avoidance Actions, Claims and TAG Litigation</u>:  On the Effective Date, all Chapter 5 and state law avoidance actions, and all other claims and Causes of Action which are property of the Estate, excluding those claims and causes of

action directly relating to assets retained by the Reorganized Debtor, shall vest in the Creditors' Trust. The Creditors' Trustee shall be the Debtors' designated representative pursuant to 11 U.S.C. § 1123(b)(3) to bring all such claims on behalf of the Creditors' Trust.

6.11 **Proprietary Information:** The Confirmation Order will include a requirement that all persons, including but not limited to Corporate Finance Partners, Thielert AG, Thielert AE, Engine Components, Inc., Avco Corporation and Teledyne Technologies Incorporated, and their respective parents, sister and subsidiary companies, and all other companies or persons in their control, and each of them, shall be directed to return to the Reorganized Debtor all documents and other information owned by the Debtor related to the Debtor's business and operations (the "Proprietary Information"). For the avoidance of doubt, the Reorganized Debtor retains all of the Debtor's rights pursuant to any confidentiality agreement executed in connection with the exchange of such information.

6.12 **Vesting of Assets:** Except for the Trust Assets and as otherwise specifically provided herein, the property of the Debtor, including any and all causes of action not transferred or assigned to the Creditors' Trust under this Plan, shall vest in the Reorganized Debtor on the Effective Date free and clear of all Claims, liens, charges or other encumbrances and Interests.

## ARTICLE VII
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

7.1 **Assumption of Executory Contracts:** The Executory Contracts and Unexpired Leases set forth on the attached *Exhibit 1* to this Plan shall be assumed by the Reorganized Debtor in accordance with the terms of each such Executory Contract and Unexpired Lease as such may be modified by agreement between the non-debtor party to such Executory Contract or Unexpired Lease prior to its assumption. Brantly may amend *Exhibit 1* at any time prior to the Confirmation Date; provided, however that Brantly shall assume all liability insurance contracts of the Debtor regardless of whether such contracts are scheduled on *Exhibit 1*.

7.2 **Pre-petition Purchase Orders:** The Reorganized Debtor will assume those pre-petition executory purchase orders listed on *Exhibit 2* to this Plan covering goods not delivered to the Debtor either before or after the Petition Date; provided that the non-debtor parties agree to delay delivery upon request of the Reorganized Debtor up to 18 months. While it is the Reorganized Debtor's intent to assume virtually all of the purchase orders existing on the Petition Date Brantly may amend *Exhibit 1* at any time prior to the Confirmation Date after conducting further due diligence.

7.3 **Rejection of Executory Contracts and Unexpired Leases:** All Executory Contracts and Unexpired Leases that have not been specifically assumed by the Debtor or listed by the Debtor and/or Reorganized Debtor on *Exhibits 1* and *2* hereto shall be rejected as of the Effective Date.

7.4    **Cure of Defaults:**   Reorganized Debtor shall cure all defaults existing under any assumed Executory Contract and Unexpired Lease listed on *Exhibit 1* pursuant to the provisions of sections 1123(a)(5)(G) and 365(b) of the Bankruptcy Code, by paying the amount, if any, determined by the Bankruptcy Court required to be paid in order to assume such Executory Contract and/or Unexpired Lease.  Payment of such amounts shall be made by the Reorganized Debtor on the later of (i) the Effective Date, (ii) the date the Bankruptcy Court determines the cure amount by Final Order, or (iii) the date the Reorganized Debtor and the party to such contract agree on a cure amount.  The Cure Amounts for purchase orders assumed under paragraph 7.2 of the Plan shall be deemed to be zero since the Reorganized Debtor will take delivery of goods covered by such purchase orders.

7.5    **Rejection Damage Claims:**   Each person who is a party to an Executory Contract and/or Unexpired Lease rejected pursuant to this Article shall be entitled to file, not later than thirty (30) days after the Effective Date, which is the deemed date of such rejection, a proof of claim for damages alleged to arise from the rejection of the Executory Contract and/or Unexpired Lease to which such person is a party.  A copy of such Claim shall be sent to the Creditor's Trustee.   The Bankruptcy Court shall determine any such objections, unless they are otherwise resolved.  All Allowed Claims for rejection damages shall be treated as Class 7 Claims, and the Creditor's Trust and/or the Creditor's Trustee shall have standing to object to any such rejection damage Claim so filed.

**ARTICLE VIII**
**PROVISIONS REGARDING DISTRIBUTIONS**

8.1    **Date of Distributions:**   Except as otherwise provided by this Plan, any Distributions and deliveries to be made to holders of Allowed Claims in Classes 1-6, shall be made on the Effective Date or as soon thereafter as may be practicable.  As to Disputed Claims, Distributions shall be made as set forth in Article VIII hereof.

8.2    **Distributions:**   The Reorganized Debtor shall make all Distributions required under this Plan with respect to Claims in Classes 1-6.  All other Distributions under this Plan shall be made by the Creditors' Trust.

8.3    **Means of Cash Payment:**   Cash payments made pursuant to this Plan shall be in U.S. funds, by check drawn on a domestic bank, or, at the option of the Reorganized Debtor or the Creditors' Trust, as the case may be, by wire transfer from a domestic bank, except that payments made to foreign creditors holding Allowed Claims may be in such funds and by such means as are customary or as may be necessary in a particular foreign jurisdiction.

8.4    **Delivery of Distributions:**   Subject to Bankruptcy Rule 9010, Distributions to holders of Allowed Claims shall be made at the address of each such holder as set forth on the proofs of Claim filed by such holders (or at the last known addresses of such holder if no proof of Claim is filed or if the Debtor has been notified in writing of a change of address), except as provided below.  If any holder's Distribution is

returned as undeliverable, no further Distributions to such holder shall be made unless and until the Reorganized Debtor or Creditors' Trustee, as the case may be, is notified of such holder's then current address, at which time all missed Distributions shall be made to such holder without interest.  Amounts in respect of undeliverable Distributions shall be returned to the Reorganized Debtor with respect to Classes 7-9 and to the Creditors' Trust with respect to Classes 7-9 until such Distributions are claimed.  All claims for undeliverable distributions shall be made on or before two months following the final Distribution to Class 7 Creditors.  After such date, any claim top such unclaimed shall be forfeited.

8.5    **Time Bar to Cash Payments:**  Checks issued by the Reorganized Debtor or the Creditors' Trust, as the case may be, in respect of Allowed Claims shall be null and void if not negotiated within six months after the date of issuance thereof. Requests for re-issuance of any check shall be made directly to the Reorganized Debtor or the Creditors' Trustee, as the case may be, by the holder of the Allowed Claim with respect to which such check originally was issued.  Any claim in respect of such a voided check shall be made on or before 120 days after the date of re-issuance of such check.  After such date, all Claims in respect of void checks shall be discharged and forever barred.

