Billy G. Leonard, Jr.
Texas Bar No. 12208100
Attorney at Law
1650 W. Virginia Street, Suite 211
McKinney, Texas 75069-7703
Telephone (469) 742-0855
Fax (469) 442-0135

and

Kevin H. Good
Texas Bar No. 08139300
Conner & Winters LLP
1700 Pacific Avenue
Suite 2250
Dallas, Texas 75201
Telephone (214)217-8070
Fax (214) 217-8861

**Attorneys for Aviation Parts Supply, Inc**.

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| IN RE: | § § | |
| **SUPERIOR AIR PARTS, INC.** | § § § § | CASE NO. 08-36705-BJH-11 |
| DEBTOR | § | |

**AVIATION PARTS SUPPLY, INC.'S SUPPLEMENTAL OBJECTIONS AND BRIEF
TO THE SECOND AMENDED DISCLOSURE STATEMENT
<u>OF SUPERIOR AIR PARTS, INC.</u>**

Aviation Parts Supply, Inc. ("APS"), a creditor and party in interest, by and through undersigned counsel, files these Supplemental Objections and Brief to the Second Amended Disclosure Statement of Superior Air Parts, Inc., ("Superior") and would show the Court as follows:

## I.

## Recent Procedural Events

Following a hearing on its Motion to Shorten Time on June 22, 2009, Superior distributed its proposed Amended Disclosure Statement on June 23, 2009.

Two days later and well in advance of the deadline to file objections set for Noon, July 6, 2009, APS filed its Preliminary Objections to the Disclosure Statement on June 25, 2009 specifically identifying the absence of financial data with respect to Brantly and the absence of any financial projections with respect to the future operations of Superior.

APS filed additional objections on July 6, 2009 in advance of the deadline for filing objections.

The Court conducted a hearing on the adequacy of Superior's proposed Amended Disclosure Statement withholding ruling, but pointing out to Superior areas which should be further explained and clarified.

Superior filed its Second Amended Disclosure Statement on July 9, 2009.

APS now files these Supplemental Objections to Superior's Second Amended Disclosure Statement as it continues to be fundamentally flawed and certain subjects identified by the Court as requiring further explanation and clarification remain unaddressed.

## II.

## The Debtor and Plan Proponent Have Failed to Provide Financial Projections Required by 11 U.S.C. Section 1129(a)(11) and 1125(a)(1)

The Debtor has failed to provide financial projections and has offered no alternative to convince the Court the projections are not required.

Section 1129(a)(11) requires the debtor to provide sufficient financial documentation to allow the court to determine the feasibility of the plan.[1] If sufficient documentation is not provided, or cannot be obtained, the plan is not feasible and is unconfirmable on its face.

In *M&S Associates*, the court stated:

> Income projections offered in support of reorganization plans must be based on concrete evidence of financial progress and must not be speculative… the proponent must prove that **the debtor will have available credit and the ability to meet capital expenditures**.[2] (emphasis added)

Here, the Debtor has proposed a disclosure statement and plan that is founded on speculation. First, the plan contains no commitment for future funding and capital requirements. An *intention* to invest capital falls well short of both the "adequate information" requirement for the disclosure statement *and* the "sufficient documentation" requirement for determining the feasibility of the plan. This is not the type of information a reasonable investor can rely upon in evaluating a reorganization plan, nor is it the type of information this Court can rely upon in determining whether the plan has a realistic prospect of success.

The Debtor candidly admits that the business model proposed for the future is Debtor's current model - assembly and sales of piece parts, cylinder assemblies and Vantage engines. As previously pointed out, historical data provided in the original Disclosure Statement, in the Amended Disclosure Statement and now in the Second Amended Disclosure Statement demonstrate that this business plan results in *annual*

---

[1] *See In re Snider Farms*, 83 B.R 1003, 1011-12 (Bankr. N.D. Ind. 1988).
[2] *In re M&S Associates, LTD.*, 138 B.R. 845, 849 (Bankr. W.D. Tex. 1992).

losses of up to $4.0 million. Sufficient capital must be *committed* to cover these losses or realistic and factual financial projections must indicate that the losses will not be sustained. It is not enough to *intend* to commit capital.

