Billy G. Leonard, Jr.
Texas Bar No. 12208100
Attorney at Law
1650 W. Virginia Street, Suite 211
McKinney, Texas 75069-7703
Telephone  (469) 742-0855
Fax  (469) 442-0135

and

Kevin H. Good
Texas Bar No. 08139300
Conner & Winters LLP
1700 Pacific Avenue
Suite 2250
Dallas, Texas 75201
Telephone  (214)217-8070
Fax  (214) 217-8861

**Attorneys for Aviation Parts Supply, Inc**.

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| **IN RE:** | § § § | |
| | § | **Case No. 08-36705** |
| **SUPERIOR AIR PARTS, INC.,** | § | **Chapter 11** |
| | § | |
| **Debtor.** | § § § | |

## AVIATION PARTS SUPPLY, INC.'S FIRST AMENDED DISCLOSURE STATEMENT
## FOR COMPETING PLAN OF REORGANIZATION FOR
## SUPERIOR AIR PARTS, INC.

## DATED AUGUST 4, 2009

***THIS DISCLOSURE STATEMENT HAS BEEN FILED WITH THE BANKRUPTCY COURT,
BUT HAS NOT YET BEEN APPROVED OR DISAPPROVED BY THE COURT***.

# TABLE OF CONTENTS

**I.** INTRODUCTION ...................................................................................................... 4

**A.** DISCLAIMERS ....................................................................................................4

**B.** BRIEF EXPLANATION OF CHAPTER 11 ...........................................................5

**C.** THIS DISCLOSURE STATEMENT......................................................................5

**D.** HISTORY OF THE DEBTOR...............................................................................7

**E.** **AVIATION PARTS SUPPLY - PLAN PROPONENT** ......................................9

**F.** BRIEF SUMMARY OF CLAIMS' TREATMENT UNDER APS PLAN.............................10

**G.** FEASIBILITY OF THE APS PLAN.....................................................................11

**II.** EVENTS LEADING TO BANKRUPTCY FILING ..................................................... 12

**III.** ASSETS AND LIABILITIES AT THE TIME OF FILING ........................................... 14

**IV.** SIGNIFICANT EVENTS IN CHAPTER 11 ............................................................. 16

**V.** OPERATIONS OF THE DEBTOR IN CHAPTER 11................................................ 18

**VI.** CURRENT ANALYSIS AND VALUATION OF DEBTOR'S PROPERTY ................. 19

**A.** REAL PROPERTY .............................................................................................19

**B.** PERSONAL PROPERTY ...................................................................................19

**C.** CAUSES OF ACTION ........................................................................................19

**VII.** ADDITIONAL DETAIL OF APS PLAN ................................................................... 21

**A.** FUNDING...........................................................................................................21

**B.** ADMINISTRATIVE CLAIMS ..............................................................................22

**C.** SECURED CLAIMS............................................................................................23

**D.** UNSECURED CLAIMS ......................................................................................23

**E.** EXECUTORY CONTRACTS AND UNEXPIRED LEASES .................................23

**F.** OTHER CLAIMS REDUCTION MEASURES.....................................................24

**G.** APS CLAIMS ESTIMATES FOR GENERAL UNSECURED CLAIMS ..........................26

**H.** CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS.........................26

**I.** CLASSES ENTITLED TO VOTE .......................................................................27

**VIII.** MEANS FOR IMPLEMENTATION OF THIS PLAN ............................................... 27

**IX.** PROVISIONS REGARDING DISTRIBUTIONS ..................................................... 29

**X.** PROVISIONS FOR RESOLVING DISPUTED CLAIMS.......................................... 30

**XI.** EFFECT OF CONFIRMATION, DISCHARGE, RELEASES, AND INJUNCTION .... 31

**XII.** CONDITIONS PRECEDENT .................................................................................. 33

**XIII.** RETENTION OF JURISDICTION ........................................................................... 34

**XIV.** OTHER CONSIDERATIONS IN VOTING ON THE APS PLAN............................ 35

**A.** ALTERNATIVES TO APS' PLAN..................................................................35

**B.** TAX CONSEQUENCES ...........................................................................36

**C.** CONFIRMATION OF THE APS PLAN, VOTING PROCEDURES, AND
REQUIREMENTS FOR CONFIRMATION OF A PLAN...................................36

**XV.** MISCELLANEOUS PROVISIONS ......................................................... 39

**XVI.** CONCLUSION.................................................................................... 41

## I.  INTRODUCTION

Aviation Parts Supply, Inc., ("APS"), a creditor and party in interest in the above-styled case under Chapter 11 of the Bankruptcy Code, proposes its First Amended Plan of Reorganization for Superior Air Parts, Inc. ("Plan" or "APS Plan") dated August 3, 2009, to the Court, the creditors, and all other parties-in-interest under which APS proposes to reorganize Superior Air Parts, Inc. (the "Debtor" or "Superior") by making a cash contribution, providing a mechanism for the sale of the Vantage Engine, and using cash on hand, the cash contribution, and proceeds from the sale of the Vantage Engine as more fully described in this Disclosure Statement and in the attached Plan of Reorganization to pay creditors according to the priorities set forth in the APS Plan.

DEFINITIONS: Capitalized terms used but not defined in this Disclosure Statement are defined in Article II of the APS Plan.

## A.    DISCLAIMERS

**THE PLAN BEING PROPOSED BY APS IS A COMPETING PLAN OF REORGANIZATION AND IS BEING PROPOSED  AS AN ALTERNATIVE TO THE DEBTOR'S PLAN OF REORGANIZATION.  THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT COMES FROM A VARIETY OF SOURCES INCLUDING, BUT NOT LIMITED TO, FINANCIAL INFORMATION PROVIDED BY DEBTOR, INFORMATION OBTAINED BY APS IN THE COURSE OF ITS DUE DILIGENCE, MONTHLY OPERATING REPORTS, PLEADINGS FILED IN THE CASE, AND THE DEBTOR'S DISCLOSURE STATEMENT.**

**ALTHOUGH THIS DISCLOSURE STATEMENT, IN LARGE PART, RELIES ON INFORMATION CONTAINED IN THE DEBTOR'S DISCLOSURE STATEMENT, THIS IS NOT THE DEBTOR'S DISCLOSURE STATEMENT; IT IS APS' DISCLOSURE STATEMENT.**

NO REPRESENTATIONS CONCERNING THE DEBTOR PARTICULARLY AS TO ITS FUTURE INCOME, VALUE OF CURRENT ASSETS, OR THE VALUE OF ANY OTHER ASSETS TO BE CONSIDERED UNDER THE APS PLAN, ARE AUTHORIZED BY THE PROPONENTS OTHER THAN AS SET FORTH IN THIS STATEMENT. ANY REPRESENTATIONS OR INDUCEMENTS MADE TO SECURE YOUR ACCEPTANCE WHICH ARE OTHER THAN AS SET FORTH IN THIS STATEMENT, SHOULD NOT BE RELIED UPON IN ARRIVING AT YOUR DECISION.

THE INFORMATION CONTAINED HEREIN HAS NOT BEEN INDEPENDENTLY AUDITED FOR INCLUSION HEREIN. THIS DISCLOSURE STATEMENT IS INTENDED FOR THE SOLE USE OF CREDITORS AND OTHER PARTIES-IN-INTEREST OF THE DEBTOR TO ENABLE SUCH CREDITORS AND OTHER PARTIES-IN-INTEREST TO MAKE AN INFORMED DECISION ABOUT THE APS PLAN.

IF ANY IMPAIRED CLASS VOTES TO REJECT THE APS PLAN, APS MAY SEEK CONFIRMATION UNDER THE CRAM DOWN PROVISIONS OF § 1129(b) OF THE BANKRUPTCY CODE AND HEREBY GIVES NOTICE OF INTENT TO INVOKE THE CRAM DOWN PROVISIONS OF § 1129(b) IN THAT EVENT.

## B.    BRIEF EXPLANATION OF CHAPTER 11

Chapter 11 is the principal reorganization chapter of the Bankruptcy Code.  Upon the commencement of a Chapter 11 case, § 362 of the Bankruptcy Code provides for an automatic stay of all attempts to collect from the Debtor any claims which arose prior to bankruptcy filing or otherwise to interfere with a Debtor's property or business.  Under Chapter 11, a Debtor attempts to reorganize its business for the benefit of the Debtor, its creditors, and equity security holders in the formulation of a plan of reorganization. In some instances, liquidation in Chapter 11 is preferable to liquidation in Chapter 7 because the rights and duties of the Debtor-in-possession in Chapter 11 can be utilized to greater maximize the value of the assets of the estate and increase the return to creditors. The legal requirements for Court approval, called "confirmation", of a plan are discussed in Article XIV. C., Requirements for Confirmation of a Plan, of this Disclosure Statement.

## C.    THIS DISCLOSURE STATEMENT

<u>Why You Have Received This Disclosure Statement</u>.  You have received this Aviation Parts Supply, Inc.'s  Disclosure Statement ("Disclosure Statement") because APS filed a competing Plan of Reorganization with the Bankruptcy Court on July 15, 2009, as amended by Aviation Parts Supply, Inc.'s First Amended Plan of Reorganization filed on August 3, 2009 (the "APS Plan").  The Bankruptcy Court will hold a hearing on the adequacy of this Disclosure Statement on August 26, 2009 at 1:15 p.m. in the United States Bankruptcy Court, Northern District, 1100 Commerce Street, Dallas, TX  75242.  A copy of the APS Plan is enclosed with the materials that you have received.  This Disclosure Statement is provided pursuant to § 1125 of the Bankruptcy Code to all of the Debtor's known Creditors and other parties-in-interest whose claims are impaired in connection with the solicitation of acceptance of the APS Plan.

<u>Purpose of this Disclosure Statement</u>.  The purpose of this Disclosure Statement is to provide such information as will enable a hypothetical, reasonable investor typical of the holders of Claims against the Debtor to make an informed judgment in exercising its right either to accept or reject the APS Plan.  The definitions in the APS Plan should be referred to in reading and analyzing the APS Plan and this Disclosure Statement.

<u>Purpose of the Plan</u>.  The purpose of the APS Plan is to provide a mechanism for the reorganization of the Debtor's assets and for the payment of Creditors. The APS Plan was developed by APS after consulting with its respective financial and legal advisers, certain Creditors and other interested parties.  APS believes that the APS Plan is more attractive than other alternatives, such as the Debtor's plan of

reorganization, conversion to Chapter 7 for liquidation, or dismissal of the Chapter 11 Case. **Each creditor is urged to read the APS Plan.**

<u>Bankruptcy Court Approval of this Disclosure Statement</u>. The Bankruptcy Court conducted a hearing on this Disclosure Statement and determined that it contains information of a kind in sufficient detail, adequate to enable a hypothetical, reasonable investor typical of the Classes being solicited to make an informed judgment about the APS Plan. A hearing on approval of this Disclosure Statement is set for August 26, , 2009. It has not yet been approved by the Bankruptcy Court. The preceding statement will be included in the Disclosure Statement that is approved by the Court and circulated to creditors and other parties in interest for solicitation of approval of the APS Plan.

<u>Sources of Information</u>. The information contained in this Disclosure Statement has been submitted by the APS unless specifically stated to be from other sources. As previously indicated, since this Disclosure Statement is soliciting the acceptance of a competing plan of reorganization and since APS is not an insider of the Debtor, APS has had to rely on information obtained from a variety of sources, and this Disclosure Statement relies heavily on information contained in the Debtor's Disclosure Statement.

This Disclosure Statement contains only a summary of the APS Plan. The APS Plan, which accompanies this Disclosure Statement, is an integral part of this Disclosure Statement, and each creditor is urged to read the APS Plan prior to voting. In the event of any conflict between the information set forth in this Disclosure Statement and the APS Plan, the APS Plan language shall control.

