David W. Parham
Elliot D. Schuler
**BAKER & McKENZIE LLP**
2300 Trammell Crow Center
2001 Ross Avenue
Dallas, Texas 75201
(214) 978-3000
(214) 978-3099 Fax

**ATTORNEYS FOR THE OFFICIAL
COMMITTEE OF UNSECURED CREDITORS**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | |
|---|---|
| IN RE: § | |
| § | Case No. 08-36705 |
| SUPERIOR AIR PARTS, INC., § | |
| § | Chapter 11 |
| Debtor. § | |

**OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO AVIATION PARTS SUPPLY, INC.'S FIRST AMENDED DISCLOSURE STATEMENT FOR COMPETING PLAN OF REORGANIZATION**

COMES NOW, the Official Committee of Unsecured Creditors, and files the following objections to the First Amended Disclosure Statement of Aviation Parts Supply, Inc. (the "APS Disclosure Statement"), and would show this Honorable Court as follows:

**SUMMARY**

The APS Disclosure Statement fails, in numerous ways, to provide information of a kind, and in sufficient detail, that would enable a hypothetical, reasonable investor, typical holders of unsecured creditors, from making an informed decision regarding the Plan. Most notably, the APS Disclosure Statement fails to adequately explain substantial risk factors that are present in APS' First Amended Plan of Reorganization (the "APS

Plan"). In particular, the APS Plan contemplates the continuation of litigation that will, at a minimum, substantially delay distribution to unsecured creditors and, if not successful, could lower the recovery percentage to unsecured creditor to between 7-16%. This result would be considerably below the figures promised to unsecured creditors in the APS Disclosure Statement.

Moreover, the Disclosure Statement provides contradictory statements relating to executory contracts and provides little or no discussion of the conditions, if any, to which APS would require counter-parties to acquiesce in order to have their contracts assumed. If assumption is less than assured, APS should at least disclose the concessions it is requesting and discuss the risk to unsecured creditors and the impact of rejections. The failure to disclose significant risks coupled with aggressive projections cause the APS Disclosure Statement to read more like an advertisement or solicitation than a disclosure statement. More balance is needed.

## OBJECTIONS

### I. Inadequate Information

1) The APS Disclosure Statement does not meet the requirements of Bankruptcy Code § 1125 in that it does not provide "adequate information" as required by that provision.

2) There are a number of factors relevant to determining the adequacy of a disclosure statement.[1] These factors help the Court determine whether a hypothetical reasonable investor has enough information to make an informed judgment about a Chapter 11 plan.[2]

---

[1] *In re United States Brass Corp.*, 194 B.R. 420 (Bankr. E.D. Tex. 1996).
[2] *Id.*

3) In several respects the APS Disclosure Statement fails to provide adequate information which would enable creditors to make an informed judgment about the proposed APS Plan.

**A.     Risk Factors associated with TAG Litigation**

4) The most glaring omission is the absence of risk factors. A significant component of the APS Plan is the commencement and/or continuation of an adversary proceeding against Thielert AG:[3] an entity that holds a claim against the estate for approximately $10 million (the "TAG Litigation").[4] The APS Disclosure Statement fails to disclose that TAG has indicated it will not accept the APS Plan, that if TAG doesn't accept its treatment under the APS Plan, the TAG Litigation will, at a minimum, result in a delay, possibly significant, of payment to Unsecured Creditors.

5) Further, in citing likely recoveries to Unsecured Creditors, the APS Disclosure Statement ignores the possibility that TAG may prevail in the TAG Litigation.[5] In fact, the financial advisors to the Committee believe that in the event the TAG Litigation contemplated by the APS Plan were pursued through trial, *and TAG prevailed*, the resulting cost of litigation, combined with the inclusion of TAG's $10 million claim, could lower unsecured creditor recoveries to between 7-16%.

6) It is also unclear as to who will pay for the TAG Litigation and who is prosecuting it. The APS Plan states that APS will pay for the TAG Litigation, and its

---

[3] The APS Disclosure Statement states litigation "may be" filed, however, a Complaint was filed by APS on August 4, 2009.
[4] The APS Disclosure Statement also provides conflicting information on the treatment of the claim of Thielert Aircraft Engines GmbH ("TAE"), an entity holding a claim against the estate for approximately $18 million On the one hand, APS claims to have an agreement to resolve this claim for a cash payment of $500,000, yet APS has elected to sue TAE as well.
[5] The Committee would note that it has already obtained a consensual resolution with TAG that required substantial time and effort.

attorneys are currently named as lead counsel therein. However, the APS Disclosure Statement suggests that the Creditors' Trust may prosecute it. APS only has a minimal contingent interest in the result of the TAG Litigation. The Committee therefore questions what their incentive is to prosecute, and fully fund the TAG Litigation, should the APS Plan be confirmed. Given the significance of the TAG Litigation, the APS Disclosure Statement should have clarity with respect to prosecution, funding and settlement authority and detail risks associated therewith.[6]

