Billy G. Leonard, Jr.
Texas Bar No. 12208100
Attorney at Law
1650 W. Virginia Street, Suite 211
McKinney, Texas 75069-7703
Telephone  (469) 742-0855
Fax  (469) 442-0135

and

Kevin H. Good
Texas Bar No. 08139300
Conner & Winters LLP
1700 Pacific Avenue
Suite 2250
Dallas, Texas 75201
Telephone  (214)217-8070
Fax  (214) 217-8861

**Attorneys for Aviation Parts Supply, Inc**.

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | |
|---|---|
| IN RE: § | |
| § | |
| SUPERIOR AIR PARTS, INC. § | CASE NO. 08-36705-BJH-11 |
| § | |
| § | |
| DEBTOR § | |

**AVIATION PARTS SUPPLY, INC.'S RESPONSE TO DEBTOR'S AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS' OBJECTIONS TO AVIATION PARTS SUPPLY, INC.'S FIRST AMENDED DISCLOSURE STATEMENT**

Aviation Parts Supply, Inc. ("APS"), a creditor and/or party in interest, by and through undersigned counsel, files this its Response to Debtor's and the Official Committee of Unsecured Creditors' Objections to Aviation Parts Supply, Inc.'s First Amended Disclosure Statement ("Response") and would show the Court as follows:

## BACKGROUND

1. On August 4, 2009, Aviation Parts Supply, Inc. ("APS") filed its First Amended Disclosure Statement for Competing Plan of Reorganization for Superior Air Parts, Inc. (the "APS Disclosure Statement") which amended APS' original Disclosure Statement for Competing Plan of Reorganization for Superior Air Parts, Inc. filed on July 15, 2009.

2. A hearing to approve the APS Disclosure Statement is set for August 26, 2009 at 1:15 p.m. at the conclusion of the hearing on whether Debtor's Third Amended Plan of Reorganization (the "Debtor's Plan") should be confirmed.

3. On August 10, 2009 Superior Air Parts, Inc. ("Debtor") and the Official Committee of Unsecured Creditors ("Committee") filed separate objections to the APS Disclosure Statement.

## APS RESPONSE TO DEBTOR'S OBJECTIONS

4. The Debtor's objections basically assert that the APS Disclosure Statement should not be approved because (a) APS' First Amended Plan (the "APS Plan") is not confirmable, (b) it insufficiently describes the litigation against Thielert AG ("TAG"), (c) there is insufficient or inadequate information relating to financial information, claims estimation and payout to creditors, and (d) there is inadequate information regarding APS and its ability to fund the APS Plan. APS responds as follows:

(a) <u>Confirmability of the APS Plan</u>. Debtor asserts that APS' Disclosure Statement should not be approved for the reason that the APS First Amended Plan (the "APS Plan") is not confirmable. The Debtor, as revealed in Paragraph 12 of the Debtor's objection, asserts that the APS Plan is not confirmable because it improperly classifies the claim of TAG and that TAG has not agreed to

the proposed treatment. APS' Plan separately classifies the claim of TAG, the 100% owner of the Debtor, in Class 9 and proposes that TAG's claim be satisfied from the sale of the Vantage Engine Program. Should TAG not agree to that treatment, TAG will be treated as required by a final judgment entered in that certain Adversary Proceeding No. 09-03249 (the "TAG Adversary Proceeding") commenced by APS on August 4, 2009 seeking to equitably subordinate and/or recharacterize TAG's claim (and the claim of Thielert Aircraft Engines GmbH) as equity. A copy of the Complaint is attached hereto as Exhibit A. Under the APS Plan, if the court declines to subordinate or recharacterize TAG's claim, TAG would be treated as a Class 7 General Unsecured Creditor. Debtor asserts that since TAG hasn't consented to its treatment under the APS Plan, that the Plan is not confirmable.

The Debtor's objection is incorrect in several respects. First, the separate classification of TAG's claim is permissible and appropriate since TAG is an insider of the Debtor and since, based on the facts set forth in the Adversary Proceeding, APS believes that TAG's claim will either be subordinated or recharacterized as equity. Second, the Debtor's Plan separately classifies TAG, and third, APS' Plan is materially similar to a plan which was negotiated in early June by and between the Debtor, the Committee, TAG and APS in which TAG's claim was likewise separately classified but was not filed because the Debtor began a process of delay in order to get Brantly to make an offer for the equity of the Debtor. In fact, under the APS Plan, TAG would receive more on account of its Class 9 claim than it would have under the plan which was negotiated among the parties in early June.

