**BAKER & McKENZIE**

Baker & McKenzie LLP
2300 Trammell Crow Center
2001 Ross Avenue
Dallas, Texas 75201, USA

Tel: +1 214 978 3000
Fax: +1 214 978 3099
www.bakernet.com

Asia
Pacific
Bangkok
Beijing
Hanoi
Ho Chi Minh City
Hong Kong
Jakarta
Kuala Lumpur
Manila
Melbourne
Shanghai
Singapore
Sydney
Taipei
Tokyo

Europe &
Middle East
Almaty
Amsterdam
Antwerp
Bahrain
Baku
Barcelona
Berlin
Bologna
Brussels
Budapest
Cairo
Dusseldorf
Frankfurt / Main
Geneva
Kyiv
London
Madrid
Milan
Moscow
Munich
Paris
Prague
Riyadh
Rome
St. Petersburg
Stockholm
Vienna
Warsaw
Zurich

North & South
America
Bogota
Brasilia
Buenos Aires
Calgary
Caracas
Chicago
Chihuahua
Dallas
Guadalajara
Houston
Juarez
Mexico City
Miami
Monterrey
New York
Palo Alto
Porto Alegre
Rio de Janeiro
San Diego
San Francisco
Santiago
Sao Paulo
Tijuana
Toronto
Valencia
Washington, DC

April 22, 2009

Tel: +1 214 978 3069
elliot.d.schuler@bakernet.com

**By facsimile and E-mail**

[THIS COMMUNICATION IS IN THE COURSE OF SETTLEMENT
DISCUSSIONS AND IS THEREFORE PRIVILEGED PURSUANT TO FRE 408]

Chester B. Salomon
Becker, Glynn, Melamed & Muffly LLP
299 Park Avenue
New York, NY 10171
Facsimile: (212) 888-0255
Email: csalomon@beckerglynn.com

Vincent P. Slusher
Cynthia W. Cole
Beirne, Maynard & Parsons, L.L.P.
1700 Pacific Avenue, Suite 4400
Dallas, TX 75201
Facsimile: (214) 237-4340
Email: vslusher@bmpllp.com
Email: ccole@bmpllp.com

RE:   *Superior Air Parts, Inc.*, Case No. 08-36705-bjh11
      United States Bankruptcy Court for the Northern District of Texas

Dear Messrs. Salomon and Slusher and Ms. Cole:

Please be advised that Baker & McKenzie LLP represents the Official Committee of Unsecured Creditors (the "Committee") in the Chapter 11 bankruptcy case of Superior Air Parts, Inc. ("Superior").

The Committee has undertaken an investigation into the claims asserted in Superior's bankruptcy case by your respective clients, Thielert AG and Thielert Aircraft Engines GmbH. During the course of the investigation, we uncovered numerous actions or inactions on the part of your clients, which actions, or inactions, we believe create more than a sufficient basis to recharacterize and/or equitably subordinate their claims in this case.

We are prepared to file suit against each of your clients, and have taken the liberty of putting together a complaint, a copy of which is enclosed with this letter. We believe the evidence and testimony to be presented in this matter to be very strong and ultimately believe that both of your client's claims will be prioritized beneath that of unsecured creditors.



Baker & McKenzie LLP is a member of Baker & McKenzie International, a Swiss Verein.

However, prior to such filing, we would welcome the opportunity to meet with you, at your earliest convenience, to see if you would be willing to voluntarily recharacterize or subordinate your claims without incurring the expense of litigation. We look forward to your response after you have had an opportunity to review the proposed complaint.

Please be advised that we plan on filing this Complaint no later than April 29, 2009, if a resolution is not obtained.

Should you have any questions or concerns, you may discuss this matter me at (214) 978-3069.

