Billy G. Leonard, Jr.
Texas Bar No. 12208100
Attorney at Law
1650 W. Virginia Street, Suite 211
McKinney, Texas 75069-7703
Telephone (469) 742-0855
Fax (469) 442-0135

and

Kevin H. Good
Texas Bar No. 08139300
Conner & Winters LLP
1700 Pacific Avenue
Suite 2250
Dallas, Texas 75201
Telephone (214) 217-8070
Fax (214) 217-8861

***Attorneys for Aviation Parts Supply, Inc.***

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| **SUPERIOR AIR PARTS, INC.,** | § | **CASE NO. 08-36705-BJH-11** |
| | § | |
| | § | |
| **DEBTOR** | § | |

## AVIATION PARTS SUPPLY, INC.'S OBJECTIONS TO CONFIRMATION OF THE THIRD AMENDED PLAN OF REORGANIZATION OF SUPERIOR AIR PARTS, INC. AND BRIEF IN SUPPORT THEREOF

Aviation Parts Supply, Inc. ("APS"), a creditor and party in interest, by and through undersigned counsel, files these Objections to the Third Amended Plan of Reorganization ('Plan") of Superior Air Parts, Inc. ("Superior"), and would show the Court as follows:

## I.

## <u>Brief Procedural Status</u>

1.     Superior's Third Amended Disclosure Statement including Superior's Third Amended Plan of Reorganization was approved for distribution on July 23, 2009.

2.     Objections to Superior's Third Amended Plan of Reorganization are due no later than August 20, 2009.

3.     APS files herewith APS' Objections to Superior's Third Amended Plan of Reorganization prior to said August 20, 2009 deadline.

4.     The Confirmation hearing is set for August 26, 2009.

## II.

## <u>Standing</u>

APS is a creditor, a party in interest and has filed the APS First Amended Disclosure Statement and Plan of Reorganization for Superior.   APS has standing to file its objections to Debtor's Third Amended Plan of Reorganization. 11 U.S.C. 101(10); 11 U.S.C. 1109(b), 11 U.S.C. 1112(b); 11 U.S.C. 1128(b).

## III.

## <u>Statutory Requirements for Confirmation</u>

11 U.S.C Section 1129 contains the statutory requirements that any plan of reorganization must satisfy before a court can confirm the plan.  With respect to the Superior Third Amended Plan of Reorganization, APS highlights the following provisions:

### 11 U.S.C. § 1129. Confirmation of plan

(a) The court shall confirm a plan <u>only</u> if <u>all</u> of the following <u>requirements</u> are met:

\*\*\*

(3) The plan has been proposed in <u>good faith</u> and not by any means forbidden by law.

\*\*\*

11) Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.

\*\*\*. (emphasis added)

Referencing 11 U.S.C 1129(a)(11), the Historical and Revision Notes Legislative Statements simply, but clearly, state the following:

"Paragraph (11) <u>requires</u> a determination regarding <u>feasibility</u> of the plan. It is a slight elaboration of the law that has developed in the application of the word "feasible" in Chapter X of the present Act [chapter 10 of former title 11]." (emphasis added)

## IV.

## A.  Standards for Confirmation – 11 U.S.C Section 1129(a)(11)

1.    Burden of Proof:

The burden of proof to establish feasibility is on the Plan Proponents, and they must do so by a preponderance of the evidence. *In re Gen. Electrodynamics Corp.,* 368 B.R. 543 (Bankr.N.D.Tex.2007).

2.    Feasibility:

(a)    In considering confirmation of a plan of reorganization, the bankruptcy court has an affirmative obligation to scrutinize a reorganization plan to determine whether it is "feasible." *In re Lakeside Global Village VIII, II, Ltd.,* 116 B.R. 499, 506 (Bankr. S.D. 1898) citing

*Prudential Ins. Co. of America v. Monnier (In re Monnier Bros.),* 755 F.2d 1336, (8th Cir. 1985);

(b)     In order to allow confirmation, the court must make a specific finding that the plan, as proposed, is "feasible." In re Lakeside Global Village VIII, II, Ltd., 116 B.R. 499, 506 (Bankr. S.D. 1898), citing *In re Neff,* 60 B.R. 448, 453 (Bankr. N.D. Tex. 1985), aff'd. mem. 785 F.2d 1033 (5th Cir. 1986).

(c)     The term "feasibility" means something that is capable of being done or carried out.   To satisfy the feasibility requirement, the Plan Proponent must show that there is a reasonable possibility of a successful reorganization within a reasonable time.   *United Savings Association v. Timbers of Inwood Forest Association, Ltd.,* 484 U.S. 365 (1988).

(d)     Traditional factors which have evolved to aid a bankruptcy court in a feasibility analysis include:

        (i)      the adequacy of the capital structure;

        (ii)     the earning power of the business;

        (iii)    economic conditions;

        (iv)     the ability of management;

        (v)      the probability of the continuation of the same management; and

        (vi)     any other related matter which determines the prospects of a sufficiently successful operation to enable performance of the provisions of the plan. *Canal Place Ltd. Partnership v.*

*Aetna Life Insurance Co. (In re Canal Place Ltd. Partnership),* 921 F.2d 569, 577 (5th Cir.1991).

