Stephen A. Roberts (SBN 17019200)
Robert P. Franke (SBN 07371200)
Duane J. Brescia (SBN 24025265)
Elizabeth P. Volmert (SBN 00785716)
**STRASBURGER & PRICE, LLP**
600 Congress, Suite 1600
Austin, Texas 78701
Tel. (512) 499-3600  /  Fax (512) 499-3660
stephen.roberts@strasburger.com
bob.franke@strasburger.com
duane.brescia@strasburger.com
elizabeth.volmert@strasburger.com

**ATTORNEYS FOR DEBTOR SUPERIOR AIR PARTS, INC.**

**UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| IN RE: | § § | Case No. 08-36705 |
| SUPERIOR AIR PARTS, INC., | § § | Chapter 11 |
| Debtor. | § § § | |

**DEBTOR'S RESPONSE
TO OBJECTIONS TO CONFIRMATION OF THIRD AMENDED PLAN OF
REORGANIZATION DATED JULY 3, 2009 AND PROPOSED MODIFICATION.**

TO:   THE HONORABLE BARBARA J. HOUSER,
    UNITED STATES BANKRUPTCY JUDGE:

Superior Air Parts, Inc. ("Superior" or "Debtor") files this Response to the Objections to Confirmation of the Third Amended Plan of Reorganization Dated July 23, 2009 Filed By the Debtor and the Official Committee of Unsecured Creditors ("Committee") and respectfully states as follows:

1.    The Debtor received objections from two creditors to confirmation of its Third Amended Plan of Reorganization Dated July 23, 2009 ("Plan"):  (1) Aviation Parts

Supply, Inc. [Docket No. 371] and a Supplemental Objection [Docket No. 390] filed on August 24, 2009, after the deadline and (2) Airsure Ltd., L.L.C. [Docket No. 372].

2. APS raised several issues concerning feasibility and other matters: (i) no feasibility under 11 U.S.C. §1129(a)(11); (ii) lack of good faith under 11 U.S.C. §1129(a)(3); (iii) TAE's ballot rejection under 11 U.S.C. §1129(7) and cramdown under 11 U.S.C. §1129(b); and (iv) some exhibits used in a deposition of Kent Abercrombie amount to a material modification of the Plan under 11 U.S.C. §1127, requiring resolicitation.

3. Airsure raised an issue concerning the payment of earned brokerage fees pursuant to previously sold insurance policies (alleging unfair discrimination because the policies are being assumed under the Plan).

4. The Debtor responds to the issues raised in both objections in this response. Contrary to the objections, the plan is feasible, does not discriminate among similar creditors and otherwise satisfies the requirements of 11 U.S.C. § 1129.

A. **The Plan is Feasible Under 11 U.S.C. §1129(a)(11).**

5. <u>Feasibility Standards</u>. To allow confirmation, a bankruptcy court must make a specific finding that Chapter 11 plan as proposed is feasible, as required by §1129(a)(11) of the Bankruptcy Code. *See In the Matter of T-H New Orleans Ltd. Partnership,* 116 F.3d 790, 801 (5th Cir. 1997) (citing *In re M & S Assoc. Ltd.*, 138 B.R. 845, 848 (Bankr. W.D. Tex. 1992)). The standard of proof required by the proponent to prove a Chapter 11 plan's feasibility is by a preponderance of the evidence and an appellate court reviews the bankruptcy court's finding that a debtor's plan is feasible under the clearly erroneous standard. *See In re Briscoe Enter., Ltd., II*, 994 F.2d 1160,

1165-66 (5th Cir.1993). Importantly, "where there are two permissible views of the evidence, the [bankruptcy court's] choice between them cannot be clearly erroneous." *Id.* at 1166 (quoting *United States v. Yellow Cab*, 338 U.S. 338, 70 S. Ct. 177 (1949)).

