1                        IN THE UNITED STATES BANKRUPTCY COURT
                        FOR THE NORTHERN DISTRICT OF TEXAS
2                                  DALLAS DIVISION

3     In Re:                          )   **Case No. 08-36705-bjh-11**
                                      )   Chapter 11
4     SUPERIOR AIR PARTS, INC.,       )
                                      )   Dallas, Texas
5              Debtor.                )   Wednesday, August 26, 2009
                                      )   1:15 p.m. Docket
6                                     )
                                      )   - CONFIRMATION HEARING [280]
7                                     )   - AMENDED MOTION TO APPROVE
                                      )     BID PROCEDURES [284]
8                                     )   - EXPEDITED MOTION TO ALLOW
                                      )     CLAIMS ON PROVISIONAL BASIS
9                                     )     FOR VOTING PURPOSES [387]
                                      )   - EMERGENCY MOTION TO ENFORCE
10                                    )     BID PROCEDURES ORDER [360]
      _____)
11
                             TRANSCRIPT OF PROCEEDINGS
12                  BEFORE THE HONORABLE BARBARA HOUSER,
                    UNITED STATES CHIEF BANKRUPTCY JUDGE.
13
      APPEARANCES:
14
      For the Debtor:                    Stephen A. Roberts
15                                       Duane J. Brescia
                                         STRASBURGER & PRICE, LLP
16                                       600 Congress Ave., Ste. 1600
                                         Austin, TX  78701
17                                       (512) 499-3600

18    For Aviation Parts                 Kevin H. Good
      Supply, Inc.:                      CONNER & WINTERS, LLP
19                                       1700 Pacific Avenue, Suite 2250
                                         Dallas, TX  75201
20                                       (214) 217-8888

21    For Aviation Parts                 Billy G. Leonard, Jr.
      Supply, Inc.:                      Attorney at Law
22                                       1650 W. Virginia Street,
                                           Suite 211
23                                       McKinney, TX  75069
                                         (469) 742-0855

24

25

```
 1   APPEARANCES, cont'd.:

 2   For the Official Committee    David William Parham
     of Unsecured Creditors:       BAKER & MCKENZIE, LLP
 3                                 2001 Ross Ave., Suite 2300
                                   Dallas, TX  75201
 4                                 214-978-3034

 5   For Xi'an Free Sky            Matthew S. Okin
     Aviation, Proposed            OKIN & ADAMS, LLP
 6   Purchaser:                    3102 Maple Avenue, Suite 450
                                   Dallas, TX  75201
 7                                 (713) 228-4100

 8   For Dr. Bruno M. Kübler,      Daniel P. Winikka
     Insolvency Administrator,     JONES DAY
 9   Thielert Aircraft             2727 North Harwood Street
     Engines, GmbH:                Dallas, TX  75201-1515
10                                 (214) 969-4523

11   For Dr. Achim Ahrent,         Chester B. Salomon
     Insolvency Administrator,     BECKER, GLYNN, MELAMED & MUFFY, LLP
12   Thielert AG:                  299 Park Avenue
                                   New York, NY  10171
13                                 (212) 888-3033

14   For AirSure Limited:          Nathan Nichols
                                   SULLIVAN & HOLSTON
15                                 4131 N. Central Expressway,
                                     Suite 980
16                                 Dallas, TX  75204
                                   (214) 528-9560
17
     Appearing Telephonically:     Ann Taylor
18
     Court Recorder:               Dinah Morgan Peters
19                                 UNITED STATES BANKRUPTCY COURT
                                   1100 Commerce Street, 12th Floor
20                                 Dallas, TX  75242
                                   (214) 753-2005
21
     Transcription Service:        Kathy Rehling
22                                 209 Bay Circle
                                   Coppell, TX  75019
23                                 (972) 304-1998

24
             Proceedings recorded by electronic sound recording;
25              transcript produced by transcription service.
```

1              <u>DALLAS, TEXAS - AUGUST 26, 2009 - 1:28 P.M.</u>

2              THE COURT:  Be seated, please.  My apologies for our

3     late start.  We had lengthy hearings this morning that didn't

4     conclude until about a quarter of 1:00, so we're starting a

5     little late here because we ran over this morning.

6          So I'll take appearances in the Superior case, please.

7              MR. ROBERTS:  Your Honor, Steve Roberts for the

8     Debtor.

9          I'd like to advise you we've got a couple parties, TAE and

10    TAG, out in the hallway.  I guess they're very close to a

11    settlement in a major piece of this, so we would ask the Court

12    after announcements to give them a few more minutes.  It could

13    shorten this hearing for hours if they reach an agreement.

14             THE COURT:  Other appearances, please?

15             MR. GOOD:  Kevin Good and Billy Leonard for Aviation

16    Parts Supply.

17             THE COURT:  Thank you.

18             MR. PARHAM:  David Parham for the Unsecured Creditors'

19    Committee.

20             MR. OKIN:  Matthew Okin for Xi'an Free Sky Aviation,

21    the buyer.

22             THE COURT:  All right.

23             MR. ROBERTS:  Your Honor, I should have also announced

24    my partner Duane Brescia is here with the Debtor.

25             THE COURT:  Good.

 1          MR. ROBERTS:  And we've been advised the parties that

 2  have been consulting do have a deal, so we are ready to

 3  proceed.

 4          THE COURT:  Excellent.  Other appearances, please?

 5          MR. WINIKKA:  Good afternoon, Your Honor.  Dan

 6  Winikka, Jones Day, on behalf of Dr. Kübler, Insolvency

 7  Administrator for Thielert Aircraft Engines, GmbH.

 8          MR. SALOMON:  Good afternoon, Judge.  Chester Salomon

 9  from Becker Glynn in New York representing TAG and its

10  Insolvency Administrator, Dr. Ahrent.

11          THE COURT:  Very well.

12          MR. NICHOLS:  Good afternoon.  Nathan Nichols from

13  Sullivan and Holston on behalf of AirSure Limited.

14          THE COURT:  All right.  We had some parties request

15  the opportunity to appear, I guess one party, telephonically.

16  So let me patch Ms. Taylor in.

17      (Telephonic appearance connected.)

18          MS. TAYLOR:  Ann Taylor.

19          THE COURT:  Ms. Taylor, this is Judge Houser.  We're

20  taking up the Superior matter this afternoon.

21          MS. TAYLOR:  Thank you very much, Your Honor.

22          THE COURT:  All right.  Mr. Roberts, are you ready to

23  proceed?

24          MR. ROBERTS:  Yes, Your Honor.  We have several

25  different motions, but this would not be the Superior Air Parts

1   case if we did not have surprise hit us all on the eve of

2   another hearing, and we did, late last week.  Under our plan,

3   we had provided for Thielert Aircraft Engines, which we call

4   TAE, to be paid $500,000 on their claim.  We had what we

5   thought was a Rule 11 agreement, where they'd agreed to vote

6   for the plan.

7        Last Thursday, Dr. Kübler, the German insolvency

8   administrator, filed a ballot rejecting the plan, creating a

9   host of issues for the parties to get the plan confirmed today.

10       Counsel for TAG, Thielert Aircraft -- Thielert AG, the --

11  our parent corporation, and they have been negotiating between

12  themselves as to the relative payout between themselves, which

13  would not affect each other, in order to solve this problem.

14  We've been advised they have a settlement.  If the Court will

15  allow us, we'd like for them to announce the settlement that

16  they've made.

17            THE COURT:  Please.  Mr. Salomon?

18            MR. SALOMON:  Thank you, Judge.  Judge, I have been

19  communicating with representatives of TAE in the hallway today

20  and have spoken with Dr. Ahrent in Germany concerning a

21  resolution of the dispute between the TAG and TAE claims.  And

22  we have come to a resolution that we want to read on the record

23  of the Court.  It does not affect the plan of reorganization in

24  the sense that the distributions will be as the plan states,

25  but I think it's important for the Court to know the elements

1   of this, and they are as follows.

2       That TAE agrees to accept the relief that has been sought

3   by the Creditors' Committee motion that was filed yesterday

4   concerning the allowance of the claim for voting purposes and

5   concerning further the Rule -- the so-called Rule 11 agreement

6   that had been signed in mid-July by TAE representatives.  ATAE

7   representatives, the Committee, and the Debtor.  And there is

8   -- and it will also change its vote, TAE will change its vote

9   to a vote in favor of the Chapter 11 plan.

10      Dr. Ahrent, as Insolvency Administrator, agrees that, of

11  the dividend that TAG shall receive from the Superior case

12  pursuant to the confirmed plan, he -- the Insolvency

13  Administrator will pay to TAE's insolvency administrator, Dr.

14  Kübler, the sum of $300,000.  That's American dollars.  This is

15  all subject to a final order confirming the plan.

16      That's -- that is the deal that has been arrived at today.

17  Did Your Honor have any questions?

18          THE COURT:  I do not.

19          MR. SALOMON:  Thank you.

20          THE COURT:  I would like counsel for TAE to confirm

21  that that's his understanding of the agreement.

22          MR. WINIKKA:  Sure, Your Honor.  Dan Winikka, again,

23  for the record.

24      That is correct, with, I think, one minor tweak.  Mr.

25  Salomon indicated that we agreed to accept the relief as stated

1   in the Creditors' Committee's motion.  I mean, I think,

2   fundamentally, we're talking about the same thing, but what TAE

3   has agreed to, or rather the Insolvency Administrator has

4   agreed to, is to change its vote to accept the plan.  I mean, I

5   think fundamentally that is the relief the Creditors' Committee

6   were seeking.  But, you know, if you technically look at the

7   motion, they were asking for the Court to enter an order, you

8   know, not counting our vote and other issues.

9        So, just with that clarification, though otherwise as

10   stated on the record, that is the deal we've agreed to.

11            THE COURT:  Excellent.  Mr. Salomon?

12            MR. SALOMON:  That clarification is acceptable to TAG,

13   Your Honor.

14            THE COURT:  Very well.  All right.  Mr. Roberts?

15            MR. ROBERTS:  Your Honor, I'd like to proceed with a

16   couple other announcements.  We've uploaded an order confirming

17   the plan in which we've made a modification to address the

18   insurance companies' objections, but I have a copy for you as

19   well.

20            THE COURT:  Have you uploaded it or filed it?

21            MR. ROBERTS:  I don't recall which we did.

22            THE COURT:  We prefer things not be uploaded until

23   after hearings are concluded.

24            MR. ROBERTS:  I just can't, off the top of my head,

25   know.  I know what we've been doing is sending things to

1   chambers, and I'm not sure which that is.

2             THE COURT:  Fair enough.

3             MR. ROBERTS:  Your Honor, at the same time, here's my

4   exhibit book.

5             THE COURT:  Thank you.

6             MR. ROBERTS:  Your Honor, I've included within the

7   exhibit book certain pleadings just for the convenience of the

8   Court, and in the exhibit book, the first two are the amended

9   disclosure statement and our amended plan, --

10            THE COURT:  All right.

11            MR. ROBERTS:  -- which have not been changed since

12   they were filed and voted on.

13            THE COURT:  Very well.

14            MR. ROBERTS:  What we did, the -- under the plan, we

15   had proposed to assume the obligations under our insurance

16   policies to pay for defense costs.  And there was a dispute

17   with the insurers whether our obligations under those policies

18   were broader, whether they would include paying deductibles for

19   parties that had not waived their claims, or whether that was

20   an obligation to the Plaintiff, not to the insurance company.

21       So what we did in Paragraph 27 of the order is we agreed to

22   a modification.  Whereas Paragraph 7.1 of the plan had referred

23   to our assuming -- I will read what it did say.  "The

24   Reorganized Debtor will assume any and all reimbursement

25   obligations of the Debtor under the liability insurance

1   policies listed on Exhibit 1."  And 'reimbursement obligations'

2   was fairly narrowly defined for defense costs.  We have simply

3   eliminated that, any qualification, and said, "We shall assume

4   the liability insurance policies listed on Exhibit 1."  The

5   insurance companies had pointed out we had missed some policy

6   numbers on some co-insurance.  We added those.

7       That -- and we would say that modification, if anything,

8   makes it more beneficial to all the other creditors, because it

9   eliminates any possibility of there being contingent claims on

10  the Creditors' Trust.

11      So that's what we've put in the order.

12      Also, as for the taxing authorities, Coppell and other

13  taxing authorities, they wanted a clarification.  We don't

14  think it's a change.  All they have is a postpetition

15  administrative claim.  The final paragraph of the proposed

16  order confirming the plan, what we had done in the plan is we

17  had treated them as administrative claimants so they'll be paid

18  when due, which is next January or February, the personal

19  property taxes.  The taxing authority communicated with us and

20  said, "Well, what about retaining our lien?" and raising

21  several other issues.  So we agreed to the language in

22  Paragraph 51, basically saying they will be paid when due and

23  you are entitled to your liens.

24          THE COURT:  All right.

25          MR. ROBERTS:  Those are the two modifications to the

1  plan, Your Honor, which we submit are not such modifications

2  that would require renotice or revoting to the other parties.

3        THE COURT:  Does any party want to be heard in

4  connection with the two proposed modifications to the plan?

5        A VOICE:  No, Your Honor.

6        THE COURT:  Very well.  Please.

7        MR. ROBERTS:  Your Honor, we have a motion by TAG to

8  count its vote.  TAG voted for the plan.  Yet APS, at the time,

9  I believe, they amended the disclosure statement, filed a suit

10 and objection to TAG's claim.  So TAG voted for the plan, and

11 -- however, in our ballot summary, which I guess I should have

12 pointed out before now, which is Exhibit M in the book, --

13        THE COURT:  All right.

14        MR. ROBERTS:  -- we categorize TAG as being a ballot

15 that was cast that we would not count because it was not an

16 allowed claim.

17        THE COURT:  Right.

18        MR. ROBERTS:  In your rulings, where we would be

19 without that relief is a single creditor class who has not

20 technically voted -- actually, they technically voted -- who

21 has not voted against the plan and who has not objected to the

22 plan.  In fact, they've done something one step more, which is

23 they've tried to vote for the plan.  And under the prior

24 rulings of this Court, as I understand it, you have ruled in

25 the past that a creditor who, as a single-creditor class, who

1    --

2            THE COURT:  I have not held that.

3            MR. ROBERTS:  Okay.  I will -- we will -- then they

4    can proceed with the motion.

5        What I was getting to is we don't think it matters.  But if

6    it does matter, then we need to proceed with the motion.

7            THE COURT:  I mean, if you can refresh my

8    recollection.  But no, I don't believe that a non-voting class

9    is an acceptance.

10           MR. ROBERTS:  I do have that citation, Your Honor.

11           THE COURT:  And it's a case of mine?

12           MR. ROBERTS:  In fact, I've got the case.  It's *In re*

13   *John Link*, and then you cite to the Tenth Circuit case, if I

14   can -- yes, Your Honor.  Can I--?

15           THE COURT:  Please.

16           MR. ROBERTS:  I think it's in more than one place.  I

17   spotted it in Paragraph 20, where you cite the Tenth Circuit

18   for the proposition that, if they don't object and they don't

19   vote against it and they're a single-creditor class, they're

20   deemed to have accepted the plan.

21       In fact, the Tenth Circuit opinion says that the creditor

22   itself is deemed to have accepted the plan.  And I have that

23   opinion as well.

24       (Pause.)

25           THE COURT:  I have absolutely no recollection of this

 1  case at all.  Are you sure it's my case?

 2       MR. ROBERTS:  Boy, I hope so, Your Honor, if I handed

 3  it to you.

 4       THE COURT:  Well, I mean, it says it is, but --

 5       MR. ROBERTS:  Yes.  Well, all we have -- all there was

 6  was a Lexis cite, Your Honor.  I don't believe there's a

 7  Reporter's cite.

 8    (Counsel confer.)

 9       THE COURT:  I have absolutely no recollection of this

10  case.

11    Well, it wouldn't have been me.  It's the Amarillo

12  Division.  So --

13       MR. ROBERTS:  There's another Judge Houser?

14       THE COURT:  No.  That would have been Judge Jones out

15  in Amarillo.  So I think there is an error in terms of this

16  being a decision of mine.  I've not ever sat out in our

17  Amarillo Division.  But certainly it's a decision from the

18  Northern District of Texas, --

19       MR. ROBERTS:  Okay.

20       THE COURT:  -- I'll grant you that.

21       MR. ROBERTS:  Your Honor, I would just ask at this

22  point we just carry that motion with the confirmation hearing,

23  so if the Court deems it necessary to rule on the motion in

24  connection with confirmation, I would ask that we can handle it

25  that way.

1              THE COURT:  All right.

2              MR. ROBERTS:  We would ask that we proceed at this

3    point, then, with our confirmation.  There are other motions on

4    file today, but it seems to us that's the next order of

5    business.

6              THE COURT:  I agree.

7              MR. ROBERTS:  Okay.

8              THE COURT:  Mr. Leonard?

9              MR. LEONARD:  Your Honor, if I may interject.  If you

10   do want to take up the motion to allow TAG's claim for voting

11   purposes, we do have some comments.

12             THE COURT:  Oh, of course.  But I had just understood

13   Mr. Roberts to suggest that we defer that.

14             MR. ROBERTS:  That we carry it with the plan, so

15   whatever evidence already is put on in connection with the

16   plan, we can use with that motion.

17             THE COURT:  Any objection to that?

18             MR. LEONARD:  No, Your Honor.

19             THE COURT:  Very well.

20             MR. GOOD:  And Your Honor, if I may be heard.  We

21   filed a motion regarding the bid procedures, on APS's status as

22   a back-up bidder.

23             THE COURT:  Right.

24             MR. GOOD:  I just wanted to bring that to the Court's

25   attention.  It would follow on, I presume, after the

1   confirmation, but I didn't want to lose track of that in this

2   process.

3          THE COURT:  No, no, no.  And we've got also your

4   disclosure statement and we've got a number of things on the

5   docket for today.

6          MR. GOOD:  Yes.  Yes.

7          THE COURT:  Right.

8          OPENING STATEMENT ON BEHALF OF THE DEBTOR

9          MR. ROBERTS:  Okay.  Before proceeding with evidence,

10  Your Honor, I'd like to set a framework on what we are going to

11  present today and what we believe the issues are.  And I think

12  what this Court views the issues are through today may depend

13  on how long this hearing is going to be.

14     And I believe the Creditors' Committee also would like to

15  make an opening comment as well.

16     The way we see it is we have a company called Aviation

17  Parts Supply who was assigned a $31,000 unsecured claim from

18  Superior's own law firm, their own lawyers, and has since that

19  time attempted to acquire this company.  Not by bidding higher

20  than anyone else, but by using every legal tactic that they've

21  been able to come up with to thwart every other plan.

22     What we have here is very straightforward.  Under this

23  plan, under the Debtor's and the Committee's plan, we have a

24  purchaser that's going to pay $7 million in cash on the

25  effective date as a condition of the plan being effective, and

1    that money is being used to pay creditors.  Creditors are not

2    relying on what happens with Superior, the Reorganized

3    Superior, after they've been paid.

4        Another feature of the plan is that there were certain

5    parties that had open purchase orders that were given a choice:

6    You can either accept substitute purchase orders with the

7    Reorganized Debtor and take a credit risk, or you can choose

8    not to and file your claim.  We have filed a list as required

9    by the plan of those that we are rejecting.  However, there are

10   many that we have assumed, and the testimony we'll be hearing

11   is those creditors, not a single one of them asked for pro

12   formas or projections, were not relying on anything other than

13   the choice given to them.

14       The thrust of APS's objection is that the Chinese have

15   filed a disclosure statement that says their idea for this

16   company is to rebuild the engine business, and their

17   interpretation is they're not going to do that at all, that the

18   pro formas that we had -- intend to present as evidence show

19   that's going to take a long time.

20       Now, what we're going to present is the Chinese have been

21   consistent from Day One:  They're buying this company.  They

22   want the engines, they want the parts, they want the parts

23   business, they want the ability to export engines to China as

24   the market develops, and they are putting the money where their

25   mouth is.  They've put $700,000 down, nonrefundable.  If they

1  don't fund within thirty days, we get the $700,000, and the

2  testimony will be that would cover any loss we suffer in that

3  thirty days.

4      We have every single vendor who has voted vote for this

5  plan.  We have the support of the Committee.  So we believe

6  that most of APS's objection is largely irrelevant, because the

7  issue of feasibility -- is it feasible -- we believe the

8  question is:  Is it feasible that the Debtor is going to pay

9  the claims of the creditors as provided in the plan?  That is

10 the commitment to the creditors.  That is what the creditors

11 voted on.

12     So we will put on our case; they will put on theirs.  But

13 the thrust of what we believe they are putting on is of, one,

14 no relevance, and two, certainly no relevance to their claim,

15 because they have a $31,000 unsecured claims which is being

16 paid out of the Creditors' Trust.  So they are, in essence,

17 trying to file objections for all the parties that chose not to

18 file objections.  They have tried to thwart this plan for all

19 those parties who are supporting the plan.

20     Thank you.

21         THE COURT:  Please.

22      OPENING STATEMENT ON BEHALF OF THE CREDITORS' COMMITTEE

23         MR. PARHAM:  Your Honor, just very briefly.  The --

24 oh, I would like to introduce, by the way, some of my Committee

25 members.  The Committee Chair, Ron Weaver, is here.  Mr. Chuck

1  Dedmon is here also.  Mr. Dedmon is a former president of

2  Superior Air Parts and is the representative of one of the

3  largest creditors in the case.  And Tim Archer, who's also a

4  former president of Superior Air Parts and has been a

5  consultant to our Committee.  So I did want to want to

6  recognize them, and they've all worked very hard during the

7  course of this case.

8      To the issue -- to the extent today that the issue is

9  feasibility, the Committee's view of this is that this plan is

10  feasible, for a number of reasons.  We think that the deposit

11  is significant.

12      With respect to the cash contribution, although it's not

13  here presently, you know, we have confirmed through our Hong

14  Kong offices that what they're saying in terms of the

15  procedures for getting it out of China, getting the money out

16  of China, in fact do exist, and our belief is that it's not a

17  question of it can be gotten out of China, it's a question of

18  when.  And frankly, they appear to be moving along and getting

19  their regulatory approvals quicker than we would have thought

20  that they would.  So we're very comfortable.  We think it's

21  simply really a formality at this point.  Primarily, the

22  Chinese government, as I suspect Mr. Tong will say, just wants

23  to know that it's a real company that they're buying and it's a

24  real deal, and that's a test that's easily satisfied.

25      We would also note, as Mr. Roberts has just indicated,

1   there were no objections to this from any creditors who are

2   taking a payout over time.  Our view of Brantly and --

3       (Static noise.)

4       THE COURT:  Does somebody have a BlackBerry or some

5   other device close to a microphone?  We're picking up some

6   static.

7       All right.  Please.  Thank you.

8       MR. PARHAM:  Yes.  Our view of Brantly is that, you

9   know, they're making this $7 million contribution in full

10  knowledge of the fact that additional funding is going to be

11  necessary for this company, and that they would not be making

12  this $7 million payment if they didn't in fact intend to follow

13  up with the additional funding that will be necessary to

14  rebuild the company over some period of time.

15      More significantly, the Committee thinks that because of

16  the long-term vision that this purchaser has, that it makes it

17  a very good strategic fit for them and it gives them incentive

18  and motivation to in fact perform.

19      And the final point that we would note is that there seems

20  to be some -- there seems to be a lot of agreement within the

21  industry that the engines are worth significantly more with the

22  piece parts business up and operating.  And so to the extent

23  that the focus of the long-term Brantly plan may be on engines,

24  there is certainly significant strategic and business reason

25  for them to rebuild the piece parts business, as they have

1   indicated that they intend to do.

