Chester B. Salomon
CS-2319 (SDNY)
Becker, Glynn, Melamed & Muffly LLP
299 Park Avenue
New York, New York 10171
Tel.: (212) 888-3033
Fax : (212) 888-0255
csalomon@beckerglynn.com

Attorneys for Applicant Corporate Finance Partners Mid Cap GmbH

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| **IN RE:** | § | **Case No. 08-36705** |
| | § | |
| **SUPERIOR AIR PARTS, INC.** | § | **Chapter 11** |
| | § | |
| **Debtor.** | § | |

## FEE APPLICATION COVER SHEET

First and Final Fee Application of Corporate Finance Partners Mid Cap GmbH from inception to September 28, 2009.

Capacity: Investment Consultants for Debtor; Counterparty to Assumed Executory Contract

Chapter 11

Debtor/Case: Superior Air Parts, Inc. 08-36705

Retainer Received (and applied): None

Amount Previously Paid: -0-

Applicant seeks first and final approval and allowance of fees of $210,000 and expenses of $20,871.65 pursuant to an Engagement Letter (Advisory Assignment) in respect of services performed from June 2008 (prior to inception of this case on December 31, 2008) through September 28, 2009, the Effective Date of the Third Amended Joint Plan of Reorganization. Applicant requests that the Debtor be authorized and ordered to pay Applicant approved fees and expenses in the aggregate amount of $230,871.65. A detail of this amount follows:

<u>Payment Amount Requested</u>

Fees:          $210,000.00
Expenses:      $ 20,871.65

Sub-total:     $230,871.65

Total Payment Requested:     $230,871.65

<u>Expenses</u>

Copies per page:     $N/A          Other (specify:)  See Application at
Faxes per page:      $N/A          Paragraph 20 and Exhibit F

Dated: Berlin, Germany
        October 28, 2009

BECKER, GLYNN, MELAMED                    /s/ Daniel Schenk
 & MUFFLY LLP                             Daniel Schenk,
Counsel for Applicant                     Managing Director of Applicant


By: /s/ Chester B. Salomon    
Chester B. Salomon
299 Park Avenue
New York, New York 10171
Tel.: (212) 888-3033
Fax:  (212) 888-0255
csalomon@beckerglynn.com

Chester B. Salomon
CS-2319 (SDNY)
Becker, Glynn, Melamed & Muffly LLP
299 Park Avenue
New York, New York 10171
Tel.: (212) 888-3033
Fax : (212) 888-0255
csalomon@beckerglynn.com

Attorneys for Applicant Corporate Finance Partners Mid Cap GmbH

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| **IN RE:** | § | **Case No. 08-36705** |
| | § | |
| **SUPERIOR AIR PARTS, INC.** | § | **Chapter 11** |
| | § | |
| **Debtor.** | § | |

## FIRST AND FINAL APPLICATION OF
## CORPORATE FINANCE PARTNERS MID CAP GMBH
## FOR COMPENSATION AND REIMBURSEMENT OF EXPENSES

**ANY OBJECTION OR RESPONSE TO THE APPLICATION FILED HEREIN MUST BE IN WRITING AND FILED WITH THE CLERK OF THE UNITED STATES BANKRUPTCY COURT AT 1100 COMMERCE STREET, DALLAS, TX 75242, BEFORE THE CLOSE OF BUSINESS ON OR BEFORE TWENTY (20) DAYS FROM THE DATE OF SERVICE HEREOF. A COPY MUST ALSO BE SERVED UPON COUNSEL FOR THE APPLICANT PRIOR TO THE DATE AND TIME SET FORTH HEREIN.  A HEARING WILL TAKE PLACE AT 9:00 A.M. ON WEDNESDAY, NOVEMBER 25, 2009 IN THE UNITED STATES BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION, 1100 COMMERCE STREET, ROOM 1424, DALLAS, TX, 75242-1496.**

TO:   **THE HONORABLE BARBARA J. HOUSER,
UNITED STATES BANKRUPTCY JUDGE**

Corporate Finance Partners Mid Cap GmbH ("CFP" or "Applicant"), approved

Investment Consultant for Superior Air Parts, Inc. ("Superior" or "Debtor"), respectfully

submits its First and Final Application for Compensation and Reimbursement of

Expenses, as follows:

**Background, Applicant's Retention, and Assumption of
Applicant's Engagement Letter Agreement**

1.      Applicant hereby seeks final approval and allowance of fees of $210,000

and expenses of $20,871.65 for services performed from the commencement of

Applicant's engagement as of June 2008 through September 28, 2009, the Effective Date

of the Debtor's Plan and the payment of $230,871.65 in fees and expenses.  These

amounts include all fees and expenses incurred during the case as detailed below.

2.      On December 31, 2008, the Debtor filed a voluntary petition for relief

under chapter 11 of the Bankruptcy Code.  The Debtor continued to operate its business

and manage its properties and assets as a debtor-in-possession pursuant to §§ 1107(a) and

1108 of the Bankruptcy Code.  A Creditors' Committee has served in the case.  No

chapter 11 trustee or examiner has been appointed in the case.

3.      Superior is a Texas corporation with its offices and operating facilities

located in Coppell, Dallas County, Texas.  It was founded in 1967 in order to supply the

United States Air Force and commercial customers with replacement parts for piston

powered aircraft engines.  Superior is one of the largest suppliers of parts under Federal

Aviation Administration's ("FAA") Parts Manufacturer Approval ("PMA") regulations

for piston engines.  It provides Superior-brand parts for engines created by two primary

original equipment manufacturers ("OEMs"), the Continental division of Teledyne, Inc.

and the Lycoming division of Textron, Inc.  (the "Parts Business").   Its customers are

companies that perform maintenance and overhaul work in the general aviation industry.

Superior is also an OEM for the (i) 180-horsepower Vantage Engine and (ii) Superior or

owner-built XP-360 Engine for various aircraft companies (the "Engine Business").

4.      In 2006, 100% of the ownership interests of Superior was acquired by

Thielert, AG ("Thielert"), a German corporation based in Hamburg, Germany.  Also in

2006, Thielert purchased the debt of Superior's senior secured lender and subordinated

lenders secured by substantially all of the Debtor's assets.  At filing the outstanding

indebtedness to Thielert was approximately $10 million.

5.      On April 30, 2008, Thielert filed an insolvency proceeding in Hamburg,

Germany and Dr. Achim Ahrendt was appointed as the preliminary Insolvency

Administrator.  Dr. Ahrendt determined that it was in the best interest of Thielert and

Superior to sell Superior or its assets.  In May 2008, Thielert engaged CFP to serve as

investment advisor and to seek possible suitors for Superior.  As part of the engagement

Thielert agreed to pay Applicant a retainer of 15,000 Euros per month plus a success fee

by September 2008.  Thielert paid CFP 55,000 Euros on account of the monthly retainer.

As the proposed transaction moved from a stock sale by Thielert to an asset sale by

Superior, it became necessary for Superior to become the contracting party.  As stated in

further detail below, Applicant negotiated with Superior compensation consisting only of

the success fee at the same percentages as in the Thielert engagement.  CFP canvassed

the market, negotiated with numerous potential purchasers, and enabled interested parties

-- 3 --

to conduct substantial due diligence.  As described below, Superior entered into an asset purchase agreement on December 30, 2008 with Avco Corporation ("Avco"), a wholly-owned subsidiary of Textron, Inc., the highest bidder then to date, pursuant to which the purchaser agreed to buy substantially all of Superior's assets for $11.5 million.  CFP negotiated the business and financing terms of the sale.

