## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| **IN RE:** | ) Case No. 08-36705-bjh11 |
| | ) Chapter 11 |
| **SUPERIOR AIR PARTS, INC.,** | ) |
| | ) |
| | ) |
| **Debtor.** | ) |
| | ) |
| _____ | ) |
| **LYCOMING ENGINES, a Division** | ) Adversary No. 12-03035-bjh |
| **of Avco Corporation,** | ) |
| | ) |
| **Plaintiff,** | ) Courtroom 2 |
| | ) 1100 Commerce Street |
| **versus** | ) Dallas, Texas 75242-1496 |
| | ) |
| **SUPERIOR AIR PARTS, INC.,** | ) |
| | ) May 15, 2012 |
| **Defendant.** | ) 1:31 P.M. |


TRANSCRIPT OF CASE NO. 08-36705-BJH11:  MOTION TO REOPEN CASE
FILED BY SUPERIOR AIR PARTS, INC. (662)
TRANSCRIPT OF ADVERSARY PROCEEDING 12-03035-BJH: MOTION FOR
REMAND FILED BY PLAINTIFFS LYCOMING ENGINES, A DIVISION OF AVCO
CORPORATION, TEXTRON INNOVATIONS, INC. (13).
BEFORE HONORABLE BARBARA J. HOUSER
UNITED STATES CHIEF BANKRUPTCY JUDGE

APPEARANCES:

For Superior Air Parts,    Passman & Jones
Inc.:                      By:  JAMES F. ADAMS, ESQ.
                                JERRY C. ALEXANDER, ESQ.
                                CHRISTOPHER ALAN ROBISON, ESQ.
                           1201 Elm Street, Suite 2500
                           Dallas, Texas 75270

ECRO:                      Nicole Whittington

**TRANSCRIPTION SERVICE:**   **TRANSCRIPTS PLUS, INC.**
                           **435 Riverview Circle**
                           **New Hope, Pennsylvania 18938**
                           **Telephone:  215-862-1115**
                           **Facsimile: 215-862-6639**
                           e-mail CourtTranscripts@aol.com

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

```
APPEARANCES:
(Continued)

For Lycoming Engines:      Olson, Nicoud & Gueck, LLP
                           By:  DENNIS OLIVER OLSON, ESQ.
                           1201 Main Street, Suite 2470
                           Dallas, Texas 75202

                           Smith Moore
                           By:  CHARLES SMITH, ESQ.
                              DAVID V. DENNY, ESQ.
                           3030 Lincoln Plaza
                           500 North Akard Street
                           Dallas, Texas 75201
```

EXHIBITS

| DEBTOR'S EXHIBITS | MARKED | ADMITTED |
|---|---|---|
| 1 through 20 | 16 | 16 |
| 21 through 25 | 15 | 15* |
| 26 through 34 | 16 | 16 |

*Admitted under seal.

1          THE COURT:   Be seated, please.  All right.  We'll

2    take up appearances in Superior Air Parts and the related

3    adversary proceeding.

4          MR. ADAMS:  Your Honor, Jim Adams on behalf of

5    Superior Air Parts, the debtor and defendant in the case.

6          With me from Passman and Jones is Jerry Alexander and

7    Chris Robison.

8          And then we have some witnesses today:  Mr. Tom Tong

9    who is with Locke Lord and Mr. Tim Archer, with the red tie on,

10   and Mr. Kent Abercrombie in the back, and then Mr. Chuck Dedmon

11   in the front.

12         THE COURT:  Excellent.  Good afternoon.  Mr. Olson?

13         MR. OLSON:  Your Honor, Dennis Olson representing

14   Avco/Lycoming.  I have with me Mr. Charles Smith, who's with

15   the firm Smith and Moore, he's designated as a witness, he's

16   also the attorney of record that filed the suit in State Court.

17   With him is David Denny, an attorney in his firm.

18         THE COURT:  Excellent.  Good afternoon.

19         UNIDENTIFIED ATTORNEY:  Good afternoon, Your Honor.

20         THE COURT:  All right.  Well, thanks, everyone, for

21   your flexibility.  We had -- and I hope Ms. Salcido made this

22   clear, we just had the opportunity to move this up, and get you

23   done sooner today.  So, we thought we'd at least check with you

24   and see if that worked.  So, I'm glad it did for everyone.

25         Are we ready to proceed?

5

1                    (No audible response heard)

2          THE COURT:  I think we should first, obviously, take

3  up the motion to reopen, and then once we've addressed that,

4  we'll take up the motion for remand and motion to dismiss.

5          MR. ADAMS:  Yes, Your Honor.  Your Honor, we filed

6  the motion to reopen basically for two main reasons:

7              One is there seems to be a split of authority on

8  whether or not you can have a adversary proceeding in a case

9  that is closed.  Some case -- some opinions say, "Yes, you

10  can."  Others say, "You can't."  We decided it would be a

11  better practice to go ahead and spend the filing fee and file

12  the motion to reopen, depending on -- well, not knowing which

13  way the Court preferred it to be done.  Also --

14          THE COURT:  Your government thanks you.

15                      (Laughter)

16          MR. ADAMS:  Yes, that was $1,000 filing fee, if I

17  remember correctly.  And my credit card did go through on that

18  one.

19                      (Laughter)

20          MR. ADAMS:  Your Honor, and the second reason is

21  there will be a discussion about whether or not Lycoming has

22  filed any pleadings requesting a declaration from a court that

23  the license agreements at issue were rejected in the bankruptcy

24  or not, and there's some technical aspects to that that we were

25  hoping that if the case was reopened and the Court had found

6

1   that there were some problems on whether or not the licenses

2   were rejected, we were hoping to try to remedy that situation

3   through 1142 or something like that to be able to address that

4   issue.  Again, we're hoping we don't have to reach that point,

5   but that was our second basis for doing it as a discussion in

6   the motion.

7        In particular, the Fifth Circuit has said that -- in

8   the matter of Case (phonetic) that motions to reopen should be

9   granted -- well, should be considered broadly and/or

10  discretionary or, generally speaking, granted.  And among other

11  reasons is to enforce the discharge injunction and to interpret

12  or clarify the terms of a confirmed plan.

13       And in this particular case, we are contending that

14  the plan might need to be clarified as to whether or not the

15  license agreements survive the bankruptcy, and if so, whether

16  or not the indemnity provisions of the license agreements were

17  discharging debts under that were discharged in the bankruptcy.

18       And we also quoted some material from the plan and

19  order whereby this order retained exclusive jurisdiction, as

20  mentioned in Section 12.01 of the confirmation order, I believe

21  it was.

22       And, therefore, we -- citing 1127(b) and 1442(c) of

23  the Bankruptcy Code, we had asked that the Court reopen the

24  case and, of course, Section 350 of the Bankruptcy Code.

25       THE COURT:  Very well.  Mr. Olson?

1          MR. OLSON:  Your Honor, of course, we oppose the

2    reopening of the case.  We think the Court needs to reopen the

3    case if the Court decides to remand.

4          I think if the Court decides to remand, it's whatever

5    the Court's policy is on having an open adversary with a main

6    case.

7          THE COURT:  Well, but --

8          MR. OLSON:  I have no opinion either way.

9          THE COURT:  Right.  But if that's the case, I'm

10   hearing you not really opposing reopening, what you really want

11   is for me to remand the adversary proceeding and then reclose

12   the case.

13         MR. OLSON:  That's another way to do it, and I don't

14   have a bit of problem with that.

15         Also in response to the comments about the rejection,

16   non-bankruptcy lawyers filed this in State Court.  And in the

17   exchange of letters, they've kind of gotten off on that, and

18   you may have seen those exhibits.  But for whatever it's worth,

19   my review of the file and the record would indicate that the

20   license agreements were not rejected, passed right trough, they

21   were never addressed, scheduled, or anything else.  I think

22   everybody operated for years post bankruptcy believing that

23   those license agreements were in effect.

24         If that's their position, as well, we could just

25   stipulate to that.  And I'm not trying to trap them, but I

8

1  think that the discourse kind of got off on that tangent.  But

2  I would ask you if that is ya'll's position?

3       MR. ADAMS:  Your Honor, I'd be happy to address that

4  in the motion to remand.  On that -- if you'd like a preview of

5  that, I can go ahead and give that to you.

6       THE COURT:  Well, I mean I think Mr. Olson's question

7  was just simpler:  Are you contending -- you're not -- are you

8  contending that the agreements were rejected?  Because I

9  don't --

10       MR. ADAMS:  No, Your Honor.

11       THE COURT:  -- read you --

12       MR. ADAMS:  No, Your Honor.

13       THE COURT:  to be contending that.

14       MR. ADAMS:  There are two parts to the agreement, at

15  least.

16       THE COURT:  Yes.

17       MR. ADAMS:  There are two parts to the agreement, at

18  least, and the -- one is that you pay your money, you get your

19  perpetual license.  And it's kind of unique because it's up-

20  front payment, rather than ongoing royalties.  We believe that

21  that, without a doubt, survived the bankruptcy.

22       But we also believe that it's possible that the

23  indemnity provision in the license agreement -- any claims

24  arising from that were discharged in the bankruptcy and we've

25  cited some authority for the concept --

1          THE COURT:  No, no, no.  I understand all that.

2          MR. ADAMS:  Okay.

3          THE COURT:  The question that I think Mr. Olson was

4   raising is do you contend that you rejected this agreement

5   under 365?

6          MR. ADAMS:  No.

7          THE COURT:  I understood the debtor to be taking the

8   position that this was not an executory contract on the

9   petition date.  You didn't schedule it on G, et cetera, et

10  cetera.

11          MR. ADAMS:  Yes, correct, Your Honor.  Correct, Your

12  Honor.

13          And we believe that it did not need to be scheduled

14  and, no, it was not rejected in the bankruptcy.

15          THE COURT:  Okay.

16          MR. OLSON:  And we would agree with that and

17  stipulate to that.

18          THE COURT:  All right.

19          MR. OLSON:  And that's --

20          THE COURT:  So, the parties are stipulating this was

21  not an executory contract.

22          MR. OLSON:  Yes, ma'am.

23          THE COURT:  Okay.  Mr. Olson -- I mean, Mr. Adams?

24          MR. ADAMS:  Yes, Your Honor.

25          THE COURT:  Okay.  Great.  Well, I'm going to reopen

1  the case.  Quite frankly, I don't know how you can remove an

2  action to Bankruptcy Court in a closed case.  There's nothing

3  to remove it to.

