Craig F. Simon
Texas Bar No. 00784968
Daniel P. Winikka
Texas Bar No. 00794873
Simon, Ray & Winikka LLP
2525 McKinnon Street, Suite 540
Dallas, TX 75201
Phone: (214) 871-2292
Facsimile: (469) 759-1699
Counsel for Dr. Kübler, in his capacity as Insolvency
Administrator of Thielert Aircraft Engines GmbH

IN THE UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| In re: <br><br> SUPERIOR AIR PARTS, INC. <br><br> Debtor. | Chapter 11 <br><br> Case No. 08-36705-BJH-11 |

MOTION TO COMPEL ARBITRATION AND
DISMISS WITHOUT PREJUDICE OR STAY ALL PROCEEDINGS
RELATED TO SUPERIOR AIR PARTS, INC.'S MOTION TO ENFORCE

Dr. Bruno Kübler, in his capacity as insolvency administrator (the "Insolvency Administrator") of Thielert Aircraft Engines GmbH ("TAE")[1], files this Motion to Compel Arbitration and Dismiss Without Prejudice or Stay All Proceedings Related to Superior Air Parts, Inc.'s ("Superior") Motion to Enforce [D.I. 684]. In support of this Motion, the Insolvency Administrator respectfully states as follows:

I.   PRELIMINARY STATEMENT

1.   The Motion to Enforce asks this Court to decide one issue – whether Superior or TAE is the owner of certain property currently in the Insolvency Administrator's possession in

---

[1] Under the German Insolvency Code, TAE can only act through its insolvency administrator, Dr. Bruno Kübler.

Germany. The Insolvency Administrator does not dispute that he is required under applicable law to return any property that belongs to Superior. The only question to be resolved is whether, and to what extent, Superior owns property in the Insolvency Administrator's possession. The issue over ownership is solely a matter of applicable non-bankruptcy law and must be resolved in arbitration.

2. The property at issue was allegedly provided to TAE prepetition pursuant to the terms of a Supplier Agreement that governed the trade relationship between Superior and TAE at the time. Since Superior's claims to ownership of the disputed property are based on the Supplier Agreement, resolution of the parties' dispute falls squarely within the scope of the arbitration clause of that agreement, which expressly provides that the parties "shall" arbitrate "any dispute" "related to" the Supplier Agreement.

3. Accordingly, when it became evident that the parties were not likely to be able to resolve the ownership dispute consensually, the Insolvency Administrator commenced an arbitration proceeding as required by the Supplier Agreement. Superior, however, refused to arbitrate and instead filed the Motion to Enforce, seeking to litigate the ownership issue in this forum.

4. The Court should decline Superior's invitation and instead compel Superior to arbitrate this dispute. Since the arbitration agreement is a valid and binding agreement between the parties that broadly requires arbitration of all issues "related to" the Supplier Agreement, the Federal Arbitration Act requires arbitration. Although bankruptcy courts have discretion to refuse to enforce an arbitration clause in certain core matters where there would be a demonstrated specific conflict between enforcement of the arbitration clause and the provisions, or purposes, of the Bankruptcy Code, there is no discretion here. The ownership dispute is a noncore issue and arbitration of the dispute cannot possibly conflict with the purposes of the Bankruptcy Code given that Superior's bankruptcy case was closed three years ago and creditors have received all distributions in cash as required under Superior's plan of reorganization. Resolution of this dispute will not affect property of the bankruptcy estate or distributions to

creditors. Accordingly, the Court should compel Superior to arbitrate this dispute as agreed in the Supplier Agreement.

5. Finally, since the ownership issue must be resolved before the Court can make any ruling on the Motion to Enforce and since the Insolvency Administrator will promptly return to Superior any property that the arbitrator determines Superior owns, the Insolvency Administrator respectfully requests that the Court dismiss the Motion to Enforce without prejudice or, in the alternative, stay all proceedings related to the Motion to Enforce and adjourn the scheduled hearing on that matter until the arbitrator issues the necessary ruling resolving the ownership dispute.

## II.    JURISDICTION

6. This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334. Venue for this matter is proper in this district pursuant to 28 U.S.C. § 1409.

