Jerry C. Alexander
Texas State Bar No. 00993500
James F. Adams
Texas State Bar No. 00863450
Christopher A. Robison
Texas State Bar No. 24035720
PASSMAN & JONES
A Professional Corporation
1201 Elm Street, Suite 2500
Dallas, Texas 75270-2599
(214) 742-2121 Telephone
(214) 748-7949 Facsimile

COUNSEL FOR SUPERIOR AIR PARTS, INC.

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| In Re: § | |
| § | Case No. 08-36705-bjh-11 |
| SUPERIOR AIR PARTS, INC., § | Chapter 11 |
| § | |
| Debtor. § | |
| § | |

**SUPERIOR AIR PARTS, INC.'S RESPONSE TO THIELERT AIRCRAFT
ENGINES GMBH'S MOTION TO COMPEL ARBITRATION**

COMES NOW, Superior Air Parts, Inc. ("*Superior*"), and serves the following response to the Motion to Compel Arbitration [Bankr. Doc. #689] filed by Dr. Bruno Kübler ("*Kübler*") in his capacity as the German insolvency administrator for Thielert Aircraft Engines GmbH ("*TAE*") in the above-styled bankruptcy case.

### I.    FACTUAL AND PROCEDURAL BACKGROUND

**A.    Superior's Business.**

Superior is a manufacturer of replacement parts for various piston-driven gasoline-powered aircraft engines ("*AVGas Engines*"), including engines originally manufactured by Lycoming Engines ("*Lycoming*") and Teledyne/Continental Motors Corp. ("*TCM*"). The Federal Aviation Administration ("*FAA*") issued various Parts Manufacturing Approvals and

supplements (collectively "*PMA*s") to Superior authorizing Superior to manufacture such replacement aircraft parts. Each PMA was issued by the FAA after a review of an application and supporting data, typically including specifications, designs, test results, computations, drawings and/or other technical data (collectively "*Data Packs*") for either a single part, variations of a part manufactured to different sizes, or a group of related parts in a kit.

Superior also designed, manufactured and sold two experimental AVGas Engines, the XP-360 and the XP-400, plus parts for such engines (collectively the "*Experimental Engines*"), pursuant to FAA approval.

Together the replacement parts business for Lycoming and TCM AVGas Engines and the new and replacement parts for Superior's Experimental Engines constituted Superior's "piece parts business."

### B.    The Superior/TAE Relationship.

TAE was historically a manufacturer of parts for piston-driven diesel-powered aircraft engines ("*Diesel Engines*") in Germany. Starting in approximately 2001, Superior used the services of TAE as a subcontractor or supplier to build replacement parts for AVGas Engines pursuant to Superior's PMA. Superior purchased such replacement parts from TAE to in turn sell to Superior's customers. Superior also used TAE's services in connection with the designing, testing, and building of parts for Superior's Experimental Engines. Pursuant to a supplier arrangement TAE, as the supplier/seller, agreed to manufacture parts for Superior as the distributor/buyer according to Superior's specifications. Superior agreed to furnish its specifications, designs, test results, computations, drawings and/or other technical data to TAE to assist in the manufacturing process. TAE agreed to safeguard and return such property to Superior upon termination of the supplier relationship.

C. **Superior's Bankruptcy Filing, the Plan, and the Court's Confirmation Order.**

On December 30, 2008, Superior filed for Chapter 11 bankruptcy protection by initiating the above-styled bankruptcy case. On July 23, 2009, Superior filed its Third Amended Plan of Reorganization [Bankr. Doc. #322] ("***Plan of Reorganization***"). The Plan of Reorganization proposed to cancel all existing ownership interests in the Debtor, continue the Debtor's existence, reorganize the Debtor to allow it to continue its "business, including the assembly and sale of piece parts, cylinder assemblies, and Vantage engines", issue new ownership interests in the Debtor to Brantly International, Inc. and/or other entities (collectively the "***Brantly Group***"), and make various distributions to its creditors, including TAE.[1]

Superior's "piece parts business" was defined on pages 8 and 9 of Superior's Plan of Reorganization as follows:

