Stephen Roberts
Robert P. Franke
Duane J. Brescia
**STRASBURGER & PRICE, LLP**
600 Congress, Suite 1600
Austin, Texas 78701
(512) 499-3600 / (512) 499-3660 Fax

**ATTORNEYS FOR DEBTOR**
**SUPERIOR AIR PARTS, INC.**


David W. Parham
Elliot D. Schuler
**BAKER & MCKENZIE LLP**
2300 Trammell Crow Center
2001 Ross Avenue
Dallas, Texas 75201
(214) 978-3000 / (214) 978-3099 Fax

**ATTORNEYS FOR THE OFFICIAL**
**COMMITTEE OF UNSECURED CREDITORS**


## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| | § | |
| **IN RE:** | § | |
| | § | **Case No. 08-36705** |
| **SUPERIOR AIR PARTS, INC.,** | § | |
| | § | **Chapter 11** |
| **Debtor.** | § | |
| | § | |
| | § | |

## THIRD AMENDED DISCLOSURE STATEMENT OF
## SUPERIOR AIR PARTS, INC. AND
## THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS

## DATED JULY 23, 2009


*THE UNITED STATES BANKRUPTCY COURT HAS FOUND THAT THIS DISCLOSURE STATEMENT PROVIDES ADEQUATE INFORMATION FOR CREDITORS AND PARTIES IN INTEREST TO MAKE AN INFORMED JUDGMENT ABOUT THE PLAN AND HAS, THEREFORE, APPROVED THIS DISCLOSURE STATEMENT.  THE COURT SHALL DETERMINE WHETHER TO APPROVE THE PLAN AT THE CONFIRMATION HEARING BASED UPON THE VOTES OF THE CREDITORS AND PARTIES IN INTEREST AND APPLICABLE BANKRUPTCY LAW.*

# TABLE OF CONTENTS

**I. INTRODUCTION** ........................................................................................... 1

    A. DISCLAIMERS ................................................................................. 1
    B. BRIEF EXPLANATION OF CHAPTER 11 ........................................ 1
    C. THIS DISCLOSURE STATEMENT .................................................. 2
    D. HISTORY OF THE DEBTOR ........................................................... 3
    E. EVENTS LEADING TO THE FILING ............................................... 6

**II. ASSETS AND LIABILITIES AT THE TIME OF FILING** ............................ 7

**III. SIGNIFICANT EVENTS IN CHAPTER 11** ............................................... 11

    A. OPERATIONS OF THE DEBTOR IN CHAPTER 11 ........................ 13

**IV. CURRENT ANALYSIS AND VALUATION OF DEBTOR'S PROPERTY** ............... 13

    A. REAL PROPERTY ........................................................................... 13
    B. PERSONAL PROPERTY .................................................................. 13
    C. CAUSES OF ACTION ...................................................................... 14

**V. SUMMARY OF DEBTOR'S PLAN** .......................................................... 15

    A. ADMINISTRATIVE CLAIMS AGAINST THE DEBTOR ..................... 18
    B. CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS ............. 19
    C. CLASSIFICATION AND TREATMENT OF CLAIMS AGAINST AND INTERESTS
    IN THE DEBTOR ................................................................................. 20
    D. ACCEPTANCE OR REJECTION OF THE PLAN ............................. 24
    E. MEANS FOR IMPLEMENTATION OF THIS PLAN .......................... 24
    F. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES .... 29
    G. PROVISIONS REGARDING DISTRIBUTIONS .................................. 31
    H. PROVISIONS FOR RESOLVING DISPUTED CLAIMS ..................... 32
    I. EFFECT OF CONFIRMATION, DISCHARGE, RELEASES, AND INJUNCTION 33

**VI. CONDITIONS PRECEDENT** ................................................................. 34

**VII. RETENTION OF JURISDICTION** .......................................................... 35

**VIII. MISCELLANEOUS PROVISIONS** ......................................................... 37

**IX. FEASIBILITY OF THE PLAN** ................................................................. 39

**X. OTHER CONSIDERATIONS IN VOTING ON THE PLAN** ....................... 43

    A. ALTERNATIVES TO DEBTOR'S PLAN ........................................... 43
    B. TAX CONSEQUENCES ................................................................... 44

i

    C.   CONFIRMATION OF THE DEBTOR'S PLAN, VOTING PROCEDURES, AND REQUIREMENTS FOR CONFIRMATION OF A PLAN ........................................... 49

**XI.  CONCLUSION**...................................................................................................... **51**

ii

## I.  INTRODUCTION

Superior Air Parts, Inc. ("Debtor" or "Superior"), Debtor-in-possession in the above-styled case under Chapter 11 of the Bankruptcy Code, and the Official Committee of Unsecured Creditors ("Committee") are proposing their Third Amended Plan of Reorganization ("Plan") dated July 17, 2009, to the Court, the creditors, and all other parties-in-interest under which they will propose to sell the Debtor's property under a proposed sale to Brantly International, Inc. or to a higher bidder under a Bid Procedure approved by the Court, if necessary, and use the proceeds to pay creditors according to the priorities set forth in the Plan.

DEFINITIONS:  Capitalized terms used but not defined in this Disclosure Statement are defined in Article II of the Plan.

## A.    DISCLAIMERS

NO REPRESENTATIONS CONCERNING THE DEBTOR PARTICULARLY AS TO ITS FUTURE INCOME, VALUE OF CURRENT ASSETS, OR THE VALUE OF ANY OTHER ASSETS TO BE CONSIDERED UNDER THE PLAN, ARE AUTHORIZED BY THE PROPONENTS OTHER THAN AS SET FORTH IN THIS STATEMENT. ANY REPRESENTATIONS OR INDUCEMENTS MADE TO SECURE YOUR ACCEPTANCE WHICH ARE OTHER THAN AS SET FORTH IN THIS STATEMENT, SHOULD NOT BE RELIED UPON IN ARRIVING AT YOUR DECISION.

THE INFORMATION CONTAINED HEREIN HAS NOT BEEN INDEPENDENTLY AUDITED FOR INCLUSION HEREIN.

THIS DISCLOSURE STATEMENT IS INTENDED FOR THE SOLE USE OF CREDITORS AND OTHER PARTIES-IN-INTEREST OF THE DEBTOR TO ENABLE SUCH CREDITORS AND OTHER PARTIES-IN-INTEREST TO MAKE AN INFORMED DECISION ABOUT THE PLAN.

IF ANY IMPAIRED CLASS VOTES TO REJECT THE PLAN, THE DEBTOR MAY SEEK CONFIRMATION UNDER THE CRAM DOWN PROVISIONS OF § 1129(B) OF THE BANKRUPTCY CODE AND HEREBY GIVES NOTICE OF INTENT TO INVOKE THE CRAM DOWN PROVISIONS OF § 1129(B) IN THAT EVENT.

## B.    BRIEF EXPLANATION OF CHAPTER 11

Chapter 11 is the principal reorganization chapter of the Bankruptcy Code.  Upon the commencement of a Chapter 11 case, § 362 of the Bankruptcy Code provides for an automatic stay of all attempts to collect from the Debtor any claims which arose prior to bankruptcy filing or otherwise to interfere with a Debtor's property or business.  Under Chapter 11, a Debtor attempts to reorganize its business for the benefit of the Debtor, its creditors, and equity security holders in the formulation of a plan of reorganization. In some instances, liquidation in Chapter 11 is preferable to liquidation in Chapter 7 because the rights and duties of the Debtor-in-possession in Chapter 11 can be utilized to greater maximize the value of the assets of the estate and increase the return to

**THIRD AMENDED DISCLOSURE STATEMENT OF SUPERIOR AIR PARTS, INC., DATED JULY 23, 2009  Page 1**
567458.20/SPA/20354/0102/072309

Appx_0049

creditors. The legal requirements for Court approval, called "confirmation", of a plan are discussed in Article XII. C., Requirements for Confirmation of a Plan, of this Disclosure Statement.

## C.    THIS DISCLOSURE STATEMENT

Why You Have Received This Disclosure Statement.   You have received this Third Amended Disclosure Statement ("Disclosure Statement") because the Debtor filed a Plan of Reorganization (the "Plan") with the Bankruptcy Court.  The Bankruptcy Court will hold a hearing on the adequacy of this Disclosure Statement on July 22, 2009 at 3:30 p.m. in the United States Bankruptcy Court, Northern District, 1100 Commerce Street, Dallas, TX  75242.  A copy of the Plan is enclosed with the materials that you have received.   This Disclosure Statement is provided pursuant to § 1125 of the Bankruptcy Code to all of the Debtor's known Creditors and other parties-in-interest whose claims are impaired in connection with the solicitation of acceptance of the Plan proposed by the Debtor.

Purpose of this Disclosure Statement.  The purpose of this Disclosure Statement is to provide such information as will enable a hypothetical, reasonable investor typical of the holders of Claims against the Debtor to make an informed judgment in exercising its right either to accept or reject the Plan.  The definitions in the Plan should be referred to in reading and analyzing the Plan and this Disclosure Statement.

Purpose of the Plan.  The purpose of the Plan is to provide a mechanism for the reorganization of the Debtor's assets and for the payment of Creditors. The Plan was developed by the Debtor and the Committee after consulting with its respective financial and legal advisers, certain Creditors and other interested parties.  The Debtor believes that the Plan is more attractive than other alternatives, such as conversion to Chapter 7 for liquidation or dismissal of the Chapter 11 Case.  **Each creditor is urged to read the Plan.**

Bankruptcy Court Approval of this Disclosure Statement.  The Bankruptcy Court conducted a hearing on this Disclosure Statement and determined that it contains information of a kind in sufficient detail, adequate to enable a hypothetical, reasonable investor typical of the Classes being solicited to make an informed judgment about the Plan.

Sources of Information.  The information contained in this Disclosure Statement has been submitted by the Debtor or the Committee unless specifically stated to be from other sources.

This Disclosure Statement contains only a summary of the Plan.  The Plan, which accompanies this Disclosure Statement, is an integral part of this Disclosure Statement, and each creditor is urged to read the Plan prior to voting.  In the event of any conflict between the information set forth in this Disclosure Statement and the Plan, the Plan language shall control.

**THIRD AMENDED DISCLOSURE STATEMENT OF SUPERIOR AIR PARTS, INC., DATED JULY 23, 2009  Page 2**

The Debtor makes no representations with respect to the effects of taxation (state or federal) on the Creditors, and no such representations are authorized. The Debtor' Creditors are encouraged to seek the advice of their own professional tax advisor(s) if they have any such questions.

<u>Only Authorized Disclosure</u>. No party is authorized to give any information with respect to the Plan, other than what is contained in this Disclosure Statement or any other Disclosure Statement approved by the Court. No representations concerning the Debtor, its business, or the value of its property have been authorized by the Bankruptcy Court, other than as set forth in this Disclosure Statement. Any information, representations, or inducements made to obtain acceptance or rejection of the Plan other than, or inconsistent with, the information contained herein and in the Plan should not be relied upon by any entity in voting on the Plan.

Any representation or inducement made to you not contained in this Disclosure Statement should be reported to the Debtor's attorney, who shall deliver such information to the Bankruptcy Court for such action as may be appropriate.

This Disclosure Statement and accompanying exhibits will be transmitted by first-class mail to all creditors who have either been scheduled by the Debtor, have filed a proof of claim, or properly requested notice under Bankruptcy Rule 2002.

**D.    HISTORY OF THE DEBTOR**

<u>History and Overview of the Debtor's Business</u>. Superior Air Parts, Inc. ("Debtor" or "Superior") is a Texas corporation located in Coppell, Dallas County, Texas which was formed in 1967 with the primary goal of supplying replacement parts for piston powered aircraft engines used by the United States Air Force and marketing such products commercially. Superior became one of the largest suppliers of parts under Federal Aviation Administration's ("FAA") Parts Manufacturer Approval ("PMA") regulations for piston engines. It provides Superior-brand parts for engines created by two primary original equipment manufacturers ("OEMs"), the Continental division of Teledyne Industries, Inc. and the Lycoming division of Textron, Inc. Superior is also an OEM for the (i) 180-horsepower Vantage Engine and (ii) Superior or owner-built XP-360 experimental engine.

Superior's customers generally are companies which perform maintenance and overhaul work in the general aviation industry. The vast majority of these customers and engine shops are fully equipped facilities that are dedicated to major engine repairs and overhauls. A number of these customers are also "Fixed Base Operators," which are companies that maintain facilities at airports to provide numerous aircraft services to the general aviation market including fuel sales, aircraft maintenance and repairs, parking, rentals, and pilot training.

<u>Debtor's previous Chapter 11 bankruptcy</u>. In 1989 Superior was acquired by SP Acquisitions Corp. with financing and investment capital from GE Capital. In 1994, Superior entered into a recapitalization transaction with Rice Mezzanine for the purpose

**THIRD AMENDED DISCLOSURE STATEMENT OF SUPERIOR AIR PARTS, INC., DATED JULY 23, 2009  Page 3**
**567458.20/SPA/20354/0102/072309**

Appx_0051

of redeeming GE Capital's equity position and reduced its debt.  By 1995, Superior's interest expense and product liability insurance expenses and warranty expenses increased by $1.35 million while net sales decreased from $36.9 to $36.1 million. The mezzanine lenders loaned and invested an additional $2.0 million and senior management was replaced.  In 1996, Superior raised $4.0 million by selling its turbine engine line and used the funds to reduce its debt. Superior achieved its budgeted revenue and profit levels in the first two quarters of 1997 but suffered a lack of liquidity due to the recall of its 540 cylinder line and the refusal of certain key vendors' to extend credit.  As a result, Superior defaulted on its interest payment to its mezzanine lender and retained turnaround consultants.

Superior filed for protection under Chapter 11 on July 14, 1997 in the Bankruptcy Court for the District of Delaware.  On or about November 24, 1997 Superior confirmed a plan pursuant to which RSTW acquired the company.

In 2001, Superior, which had a number of parts distribution facilities across the country, decided to outsource the marketing and parts distribution to Aerospace Products International ("API"), an unrelated company and focus on developing engines and engine programs.  Within months, API closed all of the distribution centers and substantially reduced its efforts to market Superior parts.  Superior's efforts to develop engines and engine programs were not as successful as hoped due to limited financial resources and market conditions.

Purchase of Debtor by TAG.    In 2006, Thielert, AG ("TAG"), a German corporation, acquired 100% of the ownership interests of Superior and purchased the $10 million debts of Superior's senior secured lender and subordinated lenders, which were secured by substantially all of the Debtor's assets.

TAG acquired Superior as part of a strategic plan to enter the North American market and expand engine offerings.  After the TAG acquisition, Superior was able to increase and maintain liquidity through 2008 because TAG continued to allow Superior to forebear from making any principal payments and Thielert Aircraft Engines GmbH ("TAE"), a German subsidiary of TAG, shipped substantial quantities of parts on credit and deferred payment indefinitely. By the time this case was commenced, TAE had shipped over $13 million in parts for which it had not been paid.  The Committee contends these transfers were, in reality, equity contributions.  TAE's treatment under the Plan is a compromise of the claims the Committee believes could be asserted against TAE.

Superior's Financial Performance Since 2005.    Since 2005, Superior has experienced EBITDA loss and a total net loss each year.  A breakdown of Debtor's performance is as follows:

THIRD AMENDED DISCLOSURE STATEMENT OF SUPERIOR AIR PARTS, INC., DATED JULY 23, 2009  Page 4
567458.20/SPA/20354/0102/072309

Appx_0052

|      | Gross Sales    | EBITDA        | Net Income                                                                                         |
|------|----------------|---------------|---------------------------------------------------------------------------------------------------|
| 2005 | $25,714.775    | ($2,443,665)  | ($5,171,469)                                                                                      |
| 2006 | $31,348,956    | ($2,879,352)  | ($451,364) (Result of Thielert AG transaction and treatment of outstanding loans and interest)   |
| 2007 | $31,140,083    | ($4,209,928)  | ($5,635,053)                                                                                      |
| 2008 | $23,007,415    | ($3,576,304)  | ($5,071,081)                                                                                      |

There are two separable components to the company: the PMA aftermarket parts business (the "Piece Parts Business") which includes the experimental engine lines, and the Vantage engine lines (the "Vantage Engine Program").  The Piece Parts Business has experienced annual sales over the last few years of $12 to $15 million with margins over 40%.  Superior has F.A.A. Parts Manufacturing Certificates ("PMAs") for over 2000 parts. While the PMAs themselves are not transferable, the data packs, engineering, testing and intellectual property supporting those PMAs are, providing an opportunity to a buyer to obtain its own PMAs. Superior does not manufacture these parts; they are manufactured to Superior's specifications by a number of suppliers worldwide and Superior's supply chain remains virtually intact.

Superior also has a line of Millennium cylinders for Lycoming and TCM engines in the 115 hp to 330 hp range.  Sales in 2006 were $12.2 million at margins of 16%. In 2007, sales declined to $10 million due a cylinder redesign that stopped sales of certain cylinders for 6 months and also due to the lack of capacity of key suppliers at the time, including Superior's German affiliate, TAE.  The capacity problem continued through 2008 as TAE's financial problems led it into a German insolvency proceeding, as described herein.

The certified Vantage Engine Program and experimental engine programs are an alternative to Lycoming engines in the 160 hp to 180 hp range. Only about 65 Vantage engines have been sold since they were certificated, but the purchase of the Vantage engine line is an opportunity for a buyer to enter the engine market now or in the future and at a price substantially less than the investment costs, delay, and risk in developing its own engine line.

Further information about the Debtor and its products can be found at http://www.superiorairparts.com.

**THIRD AMENDED DISCLOSURE STATEMENT OF SUPERIOR AIR PARTS, INC., DATED JULY 23, 2009  Page 5**
**567458.20/SPA/20354/0102/072309**

Appx_0053

### E.    EVENTS LEADING TO THE FILING

Thielert AG Insolvency.  On April 30, 2008, TAG filed an insolvency proceeding in Hamburg, Germany and Dr. Achim Ahrendt was appointed as the preliminary Insolvency Administrator.  TAE, which had been providing engine parts to Superior on credit, also filed an insolvency proceeding in Germany, with a different Insolvency Administrator being appointed.  Dr. Ahrendt determined that it was in the best interest of TAG and Superior to sell Superior or its assets.  In June 2008, Superior hired Corporate Finance Partners Midcap GmbH ("CFP"), a German investment company based in Berlin, Germany to serve as its investment advisor and to seek possible suitors for Superior.

Efforts to Sell Pre-Petition.  CFP canvassed the market, negotiated with numerous potential purchasers, and enabled interested parties to conduct substantial due diligence.  Specifically, CFP identified 76 potential investors (from Superior's industry, adjacent industries, as well as financial investors) world-wide, approached those investors, provided initial information about Superior as well as discussed with the investors their potential interest in acquiring Superior.  Eleven investors showed an initial interest and entered into Confidentiality Agreements with CFP.  To those investors, a detailed information package was made available and CFP requested those investors to submit an offer.  Four offers were received and due diligence was awarded to those investors, including access to a data room, containing detailed financial, operating and legal information and discussion with Superior management.

In pleadings filed in this case, Aviation Parts Supply Inc. ("APS"), a Texas corporation formed in 2008 for the purpose of acquiring Superior, claims that it made a "definite" offer to buy Superior in December 2008 "without any damage or losses being imposed on the Debtor's creditors" and "without a requirement that Superior file Chapter 11."  No such offer was received by Superior.

The criteria for selection of a purchaser included the purchase price being offered as well as having the financial wherewithal to consummate a transaction without a financing contingency (i.e., to provide maximum closing certainty).  Parallel negotiations and confirmatory due diligence was pursued. CFP handled this stage of the transaction process and the confirmatory due diligence phase, for which substantial additional information had to be prepared.

Purchase Agreement with Avco Corporation.  As a result of those efforts, Superior entered into an asset purchase agreement on December 30, 2008 with Avco Corporation ("Avco"), a wholly-owned subsidiary of Textron Inc., the highest bidder to date, pursuant to which Avco agreed to buy substantially all of Superior's assets for $11.5 million, subject to adjustments for inventory reductions after October 31, 2008.

One of the conditions of the purchase agreement was that the purchase be consummated through a Chapter 11 bankruptcy proceeding.  This Chapter 11 case was filed to liquidate the assets of Superior and to obtain the highest and best price for creditors, either through the purchase agreement with Avco or at a public auction.

**THIRD AMENDED DISCLOSURE STATEMENT OF SUPERIOR AIR PARTS, INC., DATED JULY 23, 2009  Page 6**
**567458.20/SPA/20354/0102/072309**

Appx_0054

## II.  ASSETS AND LIABILITIES AT THE TIME OF FILING

On December 31, 2008, the Debtor filed its schedules of assets and liabilities and a Statement of Financial Affairs required by the Bankruptcy Code.  Bankruptcy Schedule A lists ownership of real property.  Bankruptcy Schedule B lists personal property.  Amended schedules for certain categories were filed on June 29, 2009.

Real Property.  The Debtor did not own any real property.

Personal Property.  The Debtor's personal property consists primarily of cash on hand, inventory, accounts receivable, equipment, machinery, and tooling.  As of the date of filing, scheduled personal property was estimated to total $18,139,685.16 including approximately $412,000 in cash, $11,158,744 in inventory, $5,392,055 in accounts receivable, $156,287 in equipment and aircraft accessories, $116,870 in machinery and $779,408 in tooling. The Debtor also owns Intellectual Property related to its PMAs, Production Certificates, Type Certificates and Supplemental Type Certificates of undetermined value.  The Debtor has an $81,000 security deposit with its landlord, Texas Duggan Limited Partnership.

Potential Liabilities.  The Debtor has conducted a claims analysis of potential allowed claims.  The Debtor calculated the claims listed as undisputed on its schedules, superseded by proofs of claims and any court orders adjudicating or affecting claims. The Debtor also reduced the potential allowed claims to the extent the Debtor has insurance to cover such claims. The Debtor's claims analysis is as follows:

Secured Tax Claims $74,617.82;

Priority Employee Claims $56,144.43;

Secured Claims $227,620.42; and

General Unsecured Claims (excluding Insiders, open purchase orders, and executory contracts) $ 5,828,635.[1]

This amount consists of the following:

$2,053,176 in trade claims;

$285,319 in actual warranty claims;

$83,140 in loss of warranty claims; and

$3,407,000 contingent insurance-related claims[2]; and

---

[1] This total does not include a proof of claim filed by "Certain London Market Insurers" in an "Unliquidated" amount. See Contingent Insurance-Related Claims.
[2] This is the maximum exposure for all known claims under the Debtor's deductible obligations under its insurance policies. See Contingent Insurance-Related Claims

**THIRD AMENDED DISCLOSURE STATEMENT OF SUPERIOR AIR PARTS, INC., DATED JULY 23, 2009  Page 7**

Unsecured Claims of parent (TAG) and affiliate (TAE): $28,354,871.28.

The Debtor estimates the valid amount of General Unsecured Claims is substantially less than these amounts. The Creditors' Trustee will examine all of the claims and object to those claims which are disputed and have not been resolved as of the Confirmation Hearing.

Contingencies Increasing or Decreasing Claims of and Payments to General Unsecured Creditors. Payments to general unsecured creditors, excluding insiders, are to be paid pro rata out of the Creditors' Trust established under the Plan. The Debtor and the Creditors' Committee estimate that there will be $2,595,000 in funds to distribute to such creditors; however, the amount may be less due to adjustments to the Cash Contribution based upon levels of inventory, accounts receivable and cash at closing.

The Reorganized Debtor is assuming certain obligations which reduce the amount of claims and there are certain contingencies which increase or decrease the pool of such claims and payments to individual creditors.

The Reorganized Debtor is assuming any obligations of the Debtor under the policies to pay or reimburse insurers the fees and expenses incurred by the insurers in settlement of the claims (the "Reimbursement Obligations"), and so the Debtor does not believe that the insurers will have any claim payable out of the Creditors' Trust in this case. This will reduce the contingent liability arising out of known tort claims from $3,407,000 to $700,000. See Contingent Insurance-Related Claims below.

