Craig F. Simon
Texas Bar No. 00784968
Daniel P. Winikka
Texas Bar No. 00794873
SIMON, RAY & WINIKKA LLP
2525 McKinnon Street, Suite 540
Dallas, TX 75201
Phone: (214) 871-2292
Facsimile:  (469) 759-1699
Counsel for Dr. Kübler, in his capacity as Insolvency
Administrator of Thielert Aircraft Engines GmbH

## IN THE UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| SUPERIOR AIR PARTS, INC. | Case No. 08-36705-BJH-11 |
| Debtor. | |

## OWNIBUS HEARING BRIEF OF INSOLVENCY ADMINISTRATOR
## RELATING TO MOTION TO ENFORCE CONFIRMATION ORDER

## Table of Contents

I.   PRELIMINARY STATEMENT .......................................................................................4

II.  BACKGROUND FACTS...............................................................................................6

III. ARGUMENT AND AUTHORITIES...............................................................................10

   A.   The Plan and Confirmation Order Did Not Give Superior Ownership of the TAE
Materials.......................................................................................................................................10

   B.   The Supplier Agreement Does Not Give Superior Ownership of the TAE
Materials…………………………………………………………………………….………...12

   C.   The Data in the Superior 2D Drawings Is Not a Trade Secret or Confidential, But
Even If It Was, Superior Does Not Own the TAE
Materials………………………………………..…………………………………………….16

IV.CONCLUSION.................................................................................................................22

## Table of Authorities

### Cases

*Adelphon, Inc. v. DiRico,* CA 3-91-2551-T, 1992 WL 281395 (N.D. Tex. March 26, 1992) 18, 21

*Global Water Group, Inv. v. Atchley,* 244 S.W.3d 924, 928-29 (Tex. App.—Dallas 2008, pet. denied) .................................................................................................................... 17, 18, 21

*Cataphote Corp. v. Hudson,* 444 F.2d 1313, 1316 (5th Cir. 1971) ............................................... 19

*In re Chesnut*, 03-41050-DML-13, 2008 WL 2962943 at *1 (Bankr. N.D. Tex. July 29, 2008). 11

*In re Jones*, BK 10 B 04352, 2011 WL 748427 at *1 (Bankr. N.D. Ill. Feb. 24, 2011)............... 11

*In re Matter of Uniservices, Inc.*, 517 F.2d 492, 496-97 (7th Cir. 1975). .................................... 20

*Interspiro USA, Inc. v. Figgie Int'l. Inc.*, 18 F.3d 927 (Fed. Cir. 1994)........................................ 20

*Johnson v. Owens*, 629 S.W.2d 873, 875 (Tex. App. – Fort Worth 1982, writ ref'd n.r.e.)......... 15

*K & G Oil Tool & Serv. Co. v. G & G Fishing Tool Serv.*, 158 Tex. 594, 314 S.W.2d 782 (1958) *on reh'g sub nom*, A-6577, 1958 WL 91271 (Tex. June 4, 1958)…………………………………18

*Lawfinders Assoc., Inc. v. Legal Research Ctr., Inc.,* 65 F. Supp. 2d 414, 418 (N.D. Tex. 1998) .......................................................................................................................... ……..17, 18

*Luccous v. J.C.Kinley Co.,* 376 S.W.2d 336 (Tex. 1964)............................................................. 21

*Picker Int'l. Corp. v. Imaging Equip. Servs., Inc.*, 931 F. Supp. 18, 35 (D. Mass. 1995), *aff'd sub nom Picker Int'l., Inc. v. Leavitt*, 94 F.3d 640 (1st Cir.1996) .................................................... 20

*Pitchfork Land and Cattle Co. v. King*, 346 S.W.2d 598, 602-03 (Tex. 1961) ............................ 15

*Rolls-Royce Corp. v. H.E.R.O.S., Inc.*, No. 3:07-CV-00739-D, 2008 WL 7960055 at p. 14 (N.D. Tex. June 12, 2008)................................................................................................................ 17

*Ross v. Texas One P'ship*, 796 S.W.2d 206, 210 (Tex. App. 1990) writ denied, 806 S.W.2d 222 (Tex. 1991)................................................................................................................................. 15

*Wissman v. Boucher,* 240 S.W.2d 278, 279-280 (Tex. 1951)....................................................... 18

*Woodard v. Gen. Motors Corp.*, 298 F.2d 121, 129 (5th Cir. 1962) ............................................ 19

### Statutes

Tex. Civ Prac. & Rem. Code § 134A.001 .................................................................................... 17

Dr. Bruno Kübler, in his capacity as Insolvency Administrator (the "Insolvency Administrator") of Thielert Aircraft Engines GmbH ("TAE"),[1] files this omnibus hearing brief in response to Superior Air Parts, Inc.'s ("Superior") Motion to Enforce [D.I. 684] and related Hearing Brief Regarding the *Res Judicata* Effect of Superior's Confirmed Plan and the Court's Confirmation Order [D.I. 725] ("Superior *Res Judicata* Brief") and Hearing Brief Regarding Estoppel by Contract, Enforcement of Confidentiality Agreement, and Superior's Ownership of Documents "Created" By TAE [D.I. 724] ("Superior Estoppel Brief"). In support hereof, the Insolvency Administrator respectfully represents as follows.

