A. Well, PMA process originally was set up to qualify products, to install on type certificated engines that may have a broader reach.

For example, a sparkplug is approved under the PMA regulations, even though it is shipped out the doors as part of an OEM engine or an igniter or a nozzle, or whatever. Ignition systems, fuel systems, all of those are approved normally under the PMA regulations.

But in the '50s, the regulations started to be used by people who wanted to manufacture parts as replacement parts for a type certificate holder. In other words, not in conjunction with, but in competition with the type certificate holder.

And when competition was then interjected into it, it became controversial, and there was a lot of market fight going on in that area.

Q. And that -- is that just historical information that you've read about or heard about?

A. And participated in.

Q. In the '50s?

A. Actually, I did have some -- some knowledge and work in the late '50s with this.

Q. What empirical evidence or data do you have to correlate your discussion of market conditions to what Rolls-Royce is doing with respect to the Model 250 engine?

A. From reading, what I understand Rolls-Royce to be doing with changing -- changing their bulletins, changing their information, using supersedure procedure, that type of thing, I think they're following the identical path that other competition has, other OEMs have, over the years.

Q. And what have you been reading?

A. Well, I've read the complaint and I've read the countercomplaint about the changing of the bulletins.

Q. Do you have any empirical evidence or data to support the allegations that are in the counterclaim?

A. Have I seen any of this? No, I don't.

Q. Did you do any independent analysis of competition and economic considerations for PMA parts for the Model 250?

A. No, I didn't.

Q. So, you have no basis to correlate these statements to the Model 250 or to Rolls-Royce?

A. Other than my understanding of what's going on in the industry.

Q. Turning to Page 5 of your report ...

A. (Complying.) Uh-huh.

Q. There's some discussion about economic structure of the market. Again, none of this makes its way into your list of opinions on Page 13.

Is this something that you're not going to testify to at trial?

A. I may.

Q. Are you rendering an opinion as to any economic or competitive analysis of the PMA market?

A. I'm explaining how the PMA market works and the basic economic structure of that market and why -- why it exists the way it is.

Q. And what is the basis for that testimony?

A. Well, it's my knowledge of the industry and the way the industry is actually structured. I mean, the -- it's very clear that the OEM sells the product at -- at a relatively low price to the OEM air frame manufacturer, and the profit margins on the products increase proportionately to how much they can control -- how much economic control they have over the product.

Q. When you --

A. It's very similar to selling a razor and razor blades. Razors are cheap, razor blades aren't.

Same would be true in color printers for your computer. The printers are very cheap, the ink replacements are very expensive.

Q. When you refer to the OEM, who are you referring to?

A. Could be any of the OEMs. It could be TCM, it could be Lycoming, it could be Pratt & Whitney, it could be Rolls-Royce or Allison.

Q. Do you have any evidence that it is?

A. I have no specific evidence other than the way the market is structured.

Q. And when you're talking about market, you're referring to the PMA market?

A. I'm talking actually not just the PMA market, the total aftermarket for products. The OEM market leads to the PMA market. So, this is -- this is not just the PMA market, it's the -- actually, the OEM and total market.

Q. So, you have no evidence or data to correlate this discussion of economic structure to what Rolls-Royce is doing or to the Model 250 engine?

A. I have done no analysis on cost or pricing.

Q. So, you've done no independent analysis of the economic structure of the market for Model 250 engine --

A. That's correct.

Q. -- parts?

What time frame are we talking about when you're discussing the economic structure of the market?

A. The way the market was structured in the '50s, the '60s, and actually, the way it's structured now.

Q. One of your statements in the third bullet point is that gross margins on replacement parts sales were the highest of all market segments.

What empirical data or evidence do you have to support this statement?

A. The information is based on my experience with a number of different aircraft companies, Teledyne, Lycoming, Pratt.

Q. Do you have any data or evidence specific to Rolls-Royce or the Model 250 engine?

A. No.

Q. Turning to Page 6 of your report ...

A. (Complying.)

Q. This is a similar situation in that none of the discussion on OEM competitive restrictions to PMA suppliers makes its way into your opinions on Page 13.

Are you rendering an opinion on whether Rolls-Royce engages in such alleged competitive activities?

A. From the information that I was able to obtain from the complaint and the counterclaim, it appears that they are following the very similar path.

Q. And you've done no independent analysis to confirm the allegations --

A. Well, I have knowledge of what goes on in the industry. For example, I know that -- from ARSA documents, for example, that -- that there's been claims that Rolls-Royce has refused to make their ICAs available, their Instructions for Continued Airworthiness available to the industry.

Q. Do you have any personal knowledge of the market conditions with respect to the Model 250 engine?

A. The actual market itself? No.

Q. Or the PMA market for the Model 250 engine?

A. No.

Q. Looking at No. 1 of your --

A. (Complying.) Uh-huh.

Q. -- competitive restrictions, it -- you refer to it as the "disparagement technique."

A. Right.

Q. Isn't it true that a PMA applicant can get approval simply by copying the OEM's drawing?

A. Sim -- no, that's not true. They can't get a PMA made by simply copying the drawing.

Q. So, how does one obtain PMA approval based on identicality?

A. Well, the first step is, of course, using the design data. And if they had an OEM drawing and -- and using information off of it, they can.

