Craig F. Simon
Texas Bar No. 00784968
Daniel P. Winikka
Texas Bar No. 00794873
SIMON, RAY & WINIKKA LLP
2525 McKinnon Street, Suite 540
Dallas, TX 75201
Phone: (214) 871-2292
Facsimile: (469) 759-1699
Counsel for Dr. Kübler, in his capacity as Insolvency
Administrator of Thielert Aircraft Engines GmbH

## IN THE UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| SUPERIOR AIR PARTS, INC. | Case No. 08-36705-BJH-11 |
| Debtor. | |

## BRIEF OF INSOLVENCY ADMINISTRATOR
## RELATING TO MOTION TO ENFORCE CONFIRMATION ORDER
## PURSUANT TO COURT'S JULY 23, 2014 RULING REGARDING BRIEFIN

## Table of Contents

PRELIMINARY STATEMENT.................................................................................3

ARGUMENT AND AUTHORITIES.......................................................................6

   A. The Plan and Confirmation Order Did Not Give Superior Ownership of the TAE
Materials........................................................................................7

   B. The TAE Materials Contain Extensive Engineering Manufacturing Know-How of
TAE that did not come from Superior and are Anything but "Identical"...............11

   C. The Supplier Agreement Does Not Give Superior Ownership of the TAE
Materials.......................................................................................12

   D. The Fact that the TAE Materials Contain Information from the Superior 2D
Drawings Does Not Vest Superior With Ownership......................................15

      1. The Data in the Superior 2D Drawings Is Not a Trade Secret or Confidential...16

      2. Estoppel by Contract Does Not Bar the Insolvency Administrator from
Challenging the Confidentiality of the Superior 2D Drawings.....................19

CONCLUSION........................................................................................22

# Table of Authorities

*Cases*

*Adelphon, Inc. v. DiRico,* CA 3-91-2551-T, 1992 WL 281395 (N.D.Tex. March 26, 1992)..18, 21

*Cataphote Corp. v. Hudson,* 444 F.2d 1313, 1316 (5th Cir. 1971).................................19, 21

*Cox. v. Garret, L.L.C.,* 245 S.W.3d 574, 579 (Tex. App.—Houston [14[th] Dist.] 2010, no
pet.)..................................................................................................................13

*Global Water Group, Inv. v. Atchley,* 244 S.W.3d 924, 928-29 (Tx. App.—Dallas 2008, pet.
denied)............................................................................................17, 18, 21

*In re Chesnut,* 03-41050-DML-13, 2008 WL 2962943 (Bankr. N.D. Tex. July 29, 2008).........9

*In re Matter of Uniservices, Inc.,* 517 F.2d 492, 496-97 (7th Cir. 1975)........................20, 21

*In re Jones,* BK 10 B 04352, 2011 WL 748427 (Bankr. N.D. Ill. Feb. 24, 2011)....................9

*Interspiro USA, Inc. v. Figgie Int'l. Inc.,* 18 F.3d 927 (Fed. Cir. 1994)..............................20

*K & G Oil Tool & Serv. Co. v. G & G Fishing Tool Serv.,* 158 Tex. 594, 314 S.W.2d 782
(1958)...............................................................................................................17

*Lawfinders Assoc., Inc. v. Legal Research Ctr., Inc.,* 65 F. Supp. 2d 414, 418 (N.D.Tex.
1998)................................................................................................................20

*Luccous v. J.C.Kinley Co.,* 376 S.W.2d 336 (Tex. 1964)................................................21

*Ocean Drilling & Exploration Co. v. Mont Boat Rental Svcs., Inc., 799 F2d 213, 216-17 (5th Cir.
1986)...................................................................................................................8*

*Picker Int'l. Corp. v. Imaging Equip. Servs., Inc.,* 931 F. Supp. 18, 35 (D. Mass. 1995).........20

*Woodard v. Gen. Motors Corp.,* 298 F.2d 121, 129 (5th Cir. 1962)..................................19

*Wissman v. Boucher,* 240 S.W.2d 278, 279-280 (Tex. 1951).........................................18

Statutes

Tex. Civ Prac. & Rem. Code § 134A.001…17

Dr. Bruno Kübler, in his capacity as Insolvency Administrator (the "Insolvency Administrator") of Thielert Aircraft Engines GmbH ("TAE"),[1] files this brief pursuant to the Court's directive of July 23, 2014. In support hereof, the Insolvency Administrator respectfully represents as follows.

## I.   PRELIMINARY STATEMENT

1.      The dispute between Superior Air Parts, Inc. ("Superior") and the Insolvency Administrator has evolved to become a dispute over ownership of documents and information indisputably created by TAE through years of manufacturing-related engineering work by its own engineering staff. While Superior's Motion to Enforce (the "Motion") originally purported to seek to require the Insolvency Administrator to comply with this Court's August 29, 2009 order confirming Superior's plan of reorganization [Dkt. No. 404] (the "Confirmation Order") by returning Superior's property to Superior, the dispute at this point is unrelated to the return of Superior-supplied materials.[2]

2.      Moreover, the dispute, as is now apparent, is essentially the opposite of what Superior would have this Court believe. This dispute does not involve Superior's confidential and proprietary data that TAE is seeking to monetize; rather it involves Superior's attempt to advantage itself by either obtaining TAE's proprietary information relating to the manufacturing process or preventing TAE from monetizing those assets solely based on the fact that TAE's materials contain information Superior supplied (information that the evidence will show is not confidential).

---

[1] Under the German Insolvency Code, TAE can act only through its insolvency administrator, Dr. Bruno Kübler.

