# Exhibit A

(Summary of Opinions of Insolvency Administrator's Expert,
Professor Adrian Rienäcker)

Expert testimony for the litigation Superior air parts (SAP) vs. Thielert Aircraft Engines (TAE)

Prepared by:
Prof. Dr.-Ing. Adrian Rienäcker
Managing Director Institute for Powertrain and Automotive Engineering (iaf)
Chair for Machine Elements and Tribology (mt)
Faculty of Mechanical Engineering
University of Kassel
Mönchebergstr. 3
34125 Kassel,
Germany

Home address
Gistlstr. 53a
82049 Pullach, Germany

Basis for the testimony:
- USB flash drive containing data supplied by TAE
- Telephone conferences including Mrs. Luca Botica, Mr. Craig Simon, Dr. Randolf Mohr, Mr. Dan Winikka, Mrs. Paula Reichenstein
- Review of the data contained on the USB drive
- An Excel spreadsheet "Directory-Tree-2.xls" specifying the data, SAP contends to be their property
- Telephone conversations held with Mr. Uwe Dietel
- Telephone conversations with former colleagues in the aircraft engine industry
- Internet Research
- Review of US Federal Aviation Regulations
- My own industry experience, background and education



EXHIBIT
IA-17

EXHIBIT
25

**Expert Testimony in the litigation Thielert Aircraft Engines (TAE) and Superior Air Parts (SAP)**

**Scope and background**

I understand, that SAP 2D detail drawings for various aircraft engine parts were supplied from SAP to TAE in an effort where TAE was asked to manufacture these parts for SAP, who would market them under a Federal Aviation Administration (FAA) Parts Manufacturing Approval (PMA) license. I understand in addition, that TAE created 3D CAD (computer aided design) models (volume models) from these drawings, converted dimensions from US to Metric units, derived 2D Metric detail drawings from the 3D models and derived special manufacturing drawings as well as tooling drawings and computer programs for manufacturing purposes (CNC – computer numerical control) from the 3D models.

I understand, that Superior Air Parts contends that numerous 3D models and documents on the USB drive, in excess of the original SAP 2D drawings supplied to TAE, are SAP property and must be returned to SAP.

I was asked to establish an unbiased opinion concerning the nature of the work and know-how behind the creation of the manufacturing drawings including the 3D volume models, Metric drawings and drawings for manufacturing tooling and whether, under industry practice, this information is proprietary to TAE or whether a manufacturer such as TAE would be required to share this information with its customer SAP.

**Summary of Opinions**

I have the following opinions, in summary form:

1. Based on the spreadsheet sent to TAE's counsel by SAP's counsel, it appears that SAP is claiming ownership of three categories of materials: (1) 2D drawings in US units provided by SAP to TAE; (2) 3D volume models in Metric units created by TAE; (3) 2D detail (finished part) drawings in Metric units for the TAE manufacturing workforce, detailed manufacturing drawings describing intermediate states from raw material to finished part, other manufacturing information (including models and drawings of tooling required in the manufacturing process) and manufacturing machine related information TAE created using information derived from 3D models.
2. The 2D drawings SAP provided are typically stamped or labeled "Superior Air Parts, Inc." in the box at the bottom right corner of the drawing, that also shows the part's number and it is my understanding that the TAE Insolvency Administrator has agreed to return such drawings to SAP. In a significant number of cases, TAE also initiated design changes, which were then jointly agreed and incorporated in SAP drawings, which improved the quality of the SAP drawings.
3. All 3D volume models were created by TAE as an essential prerequisite for deriving other important documents from them. Creating 3D volume models was a significant engineering effort, which required TAE's design know-how and manufacturing know-how and is – by industry practice – proprietary to TAE and not shared between a manufacturer/supplier and its customer.

4. The detailed manufacturing drawings and other manufacturing related information TAE created after creating the 3D volume models also contain sensitive manufacturing related information. Again, this work done by TAE engineers created commercially valuable, proprietary manufacturing documents that enable a supplier to fabricate the parts in a cost-effective manner and within the specifications provided by the customer. Such material would not typically be shared between a supplier and a customer and it would be considered an unfair business advantage to the customer if the supplier were forced to provide this information.

5. All information contained in the SAP 2D drawings can be readily obtained independent from SAP with moderate effort. For important parts involved, the essential information in the SAP 2D drawings can be obtained at a reasonably low cost (through internet research, engine manuals). This essential information is mainly established from the OEM engine overhaul manual, which contains all dimensions and tolerances (in exact numbers) important for assessing airworthiness and interchangeability of a spare part. These aspects of the spare part form the basis of the part's commercial value. The remaining information contained in the 2D drawing (if, and to the extent, any of it is not publicly available) can be readily and independently established to such a degree that neither the quality of the part nor the interchangeability of the part is compromised. Thus, all necessary information in the SAP drawings provided to TAE is either publicly available or readily ascertainable.

6. In several instances (e.g. the XP400 and XP 360 engines etc.), TAE developed an improved important engine or part designs, which included sophisticated engineering analysis or use of TAE engineering know-how and capabilities exceeding those of a pure parts manufacturer. These activities are indicative of an engineering partnership between TAE and SAP, which typically includes engineering work at eye level between parties.

7. I reserve the right to modify these opinions based on any additional information I may receive, and I also reserve the right to provide additional opinions in response to any information that any expert for Superior might provide.