# Exhibit C

(Partial Expert Testimony of Charles Dedmon)

2008 WL 7960055 (N.D.Tex.) (Partial Expert Testimony)
United States District Court, N.D. Texas.

ROLLS ROYCE CORP.,
v.
HEROS, INC.

No. 07CV00739.
June 12, 2008.

**(Partial Testimony of Charles B. Dedmon)**

**Case Type:** Aviation >> N/A
**Case Type:** Unfair Competition & Business Practices >> Other Unfair Competition & Business Practices
**Jurisdiction:** N.D.Tex.
**Name of Expert:** Charles B. Dedmon
**Area of Expertise:** Engineering & Science >> Aviation/Aerospace Engineer

**Representing:** Defendant

A. That's correct.

Q. Did you form Aviation Consulting Group?

A. Yes.

Q. When did you do that?

A. 1999, I believe.

Q. What kind of work does Aviation Consulting Group do?

A. Primarily, consulting on litigation, and we do consulting on FAA regulations, compliance with regulations. And I actually ran a -- ran a company as part of a con -- the consulting project.

Q. You said, litigation. What kind of litigation consulting do you do? What does that entail?

A. Primarily, product liability litigation, aircraft crash litigation.

Q. And what does that entail?

A. Generally, my work has been -- consisted of reviewing evidence, reviewing document production, trying to interpret documents that have -- have been produced, helping counsel to understand what the documents indicate and what they mean.

Q. Are you trying to help counsel determine the cause of an accident?

What are you trying to help counsel do.

WestlawNext © 2014 Thomson Reuters. No claim to original U.S. Government Works.

A. I am trying to take evidence that the coun -- that counsel has and to give my experience in the industry by telling them what the documents mean, what they show, what they -- what they indicate. Which, of course, may end up helping to find out exactly what the root cause of the accident was.

Q. Do you do that primarily for manufacturers or for plaintiffs?

A. Most of the time, for -- for manufacturers. I have worked in -- for the plaintiff in -- in at least one case.

Q. And what kind of specific products have you been involved in in this litigation consulting?

A. Specific products. Primarily, aircraft engines, piston aircraft engines, either Continental or Lycoming, and parts for those engines, whether made by the original manufacturer or PMA manufacturers.

Q. And how many times have you been hired as a consultant to do litigation-related matters?

A. I'm going to say about five or six times.

Q. Explain to me what your work relating to FAA regulation compliance entails.

A. Well, it would involve making sure that the client understands what the federal regulations are -- Federal Aviation Regulations are and what is necessary to show compliance to those regulations, both by explaining the -- the actual regulation, advisory circulars, policy memos and other documents that the FAA uses to instruct you on how to comply with the regulations.

Q. Who are your clients?

A. One of my clients was Superior Air Parts. I have worked with Aero, Inc. I have worked with -- I have worked with them -- for them twice. I've worked for a plaintiff in a crash case who had a -- it was a -- tried to be a class action suit on a crankshaft failure for a Lycoming engines -- engines.

Q. Is all of your FAA regulation compliance consulting dealing with piston aircraft engines?

A. It has been to this date.

Q. Are your clients the engine manufacturers or part manufacturers and suppliers?

A. Not the engine manufacturer -- well, actually, Yes, I've worked for one, for Superior Air Parts, who is actually an engine manufacturer. But primarily, for parts manufacturers.

Q. Are they PMA manufacturers or OEM manufacturers?

A. PMA.

Q. Do you do any work with OEMs?

A. Only to the extent that Superior Air Parts is also an OEM, because they hold some type certificates.

Q. And Superior Air Parts was your former employer; is that correct?

A. Superior Air Parts was my employer from 1969 until 1990.

And then, I went back to Superior Air Parts in 2003 to 2005 as a -- working, actually, as a consultant, as their President and CEO.

Q. How many clients do you currently have?

A. Currently, I am working with two clients.

Q. And who are those clients?

A. One is this current litigation, the H.E.R.O.S. litigation, and the other is a company called Air Power in Arlington, Texas.

Q. Is this a full-time endeavor for you?

A. No.

Q. How many hours a week do you work as a consultant?

A. At the current time? Probably 8 to 10 hours a week, average.

Q. Where are your offices located?

A. In my house.

Q. Do you have any employees?

A. No direct employees, other than my wife, who does clerical work for me. But we do hire other experts and consultants to work on projects with us.

Q. I'd like to talk to you about the work you did in this case.

A. Uh-huh.

Q. When was your first contact with this case?

A. Maybe two months ago.

Q. And how did that come about?

A. I was asked if I would be willing to look at the case and provide some expert witness reports and testimony.

Q. Who asked you to do that?

A. Jerry Alexander.

Q. Was that in a telephone call or a letter or e-mail?

A. Telephone call.

Q. And what specifically did Jerry Alexander ask you to do?

A. Jerry asked if I would take a look at the complaint and the counterclaim and if I would provide a report on the background and history of the PMA industry, tell how it works and comment about the -- some of the issues that were raised in the claim and counterclaim.

Q. When you say, "some of the issues," what issues specifically?

A. Well, he basically wanted me to look at the issues that I considered myself qualified to comment on.

Q. Would those be related to the background and history of the PMA industry?

A. Yes. And the methods that are used to obtain PMA, my experience with competition in the industry and how the competition between the OEMs and PMA suppliers typically plays out, the economics of the industry and how it leads to the actions that are taken.