8.6    **Distributions Pending Allowance/Distributions after Allowance**: Distributions pending Allowance of a Claim and distributions after Allowance of a Claim are governed by sections 9.3 and 9.4 hereof.

## ARTICLE IX
## PROVISIONS FOR RESOLVING DISPUTED CLAIMS

9.1    **Prosecution of Objections to Claims:**   After the Effective Date, the Reorganized Debtor and the Creditors' Trustee shall have the exclusive authority to file objections to Claims.  Any objections to Claims must be made before the date that is 90 days after the Effective Date, or such other date as is established by order of the Bankruptcy Court.

9.2    **Estimation of Claims:**   The Debtor, the Reorganized Debtor, or with respect to Classes 7-9, the Creditors' Trustee, may, at any time, request that the Bankruptcy Court fix, liquidate or estimate any contingent or unliquidated Claim pursuant to section 502(c) of the Bankruptcy Code or other applicable law regardless of whether the Debtor has previously objected to such Claim, and the Bankruptcy Court shall retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal relating to any such objection.   In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim, such estimated amount shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court.  The Bankruptcy Court's entry of this order may limit the distribution to be made on individual Disputed Claims regardless of the amount finally Allowed on account of such Disputed Claims and no holder shall have recourse against the Debtor, the Reorganized Debtor, the Creditors' Trust, their assets or any of their respective

professionals.  If the estimated amount constitutes a maximum limitation on such Claim, the Debtor, the Reorganized Debtor, or the Creditors' Trust may elect to pursue any supplemental proceedings to object to any ultimate payment on such Claim.  All of the aforementioned Claims objections, estimation and resolution procedures are cumulative and not necessarily exclusive of one another.   Claims may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.  If a holder of a Claim fails to seek estimation of a Claim at any time prior to the final distribution date of the Creditors' Trust, such Claim shall be treated as a disallowed Claim without further Order of the Bankruptcy Court on the final distribution date of the Creditors' Trust.  Any unliquidated claim or contingent Claim shall be treated as a Disputed Claim until and unless it becomes an Allowed Claim pursuant to a Final Order of the Bankruptcy Court.

9.3    **Payments and Distributions on Disputed Claims:**  Partial payments or partial distributions may be made with respect to a Disputed claim on the undisputed portion of such Disputed Claim, pending resolution of such disputes by Final Order.  No reserve for Disputed Claims other than those in Classes 7-9 shall be established.  All obligations in respect of Disputed Claims for Claims shall be undertaken after the Effective Date by the Reorganized Debtor.

9.4    **Distributions After Allowance:**    The Reorganized Debtor or the Creditors' Trust, as applicable, shall make all payments and distributions required to be made under this Plan as soon as practicable after the date such Disputed Claim becomes an Allowed Claim.   Such distributions shall be based upon the cumulative distributions that would have been made to the holder of such Claim under this Plan if the Disputed Claim had been Allowed on the Effective Date less actual distributions made pursuant to section 9.3 hereof.

## ARTICLE X
## EFFECT OF CONFIRMATION, DISCHARGE, RELEASES, AND INJUNCTION

10.1    **Binding Effect:**  Except as otherwise provided in section 1141(d) of the Bankruptcy Code, on and after the Effective Date, the provisions of this Plan shall bind any holder of a Claim against, or Interest in, the Debtor and its respective successors and assigns, whether or not the Claim or Interest of such holder is impaired under this Plan and whether or not such Holder has accepted this Plan.

10.2    **Discharge:**  Except as otherwise provided in this Plan or the Confirmation Order and subject to section 1141(d)(1) of the Bankruptcy Code, upon the Effective date, all debts of, Claims against and Interests in the Debtor of any nature whatsoever including interest thereon, its assets, or properties, shall be completely satisfied, discharged and released.  The discharge of the Debtor shall be effective as to each debt, Claim or Interest, regardless of whether a proof of Claim or proof of Interest therefore was filed, whether the Claim or Interest is allowed, or whether the holder thereof votes to accept this Plan.  On the Effective Date, as to every discharged debt, Claim and Interest, all persons, entities and governmental units (including, without limitation, any holder of a debt, Claim or Interest) shall be precluded from asserting

against the Debtor or Reorganized Debtor or against such Debtor's or Reorganized Debtor's assets or properties, or the Creditors' Trust or its assets any other or further debt, Claim or Interest based upon any document, instrument, act, omission, transaction, or other activity of any kind or nature that occurred before the Effective Date.

10.3   **Preservation of Rights of Action:**  Except as otherwise provided in this Plan or in any contract, instrument, or agreement entered into in connection with this Plan, in accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtor and the Creditors' Trust, as applicable, shall retain and may exclusively enforce any claims, rights and causes of action that the Debtor may hold against any person or entity that have not been released under this Plan.  The Reorganized Debtor and the Creditors' Trust, as applicable, may pursue such retained Claims, rights or causes of action, as appropriate, in accordance with the best interests of the Reorganized Debtor.

10.4   **Exculpation and Release:**  As of the Effective Date, the Debtor, the Committee, Brantly and their respective advisors, attorneys, agents or any professionals retained by them (acting in such capacity) shall neither have nor incur any liability to, nor be subject to any right of action by, any person or entity for any act taken or omitted to be taken in connection with or related to the formulation, preparation, dissemination, implementation, administration, Confirmation or effectiveness of this Plan, the Disclosure Statement, the solicitation of votes for and the pursuit of Confirmation of this Plan, the consummation of this Plan or the administration of this Plan or the property to be distributed under this Plan, or any contract, instrument or other agreement or document created or entered into in connection with this Plan, or any other act taken or omitted to be taken in connection with this Bankruptcy Case; provided, however, that the foregoing provisions of this section 10.4 shall have no effect on the liability of any person or entity that results from any such act or omission that is determined in a Final Order to have constituted gross negligence or willful misconduct.