There are 2 independent inquiries to be made:

a.    is there an adequate capital *structure?* and

b.    is there *sufficient cash flow to operate the business* and fund the plan? [3]

Focusing here on the second, courts uniformly require a significant amount of financial information be submitted with the disclosure statement for review. [4] In addition, the financial projections themselves must be based on the historical performance of the business and a realistic projection of the future operation.[5] Any projected increases in future income must be fully substantiated. [6]

In lieu of financial projections satisfying these requirements, the Debtor here states that Brantly does not know [7] what capital will be required to operate the business because its due diligence is not complete but instead pledges to "do what it takes." [8] As to proof this pledge can be relied upon by the court and hypothetical investors, the Debtor urges that since Brantly is putting up $7 million and will not want to lose it, Brantly is sufficiently incentivized to add additional operating capital. "Incentives" are insufficient especially here where such "incentives" are suspect because Brantly will be acquiring $2.0 Million in cash, $2.0 Million in Accounts Receivable and $7.1 Million in

---

[3] *Pan Am Corp. v. Delta Air Lines, Inc.,* 175 B.R. 438, 508 (S.D.N.Y. 1994); *In re SM 104 Ltd.*, 160 B.R. 202, 234 (Bankr. S.D. Fla. 1993); *In re Nelson*, 84 B.R. 90 (Bankr. W.D. Tex. 1988).
[4] *In re Cajun Elec. Power Co-op., Inc.*, 230 B.R. 715, 727 (Bankr. M.D. La. 1999).
[5] *In re Schriock Constr., Inc.*, 167 B.R. 569, 576-77 (Bankr. D.N.D. 1994).
[6] *In re Tate*, 217 B.R. 518, 520 (Bankr. E.D. Tex. 1997).
[7] The Debtor has failed to consistently attribute information to Brantly versus the Debtor. On the important issue of capital requirements we are told only that "management estimates." Whose management? Is it $4.0 million per year?
[8] The simple fix for this "dilemma" would seem to be for Brantly to complete the due diligence and produce the financial projections. Debtor's failure to provide the projections is suspect.

inventory. As Judge Jernigan recently stated with respect to an upcoming disclosure statement hearing, "show me [the Court] the money." [9]

As to "fully substantiating future increases in income", the Debtor (or someone) has apparently searched the Internet and downloaded someone's else's projections of the future of the Chinese aviation.[10] While this might be a risk Brantly investors want to take,[11] Superior is in bankruptcy and "full substantiation" should at least require Brantly to reveal the basis and time table [12] for this projected huge upswing in the Chinese general aviation market and some factually based assurance that the entire market will belong to Brantly.[13] If such market is in the offing, APS suspects that Lycoming, Continental and Chinese entrepreneurs have heard of it and are also poised to exploit it.[14]

---

[9] *In re Knight Energy Corp.*, 2009 WL 1851739 (Bankr. N.D. Tex. 2009).
[10] The Cessna 162 mentioned in Debtor's Second Amended Disclosure Statement being made in China, uses the Continental 0-200 engine. No mention of this is made in connection with the "Cessna" market in China or the fact that the Debtor's Vantage engine will most certainly "not fit" in the projected 700 Cessna being made someday. The press widely reports that the Cessna 162 program may be in serious jeopardy. The "700 Cessna" aircraft being used to support the Brantly "business plan" are Cessna 162 aircraft being built in China for the US market - not the Chinese market. http://www.aerospace-technology.com/projects/skycatcher/. Debtor's failure to reveal this information might be considered seriously misleading.
[11] A simple search of the FAA regulatory docket indicates that Brantly does not have approval to produce its B2B in China. Until that approval is obtained, there will be no need for "150" engines per year for the B2B helicopter. And, are we to seriously believe that Brantly will pay Superior $4.5 million for these engines when Brantly owns Superior? Or, is it more likely the engines will move from Coppell to China at cost - which of course does not help Superior's financial situation.
[12] The Superior engine is horizontally mounted while the engine for the Brantly B2B is mounted *vertically*. As a result, the "150 engines" that Brantly will need for the B2B helicopter have not yet been designed. APS estimates that FAA approval of the conversion will require at least 2 years as Superior's certification of its own engine required 3 years and upwards of $3.0 million to production certificate.
[13] Surely if the aviation market in China consists of a mere 1,000 aircraft, there is no near term need for 500 engines. The FAA aviation world is not a plug and play industry. Although the Superior engine may "fit" in the Diamond, it is not certified by the FAA to do so and certification again, is not a near term event. This so-called "projection" assumes also that Brantly can somehow persuade the referenced Chinese-Diamond joint venture to switch from the diesel engine that the Diamond aircraft being made in China now uses. Perhaps they can - this year, next year, the year after? What about Superior's $3.0 - 4.0 million in annual losses in the meantime?
[14] Lycoming and Continental are the world's 2 largest piston manufacturers and Superior's competitors.

A plan proponent has an obligation under 1125(a)(1) to present financial projections with the disclosure statement that can be reviewed by the "hypothetical investor" and then scrutinized by the court for compliance with 1129(a)(11).

Stated differently, although good financial projections or a letter of credit or similar instrument could be used to demonstrate an ability to address plan obligations, the debtor must have financial projections to satisfy the "adequate information" requirements of Section 1125(a)(1) of the Bankruptcy Code. If the plan proponent cannot do so, the disclosure statement must be rejected.