**APS makes no representations with respect to the effects of taxation (state or federal) on the Creditors, and no such representations are authorized. Creditors are encouraged to seek the advice of their own professional tax advisor(s) if they have any such questions.**

<u>Only Authorized Disclosure</u>. No party is authorized to give any information with respect to the APS Plan, other than what is contained in this Disclosure Statement as such may be modified or amended and approved by the Bankruptcy Court or any other Disclosure Statement approved by the Court. No representations concerning the Debtor, its business, or the value of its property have been authorized by the Bankruptcy Court, other than as set forth in this Disclosure Statement. Any information, representations, or inducements made to obtain acceptance or rejection of the APS Plan other than, or inconsistent with, the information contained herein and in the APS Plan should not be relied upon by any entity in voting on the APS Plan.

Any representation or inducement made to you not contained in this Disclosure Statement should be reported to the APS' attorneys, who shall deliver such information to the Bankruptcy Court for such action as may be appropriate.

This Disclosure Statement and accompanying exhibits will be transmitted by First-class Mail to all creditors who have either been scheduled by the Debtor, have filed a proof of claim, or properly requested notice under Bankruptcy Rule 2002.

## D.   HISTORY OF THE DEBTOR

The following information comes primarily from the Debtor's Disclosure Statement.

History and Overview of the Debtor's Business. Superior Air Parts, Inc. ("Debtor" or "Superior") is a Texas corporation located in Coppell, Dallas County, Texas which was formed in 1967 with the primary goal of supplying FAA Part 21 replacement parts for Continental and Lycoming piston powered aircraft engines. Superior's replacement parts are manufactured in accordance with Parts Manufacturer Approvals ("PMA") obtained from the FAA.

Since mid-2004, there have been two primary components to the company: 1) the PMA parts business (the "Piece Parts Business") which includes the experimental engine lines, and 2) the Type Certificated Vantage engine (the "Vantage Engine Program").

Superior has FAA PMAs for approximately 2,000 separate replacement parts, about 1,500 of which are active. Superior outsources the manufacture of the PMA parts to specialized suppliers. However, all parts must be shipped to Superior for final quality inspection.

The Vantage engine provides a market alternative to the equivalent Lycoming engine. However, only about 65 Vantage engines have been sold since it was fully certificated in late 2005.

In 2001, Superior decided to sell its regional distribution facilities and to outsource the marketing and parts distribution to Aerospace Products International ("API") so that Superior could focus on developing engines and engine programs - to become an engine OEM. Within months, API closed all of the Superior distribution centers, and API failed to meet the minimum required sales targets.

In APS' view, Superior's decisions to become an engine OEM and to outsource its piece part distribution to API had disastrous financial consequences for Superior between 2001 and 2006..

Purchase of Debtor by TAG. In 2006, Thielert, AG ("TAG"), a German holding company acquired 100% of the ownership interests in Superior by assuming the $10 million in senior and subordinated debt which debt was secured by substantially all of the Debtor's assets. TAG paid $1.00 for the equity. According to the Debtor's Disclosure Statement, "TAG acquired Superior as part of a strategic plan to enter the North American market and expand engine offerings." In APS' view, one effect of this

transaction is that Superior no longer had access to outside capital and was dependent upon TAG for capital to fund the engine programs.

To provide necessary capital, TAG arranged for Thielert Aircraft Engines GmbH ("Thielert AE"), a wholly owned and TAG controlled facility, to ship product to Superior on credit.  Based upon its due diligence, APS believes that Superior was able to maintain liquidity through 2008 only because: 1) TAG allowed Superior to forebear from making any principal payments to TAG and 2) TAG instructed Thielert AE not to collect on its invoices to Superior, a sister company.

By the time TAG and TAE filed for insolvency in the Spring or 2008, Thielert AE had shipped over $15 million in parts to Superior for which it had not been paid.  As a result of TAG's acquisition and this credit arrangement, at the time of the filing of Superior's Chapter 11, Superior was indebted to TAG and its German engine subsidiary for in excess of $28 million.

APS contends that the transfer of parts to Superior from TAG and TAE were, in reality, equity contributions by TAG and TAE.  The Committee has prepared a complaint for a proposed adversary proceeding against TAG and TAE seeking to have their claims recharacterized as equity and not debt, such that they would not be entitled to distributions from the Creditors' Trust.  The Committee has not filed the complaint, but it is anticipated that APS, the Reorganized Debtor, and/or the Committee may file such complaint or similar complaint.

<u>Superior's Financial Performance Since 2005</u>.  A summary of the Debtor's financial performance since 2005 follows:

|  | Gross Sales | EBITDA | Net Income |
|---|---|---|---|
| 2005 | $25,714.775 | ($2,443,665) | ($5,171,469) |
| 2006 | $31,348,956 | ($2,879,352) | ($451,364)  (Result of Thielert AG transaction and treatment of outstanding loans and interest) |
| 2007 | $31,140,083 | ($4,209,928) | ($5,635,053) |
| 2008 | $23,007,415 | ($3,576,304) | ($5,071,081) |

Further information about the Debtor and its products can be found at http://www.superiorairparts.com.

**Disclosure Statement**                                                                 **Page 8 of 42**

## E.    AVIATION PARTS SUPPLY - PLAN PROPONENT

Overview:    Aviation Parts, Supply, Inc. ("APS") is a Texas corporation formed in August, 2008, for the purpose of acquiring Superior's "piece part" business.  APS is invested and financially supported by a group of Superior's large distributors and engine shops with a principle interest of ensuring continued competition with the OEMs in the aftermarket engine parts business.  Approximately 38% of Superior revenue on piece parts in 2007-2008 was from APS financial supporters.

Business Model and Plan: Due diligence reveals that Superior's earnings and revenue began a precipitous decline after 2001.  Since 2001, revenue has declined 49%.  Gross margins have gone down 6% from 33% to 26% and operating expenses averaged $9.3 million annually.  In its last year of operation pre-petition, Superior's expenses were 42% of net sales.  Superior has lost an average of $3.3 million for each of the last 4 years.  Break even in 2007 would have required an overall gross margin of 36% - a percentage which Superior has never sustained and which APS believes is unachievable with an engine company.  For example, achieving this gross margin in 2007 would have required a 44.6% decrease in supplier costs.

APS' discussions with former and current Superior managers and the close connection with the business during this time frame, has convinced APS that these large losses are almost entirely due to the expense associated with the engine program.

As a result, APS' initial business plan will focus on piece parts and will not include cylinders and experimental engine kits. As the cylinder and experimental engine product lines have been essentially dormant for at least a year, APS estimates it will take up to 3 calendar quarters to re-qualify suppliers and establish inventory.[1] In order to take a conservative approach, the first year financial projections submitted with the APS Plan do not take into account the expected ramp up of the cylinders and experimental engine lines.[2]  The APS business plan does not include the Vantage Engine and the APS Plan calls for that asset to be sold for the benefit of creditors.

Management:    The APS acquisition effort has been spear headed by attorney J. Michael Bean, a founding partner of Maloney, Bean, Horn & Hull, P.C., who is currently serving on the APS Board and will serve as its initial director.  Mr. Bean is a minority investor in APS.  Mr. Bean and his firm have been Superior's product liability counsel since 1988.  From 1990 until Superior was purchased by TAG, Mr. Bean also served as Superior General Counsel.  In that capacity, he worked closely with all 7 of Superior's presidents and all 3 owners.  Mr. Bean also has extensive relationships and experience with Superior's largest distributors and engine shops and acts as liability and/or general counsel for some of these businesses.

---

[1]  APS is in final negotiations with Thielert Aircraft Engines, Gmbh, with respect to a long term contract for the manufacture of high quality camshafts, crankshafts, connecting rods and roller lifters.
[2]  As a result, any reference to "piece parts" with respect to the APS Plan does not include cylinders and experimental engines unless specifically stated.

David J. Sisson, a former president of Superior, has agreed to act as an outside director.   During Mr. Sisson's 6-year tenure as Superior's President, sales increased 15% per year from new piston and turbine engine component product development and EBITDA increased 40%.   Additional Board members will be voted upon by the APS investors based upon qualifications to run a PMA business.   The initial directors also include Dan K. Horn and Michael H. Hull, Mr. Bean's law partners. APS anticipates that Messrs. Bean, Horn and Hull will resign the Board when the formation tasks are completed and the Board fully constituted with industry experienced directors.

If the APS Plan is confirmed, Mr. Abercrombie, Superior's current President and CEO, has agreed to continue in that position.   Mr. Abercrombie's agreement to do so and APS' plan to stay at the current superior location, will mean that the FAA will not require Superior to reapply for PMAs as would be required with a new management team or a change of location.   APS believes that this transition planning will ensure a smooth and rapid - if not uninterrupted - transition to new ownership.

As a result of these arrangements and commitments, the APS key management team already in position has nearly 100 years experience in the PMA business. [3]

APS has also retained the services of two consultants on the critical regulatory issues.   Both are former high level managers at the FAA on the Aircraft Certification Office ("ACO") engineering side sand the Manufacturing Inspection District Office ("MIDO") PMA side.   The consultants have had extensive meetings with Superior and the FAA about Superior's transition to APS ownership and have the FAA's assurance that the transition can be a smooth one.

Financing Commitment:   APS has obtained a commitment for a traditional asset based term loan of $2.5 million at very favorable rates for the initial purchase. The term note requires only interest payments for the first 12 months.   In addition, through the same commitment letter, APS has arranged an operating revolver of up to $1.0 million.  APS also has access to an additional $1.5 million of capital for inventory purchases should it be necessary.

## F.   BRIEF SUMMARY OF CLAIMS' TREATMENT UNDER APS PLAN

1.      Administrative Claims will be paid in full either by a creditors' trust or the reorganized debtor;

2.      Secured and priority claims will be paid in full;

3.      Trade claims will be paid pro rata from a creditors' trust;

4.      APS will assume warranty claims where a proof of claim is filed;

---

[3] In addition, the Manager of Production and Logistics, the Director of Procurement and the Quality Assurance Lead Inspector have agreed to remain in their present positions if the APS Plan is confirmed.

5.      APS will assume loss of warranty claims where a proof of claim is filed;

6.      APS will assume and cure all insurance contracts;

7.      APS will reissue cancelled purchase orders where a supplier accepts a modified delivery schedule; and

8.      APS will assume nearly all executory contracts.

For a complete and detailed summary of treatment of claims reference is made to the APS Plan accompanying this Disclosure Statement.

## G.    FEASIBILITY OF THE APS PLAN

The financial data acquired from Superior during due diligence indicates that the piece part business has been exceptionally stable.[4]   Since 1998, piece part revenue has varied from $14 - $18.5 million and gross margins have averaged above 40%. The 11-year average for gross margin dollars is just short of $7.2 million.  As a result, APS concluded that the key to initial positive earnings in a piece part business is to control operating costs.

Working with Mr. Abercrombie, APS has projected the operating costs for a scaled down piece part business.  Comparisons are made against full year 2007 to remove the bankruptcy effects experienced in 2008.[5]  Highlights include:

• Headcount will be reduced from 49 to 22 with corresponding payroll expense reduced from $3.4M to $1.5M.

• Freight and shipping supplies reduced as a result of lower receipts related to piece part only model and conversion of component sources to US manufacturers.  Freight reduction from $933k to $340k.

• Advertising and travel reduced from $947k to $220k.  Trade show attendance will be scaled back to large national shows and print advertising will be reduced to top industry periodicals.  Ad sizes and frequency will also be reduced to streamline advertising efforts.

• Taxes are primarily related to inventory property taxes and will be reduced as a result of minimizing inventory investment to piece part inventory. Inventory turns will be maintained to ensure compliance with Freeport exemption rules.  Inventory will be maintained at approximately $5M.

• Facility size will be reduced from 41,000 sq ft to approximately 20,000 sq ft with rent and facility related expenses being reduced from $415k to $100k.