### B.    Risk Factors associated with Sale of Vantage Engine Program

7)    The APS Disclosure Statement states that "payments to be made to creditors under the APS Plan will come from the Cash contribution, Excess Cash, any litigation recoveries, and *the sale of the Vantage Engine Program.*"[7] If TAG accepts the APS Plan, 100% of the proceeds from the sale of the Vantage Engine Program will go to TAG as its only recovery.[8] If TAG does not accept the APS Plan and TAG prevails in the TAG Litigation, TAG and the trade creditors will likely share in the proceeds of the sale of the Vantage Engine Program. The APS Disclosure Statement is silent as to the market for the sale of the Vantage Engine Program, the impact of the restrictions APS is imposing on the sale of the Vantage Engine Program both in terms of market and price, and the basis for an estimation of the value of the Vantage Engine Program.

---

[6] APS implies in Section I(D) of the APS Disclosure Statement that the Committee prepared the complaint in the TAG Litigation. The Committee assumes that what APS intended to say is that the complaint prepared by APS incorporates bits and pieces from a draft document prepared by the Committee which served as the basis for resolving the claims with both TAE and TAG (resolutions APS seems intent on frustrating). The Committee disclaims any authorship of the Complaint in the TAG Litigation.
[7] *See* APS Disclosure Statement at VII(A).
[8] *See* APS Plan at 4.2(i).

### C.     Lack of Clarity on Executory Contracts and Open Purchase Orders

8) Another major deficiency in the APS Disclosure Statement is that it contains contradictory language with respect to executory contracts and open purchase orders.

9) On the one hand, the APS Disclosure Statement states that all executory contracts and unexpired leases, as well all prepetition purchase orders, will be assumed by the Reorganized Debtor. However, the Disclosure Statement, in the same section,[9] acknowledges that such will be assumed only if the counter-party in question is willing to agree to new terms and conditions. APS provides no information as to the what the proposed terms and conditions may be. While APS discloses that if a counter-party does not agree to make the appropriate concessions, such party will be entitled to an unsecured claim, APS does not quantify this amount. APS should provide clarity on this issue and adequately disclose that if APS is not successful in reaching agreements with these creditors, that there may be (i) up to an additional $5.7 million in unsecured claims for open purchase orders; and (ii) a claim for Duke Realty of approximately $400,000 for rejection of the premises lease, both of which will substantially dilute the amount available for distribution to unsecured creditors.[10]

---

[9] *See* APS Disclosure Statement at VII(E).

[10] APS should also quantify the unsecured claims resulting from their failure to resolve warranty claims, and the outstanding insurance items addressed in the APS Disclosure Statement, and the impact this will have on unsecured creditors.

10) APS ignores all of this when it states that there will only be about $1.5 million in unsecured claims.[11] In reality, that number, under the APS Plan, could be many times that amount.

11) In light of the foregoing, the rosy forecast of unsecured creditor recovery under the APS Plan is potentially misleading. While APS has listed very high ranges of potential creditor recovery, they should be required to provide details of their analysis as well as incorporate what all payment ranges will be if they fail to reach agreements with TAG, the holders of open purchase orders, the landlord, the holders of warranty claims, and otherwise fail to resolve the outstanding issues.[12]

### D.    Inadequate Information on the Creditors' Trust

12) Section 6.11 of the APS Plan details the funding of the Creditors' Trust. It is clear from the language of both the APS Plan and the APS Disclosure Statement that the Creditors Trust is intended to be the vehicle for payment to unsecured creditors. Unfortunately, the APS Disclosure Statement fails to include a copy, or even a draft version, of the proposed Creditors' Trust Agreement which governs how the Creditors' Trust is to operate. Without reviewing the proposed Creditors' Trust Agreement, unsecured creditors can't possibly evaluate whether the APS Plan is in their best interests.

---

[11] *See* APS Disclosure Statement at Article IV.
[12] APS also blanketly asserts in Section VII(A) of the APS Disclosure Statement that the "Committee has advised APS that the Committee projects there will be an additional $400,000-500,000 in excess cash transferred to the Creditors Trust" but no specifics are provided as to when this was allegedly said. The Committee has not spoken with APS about potential distributions in this case since APS voluntarily withdrew all offers for Superior, as well as forfeiting its status as a stalking horse bidder under the Plan, almost two months ago. This is another topic omitted from the Disclosure Statement.

DALDMS/665503.2

## II. Questions exist regarding Feasibility of APS to perform

13) APS also fails to adequately disclose that they are a thinly capitalized start up company or to discuss the risks associated therewith.[13]

14) More importantly, however, there is inadequate information to permit a creditor to determine if APS can fund this acquisition or thereafter operate the business. There is no disclosure of where APS' funds are coming from, or the identity of the bank that is purportedly funding the acquisition and providing APS with the working capital needed to operate the company. Further troubling is that the projections attached as an exhibit to the APS Disclosure Statement do not include or appear to provide for payment of all of the claims APS is purportedly assuming under the APS Plan.