Finally, just because a class of claims does not agree to its treatment under a proposed plan of reorganization does not make that plan unconfirmable. The Bankruptcy Code, through the cram-down provisions of Section 1129(b), provides that a plan can be confirmed over the dissent of a class or classes of claims if one impaired class votes to accept the plan. APS has a Rule 11 agreement with Thielert Aircraft Engines GmbH ("TAE") in which TAE has agreed to treatment of its claim as proposed in APS' Plan. If TAG rejects the APS Plan, APS will still have at least one impaired class of claimants accepting the APS Plan, and APS will be able to invoke the cram-down provisions for confirmation under the Bankruptcy Code. The APS Plan is not "patently" unconfirmable, and, accordingly, any issues relating to confirmability of the APS Plan are issues to be taken up at the confirmation hearing thereon, not at the Disclosure Statement hearing.

(b).    <u>The TAG Adversary Proceeding</u>. The Debtor asserts that the APS Disclosure Statement contains inadequate information regarding the TAG Adversary Proceeding and the impact of the litigation on the Debtor. The APS Disclosure Statement addresses the belief of APS and the Committee that there are causes of action against TAG, and the APS Plan specifies that it is anticipated that the Debtor, the Committee or APS would commence an adversary proceeding against TAG. APS commenced the TAG Adversary Proceeding on August 4, 2009.

Further, APS believes that, based upon the facts set forth in the TAG Adversary Proceeding complaint and its review of applicable case law, it will prevail in the Adversary Proceeding against TAG. The Committee had previously drafted a similar complaint (the "Committee Draft Complaint") against

TAE and TAG which it had anticipated to file. APS concurs with the assessment of counsel for the Committee as to the likely outcome of litigation to equitably subordinate and/or recharacterize the claims of TAG and TAE contained in a cover letter transmitting the Committee Draft Complaint to TAG and TAE, when counsel stated:

> We believe the evidence and testimony to be presented in this matter to be <u>very strong</u> and ultimately believe that both of your client's [TAG and TAE] claims will be prioritized beneath that of unsecured creditors. (emphasis added)

See letter and draft complaint attached hereto as Exhibit B.

Additionally, when the Committee prepared the Draft Complaint, counsel for the Committee indicated that they believed the proceeding would take six (6) months—not a year—and that they believed that it would likely be resolved by summary judgment. Moreover, two members of the Committee were prior presidents of Superior during much of the time of the relevant events set forth in the TAG Adversary Proceeding complaint and can attest to the accuracy of the allegations contained therein.

Upon confirmation of the APS Plan, APS will fund the litigation against TAG preserving the right to seek reimbursement of such expenses under a substantial contribution claim under Section 503(b) of the Bankruptcy Code. Contrary to Debtor's assertion in its objection, APS, as the Reorganized Debtor under the APS Plan, would remain in business and continue operations of the Debtor as contemplated under the APS Plan with the ability, if necessary, to draw on the line of credit which will be established by APS as disclosed in the Disclosure Statement. The Reorganized Debtor, as shown by the projections

and financial information contained in the APS Disclosure Statement would be able to successfully operate the business of the Reorganized Debtor post confirmation. Further, the expenses of litigating the Adversary Proceeding against TAG would not affect operations of the Reorganized post confirmation because, as mentioned earlier, APS would be funding the necessary costs associated with the TAG Adversary Proceeding.

(c) <u>Insufficient or Inadequate Information Relating to Financial Information, Claims Estimation and Payout to Creditors</u>. APS is a creditor of the Debtor, and as such, does not have day to day access to the books and records of the Debtor. It must rely on information it obtained through its due diligence, a review of monthly operating reports, schedules and statement of financial affairs, discussions with the Debtor, and information provided by the Debtor to APS. The financial information, including projections, claims estimation and payout to creditors that APS has included in the APS Disclosure Statement has primarily come from the President of the Debtor, Mr. Kent Abercrombie, and in consultation with Mr. Abercrombie. APS relied upon information provided by Mr. Abercrombie in formulating the APS Disclosure Statement and Plan. Further, prior to filing its disclosure statement, APS conferred with Mr. Abercrombie regarding APS' projections, estimation of claims and estimated payout to creditors, and Mr. Abercrombie acknowledged that he believed such information to be reasonable and accurate. APS, based upon and in reliance on information obtained from the Debtor asserts that the information contained in the APS Disclosure Statement is accurate.