Sincerely,

Elliot D. Schuler

Encl.

cc: David W. Parham (*Of the Firm*)

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| IN RE: § <br> § <br> § Case No. 08-36705-BJH-11 <br> SUPERIOR AIR PARTS, INC., § <br> § Jointly Administered <br> DEBTOR-IN POSSESSION. § <br> § Chapter 11 <br> § <br> OFFICIAL COMMITTEE OF § <br> UNSECURED CREDITORS OF § Adversary No. _____ <br> SUPERIOR AIR PARTS, INC. § <br> § <br> Plaintiff § <br> § <br> v. § <br> § <br> THIELERT AIRCRAFT ENGINES § <br> GmbH and THIELERT AG § <br> § <br> Defendants. § | |

## PLAINTIFF'S ORIGINAL COMPLAINT

TO THE HONORABLE BARBARA J. HOUSER,
UNITED STATES BANKRUPTCY JUDGE:

Official Committee of Unsecured Creditors of Superior Air Parts, Inc. (the "Committee"), by and through its counsel Baker & McKenzie, LLP files this Complaint, and for cause of action respectfully states:

### I.
### Preliminary Statement

This case is very simple. Superior Air Parts, Inc. ("Superior" or the "Debtor") was a leader in aftermarket parts for Lycoming and Continental engines. For almost forty years, Superior remained a closely held company and continued to operate profitably.

DALDMS/660312.1

Defendant Thielert AG ("TAG") is the parent corporation of Defendant Thielert Aircraft Engines GmbH ("TAE"). Both entities were owned and controlled during all relevant points in time by Frank Thielert ("Thielert"), who was ultimately removed from management due to allegations of accounting fraud and providing false evidence to German authorities.

In October 2004, Thielert obtained a working capital loan from a consortium of German banks for EUR 24.3 million. By the following Spring, reports had surfaced of "ghost invoices" in the tens of millions of dollars to several American defense contractors and the banks demanded an audit. In need of a new source for parts and ghost invoices, Thielert approached Superior regarding the possibility of TAG acquiring Superior for upwards of EUR 20 million. In reality, Thielert was looking for a new pawn to make TAG more attractive to investors for an upcoming IPO. Under the guise of the upcoming acquisition of Superior, Thielert had TAE ship an inordinate amount of product to Superior, much of which Superior never ordered. As a result thereof, Superior incurred a massive amount of debt. In so doing, by contrast, Thielert inflated TAE's receivables which made TAG more attractive for the IPO. Once the IPO was finalized, Thielert had TAG acquire the senior lien position on substantially all of Superior's assets. Armed with the senior secured position and a massive accounts receivable, Thielert was able to force the acquisition of Superior for less than 10% of the amount contemplated.

In the months leading up to the acquisition and from all points forward, Thielert played the role of puppet master whereby Superior became nothing more than a mere vehicle to enhance the apparent profitability of TAE and TAG by showing sales and large account receivable balances. Thielert did this largely by disguising equity contributions

as affiliate debt and burdening Superior with massive accounts payable. Thielert compounded the problem by forcing Superior to pay debts of TAE for which Superior had no prior responsibility.

This strategy continued until Thielert and the Defendants became the subject of a myriad of civil and criminal investigations in Germany, which ultimately led to (i) the nullification of TAG's annual reports; (ii) the voiding of certain resolutions of TAG's board of directors; (iii) the dismissal of Thielert for cause in light of accounting fraud, and providing false evidence; and (iv) the initiation of separate insolvency cases for both TAG and TAE. As a result of the foregoing, Superior turned from a market leader to one which may ultimately face liquidation and its unsecured creditors were left diluted by a $10 million claim by TAE (the "TAE Claim"), and an $18 million claim by TAG which is allegedly secured by a lien on substantially all of the Debtor's assets (the "TAG Claim").

By way of this Complaint, the Committee seeks to recharacterize the entire claim of TAE as equity and/or equitably subordinate the claims of TAG and TAE below that of unsecured creditors.

## II.
## Parties

1. Plaintiff is the Committee, which was certified and appointed by the United States Trustee on or about January 29, 2009.