(e)     Explicating the outer boundary of a finding of feasibility, courts require the debtor do more than manifest unsubstantiated hopes for a successful reorganization. *In re Canal Place Ltd. Partnership,* 921 F.2d at 577; *First Jersey Nat'l Bank. v. Brown (In re Brown),* 951 F.2d 564, 572 (3d Cir.1991).   The Court's examination of feasibility must be based on objective facts.     The court must look at the probability of *actual* performance of the proposed plan.[1]

(f)     To establish feasibility, the debtor must present proof through reasonable projections that there will be sufficient cash flow to fund the plan and maintain operations according to the plan[2]. Such projections cannot be speculative, conjectural or unrealistic.  *In re Nelson* 84 B.R. 90, 93, (Bankr. W.D. Tex. 1988)); *see also In re SM 104 Ltd.,* 160 B.R. 202, 234-37 (Bankr. S.D. Fla. 1993); *In re Lakeside Global Village II, Ltd.,* supra at 507-508.

(g)     Courts generally require significant financial information about the reorganized debtor to find a plan feasible, including detailed financial projections for the business. See, *In re Cajun Elec. Power Co-op., Inc.,* 230 B.R. 715, 727 (Bankr. M.D. La. 1999).   The financial projections

---

[1]     Houser, Carvell, Meister and Thomas, Disclosure Statement: Confirmation and Cramdown of Chapter 11 Plans, http://law.lexisnexis.com/webcenters/link.aspx?b=vat7YOPJZzc .

[2]     Here, the Reorganized Superior plans to embark on an aggressive and ambitious expansion over the current Superior operations for which sufficient funding and credible, reasonable projections are required to support a finding of the feasibility requirement.

should be based on historical performance of the business and should realistically project the anticipated results of future business operations. *In re Schriock Constr., Inc.,* 167 B.R. 569, 576-77 (Bankr. D.N.D.,1994).

## B. Superior's Plan

Superior's Plan provides that an entity within something called "The Brantly Group" is going to pay $7.0 Million at some time[3] and assume some ill-defined liabilities in return for 100% of the equity of Superior. The representations about the ongoing operations of Superior are made by "The Brantly Group," not by Superior.

What do we know of Brantly's Plan for the ongoing operation of Superior? The Plan provides, in part, as follows[4]:

> *"The Plan general (sic) provides for the resumption and continuation of the Debtor's business, including the assembly and sale of piece parts, cylinder assemblies, and Vantage engines at its facility in Coppell, Texas or nearby."*

What we also know about the Brantly Plan is that it differs dramatically from the current business being conducted by Superior, i.e. the piece part business. Brantly has represented to the creditors entitled to vote on the plan as follows:

- "Brantly believes that this acquisition could create significant opportunities for Superior and its vendors to export reliable F.A.A. certified engines and parts to Chinese airplane and helicopter manufacturers."

- "Brantly has advised that the Debtor that, in order to achieve its business plan, Brantly intends to retain Superior's management and employees and continue operations in or near Coppell, Texas, using Superior's existing supply chain to

---

[3] Under Section 11.2(c), Conditions Precedent to Effective Date, Brantly has thirty (30) days from the date of the Confirmation Order to fund the Cash Contribution, but, under Section 11.3, Brantly, the Debtor and the Committee can waive the thirty (30) day limit "at any time, without notice, without leave or order of the Bankruptcy Court and without any formal action other than proceeding to consummate this Plan." See Section B.2 below for further discussion of this issue.

[4] Plan at pages 1 and 2.

assemble and sell engines and parts in the United States and China. Brantly believes that Superior's supply chain is important."

- "Given the massive industrial and economic growth China has been experiencing, Brantly expects the number of general aviation airplanes in China to significantly increase in the near future."

- "The Brantly Group plans to resume the Reorganized Debtor's engine production as soon as feasible and plans to use that production, in part, to supply the Chinese general aviation industry."

- "The Brantly Group expects that it will be able to supply approximately 500 of these engines annually to Chinese airplane manufacturers."

- "In addition to supplying approximately 500 engines to Chinese airplane manufacturers each year, the Brantly Group expects that the Reorganized Debtor's engines can be used to satisfy Brantly's helicopter manufacturing business which demands approximately 150 engines annually."

- "Brantly has advised the Debtor that it is committed to making the necessary modifications to adapt the Debtor's engines for use in its helicopters as soon as possible."[5]

Clearly, the Brantly business plan is aggressive and ambitious and far exceeds the current and past operation of Superior. Such a business plan as described above was clearly intended to be an inducement for any creditor interested in remaining in Superior's supply chain to vote for the Superior/Brantly Plan. Just as clearly, such a business plan will require detailed plans with critical path mileposts, budgets, operating capital, research and development allocations and financial projections with revenue and expenses over time. The Brantly plan as proposed and distributed to the creditors would require far more detailed data than the rather simple piece parts business.

That said, what do we know about the past performance of Superior in its dramatically less ambitious and aggressive operations than the proposed Brantly plan? The following are financial results of the rather modest business that Brantly plans to

---

[5]    Superior Third Amended Disclosure Statement at pages 39-41.

resume and continue (and build on according to the Brantly plan description delivered to the creditors referenced above) as disclosed in the Third Amended Disclosure Statement:[6]

Superior's Financial Performance Since 2005.