6.  The Fifth Circuit holds that "the [bankruptcy] court need not require a guarantee of success . . . , [o]nly a reasonable assurance of commercial viability is required." *See T-H New Orleans*, 116 F.3d at 801 (quoting *Briscoe*, 994 F.2d at 1165-66). Consequently, all the bankruptcy court must find is that the plan offers "a reasonable probability of success." *See id.* (citing *In re Landing Assoc., Ltd.*, 157 B.R. 791, 820 (Bankr.W.D.Tex.1993)). As noted by one court:

> At bottom, it is clear that the feasibility inquiry is peculiarly fact intensive and requires a case by case analysis, using as a backdrop the relatively low parameters articulated in the statute. In this respect, however, ***it is clear that there is a relatively low threshold of proof necessary to satisfy the feasibility requirement.***

*In re Eddington Thread Mfg. Co., Inc.*, 181 B.R. 826, 832-33 (Bankr. E.D. Pa. 1995)(emphasis added). Traditional factors have evolved which courts utilize in their feasibility analysis, including: (1) the adequacy of the debtor's capital structure; (2) the earning power of the debtor's business; (3) economic conditions; (4) the ability of the debtor's management; (5) the probability of the continuation of the same management; and (6) and any other related matter which determines the prospects of a sufficiently successful operation to enable ***performance of the provisions of the plan***. *See M&S Assoc.*, 138 B.R. at 849. Finally, the mere prospect of financial uncertainty cannot defeat confirmation on feasibility grounds. *See In re Union Financial Services Group, Inc.*, 303 B.R. 390 (Bankr. E.D. Mo. 2003).

7. As discussed below, however, the standards of proof regarding feasibility vary based upon the degree of risk to the creditors posed by the discharge of their claims – low risk requires less scrutiny; high risk requires greater scrutiny. Most of the cases cited by APS are distinguishable since they are "high risk," e.g., the proposed plans therein require future performance by the debtors to meet their obligations under the plans. Moreover, the remaining cases cited by APS are distinguishable because they do not even concern plan confirmation.

8. <u>The Cases Cited By APS Are Distinguishable</u>. The majority of cases cited by APS are distinguishable from the facts of this case because they all involve plans requiring future payments to creditors from the debtor's operations. That is not the case with the Debtor's Plan – upon the Effective Date of the Plan, all creditors will either be paid in full by the Reorganized Debtor or, in the case of some administrative claims, the Class 7 General Unsecured Creditors, TAE and TAG, will be paid by the Creditors' Trust from the $7.0 million Cash Contribution, as adjusted, to be paid by Brantly. In other words, no future performance under the Plan is contemplated in order to satisfy any payments under the Plan.

9. Many of the cases cited by APS, however, concern situations where the debtor's plan includes subsequent payments to creditors (sometimes over an extended period of time) after the plan's confirmation. These opinions understandably required a higher threshold of proof to meet the feasibility requirement. See, e.g*., In re S.O.S. Alliance, Inc.*, 388 B.R. 202, 242-43 (Bankr. W.D. Tex. 2008)(plan was premised on paying creditors from a designated "Creditor Settlement Fund," the future provision for which had not been substantiated; thus provision in debtor's proposed plan, indicating

that there would be no discharge and that all creditors would be returned to their original positions if debtor breached its payment obligations under plan, did not cure "feasibility" problem); *In re Lakeside Global II, Ltd,* 116 B.R. 499, 508 (Bankr. S.D. Tex. 1989) (plan only contemplated "minimal amounts of interest" to the secured creditors and depended upon speculative appreciation in the value of real property to meet the plan's future obligations, including a balloon payment in 3 years); *In re Hurricane Memphis, LLC,* 405 B.R. 616, 621-22 (Bankr. W.D. Tenn. 2009) (tenant did not demonstrate that it would be commercially viable and able to make the required future payments to creditors under the plan); *In re Chadda,* 2007 WL 3407375 *2 (Bankr. E.D. Pa. 2007) (evidence that debtor actually sought the financing proposed was lacking and plan required payment of creditors claims for a period up to 10 years); *In re Repurchase Corporation*, 332 B.R. 336, 339 (Bankr. N.D. Ill. 2005) (future solicitation of cash contributions was questionable); *In re SM 104 Ltd.,* 160 B.R. 202, 236-37 (Bankr. S.D. Fla. 1993) (the plan failed to demonstrate adequate projections of cash flow to meet ten-year obligations under the plan); *In re Stratford Associates Ltd. Partnership*, 145 B.R. 689 (Bankr. D. Kan. 1992)(future payments from debtor's operations required by the plan); *In re Winston XXIV Ltd. Partnership*, 153 B.R. 322, 327-28 (Bankr. D. Kan. 1993) (plan called for amortization of one creditor's $10.6 million claim over thirty years, with a balloon payment being due after ten years). [1]