2        And so, with that, I would just say that the Committee

3   supports this plan.  We think it's a great deal for the

4   Unsecured Creditors.  The trade creditors have voted

5   overwhelmingly for this plan.  I'm delighted that TAE and TAG

6   were able to work out their differences and also support it.  I

7   would note simply that everyone with an economic interest, with

8   the exception of, again, APS, is in favor of this plan.

9            THE COURT:  Very well.  Other parties?

10            MR. OKIN:  Your Honor, if I might be heard briefly?

11            THE COURT:  Of course.

12        OPENING STATEMENT ON BEHALF OF THE PROPOSED PURCHASER

13            MR. OKIN:  Your Honor, Matthew Okin, O-K-I-N, for the

14   purchaser, Xi'an Free Sky Aviation.  And I also would like to

15   introduce to the Court Mr. Tom Tong, who is also an attorney

16   for the purchaser.  Mr. Tong is a Texas lawyer who also happens

17   to be fluent in Chinese and is key to the communication, my

18   ability to communicate with our client.

19        I thought I'd take just a minute, Your Honor, to just give

20   you a little perspective from our client.

21            THE COURT:  Please.

22            MR. OKIN:  You know, they first found out about this

23   opportunity, I believe, in late May.  And the chairman of the

24   company, who doesn't speak any English, immediately flew over

25   to Dallas with Mr. Tong from China to meet with Mr. Abercrombie

1  and Mr. Roberts in order to find out about this opportunity.  I

2  think when they first got involved they were looking to

3  purchase an engine program that they could use for China.  But

4  I think as they've learned more about this business, they've

5  determined, as Mr. Parham stated, that the engine business is

6  worth a lot more with the piece parts business.  And for that

7  reason, we submitted a bid for the entire business, and that's

8  what we've been interested in.

9      As we've been involved in this process, though, it has

10  become clear that APS essentially will use any means it can to

11  try to thwart this sale, as it has with every other prior sale

12  that isn't theirs.  And although we want to do whatever we can

13  to support this process and get this plan confirmed, we've been

14  a little reluctant to try to share -- to share with them the

15  level of detail that they want about future business plans that

16  we might have for this business, because, so far, everything

17  that we tell them seems to be used against us.  I don't believe

18  any of that information is really necessary for the decision

19  that the Court really has to make here.  I think what Mr.

20  Roberts said is exactly the case.

21      Nevertheless, we spent the last two days in depositions,

22  discussing projections for the business:  How did Mr.

23  Abercrombie know that the Chinese would continue to fund the

24  business two years from now?  How did they know that the

25  program would work?  And Your Honor, I would submit, as Mr.

1    Roberts did, that all of that is irrelevant, and I would

2    actually ask Your Honor, if you would, to consider ruling on

3    that issue before we start the evidence, because I think it

4    will immensely shorten the hearing.  I've got clients over in

5    China who have basically told us, call them as soon as the

6    hearing is over, wake them up at any time, they're anxious to

7    find out about this purchase.

8        As you'll see in the evidence, the final piece of

9    regulatory approval in China for us to be able to wire the $7

10   million over from China is we need a signed confirmation order.

11   They want a copy of a confirmation order the minute they can

12   get it. They want to get the money over.  They want to close on

13   this sale.

14       The plan is drafted that August 31st is our adjustment date

15   for working capital.  As of August 31st, we may not own the

16   business, but if we haven't closed, the money that's still

17   going to be spent will be ours.  We won't be running it.  So

18   the sooner we can get a confirmation order entered and the

19   sooner we can get the money wired, the sooner we can get on

20   with running with business.  And for that reason, I'd urge the

21   Court to consider shortening this hearing by ruling on what

22   everybody else seems to recognize, which is that the future

23   performance of this business, while important to my client, is

24   really not an issue that the creditors of this estate have to

25   concern themselves with.

1        Thank you, Your Honor.

2            THE COURT:  Very well.  Please.  Mr. Good?

3        OPENING STATEMENT ON BEHALF OF AVIATION PARTS SUPPLY

4            MR. GOOD:  Your Honor, Kevin Good for Aviation Parts

5    Supply.  I'll be brief.

6        The burden of proof on the confirmation hearing will rest

7    with Superior and the proponents.  And I'm very interested in

8    hearing the evidence, and we will challenge some of the

9    evidence.  We will move to exclude some of the evidence based

10   upon the deposition testimony, one of them that I took

11   yesterday, and I'll address that to the Court.

12       And I think, to highlight the evidence that I expected to

13   see that I think will not be available in this hearing, will be

14   the availability of the funds, the commitment of the funds, the

15   financial commitment of the purchaser.  Just to highlight the

16   type of evidence that I'm looking for that I, in some

17   instances, I will be objecting to, and then it will be up to

18   the Court to decide whether or not to accept that.

19       In terms of what we know about the Brantly plan, we know

20   nothing about the Brantly plan.  The deposition of Mr.

21   Abercrombie that I took on Monday, he created the projections

22   by himself with no input from Brantly.  Brantly is not here

23   today.  There's a lawyer here, Mr. Tong, from Houston, who is

24   representing Brantly.

25       So I highlight to the Court and alert to the Court the

1   existence of credible evidence on the financial feasibility,

2   not in the next year, but to pay the balance of the $7 million.

3   That is, $6.3 million.

4        Thank you.

5             THE COURT:  Any other?

6             OPENING STATEMENT ON BEHALF OF AIRSURE LIMITED

7             MR. NICHOLS:  Your Honor, AirSure had a limited

8   objection to the confirmation of the plan, and based on our

9   conversation today with the Debtor, we believe that is

10  resolved.  It was based on lack of clarity from our perspective

11  of whether the Reorganized Debtor was going to assume fully the

12  insurance policies or just part of the insurance policies, and

13  it our understanding, based on the modification today and after

14  conversation, that they will be assuming them in full.  And if

15  that's the case, then that takes care of our limited objection.

16            THE COURT:  Excellent.

17            MR. NICHOLS:  Thank you, Your Honor.

18            THE COURT:  All right.  Are we ready to proceed?

19            MR. ROBERTS:  Your Honor, I would like to move to

20  introduce into evidence all of our unopposed exhibits, which

21  would be all of the exhibits except E, G, and H.

22            THE COURT:  Any objection to Exhibits A, B, C, D, F,

23  I, J, K, L, and M?

24            MR. GOOD:  No objections from APS, Your Honor.

25            THE COURT:  Very well.  The Court will admit those

1    exhibits.

2        (Debtor's Exhibits A, B, C, D, F, I, J, K, L and M are

3    received into evidence.)

4            MR. ROBERTS:  Your Honor, I would address the Court's

5    attention to Exhibit M, our ballot summary and our

6    certification of ballots.

7            THE COURT:  All right.

8            MR. ROBERTS:  We have a ballot summary by class, and

9    we believe the ballot summary reflects for the Court that all

10   classes are either deemed accepted or have accepted the plan

11   except the interests in the Debtor, which are deemed to reject

12   since they're not receiving anything under the plan.

13       There is one correction.  Ballot Summary #5, Secured Claim

14   of Tygris Vendor Finance.  It says "Deemed Accept;" however,

15   that was the one class of secured claims that we reserved the

16   right to reject their contract, return their goods, and give

17   them both a secured and an unsecured claim, as appropriate, and

18   we exercised that.  So that made them impaired, not unimpaired,

19   and they did not vote for or against the plan or object to the

20   plan.

21           THE COURT:  All right.  So they'll be treated in Class

22   7 for their rejection claim?

23           MR. ROBERTS:  Yes, Your Honor.

24           THE COURT:  All right.

25           MR. ROBERTS:  And to put some materiality on that, I

1   think it's about -- well, it's right here -- a $67,000 claim.

2            THE COURT:  All right.

3            MR. ROBERTS:  With that, I'd like to call my first

4   witness, Mr. Kent Abercrombie.

5            THE COURT:  Very well.  Mr. Abercrombie, if you'd come

6   forward and be sworn.  You're going to take this chair.  Before

7   you sit down, if you'd raise your hand and be sworn in.

8            KENT ABERCROMBIE, DEBTOR'S WITNESS, SWORN

9                      DIRECT EXAMINATION

10  BY MR. ROBERTS:

11  Q    Mr. Abercrombie, Judge Houser has heard the lawyers do a

12  lot of talking in this case, but you've haven't had an

13  opportunity to testify yet, have you?

14  A    Not in front of Judge Houser, no.

15  Q    Okay.  You are the president of Superior Air Parts?

16  A    Yes, sir.

17  Q    And you are also the proposed president of Reorganized

18  Superior Air Parts, both under the Debtor's plan and APS's

19  proposed plan.  Correct?

20  A    Yes, sir.

21  Q    Could you tell us -- well, first of all, give us a brief

22  educational background, please.

23  A    Graduated from high school here in Dallas, W.T. White High

24  School.  Went to University of North Texas.  Graduated from the

25  University of North Texas in 1992 with a Bachelor's of Business

1   Administration with a focus on Finance.  Worked for a company

2   called Aviall in the aviation industry from 1987 till

3   approximately 1995.  Went to work for TriStar Aerospace, also

4   in the aviation industry, which was acquired by Honeywell in

5   1999.

6       In December of 2000, I left Honeywell to join Superior Air

7   Parts as the Director of Finance & Accounting at that time.  In

8   2005, I was made Vice President of Finance & Accounting for

9   Superior Air Parts.  In 2006, my role was increased to include

10  operational segments, including warehouse and production.  And

11  then in early 2007 I was promoted to the role of president.

12  Q   And you've served as president since that time?

13  A   Yes, sir.

14  Q   Also, under the Debtor's plan, you are proposed as the

15  initial sole director as well the president, correct?

16  A   Yes, sir.

17  Q   Now, Mr. Abercrombie, you have been involved, have you not,

18  in efforts to sell this company for over a year?

19  A   Yes, sir.

20  Q   Okay.  Let's go back and let's provide a little bit of

21  background here.  The sole shareholder is -- we refer to as

22  TAG, Thielert AG, correct?

23  A   Yes, sir.

24  Q   Were you with the company when Thielert AG acquired the

25  Debtor?

1  A    Yes, sir.

2  Q    And what was the condition of the company -- when was that

3  acquisition?

4  A    In March of '06.

5  Q    And what was the condition of the company prior to that

6  acquisition?

7  A    The company had been experiencing substantial losses of $4

8  to $5 million a year for a few years.  We were cash-poor,

9  tapped out our working capital revolver, were in default of

10  some of the covenants associated with the loan facility, and

11  were actually on a very cash-strapped basis entering the third

12  and fourth quarter of 2005.

13  Q    Okay.  And what did TAG pay to acquire the company?

14  A    TAG acquired the company for $10 million.

15  Q    And did they do that by acquiring debt?

16  A    They bought the loan facility from PNC for $8 million, and

17  then they paid $2 million -- or $1,999,999 for the sub debt of

18  the original owners, RST&W, and then $1 for the shares.

19  Q    Okay.  Then, after that, what was your obligation to TAG to

20  repay that debt?  How did TAG deal with that obligation?

21  A    We paid them quarterly interest payments against the loan

22  facilities.

23  Q    And you did that generally up to the last quarter before

24  the bankruptcy filing?

25  A    Yes, sir.

1  Q    Okay.  Now, TAE is a sister company, also owned by TAG,

2  correct?

3  A    Yes, sir.

4  Q    And they had filed a proof of claim somewhere north of $16

5  million in this case, right?

6  A    Yes, sir.

7  Q    What was that claim based on?

8  A    The claim was based upon inventory that had been shipped

9  from TAE to Superior Air Parts.

10 Q    So what was the deal between Superior and TAE on the

11 shipment and payment of inventory from TAE?

12 A    TAE did not expect payment on inventory until the company

13 could achieve profitability.

14 Q    And did the company achieve profitability?

15 A    No, sir.

16 Q    Now, just to speed this up a little bit, both TAG and TAE

17 filed for -- in German insolvency proceedings last year,

18 correct?

19 A    Yes, sir.

20 Q    And what effect did that have on the ability of Superior to

21 continue to operate?

22 A    It removed one of our sources of capital, which was the

23 continued product flow from Thielert AE.  So we began paying

24 TAE for any inventory that was purchased.  We've since that

25 time had layoffs and significant inventory reductions to

1  generate the cash flow needed to sustain the company.

2  Q    And did the company have any other lines of credit?

3  A    No, sir.

4  Q    And the company was -- what were the losses in 2008?

5  A    In 2008, approximately $4 million or so.

6  Q    Okay.  In connection with your efforts to try to sell this

7  company, has the company made efforts to sell the parts

8  business and the engine business both separately and together?

9  A    Yes, sir.

10 Q    And during that time, have you ever received a binding

11 offer for just the engine business?

12 A    No, sir.

13 Q    Okay.  In your opinion, is the offer presented by the

14 Debtor's plan the highest and best offer for the creditors in

15 this case?

16 A    Yes, sir.

17 Q    Okay.  Now, I would like to ask you a few questions about

18 who we refer to in the plan as Brantly.  And we've heard other

19 names -- Xi'an?

20 A    Xi'an Free Sky.

21 Q    Xi'an?  And they're all part of what we call the Brantly

22 Group, correct?

23 A    Yes, sir.

24 Q    When did -- you met, did you not, with the Brantly Group

25 here in Coppell in June 2009?

1  A    Late May/early June, yes, sir.

2  Q    Okay.  Was that roughly about the time you learned of their

3  interest in acquiring this company?

4  A    Yes.

5  Q    Okay.  And who came to Coppell to meet on behalf of

6  Brantly?  Those that you can recall.

7  A    Chairman Chang.  Chairman Shin Jong Chang (phonetic).

8  Madam Wong.

9  Q    Is that his wife?

10  A    Yes, sir.

11  Q    And what did they represent their roles with the Brantly

12  Group to be?

13  A    Chairman Chang is the lead investor principal.  And Madam

14  Wong is in the administrative/operational/accounting type

15  roles.  Additionally, they brought, I believe, a gentleman

16  named Roger Zao (phonetic) for engineering, and a gentleman

17  named Vernon Cantrell, who is the president of Brantly

18  Helicopter based in Vernon, Texas.

19  Q    Okay.  And Mr. Tong was there also to assist in

20  translation, correct?

21  A    Yes, sir.

22  Q    And tell us generally about that meeting.

23          MR. GOOD:  Objection, Your Honor, to the extent it

24  calls for hearsay from the Brantly visitors.

25          THE COURT:  Well, overruled at this point.  You may

1   object if hearsay testimony is elicited.

2           THE WITNESS:  I'm sorry.  Can you repeat the question?

3   BY MR. ROBERTS:

4   Q   Well, I'll just change the question.  Did the Brantly Group

5   express interest in buying the company?

6   A   Yes, sir.

7   Q   Okay.  Did they take a tour of the facility?

8   A   Yes, sir.

9   Q   Did they ask you questions about operations and the

10  financial situation with the company?

11  A   Yes, sir.

12  Q   Okay.  And did they express to you what their goal was in

13  their interest in acquiring the company?

14  A   Yes, sir.

15  Q   And what did they tell you that was?

16          MR. GOOD:  Objection, Your Honor.  Hearsay.

17          THE COURT:  Sustained.

18          MR. ROBERTS:  Okay.

19  BY MR. ROBERTS:

20  Q   Mr. Abercrombie, do you believe it's more likely than not

21  that the Chinese, the Brantly Group, will fund this plan?

22  A   Yes, sir.

23          MR. GOOD:  Objection, Your Honor.  Calls for

24  speculation.

25          THE COURT:  No foundation has been laid.  Sustained.

1              MR. ROBERTS:  Okay.

2     BY MR. ROBERTS:

3     Q   Mr. Abercrombie, would you identify for me --

4              MR. ROBERTS:  Excuse me one moment.  I lost my place.

5     BY MR. ROBERTS:

6     Q   In the exhibit book in front of you, would you turn to

7     Exhibit H?  No, excuse me.  Exhibit E.  Would you identify that

8     document for me?

9     A   These are pro forma financial projections for three years

10    that I developed, including the income statement, balance

11    sheet, and cash flow.

12    Q   And did you develop them under the terms of the plan

13    proposed by the Debtor?  In other words, did you take into

14    account the payment of creditors and the terms of the plan in

15    creating these pro formas?

16    A   Yes, sir.

17    Q   Okay.  What was your purpose in preparing these pro formas?

18    A   I wanted to give projections that would show the potential

19    financial commitments of the interested buyer for the

20    additional funding requirements needed for inventory as well as

21    operations.

22    Q   Okay.  And did you -- what is the correlation between this

23    -- well, --

24             MR. ROBERTS:  Well, first of all, I'd move for the

25    admission of Exhibit E, Your Honor.

 1              THE COURT:  Objection?

 2              MR. GOOD:  Your Honor, the Exhibit E is -- are

 3   projections, as I understand it, that Mr. Abercrombie has

 4   prepared that do not include many of the business points that

 5   are contained in the feasibility section, Section 9 of the

 6   disclosure statement.  And as a result of that, it does not

 7   represent what I refer to and what -- the business plan, and we

 8   object to it based upon relevance.

 9              THE COURT:  Response?  Give me one second.  Ms.

10   Salcido has e-mailed me.

11         (Pause.)

12              THE COURT:  Let me just -- I overlooked a case.  I

13   want to be sure.  Is anyone here in the Hucklebridge case?

14         (No response.)

15              THE COURT:  Very well.  Please.

16              MR. ROBERTS:  I'm sorry.  Was it overruled, Your

17   Honor?

18              THE COURT:  I haven't --

19              MR. ROBERTS:  Oh, okay.

20              THE COURT:  I asked you for a further response.

21              MR. ROBERTS:  His objection is he says he thinks it's

22   inconsistent with the business plan, so we're going to need to

23   introduce it and go through why it is not inconsistent with the

24   business plan.  Or whether it's consistent with the business

25   plan or not, it's still relevant.

1          THE COURT:  I'm going to admit it subject to a motion

2    to strike if it's not established to be consistent with the

3    business plan.

4        (Debtor's Exhibit E is received into evidence.)

5    BY MR. ROBERTS:

6    Q    Okay.  Mr. Abercrombie, would you turn to Page 15 of

7    Exhibit A, the Debtor's Third Amended Disclosure Statement?

8    A    Yes, sir.

9    Q    Would you read to us the third paragraph under "Summary of

10   the Debtor's Plan"?

11   A    "The plan provides for the resumption and continuation of

12   the Debtor's business, including the assembly and sale of piece

13   parts, cylinder assemblies, and Vantage engines at its facility

14   in Coppell, Texas or nearby."

15   Q    Okay.  And did you incorporate that portion of the business

16   plan into the pro forma in Exhibit E?

17   A    Yes, sir.

18   Q    Okay.  While we're on the disclosure statement, let's go

19   forward with some of the -- I have some other questions.  Go to

20   Page 16 at the top of the first paragraph of that disclosure

21   statement.  Now, this is a disclosure statement signed by you,

22   correct?

23   A    Yes, sir.

24   Q    And that first paragraph, if I can shorten it a bit,

25   provides that part of the Debtor's business plan is to resume

1  assembly and sale of piece parts, cylinder assemblies and

2  Vantage engines at the facility in Coppell.  Correct?

3  A    Yes, sir.

4  Q    Another part of the business plan is to take advantage of

5  what Brantly believes is a rapidly growing market for FAA-

6  certified engines and parts.  That's part of the business plan.

7  Correct?

8  A    Yes, sir.

9  Q    And did you take that into account in preparing Exhibit E?

10  A    No.

11  Q    You didn't take into account any development of engines for

12  export in China?

13  A    Some Vantages in Years 2 and 3.  Yes, sir.

14  Q    Okay.  We will go back to that.  Please go to Page 26 of

15  the disclosure statement.

16  A    Yes, sir.

17  Q    Do you see where it says, the bottom paragraph, "Funding of

18  Continuing Operations Under the Plan"?

19  A    Yes.

20  Q    Do you see where it says, "Management estimates that an

21  additional $4 million in capital or credit may be needed to

22  revive the piece parts business and to fund the cost of the

23  engine programs based on Superior's historical financial

24  performance"?

25  A    Yes, sir.

1  Q    And did the pro formas that you prepared in Exhibit E, are

2  they consistent with that estimation?

3  A    Yes, sir.

4  Q    Okay.  Now, at the risk of causing a little bit of

5  confusion, let's go back a minute.  "Management estimates an

6  additional $4 million of capital will be needed."  That's you,

7  correct?  That's your estimate?

8  A    Yes, sir.

9  Q    Did you give that estimate to the Chinese in the very first

10  meeting?

11  A    Yes, sir.

12  Q    And that estimate was in the disclosure statement, as we

13  see, correct?

14  A    Yes, sir.

15  Q    And you're showing in this pro forma approximately $4

16  million in cash needs in the first year under your business

17  plan.  I mean, under the pro formas.  Correct?

18  A    Yes, sir.  A little bit less, but yes.

19  Q    Okay.  We'll go to the pro formas in a moment.

20      On Page 39 of the disclosure statement, the second

21  paragraph contains various representations by Brantly about his

22  intention of making the acquisition, to take advantage of the

23  Chinese market as being one of those.  Correct?

24  A    Yes, sir.

25  Q    And did the Chinese leave it to you to determine how to

1   achieve that goal?  The timing?  The costs?  The start-up

2   costs?  The estimates of how long it would take?  The details?

3   A    I'm not sure I follow the question.

4   Q    Well, if the goal stated is -- one goal is to take

5   advantage of the rapidly expanding market for engines, that

6   would need to incorporate a program to at some point start

7   developing engines.  Correct?

8   A    Yes, sir.

9   Q    And does your pro forma -- and did the Chinese leave it to

10  you to determine the details of how to achieve that goal --

11  A    Yes.

12  Q    -- through the operation of Superior?

13  A    Yes, sir.

14  Q    And is your pro forma in Exhibit E a conservative estimate

15  of how to move towards that goal?

16  A    In my opinion, yes.

17  Q    Now, you mentioned earlier Brantly Helicopter.  Who is

18  Brantly Helicopter?

19  A    Brantly Helicopter is a small helicopter manufacturer in

20  Vernon, Texas.

21  Q    And is it owned by the Brantly Group?

22  A    Yes, sir.

23  Q    And did you visit the Brantly facility?

24  A    Yes, sir.

25  Q    Did you determine whether or not the Brantly Group has been

1   providing capital to that facility since it acquired it?

2   A    Yes, sir.

3   Q    And what did you determine?

4   A    That they had been funding the operations as needed.

5   Q    And describe the operations of Brantly Helicopter in

6   Vernon.

7   A    It's an approximately 21- or 22-person operation that does

8   in-house machining and assembly of the small B-2B helicopter

9   for the general aviation market, primarily in China currently.

10  Q    Okay.  And do part of your projections include a program to

11  start developing the Superior engine for the Brantly B-2B two-

12  seater helicopter?

13  A    Yes, sir.

14  Q    Okay.  And did you take a trip to China since the

15  disclosure statement plan was filed with Mr. Mike Bean of APS

16  and meet with the Brantly Group?

17  A    Yes, sir.

18  Q    And did you tour any of the facilities of the Brantly Group

19  --

20  A    Yes.

21  Q    -- for manufacturing helicopters?

22  A    Yes, sir.

23  Q    And what did you observe?

24  A    They were empty buildings at the time.  They were

25  approximately a week away from move-in.  But the facilities

1    were there and -- to house an operation for the manufacturer,

2    but there was nothing in the buildings as of yet.

3    Q    Were there Gantry cranes?

4    A    Yes, I believe there's one.

5    Q    So there's a large crane, --

6    A    Yes.

7    Q    -- empty building, and so production of helicopters had not

8    started yet?