6.      In or about October 2008 prospective bidders said that one of the conditions of the purchase agreement was that it be consummated through a Chapter 11 bankruptcy proceeding and Section 363 asset sale.  The Chapter 11 case was filed to liquidate the assets of Superior and to obtain the highest and best price for creditors, either through the purchase agreement with Avco, or a public auction.

7.      Pursuant to Order, entered February 20, 2009, (I) Approving Employment of Corporate Finance Partners Mid Cap GmbH as Investment Consultant for the Debtor and (II) Authorizing Assumption of Executory Contract with Corporate Finance Partners Mid Cap GmbH, Applicant was employed as Investment Consultant under Section 327 of the Bankruptcy Code and its Engagement Letter (Advisory Assignment) was assumed as an Executory Contract pursuant to Section 365 of the Bankruptcy Code.

8.      Annexed hereto as Exhibit A is a copy of the Order entered on February 20, 2009.  Annexed hereto and incorporated herein as Exhibit B is a copy of the Engagement Letter (Advisory Assignment), signed by Superior in December 2008 but effective in June 2008, that was assumed under Exhibit A.  Exhibit B was attached to the Debtor's (I) Application to employ CFP as Investment Consultants and (II) Motion to Assume Executory Contract with CFP, dated and filed January 7, 2009.

9.      CFP, with its principal place of business in Berlin, Germany, is an

internationally recognized consulting firm specializing in mergers and acquisitions, in

particular turnaround situations, refinancing, joint ventures, sales of going concerns, and

liquidation of assets of financially troubled companies.  CFP operates several offices in

Europe (Berlin, Frankfurt and Vienna) and the United States (Miami and Mountain

View).  CFP also has a strong track record of arranging sale transactions in Chapter 11

style proceedings.  For example, CFP assisted in some of the largest bankruptcy cases in

Germany, such as marketing and selling one of Germany's largest bankruptcy Debtors in

2007, Schieder Mobel Holding (12,000 staff, EUR 800 million sales) ("SMH Group").

CFP sold substantial parts of SMH Group out of bankruptcy, generating significant

proceeds for the bankruptcy estate and its creditors.

10.      For more than six months prior to Superior's filing, CFP provided

extensive services, culminating in an executed Asset Purchase Agreement ("APA") with

Avco, on December 30, 2008.  Beginning in or about June 2008, CFP organized and

structured the entire M&A process regarding Superior, drafted supporting transaction

documentation, approached potential investors and generated interest in Superior from

various potential Buyers.  CFP maintained contact with investors, organized due

diligence, led the most serious and interested Buyers through due diligence, assisted in

the negotiation of Letters of Intent with potential Buyers, and assisted with asset purchase

sale agreements.  The CFP team, led primarily by Managing Director Daniel Schenk,

spent over five hundred hours, including time in the United States at Superior's facilities

in Coppell, Texas, Superior's counsel's offices in Austin and Dallas, and other U.S.

locations for meetings with investors and to implement the M&A process. By the filing

date, the M&A process included:

(a)     Beginning in mid-2008 CFP identified 76 potential investors (from

Superior's industry, related industries, as well as financial investors) world-wide,

approached those investors, provided initial information about Superior as well as

discussed with the investors their potential interest in acquiring Superior. Brantly

International Inc. ("Brantly") of Vernon, Texas, whose affiliate ultimately purchased the

Debtor's assets through the Plan, later was added to the list after Applicant had its first

contact on December 31, 2009.

(b)     11 investors showed an initial interest and entered into

Confidentiality Agreements with CFP. To those investors a detailed information package

was made available and CFP requested those investors to submit an offer.

(c)     By the date of filing, four offers were received and due diligence

was provided to those investors, including access to a data room, containing detailed

financial, operating and legal information, and discussions with Superior management.

In February 2009 CFP clarified Brantly's interest and ascertained its financial capacity.

Thereafter, CFP requested Superior's counsel to follow up and counsel did so.

(d)     Annexed hereto and incorporated herein as Exhibit C is the index

to the data room established by Applicant. Annexed hereto and incorporated herein as

Exhibit D are the common questions and answers as prepared by Applicant. Applicant is

advised and believes that the data room, which was downloaded onto a CD ROM disk,

was sent by Debtor's counsel to Brantly's counsel.

(e)     By the filing date, the two most interested and serious parties were
Textron Inc. and Teledyne Technologies, Inc.  As stated above, both demanded that
Superior file for Chapter 11.  The principal benefits of dealing with these parties were the
purchase price being discussed and their capacity to consummate a transaction such as
Superior without a financing contingency (i.e. to provide maximum closing certainty).
Parallel negotiations and confirmatory due diligence were pursued.  CFP handled this
stage of the transaction process and the confirmatory due diligence phase, for which
substantial additional information had to be prepared.  Consequently, with two major
investors interested, a competitive bidding scenario was created through February 2009.

(f)     With these two entities, CFP structured and arranged to enter into a
non-exclusive Letters Of Intent with the two bidders and supported Strasburger & Price
LLP in the negotiations of an Asset Purchase Agreement ("APA") after their extensive
due diligence.

(g)     The Asset Purchase Agreement with Avco was fully negotiated by
Applicant and executed by the time of the Chapter 11 filing.

<u>The Engagement Letter (Advisory Assignment) and
Subsequent Developments</u>

11.     Pursuant to the Engagement Letter, Applicant was engaged to support
Superior throughout the sale process in seeking to consummate a Transaction.  Para.
1.  At no time did either the Debtor or CFP seek to terminate the engagement.  Para. 2.
The fee agreed to paid under the Engagement Letter was 3% of the "Transaction Value"
up to $10 million with escalating percentages thereafter.  Para. 3.1.  The 3%  rate is

-- 7 --

almost half the 5% standard rate of CFP for a M&A transaction.  Had the Avco

transaction closed, applicant would have earned a fee of  $375,000, consisting of 3% of

$10 million ($300,000) and 5% of $1.5 million ($75,000), plus expenses.

       12.     Unfortunately, neither the Avco Transaction nor a competitive bid made

by Teledyne were consummated.  Despite hundreds of hours of effort by CFP from

inception and Committee support for the Avco sale, an objection to the sale was lodged

by a small creditor of the estate, and federal and state antitrust agencies were notified of

the proposed sale and indicated preliminary objections.  Those antitrust objections

apparently caused the bidders to not pursue their bids.  On or about February 27, 2009,

the Debtor withdrew its motion to sell the Debtor's assets.

       13.     Even as Avco was signing its Asset Purchase Agreement, CFP continued

to assist in pursuit of a sale, including communicating preliminarily with Brantly.  Under

Para. 3.4 of the Engagement Letter, CFP did not have to do so in order to be entitled to a

fee.  Section 3.4 states:

> "CFP will remain entitled to the Success Fee, if, within 12 (twelve) months
> following the termination of the Engagement Letter, a Transaction is
> consummated as described in Paragraph 3.2 and 3.3, to a buyer who, during
> the term of the Engagement Letter, expressed interest in writing, signed
> confidentiality agreement, and received the information memorandum"

       14.     The entity that ultimately acquired Superior on September 28, 2009 was

an affiliate of Brantly.   Brantly satisfied the terms of Para. 3.4 of the Engagement Letter.