4         So, I would definitely be the line of authority that

5  says you can't -- I mean I know that there are some cases out

6  there that have said that an adversary proceeding can continue

7  once a bankruptcy case is closed.  But that's an adversary

8  proceeding, and I think that case law are adversary proceedings

9  that were pending at the time of closure.

10         Once a bankruptcy case is closed, there's nothing

11 here to attach to.  And, quite, frankly, just to be blunt, I

12 have talked to my Clerk of Court about how in the world you

13 successfully removed an action into a closed case.  And at

14 least I don't think that's ever going to be possible again,

15 that you're not going to be able to remove until a case

16 actually pends here.  Because otherwise, there's nothing to

17 append it to.

18         MR. ADAMS:  We saw something in Section 350 on

19 Colliers, and it's talking about going both ways, and didn't

20 see anything from the Northern District of Texas, so we figured

21 to be safe is the better thing to do.

22         THE COURT:  Well, and I agree with that.  But the

23 further anomaly is I just -- again, I think the cases that

24 you're relying upon that say that an adversary can pend in a

25 closed case are adversaries that were pending at the time that

11

1   the court went ahead --

2          MR. ADAMS:  Oh, okay.

3          THE COURT:  -- and closed the main case.  I don't

4   think we can have an adversary proceeding that just

5   mysteriously appears when we have no bankruptcy case pending at

6   the time.  So, like I say, I think you all may be the last

7   group that would be permitted to remove a case here before you

8   actually got the bankruptcy reopened.  Because I don't know how

9   -- I mean that's all sort of metaphysical to me.  We don't have

10  a bankruptcy case, and the only way a court can have -- a

11  Bankruptcy Court can have jurisdiction is if there is something

12  to attach it to.  But --

13         MR. ADAMS:  Perhaps the ECF geniuses who designed the

14  system foresaw having to remove a case timely and whether or

15  not that had anything to do with it.  I don't know.

16         THE COURT:  Maybe so.

17         MR. ADAMS:  I don't know.

18         THE COURT:  But in any event, I found it to be

19  slightly odd.  But with that said, I'm going to grant the

20  motion to reopen so that we can then reach the merits of the

21  plaintiff's request to remand and the defendant's request that

22  I dismiss the amended complaint.

23         MR. ADAMS:  Right, Your Honor.

24         Your Honor, procedurally, how do you want us to

25  proceed on the motion to remand?

12

1          THE COURT:  It seems to me that the issues are

2   reasonably intertwined.  But let's take the remand first

3   because obviously if I remand the case --

4          MR. ADAMS:  Right.

5          THE COURT:  -- I wouldn't consider the dismissal.

6   That would go back to State Court for the State Court judge.

7   But truthfully, I'm not going to rule on one without hearing

8   because the factual circumstances appear to be substantially

9   intertwined.

10          MR. ADAMS:  And do you want the movant to start?

11          THE COURT:  Yes.

12          MR. ADAMS:  Okay.

13          THE COURT:  Please.

14          MR. OLSON:  Your Honor, just by way of chronology and

15   asking the Court to take judicial notice of the fact that the

16   order confirming the third amended Chapter 11 plan was entered

17   August 27th, '09, the final decree was entered 9/23/2010, and

18   the case was closed October the 8th, 2010.

19          THE COURT:  Any objection to the Court taking

20   judicial notice of those dates?

21          MR. ADAMS:  Your Honor, I believe that all those

22   dates are correct.

23          THE COURT:  Excellent.  The Court --

24          MR. ADAMS:  Your Honor, by the way, there should be a

25   notebook up there with --

1          THE COURT:  I have it.

2          MR. ADAMS:  Okay.  -- with a bunch of exhibits and

3   pleadings in it.  And I believe that there's no objection to

4   any of those being admitted for the hearing today.

5          MR. OLSON:  That is correct.  A number of the

6   exhibits are taken from documents that were filed with the

7   Court under seal, and counsel for both sides want to protect

8   that.  So, if Mr. Adams could retrieve the Court's binder when

9   the Court's through with it, we think that's a solution --

10         THE COURT:  Well, I can't let you --

11         MR. OLSON:  -- maybe not the Court's best solution.

12         THE COURT:  I can't let you take exhibits that are

13  admitted into evidence.  You can't take them back, they're part

14  of the record.

15         MR. ADAMS:  Your Honor, in that case --

16                    (Pause)

17         MR. OLSON:  I think what both sides are concerned

18  about is the nondisclosure agreement, and third parties may be

19  seeing it.

20         I don't know if the Court can take judicial notice of

21  the documents since the Court was provided a copy, and let us

22  go from --

23         THE COURT:  When was I provided --

24         MR. OLSON:  -- that way and not offer the document.

25         THE COURT:  What -- let's be specific.  What exhibits

14

1 | are we talking about?

2 | MR. ADAMS:  Your Honor --

3 | MR. OLSON:  21 --

4 | MR. ADAMS:  Exhibits 21 through 24 are the -- the

5 | first three are the 1999 agreement documents.  And then Exhibit

6 | 25 is the 1981 agreement.

7 | THE COURT:  Yes, but those aren't things of which the

8 | Court can take judicial notice.

9 | MR. OLSON:  I --

10 | MR. ADAMS:  True.

11 | MR. OLSON:  I think both sides need the exhibit

12 | admitted.

13 | MR. ADAMS:  Your Honor --

14 | MR. OLSON:  Can we have a moment to confer?

15 | MR. ADAMS:  -- may we confer?

16 | THE COURT:  Of course.

17 | (Pause)

18 | MR. OLSON:  Question out of ignorance:  Since these

19 | were filed under seal --

20 | THE COURT:  What were filed under seal?

21 | MR. ADAMS:  Your Honor, Exhibits 21 through 25 were

22 | filed under seal with the Court earlier in connection with -- I

23 | believe it was the motion to reopen the case.

24 | THE COURT:  You mean the motion to reopen --

25 | UNIDENTIFIED ATTORNEY:  It was either the -- I think

1  it was the motion -- the first motion to dismiss --

2          MR. ADAMS:  First motion to dismiss.

3          UNIDENTIFIED ATTORNEY:  -- filed, Your Honor.

4          MR. ADAMS:  There were the license agreements --

5          THE COURT:  No.

6          MR. ADAMS:  Okay.

7          THE COURT:  Hang -- just -- so, the motion to dismiss

8  the original complaint --

9          MR. ADAMS:  Correct, Your Honor.

10          THE COURT:  -- you're telling me that these exhibits

11  were attached to that, and there's an order sealing them.

12          MR. ADAMS:  Correct, Your Honor.

13          THE COURT:  Well, why don't we just admit them and

14  admit them under seal in this hearing.

15          MR. ADAMS:  And just reseal them.

16          MR. OLSON:  That's fine, Your Honor.

17          MR. ADAMS:  That's what we were going to ask is if --

18  since they came in under seal, can we use them and just put

19  them back under seal.

20          THE COURT:  Yes.

21          MR. OLSON:  That's fine, Your Honor.

22          THE COURT:  All right.

23          MR. ADAMS:  Thanks.  And, again, that's 21 through

24  25.

25          THE COURT:  All right.  Exhibits 21 through 25 are

1 | admitted, and they will be sealed.  And I take it Exhibits 1

2 | through 20 and 26 through 34 are admitted without objection?

3 | MR. OLSON:  Correct.

4 | MR. ADAMS:  Yes, Your Honor.

5 | THE COURT:  Very well.  Please.

6 | MR. OLSON:  Your Honor, I think that the evidence

7 | that's been admitted so far would show that the license

8 | agreement, Exhibit 21 in Paragraph 5, says that to get your

9 | license, you do three things:

10 | You pay money, which they paid years prepetition;

11 | And you provide insurance;

12 | And you indemnify.

13 | In November of 2011, 13 months after the case was

14 | closed, suits were filed in which my clients made demand on

15 | Superior for indemnification, and no indemnification was

16 | provided.  So, suit was filed in January of this year, and the

17 | case was eventually removed to this Court.

18 | We think that when you refuse to perform on the

19 | indemnity, it's a repudiation of the license agreement or at

20 | least gives my clients the right to terminate the agreement.

21 | And so in our suit, we're claiming that there is no

22 | license, either because of our termination or the repudiation.

23 | And, as a result, as we're sitting here, Superior is making

24 | parts, selling parts, competing with us without a license.

25 | So, the suit seeks injunctive relief, declaratory

17

1  relief, and damages.  And in calculating the damages, we think

2  it's from the date that we terminated, or maybe as far back as

3  the date of the repudiation, which would be ostensibly in

4  January.

5        We see the various causes of action asserted under

6  Texas law as attempts to explain what they're doing while

7  they're making parts and selling parts, and so on, whether you

8  call that a conversion or any of the other theories of causes

9  of action that we've pled.

10        But we're not seeking in this suit to look at

11  anything that happened before these suits were filed in

12  November of 2011.

13        THE COURT:  But doesn't everything in your suit turn

14  on whether or not your indemnity claim is a prepetition claim?

15  I mean you're alleging -- you're alleging that you terminated

16  the agreements for the reorganized debtor's failure to pay --

17  failure to indemnify you, failure to pay defense costs and

18  otherwise take over litigation that was filed against you post

19  confirmation, right?

20        MR. OLSON:  Yes, ma'am.

21        THE COURT:  But if those indemnity claims were

22  prepetition claims that got discharged in the bankruptcy, then

23  there's no basis for you to claim breach prompting termination.

24        MR. OLSON:  Well, I think there is.

25        THE COURT:  Which is?

18

1          MR. OLSON:  Let me try an analogy this way, something

2   that we see much more commonly.

3          Debtor files an individual case, gets a discharge,

4   doesn't reaffirm the car, the house.  The liability for the

5   deficiency claim, or the note balance, is discharged.

6          But if you want to keep the collateral -- or, in this

7   instance, if you want to keep the license, you've got to keep

8   performing.

9          THE COURT:  I don't think so.

10          MR. OLSON:  If you don't, you can take it back.

11          THE COURT:  Not if it's -- not if it's -- not if it's

12   not executory.

13          MR. OLSON:  Sure.  You've got a situation where --

14          THE COURT:  I mean the debtor didn't have to reaffirm

15   anything here.

16          MR. OLSON:  No, no, no.  No, no, no.  It's -- in both

17   instances, you're talking about something that's no longer

18   property of the estate.