## III.    BACKGROUND

7. On December 15, 2001, TAE and Superior entered into a Supplier Agreement (as subsequently amended in 2005, the "Supplier Agreement"), a copy of which is attached hereto as Exhibit A, pursuant to which TAE agreed to manufacture and sell certain aircraft parts to Superior. The Supplier Agreement provided that Superior would "deliver to TAE all drawings and the related data and information that TAE may request and which is reasonably required for the intended use of the drawings" and that Superior "shall retain title to all Superior furnished drawings, related data (whether or not maintained or stored on computer) and information supplied to TAE under this Agreement." Supplier Agreement §§ 3.01, 3.02. The Supplier Agreement also provided, among other things, that any disputes "related to" the agreement would be submitted to arbitration:

> 10.05 Arbitration. TAE agrees that any dispute related to this Agreement, including the arbitrability of this Agreement shall, on the written request of the other party, be submitted to arbitration under the rules as Superior and TAE shall agree. If no agreement can be reached, such arbitration shall be governed by the

3

>   Commercial Arbitration Rules of the American Arbitration
>   Association.

(Supplier Agreement at ¶ 10.05) (the "Arbitration Provision"). At the time the Supplier Agreement was entered into, TAE was a wholly owned subsidiary of Thielert A.G. ("TAG"), a German company founded by Frank Thielert. In 2006, TAG acquired Superior, which thus became a sister company of TAE, both wholly owned by TAG.

8.    In 2008, both TAG and TAE were placed into insolvency proceedings in Germany. Dr. Kübler was appointed as the Insolvency Administrator over TAE. A separate insolvency administrator was appointed over TAG.

9.    On or about December 31, 2008, Superior commenced the above-captioned bankruptcy case by filing a voluntary chapter 11 petition. Superior filed its Third Amended Plan of Reorganization (the "Plan") on July 23, 2009 [D.I. 322], and the Court entered an order confirming the Plan (the "Confirmation Order") on August 27, 2009 [D.I. 404]. The Plan went effective and Superior emerged from chapter 11 on September 28, 2009 (the "Effective Date")[D.I. 432]. The Confirmation Order required TAG, TAE and other parties to return to reorganized Superior "all documents and other information owned by the Debtor related to the Debtor's business and operations." Confirmation Order ¶ 37.

10.    On August 20, 2010, the Trustee of the Superior Creditor's Trust filed an Application for Final Decree [D.I. 650], asserting that the case had been fully administered and the final distributions to creditors had been made. Accordingly, the Court entered an order closing the above-captioned bankruptcy case on October 8, 2010. The Court entered an order reopening the bankruptcy case on May 23, 2012 [D.I. 670] to hear an adversary proceeding that involved several bankruptcy issues, including whether certain third-party claims against Superior were barred by the Plan and the Confirmation Order.

11.    TAE continued manufacturing and selling aircraft parts to Superior throughout the course of Superior's bankruptcy case and up through the second quarter of 2013. On April 24, 2013, nearly four years after the Confirmation Order was entered, Superior sent the Insolvency Administrator a letter alleging, for the first time, that TAE, TAG and an affiliated entity had

failed to comply with the Confirmation Order. The April 24, 2013 letter cited several provisions of Superior's Plan and Confirmation Order generally describing Superior's piece parts business and Vantage engine program and demanded that TAE immediately return Superior's property, which Superior stated included a list of parts attached to the April 24, 2013 letter. A copy of the April 24, 2013 letter is attached hereto as Exhibit B and incorporated herein by reference.

12. The Insolvency Administrator was unaware that TAE was in possession of any property belonging to Superior and, to the extent TAE may be in possession of Superior property, was uncertain how to determine what property actually belonged to Superior given that Superior had provided nothing more than a list of part numbers and a general description of those parts. The Insolvency Administrator, through his counsel, responded to Superior's letter on June 3, 2013, requesting that Superior specifically identify the documents and information that Superior had furnished to TAE, provide serial numbers or similar information for any parts or other property and some proof of Superior's ownership of any property Superior believed was in TAE's possession. The June 3, 2013 letter also informed Superior of the ongoing negotiations for the potential sale of TAE's assets and therefore that it would be prudent for Superior to provide additional information relating to its request relatively quickly. A copy of the June 3, 2013 letter is attached hereto as Exhibit C and incorporated herein by reference.