> 1. Inventory. All inventories of raw materials, work-in-process, finished goods, demonstration equipment, parts, shipping containers, packaging materials, and other accessories related thereto and other materials that are used or held for use in connection with the manufacture, sale and repair of aircraft engine parts as of the Effective Date of the Plan.
>
> 2. Manufacturing Equipment and Tooling. All machinery, equipment and tooling used or held for use in connection with or necessary for the manufacture and repair of aircraft engines and aircraft engine parts including all manufacturing, production, maintenance, packaging, gauges, testing and other machinery, tooling (including dies, jigs, patterns, molds, prototypes and the like) and equipment, spare or replacement parts, computer equipment incidental to the development, design, manufacture, testing and inspection of parts, engine test cell equipment, specialized inspection and quality control equipment, and plant equipment and the like.
>
> 3. Selected IP Assets. ***All IP Assets supporting and otherwise underlying all replacement parts*** for which Seller has obtained from the FAA Parts Manufacturer Approval ("PMA"), including replacement parts for Lycoming and TCM engines as listed on as well as engineering specimens and masters related to such parts; and all electronic as well as paper copies of documents related to the foregoing, including all documentation submitted to and correspondence with the

---

[1] *See* Third Amended Plan [Bankr. Doc. #322], Article I, Summary of Plan.

**SUPERIOR AIR PARTS, INC.'S RESPONSES TO THIELERT AIRCRAFT**         **PAGE 3**
**ENGINES GMBH'S MOTION TO COMPEL ARBITRATION**
356846

FAA relating to such engines and replacement parts identified above, as well as engineering data, legacy data, inspection processes and the quality manual.

4. <u>Trademarks, Trade Dress and Trade Names and Domains</u>.  All Trademarks and Domains, including the "Superior" trade names, trademarks, service names, service marks, logos, brand names, and corporate names, and all applications, registrations, and renewals in connection therewith but excluding trademarks, trade names and trade dress relating to the engines in the Engine Program.

5. <u>Other Tangible Personal Property</u>.  All other tangible personal property of [Debtor] that is used or held for use in connection with the manufacture, repair and sale of aircraft engines and aircraft engine parts except Excluded Assets.

6. <u>Accounts Receivable</u>.  Trade accounts receivable and all notes, bonds and other evidences of Indebtedness pursuant to which Seller shall have the right to receive payments (in each case, of any nature whatsoever, whether recorded or unrecorded) arising out of sales of products delivered by [Debtor] and any related security arrangements and collateral securing the repayment or other satisfaction thereof, including any rights with respect to any third party collection procedures or any other Claims that have been commenced in connection therewith.

7. <u>Experimental Engines</u>.  Those *experimental engines* currently undergoing testing, as well as prototype, engineering specimens and masters related to such engines, including without limitation, the Model 400 Engine and related prototype(s).  ***All Intellectual Property, know-how, designs, drawings, specifications, data and documentation supporting and otherwise underlying all of [Debtor's] XP-Series Engines***.[2]

Superior's "Vantage Engine Program" is defined on pages 10 and 11 of Superior's Plan of Reorganization as follows:

> [A]ll documentation from Vantage Engines already shipped or sold to any customer for the purpose of use, test or evaluation, and **all intellectual property, components and parts related to the design, development, testing, and FAA approval of the Vantage Engines**, FAA Type Certificate No. E00001SC, (and related approvals Transport Canada Type Certificate IE-58, European Aviation Safety Agency Type Certificate EASA.(IM).E.024, and any other certifications) **including but not limited to, drawings, research, all test reports and data, engineering change requests, engineering change notices, build sheets, bill of materials, (including current and historical bill of materials, all assembly and test instructions and all continued airworthiness documentation), parts catalog and supporting data, overhaul manual and supporting data, operator and maintenance manual and supporting data, installation manual and**

---

[2] *See* Third Amended Plan [Bankr. Doc. #322], Article II, definition of "Piece Parts Business" (emphasis added).

> **supporting data, service letters and service bulletins (including all quality documentation), all product integrity team meeting minutes and documentation, all warranty claims and/or customer feedback, trademarks and logos, and all marketing material, including market studies, photographs, artwork, brochures, models and fliers, all sales information, customer inquiries and anything else related to the Vantage Engines**.

Superior's "Vantage Engines" are defined on page 10 of Superior's Plan of Reorganization as including all "SV" parts for the Vantage O-360 and IO-360" engines.