*Executory Purchase Orders.* The Reorganized Debtor is assuming outstanding purchase orders provided that vendors agree to certain modifications. Debtor had $5,288,811 in outstanding purchase orders for goods that had not been delivered as of the date of filing ("Executory Purchase Orders"). Under the Plan, the Reorganized Debtor intends to assume those purchase orders and take delivery of the goods provided that the vendors agree to delay delivery, in some cases, up to 18 months, to give the Reorganized Debtor the opportunity to revive production and sales in an orderly manner. If vendors agree to these terms, there will not be any claims arising out of these purchase orders payable out of the Creditors Trust. The Debtor believes that vendors have a economic incentive to accept the modifications and continue shipping goods to the Reorganized Debtor; however, a vendor may choose not to accept a change in terms and may file an unsecured claim for any damages it has incurred arising out of the debtor's failure to honor the purchase order. Any such claims would share pro rata with the Class 7 general unsecured claims.

*Debtor's Lease of Non-Residential Real Property.* The Debtor will negotiate to reduce any claim by its landlord. The Debtor leases its premises from Texas Duggan Limited Partnership ("Texas Duggan") and is current on its lease payments. The Debtor will attempt to negotiate a modification of a new facility lease with Texas Duggan, satisfactory to Brantly, in exchange for a release or reduction of its claim. If the Debtor is unable to renegotiate its lease, the lease may be rejected and treated as a Class 7

**THIRD AMENDED DISCLOSURE STATEMENT OF SUPERIOR AIR PARTS, INC., DATED JULY 23, 2009  Page 8**
567458.20/SPA/20354/0102/072309

Appx_0056

General Unsecured Claim, diluting payment to other general unsecured creditors. Texas Duggan has filed a proof of claim alleging that it will have a claim for $425,875 if the Debtor rejects the lease.   Any claim asserted by Texas Duggan for rejection damages will be partially offset by the deposit Texas Duggan is holding.

*Warranty Obligation*s.   The Reorganized Debtor will assume the Debtor's warranty obligations where an alleged failure of a product giving rise to such claims occurs *after* the Effective Date of the Plan regardless of whether such goods were sold prior to the Effective Date of the Plan. The Reorganized Debtor will not assume any of the Debtor's warranty obligations for alleged product failures occurring *before* the Effective Date of the Plan.   There are $285,319 in actual warranty claims including disputed warranty claims.  Any such claims, if Allowed, will share pro rata with the Class 7 general unsecured claims.

*Contingent Insurance-Related Claims*.   A proof of claim was filed by "Certain London Market Insurers" in an "Unliquidated" amount in which such insurers claim that they may have unliquidated claims up to $6,875,000 based upon the total amount of the deductibles under the Debtor's insurance policies since August 1, 2004. Except for the payment of the costs of defense discussed below, the Debtor does not believe that the insurers have any claim against the Debtor arising out of any failure of the Debtor to pay a plaintiff the deductible amount because such failure does not increase the insurer's obligation to the plaintiff; the insurers' obligations are to pay claims in excess of such deductible. The Reorganized Debtor is assuming any obligations under the policies to pay or reimburse insurers the fees and expenses incurred by the insurers in settlement of the claims (the "Reimbursement Obligations"), and so the Debtor does not believe that the insurers will have any claim payable out of the Creditors' Trust in this case.

The Reorganized Debtor is not assuming any uninsured tort claims or tort claims within the deductibles under its insurance policies. As detailed below, the distribution to general unsecured creditors could be diluted by up to $700,000 in known personal injury claims which are within the Debtor's deductible obligations under its policies. In addition, there could be additional personal injury claims of which the Debtor has not been given notice that could further dilute any payment to unsecured creditors.

The policy for the period covering incidents occurring between August 1, 2004 to July 31, 2005 may require Superior to pay 10% of the fees and expenses incurred in the settlement of claims up to $250,000. Superior has paid $74,000 in such costs, leaving a balance of $176,000. The Reorganized Debtor will assume this Reimbursement Obligation. In addition, there is a deductible of $350,000 per occurrence and $875,000 aggregate. Except as noted below, the plaintiffs who have claims arising during this policy period have waived their claims against the Debtor in this case.  The plaintiffs in *Lawrence Chevigny and Her Majesty the Queen in Right of Alberta v. Superior Air Parts, Inc.*; Court of Queens Bench of Alberta, Judicial District of Calgary, Canada  No. 0701-07487 have filed a proof of claim for $400,000 arising out of a plane crash allegedly occurring on or about July 29, 2005, but have not sought relief from the automatic stay to recommence their lawsuit and have not waived any claims against the estate and so such plaintiffs could have an unsecured claim of up to $350,000 within the

**THIRD AMENDED DISCLOSURE STATEMENT OF SUPERIOR AIR PARTS, INC., DATED JULY 23, 2009  Page 9**
567458.20/SPA/20354/0102/072309

Appx_0057

deductible which would dilute the payments to other unsecured creditors. The Debtor believes that the claims are without merit but a court could decide otherwise.

The policy for the period covering incidents occurring between August 1, 2005 to July 31, 2006 may require Superior to pay Reimbursement Obligation up to the deductible.   The deductible is $350,000 per occurrence and $875,000 aggregate. Superior has paid $25,000 in costs of defense on the one open claim during this period, leaving a balance of $325,000. The Reorganized Debtor will assume the Reimbursement Obligation.  The plaintiffs who have claims arising during this policy period have waived their claims against the Debtor in this case and so the Debtor does not believe that there are any claims which would be payable out of the Creditors Trust for this period.  However, it is possible, though unlikely, that there could be other claims that could dilute payments to unsecured creditors if an incident has occurred during this policy period, Superior does not know about it, and the applicable statutes of limitations has not run.

The policy for the period covering incidents occurring between August 1, 2006 to July 31, 2007 requires Superior to pay Reimbursement Obligations up to the deductible. The deductible is $350,000 per occurrence and $875,000 aggregate.  Superior has paid $69,000 in Reimbursement Obligations on the four open claims for this period, leaving a balance of $806,000. The Reorganized Debtor will assume the Reimbursement Obligation.  Except as noted below, the plaintiffs who have known claims arising during this policy period have waived their claims against the Debtor in this case.  On or about May 13, 2009, Peg Hudson, Sarah Hudson and Rose Hudson filed suit against Superior and other defendants in the case styled *Peg Hudson, Sarah Christine Hudson, and Rose Hudson v. ATC Aviation Technical Consultants, Canadian Aero Engines and Accessories, Corporate Aircraft Restorations, Inc., Progressive Air Services, Ltd., ECI Engine Components, Inc., Superior Air Parts, Inc., Valley Aero Engines Ltd., The Estate of Joseph Grieco, deceased, Tony Vanvari, the Executor of the Estate of Joseph Grieco, and 1419937 Ontario, Inc.*; Ontario Superior Court of Justice, Canada No. CV-09-378588, seeking the recovery of $4,000,000 arising out of an incident allegedly occurring on May 17, 2007.  The Debtor has not evaluated this claim.  These plaintiffs could have an unsecured claim of up to $350,000 within the deductible which could dilute the payments to other unsecured creditors.   Any payments made by the Reorganized Debtor would reduce this exposure to the Creditors' Trust.  It is possible that there could be other claims that could dilute payments to unsecured creditors if an incident has occurred during this policy period, Superior does not know about it, and the applicable statutes of limitations has not run.

The policies for the periods after July 31, 2007 may require Superior to pay the Reimbursement Obligation up to the deductible.   The deductible is $350,000 per occurrence and $875,000 aggregate.  There are no known claims arising out of this period.  The Reorganized Debtor will assume any obligation to pay the Reimbursement Obligation.   It is possible that there could be claims that could dilute payments to unsecured creditors if an incident has occurred during this policy period, Superior does not know about it, and the applicable statutes of limitations has not run.

**THIRD AMENDED DISCLOSURE STATEMENT OF SUPERIOR AIR PARTS, INC., DATED JULY 23, 2009 Page 10**
**567458.20/SPA/20354/0102/072309**

Appx_0058

### III.  SIGNIFICANT EVENTS IN CHAPTER 11

Superior's Efforts to Sell Substantially All of Debtor's Assets Free and Clear of Liens and Establish Auction Procedures:   On December 30, 2008, just prior to the commencement of this case, Superior entered into an asset purchase agreement with Avco Corporation ("Avco"), an affiliate of Textron Inc., wherein Avco agreed to buy substantially all of the Debtor's assets for $11 million, subject to adjustments for inventory reductions.

Superior filed a motion for approval of a bid procedure which was approved by this Court, and an accelerated bar date for claims was established.  Notice was given to all known creditors, and all owners of piston powered aircraft engines registered with the Federal Aviation Administration, and by publication in several industry publications.

The auction was conducted on February 25, 2009. The two bidders were Avco and TCM, an affiliate of Teledyne Industries, Inc.  The bidders were the manufacturers of piston powered aircraft engines in which many of the parts sold by Superior are installed and are competitors with Superior in the small aircraft parts business.  A sale to either of these purchasers raised anti-trust concerns with the United States Department of Justice and various state attorneys general who initiated investigations to determine whether a sale to either company would violate anti-trust laws. The parties were unable to reach an agreement on how to address these concerns and so the Debtor chose to decline their bids.

Since that time, Superior has continued to operate and sell parts and has continued its efforts to sell the company. The Debtor has been in contact with several parties who have expressed an interest.  Two parties came forward with firm purchase offers, Aviation Parts Supply ("APS") and Brantly International, Inc. ("Brantly").  Superior and the Committee are proposing this Plan to sell the company through a bid process with Brantly serving as the "stalking horse".

Motion to Pay Prepetition Wages and Benefits.   The Debtor sought Court authority to pay certain pre-petition obligations to the Debtor's fifteen full-time employees and one independent contractor the Debtor retained after the filing, who were necessary to the consummation of a sale.  The pre-petition obligations included (1) amounts owed to the employees for wages, salaries, vacation pay, sick leave pay, holiday pay, jury duty pay, federal, state and local payroll related taxes, deductions and withholdings, payroll deductions in respect of various benefits, and reimbursement for business expenses; and (2) benefit claims of employees.  The Debtor sought authority to pay such expenses in accordance with existing Company policies and practices.

The Court approved the Motion to Pay Prepetition Wages and Benefits on January 9, 2009.

Employment of Professionals.  On January 2, 2009, the Debtor sought to employ Stephen A. Roberts, Duane J. Brescia, and the law firm of Strasburger & Price, LLP

**THIRD AMENDED DISCLOSURE STATEMENT OF SUPERIOR AIR PARTS, INC., DATED JULY 23, 2009 Page 11**
**567458.20/SPA/20354/0102/072309**

Appx_0059

("Strasburger"), 600 Congress Ave., Suite 1600, Austin, Texas 78701 as counsel for Debtor.  The employment was approved by the Court on February 20, 2009.

On January 7, 2009, the Debtor sought to employ Daniel Schenk and Capital Financial Partners, Midcap GmbH ("CFP"), as investment consultants.  The employment was approved by the Court on February 20, 2009.

Formation of Creditors' Committee and Employment of Committee Professionals. On January 29, 2009, the United States Trustee appointed an official committee of unsecured creditors (the "Committee"), which was amended on January 30, 2009.  The committee consists of the following creditors: Avstar, KSPG Automotive Brazil LTDA, Eck Industries, Inc., Hartford Aircraft Products, Seal Science, Inc., and Zanzi, S.p.A.

Baker & McKenzie, LLP was employed as counsel to the Committee by Order dated April 8, 2009.

Lain Faulkner & Co. was employed as financial adviser to the Committee by Order dated April 8, 2009.

Debtor's Adversary Proceeding to Avoid Lien of Thielert AG (Adv. Proc. No. 09-3052).  TAG filed its proof of claim on February 11, 2009, asserting a secured claim in the amount of $10,146,611.11.  The Debtor filed Adversary Proceeding No. 09-3052 on or about February 17, 2009 seeking to avoid the liens and security interests of TAG on the grounds that TAG failed to perfect its asserted lien against the Debtor's assets.  A hearing on Debtor's Motion for Summary Judgment was held on June 22, 2009, and the court granted the Motion.

The Wrongful Death and Personal Injury Claims and Lawsuits.  At the time the bankruptcy case was filed, there were numerous personal injury and wrongful death claims and lawsuits on file against the Debtor.  These claims and lawsuits were disclosed in Debtor's schedules and statement of financial affairs.  Although the Debtor believes that each of these claims and lawsuits, and the expenses associated therewith, including local counsel and expert witness fees, are covered by insurance, there have been no assurances made by the insurance carriers that issued the applicable polices that the insurers will assume, or have assumed, financial responsibility for defending the lawsuits.

Some of the underlying insurance policies provide for deductibles, self insured retentions, reimbursement obligations, fees and expenses and related costs that the insurance carriers have stated are the responsibility of the Debtor.  Further, the insurance carriers have expressed the opinion that the Debtor's failure to assume responsibility for the payment of those items is a condition of the carrier's obligation to continue to provide a defense on behalf of the Debtor.  Several claimants filed Motions for Relief from Stay, to which the Debtor objected.  Orders were entered temporarily maintaining the stay if it would benefit the estate by preserving insurance costs or lifting the stay if it reduced claims or did not harm the estate.  As of the date of this Disclosure Statement, the Debtor has entered into agreements with all parties who filed Motions for

**THIRD AMENDED DISCLOSURE STATEMENT OF SUPERIOR AIR PARTS, INC., DATED JULY 23, 2009 Page 12**
567458.20/SPA/20354/0102/072309

Appx_0060

Relief from Stay to lift the stay and permit those claimants to pursue insurance recoveries.  In exchange, these claimants have agreed not to seek collection of their claims from the estate.

<u>Motion to Return Reclaimed Goods</u>.  The Debtor received written reclamation demands from four suppliers: Availl, Inc., Mahle Engine Components USA, Inc., Seal Science, Inc., and Emag Ignitions (TM) that all goods received by the Debtor within 45 days prior to the bankruptcy filing be returned.

Reclamation is limited to goods delivered 45 days prior to the bankruptcy filing. Reclaiming creditors must demand reclamation no later than 20 days after the date of commencement of the case.  All of the demands were received by Superior on or before 20 days after the commencement of this case and the inventory items at issue were received by Superior within 45 days of the filing of this case and were delivered in the ordinary course of business.  Upon receipt of each demand, Superior identified and segregated the remaining inventory on hand subject to the particular reclamation claim.

On or about March 5, 2009, Debtor filed its motion to return the reclaimed goods and agreed orders for the return of the remaining inventory and resolution of any residual claims have been entered on the claims of Availl, Inc., Mahle Engine Components USA, Inc., Seal Science, Inc., and Emag Ignitions (TM).

**A.    OPERATIONS OF THE DEBTOR IN CHAPTER 11**

Since filing, the Debtor has operated as Debtor-in-Possession on a very limited basis.  Superior stopped assembling cylinders and engines, eliminated its sales and marketing staff, reduced its employees from 25 to 15, and virtually ceased acquiring parts from its vendors in anticipation of the sale of its assets to Avco Corporation.  After the sale fell through, Superior began acquiring parts to fill out its inventory and continue the Piece Parts Business in a limited capacity to serve its customers.  It has sufficient cash reserves to meet its ongoing obligations under the Bankruptcy Code.

The Debtor has filed monthly operating reports which provide detailed information regarding the financial condition and operations of the Debtor. To view the monthly operating reports, go to  http://www.strasburger.com/_client/SAPMORs/  or contact Ms. Angela J. Dunn, PLS Legal Administrative Assistant, Strasburger & Price, LLP at angela.dunn@strasburger.com or 512-499-3643.

**IV.  CURRENT ANALYSIS AND VALUATION OF DEBTOR'S PROPERTY**

**A.    REAL PROPERTY**

The Debtor does not own any real property.

**B.    PERSONAL PROPERTY**

As of May 15, 2009, the Debtor's personal property consists primarily of cash on hand, inventory, accounts receivable, equipment, machinery, and tooling totaling

**THIRD AMENDED DISCLOSURE STATEMENT OF SUPERIOR AIR PARTS, INC., DATED JULY 23, 2009 Page 13**
**567458.20/SPA/20354/0102/072309**

Appx_0061

$17,172,437. The Debtor had approximately $3,526,957.40 in cash as of May 14, 2009. The current value of the inventory is $7,503,741.27; accounts receivable $5,099.042.50; equipment $29,324.37; machinery $116,869.81; and tooling $474,616.83.  The Debtor also owns Intellectual Property related to its PMAs, Production Certificates, Type Certificates and Supplemental Type Certificates of undetermined value.

## C.    CAUSES OF ACTION

Fraudulent Transfer and Voidable Preference Claims.  All Fraudulent Transfer and Voidable Preference claims are being preserved and assigned to the Creditors Trust, except as specifically released in the Plan.  Under Chapter 5 of the Bankruptcy Code, the bankruptcy estate has the right to recover property of the Debtor which was conveyed fraudulently or for less than reasonably equivalent value while the Debtor was insolvent ("Fraudulent Transfers").  The bankruptcy estate is also entitled to recover payments made to creditors on existing, legitimate debts where such payments were to insiders within one year of the bankruptcy filing or to anyone else, including vendors, within 90 days of the bankruptcy filing ("Voidable Preferences").  There are certain defenses that payees may assert to defeat Voidable Preference claims, the most common one being that the payment was made timely, in the ordinary course of business and according to ordinary business terms.  Moreover, for a payment to be a Voidable Preference, it must enable the payee to receive more than the payee would have received in a Chapter 7 liquidation had the payment not been made.  Accordingly, a payment to a fully secured creditor would not be a Voidable Preference.  Similarly, payments to employees, whose claims have priority over the claims of general unsecured creditors in Chapter 7 liquidation, are rarely Voidable Preferences.

In the 90-days preceding the chapter 11 filing, Debtor made $3,079,674 in payments to creditors.  See attached *Exhibit A*.  These payments may constitute Voidable Preferences or Fraudulent Transfers.

In the 12-months preceding the chapter 11 filing, Debtor made $1,338,954 in payments to insiders.  See attached *Exhibit B.* These payments may constitute Voidable Preferences or Fraudulent Transfers.  Claims to recover transfers to TAG and TAE are, however, being released pursuant to the Plan.

The Creditors' Trustee will evaluate these avoidance claims following Confirmation and determine whether or not to file adversary proceedings to avoid these transfers.

Cause of Action Against Thielert AG:  TAG is the owner of all of Superior's outstanding shares, and claims a security interest in substantially all of Superior's assets, which consist solely of personal property.  TAG filed a Proof of Claim in this case asserting a secured claim in the amount of $10,146,611.11.  Debtor filed its adversary proceeding against TAG pursuant to its "Avoidance Powers" under 11 U.S.C. § 544.  The lawsuit seeks to avoid the lien and security interest of TAG because TAG failed to maintain perfection of its security interest in Superior's assets.  On June 22, 2009, a hearing was held and the court granted Superior's Motion to Summary

Judgment.  The Committee has advised TAG that it believes the Debtor has claims for equitable subordination and recharacterization against TAG related to the pre-petition dealings between TAG and the Debtor. TAG does not believe that such claims have merit.  The Committee believes the cost of pursuing such litigation could be as high as $500,000. These claims are being released as a part of the plan.

Cause of Action Against Thielert Aircraft Engines GmbH.   The Committee asserts, and has advised TAE, that it believes the Debtor has claims against TAE, including a claim to recharacterize TAE's claim as an equity interest.  The Committee believes the cost of pursuing such litigation could be as high as $500,000. The Plan includes a compromise of these claims against TAE, and a release of TAE.  Pursuant to the compromise, TAE will receive $500,000 for its claim that was filed for an amount in excess of $18 million, and have no further claims against the Debtor.  These claims are being released as a part of the plan.

## V.  SUMMARY OF DEBTOR'S PLAN

Capitalized terms used in the following summary are as defined in Article II of the Plan, Definitions. The following summary is included for convenience of the reader and shall not modify the specific terms of this Plan:

This Plan provides for the treatment of all Claims in a manner that the Debtor and the Committee believe is in the best interests of Creditors and is fair and equitable.

The Plan provides for the resumption and continuation of the Debtor's business, including the assembly and sale of piece parts, cylinder assemblies, and Vantage engines at its facility in Coppell, Texas or nearby.

The equity ownership in the Debtor will be transferred to the Brantly Group, unless a higher and better offer is received pursuant to the Bid Procedure approved by the Court on July 22, 2009. The Brantly Group consists of a number of aviation-oriented businesses owned by Chinese nationals with the overall goal of expanding civil aviation in China by developing and manufacturing aircraft for the developing Chinese aviation market.  The Brantly Group consists of Brantly International, Inc., a Texas corporation which manufactures B2B two-seat and 305 five-seat helicopters in Vernon, Texas, Qingdao Haili, a company that also produces B2B helicopters; Weifang Freesky Aviation Technologies Co., a research and development company currently developing helicopters oriented to the Chinese market; and Weifang Tianxiang Aviation Industrial Co., a manufacturer of the 305 five-seat helicopters (collectively the "Brantly Group").

The Brantly Group has designated Weifang Freesky Aviation Technologies Co as the entity to which the stock will be issued but has the option to designate any of the other affiliates prior to closing.   The entity to which the stock will be issues will be referred to as "Brantly.  TAG will receive no distribution on account of its shares in the Debtor and those shares will be cancelled.

Brantly has advised the Debtor that it is Brantly's intention to invest sufficient capital in the Reorganized Debtor for the Reorganized Debtor to resume the assembly and sales of piece parts, cylinder assemblies and Vantage engines at its facility in Coppell, Texas or nearby and to take advantage of what Brantly believes is a rapidly growing market for F.A.A. certified Vantage engines and parts in China. *See* Feasibility of the Plan, Section IX*,* for more details.

Brantly has advised the Debtor that it intends to have the Reorganized Debtor retain all existing employees of the Debtor and to retain Kent Abercrombie, the current President of the Debtor, to operate the Reorganized Debtor.  The Debtor has advised all of its employees of the pending acquisition by Brantly and the Debtor believes that all current employees will stay with the Reorganized Debtor provided that Brantly fulfills its commitments as described under Section IX, Feasibility of the Plan.

Brantly will pay a Cash Contribution of $7.0 million, subject to certain adjustments, into a Creditors Trust for payment of Allowed Claims, as more particularly described in the Plan.  The Cash Contribution will be decreased pursuant to the Purchase Price Adjustment if, at closing, Superior has less than $2 million in cash and less than $9.14 million in gross inventory and accounts receivable (excluding the account receivable from TAE) and will be increased if gross inventory and accounts receivable (excluding the account receivable from TAE) exceed that amount. Any cash in excess of $2 million will be transferred to the Creditors' Trust.

Under the sale to Brantly, the Debtor projects that there will be $7 million available to distribute to all Creditors after payment of its professional fees and the professional fees of the Committee, and the § 503(b)(9) administrative claims due to vendors who shipped goods to the Debtor within twenty days of the Petition, provided that the Effective Date of the Plan occurs by September 1, 2009. These projections are Debtor's best estimates. The Cash Contribution could be more or less after the Purchase Price Adjustment due to factors beyond Debtor's control, and so, there could be more or less cash available to pay unsecured creditors.

The Creditors' Trust will distribute $500,000 to TAE, in full satisfaction of its proof of claim filed in the amount of $18,208,260.  The Creditors' Trust will distribute 58% of the first $5.0 million of Distributable Cash and 67% of Distributable Cash above $5.0 million to TAG, Debtor's parent, in full satisfaction of TAG's proof of claim filed in the amount of $10,146,611.  In consideration for the concessions made by TAE and TAG, they will be released from any and all claims and causes of action by anyone in connection with the Debtor or this case.

The Debtor estimates that the Creditors' Trust will have approximately $2,595,000 to pay the non-insider unsecured creditors. Lain Faulkner, the Committees' Financial Consultants, has estimated that the payout to Class 7 General Unsecured Creditors will likely range from 45% to 60% based on the various contingencies discussed in Potential Liabilities under Article II of this Disclosure Statement.

**THIRD AMENDED DISCLOSURE STATEMENT OF SUPERIOR AIR PARTS, INC., DATED JULY 23, 2009 Page 16**
**567458.20/SPA/20354/0102/072309**

Appx_0064

The Secured Claims which consist of claims secured by liens on Debtor's parts cleaning oil machine (Class 3), telephone system (Class 4), and Debtor's CMM parts measuring machine (Class 6), will be assumed by the Reorganized Debtor and paid in accordance with their terms. The secured claim which consists of a claim secured by liens on the Debtor's office equipment (Class 5) will be either be assumed by the Reorganized Debtor or the Debtor will return the collateral to the holder of the Secured Claim in satisfaction of the Secured Claim.   The 2009 taxes will be paid by the Reorganized Superior when due.