## I.    PRELIMINARY STATEMENT

1.    This dispute has taken a dramatic turn since the last time the parties appeared before the Court in connection with Superior's motion to continue. At that time, TAE believed that Superior was seeking the return of property it had supplied to TAE. In fact, the parties had essentially reached an agreement that TAE had done so, but a consensual resolution of the motion had not been reached because Superior would not agree that TAE was free to use or transfer the remainder of TAE's segregated materials. It is now clear that Superior seeks much more than the return of its property. Specifically, Superior now asks this Court to order the Insolvency Administrator to provide TAE's own property to Superior – property that TAE created through years of manufacturing-related engineering work by its own engineering staff.

2.    Superior filed its Motion to Enforce (the "Motion") seeking to require TAE, a former affiliate of Superior that itself has been through insolvency proceedings in Germany, and the Insolvency Administrator, to comply with this Court's August 29, 2009 order confirming Superior's plan of reorganization [D.I. 404] (the "Confirmation Order") by returning Superior's property to Superior. As Superior explained in its Motion, pursuant to the supplier relationship

---

[1] Under the German Insolvency Code, TAE can act only through its insolvency administrator, Dr. Bruno Kübler.

between Superior and TAE, "Superior supplied TAE with various Data Packs, blueprints, castings and other documents owned by Superior to allow for the fabrication of parts for Superior . . ." (Motion to Enforce at 2). Superior's Motion makes clear that it seeks the "return" of Superior's property. (*E.g.,* Motion at 9.) It does not make any reference to obtaining, for the first time, documents, data or information created by TAE.

      3.     After much effort, the Insolvency Administrator was ultimately able to locate what he believed to be the universe of drawings and program files Superior had provided to TAE. The Insolvency Administrator produced those documents to Superior in connection with the discovery related to the Motion to Enforce. Superior reviewed those documents and confirmed that Superior had provided the documents to TAE and those documents were Superior's property. Upon Superior's confirmation, the Insolvency Administrator agreed that those documents (and later others that Superior identified after reviewing TAE's files) (collectively, the "Returned Materials") would be returned to Superior and agreed he would not transfer, sell or otherwise convey those documents and files to any third parties.

      4.     There does not appear to be any dispute that the Returned Materials constitute all materials that Superior provided TAE during their supplier relationship (or at least all materials Superior provided to TAE that Superior cares about). After reviewing additional files in the Insolvency Administrator's possession in Germany, however, Superior is now for the first time taking the position that it owns not just the documents and information it provided to TAE but also all drawings and other proprietary manufacturing documents that TAE created through countless hours of its own engineering work to manufacture parts in the most efficient manner. Even though it cannot dispute that TAE, and not Superior, created those materials, Superior contends its owns all of these proprietary manufacturing documents and data (collectively, the "TAE Materials") based solely on the allegation that information from the drawings that Superior provided to TAE is also included in, and served as the starting point for, the models and related documents TAE created.

5.     There is no legal or factual basis for Superior's attempt to now obtain TAE's proprietary manufacturing information. The Supplier Agreement between the parties clearly states that TAE is obligated only to "return" the documents and data Superior "furnished" or "supplied" to TAE. Nothing in the Supplier Agreement grants Superior ownership of, or other rights to, engineering work-product and information TAE created. The evidence will show that this is in fact consistent with industry practice. A manufacturer/supplier would be significantly disadvantaged if a customer like Superior could obtain the manufacturer's engineering work product because the customer could provide it to a competing manufacturer that could then charge much less by relying upon that manufacturing work product without incurring the significant cost necessary to develop it. Furthermore, contrary to Superior's assertions, the Plan and Confirmation Order did not somehow constitute a determination that the TAE Materials are Superior's property.

6.     In addition, although not required to refute Superior's ownership claims, the evidence will also show that, contrary to Superior's assertions, all the information contained in the drawings Superior provided to TAE is available in the public domain or is otherwise readily ascertainable. Accordingly, even if it were relevant to the issue of ownership of the TAE Materials, which it is not, Superior's assertion that the drawings it provided to TAE contain trade secrets or other confidential information is not correct.

7.     Superior's attempt to use this Court's authority pursuant to the Confirmation Order to obtain materials that (a) Superior did not create or provide to TAE; (b) were, in fact, created by TAE and were not provided to Superior during the course of the working relationship between the parties; and (c) are proprietary to TAE, should be rejected.

## II.      BACKGROUND FACTS

8.     On December 15, 2001, TAE and Superior entered into a Supplier Agreement (as subsequently amended in 2005, the "Supplier Agreement"), a copy of which is attached hereto as Exhibit A, pursuant to which TAE agreed to manufacture and sell certain aircraft parts to Superior. The Supplier Agreement provided that Superior would "deliver to TAE all drawings

and the related data and information that TAE may request and which is reasonably required for the intended use of the drawings" and that Superior "shall **retain** title to all **Superior furnished** drawings, related data (whether or not maintained or stored on computer) and information **supplied to TAE** under this Agreement." Supplier Agreement §§ 3.01, 3.02 (emphasis added).[2] While this provision unambiguously provides only that Superior does not lose, but instead "retains," title to drawings, related data and information Superior furnishes, Superior apparently contends that the agreement somehow vests it with title to any "related data" that TAE creates. While the parties could have agreed to such a provision, they plainly did not.