But the second step is getting the PMA approval, is establishing the quality control system.

[Note: Pages 98-101 missing in original document]

A. I'm suggesting that that is a typical technique for OEMs in fighting PMA competition and that I've seen it in a number of -- from a number of different companies.

And in using words like "imitation" -- and if Rolls-Royce has gone to customers and used this type of disparaging discussion, then, they're following the -- the same path that others have.

Q. How many companies do you know of that employ this technique?

A. Gosh, I've seen it used by -- I don't know. I could probably name at least half a dozen right off.

Q. And how many companies are there in the entire industry?

A. I don't know.

Q. And you have no evidence that Rolls-Royce has done that?

A. Like I say, they used -- you know, by using the word "imitation" in -- in their claim, they've actually fallen into using one of the common terms that's used in disparagement.

Q. I'm referring to No. 1-A.

A. Uh-huh. I don't -- I don't have any specific knowledge that Rolls-Royce has said -- told anybody that PMAs are getting a free ride.

Q. Looking at No. 1-B, you say that OEMs tell potential customers, suppliers, and even the FAA, that PMA suppliers are only interested in spare parts, not servicing the entire engine.

A. Uh-huh.

Q. Aren't PMA manufacturers and suppliers, by definition, interested in only spare parts?

A. Well, yes, but they can go up to and include the entire engine.

Q. Do you know of any PMA manufacturer or supplier that manufactures every single part for a particular engine?

A. Yes.

Q. And who is that?

A. Superior Air Parts.

Q. And what engine is that?

A. Lycoming 0-320, 03-60 series.

Q. Is that the only engine that you're aware of?

A. Yes.

Q. Are there any PMA manufacturers of Rolls-Royce Model 250 parts that manufacture every single part of the Model 250 engine?

A. I don't know.

Q. Do you know whether any of the PMA manufacturers for the Model 250 engine parts manufacture only spare parts?

A. I don't know.

Q. Other than the example that you gave for Superior Air Parts, how is Item 1-B false?

A. How is Item 1-B what?

Q. How is Item 1-B false?

A. How is it false?

Q. Yes. You're telling me that this is a disparagement technique.

How is it false?

A. Oh, it's -- it -- not necessarily false. It's the way that they go about telling them. It's couched in terms of "they're only interested in spare parts," "they're not spending the time and money in developing the entire engine, and therefore, you should not buy their product, because it's not doing us any good as a company," and "it's hurting us as a company."

Q. So, with the exception of Superior Air Parts, isn't Item 1-B true with respect to every single PMA supplier?

A. It could very well be, yes. But that's competition. That's what's -- what you're supposed to do.

Q. Do you know whether H.E.R.O.S. or -- I'm sorry, do you know whether Hye-Tech is only interested in spare parts?

A. I don't know.

Q. And you have no empirical data or evidence to correlate Item 1-B to Rolls-Royce or the Model 250 engine?

A. No.

Q. Looking at Item 1-C, what do you mean by "fast moving replacement parts"?

A. Well, it's -- if one is going to make replacement parts, one would make, first, the ones that are replaced the most often, the fast moving, the high -- high replacement items.

Q. And what kind of parts are replaced the most often?

A. Parts that are subject to rotation and movement, friction, wear.

Q. Do those tend to be the less complex parts to make?

A. Not necessarily.

Q. Is it your opinion that PMA suppliers select parts on which to get PMA approval that are easier to make first and go to more complex parts later?

A. Yes.

Q. Is the statement that "PMA suppliers are picking the raisins out of the cake" false?

A. Not necessarily false, but it's -- when it's used as -- as disparagement, as a disparagement term, then it becomes harmful.

Q. So, it's true that PMA suppliers generally manufacture only fast-moving replacement parts?

A. Generally? I would say that that's not an accurate statement. I would say that they generally start with the faster moving replacement parts and gradually move towards items that are replaced less often.

Q. Do you have any empirical evidence or data to support the conclusion that Rolls-Royce engages in any of the conduct described in Item 1-C with respect to the Model 250 engine?

A. No.

Q. Moving to 1-D, do you have any evidence or data that Rolls-Royce engages in the conduct described in that paragraph?

A. As I mentioned, they use the word "imitation" in their -- in their complaint, and I believe that I also read somewhere where -- in one of the articles I was reading where they referred to it as "bucket shop parts."

Q. And what article is that?

A. I -- I don't remember exactly which article it was.

Q. Is a PMA part not an imitation of an OEM part?

A. A PMA part is a replacement that meets the same airworthiness requirements as the OEM part.

Q. Other than your review of the counterclaim filed by H.E.R.O.S. and Hye-Tech, do you have any evidence that Rolls-Royce engages in this conduct?

A. No.

Q. Moving to Item No. 2, dealing with administrative barrier techniques, in 2-A, you refer to information.

What information are you referring to?