[2] The Insolvency Administrator has already returned to Superior hundreds of documents that were identified either by the Insolvency Administrator through his own review or by Superior following its review of documents in Germany as documents that were created by Superior and supplied to TAE by Superior. Based on testimony on July 22, 2014 from Superior witnesses that there are additional Superior-provided documents that they believe remain in the Insolvency Administrator's possession, counsel for the Insolvency Administrator has reached out to counsel for Superior to work out a process to identify and return such documents.

3.      As the movant here, Superior bears the burden of establishing that the information created by TAE, maintained by TAE, and in TAE's possession, is owned not by TAE but instead by Superior. It appears that Superior's claim of ownership is based on four things: (1) Superior's Third Amended Plan of Reorganization (the "Plan") and/or Confirmation Order; (2) Superior's view that the TAE Materials are "identical" to the 2D drawings and other information Superior provided;[3] (3) the Supplier Agreement and/or accompanying purchase orders; and (4) the assertion that the information in the 2D drawings provided to TAE is confidential and proprietary and cannot be separated from the manufacturing process information that TAE created. Each of these arguments must be rejected.

4.      First, the Plan and Confirmation Order did not somehow determine ownership of the TAE Materials. The general descriptions of Superior's business in the Plan and related Disclosure Statement (the "Disclosure Statement") make no mention of the TAE Materials or any materials created by suppliers. The Plan and Confirmation Order cannot rightfully be read as a determination that the TAE Materials are Superior's property.

5.      Superior's position that the TAE Materials belong to Superior because they are "identical" to Superior's original drawings is also incorrect. The evidence will establish that 3D volume models, drawings and additional manufacturing-related documents TAE created contain much more than translations from English to German and from English measurements to metric. In this respect, Mr. Marwill's use of the FAA "identicality" standard renders his opinion that the TAE Materials are and must be identical irrelevant in determining the real issue. As the testimony reflected, "identicality" under the FAA standards only means that no "major" changes were made to the design of the part (the finished part requirements) because any "major" change requires a new part number. Mr. Marwill conflates the issue of the finished parts requirements with the process for manufacturing the parts to meet the finished parts requirements.

---

[3] Although Superior has contended that the 3D volume models and drawings TAE created are essentially duplicates of Superior-provided drawings and are identical other than conversion of English to German and English standard measurements to metric, the evidence will show that that assertion is clearly incorrect.

6.      The Insolvency Administrator is not contending, and has never contended, that TAE made changes to the design and finished part requirements and that, as a result, TAE owns the drawings that reflect such changes. While TAE's engineers made design changes in approximately 59 instances, Superior and its expert mistakenly assume that those changes are the basis for TAE's contention that Superior does not own TAE's documents. Indeed, the focus by Marwill only on those documents reflects Superior's fundamental misunderstanding of TAE's contentions. The core of TAE's contention relates not to those relatively few *design and finished part* changes that TAE provided, but instead to the far greater number of documents TAE engineers created related to the *manufacturing* of the parts. Superior's expert did not even review that vast number of documents, and those documents in fact contain information that is proprietary to TAE.

7.      Likewise, pursuant to the Supplier Agreement between the parties, TAE agreed to sell finished parts to Superior at a particular price. Superior did not contract for TAE to develop and give to Superior a manufacturing process for Superior's parts. Materials TAE creates for its manufacturing process (whether or not such materials may also contain information Superior furnished) are TAE's property absent the parties' agreeing otherwise. The parties clearly did not do so under the Supplier Agreement.

8.      The Supplier Agreement states that TAE is obligated only to "return" the documents and data Superior "furnished" or "supplied" to TAE. Nothing in the Supplier Agreement grants Superior ownership of, or other rights to, engineering work-product and information that TAE creates. The evidence will show that this is, in fact, consistent with industry practice. A manufacturer/supplier would be significantly disadvantaged if a customer like Superior could obtain the manufacturer's engineering work product because the customer could provide it to a competing manufacturer that could then charge much less by relying upon that manufacturing work product without incurring the significant cost necessary to develop it. Accordingly, Superior's attempt to re-write the agreement, through questionable expert

testimony that purchase of the parts automatically equals purchase of the manufacturing materials, should be rejected.

9.      Finally, the mere fact that the TAE Materials contain information from the Superior 2D drawings does not somehow vest Superior with ownership. Superior has cited no authority that would lead to such a result even if the TAE Materials contain Superior information that is confidential and proprietary and that cannot be separated from the TAE Materials. Moreover, the evidence will establish that all the information contained in the drawings Superior provided to TAE is available in the public domain or is otherwise readily ascertainable. Accordingly, any inability to separate the Superior provided information from the TAE Materials provides no basis for Superior to claim ownership or demand destruction of the TAE Materials.

10.      Superior's attempt to use this Court's authority pursuant to the Confirmation Order to obtain materials that (a) Superior did not create or provide to TAE; (b) were, in fact, created by TAE and were not provided to Superior during the course of the working relationship between the parties; and (c) are proprietary to TAE, should be rejected.[4]

## II.      ARGUMENT AND AUTHORITIES

11.      The Insolvency Administrator does not dispute that whatever property Superior actually **owned** on the date of confirmation vested in reorganized Superior. Nor does he contest his obligation, whether pursuant to the Confirmation Order, the Supplier Agreement or otherwise, to return Superior's property to Superior. But Superior has made clear both through prior briefing and during the July 22-23 hearing that its Motion to Enforce is a mechanism by which Superior wants to obtain information and documents well beyond materials Superior provided to TAE. As counsel for Superior acknowledged during his opening remarks during the July 22, 2014 hearing, it is Superior's burden to prove that it owns the TAE Materials. *See*

---

[4] The background facts involved in this dispute are set out in detail in the Insolvency Administrator's Preliminary Response to Motion to Enforce [Dkt. No. 688] and Omnibus Brief in Opposition to Motion to Enforce [Dkt. No. 730]. The Insolvency Administrator has omitted a further recitation of those background facts here, but refers the Court to those prior briefs.