Q. Are you being asked to testify as a damages expert in this case?

A. No.

Q. You're not a CPA, are you?

A. No.

Q. Are you being asked to testify as an economist in this case?

A. I'm being asked to testify solely as an expert on the PMA industry and only to the economics as they play into that.

Q. So, you were not asked to perform any sort of market analysis?

A. No.

Q. And you have not done that?

A. No.

Q. And you are not a lawyer, correct?

A. I'm sorry?

Q. You are not a lawyer, correct?

A. Correct.

Q. Have you been retained as an expert in the case involving Avidair pending in Missouri?

A. No.

Q. How many hours have you spent on this case?

A. Oh, I would say that I've probably spent 20-25 hours on the case right now, ballpark estimate.

Q. Your report only states your hourly rate.

Have you invoiced?

A. I have not invoiced.

Q. Do you intend to invoice anybody for your work?

A. Yes.

Q. How much would that invoice reflect?

A. It'll reflect $175 an hour times the number of hours that I put in on the case, and plus any applicable expenses.

Q. And so, you estimate you've spent about 20-25 hours?

A. Correct.

Q. Is any portion of your compensation contingent on the outcome of this case?

A. No.

Q. Of those 20-24 -- 25 hours, how would you break that down in terms of -- how many hours did you spend on research?

A. I probably spent 8 to 10 hours, maybe 12 hours, of actually going through, retrieving documents, reviewing the sources and the documents, and the rest of the time was spent in writing and rewriting the opinion.

Q. Did you have any communication with anyone at H.E.R.O.S. or Hye-Tech?

A. No.

Q. So, you've had no communications with Heros Kajberouni?

A. No.

Q. And you've had no communications with Armond Kajberouni?

A. No.

Q. Of the information you provided to us in response to the subpoena and some of the information that's cited in your report, other than the complaint and answer, was everything else something that you located or generated as part of your research?

A. Yes.

Q. Did you rely on all that information in rendering your opinions, or did you reject anything in particular that you didn't find helpful?

A. I don't remember rejecting any of the material. No, I used -- used all of it. I didn't use all of each piece of material. I did take representative information from a number of different sources.

Q. And what sources were those?

A. Federal Aviation Regulations, articles I used, some reports and talks and presentations that I had previously done over the years on the same subjects.

Q. Did you review any discovery responses or document productions as part of your work?

A. You mean as part of this case or --

Q. Yes.

A. No.

Q. Did you ask to review any discovery responses or document productions?

A. No.

Q. Did you feel like you needed that information in rendering your opinions?

A. Not to render the opinions I was asked to give.

Q. Did you review Heros Kajberouni's deposition?

A. No.

Q. Did you review Armond Kajberouni's deposition?

A. No.

Q. Did you review Joe Gast's deposition?

A. No.

Q. Did you review Jerry Hyatt's deposition?

A. No.

Q. Did you review Kevin Peterson's deposition?

A. No.

Q. Did you review any AMC agreements or policy manuals from Rolls-Royce?

A. No.

Q. Did you review any Rolls-Royce fleet agreements?

A. No.

Q. Did you review any Rolls-Royce customer service agreements?

A. No.

Q. Did you review any confidentiality or nondisclosure agreements of Rolls-Royce?

A. No.

Q. Did you review any supplier contracts or purchase agreements with Rolls-Royce?

A. No.

Q. Did you review Schedule 1.1 of a settlement agreement between David Rain and Rolls-Royce?

A. No.

Q. Did you review any contracts between Rolls-Royce and the U.S. army relating to Model 250 engines' parts, overhaul, and so forth?

A. No.

Q. Did you review any Rolls-Royce part drawings or specifications?

A. No.

Q. Did you review any Rolls-Royce part drawings or specifications related to the Model 250?

A. No.

Q. Did you review any Rolls-Royce repair schematics or instructions or other service documents?

A. No.

Q. Did you review any Rolls-Royce repair schematics or instructions or other service documents related to the Model 250?

A. No.

Q. Did you review any Hye-Tech part drawings or specifications?

A. No.

Q. Did you review any Hye-Tech part drawings or specifications related to the Model 250?

A. No.

WestlawNext © 2014 Thomson Reuters. No claim to original U.S. Government Works.

Q. Did you review any H.E.R.O.S. repair schematics or instructions or other service documents?

A. No.

Q. Nothing relate to the Model 250 --

A. No.

Q. -- H.E.R.O.S.?

Did you review any data packages submitted by H.E.R.O.S. for approval of DER repairs?

A. No.

Q. Did you review any data packages submitted by H.E.R.O.S. for approval of DER repairs for the Model 250 engine?

A. No.

Q. Did you review any data packages submitted by Hye-Tech for PMA approval?

A. No.

Q. No Hye-Tech data packs related to the Model 250?

A. No.

Q. Did you search the FAA website to research PMA grants to particular entities relating to the Model 250 engine?

A. Yes.

Q. How long did you search on the FAA website?

A. I don't know. I've been there several times. Probably, you know, a couple of hours, an hour and a half. I've been back and forth to that website a number of times.

Q. So, about an hour and a half?

A. Possibly.

Q. And did you identify any particular entities that have PMA grants for Model 250 engine parts?

A. I saw a number of people that have -- a number of companies that have PMAs for the Allison 250.

Q. Did you or do you feel like you need additional information or documents to render your opinions in this case?

A. Not the opinions I was asked to render to this point.

Q. Did you ask Mr. McConwell, Mr. Robeson, Mr. Alexander or H.E.R.O.S. or Hye-Tech for any documents you felt like you needed?

A. No.

Q. Did you ask for any documents that you were not provided?

A. No.

Q. What kind of information did you obtain from the FAA's website?

A. I went to the website to get copies of current regulations, current policy on PMA parts, current orders, which are the books that tell you how to actually process PMAs.

I went there to look at the companies that had obtained PMAs for the Allison 250 and other engines. And I looked to see how -- not only how many suppliers, how many PMAs, and by what method they had been obtained.

Q. What kind of information did you obtain from the Aeronautical Repair Station Association's website?

A. I think -- I believe I got material on the Instructions for Continued Airworthiness. And also, the complaint that was filed by ARSA against Rolls-Royce.