10.5   **Injunction:**  Except as otherwise provided in, or permitted under this Plan, from and after the Effective Date, all persons and entities that have held, currently hold or may hold a Claim or Interest or other debt or liability or right that existed prior to the Effective Date, are permanently enjoined on and after the Effective Date against the (a) commencement or continuation of any judicial, administrative, or other action or proceeding against the Debtor, Reorganized Debtor, the Committee, or Brantly, as the case may be, on account of Claims against or Interests in the Debtor; (b) enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree, or order against the Debtor, Reorganized Debtor, the Committee, or Brantly, or any assets or property of same; or (c) creation, perfection or enforcement of any encumbrance of any kind against the Debtor, Reorganized Debtor, the Committee, or Brantly, as the case may be, arising from a Claim.  This provision does not enjoin the prosecution any claims that arise on or after the Effective Date nor does it enjoin the determination of the allowance of any Claims that arose prior to the Effective Date by a court of competent jurisdiction.

# ARTICLE XI
# CONDITIONS PRECEDENT

11.1 **Deposit:** Brantly shall have made an earnest money deposit of $700,000 into a segregated Debtor-In-Possession Account refundable upon the terms of this Plan.

11.2 **Conditions Precedent to Effective Date:** The Effective Date shall not occur until each of the following conditions shall have been satisfied or waived pursuant to the provisions hereof:

(a) Confirmation Order: The Confirmation Order, in form and substance satisfactory to Brantly, the Debtor, and the Committee in their reasonable discretion, confirming this Plan shall have become a Final Order.

(b) No Material Modifications to Plan: No material modifications, as determined by Brantly in its reasonable discretion, shall have been made to this Plan without the consent of Brantly.

(c) Effective Date: The Effective Date of this Plan shall have occurred on or before August 31, 2009.

(d) Unrestricted Cash: The Debtor shall have on the Effective Date $2,000,000, excluding the Cash Contribution as such amount may be adjusted by the Purchase Price Adjustment. To the extent the Debtor does not have sufficient cash on hand to satisfy this condition, the Cash Contribution shall be reduced by the amount of any deficiency.

11.3 **Waiver of Conditions:** Brantly may waive any of the conditions set forth in section 11.2 of this Plan except for Condition 11.2(a) which may be waived only with the concurrence of the Debtor and Committee, at any time, without notice, without leave or order of the Bankruptcy Court, and without any formal action other than proceeding to consummate this Plan.

11.4 **Expense Reimbursement:** If Brantly is not approved by the Bankruptcy Court as Buyer by reason of the acceptance of an overbid for the equity in or assets of the Debtor in an alternative transaction and such alternative transaction closes or becomes effective, (a) the Debtor shall arrange for the immediate return of the deposit in 11.1 to Brantly and (b) Brantly will be entitled to receive a reimbursement of attorneys fees and expenses incurred by Brantly in connection with this Bankruptcy Case up to Three Hundred Fifty Thousand Dollars ($350,000.00) (the "Expense Reimbursement"). Such Expense Reimbursement shall be paid by the Debtor in cash payable within five Business Days after Brantly submits an itemization of such expenses to the Debtor and the Committee unless either the Committee or the Debtor objects in which case only the undisputed portion will be timely paid and Brantly may seek court approval for the payment of any disputed portion.

# ARTICLE XII
## RETENTION OF JURISDICTION

12.1  **Retention of Jurisdiction:**  The Bankruptcy Court shall retain exclusive jurisdiction over this Bankruptcy Case after Confirmation for the following purposes:

(a)  to consider and effect any modification of this Plan under section 1127 of the Bankruptcy Code;

(b)  to hear and determine all controversies, suits and disputes that arise in connection with the interpretation, implementation, effectuation, consummation or enforcement of this Plan;

(c)  to hear and determine all requests for compensation and/or reimbursement of expenses for the period commencing on the Petition Date through the Effective Date;

(d)  to hear and determine all objections to Claims and Interests, and to determine the appropriate classification of any Claim or Interest, and other controversies, suits and disputes that may be pending at or initiated after the Confirmation Date, except as provided in this Plan or the Confirmation Order;

(e)  to hear and determine all claims that the Debtor, Reorganized Debtor, or the Creditors' Trust could assert under the Bankruptcy Code;

(f)  to consider and act on such other matters consistent with this Plan as may be provided in the Confirmation Order;

(g)  to make such orders as are necessary and appropriate to carry out and implement the provisions of this Plan;

(h)  to approve the reasonableness of any payments made or to be made, within the meaning of section 1129(a)(4);

(i)  to exercise the jurisdiction granted pursuant to section 505 of the Bankruptcy Code to determine any and all federal, state, local and foreign tax liabilities of, and any and all refunds of such taxes paid by the Debtor;

(j)  to hear and determine any issues or matters in connection with any property not timely claimed as provided in this Plan;

(k)  to hear and determine any controversies with respect to any settlements approved by the Court;

(l)    to enable the Reorganized Debtor, the Committee, the Creditors' Trust and any party-in-interest to consummate any and all proceedings that it may bring to set aside liens or to recover preferences, fraudulent transfers, assets or damages to which it may be entitled under applicable bankruptcy, federal or state law;

(m)    to correct any defect, cure any omission or reconcile any inconsistency in this Plan or in the Confirmation Order as may be necessary to carry out the purposes and intent of this Plan:

(n)    to determine any and all motions, applications, adversary proceedings and contested matters whether pending in the Bankruptcy Case as of the Effective Date or brought subsequently by the Reorganized Debtors or the Creditors' Trust, as the case may be.

12.2    **No Limitation:**    Nothing contained in this Article XII shall be construed so as to limit the rights of the Reorganized Debtor or the Creditors' Trust to commence or prosecute any claim in any court of competent jurisdiction.

### ARTICLE XIII
### MISCELLANEOUS PROVISIONS

13.1    **Modification:**    After the Effective Date, this Plan shall not be modified except upon the agreement of the Reorganized Debtor and the Creditors' Trustee.

13.2    **Headings:**    All headings utilized in this Plan are for convenience and reference only, and shall not constitute a part of this Plan for any other purpose.

13.3    **Safe Harbor:**    Issuance of stock in conjunction with the Plan is exempt from securities laws pursuant to section 1145(a)(1) of the Bankruptcy Code.

13.4    **Due Authorization:**    Each and every holder of a Claim who elects to participate in the distributions provided for herein warrants that such holder is authorized to accept, in consideration of such Claim against the Debtor, the distributions provided for in this Plan and that there are not outstanding commitments, agreements, or understandings, expressed or implied, that may or can in any way defeat or modify the rights conveyed or obligations undertaken by such holder of a Claim under this Plan.

13.5    **Authorization of Corporate Action:**    All matters and actions provided for under this Plan involving the structure of the Debtor or action to be taken by or required of the Debtor or Reorganized Debtor shall be deemed to have occurred and be effective as provided herein, and shall be deemed to be authorized and approved in all respects without any requirement for further action by the Debtor or Reorganized Debtor.