For example, the court in *In re Tavern Motor Inn*[15] stated in relevant part:

> In order to provide guidance to this debtor and future Chapter 11 debtors who file plans in this Court, we list below the minimum information we need to determine the financial feasibility of a non-liquidating Reorganization Plan of a small to medium size company not listed on a stock exchange. ***This information satisfies the requirements of 11 U.S.C Section 1125(a)(1) as it pertains to financial data.*** Besides statutory fulfillment, the gathering and review of the financial information will force debtor to face squarely the prospects of its rehabilitation instead of the commonly seen financial ostrich approach. Accordingly, a Plan must at least include: . . . (emphasis supplied)
> 2) Quarterly cash receipts and disbursements and forecasts which, at a minimum, cover the first 12-18 months of any Plan. . . .
> 3) Projected or forecasted financial statements covering the shorter of 3 years or the Plan expiration date if less than 3 years, compiled or reviewed . . . .
>
> The realities of reorganization under Chapter 11, for the unorganized and unsophisticated creditor, and the removal of Bankruptcy Judges from the day to day administrative supervision of cases inhibit the availability of objective data about the debtor, its operations, policies, competitive position, and the quality of its management.
> Neither the Court nor creditors should have to perform acrobatic feats of financial analysis in order to make an informed judgment about a proposed plan. ***Nor should a creditor have to wait until an evidentiary hearing to learn that statements or objectives in the Plan are predicated on data that is simplistically or incorrectly stated.*** (emphasis added)

---

[15] 56 B.R. 449, 454-55 (Bankr.D.Vt.1985)

The *In re Tavern Motor Inn* court's reference to the "adequate information" requirements for disclosure statements indicate unequivocally that a disclosure statement proponent must submit the financial projections with the disclosure statement for review by the creditors and the court before the confirmation hearing.

More generally, courts have developed lists of factors that may be used for evaluating the adequacy of a disclosure statement that routinely include a requirement for financial projections. [16] In pertinent part, the usual list reads:

> . . financial information, data, valuations or projections relevant to the creditors' decision to accept or reject the Chapter 11 plan; . . . .[17]

In specifically *disapproving* a disclosure statement for lacking financial projections, the court in *In re Adana Mortgage Bankers* stated:

> The Disclosure Statement provides no financial information, data, valuations, or projections relevant to the determination by the Creditors of whether to accept or reject Debtor's Plan. Such financial information is the nature of that required under Section 1125 to constitute "adequate information." . . . . The basic financial information must be supplied in the statement.[18]

Indeed, it appears to be so widely assumed that the disclosure statement will include proforma projections and the focus turns to the backup for the projections:

> Merely attaching *pro forma* income calculations to the Disclosure Statement is insufficient. A more detailed analysis of the projected income, expenses, and surplus funds available for satisfaction of claims and interest is appropriate. Further, the Disclosure Statement should clearly identify all assumptions made in calculating *pro forma* information and should set forth those facts supporting all estimates. Information regarding the accounting and valuation methods used in preparation of the Disclosure Statement's financial exhibits must also be included. [19]

---

[16] Numerous courts have prescribed a list of disclosures which typically should be included in a disclosure statement. There is indeed a "mountain" of case law supporting the requirement.
[17] *In re Metrocraft Publishing Services, Inc.*, 39 B.R. 567 (Bankr. N.D. Ga. 1984).
[18] *In re Adana Mortgage Bankers, Inc.*, 14 B.R 29 (Bankr. N.D. Ga. 1981).
[19] *In re Cardinal Congregate I*, 121 B.R. 760 (Bankr. S.D. Ohio 1990)(disclosure statement lacked necessary information)

APS urges this Court to require the Debtor attach *Brantly's* financial projections to the disclosure statement and that such projections be based on the historical performance of the Debtor's business and a realistic projection of the future operation. Any projected increases in future income must be fully substantiated.

### III.

### The Debtor and Plan Proponent Have Failed to Discuss the Cost of the TAE Litigation and the Results of Failure

The Debtor's Second Amended Disclosure Statement continues to be silent with respect to the proposed TAE litigation, the costs thereof, the potential results of same and the impact of the success or failure of same. As has been stated in a similar context: [20]

> Rather, the statement should inform the reader what the undisputed claims are, what the disputed claims are, **what effect, if any, there will be on the distribution if disputed claims are or are not allowed,** and when will distribution be made. **This requires** a total dollar amount projected for the undisputed claims, and **a total dollar amount projected for the disputed claims should they be allowed over objections**. (emphasis added) [21]

In a previous liquidation analysis, the Committee estimated the litigation against TAE would cost $500,000. If so, this would reduce the trust by 25% and the payout accordingly.