---

[4]   Exhibit A.
[5]   A detailed expense analysis is attached as Exhibit B.

- Warranty reserve expense will be reduced as a result of the lower sales as well as a change in the warranty policy. Current policy coverage and term will be reduced resulting in estimated annual warranty expense of less than $75,000 i.e. savings of nearly $1.0 million annually.

- Product liability insurance will be reduced from $2.6M to $900,000 net commission by reducing sales to piece parts only.

The more detailed expense analysis is attached as Exhibit B, and indicates that operating expenses can conservatively be reduced from $11.4 to $3.5 million - a savings of $7.9 million over 2007.

On the revenue side, based upon both pre- and post-petition performance, APS projects piece parts sales estimated at approximately $14.5-15 million. By comparison, 2007 piece part sales were $14.8 million. The 11-year average is $15.6 million. The overall gross margin going forward on piece part sales is conservatively estimated at 38.5% versus 41.2% in 2007 and the 11-year average of over 40%.

In summary, using the 11-year historical piece part financial data, reducing operating costs as described and making a conservative prediction on sales and margins for the first year of normalized operations based upon historical performance, [6] APS predicts a first year EBITDA of $1.5 - 1.9 million. [7]

## II.  EVENTS LEADING TO BANKRUPTCY FILING

Thielert AG Insolvency.  On April 30, 2008, TAG filed an insolvency proceeding in Hamburg, Germany and Dr. Achim Ahrendt was appointed as the preliminary Insolvency Administrator.  Thielert AE, which had been providing engine parts to Superior on credit, also filed an insolvency proceeding in Germany, with a different Insolvency Administrator being appointed.  By virtue of the German proceeding, Dr. Ahrendt became the sole shareholder of Superior and therefore had the sole authority to determine its future.  Accordingly, Dr. Ahrendt decided to sell Superior or its assets for the benefit of the TAG creditors in Germany.  In June 2008, Superior hired Corporate Finance Partners Midcap GmbH ("CFP"), a German investment company based in Germany to serve as its investment advisor and to seek possible suitors for the purchase of Superior.

Efforts to Sell Pre-Petition.  In the Debtor's Disclosure Statement, CFP claims to have "canvassed the market, negotiated with numerous potential purchasers, and enabled interested parties to conduct substantial due diligence."  CFP claims to have "identified 76 potential investors (from Superior's industry, adjacent industries, as well as financial investors) world-wide, approached those investors, provided initial

---

[6]   As can be seen on the exhibit, there will be some revenue lag as APS will make a $1.5 - 2.0 million investment in inventory and re-establish the supply chain.
[7]   Exhibit D.

information about Superior as well as discussed with the investors their potential interest in acquiring Superior."  CFP further claims that "eleven investors showed an initial interest and entered into Confidentiality Agreements with CFP."  CFP claims (without naming) that "four offers were received and due diligence was awarded to those investors, including access to a data room, containing detailed financial, operating and legal information and discussion with Superior management."

APS' Pre-Petition efforts to Purchase Superior.

Beginning in May 2008, through CFP, Dr. Ahrendt advised that the goal of Dr. Ahrendt and CFP was to raise as much cash as possible for the TAG insolvency estate i.e. for its creditors.  According to Dr. Ahrendt and CFP, the original plan was to close a sale of Superior by August 1, 2008.  As a result, APS believes that prudent business practices such as reducing employee headcount, securing a line of credit, shedding unprofitable business lines such as the engine program and renegotiating the Thielert AE debt and the facility lease were not begun.

APS believes that, because the FAA "replacement part" market is a niche market, it takes special experience and skill to be successful.  As APS believes the financial information in the Debtor's Disclosure Statement makes quite clear, Superior had not achieved success as an "engine company" and changes were needed to return to profitability.  As a result, over the course of the next 7 months, and quite predictably in the view of APS, the pre-petition efforts to sell Superior resulted in bids by only the three Superior competitors and APS.  APS came to the early conclusion that at least two of the competitors intended to close Superior to improve the market position of those competitors, and so advised Dr. Ahrendt and CFP.  APS also advised CFP and Dr. Ahrendt that selling Superior to any of Superior's competitor raised antitrust issues in APS' view.

On June 27, 2008 a predecessor-in-interest to APS offered to buy Superior's assets for $5-7 million depending upon the value of the inventory at closing, to assume the non-Thielert AE trade payables and to assume the facility and equipment leases.  Then, on September 12, 2008, APS offered to buy Superior's assets for $5.8 million plus a percentage of the later sale of the Vantage Engine, to leave the cash and the $1.3 million balance of the accounts receivable with Dr. Ahrendt and to assume the facility and equipment leases.  As an alternative, APS offered to buy the "piece part" business for $6.0 million cash.

Although each of APS' bids would have resulted in Superior continuing its operations as a piece part company and avoiding Chapter 11, each bid was rejected by Dr. Ahrendt for the reason that, in Dr. Ahrendt's opinion, the bids did not net enough cash for the TAG creditors in Germany.

APS then met with Dr. Ahrendt and CFP in New York on December 3, 2008, and through one of its investors offered to buy the shares of Superior for $4.0 million cash and 90% of the net proceeds from a future sale of the Vantage Engine, the total

consideration proceeds to be split by agreement between TAG and TAE.  At the meeting, Dr. Ahrendt indicated he thought that the engine sale could bring $5 million.  If true, this made the offer worth up to $8.5 million and the assumption of all of Superior's liabilities.  However, after the offer was confirmed in writing several days later at CFP's request, and despite several follow up inquiries from APS, APS received no further response from Dr. Ahrendt or CFP.

APS then learned on New Year's Eve day that on December 30, 2008, Superior had executed an Asset Purchase Agreement with Avco Corporation.

Purchase Agreement with Avco Corporation.  Superior entered into an asset purchase agreement on December 30, 2008 with Avco Corporation ("Avco"), a wholly-owned subsidiary of Textron Inc., pursuant to which Avco agreed to buy substantially all of Superior's assets for $11.5 million, subject to adjustments for inventory reductions after October 31, 2008.  According to APS' calculations, by the time of the proposed auction, the inventory adjustment resulted in a cash price of approximately $9.5 million plus a requirement that Superior set aside $500,000 for certain contingencies.

One of the conditions of the purchase agreement was that the purchase be consummated through a Chapter 11 bankruptcy proceeding.  As indicated by the Debtor in its Disclosure Statement, this Chapter 11 case was filed to liquidate the assets of Superior and to obtain the highest and best price for creditors, either through the purchase agreement with Avco or at a public auction. Another condition of the purchase agreement was that the court make certain findings that could be used by Avco as a defense to any government antitrust investigations.

In summary, APS' due diligence indicates that Superior did not need to file Chapter 11.  It was not insolvent and was meeting its financial obligations as they came due.  Rather, Superior filed for Chapter 11 at Dr. Ahrendt's instruction in order to facilitate the Avco purchase so that Dr. Ahrendt could net the maximum cash for the insolvent TAG estate's creditors in Germany.

## III.  ASSETS AND LIABILITIES AT THE TIME OF FILING

The following information is taken primarily from the Debtor's Disclosure Statement except where indicated:

On December 31, 2008, the Debtor filed its schedules of assets and liabilities and a Statement of Financial Affairs required by the Bankruptcy Code.  Bankruptcy Schedule A lists ownership of real property.  Bankruptcy Schedule B lists personal property.  Amended schedules for certain categories were filed by the Debtor on or about June 29, 2009.

Real Property.  The Debtor did not own any real property.

Personal Property.   The Debtor's personal property consists primarily of cash on hand, inventory, accounts receivable, equipment, machinery, and tooling.   As of the date of filing, scheduled personal property was estimated to total $18,139,685.16 including approximately $412,000 in cash, $11,158,744 in inventory, $5,392,055 in accounts receivable, $156,287 in equipment and aircraft accessories, $116,870 in machinery and $779,408 in tooling. The Debtor also owns Intellectual Property related to its PMAs, Production Certificates, Type Certificates and Supplemental Type Certificates of undetermined value.   The Debtor has indicated that it has an $81,000 security deposit with its landlord, Texas Duggan Limited Partnership.

Potential Liabilities.   The Debtor provided APS and the Committee the Debtor's claims analysis of potential allowed claims.   The Debtor's claims analysis, as set forth in its Disclosure Statement, is as follows:

Secured Tax Claims $74,617.82;
Priority Employee Claims $56,144.43;
Secured Claims $227,620.42; and

General Unsecured Claims:   This amount consists of the following:

$2,053,176 in trade claims;
$285,319 in actual warranty claims;
$83,140 in loss of warranty claims;
$3,407,000 contingent insurance-related claims;
$28,354,871.28 in unsecured claims of TAG and Thielert AE;
$5,288,811 in outstanding purchase orders, excluding TAE;
$425,785 in real estate leases; and
$90,948 in executory contracts.

APS Claims Estimates:   APS estimates the actual amount of General Unsecured Claims will be not more than $1.5 million, after allowing for separate treatment and reduction of the TAG and TAE claims, and after allowing for the other claims reductions and claim assumptions APS proposes below.

As noted, APS believes that Superior did not need to file Chapter 11.   If this is correct, and if the APS Plan essentially "rewinds the clock" to December 31, 2008, by assuming the promises Superior had made to its creditors at that point as is proposed, one would expect the General Unsecured Claims to be approximately the same as Superior's non-TAE trade payables on December 31, 2008.   The Debtor's schedules indicate that the non-TAE payables were slightly more than $1.1 million.

It is anticipated that the Creditors' Trustee will examine all of the claims and object to those which are disputed and have not been resolved as of the Confirmation Hearing.

## IV.  SIGNIFICANT EVENTS IN CHAPTER 11

Superior's Efforts to Sell Substantially All of Debtor's Assets Free and Clear of Liens and Establish Auction Procedures:   On December 30, 2008, just prior to the commencement of this case, Superior entered into an asset purchase agreement with Avco Corporation ("Avco"), an affiliate of Textron Inc., wherein Avco agreed to buy substantially all of the Debtor's assets for $11 million, subject to adjustments for inventory reductions.

Superior filed a motion for approval of a bid procedure which was approved by this Court, and an accelerated bar date for claims was established.  Notice was given to all known creditors, and all owners of piston powered aircraft engines registered with the Federal Aviation Administration, and by publication in several industry publications.

The auction was conducted on February 25, 2009. The two bidders were Avco and TCM, an affiliate of Teledyne Industries, Inc.  The bidders were the manufacturers of piston powered aircraft engines in which many of the parts sold by Superior are installed and are competitors with Superior in the small aircraft parts business.  A sale to either of these purchasers raised anti-trust concerns with the United States Department of Justice and various state attorneys general who initiated investigations to determine whether a sale to either company would violate anti-trust laws. According to the Debtor, the parties were unable to reach an agreement on how to address these concerns, and the Debtor chose to decline their bids.

Since that time, Superior has continued to operate and sell parts and has continued its efforts to sale the company. APS knows of two parties who came forward with firm purchase offers, APS and Brantly International, Inc. ("Brantly").

Motion to Pay Prepetition Wages and Benefits.   The Debtor sought Court authority to pay certain pre-petition obligations to the Debtor's fifteen full-time employees and one independent contractor the Debtor retained after the filing, who were necessary to the consummation of a sale.  The pre-petition obligations included (1) amounts owed to the employees for wages, salaries, vacation pay, sick leave pay, holiday pay, jury duty pay, federal, state and local payroll related taxes, deductions and withholdings, payroll deductions in respect of various benefits, and reimbursement for business expenses; and (2) benefit claims of employees.  The Debtor sought authority to pay such expenses in accordance with existing Company policies and practices.

The Court approved the Motion to Pay Prepetition Wages and Benefits on January 9, 2009.