15) The lack of information on these key points is made more critical in this instance because APS is not putting up any deposit upon approval of the APS Disclosure Statement, or even prior to a creditor vote on the APS Plan. Instead, APS will not deposit any funds until 3 days prior to the confirmation hearing. Prior to that point they have no obligation to do anything. Thus, creditors will be asked to vote on a plan with no guarantee that the purported plan funder will even make a minimal deposit.

16) The unwillingness/inability to make an upfront deposit is disconcerting because APS is only contributing $500,000 to buy the company. While APS states its Cash Contribution is $2.5 million, $2 million of that amount is the Debtor's money which

---

[13] APS does not disclose that Maloney Bean, Horn & Hull, the principals of which are the "face of APS", has filed an unsecured claim against the estate in the approximate amount of $425,000, and that such claim has been objected to by the Debtor. APS does not disclose whether this claim will be released if the APS Plan is confirmed. APS likewise does not disclose that the only reason why they are a creditor is because Maloney Bean, Horn & Hull severed out part of its alleged claim against the estate and sold it to APS.

DALDMS/665503.2

is staying behind for APS' use going forward.[14] Furthermore, of the $500,000 amount actually contributed, *none* of it is going to unsecured creditors. All of it is going to satisfy the claim of TAE.

### III.    No basis exists for the Expense Reimbursement.

17)    Worst of all, APS seeks to actually reward itself for their time and expense of derailing the current sale process contemplated in this case. The APS Disclosure Statement and APS Plan seeks to provide APS with an expense reimbursement of $350,000.[15] The $350,000 expense reimbursement is staggering given the fact that APS is not putting up a deposit until three days prior to confirmation, and they are only paying $500,000 in new cash. Moreover, there is no auction.  APS is not a stalking horse.  There is no basis whatsoever for APS to receive an expense reimbursement, let alone one that is virtually the same amount as the cash APS is proposing to pay.

### IV.    Additional Objections

18)    The Committee reserves the right to raise additional objections and/or withdraw this objections as further information comes to light and as circumstances may change in this bankruptcy case.

### Conclusion

The APS Disclosure Statement is deficient in a number of respects.  Creditors should receive a balanced disclosure statement detailing the risks associated with the APS Plan, which under some scenarios could be worse for creditors than a liquidation.

---

[14] Further misleading creditors is that upon confirmation APS will immediately cause a $1,000,000 credit facility for the immediate use and benefit of the *Reorganized Debtor*.  None of that $1,000,000 is for payment of claims of unsecured creditors.
[15] *See* APS Disclosure Statement at Section XII.

WHEREFORE, PREMISES CONSIDERED, the Committee respectfully requests the Court not to approve the APS Disclosure Statement or, alternatively, in the event the APS Disclosure Statement is approved for solicitation, to require APS to amend such Disclosure Statement in accordance with these objections prior to any solicitation of votes on the APS Plan.

Dated: August 10, 2009
       Dallas, Texas

       Respectfully submitted,

       /s/  Elliot D. Schuler
          David W. Parham
          State Bar No. 15459500
          Elliot D. Schuler
          State Bar No. 24033046
**BAKER & McKENZIE LLP**
2300 Trammell Crow Center
2001 Ross Avenue
Dallas, Texas   75201
Telephone: (214) 978-3000
Facsimile:  (214) 978-3099

**ATTORNEYS FOR THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS**

## CERTIFICATE OF SERVICE

   The undersigned attorney hereby certifies that he caused a true and correct copy of the foregoing to be served upon the persons or entities identified below via electronic mail, and on all other parties via the Court's ECF filing system on August 10, 2009.

| | |
|---|---|
| **Duane J. Brescia** <br> **Stephen A. Roberts** <br> Strasburger & Price LLP <br> 600 Congress Ave., Ste. 1600 <br> Austin, TX 78701 <br> Email: duane.brescia@strasburger.com <br> Email: stephen.roberts@strasburger.com | **Kevin H. Good** <br> Conner & Winters, LLP <br> 1700 Pacific Avenue, Suite 2250 <br> Dallas, TX 75201 <br> Email: kgood@cwlaw.com |
| **Billy G. Leonard, Jr.** <br> Attorney at Law <br> 1650 W. Virginia Street, Suite 211 <br> McKinney, TX 75069 <br> Email: bleonard@billyleonardlaw.com | **Chester B. Salomon** <br> Becker, Glynn, Melamed & Muffly LLP <br> 299 Park Avenue <br> New York, NY 10171 <br> Email: csalomon@beckerglynn.com |
| **Matthew Okin** <br> Okin Adams & Kilmer LLP <br> 1113 Vine Street, Suite 201 <br> Houston, TX 77002 <br> Email: mokin@oakllp.com | **Tom Tong** <br> Tong & Sung, P.C. <br> 3050 Post Oak Blvd., Suite 1720 <br> Houston, Texas 77056 <br> Email: tomtong@tonglawfirm.com |

                 /s/ Elliot D. Schuler
                 Elliot D. Schuler