Specifically, the APS predictions of the unrestricted cash and current assets on hand at the end of September were proposed by Mr. Abercrombie who

has stated repeatedly that he can maintain the financial position of the Debtor in balance as long as legal fees do not get out of hand.  APS' predictions of the ultimate payouts on unsecured claims were developed by APS in close connection with Mr. Abercrombie.  Mr. Abercrombie has estimated for the Debtor's Third Amended Plan that the claims on the open purchase orders will not be more than $2.5 – 3.0 million based upon conversations Superior has had with the trade vendors—not the $5.2 million alleged in Debtor's objections.

APS' Disclosure Statement estimates that the payout to non-insider unsecured creditors will be between 79%-100%.  *See*, APS Disclosure Statement p. 26.  As stated above, these estimates are based on information obtained by APS from the Debtor.

Contrary to the Debtor's objection, the APS Disclosure Statement does set forth the claims estimations and assumptions upon which this estimation is based.  As stated in the APS Disclosure Statement, the claims reduction projected to be obtained under the APS Plan will be obtained through APS' assumption of warranty claims where a proof of claim has been filed, the assumption of loss of warranty claims where a proof of claim has been filed, the assumption and cure of all insurance contracts, the reissuance of cancelled purchase orders where a supplier accepts a modified delivery schedule, and assumption of executory contracts.

As further indicated in the APS Disclosure Statement, APS believes that it will be successful in negotiating supplier agreements, the facility lease and executory contracts such that the estimated payout to unsecured creditors would be 100%.

Debtor alleges that APS' plan to reissue open purchase orders will result in APS obtaining unusable inventory. This just isn't so. There is no "unusable" inventory reflected in the open purchase orders as the cylinders and experimental engine parts on order can and will be sold as piece parts—as they once were.

APS has continued to be in contact with the Debtor regarding its ongoing operations and financial condition and the continued validity and accuracy of the information contained in the APS Disclosure Statement. Based on these conversations and information obtained from the Debtor, the information contained in the APS Disclosure Statement continues to be accurate.

In that connection, the Debtor argues in its objection that because of the $2.0 million unrestricted cash requirement of the APS Plan and the alleged decline in cash and/or current assets of the Debtor that the Purchase Price Adjustment will kick in and reduce the amounts available to distribute to creditors. APS doesn't agree with the assessment contained in the Debtor's objection regarding the amount of unrestricted cash that is projected to be on hand at closing; however, if those estimates are correct, APS has the right to waive the unrestricted cash requirements. And, in such event, APS could continue to operate the Reorganized Debtor, for as disclosed in the APS Disclosure Statement, APS has, in addition to a $1.0 million revolver, access to an additional $1.5 million in capital.

(d) <u>Inadequate Information Regarding APS and its Ability to Fund the APS Plan</u>. The APS Disclosure Statement contains detailed information about APS, its business plan, management and financing commitment. *See*, APS Disclosure Statement at pages 9, 10, 11. Section 1129(a)(5) requires a plan

proponent to disclose the identity of directors and officers of the Reorganized Debtor proposed to serve after confirmation.  Beginning on page 9, the APS Disclosure Statement discloses that Mr. J. Michael Bean, Dan K. Horn, and Michael H. Hull will be the initial directors of the Reorganized Debtor; that Mr. David J. Sisson, a former president of the Debtor will act as an outside director; and that additional board members with qualifications to run a parts manufacturing business will be appointed to the board.  Further, it is disclosed that Mr. Abercrombie with remain as president of the Reorganized Debtor as will other key members of the Debtor's existing management team, including the Manager of Production and Logistics, the Director of Procurement and the Quality Assurance Lead Inspector.  It is additionally disclosed that APS has retained the services of two highly regarded regulatory consultants.

These disclosures more than satisfy the requirements of the Bankruptcy Code and far exceed the disclosures contained in the Debtor's Disclosure Statement, which discloses merely that Mr. Abercrombie has been asked to be the President and an initial director under the Debtor's Plan to which Mr. Abercrombie has only gone so far as to say he might stay on if he feels the Debtor's plan is feasible.

Contrary to the assertions contained in the Debtor's objection, APS has the ability to fund the APS Plan and has disclosed such ability in the APS Disclosure Statement.  As disclosed on page 10 of the Disclosure Statement, APS has obtained the necessary financing commitment from a bank for an asset based term loan of $2.5 million and has arranged an operating revolving line of credit of up to $1.0 million.  Further, APS has access to an additional $1.5 million of capital if necessary.  APS' financing commitment has been disclosed on

several occasions. Mr. Abercrombie has met with APS' bankers to confirm and finalize the terms of the lending agreement, and Mr. Abercrombie has seen the commitment letter and has confirmed that APS' funding is in place. Additionally, APS has previously provided counsel for the Committee with confirmation that it has a commitment letter for the funding proposed in APS' Plan. Finally, Mr. Abercrombie has advised TAG, the Committee and the Debtor's counsel that APS has the money to do what it proposes to do.