2. Defendant Thielert Aircraft Engines GmbH is an affiliate of the Debtor and has asserted a general unsecured claim in this case. Defendant may be served with process by _____ upon Dr. Bruno Kubler, Esq., Insolvency Administrator, Nieritzstr. 14, 01097, Dresden, Germany. A copy of same will also be

DAL:DMS/660312.1

sent to its counsel, Vincent P. Slusher, Beirne, Maynard & Parson, LLP, 1700 Pacific Avenue, Suite 4400, Dallas, Texas 75201.

3. Defendant Thielert AG is the owner of all of the shares of the Debtor and has filed a proof of claim in this case asserting a secured position in substantially all of Superior's assets. Defendant may be served with process by _____ upon Dr. Achim Ahrendt, Albert-Einstein-Ring 1122761 Hamburg, Germany. A copy of same will also be sent to its counsel, Chester B. Salomon, Becker, Glynn, Melamed & Muffly LLP, 299 Park Avenue, 16th Floor, New York, New York 10171.

## III.
## Jurisdiction and Procedural Background

4. This Court exercises jurisdiction over this proceeding pursuant to 28 U.S.C. §§ 157 and 1334.

5. This is a core proceeding under 28 U.S.C. § 157(b)(2)(A),(B), (C), or (O).

6. Pursuant to 28 U.S.C. §§ 1408 and 1409, venue is proper in this Court.

7. This adversary proceeding is brought pursuant to Sections 547 and 550 of title 11 of the United States Code (the "Bankruptcy Code").

## IV.
## Facts

**Relationship of Defendants and Criminal History of its Founder**

8. Defendant TAE is a manufacturer of kerosene piston aircraft engines and a developer of engine components. TAE was the only Thielert related aircraft parts entity until the IPO in November 2005, at which time TAE became a wholly owned subsidiary of the newly formed TAG.

DALDMS/660312.1

9. Both TAG and TAE are located in Germany and were founded, operated, and controlled during the years in question, by Thielert. In April 2008, Thielert was terminated by TAG's board of directors, and is currently facing advanced stage criminal investigations for accounting fraud, and providing false evidence.

10. The termination of Thielert came on the heels of a decision by a German court which found that Thielert had among other things, created "ghost invoices" for imaginary orders to TAE, created false financial statements, and presented false information to potential investors. As a result thereof, several years of TAG's annual reports were voided and both TAG and TAE immediately commenced insolvency proceedings in Germany.

**History of TAG and TAE**

11. Thielert began building auto engines in the early 1990's when he formed Thielert Auto Technik and Thielert Motoren which were Hamburg-based companies that built crankshafts, camshafts, and cylinder heads for German automobiles.

12. In the early part of the 21st century, Thielert founded TAE for the purpose of designing turbo diesel engines for the aviation industry. Thanks in large part to subsidies obtained from the German government for businesses operating in former East Germany, Thielert was able to cheaply build a brand-new, ultramodern aircraft engine facility in Liechtenstein, Saxony — in the southeast corner of former East Germany. There, supported by CADCAM (computer assisted design and manufacturing) technology and a multitude of the latest multiaxis milling, machining, grinding, and measuring equipment, Thielert had TAE start designing the turbo diesel engines.

DALDMS/660312.1

13. Using government-wage subsidies, Thielert expanded TAE's workforce with the idea that employing more people meant a greater capability of producing more product.

14. In October 2004, TAG obtained EUR 24.3 million in working capital from a consortium of banks, based in large part on millions of dollars of alleged receivables owing from large American defense contractors to TAE. However, in the Spring of 2005, these banks requested an audit of these receivables in light of reports that many of the unpaid invoices did not exist, and were instead fabricated by Thielert. A subsequent audit report issued by BDO Deutsche Warentreuhand AG showed massive discrepancies between the amounts TAE had booked as invoices to customers, and actual cash received from those customers between January 2003 – April 2005. It is believed that less than 1% of the receivables were ultimately found to be verifiable.

**Relationship between Superior and the Defendants**

15. In the Spring of 2005, around the same time that the banks were investigating into the phantom receivables, Thielert was in the process of setting up an Initial Public Offering for TAG (the "IPO"). In order to attract investors, Thielert needed to find a new way to make TAE appear more lucrative.