Since 2005, Superior has experienced EBITDA loss and a total net loss each year. A breakdown of Debtor's performance is as follows:

|  | Gross Sales | EBITDA | Net Income |
|---|---|---|---|
| 2005 | $25,714.775 (sic) | ($2,443,665) | ($5,171,469) |
| 2006 | $31,348,956 (Result of Thielert AG ("TAG") transaction and treatment of outstanding loans and interest) | ($2,879,352) | ($451,364) |
| 2007 | $31,140,083 | ($4,209,928) | ($5,635,053) |
| 2008 | $23,007,415 | ($3,576,304) | ($5,071,081) |

Superior, having established the prima facie case for a failed enterprise based upon the above disastrous financial performance, now must carry the burden of proof by a preponderance of the admissible, credible evidence that the Superior Third Amended Plan of Reorganization embodying the aggressive and ambitious Brantly business plan is feasible. [7]

---

[6]    Id at page 4 and 5.

[7]    Due diligence reveals that Superior's earnings and revenue began a precipitous decline after 2001. Since 2001, revenue has declined 49%. Gross margins have gone down 6% from 33% to 26% and operating expenses averaged $9.3 million annually. In its last year of operation pre-petition, Superior's expenses were 42% of net sales. Superior has lost an average of $3.3 million for each of the last 4 years. Break even in 2007 would have required an overall gross margin of 36% - a percentage which Superior has never sustained and which APS believes is unachievable with an engine company. For example, achieving this gross margin in 2007 would have required a 44.6% decrease in supplier costs. It is well known by the Debtor that this decline resulted from Superior's failed effort to be an "engine" company as Brantly now proposes.

1.    Absence of Predictable, Expected, Required and Typical Feasibility Evidence Tendered By Superior.

Despite the objections of APS to the Disclosure Statement regarding the complete absence of feasibility evidence and despite the Court's indication that the feasibility issues would be carried forward to the confirmation hearing, to date, August 20, 2009, four (4) business days prior to the confirmation hearing, Superior has not produced a single piece of information regarding the following[8]:

1)    Ability of the Reorganized Debtor to reverse the year after year EBITDA losses averaging nearly $3.3 Million;

2)    Adequacy of the Reorganized Capital Structure;

3)    Earning power of the business;

4)    Impact of current economic conditions;

5)    Financial projections showing profits and losses; and

6)    Financial commitment to fund losses and sustain the Reorganized Debtor until the losses, if any, are reversed.

Superior has been on notice of the APS objections to feasibility since at least June 25, 2009 when APS filed its Preliminary Objections to Superior's Amended Disclosure Statement filed on June 23, 2009. Fifty eight (58) days have passed without the disclosure of any material financial information leaving the Court and the creditors to

---

[8] APS now understands that Superior will be belatedly producing Exhibits in anticipation of the hearing set for August 26, 2009 on August 21, 2009, the day after Objections and votes are due pursuant to the Court's Order. No creditor has seen any such documents prior to voting or has been able to scrutinize and critique them in light of the representations made by Superior and Brantly regarding the Brantly business plan, the revival of the engine business which has lost so much money for so many years and the purported Chinese market that will transform the company from a loser to a winner. "Sandbagging" evidence that is so critical to the interested parties in this case and to the Court is unacceptable. APS reserves its rights to supplement this Objection based upon whatever is belatedly disclosed by Superior or Brantly.

speculate as to the true identity of "The Brantly Group," their financial ability to perform, the availability of funds to close the transactions contemplated and the future of the Reorganized Debtor. Nothing relevant has been provided by Superior to the Court and creditors to answer the questions that the Court must ask under Section 1129(a)(11) – regardless of whether an objection is even made. *In re Great Northwest Recreation Center, Inc.,* 74 B.R. 846, 852 (Bankr. D. Mont. 1987).

Feasibility questions arise in every Chapter 11 reorganization. Feasibility questions are routinely addressed – sometimes successfully, sometimes unsuccessfully – but feasibility questions are <u>always</u> addressed. Why has Superior not provided the Court and the creditors with this predictable and expected financial information? Why has Superior put the Court in this position if Superior has the information required? If Superior does not have this information, why not?

2.      Absence of Predictable, Expected, Required and Typical Feasibility Evidence Tendered by Brantly.

Brantly has purportedly done due diligence on Superior and purportedly has vast aviation expertise. Brantly purportedly has the financial ability and intends to "contribute the necessary capital to fulfill its plan."[9] Why, then, when Superior addresses the plans of "The Brantly Group" in its Section IX entitled "Feasibility" of the Third Amended Disclosure Statement, hasn't Brantly provided Superior and the Court with the results of its due diligence, its business plan that will reverse the established year after year losses, its anticipated capital requirements, its financial projections, its income statements, its balance sheets and its capital structure to assure that the Reorganized

---

[9] Superior Third Amended Disclosure Statement at Section IX, Feasibility at page 43.

Debtor has a reasonable chance at success?  Any investor with basic staff and outside advisors would understand that such information is fundamental to a successful finding of feasibility.  Absent this information, Superior's Third Amended Plan of Reorganization fails to satisfy the feasibility requirements and cannot be confirmed. *In re Adana Mortgage Bankers*, 14 B.R. 29 (Bankr. N.D. Ga. 1981)

> 3.    Illusory Effective Date.

As referenced in footnote 2 above, Section 11.2(c), Conditions Precedent to Effective Date provides as follows:

> "<u>Funding</u>:    Brantly shall have funded the Cash Contribution [$7 Million as adjusted by Section 11.2(d)] within thirty (30) days after the entry of the Confirmation Order provided that : ..."