---

[1] In addition, APS also cites *In re Haardt*, 65 B.R. 697 (Bankr. E.D. Pa. 1986) for the proposition that the "lack of a refinancing commitment rendered the plan infeasible." See APS Brief at 14. However, that case presented a unique set of facts concerning an individual bankrupt which are not germane to the facts of this case. Specifically, while the proposed plan in *Haardt* did represent that 100% of claims would be satisfied, the evidence demonstrated the impossibility of that assertion. *In re Haardt*, 65 B.R. at 702 (debtor sought to "prolong an apparently hopeless situation with the promise of post-confirmation efforts to refinance"). The court focused on the fact that two of the three properties proposed to be sold to finance payments to creditors had been previously sold through a sheriff's sale and debtor failed to show

10. Greater scrutiny of the feasibility of a plan under these situations makes sense and is warranted because the risk posed to the creditors by the discharge is markedly increased when the plan contemplates the use of future payments to compensate creditors for their claims. See *In re Ridgewood Apartments of DeKalb County, Ltd.*, 183 B.R. 784, 790 (Bankr. S.D. Ohio 1995) (scrutiny of feasibility should increase as the effect of the discharge on creditors increases). Accordingly, the majority of cases relied upon by APS simply do not address issues which are analogous to the unique facts of this case.

11. <u>Other Cases Cited by APS Do Not Involve Plan Confirmation</u>. Moreover, other cases cited by APS are distinguishable because they do not concern confirmation of a plan and § 1129(a)(11) with its feasibility requirements but, rather, discuss different bankruptcy issues. See, e.g., *In the Matter of Canal Place Ltd. Partnership*, 921 F.2d 569 (5th Cir. 1991) (seeking relief from the stay due to the debtor's alleged inability to demonstrate a "reasonable prospect of successful reorganization"; no reference to §1129(a)(11)); *In re Brown*, 951 F.2d 564 (3d Cir. 1991) (the concept of feasibility is not even mentioned in this case; issue is rehabilitation under § 1112(b)); *In re Schriock Construction, Inc.*, 167 B.R. 569 (Bankr. D. N.D. 1994) (issue is rehabilitation under §1112(b) and whether the case should be converted to Chapter 7); *In re Adana Mortgage Bankers, Inc.*, 14 B.R. 29 (Bankr. N.D. Ga. 1981) (approval of the disclosure statement at issue, not confirmation of the plan). Therefore, these cases should not be considered or relied upon in any feasibility analysis conducted by this Court.

---

how title to such properties could be revested to her in support of the plan). See *id.* Certainly, no analogous facts are present in this case.

**DEBTOR'S RESPONSE TO OBJECTIONS TO CONFIRMATION OF THIRD AMENDED PLAN OF REORGANIZATION DATED JULY 3, 2009 AND PROPOSED MODIFICATION - Page 6 of 13**
641287.1/SPA/20354/0102/082509

12. <u>Brantly will obtain the necessary approvals from the Chinese Government.</u>

APS has argued extensively that it does not believe that Brantly, which is owned by Chinese nationals, will obtain the necessary approval from the Chinese government to import the funds necessary to consummate the purchase and capitalize the Reorganized Debtor.  To the contrary, the Debtor intends to proffer testimony of Tom Tong, a co-founder and partner at the law firm of Tong & Sung, P.C. in Houston, Texas. Mr. Tong is counsel for the "Brantly Group" as that term is defined in the Debtor's Third Amended Plan.  Before co-founding the firm of Tong & Sung, P.C., Mr. Tong spent six years with Locke Liddell & Sapp, where he developed the firm's successful China practice utilizing his bilingual and bi-cultural skills.  Mr. Tong regularly represents U.S. and Chinese companies in both inbound and outbound transactions and dispute resolution matters.  According to Mr. Tong, who will testify at confirmation:

> Before the Brantly Group can obtain approval to transfer U.S. currency to an account outside of the People's Republic of China for the acquisition of Superior Air Parts, Inc., it first must comply with certain Chinese regulations governing overseas investment projects. Generally, the Chinese government agencies are very supportive of foreign acquisition projects. The purpose of the approval procedures is to ensure that foreign currency is wired out of the country only for legitimate purposes. Approvals are given as a matter of routine and I am not aware of a denial of any legitimate investment project.
>
> The first step in the approval process for foreign investment projects is to obtain the approval of the Development and Reform Commission.  The Development and Reform Commission has previously authorized the Brantly Group to start the process of acquiring Superior.  [See *Exhibit A* (translation by Mr. Tong)].
>
> The second step is to obtain the approval of the Ministry of Commerce or its provincial agency, the Bureau of Commerce.  This approval is predicated on the input from the relevant Chinese Consulate.  In this case, the Chinese consulate in Houston rendered a very favorable opinion. Based upon this opinion, the Bureau of Commerce of Shandong Province issued the Administrative Reply, [attached as *Exhibit B*], which approves