9    A    Correct.

10   Q    Did you take that into account in developing a plan for

11   providing helicopters in the future for the Brantly Group's --

12   A    Timing purposes?  Yes.

13   Q    Yes.  Okay.  So could you tell us, generally, in your

14   assessment, what is the path for the Reorganized Superior to

15   develop and export engines to China for the Chinese market?

16   A    The current certified Vantage engine is a 180-horsepower

17   horizontal-sitting engine.  We've got to reconfigure it to be a

18   vertical configuration for the B-2B, which will necessitate the

19   development of approximately thirty parts, either development

20   or modification of approximately thirty parts that will need to

21   get developed, engineering approval from the ACO Division of

22   the FAA.  We'll need to manufacture them, inspect them, and to

23   add them to our production certificate for the Vantage engine,

24   or to develop a new type certificate and production, we'll have

25   to show that we can consistently manufacture, inspect, and

1  assemble the engine.

2  Q    And will that take time?

3  A    Yes, sir.

4  Q    And do you have a conservative estimate of how long that

5  time will take built into your pro formas as Exhibit E?

6  A    I believe so, yes.

7  Q    Okay.  Now, after -- you've entered into a letter of intent

8  with Brantly to acquire Superior, correct?

9  A    Yes, sir.

10  Q    And does that give Brantly an opportunity to do due

11  diligence or cancel the deal if they weren't satisfied with due

12  diligence?

13  A    Yes, sir.

14  Q    And did they complete their due diligence?

15  A    Yes, sir.

16  Q    And did they go hard?  In other words, do they have their

17  money up now, no longer subject to due diligence?

18  A    Yes, sir.

19  Q    And have they funded and do you have in your possession the

20  $700,000 down payment required by the plan?

21  A    Yes, sir.

22  Q    Okay.  Do you have any reason to believe, based upon your

23  experience in dealing with Brantly, that they do not intend to

24  fund?

25  A    No, sir.

1  Q   Do you have any reason to believe they do intend to fund?

2  A   Yes, sir.

3  Q   And what are those reasons?

4  A   They've acquired the Brantly Helicopter Company to develop

5  for the Chinese market.  The engine that they need for that

6  helicopter is very specific, and the pricing from one of our

7  competitors is substantial.  They've developed the facilities,

8  hired some personnel from Harbin, which is a helicopter

9  manufacturer in China, to help them with the start-up of this

10 operation, and their vision for the Chinese aviation market is

11 somewhat reliant upon the development of the engine program.

12 Q   Okay.  Your competitor that sells engines, is that

13 Lycoming?

14 A   Yes, sir.

15 Q   And how much are they selling the engines for?

16 A   I believe it's $60,000.

17 Q   And what do you project that Superior can sell those

18 engines for?

19 A   Approximately $30,000.

20 Q   Now, in the disclosure statement, Brantly represented that

21 they had a goal of selling 150 engines a year, up to 500

22 engines a year.  Is that generally correct?

23 A   I believe so.  Yes, sir.

24 Q   And without doing the specific math, that could lead to a

25 substantial cost savings of millions of dollars to Brantly in

1   the future, could it not?

2   A    Yes, sir.

3   Q    Do you believe that is one of the reasons why they are

4   motivated to do this purchase?

5   A    Yes, sir.

6   Q    Now, let's shift over to the piece parts business.  Where

7   is the market for piece parts in the world?

8   A    Primarily North America.

9   Q    What percentage of the kind of piece parts you sell is in

10  North America?

11  A    Approximately 80 percent of our business in the market is

12  located in North America.

13  Q    If the Chinese simply did nothing but kick-start,

14  reinvigorate and get the piece parts business again going, do

15  you have an opinion whether or not the Reorganized Brantly

16  [*sic*], under your management, could make that a profitable

17  stand-alone business?

18  A    Focusing only on the piece parts, yes, I believe that can

19  be profitable.

20  Q    So do you think that the development of the piece parts

21  business has a value to the development of the engine business?

22  A    Yes, sir.

23  Q    And what is that value?

24  A    Any profit generated from the piece part business could be

25  used to subsidize the development of the engine programs.

1  Q    Okay.  And does your pro forma in Exhibit E reflect a

2  redevelopment of the piece parts business?

3  A    Yes, sir.

4  Q    Conservatively, how long would you think it would take for

5  the Chinese to begin selling Superior engines in China for

6  their helicopters?

7  A    For the helicopters, maybe two years.

8  Q    Okay.  Do you know whether that was longer or shorter than

9  they thought when they first approached you?

10  A    Longer.

11  Q    Okay.  And did you advise them of that?

12  A    Yes, sir.

13  Q    Did they show any hesitation that they wanted to go forward

14  with the deal based upon that?

15  A    No, sir.

16  Q    And do your pro formas reflect it could take that long?

17  A    Yes, sir.

18  Q    Now, if -- you don't know all of the possible airplane or

19  helicopter manufacturers in China, do you?

20  A    No, sir.

21  Q    So if Brantly, for example, could find other buyers for its

22  engines, its airplane engines, unmodified engines, would it be

23  able to -- would Superior be able to sell engines into China

24  sooner than that?

25          MR. GOOD:  Objection, Your Honor.  Calls for

 1  speculation.

 2           THE COURT:  Sustained.

 3  BY MR. ROBERTS:

 4  Q   If the Chinese found a market for aircraft engines in

 5  China, how long would it take Superior to produce and export

 6  those engines?

 7  A   We're probably six to nine months away.

 8  Q   You don't reflect that possibility in these pro formas, do

 9  you?

10  A   No, sir.

11  Q   And as you sit here, you do not know the Chinese market to

12  know whether or not that's a possibility or not, do you?

13  A   No, sir.

14  Q   You'd agree that would be an entrepreneurial risk for

15  Brantly?

16  A   Yes, sir.

17  Q   Okay.  Let's look at these pro formas just a little bit

18  more.  I asked you generally whether you were showing where

19  they would need about $4 million in cash in the first year.

20  Can you show us what line that shows what cash they will need

21  and just generally tell us what assumptions you made and how

22  you arrived at that number?

23  A   Yeah.  In Exhibit E, Page 2, which is the balance sheet,

24  the Cash line, --

25  Q   At the top?

                    Abercrombie - Direct                    45

1  A    At the very top, yes, sir, under Current Assets.  The Year

2  1 projection on the far right is bracketed, which is a negative

3  $3.436 million.

4  Q    Okay.  Now, how did you arrive at that number?

5  A    We did a projection of what we've been able to do

6  historically on sales levels, used recent history that we've

7  been experiencing through the bankruptcy on sales levels for

8  the first six months of the projection.  The inventory

9  requirement needed to relaunch the piece part business and

10 cylinder business was taken into account.  And then the

11 expenses were estimated based upon either agreements we had

12 reached with individuals or expected reductions for certain

13 items.  And also we analyzed the personnel required to restart

14 the company to meet FAA requirements as well as do the

15 necessary engine development, and laid those personnel in.

16 Q    Okay.  So you've got some personnel for engine development.

17 What other costs do you have for engine development as opposed

18 to piece parts?

19 A    There is tooling requirements that would be reflected on

20 the Fixed Asset line.  The growth in the Fixed Asset line on

21 the balance sheet will be the tooling requirements necessary

22 for that.  And then there's also additional expenses in the

23 income statement for product development, for prototyping and

24 things of that nature.  R&D expense.

25 Q    Can you tell us, if the Reorganized Superior simply focused

1  on the piece parts business, how much less cash it would need

2  the first year, approximately?

3  A   It's not easy to break out because there's shared overhead

4  and things of that nature.  But cash-wise, you'd need

5  approximately $750,000 less of inventory.  You'd need less

6  personnel.  You'd need less tooling development, and no product

7  development, or less product -- new product development.  So it

8  could be in the neighborhood of $1-1/2 to $2 million less.

9  Q   Okay.  Now, you assisted APS in preparing the pro formas

10 for their disclosure statement, did you not?

11 A   Yes, sir.

12 Q   And those pro formas are a pure piece parts business,

13 correct?

14 A   Yes, sir.

15 Q   And those pro formas, if I'm correct, are a 12-month pro

16 forma after six months of going up to normalization, and then

17 you show the twelve months.  Correct?

18 A   Yes, sir.

19 Q   And do you show, on a pure piece parts business which you

20 would be operating owned by APS, that you would be profitable?

21 A   In that twelve-month period, yes, sir.

22 Q   And in fact, owned by Brantly, they could choose to

23 conserve cash and be profitable in the same period?

24 A   Yes, sir.

25 Q   Okay.  But this plan has an engine component, engine

1   development component.

2   A    Yes, sir.

3   Q    So kind of explain to me what's going -- what you're doing

4   to develop the engines in this first year.

5   A    We'll need to hire the engineering personnel.

6   Q    Would they be to convert the engines to a helicopter

7   engine?  Is that the purpose of that?

8   A    To convert it from the horizontal configuration to the

9   vertical configuration.  It changes the parts -- oil drain, vac

10  tubes, gears and things of that nature.  So there is new parts

11  that will have to be developed, existing parts that will have

12  to be modified, to accommodate the vertical positioning of the

13  engine.  So there's engineering personnel included within the

14  pro forma to develop those items.

15      There's product -- or research and development, product

16  development.  Expenses for, like I say, prototyping.  Any

17  necessary outside testing.  And those type of items.  And then

18  the engine testing that would be required to obtain the

19  necessary certifications.

20  Q    And would it cost the Reorganized Superior more to do that

21  if it didn't run the piece parts business as well?  What if it

22  just shut down the piece parts business?  Would it require more

23  cash to do this, or would --

24  A    I'm sorry?

25  Q    Would the piece parts business help fund the cost of this

1   development?

2   A    Yes, in time.

3   Q    So, with you as the president of the Reorganized Superior,

4   it would be your intention to -- go on.  In your opinion, is

5   your pro forma inconsistent with the disclosure statement's

6   broad description of the plan for the Reorganized Superior

7   under the ownership of Brantly?

8   A    No, sir.

9   Q    If Brantly did not fund within thirty days of the entry of

10  an order confirming the plan, and if the Debtor was able then

11  to take the $700,000 deposit for their failure to fund, would

12  the 30-day delay from the entry of the order to the end of that

13  30-day period, would the $700,000 be expected to cover any

14  losses the company would suffer in that thirty days?

15  A    Approximately.

16  Q    Have you fully informed, to the best of your ability,

17  Brantly of all of the risk that you are aware of in connection

18  with their acquisition?

19  A    I believe so.

20  Q    Do you recall approximately how much the records of the

21  Debtor reflect that TAG is owed?

22  A    TAG?

23  Q    TAG.

24  A    Approximately $10.1 million.

25  Q    And that is for the debt they've -- the remaining balance

                          Abercrombie - Cross                    49

 1  of the debt they purchased in the acquisition, correct?

 2  A    The $10 million debt and then the $146,000 of the final

 3  quarter interest payment that would have been due on December

 4  31, 2008.

 5          MR. ROBERTS:  Pass the witness.

 6          THE COURT:  Very well.  Any other -- well, I'll allow

 7  -- we'll go to cross-examination.  Does anyone wish to cross-

 8  examine?

 9          MR. GOOD:  Yes, Your Honor.

10          THE COURT:  Please.

11                      CROSS-EXAMINATION

12  BY MR. GOOD:

13  Q    Mr. Abercrombie, good afternoon.

14  A    Good afternoon.

15  Q    My name is Kevin Good.  I represent Aviation Parts Supply.

16  I think you know that, right?

17  A    Yes, sir.

18  Q    All right.  If I can take you back through just a few

19  numbers, on Exhibit E, I think you referred to the top line on

20  the balance sheet, and the number was $3,436,299.

21  A    Yes, sir.

22  Q    Is that right?

23  A    Yes, sir.

24  Q    And that's -- that's, the first year of operation of the

25  Reorganized Superior, it would have a cash consumption, if you

1   will, of $3.4 million?

2   A    Yes, sir.

3   Q    All right.  So if the purchase price, as I understand it,

4   is $7 million, --

5   A    Yes, sir.

6   Q    -- then this number would be added to the $7 million to get

7   to what would be needed to get through the first year on a --

8   just a no-profit/no-loss type of number?

9   A    Yes, sir.

10  Q    Is that right?

11  A    Yes, sir.

12  Q    So, round numbers, $10.4 million?

13  A    Yes, sir.

14  Q    Okay.  On your cash flow, which is the next -- the third

15  sheet in there, your negative cash flow for Year 1 is listed at

16  $5.16 million.  Right?

17  A    5.18, yes, sir.

18  Q    5.18?  Yeah, $5.18 million.  And the difference between

19  those numbers is just the cash in the company?

20  A    Yes, sir.

21  Q    All right.  Now, you have no knowledge, you have never seen

22  a document that shows that Brantly has the ability to fund $7

23  million, have you?

24  A    I've seen documents associated with the process and what's

25  been requested, but nothing that is firm showing that the $7

1   million is readily available.

2   Q    Okay.  You're talking about the Chinese documents?

3   A    Yes.

4   Q    Okay.  We'll -- as I asked you the other day, you have no

5   personal knowledge of --

6   A    No, sir.

7   Q    -- that, and I -- that's an area that if I asked you any

8   questions, you would decline to answer because you just don't

9   -- don't know?

10  A    That was the first time I'd seen them, yes.

11  Q    Okay.  That's fair.  All right.  Have you seen a bank

12  commitment letter from the Brantly Group or the purchaser?

13  A    No, sir.

14  Q    Have you seen a financial statement of the Brantly Group or

15  any one of those companies?

16  A    No, sir.

17  Q    Have you asked?

18  A    No, sir.

19  Q    Okay.  Do you have any information that you could bring to

20  the Court's attention today that the Brantly Group or any one

21  of their companies has the ability to fund the balance of the

22  $7 million, the $6.3 million?

23  A    No, sir.

24  Q    And I take it, since you haven't seen it, the Brantly Group

25  has never offered any of that information to you?

1   A    Correct.

2   Q    Okay.  Now, with respect to APS, you've met with the APS

3   bankers?

4   A    Yes, sir.

5   Q    You've seen the commitment letter?

6   A    Yes.

7   Q    Okay.  And -- but you have seen none of that type of

8   information from Brantly?

9   A    Correct.

10  Q    Okay.  Have any of Brantly's bankers visited with you?

11  A    No, sir.

12  Q    Now, Mr. Roberts asked you about the $700,000 deposit.

13  A    Yes, sir.

14  Q    That $700,000 is in -- is it in the Superior bank account?

15  A    It's a -- yeah, it's the debtor-in-possession account.

16  Q    Okay.  And that money came to you from Mr. Okin's trust

17  account, right?

18  A    I believe so.

19  Q    Okay.  So you don't know the source of those funds?

20  A    Correct.

21  Q    Okay.  The financial projections that Mr. Roberts was

22  talking to you about -- this is Exhibit E -- these projections

23  were created by you?

24  A    Yes, sir.

25  Q    There was no input from Brantly?

1  A    Correct.

2  Q    These projections were not submitted to Brantly for their

3  review and approval?

4  A    I submitted it to Mr. Tom Tong.

5  Q    Okay.  Did you get any feedback?

6  A    Mr. Tong called to let me know he had seen them, and that

7  Chairman Chang would like to discuss it later when he comes to

8  visit.

9  Q    Okay.  Did he -- did anybody from Brantly say, "Your

10 pricing is wrong?  Your margins are wrong?  Your expenses are

11 wrong?  There is a market here that you're missing?"  Did you

12 get any kind of detailed input like that?

13 A    The only input was that the Chinese market may have more

14 potential than what I've estimated.

15 Q    Okay.  And you personally have no knowledge of that?

16 A    No, sir.

17 Q    Okay.  Now, the -- specifically, the projections that you

18 have here in Exhibit E, they do not include, as an example, any

19 inventory purchased to supply the piece part business in China?

20 A    Not specific to China, no, sir.

21 Q    Okay.  And you don't have any specific inventory purchase

22 for the manufacturing of engines for the Cessna 172s in China?

23 A    No, sir.

24 Q    And you don't have any inventory in here for the purchase

25 of -- selling engines for the DA40 or 42 aircraft in China?

1   A    Not specific, no, sir.

2   Q    Okay.  And in terms of inventory to sell 500 engines a year

3   or 150 engines into the Brantly helicopters, those are not in

4   your projections, are they?

5   A    Correct.

6   Q    Okay.  Looking back at Exhibit E, on the balance sheet,

7   this is the second sheet, your cash position basically goes

8   negative in the fourth month, does it not?

9   A    Yes, sir.

10  Q    So without an immediate input of cash, Superior Air Parts

11  is negative cash -- is that December 31st?

12  A    Umm.

13  Q    Or sometime in December?

14  A    Yes, sir.

15  Q    Okay.   So if it takes Brantly the $7 million plus the $3.4

16  million to get through the first year, you haven't seen any

17  evidence of Brantly being able to fund that, as you sit here

18  today?

19  A    No, sir.

20  Q    Okay.  And you don't want the Court to take anything that

21  you -- any impressions that you have to be a factual basis for

22  the fact that Brantly does in fact have the ability to fund?

23  A    I'm not sure I follow the --

24  Q    I'll -- it was a bad question.

25  A    -- double negatives.

1    Q    It was a bad question.  You don't want anything that you

2    say here today to suggest to the Court that you have seen any

3    objective evidence to demonstrate that Brantly has the money to

4    fund this plan, do you?

5    A    Correct.

6    Q    Because you haven't seen it?

7    A    Correct.

8    Q    Okay.  Do you have an employment agreement with Brantly?

9    A    No, sir.

10   Q    Has one been tendered to you?

11   A    No, sir.

12   Q    Did you ask for one?

13   A    No, sir.

14   Q    Okay.  Have they just promised you?

15   A    Yes, sir.

16   Q    Okay.  APS tendered you an employment agreement, didn't

17   they?

18   A    Yes, sir.

19   Q    Okay.

20            MR. GOOD:  Pass the witness, Your Honor.

21            THE COURT:  Any other cross-examination?

22            MR. WINIKKA:  Dan Winikka again for the Thielert.

23                        CROSS-EXAMINATION

24   BY MR. WINIKKA:

25   Q    Mr. Abercrombie, I just have one or two quick questions for

1    you.  You gave some brief testimony about the shipment of parts

2    from TAE to Superior following the acquisition of Superior by

3    TAG.  Could you explain exactly again what your understanding

4    is of that deal or arrangement?

5    A    The --

6    Q    For the shipment of parts?

7    A    From TAE to Superior?

8    Q    Correct.

9    A    Yes.  TAE was shipping goods to Superior, and we were not

10   required to pay for those shipments as they were received.  We

11   made one -- I believe a million dollars worth of payments in

12   2007 for goods on a one-time -- but that's when we had cash.

13   When we didn't have cash or the ability to pay, we weren't

14   expected to pay for them.

15   Q    Okay.  And was there anything that you -- to your

16   knowledge, was there anything in writing reflecting this

17   arrangement?

18   A    Not that I can recall, no.

19   Q    Okay.

20             MR. WINIKKA:  Thank you.

21             THE COURT:  Anyone else?

22        (No response.)

23             THE COURT:  Redirect?

24                          REDIRECT EXAMINATION

25   BY MR. ROBERTS:

1  Q    Mr. Abercrombie, you intend to stay and serve as the

2  president of Superior Air Parts if this plan is confirmed,

3  correct?

4  A    Yes, sir.

5  Q    On an employment-at-will basis, correct?

6  A    Yes, sir.

7  Q    Why are you supporting this plan and making that commitment

8  if you have seen no evidence that they have the money to fund

9  either the acquisition or future costs?

10  A    I view this as an entrepreneurial venture attacked by the

11  Chinese investment group that, if successful, could be very

12  good for Superior Air Parts in the future.

13  Q    And do you have some faith that they are going to fund

14  that?

15  A    I believe they will, yes, sir.

16  Q    Now, do you believe it's more likely than not that they

17  will?

18  A    Yes, I believe they -- they will fund, more likely than

19  not.

20  Q    Now, in answer to one of Mr. Good's questions, you said no

21  input from Brantly on the business plan.  But isn't it true

22  that the disclosure statement sets forth the broad parameters

23  of the business plan that guided you in doing Exhibit E?

24          THE COURT:  Ask that question again.  I'm sorry.

25          MR. ROBERTS:  All right.

1  BY MR. ROBERTS:

2  Q   Mr. Good -- in response to a question from Mr. Good, I

3  believe you said you had no input from Brantly on developing

4  the business plan.

5  A   Yes, sir.

6  Q   But when we went through your testimony earlier, we looked

7  at statements in the disclosure statement, which were --

8  provided broad outlines for a business plan.  And then we have

9  Exhibit E, which is a detailed business plan.

10 A   Correct.

11 Q   Isn't it true that Brantly provided the input for the

12 business plan as stated in the disclosure statement?

13 A   The parameters were in place, yes, that were taken into

14 consideration.

15 Q   And they -- and that's what partially guided you to develop

16 your plan?

17 A   Yes.  The engine development and the Vantage engine sales

18 in future years.

19 Q   And in fact, they are relying on your expertise for

20 developing the detailed plan, correct?

21 A   Yes, sir.

22 Q   They are taking the entrepreneurial risk on whether they're

23 right that there's going to be the market in China, correct?

24 A   Yes, sir.

25 Q   And they're putting their money where their mouth is so

1  far?

2  A    They've made the deposit.  Yes, sir.

3  Q    As part of the plan, you approached parties with purchase

4  orders and gave them a choice whether to file a claim for

5  damages or to release that claim and rely on the credit of the

6  Reorganized Superior, correct?

7  A    Yes, sir.

8  Q    And who were the four biggest by far of those parties?

9  A    Zonzi (phonetic), Eck Industries, Molly (phonetic), and

10  Saturn Fasteners.

11  Q    And were you able to work -- reach agreement with Saturn,

12  Eck Industries, and Molly?

13  A    Yes, sir.

14  Q    And can you tell us approximately what the total purchase

15  orders involved in that -- those are?  If you want to take them

16  one at a time or collectively.

17  A    They had claims -- I believe Molly's was $900,000, Saturn's

18  was $454,000, $457,000, and Eck Industries was, I believe,

19  $900,000 as well, and Zonzi's was $1.1 million.  That may have

20  been Euro.  I can't recall right now.

21  Q    I'm not -- I'm sorry.  How much was Molly's?

22  A    Molly's, I believe, was $900,000 in total.

23  Q    So Eck was about $900,000, Molly was about $900,000, and

24  Saturn was about $454,000?

25  A    Well, Saturn had $900,000 worth of purchase orders, but

1   their claim filed was for, I believe, $457,000.

2   Q    Okay.  So those three parties are committing, if I've got

3   this correct, to look to the credit of the Reorganized Superior

4   for $1.8 million in future orders?

5   A    The future orders may not have that same value.

6   Q    Well, your purchase orders are going to be $454,000,

7   $900,000 and $900,000, or have they agreed to accept fewer?

8   A    They've agreed to accept fewer.

9   Q    Okay.  Let me get this straight, then.  How much is the

10  purchase order for Saturn, or the purchase orders for Saturn?

11  A    The purchase orders for Saturn, I believe, are $400,000.

12  Q    Okay.  And what about Eck?

13  A    Eck Industries, I believe, is two hundred and -- maybe

14  $220,000.

15  Q    And Molly?

16  A    And Molly's is approximately $450,000 to $475,000.

17  Q    Now, your disclosure statement reflects the losses that

18  this company has suffered in the last several years, correct?

19  A    Yes, sir.

20  Q    And those parties were aware of that, correct?

21  A    Yes, sir.

22  Q    So now you -- between those parties, then, the number would

23  be over a million in new purchase orders on open credit

24  accepted by three of -- those three large vendors?