Concurrently with the signing of Avco Asset Purchase Agreement, Brantly's

representative contacted Applicant by email on December 30, 2008 and Applicant

immediately notified Debtor's counsel of Brantly's stated interest.  At the time, the

Chapter 11 petition was being filed and the Avco deal and proposed bidding procedures

were about to be presented to the creditors and the Bankruptcy Court.  Brantly did not

seek to participate in the bidding procedures and it did not contact Applicant again until

mid-February 2009, on the eve of the auction sale.  In February 2009 Applicant requested

the Debtor's representatives to contact Brantly.  In due course, counsel communicated

with Brantly.  Also Applicant has been advised that Brantly was introduced to a bidder

for the Parts Business.

15.     Further communications and steps were taken between February and May

2009.  Applicant spoke weekly with Superior's counsel.

16.      After the Avco deal collapsed, in March 2009 Applicant discussed with

Superior's counsel a possible bidder in Taiwan and provided counsel with contact

information and that it communicate with the Taiwanese firm.  CFP recently learned that

the Parts Business bidder was discussing a joint bid with Brantly, which was initially

interested in the Engine Business.  CFP was not invited to assist in those negotiations.  At

that time CFP was advised that Thielert and the Debtor were concerned about the

mechanics of splitting the Parts Business from the Engine Business, and that they had

significant concerns about the financial viability of the Parts Business bidder.  In May

2009 Superior's counsel began discussions with Brantly's counsel encouraging Brantly to

bid for all Superior's assets and business.  A critical tool employed by counsel was

Applicant's CD ROM of the data room.


Factors Supporting Allowance of Compensation


17.     Unequivocally, Applicant set the stage for the ultimate sale to Brantly.

Although Applicant did not remain as active after the Avco Asset Purchase Agreement

collapsed, Applicant was instrumental in introducing Debtor's counsel to Brantly and

negotiated the Avco deal that served as the template for the Brantly sale that was

effectuated in the months between June and September 2009.  By the time that Brantly

came into the picture, Superior had been extensively marketed by Applicant.  Beginning

in at least February 2009, Applicant's work product facilitated in the negotiations for the

sale of Superior to Brantly.

18.     Although CFP was not engaged on a fixed compensation basis (such as

with attorneys and accountants for the Debtor and the Committee), it is noteworthy that

Applicant expended hundreds of hours in performing its duties.  Just the two principal

executives working on the engagement, Daniel Schenk and Fabian Pohl, spent almost 500

hours from May 2008 through February 2009.  Attached as Exhibit E is s summary of

time from May 2008 to March 2009.

19.     Further, in requesting a fee of only $210,000 Applicant is not seeking

compensation for the liabilities assumed by Brantly's affiliate as part of the acquisition of

Superior.  According to Para. 3.2 of the Engagement Letter, Applicant would be entitled

to a percentage of assumed liabilities in addition to the Cash Purchase Price.  Those

liabilities include the assumption of claims and defense costs under insurance policies (c.

$3 - 5 million), purchase orders (c. $5.3 million), the lease with Texas Duggan Limited

Partnership (c. $426,000), and warranty obligations (actual warranty claims of c.

$285,000).  If those liabilities were added to the cash component of Brantly's Purchase

price, CFP's fee request would more than triple the $210,000 applied for herein.

20.     Annexed hereto and incorporated herein as Exhibit F is a copy of a

statement of expenses sent to the Debtor on June 26, 2009 encompassing all unpaid

expenses incurred during the term of CFP's engagement.  Exhibit F refers Euros, which

presently trade at approximately $1.50 to the Euro.  The charges in Euros are:

| | |
|---|---|
| Data room charges | €801.91 |
| Travel | €9,512.40 |
| Fax, telephone, cell phone charge for six months | €3,600 |
| | |
| TOTAL | €13,914.31 |

Converting Euros to Dollars at a $1.50 rate, Applicant seeks reimbursement of

$20,871.65 in expenses.

21.     Addressing the factors considered in the 5th Circuit for fee applications,

Applicant states the following:

(a)     <u>Time and Labor Required</u>:  Attached is a summary of time devoted

through February 2009 showing 500 hours spent by professionals employed by CFP.

Time is customarily recorded on a weekly basis.  Applicant's engagements are not

measured by an hourly rate.  Commonly there is a flat rate and/or a contingency fee

negotiated with clients.  In light of the Engagement Letter, the compensation sought in

this Application is not directly related to the hours spent by CFP's professionals.


(b)     <u>The size of the fee is commensurate with the novelty and difficulty

of the questions presented in this case</u>:  This was very challenging representation for the

Debtor, the Creditors Committee and their professionals.  As stated above, a 3%

contingency is modest for an assignment such as this.  Applicant spent significant time

and resources finding and working with prospective purchasers and their representatives

in this complex and highly regulated industry.  As the collapse of the Avco sale was

imminent, Applicant learned about Brantly and took appropriate steps to pursue that lead. The lead resulted in a $7 million benefit to the estate and its creditors.

(c)     <u>The skill requisite to perform investment consulting services</u>:  The sale of Superior required a high degree of skill, sophistication and experience.  The creation of the data room and the questions and answers summary demonstrated Applicant's skill.

(d)     <u>Preclusion of other employment</u>:  This representation did not preclude Applicant from accepting other cases.

(e)     <u>Customary fee</u>:  As indicated in (a) above, a contingency fee is customary for this type of assignment.

(f)     <u>Whether the fee is fixed or contingent</u>: Contingent.  Applicant was engaged to performed services to facilitate a sale.  The services were performed and the sale took place.  As set forth above, Applicant was involved in all material aspects of the solicitation and sale of Superior.

(g)     <u>The amount of time involved and the results obtained</u>:  Even if hundreds of hours were not devoted to the Superior deal, under common practice Applicant would be entitled to its agreed fee.  Here Applicant should be credited and compensated for having set the stage for Superior's sale and for Applicant's involvement when Brantly expressed its interest in Superior.

(h)     <u>The experience, reputation and ability of the professionals who performed services in the case</u>:  As indicated in Mr. Schenk's Rule 2014 affidavit filed at the inception of the case, Mr. Schenk is a highly experienced and effective advisor to companies and insolvency administrators.

(i)      <u>The undesirability of the case</u>: The representation was not

undesirable.  However it involved challenging issues.

(j)      <u>Awards in similar cases</u>: The compensation requested is

comparable to compensation in other cases of the size and complexity of Superior's

Chapter 11 case.

WHEREFORE, Applicant requests an award of final compensation of $210,000

for professional services performed from June 2008 to the Effective Date of the plan;

reimbursement of expenses in the amount of $20,871.65 as detailed in this application

and Exhibit E hereto, a direction that the Debtor pay Applicant approved fees and

expenses in the amount of $230,871.65, and such other and further relief as is just.


Dated:  Berlin, Germany
          October 28, 2009

BECKER, GLYNN, MELAMED                      CORPORATE FINANCE ET AL
 & MUFFLY LLP                               Applicant
Attorneys for Applicant


By: <u>/s/ Chester B. Salomon</u>           By: <u>/s/ Daniel Schenk</u>
Chester B. Salomon                               Daniel Schenk,
299 Park Avenue                                  Managing Director
New York, New York 10171
Tel.: (212) 888-3033
Fax:  (212) 888-0255
csalomon@beckerglynn.com

# EXHIBIT A

U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

**ENTERED**

TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET

The following constitutes the ruling of the court and has the force and effect therein described.