19          THE COURT:  Well, but, no --

20          MR. OLSON:  That if they want to use it --

21          THE COURT:  Wait, wait, wait.  Try your analogy again

22   because I'm not following.

23          MR. OLSON:  Well --

24          THE COURT:  Because this isn't an individual debtor.

25          MR. OLSON:  No, no.

19

1          THE COURT:  So, reaffirmation doesn't apply.

2          MR. OLSON:  No, I understand that.  But we're talking

3    about how something post bankruptcy that you don't have an

4    obligation to pay for anymore, the obligation to pay has been

5    discharged --

6          THE COURT:  No.

7          MR. OLSON:  But if you want to keep the license,

8    you've got to keep performing.

9          THE COURT:  Where does -- where do you -- you cited

10   me to nothing, Mr. Olson, that supports that position in your

11   papers.  Have you?

12         MR. OLSON:  No, I have not.  I think that it's just

13   that simple.

14         THE COURT:  Well, but --

15         MR. OLSON:  You've got one --

16         THE COURT:  -- then there should be a whole host of

17   cases that tell me it's that simple because I'm not seeing

18   that.

19         MR. OLSON:  Well, you --

20         THE COURT:  If it's not executory, and the payment

21   obligation got discharged for your client's failure to file a

22   proof of claim, then the debtor has a perpetual license and

23   discharge the obligation to indemnity.

24         MR. OLSON:  You can lose the license, though.

25         THE COURT:  How?

20

1        MR. OLSON:  Continuing to make our parts, use our

2  plans, and when those planes that you put those parts on crash,

3  you don't step up and perform the indemnity in the insurance

4  provision for the license, you can lose the license.

5        THE COURT:  But cite me --

6        MR. OLSON:  It's --

7        THE COURT:  Cite me a single case that supports that

8  proposition.  Because you haven't.

9        MR. OLSON:  Well --

10       THE COURT:  And there's a lot of cases that say a

11 prepetition indemnity agreement is a prepetition claim for

12 which a proof of claim should have been filed.  Admittedly it

13 was a contingent claim.  Admittedly it had not yet matured with

14 respect to airplanes that crashed post confirmation.  But the

15 claim could and should have been filed, and when it wasn't, it

16 got discharged.

17       MR. OLSON:  Yes, ma'am.  But if -- when we get sued

18 and we ask you to perform the indemnity and you say I've got a

19 complete defense of discharge in bankruptcy, and the Texas

20 rules provide for that --

21       THE COURT:  Right.

22       MR. OLSON:  -- then we can say, "Okay, but you can't

23 make our parts anymore, you can't keep selling and competing if

24 you don't."

25       THE COURT:  I don't --

1          MR. OLSON:  You can forfeit the license.  You can

2   have all the fruits of what you took up until that point.

3          THE COURT:  I hear you.  But what's the theory, and

4   where's your law that supports that?

5          MR. OLSON:  Well, I think that --

6          THE COURT:  I mean I understand your argument.  But

7   you've cited me absolutely noting that supports that

8   proposition.

9          MR. OLSON:  Well, you're either standing on the

10  contract or you're not.  And if you want the benefits of the

11  contract, the license, the access to the plans, the ability to

12  sell and complete, then you perform.

13          If you don't want the benefit of the contract, you

14  can walk away from it, and you don't have any license -- any

15  obligation except quit selling, quit competing, quit using our

16  plans.

17          THE COURT:  Okay.  Again, we're -- I understand

18  exactly what you're saying.  You have cited me nothing --

19          MR. OLSON:  Well --

20          THE COURT:  -- to support that proposition --

21          MR. OLSON:  I think that the first --

22          THE COURT:  -- under State law or, frankly,

23  bankruptcy law.

24          MR. OLSON:  The first thing that comes to my mind

25  would be GAB versus Hanks, the Texas Supreme Court case.  It's

22

1  about 30 years old, I can't put it much closer than that.  But

2  that's where you've got a contract that has several parts to

3  it, and you can't keep wanting to reject the rest.

4           THE COURT:  That's --

5           MR. OLSON:   You're either on it, or off it.

6           THE COURT:  That's not a bankruptcy decision, so it

7  doesn't have anything to do with the effect of bankruptcy on

8  one of the parts.

9           MR. OLSON:  But I think --

10          THE COURT:  Right?

11          MR. OLSON:  -- under Texas contract law here as to

12 what is this creature, this license agreement that survived the

13 bankruptcy, and you go down the road several years --

14          THE COURT:  But the obligation to indemnify got

15 discharged.

16          MR. OLSON:  And that's fine.  If that's been

17 discharged, and they can plead that in State Court --

18          THE COURT:  Well, they can plead it here --

19          MR. OLSON:  That's right.

20          THE COURT:  -- if I keep it here.

21          MR. OLSON:  That's right.  They can do that.  But

22 when they do, the Texas law question then is can we then

23 terminate the license.  Say from this day forward, "Make no

24 more parts, make no more sales."  How can they keep competing

25 with us and making those parts, and they go down and we get

23

1 sued, and they don't?  See, that's the unfair part of it.

2         THE COURT:  Well, I hear about it being unfair, but

3 you could have solved that.  You could have filed a claim in

4 the bankruptcy case.

5         MR. OLSON:  Well --

6         THE COURT:  And that claim then would have survived.

7 But you didn't do a thing.

8         MR. OLSON:  No, I understand.

9         THE COURT:  And "you" personally --

10        MR. OLSON:  I understand.

11        THE COURT:  -- is not personally.  Your clients did

12 not --

13        MR. OLSON:  And the reason --

14        THE COURT:  -- do anything to protect themselves from

15 that scenario.

16        MR. OLSON:  On the discharge, that's right.  But,

17 again, this license was one of the things sold to Brantly, it's

18 an asset.

19        THE COURT:  Right.

20        MR. OLSON:  Everybody understood that.  We were not

21 on the mailing list, we were not on Schedule F.

22        THE COURT:  Well, that's not really true.

23        MR. OLSON:  We were present for a lot --

24        THE COURT:  Ms. Rockaman (phonetic) filed a notice of

25 appearance --

24

1          MR. OLSON:  She was.

2          THE COURT: -- on behalf of your client.

3          MR. OLSON:  And later -- and later --

4          THE COURT:  We checked that today.

5          MR. OLSON:  And post confirmation --

6          THE COURT:  So, your client got copies of everything.

7          MR. OLSON:  We're not claiming no notice.  She sat

8  through this thing, started off as the buyer.

9          THE COURT:  Absolutely.

10          MR. OLSON:  So, the collective group -- and that's

11  what I said earlier, I don't think anybody that's involved

12  thought that this license agreement was rejected or went away,

13  or that it was executory.

14          THE COURT:  Right.

15          MR. OLSON:  I think everybody treated it -- it passed

16  through to Brantly.  Now Brantly has bought an asset.  And if

17  they want to continue to make and sell and compete, they can.

18  They've got the right to do that.

19          When the demand is made to perform on the indemnity,

20  and they opt not to do that, I think they can do that.

21          But when they do, I think that gives us the right to

22  terminate, treat that as a repudiation.

23          THE COURT:  Well, I understand you think that.  It

24  would now be helpful if there was legal authority that

25  supported your position.  Because, again, you've cited me

1  nothing.

2         MR. OLSON:  Well, <u>GAB versus Hanks</u> --

3         THE COURT:  Well, but you --

4         MR. OLSON:  -- would stand for that proposition.

5         THE COURT:  You're citing that to me for the first

6  time here without --

7         MR. OLSON:  That's -- that's true, Your Honor.

8         THE COURT:  And it's not a bankruptcy involved case,

9  I'm guessing.

10        MR. OLSON:  No, it's not.  But I think that sometimes

11  I err in not giving more extensive briefing under the

12  assumption that that's something that we're all familiar with,

13  and I apologize for that.

14        But I do think that the concept that you're either

15  standing on the contract or you're not standing on the contract

16  is one of the most basic fundamentals of contract law.  And I

17  don't think they can have it both ways.  They -- they got out

18  of here with the contract with our blessing.

19        THE COURT:  And, again, I understand that that's what

20  you think.  But it would be helpful if there was legal

21  authority that supports your view of what the law should be

22  because bankruptcy potentially has interfered with that

23  thinking.

24        Now the case law is, I think, abundantly clear that

25  the indemnity claim of your clients is a prepetition claim.  I

26

1  can cite you a lot of cases that we have found that so hold

2  that --

3          MR. OLSON:  Oh, and I agree with that.

4          THE COURT:  -- prepetition agreement gave rise to a

5  contingent, unmatured indemnity claim that got discharged --

6          MR. OLSON:  And I agree with that.

7          THE COURT:  -- because nobody filed a proof of claim.

8          MR. OLSON:   And I agree with that.

9          THE COURT:  So, now if the indemnity obligation has

10 been discharged, query how you revive it.

11         MR. OLSON:  It --

12         THE COURT:  It got discharged.

13         MR. OLSON:  The debtor, post discharge, can say, "I

14 don't want to."  It clearly has the right to do that.

15         THE COURT:  The debtor has no legal obligation to

16 pay.  It doesn't have to say, "I don't want to."  The debtor is

17 legally excused from paying.

18         MR. OLSON:  But I'm saying, like the mortgage

19 company, if you quit, I can take the house.  If you quit, I can

20 take the license.

21         THE COURT:  Well, but see --

22         MR. OLSON:  Because otherwise you can't say that

23 there's any fairness --

24         THE COURT:  But see, the mortgage didn't get

25 discharged, that's the difference.  The mortgage obligation

1 didn't get discharged in bankruptcy.  The mortgage obligation

2 survives the bankruptcy, either through reaffirmation in a

3 Chapter 7, or because it's not dischargeable in a Chapter 13.

4 It survives.

5          What -- the debt that you restructure in a 13 under

6 the plan is the arrears.  But unless the mortgage is going to

7 mature within the term of the plan, you don't discharge a

8 mortgage in Chapter 13.  You -- you get the ability to pay the

9 arrears over time, but the mortgage survives.

10          MR. OLSON:  What the debtor gets --

11          THE COURT:  That's statutory.

12          MR. OLSON:  What the debtor gets in a Chapter 7 is

13 discharge of the deficiency.  If they quit paying, they lose

14 the car through repossession, they lose the house through

15 foreclosure.  The lender can't pursue the deficiency claim

16 because of the discharge.