13. Five weeks later, on July 9, 2013, Superior responded by sending a further letter to counsel for the Insolvency Administrator, repeating the general descriptions of Superior's business contained in the Plan and alleging that the property in question consists of "[a]ny technical specifications, blueprints, drawings, test data, work instructions, PMAs or materials relating to" Superior part numbers. A copy of the July 9, 2013 letter is attached hereto as Exhibit D and incorporated herein by reference. In an apparent attempt to interfere with the potential sale transaction, the July 9, 2103 letter indicated that Superior had sent a copy of the letter to the potential purchaser with whom the Insolvency Administrator was in the midst of negotiations. The July 9, 2013 letter contained no additional information that would assist the Insolvency Administrator in determining what, if any, Superior property may be in his possession. Thus, counsel for the Insolvency Administrator initiated a follow-up telephone call with Superior and

Superior's counsel on July 11, 2013 to try to better understand Superior's position and how the parties might address the issues. On that call, Mr. Abercrombie with Superior indicated that information was provided to TAE over the period of many years and that there was a governing agreement that was entered into before Superior became a Thielert affiliate. Counsel for the Insolvency Administrator asked for a copy of that agreement and inquired whether Superior could provide a detailed inventory of the specific information furnished to TAE. Mr. Abercrombie indicated that Superior could generate such an inventory but that doing so would require some time and effort. Later that same day, Superior filed a Motion to Show Cause (the "Show Cause Motion") [D.I. 673], asking the Court to enter an order requiring the Insolvency Administrator to show cause why TAE should not be held in contempt and enjoined for allegedly violating the terms of the Confirmation Order four years after it was entered by failing to turn over the property allegedly belonging to Superior.

14. On July 18, 2013, Superior's counsel sent an additional letter to counsel for the Insolvency Administrator attaching a copy of the Supplier Agreement and a sample purchase order and explaining that the Supplier Agreement contemplated that proprietary information would be provided to TAE and that Superior would retain title to any such proprietary information furnished. A copy of the July 18, 2013 letter is attached hereto as Exhibit E and incorporated herein by reference. With respect to the Insolvency Administrator's request for a specific listing of the proprietary information furnished to TAE, Superior indicated that it was not seeking "any data related to diesel powered aircraft engines . . . or machinery" and once again merely reiterated general categories information, stating that the property includes "drawings, specifications, and engineering, manufacturing, inspection and test data" and other categories for all Superior "AVGas Engines" and Superior parts. This information, however, was wholly inadequate to enable the Insolvency Administrator to carry out his duties to ensure he both returns any property over which Superior has rightful ownership but also does not transfer to Superior any property over which the TAE has rightful ownership given the substantial time period involved and the facts that (a) the parties operated under common control for a substantial period of time; (b) TAE had developed a substantial amount of its own

6

drawings, technical specifications, test data, reports and other information; and (c) employees with historical knowledge of what may have been provided by Superior and under what agreements or circumstances were no longer available to assist.

15. Thereafter, on July 23, 2013, the Insolvency Administrator closed the sale of TAE's assets. Given that the Insolvency Administrator did not have an adequate basis yet to properly determine what, if any, information in his possession properly belonged to Superior, out of an abundance of caution and to ensure that he did not transfer to the buyer any documents or information that Superior might conceivably own, the Insolvency Administrator segregated all documents, information and other property that related in any way to the general descriptions and part numbers Superior had provided. That property (the "Segregated Property") was withheld from the sale and remains segregated at this time.

16. To provide time for the parties to investigate and discuss an amicable resolution of the property dispute, Superior and the Insolvency Administrator, TAE and Centurion entered into a Tolling Agreement, providing, among other things, that Superior would not seek to have the Motion to Show Cause heard until sometime after September 30, 2013.