Superior's Plan of Reorganization also provides that "the property of the Debtor … shall vest in the Reorganized Debtor on the Effective Date free and clear of all claims, liens, charges or other encumbrances and interests." *See* page 17, § 6.13 of Superior's Plan of Reorganization. Section 6.12 of Superior's Plan of Reorganization further provides that:

> **all persons, including but not limited to** Corporate Finance Partners, **TAG**, **TAE**, Engine Components, Inc., Avco Corporation and Teledyne Technologies Incorporated, and their respective parents, sister and subsidiary companies, and all other companies or persons in their control, and each of them, shall be directed to **return to the Reorganized Debtor all documents and other information owned by the Debtor related to the Debtor's business and operations (the "Proprietary Information")**. For the avoidance of doubt, the Reorganized Debtor retains all of the Debtor's rights pursuant to any confidentiality agreement executed in connection with the exchange of such information.

Neither TAE nor Kübler objected to Superior's Plan of Reorganization and thus waived all objections thereto. TAE and Kübler are also bound by the terms of the Plan of Reorganization.

On August 27, 2009, the Bankruptcy Court entered an order [Bankr. Doc. #404] ("*Confirmation Order*") in the Superior Bankruptcy Case confirming Superior's Plan of Reorganization. Paragraph 36 of the Confirmation Order provides, in relevant part, that "all property of the Estate shall vest in the Reorganized Debtor as of the Effective Date, and the Reorganized Debtor shall take and hold all such assets free and clear of all Claims, Liens, encumbrances and other interests of holder of Claims and Interests."

Paragraph 37 of the Confirmation Order reiterates, in relevant part, that "[p]ursuant to §6.12 of the Plan, **all persons, including but not limited to** Corporate Finance Partners, TAG, **TAE**, Engine Components, Inc., Avco Corporation and Teledyne Technologies Incorporated, **and their respective parents, sister and subsidiary companies, and all other companies or persons in their control, and each of them, shall be directed to return to the Reorganized Debtor all documents and other information owned by the Debtor related to the Debtor's business and operations (the 'Proprietary Information')**."

The Confirmation Order also discharged any debts that Superior might have owed TAE (¶ 35), and enjoined everyone, including TAE, from asserting any claims against Superior or its property which arose prior to the Effective Date (¶ 32 - 35).

Neither TAE nor Kübler timely appealed the Confirmation Order, which has become final and non-appealable. Accordingly, TAE and Kübler are bound by the Confirmation Order.

Superior's Plan of Reorganization became effective on September 28, 2009. *See* Notice of Effective Date [Bankr. Doc. #432].

As a result of the Plan of Reorganization and Confirmation Order, TAE received approximately $500,000 in distributions making it one of the most heavily compensated creditors.

D. **Superior's Demand for Return of its Property, the Motion to Show Cause, and the Tolling Agreement.**

Superior continued to do business with TAE post-confirmation, and thus Superior left its drawings, designs and other Proprietary Information in TAE's possession for use in the production and testing of parts for AVGas Engines. In approximately Spring 2013, TAE completed its last order for Superior. On April 24, 2013, Superior demanded that TAE return its

drawings, designs and other Proprietary Information as described in the letter attached to TAE's Motion to Compel Arbitration as Exhibit B.

TAE and Kübler delayed in responding to Superior's demand, and then requested additional information, including a copy of a 2001 Supplier Agreement between Superior and TAE, a 2005 amendment thereto, and a sample purchase order, which Superior supplied. Counsel for TAE and Kübler eventually indicated that TAE and Kübler might be in the process of selling Superior's property despite the provisions in the Confirmation Order. Accordingly, on July 11, 2013, Superior filed its Motion to Show Cause [Bankr. Doc. #673] requesting that the Court enforce its Confirmation Order by holding TAE and Kübler in contempt.

TAE and Kübler failed to respond to Superior's Motion to Show Cause, and instead requested that Superior delay a scheduled hearing on the Motion to Show Cause so that TAE and Kübler could further explore Superior's demands. Superior, TAE and Kübler entered into a tolling agreement effective as of August 1, 2013, that, among other things, tolled the statute of limitations and required Superior to postpone a hearing on the Motion to Show Cause until sometime after October 30, 2013. Superior's counsel notified the deputy clerk about the tolling agreement, and the hearing on the Motion to Show Cause was removed from the docket. Neither TAE nor Kübler requested any further information from Superior during the tolling and forbearance periods.