In addition to the Cash Contribution, Brantly has agreed to take certain actions to reduce the pool of claims of unsecured creditors including the following:

1.    The Reorganized Debtor will assume all outstanding purchase orders provided that vendors agree to delay delivery for up to eighteen months if requested by the Reorganized Debtor in exchange for the release of any claims of vendors against the Debtor arising out of such purchase orders.  This will result in a reduction of the Class 7 Claims of up to $5,288,811.[3]

2.    The Reorganized Debtor will assume the Debtor's obligations under its liability insurance policies to pay defense costs up to the deductible limits as provided in the policies.

3.    The Debtor will negotiate with its landlord leasing Debtor's facilities space in Coppell, Texas to modify the existing lease in an effort reduce or eliminate the landlord's potential $450,000 claim, less its deposit, for the rejection of the existing lease.  If the negotiations are unsuccessful, the Debtor will move its operations and reject the lease.

4.    The Reorganized Debtor will honor all warranty claims for product failures occurring *after* the Effective Date of the Plan, regardless of whether such parts were sold before the Effective Date, which will reduce contingent warranty claims against the Debtor by at least $83,140, which is the aggregate amounts of proofs of claims filed by creditors for alleged damages for loss of warranties.

The Brantly offer is also subject to higher and better offers under a bid procedure approved by the Court on July 22, 2009 ("Bid Procedures").  A copy of the Order approving the Bid Procedures is enclosed with the materials that have been provided to you.  Under the Bid Procedures, Brantly will serve as the "stalking horse" for the bidding process.   If the Debtor receives a higher and better offer, then the Debtor, in

---

[3] This number represents the total invoice amount of outstanding purchase orders.  The Debtor believes that valid claims for rejected purchase orders will be substantially less than this amount due to the fact that, in many circumstances, a creditor's provable damages for a rejected purchase order will not equal the total amount of the invoice.  For example, on some claims, the creditor will realize savings from not having to purchase raw materials, or the goods could be sold to other customers, thereby mitigating its damages as compared to the invoice amount.

**THIRD AMENDED DISCLOSURE STATEMENT OF SUPERIOR AIR PARTS, INC., DATED JULY 23, 2009 Page 17**

consultation with TAG and the Committee, may ask the Court to substitute Brantly under the Plan to the entity who extends the highest, best and most confirmable offer under the Bid Procedures.  The Debtor may also select a back-up bidder in case the Successful Bid, as defined in the Bid Procedures, cannot close the transaction.

The Debtor will file a Notice of High Bidder on or before noon on August 14, 2010.  Any creditor may view and obtain a copy of the Notice after that time by going to http://www.strasburger.com/_client/SAP-Plan-Documents/ or by contacting Ms. Angela Dunn, Legal Administrative Assistant, Strasburger & Price, LLP, at angela.dunn@strasburger.com , 600 Congress, Suite 1600, Austin, Texas 78701.

The provisions of this Plan shall bind any holder of a Claim against, or Interest in, the Debtor and its respective successors and assigns, whether or not the Claim or Interest of such holder is impaired under this Plan and whether or not such Holder has accepted this Plan.

Upon the Effective Date, all debts of, Claims against, and Interests in the Debtor or its assets of any nature whatsoever, shall be completely satisfied, discharged and released to the full extent provided by § 1141(d)(1) of the Bankruptcy Code except as otherwise provided in this Plan or the Confirmation Order.  The discharge of the Debtor shall be effective as to each debt, Claim or Interest, regardless of whether a proof of Claim or proof of Interest therefore was filed, whether the Claim or Interest is Allowed, or whether the holder thereof votes to accept this Plan.  On the Effective Date, as to every discharged debt, Claim and Interest, all persons, entities and governmental units (including, without limitation, any holder of a debt, Claim or Interest) shall be precluded from asserting against the Debtor or Reorganized Debtor or against such Debtor's or Reorganized Debtor's assets or properties, or the Creditors' Trust or its assets any other or further debt, Claim or Interest based upon any document, instrument, act, omission, transaction, or other activity of any kind or nature that occurred before the Effective Date.

## A.      ADMINISTRATIVE CLAIMS AGAINST THE DEBTOR

In General.  Subject to the provisions of §§ 330(a) and 331 of the Bankruptcy Code, each holder of an Allowed Administrative Claim shall be paid by the Creditors Trust the full unpaid amount of such Allowed Administrative Claim in cash on the Effective Date or as soon as practicable thereafter, or on such other terms as may be agreed upon by such holder of such Administrative Claim and the Creditors' Trust or otherwise upon order of the Bankruptcy Court; provided, however, that allowed Administrative Claims representing obligations incurred in the ordinary course of business or otherwise assumed by the Debtor pursuant to this Plan and unpaid as of the Effective Date, shall be assumed on the Effective Date and paid or performed by the Reorganized Debtor when due in accordance with the terms and conditions of the particular agreements governing such obligations.  All requests for payment of Administrative Claims (other than Professional Fees and claims arising in the ordinary course of business) arising on or before the Effective Date must be filed by the first Business Day after the 30th day after the Effective Date or the holders thereof shall be

**THIRD AMENDED DISCLOSURE STATEMENT OF SUPERIOR AIR PARTS, INC., DATED JULY 23, 2009 Page 18**
**567458.20/SPA/20354/0102/072309**

Appx_0066

forever barred from asserting such Administrative Claims against the debtor or the Reorganized Debtor.

Professional Fee Claims.   All final applications for fees for Persons whose retention with respect to the Case has been approved by the Bankruptcy Court or who holds, or asserts, an Administrative Claim shall be filed not less than sixty (60) days after the Effective Date.   Fees for services rendered, and disbursements incurred, on behalf of the Reorganized Debtor, by professionals retained by the Reorganized Debtor, from and after the Effective Date shall be paid by the Reorganized Debtor in the ordinary course.   Fees for services rendered and expenses incurred on behalf of the Creditors' Trust, by professionals retained by the Creditors' Trustee, shall be paid by the Creditors' Trust from Trust Assets.

**B.     CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS**

Summary:  Pursuant to § 1123(a)(1) of the Bankruptcy Code this Plan designates the following classes of Claims and Interests.  A Claim or Interest is included in a particular class only to the extent that the Claim or Interest fits within the description of that class and, unless otherwise herein provided, is included in a different class to the extent that any remainder of the Claim or Interest fits within the description of such different class.  A Claim or Interest is included in a particular class only to the extent that the Claim is an Allowed Claim in that Class and has not been paid prior to the Effective Date, and, in the case of an Interest evidenced by certificated or uncertificated shares of preferred or common stock, only to the extent that such stock is outstanding immediately prior to the Effective Date.  The treatment afforded to the Creditors' Claims or Interests as set forth hereunder shall be in full satisfaction, settlement, release, and discharge for and in exchange for such Claim or Interest, respectively.  The Claims (except for the Administrative Claims which are described above and which are not required to be classified pursuant to §1123(a)(i) of the Bankruptcy Code) and Interests against the Debtor are classified as follows:

| Class | Description | Entitled to Vote |
|---|---|---|
| 1 | Priority Tax Claims | no |
| 2 | Priority Employee Claims | no |
| 3 | Secured Claim of Ervin Leasing Company | no |
| 4 | Secured Claim of Great American Leasing Corporation | no |
| 5 | Secured Claim of Tigris Vendor Finance, Inc. f/k/a US Express Leasing | yes |
| 6 | Secured Claim of National City Commercial Capital | no |
| 7 | General Unsecured Creditors | yes |
| 8 | Unsecured Claim of Thielert Aircraft Engines GmbH (TAE) | yes |
| 9 | Unsecured Claim of Thielert AG (TAG) | yes |
| 10 | Interests in The Debtor | yes |

**THIRD AMENDED DISCLOSURE STATEMENT OF SUPERIOR AIR PARTS, INC., DATED JULY 23, 2009 Page 19**

### C.    CLASSIFICATION AND TREATMENT OF CLAIMS AGAINST AND INTERESTS IN THE DEBTOR

<u>CLASS 1 - PRIORITY TAX CLAIMS</u>.

Class 1 Priority Tax Claims consist of any Claim entitled to priority in payment under § 507(a)(8) of the Bankruptcy Code.  The Debtor does not believe that any claims in this class exist.   However, filed proofs of claim in this Class total approximately $23,936.37, which the Debtor disputes, and objections to these claims are anticipated to be filed.

Unless a Creditor holding a Priority Tax Claim and the Reorganized Debtor agree to a different treatment, each Allowed Class 1 Priority Tax Claim shall receive payment in full from the Reorganized Debtor on the Effective Date of the Plan or as soon thereafter as practicable.

Class 1 is Unimpaired.   Creditors holding a Class 1 Priority Tax Claim are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code, and Creditors holding Claims in Class 1 are not entitled to vote to accept or reject this Plan.

<u>CLASS 2 - PRIORITY EMPLOYEE CLAIMS</u>.

Class 2 Priority Employee Claims consist of all Allowed Priority Claims given priority payment status pursuant to § 507(a) of the Bankruptcy Code except Administrative Claims under § 507(a)(1) and Priority Tax Claims under § 507(a)(8).  The Class 2 Claims are estimated to total $56,144.43.  These claims include all accrued vacation and other benefit pay of employees of the Debtor.

Unless a Creditor holding a Class 2 Claim agrees to a different treatment, each Allowed Class 2 claim shall receive to the extent due and owing on the Effective Date, such Claim shall be paid in full in cash by the Reorganized Debtor on the Effective Date, or as soon thereafter as is practicable; or to the extent not due and owing on the Effective Date, such Claim shall be paid in full in cash by the Reorganized Debtor when and as such Claim becomes due and owing in the ordinary course of business.

The Class 2 Claims are Unimpaired under the Plan and, accordingly, are not entitled to vote on the Plan.

<u>CLASS 3 - SECURED CLAIM OF ERVIN LEASING COMPANY</u>.

The Class 3 Claim consists of the Secured Claim of Ervin Leasing Company, the collateral for which is an oil machine to clean parts.  The contract with Ervin Leasing Company is denominated as a lease; however, the Debtor believes it is properly characterized as a financing agreement. The Debtor is current on its payments to the holder of the Class 3 claim. The Class 3 Claim is estimated to be $3,959.06 or less depending on the value of the collateral securing such Claim.

**THIRD AMENDED DISCLOSURE STATEMENT OF SUPERIOR AIR PARTS, INC., DATED JULY 23, 2009 Page 20**
**567458.20/SPA/20354/0102/072309**

Appx_0068

The Reorganized Debtor will retain the collateral, the holder of the Class 3 Claim will retain its lien on its collateral, and the Reorganized Debtor will continue paying the Class 3 Claim in accordance with the terms of the written agreement without acceleration.

The Class 3 Claim is Unimpaired under the Plan and, accordingly, is not entitled to vote on the Plan.

CLASS 4 - SECURED CLAIM OF GREAT AMERICAN LEASING CORPORATION.

The Class 4 Claim consists of the Secured Claim of Great American Leasing Corporation, the collateral for which is the Debtor's phone system.  The contract with Great American Leasing Company is denominated as a lease; however, the Debtor believes it is properly characterized as a financing agreement.  The Debtor is current on its payments to the holder of the Class 4 Claim.  The Class 4 Claim is estimated to be $13,524.47 or less depending on the value of the collateral securing such Claim.

The Reorganized Debtor will retain the collateral, the holder of the Class 4 Claim will retain its lien on its collateral, and the Reorganized Debtor will continue paying the Class 4 Claim in accordance with the terms of the written agreement without acceleration.

The Class 4 Claim is Unimpaired under the Plan and, accordingly, is not entitled to vote on the Plan.

CLASS 5 - SECURED CLAIM OF TIGRIS VENDOR FINANCE, INC., F/K/A US EXPRESS LEASING.

The Class 5 Claim consists of the Secured Claim of Tigris Vendor Finance, Inc. f/k/a US Express Leasing, the collateral for which is all of the debtor's printers, copiers and fax machines.  The contract with Tigris Vendor Finance, Inc is denominated as a lease; however, the Debtor believes it is properly characterized as a financing agreement.  The Debtor is current on its payments to the holder of the Class 5 claim.  The Class 5 Claim is estimated to be $67,329.40 or less depending on the value of the collateral securing such Claim.  The Debtor does not know what the value of the collateral is and so if the Debtor surrenders the collateral, the aggregate unsecured claims could increase by up to $67,329.40.

At the election of Brantly, Reorganized Debtor will retain the collateral, the holder of the Class 5 Claim will retain its lien on its collateral, the Debtor will cure any payment defaults as of the Effective Date, and the Reorganized Debtor will continue paying the Class 5 Claim in accordance with the terms of the written agreement without acceleration, or the Debtor will surrender to the holder of the Class 5 Claim all collateral securing such Claim in full satisfaction of its Secured Claim. Any deficiency claim shall be treated as a Class 7 General Unsecured Claim.

Brantly shall notify the Tigris Vendor Finance of its election in writing at least five (5) business days before the Voting Deadline.

THIRD AMENDED DISCLOSURE STATEMENT OF SUPERIOR AIR PARTS, INC., DATED JULY 23, 2009 Page 21
567458.20/SPA/20354/0102/072309

Appx_0069

The Class 5 Claim is Impaired under the Plan if the Debtor chooses to surrender the collateral and is entitled to vote on the Plan; otherwise, the Claim is Unimpaired and is not entitled to vote on the Plan.

CLASS 6 - SECURED CLAIM OF NATIONAL CITY COMMERCIAL CAPITAL COMPANY.

The Class 6 Claim consists of the Secured Claim of National City Commercial Capital Company, the collateral for which is a CMM parts measuring machine used for quality assurance.  The contract with National City Commercial Capital Company may be denominated as a lease; however, the Debtor believes it is properly characterized as a financing agreement.  The Debtor is current on its payments to the holder of the Class 5 Claim. The Class 6 Claim is estimated to be $123,839 or less depending on the value of the collateral securing such Claim.

The Reorganized Debtor will retain the collateral, the holder of the Class 6 Claim will retain its lien on its collateral, and the Reorganized Debtor will continue paying the Class 6 Claim in accordance with the terms of the written agreement without acceleration.

The Class 6 Claim is Unimpaired under the Plan and, accordingly, is not entitled to vote on the Plan.

CLASS 7 - GENERAL UNSECURED CLAIMS.

Class 7 consists of the Claims of Creditors holding an Allowed General Unsecured Claim against the Debtor other than TAG and TAE.

Each Creditor holding an Allowed Class 7 Claim shall receive in full satisfaction of all of its Allowed Class 7 Claim cash in the amount of its *Pro Rata* Share of Distributable Cash.  As described in the Class 9 discussion below, Class 7 Creditors shall receive 42% of the first $5.0 million of Distributable Cash and 33% of the Distributable Cash in excess of $5.0 million. In the event Class 7 Creditors are paid in full, with interest, any money remaining in the Creditors Trust shall be paid to TAG.

Class 7 is Impaired.  Creditors holding Claims in Class 7 are entitled to vote to accept or reject this Plan.

CLASS 8 - CLAIM OF THIELERT AIRCRAFT ENGINES GmbH (TAE).

The Class 8 Claim consists of the unsecured claim of TAE, an affiliate of the Debtor.  TAE filed a proof of claim in the amount of $18,208,260.17.  The Committee contends that TAE's claim should either be subordinated or re-characterized as equity.

In lieu of prolonged litigation, the Debtor the Committee and TAE have agreed to the classification and treatment of its Claim in this Class 8.  On the Effective Date, or as soon thereafter as is practicable, TAE shall receive $500,000 in full and final satisfaction of any and all Claims which TAE holds or may hold against the Debtor or the

**THIRD AMENDED DISCLOSURE STATEMENT OF SUPERIOR AIR PARTS, INC., DATED JULY 23, 2009 Page 22**
**567458.20/SPA/20354/0102/072309**

Appx_0070

Reorganized Debtor except any administrative claims for goods delivered after the commencement of this case which shall be treated as other Administrative Claims. In consideration for TAE's acceptance of this treatment, TAE shall be released from any and all claims or Causes of Action the Debtor may have against it as of the Confirmation Date.

In exchange for TAE's consent to the Plan and the reduction of its distribution if its claim were allowed in full, TAE shall be released and discharged as of the Confirmation Date from any and all claims of the Debtor and the estate, including but not limited to (a) claims for subordination or re-characterization of its claim or (b) on account of any avoidance claims arising under Chapter 5 of the Bankruptcy Code.

Class 8 is Impaired. The holder of the Class 8 Claim is entitled to vote to accept or reject this Plan.

CLASS 9 - CLAIM OF THIELERT AG (TAG)

The Class 9 Claim consists of the claim of TAG, the sole shareholder of the Debtor. TAG filed a proof of claim in the amount of $10,146,611.11 as a secured claim. However, the Debtor has filed an Adversary Proceeding and obtained a judgment avoiding the lien of TAG for the reason that the lien was unperfected and, thus, avoidable under 11 U.S.C. § 544. In addition, the Committee contends that TAG's claim should either be subordinated or re-characterized as equity.

In lieu of prolonged litigation, the Debtor, the Committee and TAG have agreed to the classification and treatment of its Claim in this Class 9. The Claim of TAG shall receive a cash payment by the Creditors' Trust on the Effective Date, or as soon thereafter as is practicable, in accordance with the following formula: Unsecured Creditors and TAG will share the first $5 million of Distributable Cash 58% to TAG and 42% to the Class 7 General Unsecured Creditors, and Distributable Cash in excess of $5 million will be shared 67% to TAG and 33% to the Class 7 General Unsecured Creditors.

In exchange for TAG's consent to the Plan and the reduction of its distribution if its claim were allowed in full, TAG shall be released and discharged from any and all claims of the Debtor and the estate, including but not limited to: (a) claims for subordination or re-characterization of its claim or (b) on account of any avoidance claims arising under Chapter 5 of the Bankruptcy Code.

TAG's rights and claims against third parties relating to the perfection of its security interest in property of the Estate shall be and are reserved and preserved.

The Class 9 Claim is Impaired under the Plan and, accordingly, is entitled to vote for or against the Plan.

CLASS 10 - INTERESTS IN THE DEBTOR

**THIRD AMENDED DISCLOSURE STATEMENT OF SUPERIOR AIR PARTS, INC., DATED JULY 23, 2009 Page 23**
**567458.20/SPA/20354/0102/072309**

Appx_0071

The Class 10 Interests consists of 100% of equity interests of the Debtor, which is held by TAG.

On the Effective Date, all Interests in THE Debtor automatically, and without any action on the part of the holders thereof, the Debtor, or the Reorganized Debtor, shall be cancelled and extinguished.

The Class 10 Interests are deemed to have rejected the Plan, accordingly, is not entitled to vote for or against the Plan.

**D.     ACCEPTANCE OR REJECTION OF THE PLAN**

**Classes Entitled to Vote**:

Classes 1, 2, 3, 4, and 6 are Unimpaired Classes under this Plan and are conclusively presumed to have accepted this Plan pursuant to §1126(f) of the Bankruptcy Code.

Classes 5, 7, 8, and 9 are Impaired Classes and are entitled to vote to accept or reject this Plan.  Class 10 will not receive or retain any distributions or property under this Plan, and, accordingly, under §1126(g) of the Bankruptcy Code is presumed to have rejected the Plan.

Cram Down:  If a Class fails to accept this Plan by the statutory majorities provided in §1126(c) of the Bankruptcy Code, the Debtor reserves the right to request the Bankruptcy Court to confirm this Plan as to such rejecting Class.

**E.     MEANS FOR IMPLEMENTATION OF THIS PLAN**

Sale of Stock to Brantly Subject to Bid Procedures.  The sale to Brantly under this Plan is subject to higher and better offers as determined by the Bid Procedures approved by the Court.  Brantly has agreed to serve as the "stalking horse" bidder for the Bid Procedures.  If a different Buyer is chosen by the Debtor, TAG and the Committee as the highest and best offer under the Bid Procedures, and approved by the Court at Confirmation, then the Buyer, as approved, will be substituted for Brantly in the Plan.  The Plan may be amended such amendments will not materially decrease or alter the payment to any Class of Claims or constitute such material modifications such that the Debtor would be required to provide additional disclosures or to solicitation additional voting from creditors within the meaning of 11 U.S.C. § 1127(a) and (c).  The Order Confirming Plan will state which terms and conditions of this Plan will be altered by the existence of a higher and better offer approved by the Court.

The Debtor will file a Notice of High Bidder on or before noon on August 14, 2010.  Any creditor may view and obtain a copy of the Notice after that time by going to http://www.strasburger.com/_client/SAP-Plan-Documents/ or by contacting Ms. Angela Dunn, Legal Administrative Assistant, Strasburger & Price, LLP, at angela.dunn@strasburger.com, 600 Congress, Suite 1600, Austin, Texas 78701.

**THIRD AMENDED DISCLOSURE STATEMENT OF SUPERIOR AIR PARTS, INC., DATED JULY 23, 2009 Page 24**
567458.20/SPA/20354/0102/072309

Appx_0072

If no Qualified Bids are received under the Bid Procedures, or if Brantly is still determined to be the highest and best offer, then the Debtor will proceed to seek confirmation of this Plan and sell its stock to Brantly as described herein, or as amended.

<u>Reorganized Debtor</u>.

(1)    <u>Cancellation of Interests</u>:  At the close of business on the Effective Date of the Plan, all of the existing ownership interests in Debtor will be canceled without any further action by the Debtor.  The obligations of the Debtor in respect of the Interests and under the Debtor's certificate of incorporation, and under any other agreements or instruments governing the Interests, including but not limited to any shareholders rights plan shall be discharged and extinguished.

(2)    <u>Continued Corporate Existence</u>:  The Reorganized Debtor shall continue its corporate existence on and after the Effective Date, with all express, incidental and attendant powers granted to it under its certificate of incorporation, as amended pursuant to the provisions of this Plan, and the laws of the state of its organization and without prejudice to any right hereafter to alter or terminate such existence (whether by contract, operation of law or otherwise) under such applicable state law. The Reorganized Debtor will continue to engage in the business of owning and operating the business of the Debtor.

(3)    <u>Issuance of New Interests</u>:   On or immediately after the Effective Date, new ownership interests, representing 100% ownership in the Reorganized Debtor, will be issued to Brantly either directly or to such entity as it may designate.  The issuance of the new ownership interests hereunder shall be exempt from the registration requirements of the Securities Act pursuant to section 1145(a) of the Bankruptcy Code.

(4)    <u>Amended Certificate of Incorporation</u>:  Not later than the Effective Date, the Reorganized Debtor shall file an Amended Certificate of Incorporation with the applicable state agency.   The Amended Certificate of Incorporation shall, among other things, prohibit the issuance of nonvoting equity securities to the extent required by section 1123(a) of the Bankruptcy Code, subject to further amendment as permitted by applicable law, and the Amended Certificate of Incorporation shall change, if required, the authorized number of shares of stock to implement this Plan.

(5)    <u>Directors and Officers of Reorganized Debtor</u>:  As of the Effective Date, and without further action of the Debtor or the Bankruptcy Court, all Persons then serving as officers or directors of the Debtor shall cease to be officers or directors of the Debtor.  Immediately as of the Effective Date, Brantly, without further action of the Debtor or the Bankruptcy Court shall select directors of the Reorganized Debtor and hire officers of the Reorganized Debtor.  The initial director and officer of the Reorganized Debtor shall be Kent Abercrombie, President and Chief Executive Officer.

**THIRD AMENDED DISCLOSURE STATEMENT OF SUPERIOR AIR PARTS, INC., DATED JULY 23, 2009 Page 25**
567458.20/SPA/20354/0102/072309

Appx_0073

Brantly Contribution:  Brantly or its designee will acquire all of the new ownership interests in Debtor, free and clear of any and all liens, claims and encumbrances to the fullest extent authorized under § 1141.  In consideration for the issuance of the new ownership interests to Brantly, Brantly or its designee will fund the Cash Contribution to the Creditors' Trust on the Effective Date.