9.      Pursuant to the Supplier Agreement, Superior provided to TAE drawings, related data and information needed to begin the manufacturing process of the aircraft parts. The vast majority of the documents/information Superior provided consisted of two-dimensional (2D) drawings (which drawings also contained information and instructions) of the finished parts that Superior wanted TAE to manufacture or bid on. To manufacture the parts in the most cost efficient manner, TAE performed a significant amount of engineering work, creating additional drawings, data and other manufacturing-related information (*i.e.*, the TAE Materials). The work TAE engineers performed created commercially valuable, proprietary manufacturing documents that would enable a manufacturer to manufacture the parts in a cost-effective manner and within the specifications provided by the customer. Consistent with industry practice, the TAE-created materials were not shared with Superior.

10.      In April 2008, both TAG and TAE were placed into insolvency proceedings in Germany. Dr. Kübler was appointed as the Insolvency Administrator over TAE. A separate insolvency administrator was appointed over TAG.

---

[2] At the time the Supplier Agreement was entered into, TAE was a wholly owned subsidiary of Thielert A.G. ("TAG"), a German company founded by Frank Thielert. In 2006, TAG acquired Superior, which thus became a sister company of TAE, both wholly owned by TAG.

11.     On or about December 31, 2008, Superior commenced the above-captioned
bankruptcy case by filing a voluntary chapter 11 petition.  Superior filed its Third Amended Plan
of Reorganization (the "Plan") on July 23, 2009 [D.I. 322], and the Court entered the
Confirmation Order confirming the Plan on August 27, 2009 [D.I. 404].  The Plan went effective
and Superior emerged from chapter 11 on September 28, 2009 (the "Effective Date") [D.I. 432].
The Confirmation Order provided that certain parties, including TAG, TAE and others, "shall be
directed" to return to reorganized Superior "all documents and other information **owned by the
Debtor** related to the Debtor's business and operations."  Confirmation Order ¶ 37 (emphasis
added).

12.     On August 20, 2010, the Trustee of the Superior Creditor's Trust filed an
Application for Final Decree [D.I. 650], asserting that the case had been fully administered and
the final distributions to creditors had been made.  Accordingly, the Court entered an order
closing the above-captioned bankruptcy case on October 8, 2010.  The Court entered an order
reopening the bankruptcy case on May 23, 2012 [D.I. 670] to hear an adversary proceeding that
involved several bankruptcy issues, including whether certain third party claims against Superior
were barred by the Plan and the Confirmation Order.

13.     TAE continued manufacturing and selling aircraft parts to Superior throughout the
course of Superior's bankruptcy case and up through the second quarter of 2013.  On April 24,
2013, nearly four years after the Confirmation Order was entered, Superior sent the Insolvency
Administrator a letter alleging, for the first time, that TAE, TAG and an affiliated entity had
failed to comply with the Confirmation Order.  The April 24, 2013 letter cited several provisions
of Superior's Plan and Confirmation Order generally describing Superior's piece parts business
and Vantage engine program and demanded that TAE immediately return Superior's property,
which Superior stated included a list of parts attached to the April 24, 2013 letter.

14.     On July 11, 2013, Superior filed a Motion to Show Cause (the "Show Cause
Motion") [D.I. 673], asking the Court to enter an order requiring the Insolvency Administrator to
show cause why TAE should not be held in contempt and enjoined for allegedly violating the

terms of the Confirmation Order four years after it was entered by failing to turn over property
allegedly belonging to Superior.

15.     Because the Insolvency Administrator did not have an adequate basis yet to
properly determine what, if any, information in his possession properly belongs to Superior, out
of an abundance of caution and to ensure that he did not transfer any property that Superior
might conceivably own, the Insolvency Administrator segregated all documents, information and
other property that related in any way to the general descriptions and part numbers Superior had
provided (the "Segregated Property").  Although the Insolvency Administrator later sold all of
TAE's assets, the Segregated Property was withheld from the assets transferred to the buyer and
remains segregated at this time.

16.     On November 14, 2013 this Court entered an order [D.I. 682] denying the Motion
to Show Cause for want of prosecution without prejudice.  The next day, on November 15, 2013,
Superior filed the Motion to Enforce [D.I. 684] (the "Motion to Enforce"), asking the Court to
enter another order effectively containing the same terms as the Confirmation Order (to the
extent that order required the immediate return of Superior's property) and directing the
Insolvency Administrator to return all property belonging to Superior.

17.     Thereafter, the Insolvency Administrator continued to try to determine what
specific materials and information Superior was seeking to have returned under the Confirmation
Order.  Based on its own review of the Segregated Property (assisted by a former TAE engineer),
the Insolvency Administrator ultimately identified what he believed to be all the materials that
Superior had furnished to TAE .  Consistent with the terms of the Supply Agreement and the
Court's Confirmation Order, TAE returned such material (*i.e.*, the Returned Materials) to
Superior.