A. Well, for example, if the FAA is asked to process a PMA design -- process PMA design data based on identicality, the FAA has the right, and in fact normal practice would be, to call for a copy of that drawing from the type certificate holder in order to make positive finding of identicality.

And in this case, what would happen is that the -- the type certificate holder would delay or refuse or attempt to refuse to send that to the FAA.

Q. You're saying that the type certificate holder has an obligation to turn over OEM data for purposes of identicality?

A. Absolutely.

Q. And what is the purpose of the data package that a PMA applicant sends to the FAA?

A. What is the purpose? It's to show airworthiness and to meet the basic requirements to demonstrate the airworthiness.

And then, if it's an identicality provision, they're showing identicality to something. And then, the FAA has the burden of going to the type certificate holder and obtaining the drawing so that they can substantiate a finding of identicality.

Q. What empirical evidence or data do you have to correlate this particular technique to Rolls-Royce in the Model 250 engine?

A. I don't.

Q. What type of information are you referring to in 2-B of this section? Is it the same kind of information we were discussing earlier?

A. Disparagement?

Q. In Item 2-B, you indicate, providing inaccurate information to the FAA.

What information are you referring to?

A. They would be able to say that a certain company does not have the technical experience or the engineering ability to either design, maintain or produce that type of part.

Q. And how would that information be provided to the FAA?

A. Verbally.

Q. What would prompt that information being provided?

A. Probably, an FAA request for information or knowledge that a particular company is attempting to obtain PMAs on -- on their product.

Q. Do you have any empirical evidence or data to correlate this particular technique to Rolls-Royce in the Model 250 engine?

A. Not at this time.

Q. Moving to Item No. 3, the price and bundling technique ...

A. (Complying.)

Q. You indicate that the OEM makes selective price reductions.

Do you know who prices Rolls-Royce's parts?

A. Who prices them?

Q. Yes.

A. No.

Q. Are you familiar with a company called Aviall?

A. Oh, yes.

Q. Do you know whether Aviall prices Rolls-Royce's parts?

A. My understanding is that Aviall is a distributor for Rolls-Royce.

Q. So, you have no knowledge of any agreement between Rolls-Royce and Aviall related to pricing?

A. No.

Q. Is there any evidence that the OEMs that you're referring to here price below cost?

A. Whether Rolls-Royce does, or whether any manufacturer?

Q. Well, start with any manufacturer.

A. I've -- yes, I've seen where they pro -- have priced below cost.

Q. Do you have any evidence that Rolls-Royce prices below cost?

A. No.

Q. Do you have any evidence that Rolls-Royce's parts are less expensive than the PMA parts?

A. Less expensive?

Q. Yes.

A. No.

Q. Will they always be more expensive?

A. Probably, yes.

Q. And again, you have no empirical evidence or data to correlate the technique discussed in Item 3-A to Rolls-Royce and the Model 250 engine?

A. No.

And I would also like to correct -- I don't think there's anything in 3 that says that manufacturers have been selling below cost.

Q. So, what would you like to correct about Item 3?

A. Well, I -- I -- you asked me if I had any evidence that they were selling below cost, and I don't have any evidence that they were selling below cost. But I want to make sure that there's nothing that I wrote here that suggested that they were.

Q. Okay. In Item 3-B, you talk about the bundling of parts.

A. Yes.

Q. What parts does Rolls-Royce bundle?

A. I don't know. The ultimate bundle is the engine itself.

Q. How is that the ultimate bundle?

A. Well, if you, for example, take all of the individual parts that go into an engine and price them out, there's -- there's an excellent chance that you would find that the total of those parts is greater than the selling price of the total engine.

Q. Do you know of any manufacturer that bundles all of the parts and charges people for that price?

A. That charges more for the individual parts that go into the engine than they do for the engine itself? Yes, I've seen that.

Q. Do you know what Rolls-Royce does?

A. No.

Q. Do you know whether Hye-Tech or H.E.R.O.S. has ever had problems buying OEM parts?

A. I don't know.

Q. Do you know -- and I may have asked you this earlier -- how many parts Hye-Tech has PMA approval for?

A. I don't remember.

Q. Is there a single PMA supplier who has approval for every single part on the Model 250 engine?

A. I don't know.

Q. With respect to any of the price and bundling techniques identified in Items 3-A, -B and -C, do you have any empirical evidence or data that Rolls-Royce is engaging in those techniques with respect to the Model 250 engine?

A. No, I don't.

Q. Moving on to No. 4 of your techniques, the change, the part number technique, is what you call it.

A. Uh-huh.

Q. You indicate that part numbers are changed even when there's no significant difference in the part.

Are you qualified to opine on the technical differences between part drawings?