Transcript of 7/22/14 hearing ("Hearing Transcript") at 5.  Because none of the bases that
Superior has set forth support Superior's claim that it owns the TAE Materials, the Motion to
Enforce should be denied.

A.    **The Plan and Confirmation Order Did Not Give Superior Ownership of the
      TAE Materials**

12.    In its *Res Judicata* Brief [Dkt. No. 725], Superior asserts that the Plan and
Confirmation Order somehow establish that Superior owns the TAE Materials and that the Plan
and Confirmation Order bar the Insolvency Administrator from contesting Superior's assertion
that it owns the TAE Materials.  This entire argument, however, is based solely on general
descriptions of Superior's business in the Plan and related Disclosure Statement and the meritless
suggestion that, based on such factual descriptions of Superior's categories of assets, the
Confirmation Order somehow established that Superior owns the TAE Materials.

13.    Superior's argument is meritless.  The Plan and Confirmation Order in no way
determined the ownership of the TAE Materials.  The Disclosure Statement, Plan and
Confirmation Order merely (a) described generally the types of assets that Superior asserted it
owned and would therefore vest in reorganized Superior and (b) required any parties holding
property "owned by Superior" to return Superior's property.  Nowhere in the Disclosure
Statement or Plan did Superior even take the position that any property TAE or any other
supplier developed is owned by Superior and would be transferred to, or vest in, reorganized
Superior, and the Plan and Confirmation Order certainly did not make a determination that
Superior owned any such materials.  For instance, as Superior points out, the Disclosure
Statement stated that "[t]he Debtor owns Intellectual Property related to its PMAs, Production
Certificates, Type Certificates and Supplement Type certificates of undetermined value."
(Superior *Res Judicata* Brief [Dkt. No. 725] at 4).  Superior obviously owns certain drawings and
related data for the parts it sells (*e.g.*, the Returned Materials as well as technical testing data it
created to obtain its PMA approvals).  *See also* Disclosure Statement at 8-9 (noting that

-6-

Superior's Piece Parts Business includes some IP assets and that any such assets will revest in reorganized Superior). But that certainly does not mean the Court determined that Superior "owns" everything that is in any way related to its business, regardless of who created the information, regardless of who possesses it, and regardless of whether or not it has ever been in Superior's possession.

14.     In fact, if anything, the record indicates that Superior did not believe it owned the TAE Materials. Although testimony at the hearing from Superior's own witnesses established that Superior was aware of the TAE Materials, Superior failed to include any description in the Disclosure Statement that it owned drawings/materials created by TAE or any other of its suppliers. Similarly, as part of the restructuring process Superior set up a comprehensive data room for potential buyers to do due diligence on Superior's assets. Superior's witnesses confirmed at trial that there were no TAE documents in the data room or otherwise made available to bidders or potential investors. If Superior believed it owned the TAE Materials and such materials were important in any way to its business, Superior surely would have ensured a copy of those materials was made available to potential buyers/investors on a confidential basis. Consistent with this position, the Plan and Confirmation Order require parties to "return" property to Superior, demonstrating that the property consists of items that Superior had furnished to such parties, not property created by such third parties. *See* Plan of Reorganization §6.12 and Confirmation Order ¶ 37 (each requiring parties "return to the Reorganized Debtor").

15.     The Plan and Confirmation Order only provide that "the property of the Debtor" vests in reorganized Superior and that parties "return" to reorganized Superior all property "owned by the Debtor." Each of the applicable provisions is limited to property actually "owned" by Superior. Plan of Reorganization §6.12 and Confirmation Order ¶ 37 (each providing that parties "return to the Reorganized Debtor all documents and other information **owned by the Debtor** related to the Debtor's business and operations (the "Proprietary Information")) (emphasis added); *see also* Plan §6.13 ("the **property of the Debtor** . . . shall vest in the Reorganized Debtor") (emphasis added) and Confirmation Order ¶ 36 ("all **property**

-7-

**of the Estate** shall vest in the Reorganized Debtor") (emphasis added). It is undisputed that any property—intellectual or otherwise—not owned by Superior is not subject to the Confirmation Order.

16.     Notwithstanding that the Confirmation Order made no determination whatsoever about ownership of the TAE Materials, in its Res Judicata Brief, Superior contends that *res judicata* bars TAE from *defending* Superior's assertion of ownership of the TAE Materials. *See Res Judicata* Brief at 2-5. *Res judicata*, otherwise known as claim preclusion, is not applicable here. As the Fifth Circuit has explained, under the doctrine of *res judicata*, "[f]or a prior judgment to bar a subsequent action, it is firmly established (1) that a prior judgment must have been rendered by a court of competent jurisdiction; (2) that there must have been a final judgment on the merits; (3) that the parties, or those in privity with them, must be identical in both suits; and (4) that the same cause of action must be involved in both suits." *See Ocean Drilling & Exploration Co. v. Mont Boat Rental Svcs., Inc.*, 799 F2d 213, 216-17 (5th Cir. 1986). Here, Superior is the party seeking relief (thus if either party is asserting a claim or "cause of action" it is Superior), and Superior has the burden of proof to establish ownership. TAE is not asserting a claim against Superior, let alone a claim that TAE could or should have asserted against Superior in connection with confirmation of the Plan. Rather, TAE is presenting evidence and argument to the Court why Superior has not, and cannot, meet its burden to show it owns the TAE Materials. Claim preclusion does not apply in this circumstance and does not preclude TAE from defending Superior's assertions. In fact, if a "claim" that TAE owns (or does not own) the TAE Materials constitutes a claim that is the same cause of action involved in confirmation of the Plan, then Superior should be barred by *res judicata* from asserting that TAE does not own the TAE Materials. That is, in such instance, Superior could have litigated the claim it is now asserting (that it owns the TAE-created materials) at the time of confirmation, but it failed to do so.