Q. What kind of information did you obtain from the Modification Replacement Parts Association website?

A. Very little, actually. I received links to some news articles and some general information that's on there.

Q. Did you prepare any prior drafts of your report?

A. I only have one computer report, and I don't have a draft of it, keep drafts.

Q. So, when you were drafting your report, you continually were changing the same document?

A. That's correct.

Q. Have we exhausted all of the work that you did in this case in reaching your opinions?

A. Do you mean is this all the work I'm going to do in this case?

Q. Thus far, have we discussed everything that you did?

A. Yes.

Q. Do you contemplate doing any further work before testifying at trial?

A. If I'm asked to, yes.

Q. At this time, do you contemplate doing any further work relating to the opinions you've rendered so far?

A. I don't know of any other work that I'm going to be asked to do.

Q. Do you feel that further work is necessary to reach your opinions in this case?

WestlawNext © 2014 Thomson Reuters. No claim to original U.S. Government Works.

A. No, I think I've reached the opinions I've been asked to reach in this case. If I'm asked to reach further opinions, I may need to do further research and look at additional documents.

Q. But you've done all the work you feel you need to do to reach the current opinions that you've --

A. Correct.

Q. Did you receive any assistance from others in preparing your report?

A. No.

Q. Have you had any communications with any other experts retained on behalf of H.E.R.O.S. or Hye-Tech?

A. No.

Q. So, you had no communications with Jerry Reno?

A. With who?

Q. Jerry Reno.

A. No.

Q. Any communication with Mick Molish?

A. No.

Q. Any communication with Christopher Floun (phonetic)?

A. No.

(The Court Reporter marked a document for identification as Deposition Exhibit No. 217.)

Q. I'll hand you what's been marked as Exhibit 217, which is a copy of your report in this case.

A. Uh-huh.

Q. I'd like to have you turn with me to Page 13 of your report, which is your list of eight opinions that you've reached.

A. (Complying.)

Q. On Opinion No. 1, you talk about the safety of the civil aviation industry in the United States.

What disputed issue does this particular opinion help prove or disprove in this case.

A. I don't know about the disputed issues. I was asked to provide a background of the PMA industry, its history, how it works, why it works, and to comment on the process of receiving both design and production approval for PMA parts.

WestlawNext © 2014 Thomson Reuters. No claim to original U.S. Government Works.

Q. Is the safety of the civil aviation industry in the United States at issue in this case?

A. Well, I think the -- the point I was trying to get to here, and make later on, is that the FAA -- because of the actions of the FAA and the industry, the U.S. has the safest civil aviation industry in the world, and that is -- follows that when the FAA approves a process or a product, it contributes to that safety.

Q. Were you asked to opine on the safety of the civil aviation industry in the United States?

A. I was asked to give an opinion about the safety of PMA parts.

Q. Is this more of an introductory statement as opposed to an expert opinion?

A. Yes, in the sense that it is introductory to -- we have a safe aviation system, and therefore -- and because of the FAA. And therefore, when the FAA issues regulations, they're to further that aviation safety. And when they approve products and parts, they, in fact, are taking the position that those products and parts are safe.

Q. Moving to Opinion No. 2, can you explain for me the difference between the same airworthiness requirements and substantially the same airworthiness requirements?

A. I'm sorry? Okay, let me read that.

Yes. The regulations that are set out for PMA holders in 21.303 are substantially the same as the airworthiness requirements that are set up for types of certificate holders.

There are a few minor wording differences with regards to -- particularly to material review board activity, MRB activity. And the FAA currently has a program on right now to make sure that the wording in both cases is exactly the same.

Q. In Opinion No. 2, are you merely summarizing your interpretation of 21.303?

A. I'm summarizing my interpretation and my experience over 40 years with 21.303.

Q. So, how did you reach Opinion No. 2? Did you simply read the regulation and then summarize that or restate what you believe to be the law?

A. Yes. And I have, again, restated my experience that when the FAA makes a positive finding that a product is airworthiness -- airworthy, it has met the minimum standards for airworthiness. And so, therefore, a PMA part that meets the standards is the same as a type certificated part that meets the standards.

Q. What in regulation 21.303 supports your opinion that the issuance of a PMA to a company indicates that the FAA has made a positive finding of airworthiness?

A. The way the 21.303 reads is that the applicant must show compliance with the regulation, airworthiness regulation.

Q. So, in reaching that opinion, you're simply reading the regulation and interpreting what you believe the language to say?

A. I'm telling you what -- yes, I'm interpreting that, what that language does say and what is required to meet the -- to show compliance.

Q. Moving to Opinion No. 3, you indicate that H.E.R.O.S., Hye-Tech and Heros Kajberouni have obtained PMA for a number of replacement parts for type certificated products.

Does H.E.R.O.S. hold any PMA approvals.

A. I did not find any for H.E.R.O.S. What I used is H.E.R.O.S. as a combination of all three.

I did find PMAs for Hye-Tech. And because I did not do a complete and exhaustive search of all of the PMAs for the Allison 250, or otherwise, I didn't know if H.E.R.O.S. actually had made some PMA -- had received some PMAs. I did not a find any listed for H.E.R.O.S.

Q. And that was part of your FAA search?

A. Yes.

Q. Do you know what kind of company H.E.R.O.S. is?

A. Basically, that they're in the -- the aircraft engine repair business.

Q. Do you know whether they're a certified repair shop?

A. I don't.

Q. Are you reaching any opinions in this case related to DER repairs?

A. No.

Q. So, your opinions here are related exclusively to the PMA approval process?

A. That's correct.

Q. Do you know whether Heros Kajberouni individually holds any PMA approvals?

A. I don't.

Q. Did you search for his name in the FAA website database?

A. No, I didn't.

Q. As part of your search of the FAA website database, you indicated that you found PMA grants to Hye-Tech; is that correct?