13.6    **Further Assurances and Authorizations:**    The Debtor, the Reorganized Debtor, the Creditors' Trust or Creditors' Trustee, if and to the extent necessary, shall

seek such orders, judgments, injunctions, and rulings that may be required to carry out further the intentions and purposes, and to give full effect of the provisions, of this Plan.

13.7  **Applicable Law:**  Except to the extent that the Bankruptcy Code or other federal law is applicable, the rights, duties and obligations arising under this Plan shall be governed by and construed and enforced in accordance with the laws of the State of Texas.

13.8  **No Interest:**  Except as expressly provided for in this Plan, or allowed by the Court, no interest, penalty or late charge is to be allowed on any Claim subsequent to the Petition Date.

13.9  **No Attorneys' Fees or Broker Fees:**  No attorneys' fees will be paid with respect to any Claim, other than Claims of attorneys and financial advisors retained by Debtor or the Committee, except as specified herein or as allowed by an Order of the Court. No commissions or broker's fees will have been earned as a result of the transactions contemplated by this Plan unless such fees are earned pursuant to a prior order of the Court in this case.

13.10  **Notice of Default:**  In the event of any alleged default under the Plan, any Creditor or party-in-interest must give a written default notice to the Reorganized Debtor and the Creditors' Trustee with copies to their respective counsel of record specifying the nature of the default.  Upon receipt of the default notice, the Reorganized Debtor, or the Creditors' Trustee, as the case may be, shall have ten (10) days to cure such default from the time of receipt of the default notice.  If such default has not been cured within the applicable time period, the default may be brought to the attention of the Court.

13.11  **Consummation:**  For all purposes, consummation (and substantial consummation of this Plan) shall occur the instant upon which the new equity interest are issued and payments required to be made on the Effective Date are made; consummation shall occur on or promptly following the Effective Date.

DATED:  June 23, 2009

Respectfully submitted,

| | |
|---|---|
| **DEBTOR:**<br>**Superior Air Parts, Inc.** | **APPROVED AS TO FORM:** |

| | |
|---|---|
| _/s/ Kent Abercrombie_<br>Kent Abercrombie, President | _/s/ Stephen A. Roberts_<br>Stephen Roberts<br>Texas Bar No. 17019200<br>Robert P. Franke<br>Texas Bar No. 07371200<br>Duane J. Brescia<br>Texas Bar No. 240252650<br>**STRASBURGER & PRICE, LLP**<br>600 Congress, Suite 1600<br>Austin, Texas 78701<br>Telephone:  (512) 499-3600<br>Facsimile:  (512) 499-3660 |

**COUNSEL FOR DEBTOR**

_/s/ David w. Parham_
David W. Parham
**BAKER & McKENZIE**
State Bar No. 15459500
Elliot D. Schuler
State Bar No. 24033046
R. Adam Swick
State Bar No. 24051794
2300 Trammell Crow Center
2001 Ross Avenue
Dallas, Texas 75201
Telephone: (214) 978-3000
Facsimile: (214) 978-3099

**COUNSEL FOR THE OFFICIAL
COMMITTEE OF UNSECURED
CREDITORS**

Exhibit 1


Insurer Claims:  With respect to all claims filed by insurers, including those for deductibles, the Reorganized Debtor shall assume all insurance policies.  Brantly further intends to contact each insurer and indicate that the Reorganized Debtor will honor the obligations under the insurance policies, including payment of deductibles, as and when they become due and in exchange, the insurers will release all claims against the Debtor.  In lieu of providing an irrevocable letter of credit under the 2008-2009 product liability policy, Brantly will purchase deductible buy down insurance for at least that policy year.  The insurance negotiations will be conducted by the Reorganized Debtor's insurance broker who has advised its belief that the insurers will compromise their claims in this fashion.

EXHIBIT 1

615258.5/SPA/20354/0102/062309

Exhibit 2

| | Supplier | Canceled PO's | POs issued thru 5/8 | Balance |
|---|---|---|---|---|
| 1 | Ace Grinding | $63,865 | $36,628 | $27,237 |
| 2 | Advanced Machining | $33,549 | $370 | $33,179 |
| 3 | Air Parts Company | $690 | $3,567 | $0 |
| 4 | Air Power Inc. | $14,785 | $0 | $14,785 |
| 5 | Alcoa Fastening Systems | $51,550 | $0 | $51,550 |
| 6 | Associated Spring--Milwaukee | $11,721 | $12,375 | $0 |
| 7 | Associated Spring--Saline | $1,688 | $4,175 | $0 |
| 8 | Associated Spring--Corry | $13,575 | $0 | $13,575 |
| 9 | Automatic Screw Machine | $54,617 | $25,608 | $29,010 |
| 10 | The Bland Company | $30,575 | $488 | $30,088 |
| 11 | Boring Machine | $70,952 | $0 | $70,952 |
| 12 | Bunting Bearings--Kalamazoo | $5,670 | $2,040 | $3,630 |
| 13 | Combustion Technologies | $48,076 | $20,790 | $27,286 |
| 14 | Corley Gasket Co. | $7,907 | $42,070 | $0 |
| 15 | CP Pistons | $3,500 | $0 | $3,500 |
| 16 | Custom Tube Products | $14,078 | $7,408 | $6,670 |
| 17 | Eaton Corporation | $8,773 | $0 | $8,773 |
| 18 | Eck Industries | $929,689 | $0 | $929,689 |
| 19 | Flex-Fab | $15,100 | $35,221 | $0 |
| 20 | Garlock--Metallic Gasket | $14,000 | $0 | $14,000 |
| 21 | Gates Rubber Company | $3,150 | $2,261 | $889 |
| 22 | Genesee Stamping & Fabricating | $1,988 | $4,120 | $0 |
| 23 | Gerhardt Gear | $55,970 | $10,698 | $45,273 |
| 24 | Hartford Aircraft | $88,149 | $4,429 | $83,720 |
| 25 | Helio Precision Products | $76,698 | $7,456 | $69,242 |
| 26 | Mahle--Atlantic | $251,761 | $110,509 | $141,251 |
| 27 | Mahle--Caldwell | $38,206 | $33,260 | $4,946 |
| 28 | Mahle--Manchester | $685,854 | $90,034 | $595,820 |
| 29 | Morrissey, Inc. | $1,175 | $1,208 | $0 |
| 30 | Motion Industries | $3,833 | $2,731 | $1,102 |
| 31 | N.E.W. Industries | $146,495 | $11,464 | $135,031 |
| 32 | Ohio Gaslet & Shim | $16,000 | $13,970 | $2,030 |
| 33 | Parker Seal | $12,180 | $9,460 | $2,720 |
| 34 | Portland Forge | $48,821 | $0 | $48,821 |
| 35 | Rubber Associates | $700 | $700 | $0 |
| 36 | Saturn Fasteners | $929,416 | $20,090 | $909,326 |
| 37 | Seal Science, Inc. | $8,589 | $11,786 | $0 |
| 38 | SKF Sealing Solutions | $21,611 | $18,268 | $3,343 |