More importantly, as TAE is by far the largest creditor, should the recharacterization litigation *fail*, the trust would be faced with a claim for over $18

---

[20] This is a striking omission in light of the fact that in the immediately preceding paragraph, the Debtor *does* disclose the cost $500,000 of the litigation against TAG in support of the Debtor's argument that it has done the creditors a great service by obtaining a release from TAG in lieu of litigation. If it would cost $500,000 to litigate whether TAG has a secured claim, it will surely cost that much to recharacterize TAE.
[21] *In re Ferretti*, 128 B.R. 16 (Bankr. D.N.H. 1991).

million. [22]  Under these circumstances, what would the percentage payout be? The Debtor has failed to submit "adequate data" in discussing this contingency.

## IV.

### The Debtor and Plan Proponent Have Failed to Advise
### Whether Current Management Has Agreed to Continue

In disapproving a disclosure statement for failing to disclose management, the court in *In re Adana Mortgage Bankers* stated:

> The Disclosure Statement does not disclose the identity or experience of the proposed management of Debtor's business pursuant to Debtor's Plan. [23]

Rather than disclosing the identity of proposed management, Debtor's Second Amended Disclosure Statement states:

> Brantly has advised the Debtor that [sic] *intends* to have the Reorganized Debtor retain all existing employees of the Debtor and to retain Kent Abercrombie, the current President of the Debtor, to operate the Reorganized Debtor. The Debtor has advised all of its employees of the pending acquisition by Brantly and the Debtor *believes* that all current employees will stay with the Reorganized Debtor *provided that* Brantly fulfills its commitments as described under Section IX Feasibility of the Plan. [24] (emphasis added)

In addressing this precise issue at the hearing on July 6, the Court advised the Debtor to clarify whether or not Mr. Abercrombie and/or other management had agreed to stay on "to operate the Reorganized Debtor." Although this section of the statement has now been amended, a hypothetical investor and this court still do not know directly the answer to a simple question - has he?

---

[22] As TAE was a subsidiary of TAG and merely taking instructions from the latter, any litigation against TAE will likely result in a claim for indemnity, contribution or reimbursement by the insolvency administrator for TAE against TAG and further delay any distribution as the claim of TAG and TAE is upwards of $28 million.
[23] *In re Adana Mortgage Bankers, Inc.*, 14 B.R 29 (Bankr. N.D. Ga. 1981).
[24] Disclosure Statement, p. 19

Further, this representation in the disclosure statement is inconsistent with the amended Plan which asserts unequivocally that "The initial director and officer of the Reorganized Debtor shall be Kent Abercrombie, President and Chief Executive Officer." If that is true, it should be a simple matter to amend the disclosure statement to so state rather than to *suggest* that Mr. Abercrombie will stay on " *provided that* Brantly fulfills its commitments as described under Section IX Feasibility of the Plan" as noted on the disclosure statement. [25]

Clearly, Brantly believes Mr. Abercrombie's retention is critical to the future success of Superior as Brantly "intends" for Mr. Abercrombie to stay on. Superior's suppliers and other creditors will likely agree that future success of Superior will require someone of Mr. Abercrombie's caliber and are entitled to know whether he has made a decision as is implied in the disclosure statement and stated directly in the Plan.

APS urges the court to require the Debtor to make this simple disclosure for the benefit of the hypothetical investor and to satisfy's the Court's requirement under **Section 1129(a)(5)(A)(i)**:

> The proponent of the plan has disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the plan, as a director, officer, or voting trustee of the debtor, an affiliate of the debtor participating in a joint plan with the debtor, or a successor to the debtor under the plan;

WHEREFORE, PREMISES CONSIDERED, APS files these Supplemental Objections to the Second Amended Disclosure Statement of Superior Air Parts, Inc. and requests an order of the Court denying approval of the Second Amended Disclosure Statement and for such other and further relief as may be just and equitable.

DATE: July 13, 2009

---

[25] Respectfully, perhaps it is time for the Court to hear from Mr. Abercrombie directly on this point.

Respectfully submitted,

By: /s/Billy G. Leonard, Jr.
   BILLY G. LEONARD, JR.
   Texas State Bar No. 12208100
   1650 W. Virginia Street, Suite 211
   McKinney, Texas 75069
   (469) 742-0855
   (469) 442-0135 (Facsimile)

and

Kevin H. Good
Texas Bar No. 08139300
Conner & Winters LLP
1700 Pacific Avenue
Suite 2250
Dallas, Texas 75201
Telephone (214)217-8070
Fax (214) 217-8861

**Attorneys for Aviation Parts Supply, Inc.**

Certificate of Service

The undersigned counsel certifies that on the 13th day of July, 2009, a true and correct copy of the foregoing was served to those persons receiving electronic notification from the Court's electronic filing system and via e-mail to Mr. Stephen Roberts, counsel for the Debtor and Mr. Dave Parham, counsel for the Unsecured Creditors' Committee.

/s/Billy G. Leonard, Jr
Billy G. Leonard