Employment of Professionals. On January 2, 2009, the Debtor sought to employ Stephen A. Roberts, Duane J. Brescia, and the law firm of Strasburger & Price, LLP ("Strasburger"), 600 Congress Ave., Suite 1600, Austin, Texas 78701 as counsel for Debtor.  The employment was approved by the Court on February 20, 2009.

On January 7, 2009, the Debtor sought to employ Daniel Schenk and Capital Financial Partners, Midcap GmbH ("CFP"), as investment consultants. The employment was approved by the Court on February 20, 2009.

Formation of Creditors' Committee and Employment of Committee Professionals. On January 29, 2009, the United States Trustee appointed an official committee of unsecured creditors (the "Committee"), which was amended on January 30, 2009. The committee consists of the following creditors: Avstar, KSPG Automotive Brazil LTDA, Eck Industries, Inc., Hartford Aircraft Products, Seal Science, Inc., and Zanzi, S.p.A.

Baker & McKenzie, LLP was employed as counsel to the Committee by Order dated April 8, 2009.

Lain Faulkner & Co. was employed as financial adviser to the Committee by Order dated April 8, 2009.

Debtor's Adversary Proceeding to Avoid Lien of Thielert AG (Adv. Proc. No. 09-3052). TAG filed its proof of claim on February 11, 2009, asserting a secured claim in the amount of $10,146,611.11. The Debtor filed Adversary Proceeding No. 09-3052 on or about February 17, 2009 seeking to avoid the liens and security interests of TAG on the grounds that TAG failed to perfect its asserted lien against the Debtor's assets. A hearing on Debtor's Motion for Summary Judgment was held on June 22, 2009 at 9:00 a.m., and the court granted the Motion.

The Wrongful Death and Personal Injury Claims and Lawsuits. At the time the bankruptcy case was filed, there were numerous personal injury and wrongful death claims and lawsuits on file against the Debtor. These claims and lawsuits were disclosed in Debtor's schedules and statement of financial affairs and were automatically stayed by the Chapter 11 proceeding (the "Stays").

The underlying insurance policies covering some of these lawsuits and claims provide for expense and indemnity deductibles that the insurance carriers have stated are the responsibility of the Debtor. Further, the Debtor claims that the insurance carriers have expressed the opinion that the Debtor's failure to assume responsibility for the payment of those items is a condition of the carrier's obligation to continue to provide a defense on behalf of the Debtor.

Several claimants filed Motions for Relief from the Stays. The Debtor has entered into agreements with all parties who filed Motions for Relief from Stay to lift the stay and permit those claimants to pursue insurance recoveries. In exchange, these claimants have agreed not to seek collection of their claims from the estate. However, the extent of the Debtor's contractual requirements to pay deductibles is the subject of various objections and has not been decided.

Motion to Return Reclaimed Goods. According to the Debtor, it received written reclamation demands from four suppliers: Avail, Inc., Mahle Engine Components USA,

Inc., Seal Science, Inc., and Emag Ignitions (TM) that all goods received by the Debtor within 45 days prior to the bankruptcy filing be returned.

Reclamation is limited to goods delivered 45 days prior to the bankruptcy filing. Reclaiming creditors must demand reclamation no later than 20 days after the date of commencement of the case.  The Debtor has indicated that all of the demands were received by Superior on or before 20 days after the commencement of this case and the inventory items at issue were received by Superior within 45 days of the filing of this case and were delivered in the ordinary course of business.  Upon receipt of each demand, Superior has indicated that it identified and segregated the remaining inventory on hand subject to the particular reclamation claim.

On or about March 5, 2009, Debtor filed its motion to return the reclaimed goods and agreed orders for the return of the remaining inventory and resolution of any residual claims have been entered on the claims of Av, Inc., Mahle Engine Components USA, Inc., Seal Science, Inc., and Emag Ignitions (TM).

Exclusivity.  Under Section 1121 of the Bankruptcy Code, and unless otherwise permitted by order of the Bankruptcy Court, only the Debtor may file a plan until after 120 days after the date of filing the Bankruptcy Petition.  Should the Debtor file a plan during this 120 day period, it has an additional 60 day period in which to obtain acceptance of its plan; otherwise, the Debtor loses the exclusive right to propose a plan. The Debtor obtained one extension of the exclusivity period.

Exclusivity expired on July 14, 2009.

Debtor's Disclosure Statement and Plan.  The Debtor obtained approval of its Disclosure Statement on July 22, 2009.  Reference is made to the Debtor's Disclosure Statement and Debtor's Plan of Reorganization should a Creditor want information concerning the Debtor's proposal for Superior's reorganization.

## V.  OPERATIONS OF THE DEBTOR IN CHAPTER 11

The Debtor's Disclosure Statement indicates that since filing, the Debtor has operated as Debtor-in-Possession on a very limited basis.  Superior stopped assembling cylinders and engines, eliminated its sales and marketing staff, reduced its employees to 15, and virtually ceased acquiring parts from its vendors in anticipation of the sale of its assets to Avco Corporation.  Further, the Debtor indicates that after the Avco sale fell through, Superior began acquiring parts to fill out its inventory and continue the Piece Parts Business in a limited capacity to serve its customers.  The Debtor states that it has sufficient cash reserves to meet its ongoing obligations under the Bankruptcy Code.

The Debtor has filed monthly operating reports which provide detailed information regarding the financial condition and operations of the Debtor. For Creditors

who have an account subscription with PACER, a fee service which allows online access to court electronic records, the monthly operating reports may be accessed online under the Superior Bankruptcy Proceeding electronic docket.  Alternatively, Creditors may contact counsel for APS and obtain copies of the monthly operating reports filed by the Debtor.

## VI.  CURRENT ANALYSIS AND VALUATION OF DEBTOR'S PROPERTY

### A.  REAL PROPERTY

The Debtor does not own any real property.

### B.  PERSONAL PROPERTY

According to the Debtor, as of May 15, 2009, (i) the Debtor's personal property consists primarily of cash on hand, inventory, accounts receivable, equipment, machinery, and tooling totaling $17,172,437; (ii) the Debtor had approximately $3,526,957.40 in cash as of May 14, 2009; (iii) the current value of the inventory is $7,503,741.27; (iv) Debtor has accounts receivable in the amount of $5,099.042.50, equipment in the amount of $29,324.37, machinery in the amount of $116,869.81, and tooling in the amount of $474,616.83.  The Debtor also owns Intellectual Property related to its PMAs, Production Certificates, Type Certificates and Supplemental Type Certificates of undetermined value.

### C.  CAUSES OF ACTION

Fraudulent Transfer and Voidable Preference Claims.  All Fraudulent Transfer and Voidable Preference Claims are being preserved and, as part of the APS Plan, assigned to the Creditors' Trust, except at specifically provided in the Plan.  Under Chapter 5 of the Bankruptcy Code, the bankruptcy estate has the right to recover property of the Debtor which was conveyed fraudulently or for less than reasonably equivalent value while the Debtor was insolvent ("Fraudulent Transfers").  The bankruptcy estate is also entitled to recover payments made to creditors on existing, legitimate debts where such payments were to insiders within one year of the bankruptcy filing or to anyone else, including vendors, within 90 days of the bankruptcy filing ("Voidable Preferences").  There are certain defenses that payees may assert to defeat Voidable Preference claims, the most common one being that the payment was made timely, in the ordinary course of business and according to ordinary business terms.  Moreover, for a payment to be a Voidable Preference, it must enable the payee to receive more than the payee would have received in a Chapter 7 liquidation had the payment not been made.  Accordingly, a payment to a fully secured creditor would not be a Voidable Preference.  Similarly, payments to employees, whose claims have priority over the claims of general unsecured creditors in Chapter 7 liquidation, are rarely Voidable Preferences.

In the 90-days preceding the chapter 11 filing, Debtor made $3,079,674 in payments to creditors.  These payments may constitute Voidable Preferences or Fraudulent Transfers.

In the 12-months preceding the chapter 11 filing, Debtor made $1,338,954 in payments to insiders.  These payments may constitute Voidable Preferences or Fraudulent Transfers.

APS anticipates that the Creditors' Trustee will evaluate these avoidance claims following Confirmation and determine whether or not to file adversary proceedings to avoid these transfers.

<u>Cause of Action Against Thielert AG and Thielert AE</u>:  TAG is the owner of all of Superior's outstanding shares, and claims a security interest in substantially all of Superior's assets, which consist solely of personal property.  TAG filed a Proof of Claim in this case asserting a secured claim in the amount of $10,146,611.11.  Debtor filed its adversary proceeding against TAG pursuant to its "Avoidance Powers" under 11 U.S.C. § 544.  The lawsuit seeks to avoid the lien and security interest of TAG because TAG failed to maintain perfection of its security interest in Superior's assets.  On June 22, 2009, a hearing was held and the court granted Superior's Motion to Summary Judgment.

APS believes that APS and/or the Debtor have claims against TAG related to pre-petition dealings between TAG and the Debtor, including a claim to equitably subordinate TAG's claim to all unsecured claims.  Further APS believes that the Debtor has claims against TAG for insider payments made pre-petition that were not in the ordinary course of business.  The Debtor states in the Debtor's Disclosure Statement that TAG does not believe that such claims have merit.

APS believes that APS and/or the Debtor have claims against Thielert AE, including a claim to recharacterize Thielert AE's claim as an equity interest.  The APS Plan includes a compromise of these claims against TAE, and a release of TAE. Pursuant to the compromise, TAE will receive $500,000 in exchange for a release of its filed claim in excess of $18 million.

## VII.  ADDITIONAL DETAIL OF APS PLAN

**THIS PLAN IS A COMPETING PLAN OF REORGANIZATION AND IS BEING PROPOSED AS AN ALTERNATIVE TO THE DEBTOR'S PLAN OF REORGANIZATION CURRENTLY BEING SOLICITED FOR APPROVAL BY THE DEBTOR.  THIS IS NOT THE DEBTOR'S PLAN OF REORGANIZATION; IT IS A PLAN BEING PROPOSED BY APS, A CREDITOR OF THE DEBTOR.**

Capitalized terms used in the following summary are as defined in the APS Plan under Article II, Definitions. The following summary is included for convenience of the reader and shall not modify the specific terms of the APS Plan:

The APS Plan provides for the treatment of all Claims in a manner that is in the best interests of Creditors and is fair and equitable.  It calls for the continued operation of the Debtor, the establishment of a creditors' trust for the benefit of unsecured creditors, the cancellation of existing equity and the issuance of new equity in the Reorganized Debtor to Aviation Parts Supply, Inc.

## A.    FUNDING

In consideration for the issuance of 100% of the shares in the Reorganized Superior Air Parts, Inc ("Superior") , APS will 1) make a Cash Contribution of $2.5 million, subject to certain adjustments, into a Creditors' Trust for payment of Allowed Claims, as more particularly described in the plan, and 2) relinquish all rights to the Vantage Engine Program so that it can be sold for the benefit of the Class 9 creditor. The Cash Contribution will be decreased pursuant to the Purchase Price Adjustment if, at closing, Superior has less than $2 million in cash and less than $9.14 million in gross inventory and accounts receivable (excluding the account receivable from Thielert AE) and will be increased if gross inventory and accounts receivable (excluding the account receivable from Thielert AE) exceed that amount. Any cash in excess of $2 million will be transferred to the Creditors' Trust.  The Committee has advised APS that the Committee projects that there will be an additional $400,000 - 500,000 in excess cash transferred to the Creditors' Trust.

These projections are APS' best estimates based on information it has obtained from the Debtor, the Committee and APS' own due diligence. The Cash Contribution could be more or less after Adjustments to the Purchase Price due to factors beyond Debtor's control, and so, there could be more or less cash available to pay unsecured creditors.

In addition to the Cash Contribution, APS or its designee will cause a $1,000,000 credit facility to be provided for the immediate use and benefit of the Reorganized Debtor in its ongoing operations.