(e) <u>Miscellaneous objections</u>. In addition to the foregoing categories, the Debtor's objection contains other miscellaneous objections, most of which have been addressed in the foregoing response.

Debtor objects to the APS Disclosure Statement because Debtor asserts that APS, by filing its plan, is attempting to circumvent the solicitation provisions of the Bankruptcy Code.

APS is not attempting to circumvent the solicitation provisions of Section 1125 of the Bankruptcy Code. Debtor's exclusivity period terminated on July 14, 2009. Upon termination of exclusivity, APS was permitted to file a competing plan of reorganization, and it did. APS submitted its plan because, *inter alia*, it believes that the APS Plan is in the best interest of the creditors as it will result in a high payout to unsecured creditors while at the same time provide a continued Superior Air Parts manufacturing parts in the United States, buying product from its current vendors, many of which are creditors, and selling product to current customers who rely on the continued existence of Superior in the United States market place to provide quality product at competitive prices. Further, APS has serious concerns regarding the feasibility of the Debtor's Plan and Brantly's ability to timely (if at all) transfer funds from China to the United States. APS

sought, but was denied, permission to dual track the APS Plan with the Debtor's Plan. Now, the APS Disclosure Statement is set to be heard at the conclusion of the confirmation hearing on the Debtor's Plan. APS has not solicited acceptances of its plan or rejections of the Debtor's Plan.

The Debtor also raises objections regarding the deposit provisions of the APS Plan. It doesn't appear that these objections are disclosure statement objections but rather are nothing more than an attempt to improperly solicit rejections of the APS Plan prior to approval of the APS Disclosure Statement.

The APS Disclosure Statement clearly specifies the amount and timing of the deposit to be made by APS. As disclosed in the APS Disclosure Statement, on page 13, APS engaged in pre-petition efforts to purchase Superior. APS did not withdraw from those negotiations and efforts. Immediately prior to the filing of this bankruptcy proceeding, APS and the ownership of Superior were in discussions regarding the purchase of the ownership interest in Superior. In early December, 2008, APS made an offer to purchase the shares of Superior; however, the owner of Superior never responded. Instead, APS was notified on December 31, 2009 that Superior had filed bankruptcy on December 30th in order to comply with the terms of an Asset Purchase Agreement Superior had executed with Avco Corporation as purchaser. APS didn't withdraw its offer; it was ready, willing and able to proceed.

Subsequent to filing of the bankruptcy proceeding and the Debtor's decision to decline the Avco Corporation offer, APS engaged in negotiations with the Debtor, the Committee, TAE and TAG to reach an agreement regarding a plan of reorganization whereby APS would own the Reorganized Debtor. As a result of those negotiations, a plan of reorganization was prepared and was on

the verge of being filed in early June, when APS learned that the Debtor was in discussions with Brantly for Brantly to file a competing bid against for the ownership of the Reorganized Debtor. APS believed then, and continues to believe, that the Debtor, at the insistence of TAG intentionally delayed the negotiations of the Plan so that it could cut a deal with Brantly. Accordingly, APS withdrew its offer and did not want to be a stalking horse under those circumstances.

The Debtor subsequently filed its plan whereby Brantly would purchase the equity of the Debtor through a bid procedure. When it became obvious that the bid procedures were designed to not accommodate an APS bid and give the sole shareholder the power to veto any bid, including an APS bid, APS, consistent with its stated intention of purchasing the piece parts business of Superior filed its competing APS Plan. Provisions were added to the bid procedures proposed by the Debtor that purported to permit an APS bid to be made and to be considered as a back-up bid under the provisions of the bid procedures. APS made a timely bid as required by the bid procedures and made the required good faith deposit of $250,000. APS was notified on August 13th, that its bid was rejected, and through subsequent communications with the Debtor, learned that APS was not chosen as a back-up bidder as well, which APS believes is in violation of the bid procedures. Such dispute is the subject of a motion filed of even date herewith. Despite Debtor's assertions in its objection to the APS Disclosure Statement, APS is a motivated buyer with the wherewithal and ability to carry out the terms and conditions of the APS Plan.

Debtor argues that the APS projections fail to take into account "the recent downturn" in the United States market. APS' projections were based on

conservative estimates and in consultation with the president of the Debtor and took into consideration the impact of the current market. Ironically, the Debtor argues that APS' projections are not sufficiently detailed when the Debtor declined to include projections at all in connection with its Third Amended Plan.