16. Thielert decided to approach Superior's ownership about the possibility of TAG acquiring Superior. While TAE had been a supplier of Superior's dating back several years, Superior did not have a payable balance owing to TAE in the first half of 2005.

17. For many years prior to this point in time, Superior had an established reputation as one of the largest suppliers of parts under Federal Aviation Administration's

DALDMS/660312.1

("FAA") Parts Manufacturer Approval ("PMA") regulations for piston engines. Thielert was intrigued with Superior's presence in the market and their ability to distribute and service TAE's products. He likewise believed that acquiring Superior would be a very lucrative way for TAE to gain further penetration into the US market.

18. Throughout the early part of 2005, Superior and Thielert had several meetings regarding the potential acquisition. In March or April of 2005, the parties met in Addison, Texas for the specific purpose of outlining a Memorandum of Understanding for TAG's acquisition. The terms of the Memorandum of Understanding contemplated an acquisition price of approximately EUR 20 million.

19. While the discussions were very active, and the plans for the future were progressing, Thielert required that Superior keep all mention of TAG's potential acquisition quiet. Thielert advised Superior that he wanted to wait to announce the acquisition until after TAG's IPO was successful. Thielert believed doing likewise would help increase the value of TAG's stock following the IPO.

20. While Thielert was secretly jockeying to acquire Superior, he began actively exploiting this eventual relationship by having TAE flood Superior with products in the months leading up to the IPO. Between June 2005 and November 2005, TAE shipped approximately $900,000 worth of products to Superior.

21. Although TAE was supplying Superior product with rapidly increasing frequency, the shipments were not necessarily made pursuant to purchase orders from Superior. Upon information and belief, Thielert would instead have TAE ship whatever was built that week (regardless of quantity) rather than what Superior ordered, or even needed. More often than not, Superior didn't have existing purchase orders from

DALDMS/660312.1

customers for those products, and the amount of the shipments drastically exceeded what Superior could expect to sell, or even had the capability to sell, in the foreseeable future.

22. Although Superior never ordered the products received, TAE would invoice Superior for everything shipped, and often times, for items that were never shipped at all. The influx of massive amounts of product created an extremely large payable on Superior's books. Believing a sale to Thielert imminent, Superior did not resist the influx of parts.

23. Upon information and belief, Thielert reported all of TAE's shipments (and in many cases, non-shipments) to Superior as purchase orders, in an effort to inflate TAE's alleged receivables.[1] Thielert had a strong incentive for TAE to produce as much as it could. The government-wage subsidy allowed TAE to consistently keep their machines in Germany running and making product without receiving cash for the purported "sales" to Superior and, in turn, the "sales" and large account receivable made TAE and TAG more attractive to investors. Upon information and belief, TAE would simply produce as much they could, whether or not Superior ordered anything close to those amounts.

24. By flooding Superior with product, Thielert dramatically inflated TAE's receivables. Thielert's actions were ultimately successful as TAG went public on the Prime Standard market segment of the Frankfurt Stock Exchange on November 17, 2005. Upon information and belief, there was no reference to the potential acquisition of

---

[1] At the time of the IPO, what Superior reflected as being payable to TAE was substantially less than what TAE had listed as its outstanding receivable balance. Superior inquired into the severe discrepancy but was advised by Thielert that German accounting principles allegedly provide for an accounting standard that allowed TAE to bill for work not yet completed.

DALDMS/660312.1

Superior anywhere in TAG's public offering documents even though the acquisition followed shortly thereafter.

25.     After the IPO was finalized, Superior's accounts payable to TAE had ballooned to approximately $900,000.00. Despite the record balance, Superior was never pressured to make payments to TAE. In fact, despite shipping more than $1,250,000.00 worth of product to Superior in 2005,[2] Superior only made three payments that entire year which collectively totaled $150,000.00. Each of those payments was made in the days leading up to the IPO.

26.     Shortly thereafter, in February 2006, TAG obtained an assignment of the debt of Superior's secured creditors for the outstanding balance of $6-8 million.[3] Almost immediately after it acquired a lien on substantially all of Superior's assets, TAG was able to exploit the secured position and Superior's rapidly increasing payable, by purchasing 100% of the ownership interests of Superior for just USD $2 million---less than 10% of the EUR 20 million discussed prior to the IPO.