However, Section 11.3 provides:

> "Brantly may waive any of the conditions set forth in section 11.2 of this Plan, except for condition ... 11.2(c) which may be waived only with the concurrence of the Debtor and the Committee, <u>at any time</u>, <u>without notice</u>, <u>without leave or order of the Bankruptcy Court</u>, and <u>without any formal action</u> other than proceeding to consummate this Plan." (emphasis added)

In essence, there is no Effective Date as the Effective Date can be moved without any accountability to the Court or anyone else.

Section 1129 (a)(9)(A), (B) and (C) all require payments or other actions to take place on the Effective Date.  Where a plan's Effective Date is imprecise, the plan cannot comply with the requirements of Section 1129(a) (9) and cannot be confirmed. *In re. Ralph C. Taylor*, 156 B.R. 995, 997 (Bankr. N.D. Ohio 1993.  Here, the Effective Date is not only imprecise, it is completely unknown and further, completely and expressly beyond the control of the Court.

Why would Superior support such an imprecise Effective Date and why would Brantly need the flexibility of such an illusory Effective Date? APS submits that the reason is precisely why APS objected to the Debtor's Disclosure Statement based upon the absence of feasibility evidence. Neither Superior nor Brantly can present any admissible, credible testimony regarding the precise date when Brantly will, for certain, be able to deliver the funds necessary to set the Effective Date. If either Superior or Brantly could have delivered such testimony, surely they would have. The plan cannot be confirmed with an imprecise, illusory, indeed, ephemeral Effective Date.

4.      Absence of Financial Commitments.

Superior's Third Amended Disclosure Statement very carefully pronounces:

> "Brantly has not given the guarantee of how much capital it will invest in the reorganized Debtor to achieve its business plan."[10]

This statement follows management's (presumably Superior's management) pronouncement that an "additional $4 Million in capital or credit may be needed to revive the piece parts business and to fund the costs of the engine programs...."

In its Third Amended Plan of Reorganization, Superior, once again, states:

> "Brantly <u>may</u> provide sufficient capital to the Reorganized Debtor so that the Reorganized Debtor can honor its obligations under the Plan to honor warranties, pay the purchase orders assumed under the Plan, and pay for the Reimbursement Obligations within the insurance deductibles."   (emphasis added)

The use of the term "may" is clearly a conscious effort by Brantly to confirm that Brantly is making no such financial commitment.

---

[10]      Id at page 43.

So what financial commitment is to be offered in evidence? There is the refundable $700,000 deposit made by Brantly and nothing more. Importantly, there is (i) no evidence of the financial commitment of the $6.3 Million balance to be paid by Brantly, (ii) no evidence of the financial commitment by Brantly to fund the expected losses year after year, (iii) no evidence of the financial commitment to fund the $4 Million to revive the piece parts business (iv) no evidence of the financial commitment to fund the costs of the engine programs as stated by Superior's management and (v) no evidence of the financial commitment to fund Brantly's obligations under the Plan to honor warranties, pay the purchase orders assumed under the Plan, and pay for the Reimbursement Obligations within the insurance deductibles.

How much is the shortfall in financial commitment? It is at least $10.3 Million. ($6.3 + $4.0 = $10.3 Million) in year one alone. Disregarding the costs involved in item (v) above, Brantly has deposited $700,000 or 6.36% of the $11.0 Million which includes the Cash Contribution and the required capital or credit stated by Superior management. For the remaining 93.64% or $10.3 Million, Superior and Brantly say: _____? Trust Me? That is not evidence on which a plan, any plan, can be confirmed.[11]

Case law is legion with hornbook law statements on this subject:

In *In re Ralph C. Tyler, P. E., P.S., Inc.,* supra at 997 (Bankr. N.D. Ohio 1993), the Court concluded that the plan did not meet the feasibility requirements where the

---

[11]    This, despite the fact that Brantly has represented to Superior that Brantly's purchase of the stock of the Reorganized Debtor is no longer contingent upon due diligence reviews by Brantly, nor is it contingent upon Brantly obtaining financing. Id at page 41.

**AVIATION PARTS SUPPLY, INC.'S OBJECTIONS TO CONFIRMATION OF THE THIRD AMENDED PLAN OF REORGANIZATION OF SUPERIOR AIR PARTS, INC. AND BRIEF IN SUPPORT THEREOF**

plan provided for exit financing, but the debtor provided no evidence of any commitment to provide such financing.

In *In re Wiston*, 153 B.R. 322 (Bankr. D. Kansas 1993 ), the Court found that the plan was not feasible when general partner's promise to pay $100,000 cash to the debtor in the next two years was not supported by proof he has any tangible means of satisfying the promise where, without his contribution, the plan showed a negative cash flow.

In *In re Chadda,* 2007 WL 3407375 (Bankr. E.D. PA. 2007), the Court found that any "evidence" of refinancing was speculative without evidence of actual loan commitment.

In *In re Stratford Associates Ltd. Partnership,* 145 B.R. 689, 699 (Bankr. D. Kan. 1992), the Court found that without proper funding in place or without evidence of a firm commitment of such funding, the Court cannot find the plan feasible.

In *In re Haardt*, 65 B.R. 697, 702 (Bankr. E.D. Pa. 1986), the Court found the lack of a refinancing commitment rendered the plan infeasible.