> the initial acquisition of Superior for up to $10 million and authorizes the Brantly Group to, among other things, obtain an Approval Certificate for Oversees Investment.
>
> The Brantly Group has also obtained the Approval Certificate for Overseas Investment. [which is attached as *Exhibit C*].
>
> Now that the investment has been approved. The last step is to obtain approval to transfer the foreign currency for the investment, which is the final stage a Chinese company must go through in order to wire investment funds out of the country. The State Administration of Foreign Exchange, or the local counterpart of this foreign currency control agency would normally allow an investor to wire the funds with the two approvals and the approval certificate, which the Brantly Group has already obtained. Due to the fact that the acquisition of Superior requires the bankruptcy court's confirmation of a plan approving the acquisition, the State Administration of Foreign Exchange requires the entry of a confirmation order approving a sale to the Brantly Group before it will permit the transfer of funds to an account in the United States. By law, the State Administration of Foreign Exchange has twenty working days to issue the approval, but the Brantly Group will use its best efforts to obtain the approval on an accelerated basis, as it was able to do with the first two approvals.

According to this information, which will be presented as testimony at confirmation, approval of this transaction with Brantly by the Chinese government is imminent and probable. APS has offered no contradicting testimony. Indeed, much of what APS asserts in its Objection concerning the situation in China is completely unsubstantiated.

### B. **APS Does Not Raise a Valid Material Modification Argument.**

13. Just as with the feasibility argument above, APS's claim that there has been a material modification fails. APS argues that the Debtor's Plan has been materially modified because it took the deposition of Kent Abercrombie, the Debtor's President, and he submitted some intentionally conservative pro formas to demonstrate feasibility. First, this is just a rehash of APS's feasibility argument, which is refuted above. Second, these pro formas are not the Debtor's business plan, as APS suggests,

and regardless, they do not amount to a modification of the Plan in any way. As this Court made clear at the Disclosure Statement hearing on this Plan, no creditor is being forced to look toward future revenue to satisfy payment of its claims under the Plan. The Debtor's projections are entirely irrelevant to that analysis. Suppliers who are offered a renewed purchase order may choose to reject that offer, so they are not prejudiced either. APS does not even state which Plan term is somehow modified. In light of these facts, APS's argument is just plain irrelevant.

C.    **Treatment of TAE's Claim satisfies 11 U.S.C. §1129(a)(7).**

14.    APS claims that the Plan cannot satisfy 11 U.S.C. §(a)(7), noting that TAE submitted a ballot rejecting the Plan (which is contrary to the Rule 11 Agreement signed by TAE, attached at *Exhibit D*) and therefore the Plan cannot meet the "best interests of creditors" test. First, TAE's claim is being *compromised* by the Plan, so this Court cannot find as a matter of law that TAE is not getting more than it would get in liquidation. TAE has filed a proof of claim in excess of $18,000,000 and is getting paid $500,000 and a release in full settlement of its claim under the Plan. However, the Plan contains a compromise of the estate's claims against TAE for subordination and recharacterization. TAE's claim may wind up being $0.00 and/or recharacterized as equity. In that case, the $500,000 payment and release exceeds any liquidation scenario, complying with §1129(a)(7)(ii). Second, the rejecting ballot must be annulled and declared an "accept" according to the Rule 11 Agreement. The Debtor and the Committee do not know why TAE submitted a rejecting ballot and have been in contact with TAE's U.S. counsel to resolve the issue. To date, no information is available. The Debtor asserts that the TAE ballot should be disallowed under 11 U.S.C. §1126(e) as

submitted in bad faith by virtue of its prior Rule 11 agreement with the Debtor and the Committee. This would satisfy §1129(a)(7)(i).

D.  **The Treatment of TAE satisfies 11 U.S.C. § 1129(b).**

15.  APS also argues that the Plan fails the test for cramdown because it discriminates unfairly in its treatment of TAE. First, APS has no standing to make this argument because it is not harmed. TAE has not filed an objection to the Plan. Even if the cramdown provisions were to be considered by this Court for confirmation purposes, the Plan is fair and reasonable regarding TAE because *it is exactly the same treatment afforded to TAE under APS's plan, the treatment for which TAE has previously agreed.* APS's argument in this regard is absurd and should be flatly rejected. It would make a mockery of this Court and the bankruptcy process for APS to argue that TAE's treatment under the Debtor's Plan is unfair when it is the same treatment afforded to TAE by APS, an agreement which TAE has already deemed acceptable by agreement. TAE's Rule 11 agreement with the Debtor and the Committee effectively defeats this argument.