25  A    Yes, sir.

1  Q   Correct?  And in doing that, did they ask you for pro forma

2  financial statements?

3  A   No, sir.

4  Q   Did they insist on any evidence that Brantly was going to

5  fund the acquisition, fund the acquisition or fund future

6  negative cash flows?

7  A   No, sir.

8  Q   Assuming that Brantly funds the purchase price, the balance

9  of the $7 million, that money gets paid into the Creditors'

10  Trust, correct?

11  A   Yes, sir.

12  Q   So the creditors aren't relying on the future of this

13  company to get paid what they're being promised under this

14  plan, correct?

15  A   Correct.

16  Q   That is administered by the Creditors' Trust, not by

17  Superior, correct?

18  A   Correct.

19  Q   In the disclosure statement, there is considerable

20  representations made by Brantly that they need Chinese

21  government approval of several layers to fund this transaction.

22  Correct?

23  A   Yes, sir.

24  Q   And you don't have any -- you can't read Chinese, I

25  presume, correct?

1   A    No, sir.

2   Q    So Chinese government documents are not something you can

3   authenticate or identify, correct?

4   A    Correct.

5   Q    And yet, without that evidence, you're still supporting

6   this plan.  Why are you not concerned about that issue in

7   supporting this plan?

8            MR. GOOD:  Objection, Your Honor.  Relevance.

9            THE COURT:  Overruled.

10           THE WITNESS:  I've met with the principals of the

11  Brantly Group in China.  They've come to the States and met

12  here.  I've met with the president of the Brantly Helicopter

13  Group in Vernon.  I just have a personal comfort that they have

14  a vision and that they have the wherewithal to do it and the

15  desire.

16  BY MR. ROBERTS:

17  Q    And you've already testified earlier that you've seen that

18  they did follow through and acquire Brantly and have been

19  funding Brantly since it acquired it, right?

20  A    Yes, sir.

21  Q    And when you saw the Brantly facility, did it appear that

22  it was -- or do you know whether it was profitable or whether

23  the Brantly Group was having to fund negative cash flow?

24  A    It was told to us that they were funding --

25           MR. GOOD:  Objection, Your Honor.  Hearsay.

1              THE COURT:  Sustained.

2              MR. ROBERTS:  Okay.  Pass the witness.

3              THE COURT:  Recross?

4              MR. GOOD:  Briefly, Your Honor.

5                         RECROSS-EXAMINATION

6   BY MR. GOOD:

7   Q   Mr. Abercrombie, the last subject that Mr. Roberts was

8   talking to you about, when you went up to the Vernon facility

9   where Brantly Helicopters is located, did you see any

10  financials?

11  A   No, sir.

12  Q   Did you ask to see any financials?

13  A   No, sir.

14  Q   Do you know how much of an investment that Brantly made up

15  there?

16  A   No, sir.

17  Q   Do you know how much money Brantly is funding on a month-

18  to-month basis up there?

19  A   No, sir.

20  Q   So, basically, what you heard about the Brantly facility in

21  Vernon came to you from Vernon Cantrell?

22  A   Yes, sir.

23  Q   And you asked for no back-up?

24  A   No, sir.

25              MR. GOOD:  Pass the witness, Your Honor.

1          THE COURT:  Anyone else?  Any further questions for

2    this witness?

3        (No response.)

4          THE COURT:  Thank you very much.  You may step down.

5        (The witness steps down.)

6          THE COURT:  Any other evidence in support of

7    confirmation?

8          MR. ROBERTS:  Yes, Your Honor.  May I have one brief

9    moment to consult with counsel?

10          THE COURT:  You may.

11        (Counsel confer.)

12          MR. ROBERTS:  Your Honor, the proponents would call

13    Mr. Tom Tong.

14          THE COURT:  Mr. Tong, if you'd come forward and be

15    sworn.

16              TOM TONG, DEBTOR'S WITNESS, SWORN

17          MR. ROBERTS:  Your Honor, --

18          MR. GOOD:  Your Honor, at this point, APS would object

19    to any testimony from Mr. Tong, as he is a lawyer appearing as

20    a material witness in a case on behalf of his client, and under

21    the -- and he's a Texas lawyer, and under Disciplinary Rule

22    3.08 it precludes a lawyer from being a material witness and

23    testifying in a contested matter, and we would object to it.

24          THE COURT:  Do you have a copy of that for me?

25          MR. GOOD:  Yes, I do, Your Honor.

1          (Pause.)

2          THE COURT:  Well, but this says he can't accept or

3   continue employment as an advocate in Court if he's going to be

4   a material fact witness.  At least so far, Mr. Tong hasn't

5   advocated anything in this Court.

6          MR. GOOD:  Well, Your Honor, he has appeared in this

7   case, been introduced in this case, not just today but in a

8   prior hearing.  And this is a contested matter.  Where he can

9   continue employment -- where -- and he is remaining in

10  employment, it -- the Disciplinary Rule says that he cannot be

11  a material witness.

12         THE COURT:  Well, but that's his problem vis-à-vis the

13  State Bar, isn't it?  It does not preclude him --

14         MR. ROBERTS:  Your Honor, they sprung this on us, but

15  there's Fifth Circuit law that says exactly what you just said.

16  You can't use this for tactical purposes to eliminate

17  testimony.

18         MR. GOOD:  Well, Your Honor, the -- let me stop a

19  minute here.  (Pause.)  In -- this is my last point, Your

20  Honor.  In the deposition I took from Mr. Tong yesterday, there

21  were several instances where I asked for factual information

22  that Mr. Tong and his counsel, properly so, objected to it on

23  the basis of attorney-client privilege.  So if I'm going to

24  cross-examine a witness in a case, number one, I'm entitled to

25  find out what he's going to testify to to prepare for the

1   cross-examination.  I was prevented from doing that yesterday.

2   And this is kind of the meaning behind this rule, so that you

3   don't have advocates, lawyers, testifying on behalf of their

4   clients, yet protecting the information that they have based

5   upon attorney-client privilege.  We'll move to strike.

6        THE COURT:  Well, it seems to me that we should

7   address this as the questions are asked of Mr. Tong.  And to

8   the extent a question is asked by Mr. Roberts which you were

9   precluded from getting an answer to yesterday, we'll need to

10  revisit that issue.

11       MR. GOOD:  All right, Your Honor.  I understand.

12       MR. OKIN:  Your Honor, if I might.  I do want to make

13  sure things are clear for the Court.  My concern was exactly

14  the one Mr. Good expressed when we discussed the possibility of

15  Mr. Tong testifying, which is that he is representing his

16  client in this transaction.  Not in court as an advocate, but

17  on the transaction.

18       THE COURT:  Right.

19       MR. OKIN:  For that reason, the deposition was

20  purposely limited up front.  We provided Mr. Good with a

21  proffer of Mr. Tong's expected testimony and allowed him to

22  cross-examine Mr. Tong on those topics.

23     It may be messy, but it's a means to an end where you've

24  got clients over in China who don't speak any English, have

25  already made multiple trips to the United States in support of

1  this transaction, and we need a very limited amount of

2  information from Mr. Tong to just establish the process for

3  getting the money over here.  We'd just ask the Court's

4  indulgence so we can at least -- so the Debtor can at least

5  establish the basis on which the buyer is going to be able to

6  fund the money.

7          THE COURT:  Well, let's start the testimony and we'll

8  see what objections are made.

9          MR. ROBERTS:  Your Honor, I would ask leave of Court

10 to allow Mr. Okin to do this direct rather than have me ask

11 questions and have multiple lawyers on one side.

12         THE COURT:  That's fine.

13         MR. OKIN:  Thank you, Your Honor.

14                    DIRECT EXAMINATION

15 BY MR. OKIN:

16 Q   Could you please state your name?

17 A   Tom Tong.

18 Q   And Mr. Tong, could you explain just briefly to the Court

19 your -- where you're from and your educational background?

20 A   Born, raised in China.  Went to college in China.  Came to

21 the States to go to business school first.  Had my MBA.  Then

22 worked a few years and then went to law school in --

23 Q   You went to law school in the United States?

24 A   Yeah.  Vanderbilt University.

25 Q   And --

1  A    And --

2  Q    What year did you graduate from law school?

3  A    1999.

4  Q    And since 1999, you've been a practicing lawyer in the

5  United States?

6  A    In Texas.

7  Q    Where?

8  A    First with Liddell Sapp, Locke Liddell -- Locke Lord now.

9  And since 2005, I started my own boutique firm, and have been

10  since.

11  Q    And what's the focus of your practice?

12  A    Mostly China-related work.

13  Q    And when you say "China-related work," what does that

14  entail?

15  A    I advise U.S. companies invest in China, and Chinese

16  companies invest in the U.S.

17  Q    And in this case, your client is looking to invest in the

18  U.S.?

19  A    Correct.

20  Q    And how many -- have you done other transactions like this

21  for clients looking to invest in the U.S.?

22  A    Yes.

23  Q    Are you familiar with the requirements in China for a

24  Chinese national to bring money into the United States to

25  invest in companies?

Tong - Direct                              69

1    A    Yes.

2    Q    Could you generally just tell the Court, is that a simple

3    process or a complicated process?

4          MR. GOOD:  Objection, Your Honor.  There's no

5    foundation.  Mr. Tong has testified that he's a Texas lawyer,

6    not a Chinese lawyer, and the question now involves regulations

7    and governmental processes in China.

8          MR. OKIN:  Your Honor, we haven't offered Mr. Tong as

9    an expert witness on Chinese law.  Mr. Tong has got experience

10   doing transactions in China and from Chinese nationals in the

11   United States and is familiar with what that entails, and we're

12   offering him as a fact witness explaining how that works.

13         THE COURT:  I'll overrule the objection.  I believe

14   that the weight that should be accorded Mr. Tong is something

15   that the parties can argue about, and you can cross-examine him

16   with respect to the depth of his knowledge.

17   BY MR. OKIN:

18   Q    Mr. Tong, I think the question I'd asked you is, generally,

19   can you tell the Court, is that -- is moving money out of China

20   for a purchase of assets outside of the country an easy process

21   or a complicated process?

22   A    It can be burdensome.

23   Q    And do you have any general idea of how long it usually

24   takes to get the necessary approvals to move the money?

25         MR. GOOD:  Objection, Your Honor.  We're not talking

1  about generally.  We're talking about specifically in this

2  case, if the witness knows.

3          THE COURT:  Well, --

4          MR. OKIN:  Your Honor, we're trying to establish,

5  relative to other circumstances, whether this is -- how long

6  this will take.  I think it's relevant.

7          THE COURT:  Overruled.

8          THE WITNESS:  Generally, any company or any individual

9  who wants to start a project overseas, he has to have a

10 approval from the State Development and Reform Commission.

11 That approval will allow the company to start the initial

12 process.

13    Then the company -- the investing company or individual

14 would have to go to their local provincial Bureau of Commerce

15 or Department, Department of Commerce, to get approval so that

16 the investing company can get issued a approval certificate for

17 overseas investment by enterprises.

18    Then the company can take that approval certificate to the

19 relevant or the local foreign currency controller -- the actual

20 name should be the State Administration of Foreign Exchange --

21 so that it can show them the approval certificate and the

22 foreign exchange control can allow the investing company or

23 individual to transfer the necessary foreign currency out of

24 China to wherever the investment might be.

25 BY MR. OKIN:

1  Q   And that would be the last step, that you just described

2  there?

3  A   As far as money is concerned.

4  Q   Okay.  Now, in your experience, how long does that process

5  usually take?

6  A   Oh, it can be a few months.  Each step, each government

7  agency generally has about twenty working days to issue the

8  approval.  As long as they issue the approval within twenty

9  working days, nobody gets in trouble.

10  Q   Now, out of those steps that you just named, do you know

11  how many hurdles the purchaser in this transaction has already

12  cleared?

13  A   It essentially cleared the State Development and Reform

14  Commission.  It got the --

15       MR. GOOD:  Objection, Your Honor.  Calls for

16  speculation.  I mean, calls for hearsay.  There's no foundation

17  as to the basis of Mr. Tong's knowledge of the steps that have

18  been cleared in this case.

19       THE COURT:  I'll sustain the lack of foundation.

20  BY MR. OKIN:

21  Q   Mr. Tong, are you -- do you know which steps the buyer in

22  this case has cleared in this process?

23  A   All steps except the foreign currency.

24  Q   So I'm asking you if you know.

25  A   Yes.

Tong - Direct                          72

1  Q    Okay.  How do you know?

2  A    I've seen copies of the approval and the certificates.

3  Q    Have you seen the originals?

4  A    I have not.

5  Q    You've seen what types of copies?

6  A    PDF copies.  Scanned e-mail to me from my client.

7  Q    And were these -- there were in Chinese?

8  A    Yes.

9  Q    And how could you tell that these were the actual Chinese

10 documents approving this transaction?

11 A    I have seen enough in the past.

12 Q    What about the particular documents sent to you indicates

13 that they were the actual documents?

14 A    They have the letterhead and have the seal, official seal,

15 at the end of the document.

16 Q    And based on that, is that enough for you to draw a

17 conclusion as to whether or not your client has fulfilled all

18 of the steps necessary to move the money out of China?

19          MR. GOOD:  Objection, Your Honor.  If --

20          THE WITNESS:  Yes.  It's my --

21          MR. GOOD:  If that's the basis of Mr. Tong's

22 testimony, based upon these documents that he has, then the

23 best evidence of that testimony -- of that -- of those hurdles

24 are the documents themselves, not Mr. Tong's testimony of them.

25 And we object to his testimony absent the documents.

1          THE COURT:  Response?

2          MR. OKIN:  Your Honor, we do have the documents,

3   they're the same photocopies that Mr. Tong has viewed, and

4   we're happy to introduce them.  They're in the Debtor's exhibit

5   book.

6      In this case, however, the point here is not really to

7   prove the truth of the matter to a definitive point that the

8   buyer has absolute authority to send the money today.  At the

9   end of the day, the Debtor has got protection.  It's got a

10  deposit.  There's thirty days for the money to come in.  It's

11  essentially -- I think it goes to the weight generally that the

12  Court just applies to the overall likelihood that this plan is

13  going to be fulfilled.

14         THE COURT:  Where --

15         MR. OKIN:  And I think you can -- you can weigh it

16  accordingly.

17         THE COURT:  Where are the documents?

18         MR. OKIN:  Your Honor, they're exhibits -- the part of

19  the proffer that was provided to APS, Exhibit G.  And if Your

20  Honor would prefer, I'm happy to authenticate -- try to have

21  Mr. Tong identify the documents and offer them.  I anticipated

22  that that would draw an objection from Mr. Good, and figured

23  that --

24         THE COURT:  Well, it probably will, but let's try.

25      (Laughter.)

1          MR. OKIN:  That's fine, Your Honor.  I'm trying to

2   just generally inform the Court without having to worry about

3   that, but we can do it that way.

4   BY MR. OKIN:

5   Q   Mr. Tong, will you look at Exhibit G, please?  Flip through

6   that and make sure you're familiar with all of it.  (Pause.)

7   Now, mixed in throughout Exhibit G are English pages and then

8   Chinese pages, Chinese-language pages.  Can you explain to the

9   Court what the -- what these -- why there's English and why

10  there's then Chinese?

11  A   The Chinese were sent to me by my client and the

12  translations -- the English pages are translations of each of

13  the documents.

14  Q   And who translated these?

15  A   I did.

16  Q   You actually read the Chinese and then typed this

17  translation?

18  A   Yes.

19  Q   How long ago was this done by you?

20  A   Last week.

21  Q   And these are accurate translations of the Chinese

22  documents?

23  A   Yes.

24  Q   And these are in Mandarin, Chinese?

25  A   Correct.

1  Q   Now, so each translation begins a new document?

2  A   The way -- it's the same -- yes.

3  Q   So how many individual Chinese documents are there in this

4  Exhibit G?

5  A   Three.

6  Q   Okay.  And let's take them in order, one at a time, just so

7  we can identify them and how we know what they are.  So

8  starting with the first one, going past the first two English

9  translation pages to the third page of Exhibit G, what does

10 this document on its face appear to be?

11 A   The third page?  The first Chinese page?

12 Q   Yes.  The third page of the exhibit.  Whose letterhead is

13 that at the top?

14 A   It's the Development and Reform Commission of Zun Don

15 (phonetic) Province.

16 Q   Okay.  And it's dated what?

17 A   Date, July 1st, 2009.  And I just want to point out the

18 translation didn't -- was not assembled --

19 Q   Yeah.  This is totally --

20 A   Exactly.

21 Q   -- out of order, isn't it?

22 A   Yes.

23 Q   Okay.  I was noticing that as you were.

24        THE COURT:  So what --

25        MR. OKIN:  Yes.  Your Honor, I don't know if we want

1  to reassemble this exhibit or --

2          THE WITNESS:  They're all there.  Just not in the

3  right order.

4          MR. OKIN:  The -- let's --

5          THE WITNESS:  The last two pages of G goes with what

6  I'm looking at right now.

7          THE COURT:  The last two pages of G go with the first

8  page, the first and second page?

9          MR. OKIN:  Yes.

10         THE WITNESS:  Of Chinese.  That's right.

11         MR. OKIN:  Your Honor, I think maybe what would be

12  best is why don't we disassemble one exhibit?  We haven't

13  taken a break.  Would Your Honor be interested in taking a

14  break and we'll reassemble an exhibit, at least one for the

15  witness and one for the Court, so that we can do this in a way

16  that everybody can understand what we're doing?

17         THE COURT:  Sure.  Be sure, obviously, that you --

18         MR. OKIN:  We'll make sure counsel knows.

19         THE COURT:  -- Mr. Good knows which order you're

20  reassembling.  But I'll loan you back my exhibit and we'll take

21  a ten-minute recess.

22         MR. OKIN:  Thank you, Your Honor.

23         THE COURT:  Thank you.

24         THE CLERK:  All rise.

25     (A recess ensued from 3:10 p.m. to 3:25 p.m.)

 1           THE COURT:  Be seated, please.  All right.

 2           MR. OKIN:  Your Honor, I think we have a solution.  I

 3  hope --

 4           THE COURT:  All right.

 5           MR. OKIN:  I hope it works.  We --

 6           THE COURT:  Now, I only gave you one back, --

 7           MR. OKIN:  Yes.

 8           THE COURT:  -- and I've now got two.  So --

 9           MR. OKIN:  We checked with your clerk and I understand

10  you keep one for chambers.  And I want to explain what the two

11  are, because we did two different -- we reordered three sets of

12  the exhibits:  the witness', mine and yours.

13           THE COURT:  All right.

14           MR. OKIN:  Everybody else's, we didn't reorder it.

15  But before we reordered those three, we numbered the pages in

16  the original order 1 through 11.

17           THE COURT:  All right.

18           MR. OKIN:  And then reordered them.  So anybody who's

19  got an un-reordered set of exhibits can follow along by page

20  number.

21           THE COURT:  Okay.

22           MR. OKIN:  Your Honor, you should be able to go

23  through in order as we go.

24           THE COURT:  All right.

25           MR. OKIN:  But that way, the record will be clear and

1   the other set of exhibits otherwise not reordered for you, when

2   you have it back in chambers, you'll have -- you'll know what

3   pages we were referring to.

4           THE COURT:  All right.

5   BY MR. OKIN:

6   Q   So, hoping that works:  Mr. Tong, now, looking at Exhibit

7   G, the first translated page of the first document in the

8   logical order of approval, on what page number is that?

9   A   Page 9.

10  Q   Okay.  And that's a translation of what document?  What

11  page number is at the bottom of the Chinese documents?

12  A   3 and 4.

13  Q   Okay.  So Page 9 is a translation of 3 and 4?

14  A   Correct.

15  Q   And --

16          THE COURT:  I'm sorry.  I'm now more confused than I

17  was before.

18          MR. OKIN:  I'm sorry, Your Honor.

19          THE COURT:  The book that I have that has -- is

20  numbered 1 through 9 at the bottom, or 1 through --

21          MR. OKIN:  11.

22          THE COURT:  -- 11 at the bottom.

23          MR. OKIN:  And they're in order 1 through 11?

24          THE COURT:  Yes.

25          MR. OKIN:  Your Honor, if you take the other book,

1   they're already reordered.

2           THE COURT:  All right.

3           MR. OKIN:  The first page should be 9, if we didn't do

4   it wrong.

5           THE COURT:  Got it.

6           MR. OKIN:  Okay.

7           THE COURT:  Thank you.

8           MR. OKIN:  Sometimes they seem like good ideas to me.

9   They don't always turn out to be.  I'm hoping this works.

10  BY MR. OKIN:

11  Q   So, again, Mr. Tong, so Page 3 and 4 is the Chinese

12  document.  And what is the letterhead of that document?

13  A   That's the letterhead of the Development and the Reform

14  Commission of Zun Don Province.

15  Q   Okay.  And what is the Development and Reform Commission of

16  Zun Don Province?

17  A   That's the government agency that I mentioned that would

18  approve the initial stage of the -- any foreign investment

19  project.

20  Q   Okay.  And what's the title of this document?

21  A   Response to the Report of the Acquisition of Superior Air

22  Parts, Inc. of the United States of America by Xi'an Free Sky

23  Aviation Science & Technology Co., Ltd.

24  Q   And the date on the document?

25  A   July 1, 2009.

1  Q    Okay.  And you mentioned earlier, when we were talking

2  about being able to tell they were actual Chinese official

3  documents, the seal.  Where does the seal appear on this

4  document?

5  A    That's at the very end of the document.

6  Q    That's the circle at the bottom, at the -- in the middle of

7  the last page, of Page 4?

8  A    With the red star in the middle.

9  Q    And --

10          MR. GOOD:  Objection, Your Honor.  To the extent the

11  witness is reading the document into the record, it's hearsay,

12  and we object to it.  And moreover, these documents that appear

13  -- I want to make sure I get my objection in sufficiently early

14  -- these documents are not properly authenticated under the

15  Federal Rules, Rule 902.3, and they're inadmissible.

16          MR. OKIN:  Your Honor?

17          THE COURT:  Response?

18          MR. OKIN:  I am attempting as best I can to not ask

19  Mr. Tong about the contents of the documents, merely to

20  identify them and attempt to authenticate them.  I do believe,

21  if we want to address the admissibility of these documents now,

22  that Your Honor can admit into evidence documents that you

23  believe assist you as the trier of fact in determining the

24  issues in dispute.

25          THE COURT:  Give me a cite to the Federal Rule of

1  Evidence.

2            MR. OKIN:  That'd be Rule --

3            THE COURT:  Because a foreign public document does

4  have specific requirements under 902.3.

5            MR. OKIN:  Yes, Your Honor.

6            THE COURT:  Which is what I take it these are, foreign

7  public documents.

8            MR. OKIN:  They are, Your Honor.  But in Rule -- I

9  apologize, Your Honor.  I did not know I would be doing this

10 right now, so I didn't --

11           THE COURT:  Understood.

12           MR. OKIN:  -- come prepared to argue the legality of

13 it.

14     I'm not able to put my finger on the exact rule, the cite.

15 But I do believe, Your Honor, that instances, especially in a

16 bench trial when there is no jury, that the trier of fact can

17 weigh the credibility of a document even if it is not

18 authenticated specifically under the technical requirement of

19 the particular Rule of Evidence.

20           THE COURT:  But how do I have any idea what these

21 documents are?  I don't speak Mandarin.

22           MR. OKIN:  Your Honor, again, it's no different than

23 weighing the credibility of the fact testimony of any witness.