Signed February 18, 2009

*[signature]*

United States Bankruptcy Judge

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | CASE NO. 08-36705 |
| SUPERIOR AIR PARTS, INC. | § | |
| | § | CHAPTER 11 |
| DEBTOR, | § | |
| | § | |

### ORDER (I) APPROVING EMPLOYMENT OF CORPORATE FINANCE PARTNERS MIDCAP GMBH AS INVESTMENT CONSULTANT FOR THE DEBTOR (II) AUTHORIZING ASSUMPTION OF EXECUTORY CONTRACT WITH CORPORATE FINANCE PARTNERS MIDCAP GMBH

On this day, came on for consideration of the Debtor's (I) Application to Employ Corporate Finance Partners Midcap GmbH ("CFP") to serve as Investment Consultants and (II) Motion to Assume Executory Contract with Corporate Finance Partners Midcap GmbH ("Application"), as more particularly set forth in the Application. No notice of hearing on said Application need be given and no objections have been filed that have not been withdrawn. The Debtor and CFP have represented to this Court that CFP holds or represents no interest adverse to the Debtor or its estate, that it is is disinterested, and that its employment is in the best interest of the estate. It is therefore

ORDER (I) APPROVING EMPLOYMENT OF CORPORATE FINANCE PARTNERS MIDCAP GMBH AS INVESTMENT CONSULTANT FOR THE DEBTOR (II) AUTHORIZING ASSUMPTION OF EXECUTORY CONTRACT WITH CORPORATE FINANCE PARTNERS MIDCAP GMBH– page 1 of 2
557827.1/SPA/20354/0101/020309

ORDERED, that the Debtor is hereby authorized to employ Corporate Finance Partners Midcap GmbH, in the capacities and on the terms set forth in the Services Agreement attached as *Exhibit A* to the Application, pursuant to 11 U.S.C. § 327(a), with all fees payable subject to interim and/or final application to and approval of this Court; and it is further

ORDERED, that CFP shall comply in all respects with N.D. TX L.B.R. 2016.1 and the Rules of the Court as set forth in the United States Bankruptcy Court Northern District of Texas Attorney Desk Reference, including Appendix B thereof; it is further

ORDERED, that the Debtor is authorized to assume the executory contract with CFP and that no cure provisions are required.

##END OF ORDER##

Order submitted by:
*/s/ Duane J. Brescia*
Stephen A. Roberts
Duane J. Brescia
Strasburger & Price, LLP
600 Congress Avenue, Suite 1600
Austin Texas, 78701
Tel. (512) 499-3600 / Fax (512) 499-3660
Stephen.roberts@strasburger.com
Duane.brescia@strasburger.com

# EXHIBIT B



## CORPORATE FINANCE PARTNERS

CFP MidCap GmbH - Torstr. 35 - 10119 Berlin

Kent Abercrombie
President/CEO
Superior Air Parts Inc.
621 S. Royal Lane, Suite 100
Coppell, TX 75019-3805
USA

**Corporate Finance Part-
ners
MidCap GmbH**
Torstr. 35
10119 Berlin
Germany
Tel:  +49 30 4979999 60
Fax: +49 30 4979999 67

Email: mcap@cfpartners.com
Web:  www.cfpmidcap.com

**Daniel Schenk**
Managing Director
Mob:  +49 172 1985 861

Effective as of June 2008

## **ENGAGEMENT LETTER (Advisory Assignment)**

between

### **Superior Air Parts Inc.**

- hereinafter referred to as "SAP" -

and

### **Corporate Finance Partners Midcap GmbH**
Berlin, Germany
hereinafter referred to as "*CFP*"

subject to the approval of

### **Thielert AG**
**represented by Dr. Achim Ahrendt**
in his function as its
(preliminary) Insolvency Administrator

- hereinafter referred to as "TAG or the Company" -

<u>Preamble:</u>

(i)  Superior Air Parts Inc. (SAP) is a 100% subsidiary of TAG. TAG has filed for
insolvency and is represented by the insolvency administrator Dr. Achim
Ahrendt. Superior Air Parts Inc. is not under insolvency protection.

(ii)  CFP has worked since ~~June 2007~~ *May 2008* on a potential sale of SAP on behalf of
SAP owner as well as SAP major creditors.

(iii)  Investors, through Corporate Finance Partners (CFP) have approached SAP
as well as TAG in order to acquire SAP or major assets of SAP, most pref-
erably via a Chapter 11 procedure, a so called pre-packaged bankruptcy.

Corporate Finance Partners MidCap GmbH
Amtsgericht Charlottenburg von Berlin HRB 101757 B
Geschäftsführer: Felix Thorsten Markus Schauerte – Daniel Schenk
Deutsche Bank – BLZ 10070024 – Konto 1587872

(iv)    CFP is therefore engaged by SAP to assist in the sale of assets by SAP, po-
tentially via Chapter 11 and maximize value to Superior's creditors (the
"Transaction")

(v)    TAG and its subsidiary Thielert Aircraft Engines GmbH are by far the major
creditors of SAP with a combined claim of approx. USD 26 million out-
standing.

(vi)    Any fees for services rendered by CFP shall be paid directly by SAP to CFP.
In case of a Chapter 11 procedure, any fees due to CFP shall be paid prior
to distribution to Creditors, subject to approval of the Bankruptcy Court
and the Creditors.

(vii)    CFP will work closely with SAP's retained law firm Strasburger, namely Mr.
Stephen Roberts with respect to a potential Chapter 11 procedure.

CFP, Thielert AG and SAP (hereinafter together referred to as "the Parties") hereby agree
to the following:

## 1.    Scope of Advisory Assignment

1.1.    CFP will, as advisor, support SAP throughout the sales process as described in the
Preamble (hereinafter referred to as "Advisory Assignment").

1.2.    This Advisory Assignment includes the obligation to provide the following services:

(i)    organization and management of the Transaction,

(ii)    identification and contact of potential buyers,

(iii)    preparation of a short profile and further supporting documentation;,

(iv)    support with management presentations,

(v)    obtain and verify Transaction offers from potential buyers, provide support
in the assessment of these offers,

(vi)    support and organize due diligence activities, including the set-up and
management of a data room,

(vii)    assistance and support with Transaction negotiations with potential buyers.

1.3.    It is hereby noted that CFP will not render accounting, legal or tax advice. The
valuation advice provided by CFP will be given on the understanding that, unless ex-
pressly agreed in writing, CFP does not accept responsibility for the accounting or
other data and commercial assumptions on which such a valuation is based, the as-
sessment and evaluation of which remain to be SAP's responsibility respectively.

1.4.    Other possible advisory services which should be performed by CFP shall be bind-
ing only after consultation with SAP and confirmation by CFP either in writing, by fac-
simile, or e-mail prior to the beginning of the Advisory Assignment.

## 2.    Duration / Timetable / Termination

2.1.    The duration of the Advisory Assignment depends upon the realization of the ob-
jectives defined in the Preamble.

2.2.    This Engagement Letter may be terminated at any time by the parties upon their
mutual agreement or terminated by one of the parties by 30-days' notice. Any such
termination must be done in writing. Any liabilities or obligations, which may have
arisen under this Engagement Letter prior to termination, will not be affected by the
termination.