17          THE COURT:  Not quite, but we aren't dealing with a

18 mortgage so --

19          MR. OLSON:  I understand.  But I think that if you

20 buy a license -- if somebody --

21          THE COURT:  And paid for the license.

22          MR. OLSON:  -- says that it's transferable --

23          THE COURT:  Right?

24          MR. OLSON:  -- assignable --

25          THE COURT:  They fully paid for the license?

28

1          MR. OLSON:  Prepetition.

2          THE COURT:  Yes.  But I mean they paid for a

3 perpetual license.

4          MR. OLSON:  But it's perpetual only in the sense that

5 there's no term.  It doesn't expire.

6          THE COURT: Right.

7          MR. OLSON:  You can still lose your license.

8          THE COURT:  If you don't do something, you're still

9 obligated legally to do --

10          MR. OLSON:  Which is to insure --

11          THE COURT:  And my point -- my point is is that they

12 discharged, at least as I'm thinking it now -- and, frankly,

13 you didn't cite me anything to the contrary -- that they

14 discharged the obligation that you want to now claim they've

15 breached.  And if it's been discharged, it can't be breached.

16          MR. OLSON:  I -- I understand, and I'd like to give

17 you some authority.  But I'm telling you we're not fighting

18 them on the concept that it's discharged if that's the way they

19 want to treat it.  But they don't get to keep making -- keep

20 using our plans, keep competing if they don't perform on what

21 it takes to keep the license.  That's Paragraph 5 of Exhibit

22 21.

23          They can go either way.  If they say, "That was

24 discharged," then they're not standing on the contract anymore,

25 and it's gone, and we understand that.  We were never told that

29

1  until January of this year, so that's when their damages would

2  start.

3          But if they want to keep the license, keep competing,

4  they have to keep performing.

5          THE COURT:  I understand your argument.

6          MR. OLSON:  Let me see if I can get you some

7  authority that would -- I know we're not communicating, and I

8  apologize for that.

9          THE COURT:  No, we are communicating.  I mean I

10  understand exactly what you're telling me, I just --

11  unfortunately you gave me no authority to support that.  And at

12  least I don't know that I agree with it as a matter of law.

13  And, frankly, you didn't help me come to your conclusion by

14  giving me any authority that we could read in preparation for

15  today's hearing.

16          MR. OLSON:  I understand.

17          THE COURT:  So, I mean --

18          MR. OLSON:  I understand that.

19          THE COURT:  But I understand your argument exactly,

20  and I understand that it seems unfair --

21          MR. OLSON:  Um-hum.

22          THE COURT:  -- because I had to think about that

23  piece myself.

24          But the problem is is I don't think you can declare a

25  breach of a contract when the obligation under the contract has

30

1   been discharged in bankruptcy.  They didn't breach it, they

2   just no longer have any legal obligation to perform.

3            So, again, I'm all ears to --

4            MR. OLSON:  But if --

5            THE COURT:  -- read your authority, but --

6            MR. OLSON:  My point is if they don't have any

7   obligation, we don't either.

8            THE COURT:  No, they bought the perpetual license,

9   and that still exists.  That passed -- to use your words, "that

10  passed through the bankruptcy."

11           MR. OLSON:  But the cost --

12           THE COURT:  You didn't argue that this was an

13  executory contract.

14           MR. OLSON:  No, ma'am.

15           THE COURT:  And you could have either -- you could

16  have come in and said, "Judge, they're wrong, this is

17  executory, make them assume it or reject it."  And if they

18  assume it, they're going to have to cure the prepetition

19  breaches.

20           MR. OLSON:  Which were none.

21           THE COURT:  Well, but you would have then preserved

22  the indemnity right because you would have argued about that.

23  But you didn't do anything --

24           MR. OLSON:  No, ma'am.

25           THE COURT:  -- in the case.  So, I'm struggling with

31

1  how you can declare a default on an obligation that got

2  discharged.  I mean you're -- the only defaults you've declared

3  under this license -- either of the licenses is the failure to

4  indemnify you.

5          MR. OLSON:  Yes.

6          THE COURT:  And --

7          MR. OLSON:  And if -- it's --

8          THE COURT:  If that -- if the debtor no longer has

9  that obligation, then I guess I'm struggling how that can be

10  properly declared a default.

11          MR. OLSON:  Well, and, again, maybe we're not using

12  the right terms.  But if we're put on notice in January that

13  they're no longer standing on the contract, and we can put them

14  on notice, and we're not standing on it either and your license

15  is gone.

16          THE COURT:  But they are standing on the contract.

17  They're just --

18          MR. OLSON:  Then they --

19          THE COURT:  The --

20          MR. OLSON:  Then they need to step up --

21          THE COURT:  The one provision that was discharged no

22  longer is enforceable against them, I think, is their argument

23  because --

24          MR. OLSON:  Well --

25          THE COURT:  -- they got it discharged.

1          MR. OLSON:  I do, too, but I don't see how they can

2  have their cake and eat it too.

3          THE COURT:  And sadly the answer may be because you

4  guys didn't do anything to protect yourself in the bankruptcy

5  case, and you're now bound.

6          MR. OLSON:  Well, I hear you.  I --

7          THE COURT:  I mean that happens all the time.

8  Republic Supply versus Shoaf, as an example.

9          MR. OLSON:  Sure.  Espinosa, and so on.

10          THE COURT:  Right.

11          MR. OLSON:  But I would like some time to submit you

12  some authority on that because I think that's the linchpin of

13  the hearing today.

14          THE COURT:  It's the linchpin of everything,

15  frankly --

16          MR. OLSON:  I think it is.

17          THE COURT:  -- as I see it.

18          MR. OLSON:  I think that's right.  And --

19          THE COURT:  If they aren't in breach, then -- and we

20  spent a lot of time -- I don't want anybody to think we're sort

21  of --

22          MR. OLSON:  No.

23          THE COURT:  -- truncating this.  We spent a lot of

24  time getting ready for this hearing.  But it seems to me that

25  with respect to the motion to dismiss, based on our work, and

1  you can argue with me, every claim, except possibly the

2  business disparagement claim, which, frankly, I don't think

3  you've pled facts that support Iqbal or Twombly, but that's

4  sort of another issue.

5          But everything else rises or falls on "they didn't do

6  what they were supposed to do, therefore, they've stolen our

7  designs.  They didn't do what they were supposed to do,

8  therefore, they can't use it anymore."

9          MR. OLSON:  That's right.

10         THE COURT:  Et cetera, et cetera.  So, to me, the

11 whole linchpin, everything is what happened to the contract in

12 the bankruptcy process.  And specifically narrowing it down

13 further -- because you now agree -- there appeared to be some

14 dispute in the papers, and I agree with you, Mr. Olson, that I

15 think non-bankruptcy people were using language loosely.  But

16 we now have the stipulation that the licenses were not

17 rejected, that they were not executory contracts subject to

18 assumption or rejection.  So, that's now of record and

19 stipulated to.

20         So, now the issue is did the indemnity obligation get

21 discharged.  Which I think I heard you say that it did, you

22 didn't disagree with that --

23         MR. OLSON:  Well --

24         THE COURT:  -- but, to use your words, you don't

25 think they can have their cake and eat it, too.

1          MR. OLSON:  That's right.

2          THE COURT:  That if they want to use the license

3 going forward, they then have to fully perform even if the

4 indemnity obligation was discharged.

5          MR. OLSON:  That's right.  I -- I -- I don't have a

6 lot of heartburn with saying that it was discharged.  I think a

7 more preferable construction would be that it passed through

8 unaltered, and it goes on, the relationship is as though there

9 were no bankruptcy.

10          And if you look Shoaf and Espinosa, and some of those

11 cases, and some of the others that we've had in recent years

12 about what to put in a Chapter 13 plan, how much has to be in

13 there or not, in fairness to us, and in fairness to Ms.

14 Rockaman, there was nothing in here that said "We're going to

15 keep the license, but we're going to discharge any obligation,

16 and so we can sell and use your plans, and compete, and never

17 have any downside for doing so."

18          THE COURT:  But people don't normally say that.

19          MR. OLSON:  Well, in Shoaf, they said "We're going to

20 discharge the guarantors."

21          THE COURT:  Well, but you all didn't file --

22          MR. OLSON:  And in Espinosa --

23          THE COURT:   -- a claim.  There wasn't anything to

24 tell you.

25          MR. OLSON:  That's right.  They didn't owe us

1  anything.

2         THE COURT:  It's just a legal -- well, but there was

3  admittedly a contingent unmatured obligation under the

4  indemnity.  I mean you can't really argue with that.

5         MR. OLSON:  I don't.  I don't argue with you about

6  that.

7         THE COURT:  So, a claim within the meaning of the

8  Bankruptcy Code existed, and could have been filed if you had

9  wanted to.

10         MR. OLSON:  And would have been allowed.

11         THE COURT:  And then you could have estimated the

12  indemnification claim on a going forward basis, or whatever.

13         MR. OLSON:  Well, it's the --

14         THE COURT:  I mean there are remedies that the Code

15  provided to the holder of a contingent unmatured claim.  And,

16  unfortunately, your client didn't exercise any of those

17  remedies.

18         MR. OLSON:  No, that's true.

19         THE COURT:  And now it's potentially coming back to

20  bite them.  But the debtor doesn't have to tell them, "Oh, by

21  the way, there's a contingent claim, you should do something

22  because we're going to discharge it."  That's just as a matter

23  of law the effect.

24         MR. OLSON:  No, it's -- that's not the disclosure I

25  would have looked for.  The disclosure I would have looked for

1  would have said, "We've got the license agreement now, and

2  we're not going to insure, we're not going to indemnify, we're

3  just going to use your plans and make your parts, and compete

4  with you.  And if the planes crash, we don't have to pay."

5           THE COURT:  I don't know why they would have to tell

6  you that in a plan.

7           MR. OLSON:  Well, I think it's little bit of --

8           THE COURT:  Of course they were going to --

9           MR. OLSON:  -- a hidden vulture.

10          THE COURT:  Of course they have a license.  There's a

11  perpetual license, you gave it to them.  You knew about it.

12          MR. OLSON:  It has no expiration.

13          THE COURT:  And, frankly, if the effect of -- the

14  legal effect of not filing a claim is that the claim got

15  discharged.  I don't think the debtor has to tell people all

16  the bad things that might happen to them.  Again, there was

17  experienced counsel of record for your client in the case.