17. During the pendency of the Tolling Agreement, Superior provided no additional information to the Insolvency Administrator, and the parties had no further discussions. Because it appeared that formal discovery and litigation may be necessary to resolve the issue between the parties, pursuant to the terms of the Supplier Agreement, the Insolvency Administrator sent Superior a Demand for Arbitration (the "Arbitration Demand") on October 30, 2013. Through the Arbitration Demand, the Insolvency Administrator seeks (1) to require Superior to (a) identify the specific documents and information that were provided to TAE and (b) provide other information that may be required for the Insolvency Administrator to determine what, if any, property under his control might be owned by Superior and (2) to the extent necessary, a declaratory judgment that some or all of the Segregated Property is not owned by Superior. A copy of the Arbitration Demand is attached hereto as Exhibit F and is incorporated herein by reference. To date, Superior has not responded in any fashion to the Arbitration Demand.

18. On November 14, 2013 this Court entered an order [D.I. 682] denying the Motion to Show Cause for want of prosecution without prejudice to refiling. The next day, on November 15, 2013, Superior filed the Motion to Enforce [D.I. 684] (the "Motion to Enforce"), asking the Court to enter another order effectively containing the same terms as the Confirmation Order and directing the Insolvency Administrator to return all property belonging to Superior. The Motion to Enforce, which failed to even mention the Arbitration Demand, was subsequently set for hearing on December 20, 2013.

19. Counsel for the Insolvency Administrator subsequently contacted counsel for Superior to (a) inform counsel that the Insolvency Administrator intended to file a motion to compel arbitration and (b) attempt to reach an agreement on a schedule for the Motion to Enforce and the motion to compel arbitration. Counsel for the Insolvency Administrator also informed counsel for Superior that the Insolvency Administrator intended to seek discovery and that the Insolvency Administrator's witnesses from Germany are not able to travel from Germany to attend a hearing on December 20 even if the discovery could be completed sufficiently in advance of that hearing. Accordingly, counsel for the Insolvency Administrator suggested that the parties identify a future date for an evidentiary hearing on the Motion to Enforce that would work for both parties and, if acceptable to the Court, use the December 20 hearing to address the Insolvency Administrator's motion to compel arbitration.

20. On December 3, 2013, the parties jointly contacted the Court and obtained some additional available dates for an evidentiary hearing on the Motion to Enforce if the Court denies this Motion to Compel Arbitration. Counsel for Superior indicated that he was available on at least certain of those potential dates, including January 20 and 21, 2014. Counsel for the Insolvency Administrator subsequently verified that necessary persons in Germany could be available on those dates as well, and on December 4, 2013, requested that Superior agree to schedule the evidentiary hearing on the Motion to Enforce for one of those two dates. Although there was no agreement yet on a schedule, in the interest of time, counsel for the Insolvency Administrator also served discovery requests on counsel for Superior on December 4, 2013. Despite more than one request for a response, to date counsel for Superior has not responded to

8

the requests for an agreement on a future date for the evidentiary hearing on the Motion to Enforce.

21. The Insolvency Administrator does not dispute that he is obligated under applicable law to return any of the Segregated Property that belongs to Superior.[2] That issue has nothing to do with Superior's reorganization, which concluded years ago, and depends solely upon the application of non-bankruptcy law to the facts as determined by the trier of fact after discovery.

## IV. RELIEF REQUESTED

22. By this Motion, the Insolvency Administrator requests the entry of an order (a) compelling Superior to arbitrate the dispute regarding ownership of the Segregated Property; and (b) either staying all proceedings related to the Motion to Enforce until the ownership of the Segregated Property has been determined in the arbitration or dismissing the Motion to Enforce without prejudice.

## V. BASIS FOR RELIEF

### The Court Should Compel Superior to Arbitrate the Ownership Dispute

23. Section 4 of the Federal Arbitration Act (the "FAA") provides that "[a] party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court which, save for such agreement, would have jurisdiction under title 28, in a civil action or in admiralty of the subject matter of a suit arising out of the controversy between the parties, for an order directing that such arbitration proceed in the manner provided for in such agreement." 9 U.S.C. § 4.