As the close of the forbearance period approached, Superior made a settlement proposal to TAE and Kübler. On October 30, 2013, TAE and Kübler rejected Superior's settlement overture and made a purported demand for arbitration pursuant to the 2001 Supplier Agreement, as amended in 2005.

### E. Superior's Motion to Enforce and TAE's Motion to Compel Arbitration.

As Superior was studying the purported demand for arbitration, the Bankruptcy Court issued an order [Bankr. Doc. #682] on November 14, 2013, dismissing the Motion to Show Cause without prejudice for want of prosecution. Superior refiled its motion on November 15, 2013 as the current Motion to Enforce [Bankr. Doc. #684] and requested a hearing date. The Motion to Enforce was originally scheduled by the deputy clerk for hearing on December 18, 2013, but the hearing was rescheduled to December 20, 2013 at the request of counsel for TAE and Kübler. Soon thereafter, TAE and Kübler started requesting a further delay of the hearing on the Motion to Enforce.

On December 3, 2013, the deputy clerk warned counsel for TAE and Kübler that any request for further delay by TAE and Kübler should be immediately filed in the form of a motion for expedited hearing regarding such a continuance. Instead, TAE served its first set of discovery requests on December 4, 2013 without reserving any arbitration rights. TAE waited until December 9, 2013, the last possible day to respond to the Motion to Enforce, to file a motion for continuance [Bankr. Doc. #690]. TAE also filed A Preliminary Response to the Motion to Enforce [Bankr. Doc. #688] and a Motion to Compel Arbitration [Bankr. Doc. #689] on December 9, 2013.[3]

On December 12, 2013, the Bankruptcy Court scheduled a hearing on the Motion to Compel Arbitration for January 21, 2013, and directed that Superior should file its response by December 23, 2013, and TAE file its reply by December 30, 2013. The Bankruptcy Court also rescheduled the hearing on the Motion to Enforce to Enforce to February 18, 2013.

---

[3] The Motion to Enforce was also filed against TAE affiliate Centurion Aircraft Engines AG+Co. KG ("*Centurion*"), but Centurion did not file a response or join in the Motion to Compel Arbitration.

**SUPERIOR AIR PARTS, INC.'S RESPONSES TO THIELERT AIRCRAFT**                       **PAGE 8**
**ENGINES GMBH'S MOTION TO COMPEL ARBITRATION**
356846

## II. SUPERIOR'S MOTION TO ENFORCE IS NOT PREDICATED ON THE SUPPLIER AGREEMENT

TAE's Motion to Compel Arbitration is predicated on the erroneous premise that Superior's Motion to Enforce seeks to compel enforcement of the 2001 Supplier Agreement, as amended in 2005, which TAE contends contains an applicable arbitration clause. In fact, the Motion to Enforce does **not** mention the 2001 Supplier Agreement (nor did the original April 24, 2013 demand letter or the July 11, 2013 Motion to Show Cause), but instead seeks enforcement of the Plan of Reorganization and this Court's Confirmation Order. Accordingly, the relief sought by Superior is not dependent on the 2001 Supplier Agreement or any clause therein which purportedly grants TAE any applicable arbitration rights.[4] Indeed, the first time that Superior mentioned the 2001 Supplier Agreement was after the Motion to Show Cause was filed in correspondence responding to a request for a copy of the agreement.

## III. TAE HAS NO RIGHT TO COMPEL ARBITRATION UNDER THE SUPPLIER AGREEMENT

Although the Federal Arbitration Act establishes a strong policy in favor of arbitration, the law does not make arbitration clauses inviolate. Indeed, the Fifth Circuit has specifically sanctioned the discretion of a bankruptcy court to refuse to enforce arbitration clauses (*see* Part IV, below).