Brantly Deposit:  The Debtor has been advised by Brantly's counsel, Okin, Adams & Kilmer, LLP, that on June 30, 2009, Brantly or its designee, deposited the sum of $700,000 (the "Deposit") into the trust account of Okin Adams & Kilmer, LLP.  Upon approval of mutually agreeable Bid Procedures, Brantly has agreed to instruct its attorneys to transfer the Deposit into a segregated account established by the Debtor-in-Possession and will be non-refundable except in the following circumstances: (a) no order confirming this Plan has been entered by the Bankruptcy Court prior to August 31, 2009, (b) the Bankruptcy Court enters an order denying confirmation of this Plan, (c) any of the conditions precedent set forth in section 11.2 of the Plan are not satisfied or waived by Brantly as provided therein, or (d) at the conclusion of the Bid Procedures, Brantly has not been determined to have been the highest bidder.

Funding of Payments to Creditors:  Payments to be made to creditors under this Plan will come from the Cash Contribution, Excess Cash and recoveries from Causes of Action vested in the Creditors' Trust, if any.  On the Effective Date, the Reorganized Debtor shall fund the Creditor's Trust by making the Cash Contribution.

Purchase Price Adjustment:  On the earlier of the Effective Date or August 31, 2009, Brantly and the Creditors' Trustee shall calculate the Purchase Price Adjustment. On the Effective Date all funds payable to the Creditors' Trust pursuant to the Purchase Price Adjustment, and the Excess Cash, shall be paid to the Creditors' Trust by Brantly.

Facility Lease:  The Debtor will attempt to negotiate a modification of a new facility lease with Texas Duggan Limited Partnership ("Texas Duggan"), satisfactory to Brantly, in exchange for a release or reduction of its claim.  If the Debtor is unable to renegotiate its lease, the lease may be rejected and treated as a Claim under Class 7. The Debtor shall advise the Creditors' Committee of any agreement reached with Texas Duggan and shall provide copies of the agreement to the Creditors' Committee by the earlier of the bid deadline, set by separate order, or three days prior to Confirmation.

Reorganized Debtor to Honor Certain Warranties:  The Reorganized Debtor will assume the Debtor's warranty obligations where an alleged failure of a product giving rise to such claims occurs after the Effective Date of the Plan regardless of whether such goods were sold prior to the Effective Date of the Plan. The Reorganized Debtor will not assume any of the Debtor's warranty obligations for alleged product failures occurring before the Effective Date of the Plan.

Funding of Continuing Operations.  Upon the Effective Date, the Reorganized Debtor will have Unrestricted Cash of $2 million in working capital.  Management estimates that an additional $4 million in capital and/or credit may be needed to revive the piece parts business and to fund the costs of the engine programs, based upon

**THIRD AMENDED DISCLOSURE STATEMENT OF SUPERIOR AIR PARTS, INC., DATED JULY 23, 2009 Page 26**
**567458.20/SPA/20354/0102/072309**

Appx_0074

Superior's historical financial performance, as discussed in Article I, D. <u>History of the Debtor</u>. However, capital requirements may be less depending on the volume of engine exports to China and the pricing on the exported engines, neither of which has yet been determined. Brantly is continuing to conduct due diligence to determine what it believes Superior's capital requirements will be. Brantly has not yet specified how much capital it will invest in the future; however, Brantly may provide sufficient capital to the Reorganized Debtor so that the Reorganized Debtor can honor its obligations under the Plan to honor warranties, pay the purchase orders assumed under the Plan, and pay for the defense costs within its insurance deductibles; otherwise, Brantly will lose its $7 million investment. Accordingly, the Debtor believes that Brantly has sufficient economic incentives to adequately capitalize the Reorganized Debtor.

<u>Plan Documents</u>: Implementation of the Plan requires the execution of certain documents by the Debtor and other parties. No further Court order must be obtained prior to execution of such documentation. In the event any party does not agree to execution of such documentation, Brantly may appoint a party to execute it on such party's behalf.

<u>Creditors' Trust</u>:

(1)    <u>Trust Assets</u>. On the Effective Date, the Trust Assets shall vest in the Creditor's Trust.

(2)    <u>Creditors' Trust</u>: Prior to the Effective Date, the Creditors' Trust shall be established pursuant to the Creditors' Trust Agreement, for the purpose of liquidating the Trust Assets, resolving all Disputed Claims and making distributions to Creditors holding Allowed Claims as provided in this Plan. On the Effective Date, the Trust Assets shall be transferred to and vest in the Creditors' Trust. Subject to and to the extent set forth in any other applicable provision of the Plan, the Confirmation Order, the Trust Agreement or other agreement (or any other order of the Bankruptcy Court entered pursuant to or in furtherance hereof), the Creditors' Trust shall be empowered to: (i) effect all actions and execute all agreements, instruments and other documents necessary to implement the Plan; (ii) make Distributions contemplated hereby; (iii) establish and administer any reserves with respect to Disputed Claims; (iv) comply herewith and with its obligations hereunder; (v) object to Claims and resolve such objections; (vi) employ professionals to represent it with respect to its responsibilities; and (vii) exercise such other powers as may be vested in it or as deemed by it to be necessary and proper to implement the provisions thereof.

(3)    <u>Trust Governance</u>: The Creditors' Trust Agreement shall provide for an advisory committee which may include members of the Committee. The Creditors' Trustee shall be appointed by the Committee. Powers, rights and responsibilities of the  Creditors' Trustee shall be specified in the Creditors' Trust Agreement and shall include the authority and responsibility to: (i) receive, manage, invest, supervise and protect the Trust Assets; (ii) pay taxes or other obligations incurred by the Creditors'

**THIRD AMENDED DISCLOSURE STATEMENT OF SUPERIOR AIR PARTS, INC., DATED JULY 23, 2009 Page 27**
567458.20/SPA/20354/0102/072309

Appx_0075

Trust (iii) retain and compensate, without further order of the Bankruptcy Court, the services of professionals to advise and assist in the administration, prosecution and distribution of the Trust Assets; and (iv) prosecute, compromise and settle in accordance with the specified terms of the Plan and the Trust Agreement all Disputed Claims. Other rights and duties of the Creditors' Trustee and the Trust beneficiaries shall be as set forth in the Creditors' Trust Agreement.

(4)     <u>Fees and Expenses of the Creditors' Trust</u>:   The Creditors' Trust expenses shall be paid from the Trust Assets in accordance with the Creditors' Trust Agreement.  In no event shall the Debtor or Reorganized Debtor be responsible for any such fees or expenses.

(5)     <u>Reports to be Filed by the Creditors' Trustee</u>:  The Creditors' Trustee, shall file quarterly reports with the Court regarding the administration of property subject to its ownership and control pursuant to the Plan, distributions made by it and other matters required to be included in such report.

(6)     <u>Expenses for Professionals of the Creditors' Trust</u>:   The Creditors' Trustee may employ, without further order of the Court, professionals to assist in carrying out its duties hereunder and may, after review by the Trust Advisors, compensate and reimburse the expenses of these professionals without further order of the Court from the Trust Assets in accordance with the Creditors' Trust Agreement.

(7)     <u>Excess Funds in Creditors' Trust</u>:   To the extent funds remain in the Creditors' Trust after payment in full of all Allowed Claims required to be paid by the Creditors' Trust, with interest at the Plan Rate, such surplus shall be paid to TAG.

(8)     <u>Indemnification</u>:  The Creditors' Trust Agreement may include reasonable and customary indemnification provisions that are acceptable to the Trust Advisors and Creditors' Trustee.  Any such indemnification shall be the sole responsibility of the Creditors' Trust.

(9)     <u>Vesting of Chapter 5 and State Law Avoidance Actions, Claims and TAG and TAE Litigation</u>:  On the Effective Date, all Chapter 5 and state law avoidance actions, and all other claims and Causes of Action which are property of the Estate, excluding those claims and causes of action directly relating to assets retained by the Reorganized Debtor, shall vest in the Creditors' Trust.  The Creditors' Trustee shall be the Debtors' designated representative pursuant to 11 U.S.C. § 1123(b)(3) to bring all such claims on behalf of the Creditors' Trust.

<u>Proprietary Information</u>:  The Confirmation Order will include a requirement that all persons, including but not limited to Corporate Finance Partners, TAG, TAE, Engine Components, Inc., Avco Corporation and Teledyne Technologies Incorporated, and their respective parents, sister and subsidiary companies, and all other companies or persons in their control, and each of them, shall be directed to return to the Reorganized Debtor all documents and other information owned by the Debtor related to the Debtor's

**THIRD AMENDED DISCLOSURE STATEMENT OF SUPERIOR AIR PARTS, INC., DATED JULY 23, 2009 Page 28**
**567458.20/SPA/20354/0102/072309**

Appx_0076

business and operations (the "Proprietary Information"). For the avoidance of doubt, the Reorganized Debtor retains all of the Debtor's rights pursuant to any confidentiality agreement executed in connection with the exchange of such information.

Vesting of Assets:  Except for the Trust Assets and as otherwise specifically provided herein, the property of the Debtor, including any and all Causes of Action not transferred or assigned to the Creditors' Trust under this Plan, shall vest in the Reorganized Debtor on the Effective Date free and clear of all Claims, liens, charges or other encumbrances and Interests.

## F.    TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

Assumption of Insurance Policies:  The Reorganized Debtor will assume any and all Reimbursement Obligations of the Debtor under the liability insurance policies listed on *Exhibit 1* to the Plan.

Assumption and Modification of Prepetition Purchase Orders:  The Reorganized Debtor will assume those prepetition executory purchase orders listed on *Exhibit 2* to the Plan, which consist of legally binding purchase orders in existence when this case was commenced but where the goods had not yet been delivered ("Executory Purchase Orders"), provided that the non-debtor parties agree to:

(a) give the Reorganized Debtor a credit for any goods identified on the Executory Purchase Orders which were ordered and paid for after the commencement of this case and

(b) modify the delivery date on such purchase orders for up to 18 months from the Effective Date as requested by the Debtor prior to confirmation of the Plan, in order to give the Reorganized Debtor an opportunity to restore full operations in an orderly and cost-effective manner.

The Debtor will contact all vendors on *Exhibit 2* to the Plan at least seven days before the deadline for voting on the Plan and request modifications to an Executory Purchase Order.  If an agreement is reached on an Executory Purchase Order, the Reorganized Debtor will assume the Executory Purchase Order as modified by the written agreement of the parties.

Any vendor may refuse to agree to any modification to the Executory Purchase Orders requested by the Debtor.  If the vendor and the Debtor cannot reach an agreement on modifications to an Executory Purchase Order, the Debtor may reject such purchase order by notifying the vendor of such rejection and filing a notice of such rejection with the Court on or before the Confirmation of the Plan.  If an Executory Purchase Order is rejected, the vendor may file a proof of claim for any damages arising out of the cancellation of the purchase order which, if allowed, shall become part of the Class 7 General Unsecured Claims.  The Debtor and the Committee reserve for the Creditors' Trust any rights to object to such claims.

**THIRD AMENDED DISCLOSURE STATEMENT OF SUPERIOR AIR PARTS, INC., DATED JULY 23, 2009 Page 29**
**567458.20/SPA/20354/0102/072309**

Appx_0077

<u>Assumption and Modification of Lease with Texas Duggan Limited Partnership.</u>
The Debtor will attempt to renegotiate its lease of its facility in Coppell, Texas with Texas Duggan based on today's market conditions. If the Debtor reaches an agreement, Debtor will file with the court a notice of assumption and modification of such lease at least ten days prior to the Confirmation Date. Otherwise such lease will be rejected as of the Effective Date of the Plan and the Debtor will vacate the premises on or before that date. The Debtor is currently paying its rent and so does not expect to pay any cure amount if it assumes the lease. Texas Duggan's proof of claim for any damages arising out of the cancellation of the lease, if allowed, shall become part of the Class 7 General Unsecured Claims. The Debtor and the Committee reserve for the Creditors' Trust any rights to object to such claim.

<u>Rejection of Executory Contracts and Unexpired Leases</u>:    All Executory Contracts and Unexpired Leases that are not been specifically assumed by the Debtor under the Plan shall be rejected as of the Effective Date.

<u>Cure of Defaults</u>: Reorganized Debtor shall cure all defaults existing under any assumed insurance contracts on *Exhibit 1* pursuant to the provisions of §§ 1123(a)(5)(G) and 365(b) of the Bankruptcy Code, by paying the amount, if any, determined by the Bankruptcy Court required to be paid in order to assume such Executory Contract and/or Unexpired Lease. Payment of such amounts shall be made by the Reorganized Debtor on the later of (i) the Effective Date, (ii) the date the Bankruptcy Court determines the cure amount by Final Order, or (iii) the date the Reorganized Debtor and the party to such contract agree on a cure amount.

Currently, the Debtor may be obligated to pay an estimated $93,398 in defense costs and this amount may increase by the Confirmation of the Plan because the automatic stay has been lifted to allow personal injury litigation to go forward as of July 15, 2010.

The Cure Amounts for Executory Purchase Orders assumed under paragraph 7.2 of the Plan shall be deemed to be zero since the Reorganized Debtor will take delivery of goods covered by such purchase orders.

<u>Rejection Damage Claims</u>: Each person who is a party to an Executory Contract and/or Unexpired Lease rejected pursuant to this Article shall be entitled to file, not later than thirty (30) days after the Effective Date, which is the deemed date of such rejection, a proof of claim for damages alleged to arise from the rejection of the Executory Contract and/or Unexpired Lease to which such person is a party. A copy of such Claim shall be sent to the Creditor's Trustee. The Bankruptcy Court shall determine any such objections, unless they are otherwise resolved. All Allowed Claims for rejection damages shall be treated as Class 7 Claims, and the Creditor's Trust and/or the Creditor's Trustee shall have standing to object to any such rejection damage Claim so filed.

**THIRD AMENDED DISCLOSURE STATEMENT OF SUPERIOR AIR PARTS, INC., DATED JULY 23, 2009 Page 30**
567458.20/SPA/20354/0102/072309

Appx_0078

### G.    PROVISIONS REGARDING DISTRIBUTIONS

Date of Distributions:    Except as otherwise provided by the Plan, any Distributions and deliveries to be made to holders of Allowed Claims in Classes 1-6, shall be made on the Effective Date or as soon thereafter as may be practicable.  As to Disputed Claims, Distributions shall be made as set forth in Article VIII of the Plan.

Distributions:    The Reorganized Debtor shall make all Distributions required under the Plan with respect to Claims in Classes 1-6.  All other Distributions under the Plan shall be made by the Creditors' Trust.

Means of Cash Payment:  Cash payments made pursuant to this Plan shall be in U.S. funds, by check drawn on a domestic bank, or, at the option of the Reorganized Debtor or the Creditors' Trust, as the case may be, by wire transfer from a domestic bank, except that payments made to foreign creditors holding Allowed Claims may be in such funds and by such means as are customary or as may be necessary in a particular foreign jurisdiction.

Delivery of Distributions:    Subject to Bankruptcy Rule 9010, Distributions to holders of Allowed Claims shall be made at the address of each such holder as set forth on the proofs of Claim filed by such holders (or at the last known addresses of such holder if no proof of Claim is filed or if the Debtor has been notified in writing of a change of address), except as provided below.  If any holder's Distribution is returned as undeliverable, no further Distributions to such holder shall be made unless and until the Reorganized Debtor or Creditors' Trustee, as the case may be, is notified of such holder's then current address, at which time all missed Distributions shall be made to such holder without interest.  Amounts in respect of undeliverable Distributions shall be returned to the Reorganized Debtor with respect to Classes 1-6 and to the Creditors' Trust with respect to Classes 7-9 until such Distributions are claimed.  All claims for undeliverable distributions shall be made on or before two months following the final Distribution to Class 7 Creditors.  After such date, any claim shall be forfeited.

Time Bar to Cash Payments:  Checks issued by the Reorganized Debtor or the Creditors' Trust, as the case may be, in respect of Allowed Claims shall be null and void if not negotiated within six months after the date of issuance thereof.  Requests for reissuance of any check shall be made directly to the Reorganized Debtor or the Creditors' Trustee, as the case may be, by the holder of the Allowed Claim with respect to which such check originally was issued.  Any claim in respect of such a voided check shall be made on or before 120 days after the date of reissuance of such check.  After such date, all Claims in respect of void checks shall be discharged and forever barred.

Distributions Pending Allowance/Distributions after Allowance:    Distributions pending Allowance of a Claim and distributions after Allowance of a Claim are governed by sections 9.3 and 9.4 of the Plan.

**THIRD AMENDED DISCLOSURE STATEMENT OF SUPERIOR AIR PARTS, INC., DATED JULY 23, 2009 Page 31**
**567458.20/SPA/20354/0102/072309**

Appx_0079

H.        PROVISIONS FOR RESOLVING DISPUTED CLAIMS

Prosecution of Objections to Claims:  After the Effective Date, the Reorganized Debtor and the Creditors' Trustee shall have the exclusive authority to file objections to Claims which they would, respectively, be required to pay.  Any objections to Claims must be made before the date that is 90 days after the Effective Date, or such other date as is established by order of the Bankruptcy Court.

Estimation of Claims:  The Debtor, the Reorganized Debtor, or with respect to Classes 7-9, the Creditors' Trustee, may, at any time, request that the Bankruptcy Court fix, liquidate or estimate any contingent or unliquidated Claim pursuant to section 502(c) of the Bankruptcy Code or other applicable law regardless of whether the Debtor has previously objected to such Claim, and the Bankruptcy Court shall retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal relating to any such objection.  In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim, such estimated amount shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court.  The Bankruptcy Court's entry of this order may limit the distribution to be made on individual Disputed Claims regardless of the amount finally Allowed on account of such Disputed Claims and no holder shall have recourse against the Debtor, the Reorganized Debtor, the Creditors' Trust, their assets or any of their respective professionals.  If the estimated amount constitutes a maximum limitation on such Claim, the Debtor, the Reorganized Debtor, or the Creditors' Trust may elect to pursue any supplemental proceedings to object to any ultimate payment on such Claim. All of the aforementioned Claims objections, estimation and resolution procedures are cumulative and not necessarily exclusive of one another.  Claims may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.  If a holder of a Claim fails to seek estimation of a Claim at any time prior to the final distribution date of the Creditors' Trust, such Claim shall be treated as a disallowed Claim without further Order of the Bankruptcy Court on the final distribution date of the Creditors' Trust.  Any unliquidated claim or contingent Claim shall be treated as a Disputed Claim until and unless it becomes an Allowed Claim pursuant to a Final Order of the Bankruptcy Court.

Payments and Distributions on Disputed Claims:  Partial payments or partial distributions may be made with respect to a Disputed claim on the undisputed portion of such Disputed Claim, pending resolution of such disputes by Final Order.  No reserve for Disputed Claims other than those in Classes 7-9 shall be established.  All obligations in respect of Disputed Claims for Claims shall be undertaken after the Effective Date by the Reorganized Debtor.

Distributions After Allowance:  The Reorganized Debtor or the Creditors' Trust, as applicable, shall make all payments and distributions required to be made under this Plan as soon as practicable after the date such Disputed Claim becomes an Allowed Claim.  Such distributions shall be based upon the cumulative distributions that would have been made to the holder of such Claim under the Plan if the Disputed Claim had

**THIRD AMENDED DISCLOSURE STATEMENT OF SUPERIOR AIR PARTS, INC., DATED JULY 23, 2009 Page 32**
567458.20/SPA/20354/0102/072309

Appx_0080

been Allowed on the Effective Date less actual distributions made pursuant to Section 9.3 of the Plan.

**I.    EFFECT OF CONFIRMATION, DISCHARGE, RELEASES, AND INJUNCTION**

Binding Effect:  Except as otherwise provided in § 1141(d) of the Bankruptcy Code, on and after the Effective Date, the provisions of this Plan shall bind any holder of a Claim against, or Interest in, the Debtor and its respective successors and assigns, whether or not the Claim or Interest of such holder is impaired under this Plan and whether or not such Holder has accepted the Plan.

Discharge:  Except as otherwise provided in the Plan or the Confirmation Order and subject to § 1141(d)(1) of the Bankruptcy Code, upon the Effective date, all debts of, Claims against and Interests in the Debtor of any nature whatsoever including interest thereon, its assets, or properties, shall be completely satisfied, discharged and released.  The discharge of the Debtor shall be effective as to each debt, Claim or Interest, regardless of whether a proof of Claim or proof of Interest therefore was filed, whether the Claim or Interest is Allowed, or whether the holder thereof votes to accept this Plan.  On the Effective Date, as to every discharged debt, Claim and Interest, all persons, entities and governmental units (including, without limitation, any holder of a debt, Claim or Interest) shall be precluded from asserting against the Debtor or Reorganized Debtor or against such Debtor's or Reorganized Debtor's assets or properties, or the Creditors' Trust or its assets any other or further debt, Claim or Interest based upon any document, instrument, act, omission, transaction, or other activity of any kind or nature that occurred before the Effective Date.

Preservation of Rights of Action:  Except as otherwise provided in the Plan or in any contract, instrument, or agreement entered into in connection with the Plan, in accordance with § 1123(b) of the Bankruptcy Code, the Reorganized Debtor and the Creditors' Trust, as applicable, shall retain and may exclusively enforce any claims, rights and causes of action that the Debtor may hold against any person or entity that have not been released under the Plan.  The Reorganized Debtor and the Creditors' Trust, as applicable, may pursue such retained Claims, rights or causes of action, as appropriate, in accordance with the best interests of, as applicable, the Reorganized Debtor or the Class 7 and Class 9 Creditors.

Exculpation and Release:  As of the Effective Date, the Debtor, the Committee, Brantly and their respective advisors, attorneys, agents or any professionals retained by them (acting in such capacity) shall neither have nor incur any liability to, nor be subject to any right of action by, any person or entity for any act taken or omitted to be taken in connection with or related to the formulation, preparation, dissemination, implementation, administration, Confirmation or effectiveness of the Plan, the Disclosure Statement, the solicitation of votes for and the pursuit of Confirmation of the Plan, the consummation of the Plan or the administration of the Plan or the property to be distributed under the Plan, or any contract, instrument or other agreement or document created or entered into in connection with the Plan, or any other act taken or omitted to be taken in connection with the Bankruptcy Case; provided, however, that the

foregoing provisions of section 10.4 of the Plan shall have no effect on the liability of any person or entity that results from any such act or omission that is determined in a Final Order to have constituted gross negligence or willful misconduct.  Notwithstanding the foregoing, Brantly shall not be released from any of its obligations under the Plan.

Injunction:  Except as otherwise provided in, or permitted under the Plan, from and after the Effective Date, all persons and entities that have held, currently hold or may hold a Claim or Interest or other debt or liability or right that existed prior to the Effective Date, are permanently enjoined on and after the Effective Date against the (a) commencement or continuation of any judicial, administrative, or other action or proceeding against the Debtor, Reorganized Debtor, the Committee, or Brantly, as the case may be, on account of Claims against or Interests in the Debtor; (b) enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree, or order against the Debtor, Reorganized Debtor, the Committee, or Brantly, or any assets or property of same; or (c) creation, perfection or enforcement of any encumbrance of any kind against the Debtor, Reorganized Debtor, the Committee, or Brantly, as the case may be, arising from a Claim.  This provision does not enjoin the prosecution any claims that arise on or after the Effective Date nor does it enjoin the determination of the allowance of any Claims that arose prior to the Effective Date by a court of competent jurisdiction.

## VI.  CONDITIONS PRECEDENT

Deposit:  Brantly shall have made an earnest money deposit of $700,000 into a segregated Debtor-In-Possession Account refundable upon the terms of the Plan and Bid Procedures.

Conditions Precedent to Effective Date:  The Effective Date shall not occur unless and until each of the following conditions shall have been satisfied or waived pursuant to the provisions hereof:

(a)    Confirmation Order:  The Confirmation Order, in form and substance satisfactory to Brantly, the Debtor, and the Committee in their reasonable discretion, confirming this Plan shall have been entered on or before August 31, 2009 and have become a Final Order.

(b)    No Material Modifications to Plan:    No material modifications, as determined by Brantly in its reasonable discretion, shall have been made to this Plan without the consent of Brantly.

(c)    Funding:  Brantly shall have funded the Cash Contribution within thirty (30) days after the entry of the Confirmation Order provided that:

(i) the Purchase Price Adjustment shall be calculated as of August 31, 2009, regardless of the actual Closing Date; and

**THIRD AMENDED DISCLOSURE STATEMENT OF SUPERIOR AIR PARTS, INC., DATED JULY 23, 2009 Page 34**
567458.20/SPA/20354/0102/072309

Appx_0082

(ii) the dollar amount of any premiums for liability insurance paid by the Debtor for coverage after August 31, 2009 will be deducted from Unrestricted Cash.