18.     Following the Insolvency Administrator's return of the Returned Materials,
Superior agreed that the Returned Materials appeared to constitute all the property Superior had
furnished to TAE (with the exception of 2D drawings for approximately 15 part numbers).  But
after the Insolvency Administrator requested that Superior permit him to transfer or use the

remainder of the Segregated Property, Superior decided to travel to Germany to review the remainder of the Segregated Property. Superior's Keith Chatten and Jeff Lochridge spent three days in the Insolvency Administrator's office in Cologne, Germany in June 2014. There, they were provided access to (a) a USB drive housing thousands of documents, (b) various hard copy documents, and (c) databases that house additional information. During the review, Superior located additional documents that the Insolvency Administrator agreed to return to Superior. The parties were not able to reach agreement regarding the ownership of certain other documents that Superior did not furnish TAE but that Superior now claims it owns. These additional materials, all of which were created by TAE and that include valuable manufacturing engineering information created by TAE, are the TAE Materials.

## III.   ARGUMENT AND AUTHORITIES

19.     The Insolvency Administrator does not dispute that whatever property Superior actually **owned** on the date of confirmation vested in reorganized Superior. Nor does he contest his obligation, whether pursuant to the Confirmation Order, the Supplier Agreement or otherwise, to return Superior's property to Superior. But the information and documents Superior seeks extend well beyond materials Superior owns, which is limited to the materials the Insolvency Administrator has already provided to Superior (*i.e.*, the Returned Materials). Because Superior—which has the burden of proof on its Motion—has failed to articulate any legitimate basis for its demand that it owns the TAE Materials or any other materials or information other than that which Superior supplied to TAE and which the Insolvency Administrator has already returned or agreed to return, the Motion to Enforce should be denied.

### A.     The Plan and Confirmation Order Did Not Give Superior Ownership of the TAE Materials

20.     In its *Res Judicata* Brief, Superior asserts that the Plan and Confirmation Order somehow establish that Superior owns the TAE Materials and that the Plan and Confirmation Order bar any claims of TAE that TAE owns the TAE Materials. This entire argument, however,

is based solely on general descriptions of Superior's business in the Plan and related disclosure statement (the "Disclosure Statement").

21.     Superior's argument is meritless.  The Plan and Confirmation Order in no way determined the ownership of the TAE Materials.  The Disclosure Statement, Plan and Confirmation Order merely (a) described generally the types of assets that Superior owned and that would vest in reorganized Superior and (b) required any parties holding property "owned by Superior" to return Superior's property.  Nowhere in the Disclosure Statement or Plan did Superior take the position that any property TAE or any other supplier developed is owned by Superior and would be transferred to, or vest in, reorganized Superior.  For instance, as Superior points out, the Disclosure Statement stated that "[t]he Debtor owns Intellectual Property related to its PMAs, Production Certificates, Type Certificates and Supplement Type certificates of undetermined value." (Superior *Res Judicata* Brief at 4).  Superior obviously owns certain drawings and related data for the parts it sells (*e.g.*, the Returned Materials).  *See also* Disclosure Statement at 8-9 (noting that Superior's Piece Parts Business includes some IP assets and that any such assets will revest in reorganized Superior).  Accordingly, both cases Superior cites as supporting its position are completely inapposite because in each case the Debtor not only listed the specific item of property as its asset but also listed a third party as having a lien on that asset.  *See In re Chesnut*, 03-41050-DML-13, 2008 WL 2962943 at *1 (Bankr. N.D. Tex. July 29, 2008) (noting that the plan listed the specific parcel of real property as an asset subject to a lien held by third party); *In re Jones*, BK 10 B 04352, 2011 WL 748427 at *1 (Bankr. N.D. Ill. Feb. 24, 2011) (noting that the debtor listed on schedule D certain jewelry and a secured creditor that held a lien on that jewelry).

22.     In fact, if anything, the record indicates that Superior did not believe it owned the TAE Materials.  Although testimony at the hearing from Superior's own witnesses will establish that Superior was aware of the TAE Materials, Superior failed to include any description in the Disclosure Statement that it owned drawings/materials created by TAE or any other of its suppliers.  Similarly, as part of the restructuring process Superior set up a comprehensive data

room for potential buyers to do due diligence on Superior's assets. There were no TAE documents in the data room. If Superior believed it owned the TAE Materials and such materials were important in any way to its business, Superior surely would have ensured a copy of those materials was made available to potential buyers/investors on a confidential basis. Consistent with this position, the Plan and Confirmation Order require parties to "return" property to Superior, demonstrating that the property consists of items that Superior had furnished to such parties, not property created by such third parties. See Plan of Reorganization §6.12 and Confirmation Order ¶ 37 (each requiring parties "return to the Reorganized Debtor").