A. Yes.

Q. How are you qualified?

A. I have been involved in part design, part analysis for 40 years.

Q. Do you personally engage in the design of parts?

A. I have, yes.

Q. Do you have any engineering expertise?

A. Only developed as a -- as a practical matter in the industry. I am not a degreed engineer.

Q. Did any of the companies you worked for not have any engineers?

A. No, we've always had engineers.

Q. So, what did engineers do if you're designing parts?

A. What do engineers do?

Q. What did those engineers do if you were designing parts?

A. They would check and they would work and they would assist in the design process.

Q. Were you the primary designer in those situations?

A. In some parts, yes.

Q. Isn't it expensive for an OEM to change a part number?

A. It can be.

Q. How can it be expensive?

A. Well, if they -- if they change manuals to reflect the new part numbers, such as illustrative parts catalogs and service bulletins, and that type of thing, that -- there can be an expense related to that.

Q. Would that counter against using -- change the part number technique that you described?

A. Well, it would run counter to it, and it would only be offset if they could get some sort of competitive advantage over a PMA holder who would no longer be able to offer a part of that same part number.

Q. Can you identify an OEM that has engaged in this technique?

A. Yes.

Q. Who has engaged in this technique?

A. Teledyne Continental Motors, AVCO Lycoming, Textron Lycoming.

Q. Can you identify a Rolls-Royce part where the number was changed but there was no significant difference in the part?

A. No.

Q. Do you have any empirical evidence or data to suggest that Rolls-Royce engages in this technique with respect to the Model 250 engine?

A. No.

Q. Moving to Item No. 5, your mandatory service bulletin technique ...

A. (Complying.) Uh-huh.

Q. You state that the OEM can overstate the importance of an issue by using the word "mandatory" in the title.

What evidence or data do you have that Rolls-Royce has done this?

A. I don't have any evidence for Rolls-Royce.

Q. You have no documents produced by Rolls-Royce related to this technique?

A. No.

Q. In connection with Item No. 6, you're discussing the ICA, or Instructions for Continued Airworthiness.

Has the FAA ever instructed Rolls-Royce or any OEM that every single technical document relating to an engine constitutes Instructions for Continued Airworthiness that must be provided?

A. I don't know.

Q. Isn't it true that there are no regulations that require Rolls-Royce or any OEM to make available every single technical document?

A. I'm not aware of any.

Q. Has the FAA ever said that an OEM must make ICA available to anyone who wants it free of charge?

A. No.

Q. Is it fair for an OEM to charge customers for its ICA?

A. Yes, it's fair for them to charge a reasonable price. But I think you -- you need to understand that in order to comply with the regulations, they must be readily available at reasonable cost.

One can't price them so high as to be a barrier to getting Instructions for Continued Airworthiness into the hands of the people that need them.

Q. I see that you quoted here from one of the regulations, 21 -- Section 21.50.

Is this merely your excerpt of the law that you found to be relevant on this section?

A. Yes, it was an excerpt from 21.50.

Q. And you're interpreting Section 21.50 and its requirements here?

A. Yes.

Q. Would you agree that the ICA requirements only apply to type certificate applications made after January 28, 1981?

A. That is correct as far as the regulation is written, although the FAA is now encouraging, for safety sake, that the ICAs going back be furnished.

Q. But under this regulation, it only applies to applications made after January 28, 1981?

A. Correct.

Q. When was the Model 250 type certificated?

A. I don't know.

Q. So, you don't have any knowledge whether Rolls-Royce is even subject to this regulation?

A. No.

Q. Do you have any empirical evidence or data to correlate the restricted ICA technique described in Paragraph 6 to Rolls-Royce or the Model 250 engine?

A. I have only the complaints that have been filed against Rolls-Royce for failure to supply them.

Q. Are you familiar with Advisory Circular No. 33.4-1?

A. No.

Q. In the section on Page 8 that continues on from Item No. 6, are you again continuing to interpret what you believe 21.50 to mean?

A. 21.50?

Q. Yes.

A. I believe this is dealing more with 21.303.

Q. On Page 8?

A. Yes. Down at the bottom, where it says, develop design data, is that where you're talking?

Q. Oh, I haven't gotten to that section yet.

A. Okay.

Q. I'm still finishing up with this.

A. So, above that, yes.

Q. Yes.

A. Yes, that would be 21.50.

Q. Okay. And you're just merely interpreting that regulation there?

A. Yes.

Q. You reference a letter from James Whitlow, the deputy chief counsel of the FAA.

A. Yes.

Q. What legal effect does that letter have?

A. What legal effect?

Q. Yes.

A. I don't know. It is -- it is an opinion from the chief counsel of the FAA, so I would assume that it has some effect.

Q. And are you interpreting that letter as how --

MS. MOTE: Strike that.

Q. Are you interpreting that letter in rendering your opinions here?

WestlawNext © 2014 Thomson Reuters. No claim to original U.S. Government Works.

A. Yes, I am. I'm interpreting and I'm reading exactly the words that -- that are quoted there.

Q. In Footnote 10, you use the phrase, the letter is generally quoted as applying to the whole issue of certificate holders.

A. Yes.

Q. Who generally quotes that letter?

A. It's generally quoted by anybody in the industry. Companies, FAA, organizations representing companies in the -- in the industry.

Q. Moving up to the body of the text, still in the same section, you say that certain OEMs have restricted the distribution of ICA for their product in order to control the market for repair and maintenance.

Which OEMs do this?