17.     Furthermore, the two cases Superior cites in its Res Judicata Brief do not support Superior's novel assertion because each of those cases involved a subsequent attempt by the

creditor to challenge the actual terms of the plan and confirmation order at issue. In *In re Chesnut*, 03-41050-DML-13, 2008 WL 2962943 at \*1 (Bankr. N.D. Tex. July 29, 2008), a secured creditor sought to challenge a lien release requirement in a plan of reorganization on the basis that the property secured by the lien was not community property and therefore owned solely by the debtor's spouse. The plan in that case, however, specifically listed the secured creditor's claim as being secured by the applicable property and further required release of the lien upon repayment. *In re Chesnut*, 2008 WL 2962943 at \*3. The secured creditor was directly challenging the plan treatment and plan requirement for release of the lien. The other case Superior cites, *In re Jones*, BK 10 B 04352, 2011 WL 748427 at \*1 (Bankr. N.D. Ill. Feb. 24, 2011), is likewise inapplicable for the same reason. Indeed, the case involved a motion by a secured creditor for relief from the applicable confirmation order. Like the *Chesnut* case, the debtors in *In re Jones* listed the secured creditor as having a claim of a certain amount secured by specific property (jewelry) and further provided for how that claim would be paid. *In re Jones*, 2011 WL 748427 at \*1. The secured creditor sought relief from the confirmation order and sought to amend the plan to provide that the jewelry upon which it had a lien was not property of the debtors' estate because the debtors failed to properly redeem the property as required under section 541(b)(8) of the Bankruptcy Code. Id. at \*2. Here, the Plan and Confirmation made no determination of ownership, and TAE is in no way challenging the terms of the Plan or Confirmation Order.

**B.      The TAE Materials Contain Extensive Engineering Manufacturing Know-How of TAE that did not come from Superior and are Anything but "Identical"**

18.      During the first part of the hearing on the Motion to Enforce, Superior focused much of its time on testimony that the TAE Materials are "identical" to the 2D drawings provided by Superior. *See, e.g.,* Hearing Transcript at 118-19, 124. Indeed, both Mr. Chatten and Mr. Marwill testified that the TAE Materials reflected only translations from English to German and from English measurements to metric. *Id.* at 61, 116. They also focused on the fact

that, because the TAE Materials contained Superior part numbers, the materials necessarily are
"identical." *See, e.g., id.* at 63-64. This "identicality" appears to be central to Superior's claim
for all documents and drawings "related to" information Superior supplied, regardless of the fact
that TAE engineers created the documents and drawings and that they reflect TAE's engineering
judgment. But Superior's argument is misplaced and incorrect.

19.     Professor Adrian Rienäcker, the expert TAE retained to examine the Segregated
Property, will testify that the TAE Materials are comprised of several categories of materials
TAE created as part of its work to create and document a cost-effective process to manufacture
the parts. Such materials include 3D volume models, 2D detail (finished part) drawings based on
the volume models, detailed manufacturing drawings and other manufacturing information and
manufacturing machine related information (CNC code). Professor Rienäcker will testify that
such materials were created by TAE through significant engineering efforts and that they contain
sensitive manufacturing-related information. *See* Summary of Opinions, attached as Exhibit A.
It is this extensive information—that provides the detailed manufacturing engineering
information needed to actual create the parts step-by-step—that makes the TAE materials
different from the 2D drawings Superior supplied.

20.     While Professor Rienäcker will explain why the Superior and TAE drawings are
quite different, a simple visual inspection by a layman also leads to the same conclusion. The
drawings, on their face, reflect significant differences. Again, because the TAE drawings are for
the same part numbers as the drawings Superior supplied they must be "identical" under
Marwill's standard, but that does not make them "identical" under any other sense of the word.

21.     Mr. Marwill's focus on an extremely small subset of the TAE drawings – *i.e.*,
those related to the parts for which TAE engineers created design changes – completely misses
the point and reflects a fundamental misunderstanding of Dr. Kubler's contentions. Professor
Rienäcker's testimony will not focus on the approximately 59 changes that were discussed at
some length during the hearing, but instead on the fact that the TAE Materials at issue contain

new, manufacturing-related information TAE created that cannot be traced back to the 2D
drawings or other materials Superior provided to TAE.

22.     Professor Adrian Rienäcker will also testify that manufacturers such as TAE
undertake significant independent work to create these valuable, proprietary documents
necessary for the manufacturer to make the parts in a cost-effective manner and within the
specifications provided by the customer.  *See* Ex. A.  Such manufacturers generally do not share
those manufacturing-related documents with their customer.  Instead, such materials are treated
by a manufacturer (like TAE) as valuable, proprietary information owned by the manufacturer.
*Id.*  If the customer was entitled to such materials, it would put the manufacturer at a significant
disadvantage for future dealings because it would enable the customer to provide such materials
to competing manufacturers that could in turn manufacture the parts without having to invest the
time and money to develop their own processes.  *Id.*

23.     This proprietary information created by TAE that did not originate from Superior
is what makes the TAE Materials valuable to TAE and makes clear that the TAE Materials are
not "identical" to the Superior 2D drawings.