A. Correct.

Q. How many does Hye-Tech have?

A. I didn't count. I just looked at some of the representative PMAs.

Q. Which representative PMAs did you look at?

A. I don't even remember the part numbers. I went down, selected part numbers and opened up to see the approval means.

Q. Were you looking for particular part numbers in particular, or you just searched around the website any time you saw Hye-Tech's name?

A. I just did a random search. I was not looking for any specific part.

Q. Also in Opinion No. 3, you state again that the FAA has made a positive finding that H.E.R.O.S. meets the airworthiness requirements of the FARs and has demonstrated the ability to produce replacement parts that are equal in airworthiness to an OEM.

On what do you base that opinion?

A. I base that opinion on the FA -- Federal Aviation Regulations, which require that in order to obtain a PMA that the applicant must show that the product complies with the airworthiness requirements. And they're the same airworthiness requirements that are met by the OEM. So that by meeting the same requirements as the OEM, the parts are equally -- equally safe.

Q. Which regulation are you referring to in particular?

A. Be reg -- federal regulation 21.303, be other regulations within Part 21, and also, Part 33 of the Federal Aviation Regulations.

Q. What regulation's in Part 21?

A. Part 21 is certification procedures for products and parts.

Q. Which specific regulations did you look at in Part 21?

A. 21.303.

Q. What about Part 33 of the Federal --

A. Yeah.

Q. -- Aviation Regulations?

A. Part 33 is airworthiness standards, and it spells out the specific requirements for airworthiness of engines and other products.

Q. And in reaching your opinion about the positive finding that H.E.R.O.S. meets airworthiness requirements, you're basing that on your interpretation and reading of the federal regulations?

A. Right, and my knowledge of working with those regulations in the industry for 40 years.

Q. Moving to Opinion No. 4, you state that the information for developing design data for PMA application is available in the public domain.

What information are you referring to here?

A. I'm referring to information that he used to develop design data. My personal experience is with piston engines, but I am aware that the data is available in -- in the public domain.

WestlawNext © 2014 Thomson Reuters. No claim to original U.S. Government Works.

Q. How are you aware?

A. Because I've been in the PMA business for 40 years, and that's the way that you obtain design data, you develop design data.

Q. This is a pretty broad statement. Are you saying that all information related to all data and all parts is in the public domain?

A. No.

Q. Then, what specific parts, what specific data are you referring to here?

A. Information that is necessary to develop parts. It's not every bit of the information is available in the public domain, but, certainly, sufficient information is available in the public domain to prepare and submit design data to the FAA.

Q. I guess I'm trying to understand what -- if you're saying that this doesn't apply to all parts and all data, then, what data and what parts does it apply to?

A. Well, I'm not aware of any data that is not available in the public domain, but there must be some.

Q. You're not aware of any data related to parts that's not in the public domain?

A. No. I may explain that by saying that every bit of information that I have sought out to obtain PMAs has been available in the public domain.

Q. And what are those parts that you have -- you've sought to obtain PMA approval?

A. Parts for Continental and Lycoming aircraft engines. All of the parts, actually.

Q. How many parts have -- have you tried to obtain PMA approval for with respect to the Continental and Lycoming aircraft engines?

A. Several thousand.

Q. And that related to piston engines?

A. Yes.

Q. And every single one of those several thousand parts, the information was in the public domain?

A. Yes.

Q. And is that your opinion that they were in the public domain? How do you know it was in the public domain?

A. Well, it is my opinion that they are in the public domain. And for many of the items, we had litigation over whether or not they were proprietary and whether they were in the public domain. And in each case, we settled the litigation without admitting that there was anything that wasn't in the public domain.

Q. So, your conclusion that that information was in the public domain is just a personal opinion of yours?

A. Personal opinion borne out by results of litigation and the experience in the industry.

Q. What analysis have you done to correlate your statement in Opinion No. 4 to the gas turbine aircraft engine industry?

A. I don't know that I did any correlation. I have had experience in obtaining information for and obtaining PMAs for the PT-6 engine, Pratt Whitney PT-6 turbine.

Q. And what experience is that?

A. We had a subsidiary company that developed parts for the PT-6 engine, tested them. We obtained FAA approval and actually went into production and sale of the product.

Q. And how did you obtain FAA approval?

A. By meeting the regulations that are spelled out in 21.303.

Q. Did your request for PMA approval relate to information that you believed was in the public domain?

A. We used information that was in the public domain in order to develop our design data.

Q. What information in Hye-Tech's data packages are in the public domain?

A. I don't know. I haven't reviewed any of their -- their packages.

Q. Did this -- any of the information in the Hye-Tech data packages come from products developed at U.S. government expense?

A. It would appear from the readings of the claim and counterclaim that they did.

Q. Do you have any empirical data that shows that this information came from data for products developed at U.S. government expense?

A. No.

Q. Do you know whether any of the information in Hye-Tech's data packages came from data developed by actual manufacturing sources that have assisted in developing products?

A. No.

Q. Do you have any information that the Hye-Tech data packages contained information from data published in maintenance manuals and service documents?

A. Would you say that again?

Q. Do you have any information that the Hye-Tech data packages contained data published in maintenance manuals and service documents?

A. Let me answer that by saying the only information I have about how H.E.R.O.S. or Hye-Tech get their information is from the statements that are filed in their counterclaim.

Q. So, you have no empirical evidence or data to support that any of the information contained in the Hye-Tech data packages are in the public domain?

A. Correct.

Q. Did you review any of the Rolls-Royce technical information that David Rain returned to the company as part of his settlement in the lawsuit?