EXHIBIT 2
Page 1

| | | | | | |
|---|---|---|---|---|---|
| 39 | Sky-Tec | | $13,000 | $0 | $13,000 |
| 40 | Techni-Products | | $14,150 | $0 | $14,150 |
| 41 | VB Seals | | $23,800 | $0 | $23,800 |
| 42 | V&L Tool | | $72,321 | $0 | $72,321 |
| 43 | Wrico | | $985 | $0 | $985 |
| 44 | WSK Kalisz | | $413,611 | $0 | $413,611 |
| 45 | Wyandotte Industries | | $19,470 | $7,495 | $11,975 |
| | | Subtotal | $4,342,293 | $550,678 | $3,857,279 |
| 46 | Zanzi (Dollar) | | $1,514,801 | $83,269 | $1,431,532 |
| | | **TOTAL** | **$5,857,094** | **$633,947** | **$5,288,811** |
| | | | | | |
| | Zanzi (Euro) | | € 1,220,963 | € 59,800 | € 1,161,162 |

EXHIBIT 2
Page 2

615258.5/SPA/20354/0102/062309

**EXHIBIT 3**

**CREDITORS' TRUST AGREEMENT**

EXHIBIT 3

615258.5/SPA/20354/0102/062309

## TRUST AGREEMENT AND DECLARATION OF TRUST

This Trust Agreement and Declaration of Trust ("<u>Agreement</u>") is made and entered into as of the _____ day of _____, 2009 ("<u>Effective Date</u>"), by and among Superior Air Parts Inc., debtor and debtor-in-possession in the bankruptcy case, Case No. 08-36705 (the "<u>Debtor</u>" or "<u>Superior</u>") and (the "<u>Trustee</u>").

WHEREAS, Superior filed a bankruptcy petition under Chapter 11 of the United States Code (the "<u>Bankruptcy Code</u>") on December 31, 2008 ("<u>Petition Date</u>") commencing the case of *In re Superior Air Parts Inc.*, Case No. 08-36705 ("<u>Bankruptcy Case</u>"), in the United States Bankruptcy Court for the Northern District of Texas, Dallas Division ("<u>Bankruptcy Court</u>").

WHEREAS, on or about January 29, 2009, the United States Trustee's Office formed the Official Committee of Unsecured Creditors (the "<u>Committee</u>");

WHEREAS, the Bankruptcy Court entered an order confirming the Plan of Reorganization (the "<u>Plan</u>") proposed by the Debtor and the Committee on _____, 2009 in the Bankruptcy Case;

WHEREAS, the Plan provides for (i) the transfer of the Trust Assets (as defined in the Plan, together with all other assets as may become part of the trust estate, the "<u>Trust Assets</u>"), into a newly created grantor trust, (ii) the management, safekeeping and orderly liquidation of the Trust Assets by the Trustee with direction from the Trust Advisors, (iii) the distribution to the Trust's creditors and beneficiaries of the net proceeds from the sale, lease or other disposition of all or part of the Trust Assets, and (iv) the ultimate distribution of any remaining proceeds (or if such assets cannot be sold, the distribution thereof) to the creditors and beneficiaries of the Trust in accordance with the Plan upon termination of the Trust;

NOW, THEREFORE, in order to effectuate and comply with the terms and conditions of the Plan, the parties hereto agree as follows:

1. **<u>Creation of the Trust.</u>**

    1.1     <u>Appointment of the Trustee</u>.   In accordance with the provisions of the Plan, _____ is hereby named as the Trustee to hold, manage, and distribute the Trust Assets for the benefit of the Trust beneficiaries pursuant to the terms of this Agreement and the Plan.

    1.2     <u>Acceptance by the Trustee</u>.  The Trustee is willing and does hereby accept the appointment to serve as trustee and hereby agrees to administer the Trust Assets pursuant to the terms of this Agreement and the Plan.

    1.3     <u>Name of the Trust</u>.  The Trust established hereby shall bear the name "Superior Creditors' Trust."  In connection with the exercise of his powers as trustee, the Trustee may use such name or such variation thereon as he sees fit, or may use his own name, as Trustee, or otherwise.

<u>**TRUST AGREEMENT AND DECLARATION OF TRUST**</u> **– Page 1**

1.4     Trust Advisors.   An oversight committee (the "Trust Advisors") operating by majority vote, shall have the power, subject to the terms of the Plan and this Agreement, to direct the activities of the Trustee or to remove and replace the Trustee.  In particular, and not by way of limitation, the Trust Advisors shall have the power to (a) review and approve payment of all professional fees and expenses prior to payment by the Trustee; (b) review and approve any settlements proposed by the Trustee involving litigation claims which seek recovery in excess of $_____.  The Trust Advisors shall initially consist of _____ members, but may operate with as few as _____ members.  The initial Trust Advisors will be appointed by the Committee.  In the event that the Trust Advisors become unable or unwilling to continue service, then the Trustee shall appoint any replacements for such members, subject to the consent of the remaining members.  The Trust Advisors shall serve without compensation however reasonable expenses may be reimbursed by the Trustee at his sole discretion.

1.5     Beneficiaries of the Trust.   The beneficiaries of the Trust shall be the holders of Allowed Claims who shall receive a beneficial interest in the Trust in accordance with their treatment under the terms of the Plan and this Agreement, but only to the extent provided in the Plan.

1.6     Transfer of the Trust Assets to the Trust.   In accordance with the provisions of the Plan, right, title and interest in and to the Trust Assets are hereby vested in the Trust and preserved for the benefit of the Trust beneficiaries.  From and after the Effective Date of this Agreement, the Trust Assets shall be administered by the Trustee on behalf of the Trust beneficiaries.  Prior to or contemporaneously with the execution of this Agreement, the Debtor shall have executed and delivered to, or to the order of, the Trustee any and all documents and other instruments as may be necessary or useful to conform title to the Trust Assets, including the Debtor's books and records relating to the Trust Assets.

1.7     Funding of the Trust.   The activities of the Trust will be funded by the Trust Assets and/or the proceeds of the disposition thereof.