Before the Effective Date, APS may designate an affiliated company to become the owner of 100% of the shares of the Reorganized Debtor.  APS or its designee will

acquire all of the new ownership interests in Debtor, free and clear of any and all liens, claims and encumbrances to the fullest extent authorized under §1141.   In consideration for the issuance of the new ownership interests to APS or its designee, APS or its designee will fund the Cash Contribution to the Creditors' Trust on the Effective Date.

On or before 3 days prior to the Confirmation Hearing, APS or its designee shall deposit the sum of $250,000 in an escrow account to be established by APS or its designee, which amounts shall be refundable only if  (a) Confirmation of the APS Plan is denied, (b) the Effective Date does not occur on or before September 30, 2009, or (c) any of the other conditions precedent set forth in section 11.1 of the APS Plan are not satisfied or waived by APS as provided therein.

Payments to be made to creditors under the APS Plan will come from the Cash Contribution, the Excess Cash, any litigation recoveries, and the sale of the Vantage Engine Program. On the Effective Date, the Reorganized Debtor/APS shall fund the Creditors' Trust by making the Cash Contribution.

## B.    ADMINISTRATIVE CLAIMS

<u>In General</u>.   Subject to the provisions of sections 330(a) and 331 of the Bankruptcy Code, each holder of an Allowed Administrative Claim shall be paid by the Creditors Trust the full unpaid amount of such Allowed Administrative Claim in cash on the Effective Date or as soon as practicable thereafter, or on such other terms as may be agreed upon by such holder of such Administrative Claim and the Creditors' Trust or otherwise upon order of the Bankruptcy Court; provided, however, that allowed Administrative Claims representing obligations incurred in the ordinary course of business or otherwise assumed by the Debtor pursuant to the APS Plan and unpaid as of the Effective Date, shall be assumed on the Effective Date and paid or performed by the Reorganized Debtor when due in accordance with the terms and conditions of the particular agreements governing such obligations.   All requests for payment of Administrative Claims (other than Professional Fees and claims arising in the ordinary course of business) arising on or before the Effective Date must be filed by the first Business Day after the 30th day after the Effective Date or the holders thereof shall be forever barred from asserting such Administrative Claims against the debtor or the Reorganized Debtor.

<u>Professional Fee Claims</u>.   All final applications for fees for Persons whose retention with respect to the Case has been approved by the Bankruptcy Court or who holds, or asserts, an Administrative Claim shall be filed not less than sixty (60) days after the Effective Date.   Fees for services rendered, and disbursements incurred, on behalf of the Reorganized Debtor, by professionals retained by the Reorganized Debtor, from and after the Effective Date shall be paid by the Reorganized Debtor in the ordinary course.   Fees for services rendered and expenses incurred on behalf of the Creditors' Trust, by professionals retained by the Creditors' Trustee, shall be paid by the Creditors' Trust.

## C.   SECURED CLAIMS

Secured Claims which consist of claims secured by liens on Debtor's testing equipment, office equipment and telephone system will either be assumed by APS and paid in accordance with their terms or the Debtor will return the collateral to the holder of the Secured Claim in satisfaction of the Secured Claim.  Any deficiency would be treated as a Class 7 General Unsecured Claim.  The 2009 taxes will be paid by the Reorganized Superior, owned by APS, when due.

## D.   UNSECURED CLAIMS

The Creditors' Trust will distribute $500,000 to Thielert AE in full satisfaction of its proof of claim filed in the amount of $18,208,260. In consideration for the concessions made by Thielert AE, it will be released from any and all claims and causes of action by anyone in connection with the Debtor.

The Creditors' Trust will then distribute the Balance of the assets of the Creditors' Trust as follows: 1) the Vantage Engine Program will be transferred to TAG, Debtor's parent, in full satisfaction of it proof of claim filed in the amount of $10,146,611, 2) cash payments to the holders of the Class 7 General Unsecured Claims, and 3) the Reorganized Debtor/APS will receive any surplus cash in the Creditors' Trust.

The Debtor will transfer the Vantage Engine Program free and clear of all liens, claims and encumbrances into the Creditors Trust for later sale, subject to certain limited restrictions, with 100% of the net proceeds from any subsequent sale of the Vantage Engine Program to TAG.  APS estimates that the Vantage Engine Program could be sold for $4.0 - 5.0 million based upon discussions with TAG, the Committee and APS' own analysis.  Alternatively, should TAG not accept the Plan, TAG will be paid as ordered by the court adjudicating the TAG Litigation.

## E.   EXECUTORY CONTRACTS AND UNEXPIRED LEASES

Assumption of Executory Contracts:  The Executory Contracts and Unexpired Leases set forth on Exhibit 1 to the APS Plan shall be assumed by the Reorganized Debtor in accordance with the terms of each such Executory Contract and Unexpired Lease as such may be modified by agreement between the non-debtor party to such Executory Contract or Unexpired Lease prior to its assumption.

APS intends to negotiate modifications to certain of the contracts listed on Exhibit 1 to the APS Plan.  Should such negotiations not be successful, APS reserves the right to remove such executory contract or unexpired lease from the list of contracts and/or leases to be assumed.  APS may amend Exhibit 1 at any time prior to the Confirmation Date.

Rejection of Executory Contracts and Unexpired Leases:   All Executory Contracts and Unexpired Leases that have not been specifically assumed by the Debtor or listed by the Debtor and/or Reorganized Debtor on Exhibit 1 to the APS Plan shall be rejected as of the Effective Date, and the rejection claim shall be treated as a Class 7 General Unsecured Claim.

Cure of Defaults:   Reorganized Debtor shall cure all defaults existing under any assumed Executory Contract and Unexpired Lease pursuant to the provisions of sections 1123(a)(5)(G) and 365(b) of the Bankruptcy Code, by paying the amount, if any, determined by the Bankruptcy Court required to be paid in order to assume such Executory Contract and/or Unexpired Lease.   Payment of such amounts shall be made by the Reorganized Debtor on the later of (i) the Effective Date, (ii) the date the Bankruptcy Court determines the cure amount by Final Order, or (iii) the date the Reorganized Debtor and the party to such contract agree on a cure amount. Reorganized Debtor contemplates that there will be no cure amounts on assumed contracts as Reorganized Debtor intends to enter into consensual agreements to modify the contracts being assumed under the APS Plan with such modifications to be in lieu of cure amounts under sections 1123(a)(5)(G) and 365(b) of the Bankruptcy Code.

## F.   OTHER CLAIMS REDUCTION MEASURES

APS has taken and/or agreed to take certain specific actions to significantly reduce the pool of claims of unsecured creditors including the following:

Prepetition Purchase Orders:   With respect to prepetition purchase orders, and except where the Debtor has already reached a different agreement with a supplier of manufactured product prior to the Effective Date, it is the Reorganized Debtor/APS' intent to honor those purchase orders at the original purchase order price and to purchase:

a)   all goods finished as of the Petition Date, and

b)   all unfinished goods identified to the contracts as of the Petition Date, where a modified delivery schedule and supply contract can be negotiated with the suppliers.

Provided however, that the Reorganized Debtor APS shall claim:

a)   a credit from the supplier for any manufactured product ordered and paid for between the Petition Date and the Effective Date and,

b)   require the supplier to ship such finished and unfinished goods to the Reorganized Debtor APS on the agreed schedule.

APS will contact all suppliers with prepetition purchase orders at least ten days before the deadline for voting on the APS Plan and request modifications to the purchase order.  If an agreement is reached on the purchase order, the Reorganized

Debtor will assume the purchase order as modified by the written agreement of the parties.

Any supplier may refuse to agree to any modification to the purchase orders requested by APS.  If the vendor and APS cannot reach an agreement on modifications to a purchase order, APS may reject such purchase order by notifying the vendor of such rejection and filing a notice of such rejection with the Court on or before the Confirmation of the APS Plan.  If a purchase order is rejected, the vendor will have an unsecured claim for any damages arising out of the cancellation of such purchase order, and APS and the Committee reserve any rights to object to such claims.

Any prepetition claims relating to purchase orders for other than finished goods and unfinished goods identified to the pre-petition purchase orders, shall be rejected and treated as a claim under Class 7.

Where the Debtor has reached an agreement with a supplier of manufactured product prior to the Effective Date with respect to a prepetition purchase order, Reorganized Debtor APS will honor that agreement.

Supplier trade payable claims for finished goods delivered prior to the Petition Date shall be treated as a Claim under Class 7.

<u>TAE Claim</u>:  APS has negotiated a release of TAE's $18,208,260 claim in exchange for:

    a)    a cash payment of $500,000;

    b)    the purchase of certain finished and unfinished product;  and

    c)    a long term supply contract.

<u>Product Liability Insurance Contracts</u>:  The Reorganized Debtor APS will assume the Debtor' obligations under its liability insurance policies and cure any defaults, including paying unpaid broker's commissions and accrued deductibles.

<u>Facility Lease</u>:    APS and the Debtor are in discussions with Duke Realty regarding amending the facility lease and APS expects there will be such an agreement prior to the Effective date in exchange for a release of Duke Realty's claim and the Reorganized Debtor APS will assume such amended lease.  Failing agreement satisfactory to APS, the facility lease will be rejected and treated as a Claim under Class 7.

<u>Warranty and Loss of Warranty Claims</u>: The Reorganized Debtor/APS will assume:

    a)    all warranty claims and loss of warranty claims where the claimant has filed a proof of claim; and

b)      will fulfill any warranty obligations related to product sold prior to the Petition Date where the claim arises after the Effective Date.

## G.    APS CLAIMS ESTIMATES FOR GENERAL UNSECURED CLAIMS

APS estimates that the payout for non-insider unsecured claims will vary from 79% - 100%.

<u>Estimated Payouts to Unsecured Creditors</u>:    Under the APS Plan, APS is agreeing to fully assume all obligations set out in Debtor's Disclosure Statement or schedules *except* the 1) prepetition purchase orders, 2) the facility lease, 3) certain executory contracts and 4) trade payables.  As a result, the payout to the non-insider unsecured creditors from the Creditors' Trust depends upon the response of certain creditors to APS' proposals listed above.

<u>Payout if APS Proposed Claims Reduction is Successful</u>:    If APS is successful in negotiating the supplier agreements, facility lease and executory contracts as anticipated, APS estimates the payout to non-insider unsecured creditors will be 100%.

Assuming the engine sells for $4.0 million, TAG would receive $4.0 million.

<u>Payout if APS Proposed Claims Reduction is not Successful</u> On the other hand, if APS is not successful in negotiating the supplier agreements, the facility lease or the executory contracts as anticipated, APS estimates that the payout to non-insider unsecured creditors will be approximately 79.9%.

Assuming the engine sells for $4.0 million, TAG would receive $4.0 million.