Debtor objects that the APS Disclosure Statement doesn't contain an analysis of what the impact would be upon the Reorganized Debtor if it cannot remain at the current leased premises. The only change to the current APS projections would be that the Reorganized Debtor would pay less rent.

Debtor complains that there is no proof of the estimated proceeds from the sale of the Vantage Engine Program. Mr. Abercrombie has stated that he believes the Vantage Engine Program can be sold for up to $6.5 million. APS and Mr. Abercrombie recently met with Brantly and discussed the value of the Vantage Engine Program and concluded that the engine could be sold to Brantly for at least $4.5 million.

The Debtor objects because it alleges that the APS Disclosure Statement doesn't give a detailed discussion about the warranty claims. The reason that there is not a detailed discussion is that APS' plan is to assume the warranty claims as set forth in the APS Disclosure Statement and Plan.

## **APS RESPONSE TO THE COMMITTEE'S OBJECTION**

5. Many of the Committee's objections to the APS Disclosure Statement are similar to those raised by the Debtor. Reference is made to the foregoing discussion and incorporated herein. As to the remaining objections, APS responds as follows:

(a) <u>Inadequate Information</u>. The Committee asserts that the APS Plan does not contain adequate information regarding the risks associated with the

sale of the Vantage Engine Program. APS asserts that no such risks exist as APS believes that Brantly's main goal is to purchase the Vantage Engine Program and will do so if the APS Plan is confirmed. Otherwise, the risk factors in the plan that APS, the Committee and Superior were finalizing in early June remain the same. *See*, copy of the June draft plan attached hereto as Exhibit C.

The Committee asserts that there is lack of clarity in the APS Disclosure Statement regarding executory contracts and open purchase orders. The provisions of the APS Disclosure Statement regarding these matters is essentially identical to those of the Debtor's Third Amended Disclosure Statement approved by the Court.

The Committee asserts that the APS Disclosure Statement contains inadequate information regarding the proposed Creditors Trust Agreement. APS intends to use the Creditors Trust Agreement prepared by the Debtor and the Committee in connection with the Debtor's Third Amended Plan, with changes to be made to conform its terms with the terms and provisions of the APS Plan.

The Committee asserts that the APS Plan does not adequately disclose APS' capitalization and its ability to fund the acquisition and operation of Superior post confirmation. As discussed in the foregoing response to the Debtor's projections, the APS Plan contains financial data, claims estimations, and projections that were prepared by APS in consultation with Superior's president based upon historical records and reviewed and approved with few questions by Chuck Dedmon and Tim Archer, both of whom were former president's of Superior and who are on the Committee and/or consulting with the Committee.

Finally, the APS Plan and Disclosure Statement is based substantially upon the June plan negotiated primarily by and between APS and the Committee

and contains significantly more financial information regarding the Reorganized Debtor than is contained in the Debtor's Third Amended Disclosure Statement which is completely devoid of any pro formas or financial projections of the Reorganized Debtor.

## **SUMMARY**

6.      The APS Disclosure Statement contains adequate information and meets the requirements of Section 1125 of the Bankruptcy Code.

7.      APS reserves the right to file additional responses to the Debtor and Committee's objections to the APS Disclosure Statement.

WHEREFORE, PREMISES CONSIDERED, APS files this Response to the Debtor and the Committee's objection to Aviation Parts Supply, Inc.'s First Amended Disclosure Statement and seeks an order of the Court approving the APS Disclosure Statement and for such other and further relief as may be just and equitable.

DATE: August 14, 2009

Respectfully submitted,


By: /s/ Billy G. Leonard, Jr.
BILLY G. LEONARD, JR.
Texas State Bar No. 12208100
1650 W. Virginia Street, Suite 211
(469) 742-0855
(469) 442-0135 (Facsimile)

and

Kevin H. Good
Texas Bar No. 08139300
Conner & Winters LLP
1700 Pacific Avenue
Suite 2250
Dallas, Texas 75201
Telephone  (214)217-8070
Fax  (214) 217-8861

**Attorneys for Aviation Parts Supply, Inc**.


## CERTIFICATE OF SERVICE

The undersigned counsel certifies that on the 14th day of August, 2009, a true and correct copy of the foregoing was served on those persons receiving electronic notification from the Court's electronic filing system and via e-mail to Mr. Stephen Roberts, counsel for the Debtor and Mr. Dave Parham, counsel for the Unsecured Creditors' Committee and to those persons on the attached service list.

/s/ Billy G. Leonard, Jr.
BILLY G. LEONARD, JR.