27.     Right before closing of the Superior acquisition, TAG pressured Superior to make sure that Superior's payables equaled TAE's receivables despite the fact that there was a significant disparity in the records. Upon information and belief, Thielert manipulated Superior's books and records to make sure everything properly balanced in light of ongoing investigations in Germany.

**Capitalization of Superior after acquisition by TAG**

---

[2] This figure is what is reflected in Superior's books and records. It is presumed that TAE would assert a different, likely higher, amount.
[3] However, TAG did not file a UCC Financing Statement with the Texas Secretary of State, perfecting its security interests in the Debtor's assets and thus should ultimately be no more than an unsecured creditor in this case.

DALDMS/660312.1

28. At the time of the acquisition, Thielert advised Superior that TAG would continually inject capital into Superior and provide Superior with whatever they needed regarding capitalization. Despite these assurances, Superior never received any cash infusions from TAG or TAE. Rather than infusing capital, as promised, Thielert advised Superior that he wanted Superior to "self-fund" through selling parts that TAG would provide through TAE. As a result thereof, TAE became Superior's primary supplier of cylinders and Superior remained a thinly or inadequately capitalized company, relying on cylinders and parts inventories that greatly exceeded Superior's needs, rather than cash, for capital.

29. From that point forward, any time Superior asked TAG for money, Thielert would simply advise that TAG would have TAE supply more parts for Superior to sell. Upon information and belief, TAG would make cash infusions into TAE, or otherwise capitalize TAE, to cover the costs of the products shipped to Superior.

30. Despite the fact that the payables balance to TAE continued to increase at a massive rate, TAE never demanded, or required, payment for items shipped. In fact, Superior did not even make one payment to TAE in 2006 despite TAE providing approximately $7,000,000.00 worth of product. Thielert intended this arrangement to be TAG's way of capitalizing Superior. [4]

31. This arrangement continued from the time of the acquisition in March 2006 until April 2008, when both TAE and TAG commenced insolvency proceedings and shipments to Superior forever ceased.

---

[4] As an additional measure of capitalization, Thielert had TAE perform all of Superior's research and development. Superior also had no outside development or engineering charges.

DALDMS/660312.1

**Complete lack of control over TAE account and decrease in ability to manage funds following acquisition**

32. Following the acquisition, all of Superior's assets were pledged to TAG and Superior had a massive receivable owing to TAE. As a result, Superior had no leverage in its dealings with TAE. TAG would just have TAE start shipping and invoicing whether Superior agreed to the orders or not. TAE would dump product that Superior never ordered onto Superior, force them to take it, and ultimately sell it to Superior's customers. Due to the vast amount of inventory that Superior was compiling, more often than not, Superior did not obtain the customary margins that it would usually generate on these items.

33. While TAE was not pressuring Superior to make payment, Superior was properly accounting for each of the invoices (at least the ones it knew of), and as a result it was carrying an extremely large payable. The more TAE supplied, the larger that payable became.

34. Towards the end of 2006, however, an unknown whistleblower with access to TAG's corporate documents sent a proposed criminal complaint to the prosecutor's office in Hamburg, Germany which included internal company information, and publicized the earlier audit report from the firm's auditor BDO. The complaint alleged that the firm had written "ghost invoices" for imaginary orders, in order to raise revenue and profit reports, secure loans, and drive up TAG's share price.

35. As a result thereof, Hamburg's prosecutor began an official investigation, on the grounds that TAG attempted to obtain bank loans and stock investors under false pretenses. Several civil complaints likewise followed shortly thereafter. The end result was that TAG's annual reports for several years were nullified and many of the

DALDMS/660312.1

resolutions of its board of directors were voided. Thielert was promptly terminated for cause and the insolvency proceedings ensued.