Succinctly stated, the source of funding must be shown to be firm as it goes directly to feasibility. *In re Hurricane Memphis*, 405 B.R. 616, 625 (Bankr. W.D. Tenn., 2009) where confirmation was denied when there was no testimony that an investor was willing to provide the business with the initial $400,000.00 in startup capital nor that he was able to do so.  Similarly, in addressing the proof of funding question, the Court in *In re Repurchase*, 332 B.R. 336, 343 (Bankr. N.D. Ill. 2006) found that the debtor had

failed to prove that funding was available to finance the $500,000 as capital required to restart that business. The only evidence offered on that point came from the debtor's president who testified that his wife would be the contributing source for needed capital and that debtor would also enter into sharing agreements for unitization of its net operating loss carryovers for the purpose of generating cash for post-confirmation operations. Because the testimony lacked "any form of corroboration or contract from the alleged sources of these funds," the court concluded the testimony amounted to nothing more than sheer speculation and wishful thinking.

Finally, and apropos to the instant case, in *In re S.O.S.*, 388 B.R. 202, 240 (Bankr. W.D. Tx. 2008), the Court denied confirmation where the debtor offered "*no* evidence at the hearing to show that it *could* meet that obligation - no commitments, no evidence of relevant past performance, *nothing*".

Here, Superior and Brantly have thus far offered no evidence, nothing, in the form of financial ability and nothing in the form of financial commitment, despite being on notice of the uncontroverted and long established legal requirements and the objections made as early as June 25, 2009. Superior and Brantly want to shift the burden and risk to the Court to confirm a plan without providing the Court with any evidence to support such a Confirmation Order on this issue.

5.      Absence of Regulatory Clearances.

31 CFR Part 800 entitled "Regulations Pertaining to Mergers, Acquisitions, and Takeovers by Foreign Person" implements the amendments to 50 U.S.C App 2170. Section 721. The statute and regulations authorize the President of the United States to review mergers, acquisitions, and takeovers by or with any foreign person which could

result in foreign control of any person engaged in interstate commerce in the United

States to determine the effects of such transactions on the national security of the

United States. Section 800.207 provides as follows:

> "The term *covered transaction* means any transaction that is proposed or
> pending after August 23, 1988, by or with any foreign person, which could
> result in control of a U.S. business by a foreign person."

A foreign person is defined in Section 800.216 as follows:

> "The term *foreign person* means:
>
> (a)   Any foreign national, foreign government, or foreign entity; or
>
> (b)   Any entity over which control is exercised or exercisable by a foreign
>       national, foreign government, or foreign entity.

Superior has disclosed the identity of Weifang Freesky Aviation Technologies

Co. ("Weifang") as the entity to which the Superior stock will be issued.[12]   The

acquisition by Weifang is a transaction covered by 31 CFR 800.

Section 800.401 provides the procedures for submission of the Voluntary Notice

to the Staff Chairperson at the Office of Investment Security and to the Committee's

Section of the Department of the Treasury. Section 800.402 sets forth the detailed

contents of the Voluntary Notice.

Section 800.501 et seq. describes the Committee procedures and its review and

investigation.   The Committee can decide not to undertake an investigation or can

initiate an investigation.  Pursuant to Section 800.506, the Committee can, among other

things, recommend that the President suspend or prohibit the transaction.  Importantly,

the President has the ability to unravel a transaction that has already been

---

[12]      Id at page 15.

**AVIATION PARTS SUPPLY, INC.'S OBJECTIONS TO CONFIRMATION OF THE THIRD AMENDED
PLAN OF REORGANIZATION OF SUPERIOR AIR PARTS, INC. AND BRIEF IN SUPPORT THEREOF**

consummated.  See Section 800.101.

APS has determined that neither Superior nor Brantly has provided the Voluntary Notice prescribed by Section 800.401 et seq.  As a result, the contemplated covered transaction between Superior and Brantly has not been reviewed and accepted by the CFIUS.  Absent such acceptance, the actions contemplated by the Plan are subject to being reversed under the CFIUS Regulations and should not be confirmed.

## V.

### A.  Standards for Confirmation – 11 U.S.C Section 1129(a)(3)

11 U.S.C. 1129(a)(3) requires that a plan be proposed in "good faith" and here, Superior bears the burden of proof of good faith by a preponderance of admissible, credible evidence.  *In re SM 104 Ltd.,* 160 B.R. 202 (Bankr. S.D. 1993).  Some courts do not consider pre-petition conduct as relevant; while others do. Compare *In re Valley View Shopping Center LP,* 260 B.R. 10, 29 (Bankr D. Kansas 2001) with *In re Natural Land Corp.,* 825 F.2d 296, 298 (11th Cir 1987).  The totality of circumstances should be evaluated in determining whether the plan has been proposed in good faith.[13]

### B. Superior's Plan

Brantly Representations to Superior:

A review of Superior's Third Amended Disclosure Statement reveals what APS believes are multiple inaccurate and misleading statements made by "The Brantly Group" to Superior, to the Court and to the creditors who have voted for or against the Plan.

---

[13]      Houser, Carvell, Meister and Thomas, Disclosure Statement: Confirmation and Cramdown of Chapter 11 Planshttp://law.lexisnexis.com/webcenters/link.aspx?b=vat7YOPJZzc

1.     Brantly asserts that it "produces" the B2B helicopter in a 2 and 5-seat version.[14]  It presently does neither, though the statement was clearly intended to suggest to the creditors that there was a ready market for Superior's parts.