E.  **Airsure's Objection is Unsubstantiated and Invalid.**

16.  Airsure's objection is not valid. It appears as if Airsure is arguing that its brokerage agreement with the Debtor is tied to the insurance policies being assumed by the Reorganized Debtor. Airsure claims that it is being unfairly treated because its claim under the brokerage agreement is not also being assumed. However, Airsure has not provided any facts to support any showing that the brokerage fees are part of the insurance polices being dealt with by the Plan, so there can be no claim of unfair treatment. Airsure has an unsecured claim for its brokerage fees. In addition, based

upon the amendments proposed to the Plan, if approved, the Debtor is assuming all liability insurance policies.  If Airsure's brokerage claim is part of the policy, an assertion to which the Debtor does not agree, it is being assumed as well and there is no discriminatory treatment.  Finally, Airsure has provided no contractual or legal basis for its claim that a broker for an insurance policy is being unfairly discriminated against by the Debtor assuming the policy.

**F.    Proposed Modification to Assumption of Insurance Policies.**

17.    In accordance with §1127 of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 3019, the following modification to the Plan is requested:

(i) **Article VII:**  Section 7.1, is REPLACED IN ITS ENTIRETY with the following:

7.1    Assumption of Insurance Policies:  The Reorganized Debtor shall assume the liability insurance policies listed on Exhibit 1 and the following policy numbers: 1853615-01, 1853615-02, 1853615-03, 1853615-04, 1853615-05, A1PR000311708AM, 92CVS101560, and AVT000762(08).

This modification does not adversely change the treatment of any Claim or Interest under the Plan, and thus no further solicitation of acceptances to the Plan is required.

WHEREFORE, the Debtor prays that the Court (i) confirm the Third Amended Plan or Reorganization Dated July 23, 2009, with the modification described herein, filed by the Debtor and the Committee, (ii) overrule all objections to its Plan and  (iii) grant such other and further relief as this Court may deem just and proper.

Respectfully submitted,

 /s/ Duane J. Brescia
Stephen A. Roberts (SBN 17019200)
Robert P. Franke (SBN 07371200)
Duane J. Brescia (SBN 24025265)
Elizabeth P. Volmert (SBN 00785716)
**STRASBURGER & PRICE, LLP**
600 Congress, Suite 1600
Austin, Texas 78701
Tel. (512) 499-3600  /  Fax (512) 499-3660
stephen.roberts@strasburger.com
bob.franke@strasburger.com
duane.brescia@strasburger.com
elizabeth.volmert@strasburger.com

**Bankruptcy Attorneys for Debtor Superior Air Parts, Inc.**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the above and foregoing document was served upon the parties listed below via email on August 25, 2009, and on the attached service list via First Class U.S. Mail, postage prepaid on August 26, 2009.

| | |
|---|---|
| Airsure, Ltd.<br>Rosa Orenstein<br>Nathan M. Nichols<br>Sullivan & Holston<br>4131 North Central Expressway, Suite 980<br>Dallas, TX 75204<br>rorenstein@sullivanholston.com<br>nnichols@sullivanholston.com | Billy G. Leonard, Jr.<br>Attorney at Law<br>1650 W. Virginia Street, Suite 211<br>McKinney, TX 75069<br>bleonard@billyleonardlaw.com |
| Kevin H. Good<br>Conner & Winters, P.C.<br>1700 Pacific Avenue, Suite 2250<br>Dallas, TX 75201<br>KGood@cwlaw.com | Mr. Chester B. Salomon<br>Becker, Glynn, Melamed & Muffly LLP<br>299 Park Avenue<br>New York, N.Y. 10171<br>csalomon@beckerglynn.com |
| Matt Okin<br>Brian Kilmer<br>Okin Adams & Kilmer, LLP<br>1113 Vine Street, Suite 201<br>Houston, TX 77002<br>mokin@oakllp.com<br>bkilmer@oakllp.com | David Parham<br>Elliot Shuler<br>Baker & McKenzie LLP<br>2001 Ross Ave., Suite 2300<br>Dallas, TX 75201<br>david.w.parham@bakernet.com<br>elliot.d.schuler@bakernet.com |

                                           _/s/ Duane J. Brescia_
                                           Duane J. Brescia