24 You're essentially taking the testimony of Mr. -- Your Honor,

25 that's why, in fact, I didn't go with the documents first;  I

1  went with Mr. Tong's testimony.  We're basically asking --

2           THE COURT:  But we've got a best evidence problem with

3  this testimony.  The best evidence -- I mean, his oral

4  testimony is simply going to tell me about documents that he's

5  read and is relying upon.  That's a classic best evidence

6  problem.

7           MR. OKIN:  Yes, Your Honor.

8           THE COURT:  And now we get to the documents

9  themselves, and we've got an authentication problem because --

10  so, unless you can cite me to a case law decision or a rule of

11  evidence that supports what you're hoping that I can do, --

12          MR. OKIN:  Your Honor, going back to the best evidence

13  rule -- and again, it's why we didn't go with the documents --

14  we're not trying -- we didn't start out trying to prove to the

15  Court that there are in existence Chinese government documents

16  that state that the purchaser can transfer money into the

17  United States.  We started out trying to prove to the Court

18  that the purchaser has obtained most, with the exception of

19  one, regulatory approvals necessary in order to transfer the

20  money, not which specific approval -- the contents of a

21  specific approval or a specific document.  Merely that Mr.

22  Tong, as both the attorney for the buyer and as their U.S.

23  agent attempting to facilitate this transaction, is familiar

24  with the stages of the transaction and the communication with

25  his client and is aware, as a representative of the client, of

 1 | where they are in this process, and can testify to that fact.

 2 |         THE COURT:  Well, --

 3 |         MR. OKIN:  I don't think you need to find that the

 4 | Department -- that the Bureau of Commerce in Zun Don Province

 5 | has specifically issued an approval.

 6 |         THE COURT:  Well, then try and prove what you are

 7 | trying to prove some other way.  But at least I do think there

 8 | is a problem with the admission of these documents in the face

 9 | of APS's objection to them.  So I'll sustain the objection.

10 |     I mean, is there some reason why we didn't get certified

11 | copies?

12 |         MR. OKIN:  Your Honor, because we didn't -- we didn't

13 | know we even would have to prove this issue until the end of

14 | last week.  Quite frankly, a buyer usually putting down a ten

15 | percent deposit, nonrefundable, we figured that ought to be

16 | enough proof, when there's only thirty days to close, that we

17 | can fund the money.  And it was only in response to APS's

18 | continued objections that we even asked for it.

19 |         THE COURT:  Fair enough.

20 | BY MR. OKIN:

21 | Q   We'll try this, Mr. Tong.  Do you -- has the buyer sought

22 | the necessary regulatory approvals that you described to the

23 | Court earlier?

24 | A   Yes.

25 |         MR. GOOD:  Objection.  No foundation.  He hasn't

 1 | demonstrated that he knows what's going on in China.

 2 |           THE COURT:  Well, --

 3 |           MR. OKIN:  Your Honor, he's an agent for the buyer.

 4 |           THE COURT:  Well, lay the foundation.  How do you know

 5 | what's been done in China?

 6 | BY MR. OKIN:

 7 | Q   Mr. Tong, what's been your -- what has your involvement

 8 | been in this transaction?

 9 | A   I've been talking to my client on a daily basis on the

10 | telephone or through e-mail.

11 | Q   And you visited China as well?

12 | A   Yes.

13 | Q   The clients visited you?

14 | A   Every time they came to States, I meet with them.

15 | Q   And you're advising them on the legal issues involved in

16 | this purchase?

17 | A   Yes.

18 | Q   Are you advising them on things beyond the legal issues?

19 | Advising them on how to conduct the business deal itself in the

20 | U.S.?

21 | A   No.

22 | Q   You're not advising them as to where the money needs to be

23 | wired, when it needs to be wired, how much they need to pay?

24 | A   That much, I only convey the message, yes.

25 | Q   You haven't consulted with them on strategy, on bidding,

1  things of that nature?

2  A    I have.

3  Q    And how the payment process should work?

4  A    Yes.

5  Q    And in that -- based on all of that, has that given you

6  reason to know what your client is doing with regard to having

7  the money transferred from China to the United States?

8  A    Yes.

9         MR. GOOD:   Your Honor, that calls for hearsay.

10        MR. OKIN:   Your Honor, --

11        THE COURT:   It does appear that how he knows that is

12 from what his clients have told him they've done.

13        MR. OKIN:   Your Honor, but he's not a third party

14 witness testifying to another's acts.   He's essentially an

15 agent for the buyer in the United States.

16        THE COURT:   I'm going to sustain --

17        MR. OKIN:   He'd be no different than a corporate

18 representative.

19        THE COURT:   I'm going to sustain the hearsay

20 objection.   At least so far, it appears that his knowledge is

21 not based upon direct involvement in China, but rather what his

22 client has told him about their efforts in China or what he's

23 read from looking at documents the client sent to him.

24 BY MR. OKIN:

25 Q    Mr. Tong, you're aware that the Debtor's plan requires the

1  buyer to close within thirty days of the entry of confirmation

2  order?

3  A    Yes.

4  Q    And the buyer is aware of that?

5  A    Yes.

6  Q    And has the buyer expressed any concern over being able to

7  meet that deadline?

8  A    No.

9          MR. GOOD:  Objection, Your Honor.  Calls for hearsay.

10         THE COURT:  Sustained.

11 BY MR. OKIN:

12 Q    Mr. Tong, were you a party to the discussions with the

13 Debtor as to the terms of when the effective date -- when the

14 money would be due, on the purchase would be due?

15 A    Yes.

16 Q    And therefore do you know why there's a 'thirty days after

17 the effect of the confirmation order being entered' requirement

18 in the plan?

19 A    I do know.

20 Q    Why is it in there?

21 A    Because of the government approval process.

22 Q    Is that something the buyer wanted?  Is that something the

23 buyer asked for?

24 A    Yes.

25 Q    And they asked for that -- do you know why they asked for

1   that?

2   A   Because they have been talking to the government and they

3   had found out the government approval needs time.

4   Q   And that's how much time they'd thought they needed?

5   A   Right.

6   Q   And they made the $700,000 deposit on the assumption or on

7   the basis of that belief that the thirty days would be

8   sufficient?

9   A   Right.

10   Q   In your role as we've just discussed, do you know of any

11   reason why thirty days will not be sufficient?

12   A   I don't.

13   Q   Do you expect that they'll be able to fund?

14   A   Yes.

15           MR. OKIN:   I'll pass the witness, Your Honor.

16           THE COURT:   Cross-examination?

17                       CROSS-EXAMINATION

18   BY MR. GOOD:

19   Q   Mr. Tong, good afternoon.   My name is Kevin Good.

20   A   Good afternoon.

21   Q   I represent Aviation Parts Supply.   You know that?

22   A   Yes.

23   Q   Okay.   Let me ask you just a few questions here.   (Pause.)

24   Mr. Tong, in terms of whatever approval processes are going on

25   in China, you were not involved in any of that, were you?

1   A    No, I was not.

2   Q    Okay.  Have you ever seen a financial statement from any of

3   the members of the Brantly Group?

4   A    No.

5   Q    Have you ever seen a bank account with money in it, bank

6   statement, from any of your clients, the Brantly Group?

7   A    No.

8   Q    And is it my understanding that if there is no confirmation

9   order today entered by the Court, that the money will not be

10  released from China?

11  A    That is correct.  The release depends on the confirmation

12  today.

13  Q    And that's dictated by Chinese law?

14  A    Yes.

15       THE COURT:  I don't understand that.  What do you

16  mean, that's dictated by Chinese law?

17       THE WITNESS:  Well, I'm trying to make it simple.

18  That's why I hesitated.  It's not really law.  The Foreign

19  Currency Control Agencies wants to just have your final

20  confirmation to confirm that -- that this is -- there is a

21  transaction going on.  If they're rejected, they shouldn't send

22  the money out.

23  BY MR. GOOD:

24  Q    And Mr. Tong, I asked you the other day whether or not you

25  could guarantee to this Court that $10 million or $7 million or

1  any millions of dollars were going to be transmitted and

2  released from China based upon the actions of the Chinese

3  government, and your answer was what?

4  A    I said nobody can guarantee anything.

5  Q    There are no guarantees, right?  Isn't that true?

6  A    Correct.

7  Q    If you're going to show money, you've got to have a bank

8  commitment letter or cash in the bank.  Isn't that true?

9  That's a guarantee?

10  A    I do not understand.  Say it again.

11  Q    All right.  I'll pass that.

12      Mr. Tong, you talked some generally about your experience

13  in transactions to and from China.  Have you ever been involved

14  in a transaction where $10 million was being transmitted to the

15  United States for acquisition of a company in bankruptcy?

16  A    No, not in bankruptcy.  At all.

17  Q    So, you've no experience in this type of a transaction

18  where money was coming out of China to acquire a company coming

19  out of bankruptcy?

20  A    No.  Not, again, in a bankruptcy context.

21  Q    Understood.  Now, have you seen any board of directors'

22  minutes, --

23  A    No.

24  Q    -- resolutions -- just a minute.  Let me finish.  Board of

25  directors' resolutions, minutes, or unanimous consents from

1    your client that commit your client to the acquisition of

2    Superior Air Parts?

3    A    No.

4    Q    Have you asked for them?

5    A    No.

6    Q    Have you seen any corporate resolution or unanimous consent

7    of the board of directors of your client to commit $10 million

8    for the acquisition of Superior Air Parts?

9    A    No.

10   Q    $7 million for the acquisition of Superior Air Parts?

11   A    No, I have not seen.

12           MR. GOOD:  Your Honor, I'll pass the witness.

13           MR. OKIN:  Brief redirect, Your Honor?

14           THE COURT:  Anyone else have cross-examination?

15       (No response.)

16           THE COURT:  Yes, please.

17                        REDIRECT EXAMINATION

18   BY MR. OKIN:

19   Q    Mr. Tong, counsel for APS keeps mentioning $10 million.

20   Where does that number come from?

21   A    That's actually written in the -- two of the -- one of the

22   approvals and the approval certificates.

23           MR. GOOD:  Objection.  To the extent that he's reading

24   from a document that's not in evidence, it's hearsay.

25           MR. OKIN:  Your Honor, Mr. -- APS has asked repeatedly

 1   about whether we -- Mr. Tong knows if there's $10 million out

 2   there.

 3          THE COURT:  I assume it's the $7 million plus the cash

 4   that's needed for ongoing operations.

 5          MR. OKIN:  It's the amount that APS has -- that

 6   Brantly has asked for approval to transfer.

 7          THE COURT:  Mr. Abercrombie?

 8          MR. OKIN:  Did Your Honor -- I don't know if you ruled

 9   on that.  Can he answer it, or --

10          THE COURT:  Well, how does he know?  Lay the

11   foundation for how he knows how much money --

12   BY MR. OKIN:

13   Q   Are you familiar with how much --

14          MR. OKIN:  Your Honor, we'll move on.  I think this is

15   just getting extraneous.

16   BY MR. OKIN:

17   Q   You mentioned -- you were talking about the currency

18   control issue.  What's the purpose of needing -- what's the

19   government purpose, if you know, behind requiring this final

20   approval?

21          MR. GOOD:  Objection, Your Honor.  Foundation.

22          MR. OKIN:  I think we've covered that, Your Honor.

23   He's familiar with transactions in China.  He's -- he grew up

24   there.

25          THE COURT:  Overruled.

1          THE WITNESS:  The government just want to make sure

2   that hard-earned foreign currency goes to the legitimate

3   purpose.

4   BY MR. OKIN:

5   Q   So if the Court were not to approve this purchase, your

6   client wouldn't then have the ability to transfer $10 million

7   into the United States for some other purpose?

8   A   Correct.

9   Q   Is it your understanding that the final approval that's

10  necessary requires any discretion by the agency that's supposed

11  to issue it?

12  A   No.  That's just for verification.

13  Q   So it's just a certification that they issue based on the

14  order?

15  A   Yes.

16  Q   Now, lastly, --

17          MR. OKIN:  Actually, I think that's all.

18      Your Honor, one other thing, though.  I'm not going to go

19  back to the exhibits, but I did find the rule, and I just

20  wanted to point it out to you.

21          THE COURT:  Please.

22          MR. OKIN:  Rule 901.  You know, the self-

23  authentication rule of 902 is supposed to make it easier on us

24  for presenting documents that are self-authenticating, --

25          THE COURT:  Right.

 1              MR. OKIN:   -- and the rules for how you self-

 2      authenticate it.  But Rule 901(a) is really the general rule

 3      for authentication of documents, and it doesn't only apply to a

 4      letter that a party may have sent to another.  It can apply to

 5      a government document.  You usually wouldn't use it because you

 6      would have self-authenticating documents.  But what I was

 7      trying to state for Your Honor and my memory was failing me is

 8      that, if it would -- if it's generally -- if you're generally

 9      satisfied that it's what it -- the proponent purports it to be,

10      that you can admit it, especially in light of a determination

11      by you that it does assist the trier of fact in reaching

12      conclusions on disputed issues.

13              THE COURT:  Well, are you going back to this, or not?

14              MR. OKIN:  Mr. Roberts wants me to ask to introduce

15      them, so yes, Your Honor, we'll move to introduce the three

16      Chinese-language documents.

17          (Pause.)

18              THE COURT:  Mr. Good?

19              MR. GOOD:  Yes, Your Honor.  We maintain our

20      objection.  It's hearsay.  They're unauthenticated.  They're

21      inadmissible.  The general rule is one for general guidance.

22      In this particular case, we have a specific rule on self-

23      authentication.

24          And you have to understand also, Your Honor, where Mr. Tong

25      testified that he got these documents.  He didn't get them from

1   the government; he got them from his client.  He doesn't have

2   the originals.  They came to him as an attachment, a PDF

3   attachment, to an e-mail.  There is a requirement for an

4   attestation, but there's also the second requirement for a

5   final certification.

6          THE COURT:  Well, but look at 901(b)(7).

7          MR. GOOD:  Yes, Your Honor.

8          THE COURT:  Because it deals with public records or

9   reports and provides a basis for them to be excepted from the

10  authentication requirement.  So I agree with you that 902.3

11  would suggest that the proponents of these documents have a

12  problem, but let's focus for a moment on 901(b)(7).

13         MR. GOOD:  All right, Your Honor.  Let's talk about

14  that.  Evidence -- this is 901(b)(7).  "Evidence that a writing

15  authorized by law."  There's no evidence in this record that

16  these records were authorized by law.  They may look like

17  they're legal.  They may look like they have a seal.  But

18  there's no -- there's no testimony, and Mr. Tong is not a

19  Chinese lawyer, that these documents are writings authorized by

20  law, nor that they are to be recorded or filed anywhere.  The

21  only testimony that Mr. Tong can provide is that he got them

22  from his client.

23         THE COURT:  Right.  All right.  Well, keep reading,

24  though.

25         MR. GOOD:  Sure.

1           THE COURT:  "Or is a purported public record, report,

2    statement or data compilation in any form as from the public

3    office where items of this nature are kept."

4           MR. GOOD:  And there's no testimony as to where the

5    items are kept, items of this nature are kept.  What we're

6    talking about here are PDF copies, the originals of which we

7    don't know, and quite frankly, we don't know whether they

8    actually came from any office.  They could have been

9    fabricated.  I'm not suggesting that, Your Honor, but that's

10   the reason why you have to have some type of a foundation for

11   these documents.

12       And where -- I would also suggest, Your Honor, where there

13   is -- where there is a specific provision dealing with specific

14   foreign public documents, there's reasons, policy reasons, for

15   that.  The public records or reports in 901 -- and I haven't

16   looked at the specific case law under there, but my suspicion

17   is that we're talking about U.S. documents, U.S. filings,

18   things of that nature.  When you go offshore, I mean, everybody

19   has their own special way of doing things, and the

20   clearinghouse is asking for that final certification or to take

21   it to the U.S. counsel, consul, to have it authorized.  And for

22   that reason, Your Honor, these aren't authenticated.

23       And as to the parties in this case, they constitute hearsay

24   and we object to them.

25           MR. OKIN:  Your Honor, a few things.  As I already

1  said, 902 and 901(b), I mean, 901(b) is very explicit about it.

2  They're not intended to limit the Court's ability to find

3  documents authentic and admit them.  They're intended to

4  illustrate examples of what might help make something

5  authentic.  And 902 is essentially a rule intended to help the

6  process so you wouldn't have to hire a legal expert to come in

7  and testify as to what the documents are.  But the Court admits

8  all the time PDFs or printed letters from PDFs, correspondence,

9  and a witness is asked, "Do you recognize this letter?"  You

10 know, "How do you recognize it?"

11         THE COURT:  But generally it's in English where I can

12 read it and understand what it says.

13         MR. OKIN:  That's true, Your Honor.  And I'd submit

14 there that you have to determine that you're able to at least

15 afford some weight to these that is worth even admitting them.

16 I don't think you have to give them the full faith and credit,

17 or you can.  I think you can weigh into the fact the witness's

18 testimony, the fact that Mr. Tong is a Texas lawyer and has an

19 additional duty to the Bar to be truthful, and if he -- I mean,

20 he -- I think -- Mr. Good can cross-examine Mr. Tong on how he

21 knows what he knows and the veracity of what he's saying.  If

22 he's questioning whether Mr. Tong is correctly identifying

23 these documents or correctly translating them, that's one

24 thing.  If he's just -- doesn't believe that Mr. Tong's client

25 actually got these from the government and created them out of

1  whole cloth, I guess that's another.  And there are different

2  findings that you can make in terms of whether you choose to

3  admit this or not.

4      And in the end, I think you just need -- I think it's an

5  issue of whether you think it could be helpful to your

6  determination to have those available to you.

7          THE COURT:  I don't think that's the issue.  Of course

8  it would be helpful.  But this is an issue of your burden of

9  proof or the proponents' burden of proof to establish

10 feasibility, and I have no ability to know what these documents

11 are.

12     And I don't mean that to impugn your integrity, Mr. Tong.

13 But, frankly, you didn't get them from the governmental

14 offices.  You got them from your client.  And you don't know

15 that they are what they are really either, other than your

16 client tells you that they are.

17     So I don't believe that 901 -- I don't believe that I am in

18 a position to conclude that these are authentic documents such

19 that I can remove the requirements of the Federal Rules of

20 Evidence as set forth in Rule 902.3 for them to bear the

21 appropriate certifications that are required for them to be

22 self-authenticating.

23     So I will decline the invitation to allow them to be

24 admitted in accordance with Rule 901(b).

25          MR. OKIN:  Okay.  We'll pass the witness, Your Honor.

 1           THE COURT:  Very well.

 2           MR. GOOD:  No further questions, Your Honor.

 3           THE COURT:  Very well.  Thank you, Mr. Tong.  You may

 4  step down.

 5      (The witness steps down.)

 6           MR. ROBERTS:  Your Honor, we do not have additional

 7  witnesses.  There have been exhibits introduced into evidence

 8  that we will comment on in closing to show where we've met our

 9  burden of proofs of the documentation.  We don't think we need

10  testimony for that.

11           THE COURT:  All right.  So the Debtor rests?

12           MR. ROBERTS:  Well, not quite, because we've got two

13  issues that are interrelated, and that are the votes of TAE and

14  TAG.

15           THE COURT:  All right.

16           MR. ROBERTS:  So I think it would be an appropriate

17  time to, one, on the motion of the Creditors' Committee, to

18  compel TAE to perform -- to comply with the Rule 11 agreement

19  and change its vote to an affirmative vote.  We've heard TAE

20  say, "Well, that relief, we agree to."  But we haven't gotten

21  entry of an order approving that motion and allowing that vote.

22  So I think it's important that that be taken up.

23      And then we have put on evidence that goes to TAG's motion

24  as to who they are, what they are owed, and why they should be

25  able to vote, in spite of the fact that APS has filed

1    objections to them.

2        So, in order to close on the plan, I would prefer to show

3    that we have the votes of TAG and TAE, and we have motions

4    before this Court to address those.

5              THE COURT:  Well, then let's take those motions up.

6              MR. ROBERTS:  Okay.

7              THE COURT:  Mr. Salomon?

8              MR. SALOMON:  Thank you, Your Honor.

9        Your Honor, I think what's first on today is the motion to

10   expedite, the motion that was filed the day before yesterday, I

11   believe.  And then, if Your Honor grants that motion to

12   expedite, we'll hear the motion on the merits.

13             THE COURT:  Right.

14             MR. SALOMON:  It's obviously in connection with the

15   confirmation that we are making this motion, and for that

16   reason I think -- for that reason alone, I think it should be

17   expedited.  The -- APS has filed a response to our motion, so

18   they are prepared to address it on the merits, apparently.  And

19   I would like, if Your Honor please, I would like to proceed

20   with the main motion.

21             THE COURT:  Any objection to proceeding to the merits

22   of the motion for temporary allowance?

23             MR. GOOD:  No, Your Honor.

24             THE COURT:  Very well.  Then the motion to expedite

25   will be granted, and we'll proceed to the merits of the request

1   for a temporary allowance of the claim for voting purposes.

2         MR. SALOMON:    Thank you, Judge.

3      Judge, this motion is occasioned because, again, APS seems

4   to seek to disenfranchise creditors.    TAG is one of the largest

5   creditors in this case.    It is the shareholder.    It paid, as

6   Mr. Abercrombie testified, $10 million in hard cash in order to

7   purchase claims.    It's those claims that form the basis of

8   TAG's proof of claim that's been filed in the Court.

9      Your Honor previously has ruled that TAG's claim is not a

10  secured claim.    We have accepted that.    No appeal was taken of

11  Your Honor's order.    TAG has compromised its claim in order to

12  make -- after some back-and-forth with representatives of the

13  Creditors' Committee -- in order to confirm a Chapter 11 plan.

14  The Committee has supported this Chapter 11 plan.    So has TAG.

15  TAG cast a ballot, timely cast a ballot in favor of the plan.

16  TAG wants the Court to understand -- even though it

17  understands that it is an insider and that confirmation

18  standards require that Your Honor have an impaired accepting

19  class of a non-insider.    We do understand that.    But we want

20  the Court to understand, too, that TAG wants its claim to be

21  considered -- rather, its vote to be considered.    That it

22  wholeheartedly supports this plan, that it believes that it's

23  in the best interest of TAG and the creditors and the estate

24  for the plan to be confirmed.    And we are concerned -- I'm

25  sure Mr. Roberts can speak to this -- about the consequence of

1  a failure of this confirmation, of this confirmation

2  proceeding.

3         THE COURT:  But legally, it doesn't have any effect

4  whether you vote or not, does it?

5         MR. SALOMON:  I don't think, ultimately, yes, but I

6  think it's important for the Court to understand that, as one

7  of the largest creditors in the case that is separately

8  classified under the plan, that TAG does support the plan and

9  it wants the Court to know that.

10     Thank you.

11         THE COURT:  Mr. Leonard?

12         MR. LEONARD:  Just briefly, Your Honor.  I think you

13  pointed out, we filed our response.  The motion was a little

14  bit vague because they said they wanted their equity interest

15  provision allowed for voting purposes, and, of course, under

16  the plan, their equity is cancelled and they're deemed to

17  reject it, so they're not entitled to vote.

18         THE COURT:  Right.

19         MR. LEONARD:  Secondly, with respect to their Class 9

20  claim, as you pointed out and as Mr. Salomon also mentioned,

21  they are an insider, and under 1126(g) -- I'm sorry, under the

22  -- yes, under the 1126, the plan provides that Class 10 has

23  been deemed to reject the plan.  I'm sorry.  As to

24  1129(a)(10), an impaired class has to vote to accept the plan

25  without including consideration of votes of an acceptance by

1    an insider.

2          THE COURT:  Right.  But we have that here.  So they

3    have triggered their ability to cram the plan down if we

4    needed to go to cram-down, but, frankly, we don't need to go

5    to cram down.