2.3.    The right to terminate this Engagement Letter for significant reasons remains un-
affected.

Corporate Finance Partners MidCap GmbH
Amtsgericht Charlottenburg von Berlin HRB 101757 B
Geschäftsführer: Felix Thorsten Markus Schauerte – Daniel Schenk
Deutsche Bank – BLZ 10070024 – Konto 1587872

### 3.   Compensation

3.1.    In the event of consummating a Transaction *CFP* shall be entitled to a one-time success fee (hereinafter referred to "Success Fee"). *CFP* shall receive the Success Fee upon consummation of a Transaction.

The consummation (signing of a binding agreement and receipt of respective cash proceeds from the Transaction by SAP, or by the Bankruptcy Estate in case of a Chapter 11) of a Transaction is defined as:

i.    the sale or disposal of SAP's assets or parts of it, and/or;

ii.    the sale or disposal of the business operations of *SAP* or a significant portion of the business operations, contributed to a corporate joint venture with a third party, and/or;

iii.    the merging of *SAP* with the business operations of a third party, and/or;

iv.    any other binding agreement entered into between the company and a third party as a result of the services rendered by *CFP* according to this Advisory Assignment, including, but not limited to, the equivalent to a disposal of *SAP* or assets of *SAP* from a commercial point of view.

The Success Fee payable to *CFP* upon consummation of the Transaction will be calculated based on an escalating schedule, i.e. a higher percentage applicable to the amounts for which defined hurdle amounts are being overachieved, and be based on the following schedule:

Transaction Value

| from US$ m | to US$ m | Fee Percentage |
|---|---|---|
| 0 | 10 | 3% |
| 10 | 12 | 5% |
| 12 | 17 | 7.5% |
| above | 17 | 10% |

For the avoidance of doubt; the respective percentage is always applicable to the amount exceeding the hurdle amount; and the Transaction Value calculates as follows:
- 3% on the first USD 10 million of Transaction Value
- 5% on the next USD 2 million, i.e. from USD 10m to 12m
- 7,5% on the next USD 5 million, i.e. from USD 12m to USD 17m
- 10% on every USD exceeding the amount of USD 17m

3.2.    The "Transaction Value" as mentioned above includes:

(i)    The agreed purchase price for the disposed assets and as prescribed in a binding agreement, in particular any fixed assets, any intellectual property, inventory as well as other current assets, whereas accounts receivable and cash are excluded from the definition of the Transaction Value.

Corporate Finance Partners MidCap GmbH
Amtsgericht Charlottenburg von Berlin HRB 101757 B
Geschäftsführer: Felix Thorsten Markus Schauerte – Daniel Schenk
Deutsche Bank – BLZ 10070024 – Konto 1587872

(ii) Any liabilities of SAP that might be taken over (applicable if there is no Chapter 11 procedure) by the acquirer.

(iii) In addition to the consideration immediately due upon consummation of the Transaction, the Transaction Value shall include installment, contingent, escrow payments (e.g. Earn-out) or similar future payments granted by the acquirer to the Company for the stakes of for any major assets that may be sold separately post Closing of a transaction and for which SAP or the Creditors will receive proceeds. In the event future payments are made to the company be it installment, contingent, escrow payments or any other delayed payments.

3.3.   If more than one agreement or Transaction is consummated the cumulative amount of the consideration of such agreements and/or Transactions shall apply to determine the Transaction Value as described in paragraph 3.2/3.3..

3.4.   *CFP* will remain entitled to the Success Fee, if, within 12 (twelve) months following the termination of this Engagement Letter, a Transaction is consummated as described in Paragraph 3.2 and 3.3. to a buyer who, during the term of the Engagement Letter, expressed interest in writing, signed confidentiality agreement, and received the information memorandum. Paragraph 3.4 and 3.5 remain in effect and shall also apply.

3.5.   All reasonable travel and other out-of-pocket expenses incurred by *CFP* in connection with the Advisory Assignment, including the costs and expenses of external advisors (such as accountants, lawyers etc.) whose engagement has been previously approved in written by the company, will be reimbursed separately from time to time, upon request.

3.6.   All fees, reimbursements of expenses and other sums payable to *CFP* are due upon receipt of.

## 4.   Information and Confidentiality

4.1.   Information

4.1.1.   SAP will ensure to keep *CFP at any time* fully informed of all strategies, developments and discussions relevant to the Advisory Assignment and that no initiatives relevant to the Advisory Assignment will be taken without prior consultation with *CFP*. SAP will provide *CFP* with, and give access to, all information which is relevant for the purposes of the Advisory Assignment.

4.1.2.   *CFP* will assume that all information provided by SAP, *the Company* and its advisors (hereinafter referred to as the "Information") is correct. *CFP* is not obliged to verify that the Information is true, accurate and complete or is in no way misleading. SAP agrees to indemnify and hold harmless *CFP* from any and all claims from third parties resulting from incorrect, incomplete, or misleading Information.

4.2.   Confidentiality

4.2.1   *CFP* shall keep the Information strictly confidential and use the Information solely in respect to the Advisory Assignment. This shall not apply to any such information, which:

(i)   is already in the public domain at the time of disclosure by SAP, TAG or any of its advisors or has entered the public domain thereafter without any failure to act by *CFP*, or

(ii)    is already known to *CFP* at the time of disclosure by SAP, TAG or any of its advisors and has not previously been obtained by *CFP* either directly or indirectly from the administrator/the company or any of its advisors, or

(iii)    has been made accessible to *CFP* after disclosure by SAP, the Company or any third party having no obligation of secrecy to the administrator/the company with respect thereto.

4.2.2    *CFP* is allowed to make available the Information to other individuals within its organization to the extent necessary for the fulfillment of the Advisory Assignment. *CFP* has taken all necessary precautions, which can reasonably be expected to prevent these persons from using the Information for themselves or for others or from passing on the Information to any third parties, unless necessary in respect to the Advisory Assignment. *CFP* assumes responsibility for violation of the confidentiality provisions of this Engagement Letter or misuse of the Information by its employees.

4.2.3    Any obligation resulting from 4.2 shall remain valid even in the event of the termination of this Engagement Letter.

## 5.    Publications and Compliance

5.1.    The parties will make sure that throughout the duration of this Engagement Letter detailed public statements or other publications and documents concerning the Advisory Assignment or relating to it will neither be made nor published without prior consultation with the other party. The Parties will also ensure that any such statement, publication or other documents will be in any case complete, correct and not misleading and, where appropriate, will contain all information and expressions of opinion necessary for legal or regulatory purposes and all such opinions will be honestly held and given after due and careful consideration. All parties will comply with all applicable legal and regulatory provisions.

5.2.    Advice (including any opinion or report), whether written or oral given by *CFP* to SAP, or any communications between *CFP* and SAP in connection with the Advisory Assignment may only be used and relied upon by SAP/TAG and may not be used or relied upon by any third party and may not be disclosed to any third party without the prior written approval of *CFP*.

5.3.    Subject to prior written consent from SAP/TAG (such consent may not be unreasonably withheld), *CFP* may place advertisements in financial and other newspapers and journals at *CFP'* expense describing *CFP'* involvement in any transaction resulting from its engagement under this Engagement Letter and its services rendered.