18          MR. OLSON:  That's right.

19          THE COURT:  They had very sophisticated bankruptcy

20  counsel representing them.

21          MR. OLSON:  They did.  And I -- I -- I think that's

22  why my thinking is that it just passes through unaltered, and

23  the relationship is the same going forward.  Otherwise the

24  purchaser -- if he knows, "You know, I can't ever be sued for

25  this, and I don't have to pay for insurance," my profit margins

1   just went way up.

2          THE COURT:  But see ride through was a concept of

3   executory contracts.

4          MR. OLSON:  Well --

5          THE COURT:  And --

6          MR. OLSON:  It's --

7          THE COURT:  And that's what -- and the First Circuit

8   never recognized ride through.  In fact, expressly didn't.

9          So, I mean, I'm struggling -- I know exactly what

10  you're saying.

11         MR. OLSON:  Let me see if I can find something to

12  help you a little.

13         THE COURT:  The problem is is that there were

14  remedies that would have protected your client's interest with

15  respect to this contingent unmatured claim.  And, again, they

16  just didn't do anything.

17         MR. OLSON:  No, I -- I understand that, and I -- I

18  just am not articulating well enough why I think that that's

19  not the end of the inquiry.  The fact that it was discharged, I

20  think --

21         THE COURT:  No, no.

22         MR. OLSON:  -- leads to --

23         THE COURT:  You're articulating it perfectly well.  I

24  understand exactly what you're saying.

25         MR. OLSON:  And leads to under what conditions can we

1 terminate the license.

2          THE COURT:  Right.  But, again, you didn't give me

3 any authority.

4          MR. OLSON:  I understand.

5          THE COURT:  I understand your argument.  But it's

6 just an argument without any legal authority to support it at

7 the moment.  And unfortunately --

8          MR. OLSON:  I didn't -- I had my blinders on.  I

9 didn't see that would be where the Court would have a hangup.

10 I apologize for that.

11          THE COURT:  Well, no, I mean that one seems

12 relatively -- well, no.  But, again, I -- you know, it seems to

13 me that the debtor discharged the obligation, and I don't know

14 how you declare a default on a discharged obligation.  And

15 that, at least at the moment, is where my thinking is.  And if

16 you can't declare a default, then all the bad things that you

17 claim they've done aren't bad things.  You know, yes, they've

18 continued to use the license and, yes, they've continued to do

19 other things.  But at least it appears they have that right,

20 and that -- again, I'm struggling with how you breach a

21 contract when the only breach is an obligation you no longer

22 have a right to expect them to do.  And that's where you may --

23 I mean obviously you still think there is a right to enforce

24 that provision, and I, at least, think it was a discharged

25 obligation and, therefore, I'm struggling with how there's

39

1  still a legal right.

2          MR. OLSON:  Well, I think that if they don't have the

3  obligation to pay me anymore, we've done away with involuntary

4  servitude, I can quit doing business with them.  I can

5  terminate.

6          THE COURT:  Well, but -- no, your license -- show me

7  where in the license agreement you have that right.

8          MR. OLSON:  Well --

9          THE COURT:  That's the problem.

10          MR. OLSON:  The consideration is Paragraph 5 of

11  Exhibit 21, it's in three parts.  They fully performed the

12  cash.

13          THE COURT:  Correct, they did.

14          MR. OLSON:  They were current on the insurance and

15  the indemnity.

16          THE COURT:  Right.

17          MR. OLSON:  Post confirmation.

18          THE COURT:  Yup.  Yup.

19          MR. OLSON:  But I think they go hand-in-hand.  They

20  can stand on the contract in January of '12, or they can get

21  off of the contract in January of 12, and I think it's their

22  call.

23          THE COURT:  Well, again --

24          MR. OLSON:  But I don't think they can do both.

25          THE COURT:  -- some legal authority to support that

40

1   would be helpful under the circumstances of the obligation that

2   you think they have is a prepetition claim that got discharged

3   in bankruptcy.  And to me, that's the narrow issue that you

4   need to help me with.

5          MR. OLSON:  All right.

6          THE COURT:  Because I don't know how you breach an

7   obligation that was discharged.

8          MR. OLSON:  Well, the question is what remedy do I

9   have upon discovery that they're not going to perform, and that

10  your suggestion and answer may be none.  And I don't want to

11  concede that yet.

12         THE COURT:  Well, and,  you know, I'm happy to read

13  any authority to the contrary.  But the way it logically flows

14  to me is you had says to protect yourself, you didn't exercise

15  them, the obligation to indemnify you got discharged as a

16  prepetition claim, and I don't know how you now claim breach of

17  a discharged obligation as the triggering event to terminate a

18  contract that otherwise still is in effect and gave them

19  rights.  That's the hangup I've got.  Because that's the only

20  default you're claiming.

21         MR. OLSON:  Everything stems from that.  If they'd

22  have said, "Sure, our carrier had these lawyers, and away we

23  went," we wouldn't be here.

24         THE COURT:  Understand.

25             (Attorneys engaged in off-the-record colloquy)

41

1          MR. OLSON:  The other thing that we would want to

2   address, if we could submit some briefing also, is if the

3   answer is that we have no right left, we want to spend some

4   time to focus on what's left of our complaint, and whether we

5   think we could further amend it.

6          THE COURT:  Well, so instead of dismissal, you want

7   the opportunity to amend but --

8          MR. OLSON:  Well, I think --

9          THE COURT:  Let me just make sure I heard you right.

10  Is that true?

11         MR. OLSON:  No.  What I'm saying is we had asked for

12  some time to submit you some briefing on what right we may have

13  upon learning that they're not going to perform.

14         THE COURT:  Right.

15         MR. OLSON:  And as a second part to that is if the

16  result of our briefing is that the Court's position remains the

17  same.  I'm not, as I'm standing here, sure of what's left of

18  our complaint.  I just don't want to cross that bridge.  I

19  would want to address that in the same briefing --

20         THE COURT:  Well, but --

21         MR. OLSON:  -- that we sent you so that if you're

22  right about that --

23         THE COURT:  But isn't --

24         MR. OLSON:  -- is there anything left we can sue

25  them --

42

1          THE COURT:  But today's the date to address that.

2   Why can't we address that now?

3          MR. OLSON:  Well, you can.

4          THE COURT:  I mean that they -- I'm not arguing

5   anything they didn't argue.

6          MR. OLSON:  No, I understand.  I understand.

7          THE COURT:  I don't think.

8          MR. OLSON:  But in a motion to dismiss --

9          THE COURT:  Right.

10          MR. OLSON:  -- if the Court determines at the hearing

11  that it doesn't look like the pleading passes muster, you

12  typically get an opportunity to replead.

13          THE COURT:  That's what I just said.

14          MR. OLSON:  And we would want --

15          THE COURT:  Are you asking me for leave to file an

16  amended complaint in lieu of dismissal if I think the complaint

17  has to be dismissed?

18          MR. OLSON:  Sure.

19          THE COURT:  Okay.

20          MR. OLSON:  Sure.

21          THE COURT:  I mean I think we're saying the same

22  thing.

23          MR. OLSON:  Yes, ma'am.  Yes, ma'am.  I would just

24  want to leave that door open to see if we could take a stab at

25  that if we're wrong --

43

1          THE COURT:  Well, but what do you think is left?

2  Because as I go through your first amended complaint, your

3  first claim, misappropriation of trade secrets, would be gone

4  because if they have no obligation to pay or to -- if they have

5  no obligation to indemnify, and that was the only breach which

6  you've told me before it is, then they haven't stolen anything.

7  So, it appears that that claim fails.

8          MR. OLSON:  Well, that's -- Mr. Smith has some

9  thoughts on what might still remain, and if I could just leave

10 that door open, he and I can confer to see if there's anything

11 that --

12         THE COURT:  Well, but --

13         MR. OLSON:  -- we could add in a second amended --

14         THE COURT:  But the -- we need to address it today.

15 I mean the motion to dismiss is set today.

16         MR. OLSON:  Well, can Mr. Smith address that?

17         THE COURT:  Of course.

18         MR. OLSON:  Thank you.

19         MR. SMITH:  Your Honor, this license agreement -- the

20 1991 license agreement, in this essence, just covered 11 parts.

21 On engines -- a number of engine models, of which there are far

22 more than 11 parts in an aircraft engine.

23         Part of the claims here initially were -- obviously

24 the indemnity has been discussed.  Failure to insure as an

25 ongoing obligation was something that we believe, you know,

44

1  survived, and was their requirement to keep the license in

2  effect.

3         But even more than that, these other claims go far

4  beyond these 11 parts.  They're building hundreds of parts, and

5  those other parts that are not supported and not permitted by

6  this specific license agreement and by the terms of it is

7  confined to the 11 parts is the rest of the -- it's the dog,

8  essentially the license agreement is the tail.  It's got 11

9  parts it covers, but there's this whole other host of parts out

10 there that are being built and sold by this company that go

11 well beyond those 11 parts, and those are still part of the

12 claims of theft of trade secrets, using the information -- the

13 derivative information, 11 parts, to build the other number of

14 parts that are out here that are also part of the theft of

15 trade secrets and conversion claims that exist, and that's a

16 far greater claim than even the 11 parts are.

17        So, we would say there's a --

18        THE COURT:  Where in your complaint do you tell us

19 about that?

20        MR. SMITH:  Let me --

21        THE COURT:  Because I thought the whole issue was

22 they didn't indemnify you, therefore, you terminated,

23 therefore, they had no right under the license, therefore, they

24 have misappropriated, they have done all these other bad

25 things.

1           MR. SMITH:  Well, that's -- in essence, Your Honor,

2    that's the tail of it, but the rest of the dog is far greater

3    because they're building all of these other parts, as well.

4           THE COURT:  I understand the argument.  But where in

5    the complaint do I see --

6           MR. SMITH:  Let me find it.

7           THE COURT:  -- that as the allegation?  Because I

8    certainly didn't understand it from reading either the original

9    complaint or the first amended.

10          MR. SMITH:  It begins on Page 5, and it, in essence,

11   details the part of -- if I might, let me digress.  This is

12   part of why the 1981 agreement was in there.  It started out

13   where there was a dispute about whether or not they could even

14   build these parts for Lycoming.  They reach an agreement in

15   1981 that there were a number of parts that they could build.

16          Because of ongoing concerns about building other

17   parts, the 1999 agreement came, it squeezed it back down, it

18   revoked the '81 agreement, and it says you're entitled to build

19   11 parts, as long as you continue to insure us, and as long as

20   you indemnify us from the, you know, any lawsuits from those

21   parts.