24. The Fifth Circuit has established a two-step analysis to determine whether parties must arbitrate a particular claim: (a) "whether the parties agreed to arbitrate the dispute;" and

---

[2] Indeed, Dr. Kübler, as the court-appointed insolvency administrator, must ensure for the benefit of TAE's creditors that he (i) complies with any legal obligation to return property to Superior and (ii) properly retains and, to the extent feasible, obtains value for all of TAE's assets. The sole issue is the need to determine what, if any, of the Segregated Property Superior owns. These are duties that the Insolvency Administrator takes very seriously given that he might have personal liability to third parties under section 60 of the German Insolvency Code if he violates his duties.

9

(b) "whether any federal statute or policy renders the claim nonarbitrable." JP Morgan Chase & Co. v. Conegie, 492 F.3d 596, 598 (5th Cir. 2007). Because both prongs of the test are satisfied here, the Court should compel Superior to arbitrate the ownership dispute.

### *The Parties Agreed to Arbitrate any Ownership Dispute*

25. In determining whether the parties agreed to arbitrate a particular dispute, the Fifth Circuit instructs courts to review two considerations: (a) "whether there is a valid agreement to arbitrate between the parties;" and (b) "whether the dispute in question falls within the scope of that arbitration agreement." Id.

26. As to the first consideration, the Arbitration Provision in the Supplier Agreement is clearly a "valid agreement to arbitrate."[3] As an initial matter, Superior bears the burden of establishing the invalidity of the Arbitration Provision. See Carter v. Countrywide Credit Indus., Inc., 362 F.3d 294, 297 (5th Cir. 2004) (citing Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20, 26 (1991) ("There is a strong presumption in favor of arbitration and a party seeking to invalidate an arbitration agreement bears the burden of establishing its invalidity").

27. Moreover, section 2 of the FAA provides that an arbitration provision in "a contract evidencing a transaction involving commerce" is "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. The Supplier Agreement, which is a contract for the manufacture and sale of goods between a Texas entity and a German entity, is a "transaction involving commerce."

28. As to the second consideration, the parties' ownership dispute falls within the scope of the Arbitration Provision. Although the scope of an arbitration provision is generally an issue for judicial determination, the parties can agree to reserve the issue of arbitrability of particular claims for the arbitrator by including clear and unmistakable language to that effect in

---

[3] Whether or not the Supplier Agreement was rejected in Superior's bankruptcy case, rejection does not void an arbitration provision. In re Mirant, 316 B.R. 234, 238 n.5 (Bankr. N.D. Tex 2004); Madison Foods, Inc. v. Fleming Cos., Inc. (In re Fleming Cos., Inc.), 325 B.R. 687, 693-94 (Bankr. D. Del. 2005).

the agreement. See, e.g., AT&T Technologies, Inc. v. Commc'ns Workers of Am., 475 U.S. 643, 649 (1986). In this case, the Supplier Agreement provides, in relevant part, that "TAE agrees that any dispute related to this Agreement, **including the arbitrability of this Agreement** shall . . . be submitted to arbitration . . . ." Supplier Agreement at § 10.05 (emphasis added). The inclusion of the bolded phrase clearly evidences the parties' intent that an arbitrator decide any disputes regarding the arbitrability of issues under the Supplier Agreement.

29.     Even if the above language were not included in the Supplier Agreement, however, the dispute regarding ownership of the Segregated Property would fall within the scope of the Arbitration Provision. By its express terms the Arbitration Provision applies to "any dispute **related to** this [Supplier] Agreement." Supplier Agreement at § 10.05 (emphasis added). The Fifth Circuit has characterized similar arbitration clauses that include the phrase "related to" as "broad," and held that they "embrace all disputes between the parties having a significant relationship to the contract regardless of the label attached to the dispute." Pennzoil Exploration and Prod. Co. v. Ramco Energy Ltd., 139 F.3d 1061, 1067 (5th Cir. 1998). Moreover, in determining the scope of an arbitration agreement, courts must resolve any doubts in favor of arbitration. Steelworkers v. Warrior & Gulf Navigation Co., 363 U.S. 574, 582-83 (1960) ("[a]n order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage"); Banc One Acceptance Corp. v. Hill, 367 F.3d 426, 429 (5th Cir. 2004) ("once a court determines that an agreement to arbitrate exists, the court must pay careful attention to the strong federal policy favoring arbitration and must resolve all ambiguities in favor of arbitration").