To determine whether parties must arbitrate claims, the Fifth Circuit has established a two-step test. First, the court must determine whether the parties have agreed to arbitrate the dispute; second, the court must determine whether there is a federal statute or policy that renders the claims non-arbitrable. *See Sherer v. Green Tree Serv., LLC*, 548 F.3d 379, 381 (5th Cir. 2008). In this instance, the parties have not agreed to arbitration the dispute before the Court (in

---

[4] Neither Kübler nor Centurion were parties to the 2001 Supplier Agreement and are not beneficiaries thereof, thus even if the 2001 Supplier Agreement granted TAE some arbitration rights, such rights do not extend to either Kübler or Centurion potentially resulting in duplicitous litigation.

fact, Superior has not agreed to arbitrate any dispute with TAE or Kübler). Accordingly, the Motion to Compel should be denied.

The 2001 Supplier Agreement makes two references to arbitration. First, ¶ 10.05 of the 2001 Supplier Agreement states:

> ***TAE agrees*** that any dispute related to this Agreement, including the arbitrability of this Agreement shall, **on the written request of the other party**, be submitted to arbitration under the rules as Superior and TAE shall agree. If no agreement can be reached, such arbitration shall be governed by the Commercial Arbitration Rule of the American Arbitration Association.

Second, ¶ 15 of Schedule 1.02 provides:

> ***Seller*** *[i.e. TAE]* ***agrees*** that any dispute related to a purchase order or this agreement shall, **on the written request of *Superior***, be submitted to arbitration under the rules as Superior and Seller shall agree. If no agreement can be reached, such arbitration shall be governed by the Commercial Arbitration Rule of the American Arbitration Association.

Both provisions give <u>Superior</u> the option of compelling TAE to arbitration, but the reverse is not true. There is no language in either provision whereby Superior agrees to submit a dispute to arbitration on the written request of TAE.

Moreover, Superior and TAE demonstrated that they knew how to make provisions of the 2001 Supplier Agreement mutual when they so desired, such as Paragraphs 10.01, 10.02, 10.03, 10.04, 10.06, 10.11 and 10.12. In short, the arbitration provision was written to be a one-way street in Superior's favor, and any other interpretation would do violence to the basic rules of contract construction under Texas law.[5]

---

[5] Paragraph 10.01 of the 2001 Supplier Agreement provides that the "Agreement shall be construed and interpreted by and in accordance with the laws of the State of Texas, and whether or not any conflicts of law principle would refer the interpretation to the law of another jurisdiction." Under Texas law, "…courts treat arbitration agreements as other contracts in applying the legal rules to interpret them. The goal is to discern the true intentions of the parties, as the FAA's primary purpose is to ensure private agreements to arbitrate are enforced according to their terms, no more, no less." *In re Olshan Foundation Repair Co.*, LLC, 328 S.W.3d 883, 889 (Tex. 2010).

**SUPERIOR AIR PARTS, INC.'S RESPONSES TO THIELERT AIRCRAFT**     **PAGE 10**
**ENGINES GMBH'S MOTION TO COMPEL ARBITRATION**
356846

Indeed, to read mutual arbitration rights into the 2001 Supplier Agreement would be inconsistent with other language in the agreement. For example, ¶ 10.02 of the 2001 Supplier Agreement provides:

> The parties agree and understand that the obligations of the parties under this Agreement shall be and are performable in Dallas County, Texas. The parties consent and agree that venue of any suit or legal proceeding brought by the other, or those in privity with them, and related to this Agreement, shall be in Dallas County, Texas. Further, *the parties agree* **to hereby submit to the jurisdiction of the state or federal courts that are located in Dallas County, Texas**, and designate the Secretary of State of Texas as their agent for service of process.

Paragraph 18 of Schedule 1.02 similarly provides:

> Seller agrees and understand that the obligations of the parties under the purchase orders and this agreement shall be and are performable in Dallas County, Texas. Seller consents and agrees that venue of any suit or legal proceeding brought by Seller or those in privity with Seller shall be in Dallas County, Texas. Further, *Seller agrees* **to hereby submit to the jurisdiction of the state or federal courts that are located in Dallas County, Texas**, and designates the Secretary of State of Texas as its agent for service of process.

Superior respectfully submits that any interpretation of the 2001 Supplier Agreement to grant TAE arbitration rights would be inconsistent with TAE expressly submitting to the jurisdiction of the state and federal courts located in Dallas County, Texas.