(d)    <u>Unrestricted Cash</u>:  On August 31, 2009 (or at Closing, if earlier), the Debtor shall have the Unrestricted Cash (defined in the Plan as $2,000,000, excluding the Cash Contribution, as such amount may be adjusted by the Purchase Price Adjustment) less any payments made pursuant to 11.2(c)(iii) of this Plan.  To the extent the Debtor does not have sufficient cash on hand to satisfy this condition on August 31, 2009, the Cash Contribution shall be reduced by the amount of any deficiency in satisfaction of this condition.

<u>Waiver of Conditions</u>:  Brantly may waive any of the conditions set forth in Section 11.2 of the Plan, except for condition 11.2(a) and condition 11.2(c), which may be waived only with the concurrence of the Debtor and Committee, at any time, without notice, without leave or order of the Bankruptcy Court, and without any formal action other than proceeding to consummate this Plan.

<u>Expense Reimbursement</u>:  If Brantly is not approved by the Bankruptcy Court as Buyer by reason of the acceptance of an overbid for the equity in or assets of the Debtor in an alternative transaction and such alternative transaction closes or becomes effective, (a) the Debtor shall arrange for the immediate return of the deposit in 11.1 of the Plan to Brantly and (b) Brantly will be entitled to receive a reimbursement of attorneys fees and expenses incurred by Brantly in connection with this Bankruptcy Case up to Three Hundred Fifty Thousand Dollars ($350,000.00) (the "Expense Reimbursement").  Such Expense Reimbursement shall be paid by the Debtor in cash payable within five Business Days after Brantly submits an itemization of such expenses to the Debtor and the Committee unless either the Committee or the Debtor objects in which case only the undisputed portion will be timely paid and Brantly may seek court approval for the payment of any disputed portion.

<u>Non-Occurrence of Effective Date</u>.  If Brantly does not satisfy Condition 11.2(c) and the Debtor and the Committee do not agree to extend the date of Funding, the Effective Date shall not occur and Brantly will forfeit its deposit.

## VII.  RETENTION OF JURISDICTION

The Bankruptcy Court shall retain exclusive jurisdiction over this Bankruptcy Case after Confirmation for the following purposes:

(a)    to consider and effect any modification of the Plan under § 1127 of the Bankruptcy Code;

(b)    to hear and determine all controversies, suits and disputes that arise in connection with the interpretation, implementation, effectuation, consummation, or enforcement of the Plan;

**THIRD AMENDED DISCLOSURE STATEMENT OF SUPERIOR AIR PARTS, INC., DATED JULY 23, 2009 Page 35**
567458.20/SPA/20354/0102/072309

Appx_0083

(c)      to hear and determine all requests for compensation and/or reimbursement of expenses for the period commencing on the Petition Date through the Effective Date;

(d)      to hear and determine all objections to Claims and Interests, and to determine the appropriate classification of any Claim or Interest, and other controversies, suits and disputes that may be pending at or initiated after the Confirmation Date, except as provided in the Plan or the Confirmation Order;

(e)      to hear and determine all claims that the Debtor, Reorganized Debtor, or the Creditors' Trust could assert under the Bankruptcy Code;

(f)      to consider and act on such other matters consistent with the Plan as may be provided in the Confirmation Order;

(g)      to make such orders as are necessary and appropriate to carry out and implement the provisions of the Plan;

(h)      to approve the reasonableness of any payments made or to be made, within the meaning of § 1129(a)(4);

(i)      to exercise the jurisdiction granted pursuant to § 505 of the Bankruptcy Code to determine any and all federal, state, local and foreign tax liabilities of, and any and all refunds of such taxes paid by the Debtor;

(j)      to hear and determine any issues or matters in connection with any property not timely claimed as provided in the Plan;

(k)      to hear and determine any controversies with respect to any settlements approved by the Court;

(l)      to enable the Reorganized Debtor, the Committee, the Creditors' Trust and any party-in-interest to consummate any and all proceedings that it may bring to set aside liens or to recover preferences, fraudulent transfers, assets or damages to which it may be entitled under applicable bankruptcy, federal or state law;

(m)      to correct any defect, cure any omission or reconcile any inconsistency in the Plan or in the Confirmation Order as may be necessary to carry out the purposes and intent of the Plan; and

(n)      to determine any and all motions, applications, adversary proceedings and contested matters whether pending in the Bankruptcy Case as of the Effective Date or brought subsequently by the Reorganized Debtors or the Creditors' Trust, as the case may be.

No Limitation:  Nothing contained in Article XII of the Plan shall be construed so as to limit the rights of the Reorganized Debtor or the Creditors' Trust to commence or prosecute any claim in any court of competent jurisdiction.

## VIII.  MISCELLANEOUS PROVISIONS

Modification:  After the Effective Date, the Plan shall not be modified except upon the agreement of the Reorganized Debtor and the Creditors' Trustee.

Headings:  All headings utilized in the Plan are for convenience and reference only, and shall not constitute a part of the Plan for any other purpose.

Safe Harbor:  Issuance of stock in conjunction with the Plan is exempt from securities laws pursuant to § 1145(a)(1) of the Bankruptcy Code.

Due Authorization:  Each and every holder of a Claim who elects to participate in the distributions provided for herein warrants that such holder is authorized to accept, in consideration of such Claim against the Debtor, the distributions provided for in the Plan and that there are not outstanding commitments, agreements, or understandings, expressed or implied, that may or can in any way defeat or modify the rights conveyed or obligations undertaken by such holder of a Claim under the Plan.

Authorization of Corporate Action:  All matters and actions provided for under the Plan involving the structure of the Debtor or action to be taken by or required of the Debtor or Reorganized Debtor shall be deemed to have occurred and be effective as provided herein, and shall be deemed to be authorized and approved in all respects without any requirement for further action by the Debtor or Reorganized Debtor.

Further Assurances and Authorizations:  The Debtor, the Reorganized Debtor, the Creditors' Trust or Creditors' Trustee, if and to the extent necessary, shall seek such orders, judgments, injunctions, and rulings that may be required to carry out further the intentions and purposes, and to give full effect of the provisions, of the Plan.

Applicable Law:  Except to the extent that the Bankruptcy Code or other federal law is applicable, the rights, duties and obligations arising under the Plan shall be governed by and construed and enforced in accordance with the laws of the State of Texas.

No Interest:  Except as expressly provided for in the Plan, or allowed by the Court, no interest, penalty or late charge is to be Allowed on any Claim subsequent to the Petition Date.

No Attorneys' Fees or Broker Fees:  No attorneys' fees will be paid with respect to any Claim, other than Claims of attorneys and financial advisors retained by Debtor or the Committee, except as specified herein or as allowed by an Order of the Court. No commissions or broker's fees will have been earned as a result of the transactions contemplated by the Plan.

**THIRD AMENDED DISCLOSURE STATEMENT OF SUPERIOR AIR PARTS, INC., DATED JULY 23, 2009 Page 37**
**567458.20/SPA/20354/0102/072309**

Appx_0085

Notices.  All notices, requests or demands in connection with the Plan shall be in writing and shall be deemed to have been given when received or, if mailed, five (5) days after the date of mailing, provided such writing shall have been sent by registered or certified mail, postage prepaid, return receipt requested, and sent to the following parties, addressed to:

**Debtor:**
Kent Abercrombie
621 S. Royal Lane, Suite 100
Coppell, TX 75019-3805

**Debtor's counsel:**
Stephen A. Roberts
Robert P. Franke
Duane J. Brescia
STRASBURGER & PRICE, LLP
600 Congress, Suite 1600
Austin, Texas 78701
(512) 499-3600 | (512) 499-3660 Fax

**Counsel For The Official Committee Of Unsecured Creditors**
David W. Parham
Elliot D. Schuler
BAKER & McKenzie LLP
2300 Trammell Crow Center
2001 Ross Avenue
Dallas, Texas 75201
(214) 978-3000 | (214) 978-3099 Fax


All notices and requests to holders of Claims and Interests shall be sent to them at the address listed on the last-filed proof of claim and if no proof of claim is filed, at the last known address.

Notice of Default:  In the event of any alleged default under the Plan, any Creditor or party-in-interest must give a written default notice to the Reorganized Debtor and the Creditors' Trustee with copies to their respective counsel of record specifying the nature of the default.  Upon receipt of the default notice, the Reorganized Debtor, or the Creditors' Trustee, as the case may be, shall have ten (10) days to cure such default from the time of receipt of the default notice.  If such default has not been cured within the applicable time period, the default may be brought to the attention of the Court.

Consummation:  For all purposes, consummation (and substantial consummation of the Plan) shall occur the instant upon which the new equity interest are issued and payments required to be made on the Effective Date are made; consummation shall occur on or promptly following the Effective Date.

**THIRD AMENDED DISCLOSURE STATEMENT OF SUPERIOR AIR PARTS, INC., DATED JULY 23, 2009 Page 38**
567458.20/SPA/20354/0102/072309

Appx_0086

### IX.  FEASIBILITY OF THE PLAN

The Debtor and the Committee believe that the Plan is feasible.

Payments to the unsecured creditors, TAG and TAE do not depend on the future success of the Reorganized Debtor.  All Allowed Class 7 General Unsecured Claims will be paid out of the Creditors Trust which will be funded with an estimated $7.0 million at closing and from proceeds of any Cause of Action transferred to the Creditor's Trust, should the Trustee pursue any claim, if any.  Upon confirmation of the Plan, over $30 million in debt will be released, giving the Reorganized Debtor a fresh start.

Brantly has advised the Debtor that it is making this acquisition to take advantage what it believes to be a rapidly expanding general aviation market in China as well as to continue Superior's operations and sales in the United States, taking advantage of Superior's reputation, expertise, F.A.A. certifications, and supply chain.  Brantly believes that this acquisition could create significant opportunities for Superior and its vendors to export reliable F.A.A. certified engines and parts to Chinese airplane and helicopter manufacturers.  According to Brantly, F.A.A. certified engines and parts are valuable in China due to their quality and reliability.  Brantly has advised that the Debtor that, in order to achieve its business plan, Brantly intends to retain Superior's management and employees and continue operations in or near Coppell, Texas, using Superior's existing supply chain to assemble and sell engines and parts in the United States and China. Brantly believes that Superior's supply chain is important.  Brantly's counsel has advised the Debtor that there is no treaty between the United States and China which would allow the importation of parts from China into the United States for sale in the parts market and that it would be likely be very difficult to obtain government approval to import parts for inclusion in an F.A.A. certified engine.

The Brantly Group consists of a group of several entities including: (1) Brantly International, Inc. which produces B2B two-seat and 305 five-seat helicopters.   The B2B model has already received VTC (the Chinese equivalent of an F.A.A. Type Certificate) from CAAC (the Chinese equivalent of FAA).  (2) Qingdao Haili which is also a producer of B2B with an initial annual capacity of producing 80 helicopters using Lycoming engines.  (3) Weifang Freesky Aviation Technologies Co. which engages in research and development to develop helicopters oriented to the Chinese aviation market.  (4) Weifang Freesky Aviation Industrial Co. which will be manufacturing the 305 five-seat helicopters and future improved versions of that craft.

The Brantly Group's core management team and engineering team joined the Brantly Group two years ago from Harbin Aviation Industry Group, which was China's first, largest, and best helicopter manufacturer.   Harbin Aviation was previously state owned, but is now a publicly listed company.

The Brantly Group believed that the Chinese general aviation market has significant untapped potential which is best demonstrated by comparison to the U.S. market.  Currently, there are more than 230,000 general aviation airplanes in the United States, whereas there are currently approximately only 1,000 in China.  Given the

**THIRD AMENDED DISCLOSURE STATEMENT OF SUPERIOR AIR PARTS, INC., DATED JULY 23, 2009 Page 39**
**567458.20/SPA/20354/0102/072309**

Appx_0087

massive industrial and economic growth China has been experiencing, Brantly expects the number of general aviation airplanes in China to significantly increase in the near future. Brantly also believes that the Chinese government recognizes the need for growth in this industry, and has been very supportive of the aviation industry.

The policy environment and market conditions for private industry to enter into this field have dramatically improved in recent years. Until recently, there were few manufacturers of general aviation aircraft and few civilian airports. This is changing rapidly.

The General Administration of Civil Aviation of China (CAAC) released an airport development plan in March 2008, under which the number of airports nationwide will increase to 192 by 2010, and to 244 by 2020. At the end of 2006, there were 147, including 45 used for both civilian and military purposes. [4]

In 2006 Diamond Aircraft Industries GmbH entered into a joint venture to manufacture DA40 Diamond Aircraft in China under the name Shandong Bin Ao Aircraft Industries Co. Ltd. with a capacity of building 1,000 aircraft per year.[5]    In November 2007, Cessna Aircraft Co. entered into an agreement for China's Shenyang Aircraft Corp, a unit of state-owned China Aviation Industry Corp, to build the Model 162 SkyCatcher in China. At the time Lin Zouming, president of China Aviation Industry Corp. I, which owns Shenyang, added that, with China's economic expansion, his company "has placed strategic importance on general aviation development and will strongly support and promote the business." Production is expected to commence in 2009.[6]    In December 2008 the Shanghai Airport Authority broke ground on the Hongqiao Airport Business Aviation Center to serve privately owned aircraft.[7]

The Brantly Group plans to resume the Reorganized Debtor's engine production as soon as feasible and plans to use that production, in part, to supply the Chinese general aviation industry. Brantly and Debtor's management believe that the O-360 and IO-360 engines manufactured by the Debtor can be used without modification in certain fixed-wing airplanes such as the Diamond 40 and 42 and Cessna 172. Brantly estimates that the Chinese aviation industry has the annual capacity to produce approximately 300 Diamonds and 700 Cessnas, all of which rely on imported engines. The Brantly Group expects that it will be able to supply approximately 500 of these engines annually to Chinese airplane manufacturers.

In addition to supplying approximately 500 engines to Chinese airplane manufacturers each year, the Brantly Group expects that the Reorganized Debtor's engines can be used to satisfy Brantly's helicopter manufacturing business which

---

[4] China Daily 3/25/08: http://www.chinadaily.com.cn/bizchina/2008-03/25/content_6563240.htm
[5] 2006 Diamond Aircraft press release: http://www.diamondair.de/news_detail+M54b70e94d9c.html
[6] Associated Press 11/28/2007:
http://www.apics.org/APICS/Resources/ViewArticle.aspx?articleId=20071128/ap20071128apworldstream
englishbusinessD8T6SHV01newsaporganpaEDIT.xml
[7] Shanghai, China website:
http://www.shanghai.gov.cn/shanghai/node17256/node18151/userobject22ai30674.html

**THIRD AMENDED DISCLOSURE STATEMENT OF SUPERIOR AIR PARTS, INC., DATED JULY 23, 2009 Page 40**

demands approximately 150 engines annually.  Brantly has advised the Debtor that it is committed to making the necessary modifications to adapt the Debtor's engines for use in its helicopters as soon as possible.

As for the Debtor's parts business, the Brantly Group expects to target the large piston-engine maintenance market.  The Brantly Group plans to introduce the Debtor's parts business into China, while also maintaining its current U.S. based operation and satisfying and expanding its existing customer base in the U.S.

In addition to the Debtor's current estimated annual sales of approximately $16 million for engines, cylinders, and parts, the Brantly Group believes that a conservative estimate of additional sales to China would include at least 150 engines per year, generating an additional $4.5 million in revenue.  In addition, sales to China would also generate additional parts and service revenue, the exact amount of which is still being estimated.

In addition to boosting the Reorganized Debtor's sales by expanding its market into China and into helicopters, the Brantly Group expects that synergies and other sourcing strategies will allow it to significantly reduce the Reorganized Debtor's operating costs.  Further, the Brantly Group believes that its previous experience in purchasing and operating Brantly should provide additional evidence of the management group's ability to successfully manage the future of the Reorganized Debtor.  The Brantly Group stands ready to provide the necessary short-term capital to the Reorganized Debtor to allow it to resume and expand its operations.

Brantly has advised the Debtor that it has $7 million in available cash to close the transaction and make the Cash Contribution to the Creditors Trust contemplated by the Plan.  Brantly's purchase of the stock of the Reorganized Debtor is no longer contingent upon due diligence reviews by Brantly, nor is it contingent upon Brantly obtaining financing.

At Brantly's request the Closing Date of the Plan may occur up to 30 days after entry of an order confirming the Plan.  Brantly has requested this time in order to be certain that it will have received all necessary Chinese government approvals for the transfer of U.S. Dollars out of China.  Brantly believes that the approval process is principally a bureaucratic formality and approval for transfer of the purchase funds will be obtained without problem.  To the extent any risk related to Chinese government approval does exist, Brantly has assumed such risk by paying a $700,000 deposit towards the purchase which would be lost if Brantly were unable to close due to a failure to obtain Chinese government approval for the fund transfer.

In order to help creditors understand the approval process that Brantly will be undertaking, Brantly has provided the Debtor with the following description of that process:

**THIRD AMENDED DISCLOSURE STATEMENT OF SUPERIOR AIR PARTS, INC., DATED JULY 23, 2009 Page 41**
567458.20/SPA/20354/0102/072309

Appx_0089

Before Brantly can obtain approval to transfer of $7 million in U.S. dollars to any foreign account, it first must meet certain Chinese regulations governing overseas investment projects:

1.    Registration and approval of the Project (i.e. acquisition of Superior stock) by the State Reform and Development Commission ("SRDC").    Brantly has already completed this registration and received preliminary approval.  The SRDC is awaiting the more definitive transaction agreement evidencing the acquisition project before it issues the final approval.  Brantly believes the Stock Purchase Agreement recently executed between it and the Debtor and/or the entry of the Bid Procedures Order will be sufficient to obtain final SRDC approval.

2.    Approval by the Ministry of Commerce ("MOFCOM") for foreign investment.  Brantly has initiated the process at the district and municipal level MOFCOM agencies, which are now in the process of getting confirmation from the Chinese Consulate in Houston.   Once the Consulate confirmation is received, and a definitive purchase agreement is provided, the Province level MOFCOM will issue an approval for the foreign investment Project.

3.    Foreign Exchange Control approval.   This process requires the investor's local bank to issue a funding source certificate and the MOFCOM's approval for the foreign investment.  Brantly's own bank in China has already provided the funding source certificate, but the MOFCOM approval is still pending as outlined in Step 2 above.

Overall, the Chinese governmental agencies are very supportive of foreign acquisition projects.  The approval procedures, while seemingly complicated, are designed to ensure that precious foreign currency is wired out of the country only for the specific purposes that Brantly has stated.  To illustrate how the Chinese government governs by granting approvals, the Chinese government encourages foreign companies to invest in China and has created all sorts of incentives to attract foreign investors, yet all foreign investment projects are subject to approvals by MOFCOM or its local agencies.  Approvals are given as a matter of routine and Brantly is not aware of a denial of any legitimate investment project.

As indicated above, Brantly has already initiated the process on the three different tracks, and the only missing pieces are the investigative confirmation by the Chinese consulate in Houston, and the definitive transaction agreement, which both SRDC and MOFCOM would like to see before the final approval is given.  Brantly believes the recently executed Stock Purchase Agreement and/or the signed Bidding Procedures Order will provide SRDC and MOFCOM with the documentation that they require.  If SRDC or MOFCOM delay approval because they deem the purchase uncertain due to the possibility that another bidder might out bid Brantly or the Court might not confirm the Plan, entry of an order confirming the Plan will certainly satisfy this last possible concern.  In order to protect against this last possible delay, Brantly has requested 30 days from the entry of an order confirming the Plan to close.  If, as anticipated, Chinese government approval is obtained more quickly, Brantly is anxious

**THIRD AMENDED DISCLOSURE STATEMENT OF SUPERIOR AIR PARTS, INC., DATED JULY 23, 2009 Page 42**
**567458.20/SPA/20354/0102/072309**

Appx_0090

to begin operating the Reorganized Debtor and intends to close the purchase as soon as possible.

The Reorganized Debtor will have $2 million in cash at closing and Brantly has advised the Debtor that it will provide additional capital and credit as needed for the Reorganized Debtor to assume the executory contracts and warranties it is assuming under the Plan and to achieve Brantly's business plan.

Management estimates that an additional $4 million in capital and/or credit may be needed to revive the piece parts business and to fund the costs of the engine programs, based upon Superior's historical financial performance, as discussed in Article I, D. History of the Debtor.   However, capital requirements may be less, depending on the volume of engine exports to China and the pricing on the exported engines, neither of which has yet been determined.  Brantly is continuing to conduct due diligence to determine what it believes Superior's capital requirements will be.

Brantly has not given the guarantee of how much capital it will invest in the Reorganized Debtor to achieve its business plan; however, Brantly has advised the Debtor that it views this acquisition as a long term investment with tremendous potential for growth and has advised the Debtor that it intends to contribute the necessary capital to fulfill its plan.   Brantly is betting $7 million that the Reorganized Debtor will be successful and points out that it is aware of the significant losses that Superior has suffered as disclosed in this Disclosure Statement and so it would not make any sense for it to spend $7 million to acquire Superior unless it had the commitment and wherewithal to meet the Reorganized Debtor's capital requirements

Creditors should consider the relative benefits and risks and compare them to alternative to the Plan in deciding to vote for or against the Plan.

## X.  OTHER CONSIDERATIONS IN VOTING ON THE PLAN

**A.     ALTERNATIVES TO DEBTOR'S PLAN**

The Debtor does not have the financial ability to reorganize on its own without selling its assets or issuing ownership of the stock to a purchaser under the Plan. The Brantly offer is the highest and best offer the Debtor has received for the acquisition and continuation of the Debtor's business.    Since the Plan contemplates a bidding procedure, any party who wishes to make a higher and better offer may do so under the Debtor's Bid Procedures.

Liquidation Analysis.   The Debtor believes that, if the case were converted to a Chapter 7 liquidation, the property could not be sold at a higher price than that contemplated to be received from Brantly and that the proceeds of sale paid to creditors would be further reduced by the substantial cost of trustee's fees and that of the trustee's attorneys and professionals, resulting in a lower distribution to creditors than as provided under the Plan.  The Debtor has performed a Chapter 7 liquidation analysis and estimates that the distribution to unsecured Creditors would be approximately $4,382.710 or 11.8% of claims. The Debtor's analysis is attached hereto as *Exhibit* C:

**THIRD AMENDED DISCLOSURE STATEMENT OF SUPERIOR AIR PARTS, INC., DATED JULY 23, 2009 Page 43**
567458.20/SPA/20354/0102/072309

Appx_0091

<u>Comparison of Plan with Liquidation Analysis.</u>  The Debtor and the Committee believe that the Plan offers Creditors the potential for the greatest recovery and is therefore in the best interests of Creditors. Lain Faulkner, the Committees' court-approved financial consultants, has estimated that the payout to Class 7 General Unsecured Creditors will likely range from 45% to 60% under the Plan, based on the various contingencies discussed in Potential Liabilities under Article II of this Disclosure Statement.

The estimated total amount of claims can vary depending on the various contingencies discussed in this Disclosure Statement; however, the distribution to unsecured Creditors under the Plan is estimated to be $7 million; whereas, the Debtor's estimated distribution to unsecured Creditors in a Chapter 7 liquidation is under $4.4 million.

According to Lain Faulkner, the estimated maximum payout to General Unsecured Creditors could reach 100% if: (1) the Debtor's estimate that valid trade claims are less than $1.6 million is correct; (2) vendors with open purchase orders accept the Reorganized Debtor's proposal to extend delivery dates so that they will be paid by the Reorganized Debtor, not the Creditors Trust, (3) the Reorganized Debtor is successful in renegotiating the Debtor's real property lease and eliminating the landlord's claim, and (4) the Debtor is not required to pay any sums to settle or satisfy product liability claims.