23.    With respect to the Plan and Confirmation Order requirements that property be "returned" to Superior, each of those provisions is limited to property actually "owned" by Superior. Plan of Reorganization §6.12 and Confirmation Order ¶ 37 (each providing that parties "return to the Reorganized Debtor all documents and other information **owned by the Debtor** related to the Debtor's business and operations (the "Proprietary Information")) (emphasis added); see also Plan §6.13 ("the **property of the Debtor** . . . shall vest in the Reorganized Debtor") (emphasis added) and Confirmation Order ¶ 36 ("all **property of the Estate** shall vest in the Reorganized Debtor") (emphasis added). It is undisputed that any property—intellectual or otherwise—not owned by Superior is not subject to the Confirmation Order. Thus, the question before the Court is whether the materials and information Superior seeks to have returned (i.e., the TAE Materials) are properly "owned" by Superior. Based on both the parties' agreement and industry practice, the answer to that question is no.

## B.    The Supplier Agreement Does Not Give Superior Ownership of the TAE Materials

24.    The Supplier Agreement executed by the parties in 2001 provided that Superior would "deliver to TAE all drawings and the related data and information that TAE may request and which is reasonably required for the intended use of the drawings." Supplier Agreement § 3.01. It further provided that Superior "shall retain title to all **Superior furnished** drawings,

related data (whether or not maintained or stored on computer) and information **supplied to TAE** under this Agreement." *Id.* at § 3.02 (emphasis added). The same provision also stated that "TAE will maintain the confidentiality of all drawings, data and information **supplied by Superior and will return such drawings, data and information** to Superior upon the termination of this Agreement." *Id.* (emphasis added). Thus, from the very outset of their relationship, the parties contemplated that Superior would retain title to those materials "furnished" or "supplied" to TAE by Superior and that TAE would keep such materials confidential and return them to Superior when the parties' relationship terminated.

25.     As noted above, the Insolvency Administrator has already agreed to return to Superior the materials Superior "furnished" or "supplied." Those obligations are not in dispute. Superior, however, is now claiming ownership not only of the 2D drawings and information it provided to TAE but also of all the 3D volume models and related drawings and manufacturing information TAE created through extensive engineering work. Specifically, counsel for Superior provided counsel for the Insolvency Administrator with a spreadsheet that identified "documents Superior contends should be turned over to Superior pursuant to the Confirmation Order, but Dr. Kubler disputes." The documents on that spreadsheet extend far beyond the "drawings, data and information *supplied by Superior.*" Indeed, the spreadsheet reveals that Superior is seeking hundreds of 3D volume models, drawings and other manufacturing-related documents that reflect years of work and manufacturing know-how of TAE (*i.e.*, the TAE Materials). In their recent depositions, Superior's witnesses confirmed that they seek all documents and drawings "related to" information supplied by Superior, regardless of the fact that TAE engineers created the documents and drawings and that they reflect TAE's engineering judgment.

26.     Professor Adrian Rienäcker, the expert TAE retained to examine the Segregated Property, will testify that the documents and drawings Superior seeks include several categories of materials TAE created as part of its work to create and document a cost-effective process to manufacture the parts. Such materials include 3D volume models, 2D detail (finished part) drawings based on the volume models, detailed manufacturing drawings and other

manufacturing information and manufacturing machine related information (CNC code), all of
which contain sensitive manufacturing-related information.

27.     Superior is no longer seeking the **return** of anything.  It is seeking to obtain
valuable commercial information TAE developed and owns regarding the detailed processes
needed to actually *manufacture* those parts.  If the parties had intended that Superior would own
such TAE-created material, it would have been a simple matter for the parties to draft the
Supplier Agreement to specify that any manufacturing materials or models TAE creates using
Superior drawings would become property of Superior.  The parties did not do so.  Instead, the
Supplier Agreement only provides that Superior shall "retain" title to the materials it "furnished"
or "supplied."  The Supplier Agreement plainly limits Superior's ownership to retention of title
to the drawings, data and information Superior actually furnished to TAE.

28.     Furthermore, while parties could certainly agree otherwise, a provision giving
Superior the right to TAE-created manufacturing materials would have been contrary to normal
industry practice.  Professor Adrian Rienäcker will testify that, in the industry, manufacturers
such as TAE undertake significant independent work to create valuable, proprietary documents
necessary for the manufacturer to make the parts in a cost-effective manner and within the
specifications provided by the customer.   Such manufacturers generally do not share those
manufacturing-related documents with their customer.  Instead, such materials are treated by a
manufacturer (like TAE) as valuable, proprietary information owned by the manufacturer.  If the
customer was entitled to such materials, it would put the manufacturer at a significant
disadvantage for future dealings because it would enable the customer to provide such materials
to competing manufacturers that could in turn manufacture the parts without having to invest the
time and money to develop their own processes.

29.     Superior suggests that TAE's creation of the TAE Materials was "improper" and
somehow a breach of the Supplier Agreement. *See* Superior Estoppel Brief at ¶26.  Consistent
with the Supplier Agreement, TAE created the TAE Materials to assist TAE in performing under

the Supplier Agreement.[3]  Contrary to Superior's assertions, however, the fact that TAE created the TAE Materials in connection with its performance under the Supplier Agreement does not somehow give Superior ownership of the TAE Materials.