A. The ones that I'm familiar with are companies like Continental, Lycoming, Pratt. And from -- from indications, Rolls-Royce, also.

Q. What do you mean by "indications"?

A. The filing of formal complaints against Rolls-Royce.

Q. Are you referring to the Part 13 formal complaint?

A. Yeah. The ARSA complaint, yes.

Q. And that's the Aeronautical Repair Station Association?

A. Yes.

Q. Do you know who they filed that complaint on behalf of?

A. No.

Q. Did you know that they filed that complaint on behalf of H.E.R.O.S.?

A. No.

Q. Did you read the Part formal 13 (sic) complaint?

A. I did not read the entire complaint.

Q. Do you know whether Hye-Tech was a party in that lawsuit?

A. I don't.

Q. Did you review Rolls-Royce's answer to the complaint?

A. No.

Q. Why not?

A. Didn't have it available.

Q. Did you ask for it?

A. No.

Q. Did you think that would be relevant in your analysis?

A. Absolutely.

Q. But you didn't ask for it?

A. Didn't have any access to it, no.

Q. Isn't it true that there has been no ruling, finding or judgment on that Part 13 formal complaint?

A. As far as I know.

Q. Were you aware that ARSA filed essentially the same complaint with the European Aviation Safety Agency?

A. I believe so, yes.

Q. Were you aware that the EASA has already rejected that complaint --

A. No.

Q. -- finding that it has no merit?

A. No.

Q. Does that affect your analysis?

A. Probably not since that -- European standards are not the United States standards.

Q. So, you would give no credence to that ruling?

A. Probably not.

Q. On Page 11 of your report, you refer to the EASA as the European equivalent of the FAA.

A. Yes.

Q. So, even though they're the European equivalent of the FAA, you would give what they do no credence?

A. They're the European equivalent of the FAA in the sense that they are the agency that oversees European aviation, but they are not the same.

In fact, some of their rulings are -- are different from rulings by the FAA, and the FAA has the ultimate authority over products that are certified in the United States, originally certified in the United States.

Q. So, the only basis for your opinion that Rolls-Royce has to -- has restricted the distribution of ICA is the ARSA complaint and the complaint filed in this lawsuit?

A. The only knowledge I have of the current time is that document, yes.

Q. And you have no other independent data or evidence to support that?

A. No.

Q. Going on to the next section, where you discuss how PMA applicants develop design data ...

A. (Complying.) Uh-huh.

Q. Again, in this section, are you merely summarizing or interpreting the federal regulations, orders and policies?

A. Well, I am interpreting the orders and the policies and the regulations, and also, talking about how the industry, in practice, goes about doing this job, this particular process.

Q. Do you know which process Hye-Tech uses?

A. Only to the extent that I have seen some Hye-Tech drawings that said that they were -- the approval design data was based on identicality.

Q. And H.E.R.O.S. has no PMA approvals; is that correct?

A. I'm sorry?

Q. H.E.R.O.S. has no PMA approvals; is that correct?

A. Not that I'm aware.

Q. You state on Page 9 of your report a list of ways to develop design data for PMA submission for approval based

A. Uh-huh.

Q. -- on identicality.

And you say, some of these are historically used.

What do you mean by "historically"?

A. In the way that design data has been obtained and used and developed since at least the late 1950s.

Q. And that's used by everyone in the PMA industry?

A. In general.

Q. In general?

You don't have anybody specific that you're referring --

A. I don't have anybody specific to exclude. I have only company -- you know, everybody that I know that in the business uses this same general technique.

Q. When we were talking about the OEM competitive reaction to PMA suppliers and that list of techniques that you describe, were you suggesting that every single OEM in the aircraft industry employs these techniques?

A. Every -- it's been my experience that every OEM that I'm aware of that has faced PMA competition has used these techniques or a combination of them.

Q. So, only the OEMs that you are aware?

A. Right.

Q. And that would be Continental and Lycoming?

A. Uh-huh, and Pratt and ...

Q. Any others?

A. Be the same with people like Parker-Hannifin, others that I've been involved with.

Q. And now, when we're talking on the PMA side, what PMA companies are you personally aware of that employ these techniques?

A. What PMA companies? Superior Air Parts, Engine Components, every -- everybody that I've worked with that's done PMAs. Aero, Incorporated. I can't go on and name every company that does PMAs.

Q. In the first bullet, you talk about obtaining design data that is in the public domain. I think you testified earlier that you don't know whether H.E.R.O.S. or Hye-Tech obtained Rolls-Royce information that was in the public domain; is that correct?

A. I don't know how they obtained their information.

Q. You discuss how the ownership of some data may reside with the U.S. government.

Is that true with the Rolls-Royce and the Model 250?

A. I don't know.

Q. Do you know how many series of the Model 250 engines there've been?

A. No.

Q. Have you reviewed any contracts between the Army and Rolls-Royce?

A. No.

Q. Do you know what the Army's position is with respect to any of the series of the Model 250 engines after Series 1?

A. No.

Q. What is your understanding of limited rights?

A. Limited rights?

Q. Yes.

A. It means that the government has the right to use them in certain ways, but it is a -- the rights to the drawings and design data are retained by the manufacturer.