### C.     The Supplier Agreement Does Not Give Superior Ownership of the TAE Materials

24.     The only real basis for Superior to have ownership over the TAE Materials is if
the parties contractually agreed that Superior would have ownership.  Based on the Supplier
Agreement, however, the parties clearly did not agree that Superior would have such ownership.

25.     The Supplier Agreement executed by the parties in 2001 provided that Superior
would "deliver to TAE all drawings and the related data and information that TAE may request
and which is reasonably required for the intended use of the drawings." Supplier Agreement §
3.01. A copy of the Supplier Agreement is attached hereto as Exhibit B.  It further provided that
Superior "shall retain title to all **Superior furnished** drawings, related data (whether or not
maintained or stored on computer) and information **supplied to TAE** under this Agreement." *Id.*

-11-

at § 3.02 (emphasis added). The same provision also stated that "TAE will maintain the confidentiality of all drawings, data and information **supplied by Superior and will return such drawings, data and information** to Superior upon the termination of this Agreement." *Id.* (emphasis added). Schedule 1.02 to the Supplier Agreement, setting forth standard terms and conditions to apply to purchase orders, contains essentially the same terms under "BUYER SUPPLIED ITEMS," which provides that Superior "shall retain title to all **Superior furnished** drawing, equipment, data and information **supplied to Seller**" and that "Seller will **return** all drawings, equipment data and information to Superior." *See* ¶12 of Schedule 1.02 (emphasis added). Thus, from the very outset of their relationship, the parties contemplated that Superior would retain title to those materials "furnished" or "supplied" to TAE by Superior and that TAE would keep such materials confidential and return them to Superior when the parties' relationship terminated.

26.     If the parties had intended that Superior would own TAE-created material, it would have been a simple matter for the parties to draft the Supplier Agreement to specify that any manufacturing materials or models TAE creates using Superior drawings would become property of Superior. Indeed, Mr. Marwill testified that in his dealings with suppliers, such a provision is often included. *See* Hearing Transcript at 134. But the parties here did not include any language to that effect. Instead, the Supplier Agreement only provides that Superior shall "retain" title to the materials it "furnished" or "supplied." The Supplier Agreement thus unambiguously limits Superior's ownership to retention of title to the drawings, data and information Superior actually furnished to TAE. This is especially telling given that, as the evidence has shown, Superior knew that TAE would create its own drawings from the Superior provided drawings.[5]

_____

[5] Mr. Wolfsson—called as a witness by Superior—testified that it was necessary for TAE to create the TAE Materials to comply with its obligations to Superior under the Supplier Agreement. Hearing Transcript at 104. And Mr. Chatten—Superior's head of engineering— testified that Superior knew that TAE was creating drawings and other manufacturing-related documents. *Id.* at 43.

27.     Faced with this insurmountable problem to its claim to ownership, Superior has made the unsupported assertion that the purchase price in the Supplier Agreement should be deemed to include the manufacturing process materials that TAE created. In particular, Mr. Marwill testified that by paying the agreed upon price for the parts, Superior was also purchasing materials TAE creates relating to the manufacturing process. *See* Hearing Transcript at 133-34. But Mr. Marwill's testimony is not supported in any way by the language of the Supplier Agreement, which must be construed as written. *See, e.g., Cox. v. Garret, L.L.C.,* 245 S.W.3d 574, 579 (Tex. App.—Houston [14[th] Dist.] 2010, no pet.). Moreover, Marwill admitted that he has no knowledge of how the purchase price between the parties was negotiated or what went into the determination of the purchase price. The plain fact is that the Supplier Agreement, on its face, is a contract for delivery of finished parts at particular prices. Nothing in the Supplier Agreement indicates that Superior paid TAE to develop a manufacturing process for Superior. The materials TAE developed, through much effort and expense, relating to the means by which TAE delivered to Superior what Superior ordered (*i.e.,* finished parts) are TAE's assets, not something Superior purchased merely by agreeing to purchase finished parts. Superior is simply attempting to re-write the contract.[6]

---

[6] Similarly, in another desperate attempt to find a way to re-write the Supplier Agreement, Superior previously contended in one of its pretrial hearing briefs that the relationship between the parties "mirrors" a principal/agent relationship and that the Court should import agency principles to re-write the contract to give Superior ownership. *See* Superior's Hearing Brief [Dkt. No. 724] at ¶¶ 20-27 (asserting that agency principles provide that anything created by the agent using the principal's property belongs to the principal). Superior did not raise this issue during the hearing and did not put on evidence necessary to establish that TAE was acting as Superior's agent. In point of fact, it is evident from the facts that the relationship between the parties was an independent contractor relationship not a principal/agency relationship because Superior did not control the details of how TAE choose to go about the manufacturing process. *See* Insolvency Administrator's Omnibus Hearing Brief [Dkt. No. 730] at ¶¶ 30-31 (explaining test and factors). The Insolvency Administrator reserves the right to address the agency argument in its Reply Brief if Superior attempts to re-assert the argument.

28.    Contrary to Superior's assertions, the fact that TAE created the TAE Materials in connection with its performance under the Supplier Agreement does not somehow give Superior ownership of the TAE Materials.