A. No.

Q. Do you have any empirical evidence or data that correlates your Opinion No. 4 to Rolls-Royce or the Model 250 engine?

A. No.

Q. Is Opinion No. 4 just a general commentary on what you see to be trends in the piston aircraft engine industry?

A. It is a statement regarding what I see not only as trends, but -- existing in not only the piston, but the entire aviation engine industry that most of the data that is used is, in fact, in the public domain and readily available.

Q. And again, your experience with the gas turbine engine industry is the PT-6?

A. That's correct.

Q. And that was a subsidiary company that was obtaining a PMA approval?

A. Yes.

Q. Are you rendering an opinion in this case that any Rolls-Royce design data used by Hye-Tech or H.E.R.O.S. in obtaining PMA approval is in the public domain?

A. I believe it is, yes.

Q. How do you know that?

A. From my experience in the industry.

Q. And you did not review any Hye-Tech data packages?

A. That's correct.

Q. And you didn't review any Rolls-Royce design data?

A. That's correct.

Q. And you're basing that opinion solely on your review of the counterclaim?

A. Yeah, and my knowledge of the industry and experience.

Q. Are you simply providing the bottom line for what's at issue in this case?

A. Say that again.

Q. Are you simply providing the bottom line for what is at issue in this case?

A. I'm not sure what you mean by that.

Q. Were you asked to render an opinion that Rolls-Royce design data is in the public domain?

A. I was asked to render an opinion about my experience with data in the public domain.

Q. And you were not asked to render an opinion about Rolls-Royce design data?

A. No.

Q. So, are you reaching an opinion about Rolls-Royce design data?

A. I think I've reached a general opinion about all of the material that has been used for making PMA applications, particularly on the basis of identicality.

Q. Do you know how many parts there are in a Model 250 engine?

A. No.

Q. Do you have any personal experience with PMA approval process relating to the Model 250 engine?

A. To who?

Q. Relating to the Model 250 engine, do you have any experience?

A. No.

Q. What is the basis for your statement in Opinion No. 4 that manufacturing sources develop data?

A. My experience has been that many of the products that are used in aircraft engines, because they are not actually manufactured by the type certificate holder, but by subcontractors or what the FAA terms suppliers, that, actually, suppliers do much, if not all, of the design and development work of the prototypes that end up being used in type certificated products.

Q. Do you have any empirical data or evidence to correlate that discussion to Rolls-Royce and the Model 250 engine?

A. To the extent that they use subcontractors, yes, that would be evidence that that happens.

Q. Do you know whether they use subcontractors?

A. I don't. I do not know.

Q. And you have not reviewed any supplier or purchase agreements between Rolls-Royce and its suppliers?

A. No.

Q. Is it your opinion that it's satisfactory for a PMA design approval to be based on any data other than the OEM data?

A. It is satisfactory?

Q. Yeah, I'm asking.

A. The approval is based on meeting the airworthiness requirements. So, whatever you use to get to that point is an FAA decision.

Q. So, you can get PMA approval based on data that's not OEM data?

A. Yes.

Q. And on what do you base that opinion?

A. I've -- I have obtained PMAs for my company by using non-OEM data.

Q. Did you represent to the FAA that it was using non-OEM data?

A. I made no representation one way or the other.

Q. Would the assumption from the FAA be that you were using OEM data?

A. I don't -- I have no idea what their assumption would be. The question was simply one of meeting the airworthiness requirements.

Q. Moving to Opinion No. 5, you identify Pacific Sky and Arnoni Aviation as two companies who have obtained PMA for replacement parts for Rolls-Royce engines by the process of identicality.

A. Right.

Q. Are these the same parts that Hye-Tech has obtained PMA approval for?

A. I don't know.

Q. Do you know whether Pacific Sky and Arnoni Aviation used the same OEM data that Hye-Tech used in obtaining PMA approval?

A. I don't.

Q. If you don't know, then, how is the fact that Pacific Sky and Arnoni Aviation have PMA approval for different parts than Hye-Tech relevant in this case?

A. It shows that the data is available in the public domain, they were able to obtain data for the submission of identicality approval and that the assumption is -- is that if some is available -- in fact, particularly, the amount of information that was used by Pacific Sky Supply, it indicates that probably all of that data is available.

Q. So, it's your opinion that if the data for one part is in the public domain that that means that the data for all parts are in the public domain?

A. It shows a likelihood that that's the case, yes.

Q. How does it show a likelihood?

A. If part data is available -- if -- if, for example, one drawing was available, it wouldn't necessarily indicate that. But if -- if dozens, hundreds of drawings have been in the public domain, it shows an indication that probably all of them are.

Q. How many Rolls-Royce parts have you looked at to determine whether their information and data is in the public domain?

A. I have searched the FAA records for maybe two or three dozen parts.

Q. Would your opinion change if -- depending on the number of parts that are in the Model 250 engine about the likelihood of it all being in the public domain?

A. Oh, I doubt it. I doubt it very seriously. I think the fact that the parts are out there indicates that -- that all of the data is available.

THE VIDEOGRAPHER: We're going off the record. The time is 10:18 A.M..

This is the end of Tape No. 1.

(AT THIS TIME THERE WAS A BRIEF RECESS TAKEN, AFTER WHICH THE FOLLOWING PROCEEDINGS WERE HAD:)

THE VIDEOGRAPHER: We're back on the record. The time is 10:23 A.M..

This is the beginning of Tape No. 2.

Q. Mr. Dedmon, before the break, we were talking about Pacific Sky and Arnoni Aviation, and I think I understood you correctly to say that you had only looked at two or three dozen Model 250 parts or Rolls-Royce parts on the FAA website that had PMA approval?

A. That's correct.

Q. And it is your opinion that regardless of how many parts there are in an engine, the fact that there may be two or three dozen parts that have PMA approval means that every single part has data that is in the public domain?