1.8     Resolution of the Causes of Action.   Subject to the terms of the Plan, the Trustee shall pursue, in his discretion, on behalf of the Trust as the designated representative of the Debtor, to either judgment, order, compromise or settlement, the causes of action transferred to the Trust pursuant to the Plan, resolution of which shall be affected in a manner reasonably calculated under the then existing circumstances to maximize the proceeds of the causes of action within the period necessary to fund timely the payments contemplated under the Plan.

1.9     Reserves.   Prior to any distribution of cash or proceeds, the Trustee shall establish adequate reserves for the operation of the Trust and Disputed Claims that may become Allowed Claims after the Effective Date.

1.10    Interim Distribution.   If and when, in the opinion of the Trustee, there are sufficient cash and proceeds to justify an interim distribution to creditors holding Allowed Claims, he may make such interim distributions to Holders of such Allowed Claims as he deems appropriate in his sole and absolute discretion; provided that the Trustee shall maintain an amount deemed necessary by the Trustee to be a sufficient reserve as required in this Section.

1.11    <u>Unclaimed Distributions</u>.  Any proceeds or other cash held for the benefit of any Holder of an Allowed Claim, if unclaimed by the distributee within ___ months after the distribution, shall be redeposited into the fund and made available for other Allowed Claims, and all liability and obligations of the Debtor and the Trust to such distributee with respect thereto shall thereupon cease.

## 2.    **Beneficial Interest of the Trust beneficiaries.**

2.1    <u>Interests Beneficial Only</u>.  The Trust beneficiaries shall have a beneficial interest in the Trust Assets only to the extent specified under the Plan.  The Trust beneficiaries' proportionate beneficial interest in the Trust Assets shall be transferable, except that a transferor of a beneficial interest must transfer its entire interest.  The beneficial interests held by the Trust beneficiaries hereunder shall not entitle any Trust beneficiary to any title or direct ownership interest in or to any of the Trust Assets as such, or to any right to call for a partition or division of the same, or to require an accounting except as specially required by the terms hereof.

2.2    <u>Evidence of Beneficial Interest</u>.  Ownership of a beneficial interest in the Trust Assets hereunder shall not be evidenced by any certificate, security, or receipt or in any other form or manner whatsoever.

2.3    <u>Relationship Creates No Partnership or the Like</u>.  The only relationship created by this Agreement is the trustee-beneficiary relationship between the Trustee and the Trust beneficiaries.  No other relationship or liability is created.  This Agreement is not intended to create and shall not be interpreted as creating an association, partnership or joint venture of any kind.

2.4    <u>Effect of Death, Incapacity or Bankruptcy</u>.  The death, incapacity or bankruptcy of any of the Trust beneficiaries during the terms of this Trust shall not operate to terminate the Trust, nor shall it entitle the representatives or creditors of the deceased to an accounting, or to take any action in the Bankruptcy Court or elsewhere for the distribution of the Trust Assets or for a partition thereof, nor shall it otherwise affect the rights and obligations of any of the other Trust beneficiaries under the Trust.

## 3.    **Rights, Powers and Duties of Trustee.**

3.1    **Powers of Trustee**.  Except as otherwise provided in the Plan, the Trustee shall have all of the following rights and powers to:

(a)    Receive and hold, to have exclusive possession and control thereof as permissible under applicable law, to maintain and to administer the Trust Assets;

(b)    Employ, retain or replace professional Persons, including attorneys, accountants, appraisers, investment advisors, expert witnesses, insurance adjustors, or other Persons whose services may be necessary or advisable, in the judgment of the Trustee, to advise or assist him in the discharge of the duties of the Trustee, or otherwise in the exercise of any powers vested in the Trustee and, subject to the provisions of the Trust, to pay to such

professionals reasonable compensation with such to be paid out of the Trust Assets (in this regard, the Trustee may employ professionals employed by the Committee);

(c)    Collect, compromise, settle or discharge any cause of action transferred to the Trust under the Plan and held by the Trust and pursue, in his discretion, on behalf of the Trust as the designated representative of the Debtor, and to defend any counterclaims, cross-actions or other offsets;

(d)    Distribute the cash and proceeds from the sale, liquidation, settlement, prosecution or other distribution of the Trust Assets;

(e)    Seek a determination from the Bankruptcy Court of the Allowed Amount of any Claim or Interest against the Trust, including filing objections thereto and pursuing any contest or adversary proceedings with regard thereto and entering into any compromise or settlement thereof, and to execute any contract, including, without limitation, any release in connection with any such compromise or settlement.

(f)    Maintain possession of the originals of any and all instruments and documents pertaining to the Trust Assets and any liabilities of the Trust;

(g)    Pay all reasonable expenses incurred in connection with the administration of the Trust;

(h)    Calculate and make distribution to holders of Allowed Claims all as set forth in the Plan;

(i)    Sue and be sued, including filing and defending contested matters and adversary proceedings in the Bankruptcy Court and actions or other proceedings in any other court or before any administrative agency and to pursue or defend any appeal from any judgment or order therefrom, including, without limitation, pursuing claims of the Trust, filing suit or adversary proceedings or contested matters in connection therewith and defending any counterclaims, cross-actions or other offsets in connection therewith and entering into any compromise, settlement, release, discharge or dismissal of any of the claims;

(j)    Release, convey or assign any right, title or interest in or about the Trust Assets;

(k)    Enter into contracts binding upon the Trust (but not the Trustee) which are reasonably incident to the administration of the Trust and which the Trustee, in the exercise of his best judgment, believes to be in the best interests of the Trust;

(l)    Enter into real or personal property leases (for the leasing of office space and space for the storage of records) which are reasonably incidental to the

administration of the Trust and which, in the judgment of the Trustee, will be advantageous to the Trust and will assist the Trustee in the performance of his duties under the Trust Agreement;

(m)   Abandon and charge off as worthless, in whole or in part, those actions which in the judgment of the Trustee, are in whole or in part uncollectible;

(n)   Pay taxes and excises lawfully owing by or chargeable against the Trust or property in the possession or control of the Trustee and to take any action necessary or advisable to obtain the prompt determination of any such tax liability;

(o)   Procure and pay premiums on policies of insurance to protect the Trust, or the Trust Assets, against liability for personal injuries or property damage or against loss or damage by reason of fire, windstorm, collision, theft, embezzlement, breach of fiduciary duty or other hazards against which insurance is normally carried in connection with the activities or on properties such as those with respect to which the Trustee procures such insurance;

(p)   Allocate items, receipts or disbursements either to corpus or income (or partially to corpus and partially to income) of the Trust as the Trustee, in the exercise of his best judgment and discretion, deems to be proper, without thereby doing violence to clearly established and generally recognized principles of accounting;