## H.    CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

<u>Summary</u>:    Pursuant to Section 1123(a)(1) of the Bankruptcy Code the APS Plan designates the following classes of Claims and Interests.  A Claim or Interest is included in a particular class only to the extent that the Claim or Interest fits within the description of that class and, unless otherwise herein provided, is included in a different class to the extent that any remainder of the Claim or Interest fits within the description of such different class.  A Claim or Interest is included in a particular class only to the extent that the Claim is an Allowed Claim in that class and has not been paid prior to the Effective Date, and, in the case of an Interest evidenced by certificated or uncertificated shares of preferred or common stock, only to the extent that such stock is outstanding immediately prior to the Effective Date.  The treatment afforded to the creditors' Claims or Interests as set forth in the APS Plan shall be in full satisfaction, settlement, release, and discharge for and in exchange for such Claim or Interest, respectively.  The Claims (except for the Administrative Claims which are described above and which are not required to be classified pursuant to section 1123(a)(i) of the Bankruptcy Code) and Interests against the Debtor and a brief description of this treatment is set forth in the following table.  The table is a summary of classes and their treatments.  A more

detailed summary is set forth in the APS Plan accompanying this Disclosure Statement. If there is a difference between the description of the classes and their treatment between this Disclosure Statement and the APS Plan the APS Plan controls.

| Class | Description | Treatment |
|---|---|---|
| 1 | Priority Tax Claims | Paid in full |
| 2 | Priority Employee Claims | Paid in full |
| 3 | Ervin Leasing Company | Assumed by Reorganized Debtor |
| 4 | Great America Leasing Corporation | Assumed by Reorganized Debtor |
| 5 | Tigris Vendor Finance, Inc. f/k/a US Express Leasing | Assumed by Reorganized Debtor |
| 6 | Secured Claim of National City Commercial Capital | Assumed by Reorganized Debtor |
| 7 | General Unsecured Creditors | Creditors' Trust to make pro rata payments |
| 8 | Unsecured Claim of TAE | $500,000 payment from Creditors' Trust |
| 9 | Claim of TAG | If TAG accepts the Plan, 100% of net proceeds of sale of Vantage Engine Program; otherwise as determined by the outcome of the TAG Litigation |
| 10 | Interests | Cancelled |

## I.    CLASSES ENTITLED TO VOTE

Classes 1 - 6 are unimpaired Classes under the APS Plan and are conclusively presumed to have accepted the APS Plan pursuant to section 1126(f) of the Bankruptcy Code.

Classes 7 - 9 are impaired Classes and are entitled to vote to accept or reject the APS Plan.  Class 10 will not receive or retain any distributions or property under the APS Plan, and, accordingly, under 1126(g) of the Bankruptcy Code is presumed to have rejected the APS Plan.

Cram Down: If a Class fails to accept the APS Plan by the statutory majorities provided in section 1126(c) of the Bankruptcy Code, the Debtor reserves the right to request the Bankruptcy Court to confirm the APS Plan as to such rejecting Class.

## VIII.  MEANS FOR IMPLEMENTATION OF THIS PLAN

Cancellation of Interests:  At the close of business on the Effective Date of the APS Plan, all of the existing ownership interests in Debtor will be canceled without any further action by the Debtor.  The obligations of the Debtor in respect of the Interests and under the Debtor's certificate of incorporation, and under any other agreements or instruments governing the Interests, including but not limited to any shareholders rights plan shall be discharged and extinguished.

Continued Corporate Existence:   The Reorganized Debtor shall continue its corporate existence on and after the Effective Date, with all express, incidental and attendant powers granted to it under its certificate of incorporation, as amended pursuant to the provisions of the APS Plan, and the laws of the state of its organization and without prejudice to any right hereafter to alter or terminate such existence (whether by contract, operation of law or otherwise) under such applicable state law. The Reorganized Debtor will continue to engage in the business of owning and operating the business of the Debtor.

Issuance of New Interests:    On or immediately after the Effective Date, new ownership interests, representing 100% ownership in the Reorganized Debtor, will be issued to APS either directly or to such entity as it may designate.  The issuance of the new ownership interests hereunder shall be exempt from the registration requirements of the Securities Act pursuant to section 1145(a) of the Bankruptcy Code.

Amended Certificate of Incorporation:   Not later than the Effective Date, the Reorganized Debtor shall file an Amended Certificate of Incorporation with the applicable state agency.  The Amended Certificate of Incorporation shall, among other things, prohibit the issuance of nonvoting equity securities to the extent required by section 1123(a) of the Bankruptcy Code, subject to further amendment as permitted by applicable law, and the Amended Certificate of Incorporation shall change, if required, the authorized number of shares of stock to implement the APS Plan.

Directors and Officers of Reorganized Debtor:   As of the Effective Date, and without further action of the Debtor or the Bankruptcy Court, all Persons then serving as officers or directors of the Debtor shall cease to be officers or directors of the Debtor. Immediately as of the Effective Date, APS, without further action of the Debtor or the Bankruptcy Court shall select directors of the Reorganized Debtor and hire officers of the Reorganized Debtor.   The initial director of the Reorganized Debtor shall be J. Michael Bean, and the initial officer of the Reorganized Debtor shall be Kent Abercrombie, President and Chief Executive Officer.

Plan Documents:    Implementation of the APS Plan requires the execution of certain documents by the Debtor and other parties.  No further Court order must be obtained prior to execution of such documentation.  In the event any party does not agree to execution of such documentation, APS may appoint a party to execute it on such party's behalf.

Creditors' Trust:     Prior to the Effective Date of the APS Plan, the Creditors' Trust shall be established pursuant to the Creditors' Trust Agreement, for the purpose of liquidating the Trust Assets, resolving all Disputed Claims and making distributions to Creditors holding Allowed Claims as provided in the APS Plan.  On the Effective Date, the Trust Assets shall be transferred to and vest in the Creditors' Trust.  Subject to and to the extent set forth in any other applicable provision of the APS Plan, the Confirmation Order, the Trust Agreement or other agreement (or any other order of the Bankruptcy Court entered pursuant to or in furtherance hereof), the Creditors' Trust

shall be empowered to: (i) effect all actions and execute all agreements, instruments and other documents necessary to implement the APS Plan; (ii) make Distributions contemplated hereby; (iii) establish and administer any reserves with respect to Disputed Claims; (iv) comply herewith and with its obligations hereunder; (v) object to Claims and resolve such objections; (vi) employ professionals to represent it with respect to its responsibilities; and (vii) exercise such other powers as may be vested in it or as deemed by it to be necessary and proper to implement the provisions thereof.

For detailed information regarding the Creditors' Trust please see the APS Plan and the Creditors' Trust Agreement attached thereto.

Vesting of Chapter 5 and State Law Avoidance Actions, Claims and Litigation: On the Effective Date the litigation claims, all Chapter 5 and state law avoidance actions, including the TAG Litigation and all other claims and Causes of Action which are property of the Estate, excluding those claims and causes of action directly relating to assets retained by the Reorganized Debtor, shall vest in the Creditors' Trust. The Creditors' Trustee shall be the Debtors' designated representative pursuant to 11 U.S.C. § 1123(b)(3) to bring all such claims on behalf of the Creditors' Trust.

Vesting of Assets: Except for the Trust Assets and as otherwise specifically provided herein, the property of the Debtor, including any and all causes of action not transferred or assigned to the Creditors' Trust under the APS Plan, shall vest in the Reorganized Debtor on the Effective Date free and clear of all Claims, liens, charges or other encumbrances and Interests.

Rejection Damage Claims: Each person who is a party to an Executory Contract and/or Unexpired Lease rejected pursuant to this Article shall be entitled to file, not later than thirty (30) days after the Effective Date, which is the deemed date of such rejection, a proof of claim for damages alleged to arise from the rejection of the Executory Contract and/or Unexpired Lease to which such person is a party. A copy of such Claim shall be sent to the Creditor's Trustee. The Bankruptcy Court shall determine any such objections, unless they are otherwise resolved. All Allowed Claims for rejection damages shall be treated as Class 7 Claims, and the Creditor's Trust and/or the Creditor's Trustee shall have standing to object to any such rejection damage Claim so filed.

## IX.  PROVISIONS REGARDING DISTRIBUTIONS

Date of Distributions: Except as otherwise provided by the APS Plan, any Distributions and deliveries to be made to holders of Allowed Claims in Classes 1 and 2, shall be made on the Effective Date or as soon thereafter as may be practicable.

Distributions: The Reorganized Debtor shall make all Distributions required under the APS Plan with respect to Claims in Classes 1-6. All other Distributions under the APS Plan shall be made by the Creditors' Trust.

Means of Cash Payment:  Cash payments made pursuant to the APS Plan shall be in U.S. funds, by check drawn on a domestic bank, or, at the option of the Reorganized Debtor or the Creditors' Trust, as the case may be, by wire transfer from a domestic bank, except that payments made to foreign creditors holding Allowed Claims may be in such funds and by such means as are customary or as may be necessary in a particular foreign jurisdiction.

Delivery of Distributions:   Subject to Bankruptcy Rule 9010, Distributions to holders of Allowed Claims shall be made at the address of each such holder as set forth on the proofs of Claim filed by such holders (or at the last known addresses of such holder if no proof of Claim is filed or if the Debtor has been notified in writing of a change of address), except as provided below.  If any holder's Distribution is returned as undeliverable, no further Distributions to such holder shall be made unless and until the Reorganized Debtor or Creditors' Trustee, as the case may be, is notified of such holder's then current address, at which time all missed Distributions shall be made to such holder without interest.  Amounts in respect of undeliverable Distributions shall be returned to the Reorganized Debtor with respect to Classes 1- 6 and to the Creditors' Trust with respect to Classes 7-9 until such Distributions are claimed.  All claims for undeliverable distributions shall be made on or before two months following the final Distribution to Class 7 Creditors.  After such date, any claim top such unclaimed shall be forfeited.

Time Bar to Cash Payments:  Checks issued by the Reorganized Debtor or the Creditors' Trust, as the case may be, in respect of Allowed Claims shall be null and void if not negotiated within six months after the date of issuance thereof.  Requests for reissuance of any check shall be made directly to the Reorganized Debtor or the Creditors' Trustee, as the case may be, by the holder of the Allowed Claim with respect to which such check originally was issued.  Any claim in respect of such a voided check shall be made on or before 120 days after the date of reissuance of such check.  After such date, all Claims in respect of void checks shall be discharged and forever barred.


## X.  PROVISIONS FOR RESOLVING DISPUTED CLAIMS

Prosecution of Objections to Claims:  After the Effective Date, the Reorganized Debtor and the Creditors' Trustee shall have the exclusive authority to file objections to Claims.  Any objections to Claims must be made before the date that is 90 days after the Effective Date, or such other date as is established by order of the Bankruptcy Court.

Estimation of Claims:  The Debtor, the Reorganized Debtor, APS, or with respect to Classes 7-9, the Creditors' Trustee, may,  at any time, request that the Bankruptcy Court fix, liquidate or estimate any contingent or unliquidated Claim pursuant to section 502(c) of the Bankruptcy Code or other applicable law regardless of whether the Debtor has previously objected to such Claim, and the Bankruptcy Court shall retain jurisdiction

to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal relating to any such objection. In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim, such estimated amount shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. The Bankruptcy Court's entry of this order may limit the distribution to be made on individual Disputed Claims regardless of the amount finally Allowed on account of such Disputed Claims and no holder shall have recourse against the Debtor, the Reorganized Debtor, the Creditors' Trust, their assets or any of their respective professionals. If the estimated amount constitutes a maximum limitation on such Claim, the Debtor, the Reorganized Debtor, or the Creditors' Trust may elect to pursue any supplemental proceedings to object to any ultimate payment on such Claim. All of the aforementioned Claims objections, estimation and resolution procedures are cumulative and not necessarily exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court. If a holder of a Claim fails to seek estimation of a Claim at any time prior to the final distribution date of the Creditors' Trust, such Claim shall be treated as a disallowed Claim without further Order of the Bankruptcy Court on the final distribution date of the Creditors' Trust. Any unliquidated claim or contingent Claim shall be treated as a Disputed Claim until and unless it becomes an Allowed Claim pursuant to a Final Order of the Bankruptcy Court.

Payments and Distributions on Disputed Claims: Partial payments or partial distributions may be made with respect to a Disputed claim on the undisputed portion of such Disputed Claim, pending resolution of such disputes by Final Order. No reserve for Disputed Claims other than those in Classes 7-9 shall be established. All obligations in respect of Disputed Claims for Claims other than those in Classes 7-9 shall be undertaken after the Effective Date by the Reorganized Debtor.