36. Around the time the investigation started, TAG advised Superior's management that one of its own executives in Germany would now be completely in charge of overseeing Superior's operations. While Superior's personnel maintained physical control of the company's finances after this point in time, certain senior officers of TAG in Germany had direct supervisory authority over even the highest officers at Superior. As a result thereof, TAG had the power to direct how Superior managed its cash, and exercised that power.

37. As a result of this decision, Superior started issuing payments to TAE in early 2007 for the first time since the IPO---a period of almost 15 months. Most notably, Superior made two payments in January 2007 totaling $1,000,000.00 which in and of themselves depleted virtually all of Superior's available cash. From that point forward, Superior would issue payments to TAE, whenever requested by TAG, in whatever amounts they could afford.

38. Further complicating Superior's cash position at this point in time, was that several of Superior's largest customers were specifically instructed to invoice Superior for products shipped to TAE in Germany. Thus, in addition to incurring debt and making payments for TAE's product for which Superior never ordered, Superior was now being required to pay for products for which they never ordered and were never intended to receive. Upon information and belief, Superior did in fact pay for the product ordered by, and delivered to, TAE.

DALDMS/660312.1

## V.
## First Claim for Relief
### (Recharacterization of the TAE Claim)

39. The Committee repeats and realleges each and every allegation contained in paragraphs 1 through 38 above.

40. All of the invoices included in the TAE Claim, though couched as debt transactions, were disguised equity contributions.

41. Superior was thinly or inadequately capitalized throughout the relevant period of time.

42. At the time of the acquisition of Superior, TAG indicated its firm intent to continually capitalize Superior.

43. While TAG never made any cash infusions into Superior, it made clear its intent to capitalize Superior through the rapid increase in supply of product and services from its affiliated entity TAE.

44. TAE confirmed this intent by failing to request Superior to make timely or consistent payments for three years worth of invoices. In fact, there was no expectation of repayment. To the extent cash was sent to TAE or TAG, it appears such was done on a random basis when TAE needed cash.

45. The Committee therefore requests that the Court enter judgment against Defendant TAE recharacterizing the entire TAE Claim as equity, and awarding the Committee all other relief available under the law and the facts.

## VI.
## Second Claim for Relief
### (Equitable Subordination of the TAG Claim and TAE Claim)

46. The Committee repeats and realleges each and every allegation contained in paragraphs 1 through 45 above.

47. Each of the acts and omissions described above constitute abuses of TAG's position as controlling shareholder and purported secured creditor. TAG and TAE treated Superior as a mere instrumentality to carry out fraudulent, illegal schemes in Germany. Moreover, Superior was left undercapitalized, with massive inventory which was not needed or readily saleable rather than cash as "capital." The inequitable conduct resulted in severe injury to the Debtor and its trade creditors and/or conferred an unfair advantage on TAG and TAE sufficient to support equitable subordination of the TAG Claim and TAE Claim under 11 U.S.C. §510(c) and other applicable law.

48. Equitable subordination of TAG Claim and/or the TAE Claim would not be inconsistent with the provisions of the Bankruptcy Code.

49. The Committee therefore requests that the Court enter judgment against the Defendants equitably subordinating all of their claims, and awarding the Committee all other relief available under the law and the facts.

## VII.
## Prayer

Based upon the foregoing, and the law and the facts to be presented at trial, the Committee requests that the Court cite Defendants to appear and grant the Committee the following relief: (1) recharacterize as equity, the entire claim of Defendant TAE; (2) equitably subordinate any and all claims of Defendants TAG and TAE; and (3) award the Committee all other and further relief to which the Committee may be entitled.

DALDMS/660312.1

DATED: April ____, 2009
Dallas, Texas

Respectfully submitted,

**BAKER & McKENZIE**

By: ___/s/_____

David W. Parham
State Bar No. 15459500
Elliot D. Schuler
State Bar No. 24033046
R. Adam Swick
State Bar No. 24051794
2300 Trammell Crow Center
2001 Ross Avenue
Dallas, Texas 75201
Telephone: (214) 978-3000
Facsimile: (214) 978-3099

**ATTORNEYS FOR THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS**

DALDMS/660312.1