Brantly International, Inc. is a Texas corporation formed in 1994.   The company was sold in 2007[15] to the Chinese investment group now seeking to purchase Superior. APS has learned that the "new" Brantly operates what has been described as a machine shop in a metal building at a small airport in Vernon, Texas.  APS has learned that Brantly has fabricated only six (6) B2B helicopters in Vernon since 2007.  At least five (5) were merely sent to Brantly in China for engineering review, maintenance training, sales display etc.  The Vernon facility  has not produced a 5-seat version in forty-five (45) years and has no plans to do so again.  While Brantly may intend to "produce" helicopters, it is not currently doing so, or at least not on a scale that will have any near term effect on Superior's market.

2.     Brantly asserts that it has plans to manufacture the B2B in China.[16]

APS visited the proposed manufacturing facility in China.  At the time of that visit late last month, the facility was completely devoid of material or tooling and had yet to produce a single helicopter.  There is no near term need for Superior engines for the B2B as implied to the creditors.

Brantly advised APS that it plans to continue to use the Vernon, Texas facility to manufacture for the US market and South America markets.  However, as noted the

---

[14]      Superior's Third Amended Disclosure Statement at page 39.

[15]      CFIUS Regulations were effective as of December 22, 2008; see 31 C.F.R. 210.

[16]      Superior's Third Amended Disclosure Statement at page 39.

**AVIATION PARTS SUPPLY, INC.'S OBJECTIONS TO CONFIRMATION OF THE THIRD AMENDED
PLAN OF REORGANIZATION OF SUPERIOR AIR PARTS, INC. AND BRIEF IN SUPPORT THEREOF**

Vernon facility is not presently making helicopters to sell.   Instead, it is merely

fabricating parts to be sent to China to manufacture helicopters there.  Further, Brantly

advised APS that it has found it too expensive to continue to make parts for the B2B in

Vernon.  As to the future of the Vernon, Texas  facility,  Brantly advised APS that it was

in the process of obtaining approval to manufacture the parts elsewhere and has asked

the FAA for an extension to the Production Certificate at the Vernon facility in order to

use the new facility in China to manufacture the helicopter. APS verified this statement

with the FAA.    As a result, APS has learned that the Vernon facility rightly considers

itself the "place holder" for the FAA Production Certificate for the B2B helicopter.  One

wonders whether this is the real future of Superior - to be the place holder for the

Vantage engine Production Certificate while all manufacturing moves to China. [17]

    3.      Brantly asserts that it produces the Brantly 305 model helicopter.[18]

Brantly does not currently "produce" a 5-seat version of the B2B. The US registry

indicates that the original Brantly produced its last Model 305 in 1965 - almost 45 years

ago.   There were only 45 of the Model 305s ever produced.   There are only 17

remaining on the US registry and only 2 are presently certified airworthy.     Brantly

advised APS that Brantly has built a plant for the manufacture of the 5-seat version in

China, but it advised APS that it has yet to manufacture a helicopter.  If Brantly plans to

manufacture the Model 305 in China, that effort also appears to be in the infancy stage

and perhaps years from first production.

---

[17] Unlike the "manufacture" of the helicopter which requires tooling, extensive machining, multiple personnel and some sort of assembly line, the engine is merely the sum of pre-manufactured parts which Superior obtains from vendors.  As a result, the engine could be readily "manufactured" in China if Brantly simply hires qualified mechanics.

[18]    Superior Third Amended Disclosure Statement at page 39.

The implication that the production of the Brantly 305 will have some beneficial near term impact on Superior is without foundation in fact.   Moreover, this supposed future production of the Model 305 in China will not likely benefit Superior in any significant manner as the he 5-seat version uses a Lycoming IVO-540 engine.   The Superior Vantage engine is an IO-360, 185 HP engine that is not compatible with the 5-seat Brantly helicopter.

4.      Brantly asserts that there is a present market for the converted Superior Vantage engine in China and that it "expects" that the Superior engines can be used to satisfy Brantly's helicopter manufacturing business which "demands" approximately 150 engines annually.[19]

This is simply untrue if it suggests there now exists such demand.  Brantly press releases indicate the Chinese plant mentioned above even at full capacity will make 80 helicopters a year.  As noted, that plant is still empty and has yet to make a single helicopter.  As a result, there is no current demand for 150 Superior engines annually, and if there is ever an impact on Superior's financial situation, it is years away.

5.      The Brantly Plan states that with respect to the Superior piece part business, Brantly "expects" to target the "large" piston-engine maintenance market in China.[20]      Brantly carefully implies that there is a present market to "target." There is none..  Brantly acknowledged to APS during the China visit that there are currently not more than 800 general aviation aircraft in the People's Republic of China.  Further, Brantly does not state whether any of these aircraft use Lycoming or Continental

---

[19]      Id at page 40.

[20]      Id at page 41.

engines which can use Superior PMA parts in maintenance activities. By comparison with this Chinese market, Superior services a U.S. aviation market of nearly 175,000 general aviation piston engine aircraft. If there are only 800 general aircraft in China now, the maintenance market for Superior piece parts will not be "large" for many, many years, if ever, and cannot help Superior make a near term profit.

6.     Brantly asserts that the Superior O-360 and IO-360 engines can be used "without modification" in certain fixed-wing airplanes, such as the Diamond 40 and 42 and Cessna 172, and that the Chinese aviation industry has the annual capacity to produce approximately 300 Diamonds and 700 Cessna aircraft, all of which rely on imported engines.[21] The implication is again, to induce creditors to think that the Brantly acquisition gives Superior access to an existing and "vast untapped aviation market" in China. It does not.