6          MR. LEONARD:  And so the point of my response to

7    their motion was they're not entitled -- I mean, their vote is

8    of no consequence because --

9          THE COURT:  But then why do you care if they -- I

10   mean, they didn't object to confirmation --

11         MR. LEONARD:  Well, --

12         THE COURT:  -- and they've now verbally told me they

13   support confirmation.  Why do you care if they vote yes?

14         MR. LEONARD:  If that's the whole reason of the

15   motion, is that they want to let the Court know they support

16   the confirmation plan, then that's fine.  I don't have any

17   opposition about it.  I do oppose that the motion be granted.

18   But if all they're willing to do is say, "We support the

19   plan," that's fine.

20         THE COURT:  Okay.  But why do you care if the motion

21   is granted if it has no legal consequence?  I mean, this --

22         MR. LEONARD:  I don't.

23         THE COURT:  To me, this --

24         MR. LEONARD:  If it has no legal consequence, I

25   don't.  I don't.

1          THE COURT:  We both agree that Class 7 overwhelmingly

2    voted to accept the plan.  That's the impaired accepting

3    class.  No class junior is taking anything, so we don't have a

4    cram-down problem because equity is being cancelled.  So, to

5    me, this is a whoop-di-doo.  It shouldn't matter to either of

6    you whether this claim is temporarily allowed or not

7    temporarily allowed.

8          MR. LEONARD:  I --

9          THE COURT:  Argue with me.  I'm --

10          MR. LEONARD:  No, I don't want to argue.

11          THE COURT:  I'm puzzled.

12          MR. LEONARD:  Based on what his -- what he -- when

13    Mr. Salomon said to the Court the main reason they want to do

14    this is to say that they support the plan, that's fine.

15          THE COURT:  Okay.  So you're all right with their

16    claim being temporarily allowed, notwithstanding your

17    adversary proceeding, for purposes of voting on the plan?  Is

18    --

19          MR. LEONARD:  Well, you know, I'm going to just stand

20    on the pleading that we oppose it because, number one, --

21          THE COURT:  But you're going to have to tell me why,

22    then, because I don't get this.  Why are you opposing the

23    temporary allowance of a claim for voting purposes?

24          MR. LEONARD:  Well, --

25          THE COURT:  It has no effect on your lawsuit.  It

1  does nothing vis-à-vis the allowability of their claim in the

2  case.

3          MR. LEONARD:  Okay, Your Honor.  There are some

4  timeliness issues as well.  They allege in their motion that

5  they didn't realize that they wouldn't be allowed to vote

6  until after the ballot summary was filed.  They knew or should

7  have known at that point in time they could have filed this

8  earlier.

9       THE COURT:  So you're objecting because they didn't

10  timely move for temporary allowance?

11          MR. LEONARD:  That's one of the grounds of the

12  objection.  Yes, Your Honor.

13     The other one is that it is of no consequence under

14  1129(a)(D) -- (a)(10).

15     And then with respect to their interests that they want

16  allowed, that's contrary to 1126(g) and the terms of the plan,

17  that they're not entitled to have their interests allowed.

18          THE COURT:  All right.

19          MR. LEONARD:  Thank you, Your Honor.

20          THE COURT:  Mr. Roberts?

21          MR. ROBERTS:  Your Honor, we agree it may not matter,

22  but we like belts and suspenders.  And 1129(a)(7) says, with

23  respect to each impaired class of claims, it has either

24  accepted the plan or will receive or retain under the plan

25  what it would get in liquidation.  They have accepted less

1   than their pro rata share with unsecured creditors as part of

2   a compromise.  I don't want to run into that issue when

3   they're standing here telling you they support that compromise

4   and there is no reason not to allow the vote for that purpose.

5   THE COURT:  Well, except they didn't file their

6   request timely.  That's a reason, --

7   MR. ROBERTS:  You know, it --

8   THE COURT:  --isn't it?

9   MR. ROBERTS:  It could be a reason if anybody other

10  than APS, who's standing in this Court trying to thwart this

11  plan, is fighting it.  We don't have the Creditors' Committee.

12  THE COURT:  Well, --

13  MR. ROBERTS:  We don't have any other creditors.  We

14  have someone just trying to thwart a technical -- a plan on a

15  technical basis.

16  THE COURT:  Well, so the Rules don't matter depending

17  upon who is raising the objection?

18  MR. ROBERTS:  I would not say that.  I would say this

19  Court's discretion can take into account who is raising the

20  objection and why.

21  Thank you.

22  THE COURT:  Mr. Salomon, why did you not file this

23  motion timely?

24  MR. SALOMON:  Your Honor, initially when I saw the

25  complaint that was filed on August 4, I had issues about

1   whether or not there was even standing on the part of APS to

2   arrogate the powers of the Debtor or the Committee to object

3   to our claim, and that is the reason I did not do it sooner.

4   I did do it -- I did do it only very recently.  I apologize if

5   that has created inconvenience.  Apparently, it did not -- the

6   delay in filing the motion did not affect APS's ability to

7   respond to the motion and to argue the motion today.

8        THE COURT:  Well, I'm going to allow the TAG claim in

9   Class 9 temporarily for purposes of voting on the plan.  I

10  don't believe there is any prejudice to APS.  They've

11  certainly not been able to identify any prejudice.

12      I also agree that it is a technical objection, although

13  technical objections should not always be minimized.  But

14  under the circumstances of this case, I don't see any harm to

15  anyone by allowing or by granting the motion and authorizing

16  the temporary allowance of TAG's claim for purposes of voting

17  in its single creditor class, that being Class 9.

18      So if you'll upload that order, Mr. Salomon, I'll sign it.

19        MR. SALOMON:  Thank you, Your Honor.

20        MR. PARHAM:  Your Honor, with respect to the

21  Creditors' --

22        THE COURT:  Mr. Parham?

23        MR. PARHAM:  -- Committee motion, I think we may have

24  a similar issue.  We would ask, though, that the Court go

25  ahead and expedite the hearing on our motion, which they have

1 | indicated they are accepting --

2 |     THE COURT:  Blackberry.  Do you have a Blackberry in

3 | your pocket?

4 |     MR. PARHAM:  I'm sorry.  Oh, you know, I do.  It was

5 | turned off, but I guess it still picks up some.  I apologize.

6 |   We would ask that the Court expedite the hearing on our

7 | motion to have them deemed to have accepted the plan,

8 | particularly in view of their statements to the Court that

9 | they're at least accepting of the ultimate relief that we were

10 | asking for.

11 |     THE COURT:  Any objection to the Court proceeding to

12 | the merits?

13 |     MR. ROBERTS:  No, Your Honor.

14 |     THE COURT:  All right.  Then we'll go to the merits.

15 |     MR. PARHAM:  Your Honor, as you know, in light of the

16 | TAE no-vote, the Committee yesterday filed a motion under

17 | various alternative grounds seeking to have their vote deemed

18 | in acceptance and have them deemed an accepting creditor of

19 | the plan.

20 |   In light of their statement that they are agreeable to the

21 | relief sought, that they be an accepting creditor, and without

22 | going then to the merits of any of the particular arguments --

23 | I understand that the *Link* case might not be quite what we

24 | thought it was when we saw your name on the opinion, for

25 | example, today -- we would ask that the Court go ahead and

1  deem TAE an accepting Class 8 creditor.

2          THE COURT:  Opposition to that?

3          MR. WINIKKA:  Your Honor, Dan Winikka, for the

4  record.

5      Not opposition, but I simply stand -- or the Court knows,

6  we've stated previously, we would be agreeable to our vote

7  being changed from a reject to an accept based on the

8  settlement we've reached with TAG that was announced on the

9  record earlier today.

10         THE COURT:  Any opposition to the Court considering

11 the vote of TAE in Class 8 to be an acceptance?

12         A VOICE:  No, Your Honor.

13         THE COURT:  Very well.  Then the Court will allow the

14 changing of the ballot such that Class 8 is also reflected to

15 be an accepting class vis-à-vis the Debtor's plan.

16         MR. ROBERTS:  Then, Your Honor, going back to our

17 status on the confirmation of the plan, the Proponents rest.

18         THE COURT:  Very well.

19     Does the Objector have any further evidence it wishes to

20 introduce?

21         MR. GOOD:  No, Your Honor.

22         THE COURT:  So the Objector rests as well?

23         MR. LEONARD:  We do, Your Honor.

24         THE COURT:  Very well.  The Court will consider the

25 evidentiary record closed.  Closing arguments?

1                 CLOSING ARGUMENT ON BEHALF OF THE DEBTOR

2          MR. ROBERTS:  Your Honor, I am aware that you read

3    pleadings and documents perhaps more thoroughly than other

4    judges I'm in front of, and so I'm going to -- I don't want to

5    say I'm going to make an assumption, but I'm not going to

6    thoroughly go through this plan that is in evidence.  I'm

7    going to highlight what I think this plan is doing that's in

8    evidence and how it complies with 1129(a).

9          THE COURT:  All right.

10         MR. ROBERTS:  And in doing that, I'll go through some

11   of the other exhibits.

12         THE COURT:  Please.

13         MR. ROBERTS:  We have a plan that simply says that

14   Brantly, the Brantly Group, will pay $7 million -- with some

15   adjustments, but approximately $7 million -- within thirty

16   days for this plan to be effective.

17         THE COURT:  Well, although you're given the ability

18   to extend that time.

19         MR. ROBERTS:  And the Creditors' Committee and the

20   Debtor can't -- can extend it.  You've heard the testimony of

21   Mr. Abercrombie:  that $700,000 should cover approximate

22   losses.

23         THE COURT:  For thirty days.  Not for any longer.

24         MR. ROBERTS:  That's correct, which is something that

25   the Creditors' Committee and the Debtor have to take into

1   account, when they can take the $700,000 and move on or agree

2   to an extension.  You have not heard the details of the

3   Chinese government approval, but what has been admitted is

4   that there is a process in China by which they want to make

5   sure the money goes to the deal, and they need an order

6   confirming a plan to give it to the Chinese government, and

7   that is the process.  And you have heard testimony that is not

8   discretionary.  That is what they are required to do upon

9   having the evidence that the money is going to this deal.

10      So you have a process by which they've put $700,000 at

11  risk.  You have evidence that they have been trying to get

12  through that process, and you have evidence that they are

13  putting that $700,000 at risk to -- after doing due diligence,

14  after looking at this company, and after hearing how much

15  money it could possibly cost them to realize their dream.

16      There is a legal question whether feasibility goes to

17  whether they're going to put up the money or that feasibility

18  goes to whether the plan is feasible if it becomes effective.

19  Either way, we believe we've met that burden of proof.

20      As the second step of feasibility, the question, we

21  believe, is whether or not the creditors are going to get what

22  they've been promised and what they voted on, which is

23  distributions out of the Creditors' Trust.

24      I didn't point out to you in the confirmation order,

25  simply because I forgot, but the Creditors' Committee has

1  appointed the Creditors' Trust to operate, to take the funds

2  and adjust claims and distribute funds.  No one is relying on

3  the future of the Debtor to be paid the claim, their pre-

4  petitioned claim, except those that have chosen to do so.  I

5  think it is extremely strong evidence to this Court that all

6  of these people have voted for the plan, that the Committee

7  endorses the plan, we have three major creditors who've

8  stepped up to the plate and agreed to extend over a million

9  dollars in credit.  And why would any --

10         THE COURT:  How do I know that?

11         MR. ROBERTS:  Because Mr. Abercrombie testified that

12  he went to the holders of the open purchase orders and gave

13  them the choice whether to file a claim and not have to rely

14  on the future reorganized Debtor --

15         THE COURT:  Right.

16         MR. ROBERTS:  -- or to waive that claim and issue new

17  purchase orders.

18         THE COURT:  But I guess I don't recall him giving me

19  a quantification of that.

20         MR. ROBERTS:  He testified that he has reached

21  agreements with Saturn, Eck and Molly to --

22         THE COURT:  I do recall that.

23         MR. ROBERTS:  -- issue new purchase orders in a total

24  of $400,000, $220,000 and $450,000, respectively.

25         THE COURT:  Right.  I do recall that.  Thank you.

1          MR. ROBERTS:  So we have creditors voting and we have

2    others extending credit.

3       With the same level of information, APS is saying this

4    Court should not approve this plan because it's not feasible.

5    I think the actions of the creditors prove that what we have

6    here is a group of Chinese that want to take an

7    entrepreneurial risk on what they believe is the future of the

8    Chinese market.  And it is, by nature, speculative.  But at

9    the same time, they are buying a piece parts business which

10   Mr. Kent Abercrombie testified on its own can be profitable.

11   They have the flexibility to put money in to get the

12   engineering done, to do the modifications, to do the FAA, in a

13   timeline that fits with them building helicopters or selling

14   engines in China.  That has not changed, despite what APS says

15   that somehow the disclosure statement is different than what

16   Mr. Abercrombie said.  All Mr. Abercrombie said was under a

17   conservative scenario, it could take this long and cost you

18   this much money.  That's sound management.

19      I would also suggest to you that's a very wise thing for a

20   man to do when he's going to be a president of a company

21   that's owned by people that are saying, "We trust you to run

22   it.  How much could this cost us?"

23      So I think we have a great deal of evidence, at least that

24   it's more probable than not that they are motivated to fund,

25   that it makes sense to the people in this courtroom other than

1    APS that they will fund, they're willing to bet that they will

2    fund, and that it makes no sense for someone to then pay $7

3    million and then not fund losses in a company when they have

4    been informed from the very beginning that it's going to take

5    at least $4 million more.  That was before they completed

6    their due diligence.

7        So we also have now, as kind of a bootstrapping, putting

8    their money where their mouth is.  $700,000 to bet they're

9    going to pay $7 million.  And once they pay $7 million, what

10   sense does it make for them not to put the money in to run the

11   company?

12       Even if that were our burden of proof, all of APS's cases

13   on future projections, all -- every one of them, are cases

14   where creditors are relying on those projections to get paid.

15   Frankly, under the APS plan, if it were here, they'd be on the

16   flip side of the coin, because their plan is kind of a mirror

17   image.  If you're not relying on the future viability of the

18   Debtor to get paid, then the feasibility of the plan doesn't

19   rely on that.  It certainly makes sense if you're offering a

20   payout and someone comes up with pro formas that says, "I'm

21   going to make $10 million," that you have to go through those

22   pro formas thoroughly to make a finding on feasibility.  That

23   is not the case here, and we have filed a brief to support

24   that.  But that's the long and short of it.

25       So, 1129(a)(1), I think that -- and also there is

1  certainly no evidence of any -- that this plan has been

2  proposed in bad faith or forbidden by law.  APS and another

3  lawyer who will handle this argues that they may need to go

4  get permission from some U.S. government agency.  We do not

5  believe that's the case.  We're talking about aircraft engines

6  for Cessnas, essentially.

7      I believe that with respect to each impaired class of

8  claims or interest, each holder of a class or claim of

9  interest has accepted the plan or will receive what they'd

10  retain under a Chapter 7.  In the exhibits, when we did not

11  spend time on it, you have an Exhibit K which is the analysis

12  of Lane Faulkner, the accountants for the Creditors'

13  Committee, which show a liquidation analysis of less than ten

14  cents on the dollar distribution to unsecured creditors.  You

15  have an analysis of the Brantly plan of from 58 to 100

16  percent, depending on various contingencies.

17          THE COURT:  Where is the Brantly plan analysis?

18          MR. ROBERTS:  It's on the second page, Your Honor.

19          THE COURT:  And what dictates whether it's the 37.66

20  to 100 percent?

21          MR. ROBERTS:  Your Honor, we have in our plan, and

22  also put in the disclosure statement, you had insurance

23  contingencies, insurance claims, you had a question of whether

24  we would be able to work a deal with the landlord.  And under

25  the plan, by the way, the landlord's lease is rejected, and we

1   don't have any evidence that that will change.  But so for the

2   purpose of this, there's a $400,000-and-some-odd claim that

3   could create some dilution.  And the purchase orders, which is

4   a very difficult number to specify.  For example, Zonzi is one

5   of the large ones that has a claim of about $1.1 million.

6   Well, that might be their outstanding purchase orders, not

7   their real claim for damages for refusal to accept delivery.

8   And so all those things figure into a variation on payment

9   under any plan.

10          THE COURT:  So, am I reading this correctly that the

11  range of payment to unsecureds under the plan is from 37.66

12  percent to 100 percent?

13          MR. ROBERTS:  No, I believe it's 58 percent, Your

14  Honor.

15          THE COURT:  Then --

16          MR. ROBERTS:  The bottom line.

17          THE COURT:  -- what are the percentages above that?

18  What's the 37.66 to 47.06?

19          MR. ROBERTS:  That's the TAG claim.  TAG is getting a

20  distribution --

21          THE COURT:  Of between 37 and --

22          MR. ROBERTS:  Of between 37 and 47.

23          THE COURT:  -- 47?

24          MR. ROBERTS:  Yes.

25          THE COURT:  So the unsecureds, even with the

1   rejection claims factored in, you're telling me, under the

2   plan will get a distribution of anywhere from 58 to 100

3   percent?

4           MR. ROBERTS:  Yes.

5           THE COURT:  Okay.

6           MR. ROBERTS:  One factor I didn't say, either:  There

7   could be claims subject to objection because of creditors.

8           THE COURT:  Of course.

9           MR. ROBERTS:  So, that could be figured.

10      So there's no question that the creditors -- well, first

11  of all, each -- I think we only had one no vote on this plan

12  in the entire plan, and that was AirSure Limited, the

13  insurance broker.  And we're showing that the unsecured

14  creditors --

15          THE COURT:  APS didn't vote no?

16          MR. ROBERTS:  APS's vote did not count because we had

17  filed an objection to their claim.  Maloney Bean -- no, excuse

18  me.  That's not right.  We did not file an objection to APS.

19  I do stand --

20          THE COURT:  So APS voted no?

21          MR. ROBERTS:  APS voted no, but APS will get paid

22  more than it would in a liquidation as an unsecured creditor.

23  I do stand corrected.

24      I'm sorry.  I skipped over (a)(5).  Your Honor, the plan

25  discloses that Kent Abercrombie will be the director and

1    officer, and the Brantly Group would be the 100 percent

2    shareholder.  There's been no evidence that that is not in the

3    best interests of creditors.  As a matter of fact, it's the

4    same management group as proposed under the APS alternative

5    plan.

6        The tax claims have not been an issue, but the tax claims

7    under the treatment of tax claims track the language of the

8    statute.  We have had no objections filed by tax creditors to

9    the plan.

10       Under (a)(10), as you can see from our ballot summary, we

11   have a class of claims that is impaired under the plan that

12   has accepted the plan without accepting -- including

13   acceptance of an insider.

14       And I will go back to this one moment.  (a)(11) says:

15   "Confirmation of the plan is not likely to be followed by the

16   liquidation or the need for further financial reorganization

17   of the Debtor or any successor to the Debtor under the plan

18   unless such liquidation or reorganization is proposed in the

19   plan."  And our point is, what is the purpose of that?  What

20   is the scope and purpose of that section?  And it is -- as one

21   person put it, if this were an asset sale and the creditors

22   get the money, it doesn't matter what the buyer does, because

23   the focus of 'no need for further reorganization or

24   liquidation' is so you don't come back and try and restructure

25   the same debts that you restructured in the first case.

1  That's what we believe is an appropriate reading.  Even --

2  even if it were broader, I think we've put on sufficient

3  evidence that it makes no sense and no one has put on any

4  evidence that Brantly would make this level of investment with

5  the knowledge that it has and not provide the necessary

6  capital.

7      You also heard Brantly's attorney make the representation

8  that they're concerned about being too specific because of

9  APS's conduct, and so we have put on, I believe, sufficient

10  evidence with that in mind, asking the Court to take judicial

11  notice of the pleadings filed in this case, filed by APS, and

12  who they are and what their apparent motivation is.

13      The terms of the plan comply with (a)(12).  (a)(13)

14  doesn't apply.  (14) does not apply.  (15) does not apply.

15  (16) does not apply.  And I don't think we have to go to

16  (b)(1) because we have all accepting classes.

17      So, Your Honor, I believe we have met our burden.  I think

18  that it was extraordinary, quite frankly, with APS filing a

19  competing plan, a disclosure statement that has not been

20  approved that says, "We're going to pay you 100 cents on the

21  dollar," that these creditors held firm and said, "Look.  We

22  want this plan."

23      And you could put it this simply.  This plan provides for

24  $7 million to creditors and no litigation, and an alternative

25  that hasn't been approved but they've been told about provides

1  $2-1/2 million and ongoing litigation with TAG and TAE.  We

2  believe this plan is in the best interests of the estate and

3  we have met all the requirements of 1129(a).

4         THE COURT:  Other supporters wish to speak?

5      CLOSING ARGUMENT ON BEHALF OF THE CREDITORS' COMMITTEE

6         MR. PARHAM:  Your Honor, I would just reiterate what

7  I said at the outset, and that is that the Committee is

8  comfortable with this, with Brantly and -- or, the purchaser.

9  We think it's a real company, that it has a real strategic

10 reason to do this.  The Committee is very much in support of

11 it, as are the creditors.  It would be nice if there was a CD

12 sitting here with $7 million and we could look at it and say,

13 "Well, there is no issue."  But I don't think that's required.

14    You know, the -- there could have been more evidence on

15 the issue, certainly.

16        THE COURT:  It's pretty thin, you've got to admit.

17 Nobody has seen a financial statement.  Nobody has seen a bank

18 account statement.  We really know nothing about this

19 purchaser other than he has bought the operation in Vernon,

20 Texas, on some terms that we have no idea of what they were.

21        MR. PARHAM:  Well, we do know that they have a

22 helicopter manufacturing facility in China.

23        THE COURT:  Well, an empty facility in China.

24        MR. PARHAM:  Agreed.  It could be a -- there could be

25 more evidence on it.  All I can say is that we have a

1 significant amount of industry experience sitting on this

2 Committee, and really from the very get-go, they thought this

3 was a great idea about Brantly and, frankly, that this would

4 work and that these guys were going to do the deal.  And that

5 was our first -- our first conversation was, well, you know,

6 who are these guys and what do they do?

7        THE COURT:  But, frankly, that's just a feeling,

8 because nobody, apparently, has seen any financial information

9 with respect to the purchaser other than the fact that

10 $700,000 is now sitting in the DIP account.  Which is not

11 insignificant.  Don't get me wrong.

12        MR. PARHAM:  Right.

13        THE COURT:  But everybody's going on gut instincts,

14 apparently.

15        MR. PARHAM:  I think there is a significant amount of

16 that.  And, you know, all that you can do to, I guess, augment

17 gut instincts are look at factors that you do know, like the

18 fact that there is a company, that they are funding on some

19 basis, that there is a significant deposit, that they have

20 made numerous trips over here.  And it just -- it appears

21 they're real and it appears this is a real deal.  And would it

22 be nice if there was more evidence?  A financial statement?  A

23 CD?  Absolutely.  No question.  But --

24        THE COURT:  And why does it make any sense to permit

25 the delay -- I'm troubled by the provision in the plan that

1  permits the delay of closing beyond the amount of the deposit

2  that would fund those losses.  Why does that make any sense?

3          MR. PARHAM:  I think it only makes sense, quite

4  frankly, if at the conclusion of that period we thought we

5  were within a day or so of closing.  I mean, you -- and maybe

6  the better way to have handled it would have been to say that

7  we could come back to the Court and ask for an extension on an

8  emergency basis if we got to the end of the 30-day period.