## 6.    Indemnification / Liability

6.1.    SAP/TAG agree to indemnify and hold harmless *CFP* from any and all claims of third parties, damages, costs and expenses (hereinafter together or separately referred to as "Disadvantages") that may arise in the course of the performance of this Advisory Assignment or in connection herewith. This indemnification does not extend to Disadvantages caused willfully or gross negligently by *CFP*. *CFP* will immediately inform SAP if any claims are brought to its notice that may lead to a liability of SAP.

6.2.    When providing services under this agreement *CFP* will exercise the care of a diligent businessman. Yet, should there be violations of its duties, *CFP* will be liable to SAP only in the event if *CFP*, its elements, or its employees caused detriment as a result of willful misconduct or gross negligence.

6.3.    It is hereby noted that any evaluation of a company prepared by *CFP* is not an expert opinion as prepared by chartered accountants or tax consultants on the basis of the balance sheets or annual accounts. When assessing the value of companies

CFP will, in particular, not carry out an evaluation of the assets and liabilities of the relevant company as is done by chartered accountants; further, CFP will not review the tax position of the company to be evaluated.

It is further noted that both the evaluation of a company to be carried out by CFP as well as the calculation of an adequate purchase price are influenced by factors of which the relative weight can be objectively verified to a limited extent only, because their assessment is based to a high degree on the subjective opinion of CFP. These factors include, in particular, the assessment of the market, of the competitors and of the competitive environment and the prospects of the economy as a whole.

6.4.    Any liability of CFP will become subject to a statute of limitations of two years after termination or expiration of this Engagement Letter.

## 7.    Miscellaneous

7.1.    This Engagement Letter shall be governed and construed in accordance with the laws of Germany. The Parties have agreed that in the event of any dispute, conflict or claim, they will: (i) attempt to resolve them by negotiations within ten (10) days of the date of such dispute, conflict or claim; (ii) in the event of any dispute, conflict or claim, which the Parties are unable to resolve by negotiations, the Parties shall refer such dispute, conflict or claim to German Arbitration Authorities, which shall appoint the arbitrator. If the claims of the party that has applied to the said authority are not recognized or not supported by the decision of this authority, the party that has applied to the authority shall cover any expenses of the other party incurred by the latter in connection with such arbitration..

7.2.    Should any of the provisions of this Assignment prove to be invalid or impracticable, all other provisions will remain unaffected. The invalid or impracticable provisions will be replaced by the provisions the parties would have agreed upon had they foreseen the invalidity or impracticability of such provisions.

We confirm our agreement with the contents of this Engagement Letter.

Place, Date _____Coppell, TX_____ 12-23-08_

_____, President_
(SAP)

Berlin, 22. December 2008

_____
(CFP) / Daniel Schenk                    Corporate Finance Partners Midcap GmbH
                                         Torstr. 35 * D-10119 Berlin
                                         Tel: 030 497 9999-60
                    ppa. _____         Fax: 030 497 9999-67
                         Gabriele Christian

approved by
Place, Date_____


_____
(TAG)

Corporate Finance Partners MidCap GmbH
Amtsgericht Charlottenburg von Berlin HRB 101757 B
Geschäftsführer: Felix Thorsten Markus Schauerte – Daniel Schenk
Deutsche Bank – BLZ 10070024 – Konto 1587872

# EXHIBIT C

Project: Taurus2008

| TYPE (F - Folder, D- Document) | Index | Title | Pages |
|---|---|---|---|
| F | 1 | Corporate Matters | 7 |
| D | 1.1 | Certificate of restated articles of incorporation (updated) | 7 |
| D | 1.2 | Amended and restated by-laws | 11 |
| D | 1.3 | Officers | 1 |
| D | 1.4 | Minutes of the meeting of the board of directors | 23 |
| D | 1.5 | Jurisdiction | 1 |
| D | 1.6 | Shares outstanding | 4 |
| D | 1.7 | Share owner | 1 |
| D | 1.8 | Restrictions on the shares | 1 |
| D | 1.9 | Organizational chart | 1 |
| D | 1.10 | Previous names of the company | 1 |
| D | 1.11 | Superior Presentation | 12 |
| F | 2 | Financial Information | |
| F | 2.1 | Financials 2002 | |
| D | 2.1.1 | Consolidated financial report as of December 31, 2002 | 22 |
| F | 2.2 | Financials 2003 | |
| D | 2.2.1 | Consolidated financial report as of December 31, 2003 | 22 |
| F | 2.3 | Financials 2004 | |
| D | 2.3.1 | Balance sheet as of December 31, 2004 | 1 |
| D | 2.3.2 | Cash flow 2004 | 1 |
| D | 2.3.3 | Income statement 2004 | 1 |
| F | 2.4 | Financials 2005 | |
| D | 2.4.1 | Balance sheet as of December 31, 2005 | 1 |
| D | 2.4.2 | Cash flow 2005 | 1 |
| D | 2.4.3 | Income statement 2005 | 1 |
| F | 2.5 | Financials 2006 | |
| D | 2.5.1 | Balance sheet as of December 31, 2006 | 1 |
| D | 2.5.2 | Cash flow 2006 | 1 |
| D | 2.5.3 | Income statement 2006 | 1 |
| D | 2.5.4 | Monthly statements 2006 | 3 |
| F | 2.6 | Financials 2007 | |
| D | 2.6.1 | Balance sheet as of December 31, 2007 | 1 |
| D | 2.6.2 | Cash flow 2007 | 1 |
| D | 2.6.3 | Income statement 2007 | 1 |
| D | 2.6.4 | Monthly statements 2007 | 6 |
| D | 2.6.5 | Bad debt reserve analysis - December 2007 | 2 |
| D | 2.6.6 | Supplier spend 2007 | 3 |
| D | 2.6.7 | Usage 2007 | 34 |
| F | 2.7 | Financials 2008 | |
| D | 2.7.1 | Balance sheet as of June 30, 2008 | 1 |
| D | 2.7.2 | Cash flow June 2008 | 1 |
| D | 2.7.3 | Income statement June 2008 | 1 |
| D | 2.7.4 | Monthly statements 2008 | 2 |
| D | 2.7.5 | Open orders as of June 07, 2008 | 13 |
| D | 2.7.6 | Fixed assets as of 30 June 2008 | 27 |
| D | 2.7.7 | Accounts payable analysis - June 2008 | 17 |
| D | 2.7.8 | Accounts receivable analysis - June 2008 | 41 |
| D | 2.7.9 | Inventory by PN - June 2008 | 37 |
| D | 2.7.10 | Trial Balance - June 2008 | 5 |
| D | 2.7.11 | Inventory by months on hand | 32 |
| F | 2.8 | Other Financial Information | |
| D | 2.8.1 | Sales by Costumer 2003-2007 | 21 |
| D | 2.8.2 | Balances of cash accounts | 20 |
| D | 2.8.3 | Allowance for bad debts | 1 |
| D | 2.8.4 | Inventory aging | 1 |
| D | 2.8.5 | Inventory net realizable value analysis | 1 |
| D | 2.8.6 | Current prepaids | 7 |
| D | 2.8.7 | Accrued liabilities | 8 |
| D | 2.8.8 | Risks attendant to foreign operations | 1 |
| D | 2.8.9 | Company pricing policies | 1 |
| D | 2.8.10 | Projected capital expenditures, depreciation and working capital arrangements | 1 |
| D | 2.8.11 | Outside financing assumptions | 1 |
| D | 2.8.12 | Current shares outstanding | 1 |
| D | 2.8.13 | Options, warrants, rights and any other potentially dilutive securties | 1 |