22          THE COURT:  Show me where in the agreement it says

23   the license is for 11 parts.

24          MR. SMITH:  Let me do that.  That is on Page --

25          THE COURT:  Exhibit?

46

1                            (Pause)

2            MR. SMITH:  Your Honor, on Exhibit 21 --

3            THE COURT:  Yes, sir.

4            MR. SMITH:  -- it's Page 2.

5            THE COURT:  All right.

6            MR. SMITH:  And in there it says basically retention

7    and provisions of proprietary materials --

8            THE COURT:  Where are you looking?  I'm sorry.

9            MR. SMITH:  Uh, 2 --

10           THE COURT:  So, 2B?

11           MR. SMITH:  2B.

12           THE COURT:  All right.

13           MR. SMITH:  And little -- little I.  "Subject to the

14   terms of this agreement, Superior shall retain the Lycoming

15   drawings and specifications currently in its possession for the

16   following 11 Lycoming parts, as well as any over or undersized

17   version of those parts."  And it gives the part numbers.

18           THE COURT:  Okay.

19           MR. SMITH:  And it goes down, it talks about

20   Lycoming --

21           THE COURT:  But you have to give them all future

22   revisions to the drawings --

23           MR. SMITH:  It does.  And then it goes on down, it

24   talks about derivative materials are part of the proprietary

25   materials, that's little four.  That means any information you

1   glean from this, that you, you know --

2            THE COURT:  All right.

3            MR. SMITH:  -- or derive from it.  Then on C, where

4   it says, "Grant license to use the proprietary materials," it -

5   - on Page 3, says at the bottom, the last two lines, the last

6   part of the -- next to the last line, "All prior licenses from

7   Lycoming to Superior to use proprietary and derivative

8   materials, as well as any prior license to use any other

9   Lycoming drawings, specifications, or information derived from

10  such drawings or specifications are hereby revoked."

11           So, basically it took that whole set of parts that

12  were out in the field for which they had been building under

13  the '81 agreement, squeezed it down to the 11 parts, and this

14  is -- the 1999 document was the go-forward document.

15           THE COURT:  Okay.

16           MR. SMITH:  The problem we have here, in addition to

17  the fact that they're, you know, building parts and not

18  providing the indemnity or the insurance is there's this whole

19  host of other parts out there for which they are building.

20  They're clearly certified by what the FAA calls "identicality,"

21  it means it's identical to the Lycoming part, probably because

22  they had the Lycoming drawing, they offered it to FAA, got

23  whatever PMAs they got to build that.  Those parts they should

24  not be building.  They should not be building any derivative

25  parts from the use of the proprietary data that they current

1  have, even from the 11 parts.  And so that's part of this

2  larger picture out here that's part of the theft of trade

3  secrets, conversion, and the other -- the other issues that we

4  have that are separate and apart from the license agreement.

5  It's essentially all of the other parts that are built on

6  Lycoming data that don't derive any rights at all from the 11-

7  part license agreement.

8          THE COURT:  Okay.

9          MR. SMITH:  But --

10         THE COURT:  I'm with you.  But now where in the

11 complaint do you say anything about this?

12         MR. SMITH:  That's at Page -- that's under the first

13 claim for relief on Page 5 where we're talking generally about

14 all of the -- all of the parts is, you know, essentially all of

15 the processes and whatnot that were Lycoming's, and we go down

16 through the '81 agreement, and we're talking about --

17         THE COURT:  Right.

18         MR. SMITH:  -- failing to honor obligations regarding

19 trade secrets, proprietary information that violated the

20 confidential relationship established in the 1999 agreement,

21 which says also you can't use any of that material to build any

22 other parts.  You can't use the derivative materials to build

23 anything else, and that they understand that they can't do

24 that, and it's a -- it grants a right to --

25         THE COURT:  Yes, but the '81 agreement's no longer in

49

1  effect.

2          MR. SMITH:  '81's not in effect.  But what I'm

3  talking about are the terms in the 1999 agreement that says --

4          THE COURT:  Right.

5          MR. SMITH:  -- that says -- it's on Page 4 of the

6  1999 agreement, it says, "Superior agrees it would be a breach

7  of this agreement for Superior to utilize any Lycoming drawings

8  or specifications not retained pursuant to Paragraph 2(b)(1),"

9  which is the 11-part paragraph, "and 2(b)(2)," which are the

10 continuing updates of those 11 parts, "or information derived

11 from such drawings or specifications that is not contained in

12 the proprietary material," not also contained in the

13 proprietary materials for the purpose of applying to the FAA

14 for a PMA pursuant to identicality method.  Further, Superior

15 agrees that any such breach would cause irreparable injury to

16 Lycoming.  And that in addition to the other available

17 remedies, Lycoming would be entitled to enjoin such breach."

18         THE COURT:  Okay.  I understand what the license

19 says.  I'm asking about the allegations in the complaint. It --

20 it --

21         MR. SMITH:  It's --

22         THE COURT:  It doesn't appear very clear to me that

23 you were talking about what you're now talking about, and I'm

24 looking for where in the document you were talking about what

25 you're now talking about.

50

1          MR. SMITH:  I think it begins at Paragraph -- well,

2   there's actually -- let me start at Paragraph 12, Your Honor.

3   Hold on a just a second.

4                    (Pause)

5          MR. SMITH:  It says in Paragraph 12, "Upon

6   information and belief, post bankruptcy case closing, Superior

7   then illegally used this trade secret and proprietary

8   information to obtain PMA approvals, to design and manufacture

9   parts, and continue to do it at this time even though request

10  to cease and desist from such activity, while continuing to

11  claim and use Lycoming trade secrets and proprietary data as

12  its own," -- on over on Page 10, begin post termination,

13  "Defendant has used and continues to use trade secrets and

14  other proprietary information to develop the designs and

15  manufacturing processes for the manufacture and replacement of

16  parts for Lycoming parts, defendant has embarked on a plan to

17  improperly obtain, improper used the plaintiff's trade secrets

18  and proprietary information knowing that it was improperly

19  obtained, and used" --

20         THE COURT:  Well, but the problem is -- and, again,

21  the illegality was continuing to use it without paying you all

22  or honoring the indemnity obligation.  I mean that's the

23  thrust --

24         MR. SMITH:  That's --

25         THE COURT:  -- of this whole complaint.

1          MR. SMITH:  But that's not -- that's not -- maybe we

2    haven't very artfully pled it, but this part is clearly beyond

3    what's been pled in connection with the indemnity and --

4          THE COURT:  With all due respect, it's not clear to

5    me.  I mean I read this stuff pretty carefully, and I thought

6    the entire -- as did my staff, and we thought the entirety of

7    the fuss was over the indemnity right, not that they were using

8    more than the 11 parts that were licensed to them.

9          MR. SMITH:  Without the -- without the licensing

10   agreement, all -- any right at all to use any kind of Lycoming

11   parts would cease.

12         THE COURT:  Right. Under --

13         MR. SMITH:  And so it seemed to me that was the

14   simplest way to deal with it is that they're not indemnifying,

15   and they're not insuring --

16         THE COURT:  No, no --

17         MR. SMITH:  -- and --

18         THE COURT:  I'm --

19         MR. SMITH:  But the --

20         THE COURT:  I understand.  I just --

21         MR. SMITH:  And the other breach was and they're

22   building stuff that's beyond their right to build as given in

23   the 1999 license agreement.  There's a host --

24         THE COURT:  And all I'm saying is that sure didn't

25   come through --

52

1                    MR. SMITH:  I understand.

2                    THE COURT:  -- in the complaint --

3                    MR. SMITH:   I hear -- I understand.

4                    THE COURT:  -- as I read it, at least.

5                    MR. SMITH:  I understand.  But it's -- as we continue

6  on, you can see that it's globally pled about the misuse of

7  trade secrets and improperly obtaining information and using

8  that.  So, it's out there, it's not only -- it's not only the

9  stuff that they have, we believe they continue to acquire

10 information that they're using improperly.  All of that is in

11 violation of the license agreement, as well as giving an

12 independent right to conversion and misappropriation of trade

13 secrets, and the other allegations that are contained in the

14 pleading.  And we can --

15                   THE COURT:  Was a termination notice given?

16                   MR. SMITH:   Yes.

17                   THE COURT:  And where is that?

18                   MR. SMITH:  That's April the 2nd, and we have it.

19                   MR. OLSON:  It's Exhibit A to the brief.

20                   MR. SMITH:  Exhibit A to the brief.

21                   MR. OLSON:  Defendant's brief.

22                   THE COURT:  Well, that's not admissible before me.

23 Is it an exhibit?

24                   MR. OLSON:  I think it's also got a number.

25                   THE COURT:  In the record.

1          MR. OLSON:  Yes, ma'am.

2                         (Pause)

3          MR. OLSON:  I believe it's Exhibit 31, Your Honor.

4          THE COURT:  Thank you.

5                         (Pause)

6          THE COURT:  But this demand letter is solely based

7   upon the indemnification and insurance provision.

8          MR. SMITH:  Judge, down at the last page, we set

9   forth the other bases which are -- include the --

10          THE COURT:  Where?

11          MR. SMITH:  For example, on Page 3 --

12          THE COURT:  Yes.

13          MR. SMITH:  -- it says, "Superior's repudiation to

14   its obligation" -- well, actually I guess it's 4, "Continued

15   use of Lycoming's proprietary data" --

16          THE COURT:  I don't know where you are.  Number 4

17   the --

18          MR. SMITH:  Page 3.

19          THE COURT:  Page 3.

20          MR. SMITH:  "Continued use of the Lycoming

21   proprietary" --

22          THE COURT:  Well, that's because you terminate for

23   the --

24          MR. SMITH:  It's not --

25          THE COURT:  It's pretty clear to me that you were

54

1  terminating this as a result of the failure to insure and

2  indemnify.

3          MR. SMITH:  That's not the only reason, and the

4  pleading --

5          THE COURT:  Well, but that's all the -- that's all

6  this letter says.  Everything flows from that.

7          MR. SMITH:  Well, also down on Page -- of the lower

8  five items says about immediately returning to Lycoming all

9  Lycoming data, including data derived from Lycoming

10 immediately.

11         THE COURT:  Well, I assume that under the license,

12 once there's a termination of it, they have to return it.  But

13 the basis for termination was you didn't insure and indemnify

14 us.