30.     Even under a less liberal standard, the dispute over ownership of the Segregated Property would have a "significant relationship" to the Supplier Agreement. Superior's July 18

Letter makes it abundantly clear that the ownership dispute derives from and is closely tied to the Supplier Agreement:

> Section 3.01 of the Supplier Agreement anticipates that Superior's IP will be delivered to TAE for use in production of items for Superior. Section 3.02 provides that (1) Superior shall retain title to all Superior IP supplied to TAE, (2) TAE will maintain the confidentiality of Superior's IP, and (3) TAE will return Superior's IP to Superior.

July 18 Letter at p. 3.

### *The Court Lacks Discretion to Deny Enforcement of the Arbitration Provision*

31. The Fifth Circuit has established an additional two-part test that a bankruptcy court must consider in determining whether it has discretion to refuse to enforce an otherwise valid arbitration provision: "whether the proceeding derives exclusively from the provisions of the Bankruptcy Code and, if so, whether arbitration of the proceeding would conflict with the purposes of the Code." Zimmerli v. Ocwen Loan Servicing, LLC, 432 B.R. 238, 241-42 (Bankr. N.D. Tex. 2010) (citing In re Nat'l Gypsum Co., 118 F.3d 1056, 1069-70 (5th Cir. 1997)). A bankruptcy court has the discretion to refuse to enforce an otherwise valid arbitration provision only if both parts of the test are satisfied. Manchester, Inc. v. Lyle (In re Manchester, Inc.), 417 B.R. 377, 385 (Bankr. N.D. Tex. 2009).

32. In this case, however, neither part of the test is satisfied. It is settled law that a bankruptcy court lacks discretion to refuse to enforce an arbitration provision with respect to non-core claims. In re Nat'l Gypsum Co., 118 F.3d 1056, 1066 (5th Cir. 1997). The ownership dispute regarding the Segregated Property is clearly non-core. It is not included in the enumerated list of core proceedings in 28 U.S.C. § 157(b), and it is neither based on any right created by federal bankruptcy law nor could it arise only in the context of bankruptcy. See, In re Wood, 825 F.2d 90, 97 (5th Cir. 1987) ("We hold, therefore, that a proceeding is core under section 157 if it invokes a substantive right provided by title 11 or if it is a proceeding that, by its

12

nature, could arise only in the context of a bankruptcy case"). In fact, given that Superior's chapter 11 reorganization concluded years ago, the outcome of the dispute will not have any effect whatsoever on Superior's chapter 11 reorganization.

33. Even if the ownership dispute were somehow considered core, it does not derive exclusively from the provisions of the Bankruptcy Code. The only issue raised by the Motion to Enforce is a state-law dispute over ownership of non-estate property, and the proceeding is only tenuously related to the provisions of the Bankruptcy Code. Where the claim is core, but the central issues to be decided are noncore, this Court has held that the proceeding is derivative of the debtor's prepetition legal rights and does not derive exclusively from the provisions of the Bankruptcy Code. In re Manchester, 417 B.R. at 386-87 (holding that core fraudulent transfer and preference claims did not derive exclusively from the Bankruptcy Code as required by the Fifth Circuit because "what is truly at issue in the Adversary Proceeding are the Lyles' (i) alleged prepetition misrepresentations to Manchester regarding the financial condition and value of Nice Cars, and (ii) alleged prepetition breaches of the Purchase Agreements . . . Accordingly, and in the words of the Fifth Circuit, the 'underlying nature' of the Adversary Proceeding does not 'derive exclusively from the provisions of the Bankruptcy Code' and is in fact 'derivative of the pre-petition legal rights possessed by [the] debtor").

34. Since the first part of the Fifth Circuit's test is not satisfied, there is no reason to even reach the second part of the test, but in any event the second part of is also not satisfied here. The second part of the Fifth Circuit test requires "a demonstrated specific conflict between enforcing an arbitration clause and the textual provisions and/or purposes of the Bankruptcy Code . . . ."). In re Nat'l Gypsum Co., 118 F.3d 1056, 1067 (5th Cir. 1997) (citing In re Chorus Data Sys., 122 B.R. 845, 851 (Bankr. D.N.H. 1990).