In short, TAE has no arbitration rights pursuant to the 2001 Supplier Agreement, and thus even if Superior were seeking relief pursuant to such agreement TAE would be unable to compel arbitration.[6]

---

[6] The 2001 Supplier Agreement also grants other rights exclusively to Superior. See, e.g., ¶ 3.02 ("Superior shall retain title to all Superior furnished drawings, related data (whether or not maintained or stored on computer) and information supplied to TAE under this Agreement. TAE will maintain the confidentiality of all drawings, data and information supplied by Superior and will return such drawings, data and information to Superior upon the termination of this Agreement."); ¶ 3.03 ("Superior's drawings, related data and information shall be used by TAE only for the performance of its obligations under this Agreement, unless otherwise provided in this Agreement or expressly approved by Superior in writing."); ¶ 3.04 ("TAE assumes the risk of, and shall be responsible for, any loss or destruction of, or damage to, the drawings, related data or information of Superior upon its delivery to TAE."); and ¶ 12 of Schedule 1.02 ("Superior shall retain title to all Superior furnished drawings, equipment, data and information supplied to Seller. Seller shall be responsible for any loss or damage to the drawings, equipment, data or information supplied by Superior, reasonable wear and tear excepted. Seller will maintain the confidentiality

## IV. EVEN IF TAE HAD ARBITRATION RIGHTS, COURT HAS DISCRETION TO DENY TAE'S MOTION

Even if the arbitration clause is binding on Superior, the Court has discretion to refuse to compel arbitration.

The Fifth Circuit has established a two-prong test for determining when a **bankruptcy court** may refuse to enforce an arbitration clause. In the bankruptcy context, the court must determine "whether the proceeding derives exclusively from the provisions of the Bankruptcy Code and, if so, whether arbitration of the proceeding would conflict with the purposes of the Code." *Insurance Co. of N. Am. v. NCG Settlement Trust & Asbestos Claims Mgmt. Corp. (In re Nat'l Gypsum Co.)*, 118 F.3d 1056, 1069-70 (5th Cir. 1997). If enforcement of the arbitration agreement would inherently conflict with the underlying purposes of the Bankruptcy Code, then the Bankruptcy Court has "significant discretion" to deny a request to compel arbitration. *In re Gandy*, 299 F.3d 489, 495 (5th Cir. 2002).

Under this framework, the bankruptcy court must first determine whether the proceeding derives exclusively from the provisions of the Bankruptcy Code, "or in other words whether [the proceeding] is a core proceeding." *See Zimmerli v. Ocwen Loan Servicing, LLC*, 432 B.R. 238, 242 (Bankr, N.D. Tex. 2010) (Hale, J.). A "core" proceeding is one that "arises under" or "arises in" a case under title 11. *Id.*; *see also* 28 U.S.C. § 1334(b). "The core versus non-core distinction determines whether the Bankruptcy court has discretion to enforce an arbitration agreement." *Id.*

"[W]hile the substance of the dispute may be governed by law peculiar to bankruptcy, the *National Gypsum* test does not require that the causes of action be derived solely from the

---

of all such drawings, data and information and may not reproduce or divulge such information without the express written consent of Superior. Superior's drawings, equipment, data and information shall be used by Seller only for the performance of its obligations under the purchase order and Seller will return all drawings, equipment, data and information to Superior at Superior's request.").

**SUPERIOR AIR PARTS, INC.'S RESPONSES TO THIELERT AIRCRAFT**     **PAGE 12**
**ENGINES GMBH'S MOTION TO COMPEL ARBITRATION**
356846

Code." *Id.* at 243 (citing *In re Mirant*, 316 B.R. 234, 238 (Bankr. N.D. Tex. 2004) (Lynn, J)). Citing Judge Lynn's opinion in *In re Mirant*, the *Zimmerli* court further noted that "'[m]any issues in bankruptcy cases arise under state law but *must* be subject to the bankruptcy court's jurisdiction for it to do its job. … Issues of lien perfection or contractual cure amounts must be addressed under state law to decide whether a secured creditor should be granted relief from the stay or if a plan of reorganization should be confirmed, for example. The vast majority of claims in any bankruptcy case will be premised on or implicate state law, to one degree or another.'" *Id.* (citing *In re Mirant*, 316 B.R. at 238) (emphasis in original)).