According to Lain Faulkner, the estimated minimum payout to General Unsecured Creditors would still exceed 27%, even in the unlikely event that all of the following contingencies occurred:  (1) <u>all</u> proofs of claims were allowed in full, including all claims the Debtor disputes, (2) all of the creditors who had open purchase orders on the date the case was commenced chose not to ship any more goods to the Debtor for full payment of such goods but instead chose to file an unsecured claim against the Debtor in the amount of the full amount of their invoices, (3) the Debtor's landlord chose not to renegotiate the Debtor's lease but chose to search for new tenant instead and the Reorganized Debtor rejected the lease and (4) there were six or more insured product liability claims filed against the Debtor in the future arising from unknown incidents which occurred in the last two years.[8] and those claims were Allowed in the full amount of the aggregate deductibles.

**B.    TAX CONSEQUENCES**

THE FOLLOWING DISCUSSION IS A SUMMARY OF SOME OF THE MAJOR FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN TO THE DEBTOR AND THE CREDITORS.  SOME CONSEQUENCES OF THE PLAN ARE DIFFICULT TO EVALUATE BECAUSE OF THE LACK OF INFORMATION, LACK OF CONTROLLING LEGAL PRECEDENT AND THE POSSIBILITY OF CHANGES IN LAW. THE DEBTOR HAS NOT APPLIED FOR RULINGS FROM THE IRS ON ANY OF THE TAX ASPECTS OF THE PLAN AND NO OPINIONS OF COUNSEL HAVE BEEN OBTAINED. EACH

---

[8] [8]The Debtor is not aware of any product liability claims arising in the last two years.

**THIRD AMENDED DISCLOSURE STATEMENT OF SUPERIOR AIR PARTS, INC., DATED JULY 23, 2009 Page 44**

**567458.20/SPA/20354/0102/072309**

HOLDER OF A CLAIM SHOULD CONSULT WITH SUCH HOLDER'S TAX ADVISOR REGARDING THE FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES OF THE PLANS.

No representation is made with respect to the tax effects of the Plan upon the Debtor or any creditor. Each holder of a Claim is strongly urged to consult with such holder's tax advisor regarding the federal, state, local and foreign tax (if any) consequences of the Plan. The following general information is provided by Counsel to the Debtor:

<u>Certain Tax Aspects Of Distributions Under The Plan</u>. The following summary is a discussion of certain federal income tax consequences of the implementation of the Plan to creditors and to the Debtor. This summary is based on the Internal Revenue Code of 1986, as amended (the "Code"), the Treasury Regulations promulgated and proposed thereunder (the "Regulations"), and judicial decisions and published administrative rulings and pronouncements of the Internal Revenue Service (the "Service") as in effect on the date hereof. Legislative or administrative changes in such rules or new interpretations thereof may have retroactive effect and could significantly alter the federal income tax consequences discussed below.

The federal income tax consequences of the Plan are subject to significant uncertainties. Debtor urges creditors to seek independent professional tax advice on the issues related to the Plan. This summary addresses only those federal income tax consequences relating to the implementation of the Plan and does not address the federal income tax consequences of the transactions, distributions and exchanges occurring prior to and leading up to the Petition Date. This summary does not address foreign, state or local tax consequences of the Plan or any estate or gift tax consequences of the Plan, nor does it purport to address all the significant federal income tax consequences of the Plan. This summary also does not purport to address the federal income tax consequences of the Plan to special classes of taxpayers (such as S corporations, banks, mutual funds, insurance companies, financial institutions, business investment companies, regulated investment companies, broker-dealers, employees and tax-exempt organizations).

<u>Federal Income Tax Consequences to Debtor</u>. The Debtor will realize cancellation of indebtedness ("COI") income in respect of each Claim generally in an amount equal to the excess, if any, of (i) the portion of the Claim (including accrued and previously deducted but unpaid interest) from which the Debtor are (or are deemed to be) discharged over; and (ii) the sum of any cash or the "issue price" under Code §§ 1273(b) and 1274 of any debt obligations distributed under the Plan in discharge of such Claims. The exact amount of COI income realized upon consummation of the Plan has not been finally determined.

Under the Code, a taxpayer is generally required to include COI income in gross income. COI income is not includable in gross income; however, if it occurs in a case under the Bankruptcy Code, provided the taxpayer is under the jurisdiction of a Court in such case and the cancellation of indebtedness is granted by the Court or is pursuant to

**THIRD AMENDED DISCLOSURE STATEMENT OF SUPERIOR AIR PARTS, INC., DATED JULY 23, 2009 Page 45**
**567458.20/SPA/20354/0102/072309**

Appx_0093

a plan approved by the Court, the Debtor's COI income, if any, resulting from the Plan should satisfy these requirements, and, therefore, should not result in recognition of gross income to the Debtor.  COI income that is excluded from gross income will reduce certain tax attributes of the taxpayer, including net operating loss (hereinafter "NOLs") carryovers, capital loss carryovers and the tax basis of assets, in a specified order of priority beginning with the NOLs and NOL carryovers, unless the taxpayer elects to have the reduction applied first to the tax basis of depreciable assets.  The reduction of tax basis is limited to the excess of (i) the aggregate of the tax bases of the taxpayer's property (determined immediately after the discharge) over; and (ii) the aggregate liabilities of the taxpayer (determined immediately after the discharge).

<u>Federal Income Tax Consequences to Creditors</u>.

*Generally.*  The federal income tax consequences of the Plan to a creditor will depend upon numerous factors, including but not limited to: (i) whether the Creditor's Claim (or portion thereof) constitutes a Claim for principal or interest; (ii) the type of consideration received by the Creditor in exchange for the Claim; and (iii) whether the Creditor is a resident of the United States for tax purposes (or falls into any of the special classes of taxpayers excluded from this discussion as noted above); and (iv) whether the Creditor has taken a bad debt deduction with respect to its Claim.  CREDITORS ARE STRONGLY ADVISED TO CONSULT THEIR TAX ADVISORS WITH RESPECT TO THE TAX TREATMENT UNDER THE PLAN OF THEIR PARTICULAR CLAIMS.

*Creditors Holding Claims.*  The federal tax consequences to Creditors will depend, initially, on the Creditors' tax basis in their Claims.  A loss generally is treated as sustained in the taxable year for which there has been a closed and completed transaction, and no portion of a loss with respect to which there is a reasonable prospect of reimbursement may be deducted until it can be ascertained with reasonable certainty whether or not such reimbursement will be recovered.  The time as to when a debt becomes wholly worthless for federal income tax purposes is a factual determination based on all relevant facts.

The fact that a Debtor has filed for bankruptcy protection may be an indication that a debt is worthless, but the IRS and Courts have held that bankruptcy does not conclusively establish worthlessness, especially where it appears that creditors will still receive some payments on the debt.  The IRS has ruled, however, that where it appears a creditor will receive only a *de minimis* recovery on its debt, such debt may be treated as wholly worthless.  Even if a debt is not wholly worthless, if the debt is partially worthless and the creditor can establish with reasonable certainty the portion of the debt that is worthless and charges that portion off of its books of account, the creditor may deduct the portion becoming worthless that tax year.  Creditors may already have made their own determinations as to the portion of their claims which are worthless and deducted such amounts.  In such cases, the deductions would reduce the Creditors' basis in their claims.

**THIRD AMENDED DISCLOSURE STATEMENT OF SUPERIOR AIR PARTS, INC., DATED JULY 23, 2009 Page 46**
567458.20/SPA/20354/0102/072309

Appx_0094

Creditors receiving cash, notes or other assets in exchange for their Claims will generally recognize taxable gain or loss in an amount equal to the difference between the amount realized and each such Creditor's adjusted tax basis in the Claim, to the extent that such consideration is not allocable to any portion of the Claim representing accrued and unpaid interest (see "Receipt of Interest", below) or to market discount, discussed below. The character of any recognized gain or loss (i.e., ordinary income, or short-term or long-term capital gain or loss) will depend upon the status of the Creditor, the nature of the Claim in the Creditor's hands, the purpose and circumstances of its acquisition, the Creditor's holding period of the Claim, and the extent to which the Creditor previously claimed a deduction for the worthlessness of all or a portion of the Claim.

A Creditor may receive a note or other evidence of indebtedness in exchange for part of its entire Claim, or may be deemed to have exchanged its note or other evidence of indebtedness if the terms of such note or other evidence of indebtedness are significantly modified under the provisions of Treasury Regulations § 1.1001-3. If the terms of the note received differ materially in kind or extent from the note or evidence of indebtedness exchanged (or deemed exchanged), the exchange of the Claim for the note will be a taxable event. The amount realized in such circumstances will be the "issue price" of the note or debt obligation received pursuant to Reg. Sec. 1.1001-1(g). Depending on the Creditor's circumstances, if it has a gain on the receipt of the note, the Creditor may be eligible to report the gain on the installment method as amounts are paid on the note, unless the Creditor chooses to elect out of the installment method of reporting. In addition, such notes may carry "original issue discount," requiring the holder thereof to accrue and report interest income over the term of the note.

Generally, a debt instrument will have a "market discount" for federal income tax purposes if the debt instrument is acquired after its original issuance for less than the issue price of such instrument plus the aggregate amount, if any, of original issue discount includable in the income of all holders of such instrument prior to such acquisition. A Creditor holding a Claim with market discount must treat as ordinary income any gain recognized on the satisfaction of such Claim pursuant to the Plan, to the extent that such gain does not exceed the accrued but previously unrecognized market discount on such Claim in the hands of the Creditor.

Creditors should consult with their own tax advisors as to the matters discussed in this section concerning character and timing of recognition of gain or loss. Because a loss will be allowed as a deduction only for the taxable year in which the loss was sustained, a Creditor that claims a loss in the wrong taxable year risks denial of such loss altogether. In the case of certain categories of Claims, consideration should be given to the possible availability of a bad debt deduction under § 166 of the Code for a period prior to the Effective Date. In addition, a portion of any distributions received after the Effective Date may be taxed as ordinary income under the imputed interest rules.

*Receipt of Interest.* If any portion of the distribution is allocated to accrued but unpaid interest, such portion would be taxable to the Creditor as interest income, except

**THIRD AMENDED DISCLOSURE STATEMENT OF SUPERIOR AIR PARTS, INC., DATED JULY 23, 2009 Page 47**
**567458.20/SPA/20354/0102/072309**

Appx_0095

to the extent the Creditor has previously reported such interest as income. In the event that a Creditor has previously reported the interest income, only the balance of the distribution after the allocation of proceeds to accrued interest would be considered received by the Creditor in respect of the principal amount of the Claim. Such an allocation to accrued but unpaid interest would reduce the amount of the gain, or increase the amount of loss, realized by the Creditor with respect to the Claim. If such loss were a capital loss, it would not offset any amount of the distribution that was treated as ordinary interest income (except, in the case of individuals, to the limited extent that capital losses may be deducted against ordinary income).

Tax Reporting and Backup Withholding. The payment to creditors may be subject to applicable withholding. For example, under federal income tax law, interest, dividends and other reportable payments may, under certain circumstances, be subject to backup withholding. Backup withholding generally applies only if the holder (i) fails to furnish its social security number or other taxpayer identification number ("TIN"); (ii) furnishes an incorrect TIN; (iii) fails to properly report interest or dividends; or (iv) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the TIN provided is its correct number and that it is not subject to backup withholding. Backup withholding is not an additional tax but merely an advance payment, which may be refunded to the extent it results in an overpayment of tax. Certain persons are exempt from backup withholding, including corporations and financial institutions.

Importance of obtaining professional tax advice. The foregoing is intended to be a summary only and not a substitute for consultation with a tax professional. The federal, state, local and foreign tax consequences of the Plan are complex and, in some respects, uncertain. Such consequences may also vary based upon the individual circumstances of each holder of a Claim. Accordingly, each holder of a Claim is strongly urged to consult with its own tax advisor regarding the federal, state, local and foreign tax consequences of the Plan.

THE FOREGOING DESCRIPTION OF FEDERAL INCOME TAX CONSEQUENCES IS INTENDED MERELY AS AN AID FOR CREDITORS, AND NEITHER THE DEBTOR, THE COMMITTEE, NOR THEIR COUNSEL ASSUME ANY RESPONSIBILITY IN CONNECTION WITH THE INCOME TAX LIABILITY OF ANY CREDITOR.

THE FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES OF THE PLAN ARE COMPLEX AND, IN MANY RESPECTS, UNCERTAIN. THE FOREGOING IS INTENDED TO BE A SUMMARY ONLY AND, AS SUCH, DOES NOT DISCUSS ALL ASPECTS OF FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR CREDITOR. ALL CREDITORS ARE STRONGLY URGED TO CONSULT WITH THEIR OWN TAX ADVISORS REGARDING THE TAX CONSEQUENCES OF THE PLAN THAT ARE RELEVANT TO THEIR PARTICULAR CIRCUMSTANCES.

C.      **CONFIRMATION OF THE DEBTOR'S PLAN, VOTING PROCEDURES, AND REQUIREMENTS FOR CONFIRMATION OF A PLAN**

At the confirmation hearing, the Bankruptcy Court will determine whether the requirements of § 1129 of the Bankruptcy Code have been satisfied, in which event the Bankruptcy Court will enter an order confirming the Plan. Those requirements include:

Best Interest Test and Liquidation Analysis. Confirmation of a plan requires that, with respect to each impaired class of creditors, each holder of an allowed claim in the class has either accepted the plan or will receive under the plan property of a value, as of the Effective Date, that is not less than the amount the holder would receive if the Debtor was liquidated under Chapter 7 of the Bankruptcy Code.

To determine if a plan is in the best interests of each class, the probable results of Chapter 7 liquidation must be compared with the results reasonably to be obtained under the Plan. The Debtor has applied the rule of absolute priority of distributions in the Plan. Under that rule no junior class of creditors may receive any distribution until all senior classes of creditors are paid in full and no holder of an equity interest may receive any distribution until all creditors are paid in full.

Feasibility. In order for a plan to be confirmed, the Bankruptcy Court must determine that a further reorganization or subsequent liquidation is not likely to result following confirmation of the Plan unless such further reorganization or liquidation is contemplated by the Plan.

Acceptance by Impaired Classes. Section 1129(a)(8) of the Bankruptcy Code generally requires that each impaired class must accept a plan by the requisite votes for confirmation to occur. A class of impaired claims will have accepted a plan if, of the holders in the class actually voting, at least two-thirds (2/3) in amount and more than one-half (1/2) in number of allowed claims, excluding the claims of insiders, cast an affirmative vote. A class of equity interests will have accepted a plan if the holders in the class actually voting at last two-thirds in number cast an affirmative vote. The vote of any person or entity can be disqualified pursuant to § 1126(e) of the Bankruptcy Code.

Fair and Equitable Test  If any impaired class of claims does not accept a plan, the Bankruptcy Court may confirm a plan pursuant to its "cram down" powers under § 1129(b) of the Bankruptcy Code, if a plan "does not discriminate unfairly" and is "fair and equitable." The Bankruptcy Court must determine at the confirmation hearing whether a plan is fair and equitable and does not discriminate unfairly against any impaired, dissenting class of claims. A plan will not discriminate unfairly if no class receives more than it is legally entitled to receive for its claims. The meaning of the phrase "fair and equitable" is different when applied to secured claims and unsecured claims.

With respect to a secured claim, the requirement that a plan be "fair and equitable" includes: (1) the impaired secured creditor retains its liens to the extent of its allowed secured claim and receives deferred cash payments at least equal to the

**THIRD AMENDED DISCLOSURE STATEMENT OF SUPERIOR AIR PARTS, INC., DATED JULY 23, 2009 Page 49**
567458.20/SPA/20354/0102/072309

Appx_0097

allowed amount of its claim with a present value as of the effective date of the plan at least equal to the value of its interest in the Debtor's interest in the property securing its liens, (2) if property subject to the lien of the impaired secured creditor is sold free and clear of its lien the impaired secured creditor receives a lien attaching to the Proceeds of the Sale, or (3) the impaired secured creditor realizes the "indubitable equivalent" of its claim under the plan.

If a holder of a claim which is at least in part secured makes a valid and timely election under § 1111(b)(2) of the Bankruptcy Code, its Allowed Secured Claim will be deemed equal to its Allowed Claim, regardless of whether the value of its collateral on the effective date is in fact less than its Allowed Claim.  In such a case a plan will be fair and equitable if:  (1) the secured creditor receives deferred cash payments that both equal the allowed amount of its claim and have a present value equal to the value of the claimant's interest in Debtor's interest in the collateral on the effective date and (2) the secured creditor retains a lien on its collateral securing its entire allowed claim.  A secured creditor that elects treatment under § 1111(b) waives its right to have a portion of its claim included as an unsecured or deficiency claim for purposes of voting.

With respect to an unsecured claim, "fair and equitable" includes the requirements that either:  (1) the impaired unsecured creditor receives property of a value equal to the amount of its allowed claim or (2) the holders of claims and equity interests that are junior to the claims of the dissenting impaired unsecured creditor class will not receive any property under the plan until the claims of the dissenting impaired unsecured creditor class are paid in full.

If creditors do not vote in numbers and amounts sufficient to accept the Plan as proposed, the Debtor nevertheless will seek confirmation of the Plan pursuant to § 1129(b) of the Bankruptcy Code, sometimes referred to as the "cram down" provision.

In addition to the above requirements, the Plan cannot be confirmed unless all quarterly United States Trustee fees payable under 28 U.S.C. § 1930 have been paid or unless the Plan provides for their payment on the Effective Date of the Plan.  Under the Plan, all fees due and owing will be paid on the Effective Date of the Plan.

Creditors Typically Entitled to Vote.  Generally, any Creditor whose Claim is Impaired under the Plan is entitled to vote if either (i) its Claim has been scheduled by the Debtor (and such Claim is not scheduled as disputed, contingent, or unliquidated), or (ii) it has filed a proof of claim on or before the last date set by the Bankruptcy Court for such filings and no objection to the claim has been filed.  Any Claim as to which an objection has been filed (and such objection is still pending) is not entitled to vote, unless the Bankruptcy Court temporarily allowed the Claim in an amount which it deems proper for the purpose of accepting or rejecting the Plan upon application by the Creditor.  Such application must be heard and determined by the Bankruptcy Court at such time as specified by the Bankruptcy Court.  A Creditor's vote may be disregarded if the Bankruptcy Court determines that the Creditor's acceptance or rejection was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

**THIRD AMENDED DISCLOSURE STATEMENT OF SUPERIOR AIR PARTS, INC., DATED JULY 23, 2009 Page 50**
567458.20/SPA/20354/0102/072309

Appx_0098

Definition of Impairment.   Under § 1124 of the Bankruptcy Code, a class of Claims or Interests is "Impaired" under a Chapter 11 plan unless, with respect to each Claim or Interest of such class, the Plan:

(1)    leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder of such claim or interest; or

(2)    notwithstanding any contractual provision or applicable law that entitles the holder of such claim or interest to demand or receive accelerated payment of such claim or interest after the occurrence of a default;

(3)    cures any such default that occurred before or after the commencement of the case under this title, other than a default of a kind specified in section 365(b)(2) of this title;

(4)    reinstates the maturity of such claim or interest as such maturity existed before such default;

(5)    compensates the holder of such claim or interest for any damages incurred as a result of any reasonable reliance by such holder on such contractual provision or such applicable law; and

(6)    does not otherwise alter the legal, equitable, or contractual rights to which such claim or interest entitles the holder of such claim or interest.

Classes Under Debtor's Plan.  The Impaired Classes entitled to vote on the Plan are Classes 5, 7, 8 and 9.

Vote Required for Class Acceptance  The Bankruptcy Code defines acceptance of a Plan by a class of Creditors or Interest holders as acceptance by holders of two-thirds (2/3) in dollar amount and a majority in number of the Claims or Interests of that class which actually cast ballots for acceptance or rejection of the Plan; i.e., acceptance takes place only if sixty-six and two-thirds percent (66-2/3%) in amount of Claims and Interests in each class and more than fifty percent (50%) of Claims or Interests voting in each class cast their ballots in favor of acceptance.

## XI.  CONCLUSION

Debtor respectfully submits that the Plan satisfies all of the statutory requirements of Chapter 11 of the Bankruptcy Code, including the "best interest" and "feasibility" requirements and that it should be confirmed even in the event a class of claims does not vote for acceptance of the Plan.  The Debtor believes that the Plan is "fair and equitable" and "does not discriminate unfairly."  Additionally, the Debtor believes that the Plan has been proposed in good faith.

Debtor respectfully submits that this Disclosure Statement is approved for circulation to its creditors and that it is permitted to solicit votes for acceptance of the Plan.

**THIRD AMENDED DISCLOSURE STATEMENT OF SUPERIOR AIR PARTS, INC., DATED JULY 23, 2009 Page 51**
567458.20/SPA/20354/0102/072309

Appx_0099

DATED: July 23, 2009.

**DEBTOR:  SUPERIOR AIR PARTS, INC.**

___ _/s/ Kent Abercrombie_ _____
**Kent Abercrombie, President**

**APPROVED AS TO FORM:**

_/s/  Stephen A. Roberts_
Stephen Roberts
Texas Bar No. 17019200
Robert P. Franke
Texas Bar No. 07371200
Duane J. Brescia
Texas Bar No. 240252650
**STRASBURGER & PRICE, LLP**
600 Congress Avenue, Suite 1600
Austin, Texas  78701
Tel: 512.499.3600 | Fax: 512.499.3660

**COUNSEL FOR DEBTOR-IN-POSSESSION**

_/s/ David w. Parham_
David W. Parham
State Bar No. 15459500
Elliot D. Schuler
State Bar No. 24033046
**BAKER & McKENZIE LLP**
2300 Trammell Crow Center
2001 Ross Avenue
Dallas, Texas 75201
Tel: 214.978.3000 | Fax: 214.978.3099

**COUNSEL FOR THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS**

**THIRD AMENDED DISCLOSURE STATEMENT OF SUPERIOR AIR PARTS, INC., DATED JULY 23, 2009 Page 52**
**567458.20/SPA/20354/0102/072309**