30.     Recognizing that the plain language of the Supplier Agreement does not give Superior the right to the TAE Materials, Superior argues that the agreement should be read to give Superior such rights on the basis that the relationship between the parties "mirrors" an agent/principal relationship, and agency principles suggest that anything created by the agent using the principal's property belongs to the principal.  Superior Contract Estoppel Brief at 10-12.

31.     The supplier relationship between Superior and TAE was clearly an independent contractor relationship, not an agency/principal relationship.  "Proof of agency requires a showing that the alleged principal has the right to assign the agent's task *and* the right to control the means and details of the process to be used to accomplish the task."  *Ross v. Texas One P'ship*, 796 S.W.2d 206, 210 (Tex. App. 1990) writ denied, 806 S.W.2d 222 (Tex. 1991) (citing *Johnson v. Owens*, 629 S.W.2d 873, 875 (Tex. App. – Fort Worth 1982, writ ref'd n.r.e.).  "On the other hand, an independent contractor is one who, in the pursuit of an independent business, undertakes a specific job for another person, using his own means and methods, without submitting himself to the other's control regarding details of the job."  *Id.* (citing *Pitchfork Land and Cattle Co. v. King*, 346 S.W.2d 598, 602-03 (Tex. 1961)).  Factors used to determine whether one is an independent contractor include:  "(1) the independent nature of the contractor's business; (2) his obligation to supply necessary tools, supplies, and materials; (3) his right to control the progress of the work except as to final results; (4) the time for which he is employed; and (5) the method by which he is paid, whether by the time or by the job."  *Id.*  Here, Superior did not have control over the details of how TAE determined to go about the manufacturing

---

[3] The Supplier Agreement is limited to a relatively small number of parts, and does not appear to have ever been expanded to apply to the far greater number of parts that Superior contends are subject to the agreement.

process, and each of the factors typically considered leave no doubt that TAE was an independent contractor. Accordingly, it is inappropriate for Superior to attempt to apply agency principles to avoid the plain language of the contract and obtain TAE work product Superior did not bargain for under the contract.

      **C.**     **The Data in the Superior 2D Drawings Is Not a Trade Secret or Confidential, But Even If It Was, Superior Does Not Own the TAE Materials**

     32.     Superior contends that TAE is estopped, based on "estoppel by contract," from arguing that the data in the Superior 2D drawings is not confidential or proprietary. Superior Estoppel Brief at 8-9. Although Superior has cited no authority for the proposition, Superior appears to be suggesting in its brief that it is entitled to the TAE Materials if those materials were derived from or contain Superior confidential and proprietary data. Both of these contentions are incorrect.

     33.     As an initial matter, the data in the Superior 2D drawings is not a trade secret or confidential but rather all information in the 2D drawings is in the public domain or readily ascertainable. Professor Rienäcker will testify that all information contained in Superior's 2D drawings can be readily obtained independent from SAP with moderate effort and at reasonably low cost from generally available sources such as internet research, engine manuals and independent engineering judgment.

     34.     Superior's own witness and designated corporate representative, Charles Dedmon, corroborates Professor Rienäcker's opinion. Mr. Dedmon is the son of Superior's founder and worked for Superior for decades, including as its President and CEO, and was largely responsible for obtaining FAA approval for Superior to manufacture the parts at issue in this dispute. Mr. Dedmon was retained as a testifying expert witness in other litigation.

     35.     In that litigation, Mr. Dedmon unequivocally and affirmatively testified that all information for the design of the replacement parts Superior produces for Continental and Lycoming engines (the so-called PMA replacement parts that are at issue here) is in the public domain:

Q. How many parts have -- have you tried to obtain PMA approval for with respect to the Continental and Lycoming aircraft engines?

A. Several thousand.

Q. And that related to piston engines?

A. Yes.

Q. And every single one of those several thousand parts, the information was in the public domain?

A. Yes.

*See* Dedmon expert testimony in *Rolls-Royce Corp. v. H.E.R.O.S., Inc.*, No. 3:07-CV-00739-D, 2008 WL 7960055 at p. 14 (N.D. Tex. June 12, 2008). A copy of this expert testimony along with Mr. Dedmon's related expert report (available at 2009 WL 6653377) is attached as Exhibit B). Mr. Dedmon recently confirmed this testimony in his deposition in this contested matter. (Dedmon 7/15/14 Dep. 111-112.)