Q. What is your understanding of unlimited rights?

A. It means the government can do whatever they want to with those drawings and design data, that they literally belong to the government.

Q. Wouldn't whether the U.S. government had limited rights or unlimited rights be a factor in the analysis of whether the information was in the public domain?

A. Maybe, yes. And I say, maybe, because, you know, limited rights documents, I'm assuming, can find their way into the public domain anyway.

Q. What do you mean by that?

A. Well, for example, if the government were to give a document under a Freedom of Information Act request or give it directly to a potential supplier representing that they had the right to do so, I don't know if a later claim of limited rights would -- would apply.

Q. What if the U.S. government did that in violation of contract?

A. Then I -- I don't know. I'm not a lawyer.

Q. You indicate that in ordering replacement parts the government reserves the right to solicit bids and proposals from other than the original supplier.

Does that hold true for Rolls-Royce?

A. I don't know.

Q. Do you know what Rolls-Royce data is available through FOIA?

A. No.

Q. Do you know what Rolls-Royce data is available through direct distribution by government officials?

A. No.

Q. Are you an expert in the Defense of Federal Aviation Regulations, or DFARs, as they're commonly referred to?

A. On what?

Q. Defense of Federal Aviation Regulations, or DFARs.

A. No.

Q. What libraries have you searched to determine that Rolls-Royce technical information is found there?

A. I have looked at nothing with regard to Rolls-Royce. I've seen other OEM data in libraries.

Q. What OEM data?

A. Oh, drawings, specifications.

Q. From which companies?

A. Teledyne Continental, Lycoming, Pratt.

Q. And what libraries was that information found in?

A. Libraries that were associated with technical schools or libraries -- historical libraries' collections.

Q. Have you ever been to any of the libraries at Purdue University?

A. At Purdue? No.

Q. How about the Indianapolis Public Library?

A. No.

Q. Moving on to the second bullet point, you're talking about obtaining design data from the, quote, unquote, actual manufacturers' subcontractors.

Do you know whether H.E.R.O.S. or Hye-Tech obtained any Rolls-Royce information in this manner?

A. I don't.

Q. And you haven't looked at any supply or purchase agreements between Rolls-Royce and its suppliers, have you?

A. No.

Q. Do you have any basis to correlate this statement to Rolls-Royce and the Model 250 engine?

A. Only in the sense that this is a general way that the industry works.

Q. Do you have any empirical data or evidence to correlate this statement to Rolls-Royce and the Model 250 engine?

A. No.

Q. Is it true that reverse engineering is not identicality, correct?

A. Reverse engineering is a process. Identicality is a finding.

Q. When you employ reverse engineering, isn't it true that that will rarely result in identical or duplicate part?

A. That's correct. Let me back up.

When you employ reverse engineering, you will find that you can develop a part that is identical in form, fit and function.

If you're talking about photographically identical with tolerances and -- and dimensions, it's highly unlikely that you're going to find that you get identicality that way.

You will and should get identicality in form, fit and function.

Q. In that first paragraph, under the reverse engineering bullet point, you've use the word -- used to develop design data to create a duplicate of the original product.

What did you mean by "duplicate"?

A. You can create a part that is essentially identical, a duplicate in form, fit and function to another product.

Q. Do you know whether H.E.R.O.S. or Hye-Tech employs reverse engineering?

A. No.

Q. So, you don't know whether they employ reverse engineering with respect to Model 250 engine parts?

A. No.

Q. And you don't know whether H.E.R.O.S. or Hye-Tech uses coordinate measuring machines or laser scanning machines?

A. I don't.

Q. Or any other computer controlled machines for the purpose of reverse engineering?

A. I don't.

Q. That last paragraph on Page 10 and moving on to Page 11, you discuss some FAA policies.

Are you again just interpreting what you believe the regs, orders and policies to say?

A. Well, I -- I quoted exactly what they do say in Footnoted 13.

And then, the first paragraph on Page 11 would be an interpretation.

Q. Moving on to the next section dealing with safety record of FAA PMA parts, you quote a sentence from some studies that were done related to the safety of PMA parts, and it appears those studies took place in 1984 and 1988.

A. Yes.

Q. Have you done anything in the last 20 years to analyze whether that statement is still correct?

A. Yes. The FAA data has been searched, and there is -- they continue to find no -- no problem with PMA parts.

Q. And what data from the FAA did you search?

A. Looked through service difficulty reports. I've looked through summary analyses.

Q. Did you look at any service difficulty reports related to PMA parts for the Model 250 engine?

A. No.

Q. Do you know whether there are any service difficulty reports with respect to the Model 250 engine parts?

A. I know there have been some service difficulties with PMA parts.

Q. You do know that there have --

A. For the --

Q. -- been difficulties?

A. Huh?

Q. There have been difficulties?

A. That there has been at least one AD note or potential AD note that I was aware of, yes.

Q. And what is that?

A. A part that was in an engine in a helicopter that had an engine failure in Hawaii.

Q. And how did you become aware of that?

A. I became aware of it when I was consulting with Superior Air Parts during the 2003-2005 time frame, and I received a call from the FAA about a -- an approval for a -- an Allison 250 part that had been approved by -- approval had been obtained by Superior in the early 1990s, but all of the approval, all the data, all the records had been sold to another company in, I believe, '95 or '96.