### D.    The Fact that the TAE Materials Contain Information from the Superior 2D Drawings Does Not Vest Superior With Ownership

29.    As apparent from the testimony Superior solicited at trial and arguments and statements made at the hearing, Superior's final argument to support its attempt to obtain or destroy the TAE Materials appears to be that the TAE Materials contain Superior's alleged confidential and proprietary information and there is no way to separate out that information. As a result of that alleged fact, Superior appears to be contending that it should either be vested with ownership of the TAE Materials or, if TAE is not required to give Superior the TAE Materials, then TAE should be required to destroy the TAE Materials.

30.    As an initial matter, the mere fact that the TAE Materials contain information from the Superior 2D drawings does not somehow vest Superior with ownership of the TAE Materials. Superior has cited no authority for this proposition, and the Insolvency Administrator is aware of no authority that would dictate such a result. As noted above, absent an agreement between the parties to give Superior such ownership, TAE owns the TAE Materials it created, and the Supplier Agreement clearly did not give Superior ownership of the TAE Materials.

31.    Furthermore, contrary to Superior's contentions, the information in the 2D drawings is not confidential and proprietary. In fact, the evidence will show that the real value is in TAE's manufacturing process information – value that Superior either wants to obtain or prevent from being sold to a competitor. Contrary to Superior's assertions at trial, the Superior 2D drawings are not in essence the "recipe" for creating the parts. Rather, as Professor Rienacker will testify, the 2D drawings are the "requirements" that the parts must meet. The parts must meet the specific measurements and tolerances or tolerance ranges. The "recipe" (*i.e.*, the "chef's secret") is the know-how and steps to get to the final requirements in the most cost

-14-

effective way (*i.e.*, the manufacturing process information). This is the information that is proprietary, not the information on the Superior 2D drawings.

### 1.    The Data in the Superior 2D Drawings Is Not a Trade Secret or Confidential

32.    The data in the Superior 2D drawings is not a trade secret or confidential because it is either (a) in the public domain or (b) readily ascertainable. It is important to remember that the Superior 2D drawings are representations of replacement engine parts that are necessarily intended to be either completely identical to—or so close in design that they are interchangeable with—original parts that were designed and created by Continental, Lycoming or others. Superior did not create the original designs of such parts; it created drawings (which Superior's former CEO previously testified contain information that is all in the public domain), it then did extensive testing of its proposed replacement parts to demonstrate and determine airworthiness and thereafter obtained approvals from the FAA to manufacture the replacement parts designed to be interchangeable with and meet the identical airworthiness standards of the OEM parts made by others.

33.    Thus, Superior's information and data relating to its PMAs includes much more than just the Superior 2D drawings provided to TAE. As Superior's witnesses testified, Superior obtained its PMAs through test and computation under the FAA regulations. It was not sufficient for Superior to just create the 2D drawings. In fact, that task was the easy part. To obtain FAA approval, Superior had to do its own testing and computation to demonstrate to the FAA that the parts would be airworthy. None of the data that Superior created and generated through this process is at issue in this case, and the Insolvency Administrator does not dispute that such data may in fact be confidential and proprietary. The Insolvency Administrator is not aware that TAE has any of that data, but if TAE does have that data, the Insolvency Administrator would certainly agree to return it to Superior.

34.     The information at issue in this case is the information reflected on Superior's 2D drawings and accompanying Engineering Orders and similar documents. Professor Rienäcker will testify that much of the information Superior supplied is available from sources such as engine maintenance manuals and sources on the Internet, and that any remaining information can be readily obtained with minimal effort. *See* Summary of Opinions, attached as Ex. A. The engine maintenance manuals alone contain the exact dimensions and tolerances needed to assess airworthiness and interchangeability of the parts. *Id.; see also* Rienäcker deposition transcript ("Rienäcker Depo") at 18. Given the nature of the PMA business, it is Professor Rienäcker's opinion that it is these aspects of a part that form the basis of its commercial value. *See* Ex. A.

35.     Superior's own witness and designated corporate representative, Charles Dedmon, corroborates Professor Rienäcker's opinion. Mr. Dedmon is the son of Superior's founder and worked for Superior for decades, including as its President and CEO, and was largely responsible for obtaining FAA approval for Superior to manufacture the parts at issue in this dispute. Mr. Dedmon was retained as a testifying expert witness in other litigation.

36.     In that litigation, Mr. Dedmon unequivocally and affirmatively testified that all information for the design of the replacement parts Superior produces for Continental and Lycoming engines (the so-called PMA replacement parts that are at issue here) is in the public domain:

> Q. How many parts have -- have you tried to obtain PMA approval for with respect to the Continental and Lycoming aircraft engines?
>
> A. Several thousand.
>
> Q. And that related to piston engines?
>
> A. Yes.
>
> Q. And every single one of those several thousand parts, the information was in the public domain?
>
> A. Yes.

*See* Dedmon expert testimony in *Rolls-Royce Corp. v. H.E.R.O.S., Inc.*, No. 3:07-CV-00739-D, 2008 WL 7960055 at p. 14 (N.D. Tex. June 12, 2008). A copy of this expert testimony along with Mr. Dedmon's related expert report (available at 2009 WL 6653377) is attached as Exhibit C). Mr. Dedmon recently confirmed this testimony in his deposition in this contested matter. (Dedmon 7/15/14 Dep. 111-112.). Given that this testimony is fatal to Superior's claims, it is not surprising that Superior elected not to call Mr. Dedmon to testify during its case-in-chief.