A. If I said that, I misspoke. In fact, it shows that if parts are being submitted for approval based on identicality, that the information that is used to prepare those is in the public domain. There may be others that are not. I can't speak to every single part in the engine.

Q. Isn't the information used to manufacture one part could be different from the information used to manufacture another part?

A. Yes, that's true.

Q. So, just because the information related to one part is in the public domain does not mean that the information for another part is also in the public domain?

A. Not necessarily, right.

Q. Did any of the parts that Arnoni Aviation obtained PMA approval for relate to the Model 250 engine?

A. I don't remember.

Q. Would your opinion change if you had checked the FAA website and it showed that Arnoni had three PMA grants, none of which are for the Model 250 engine?

A. I don't know that it would change my opinion. I was using them strictly as an example.

Q. But your opinion related to Pacific Sky and Arnoni Aviation. You have no empirical data or evidence to correlate that to the Model 250 engine?

A. I believe Pacific Sky Supply has a number of PMAs on the Model 250 engine.

Q. What about Arnoni Aviation?

A. I told you before I don't remember what theirs were.

Q. With respect to Pacific Sky, how many Model 250 PMA approvals does it have?

A. Quite a few. I don't know by number total.

Q. A dozen, half a dozen?

A. It seems like more than that. Considerably more.

Q. You can't give me an estimate?

A. I can't.

Q. Do you know how they were obtained?

A. Many were obtained by the process of identicality.

Q. How many of them were obtained by identicality?

A. Almost all of the ones I looked at. I don't remember if there were some that were obtained by testing computation or not.

Q. What part numbers and what technical data was used to obtain PMA based on identicality?

A. I did not -- I don't remember which part numbers, and I did not write those down, and I can't tell you what data was submitted. I can only tell you the method of approval.

Q. So, when you're looking at the FAA website, you can't tell what data was submitted?

A. That's correct.

Q. So, you can't tell what the source of the data was?

A. Well, you can tell in the sense that it will tell you that it was done by identicality, which means that information was -- was furnished to the FAA that positively showed that the part was identical in form, fit and function to that of a type certificated part.

It also may indicate, for example, an identicality if it was obtained in accordance with a license agreement and if it shows testing computation that can describe a whole range of testing procedures from simple bench testing and -- and dimensional testing to a full- -- full-blown engine run, 150-hour certification run.

Q. How does a finding of identicality tell you the source of the OEM data?

A. It doesn't tell you the source of the OEM data. It tells that the data presented is equivalent to -- in form, fit and function to the OEM data.

Q. So, the finding of identicality doesn't tell you whether the OEM data was stolen?

A. No.

Q. It doesn't tell you whether it was in the public domain?

A. Oh, it does tell you that if they used that information and the FA -- they're -- they've gotten a PMA on it, I think it tells you that it is in the public domain.

Q. How does it tell you that?

A. Well, if they have the PMAs and there's been no repercussions, no litigation, or anything that would cause that part to be pulled off the market, then, it would indicate that it is in the public domain.

That's -- you have to understand, I've spent 40 years in the industry. That's what I've -- have done is -- is sought out information about parts from vendors, suppliers, methods, FOIA requests, that type of thing.

Q. But you've never sought out parts related to the Model 250?

A. No.

Q. Do you know when the last time Pacific Sky obtained a Model 250 PMA?

A. I don't.

Q. Does Pacific Sky have any PMA design approval on the Model 250 parts of the 23 million series?

A. I don't know.

Q. Do you know whether Pacific Sky has any PMA design approval on the Model 250 parts in the older 6 million series?

A. I don't know.

Q. Did you review any of the data packs submitted by Pacific Sky or Amoni in reaching your Opinion No. 5?

A. No.

Q. And you didn't review any of the Rolls-Royce OEM data that may have been contained in those ...

A. No.

Q. Moving to Opinion No. 6, your statement, the finding of identicality by the FAA does not mean the data is photographically identical, on what do you base that opinion?

A. Oh, on the FAA regulations and policy statements and in practice of dealing with the FAA.

Q. So, you're summarizing your interpretation of the language in the regulations, orders and policies?

A. The orders, policies, and also, from practical experience in obtaining PMAs of identicality.

Q. Have you ever, as a DER, performed a PMA identicality finding?

A. I'm not a DER. I've had a DER find that.

Q. Do you know how a DER performs a PMA identicality finding?

A. Yes.

Q. How do they do it?

A. They look at all of the data that is presented to them and make a finding of identicality. Actually, they -- they make a recommendation that a finding be made on identicality and submit it to the FAA.

I've never had a DER that was able to -- to actually give the approval. What they do is they say that they have reviewed data and that it is equivalent -- that it is identical to the OEM.

Q. What do they do specifically when they're reviewing the data?

A. They can actually take and compare the finished drawing to a type certificate holder's drawing.

Q. Does the FAA or the DER reviewing a PMA application based on identicality ever question or investigate where the OEM data used in the application came from?

A. Not in my experience.

Q. And again, the FAA or the DER does not know the source of the OEM data?

A. Not to my experience.

Q. Does the FAA or the DER know whether the PMA applicant obtained the OEM data through a FOIA request?

A. I don't know. Not in my experience.

Q. Does the FAA or the DER have any responsibility under the regulations to police data to make sure it's not stolen or that it was properly obtained?

A. I don't know anything in the regulations that require that.

Q. So, the source of the OEM data is irrelevant for purposes of approving a PMA application based on identicality?

A. I believe that's true.

Q. So, when the FAA approves a PMA application, then, it's saying nothing about whether the applicant lawfully submitted the OEM's design data; is that correct?

A. I think years ago the FAA got itself out of that argument. The FAA makes determinations as to whether you meet the airworthiness requirements.