(q)   Deal with any governmental regulatory authority in obtaining such approvals or exemptions as may, in the opinion of the Trustee, be necessary or desirable with respect to the administration of the Trust;

(r)   Borrow funds from any Person, subject to reasonable commercial terms as agreed upon by the Trustee and prospective lender, with the advice and counsel of the Trust Advisors;

(s)   Open any bank accounts which may be necessary to operate the Trust and distribute cash to the Trust beneficiaries;

(t)   Exercise every power granted to a trustee under the Bankruptcy Code, including the rights and benefits afforded by §§ 108 and 546 of the Bankruptcy Code, which may increase the enumerated powers of the Trustee otherwise granted herein, and engage in any and all other activities, not in violation of any other terms of the Plan and Trust Agreement, which, in the judgment of the Trustee, are necessary or appropriate for the proper liquidation, management, investment and distribution of the assets of the Trust in accordance with the provisions of the Trust Agreement, to effectuate the provisions of the Plan, and to perform such other tasks as the Bankruptcy Court may direct.

3.2    <u>Representative of Estates</u>.  The Trustee is appointed as the representative of the Estate pursuant to section 1123(b)(3) of the Bankruptcy Code to pursue the causes of action transferred to the Trust pursuant to the Plan and shall be the only entity authorized to pursue the causes of action transferred to the Trust.  Unless the Trustee consents, or unless otherwise ordered by the Bankruptcy Court, no other party shall have the right or obligation to pursue any such actions.

3.3    <u>Payment of Trust Fees and Expenses</u>.  The Trustee may establish reserves and accounts at banks and other financial institutions, in a clearly specified fiduciary capacity, into which cash and property may be deposited and checks drawn or withdrawals made to pay or distribute such amounts as permitted or required for fees, expenses and other liabilities of the trust, pursuant to the Plan and this Agreement.  Such funds shall not be subject to any claim by any entity except as provided under the Plan.  All reasonable fees and expenses of the Trust and its agents, professionals and employees incurred in connection with (i) the objection to, and settlement, liquidation and payment of claims and interest against the Debtor; (ii) the liquidation or disposition of the Trust Assets; or (iii) administering the Trust and completion of the Plan shall, subject to the review and approval of the Trustee, be paid.

3.4    <u>Compensation of Trustee and Persons Employed by the Trust</u>.  The Trustee shall be paid $_____ per month for the first _____ months of the existence of the Trust.  Thereafter, he shall be paid $_____ per month for the next _____ months of the existence of the Trust.  Thereafter, he shall be paid $_____ per month for the next _____ months of the existence of the Trust.  In addition to the foregoing, the Trustee will receive a distribution fee of _____% of the first $_____ distributed to Trust beneficiaries, plus _____% of any amounts distributed to the Trust beneficiaries in excess of $_____.  The distribution fee is payable to the Trustee when distributed with any disputes being resolved by the Bankruptcy Court.  All Persons or entities employed by the Trustee shall be entitled to reasonable compensation from the Trust and such compensation shall be subject to the review and approval of the Trustee.  The Trustee shall submit all invoices for his services and for the services of any professional he retains to the Trust Advisors at least _____ days prior to paying for those services.  If any member of the Trust Advisors objects to payment of any invoice within the _____ day period, payment shall not be made on the disputed portion until the objection is resolved or on a vote by a majority of the Trust Advisors.  Any unresolved disputes shall be decided by the Bankruptcy Court. ==[THIS SECTION TO BE DISCUSSED BETWEEN THE TRUSTEE AND THE COMMITTEE]==

3.5    <u>Authorization</u>.  All Classes of Creditors that vote to accept the Plan, or who are otherwise deemed to have accepted the Plan, hereby authorize the Trustee to act on behalf and in place of such Creditor to the extent provided herein and in any document and instrument delivered hereunder or in connection herewith and to take such other action as may be incidental thereto, including, without limitation, the exercise of any discretion in connection with any determination or decision required for the administration of the Plan and the granting of any waiver, consent, amendment, suspension, supplementation, extension, renewal or other modification with respect to any and all provisions of the Plan on a conditional or unconditional basis.

3.6    <u>Exculpation</u>.  The Trustee shall be entitled to rely upon advice and opinions of counsel concerning legal matters, the authenticity of affidavits, letters, telegrams, cablegrams

**TRUST AGREEMENT AND DECLARATION OF TRUST – Page 6**

and other methods of communication in general use and usually accepted by businessmen as genuine and what they purport to be, and upon the Plan and any schedule, certificate, statement, report, notice or other writing which it believes to be genuine or to have been presented by a proper entity. Except for its or their own gross negligence or intentional misconduct, neither the Trustee, nor any of his employees or agents, shall (a) be responsible for any recitals, representations, or warranties contained in, or for the execution, validity, genuineness, effectiveness or enforceability of the Plan, (b) be under any duty to inquire into or pass upon any matter or to make any inquiry concerning the validity of any representation or warranty of the Debtor or the performance by the Debtor of its obligations or (c) in any event, be liable as such for any action taken or omitted by it or them. Each creditor agrees and acknowledges that the Trustee makes no representations or warranties with respect to the legality, validity, sufficiency or enforceability of the Plan.

3.7    Liability of Trustee/Trust Advisors. No recourse shall ever be had, directly or indirectly, against the Trustee by legal or equitable proceedings or by virtue of any statute or otherwise, or by virtue of any deed of trust, mortgage, pledge or note, or by virtue of any promises, contract, instrument, undertaking, obligation, covenant or agreement whatsoever executed by the Trustee for any purposes authorized, it being expressly understood and agreed that all such liabilities, covenants and agreements of the Trustee, whether in writing or otherwise, shall be enforceable only against and be satisfied only by the Trust, and every undertaking, contract, covenant or agreement entered into in writing by the Trustee may provide expressly against the personal liability of the Trustee. The Trustee shall not be liable for any act he may do or admit to do as the Trustee hereunder while acting in good faith. The Trustee shall not be liable in any event except for his own gross negligence or willful fraud or misconduct. The Trustee shall be indemnified and held harmless by the Trust for any and all loss by reason of his acts or contracts for the Trust except for loss arising out of the Trustee's own gross negligence or willful fraud or misconduct. This provision does not eliminate the Trustee's responsibilities and obligations regarding the filing of federal tax returns and the payment of any taxes that are due. The members of the Trust Advisors shall not be liable for any act done or omitted to be done as a member of the Trust Advisors while acting in good faith. The members of the Trust Advisors shall not be liable in any event except for gross negligence or willful fraud or misconduct.