Distributions After Allowance: The Reorganized Debtor or the Creditors' Trust, as applicable, shall make all payments and distributions required to be made under the APS Plan as soon as practicable after the date such Disputed Claim becomes an Allowed Claim. Such distributions shall be based upon the cumulative distributions that would have been made to the holder of such Claim under the APS Plan if the Disputed Claim had been Allowed on the Effective Date less actual distributions made pursuant to section 9.3 hereof.

## XI. EFFECT OF CONFIRMATION, DISCHARGE, RELEASES, AND INJUNCTION

Binding Effect: Except as otherwise provided in section 1141(d) of the Bankruptcy Code, on and after the Effective Date, the provisions of the APS Plan shall bind any holder of a Claim against, or Interest in, the Debtor and its respective successors and assigns, whether or not the Claim or Interest of such holder is impaired under the APS Plan and whether or not such Holder has accepted the APS Plan.

Discharge:  Except as otherwise provided in the APS Plan or the Confirmation Order and subject to section 1141(d)(1) of the Bankruptcy Code, upon the Effective date, all debts of, Claims against and Interests in the Debtor of any nature whatsoever including interest thereon, its assets, or properties, shall be completely satisfied, discharged and released.  The discharge of the Debtor shall be effective as to each debt, Claim or Interest, regardless of whether a proof of Claim or proof of Interest therefore was filed, whether the Claim or Interest is Allowed, or whether the holder thereof votes to accept the APS Plan.  On the Effective Date, as to every discharged debt, Claim and Interest, all persons, entities and governmental units (including, without limitation, any holder of a debt, Claim or Interest) shall be precluded from asserting against the Debtor or Reorganized Debtor or against such Debtor's or Reorganized Debtor's assets or properties, or the Creditors' Trust or its assets any other or further debt, Claim or Interest based upon any document, instrument, act, omission, transaction, or other activity of any kind or nature that occurred before the Effective Date.

Preservation of Rights of Action:  Except as otherwise provided in the APS Plan or in any contract, instrument, or agreement entered into in connection with the APS Plan, in accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtor and the Creditors' Trust, as applicable, shall retain and may exclusively enforce any claims, rights and causes of action that the Debtor may hold against any person or entity that have not been released under the APS Plan.  The Reorganized Debtor and the Creditors' Trust, as applicable, may pursue such retained Claims, rights or causes of action, as appropriate, in accordance with the best interests of the Reorganized Debtor.

Exculpation and Release:   As of the Effective Date, except for obligations expressly assumed in the APS Plan, the Debtor, the Committee, the Reorganized Debtor, APS and their respective advisors, attorneys, agents or any professionals retained by them (acting in such capacity) shall neither have nor incur any liability to, nor be subject to any right of action by, any person or entity for any act taken or omitted to be taken in connection with or related to the formulation, preparation, dissemination, implementation, administration, Confirmation or effectiveness of the APS Plan, the Disclosure Statement, the solicitation of votes for and the pursuit of Confirmation of the APS Plan, the consummation of the APS Plan or the administration of the APS Plan or the property to be distributed under the APS Plan, or any contract, instrument or other agreement or document created or entered into in connection with the APS Plan, or any other act taken or omitted to be taken in connection with this Bankruptcy Case; provided, however, that the foregoing provisions of this provision shall have no effect on the liability of any person or entity that results from any such act or omission that is determined in a Final Order to have constituted gross negligence or willful misconduct.

Injunction:  Except as otherwise provided in, or permitted under the APS Plan and except for obligations expressly assumed in the APS Plan, from and after the Effective Date, all persons and entities that have held, currently hold or may hold a Claim or Interest or other debt or liability or right that existed prior to the Effective Date, are  permanently  enjoined  on  and  after  the  Effective  Date  against  the  (a)

commencement or continuation of any judicial, administrative, or other action or proceeding against the Debtor, Reorganized Debtor, the Committee, or APS, as the case may be, on account of Claims against or Interests in the Debtor; (b) enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree, or order against the Debtor, Reorganized Debtor, the Committee, or APS, or any assets or property of same; or (c) creation, perfection or enforcement of any encumbrance of any kind against the Debtor, Reorganized Debtor, the Committee, or APS, as the case may be, arising from a Claim.  This provision does not enjoin the prosecution any claims that arise on or after the Effective Date nor does it enjoin the determination of the allowance of any Claims that arose prior to the Effective Date by a court of competent jurisdiction.

## XII.  CONDITIONS PRECEDENT

Condition Precedent to Confirmation: Confirmation shall not occur until APS shall have deposited $250,000, if applicable, into escrow.

Conditions Precedent to Effective Date:  The Effective Date shall not occur until each of the following conditions shall have been satisfied or waived pursuant to the provisions hereof:

(a)    Confirmation Order:  The Confirmation Order, in form and substance satisfactory to APS in its reasonable discretion, confirming the APS Plan shall have become a Final Order.

(b)    No Material Modifications to Plan:  No material modifications, as determined by APS in its reasonable discretion, shall have been made to the APS Plan without the consent of APS.

(c)    Effective Date:  The Effective Date of the APS Plan shall have occurred on or before September 30, 2009.

(d)    Unrestricted Cash:  The Debtor shall have on the Effective Date $2,000,000, excluding the Cash Contribution as such amount may be adjusted by the Purchase Price Adjustment.  To the extent the Debtor does not have sufficient cash on hand to satisfy this condition, the Cash Contribution shall be reduced by the amount of any deficiency.

Waiver of Conditions:  APS may waive any of the conditions set forth in the APS Plan except for Condition  "(a)" above which may be waived only with the concurrence of the Committee, at any time, without notice, without leave or order of the Bankruptcy Court, and without any formal action other than proceeding to consummate the APS Plan.

Expense Reimbursement: The APS Plan does not contemplate a bid process or overbid process.  However, to the extent APS is not approved by the Bankruptcy Court by reason of the acceptance of an overbid for the equity in the Reorganized Debtor and such alternative transaction closes or becomes effective, (a) The Debtor and the Committee shall arrange for the immediate return of the deposit required by Section 11.1 of the APS Plan  to APS and (b) APS will be entitled to receive a payment in the amount of Three Hundred Fifty Thousand Dollars ($350,000.00) (the "Expense Reimbursement"), in cash payable within (3) three Business Days following the closing of the alternate transaction.   Such Expense Reimbursement is based upon the substantial funds and other resources expended by APS in connection with the transactions contemplated by the APS Plan and APS will suffer material harm if such transactions are not consummated (because it will then be impossible for APS to realize any benefits therefrom), that the precise amount of such harm is difficult to determine, and that it would be unfair for APS to bear such harm.

# XIII.  RETENTION OF JURISDICTION

Retention of Jurisdiction:  The Bankruptcy Court shall retain exclusive jurisdiction over this Bankruptcy Case after Confirmation for the following purposes:

(a)    to consider and effect any modification of the APS Plan under section 1127 of the Bankruptcy Code;

(b)    to hear and determine all controversies, suits and disputes that arise in connection with the interpretation, implementation, effectuation, consummation or enforcement of the APS Plan;

(c)    to hear and determine all requests for compensation and/or reimbursement of expenses for the period commencing on the Petition Date through the Effective Date;

(d)    to hear and determine all objections to Claims and Interests, and to determine the appropriate classification of any Claim or Interest, and other controversies, suits and disputes that may be pending at or initiated after the Confirmation Date, except as provided in the APS Plan or the Confirmation Order;

(e)    to hear and determine all claims that the Debtor, Reorganized Debtor, or the Creditors' Trust could assert under the Bankruptcy Code;

(f)    to consider and act on such other matters consistent with the APS  Plan as may be provided in the Confirmation Order;

(g)    to make such orders as are necessary and appropriate to carry out and implement the provisions of the APS Plan;

(h)     to approve the reasonableness of any payments made or to be made, within the meaning of section 1129(a)(4);

(i)     to exercise the jurisdiction granted pursuant to section 505 of the Bankruptcy Code to determine any and all federal, state, local and foreign tax liabilities of, and any and all refunds of such taxes paid by the Debtor;

(j)     to hear and determine any issues or matters in connection with any property not timely claimed as provided in the APS Plan;

(k)     to hear and determine any controversies with respect to any settlements approved by the Court;

(l)     to enable the Reorganized Debtor, the Committee, the Creditors' Trust and any party-in-interest to consummate any and all proceedings that it may bring to set aside liens or to recover preferences, fraudulent transfers, assets or damages to which it may be entitled under applicable bankruptcy, federal or state law;

(m)     to correct any defect, cure any omission or reconcile any inconsistency in the APS Plan or in the Confirmation Order as may be necessary to carry out the purposes and intent of the APS Plan:

(n)     to determine any and all motions, applications, adversary proceedings and contested matters whether pending in the Bankruptcy Case as of the Effective Date or brought subsequently by the Reorganized Debtors or the Creditors' Trust, as the case may be.

No Limitation:  None of the foregoing shall be construed so as to limit the rights of the Reorganized Debtor or the Creditors' Trust to commence or prosecute any claim in any court of competent jurisdiction.

## XIV.  OTHER CONSIDERATIONS IN VOTING ON THE APS PLAN

## A.    ALTERNATIVES TO APS' PLAN

APS believes that at this stage in the Bankruptcy Proceeding there are essentially three alternative—the APS Plan, the Debtor's Plan, or liquidation.

APS believes that the APS Plan offers the Creditors the potential for the greatest recovery and is therefore in the best interests of creditors.

APS has reviewed information made available to it by the Debtor, information filed of record with the Court, the Debtor's Disclosure Statement, and has conducted its

own due diligence, and APS believes that a liquidation in Chapter 7 will reduce the overall amount received for the Debtor's assets and may cause the estate to incur substantial trustee's fees, thereby resulting in lower distribution to creditors.

<u>Liquidation Analysis</u>.    APS accepts the Debtor's liquidation analysis which indicates that liquidation of the Debtor would result in an estimated distribution of approximately $4,382.710 or 11.8% of claims. [8]

## B.    TAX CONSEQUENCES

Since APS is a creditor of the Debtor, it is not familiar with all the tax attributes of Debtor.  APS has reviewed the tax consequences provision of the Debtor's Disclosure Statement.  Based on the similarity of structure between the APS Plan and the Debtor's Plan, APS does not believe there to be any significant difference in tax consequences. Accordingly, the following discussion comes primarily from the Debtor's Disclosure Statement.  APS has not made an independent determination of the tax consequences of the APS Plan other than to state that it believes that the tax consequences to the Debtor and/or Reorganized Debtor would be the same under the APS Plan as it would be under the Debtor's Plan of Reorganization.  In that regard, attached hereto as Exhibit D is a copy of the discussion of tax consequences contained in the Debtor's Disclosure Statement.

APS CONCURS WITH THE DISCLAIMERS CONTAINED IN THE ATTACHED TAX CONSEQUENCES DISCUSSION AND STRONGLY ENCOURAGES CREDITORS TO CONSULT WITH THEIR OWN TAX ADVISORS OR CONSULTANTS IN TRYING TO DETERMINE THE FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES OF THE APS PLAN.

## C.    CONFIRMATION OF THE APS PLAN, VOTING PROCEDURES, AND REQUIREMENTS FOR CONFIRMATION OF A PLAN

At the confirmation hearing, the Bankruptcy Court will determine whether the requirements of § 1129 of the Bankruptcy Code have been satisfied, in which event the Bankruptcy Court will enter an order confirming the APS Plan.  Those requirements include:

<u>Best Interest Test and Liquidation Analysis</u>.  Confirmation of a plan requires that, with respect to each impaired class of creditors, each holder of an allowed claim in the class has either accepted the plan or will receive under the plan property of a value, as of the Effective Date, that is not less than the amount the holder would receive if the Debtor was liquidated under Chapter 7 of the Bankruptcy Code.

To determine if a plan is in the best interests of each class, the probable results of Chapter 7 liquidation must be compared with the results reasonably to be obtained under the APS Plan.  APS has applied the rule of absolute priority of distributions in the

---

[8]    Exhibit D.