While the referenced engines might "fit" in the several aircraft, Brantly and Superior both know that the engines cannot be "used" in the referenced aircraft because the Superior engines have never been certified for those applications. Superior knows that such FAA certification process would take years.

Further, APS does not believe that the Chinese have a current capacity to produce the Cessna 172. It is widely known that Cessna has announced that the composite Cessna 162 will be manufactured in the PRC by Shenyang Aircraft Corporation which is a subsidiary of China Aviation Industry Corporation, a Chinese government consortium of aircraft manufacturers. The Cessna 162 aircraft, however, uses the Continental 0-200 and cannot use the Superior Vantage engine nor is it slated

---

[21]     Id at page 40.

to do so.  Cessna press releases state that the Cessna 162 is being produced in the PRC for the non-Chinese market, meaning it will require FAA certification.  The reference to "700 aircraft" is a reference to Cessnas stated capacity for the Cessna 162.

As to the 2 Diamond aircraft mentioned by Brantly in support of the suggestion that there is a Chinese market to benefit Superior, in February 2008, Shandong Bin AO Aircraft Industries, Diamond Aircraft's Chinese production facility, was awarded European production authority for the DA40-TDI, Diamond's 4-place, single-engine piston aircraft. What Brantly does not mention is that the aircraft uses a *diesel* engine and is not currently certified for the Superior Vantage engine.  Superior makes no parts for a diesel engine.  Were the DA40 ever able to use a Superior Vantage engine, a lengthy certification would be required.

The Diamond 42 on the other hand is not even made in China.  However, it also uses a *diesel* engine for which Superior makes no parts.  It is a twin engine aircraft and the Vantage engine would have to be modified to be Type Certified in the aircraft.

7.    Brantly asserts that the Brantly Group "expects" that it will be able to supply approximately 500 Vantage engines annually to Chinese airplane manufacturers.[22]

In what aircraft?  When?  As noted, there are presently not more than 800 general aviation aircraft in China, the Superior engine is not certified for the Cessna 172, the Cessna 162 or either Diamond aircraft mentioned.  In fact, there is not a single aircraft that is being made in China that can use the Superior Vantage engine.

---

[22]        Id at page 40.

8.    Brantly submits that the number of airplanes in China is expected to "significantly" increase in the "near" future.[23]

The crux of the confirmation question is increase to what size and when, and to what economic advantage to Superior?  Yang Guoqing, the vice minister of the General Administration of Civil Aviation of China, said in 2006 that this market will grow at "up to 10% annually."  Other estimates suggest that the Chinese general aviation fleet will be no larger than 10,000 aircraft in 2020.  Even assuming Brantly somehow completely cornered this market for Superior, the financial impact on Superior's business is at least a decade away.

9.    Brantly asserts that its "successful experience" in purchasing and operating the Brantly helicopter facility in Vernon, Texas, is additional evidence of its management group's ability to successfully manage the future of Superior.[24]

The Vernon facility has not manufactured a helicopter for the U.S. market since the Brantly Group purchased the plant and business in 2007.  There are no new helicopters in production at the Vernon facility.  Vernon is only fabricating parts for use in the China facility.  It is essentially a machine shop.  Because of the cost of producing parts in Vernon and sending them to China, Brantly is accelerating its plans to make parts for the B2B in China.  The Brantly plan for the B2B is to move as much manufacturing to China as is cost effective.  With its current personnel level, the Vernon facility currently has the ability to product 1 helicopter every 4 months.  The established sales price for the B2B is not profitable.  Given these facts, a creditor might have

---

[23]    Id at page 39 and 40.

[24]    Id at Page 41.

concluded that Brantly has no experience that is relevant to its ability to successfully and profitably operate Superior.

<u>Superior's Conduct and Decision with Respect to the Bid Procedures:</u>

APS has filed an Emergency Motion for Interpretation and Enforcement, As Appropriate and Motion to Show Cause with respect to the conduct and decision of Superior regarding the Bid Procedures and the failure to designate APS as the Back Up Bid. APS incorporates the motion by reference and suggests that APS' Back–Up Bidder Status was rejected by the Debtor completely at the instance of Superior's 100% shareholder and largest remaining creditor, Thielert AG, and without reference to what was in the best interest of the Debtor or the creditors.

Importantly, as the Court will remember, the Committee reported its position with respect to APS' request that the APS plan be put on the same track as the Superior Plan. In its report to the Court, see Exhibit "A" attached hereto, the Committee emphasized, among other things, the following:

1.      "In the view of the Committee, this case needs to remain on its current schedule for an August confirmation hearing;" and

2.      "The Committee encourages APS to submit its plan as a bid in the proposed bidding process that could serve as a backup bid to Brantly's offer notwithstanding that it would likely not be considered a qualified bid under the proposed bid procedures."

APS did, in fact, submit its bid with the encouragement of the Committee, and it is noteworthy that the Committee has advised APS that the Committee did not make the decision to "not accept" the APS bid.

Superior and TAG's decision with respect to APS' back-up bid continues the improper pre-petition conduct of TAG, i.e., the manipulation of TAE and the manipulation of Superior as devices to defraud investors in Germany to pump up the value of the TAG stock resulting in the bankruptcy of TAG and TAE and the eventual failure of the TAG business plan for Superior, all of which is set forth in the Adversary Complaint initially drafted by the Committee and revised and filed by APS in this case.