9  That might have been a better way.

10     Certainly, from the Committee's perspective, you know, our

11  view is that it should close within thirty days.  We're

12  hopeful it will close much sooner and, in fact, we've built in

13  that the purchase price adjustment is done August 31,

14  regardless.  So, as they note, --

15          THE COURT:  Because the Debtor doesn't have any money

16  to -- at least as I think I understand, the Debtor is out of

17  cash.  The Debtor will be operating at a loss if we get past

18  the thirty days where the $700,000 is expected to cover the

19  losses.

20          MR. PARHAM:  That is correct.  That is correct.  And

21  mainly that's because there's a $400,000 insurance payment due

22  next month.  And it's not bleeding -- except for that

23  insurance payment, it's not bleeding that fast.  But next

24  month is going to be not a good month.  Now, they currently

25  have, I think, $2 or $3 million in the bank, maybe more than

1  that.  So it's not as though they're going to be completely

2  out of business.  But, yes, the $700,000 would cover just

3  those losses.  Now, --

4       THE COURT:  But, of course, we'd be administratively

5  insolvent at that point, presumably.

6       MR. PARHAM:  We would have a problem at that point.

7  And so, and to go back to the statement I made, the --

8  assuming that they close, the economic risk of those days is

9  on the purchaser and not the creditors, which --

10      THE COURT:  Agreed.

11      MR. PARHAM:  -- which was a good thing.

12    In our view, in the 30-day and the ability to extend was

13  simply that you don't want to be one or two days out and be

14  locked, so we thought that we would go that way.  It may be,

15  in hindsight, have been better, and maybe they would agree,

16  that it would be that it would be thirty days but we could

17  come back to the Court and ask for more time on some sort of a

18  showing of cause.

19    And with that, I think that the Committee would ask that

20  the plan be confirmed.

21      MR. OKIN:  Your Honor, if it would make the Court

22  feel more comfortable about the thirty days, we would

23  certainly agree to modify the terms of the plan and the

24  confirmation order to provide that any extension beyond the

25  thirty days would be on an expedited basis in front of the

1   Court.  Our hope -- I know it's just our statements -- but our

2   hope is that we'll close this transaction much sooner than

3   thirty days.  As Mr. Parham pointed out, the working capital

4   adjustments start on Monday and we need -- we would rather

5   have control rather than not.

6          THE COURT:  Let me ask the proponents to clarify one

7   thing.  I don't understand your definition of a final order,

8   so help me understand your definition of a final order.  Is it

9   anticipated that the plan can go effective if an appeal is

10  filed?  Or not?  Because I can read your definition either of

11  two ways, and that's not a good thing.

12     (Counsel confer.)

13          MR. ROBERTS:  Give us one minute.

14          THE COURT:  The definition appears on Page 7 of the

15  plan.

16          MR. ROBERTS:  Perhaps we should change the language

17  with the intent as, first of all, the thirty days for funding

18  is from the entry of an order.

19          THE COURT:  Correct.  I understood that.

20          MR. ROBERTS:  Right, and that the final order is one

21  that is not stayed when the appeal period has run.

22          THE COURT:  All right.  So --

23          MR. ROBERTS:  Which, so if it's not stayed --

24          THE COURT:  So if it's not stayed --

25          MR. ROBERTS:  -- and they file notice of appeal, that

1  thirty days runs --

2           THE COURT:  It's still final?

3           MR. ROBERTS:  -- and the final order would be --

4  well, yes.  If it's not stayed, --

5           THE COURT:  So, let me ask it this way.

6           MR. ROBERTS:  -- it becomes a final order.

7           THE COURT:   Under this plan, is the purchaser

8  closing so long as there is no stay of the order of

9  confirmation?

10          MR. ROBERTS:  I think I'll let the purchaser answer

11  that.

12          MR. OKIN:  As long as there's no stay and as long as

13  the ten days for -- either if there has been an appeal filed

14  and there is no stay or --

15          THE COURT:  The ten --

16          MR. OKIN:  -- ten days has run and no appeal has been

17  filed.

18          THE COURT:  All right.

19          MR. OKIN:  But Your Honor, just to clarify, because

20  there is one other problem in that language in the section in

21  the plan on Conditions --

22          THE COURT:  11.2?

23          MR. OKIN:  -- Conditions Precedent 11.2(a).

24          THE COURT:  Yes?

25          MR. OKIN:  I'm not sure if that's just -- it can be

1  read multiple ways or if it's misworded.  The intent there is

2  that a confirmation order needs to be entered by August 31st.

3  It doesn't have to have been -- become final by the 31st, but

4  it is a -- we just discussed the condition precedent for it.

5        THE COURT:  That was part of why the confusion

6  existed.

7        MR. OKIN:  Right.

8        MR. ROBERTS:  Your Honor, I -- it may not be clear,

9  but I read (a) to say it must be entered by the 31st and a

10  condition also is it must be a final order.  In other words,

11  an unstayed order, not by the 31st.  These are conditions

12  precedent to an effective date, and for there to be an

13  effective date --

14        THE COURT:  Yes.

15        MR. ROBERTS:  -- it has to have been entered and it

16  must be a final order.  No time running from the final order,

17  but it must be a final order or there wouldn't be an effective

18  date.

19        THE COURT:  Right.

20        MR. ROBERTS:  So if it's stayed, there won't be an

21  effective date.

22        THE COURT:  Right.  All right.  Does anyone else wish

23  to be heard in connection with confirmation of the plan that

24  is supporting confirmation?

25        A VOICE:  I'm sorry.  You asked for comments in

1   support?

2            THE COURT:  Yes.

3            MR. OKIN:  Your Honor, if I might just add a few

4   words.  I don't want to belabor this.

5        CLOSING ARGUMENT ON BEHALF OF PROPOSED PURCHASER

6        Your Honor, it's true we know nothing about -- we've

7   presented no evidence specific to the purchaser's financial

8   wherewithal.  Some of that, I believe, is the distance.  Some

9   of it is the language.  Some of it is cultural, in the first

10  place.  And I knew about that when we got involved in this

11  transaction.  I think, and I hope, and it was intended that

12  the deposit that was put down in this case was -- compensates

13  for that.  That was the intent.  Everybody I've told about how

14  much we put down was shocked that we put a $700,000 deposit

15  down.  And the intent there was to show people who were

16  undoubtedly skeptical at the beginning that we were serious.

17       Beyond simply putting down a large deposit, though, I

18  believe there is more than just a gut feel by members of the

19  Creditors' Committee and by the Debtor.  Mr. Abercrombie has

20  met with the principals both here and in China.  The

21  Creditors' Committee has had conversations with Mr. Tong and

22  has had -- there have been conversations directly to China.

23       There may still not be specifics before the Court, but I

24  do think the Court shouldn't discount the strength of the

25  support by the creditors and by the Committee and by the

1   Debtor, by Mr. Abercrombie, who's worked very closely with

2   APS's principals for this plan in the belief that they will

3   fund this, because that's not insignificant.

4       And there was a question earlier today from -- that Mr.

5   Good asked Mr. Tong about guarantees of funding.  And I've

6   been doing this long enough that I've seen bank letters of

7   commitment that aren't really worth anything more than what

8   we've got here.  At the end of the day, we're talking thirty

9   days with a $700,000 guarantee of closing, and I believe, Your

10  Honor, that that should be sufficient for the creditors'

11  wishes to be carried out here.

12      Thank you.

13          THE COURT:  Thank you.  All right.  Objector?

14      CLOSING ARGUMENT ON BEHALF OF AVIATION PARTS SUPPLY

15          MR. GOOD:  Your Honor, I'll be very brief.  I think

16  the evidence that I highlighted at the outset did not

17  materialize.  I think the Court has properly characterized it

18  as thin.  From the objective of evidence that's before this

19  Court in terms of Brantly's ability to fund, ability --

20  commitment to fund, timing, to my judgment, there's no

21  evidence.

22          THE COURT:  But what's the harm to running a 30-day

23  risk?

24          MR. GOOD:  That's a good question.  In my notes here,

25  I said the position that the Court's in right now is there's

1   $700,000 up.  There may be a back-up bid.  But there's

2   $700,000 up, and there's a 30-day window that maybe this will

3   all go well and everybody will fund and that sort of thing.

4   And I've got to come back to the law, and that's this:  The

5   burden of proof for today, August 26, is on the proponents to

6   bring you the evidence, bring the Court the evidence.  And the

7   evidence that they brought to you, in addition to the touchy-

8   feely stuff, which in my judgment does not rise to the level

9   of objective evidence that the Court should be considering,

10  the objective evidence is they've put up $700,000, which is,

11  using my numbers, it's some six percent of the total cost to

12  fund the plan, to fund it and then run the company for a year.

13          THE COURT:  Well, but, no offense, why should I care

14  about whether Reorganized -- you want me to be focused on the

15  plan as if the creditors are relying upon the operations of

16  the Reorganized Superior for their payment.  And at least --

17  virtually no creditor is relying upon the operation of the

18  Reorganized Debtor for their payment.  They're solely relying

19  upon the funds that are going to come in if Brantly is real

20  and if Brantly closes the transaction.

21      And those creditors who are agreeable to looking to the

22  Reorganized Debtor had the choice not to, and they chose to.

23      So, I hear you, and I'm certainly familiar with the cases

24  that you've cited me to, but it does seem that the factual

25  circumstances of those cases and those plans are different in

1  that in those cases the creditors were relying upon the

2  operation of the reorganized debtor for their payment, which

3  is really not the case here.

4          MR. GOOD:  I don't disagree with you, Your Honor.   In

5  the academic world, I mean, that's still a question and

6  there's still evidence and there's still a comfort factor.

7  But in the real world in this case, having heard the purchase

8  order contractors agreeing to what they're agreeing to, you

9  know, God bless them.  I hope that it all works out.

10     But the evidence not on the feasibility in terms of

11  projections, but the evidence before the Court today in terms

12  of Brantly's ability to fund, commitment to fund:  there isn't

13  any.  The only evidence, I submit to Your Honor, that they

14  have the ability and they're committed to the ability is the

15  $700,000 that's up.

16          THE COURT:  Well, and the fact that they've made

17  trips here.  I mean, I don't think it's quite as bad as you're

18  telling me it is, but I'll agree with you that it's very thin.

19          MR. GOOD:  Yes.  And not to be caustic:  yes, they've

20  made trips here.  I heard that pronouncement by several

21  people.  Why aren't they here?  Why aren't they here?  I mean,

22  they're putting the burden on this Court to enter a

23  confirmation order so that something is going to happen in

24  China.  To my way of thinking, that's the other way around.

25     So, Your Honor, that's all I'm going to say.  You know our

1    position, and our position is there is either no admissible

2    evidence to support the funding or insufficient admissible

3    evidence to support the funding for confirmation of the plan.

4        Thank you, Your Honor.

5            THE COURT:  Thank you very much.  Mr. Roberts?

6            MR. ROBERTS:  Your Honor, I just wanted to clear up

7    what I believe is a misconception on the administrative

8    insolvency.

9            THE COURT:  All right.

10           MR. ROBERTS:  In the plan and in the pro formas that

11   we've presented, there is an assumption that there's $2

12   million in cash as of August 31 and that there's $9.14 million

13   in gross receivables and inventory.  Those are the numbers.

14   Those are the numbers that could slip, according to Mr.

15   Abercrombie by approximately $700,000 in a month?  Nowhere

16   close to administrative insolvency.  Those numbers, his

17   testimony is that you take the $9.14 [million] and the $2

18   million in cash.

19       You've heard before about --

20           THE COURT:  But I thought we were about to run out of

21   cash?

22           MR. ROBERTS:  We have -- we have over $2 million.

23   The $2 million, to be clearer, is you're netting out estimated

24   administrative expenses to get to the $2 million.  There's $2

25   million left to pump into the company.

1          THE COURT:  After administrative expenses have been

2    --

3          MR. ROBERTS:  Right.  We have sufficient cash right

4    now, estimated, to pay accrued administrative expenses and

5    have approximately $2 million.  That's what's in the pro

6    forma.  So we're not.  It's -- the problem is we want to make

7    sure there's $2 million so the $7 million goes to the

8    creditors instead of being eaten up by administrative expenses

9    in this incredible continuing saga of a legal battle.  That is

10   our problem.

11      And that we have other motions.  We have APS.  We have

12   other issues.  And by not confirming this plan, I think you're

13   risking administrative insolvency, greater administration

14   insolvency, because you have what was so carefully and most

15   difficultly put together -- which is settlements with TAE,

16   TAG, the Unsecured Creditors -- that could all fall apart.

17      You saw how fragile it is.  When we have a Rule 11

18   agreement in the record that says TAE will vote for the plan

19   if it gets $500,000, they turn around and say, "No, we won't,"

20   and here we are in confirmation saying, "Oh, okay, we will, if

21   we get some more money from TAG."  That's just how difficult

22   this case has been.  I've been doing this 27 years and I

23   haven't had quite this experience of something new and

24   different coming up unexpected and costing these creditors

25   money.

1    Finally, to the extent that the Debtor, I mean, the Buyer

2  said he'd be willing -- to modification, I'll state for the

3  proponents, would be willing to put a modification in the

4  order that the 30-day deadline must be met or the Court can

5  extend it for cause upon motion filed before that thirty days

6  goes up.  You have heard the reasons for from the Committee,

7  is we're talking about technical.  Even the United States

8  government is going to do things slower than they're supposed

9  to.  That's the concern of locking it down to exactly thirty

10  days.  And I think that can address it.

11    And the Court can certainly determine, if we're back in

12  thirty days, if we came up for some other reason for cause,

13  I'm sure you'd have quite a good recollection of this day.

14        THE COURT:  Well, tell me what you're proposing to

15  change in the plan with respect to the thirty days.

16        MR. ROBERTS:  I believe it would be in the Conditions

17  Precedent.

18        THE COURT:  I'm guessing it would have to be in 11.3,

19  where --

20        MR. ROBERTS:  I'm sorry.  Are we talking about the

21  plan?  Oh, I'm looking at the disclosure statement.

22        THE COURT:  Page 27.

23        A VOICE:  11.3.

24        MR. ROBERTS:  I'm sorry.  I was looking at --

25      (Counsel confer.)

1          MR. ROBERTS:  That's what I was reading.  I was

2  reading it on the wrong page.

3      (Counsel confer.)

4          MR. ROBERTS:  Your Honor, I think the easiest

5  language, I'd say, notwithstanding the language in 11.3 and

6  11.5, the --

7          THE COURT:  Well, why don't we just take out 11 -- I

8  mean, it seems like the simplest is, if you're proposing that

9  the thirty days can only be extended by court order --

10          MR. ROBERTS:  For cause.

11          THE COURT:  -- on motion, --

12          MR. ROBERTS:  Yes.

13          THE COURT:  -- then you've got to delete 11.2(c) from

14  11.3, don't you?

15          MR. ROBERTS:  I'm sorry.  11.2(c)?

16          THE COURT:  Right, which is the funding.  Don't you

17  just --

18          MR. ROBERTS:  No, we want to keep that in there.

19          THE COURT:  No.

20      (Counsel confer.)

21          MR. ROBERTS:  Oh, take it out of 11.3?

22          THE COURT:  Correct.

23          MR. ROBERTS:  I'm sorry.

24          THE COURT:  And then you can say that Condition

25  11.2(c) may only be modified -- I mean, I don't want to write

1    your plan for you, but basically --

2           MR. ROBERTS:  I'm following you.  Condition 11.3 may

3    only be modified --

4           THE COURT:  11.2(c) can only be modified on motion

5    and after notice and hearing.

6           A VOICE:  Your Honor, can we at least provide,

7    though, for -- the notice -- obviously, there needs to be

8    notice, but just the general reference of notice there makes

9    me a little nervous in that we're likely to be facing an

10   emergency situation --

11          THE COURT:  Well, I would expect that you'd file a

12   motion for expedited hearing.  Certainly.

13          MR. ROBERTS:  And we would propose to add a paragraph

14   to the order confirming plan making that edit to 11.3.  So,

15   as I'm reading it, you would strike out after 11.2(a) the

16   words, "and Condition 11.2(c)."  Add a sentence in the end and

17   say, "Condition 11.2(c) may be only modified upon motion after

18   notice and hearing."

19       I think 11.5 needs to be changed slightly.

20          THE COURT:  Let's get there in one second.

21          MR. ROBERTS:  Okay.

22          THE COURT:  So, you're going to strike, so it will

23   say, "Brantly may waive any of the conditions set forth in

24   11.2 of this plan except for Condition 11.2(a), which may be

25   waived only with the concurrence of the Debtor and Committee,

1  at any time without notice, without" da, da, da, da, da.  And

2  then a sentence:  "Condition 11.2(c) may be modified only on

3  motion" --

4       MR. ROBERTS:  Modified only on -- actually, modified

5  by order of the Court.

6       THE COURT:  That works.

7       MR. ROBERTS:  Upon motion after notice and hearing.

8       THE COURT:  All right.  And what are you proposing to

9  do about --

10       MR. ROBERTS:  On 11.5, I would -- it should say, "If

11  Brantly does not satisfy Condition 11.(c)" and then 'and,' and

12  then I'd cross out "the Debtor and the Committee do not agree

13  to extend the date" -- "do not agree."  So I'd say, "If

14  Brantly does not satisfy Condition 11.2(a) and the Court does

15  not extend the date of funding, the effective date shall not

16  occur and Brantly will forfeit its deposit."

17       THE COURT:  You have Funding as a capitalized letter,

18  and that doesn't appear to be a defined term in the plan.  So

19  is that -- isn't it the date of closing?  Oh, I guess you used

20  Funding in 11.2(c).

21       MR. ROBERTS:  That's where I was going to go look.

22       THE COURT:  But it's not really defined there.  But

23  do you want to just use funding, lower case, "As set forth in

24  11.2(c)"?

25       MR. ROBERTS:  That would -- yes.

1        THE COURT:  All right.  And what, if anything, are

2  you proposing to do about the Final Order definition?

3        MR. ROBERTS:  Well, I was just going to use the final

4  order to state that modification.  I mean, it's my practice

5  where we've already got the plan filed to make any

6  modifications of the plan by adding a paragraph in the order.

7        THE COURT:  Well, I understand, but what's the

8  language change you're proposing with respect to the

9  definition of Final Order?

10        MR. ROBERTS:  Okay.  Oh, the definition.  I'm sorry.

11     (Pause.)

12        THE COURT:  If any.

13        MR. ROBERTS:  Yes.  I don't know whether we just

14  announced a clarification, but it's -- if it's not clear, we

15  can change it, so --

16     (Pause.)

17        MR. ROBERTS:  I can't speak for Brantly, but my

18  proposal would be to put a period after the word 'expired.'  I

19  think the remainder must come from some other context because

20  I don't think it adds anything but confusion.

21        MR. OKIN:  Well, Your Honor, I'd be willing, if

22  everybody else deems it necessary, to take out the "become

23  conclusive on all matters adjudicated thereby."  I'm not --

24        THE COURT:  All right.

25        MR. OKIN:  But I think that it's still in full force

1   and effect is a necessary part of that --

2            THE COURT:  Understood.  Understood.

3            MR. ROBERTS:  I have no problem with that, Your

4   Honor.  So we'll just strike out the phrase, "after expired,"

5   and before the comma.  "And is in full force and effect" will

6   stay in.

7            THE COURT:  All right.  Does anyone want to be heard

8   with respect to the proponents' proposed modifications of the

9   definition of Final Order, 11.3, the Waiver of Conditions

10  provision, or 11.5?

11           A VOICE:  We do not, Your Honor.  We followed the

12  changes.

13           THE COURT:  Very well.

14           MR. ROBERTS:  Your Honor, I have one final comment.

15           THE COURT:  Please.

16           MR. ROBERTS:  I don't think this is a hunch.  I think

17  we're dealing with sophisticated creditors, a sophisticated

18  Creditors' Committee.  If you look at who's on that committee,

19  we're dealing with people that are exercising their business

20  judgment.  We have the president of Superior, who's being

21  offered a job by both of these people, standing up here and

22  testifying that he is in support of this and he believes it's

23  more likely than not that they will fund.  I don't think it's

24  a hunch.

25      I think it's thin.  You know, the Debtor can only get what

1    it wants.  And I am a skeptical person.  Too often you see

2    things fall apart.  But I think what everybody has seen here

3    is, given the totality of the circumstances -- some of which

4    in this courtroom, and some of which just meeting and talking

5    to people and developing what level of trust you have.

6    Looking at their idea and thinking, "Well, that's not

7    harebrained.  That makes sense."  The fact that they came in,

8    they've moved quickly, they did their due diligence, they

9    finished, they put up their money:  those aren't hunches.  I

10   think those are things that fit into the business judgment of

11   creditors.

12        Thank you.

13            MR. WINIKKA:  Your Honor, if I might be heard for one

14   minute.

15            THE COURT:  Of course.

16            MR. WINIKKA:  Dan Winikka for the record, Your Honor.

17     We would just ask for one clarification out of an

18   abundance of caution to make sure there's no misunderstanding

19   here.  To the extent the plan is confirmed, Your Honor, it

20   provides for releases of TAE's -- any claims against TAE.  And

21   subsequent to the filing of the plan, issues arose with

22   respect to this Rule 11 agreement.  There was also an

23   objection to our claim filed alleging that there may have been

24   preferential transfers.

25        So, I mean, I would simply ask just for clarification of

1  the record that the Debtors and the Creditors' Committee

2  confirm that the releases of claims against TAE in the plan

3  would cover all of those potential claims or causes of action.

4  Which I think the language plainly does, but we would like --

5        MR. PARHAM:  Certainly, our view is that the releases

6  provided for in the plan would release any claims the estate

7  would have in this.

8        THE COURT:  Very well.

9     All right.  Well, this case has posed interesting issues

10 from time to time, and today is no exception to that.  I'm

11 going to eliminate the suspense.  I will confirm the plan.  Now

12 let me go back and explain why.

13    It is of significance to the Court that every impaired

14 class has voted to accept the plan, by overwhelming proportion,

15 with the exception of the current equity holders whose

16 interests are being canceled, so under the Bankruptcy Code, of

17 course, they're deemed to have rejected the plan.  But the

18 Court is satisfied that the cancellation of the equity

19 interests in this case is appropriate under the circumstances

20 of the case and satisfies the requirements for confirmation in

21 accordance with the Bankruptcy Code.

22    The only party who is objecting to confirmation of this

23 plan is APS, who at least I believe -- and Mr. Good, you or Mr.

24 Leonard can clarify this for me -- purchased a claim

25 postpetition against the Debtor such that it became a creditor

1  of these estates postpetition.  Is that --

2         MR. GOOD:  That's correct, yes.

3         THE COURT:  And that's perfectly fine.  It's all right

4  to purchase claims to become a creditor in cases.  But the

5  further twist here is that not only did APS become a creditor

6  voluntarily after the Debtor filed bankruptcy, it also has been

7  very interested in acquiring the Debtor.  Again, that's also

8  good, and competition for acquisition of debtors in bankruptcy

9  is exactly what the Court encourages, likes, and is good for

10  creditors.  But that certainly does cause the Court to reflect

11  upon what interest is motivating APS in opposing confirmation

12  of a plan that, if it closes, would make a distribution to them

13  and every other unsecured creditor ranging from 58 percent, as

14  estimated in Exhibit K, to 100 percent of their claim.  The

15  record is undisputed that in liquidation unsecured creditors

16  would receive less than a ten percent distribution.

17     And so one could conclude that APS's interest in opposing

18  confirmation of this plan is not really as a result of their

19  economic interest as a creditor but rather is within their

20  interests as a potential acquirer of the Debtor.  That is

21  furthered by a motion that I have not yet heard, but is set for

22  hearing today, although it looks like we won't reach it today,

23  which is to compel the Debtor to designate APS as the back-up

24  bidder in connection with the plan in the event that the

25  Brantly Group fails to close pursuant to the terms of the plan.

1    So, again, it's apparent to the Court that APS's most

2 significant interest here is likely as a result of their desire

3 to be the successful purchaser of the reorganized Superior Air

4 Parts and less motivated by their interests as an unsecured

5 creditor in these estates.