**Project: Taurus2008**

| TYPE (F - Folder, D- Document) | Index | Title | Pages |
|---|---|---|---|
| D | 2.8.14 | Outstanding debt | 1 |
| D | 2.8.15 | Derivatives and any off balance sheet liabilities | 1 |
| D | 2.8.16 | Governmental grants outstanding | 1 |
| D | 2.8.17 | PL Analysis 2004-2007 | 2 |
| D | 2.8.18 | 2006-2008 Sales by Month | 3 |
| F | 3 | Human Resources | |
| D | 3.1 | Employee Listing | 1 |
| D | 3.2 | Collective bargaining agreements or labor union contracts | 1 |
| D | 3.3 | Labor unrest situations | 1 |
| D | 3.4 | Bonus plans | 1 |
| D | 3.5 | Group insurance | 15 |
| D | 3.6 | Any employment, consulting or deferred compensation agreements | 1 |
| D | 3.7 | Compensation policies | 1 |
| D | 3.8 | Confidentiality, noncompetition or similar agreements | 1 |
| D | 3.9 | Workers' compensation and unemployment compensation insurance obligations | 1 |
| D | 3.10 | Workers' compensation and employers liability insurance policy | 22 |
| D | 3.11 | Pending or threatened disputes, claims, litigation, or proceedings | 1 |
| D | 3.12 | Employee confidentiality agreements | 6 |
| F | 4 | Litigation and Contingent Liabilities | |
| D | 4.1 | Legal actions against the company | 1 |
| D | 4.2 | Copies of pleadings | 1 |
| D | 4.3 | Any investigations in the last five years | 1 |
| D | 4.4 | Any litigation in the last five years | 1 |
| D | 4.5 | Notice of proposed rulemaking (NPRM) | 8 |
| D | 4.6 | Product liability open claims with brief description | 1 |
| D | 4.7 | API settlement | 4 |
| D | 4.8 | Blanchette – legal settlement | 3 |
| D | 4.9 | Camtech settlement | 15 |
| D | 4.10 | Product liability loss history for last 10 years | 1 |
| D | 4.11 | Mgmt. Assessment of potential liability out of NPRM | 18 |
| D | 4.12 | FAA 21.3 reporting | 25 |
| F | 5 | Company Contracts and Agreements | |
| F | 5.1 | Service Agreements | |
| D | 5.1.1 | Cleaning service agreement | 7 |
| F | 5.2 | Loan and Credit Agreements | |
| D | 5.2.1 | Guarantees of debt | 1 |
| D | 5.2.2 | Notes payable to any officer, director or employee | 1 |
| D | 5.2.3 | Letters of credit | 1 |
| D | 5.2.4 | Commitments for capital expenditures | 1 |
| D | 5.2.5 | Other contingent liabilities | 1 |
| D | 5.2.6 | Industrial revenue bonds | 1 |
| D | 5.2.7 | Instruments creating security interests in the company's assets | 1 |
| F | 5.2.8 | Working Capital Revolver | |
| D | 5.2.8.1 | Revolving credit and security agreement (RCSA) | 23 |
| D | 5.2.8.2 | RCSA 2 | 20 |
| D | 5.2.8.3 | RCSA 3 | 20 |
| D | 5.2.8.4 | RCSA 4 | 13 |
| D | 5.2.8.5 | RCSA – schedules | 15 |
| D | 5.2.8.6 | Post-Closing agreement | 9 |
| D | 5.2.8.7 | Patton Boggs LLP – letter | 13 |
| D | 5.2.8.8 | Revolving credit note | 2 |
| D | 5.2.8.9 | Stock pledge agreement | 12 |
| D | 5.2.8.10 | Subordination agreement | 11 |
| D | 5.2.8.11 | Domestic borrowing base certificate | 2 |
| D | 5.2.8.12 | Revolving credit advance request | 2 |
| D | 5.2.8.13 | GE Capital – account for payment | 1 |
| D | 5.2.8.14 | Secretary's certificate | 16 |
| D | 5.2.8.15 | Financial condition certificate | 2 |
| D | 5.2.8.16 | Letter to Aerospace Products and Farnsworth Industrial | 3 |
| D | 5.2.8.17 | Letter to CAMTech | 3 |
| D | 5.2.8.18 | Letter to CAMTech and Auburn Property Management | 3 |
| D | 5.2.8.19 | Letter to Western Skyways | 3 |
| D | 5.2.8.20 | Assumed name certificate | 17 |
| D | 5.2.8.21 | Joint application for working capital guarantee | 8 |

**Project: Taurus2008**

| TYPE (F - Folder, D- Document) | Index | Title | Pages |
|---|---|---|---|
| D | 5.2.8.22 | EX-IM revolving credit note | 2 |
| D | 5.2.8.23 | Lessor's agreement | 3 |
| D | 5.2.8.24 | Export-related borrowing base certificate | 3 |
| D | 5.2.8.25 | Export-import bank of the united states working capital guarantee program | 21 |
| D | 5.2.8.26 | Forbearance agreement | 11 |
| D | 5.2.8.27 | First amendment to RCSA | 7 |
| D | 5.2.8.28 | Second amendment to revolving RCSA | 5 |
| D | 5.2.8.29 | Amendment to forbearance agreement | 9 |
| D | 5.2.8.30 | Waiver, third amendment to RCSA and second amendment to forbearance agreement | 10 |
| D | 5.2.8.31 | Waiver, fourth amendment to RCSA and third amendment to forbearance agreement | 10 |
| D | 5.2.8.32 | Fifth amendment to RCSA and fourth amendment to forbearance agreement | 11 |
| D | 5.2.8.33 | Sixth amendment to RCSA and fifth amendment to forbearance agreement | 9 |
| D | 5.2.8.34 | Waiver letter | 7 |
| D | 5.2.8.35 | Assignment agreement | 13 |
| D | 5.2.8.36 | Letter regarding assignment agreement | 3 |
| F | 5.3 | Sales Agreements | |
| D | 5.3.1 | Aircraft parts purchase agreement - direct purchase | 9 |
| D | 5.3.2 | Aircraft parts purchase agreement - distributor | 10 |
| D | 5.3.3 | Aircraft parts purchase agreement - international | 10 |
| D | 5.3.4 | Contract customers | 1 |
| F | 5.4 | Supplier Agreements | |
| D | 5.4.1 | Supplier agreement - Thielert Aircraft Engines GmbH | 15 |
| D | 5.4.2 | Supplier agreement 2 | 10 |
| F | 5.5 | Software and Technology Agreements | |
| D | 5.5.1 | Software and equipment agreement - International Business Systems | 23 |
| D | 5.5.2 | Local service agreement - Time Warner Telecom | 9 |
| D | 5.5.3 | Maintenance agreement - Interwest Communications Corporation | 4 |
| D | 5.5.4 | Software maintenance - Tristar | 3 |
| D | 5.5.5 | Enterprise agreement addendum - Cebos | 3 |
| D | 5.5.6 | Engagement agreement - Choice Solutions | 15 |
| D | 5.5.7 | Master service agreement - Choice Solutions | 6 |
| D | 5.5.8 | Order agreement - New Horizons | 2 |
| D | 5.5.9 | Renewal certificate March 2008 - Citrix | 1 |
| D | 5.5.10 | Renewal certificate April 2008 - Citrix | 1 |
| D | 5.5.11 | Service contract - Cisco | 2 |
| D | 5.5.12 | Copy rental agreement - Print, inc | 2 |
| F | 5.6 | Equipment Lease | |
| D | 5.6.1 | Lease agreement | 11 |
| F | 5.7 | Other Agreements | |
| D | 5.7.1 | Joint venture and partnership agreements | 1 |
| D | 5.7.2 | Agreements for the acquisition or sale of any business or properties | 1 |
| D | 5.7.3 | Fiduciary or agency agreements, including agreements with finders and brokers | 1 |
| D | 5.7.4 | Licenses and franchise agreements | 1 |
| D | 5.7.5 | Marketing activities | 21 |
| D | 5.7.6 | Sales or purchase agreements for a term in excess of one year | 1 |
| F | 6 | Intellectual Property Matters | |
| D | 6.1 | List of trademarks | 2 |
| D | 6.2 | Domains List Network Solutions | 1 |
| D | 6.3 | Information Technology Systems and Infrastructure Description | 5 |
| D | 6.4 | List of PMAs | 40 |
| F | 7 | Real Property | |
| D | 7.1 | Industrial lease agreement | 27 |
| D | 7.2 | First amendment to industrial lease agreement | 8 |
| D | 7.3 | Certificate of occupancy | 1 |
| D | 7.4 | Hangar rental for test cell location | 1 |
| F | 8 | Marketing, Sales, and Distribution | |
| D | 8.1 | Marketing, sales and distribution strategy | 2 |
| D | 8.2 | Marketing examples | 3 |
| D | 8.3 | Top 10 Customers | 1 |
| D | 8.4 | Compensation of sales employees | 1 |
| D | 8.5 | List of customers | 1 |
| F | 9 | Tax | |
| F | 9.1 | Tax 2004 | |
| D | 9.1.1 | US Corporation income taxreturn - 2004 | 26 |