15         MR. SMITH:  That wasn't -- that wasn't the intent,

16 and that wasn't what we were trying to say.  And I thought that

17 we had it -- since there are -- there's probably 90 percent of

18 the parts they built are not these 11 parts, I mean there's

19 this whole host of other parts that are based upon Lycoming

20 data that are not authorized by this license agreement that we

21 are bringing to a conclusion, as well, because part of the

22 problem was if we're not getting insurance, and we're not being

23 indemnified, we need to bring it all to a close because we've

24 got tremendous exposure out there from anything that's a

25 Lycoming look-alike part.  But it wasn't -- it clearly wasn't

1 the only -- I mean we could have limited it to just the license

2 agreement and those 11 parts if that was what we were intending

3 to do.  But we were far more concerned with this entire array

4 of parts that are being built by Superior that's -- creates an

5 enormous liability exposure to Lycoming.

6          So, it's -- I'm not just here -- the pleading is a

7 fairly lengthy pleading, it was -- we put it on file fairly

8 quickly to try to bring up these issues that we thought were

9 critical issues that needed to be addressed.  So, I would say

10 that if the Court would like for us to more specifically lay

11 that out, I'll be pleased to do that.  But I can tell the Court

12 it was our intention to cover this multitude of other parts, as

13 well, and certainly, you know, we don't have to terminate their

14 right to -- you know, to -- we don't have to send them a letter

15 of termination and say don't build our other -- these other

16 parts that we know you're building using our data because they

17 weren't covered by the 1999 agreement anyway.  I mean we

18 certainly were -- we put them on notice they needed to cease

19 and desist from building those, but our position was is that

20 they weren't entitled to build anything beyond the 11 parts, as

21 the agreement said.

22          So, even if the Court came to the conclusion that

23 there was a pass-through and they had a right to build 11

24 parts, that doesn't cover that -- they've got no right to build

25 the other things that they're currently building, for which we

1  have a legitimate theft of trade secret claim beyond the scope

2  of the 1999 agreement.  We probably should have gotten the

3  Court more information on this sooner, and I apologize for

4  that.

5          THE COURT:  Very well.

6          MR. SMITH:  Thank you, Your Honor.

7          THE COURT:  Thank you.  Mr. Adams?

8          MR. ADAMS:  Yes, ma'am.  Your Honor, I sense that

9  you've read our pleadings, and so I'm not going to go through

10 and rehash a lot of the stuff that the Court has already picked

11 up on.

12          The witnesses that we have here today were really

13 going onto the issues that I think the Court has already

14 addressed and, with the possible exception of one witness, I

15 don't see any reason to call them to the stand.

16          THE COURT:  Well, I mean, this was really opening

17 argument in part, but obviously we got perhaps a bit beyond

18 that.  But if you have evidence you wish to put on, feel free.

19          MR. ADAMS:  Yes, Your Honor.  Your Honor, I think

20 you've hit upon the key thing, which is that the claims -- with

21 the possible exception of the business disparagement claim

22 turned upon the issue of whether or not the indemnity provision

23 was discharged in the bankruptcy.  And I really don't see any

24 point to dwell on that further unless the Court has any

25 questions that you would like to ask of that.

57

1              Regarding the termination --

2              THE COURT:  Are the -- is the reorganized debtor

3  manufacturing more than the 11 parts?

4              MR. ADAMS:  Your Honor, the reorganized debtor is

5  manufacturing not only the 11 parts, but also all the oversize

6  parts and undersize parts that were referenced in that

7  paragraph of the licensing agreement that you read.

8              THE COURT:  Well, let's look at that so that I better

9  understand what the debtor is or isn't doing.  So, let's look

10 at Exhibit 21.  So, under the Exhibit 21 agreement, you got the

11 drawings and specifications for 11 parts, as well as over or

12 undersized versions of those parts.

13             MR. ADAMS:  Yes, Your Honor.

14             THE COURT:  And do you agree that's all you're

15 supposed to be manufacturing pursuant to this licensing

16 agreement?

17             MR. ADAMS:  Pursuant to this licensing agreement.

18 There are other ways to manufacture the part, such as creating

19 the part and applying for the PMA without any of the alleged

20 trade secret proprietary rights information.

21             THE COURT:  Right.

22             MR. ADAMS:  And they have gone and manufactured other

23 parts is my understanding, not relying upon that data.

24             THE COURT:  And they've gotten PMAs from the FAA

25 without using the proprietary information of Lycoming.

1          MR. ADAMS:  That's my understanding, Your Honor.

2          THE COURT:  So, you would dispute that you have

3  developed parts in violation of the license agreement -- put

4  aside the indemnity issue.

5          MR. ADAMS:  Yes, Your Honor.  Whether the indemnity

6  survived or not, yes.

7          THE COURT:  Your position is you're only doing what

8  the license permitted you to do.

9          MR. ADAMS:  Exactly, Your Honor.  And whatever else

10  we could do without needing a license --

11          THE COURT:  Right.

12          MR. ADAMS:  -- from Lycoming.

13          THE COURT:  Right.  But I suppose you would

14  acknowledge that that could be a disputed factual issue as to

15  whether you are doing something beyond what the license permits

16  you to do or what law would permit you to do, i.e., develop

17  your own stuff without relying upon them.

18          MR. ADAMS:  It -- perhaps so,  Your Honor.  As Your

19  Honor noticed, neither the original petition nor the first

20  amended petition referenced a single one of the Lycoming part -

21  - or a single piece of the alleged trade secret proprietary

22  information that supposedly had been misused despite the fact

23  that our original motion to dismiss contained that very

24  allegation in there that needs to be dismissed because of the

25  failure to identify any of the things that Superior is

1  supposedly violating.

2           And they've already had their one opportunity to

3  replead.  And if I hear them correctly today, they're up here

4  asking for, you know, a second opportunity.

5           THE COURT:  Well, but that -- that was a replead as

6  of right.

7           MR. ADAMS:  True, Your Honor.

8           THE COURT:  So, they have not gotten court -- they

9  had a replead as of right in response to the motion to dismiss

10  under the federal rules.

11          MR. ADAMS:  Correct, Your Honor.

12          THE COURT:  So, this is the first time they've asked

13  the Court for leave to allow them to take another stab at it.

14          MR. ADAMS:  Yes, Your Honor.

15          THE COURT:  Okay.

16          MR. ADAMS:  Your Honor, if you'd like, I could go

17  through the -- is there anything further that you'd like to

18  hear on the motion to remand issue?  Because we're -- on the

19  motion to remand, we're not really deciding the merits of the

20  claims.  What we're deciding is whether or not the Court has

21  jurisdiction to hear that.

22          If the Court would like to go on to the motion to

23  dismiss, then I'm prepared to address that issue now.

24          Oh, on the -- on the advertising claim, which was

25  called the business disparagement claim --

1          THE COURT:  Yes.

2          MR. ADAMS:  -- I do have a witness here today who can

3  testify that that claim -- that advertising or similar

4  advertising was being used as far back as 1987, I believe.

5  And, therefore, obviously that would be a prepetition claim

6  likewise that Lycoming should have listed along with its

7  contingent unmatured claim that the Court discussed earlier.

8          THE COURT:  Well, let me -- well, let me put it this

9  way.  Do you wish to put on any evidence?

10          MR. ADAMS:  Your Honor, after being through the

11  colloquy with counsel, I don't see any need to put on any

12  additional evidence.

13          THE COURT:  All right.  Then let me -- why don't you

14  take a seat for a minute.  Let me tell you where I think we

15  are, and then we'll see what's left to do.

16          MR. ADAMS:  Yes, Your Honor.

17          THE COURT:  So, I've granted the motion to reopen.

18          Mr. Olson, your motion to remand was also not

19  terribly helpful in that you cite the Court, again, not a

20  single legal authority with respect to remand.  And this all

21  seems to me to be premised upon the lack of jurisdiction of the

22  Court arguing that these claims all arose post confirmation

23  and, therefore, I don't have jurisdiction.

24          Am I missing something on your motion to remand?

25          MR. OLSON:  No, ma'am.  The first was you simply

61

1  don't have 1334 jurisdiction.

2          Or if you do, then the equitable remand under 1452

3  would be what we wanted.

4          THE COURT:  Okay.

5          MR. OLSON:  There's nothing more to it than that.

6          THE COURT:  Right.  But unfortunately you don't even

7  cite that much to me in your motion.  There is not a case, nor

8  a statute, cited in the four pages of the motion.

9          THE COURT:  I'm going to deny the motion to remand:

10          First, I think that this Court clearly does have

11  jurisdiction.  As we have just discussed, in the first instance

12  based upon the current allegations and, frankly, the demand

13  letter, the sole basis for declaring a breach of the 1999

14  agreements was the reorganized debtor's failure to insure and

15  indemnify.

16          And that turns, as we've all agreed, on -- at least

17  in the first instance -- whether or not this obligation to

18  indemnify was discharged in the bankruptcy case.

19          Under Craig Stores, U.S. Brass, that is clearly a

20  core determination by this Court.  The scope of the discharge

21  is something that is at the heart of the bankruptcy process.

22  It arises under the Bankruptcy Code and, therefore, there is

23  little doubt that this Court has core jurisdiction to decide

24  whether or not the debtor breached the 1999 agreements, which

25  by stipulation of these parties, you have all agreed, was not

1  an executory contract.

2          So, that contract, that right, the license agreement

3  was property of the debtor's estate under Section 541.

4          And the effect of the plaintiff's, Lycoming Engines'

5  -- which is a division, as I understand it, of Avco Corporation

6  and Textron Innovations, Inc. -- failure to file a proof of

7  claim and the impact of that are all issues that are issues

8  that arise under the provisions of Title 11, question of

9  Section 541, and the question of the effect of confirmation of

10 a Chapter 11 plan, and the plaintiff's failure to file a proof

11 of claim in the bankruptcy case.

12         So, given that the motion to remand is premised upon

13 a lack of jurisdiction by this Court, it has to be denied

14 because this Court concludes that it does have jurisdiction.

15 Because at least as currently pled, everything is intertwined

16 with the failure of the plaintiffs to file a claim, the effect

17 of that failure on their ability to now declare a default of an

18 agreement based upon the debtor's refusal to indemnify when the

19 debtor believes that that obligation was discharged in its

20 bankruptcy case.