13

35. There is, however, no specific conflict here between the provisions and purposes of the Bankruptcy Code and arbitration of the dispute over ownership of the Segregated Property. Superior's bankruptcy case closed more than three years ago and all distributions under the Plan have been made to creditors in cash. Accordingly, resolution of this dispute will not affect property of the bankruptcy estate or distributions to creditors.

**The Court Should Stay or Dismiss Without Prejudice All Proceedings Related to the Motion to Enforce**

36. Federal law mandates that the Court stay these proceedings pending arbitration. Section 3 of the Federal Arbitration Act provides that "[i]f any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending . . . shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement . . . ." 9 U.S.C. § 3.

37. The Insolvency Administrator believes the arbitration will resolve all issues raised by Superior's Motion to Enforce. However, to the extent the Motion to Enforce rasies any nonarbitrable issues (which the Insolvency Administrator does not believe to be the case) this Court still has the inherent authority to stay the proceedings. Landis v. N. Am. Co., 299 U.S. 248, 254 (1936) ("the power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants"). Pursuant to Landis, courts have the authority "to stay litigation of nonarbitrable issues pending resolution of the arbitration of arbitrable issues." Second Ave. Holdings, LLC v. Latimer (In re Latimer), 489 B.R. 844, 866 (N.D. Ala. 2013). A court's decision to stay nonarbitrable issues requires "the exercise of judgment, which must weigh competing interests and maintain an even balance." Landis, 299 U.S. at 254. There is no

14

set list of factors that a court must evaluate, and "in the end, benefit and hardship will have to be set off, the one against the other, and a balance ascertained." Latimer, 489 B.R. at 867.

38. Further Proceedings on the Motion to Enforce will be wholly unnecessary no matter how the arbitrator rules because the Insolvency Administrator will promptly return to Superior whatever property the arbitrator determines is owned by Superior. For that reason, the Insolvency Administrator submits that there is no reason to maintain the Motion to Enforce on the Court's calendar and that the Motion to Enforce should be dismissed without prejudice. At a minimum, however, the Court should stay proceedings related to the Motion to Enforce until the arbitration has concluded because resolution of the ownership issue is necessary before the Court can rule on the Motion to Enforce. Moreover, a stay will not burden Superior in any way because proceedings in this Court relating to the Motion to Enforce have not yet commenced, and the arbitration can and should proceed without delay.

## VI. CONCLUSION

The Insolvency Administrator respectfully requests that the Court enter an order: (i) compelling Superior to arbitrate the ownership dispute over the Segregated Property; (ii) dismissing the Motion to Enforce without prejudice or, alternatively, staying the Motion to Enforce pending the conclusion of the arbitration; and (iii) granting such other and further relief to the Insolvency Administrator as the Court deems proper.

Dated: December 9, 2013

SIMON, RAY & WINIKKA LLP

By: /s/ Craig F. Simon

Craig F. Simon, Esq.
State Bar No. 00784968
Daniel P. Winikka, Esq.
State Bar No. 00794873
2525 McKinnon Street, Suite 540
Dallas, TX  75201
Telephone:  (214) 871-2292
Facsimile:   (469) 759-1699

*Counsel for the Insolvency Administrator*

## CERTIFICATE OF CONFERENCE

The undersigned certifies that counsel for the Insolvency Administrator contacted counsel for Superior regarding the Arbitration Demand and to inquire whether Superior intended to comply with the obligation to arbitrate the dispute. Superior's counsel stated that Superior intends to ask this court to hear the dispute. Accordingly, this motion is presented to the Court for determination.

/s/ Craig F. Simon
Craig F. Simon

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 9th day of December 2013, a true and correct copy of the foregoing document has been served on the parties listed below via the Court's ECF filing system, first class mail or other appropriate means.

/s/ *Craig F. Simon*
Craig F. Simon

U.S. Trustee
1100 Commerce Street, Room 976
Dallas, TX 75242-1496

Jerry Alexander
James Adams
Christopher Robison
PASSMAN & JONES
1201 Elm Street, Suite 2500
Dallas, TX 75270