Applying the first prong of the *National Gypsum* test to the instant proceeding, Superior's Motion to Show Cause is a "core" proceeding because it is premised *solely* upon the Plan of Reorganization and this Court's Confirmation Order. *In re Lyondell Chem. Co.*, 445 B.R. 277, 287 (Bankr.S.D.N.Y.2011) ("[A] bankruptcy court retains core jurisdiction to interpret and enforce its own prior orders, including and especially confirmation orders."); *Matter of Nat'l Gypsum Co.,* 118 F.3d 1056, 1064 (5th Cir.1997) proceeding to enforce or construe a bankruptcy court's discharge injunction issued pursuant to its confirmation order is "core" 28 U.S.C. § 157(b)); 28 U.S.C. § 157(b)(2)(L) ("core proceedings include, but are not limited to … confirmations of plans"). In fact, Superior specifically prayed that TAE be ordered to "comply with Section 6.12 of Superior's Plan of Reorganization and Paragraph 37 of the Confirmation Order." *See* Motion to Show Cause [Bankr. Doc. #684], p. 9. Accordingly, the first prong of the *Nat'l Gypsum* test is satisfied.

The second part of the *Nat'l Gypsum* test requires the court to determine if arbitration of the proceeding would conflict with the purposes of the Bankruptcy Code. *In re Nat'l Gypsum,* 118 F.3d at 1067. The Fifth Circuit has identified three purposes for this court to consider: (1)

resolution of purely bankruptcy issues in a centralized forum; (2) protection of reorganizing debtors and creditors from piecemeal litigation; and (3) the bankruptcy court's unquestionable power to enforce its own orders. *Id.* at 1069; *see also In re Mirant*, 316 B.R. at 241.

Two of the three factors identified above weigh in Superior's favor. With regard to factors (1) and (3) – resolution of purely bankruptcy issues in a centralized forum and the bankruptcy court's unquestionable power to enforce its own orders – Superior submits that interpretation and enforcement of this Court's Confirmation Order should be done by *this Court*, rather than by an arbitration panel or in any other forum. The second factor – protection of reorganizing debtors and creditors from piecemeal litigation – does not weigh in favor of TAE or Superior.[7]

Moreover, Superior's Plan of Reorganization and Disclosure Statement clearly gave notice that one of the main purposes of the reorganization was to allow Superior to continue its "piece parts business" and that TAE and others would be required to deliver the "drawings, data, etc." to Superior free and clear of any liens, claims or encumbrances. The Court's Confirmation Order [Bankr. Doc. 404] required the same in ¶¶ 36 and 37. TAE was one of Superior's largest creditors, and it was actively involved in Superior's bankruptcy case. TAE failed to object to either the Plan of Reorganization or the Confirmation Order, nor appealed the same. Accordingly, if TAE ever had any claim against Superior related to the property Superior seeks to compel TAE to return, TAE is enjoined from asserting that claim by the Court's Confirmation Order.

In short, granting TAE's Motion would not only be contrary to the purposes of the Bankruptcy Code, but also would be a wanton usurpation of the Bankruptcy Court's authority.

---

[7] In the event TAE contents an arbitration panel must decide issue of "ownership" *before* Superior may ask this Court to enforce its Confirmation Order, Superior submits that the second factor then weighs in favor of Superior.

Respectfully submitted,

**PASSMAN & JONES**
   A Professional Corporation

By: */s/ Jerry C. Alexander*
   Jerry C. Alexander
   Texas Bar No. 00993500
   James F. Adams
   Texas Bar No. 00863450
   Christopher A. Robison
   Texas Bar No. 24035720
   1201 Elm Street, Suite 2500
   Dallas, Texas 75270-2599
   (214) 742-2121 Telephone
   (214) 748-7949 Facsimile
   alexanderj@passmanjones.com
   jimadams@passmanjones.com
   robisonc@passmanjones.com

COUNSEL FOR SUPERIOR AIR
PARTS, INC.

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served this 23rd day of December, 2013, pursuant to the Federal Rules of Bankruptcy Procedure, via First Class U.S. Mail, fax, and ECF/PACER upon the following:

Daniel P. Winikka and Craig Simon
Simon, Ray & Winikka LLP
2525 McKinnon Street, Suite 540
Dallas, Texas 75201

U.S. Trustee
1100 Commerce Street, Room 976
Dallas, Texas 75242-1496

   */s/ Jerry C. Alexander*
   Jerry C. Alexander