Appx_0100

| Date | Check / Wire Number | Check / Wire Total | Name on Check / Wire | Explanation |
|---|---|---|---|---|
| | | | | |
| 10/6/2008 | 1024 | $504.73 | European Aviation Safety Agency | Liablilty Insurance |
| 10/6/2008 | 1023 | $62,500.00 | AirSure Limited | Liablilty Insurance |
| 10/6/2008 | 1025 | $5,805.32 | WSK Kalisz | Payment on Account |
| 10/6/2008 | 1026 | $32,257.92 | KS Pistoes | Payment on Account |
| 10/7/2008 | 1027 | $5,000.00 | Conners & Winters | Lawyers |
| 10/24/2008 | 1031 | $62,500.00 | AirSure Limited | Liablilty Insurance |
| 12/12/2008 | 1044 | $261,250.00 | AirSure Limited | Liablilty Insurance |
| 12/16/2008 | 1045 | $130,625.00 | AirSure Limited | Liablilty Insurance |
| 10/3/2008 | 59925 | $85.00 | Fireplaces & More | Test Cell |
| 10/3/2008 | 59926 | $1,400.00 | Michael Nutt | 110 |
| 10/3/2008 | 59927 | $132.86 | ADP Inc | 886275 |
| 10/3/2008 | 59928 | $402.00 | LE Jones Co | 30781 |
| 10/3/2008 | 59929 | $7,559.40 | Custom Tube Products Inc | 3858 |
| 10/3/2008 | 59930 | $2,151.00 | Associated Spring | 4902582 |
| 10/3/2008 | 59931 | $10,744.40 | Automatic Screw Machine | 172483, 172393 |
| 10/3/2008 | 59932 | $4,543.87 | Corley Gasket Co | 92563-In |
| 10/3/2008 | 59933 | $30,783.62 | Saturn Fasteners Inc | B22410-04 |
| 10/3/2008 | 59934 | $766.98 | Kapco/Valtec | 1905993-00 |
| 10/3/2008 | 59935 | $10,584.00 | Aviall Services Inc | 900541199 to 900541271 |
| 10/3/2008 | 59936 | $9,224.69 | Mahle Engine Components USA | 7207323 |
| 10/3/2008 | 59937 | $16,535.05 | Mahle Engine Components USA | CC931018 |
| 10/3/2008 | 59938 | $71,550.30 | Mahle Engine Components USA | 2281198, 2281199 |
| 10/3/2008 | 59939 | $5,583.61 | United Parcel Service | 752329388, 752329398 |
| 10/3/2008 | 59940 | $820.00 | Hurst | 55558 to 55592 |
| 10/3/2008 | 59941 | $244.65 | Aramark | 551-1091627 |
| 10/3/2008 | 59942 | $2,742.35 | Yellow Freight System Inc | 204-013139 to 362-437885 |
| 10/3/2008 | 59943 | $11.29 | UPS Supply Chain Solutions Inc | 515019400 |
| 10/3/2008 | 59945 | $138.63 | Z Packaging Inc | 58416, 58480 |
| 10/3/2008 | 59946 | $75.78 | Dynamic Technology Inc | 249640-99, 249712-99 |
| 10/3/2008 | 59947 | $306.96 | Vision Service Plan | 100108-103108 |
| 10/3/2008 | 59948 | $1,766.19 | Airparts Company Inc | 431424 to 432453 |
| 10/3/2008 | 59950 | $24,248.20 | Aetna | A5428928 |
| 10/3/2008 | 59952 | $64.95 | Bizzy Bees Pest Control Co | 201250 |
| 10/3/2008 | 59953 | $1,610.00 | Sky-Tec | 801642, 801669 |

| 10/3/2008 | 59954 | $205.84 | All American Benefits Inc | Jul-32 |
| 10/3/2008 | 59956 | $7,459.55 | Western Manufacturing Co | 84045 |
| 10/3/2008 | 59957 | $951.68 | Fedex Freight East | 1488120712 |
| 10/3/2008 | 59958 | $1,838.03 | Lynden Air Freight | 4163984 to 4167724 |
| 10/3/2008 | 59959 | $1,711.56 | Fort Dearborn Life Insurance | 100108-103108 |
| 10/3/2008 | 59961 | $272.50 | LE Clark | 100108 |
| 10/3/2008 | 59962 | $2,061.07 | TW Telecom | 2416120 |
| 10/3/2008 | 59963 | $520.79 | Staples Business Advantage | 3107593960 to 3107593964 |
| 10/3/2008 | 59964 | $570.00 | Barnstormers Inc | 100108 |
| 10/3/2008 | 59965 | $280.00 | Passports & Visa | 44311 |
| 10/3/2008 | 59966 | $6,230.00 | Gerhardt Gear | 60011 |
| 10/3/2008 | 59967 | $1,189.76 | Manitowoc Tool & Machining LLC | IN-048539 |
| 10/3/2008 | 59968 | $265.21 | Choice Solutions LLC | INV-91560 |
| 10/3/2008 | 59969 | $1,424.69 | Helio Precision Products | 116404 to 116502 |
| 10/3/2008 | 59973 | $2,812.74 | N.E.W. Industries Inc | 58553 |
| 10/3/2008 | 59975 | $3,750.00 | Techni Products Inc | 08-1553 to 08-1551 |
| 10/3/2008 | 59976 | $1,261.29 | Amco Enterprises | 110130-00 |
| 10/3/2008 | 59977 | $41,592.00 | Crane Cams | 118102 to 117678 |
| 10/3/2008 | 59978 | $3,533.76 | Weatherproofing Services | 2696 |
| 10/3/2008 | 59979 | $5,971.10 | AIICO, Inc | 150100167273 |
| 10/3/2008 | 59980 | $0.00 | Progressive Air Services LTD | VOID - See check 60210 |
| 12/24/2008 | 59980 | $1,635.88 | Progressive Air Services LTD | Void and Reissue CK60210 |
| 10/6/2008 | 59981 | $801.05 | Web Trends Inc | 9015123 |
| 10/10/2008 | 59982 | $301.43 | Ervin Leasing Company | 2748664 |
| 10/10/2008 | 59983 | $3,270.00 | Hartford Aircraft Products | 48932-1 |
| 10/10/2008 | 59984 | $12,386.92 | Eaton Corporation | 60078 |
| 10/10/2008 | 59985 | $3,424.44 | Ace Grinding & Machine Company | 4277 to 4275 |
| 10/10/2008 | 59986 | $2,890.33 | Corley Gasket Co | 92676-IN |
| 10/10/2008 | 59987 | $15,100.00 | Flex-Fab, LLC | 520170 |
| 10/10/2008 | 59988 | $1,540.84 | Ohio Gasket & Shim | 40434 |
| 10/10/2008 | 59989 | $2,587.50 | Saturn Fasteners Inc | B27429-01 |
| 10/10/2008 | 59990 | $1,461.69 | Seal Science Inc | 58556 |
| 10/10/2008 | 59991 | $1,116.50 | Umpco | 377593 |
| 10/10/2008 | 59992 | $62,238.80 | Mahle Engine Components USA | 7207512 |
| 10/10/2008 | 59993 | $15,876.10 | Mahle Engine Components USA | 2281274 |
| 10/10/2008 | 59994 | $2,454.49 | Varga Enterprises Inc | 283336-001 to 283334-005 |
| 10/10/2008 | 59995 | $4,557.33 | United Parcel Service | 752329408 |

| 10/10/2008 | 59996 | $680.00 | Hurst | 55605 |
|---|---|---|---|---|
| 10/10/2008 | 59997 | $1,336.74 | AT&T Mobility | 824772178 |
| 10/10/2008 | 59998 | $244.65 | Aramark | 551-1106733 |
| 10/10/2008 | 59999 | $2,776.71 | Yellow Freight System Inc | 005-865142 to 248-560747 |
| 10/10/2008 | 60001 | $6,538.20 | Trade-A-Plane Advertising | I0741205 |
| 10/10/2008 | 60002 | $3,100.00 | Carl H Johnson | 35 |
| 10/10/2008 | 60003 | $488.84 | Z Packaging Inc | 58430 |
| 10/10/2008 | 60004 | $4,993.75 | Experimental Aircraft Association | 1-000510915 |
| 10/10/2008 | 60005 | $12,550.00 | Sky-Tec | 801675 to 801696 |
| 10/10/2008 | 60006 | $4,556.00 | Kitplanes | 2402 |
| 10/10/2008 | 60007 | $413.06 | City of Coppell | 30000675 |
| 10/10/2008 | 60008 | $1,680.00 | Michael Nutt | 111 |
| 10/10/2008 | 60009 | $118.67 | Prostar Services Inc | 478449 |
| 10/10/2008 | 60010 | $802.09 | Lynden Air Freight | 4171911, 982978 |
| 10/10/2008 | 60011 | $1,024.23 | Superior Transport | 11683 |
| 10/10/2008 | 60012 | $197.50 | Staples Business Advantage | 3108140878 |
| 10/10/2008 | 60013 | $5,683.13 | Interwest Communications Corp | 5668, 5669 |
| 10/10/2008 | 60014 | $271.17 | Comfort Technologies LLC | 10958 |
| 10/10/2008 | 60015 | $11,854.66 | Helio Precision Products | 116621 to 116620 |
| 10/10/2008 | 60016 | $5,339.40 | US Express Leasing Inc | 40260364 |
| 10/10/2008 | 60017 | $3,963.08 | N.E.W. Industries Inc | 58760, 58781 |
| 10/10/2008 | 60018 | $7,500.00 | Techni Products Inc | 08-1565 to 08-1564 |
| 10/10/2008 | 60019 | $450.00 | 121Five.com | SU010810 |
| 10/10/2008 | 60020 | $21,665.83 | Crane Cams | 118618 to 118290 |
| 10/13/2008 | 60021 | $239.50 | Electronics International Inc | COD |
| 10/14/2008 | 60022 | $226.00 | Internal Revenue Service | Form 5330 |
| 10/17/2008 | 60023 | $135.29 | Pitney Bowes | 462249 |
| 10/17/2008 | 60024 | $14,259.50 | Hartford Aircraft Products | 49062-1 to 49347 |
| 10/17/2008 | 60025 | $27,210.40 | Eaton Corporation | 60176 |
| 10/17/2008 | 60026 | $802.88 | Custom Tube Products Inc | 3875 |
| 10/17/2008 | 60027 | $59,564.50 | Ace Grinding & Machine Company | 4284 to 4281 |
| 10/17/2008 | 60029 | $2,890.69 | Bunting Bearing Inc | 181197, 181195 |
| 10/17/2008 | 60030 | $12,500.00 | Garlock Sealing Technologies | 1325088 |
| 10/17/2008 | 60031 | $588.00 | Gates Rubber Co | 20671728 |
| 10/17/2008 | 60032 | $4,238.84 | R&B Electronics | 55883, 55884 |
| 10/17/2008 | 60033 | $15,384.65 | Saturn Fasteners Inc | B22410-05 to DM 106275 |
| 10/17/2008 | 60034 | $670.58 | Seal Science Inc | 58690 |

| 10/17/2008 | 60035 | $92.31 | Kapco/Valtec | 1936824-00 |
| 10/17/2008 | 60036 | $11,547.50 | Wyandotte Industries Inc | 18600 |
| 10/17/2008 | 60037 | $1,297.35 | Varga Enterprises Inc | 285568-002 |
| 10/17/2008 | 60038 | $26.74 | Federal Express | 2-947-33764 |
| 10/17/2008 | 60039 | $1,375.00 | Hurst | 55633 to 55669 |
| 10/17/2008 | 60040 | $2,612.06 | Harris Packaging Corp | 238598 |
| 10/17/2008 | 60041 | $244.65 | Aramark | 551-1124574 |
| 10/17/2008 | 60042 | $912.80 | Yellow Freight System Inc | 005-865246 to 005-865430 |
| 10/17/2008 | 60043 | $12,338.60 | AOPA Pilot | 10015809 |
| 10/17/2008 | 60044 | $215.87 | UPS Supply Chain Solutions Inc | 517498756 to 518238141 |
| 10/17/2008 | 60046 | $292.28 | Nicol Scales Inc | 67635 |
| 10/17/2008 | 60048 | $3,950.00 | Advanced Machining & Tool Inc | 69867 |
| 10/17/2008 | 60049 | $9,104.26 | Airparts Company Inc | 436289 to 437194 |
| 10/17/2008 | 60052 | $159.40 | Dallas Recycling | 26781 |
| 10/17/2008 | 60053 | $1,440.00 | Sky-Tec | 801757 |
| 10/17/2008 | 60054 | $580.00 | SAE International | 13697498-1 |
| 10/17/2008 | 60055 | $191.08 | Lynden Air Freight | 4175584 |
| 10/17/2008 | 60057 | $345.91 | Corporate Express Inc | 90128794 |
| 10/17/2008 | 60058 | $4,767.09 | Air Power Inc | 169884 |
| 10/17/2008 | 60059 | $824.80 | Pack Ready | 1957 |
| 10/17/2008 | 60060 | $1,020.29 | Comfort Technologies LLC | 10986 |
| 10/17/2008 | 60064 | $2,661.37 | Technifax Office Solutions | 77144 |
| 10/17/2008 | 60065 | $2,077.11 | Dennis Cheatham | 1190 to 1195 |
| 10/17/2008 | 60067 | $9,000.00 | Techni Products Inc | 09-1014 to 09-1015 |
| 10/17/2008 | 60068 | $143.56 | ADP Inc | 897304 |
| 10/17/2008 | 60069 | $1,780.00 | Crane Cams | 119593 |
| 10/17/2008 | 60070 | $1,677.88 | Labrie Commercial Cleaning | 202056 |
| 10/2/2008 | 60071 | $32.40 | Comptroller of Public Accounts | Qtr ending 09/30/08 |
| 10/21/2008 | 60072 | $1,128.80 | AirSure LTD, LLC | 15310R |
| 10/23/2008 | 60073 | $1,000.00 | John Riemer | Customer Refund |
| 10/24/2008 | 60074 | $172.23 | Uti, United States Inc | DFW826860800 |
| 10/24/2008 | 60076 | $150,667.54 | Eaton Corporation | 60280 to 60282 |
| 10/24/2008 | 60077 | $299.07 | Associated Spring | 1317872 |
| 10/24/2008 | 60078 | $3,051.39 | SKF Sealing Solutions | 1737668, 1738162 |
| 10/24/2008 | 60079 | $2,770.19 | Corley Gasket Co | 92819-IN, 92836-IN |
| 10/24/2008 | 60080 | $54,613.90 | Mahle Engine Components USA | 7207745, 7207751 |
| 10/24/2008 | 60081 | $20,143.55 | Mahle Engine Components USA | 2281320, 2281321 |

| 10/24/2008 | 60082 | $1,392.41 | Varga Enterprises Inc | 284325-001, 283335-005 |
|---|---|---|---|---|
| 10/24/2008 | 60083 | $289.47 | Federal Express | 8-895-52625 |
| 10/24/2008 | 60084 | $1,540.00 | Hurst | 55718 to 55694 |
| 10/24/2008 | 60085 | $782.27 | Harris Packaging Corp | 238909 |
| 10/24/2008 | 60086 | $244.65 | Aramark | 551-1140375 |
| 10/24/2008 | 60087 | $915.46 | Staveley Services Fluids | C185818 |
| 10/24/2008 | 60088 | $721.86 | Genessee Stamping & Fabricating | 56564 |
| 10/24/2008 | 60089 | $1,251.74 | Z Packaging Inc | 58478 |
| 10/24/2008 | 60090 | $2,241.12 | Airparts Company Inc | 439387 to 440188 |
| 10/24/2008 | 60091 | $160.00 | Mike's Cartage Company | 82109 |
| 10/24/2008 | 60092 | $110.65 | Prostar Services Inc | 487040 |
| 10/24/2008 | 60093 | $1,443.68 | Superior Transport | 12080 |
| 10/24/2008 | 60094 | $606.85 | Securlock Storage Centers | 101508 |
| 10/24/2008 | 60095 | $783.74 | Air Power Inc | 170406 |
| 10/24/2008 | 60096 | $7,724.37 | Cygnus Business Media | 26081021 |
| 10/24/2008 | 60097 | $2,930.20 | E-Mag Ignitions | 1761 |
| 10/24/2008 | 60098 | $33,813.00 | AirSure LTD, LLC | 15453 |
| 10/24/2008 | 60099 | $13,800.00 | Gerhardt Gear | 60282 |
| 10/24/2008 | 60100 | $7,126.08 | N.E.W. Industries Inc | 59043 to 59410 |
| 10/24/2008 | 60101 | $3,696.73 | Suez Energy Resources NA | 93908-02006 |
| 10/24/2008 | 60102 | $14,444.30 | Crane Cams | 120028 to 120199 |
| 10/24/2008 | 60103 | $594.01 | Sampson Enterprises Inc | 6358, 6357 |
| 10/24/2008 | 60104 | $5,971.10 | AICCO, Inc | 150100167273 |
| 10/24/2008 | 60105 | $118.98 | Citicapital (SM) | 16694802 |
| 10/24/2008 | 60106 | $868.88 | Oregon Employment Department | Tax Assessment |
| 10/31/2008 | 60110 | $229.57 | Dominoes Pizza | Haloween Luncheon |
| 10/31/2008 | 60111 | $37,533.26 | Texas Dugan LP | R0669664 |
| 10/31/2008 | 60112 | $9,570.09 | Custom Tube Products Inc | 3918 to 3947 |
| 10/31/2008 | 60113 | $2,028.77 | Ace Grinding & Machine Company | 4311, 4312 |
| 10/31/2008 | 60114 | $1,148.12 | Corley Gasket Co | 92956-IN |
| 10/31/2008 | 60115 | $410.00 | Truarc Company LLC | 362630 |
| 10/31/2008 | 60116 | $157.40 | Aviall Services Inc | 900545829 |
| 10/31/2008 | 60117 | $101,374.73 | Mahle Engine Components USA | 7207865 |
| 10/31/2008 | 60118 | $17,473.00 | Mahle Engine Components USA | 2281393 |
| 10/31/2008 | 60119 | $6,184.03 | United Parcel Service | 752329418, 752329428 |
| 10/31/2008 | 60120 | $215.72 | ADT Security Services | 80501670 |
| 10/31/2008 | 60121 | $1,963.61 | Harris Packaging Corp | 239154 |

| 10/31/2008 | 60122 | $244.65 | Aramark | 551-1155433 |
| 10/31/2008 | 60123 | $1,727.09 | Yellow Freight System Inc | 079-894685 to 384-225627 |
| 10/31/2008 | 60124 | $338.06 | BMC Solutions Inc | 715426 |
| 10/31/2008 | 60125 | $124.61 | Deli Management Inc | 8.101E+13 |
| 10/31/2008 | 60126 | $392.97 | UPS Supply Chain Solutions Inc | 522604193 |
| 10/31/2008 | 60127 | $1,007.70 | Protective Packaging Corp | 66932 |
| 10/31/2008 | 60128 | $1,045.32 | Safety-Kleen | 37393617 |
| 10/31/2008 | 60129 | $2,880.00 | Aircraft Engine & Accessory | 94720 |
| 10/31/2008 | 60130 | $4,427.00 | Omni Packaging Corporation | 437412 |
| 10/31/2008 | 60131 | $40.00 | Aviation International Corp | 1-332770 |
| 10/31/2008 | 60132 | $465.91 | Z Packaging Inc | 58501 |
| 10/31/2008 | 60133 | $600.00 | ING | 30934 |
| 10/31/2008 | 60134 | $803.40 | Advanced Machining & Tool Inc | 69915 |
| 10/31/2008 | 60136 | $734.32 | Greatamerica Leasing Corp | 7889121 |
| 10/31/2008 | 60139 | $1,309.83 | Print Inc | 12652357 |
| 10/31/2008 | 60140 | $205.84 | All American Benefits Inc | Jul-18 |
| 10/31/2008 | 60142 | $844.82 | Winsted Precision Ball Company | 2538169498 |
| 10/31/2008 | 60143 | $174.63 | Fedex Freight East | 774716007 |
| 10/31/2008 | 60144 | $1,363.22 | Aviation Group Limited | 2008-1017 |
| 10/31/2008 | 60145 | $28,931.51 | Lynden Air Freight | 65022990 to 40360870 |
| 10/31/2008 | 60146 | $332.00 | Colorado Air Parts Inc | 102008 |
| 10/31/2008 | 60147 | $2,007.85 | TW Telecom | 2486852 |
| 10/31/2008 | 60148 | $391.65 | Staples Business Advantage | 3109252934 |
| 10/31/2008 | 60151 | $224.88 | On Time Express | DFW193930 |
| 10/31/2008 | 60153 | $67.74 | Easylink Services Corporation | 7830750810 |
| 10/31/2008 | 60155 | $22,500.00 | Techni Products Inc | 09-1038 to 09-1022 |
| 10/31/2008 | 60157 | $146.72 | ADP Inc | 913454 |
| 10/31/2008 | 60158 | $21,307.86 | Crane Cams | 120717 to 120800 |
| 11/7/2008 | 60159 | $2,761.00 | The Expo Group | AOPA |
| 11/7/2008 | 60160 | $0.00 | Void | |
| 11/7/2008 | 60161 | $24,140.00 | Larry Biron | Customer Refund |
| 11/7/2008 | 60162 | $550.00 | Hartford Aircraft Products | 49670 |
| 11/7/2008 | 60163 | $5,528.27 | Eaton Corporation | 60671, 60629 |
| 11/7/2008 | 60164 | $8,989.80 | Associated Spring | 4903075 |
| 11/7/2008 | 60165 | $10,126.08 | Corley Gasket Co | 93038-IN, 93037-In |
| 11/7/2008 | 60166 | $4,309.20 | Ohio Gasket & Shim | 40900 |
| 11/7/2008 | 60167 | $9,083.52 | R&B Electronics | 56126 |

| 11/7/2008 | 60168 | $114.75 | Executive Printing Systems | 16054 |
|---|---|---|---|---|
| 11/7/2008 | 60169 | $25,608.86 | Saturn Fasteners Inc | B27324-01 |
| 11/7/2008 | 60170 | $13,266.07 | Seal Science Inc | 59103 to 59254 |
| 11/7/2008 | 60171 | $62.33 | Kapco/Valtec | 1963804-00 |
| 11/7/2008 | 60172 | $25.00 | Truarc Company LLC | 362786 |
| 11/7/2008 | 60173 | $88,677.77 | Mahle Engine Components USA | 7208057 |
| 11/7/2008 | 60174 | $35,917.13 | Mahle Engine Components USA | 2281420 to 2281453 |
| 11/7/2008 | 60175 | $6,065.57 | Varga Enterprises Inc | 284377-001 to 283336-002 |
| 11/7/2008 | 60176 | $6,002.22 | United Parcel Service | 752329438, 752329448 |
| 11/7/2008 | 60177 | $109.95 | Northwest Propane Gas Co | 1265094 |
| 11/7/2008 | 60178 | $2,503.45 | AT&T Mobility | 824772178 |
| 11/7/2008 | 60179 | $2,689.79 | Harris Packaging Corp | 239225, 239404 |
| 11/7/2008 | 60180 | $244.65 | Aramark | 551-1170551 |
| 11/7/2008 | 60181 | $687.35 | Yellow Freight System Inc | 005-865013 to 079-894141 |
| 11/7/2008 | 60182 | $6,538.20 | Trade-A-Plane Advertising | I0749950 |
| 11/7/2008 | 60183 | $3,400.00 | Carl H Johnson | 36 |
| 11/7/2008 | 60184 | $21.10 | Grainger | 9748292985 |
| 11/7/2008 | 60185 | $432.00 | Aviation International Corp | 1-332911 to 1-333103 |
| 11/7/2008 | 60186 | $523.10 | Z Packaging Inc | 58523 |
| 11/7/2008 | 60187 | $306.96 | Vision Service Plan | 110108-113008 |
| 11/7/2008 | 60188 | $2,228.28 | Airparts Company Inc | 440774 to 444200 |
| 11/7/2008 | 60189 | $4,993.75 | Experimental Aircraft Association | 1-00514779 |
| 11/7/2008 | 60190 | $2,917.56 | RSM McGladrey | R-2943006-311 |
| 11/7/2008 | 60191 | $330.49 | MSC Industrial Direct Co Inc | 35025358 |
| 11/7/2008 | 60192 | $23,054.20 | Aetna | A5541642 |
| 11/7/2008 | 60194 | $64.95 | Bizzy Bees Pest Control Co | 203161 |
| 11/7/2008 | 60195 | $4,556.00 | Kitplanes | 2535 |
| 11/7/2008 | 60196 | $413.06 | City of Coppell | 30000675 11/08 |
| 11/7/2008 | 60197 | $437.89 | Fedex Freight East | 1717089382, 1488069752 |
| 11/7/2008 | 60198 | $134.82 | Prostar Services Inc | 496034 |
| 11/7/2008 | 60199 | $125.29 | Lynden Air Freight | 4190600 |
| 11/7/2008 | 60200 | $1,711.56 | Fort Dearborn Life Insurance | 110108-113008 |
| 11/7/2008 | 60202 | $520.05 | Corporate Express Inc | 90838327 |
| 11/7/2008 | 60203 | $570.00 | Barnstormers Inc | 110108 |
| 11/7/2008 | 60205 | $9,839.35 | Helio Precision Products | 117318 to 117314 |
| 11/7/2008 | 60207 | $5,339.40 | US Express Leasing Inc | 40260364 11/08 |
| 11/7/2008 | 60208 | $1,327.92 | Akorbi Consulting | SA003T0822 |