36.     Because the 2D drawing information is in the public domain or readily ascertainable, it does not meet the definition of a trade secret and is not confidential. To qualify as a trade secret, information (including a formula, pattern, compilation, program, device, method, technique or process) must (a) derive independent economic value from not being known to and not being readily ascertainable by proper means by other persons; and (b) be subject to reasonable efforts to maintain its secrecy. Tex. Civ Prac. & Rem. Code § 134A.001; *see also Global Water Group, Inv. v. Atchley,* 244 S.W.3d 924, 928-29 (Tx. App.—Dallas 2008, pet. denied). Something that is not secret cannot be a trade secret. *Id.; see also Lawfinders Assoc., Inc. v. Legal Research Ctr., Inc.,* 65 F. Supp. 2d 414, 418 (N.D.Tex. 1998) ("A key part of the definition of a trade secret is secrecy."). Importantly, the concept of secrecy "is not limited solely to confidentiality, but also requires that the information 'is not generally known or readily ascertainable by independent investigation.'" *Global Water Group,* 244 S.W.3d at 928

(internal citations omitted). The ease or difficulty with which information could be duplicated by others is a key factor in determining whether a trade secret exists. *Global Water Group,* 244 S.W. 3d at 930.[4]

37.    Both state and federal courts in Texas have rejected claims of misappropriation of trade secrets—even where the defendant obtained the information or documents at issue pursuant to a subsequently-breached confidentiality agreement or otherwise improperly made use of information considered by the plaintiff to be confidential and a trade secret—based on the fact that information or material that is not secret (including because it has been disclosed or because it can be readily ascertained) is not a trade secret. *See, e.g., Global Water Group,* 244 S.W.3d at 928-30 (upholding judgment notwithstanding the verdict in favor of former employee who had signed a confidentiality agreement and had obtained information regarding a formula for mixed media pod in water purifier because the formula was not a trade secret; decision was based on, among other things, the fact that it "would not have been particularly difficult" for a competitor to duplicate the formula); *Lawfinders,* 65 F. Supp. 2d at 421 (denying injunction to prevent use of alleged trade secrets by competitor who had obtained confidential information during failed merger discussions because property was not a trade secret); *see also Wissman v. Boucher,* 240 S.W.2d 278, 279-280 (Tex. 1951); *Adelphon, Inc. v. DiRico,* CA 3-91-2551-T, 1992 WL 281395 (N.D.Tex. March 26, 1992) at *3.

38.    Furthermore, contrary to Superior's "estoppel by contract" argument, TAE is not estopped by the Supplier Agreement from arguing that the information in the Superior 2D

---

[4] Cases such as *K & G Oil Tool & Serv. Co. v. G & G Fishing Tool Serv.*, 158 Tex. 594, 314 S.W.2d 782 (1958) *on reh'g sub nom,* A-6577, 1958 WL 91271 (Tex. June 4, 1958), holding that the existence of a proper means of acquiring trade secret information does not preclude liability if the defendant did not use such means but instead obtained the information improperly or breached a confidence, are not to the contrary. As the *Lawfinders* court made clear, such opinions "assume the existence of a trade secret and focus on the second element of a misappropriation claim—the requirement that the defendant acquire the trade secret through breach of a confidential relationship or discovery it by improper means." *Lawfinders,* 65 F. Supp. 2d at 421. The threshold inquiry is whether the material is a trade secret at all, which it is not if the information is readily ascertainable by another. *Id.*

drawings is not confidential or proprietary. As an initial matter, estoppel by contract is really a misnomer, because the doctrine means nothing more than the fact that parties are bound by the terms of their contracts. *See, e.g., Woodard v. Gen. Motors Corp.*, 298 F.2d 121, 129 (5th Cir. 1962). TAE did not agree in the Supplier Agreement that Superior's drawings were confidential and proprietary. TAE only agreed to "maintain the confidentiality" of all drawings. That is, to the extent the drawings or portions of such drawings are in fact confidential, TAE agreed to maintain that confidentiality. It is not a breach of the Supplier Agreement for TAE to contend that, in fact, none of the information in the drawings is actually confidential. Moreover, in *Woodard,* the Fifth Circuit made clear that, for estoppel by contract to apply, the party claiming estoppel must show that "he was misled to his injury by a reliance upon recitals in the instrument and that he had no notice of facts contrary to those recited." *Id.* In this instant case, the "recitals" at issue were, again, made by Superior (not by TAE), and Charles Dedmon's testimony indicates that Superior actually knew at the time of those recitals that the information it was providing was readily ascertainable and, therefore, not confidential or a trade secret. Accordingly, estoppel by contract cannot apply.

39.    Moreover, the Fifth Circuit has expressly recognized that providing material subject to a confidentiality agreement cannot create a duty not to use the information if it was not a trade secret or confidential to begin with. *See Cataphote Corp. v. Hudson,* 444 F.2d 1313, 1316 (5th Cir. 1971). The *Cataphote* court noted:

> A duty not to use an idea already known cannot be created by
> virtue of the fact that one makes a confidential disclosure of that
> idea. If the rule were not so restricted it is obvious that by
> disclosing an idea under delusions of confidence, the person
> making the disclosure thereafter could prevent the confidante from
> subsequently making use of it, even though the idea was well
> known prior to the date of the disclosure....

*Id.; see also also Lawfinders,* 65 F. Supp. 2d at 419-20 (discussing cases, including *Cataphote* , finding that information that was not confidential or a trade secret did not become so by virtue of being disclosed under a confidentiality agreement).