Q. So, Superior Air Parts was the one that created the PMA part?

A. They originally obtained a PMA on this part, yes.

Q. And had they manufactured the PMA part that was in the helicopter that crashed?

A. I don't know. I don't think they did.

Q. How was that contact with the FAA resolved?

A. I think they went ahead and issued a bulletin, an airworthiness directive on it, and Superior -- it mentioned the Superior part from eight or nine years previously, but there was no further contact with Superior.

Q. Now, at the bottom of Page 11, you have a couple of quotes, and are those taken verbatim from those news articles that you provided to us?

A. Uh-huh. Yes.

Q. And the same thing for the quotes on Page 12, those are verbatim from various news articles?

A. Yes.

Q. And so, you merely pasted those into your report; is that correct?

A. What was the question?

Q. Did you paste those portions into your report from --

A. Yes.

Q. -- the websites?

A. Yes.

MS. MOTE: Can we go off the record for a second.

THE VIDEOGRAPHER: We're going off the record. The time is 12:21 P.M.

(AT THIS TIME THE NOON RECESS WAS TAKEN, AFTER WHICH THE FOLLOWING PROCEEDINGS WERE HAD:)

Afternoon Session

June 12, 2008

Dallas, Texas

**CHARLES** B. **DEDMON**, the witness herein, having been previously duly sworn, under the penalties of perjury, to tell the truth, the whole truth and nothing but the truth, was examined and continued testifying as follows:

THE VIDEOGRAPHER: We're back on the record. The time is 1:30 P.M..

WestlawNext © 2014 Thomson Reuters. No claim to original U.S. Government Works.

This is the beginning of Tape No. 4.

DIRECT EXAMINATION (cont'g),

QUESTIONS BY MS. MOTE:

Q. Mr. Dedmon, before we broke for lunch, we were -- you had mentioned a crash that you were aware of that had occurred in Hawaii?

A. Yes.

Q. Didn't that crash relate to an EXTEX part?

A. Yes, it did, I believe.

Q. Do you recall which part?

A. No, I don't.

Q. Do you know whether that -- the PMA on that part was obtained by test and computation?

A. I don't know.

Q. You don't know?

Do you know the status of any post-accident investigation?

A. No.

Q. Were you aware that the investigation showed that the dimensions were outside of the OEM-mandated tolerances?

A. No.

Q. Did anyone from H.E.R.O.S. or Hye-Tech ever show you a letter from Redstone regarding its position on the availability of Rolls-Royce data?

A. No.

Q. So, you don't know what Redstone's position was with respect to Rolls-Royce data that may or may not have been in the public domain?

A. No.

Q. Will you be offering any opinions on the anti-trust claims that are at issue in this case?

A. Not that I know of.

Q. Is that a "no"?

A. Well, it's "not that I know of." I don't know if I'm going to be asked to do that or not.

Q. Have you been asked today to do that?

A. No.

Q. And it's not your intention at this time to render any opinions on the anti-trust claims?

A. I don't know. I have not been asked to do any of that.

Q. You gave us a couple of documents at the beginning of your deposition that had not been included in the materials that you had previously submitted in response to our subpoena.

One of them was a special airworthiness information bulletin.

A. Yes.

Q. It appears that this relates to a Lycoming engine; is that correct?

A. Correct.

Q. So, the Model 250 was not the subject matter of this bulletin?

A. No.

Q. And Rolls-Royce is not discussed in this bulletin?

A. No.

Q. Why did you consider it, then?

A. It was one of the documents that I had looked at. It is a document that evidences that sometimes an OEM part will be subject to an airworthiness directive or some sort of an inspection requirement that a PMA part is not the same, interchangeable PMA part is not required to be done.

Q. Are you aware of any Rolls-Royce parts that have been subject to airworthiness directives?

A. No.

Q. The other document that you gave us was a decision of the appraisal umpire.

Were you appointed by the court to conduct an appraisal of an aircraft.

A. I was appointed by the court to be an -- the umpire and decide the final settlement between the insurance company and the plane owner.

Q. This was not a helicopter with a Rolls-Royce engine --

A. No.

Q. -- in it, was it?

A. No.

Q. So, it did not have a Model 250 engine in it?

A. No.

Q. And this appraisal decision did not relate to H.E.R.O.S.?

A. No.

Q. It did not relate to Hye-Tech?

A. No.

Q. Was there any particular reason why you included this information in the materials you provided to us?

A. When we -- when I looked at and -- we all looked at the production request. There was a question in our mind as to whether or not that would be responsive to the request. I believe it said any opinions that I'd offered in a five- or ten-year period. And so, to be on the safe side, I just went ahead and produced it.