37.     Because the information provided by Superior is in the public domain or readily ascertainable, it does not meet the definition of a trade secret and is not confidential. To qualify as a trade secret, information (including a formula, pattern, compilation, program, device, method, technique or process) must (a) derive independent economic value from not being known to and not being readily ascertainable by proper means by other persons; and (b) be subject to reasonable efforts to maintain its secrecy. Tex. Civ Prac. & Rem. Code § 134A.001; *see also Global Water Group, Inv. v. Atchley,* 244 S.W.3d 924, 928-29 (Tx. App.—Dallas 2008, pet. denied). Something that is not secret cannot be a trade secret. *Id.; see also Lawfinders Assoc., Inc. v. Legal Research Ctr., Inc.,* 65 F. Supp. 2d 414, 418 (N.D.Tex. 1998) ("A key part of the definition of a trade secret is secrecy."). Importantly, the concept of secrecy "is not limited solely to confidentiality, but also requires that the information 'is not generally known or readily ascertainable by independent investigation.'" *Global Water Group,* 244 S.W.3d at 928 (internal citations omitted). The ease or difficulty with which information could be duplicated by others is a key factor in determining whether a trade secret exists. *Global Water Group,* 244 S.W. 3d at 930.[7]

---

[7] Cases such as *K & G Oil Tool & Serv. Co. v. G & G Fishing Tool Serv.*, 158 Tex. 594, 314 S.W.2d 782 (1958) *on reh'g sub nom,* A-6577, 1958 WL 91271 (Tex. June 4, 1958), holding that the existence of a proper means of acquiring trade secret information does not preclude liability if the defendant did not use such means but instead obtained the information improperly or breached a confidence, are not to the contrary. As the *Lawfinders* court made clear, such opinions "assume the existence of a trade secret and focus on the second element of a misappropriation claim—the requirement that the defendant acquire the trade secret through breach of a confidential relationship or discovery it by improper means." *Lawfinders,* 65 F.

38.     Both state and federal courts in Texas have rejected claims of misappropriation of

trade secrets—even where the defendant obtained the information or documents at issue pursuant

to a subsequently-breached confidentiality agreement or otherwise improperly made use of

information considered by the plaintiff to be confidential and a trade secret—based on the fact

that information or material that is not secret (including because it has been disclosed or because

it can be readily ascertained) is not a trade secret. *See, e.g., Global Water Group,* 244 S.W.3d at

928-30 (upholding judgment notwithstanding the verdict in favor of former employee who had

signed a confidentiality agreement and had obtained information regarding a formula for mixed

media pod in water purifier because the formula was not a trade secret; decision was based on,

among other things, the fact that it "would not have been particularly difficult" for a competitor

to duplicate the formula); *Lawfinders,* 65 F. Supp. 2d at 421 (denying injunction to prevent use

of alleged trade secrets by competitor who had obtained confidential information during failed

merger discussions because property was not a trade secret); *see also Wissman v. Boucher,* 240

S.W.2d 278, 279-280 (Tex. 1951); *Adelphon, Inc. v. DiRico,* CA 3-91-2551-T, 1992 WL 281395

(N.D.Tex. March 26, 1992) at *3.

### 2.     Estoppel by Contract Does Not Bar the Insolvency Administrator from Challenging the Confidentiality of the Superior 2D Drawings

39.     Furthermore, the information in the 2D drawings does not become confidential

and proprietary solely by Superior suggesting in the Supplier Agreement that the drawings are

confidential or labeling its drawings as proprietary. In one of its pre-hearing briefs, Superior

contended that under the principle of "estoppel by contract," TAE is estopped by the Supplier

Agreement from arguing that the information in the Superior 2D drawings is not confidential or

proprietary. *Superior Hearing Brief (DKT. No. 742) at 8-9.* Contrary to Superior's assertions,

the information in the 2D drawings does not become confidential and proprietary solely by

---

(continued…)

Supp. 2d at 421. The threshold inquiry is whether the material is a trade secret at all, which it is
not if the information is readily ascertainable by another. *Id.*

Superior suggesting in the Supplier Agreement that the drawings are confidential or solely by labeling its drawings as proprietary.

40.     As an initial matter, estoppel by contract is really a misnomer, because the doctrine means nothing more than the fact that parties are bound by the terms of their contracts. *See, e.g., Woodard v. Gen. Motors Corp.*, 298 F.2d 121, 129 (5th Cir. 1962). TAE did not agree in the Supplier Agreement that Superior's drawings were confidential and proprietary. TAE only agreed to "maintain the confidentiality" of all drawings. That is, to the extent the drawings or portions of such drawings are in fact confidential, TAE agreed to maintain that confidentiality. It is not a breach of the Supplier Agreement for TAE to contend that, in fact, none of the information in the drawings is actually confidential. Moreover, in *Woodard,* the Fifth Circuit made clear that, for estoppel by contract to apply, the party claiming estoppel must show that "he was misled to his injury by a reliance upon recitals in the instrument and that he had no notice of facts contrary to those recited." *Id.* In this instant case, the "recitals" at issue were, again, made by Superior (not by TAE), and Charles Dedmon's testimony indicates that Superior actually knew at the time of those recitals that the information it was providing was readily ascertainable and, therefore, not confidential or a trade secret. Accordingly, estoppel by contract cannot apply.

41.     Moreover, the Fifth Circuit has expressly recognized that providing material subject to a confidentiality agreement cannot create a duty not to use the information if it was not a trade secret or confidential to begin with. *See Cataphote Corp. v. Hudson,* 444 F.2d 1313, 1316 (5th Cir. 1971). The *Cataphote* court noted:

> A duty not to use an idea already known cannot be created by
> virtue of the fact that one makes a confidential disclosure of that
> idea. If the rule were not so restricted it is obvious that by
> disclosing an idea under delusions of confidence, the person
> making the disclosure thereafter could prevent the confidante from
> subsequently making use of it, even though the idea was well
> known prior to the date of the disclosure....