Q. So, they're basically looking at two part drawings and saying whether they're identical or not?

A. Right.

Q. Regardless of their source?

A. Identical in form, fit and function.

Q. Regardless of the source of the drawing?

A. Yes, that's correct.

Q. Where in the regulations does it say that identicality does not mean that they're photographically identical?

A. It doesn't use those words. I believe I submitted documents to show that the FAA takes the position that if a product -- just because a product is submitted on the basis of identicality and that they can find identicality, they can, in turn, request additional information regarding testing and other information so that it's clear that the document -- that the part does not have to be photographic or a copy of the material. That it just merely has to -- not merely. It has to be identical in form, fit and function. And the FAA policy letters and orders clearly state that.

Q. And that's your interpretation of the orders and regulations?

A. Yes. And it's also been my experience in obtaining PMAs.

Q. Does the PMA part have to be identical in materials used?

A. It has to be identical or equivalent material.

Q. Is equivalent the same thing as identical?

A. No.

Q. So, does it have to be identical or equivalent?

A. It can be equivalent.

Q. When can it be equivalent?

A. Well, I think what we're getting tied up is -- again, is in the knot of what is meant by identicality. It's identicality in form, fit and function.

If, for example, you were to submit a drawing and it had a different material than was previously approved for the type certificate holder, you would have to submit additional data to substantiate the change in the material. That would not necessarily change the approval method from identicality.

Q. Under FAA Order 81-10.42, doesn't the applicant have to show every aspect of the submitted design is identical to the type certificated part?

A. That's what 81-10.42 says, yes.

Q. And what are the common areas of identicality?

A. What are the common areas? Form, fit and function.

Q. Assembly?

A. That would be what would be under -- under fit.

Q. What else?

A. Yes, it is the way the product fits into any -- any higher level product.

Q. What about --

A. I'm sorry. Let me --

Q. Okay.

A. Let me -- it -- it has -- when I say fit, it has to do with how the part fits in any higher level assembly, and also, how it would fit and mate with any other product which is running against it or in conjunction with it.

Q. What about specifications? Is that a common area of identicality?

A. Yes.

Q. Tolerances?

A. Tolerances. Tolerances, again, don't have to be identical. For example, if a PMA applicant submits a part with tighter tolerances than what's on the type certificate drawing, that would -- would satisfy the airworthiness requirements, so that even though they were not identical, they -- they were tighter and fell within a -- a narrower range. And so, therefore, you could have approval on identicality.

Q. Even if they weren't identical?

A. Yes.

Q. What about dimensions, is that a common area of identicality?

A. Yes.

Q. And materials?

A. Yeah, I believe we talked about that, materials.

Q. Moving to Opinion No. 7 on Page 13 of your report, you state that the design data for a part can readily be determined by reverse engineering.

What design data are you referring to here?

A. You can pretty much tell everything that you need about a product from reverse engineering, including dimensions, tolerances, material, heat treatment, surface treatments, plating, that type of thing.

Q. Do you believe that if a part can be reverse engineered, regardless of how much time it takes and how expensive it is, it's still readily ascertainable?

A. Yes.

Q. What is the basis for that opinion?

A. Experience. I've done a number of reverse engineerings, and I've also been in an industry where reverse engineering is common.

Q. What parts have you reverse engineered?

A. Valve guides, valves, pistons.

[Note: Pages 66-69 missing in original document]

Q. So, if I can just understand what you're saying in Opinion No. 7, you're saying that "readily" is not an appropriate word there?

A. No, I didn't say -- it -- it may not be if we're talking in terms of the time and amount of money.

I'm saying that the process of performing reverse engineering is -- is a standard practice, and it can be readily done, any part. It may take longer and it may cost more, but it can still be readily done.

Q. So, if a part costs half a million dollars to reverse engineer and two years to do it, is that readily determined?

A. I don't know anything -- any part like that. That's a speculation as to cost and time.

Q. Well, I guess I'm just trying to understand what you mean by "readily."

A. I meant that it can be done, that any part can be done following regular procedures, and it can be readily done.

Q. Can it be done, or can it be readily done?

A. It can be readily done.

Q. And what do you base that opinion on?

A. On my experience in the industry and the fact that I have done that.

Q. What empirical evidence or data do you have to correlate that opinion to Rolls-Royce and the Model 250 engine specifically?

A. I didn't do any correlation there.

Q. Are you commenting generally on what you view as the trends in the aircraft engine industry?

A. Would you repeat that?

Q. Are you simply commenting generally on the trends that you view in the aircraft industry?

A. Yes.

Q. Are you rendering an opinion that the data for Rolls-Royce Model 250 parts that Hye-Tech has obtained PMA approval for are readily ascertainable by reverse engineering?

A. I believe that to be true, although I don't know -- haven't seen any of Hye-Tech's information.

Q. So, you believe that to be true, but you have no basis for that opinion?

A. Right. Other than my experience in that the parts -- like I say, all of the parts that are in these engines are reverse engineering -- are -- let me start over.

All of the parts that are in the engine, the design data can be obtained by reverse engineering.

Q. What Rolls-Royce parts for the Model 250 engine have been reverse engineered?

A. I don't know.

Q. You don't know whether H.E.R.O.S. has ever done it?

A. No.

Q. You don't know whether Hye-Tech has ever done it?

A. No.

Q. Forgive me, I may have asked you this earlier, have you ever tried to reverse engineer a Rolls-Royce part for the Model 250?

A. No.

Q. Have you ever tried to reverse engineer a turbine nozzle?

A. I don't remember. I don't believe so.

Q. Have you ever tried to reverse engineer a compressor vane?

A. Yes, we've done vanes and blades before.

Q. A compressor vane for a gas turbine engine?

A. Yes.

Q. And that related to the PT-6?

A. Yes.

Q. Tell me about that process.

A. The process of taking -- taking any of the vanes or the blades or -- and sending them to a manufacturer of blades and vanes and having them go through the reverse engineering process and develop blueprints, drawings and specifications.