3.8    No Personal Obligation for Trust Liabilities. Persons dealing with the Trustee, or seeking to assert claims against the Debtor, shall look only to the Trust Assets to satisfy any liability incurred by the Trustee or the Debtor, to such person in carrying out the terms of this Trust, and the Trustee shall not have any personal, individual obligation to satisfy any such liability.

3.9    No Liability for Acts of Predecessors. No successor trustee shall be in any way responsible for the acts or omissions of any trustee in office prior to the date on which he becomes a trustee, unless a successor trustee expressly assumes such responsibility.

3.10    Delegation of Powers. The Trustee shall be entitled to delegate such authority to his employees and agents as he shall reasonably deem necessary to perform his responsibilities under the Plan and this Agreement.

3.11    <u>Resignation, Death or Removal</u>.  The Trustee or any successor trustee may resign upon _____ days written notice.  In that event, or in the event of the death of the Trustee or a successor trustee, the Trust Advisors will appoint a substitute or successor Trustee to perform the duties, functions and obligations and to exercise the rights and authority of the Trustee as described in the Plan.

3.12    <u>Investment of Funds</u>.  All proceeds and other cash (except for amounts which the Trustee determines, in his sole discretion, are needed for immediate payments and distributions) shall be invested and reinvested by the Trust in United States Treasury Bills or in certificates of deposits, demand deposit or interest-bearing accounts of banking institutions acceptable under the Bankruptcy Code, or such other investments as shall be prudent and appropriate under the circumstances, in such amounts and upon such terms as a reasonable and prudent fiduciary would select and with a view toward sufficient liquidity to make the distributions contemplated by the Plan.  All interest earned on such proceeds and other cash shall be retained by the Trust and distributed in accordance with the Plan.

3.13    <u>Tax Treatment</u>.  The Trust shall be treated as a grantor trust in accordance with the provisions of the Internal Revenue Code.  The Trust beneficiaries will be treated as the grantors of the Trust Assets to the Trust and deemed the owners of such Trust.  Any valuation of the Trust Assets by the Trust beneficiaries shall be consistent with the valuation of Trust Assets used by the Trust.

3.14    <u>Termination</u>.  The Trust shall terminate upon the earliest to occur of:  (a) the fulfillment of the Trust purpose by the prosecution or other resolution of all of the Transferred Causes of Action and the collection and disposition of the other Trust Assets, and the distribution of funds to creditors or (b) the term of five (5) years from the Effective Date.  The Trustee may apply to the Bankruptcy Court to terminate the Trust prior to the expiration of the five (5) year term in the event all activities of the Trust are completed.  The Trustee may, with the consent of the Bankruptcy Court, extend the term of the Trust if the conclusion of the causes of action transferred to the Trust pursuant to the Plan, the collection and disposition of the other Trust Assets and distribution of funds to creditors therefrom has not been completed, or if other circumstances require such extension.

3.15    <u>Reporting </u>Duties. The Trustee shall file quarterly reports with the Bankruptcy Court regarding the administration of property subject to the Trust, distributions made by the Trust, and other matters concerning the Trusts Assets.

3.16    <u>Bond Requirements</u>



4.       <u>**Construction of this Instrument.**</u>

4.1     <u>Applicable Law</u>.  The Trust created herein shall be construed, regulated and administered under the laws of the State of Texas and the United States of America.  The Trustee agrees and consents that the Bankruptcy Court shall retain jurisdiction to enforce this Agreement in order to effectuate the provisions of the Plan.

4.2    <u>Amendment of Trust Agreement</u>.  Except for non-material modifications as solely determined by the Trustee and the Trust Advisors, this Agreement may not be amended, modified, terminated, revoked or altered unless ordered by the Bankruptcy Court.

4.3    <u>Interpretation and Capitalized Terms</u>.  The enumeration and headings contained in this Agreement are for convenience of reference only and are not intended to have any substantive significance in interpreting the same.  Unless the context otherwise requires, whenever used in this Agreement the singular shall include the plural and the plural shall include the singular.  Capitalized terms herein are ascribed the meanings assigned to them in the Plan unless otherwise specifically defined herein.

4.4    <u>Severability</u>.  If any provision of this Agreement shall for any reason be held invalid or unenforceable by any court, governmental agency or arbitrator of competent jurisdiction, such invalidity or unenforceability shall not affect any other provision hereof, but this Agreement shall be construed as if such invalid or unenforceable provision had never been contained herein.

4.5    <u>Entire Agreement</u>.  This Agreement (including the recitals) constitutes the entire agreement by and among the parties and there are no representations, warranties, covenants or obligations except as set forth herein.  This Agreement, together with the Plan, supersedes all prior and contemporaneous agreements, understandings, negotiations and discussions, written or oral, of the parties hereto, relating to any transaction contemplated hereunder.  Except as otherwise specifically provided herein and in the Plan, nothing in this Agreement is intended or shall be construed to confer upon or to give any person other than the parties hereto and the Trust beneficiaries any rights or remedies against the Trust, the Trustee or the Trust Assets. To the extent the terms of this Agreement conflict with the Plan, the terms of the Plan shall govern.

4.6    <u>Notices</u>.  Any notice or other communication by the Trustee to any of the Trust beneficiaries shall be deemed to have been sufficiently given, for all purposes, when hand delivered or mailed by first class mail, postage prepaid, and addressed to such Beneficiary at its address as shown in the records of the Trustee which records shall be initially based upon records provided by the Debtor.  Any notice or other communication which may be or is required to be given, served or sent to the Trustee shall be in writing and shall be mailed by registered or certified mail, return receipt requested, postage prepaid, or transmitted by hand delivery, addressed to the Trustee at his address set forth on the signature page hereof.  The Trustee or a Trust beneficiary may designate by notice in writing a new address to which any distribution notice, demand, request, or communication shall be mailed or delivered in the manner described above and such change shall be effective from and after receipt by the Trustee.

4.7    <u>Counterparts</u>.  This Agreement may be executed in any number of counterparts and by the different parties hereto on separate counterparts, each of which so executed and delivered shall be an original document, but all of which counterparts shall together constitute one and the same instrument.

IN WITNESS WHEREOF, the undersigned have caused this instrument to be executed as of the day and year first above written.

<u>**TRUST AGREEMENT AND DECLARATION OF TRUST**</u> – Page 9
DALDMS/661944.2
616969.1/SPA/20354/0102/062309

**SUPERIOR AIR PARTS, INC.**


By:   _____


**TRUSTEE:**


By:   _____

DALDMS/661944.2
616969.1/SPA/20354/0102/062309