APS Plan.  Under that rule no junior class of creditors may receive any distribution until all senior classes of creditors are paid in full and no holder of an equity interest may receive any distribution until all creditors are paid in full.

      <u>Feasibility</u>.  In order for a plan to be confirmed, the Bankruptcy Court must determine that a further reorganization or subsequent liquidation is not likely to result following confirmation of the APS Plan unless such further reorganization or liquidation is contemplated by the APS Plan.

      <u>Acceptance by Impaired Classes</u>.  Section 1129(a)(8) of the Bankruptcy Code generally requires that each impaired class must accept a plan by the requisite votes for confirmation to occur.  A class of impaired claims will have accepted a plan if, of the holders in the class actually voting, at least two-thirds (2/3) in amount and more than one-half (1/2) in number of allowed claims, excluding the claims of insiders, cast an affirmative vote.  A class of equity interests will have accepted a plan if the holders in the class actually voting at last two-thirds in number cast an affirmative vote.  The vote of any person or entity can be disqualified pursuant to § 1126(e) of the Bankruptcy Code.

      <u>Fair and Equitable Test</u>  If any impaired class of claims does not accept a plan, the Bankruptcy Court may confirm a plan pursuant to its "cram down" powers under § 1129(b) of the Bankruptcy Code, if a plan "does not discriminate unfairly" and is "fair and equitable."  The Bankruptcy Court must determine at the confirmation hearing whether a plan is fair and equitable and does not discriminate unfairly against any impaired, dissenting class of claims.  A plan will not discriminate unfairly if no class receives more than it is legally entitled to receive for its claims.  The meaning of the phrase "fair and equitable" is different when applied to secured claims and unsecured claims.

      With respect to a secured claim, the requirement that a plan be "fair and equitable" includes:  (1) the impaired secured creditor retains its liens to the extent of its allowed secured claim and receives deferred cash payments at least equal to the allowed amount of its claim with a present value as of the effective date of the plan at least equal to the value of its interest in the Debtor's interest in the property securing its liens, (2) if property subject to the lien of the impaired secured creditor is sold free and clear of its lien the impaired secured creditor receives a lien attaching to the Proceeds of the Sale, or (3) the impaired secured creditor realizes the "indubitable equivalent" of its claim under the plan.

      If a holder of a claim which is at least in part secured makes a valid and timely election under § 1111(b)(2) of the Bankruptcy Code, its Allowed Secured Claim will be deemed equal to its Allowed Claim, regardless of whether the value of its collateral on the effective date is in fact less than its Allowed Claim.  In such a case a plan will be fair and equitable if:  (1) the secured creditor receives deferred cash payments that both equal the allowed amount of its claim and have a present value equal to the value of the claimant's interest in Debtor's interest in the collateral on the effective date and (2) the

secured creditor retains a lien on its collateral securing its entire allowed claim. A secured creditor that elects treatment under § 1111(b) waives its right to have a portion of its claim included as an unsecured or deficiency claim for purposes of voting.

With respect to an unsecured claim, "fair and equitable" includes the requirements that either: (1) the impaired unsecured creditor receives property of a value equal to the amount of its allowed claim or (2) the holders of claims and equity interests that are junior to the claims of the dissenting impaired unsecured creditor class will not receive any property under the plan until the claims of the dissenting impaired unsecured creditor class are paid in full.

If creditors do not vote in numbers and amounts sufficient to accept the APS Plan as proposed, APS nevertheless will seek confirmation of the APS Plan pursuant to § 1129(b) of the Bankruptcy Code, sometimes referred to as the "cram down" provision.

In addition to the above requirements, the APS Plan cannot be confirmed unless all quarterly United States Trustee fees payable under 28 U.S.C. § 1930 have been paid or unless the APS Plan provides for their payment on the Effective Date of the APS Plan. Under the APS Plan, all fees due and owing will be paid on the Effective Date of the APS Plan.

Creditors Typically Entitled to Vote. Generally, any Creditor whose Claim is Impaired under a plan is entitled to vote if either (i) its Claim has been scheduled by the Debtor (and such Claim is not scheduled as disputed, contingent, or unliquidated), or (ii) it has filed a proof of claim on or before the last date set by the Bankruptcy Court for such filings and no objection to the claim has been filed. Any Claim as to which an objection has been filed (and such objection is still pending) is not entitled to vote, unless the Bankruptcy Court temporarily allowed the Claim in an amount which it deems proper for the purpose of accepting or rejecting a plan upon application by the Creditor. Such application must be heard and determined by the Bankruptcy Court at such time as specified by the Bankruptcy Court. A Creditor's vote may be disregarded if the Bankruptcy Court determines that the Creditor's acceptance or rejection was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

Definition of Impairment. Under § 1124 of the Bankruptcy Code, a class of Claims or Interests is "Impaired" under a Chapter 11 plan unless, with respect to each Claim or Interest of such class, the plan:

1.    leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder of such claim or interest; or

2.    notwithstanding any contractual provision or applicable law that entitles the holder of such claim or interest to demand or receive accelerated payment of such claim or interest after the occurrence of a default

3.    cures any such default that occurred before or after the commencement of the case under this title, other than a default of a kind specified in section 365(b)(2) of this title;

4.    reinstates the maturity of such claim or interest as such maturity existed before such default;

5.    compensates the holder of such claim or interest for any damages incurred as a result of any reasonable reliance by such holder on such contractual provision or such applicable law; and

6.    does not otherwise alter the legal, equitable, or contractual rights to which such claim or interest entitles the holder of such claim or interest.

Classes Under APS' Plan.  The Impaired Classes entitled to vote on the APS Plan are Classes 3, 4, 5 and 6 unless APS elects to retain the collateral and Classes 7, 8 and 9.

Vote Required for Class Acceptance  The Bankruptcy Code defines acceptance of a Plan by a class of Creditors or Interest holders as acceptance by holders of two-thirds (2/3) in dollar amount and a majority in number of the Claims or Interests of that class which actually cast ballots for acceptance or rejection of a plan; i.e., acceptance takes place only if sixty-six and two-thirds percent (66-2/3%) in amount of Claims and Interests in each class and more than fifty percent (50%) of Claims or Interests voting in each class cast their ballots in favor of acceptance.

# XV.  MISCELLANEOUS PROVISIONS

Proprietary Information:  The Confirmation Order will include a requirement that all persons, including but not limited to Corporate Finance Partners, Thielert AG, Thielert Aircraft Engines, Engine Components, Inc., Avco Corporation and Teledyne Technologies Incorporated, and their respective parents, sister and subsidiary companies, and all other companies or persons in their control, and each of them, shall be directed to return to the Reorganized Debtor all documents and other information owned by the Debtor related to the Debtor's business and operations (the "Proprietary Information"). For the avoidance of doubt, the Reorganized Debtor/APS shall retain all of the Debtor's rights pursuant to any confidentiality agreement executed in connection with the exchange of such information

Modification:  After the Effective Date, the APS Plan shall not be modified except upon the agreement of the Reorganized Debtor and the Creditors' Trustee.

Headings:  All headings utilized in this Disclosure Statement and the APS Plan are for convenience and reference only, and shall not constitute a part of the APS Plan for any other purpose.

Safe Harbor:  Issuance of stock in conjunction with the APS Plan is exempt from securities laws pursuant to section 1145(a)(1) of the Bankruptcy Code.

Due Authorization:  Each and every holder of a Claim who elects to participate in the distributions provided for in the APS Plan warrants that such holder is authorized to accept, in consideration of such Claim against the Debtor, the distributions provided for in the APS Plan and that there are not outstanding commitments, agreements, or understandings, expressed or implied, that may or can in any way defeat or modify the rights conveyed or obligations undertaken by such holder of a Claim under the APS Plan.

Authorization of Corporate Action:  All matters and actions provided for under the APS Plan involving the structure of the Debtor or action to be taken by or required of the Debtor or Reorganized Debtor shall be deemed to have occurred and be effective as provided herein, and shall be deemed to be authorized and approved in all respects without any requirement for further action by the Debtor or Reorganized Debtor.

Further Assurances and Authorizations:  The Debtor, the Reorganized Debtor, the Creditors' Trust or Creditors' Trustee, if and to the extent necessary, shall seek such orders, judgments, injunctions, and rulings that may be required to carry out further the intentions and purposes, and to give full effect of the provisions, of the APS Plan.

Applicable Law:  Except to the extent that the Bankruptcy Code or other federal law is applicable, the rights, duties and obligations arising under the APS Plan shall be governed by and construed and enforced in accordance with the laws of the State of Texas.

No Interest:  Except as expressly provided for in the APS Plan, or allowed by the Court, no interest, penalty or late charge is to be Allowed on any Claim subsequent to the Petition Date.

No Attorneys' Fees or Broker Fees:  No attorneys' fees will be paid with respect to any Claim, other than Claims of attorneys and financial advisors retained by Debtor or the Committee, except as specified herein or as allowed by an Order of the Court. No commissions or broker's fees will have been earned as a result of the transactions contemplated by the APS Plan.

Notice of Default:  In the event of any alleged default under the APS Plan, any Creditor or party-in-interest must give a written default notice to the Reorganized Debtor and the Creditors' Trustee with copies to their respective counsel of record specifying the nature of the default.  Upon receipt of the default notice, the Reorganized Debtor, or the Creditors' Trustee, as the case may be, shall have ten (10) days to cure such default from the time of receipt of the default notice.  If such default has not been cured within the applicable time period, the default may be brought to the attention of the Court.

<u>Notices</u>:  All notices, requests, elections or demands in connection with the APS Plan shall be in writing and shall be deemed to have been given when received or, if mailed, five (5) days after the date of mailing provided such writing shall have been sent by registered or certified mail, postage prepaid, return receipt requested and addressed as follows:

> Billy G. Leonard, Jr.
> Texas Bar No. 12208100
> Attorney at Law
> 1650 W. Virginia Street, Suite 211
> McKinney, Texas 75069-7703
> Telephone  (469) 742-0855
> Fax  (469) 442-0135

and

> Kevin H. Good
> Texas Bar No. 08139300
> Conner & Winters LLP
> 1700 Pacific Avenue
> Suite 2250
> Dallas, Texas 75201
> Telephone  (214)217-8070
> Fax  (214) 217-8861

<u>Consummation</u>:  For all purposes, consummation (and substantial consummation of the APS Plan) shall occur the instant upon which the new equity interest are issued and payments required to be made on the Effective Date are made; consummation shall occur on or promptly following the Effective Date.

## XVI.  CONCLUSION

APS respectfully submits that the APS Plan satisfies all of the statutory requirements of Chapter 11 of the Bankruptcy Code, including the "best interest" and "feasibility" requirements and that it should be confirmed even if a class of claims does not vote for acceptance of the APS Plan.  APS believes that the APS Plan is "fair and equitable" and "does not discriminate unfairly."  Additionally, APS believes that the APS Plan has been proposed in good faith.

APS respectfully requests that this Disclosure Statement be approved for circulation to creditors and that it is permitted to solicit votes for acceptance of the APS Plan.

DATED: August 4, 2009.

**Plan Proponent:**

**AVIATION PARTS SUPPLY, INC.**


    ___/s/ *J. Michael Bean*_____
**J. Michael Bean, President**

**APPROVED AS TO FORM:**

Billy G. Leonard, Jr.
Texas Bar No. 12208100
Attorney at Law
1650 W. Virginia Street, Suite 211
McKinney, Texas 75069-7703
Telephone  (469) 742-0855
Fax  (469) 442-0135

and

Kevin H. Good
Texas Bar No. 08139300
Conner & Winters LLP
1700 Pacific Avenue, Suite 2250
Dallas, Texas 75201
Telephone  (214) 217-8070
Fax  (214) 217-8861

**Attorneys for Aviation Parts Supply, Inc.**