<u>Brantly and Superior Raise Serious Confirmation Issues on Good Faith.</u>

APS relates the above information to raise the issue of whether the required element of good faith can be met in light of the acts, omissions and misrepresentations of Brantly and Superior referenced above. Specifically, (1) Superior's rejection of the Back-Up Bid status for the APS bid, (2) Superior's failure to provide the usual, predictable feasibility evidence well established in case law for many years, (3) Brantly's concealment of the results of its due diligence, (4) Brantly's failure to provide the usual, predictable feasibility evidence well established in case law for many years, all combined with (4) Brantly's multiple inaccurate and misleading statements to Superior which included same in Superior's Third Amended Disclosure Statement on which Superior and Brantly intended the creditors to rely result in the unalterable conclusion that there is a lack of candor demonstrated by both Superior and Brantly and that Superior and Brantly have a hidden agenda. One is left to speculate what is being concealed and why, and just as importantly, why Superior has failed to insist upon full disclosure by Brantly. Clearly, something is seriously amiss.

APS respectfully reserves the right to supplement these Objections prior to the hearing hereon.

# VI.

## Relief Sought

Wherefore, Premises Considered, APS respectfully moves the Court, that, on consideration of the above Objections and other Motions to be heard on August 26, 2009, that an Order be entered as follows:

1.      Confirmation of Superior's Third Amended Plan of Reorganization with "The Brantly Group" being the Successful Bidder be DENIED;

2.      Designating APS as the Back Up Bidder in accordance with the Bid Procedures;

3.      Confirmation of Superior's Third Amended Plan of Reorganization with APS being the Successful Bidder be APPROVED;

4.      And for such other and further relief to which APS would show itself justly entitled.

Respectfully Submitted:

/s/ Kevin H. Good
Kevin H. Good
Texas Bar No. 08139300
Conner & Winters LLP
1700 Pacific Avenue, Suite 2250
Dallas, Texas 75201
Telephone  (214) 217-8070
Fax  (214) 217-8861

and

Billy G. Leonard, Jr.
Texas Bar No. 12208100
Attorney at Law
1650 W. Virginia Street, Suite 211
McKinney, Texas 75069-7703
Telephone (469) 742-0855
Fax (469) 442-0135

***Attorneys for Aviation Parts Supply, Inc.***

## CERTIFICATE OF SERVICE

I hereby certify that on the 20th day of August, 2009, a true and correct copy of the foregoing document was served to the following:

Via facsimile and email to Matthew S. Okin, Esq., counsel for Brantly, Stephen A. Roberts, Esq., counsel for Debtor, David Parham, Esq., counsel for the Official Unsecured Creditors' Committee, and Chester Salomon, Esq., counsel for TAG, via email only to Mary Frances Durham, U.S. Department of Justice Office of the United States Trustee, and on August 20, 2009 by first class U.S. Mail to the attached service list, postage prepaid.

/s/ Kevin H. Good
Kevin H. Good

| | |
|---|---|
| **From:** | Parham, David [David.W.Parham@BAKERNET.com] |
| **Sent:** | Monday, July 20, 2009 11:12 AM |
| **To:** | holly_meister@txnb.uscourts.gov |
| **Cc:** | Roberts, Stephen; bleonard@billyleonardlaw.com; Kevin H. Good; duane.brescia@strasburger.com; csalomon@beckerglynn.com; bkilmer@oakllp.com; mokin@oakllp.com; tomtong@tonglawfirm.com; Schuler, Elliot |

Dear Ms. Meister,

At the conclusion of the telephonic hearing in this case last Friday, Judge Houser asked that I apprise the Court, through an e-mail to you, of the Committee's views on whether or not the disclosure statement hearing on the Debtor/Committee plan of reorganization should be continued or the time for considering the APS disclosure statement shortened, so as to permit both the APS and Debtor/Committee plans to go out simultaneously for a creditor vote. The Committee has now met and discussed both plans, and the questions posed by the Court.

In the view of the Committee this case needs to remain on its current schedule for an August confirmation hearing. Thus, the Committee would oppose a continuance of the hearing on the Debtor/Committee disclosure statement. With respect to shortening time, we do not believe that the APS plan would be confirmable over the objection of Thielert AG "TAG" and TAG has advised us over the weekend that they will oppose the APS plan so long as Brantly, the proposed purchaser under the Debtor/Creditor plan, remains as a bidder. The Committee is also concerned that a competing plan scenario could create confusion among the voters and/or have an otherwise adverse effect on the case. Accordingly, the Committee opposes a shortening of time to dual track the two plans.

The Commitee encourages APS to submit its plan as a bid in the proposed bidding process that could serve as a backup bid to Brantly's offer notwithstanding that it would likely not be considered a qualified bid under the proposed bid procedures.

Best Regards,
Dave

David W. Parham
Baker & McKenzie
2300 Trammell Crow Center
2001 Ross Avenue
Dallas, Texas  75201
Tel: 1 214 978 3034
Fax: 1 214 978 3099
David.W.Parham@bakernet.com

Pursuant to requirements related to practice before the Internal Revenue Service, any tax advice contained in this communication (including any attachments) is not intended to be used, and cannot be used, for the purposes of (i) avoiding penalties imposed under the United States Internal Revenue Code or (ii) promoting, marketing or recommending to another person any tax-related matter.

This message may contain confidential and privileged information. If it has been sent to you in error, please reply to advise the sender of the error and then immediately delete this message. Please visit www.bakernet.com/disclaimer_bm for other important information concerning this message.

**EXHIBIT "A"**