6    With that said, the Court has not disregarded their

7 objection and the basis of that objection.  They are

8 undisputedly a creditor holding an unsecured claim against the

9 estate.  They have every right to participate in these

10 proceedings, and have done so effectively, represented ably by

11 its counsel.  And the issues that they raise are not

12 insignificant issues.  The big issue that APS has presented to

13 the Court in opposition to confirmation of the plan today is

14 the issue of feasibility of the plan and whether the plan has

15 been proposed in good faith.

16    We focused more in the argument today on the feasibility

17 issue and less on good faith, but the Court is first satisfied

18 that this plan has been proposed in good faith.  The plan is

19 jointly proposed by the Debtor and the Official Committee of

20 Unsecured Creditors.  Clearly, both parties are acting in the

21 economic interest of the creditors in attempting to succeed in

22 emerging from Chapter 11 by the Reorganized Debtor.  So there

23 is nothing that has been introduced into evidence that would

24 suggest anything but the Debtor's good faith in proposing this

25 plan, as it was joined in by the Official Committee of

1  Unsecured Creditors.  So the Court will overrule the objection

2  that the plan was not proposed in good faith.

3      With respect to feasibility, there are really two

4  feasibility issues.  The first is feasibility of the

5  Reorganized Debtor as an ongoing business entity.  As the

6  Debtor's current president and anticipated president post-

7  confirmation has testified, the purchaser of the Reorganized

8  Debtor will be required to infuse additional capital into this

9  debtor to the extent the Debtor is going to be successful in

10  its ongoing post-reorganization business operations.

11      There is very thin evidence with respect to the financial

12  wherewithal of the Brantly Group to do this.  We have no

13  financial statement of the acquirer.  We have no bank statement

14  of the acquirer.  What we do have is a $700,000 deposit towards

15  the purchase, which really doesn't go to the issue of funding

16  for ongoing operations of the business enterprise, although as

17  counsel for the proponents has argued, it does indicate an

18  interest in closing the transaction, because at this point the

19  money is "hard" in the sense that, if Brantly fails to close,

20  they will lose $700,000, which is not an insignificant amount

21  of money to put up to then simply walk away from for no reason.

22      But more importantly, the Court is not as concerned about

23  the feasibility of ongoing operations under the unique

24  circumstances of this case, and that is there is no creditor of

25  which the Court is aware that is relying upon the future

1  operation of Reorganized Superior Air Parts from which to pay

2  its claim other than a handful of executory contract parties

3  who have agreed to look to the Reorganized Debtor for their

4  payment in lieu of their executory contract being rejected by

5  the Debtor and their participation as an unsecured creditor for

6  their rejection claim.  Every other unsecured creditor in these

7  cases is not looking to the Reorganized Debtor for payment of

8  their unsecured prepetition claim.  Rather, they are looking to

9  the Creditors' Trust as the source of that payment, and

10  provided that Brantly closes on the plan, the source of those

11  funds will be assured to creditors.

12      So the risk that APS has argued exists with respect to the

13  future viability of Reorganized Superior Air Parts is of no

14  concern to the Debtor's prepetition unsecured creditors except

15  with respect to a handful of parties who, as the Court has

16  said, have agreed to modify the terms of their executory

17  contracts and to have those modified contracts assumed by the

18  Reorganized Debtor and satisfied by the Reorganized Debtor from

19  future business operations.

20      From the Court's perspective, those handful of unsecured

21  creditors have essentially agreed to assume the business risk

22  associated with the Reorganized Debtor's continued operations,

23  and as a result of that the Court will not second-guess their

24  willingness to move forward with the Reorganized Debtor in the

25  future.

1          Turning to the other feasibility issue, that relates to the

2     feasibility of Brantly coming up with the additional $6.3

3     million that is required to enable a closing to occur under the

4     terms of this plan.  APS argues that there is insufficient

5     evidence from which the Court can find that the plan is

6     feasible because of the proponents' failure to introduce a bank

7     commitment letter, financial statements of the Brantly Group,

8     or some other evidence that establishes the financial

9     wherewithal of the Brantly Group to actually close the

10    transaction.

11         The Court certainly would be happier if such evidence had

12    been introduced.  That would make a feasibility finding much

13    simpler.  However, the Court has been offered the explanation

14    of at least why it is difficult for the Brantly Group to have

15    provided evidence of funding, and that is because of relatively

16    cumbersome procedures that are required before Chinese

17    nationals are permitted to take funds out of China and invest

18    them in a U.S. business.

19         The Court has already expressed its view that the

20    evidentiary record in support of feasibility of Brantly to

21    close is thin.  The Court agrees that the record is thin.  But

22    notwithstanding the thinness of the record, the Court is

23    satisfied that a slightly more than preponderance of the

24    evidence supports the Court's view that this plan is feasible

25    and that it is more likely than not that Brantly will close and

1  fund the plan.

2      We have the $700,000 of cash that is currently sitting in

3  the debtor-in-possession account.  We have the explanation of

4  why further funds are not yet available.  We have the fact that

5  Brantly's representatives have traveled to the United States in

6  anticipation of this acquisition.  We have the fact that

7  Brantly has made another acquisition in Vernon, Texas in a

8  related industry, and is apparently funding those operations on

9  some level, although certainly we know little about the basis

10 upon which Brantly is funding those operations.

11     Taken on a cumulative basis, the Court will find that the

12 Debtors and the Committee, as proponents of this plan, have

13 carried their burden of proof.  But the Court agrees that that

14 is a close question on the factual record that has been made

15 before the Court today.

16     The Court further concludes, however, that there is little

17 risk to the estate by taking a chance on whether Brantly will

18 close.  The evidence is undisputed that the $700,000 deposit,

19 which Brantly will forfeit if it does not close, is sufficient

20 to fund operations over the course of the next thirty days,

21 which is the period of time that Brantly has to complete the

22 governmental approval process so that it can take funds and

23 spend them here in the United States to complete this

24 transaction.

25     So, in short, if there are losses over the course of the

1 next thirty days while we wait to see if the closing occurs,

2 those losses are covered by the deposit that will be forfeited

3 by Brantly if no closing occurs.  And of course, if a closing

4 occurs, then the Unsecured Creditors will receive an extremely

5 substantial recovery in this case that may be as much as 100

6 percent recovery.

7      With respect to all of the other requirements of

8 confirmation as set forth in Section 1129 of the Bankruptcy

9 Code, the Court is satisfied based upon the evidentiary record

10 that has been made that the proponents have also satisfied

11 their burden of proof here today and have established that the

12 plan complies with the requirements of the Bankruptcy Code for

13 confirmation and should be confirmed.

14      The Court had not seen a copy of the proposed order

15 confirming the plan, so I'm going to take a few minutes and

16 review that, since obviously I understand that the entry of an

17 order that is acceptable to the proponents and the purchaser is

18 a condition to the plan going forward.  So let me take just a

19 few moments and review that proposed form of order.

20      (Pause.)

21        THE COURT:  I don't understand -- well, I found a typo

22 in Paragraph 10.  "The proponents of the plan have" instead of

23 "has."  But I don't understand the first sentence of 14.  "The

24 only equity interest is that of the Debtor.  Therefore, 1129(b)

25 is not applicable."  I don't follow that.

1           MR. BRESCIA:  Your Honor, I've been the primary

2   architect of the order, with input from a lot of different

3   people.  My understanding was is that, you know, sometimes

4   there are -- equity interests have different voting

5   circumstances, and so, you know, we have to have proxies and

6   other people voting, and so --

7           THE COURT:  Well, who are the shareholders?

8           MR. BRESCIA:  TAG is the only shareholder I know of.

9           THE COURT:  Right.  But so that's a third party.

10          MR. BRESCIA:  Sometimes there can be other kinds of

11  equity interests, I guess.

12          THE COURT:  Right.  But -- oh.  Well, but we have to

13  -- TAG is deemed to have rejected because its shares are

14  canceled.  So we've got to cram the plan down.  So I don't

15  understand that sentence, that 1129(b) is not applicable.  It

16  is applicable, because TAG is deemed to have rejected.

17          MR. BRESCIA:  The -- with regard to cram-down of

18  interests, that is correct, Your Honor.  You're right.  So

19  that's probably not a proper phrase.

20          THE COURT:  All right.  So I would propose to strike

21  the first sentence, because I don't think it's accurate.

22  Anybody disagree with that?

23      (No response.)

24          MR. BRESCIA:  What paragraph is that?  I'm sorry, Your

25  Honor.

1          THE COURT:  14.  And I'm just proposing to strike the

2    first sentence.  Comment?

3          MR. BRESCIA:  No.  That's -- no comment.  I'm sorry.

4          THE COURT:  All right.

5      (Pause.)

6      What's Paragraph 22 all about?  I haven't made such a

7    ruling --

8          MR. BRESCIA:  Your Honor, 1129(c) says the Court can

9    only confirm one plan.

10         THE COURT:  Well, but I haven't even approved a

11   disclosure statement on a second plan yet, so I think that

12   provision deals when you have competing plans --

13         MR. BRESCIA:  Competing plans.

14         THE COURT:  -- that were solicited simultaneously.  So

15   I don't think we need Paragraph 22, either.  If somebody

16   disagrees, speak up.

17         MR. LEONARD:  That also applies to Paragraph 30, the

18   last sentence, Your Honor.

19         THE COURT:  All right.  Got it.  Hadn't read that far

20   yet.

21     (Pause.)

22     I would propose to add, in Paragraph 28, "The findings of

23   this Court above and those" -- well, "together with those

24   announced" -- well, the point being I want to incorporate the

25   findings and conclusions I stated on the record with those I'm

1  making in this order.  So I don't want to micromanage, but

2  whatever language you want to add that would incorporate the

3  findings and conclusions that I've articulated orally with

4  those made in this order.

5       (Pause.)

6       And we're going to strike the last sentence in Paragraph

7  30.

8       (Pause.)

9       39 seems repetitive of a prior -- am I -- didn't we deal

10  with executory contracts someplace else?

11       MR. BRESCIA:  There was a provision in the findings

12  proposed by the Debtor of a modifying Section 7.1 dealing with

13  insurance.  And this one was just to pick up the other rulings

14  regarding executory contracts.

15       THE COURT:  I could have sworn there was another

16  executory contract provision that I read.

17       MR. OKIN:  Your Honor, there's a Paragraph 23 in, I

18  guess it's the findings, just dealing with what the claim

19  provides --

20       THE COURT:  All right.  All right.  One is a finding

21  and the other is a conclusion.  Works for me.

22       (Pause.)

23       I would propose to add at the beginning of Paragraph 40,

24  "To the extent permitted by law."  As you all know, there is a

25  body of law developing with respect to the scope of post-

1 confirmation jurisdiction, so I don't think the plan can

2 dictate jurisdiction post-confirmation.

3          MR. BRESCIA:  At the beginning --

4          THE COURT:  Any objection?  Anyone have objection to

5 adding that?

6      (No response.)

7          THE COURT:  All right.

8      (Pause.)

9      Paragraph 47.  I'm not sure I think that's an appropriate

10 provision in this order.  I mean, the legal effect of

11 modifications will be whatever it is.  I don't know that my

12 order can dictate that.

13          A VOICE:  To the extent permitted by law.

14      (Chuckles.)

15          THE COURT:  Well, I just don't think we need it.

16          A VOICE:  That's fine, Your Honor.  We were actually

17 talking about some modifications of that paragraph anyway, so

18 that's fine.

19      There is a change also in 45.

20          THE COURT:  All right.

21          MR. BRESCIA:  Yes, Your Honor.  The last sentence of

22 45.  After confirmation, I talked to Mr. Parham, and that

23 really should be the Creditors' Trustee, or Trustee of the

24 Creditors' Trust.

25          THE COURT:  Okay.  All right.  So we're going to

1  delete --

2          MR. BRESCIA:  So you want to strike 47?

3          THE COURT:  Please.  Why do we need 49?

4          MR. BRESCIA:  In light of what's been discussed here

5  today, I think the Court has its definition of a final order,

6  so -- it's just one that we always like in there unless anybody

7  doesn't agree.

8          THE COURT:  No.  49.

9          MR. BRESCIA:  Right.  Order not stayed?

10          THE COURT:  Order is not stayed.

11          MR. OKIN:  Your Honor, that is one that does matter to

12  us, for a few reasons.  One, although I'm sure it's -- it may

13  be hopelessly optimistic, but we really do want to close this

14  as quickly as we can.  The working capital adjustment date is

15  Monday.  And while I don't think there's really any realistic

16  chance that we'll be ready to close on Monday, if we could, we

17  would, and a stay would prevent that.

18      The other issue is one of the main reasons we want to get

19  this order entered, is we need to be able to show the Chinese

20  government that the money -- that this is going to happen.  I

21  think -- I don't know how that ten-day stay would be

22  interpreted.  I don't know if they'll even know what it means.

23  But anything that does seem to limit the enforceability of the

24  order, I think is a problem for us in terms of making sure we

25  can get funding.

 1           THE COURT:  Well, but I've got to tell you.  I'm a

 2    little troubled with waiving that.  I mean, I don't know if APS

 3    is going to appeal.  I assume they may.  And it seems like,

 4    given the fact that we don't know when you'll be able -- I

 5    mean, I fully intend to enter a confirmation order.  The issue

 6    is whether or not I stay the effect of that order or -- well,

 7    frankly, I don't stay it.  It's just an automatic stay under

 8    the Bankruptcy Rules.  I know of no reason why, if you're able

 9    to close sooner, you can't come in and ask me to waive the stay

10    subsequently.

11           MR. OKIN:  It really is the combined issues, Your

12    Honor.  I understand we could come in and ask you to waive it

13    if we're ready to close on Monday, for example.  I really -- I

14    mean, it's a cultural issue.  And you know, as an example, and

15    it's not this issue, Mr. Tong, as we were marking this up,

16    asked me to make sure we're not going to -- this isn't going to

17    be an interlineated signed order, because that would be an

18    issue.

19       And I'm just -- we really do need an order that clearly

20    says we're going to be able to purchase this.  I'm concerned as

21    to how an order -- something indicating that there's a stay

22    would be interpreted.

23           THE COURT:  Well, this may be an unfair question, but

24    so let me ask it.  Does APS intend to appeal?

25           MR. GOOD:  Mr. Leonard and I were talking about that,

1    and we have to discuss it with our client.  At this point, I

2    don't know.

3          THE COURT:  We're just talking here, but would you be

4    comfortable with, if they intend to close within the first ten

5    days, if I don't -- if I waive the stay and they propose to

6    close within the first ten days, they've got to give you 24

7    hours' notice or a business day's notice or something that

8    would give you all the opportunity to come in and ask for a

9    stay pending appeal?

10          MR. GOOD:  Okay.  I think --

11          THE COURT:  I want to not prejudice you, but I also

12    hear counsel's concerns.

13          MR. GOOD:  I think we can manage that, Your Honor,

14    yes.

15       (Counsel confer.)

16          MR. GOOD:  May we have a minute?

17          THE COURT:  Of course.

18       (Counsel confer.)

19          THE COURT:  While they're talking, I would prefer to

20    delete Paragraph 50.  We usually issue a post-confirmation

21    order that sort of dictates the timing of things.  So --

22          MR. BRESCIA:  That's fine, Your Honor.  Also, from the

23    earlier announcements on the modifications to the plan, we

24    would put that in there as well.

25          THE COURT:  Understand.

1    (Pause.)

2    MR. GOOD:  Your Honor, I heard the Court's question.

3    Are you proposing to put something in the order to reflect that

4    if the closing is going to take place, that APS would be

5    notified within 24 hours?

6    THE COURT:  Well, what I was proposing is that if

7    Paragraph 49 remained in, we would add a provision that said,

8    in the event that -- whatever the proper language is -- the

9    plan is going to be closed or the transaction, whatever it is,

10    is going to be closed within the first ten days following the

11    entry of this order, that the proponents are required to give

12    APS notice, you know, 24 hours' notice, prior to the closing.

13    MR. GOOD:  Let me just visit with my client and we'll

14    have a response for you.  Okay?

15    THE COURT:  Fair enough.

16    (Pause.)

17    MR. GOOD:  That's acceptable, Your Honor.

18    THE COURT:  Does that work for everyone?

19    MR. OKIN:  It does, Your Honor.  That's fine.

20    THE COURT:  All right.  So then you'll get the --

21    technically right.  But basically, it's --

22    MR. BRESCIA:  Since we're making some other changes,

23    we can get the text right.

24    THE COURT:  Yes.  24 hours' notice if you're going to

25    try and close the plan within the first ten days following the

1   entry of the confirmation order.

2          MR. BRESCIA:  I presume, to avoid arguments, we'd say

3   one business day.

4          THE COURT:  I'm sorry?

5          MR. BRESCIA:  I assume, to avoid arguments, we'd say

6   one business day.

7          THE COURT: Yes.  Yes.  Good.

8      Those are all of my comments to the proposed order.  Does

9   anyone have any other objection to the proposed form of the

10  confirmation order?

11     (No response.)

12         THE COURT:  All right.  Then, Mr. Roberts, if you

13  would make these -- well, Mr. Brescia, if you would make these

14  changes to the proposed confirmation order and the

15  modifications that you've discussed, I'd like you to circulate

16  that to Mr. Good and Mr. Leonard prior to submitting it to me.

17  I'd like them to sign off on the form of the order.  Obviously

18  not the substance of it, but sign off on the form of the order.

19  /s/ is fine, but I would like to know that they've reviewed it

20  and they find it to be in acceptable form.  And then upload it.

21  I'll sign it.

22     Now, --

23         MR. BRESCIA:  Are you going to be here tomorrow, Your

24  Honor?

25         THE COURT:  I am here tomorrow, but I'll be leaving at

1  the end of the day and will not be in the office on Friday.

2  I've got to go to New Orleans on business Thursday night.  So

3  get it here as early in the day as you can tomorrow.  If you'll

4  do me a favor, when you upload it, let Ms. Salcido know that

5  it's been uploaded.  She leaves at 4:30, so don't miss --

6  that's a very important time.  Don't miss that time.  Get it

7  here as early in the day as you can, but certainly before 4:30.

8  And ask her to just directly send it to me, to my order box,

9  and that way I will be sure to look for it before I leave so

10  that I can get it signed.

11      Well, we've got a bunch of other stuff on the docket today,

12  so let's just take a minute to talk about the other matters

13  that are on the docket and what we need to do about those.

14      We've got the emergency motion to enforce the bid

15  procedures order by APS, and then we've got the disclosure

16  statement hearing, I think, with respect to APS's plan.  Is

17  that right?

18          MR. GOOD:  That's correct, Your Honor.

19          THE COURT:  Well, we've clearly run out of time to

20  hear those tonight, given that it's 20 till 6:00.  Is there

21  urgency, or can we simply -- I mean, obviously, your disclosure

22  statement is moot if this plan funds and closes, because we

23  obviously would not be going forward with a different plan in

24  the event this plan closes.  So my suggestion with respect to

25  that is that we defer that for thirty days to see if the plan

1    funds.  Now, if you disagree, please let me know.

2        With respect to being the back-up bidder, certainly, I

3    would anticipate you'd like that to be heard sooner rather than

4    later.  And my suggestion there would be that you get with Ms.

5    Salcido and tell her I've asked you to find time as soon as we

6    have it available for whatever amount of time you parties agree

7    that you'd need for that to be heard, and we will go ahead and

8    try and hear that sooner, within the 30-day time period.  Does

9    that make sense?

10        MR. GOOD:  Yes, Your Honor.  I'll check with Ms.

11   Salcido tomorrow and we'll see if we can tee that up.

12       And in terms of what we want to do with the disclosure

13   statement, I need a little bit of time to think about that --

14        THE COURT:  All right.

15        MR. GOOD:  -- and report back to you.

16        THE COURT:  That'd be fine.

17        MR. GOOD:  All right.

18        THE COURT:  Just let Ms. Salcido -- if you want it

19   heard sooner than thirty days, let Ms. Salcido know.  And

20   frankly, I guess, send me a letter that tells me -- explains to

21   me why you'd like it to be heard sooner than that.  And copy

22   opposing counsel on your letter, of course, and that way they

23   can respond if they have some issue with some point that you've

24   raised in your communication.

25        MR. GOOD:  Understood, Your Honor.  I'll do that.

1          THE COURT:  All right.

2          MR. GOOD:  I'll do that.

3          THE COURT:  Good.  Anything else we should take up

4    this evening?

5       (No response.)

6          THE COURT:  Then we're in recess.  I'm going to be out

7    here for a few minutes, but you're excused at your convenience.

8       (Proceedings concluded at 5:40 p.m.)

9                          --oOo--

10

11

12

13

14

15

16

17

18                      CERTIFICATE

19     I certify that the foregoing is a correct transcript from

20   the electronic sound recording of the proceedings in the

21   above-entitled matter.

22

23

     _____        _____

24   Kathy Rehling                            Date
     Certified Electronic Court Transcriber
25   CET**D-444

1

INDEX
Page 1 of 2

2

3

PROCEEDINGS                                                              3

4

OPENING STATEMENTS

5

- Mr. Roberts on behalf of the Debtor                                   14

6

- Mr. Parham on behalf of the Creditors' Committee                     16

- Mr. Okin on behalf of Xi'an Free Sky Aviation                        19

7

- Mr. Good on behalf of Aviation Parts Supply                          22

8

- Mr. Nichols on behalf of AirSure Limited                             23

9

WITNESSES

10

| Debtor's Witnesses | Direct | Cross | Redirect | Recross | Court |
|---|---|---|---|---|---|

11

| Kent Abercrombie | 25 | 49/55 | 56 | 63 | |

12

| Tom Tong | 67 | 87 | 90 | | |

13

EXHIBITS

14

| Debtor's Exhibits | | Identified | Received |
|---|---|---|---|

15

| A | -- | 23 | 24 |
| B | -- | 23 | 24 |

16

| C | -- | 23 | 24 |
| D | -- | 23 | 24 |

17

| E | Pro Forma Financial Projections | 32 | 34 |
| F | -- | 23 | 24 |

18

| G | Proffer to APS | 73 | Denied-97 |
| I | -- | 23 | 24 |

19

| J | -- | 23 | 24 |
| K | -- | 23 | 24 |

20

| L | -- | 23 | 24 |
| M | Ballot Summary/Certification of Ballots | 23 | 24 |

21

22

CLOSING ARGUMENTS

| Mr. Roberts | 108 |
|---|---|

23

| Mr. Parham | 118 |
| Mr. Okin | 125 |

24

| Mr. Good | 127 |
| Mr. Roberts | 130 |

25

| Mr. Winikka | 138 |

1                              INDEX
                            Page 2 of 2
2

3  RULINGS

4  - TAG/TAE Agreement                                        5
   - Motion to Expedite Request for Temporary Allowance of   99
5    Claim for Voting Purposes - *Granted*
   - Motion Requesting Temporary Allowance of TAG Claim for  105
6    for Voting Purposes - *Granted*
   - Plan Confirmation - *Plan Approved as Modified*         139
7  - Disclosure Statement Hearing, APS-Proposed Plan -       156
     *Carried Pending Execution of Debtor-Proposed Plan*
8  - Emergency Motion to Enforce Bid Procedures - *Movant*   157
     *to Obtain Hearing Date*
9

10 END OF PROCEEDINGS                                        158

11 INDEX                                                  159-160

12

13

14

15

16

17

18

19

20

21

22

23

24

25