**Project: Taurus2008**

| TYPE (F - Folder, D- Document) | Index | Title | Pages |
|---|---|---|---|
| D | 9.1.2 | Franchise, excise tax return - 2004 | 7 |
| F | 9.2 | Tax 2005 | |
| D | 9.2.1 | Texas corporation franchise tax report - 2005 | 6 |
| D | 9.2.2 | Franchise, excise tax return - 2005 | 8 |
| F | 9.3 | Tax 2006 | |
| D | 9.3.1 | Franchise, excise tax return - 2006 | 6 |
| D | 9.3.2 | IRS e-file signature authorization for form 1120 - 2006 | 16 |
| D | 9.3.3 | US Corporation income taxreturn - 2006 | 15 |
| D | 9.3.4 | Extension application - 2006 | 1 |
| F | 9.4 | Tax 2007 | |
| D | 9.4.1 | Texas franchise no tax due information report - report year 2007 | 4 |
| F | 10 | Miscellaneous | |
| F | 10.1 | Supplier | |
| D | 10.1.1 | Top 10 Suppliers | 1 |
| D | 10.1.2 | Supplier Listing | 4 |
| D | 10.1.3 | Quality Requirements for Suppliers | 18 |
| F | 10.2 | Warranty | |
| D | 10.2.1 | Warranty Contingency - 2005-2008 | 1 |
| D | 10.2.2 | Warranty report - Open claims | 1 |
| D | 10.2.3 | Warranty report - Part warranty | 13 |
| F | 10.3 | Insurance | |
| D | 10.3.1 | Business auto declarations -Chubb | 11 |
| D | 10.3.2 | Property insurance - Chubb | 24 |
| D | 10.3.3 | International commercial insurance - Chubb | 14 |
| D | 10.3.4 | International general liability insurance - Chubb | 2 |
| D | 10.3.5 | International commercial auto liability insurance - Chubb | 2 |
| D | 10.3.6 | Ocean cargo insurance - Chubb | 7 |
| D | 10.3.7 | Commercial excess and umbrella insurance - Chubb | 5 |
| D | 10.3.8 | Workers' compensation and employers liability insurance policy | 1 |
| D | 10.3.9 | Product liability policy | 4 |
| D | 10.3.10 | Product liability extension | 3 |
| D | 10.3.11 | Engine Alliance product liability insurance program | 4 |
| D | 10.3.12 | 2008 Confirmation of coverage | 8 |
| D | 10.3.13 | Premium Finance Agreement | 3 |
| F | 10.4 | Press Releases | |
| D | 10.4.1 | News - March 2002 | 10 |
| D | 10.4.2 | News - January 2003 | 12 |
| D | 10.4.3 | News - January 2004 | 24 |
| D | 10.4.4 | News - January 2005 | 25 |
| D | 10.4.5 | News - July 2006 | 15 |
| D | 10.4.6 | News - January 2007 | 4 |
| F | 10.5 | Research & Development | |
| D | 10.5.1 | Engineering Projects | 1 |
| F | 10.6 | DD requests | |
| D | 10.6.1 | BS1 - Inventory by months on hand | 32 |
| D | 10.6.2 | BS9 - spending on advertising and branding | 1 |
| D | 10.6.3 | EHS1 - machinery being transferred | 1 |
| D | 10.6.4 | FIN1-9 - Financial requests | 1 |
| D | 10.6.5 | FIN6 - inventory report as ofApril 30, 2008 | 52 |
| D | 10.6.6 | FIN7 - detailed report of fixed assets | 47 |
| D | 10.6.7 | FSC1 - specific location of all tooling | 7 |
| D | 10.6.8 | FSC2 - excess anaysis report | 32 |
| D | 10.6.9 | HR1 - no existing executive compensation plans and agreements | 1 |
| D | 10.6.10 | HR2 - current organization charts | 7 |
| D | 10.6.11 | RDE1-7 R&D requests | 1 |
| D | 10.6.12 | RDE8 - report 1 | 1 |
| D | 10.6.13 | RDE8 - report 2 | 14 |
| D | 10.6.14 | RDE8 - report 3 | 15 |
| D | 10.6.15 | RDE8 - report 4 | 14 |
| D | 10.6.16 | S11 - receipt of order to date of delivery | 1 |
| D | 10.6.17 | S7 - organization chart for the sales force | 1 |
| D | 10.6.18 | BS7 - last years Strategic Plan | 15 |
| D | 10.6.19 | AQ1-2 | 1 |
| D | 10.6.20 | BS10 | 3 |

**Project: Taurus2008**

| TYPE (F - Folder, D- Document) | Index | Title | Pages |
|---|---|---|---|
| D | 10.6.21 | BS11 | 1 |
| D | 10.6.22 | BS16 | 1 |
| D | 10.6.23 | BS5 | 25 |
| D | 10.6.24 | FSC1 | 7 |
| D | 10.6.25 | HR3 | 15 |
| D | 10.6.26 | INV3 | 38 |
| D | 10.6.27 | INV4 | 50 |
| D | 10.6.28 | INV5 | 360 |
| D | 10.6.29 | PRI1a | 16 |
| D | 10.6.30 | PRI1b | 17 |
| D | 10.6.31 | S13 | 3 |
| D | 10.6.32 | S15 | 1 |
| D | 10.6.33 | S2 | 1 |
| D | 10.6.34 | S3 | 4 |
| D | 10.6.35 | S4 | 1 |
| D | 10.6.36 | S5 | 1 |
| D | 10.6.37 | Tax1 | 1 |
| D | 10.6.38 | Tax2 | 5 |