21         I'm struggling slightly because now I understand --

22 although I didn't until Mr. Olson spoke -- that there is a

23 request for equitable remand.  Can you point me to something in

24 your motion to remand that asks for equitable remand?

25         MR. OLSON:  Yes, ma'am.  Just at the tail end of it.

63

1    Either for lack of jurisdiction or to exercise its discretion.

2    I don't have the --

3            THE COURT:  Well, it's in Paragraph 17.  I've got to

4    tell you, if that's what you were arguing there, it is

5    certainly cryptic.  I mean your primary argument is in 16, that

6    I had no jurisdiction --

7            MR. OLSON:  That's right.

8            THE COURT:  -- because this is all post confirmation

9    stuff.

10           MR. OLSON:  That's right.

11           THE COURT:  It didn't have anything to do with the

12   bankruptcy case.

13           MR. OLSON:  I understand.

14           THE COURT:  And, unfortunately, I think that's just

15   wrong.

16           MR. OLSON:  I understand.

17           THE COURT:  It's not all post confirmation stuff.  It

18   is intertwined with what did happen or perhaps didn't happen in

19   the bankruptcy case due to the plaintiff's failure to file

20   proofs of claim to protect themselves.

21           I'm going to deny that portion of the motion.  And,

22   Mr. Olson, this is slightly frustrating to me.  You have

23   practiced before me for 13 years now.  You know that my strong

24   preference is to prepare thoroughly in advance for hearings,

25   and rules from the bench at the time of the hearing when

1  everything is fresh in the Court's mind.

2          Because you cited me, frankly, nothing in your

3  motions, and no legal authority in either motion, it makes it -

4  - and now you want the opportunity to brief what could and, in

5  my view, should have been briefed in advance of today's

6  hearing, I'm now in the position where if I accommodate that

7  request, I can't rule from the bench today, and I can't dispose

8  of things as I would like to while everything is still fresh.

9          So, in the future, please don't file pleadings that

10  are not helpful to the Court.  And if you have a legal theory

11  that you believe carries the day, it would certainly be helpful

12  to your cause if you would share that with the Court in advance

13  of the hearing so that I could have the opportunity to think

14  about it, read your cases, and give that some thought.

15          I will deny the motion to remand in part to the

16  extent that it is premised upon a lack of subject matter

17  jurisdiction for the reasons I've just said.

18          I believe that the issues that are raised in the

19  original complaint, which is the complaint against which I test

20  jurisdiction given that it was the original complaint that was

21  removed to this Court, that the bases alleged there for the

22  plaintiff's ability to terminate the 1999 license agreement was

23  the debtor's failure to abide by obligations that they claim

24  were discharged through confirmation of a Chapter 11 plan in

25  the underlying bankruptcy case.

65

1          Again, that implicates issues of property of the

2    estate, the effect of the discharge in bankruptcy, all of which

3    arise under the Bankruptcy Code and, therefore, this Court has

4    core jurisdiction to decide those issues.

5          The argument, just to be clear, that this all arose

6    post confirmation would go to the Fifth Circuit's decisions in

7    Craig Stores and U.S. Brass, neither of which were cited by the

8    movant.  But that deals with post confirmation related to

9    jurisdiction of the Court, which, at least at the moment, does

10   not appear to be implicated here from this Court's perspective.

11         And so the fact that the plaintiff -- the plaintiffs

12   are attempting to characterize these as all post confirmation

13   claims is ineffective, one, because they aren't post

14   confirmation claims, they all relate to pre-confirmation

15   agreement, which the plaintiffs are attempting to enforce.

16         And, secondly, given that this Court does not believe

17   that related to jurisdiction is the jurisdiction is the

18   jurisdictional basis for this Court's jurisdiction, rather it

19   is arising under or arising in, thereby making the claims core.

20   We don't need to reach the issues raised in either U.S. Brass

21   or the Craig Stores decisions.

22         The Court will carry, sadly, the request for, quote,

23   "equitable remand" because of the failure of the plaintiffs to

24   brief the issue so that the Court could analyze the theory upon

25   which they are alleging that -- I think to quote Mr. Olson --

1 the debtor can't have its cake and eat it, too.

2        I don't know exactly how that might implicate

3 equitable remand because, quite frankly, while I understand the

4 feeling that this just isn't fair, I've had no legal authority

5 cited to me from which I can come to the conclusion that while

6 perhaps unfair from the plaintiff's perspective it is legally

7 impermissible, as well.

8        So, I will carry that motion until I can better

9 understand what the plaintiff -- plaintiffs are really arguing

10 since that has not yet been supported by any legal authority in

11 their favor.

12        That brings us to the motion to dismiss which,

13 frankly, for the same reason, cannot yet be decided because,

14 again, it apparently hinges on an argument not advanced by the

15 plaintiffs until today.  The so-called "cake and eat it, too"

16 argument that somehow it is unfair and thus, legally

17 impermissible for the debtor to not be required to indemnify

18 the plaintiffs, notwithstanding the fact that the indemnity was

19 discharged in bankruptcy if they wished to continue to exercise

20 rights under the license agreement.

21        Until I understand that argument, and can dispose of

22 it on the merits, it is impossible to analyze the motion to

23 dismiss because, again, those become intertwined.

24        I will tell you if I do not find the plaintiff's

25 argument to be persuasive, and I continue of my current view

1 that the indemnity obligation was discharged due to the

2 plaintiff's failure to file a proof of claim in the bankruptcy

3 case, and then have that contingent unmatured claim estimated

4 for purposes of receiving benefits under the confirmed plan,

5 then I think much, if not all, of the complaint will have to be

6 dismissed because I don't believe you can steal something you

7 have a legal right to.

8        And if the defendant is correct, that it has a

9 perpetual license, and its indemnity obligation was discharged

10 in bankruptcy, then it appears it might be in a position where

11 it gets to keep the cake and eat it, too.

12       But, again, I can't decide that until I can

13 understand better the merits of the argument being advanced by

14 the plaintiffs here today, and whatever legal authority they

15 can muster in support of that argument.

16       If it is helpful to the parties, I would grant a

17 motion for leave to amend even if I concluded that this

18 complaint currently fails to state a claim, either because you

19 can't steal that which you have a legal right to, or because of

20 Iqbal or Twombly pleading failures.  I would give the

21 plaintiffs one last chance to try and file a complaint that

22 states appropriate claims.

23       So, unfortunately we're going to have to take this in

24 pieces because the legal issues weren't briefed prior to the

25 filing.

68

1          And so I guess rather than go down what the possible

2   branches are right now, let's just leave it at how much time do

3   you need to file your legal authorities, Mr. Olson, with

4   respect to the theory upon which you think the indemnification

5   obligation somehow survive the bankruptcy?

6          MR. OLSON:  Well, Your Honor, I think that a week or

7   ten days would be fine.

8          THE COURT:  And then I assume you would like to

9   respond.

10          MR. ADAMS:  I'm sorry?

11          THE COURT:  He said a week or ten days.

12          MR. ADAMS:  Your Honor, we'd request about the same

13   amount of time to respond.

14          THE COURT:  Can you do it in a week?

15          MR. OLSON:  Yes, ma'am.

16          THE COURT:  Okay.  Then today is the 15th.  So that

17   means the 22nd for Mr. Olson's brief, and the 29th for Mr.

18   Adams' response.

19          MR. ADAMS:  Your Honor, is that going to be right

20   after Memorial Day?

21          THE COURT:  It is.

22          MR. ADAMS:  I hate to ask, but could we get a couple

23   extra days so I don't have to --

24          THE COURT:  That's fair.

25          MR. ADAMS:  -- abuse staff over the weekend?

1        THE COURT:  The 31st.

2        MR. ADAMS:  Okay.

3        THE COURT:  Let me think for a minute.

4                    (Pause)

5        THE COURT:  Well, the fastest thing -- and this is

6   why it becomes difficult is now we're going to be 20 plus days

7   out, and then working you back in on the calendar just -- well,

8   let me think about it.  I don't know whether we'll need a

9   further hearing or not.  Let's leave it at this:  Mr. Olson,

10  you file your brief on the 22nd.  Mr. Adams, you file your

11  response on the 31st, at which time the Court will consider the

12  motion to dismiss and the request for equitable remand to be

13  under advisement.

14        If I feel the need for a further hearing after

15  reviewing the briefs, Ms. Salcido will be in touch with you to

16  try and get you in as quickly as possible.

17        If I don't need the -- feel the need for a further

18  hearing, I'll attempt to issue a ruling as promptly as

19  possible.  That may be just a telephonic ruling, and then if my

20  conclusion is that there are problems with the first amended

21  complaint, then, as I've said, in all likelihood, I will allow

22  the plaintiffs one last chance to file a complaint that states

23  a claim based upon the Court's rulings and satisfies the

24  requirements of Iqbal, Twombly, and Rule 9(b) because this

25  complaint, just word for the wise, seems a little short on

1 facts.  And I think that it would have to be substantially

2 improved in order to pass the Iqbal/Twombly muster.

3          All right.  What else can we accomplish this

4 afternoon, gentlemen?

5          MR. ADAMS:  Your Honor, technically I think this all

6 started with a request for a status conference in the adversary

7 proceeding.  Is there anything we need to do regarding that?

8          THE COURT:  No.  Normally, just so you know, when we

9 get a removed action, we always set a status conference, and

10 that way we can ask people if you're happy to be here, and if

11 you are, get a scheduling order so that we get you on our trial

12 docket.  And if you're not, we can set time frames for motions

13 to remand, so forth.

14          You all made it pretty clear, your respective

15 positions on whether you wanted to be here or not in the

16 pleadings that are already on file.  So, I think we've covered

17 everything that we would otherwise normally ask at our status

18 conference, which is great.

19          So, thank you very much.

20          MR. ADAMS:  Thank you, Your Honor.

21          MR. OLSON:  Thank you, Your Honor.

22          THE COURT:  We're in recess.  You're excused.  I'm

23 going to be out here for a few minutes.

24          MULTIPLE SPEAKERS:  Thank you.

25          (Whereupon, at 3:13 P.M.,  the hearing was adjourned.)

1

2                                CERTIFICATE

3

4       I, KAREN HARTMANN, certify that the foregoing is a correct

5  transcript from the electronic sound recording of the

6  proceedings in the above-entitled matter.

7

8

9    /s/  Karen Hartmann     AAERT CET**D0475 Date:  May 17, 2012

10 TRANSCRIPTS PLUS, INC.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25