| 11/7/2008 | 60209 | $385.00 | Chick Packaging of DFW | 8323-IN |
| 11/7/2008 | 60210 | $1,635.88 | Progressive Air Services LTD | PAP 1084589, PAP 1084459 |
| 11/17/2008 | 60211 | $2,573.78 | Valley Plating Inc | 20817D |
| 11/14/2008 | 60212 | $3,025.85 | Zenair LTD | Customer Refund |
| 11/14/2008 | 60213 | $4,957.70 | Hartford Aircraft Products | 48932-2 to 49344 |
| 11/14/2008 | 60214 | $379.40 | Eaton Corporation | 60792, 60793 |
| 11/14/2008 | 60215 | $2,570.13 | Custom Tube Products Inc | 3960 |
| 11/14/2008 | 60216 | $1,782.00 | The Bland Co | C16558 |
| 11/14/2008 | 60217 | $1,059.14 | Corley Gasket Co | 93135-IN |
| 11/14/2008 | 60218 | $2,465.30 | Motion Industries | TX01-688053, TX01-688055 |
| 11/14/2008 | 60219 | $982.54 | Gasket Manufacturing Co Inc | 31688 |
| 11/14/2008 | 60220 | $4,256.00 | R&B Electronics | 56158 |
| 11/14/2008 | 60221 | $448.96 | Kapco/Valtec | 1954223-00 to 1959872-00 |
| 11/14/2008 | 60222 | $2,629.00 | Wyandotte Industries Inc | 18936 |
| 11/14/2008 | 60223 | $24,709.95 | Mahle Engine Components USA | 7208146 |
| 11/14/2008 | 60224 | $33,221.77 | Mahle Engine Components USA | 2281493 to 2281519 |
| 11/14/2008 | 60225 | $2,050.58 | Varga Enterprises Inc | 283334-006 to 286763-001 |
| 11/14/2008 | 60226 | $244.65 | Aramark | 551-1185658 |
| 11/14/2008 | 60227 | $6,650.20 | Yellow Freight System Inc | 362-419351 to 005-866047 |
| 11/14/2008 | 60228 | $516.57 | Genesee Stamping & Fabricating | 56869 |
| 11/14/2008 | 60229 | $13,170.40 | Combustion Technologies Inc | 5550 |
| 11/14/2008 | 60230 | $300.00 | Omni Packaging Corporation | 438860 |
| 11/14/2008 | 60231 | $1,443.00 | Aviation International Corp | 1-333200 |
| 11/14/2008 | 60233 | $402.67 | Fedex Freight East | 1717784095 |
| 11/14/2008 | 60234 | $462.73 | Lynden Air Freight | 4191219, 4191109 |
| 11/14/2008 | 60235 | $1,292.36 | Superior Transport | 12536 |
| 11/14/2008 | 60237 | $27.50 | L E Clark | 110608 |
| 11/14/2008 | 60238 | $7,724.37 | Cygnus Business Media | 260H1118 |
| 11/14/2008 | 60239 | $388.75 | Pack Ready | 1999 |
| 11/14/2008 | 60240 | $2,836.50 | Manitowoc Tool & Machining LLC | IN-049873 |
| 11/14/2008 | 60242 | $301.43 | Ervin Leasing Company | 2757481 |
| 11/14/2008 | 60243 | $2,661.37 | Technifax Office Solutions | 78909 |
| 11/14/2008 | 60244 | $74.28 | Easylink Services Corporation | 7830750811 |
| 11/14/2008 | 60247 | $450.00 | 121Five.com | SU010811 |
| 11/14/2008 | 60248 | $1,677.88 | Labrie Commercial Cleaning | 202058 |
| 11/14/2008 | 60249 | $5,971.10 | AICCO, Inc | 150100167273 |
| 11/20/2008 | 60250 | $2,382.36 | Valley Plating Inc | |

| 11/20/2008 | 60251 | $19,033.83 | Ace Grinding & Machine Company | 4313 to 4317 |
|---|---|---|---|---|
| 11/21/2008 | 60252 | $54.88 | Oregon Dept of Consumer and Business Services | Taxes |
| 11/21/2008 | 60253 | $254.76 | Custom Tube Products Inc | 3985 |
| 11/21/2008 | 60254 | $10,563.10 | Associated Spring | 1318698 |
| 11/21/2008 | 60255 | $837.00 | Automatic Screw Machine | 173118 |
| 11/21/2008 | 60256 | $27,075.51 | Ace Grinding & Machine Company | 4321 to 4323 |
| 11/21/2008 | 60257 | $6,800.50 | Corley Gasket Co | 93247-IN |
| 11/21/2008 | 60258 | $2,520.00 | Fkex-Fab, LLC | 523866 |
| 11/21/2008 | 60259 | $90.78 | Aviall Services Inc | 900549183, 900549279 |
| 11/21/2008 | 60260 | $12,567.71 | Mahle Engine Components USA | 7208232 |
| 11/21/2008 | 60261 | $3,949.52 | Mahle Engine Components USA | 2281528 |
| 11/21/2008 | 60262 | $1,301.91 | Varga Enterprises Inc | 286241-001, 286813-001 |
| 11/21/2008 | 60263 | $3,835.05 | United Parcel Service | 752329458 |
| 11/21/2008 | 60264 | $263.29 | Federal Express | 2-980-35008 to 2-972-34377 |
| 11/21/2008 | 60265 | $560.00 | Hurst | 55833 to 55882 |
| 11/21/2008 | 60266 | $1,533.63 | Harris Packaging Corp | 240005 |
| 11/21/2008 | 60267 | $489.30 | Aramark | 551-1200717, 515-1215710 |
| 11/21/2008 | 60268 | $1,284.87 | Yellow Freight System Inc | 005-866558 to 079-894980 |
| 11/21/2008 | 60269 | $39.36 | UPS Supply Chain Solutions Inc | 525985660 |
| 11/21/2008 | 60270 | $1,455.00 | Aviation International Corp | 1-333974 |
| 11/21/2008 | 60271 | $622.84 | Z Packaging Inc | 58576 |
| 11/21/2008 | 60272 | $1,473.87 | Dynamic Technology Inc | 254179-99 |
| 11/21/2008 | 60273 | $7,179.12 | Airparts Company Inc | 445999 to 453561 |
| 11/21/2008 | 60274 | $108.00 | J&J Airparts Inc | 78615 |
| 11/21/2008 | 60275 | $140.38 | Aircraft Specialties Service | 169532, 169586 |
| 11/21/2008 | 60277 | $2,451.64 | Duke Realty Services | G0177177 |
| 11/21/2008 | 60278 | $246.95 | Dallas Recycling | 27200 |
| 11/21/2008 | 60279 | $2,940.00 | Sky-Tec | 802067 to 801970 |
| 11/21/2008 | 60280 | $2,246.27 | Airflow Performance Inc | Y8-C10316 |
| 11/21/2008 | 60282 | $396.74 | Thomas Reprographics | 638792, 638795 |
| 11/21/2008 | 60283 | $1,363.22 | Aviation Group Limited | 2008-1018 |
| 11/21/2008 | 60284 | $620.97 | Lynden Air Freight | 4191445, 4192672 |
| 11/21/2008 | 60285 | $1,204.61 | Superior Transport | 12790 |
| 11/21/2008 | 60286 | $0.00 | Void | |
| 11/21/2008 | 60288 | $594.60 | N.E.W. Industries Inc | 59780 |
| 11/21/2008 | 60289 | $9,000.00 | Techni Products Inc | 09-1055 |
| 11/21/2008 | 60290 | $140.32 | ADP Inc | 927785 |

| 11/21/2008 | 60291 | $15,000.00 | Boring Machine Corporation | 15816 |
| 11/21/2008 | 60292 | $48,500.00 | V&L Tool Inc | 160658 to 160660 |
| 11/21/2008 | 60293 | $29.00 | Ann McMahon | Customer Refund |
| 11/21/2008 | 60294 | $842.18 | Sal Buentello | Customer Refund |
| 11/21/2008 | 60295 | $65.00 | Larry Biron | Customer Refund |
| 11/21/2008 | 60296 | $360.00 | Sam Butler | Customer Refund |
| 11/21/2008 | 60297 | $259.97 | Larry Reeder | Customer Refund |
| 11/21/2008 | 60298 | $381.88 | Greg Vauga | Customer Refund |
| 11/21/2008 | 60299 | $470.00 | Fred Rawlins | Customer Refund |
| 11/21/2008 | 60300 | $370.35 | Max Nichols | Customer Refund |
| 11/21/2008 | 60301 | $2,457.26 | Craig Schulze | Customer Refund |
| 11/21/2008 | 60302 | $316.22 | Jean-Pierre Verdier | Customer Refund |
| 11/21/2008 | 60303 | $3,195.36 | Zephyr Aircraft Engines | Customer Refund |
| 11/21/2008 | 60304 | $1,290.00 | Paul Hershorin | Customer Refund |
| 11/21/2008 | 60305 | $1,184.23 | David Rogers Jr | Customer Refund |
| 11/21/2008 | 60306 | $17,237.24 | Cruiseair Aviation Inc | Customer Refund |
| 11/21/2008 | 60307 | $4,720.00 | Charter Automotive | 110308 |
| 11/25/2008 | 60308 | $1,014.00 | First Shred | 5003 |
| 11/25/2008 | 60309 | $1,205.00 | George Jenson | Customer Refund |
| 11/25/2008 | 60310 | $209.95 | Securlock Storage Centers | 3202 |
| 11/26/2008 | 60311 | $132.61 | Primary Plumbing | 836 |
| 12/1/2008 | 60312 | $45.00 | The Expo Group | 60159 |
| 12/1/2008 | 60313 | $58,198.53 | Eaton Corporation | 60960, 60961 |
| 12/1/2008 | 60314 | $806.52 | Ace Grinding & Machine Company | 4334 |
| 12/1/2008 | 60315 | $15,100.00 | Flex-Fab LLC | 524680 |
| 12/1/2008 | 60316 | $15,626.41 | Rostra Vernatherm | 323831 |
| 12/1/2008 | 60317 | $12,071.80 | Champion Aerospace Inc | 961053, 961084 |
| 12/1/2008 | 60318 | $4,544.75 | United Parcel Service | 752329468 |
| 12/1/2008 | 60319 | $215.72 | ADT Security Services | 82299177 |
| 12/1/2008 | 60320 | $100.00 | Hurst | 55918 |
| 12/1/2008 | 60321 | $4,188.13 | Yellow Freight System Inc | 079-895155 to 079-895170 |
| 12/1/2008 | 60322 | $338.06 | BMC Solutions Inc | 716909 |
| 12/1/2008 | 60323 | $12,338.60 | AOPA Pilot | 10015986 |
| 12/1/2008 | 60324 | $306.96 | Vision Service Plan | 120108-123108 |
| 12/1/2008 | 60325 | $6,663.51 | Airparts Company Inc | 449077 to 451421 |
| 12/1/2008 | 60326 | $1,593.75 | AOPA EXPO | 1000183 |
| 12/1/2008 | 60327 | $813.81 | Greatamerica Leasing Corp | 7976016 |

| 12/1/2008 | 60328 | $26,175.60 | Aetna | A5653832 |
| 12/1/2008 | 60329 | $37,533.26 | Texas Dugan LP | R0671285 |
| 12/1/2008 | 60330 | $900.00 | Reserve Account | 111308 |
| 12/1/2008 | 60331 | $1,309.83 | Print Inc | 12890355 |
| 12/1/2008 | 60332 | $1,157.45 | Fedex Freight East | 1616770750 |
| 12/1/2008 | 60333 | $804.00 | ASTM International | 3891108 |
| 12/1/2008 | 60334 | $1,785.93 | Lynden Air Freight | 4200168, 4199375 |
| 12/1/2008 | 60335 | $9,495.31 | Air Power Inc | 171732, 171771 |
| 12/1/2008 | 60336 | $1,731.30 | TW Telecom | 2531982 |
| 12/1/2008 | 60337 | $570.00 | Barnstormers Inc | 120108 |
| 12/1/2008 | 60338 | $214.34 | Interwest Communications Corp | 35803 |
| 12/1/2008 | 60341 | $2,226.03 | Suez Energy Resources NA | 93908-02006 |
| 12/1/2008 | 60342 | $132.86 | ADP Inc | 942603 |
| 12/3/2008 | 60343 | $5,918.00 | Valley Plating Inc | COD |
| 12/5/2008 | 60344 | $17,500.00 | AirSure LTD, LLC | 16386 |
| 12/5/2008 | 60345 | $9,097.35 | Custom Tube Products Inc | 3995 to 4015 |
| 12/5/2008 | 60346 | $8,463.00 | Automatic Screw Machine | 173371 |
| 12/5/2008 | 60347 | $139.60 | Corley Gasket Co | 93414-IN |
| 12/5/2008 | 60348 | $19,163.64 | Parker Hannifin Corporation | 24 YY933 |
| 12/5/2008 | 60349 | $9,190.70 | Ohio Gasket & Shim | 41356 |
| 12/5/2008 | 60350 | $2,948.40 | Precision Fittings | 112630 |
| 12/5/2008 | 60351 | $9,004.76 | Seal Science Inc | 59777 to 59987 |
| 12/5/2008 | 60352 | $376.31 | Valtec Aircraft Supply | 1980281-00 |
| 12/5/2008 | 60353 | $97.00 | Truarc Company LLC | 364736 |
| 12/5/2008 | 60354 | $7,392.83 | Wyandotte Industries Inc | 19097 |
| 12/5/2008 | 60355 | $13,411.00 | Mahle Engine Components USA | CC932430 |
| 12/5/2008 | 60356 | $38,698.57 | Mahle Engine Components USA | 2281637 to 2281640 |
| 12/5/2008 | 60357 | $1,508.52 | Varga Enterprises Inc | 283336-003, 283334-007 |
| 12/5/2008 | 60358 | $7,712.00 | Champion Aerospace Inc | 961282 |
| 12/5/2008 | 60359 | $4,984.79 | Harris Packaging Corp | 240563, 240564 |
| 12/5/2008 | 60360 | $244.65 | Aramark | 551-1230949 |
| 12/5/2008 | 60361 | $3,005.56 | Yellow Freight System Inc | 005-866925 to 005-864174 |
| 12/5/2008 | 60362 | $6,642.53 | Maloney, Bean, Horn & Hull PC | 22894 to 22921 |
| 12/5/2008 | 60363 | $1,610.00 | Carl H Johnson | 37 |
| 12/5/2008 | 60364 | $3,125.55 | Aviation International Corp | 1-334212, 1-334203 |
| 12/5/2008 | 60365 | $2,632.15 | Advanced Machining & Tool Inc | 70113 |
| 12/5/2008 | 60366 | $1,506.70 | Airparts Company Inc | 452275, 454236 |

| 12/5/2008 | 60369 | $11,859.00 | KPMG, LLP | 43256853 |
| 12/5/2008 | 60370 | $4,556.00 | Kitplanes | 2648 |
| 12/5/2008 | 60371 | $1,475.00 | David Austin | 41 |
| 12/5/2008 | 60372 | $145.04 | Prostar Services Inc | 515222 |
| 12/5/2008 | 60373 | $4,809.20 | Lynden Air Freight | 65022920, 4196359 |
| 12/5/2008 | 60374 | $1,711.56 | Fort Dearborn Life Insurance | 120108-123108 |
| 12/5/2008 | 60375 | $479.45 | Corporate Express Inc | 91509363 |
| 12/5/2008 | 60376 | $55.00 | LE Clark | 120208 |
| 12/5/2008 | 60377 | $2,100.00 | Colorado Air Parts Inc | 2008-491 |
| 12/5/2008 | 60378 | $358.97 | Staples Business Advantage | 3111215323, 3111215324 |
| 12/5/2008 | 60379 | $247.50 | Pack Ready | 2077 |
| 12/5/2008 | 60380 | $8,345.00 | Helio Precision Products | DM 106349 to 118020 |
| 12/5/2008 | 60382 | $750.00 | Techni Products Inc | 09-1071 |
| 12/5/2008 | 60384 | $14,731.36 | Crane Cams | 123780, 123915 |
| 12/5/2008 | 60385 | $11,500.00 | Portand Forge | 163332 |
| 12/5/2008 | 60386 | $595.40 | Shepard Exposition Service | G397921108 |
| 12/10/2008 | 60387 | $960.00 | Evans Air | Customer Refund |
| 12/10/2008 | 60388 | $57.32 | Ann McMahon | Customer Refund |
| 12/10/2008 | 60389 | $2,089.35 | Lehigh Valley Aviation Service | Customer Refund |
| 12/10/2008 | 60390 | $600.00 | Richard McSpadden | Customer Refund |
| 12/10/2008 | 60391 | $160.00 | Robert A Muholland | Customer Refund |
| 12/10/2008 | 60392 | $450.00 | Don Short | Customer Refund |
| 12/10/2008 | 60393 | $1,209.97 | Epps Aviaiton | Customer Refund |
| 12/19/2008 | 60410 | $8,129.00 | Texas Mutual Insurace Co | 20026694 |
| 12/19/2008 | 60411 | $10,234.25 | Chubb Group of Insurance Companies | 6000 0012 9900 001C |
| 12/23/2008 | 60413 | $5,332.48 | Valley Plating Inc | COD |
| 10/23/2008 | ACH | $2,527.31 | National City Commercial Capital Co LLC | |
| 11/25/2008 | ACH | $2,527.31 | National City Commercial Capital Co LLC | |
| 12/23/2008 | ACH | $2,527.31 | National City Commercial Capital Co LLC | |
| 10/6/2008 | EFT - Debit | $1,196.15 | First Data Corporation | Credit Card Fees |
| 10/6/2008 | EFT - Debit | $151.37 | First Data Corporation | Credit Card Fees |
| 10/6/2008 | EFT - Debit | $11.09 | First Data Corporation | Credit Card Fees |
| 11/4/2008 | EFT - Debit | $2,186.92 | First Data Corporation | Credit Card Fees |
| 11/4/2008 | EFT - Debit | $159.12 | First Data Corporation | Credit Card Fees |
| 11/4/2008 | EFT - Debit | $9.58 | First Data Corporation | Credit Card Fees |
| 12/4/2008 | EFT - Debit | $1,927.65 | First Data Corporation | Credit Card Fees |
| 12/4/2008 | EFT - Debit | $1,142.04 | First Data Corporation | Credit Card Fees |

Case 08-36705-bjh11 Doc 321-1 Filed 07/23/09    Entered 07/23/09 10:29:57    Page 13 of 13

| 12/4/2008 | EFT - Debit | $29.82 | First Data Corporation | Credit Card Fees |
|---|---|---|---|---|
| 10/15/2008 | Misc Fees | $884.69 | JP Morgan Chase | Bank Fees |
| 11/17/2008 | Misc Fees | $951.50 | JP Morgan Chase | Bank Fees |
| 12/15/2008 | Misc Fees | $866.37 | JP Morgan Chase | Bank Fees |
| 12/30/2008 | Misc Fees | $248.00 | JP Morgan Chase | Bank Fees |
| 12/30/2008 | Misc Fees | $128.00 | JP Morgan Chase | Bank Fees |
| | | $3,079,674.29 | | |

| Employees | WIRE AMT | DIR DEP AMT | CHECK AMT | CHECK TYPE | CHECK # | DATE |
|---|---|---|---|---|---|---|
| Dr. Kubler - TAE | $53,388.89 | | | Payment on Account | | 3/26/2008 |
| Dr. Kubler - TAE | $104,890.20 | | | Payment on Account | | 5/7/2008 |
| Dr. Kubler - TAE | $30,876.63 | | | Payment on Account | | 6/19/2008 |
| Dr. Kubler - TAE | $56,783.09 | | | Payment on Account | | 8/18/2008 |
| Dr. Kubler - TAE | $92,768.54 | | | Payment on Account | | 8/26/2008 |
| Dr. Kubler - TAE | $4,875.00 | | | Payment on Account | | 9/2/2008 |
| Dr. Kubler - TAE | $21,818.10 | | | Payment on Account | | 9/17/2008 |
| Dr. Kubler - TAE | $11,075.37 | | | Payment on Account | | 9/18/2008 |
| Dr. Kubler - TAE | $34,396.85 | | | Payment on Account | | 10/9/2008 |
| Dr. Kubler - TAE | $4,125.00 | | | Payment on Account | | 10/10/2008 |
| Dr. Kubler - TAE | $140,649.25 | | | Payment on Account | | 10/24/2008 |
| Dr. Kubler - TAE | $165,152.33 | | | Payment on Account | | 11/18/2008 |
| Dr. Kubler - TAE | $1,150.00 | | | Payment on Account | | 11/21/2008 |
| Dr. Kubler - TAE | $27,338.40 | | | Payment on Account | | 12/4/2008 |
| Dr. Ahrendt - TAG | $148,222.20 | | | Interest | | 1/4/2008 |
| Dr. Ahrendt - TAG | $146,611.11 | | | Interest | | 3/26/2008 |
| Dr. Ahrendt - TAG | $146,611.11 | | | Interest | | 6/30/2008 |
| Dr. Ahrendt - TAG | $148,222.22 | | | Interest | | 10/14/2008 |
| | | | | | | |
| | $1,338,954.29 | $0.00 | $0.00 | $1,338,954.29 | | |

Exhibit B

**Superior Air Parts**
**Ch. 7 Liquidation Analysis**
**As of 5/14/2009**
**DRAFT**

| | | | | | | *CALCULATIONS* | |
|---|---|---|---|---|---|---|---|

**CLAIMS PER DEBTOR**

| | | | | | | |
|---|---|---|---|---|---|---|
| 503(b)(9) admin | | | | | $ | 78,819 |
| Secured | | | | | $ | 17,484 |
| Priority | | | | | $ | 56,144 |
| Unsecured | | | | | | |
| Trade Unsecured | | | | | $ | 1,171,440 |
| Trade Executory Contracts (Open POs) | | | | | | 4,118,739 |
| Executory Contracts (Other) | | | | | | 446,036 |
| Warranty Claims | | | | | | 142,971 |
| Loss of Warranty Claims | | | | | | 19,580 |
| Insured Claims | | | | | | 2,919,139 |
| TOTAL Unsecured Claims excluding insiders | | | | | | 8,817,905 |
| Thielert AG | | | | | | 10,146,611 |
| Thielert AE | | | | | | 18,208,260 |
| TOTAL Unsecured Claims | | | | | $ | 37,172,776 |

**WORKING CAPITAL**

| | | | | | | |
|---|---|---|---|---|---|---|
| Cash on hand | | | | | $ | 3,754,281 |
| Accounts Receivable, net collectable | | | | | $ | 1,000,000 |
| Inventory, gross | | | | | $ | 7,736,091 |
| Accounts Payable | | | | | $ | (50,000) |

**CONVERSION OF INVENTORY TO CASH**

| | | Wkly sales | Wks sold | Margin | | |
|---|---|---|---|---|---|---|
| Inventory, gross | | | | | $ | 7,736,091 |
| Less non-FAA inventory | | | | | | (1,300,000) |
| | | | | | | 6,436,091 |
| Cost of inventory sold during orderly liquidation | | $ 100,000 | 12 | 0% | | (1,200,000) |
| Remaining inventory available for "Fire sale" | | | | | | 5,236,091 |
| Times % of cost obtained at "Fire sale" | | | | | | 15% |
| Equals cash from "Fire sale" of remaining inventory | | | | | $ | 785,414 |

**Recap of Proceeds from Inventory Liquidation**

| | | | | | | |
|---|---|---|---|---|---|---|
| Sales proceeds of inventory during orderly liquidation | | $ 100,000 | 12 | | $ | 1,200,000 |
| Plus "Fire sale" proceeds of remaining inventory | | | | | | 785,414 |
| Total cash from inventory | | | | | $ | 1,985,414 |

**Ch. 11 Bankruptcy Professionals**

| | | | | | | |
|---|---|---|---|---|---|---|
| Total thru March | | | | | $ | 650,000 |
| April estimate - Lain Faulkner | | | | | | 50,164 |
| April estimate - B&M | | | | | | 150,000 |
| April estimate - Strasburger | | | | | | 239,337 |
| Total bankruptcy professionals | | | | | $ | 1,089,501 |

| CALCULATIONS (continued) | | |
|---|---|---|
| **Debtor's Month Burn** | | |
| Rent and utilities | $ | 150,000 |
| Payroll and fringes | | 260,000 |
| Insurance - property and causalty | | 435,346 |
| Maintenance and misc. | | 110,000 |
| Total 4 month burn by debtor | $ | 955,346 |
| | | |
| **CALCULATION OF CASH TO UNSECURED CREDITORS** | | |
| Cash on hand | $ | 3,754,281 |
| Cash from collection of Accounts Receivable | | 1,000,000 |
| Cash from sale of Inventory | | 1,985,414 |
| Accounts payable | | (50,000) |
| Cash from Sale of IP packets | | 300,000 |
| Subtotal, cash generated | | 6,989,695 |
| Less debtors 4 month burn | | (955,346) |
| Less Ch. 11 bankruptcy professionals | | (1,089,501) |
| Less Warranty insurance (due September 1) | | 0 |
| Less Ch. 7 bankruptcy professionals ($50,000/month) | | (200,000) |
| Less Ch. 7 Trustee @ 3% of disbursements | | (209,691) |
| Equals cash available for creditors | | 4,535,157 |
| Pay 503(b)(9) admin claims | | (78,819) |
| Pay secured claims | | (17,484) |
| Pay priority claims | | (56,144) |
| **Equals cash available for unsecured creditors** | $ | 4,382,710 |
| | | |
| **Unsecured Claims** | $ | 37,172,776 |
| | | |
| **% Paid** | | **11.8%** |