40.    Superior cites three non-Texas cases to argue that if a party obtained information pursuant to a confidentiality agreement, it can never challenge whether that information was truly confidential or a trade secret. *See* Estoppel Brief at ¶18. Those cases, however, do not support Superior's position. First, *Interspiro USA, Inc. v. Figgie Int'l. Inc.*, 18 F.3d 927 (Fed. Cir. 1994), was a patent case in which the parties had previously entered into a settlement agreement whereby the defendant agreed to pay royalties on the sale of infringing products and subject itself to audits by the plaintiff. *Id.* at 929. On a subsequent motion to enforce the agreement, the district court made evidentiary rulings preventing the defendant from challenging the enforceability of the underlying patent. *Id.* at 932. In upholding those rulings, the Federal Circuit cited specific paragraphs of the settlement agreement that apparently stated that the defendant "waived its right to challenge the validity and enforceability of the [] patent with respect to products covered by the agreement." Thus, unlike here, the case was not based on a contract or any confidentiality provision but on a settlement agreement pursuant to which the defendant waived the right to challenge enforceability of the patent as to the relevant products. Such a scenario is clearly distinguishable from the present case.

39.    Superior also relies on *Picker Int'l. Corp. v. Imaging Equip. Servs., Inc.*, 931 F. Supp. 18, 35 (D. Mass. 1995), *aff'd sub nom Picker Int'l., Inc. v. Leavitt,* 94 F.3d 640 (1st Cir.1996) and *In re Matter of Uniservices, Inc.*, 517 F.2d 492, 496-97 (7th Cir. 1975). In *Picker,* while the court did discuss estoppel, it also went on to conduct an extensive analysis as to whether the information at issue truly was a trade secret, concluding that it was. *Picker,* 931 F. Supp. at 35-38. *Uniservices* provides even less support to Superior's position. First, the case was a decision on a covenant not to compete (not on a breach of confidentiality provision) and it involved an employer-employee relationship, which the court found included implied obligations

not to compete. *Uniservices,* 517 F. 2d at 497. Second, contrary to Superior's implication, the estoppel finding was not based solely on the fact that the former CEO had treated such information as confidential while he was an employee, but rather on his entire "prior conduct," including the fact that, when the CEO and his family sold the assets of the company to the debtor, they had valued the information at issue at $1,500,000. *Id.* Thus, the case was not based on a confidentiality provision but on a course of conduct involving implied obligations between an employer and employee and on the defendant's own affirmative representation regarding the value of the information at issue.

40.      While the few extra-jurisdictional cases Superior cites are, as shown, distinguishable, perhaps most important is the fact that Superior's argument, if accepted, would necessarily mean that a company could effectively create trade secrets (at least as between the parties) out of material that clearly did not meet the legal requirements of trade secrets, simply by disclosing the material under an agreement that referred to them as such. Such a position is contrary both to public policy and to the numerous cases that, in spite of the existence of a confidentiality agreement or provision, still begin their analysis with the threshold question of whether the material at issue is truly confidential or a trade secret. *See, e.g., Luccous v. J.C.Kinley Co.,* 376 S.W.2d 336 (Tex. 1964) (analyzing whether information at issue was a trade secret and concluding that it was not despite the fact that information had been provided pursuant to a confidential licensing agreement); *Global Water Group,* 244 S.W.3d 924 (conducting trade secret analysis and concluding information was not a trade secret despite former employee's signing a confidentiality agreement); *Adelphon,* 1992 WL 281395 (where defendant had obtained information from the plaintiff under the guise of negotiating a contract to purchase the product, concluding that it was "unnecessary for the court to resolve the issue of whether [defendant] discovered the trade secret by improper means or breached a confidence placed in him" by the plaintiff because the information did not meet the test for a trade secret).

41.      Finally, even if the 2D drawings did in fact contain confidential and proprietary data, which they do not, the fact that the TAE Materials—which were created through thousands

of man-hours of independent work by TAE and which contain extensive work done by TAE regarding information and processes necessary to manufacture the parts at a competitive rate— may also include some or all of that information does not vest Superior with ownership of the TAE Materials. Superior has cited no authority to suggest otherwise.

### IV. CONCLUSION

The Insolvency Administrator respectfully requests that the Motion to Enforce be denied and that the Insolvency Administrator be awarded any additional relief to which he may be entitled.

Dated: July 18, 2014

Respectfully submitted,

/s/ Craig F. Simon
Craig F. Simon, Esq.
State Bar No. 00784968
Daniel P. Winikka, Esq.
State Bar No. 00794873
SIMON, RAY & WINIKKA LLP
2525 McKinnon Street, Suite 540
Dallas, TX 75201
Telephone: (214) 871-2292
Facsimile: (469) 759-1699

**Counsel for Dr. Bruno Kübler, in his
Capacity as Insolvency Administrator of
Thielert Aircraft Engines GmbH**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 18th day of July, 2014, a true and correct copy of the foregoing document has been served on the parties listed below via the Court's ECF filing system, first class mail or other appropriate means.

/s/ Craig F. Simon
Craig F. Simon

U.S. Trustee
1100 Commerce Street, Room 976
Dallas, TX 75242-1496

Jerry Alexander
James Adams
Christopher Robison
PASSMAN & JONES
1201 Elm Street, Suite 2500
Dallas, TX 75270