Q. Is any of the information in this appraisal relevant to your opinions today?

A. No.

Q. I wanted to go through a couple of the documents that you produced to us in response to the subpoena.

A. Uh-huh.

Q. It may be -- it may be good for you to look at this just because they're tabbed and we can refer to them.

A. Okay.

Q. These are -- but these are the same documents that you made available to us.

If you could turn to Tab No. 4 ...

A. (Complying.) Yes.

Q. What is this document?

A. This is an outline and text of a talk that I have given at a number of seminars about the economic consideration of PMA parts. Done this, and also, PowerPoint presentations.

Q. Okay. When did you first put this outline together?

A. Sometime in the '90s. Been updated since then.

Q. How often have you updated it?

A. Well, whenever I'm in -- you know, invited to do a talk on the subject, I will go through it and update it if necessary.

Q. If you look at Tab 15 ...

A. (Complying.)

Q. There is a PowerPoint presentation, and then, a speech behind that that's dated March 28, 2000.

Is that the most recent iteration of that speech?

A. Is that No. 16?

Q. Yes -- or, I'm sorry, 15.

A. Fifteen, okay.

Q. There is a PowerPoint presentation, and then, behind that, there is a written speech called, "Economic Considerations of PMA Parts," dated March 28, 2000.

A. Yes.

Q. Is that the most recent iteration of that speech?

A. I believe that's correct.

Q. If we could focus primarily on the written portion of the speech at Tab 16 -- I'm sorry, 15 ...

A. Uh-huh.

Q. Have you done anything since March 28, 2000, to update this speech?

A. Not that I recall.

Q. Did you borrow heavily from this speech and PowerPoint in preparing your expert report in this case?

A. Oh, yes. I'm not sure "heavily" is the right word, but I do ...

Q. What portions of this speech appear in your expert report?

A. Different areas about the pricing structure. There's other outlines, and stuff, here that did -- pricing examples were not included in my report, nor -- and I did draw on the -- or, did see the outline here on competitive reaction.

Q. So, your competitive reaction portion of the speech showed up in your expert report in this case?

A. Yeah, it's the same basic outline.

Q. As well as the price section on Page 3 of your speech?

A. Yes. Essentially, yeah.

Q. And I think that same chart appears at Page 5 of your speech; is that correct? I'm sorry, Page 5 of your expert report.

A. Yes.

Q. Did you do anything to update this speech while you were inputting some of the material into your expert report in this case?

A. No.

Q. Looking at Page 1 of your speech on economic considerations of PMA parts, there's a sentence in there where you say, PMA competition which began in the piston aircraft engine market is now spreading.

Why do you believe PMA competition started in the piston market?

A. Why do I believe it did?

Q. Yes.

A. Because piston engines were dominant at the start of PMA competition.

Q. Why were they dominant?

A. Well, there were more of them in service. The economic conditions set that up, really. The -- we're talking when it first started primarily radial engines, Pratt & Whitney, Curtis Wright radial engines that were in service on airlines and DC-6 and DC-7 aircraft.

And as the industry -- as the industry was moving towards turbines, the old original equipment manufacturers showed a reluctance to support the piston engines. And so, therefore, it made part supply difficult to come by, and PMAers moved into that -- that notch.

Q. Are gas turbine engines more complex than piston engines?

A. In some areas, yes. In some areas, no.

Q. In what areas are they more complex?

A. Well, they're just different types of engines. I mean, certain parts are more complex.

There -- you can look at a piston engine and say some engine -- parts in the engine are more complex than others. You can look at a turbine engine and say the same thing.

But for example, a gasket in a turbine engine is neither more or less complex than a gasket in a piston engine.

Q. Do your thoughts on the economic

[Note: Pages 150-157 missing in original document]

So, it is not just a simple matter to -- to set up and get a PMA.

Q. Does that hold true whether it's for identicality or based on test and computation?

A. Yes, it does.

Q. Are there many situations in which test and computation is not economically feasible?

A. It -- it's possible.

Q. And why is that?

A. Well, test and computation requires, as the -- as the name implies, doing a set of tests on the product to develop your design data. And it implies that you have to do computations.

And so, depending on the cost of that, you measure the cost of your investment in that product versus whatever return that you're going to get from future sales.

So, if the cost is -- is far in excess of whatever you would get from sales, you wouldn't want to do that.

Q. On Page 6 of your speech, there is a section on identicality.

A. Uh-huh.

Q. And you make the statement that the real cost exposure in the use of identicality can be potential legal costs.

A. Yes.

Q. What lawsuits are you aware of personally related to that issue?

A. Well, when an OEM or a type certificate holder sees the word "identicality," they immediately assume that their design data was appropriated or taken without permission or in some illegal manner.

And so, what they usually end up doing is they end up suing the PMA manufacturer. Ideally, they sue him when he's small and just getting started, and that way, that -- whether or not the -- the legal challenges holds up, they can bleed the -- bleed the PMA supplier.

Q. What lawsuits are you personally aware of in which this has occurred?

A. When we had litigation with Continental and Lycoming.

Q. And that was your Superior Air Parts

A. Yes.

Q. -- litigation?