*Id.; see also also Lawfinders,* 65 F. Supp. 2d at 419-20 (discussing cases, including *Cataphote,* finding that information that was not confidential or a trade secret did not become so by virtue of being disclosed under a confidentiality agreement).

42.     Superior has cited three non-Texas cases to argue that if a party obtained information pursuant to a confidentiality agreement, it can never challenge whether that information was truly confidential or a trade secret. *See* Estoppel Brief at ¶18. Those cases, however, do not support Superior's position. First, *Interspiro USA, Inc. v. Figgie Int'l. Inc.*, 18 F.3d 927 (Fed. Cir. 1994), was a patent case in which the parties had previously entered into a settlement agreement whereby the defendant agreed to pay royalties on the sale of infringing products and subject itself to audits by the plaintiff. *Id.* at 929. On a subsequent motion to enforce the agreement, the district court made evidentiary rulings preventing the defendant from challenging the enforceability of the underlying patent. *Id.* at 932. In upholding those rulings, the Federal Circuit cited specific paragraphs of the settlement agreement that apparently stated that the defendant "waived its right to challenge the validity and enforceability of the [] patent with respect to products covered by the agreement." Thus, unlike here, the case was not based on a contract or any confidentiality provision but on a settlement agreement pursuant to which the defendant waived the right to challenge enforceability of the patent as to the relevant products. Such a scenario is clearly distinguishable from the present case.

43.     Superior also relies on *Picker Int'l. Corp. v. Imaging Equip. Servs., Inc.*, 931 F. Supp. 18, 35 (D. Mass. 1995), *aff'd sub nom Picker Int'l., Inc. v. Leavitt,* 94 F.3d 640 (1st Cir.1996) and *In re Matter of Uniservices, Inc.*, 517 F.2d 492, 496-97 (7th Cir. 1975). In *Picker,* while the court did discuss estoppel, it also went on to conduct an extensive analysis as to whether the information at issue truly was a trade secret, concluding that it was. *Picker,* 931 F. Supp. at 35-38. *Uniservices* provides even less support to Superior's position. First, the case was a decision on a covenant not to compete (not on a breach of confidentiality provision) and it involved an employer-employee relationship, which the court found included implied obligations

not to compete. *Uniservices,* 517 F. 2d at 497. Second, contrary to Superior's implication, the estoppel finding was not based solely on the fact that the former CEO had treated such information as confidential while he was an employee, but rather on his entire "prior conduct," including the fact that, when the CEO and his family sold the assets of the company to the debtor, they had valued the information at issue at $1,500,000. *Id.* Thus, the case was not based on a confidentiality provision but on a course of conduct involving implied obligations between an employer and employee and on the defendant's own affirmative representation regarding the value of the information at issue.

44.     While the few extra-jurisdictional cases Superior cites are, as shown, distinguishable, perhaps most important is the fact that Superior's argument, if accepted, would necessarily mean that a company could effectively create trade secrets (at least as between the parties) out of material that clearly did not meet the legal requirements of trade secrets, simply by disclosing the material under an agreement that referred to them as such. Such a position is contrary both to public policy and to the numerous cases that, in spite of the existence of a confidentiality agreement or provision, still begin their analysis with the threshold question of whether the material at issue is truly confidential or a trade secret. *See, e.g., Luccous v. J.C.Kinley Co.,* 376 S.W.2d 336 (Tex. 1964) (analyzing whether information at issue was a trade secret and concluding that it was not despite the fact that information had been provided pursuant to a confidential licensing agreement); *Global Water Group,* 244 S.W.3d 924 (conducting trade secret analysis and concluding information was not a trade secret despite former employee's signing a confidentiality agreement); *Adelphon,* 1992 WL 281395 (where defendant had obtained information from the plaintiff under the guise of negotiating a contract to purchase the product, concluding that it was "unnecessary for the court to resolve the issue of whether [defendant] discovered the trade secret by improper means or breached a confidence placed in him" by the plaintiff because the information did not meet the test for a trade secret).

45.     In sum, the information in the Superior 2D drawings that is also in the TAE Materials is not a trade secret or confidential and therefore the fact that the TAE Materials

contain that information does not provide a basis for Superior's contention that it should be entitled to the TAE Materials or a basis to require destruction of the TAE Materials.

## IV.   CONCLUSION

The Insolvency Administrator respectfully requests that, because the TAE Materials are not Superior's property and because any Superior-provided materials either have been or will be returned, the Motion to Enforce be denied and that the Insolvency Administrator be awarded any additional relief to which he may be entitled.

Dated:  July 28, 2014

Respectfully submitted,

/s/ Craig F. Simon
Craig F. Simon, Esq.
State Bar No. 00784968
Daniel P. Winikka, Esq.
State Bar No. 00794873
SIMON, RAY & WINIKKA LLP
2525 McKinnon Street, Suite 540
Dallas, TX  75201
Telephone:  (214) 871-2292
Facsimile:  (469) 759-1699

**Counsel for Dr. Bruno Kübler, in his
Capacity as Insolvency Administrator of
Thielert Aircraft Engines GmbH**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 28th day of July, 2014, a true and correct copy of the foregoing document has been served on the parties listed below via the Court's ECF filing system, first class mail or other appropriate means.

*/s/ Craig F. Simon*
Craig F. Simon

U.S. Trustee
1100 Commerce Street, Room 976
Dallas, TX 75242-1496

Jerry Alexander
James Adams
Christopher Robison
PASSMAN & JONES
1201 Elm Street, Suite 2500
Dallas, TX 75270