Q. Do you recall the time it took to do that?

A. No.

Q. Do you recall how much it cost to do that?

A. No.

Q. Isn't it true that under FAA Order 81-10.42 you cannot use reverse engineering to derive PMA based on identicality?

A. That's what that says, although later, when it says that test reports and computations may be used to substantiate finding of identicality, it means that you can -- in practice, you can submit data that's obtained by reverse engineering.

Q. Moving to Opinion No. 8, you state that documents and data that can be utilized to develop design data are readily available through FOIA or directly from military procurement offices.

What documents are you referring to here?

A. Design data, including blueprints and specifications.

Q. Are you saying that all documents and all data are available through FOIA?

A. No, I'm not saying that. I'm saying that what -- that design data is readily available, but not -- I can't speak to every bit in every design data, because I -- but I have obtained design data through both FOIA and direct from the military.

Q. Then, what -- I guess I'm trying to get at what documents you're referring to there, because it's a pretty broad statement. And if it's not all documents and all data, then, which documents and which data?

WestlawNext © 2014 Thomson Reuters. No claim to original U.S. Government Works.

A. Well, I've received drawings for parts, any number of parts, specifications for those parts.

Q. Which parts?

A. Parts for Continental and Lycoming aircraft engines.

Q. So, wouldn't it be more perfect to say, in your opinion, that documents and data related to parts for Continental and Lycoming may be available through FOIA?

A. Well, I also know that parts for other engine models are available.

Q. What other parts?

A. Parts for other piston engines, parts for turbine engines.

Q. Can you be more specific?

A. Parts for the Pratt & Whitney PT-6 engine. I believe the Allison 250 engines have been subject to FOIA requests.

Q. On what do you base that?

A. Just my knowledge of the industry and what's going on with manufacturers in the industry.

Q. Have you ever tried to obtain Rolls-Royce design data through a FOIA request?

A. No, I haven't.

Q. Have you ever tried to obtain Rolls-Royce design data from a military procurement office?

A. No.

Q. What empirical evidence or data do you have to correlate your opinion in Opinion No. 8 to Rolls-Royce and the Model 250 engine specifically?

A. I don't have any.

Q. So, again, you're just commenting generally on your experience and view of the trends in the aircraft engine industry?

A. Correct.

Q. Are you rendering an opinion that any Rolls-Royce design data used by Hye-Tech or H.E.R.O.S. in obtaining PMA approval is in the public domain through a FOIA request?

A. No. I don't know what they obtained by FOIA.

Q. Now, you listed eight opinions in your report. And then, there were a number of other items that were discussed through your report that didn't actually make it into your opinions.

Are the eight opinions listed here the only opinions that you're going to testify to at trial?

A. I don't know.

Q. You don't know?

A. I don't know.

Q. Are these the only opinions that you are rendering in this case?

A. At this point.

Q. Are you rendering an opinion as an economist performing a market analysis or any analysis related to anti-trust issues?

A. No.

Q. You mentioned several times, you know, your knowledge of the industry or information that you become aware of.

Is there any objective data to support that information?

A. To support the information about -- I

[Note: Pages 78-81 missing in original document]

A. In the process of test and computation, you submit to the FAA the analysis, an analytical report, showing that you have taken a -- a part that is approved under a type certificate and you have analyzed that part, you've tested it. It doesn't necessarily mean an engine test. It can be bench testing, it can be laboratory testing, it can be dimensional testing. And you have been able to document that you can build a part that meets the same airworthiness requirements.

Q. In terms of the process, you mentioned sending -- conducting tests and sending to a lab earlier. Explain --

A. Uh-huh.

Q. Explain to me what that entails.

A. Well, if you start with a part and -- and let's say you start with a basic metal part and you want to design that part, reverse engineer that part, get a test and computation approval on that part. You would send the part to a laboratory for material analysis.

They would also do testing to show if there was any heat treating, plating or any other type of other metal treatment.

And then, you would do dimensional testing to get all of the dimensions and tolerances. You would test more than one part in order to do that.

Q. Is that process more lengthy for a more complex part as opposed to a simpler part?

A. Yes.

Q. Is it more time-consuming the more complex the part is?

A. Yes.

Q. Would it be more expensive than a simpler part?

A. In the sense that it takes more time, it could be more expensive, yes.

Q. Turning back to your report, I wanted to go through a few things that you included in your report.

Turning to Page 1 ...

A. (Complying.) Uh-huh.

Q. How did you go about drafting this section, history and background?

A. Drafted it from my knowledge of the industry and pulling material out of the FAA website and other presentations that I've done.

Q. I looked at the -- FAA's website, and I noticed that there were a number of sections that were literally verbatim from the website.

Did you just cut and paste from the website and paste that in --

A. Could very well be, yes.

Q. So, if there are sections in here that are verbatim from the website, then, you just cut and paste from the website and pasted that into this document?

A. Yes.

Q. Going to Page 2 ...

A. (Complying.)

Q. The parts manufacturer approval section, how did you go about drafting this section?

A. Most of this is actually quoted directly from -- from the FARs.

Q. And did you go to a website where those FARs are located and just cut and paste the statutes into your report?

A. I would have cut and pasted the statues to be sure that they were exactly correct.

Q. So, this section here is merely a regurgitation of the various regulations?

A. Correct. I'm not sure I'd use the word "regurgitation," but ...

Q. And is this your summary of your interpretation of the regulations that you believe are pertinent to the analysis?

A. Say that again, would you, please?

Q. Is this your summary of your interpretation of their regulations that you cited in this analysis?