Jerry C. Alexander
Texas State Bar No. 00993500
James F. Adams
Texas State Bar No. 00863450
Christopher A. Robison
Texas State Bar No. 24035720
PASSMAN & JONES, P.C.
1201 Elm Street, Suite 2500
Dallas, Texas 75270-2599
(214) 742-2121 Telephone
(214) 748-7949 Facsimile

COUNSEL FOR SUPERIOR AIR PARTS, INC.

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| In Re: | § | |
| | § | Case No. 08-36705-bjh-11 |
| SUPERIOR AIR PARTS, INC., | § | Chapter 11 |
| | § | |
| Debtor. | § | |
| | § | |
| | § | |

**SUPERIOR AIR PARTS, INC.'S SUPPLEMENTAL HEARING BRIEF**

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.      OPENING STATEMENT AND ISSUES PRESENTED.................................................... 1

II.     FRAMEWORK FOR ANALYSIS ................................................................................. 2

III.    ARGUMENT AND AUTHORITIES ............................................................................. 6

      A.      Regardless of Whether TAE Modified Superior's Data and Information or
            Expressed it in a Different Manner, Superior's Property Rights Remain Intact. ... 6

      B.      Superior is Not Seeking to "Advantage Itself" by Obtaining Information
            Relating to TAE's Manufacturing Process.  Rather, Superior Seeks Return
            of its Information. ................................................................................................ 9

      C.      Enforcement of the Confirmation Order and Supplier Agreement Does Not
            Require Superior to Prove Trade Secrets............................................................. 11

      D.      Superior Disclosed its Drawings, Data, and Information to TAE In
            Confidence.  Whether TAE "Could Have" Obtained Superior's Drawings,
            Data, and Information in a Different Manner is of No Legal Consequence......... 15

      E.      Dr. Kübler is Estopped from Challenging the Confidential and Proprietary
            Nature of Superior's Drawings, Data, and Information........................................ 18

      F.      Dr. Kübler's Public Domain Arguments are Barred by *Res Judicata*. ................. 20

      G.      Dr. Kübler's Public Domain Arguments are Factually Wrong............................. 24

IV.     CONCLUSION............................................................................................................ 27

## **TABLE OF AUTHORITIES**

**Page**

**Cases**

*Adelphon, Inc. v. DiRico*, 1992 WL 281395 (N.D. Tex. 1992) .................................................. 15

*Bishop v. Miller*, 412 S.W.3d 758, 774 (Tex. App. – Houston [14th Dist.] 2013)........................ 8

*Brooks v. Excellence Mortgage, Ltd.*, No. 04-13-00106-CV, *available at* 2014 WL 2434583, at
 *11 (Tex.App. – San Antonio May 30, 2014) ........................................................................ 10

*Cataphote Corp. v. Hudson*, 444 F.2d 1313 (5th Cir. 1971) ................................................ 19

*CIGNA Corp. v. Amara*, -- U.S. --, 131 S. Ct. 1866, 179 L.E.2d 843 (2011)............................. 18

*Cox v. Garret, L.L.C.*, 245 S.W.3d 574 (Tex.App. – Houston [14th Dist.] 2010)) ...................... 2

*Dresser-Rand Co. v. Schutte & Koerting Acquisition Co.*, 2012 WL 460275 *6-8 (S.D. Tex.
 2012) ...................................................................................................................................... 13

*E.I. Du Pont De Nemours Powder Co. v. Masland*, 244 U.S. 100, 102 (1917) .................... 16, 19

*Elcor Chemical Corp. v. Agri-Sul, Inc.*, 494 S.W.2d 204 (Tex. App.—Dallas 1973, writ ref'd
 n.r.e.) .............................................................................................................................. 16, 17, 18

*First Union Commercial Corp. v. Nelson, Mullins, Riley & Scarborough (In re Varat Enters.,
 Inc.)*, 81 F.3d 1310, 1315 (4th Cir.1996)) ................................................................................ 21

*Global Water Group, Inc. v. Atchley*, 244 S.W.3d 924 (Tex. App.—Dallas 2008, pet denied).. 13,
 14

*Hyde Corp. v. Huffines*, 314 S.W.2d 763, 770 (Tex. 1958)................................................ 12, 16

*In re Chesnut*, No. 03-4105, *available at* 2008 WL 2962943, at *3 (N.D. Tex. July 29, 2008)
 (Lynn, J.); aff'd, 356 Fed. Appx. 732 (5th Cir.2009)............................................................ 21

*In re Howe*, 913 F.2d 1138, 1143 (5th Cir.1990) ................................................................ 21

*In re Jones*, No. 10 B 04352, available at 2011 WL 748427, at *3 (Bankr.N.D.Ill. Feb. 24, 2011)
 .................................................................................................................................................. 21

*In re Uniservices, Inc.*, 517 F.2d 492, 496-97 ..................................................................... 18, 20

*Johnson v. Structured Asset Services, LLC*, 148 S.W.3d 711, 721-22 (Tex. App.—Dallas, no
 pet.) .......................................................................................................................................... 18

*K & G Tool & Serv. Co. v. G & G Fishing Tool Serv.*, 314 S.W.2d 782, 787 (Tex. 1958) ......... 16

*Lawfinders Assoc. Inc. v. Legal Research Center, Inc.*, 65 F. Supp.2d 414 (N.D. Tex. 1998) ... 13,
 14

*Lear Siegler, Inc. v. Ark-Ell Springs, Inc.*, 569 F.2d 286, 289 (5th Cir. 1978)............................ 12

*Luccous v. J.C. Kinley Co.*, 376 S.W.2d 336, 337 (Tex. 1964) ............................................ 19, 20

*Ocean Drilling & Exploration Co. v. Mont Boat Rental Svcs., Inc.*, 799 F.2d 213 (5th Cir.
 1986)), and p. 14, ¶ 27 ............................................................................................................ 2

*Picker Int'l. Corp. v. Imaging Equip. Serv., Inc.*, 931 F. Supp. 18, 35 (D. Mass. 1995)........ 18, 20

*Picker Int'l, Inc. v. Leavitt*, 94 F.3d 640 (1st Cir.1996) ................................................................ 18

*Proline Products, LLC v. McBride*, 324 P.3d 430, 433 (Okla. Civ. App. Div. 3 2014)................. 8

*Reingold v. Swiftships, Inc.*, 126 F.3d 645, 651 (5th Cir. 1997)........................................... 7, 8, 9

*Republic Supply Co. v. Shoaf*, 815 F.2d 1046, 1054 (5th Cir.1987).......................................... 21

*Rhorer v. Raytheon Engineers and Constructors, Inc.*, 181 F.3d 634, (5th Cir. 1999)............... 18

*Sharma v. Vinmar Int'l Ltd.*, 231 S.W.3d 405, 424 (Tex.App. – Houston [14[th] Dist.] 2007) .. 4, 24

*Sikes v. McGraw-Edison Co.*, 671 F.2d 150, 151 (5th Cir. 1982) ................................................ 4

*Simplified Telesys., Inc. v. Live Oak Telecom, L.L.C.*, 68 S.W.3d 688 (Tex. App.—Austin 2000, pet. denied)............................................................................................................ 11, 12, 15

*SkinMedica, Inc. v. Histogen Inc.*, 869 F.Supp. 2d 1176, 1197 (S.D. Cal. 2012) ......................... 8

*T–N–T Motorsports, Inc. v. Hennessey Motorsports, Inc.*, 965 S.W.2d 18, 21–22 (Tex.App.-Houston [1st Dist.] 1998)............................................................................................ 10, 11

*Travelers Indem. Co. v. Bailey*, 557 U.S. 137, 152, 129 S.Ct. 2195, 174 L.Ed. 2d 99 (2009)..... 20

*Valley Historic Ltd. P'ship v. Bank of New York*, 486 F.3d 831, 839 (4th Cir. 2007)................. 21

*Versata Software, Inc. v. Internet Brands, Inc.*, 902 F.Supp. 2d 841, 852 (E.D. Tex. 2012)... 8, 10

*Wissman v. Boucher*, 240 S.W.2d 278 (Tex. 1951)............................................................. 14, 15

**Statutes**

TEX. CIV. PRAC, & REM. CODE 134A.001.................................................................................... 8

## SUPERIOR AIR PARTS, INC.'S SUPPLEMENTAL HEARING BRIEF

Superior Air Parts, Inc. ("Superior") files this Supplemental Hearing Brief in response to the "Brief of Insolvency Administrator Relating to the Motion to Enforce Confirmation Order Pursuant to Court's July 23, 2014 Ruling Regarding Briefin [sic]" [Dkt. 737] and in support of its Motion to Enforce [Dkt. 684].[1]

### I.     OPENING STATEMENT AND ISSUES PRESENTED

Superior owns the drawings for its PMA replacement parts, as well as the data and information contained on those drawings.  It is now apparent that Dr. Kübler agrees with this premise:  "Superior obviously owns certain drawings and related data for the parts it sells."[2]

The remaining issue is whether or not Dr. Kübler somehow owns and has the right to sell Superior's data and information to one of Superior's competitors simply because TAE placed Superior's data and information into TAE-labeled drawings or three dimensional models[3] of Superior's parts in connection with TAE's performance of the Supplier Agreement.  This is the issue on which the Court requested further briefing.[4]

In his supplemental brief (Dkt. 737), Dr. Kübler supplied no authority whatsoever in support of his contention that a supplier (*i.e.* TAE) can obtain technical data from its customer (*i.e.* Superior) in confidence, place the information into a different form, then sell the information to a competitor of the customer.  Instead, Dr. Kübler's brief contains a total of **two new authorities** – one case in support of the elements of *res judicata* and one case standing for the unremarkable proposition that a contract should be construed in accordance with its written

---

[1] This Brief is supported by an Appendix, which is referred to herein as the "SAP Appendix."

[2] *See* Dr. Kübler's Brief [Dkt. 737], p. 6, ¶ 13.

[3] The three dimensional models are referred to herein as computer assisted design or "CAD" models.

[4] *See* SAP Appendix pp. 17-18 (Excerpts from Transcript of Hearing Held July 23, 2014, p. 14, l. 18 – p. 15, l. 9).

terms.[5]  **Every other authority in Dr. Kübler's supplemental brief was previously cited in Dr. Kübler's prior hearing brief** (Dkt. 730) **or in Superior's prior briefs**.

The shortage of legal authority in Dr. Kübler's Brief is not surprising.  What Dr. Kübler is attempting to do with Superior's data and information is extraordinary and, more importantly, is prohibited by the Supplier Agreement, intellectual property law (*see* Part III.A-C, below), and this Court's Honorable Confirmation Order.

In addition to responding to Dr. Kübler's unsupported contention that he owns and has the right to sell the TAE-labeled drawings and CAD models (which Dr. Kübler admits were generated as part of TAE's work for Superior and contain Superior's information),[6] Superior's brief will address the following issues:

- Whether the Confirmation Order and Supplier Agreement should be enforced irrespective of whether the Superior drawings, data, and information constitute a trade secret.

- Whether the doctrine of estoppel by contract bars Dr. Kübler's public domain argument.

- Whether the *res judicata* effect of Superior's Plan and Confirmation Order bars Dr. Kübler's public domain argument.

- Whether Dr. Kübler's public domain argument is factually accurate.

## II.      FRAMEWORK FOR ANALYSIS

The relationship between Superior and TAE was governed by a Supplier Agreement (Hearing Exhibit "Superior 18").[7]  The Supplier Agreement defines and limits the extent of TAE's right to use Superior's information.  Stated differently, TAE (and by extension, Dr.

---

[5] *See* Brief [Dkt. 737], p. 8, ¶ 16 (citing *Ocean Drilling & Exploration Co. v. Mont Boat Rental Svcs., Inc.*, 799 F.2d 213 (5th Cir. 1986)), and p. 14, ¶ 27 (citing *Cox v. Garret, L.L.C.*, 245 S.W.3d 574 (Tex.App. – Houston [14th Dist.] 2010)).
[6] *See* Dr. Kübler's Brief, p. 2, ¶ 2 ("…TAE's materials contain information Superior supplied) and p. 10, ¶ 19 ("Professor Adrian Rienäcker, the expert TAE retained…will testify that the TAE materials are comprised of several categories of materials TAE created as part of its work to create and document a cost effective process **to manufacture the parts.**") (emphasis added).
[7] The Supplier Agreement is included in the SAP Appendix at pp. 1-15.

Kübler) have **no rights** in Superior's data and information other than those provided in the

Supplier Agreement.  There are several provisions in the Supplier Agreement that dictate this

result.

First, the Supplier Agreement recognizes that Superior will provide drawings, technical

data and information to TAE:

> 3.01.  <u>Technical Data</u>.  Superior shall deliver to TAE all drawings
> and the related data and information that TAE may request and
> which is reasonably required for the intended use of the drawings.[8]

Second, the parties agreed that Superior owned the drawings, data, and information it

provided to TAE, which necessarily includes (but is not limited to) the dimensions,

specifications, notes, and tolerances on the drawings.[9]   TAE agreed to maintain the

confidentiality of the drawings, data, and information, and TAE agreed to return the drawings,

data, and information upon termination of the Supplier Agreement:[10]

> 3.02.  <u>Title</u>.  **Superior shall retain title** to all Superior furnished
> drawings, **related data** (whether or not maintained or stored on
> computer) **and information** supplied to TAE under this
> Agreement.  TAE will maintain the confidentiality of all drawings,
> **data and information** supplied by Superior and will return such

---

[8] *See* SAP Appendix p. 2 (Supplier Agreement § 3.01); *see also* SAP Appendix p. 23 (Excerpt from Transcript of Hearing Held July 22, 2014, p. 22, ll. 7-13) (Superior's Kent Abercrombie testifying that the drawings Superior provided to TAE pursuant to the Supplier Agreement).

[9] *See* SAP Appendix p. 2, Supplier Agreement § 3.02. *see also* Superior Exhibit 31 introduced into evidence at the hearing held on July 22, 2014 (exemplar Superior drawing containing dimensions and specifications).

[10] Paragraph 37 of the Court's Confirmation Order ("Return of Proprietary Information") expressly referenced TAE and provided that "[f]or the avoidance of doubt, the Reorganized Debtor retains all of the Debtor's rights pursuant to any confidentiality agreement executed in connection with the exchange of such information.").

drawings, **data and information to** Superior upon termination of
this Agreement.[11]

Notably, TAE's obligation to return Superior's drawings, data, and information is not
limited to a particular form.[12]  Stated differently, if data or information was supplied by Superior
to TAE pursuant to the Supplier Agreement, TAE is obligated to return it, regardless of whether
or not the data or information migrated into a document generated by TAE.

Third, TAE and Superior agreed that Superior's drawings, related data, and information
could **only** be used by TAE to perform its obligations under the Supplier Agreement:

> 3.03.   <u>Proprietary Rights Data</u>.  **Superior's drawings, related
> data and information shall be used by TAE only for the
> performance of its obligations under this Agreement**, unless
> otherwise provided in this Agreement or expressly approved by
> Superior in writing.[13]

The Supplier Agreement does **not** afford TAE the right to use Superior's drawings, data, and

information for any other purpose.[14]

---

[11] *See* SAP Appendix p. 2 (Supplier Agreement § 3.02).  Dr. Kübler's interpretation of the Supplier Agreement's
confidentiality provision – that it only required TAE to maintain the confidentiality of Superior's drawings, data,
and information but may challenge their status as confidential after years of performing to the contrary under that
provision – strains credibility; the plain terms of Section 3.02 clearly indicate Superior supplied its drawings, related
data, and information to TAE in confidence.  Dr. Kübler's "interpretation" is also inconsistent with the testimony of
Mr. Wolffson – the only former TAE representative who has testified in this matter.  Mr. Wolffson testified that it
was common knowledge within TAE that Superior's drawings had to be kept confidential and that Superior's
drawings were only to be used for manufacturing the parts which were ordered by Superior.  *See* SAP Appendix p.
63 (Transcript p. 101, ll. 4-6, 14-17).  Finally, Dr. Kübler's proffered interpretation of the Supplier Agreement
disregards Texas law.  "Under Texas law, one who acquires knowledge in confidence may not use it for his own
personal gain, even if the knowledge is publicly available.  *See Sikes v. McGraw-Edison Co.*, 671 F.2d 150, 151 (5th
Cir. 1982) ("It is thus the present law of Texas that **one who acquires knowledge of this sort in confidence may
not turn it to his own use in breach of that confidence** even though subsequent events make it available to the rest
of the world.").  "In Texas, courts condemn the employment of improper means to procure trade secrets.  **The
question is not 'How could he have secured the knowledge?' but 'How did he?'"**  *Sharma v. Vinmar Int'l Ltd.*,
231 S.W.3d 405, 424 (Tex.App. – Houston [14th Dist.] 2007) (emphasis added).
[12] *See id.*
[13] *See* SAP Appendix p. 2 (Supplier Agreement § 3.03) (emphasis added).
[14] *See id.*  Noticeably absent from Dr. Kübler's Brief is any discussion of Section 3.03 of the Supplier Agreement or
any justification of why Dr. Kübler can use Superior's information (whether contained in an original Superior
drawing, TAE-labeled drawing, or CAD model) for any purpose other than to in performance of TAE's obligations
under the Supplier Agreement.

Fourth, the Supplier Agreement provided that TAE could not even reproduce Superior's

drawings, related data, and information without Superior's express written consent:

> 12.   BUYER SUPPLIED ITEMS.  **Superior shall retain title to
> all** Superior furnished drawings, equipment, **data and
> information** supplied to Seller [TAE].  Seller shall be responsible
> for any loss or damage to the drawings, equipment, **data or
> information** supplied by Superior, reasonable wear and tear
> excepted.  **Seller will maintain the confidentiality of all such
> drawings, data and information and may not reproduce or
> divulge such information without the express written consent
> of Superior**.   Superior's drawings, equipment, **data and
> information** shall be used by Seller **only** for the performance of its
> obligations under the purchase order and **Seller will return all**
> drawings, equipment, **data and information** to Superior at
> Superior's request.[15]

Finally, the drawings Superior provided to TAE pursuant to the Supplier Agreement

included a proprietary rights stamp in substantially the form set forth below, which identified the

drawing as belonging to Superior; confirmed Superior's ownership of the drawing; precluded the

recipient's right to reproduce the drawing; and limited the recipient's use of the drawing to the

manufacture of parts on Superior's behalf:[16]

---

[15] *See* SAP Appendix p. 11 (Schedule 1.02 to Supplier Agreement ("***Standard Terms and Conditions***"), ¶ 12).  Like
Section 3.03 of the Supplier Agreement, noticeably absent from Dr. Kübler's Brief is any discussion of Paragraph
12 of the Standard Terms and Conditions, its limitation on TAE's reproduction of Superior's drawings, and its
limitation on TAE's use of Superior's drawings, data, and information other than for the performance of TAE's
obligations under the Supplier Agreement.

[16] *See, e.g.*, "Superior Exhibit 31," introduced at the hearing held July 22, 2014; *see also* SAP Appendix p. 23
(Excerpt from Transcript of Hearing Held July 22, 2014, p. 22, ll. 7-13) (Superior's Kent Abercrombie testifying
that the drawings Superior provided to TAE included proprietary rights stamps).



The foregoing terms of the Supplier Agreement, as well as the proprietary rights legends affixed to Superior's drawings, defined the scope of what TAE could do with Superior's drawings, data, and information. **Importantly, the Supplier Agreement does <u>not</u> confer upon TAE ownership of Superior's data and information or the right to sell Superior's data and information to one of Superior's competitors**. Against this contractual backdrop and framework, Superior submits the following argument and authorities.

### III.    ARGUMENT AND AUTHORITIES

**A.    Regardless of Whether TAE Modified Superior's Data and Information or Expressed it in a Different Manner, Superior's Property Rights Remain Intact.**

Dr. Kübler contends the TAE-labeled drawings and CAD models are beyond the reach of the Court's Confirmation Order because, in addition to containing Superior's data and information, they allegedly contain information TAE created relating to its manufacturing process.[17] Dr. Kübler's contention is wrong for two reasons.

First, the Supplier Agreement provides that Superior "shall retain title to all Superior furnished drawings, related data (whether or not maintained or stored on computer) and information supplied to TAE," and that "TAE will maintain the confidentiality of all drawings,

---

[17] *See* Brief [Dkt. 737], p. 2, ¶ 2.

data and information supplied by Superior and will return such drawings, data and information to Superior upon termination of [the] Agreement."[18]

The Supplier Agreement's use of the terms "related data and information" indicates that Superior and TAE appreciated the intangible nature of the dimensions, specifications, tolerances, and other information embodied on Superior's drawings, and that the parties intended Superior would retain title to that information in whatever form it might take.[19] Necessarily, these plain terms dictate that Superior owns the Superior information contained in the TAE-labeled drawings and CAD models (which were derived from Superior's information) and that Dr. Kübler cannot sell these embodiments of Superior's information to a Superior competitor (or any third party for that matter).

Second, Dr. Kübler's argument – that he owns and can sell Superior's information because TAE somehow modified or improved upon Superior's design data (which was provided to TAE in confidence) by allegedly adding information related to TAE's manufacturing processes – is legally flawed and has been rejected by numerous Federal and State courts.  For example, in *Reingold v. Swiftships, Inc.*, the Fifth Circuit stated:

> Moreover, **"'the user of another's trade secret is liable even if he uses it with modifications or improvements upon it effected by his own efforts, so long as the substance of the process used by the actor is derived from the other's secret.'" "[I]f the trade secret law were not flexible enough to encompass modified or even new products that are substantially derived from the trade secret of another, the protections that the law provides would be hollow indeed."** As the Supreme Court remarked in dealing with the analogous problem of patent equivalents,

---

[18] *See* SAP Appendix p. 2 (Supplier Agreement § 3.02).

[19] Notably, paragraph 37 of the Confirmation Order ("Return of Proprietary Information") mirrors the Supplier Agreement and recognizes the intangible nature of Superior's technical data.  Specifically, the Confirmation Order requires return of "documents **and other information**…" to the Reorganized Debtor.  *See* Confirmation Order, Dkt. 404, ¶ 37 (emphasis added).

"Outright and forth right duplication is a dull and very rare type of infringement."[20]

Dr. Kübler's argument that TAE's alleged changes to Superior's information somehow give him ownership of and the right to sell Superior's information should be rejected as a matter of law. Even Dr. Kübler's expert witness, Professor Rienäcker, admits: (1) TAE could not have created the CAD models without Superior's drawings;[21] (2) all of the dimensions on Superior's parts are included in the CAD models;[22] (3) all of the "changes" TAE made to Superior's drawings are minor changes;[23] and (4) the TAE drawings are based on the Superior drawings.[24] Mr. Jasper Wolfson, the only former TAE representative that will testify in this matter, testified that TAE did not even manufacture an aviation gasoline engine (the type of engine for which Superior sells parts) and that the only customer TAE had for PMA parts was Superior.[25] Mr. Keith Chatten likewise testified that TAE did not hold any PMAs or the European equivalent of PMAs, nor did TAE manufacture or sell parts that compete with Superior's parts.[26] Thus, there

---

[20] *Reingold v. Swiftships, Inc.*, 126 F.3d 645, 651 (5th Cir. 1997) (emphasis added) (applying the Louisiana Uniform Trade Secrets Act) (Texas has adopted the Uniform Trade Secrets Act, which is codified at TEX. CIV. PRAC, & REM. CODE 134A.001 *et seq.*); *see also Versata Software, Inc. v. Internet Brands, Inc.*, 902 F.Supp. 2d 841, 852 (E.D. Tex. 2012) ("…**one need not make an exact or nearly exact copy of an algorithm or complication of information to be liable for trade secret misappropriation…**") (emphasis added); *Bishop v. Miller*, 412 S.W.3d 758, 774 (Tex. App. – Houston [14th Dist.] 2013) (actor liable for using another's trade secret with independently created improvements or modifications if the result is substantially derived from the trade secret); *SkinMedica, Inc. v. Histogen Inc.*, 869 F.Supp. 2d 1176, 1197 (S.D. Cal. 2012) ("**In the context of trade secret misappropriation, information may be improperly 'used' in that it is unlawfully acquired and then built upon or modified before being disclosed or benefit derived.**") (emphasis added); *Proline Products, LLC v. McBride*, 324 P.3d 430, 433 (Okla. Civ. App. Div. 3 2014) (Misappropriation includes use of a trade secret of another without express or implied consent by a person who at the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use. "**A trade secret is 'used' if a product or process is substantially derived from the trade secret, even if it is with independent improvements or modifications.**") (emphasis added).

[21] *See* SAP Appendix p. 42 (Rienäcker Deposition p. 49, ll. 1-4).

[22] *See* SAP Appendix pp. 42-43 (Rienäcker Deposition p. 49, l. 25 – p. 50, l. 15).

[23] *See* SAP Appendix pp. 36-37 (Rienäcker Deposition p. 29, l. 20 – p. 30, l. 1).

[24] *See* SAP Appendix pp. 38-39 (Rienäcker Deposition p. 35, l. 25 – p. 36, l. 7); *see also* Dr. Kübler's Brief, Dkt. 737, p. 2 ("…TAE's materials contain information Superior supplied.").

[25] *See* SAP Appendix pp. 29-30 (Excerpts from Transcript of Hearing Held on July 22, 2014, p. 97, ll. 2-7; p. 100, ll. 13-17).

[26] *See* SAP Appendix p. 28 (Excerpt from Transcript of Hearing Held on July 22, 2014, p. 68, ll. 8-13).

should be no dispute that the TAE-labeled drawings and CAD models were substantially derived from Superior's drawings and information.

Accordingly, TAE's purported modifications or improvements to Superior's information are of no legal consequence, and they do not afford Dr. Kübler ownership of Superior's data and information. *See Reingold*, 126 F.3d at 651. Rather, Dr. Kübler's attempt to use Superior's data and information in a manner not allowed by the Supplier Agreement (*e.g.* refusal to return the data and information to Superior and attempted sale of the data to a competitor of Superior) places Dr. Kübler in the position of a misappropriator of trade secrets, not in the position of a rightful owner.

**B.    Superior is Not Seeking to "Advantage Itself" by Obtaining Information Relating to TAE's Manufacturing Process.  Rather, Superior Seeks Return of its Information.**

In his supplemental brief, Dr. Kübler argues Superior is trying to "advantage itself by [] obtaining TAE's proprietary information relating to the manufacturing process…"[27] Dr. Kübler is incorrect – Superior is not seeking TAE's manufacturing processes or know how; it is simply asking the Court to enforce its Confirmation Order by requiring Dr. Kübler to return Superior's data and information.[28]   If Dr. Kübler wants to remove or redact any TAE manufacturing processes or know-how from the TAE-labeled drawings and CAD models of Superior's parts prior to returning Superior's information, he may do so.  Dr. Kübler should **not**, however, be permitted to retain Superior's information (whether in the form of the original Superior drawings, TAE-labeled drawings, or CAD models) and monetize Superior's information by sale to one of Superior's competitors in breach of TAE's confidential relationship with Superior.  *See Reingold*, 126 F.3d at 651.  Such a result would not only deprive Brantly International of the $7

---

[27] *See* Dr. Kübler's Brief, Dkt. 737, p. 2, ¶ 2.
[28] *See* SAP Appendix p. 2 (Supplier Agreement § 3.02) (requiring TAE to return to Superior all of Superior's drawings, data, and information); Confirmation Order (Dkt. 404) (requiring TAE to return to Superior all documents and information owned by Superior related to Superior's business).

million it paid to Superior's creditors (including TAE), but would also constitute and end-run around Superior's Plan of Reorganization and the Court's Confirmation Order.[29]

Dr. Kübler's situation is not unique or worthy of sympathy. In fact, Dr. Kübler's situation is no different than that of a former employee who was provided access to an employer's confidential information or trade secrets by virtue of a confidentiality or non-disclosure agreement. In those instances, when the employee/employer relationship is terminated, the employee may not continue to use the former employer's confidential information or trade secrets, much less keep and sell the information or trade secrets to a competitor:

> Certain duties, apart from any written contract, arise upon the formation of an employment relationship. One of those duties forbids an employee from using confidential or proprietary information acquired during the relationship in a manner adverse to the employer. This obligation survives termination of employment. **Although this duty does not bar use of *general* knowledge, skill, and experience, <u>it prevents the former employee's use of confidential information *or* trade secrets acquired during the course of employmen</u>**t.[30]

Here, TAE contractually agreed to the same duties to which an employee who has been provided access to an employer's trade secrets is bound by common law. TAE agreed Superior would retain title to its drawings and the related data and information contained on the drawings.[31] TAE agreed it would maintain the confidentiality of the drawings and information and data contained on the drawings, and would return such drawings, information, and data to

---

[29] *See Versata Software, Inc.*, 902 F.Supp. 2d at 852 ("The value of the trade secret comes from the fact that competitors do not possess the information embodied in the trade secret, which gives the holder a potential business advantage."). The idea that this information is in the public domain is ridiculous. If it were, why would Continental (or any other third party) want to pay for it?

[30] *T–N–T Motorsports, Inc. v. Hennessey Motorsports, Inc.*, 965 S.W.2d 18, 21–22 (Tex.App.-Houston [1st Dist.] 1998) (emphasis added); *Brooks v. Excellence Mortgage, Ltd.*, No. 04-13-00106-CV, *available at* 2014 WL 2434583, at *11 (Tex.App. – San Antonio May 30, 2014) ("An employer may not bar use of general knowledge, skill, and experience, **but an employer may prevent the former employee's use of confidential information or trade secrets acquired during the course of employment**.") (emphasis added).

[31] *See* SAP Appendix p. 2 (Supplier Agreement § 3.02).

Superior upon termination of the supplier relationship.[32]  TAE agreed that Superior's drawings, related data, and information would be used by TAE only for performance of TAE's obligations under the Supplier Agreement.[33]  **In short, TAE's contractual duties are identical to the duties owed by a former employee under common law**.  *Compare* Supplier Agreement §§ 3.01-3.03 *to T–N–T Motorsports, Inc.*, 965 S.W.2d at 21–22.

Because TAE is contractually bound to at least the same duties to which a former employee is bound at common law, the result here should be no different than that articulated in *T–N–T Motorsports* – TAE may utilize the ***general*** knowledge, skill, and experience learned as a Superior supplier, but TAE **cannot** use Superior's confidential information  or trade secrets (which are  indisputably contained in the TAE-labeled drawings and CAD models) disclosed to TAE pursuant to the Supplier Agreement or sell Superior's data and information to a competitor. *See T–N–T Motorsports, Inc.*, 965 S.W.2d at 21–22.[34]

## C.    Enforcement of the Confirmation Order and Supplier Agreement Does Not Require Superior to Prove Trade Secrets.

Texas courts enforce confidentiality and non-disclosure agreements, much like they would any other contract, without requiring proof that the confidential information constitutes a trade secret.[35]

In *Simplified Telesys.,Inc.,* a software developer sued former employees for, *inter alia*, breaching confidentiality agreements entered into in connection with their employment.[36]  Much like the Supplier Agreement at issue here, the confidentiality agreement at issue in *Simplified*

---

[32] *Id.*

[33] SAP Appendix p. 2 (Supplier Agreement § 3.03).

[34] Case law regarding the duties of former employees with respect to confidential information and trade secrets is especially appropriate given that Superior's expert witness, Doug Marwill, P.E., likened the role of TAE to that of Superior's manufacturing department.  *See* SAP Appendix p. 32 (Transcript of Hearing Held July 22, 2014, p. 149, ll. 7-13).

[35] *See, e.g., Simplified Telesys., Inc. v. Live Oak Telecom, L.L.C.*, 68 S.W.3d 688 (Tex. App.—Austin 2000, pet. denied).

[36] *Id.* at 690-91.

required the employees to "'hold in strictest confidence, and not use,' during the term of their

employment at Simplified 'and thereafter,…any Confidential Information of the Company,'

*except for Simplified's benefit.*"[37]  The trial court granted the defendants' no-evidence motion for

summary judgment on the basis that the plaintiff failed to prove the existence of a trade secret.[38]

In reviewing the trial court's decision, the Court of Appeals quoted the confidentiality

agreement's definition of "Confidential Information" and noted: "The confidentiality covenant

includes more than 'trade secrets.'  It embraces any 'proprietary information, technical data,' and

'know-how, including, but not limited to' the designated items."[39]  Then, the Court of Appeals,

quoting the Texas Supreme Court's seminal opinion in *Hyde Corp. v. Huffines*, stated:

> **Whether the plaintiffs have any valuable secret or not[,] the
> defendant knows the facts, whatever they are, through a
> special confidence that he accepted; and while a trade-secret
> status may be denied, the confidence cannot be.**[40]

Consequently, the Court of Appeals reversed the trial court's ruling, stating that it had

incorrectly formulated the plaintiff's burden.[41]  Because the confidentiality agreement prohibited

unauthorized use of any kind of Confidential Information belonging to Simplified, the plaintiff

was not required to prove the existence of a trade secret.[42]

The Fifth Circuit and Federal courts sitting in Texas likewise enforce confidentiality

agreements and non-disclosure agreements without requiring proof of trade secret status.[43]

---

[37] *Id.* at 692 (emphasis in original).

[38] *Id.* at 693.

[39] *Id.* at 692.

[40] *Id.* (quoting *Hyde Corp. v. Huffines*, 314 S.W.2d 763, 770 (Tex. 1958)) (internal quotations omitted) (emphasis added).  *Hyde Corp. v. Huffines* was a trade secrets case.  However, in its opinion, the Texas Supreme Court, citing to the Restatement of Agency, acknowledged: "A breach of confidence under this Clause may also be a breach of contract which subjects the actor to liability under the rules stated in the Restatement of Contracts."  *Hyde Corp. v. Huffines*, 314 S.W.2d 763, 769 (Tex. 1958) (quoting RESTATEMENT OF AGENCY, §§ 395 and 396).

[41] *Id.*

[42] *Id.* at 693-94.

[43] *See Lear Siegler, Inc. v. Ark-Ell Springs, Inc.*, 569 F.2d 286, 289 (5th Cir. 1978) ("**For purposes of this contract claim, it makes no difference whether [the materials] were technically 'trade secrets;' it is sufficient that they were confidential materials**."); *see also Dresser-Rand Co. v. Schutte & Koerting Acquisition Co.*, 2012 WL

Dr. Kübler argues that both state and federal courts in Texas have rejected claims of misappropriation of trade secrets – even in situations involving a breach of a confidentiality agreement – when the information in dispute is not secret.[44]  Dr. Kübler's cases and, more importantly, the proposition they are cited to support, miss the mark:

- First, as set forth in cases above, the Confirmation Order and Supplier Agreement may be enforced, irrespective of whether the Superior drawings, data, and information constitute a trade secret.

- Second, each of the cases cited by Dr. Kübler are factually distinguishable.

*Global Water Group, Inc. v. Atchley* involved a claim for misappropriation of trade secrets, not enforcement of a confidentiality agreement.[45]  The Court of Appeals mentioned in passing that the plaintiff, Global Water Group, Inc., required its employees to sign confidentiality agreements, but there was no claim asserted to enforce an agreement signed by the defendant, and it was unclear whether the defendant had even signed a confidentiality agreement.  In the absence of such an agreement, the Court of Appeals noted there could be no misconduct unless there was in fact a trade secret.[46]

*Lawfinders Assoc. Inc. v. Legal Research Center, Inc.* involved a claim for breach of a confidentiality agreement, but in the context of a motion for preliminary injunction.[47]  Additionally, *Lawfinders* turned on a definition included in the agreement, which required the

---

460275 *6-8 (S.D. Tex. 2012) (enforcing a confidentiality agreement requiring employees to return "all documents and materials belonging to the company" without requiring proof of trade secret status).

[44] Dr. Kübler Brief (Dkt. 737), p. 19.

[45] *Global Water Group, Inc. v. Atchley*, 244 S.W.3d 924 (Tex. App.—Dallas 2008, pet denied).

[46] *Id.* at 929.  *Global Water Group, Inc. v. Atchley* is also distinguishable in that the plaintiff offered no evidence that it owned a trade secret.  *Global Water Group, Inc.* at 929.  The Court of Appeals specifically pointed out that there was no expert testimony from an engineer or scientist explaining how the alleged trade secret was valuable or gave the plaintiff a competitive advantage.  *Id.*  In addition, the Court of Appeals found important that the plaintiff offered no evidence of the effort or expense it took to create the alleged trade secret.  *Id.* at 929-30.  The Court of Appeals also said that the "imprecise nature" of the alleged trade secret – there was no discrete formula or design at issue – countenanced against awarding trade secret protection.  *Id.* at 930.

[47] *Lawfinders Assoc. Inc. v. Legal Research Center, Inc.*, 65 F. Supp.2d 414 (N.D. Tex. 1998).

Court to determine if the disputed information was a trade secret in order to enforce the agreement. Specifically, the agreement in *Lawfinders* defined "Proprietary Information" as:

> (i) information furnished by either party to the other party, and (ii) all other information (either written or oral) furnished by either party to the other party which is described as proprietary and confidential by the disclosing party upon delivery thereof to the receiving party.[48]

The confidentiality agreement also specified that the definition of "Proprietary Information" did **not** include:

> any information which: (i) is **in the public domain** at the time communicated to the receiving party; (ii) is obtained by the receiving party, with permission to disclose, from a third party not to the receiving party's knowledge subject to a contractual or fiduciary duty not to disclose; (iii) has been independently derived by the receiving party without reference to Proprietary Information; (iv) the receiving party can demonstrate was lawfully in its possession free of any duty to the disclosing party before the date of the disclosure to the receiving party by the disclosing party; or (v) is **in the receiving party's possession at the time of disclosure**.[49]

Accordingly, the *Lawfinders* court was forced to determine whether or not the disputed information was in the public domain or in the defendant's possession at the time of disclosure in order to enforce the agreement's plain terms.[50]  *Id.*  In short, *Lawfinders* is not applicable to the instant case given the unique nature of the agreement at issue in *Lawfinders*.

*Wissman v. Boucher* involved claims for misappropriation of trade secrets and breach of an oral non-compete agreement.[51]  **There was not a confidentiality agreement or non-disclosure agreement at issue in *Wissman*.**  The alleged trade secret at issue was a metallic

---

[48] *Id.* at 423-24.
[49] *Id.* at 424 (emphasis added).
[50] As in *Global Water Group, Inc. v. Atchley* , the disputed "trade secrets" in the *Lawfinders Assoc., Inc.* case – *i.e.* the formulation of a results-based guarantee, a fee financing program, risk management policies, and direct marketing strategies – were also generic and imprecise in nature.  The Court's analysis was also made easier by the fact that these ideas were disclosed in the plaintiff's retainer letter and in magazine articles.
[51] *Wissman v. Boucher*, 240 S.W.2d 278 (Tex. 1951).

fishing rod that collapsed into a walking stick, which the Court concluded did not deserve trade secret protection.[52]   The Court held that the oral non-compete agreement was unenforceable because of its unreasonable terms – *i.e.* there were no limitations on time or space.  In short, *Wissman* is not on point.

*Adelphon, Inc. v. DiRico* also involved an application for a preliminary injunction based on a claim for misappropriation of trade secrets.[53]   **There was no confidentiality agreement or non-disclosure agreement in** *Adelphon*.  The Court declined to issue an injunction because, among other reasons, the plaintiff had disclosed its alleged trade secret to hundreds of prospective purchasers and at trade shows.[54]

In sum, none of the cases cited by Dr. Kübler are applicable.  Texas law holds that confidentiality agreements and non-disclosure agreements are to be enforced, irrespective of whether the protected information constitutes a trade secret.[55]   The result should be no different here— the Confirmation Order and Supplier Agreement should be enforced irrespective of the trade secret status of Superior's drawings, data, and information.

**D.    Superior Disclosed its Drawings, Data, and Information to TAE In Confidence. Whether TAE "Could Have" Obtained Superior's Drawings, Data, and Information in a Different Manner is of No Legal Consequence.**

As set forth above, the Court should enforce the terms of the Confirmation Order and Supplier Agreement without requiring Superior to prove trade secrets.  Assuming, *arguendo*, the Court does require Superior to prove its drawings, data, and information are trade secrets, the result is the same.

---

[52] *Id.* at 279-80.  The Court's trade secret analysis can be summarized by this quote: "[W]hile the evidence is as confused as it is abundant, it seems clear enough that, even making the doubtful assumption of novelty in the plaintiff's idea, his pole is based on familiar mechanical means and principles that are quite obvious to and easy to imitate by any reasonably experienced machinist that might see one for the first time or purchase it on the open market." *Id.*

[53] *Adelphon, Inc. v. DiRico*, 1992 WL 281395 (N.D. Tex. 1992).

[54] *Id.* at *3.

[55] *Simplified Telesys., Inc.*, 68 S.W.3d at 692.

"The basis of the trade secret case is a breach of a contract or wrongful disregard of confidential relationships."[56]  For this reason, the United States Supreme Court has declared that the starting point for a trade secrets case is not the property, but that the defendant stood in a confidential relationship with the plaintiff.[57]  Indeed, "the first thing to be made sure of is that the defendant shall not fraudulently abuse the trust reposed in him."[58]

Certain relationships (*e.g.* partners, employers and employees, licensors and licensees, and the like) are so rooted in confidence that a plaintiff need not rely on an express, written agreement to expect her secret to be maintained.[59]  In other instances, a written agreement memorializing the parties' expectations of confidence is sufficient to establish a confidential relationship.[60]

In *Elcor Chemical Corp. v. Agri-Sul, Inc.*, the plaintiff, Elcor, sued three former employees for misappropriation of trade secrets and sought to enjoin the former employees from using or disclosing its confidential information and trade secrets to a competitor.[61]  The former employees signed employment agreements with Elcor, in which they agreed, among other things, to return all records of "Confidential Information" to the company upon termination of their employment.[62]  The trial court entered judgment in favor of the plaintiff, finding that the former employees had disclosed Elcor's confidential information in breach of their agreements.[63]

---

[56] *K & G Tool & Serv. Co. v. G & G Fishing Tool Serv.*, 314 S.W.2d 782, 787 (Tex. 1958) (internal quotations omitted).

[57] *E.I. Du Pont De Nemours Powder Co. v. Masland*, 244 U.S. 100, 102 (1917).

[58] *Id.*

[59] *Hyde Corp. v. Huffines*, 314 S.W.2d 763, 769-70 (Tex. 1958).

[60] *See Elcor Chemical Corp. v. Agri-Sul, Inc.*, 494 S.W.2d 204 (Tex. App.—Dallas 1973, writ ref'd n.r.e.).

[61] *Id.* at 205-06.

[62] *Id.* at 206.  "Confidential Information" was defined as: "information not generally known about Elcor's processes and products, including information relating to research, plans, development, techniques, manufacture, projects, purchasing, accounting, financing, engineering, marketing, merchandising, and selling, including, without limitation, information set out in writing, pictures, drawings and information that is not reduced to written form."  *Id.*

[63] *Id.* at 210.

On appeal, the former employees argued any information they used or disclosed was not really secret because it could have been obtained by reading articles or trade magazines.[64]   The Dallas Court of Appeals rejected this argument and cited to numerous other cases in which the same contention made by the former employees had been rejected:

> In each of these cases the court rejected the argument now advanced by appellees by pointing out that whereas information could have been obtained from other sources the point is that such was not done.…**It does not matter that [the former employees] could have gained their knowledge from a study of books and magazines.  The fact is they did not do so.  Instead, the gained this knowledge from ELCOR by way of their confidential relationship and in so doing they incurred a duty not to use it to ELCOR's detriment.**[65]

Here, the Supplier Agreement operates just like the employment agreements in *Elcor Chemical Corp. v. Agri-Sul, Inc.*  The Supplier Agreement expressly provides that Superior's drawings, data and information were only to be used by TAE in performing its obligations under the Supplier Agreement:

> 3.03.  <u>Proprietary Rights Data</u>.  **Superior's drawings**, related data and information **shall be used by TAE only for the performance of its obligations under this Agreement**, unless otherwise provided in this Agreement or expressly approved by Superior in writing.[66]

The Supplier Agreement further confirmed that Superior retained all title to the drawings, data, and information and required TAE to maintain the confidentiality of these items:

> 3.02.  <u>Title</u>.  **Superior shall retain title to all Superior furnished drawings, related data** (whether or not maintained or stored on computer) **and information** supplied to TAE under this Agreement.  **TAE will maintain confidentiality of all drawings, data and information supplied by Superior and will return**

---

[64] *Id.*  at 212.

[65] *Id.* at 212-13 (emphasis added).

[66] *See* SAP Appendix, p. 2 (Supplier Agreement at § 3.03) (emphasis added).

**such drawings, data and information to Superior upon the termination of this Agreement.[67]**

It is undisputed that TAE received Superior's drawings, data, and information through a confidential relationship as memorialized by the Supplier Agreement; whether TAE "could" have obtained the information in another manner is legally irrelevant. As a result, Dr. Kübler does not own Superior's drawings, data, or information, has a duty not to use it to Superior's detriment, and certainly cannot sell it to Superior's competitors.[68]

**E.     Dr. Kübler is Estopped from Challenging the Confidential and Proprietary Nature of Superior's Drawings, Data, and Information.**

Estoppel by contract, a form of quasi estoppel, is a state-law doctrine.[69] Thus, federal courts look to state law when applying the doctrine.[70]

In Texas, "[e]stoppel by contract is based on the idea that a party to a contract will not be permitted to take a position inconsistent with its provisions, to the prejudice of another."[71] In other words, a party is bound by the terms of its contract unless the contract is void, annulled, or set aside in some other way, such as by fraud, accident or mistake.[72]

Federal courts have applied estoppel by contract, or a variation of it, to bar parties that contractually agree to honor and/or protect proprietary and confidential information from later challenging the "trade secret" status of the information.[73]

---

[67] *Id.* at § 3.02 (emphasis added).

[68] *See Elcor Chemical Corp. v. Agri-Sul, Inc.*, 494 S.W.2d at 212-13.

[69] *Rhorer v. Raytheon Engineers and Constructors, Inc.*, 181 F.3d 634, (5th Cir. 1999), *abrogated on other grounds by CIGNA Corp. v. Amara*, -- U.S. --, 131 S. Ct. 1866, 179 L.E.2d 843 (2011).

[70] *See id.* The Supplier Agreement between Superior and TAE provided that it would be governed by the laws of the State of Texas. *See SAP Appendix*, p. 2 (Supplier Agreement at § 10.01.)

[71] *Johnson v. Structured Asset Services, LLC*, 148 S.W.3d 711, 721-22 (Tex. App.—Dallas, no pet.).

[72] *Id.* at 722.

[73] *See Picker Int'l. Corp. v. Imaging Equip. Serv., Inc.*, 931 F. Supp. 18, 35 (D. Mass. 1995), *aff'd sub nom Picker Int'l, Inc. v. Leavitt,* 94 F.3d 640 (1st Cir.1996) (holding that defendant was estopped from challenging "trade secret" status because it agreed to treat the subject property as "confidential, proprietary information" of the plaintiff); *see also In re Uniservices, Inc.*, 517 F.2d 492, 496-97 (7th Cir. 1975) (holding that chief executive officer who treated debtor's data as confidential and proprietary during employment was estopped, after termination of his employment, from denying that data was a trade secret).

Dr. Kübler cites *Cataphote Corp. v. Hudson* for the proposition that providing materials subject to a confidentiality agreement cannot create a duty not to use the information if it was not a trade secret or confidential to begin with.[74]   The *Cataphote* case does not support this proposition.[75]   *Cataphote* was a trade secrets case applying Mississippi law.[76]   **There was not a confidentiality agreement at issue in the *Cataphote* case.**   In its analysis, the Court of Appeals did, however, note that the defendant possessed years of knowledge about the alleged trade secret processes (*i.e.* the manufacture of glass beads) before being employed by the plaintiff.[77] This prior knowledge is what the Court of Appeals was referring to, when it made the unremarkable statement quoted by Dr. Kübler: "A duty not to use an idea already known cannot be created by virtue of the fact that one makes a confidential disclosure of that idea."[78]   In the instant case, TAE had not been involved in AV Gas aircraft engines prior to its relationship with Superior.[79]

Dr. Kübler also cites *Luccous v. J.C. Kinley Co.* for the proposition that courts analyze confidentiality agreements by first deciding whether the material at issue is a trade secret.[80]   This contention is misleading for two reasons.

First, Dr. Kübler's contention is plainly contradicted by Justice Holmes's pronouncement in the *E.I. Du Pont De Nemours Powder Co. v. Masland* case that "the starting point [in a trade secrets case] is not property or due process, but that the defendant stood in confidential relations with the plaintiffs…."[81]

---

[74] Dr. Kübler Brief (Dkt. 737) at p. 20.
[75] *Cataphote Corp. v. Hudson*, 444 F.2d 1313 (5th Cir. 1971).
[76] *Id.* at 1313-14.
[77] *Id.* at 1316.
[78] Dr. Kübler Brief (Dkt. 737) at p. 20; *Cataphote* at 1316.
[79] *See* SAP Appendix, pp. 64-65 (Transcript of July 22, 2014 Hearing p. 97, ll. 2-7).
[80] Dr. Kübler Brief (Dkt. 737) at p. 22.
[81] *E.I. Du Pont De Nemours Powder Co. v. Masland*, 244 U.S. 100, 102 (1917).

Second, *Luccous* does not support Dr. Kübler's contention. *Luccous* was an appeal of a trial court's grant of a temporary injunction on the basis of misappropriation of trade secrets and breach of a license agreement.[82]    The Texas Supreme Court ultimately reversed the trial court and dissolved the injunction, but not because of a confidentiality agreement.[83]    In fact, the Court stated in closing that the license agreement was not relevant because the undisputed evidence showed it had terminated.[84]    Therefore, contrary to Dr. Kübler's contention, the *Luccous* Court did not analyze a confidentiality agreement at all.

The facts of the present dispute are more in line with *Picker* and *In re Uniservices*.  As part of its Supplier Agreement with Superior, TAE agreed that the technical drawings and related data and information were proprietary and confidential to Superior.[85]    Moreover, during the bankruptcy case, rather than objecting to Superior's claim of ownership of the intellectual property (*i.e.* the drawings, data and information) underlying its PMA business, TAE voted to benefit (to the tune of $500,000) from the sale of Superior to Brantley International for $7 million.   As a result, Dr. Kübler should be estopped, based on both TAE's contractual stipulations and its benefit from the bankruptcy sale, from now arguing that Superior's drawings, data and information are not proprietary and confidential to Superior.

**F.      Dr. Kübler's Public Domain Arguments are Barred by *Res Judicata*.**

A bankruptcy court's confirmation order is not only *res judicata* as to "every matter which was offered and received to sustain or defeat the claim or demand, but as to any other admissible matter which might have been offered for that purpose."[86]    Stated differently: "'A bankruptcy court's order of confirmation is treated as a final judgment with *res judicata* effect,'

---

[82] *Luccous v. J.C. Kinley Co.*, 376 S.W.2d 336, 337 (Tex. 1964).
[83] *Id.* at 340-41.
[84] *Id.* at 341.
[85] *See* SAP Appendix, p. 2 (Supplier Agreement at §§ 3.01 – 3.03; Schedule 1.02, ¶ 12).
[86] *Travelers Indem. Co. v. Bailey*, 557 U.S. 137, 152, 129 S.Ct. 2195, 174 L.Ed. 2d 99 (2009).

binding the parties by its terms and precluding them 'from raising **claims or issues that they**
**could have or should have raised** before confirmation.'"[87]

In the context of a motion to enforce a confirmed plan and confirmation order, courts
(including one court in this district) have held the *res judicata* effect of a confirmation order bars
subsequent challenges by a creditor to a debtor's claim of ownership of property.[88]

Here, the *res judicata* effect of Superior's Confirmed Plan and Confirmation Order bar
Dr. Kübler from challenging Superior's ownership of the drawings, data, and information
underlying Superior's PMAs by contending the drawings, data, and information is in the public
domain. Dr. Kübler was TAE's German Insolvency Administrator throughout Superior's
bankruptcy. **If Dr. Kübler believed Superior's drawings, data, and information were in the**
**public domain and wanted to sell the copies of it in TAE's possession at the time, he should**
**have raised that issue prior to confirmation, especially since he represented one of**
**Superior's largest creditors**.

The foundation of Superior's confirmed plan was the sale of Superior as a going concern
to Brantly International, Inc. ("Brantly").[89]  As consideration for the sale, Brantly contributed

---

[87] *Valley Historic Ltd. P'ship v. Bank of New York*, 486 F.3d 831, 839 (4th Cir. 2007) (quoting *First Union Commercial Corp. v. Nelson, Mullins, Riley & Scarborough (In re Varat Enters., Inc.)*, 81 F.3d 1310, 1315 (4th Cir.1996)) (emphasis added); *Republic Supply Co. v. Shoaf*, 815 F.2d 1046, 1054 (5th Cir.1987) (bankruptcy court's order confirming the plan bars subsequent actions that were raised or could have been raised in connection with confirmation); *In re Howe*, 913 F.2d 1138, 1143 (5th Cir.1990) (noting that the "law in this circuit is well settled that a plan is binding upon all parties once it is confirmed and all questions that could have been raised pertaining to such plan are res judicata").

[88] *See In re Chesnut*, No. 03-4105, *available at* 2008 WL 2962943, at *3 (N.D. Tex. July 29, 2008) (Lynn, J.) ("Because the ownership of the Property was an issue that could have been raised prior to or at the time of confirmation of the Plan and because the issue was not otherwise posed to the court, the res judicata effect of confirmation prevents TMC [a creditor] from raising this issue now"), *aff'd*, 356 Fed. Appx. 732 (5th Cir.2009); *see also In re Jones*, No. 10 B 04352, available at 2011 WL 748427, at *3 (Bankr.N.D.Ill. Feb. 24, 2011) (pawnshop creditor's argument that pawned property was not property of the estate was barred by the res judicata effect of confirmed plan).

[89] *See* Third Amended Plan of Reorganization of Superior Air Parts, Inc. and The Official Committee of Unsecured Creditors ("Plan") (Dkt. 322), pp. 1-2 ("Summary of Plan").

$7,000,000 to the Creditors' Trust formed by the Plan and Confirmation Order.[90]  Among the

distributions made by the Creditors Trust was a $500,000 distribution to TAE.[91]

One of the first steps leading to approval of the Plan was the Court-approved Disclosure

Statement.[92]  In defining Superior's "Assets and Liabilities at the Time of Filing," the Disclosure

Statement provided:

> Personal Property.  …The Debtor **owns** Intellectual Property related to its PMAs,
> Production Certificates, Type Certificates and Supplemental Type certificates of
> undetermined value.[93]

Likewise, Superior's Plan provided for "the resumption and continuation of [Superior's]

business, including the assembly and sale of piece parts, cylinder assemblies, and Vantage

engines."[94]  Superior's Plan defined "Piece Parts Business" to include:

> Selected IP Assets.  All IP Assets supporting and otherwise underlying all
> replacement parts for which Seller has obtained from the FAA Parts Manufacturer
> Approval ("PMA"), including replacement parts for Lycoming and TCM engines
> as listed on as well as engineering specimens and masters related to such parts;
> and all electronic as well as paper copies of documents related to the foregoing,
> including all documentation submitted to and correspondence with the FAA
> relating to such engines and replacement parts identified above, as well as
> engineering data, legacy data, inspection processes and the quality manual.

> Experimental Engines.  Those experimental engines currently undergoing testing,
> as well as prototype, engineering specimens and masters related to such engines,
> including without limitation, the Model 400 Engine and related prototype(s).  All
> Intellectual Property, know-how, designs, drawings, specifications, data and
> documentation supporting and otherwise underlying all of [Debtor's] XP-Series
> Engines.[95]

---

[90] *See* Plan (Dkt. 322) at p. 2.

[91] *See* Plan (Dkt. 322) at p. 15.

[92] The Third Amended Disclosure Statement for Superior Air Parts, Inc. ("Disclosure Statement") (Dkt. 321) was approved by the Court on July 23, 2009.  *See* Order Approving Debtor's Third Amended Disclosure Statement and Setting Deadlines (Dkt. 325).

[93] *See* Disclosure Statement (Dkt. 321) at p. 7 (emphasis added).  While the PMAs owned by Superior are public record, specific lists of PMA's and Type Certificates owned by Superior were also attached to Superior's Schedules and filed in the bankruptcy case.  *See, e.g.*, Dkt. 4-4 (Schedule B22 – List of PMAs, Schedule B23 – Type Certificates).

[94] *See* Plan (Dkt. 322) at pp. 1-2.

[95] *See* Plan (Dkt. 322) at pp. 8-9.

Superior's Plan of Reorganization further provided that "the property of the Debtor…shall vest in the Reorganized Debtor on the Effective Date free and clear of all Claims, Liens, charges or other encumbrances and Interests."[96]

On August 27, 2009, the Bankruptcy Court entered its Confirmation Order [Dkt. 404]. Like the Plan, the Confirmation Order provides, in relevant part, that "all property of the Estate shall vest in the Reorganized Debtor as of the Effective Date, and the Reorganized Debtor shall take and hold all such assets free and clear of all Claims, Liens, encumbrances and other interests of holder of Claims and Interests."[97]

The Confirmation Order also discharged any debts that Superior might have owed TAG or TAE/Centurion (¶ 35), and enjoined everyone, including TAG and TAE/Centurion, from asserting any claims against Superior or its property which arose prior to the Effective Date.[98]

In sum, Dr. Kübler and TAE were put on notice on multiple occasions throughout Superior's bankruptcy proceeding that: (1) Superior owned its PMAs and the technical data underlying the PMAs; and (2) Superior's PMAs and the technical data underlying the PMAs would be transferred to the Reorganized Debtor free and clear of all claims, liens, and encumbrances.  If TAE believed the Superior's drawings or the technical data underlying Superior's PMAs was in the public domain, Dr. Kübler could and should have raised that issue prior to confirmation of Superior's Plan (especially given that TAE was a creditor *and* the Confirmation Order specifically directed TAE to return Superior's property).   Instead, Dr. Kübler and TAE accepted the Plan and received a $500,000.00 distribution.[99]  Accordingly, Dr.

---

[96] *See* Plan (Dkt. 322) at p. 21 (§ 6.13).
[97] *See* Confirmation Order (Dkt. 404) at ¶ 36.
[98] *See* Confirmation Order (Dkt. 404) at ¶¶ 32 - 35.
[99] *See* Court Order dated September 21, 2009 (Dkt. 419) ("It is therefore ORDERED that the Motion is GRANTED and **TAE is hereby deemed to have <u>accepted</u> the Third Amended Plan of Reorganization filed by the Debtor and the Official Committee of Unsecured Creditors**") (emphasis added).

Kübler and TAE are barred from attacking Superior's ownership of the data underlying its PMAs by contending such data is in the public domain.

## G.    Dr. Kübler's Public Domain Arguments are Factually Wrong.

In Section D.1. of his brief (Dkt. 737), Dr. Kübler theorizes that the information and data in Superior's drawings, which were provided to TAE pursuant to the confidentiality provisions of the Supplier Agreement and terms and conditions of the Purchase Orders, was neither a trade secret nor confidential.  In an effort to support his theory, Dr. Kübler advances two arguments, both of which are meritless.

First, Dr. Kübler argues that "much" of the information Superior supplied to TAE is available from sources such as engine maintenance manuals and sources on the internet, and that any remaining information "can" be readily obtained with "minimal effort."[100]  In support of his argument, Dr. Kübler predicts that Professor Rienächer will opine that "engine maintenance manuals alone contain the exact dimensions and tolerances" needed to design all Superior parts at issue.  However, Mr. Rienächer[101] (as well as Mr. Marwill[102] and Mr. Dedmon[103]) has already testified in deposition that Superior's engine maintenance manuals contain relatively few dimensions compared to the correlative Superior drawings supplied to TAE, and that a manufacturer cannot design a part or obtain an FAA PMA from the dimensions in the engine maintenance manuals alone.  Even if Dr. Kübler's argument were correct, Dr. Kübler has presented no evidence from a fact witness that TAE obtained all of the dimensions for Superior's

---

[100] Superior maintains that whether or not the information provided to TAE was available from other sources is entirely irrelevant as a matter of law.  *See Sharma v. Vinmar Int'l Ltd.*, 231 S.W.3d 405, 424 (Tex.App. – Houston [14th Dist.] 2007) ("The question is not 'How could he have secured the knowledge?' but 'How did he?'") and authorities cited in Part III.C, above.

[101] *See* SAP Appendix pp. 40-41, 44 (Rienäcker Deposition p. 38, l. 11 – p. 39, l. 17; p. 75, ll. 15-23).

[102] *See* SAP Appendix pp. 48-51 (Marwill Deposition p. 23, l. 9 – p. 26, l. 9); *see also* SAP Appendix p. 31 (Excerpts Transcript of Hearing Held July 22, 2014, p. 143, ll. 3-9).

[103] *See* SAP Appendix pp. 56-58 (Dedmon Deposition taken July 15, 2014 ("***2014 Dedmon Transcript***") p. 45, l. 20 – p. 47, l. 12).

parts from engine maintenance manuals and sources on the internet; indeed, the evidence has been to the contrary – TAE obtained the information from Superior **in confidence**.

Second, although former Superior CEO Charles Dedmon testified in his deposition in this matter that the drawings and supporting data supplied by Superior to TAE were **not** in the public domain,[104] Dr. Kübler incorrectly argues that Mr. Dedmon previously testified in an unrelated case that Superior's drawings "contain information that is **all** in the public domain."  In an effort to support his argument, Dr. Kübler supplied the Court with select quotes from an incomplete transcript taken out of context from Mr. Dedmon's testimony as an expert witness for the defendants in a case filed seven years ago styled *Rolls-Royce Corp. v. H.E.R.O.S., Inc.*, No. 3:07-CV-00739-D previously pending in the U.S. District Court, Northern District of Texas, Dallas ("***H.E.R.O.S. Case***").

The dispute at issue in the H.E.R.O.S. Case was whether the design of an old Model 250 turbine engine originally manufactured by General Motor's Allison Gas Turbine Division, Rolls-Royce's predecessor-in-interest, was a trade secret.[105]  The Allison Model 250 engine at issue was originally developed and manufactured for the United States Army in the 1950s.[106] Accordingly, design data was used by the government and readily available under the Freedom of Information Act ("***FOIA***") and the Competition in Contracting Act of 1984.[107]  Moreover, Allison, like many OEMs of the time, took no efforts to maintain the confidentiality of the design.[108]  Indeed, a copy of the design was intentionally placed in a public library.[109]

---

[104] *See* SAP Appendix p. 55 (2014 Dedmon Transcript p. 34, ll. 16-23).
[105] *See* Memorandum Opinion and Order, H.E.R.O.S. Case Doc. 260 (Chief Judge Fitzwater), at p. 2 (Doc. 260 was subsequently withdrawn by agreed motion by the parties).  Superior does not and has never manufactured parts for the Model 250 engine.
[106] *Id*. at 2.
[107] *Id*. at 26.
[108] *Id*. at 25-26 (*e.g.*, "a number of competitors possessed nearly complete data packages for specific versions of the Model 250" engine, and Rolls-Royce "had been working for a year to 'correct procedures and practices that have been allowing [Rolls-Royce] data to be released to the general public without restriction.'")

In testimony not directly relevant to the facts of the H.E.R.O.S. Case, Mr. Dedmon opined as an expert witness that other OEMs likewise did little to keep the design of their aircraft engines confidential early in the industry (i.e. in the 1950s and 1960s) in part because they faced no competition.[110]  Accordingly, Mr. Dedmon testified that Superior was originally able to obtain drawings of early versions of Lycoming and Continental parts through public sources.

Dr. Kübler appears to argue that (1) these early Lycoming and Continental drawings were in the public domain, (2) the parts (and thus the drawings) never changed between the early days of the industry and the 2000s when Superior supplied drawings to TAE, (3) Superior obtained its PMAs based on such drawings, and (4) somehow that equates to Superior's drawings being in the public domain.  Dr. Kübler's argument fails for several reasons.

First, as Mr. Dedmon clarified in his deposition in this matter, his earlier testimony in the H.E.R.O.S. Case pertained to "early, early Continental and Lycoming parts, not the most current part[s], but early drawings" that were available through the University of Texas at Dallas.[111]  Mr. Dedmon also clarified that the Lycoming and Continental engine designs evolved over time to the point that the drawings, data and information supplied by Superior to TAE were different than those addressed in his testimony in the H.E.R.O.S. Case.[112]  Superior anticipates that Mr. Dedmon will further clarify at the hearing that the design of the Lycoming and Continental parts continued to evolve to the point that by the early 1980s Superior could no longer use drawings and supporting data that had previously been in the public domain to obtain PMAs for replacement parts.

---

[109] *Id.* at 41, n. 31.
[110] *See* SAP Appendix p. 62 (Excerpts from 6/12/08 Deposition Transcript of Charles Dedmon ("***Partial 2008 Dedmon Transcript***"), Exhibit 1 to Rolls-Royce's Appendix, H.E.R.O.S. Case Doc. 164-1, Deposition p. 162 ll. 8 – 20).
[111] *See* SAP Appendix pp. 60-61 (Partial 2008 Dedmon Transcript, p. 117, ll. 4 – 19; p. 120, l. 14 – p. 121, l. 1.
[112] *See* SAP Appendix p. 61 (Partial 2008 Dedmon Transcript p. 121, ll. 15-22).

Second, Superior anticipates that Mr. Dedmon will testify that none of the drawings supplied by Superior to TAE were for Superior parts with PMAs obtained by the "Identicality" method, but instead were obtained by the "Test and Computation" method. The Test and Computation method required Superior to create new drawings based on Superior's reverse engineering, and thus the drawings submitted to TAE are Superior's original creations.

Third, Mr. Abercrombie has already testified that Superior, unlike Lycoming and Continental during the early years, has always taken efforts to preserve the confidentiality of Superior's drawings, data or information, including those materials supplied to TAE[113], because such proprietary information represents Superior's primary asset.[114]   Superior anticipates that Mr. Dedmon will agree with Mr. Abercrombie's conclusion.

## IV.     CONCLUSION

Intellectual property law, contract law, and this Honorable Court's Confirmation Order all condemn Dr. Kübler's plan to sell Superior's drawings, data, and information to one of Superior's competitors and dictate that Superior is the rightful owner of the information, in whatever form it might take. TAE acquired Superior's drawings, data, and information in confidence pursuant to a written Supplier Agreement; as such, the law bars Dr. Kübler from now contending the drawings, data, and information are in the public domain or could have been obtained by TAE through the use of other means.

The Supplier Agreement also limited TAE's use of Superior's drawings, data, and information to the performance of TAE's obligations under the Supplier Agreement – **TAE is forbidden from using Superior's drawings, data, and information for any other purpose**. Moreover, whether or not TAE "modified" or "changed" Superior's data and information is of

---

[113] *See* SAP Appendix pp. 21-27 (Excerpts from Transcript of Hearing Held July 22, 2014 p. 20, l. 18 – p. 24, l. 14; p. 49, l. 5 – p. 50, l. 1).
[114] *See* SAP Appendix p. 24 (Excerpt from Transcript of Hearing Held July 22, 2014 p. 23, ll. 15-23).

no legal consequence.  The TAE-labeled drawings and CAD models were indisputably derived from Superior's drawings, data, and information, and Dr. Kübler's use of the TAE-labeled drawings or CAD models for any purpose other than performance of TAE's obligations under the Supplier Agreement (as well as his refusal to return Superior's information) places Dr. Kübler in the position of a trade secret misappropriator, not a rightful owner.

Finally, *res judicata* bars Dr. Kübler from challenging Superior's ownership of its drawings, data, and information through his public domain argument.  Superior's ownership was disclosed throughout Superior's bankruptcy, including in its Schedules, Disclosure Statement, and Plan.  TAE (acting through Dr. Kübler) was one of Superior's largest creditors, and it never objected.  Rather, Dr. Kübler accepted $500,000 of the $7 million in sales proceeds paid by Brantly to Superior's Creditors' Trust.  If Dr. Kübler believed Superior did not own its drawings, data, and information because it was in the public domain, he should have raised that issue prior to confirmation.

WHEREFORE, premises considered, Superior respectfully requests the Court order Dr. Kübler to either (1) turn over all TAE-labeled drawings and CAD models (with or without redaction of anything TAE allegedly added) or (2) delete and destroy all Superior drawings, data, and information from the TAE-labeled drawings and CAD models, and grant Superior any such other and further relief to which it may be entitled.

Respectfully submitted,

By: _/s/ Christopher Robison_
      Jerry C. Alexander
      Texas Bar No. 00993500
      James F. Adams
      Texas Bar No. 00863450
      Christopher A. Robison
      Texas Bar No. 24035720
      Passman & Jones, P.C.
      1201 Elm Street, Suite 2500
      Dallas, Texas 75270-2599
      (214) 742-2121 Telephone
      (214) 748-7949 Facsimile
      alexanderj@passmanjones.com
      jimadams@passmanjones.com
      robisonc@passmanjones.com

COUNSEL FOR SUPERIOR AIR
PARTS, INC.

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served this 31st day of July, 2014, pursuant to the Federal Rules of Bankruptcy Procedure, via Facsimile and/or ECF/PACER upon the following:

Daniel P. Winikka and Craig Simon
Simon, Ray & Winikka LLP
2525 McKinnon Street, Suite 540
Dallas, Texas 75201

_Attorneys for Dr. Kübler, Insolvency_
_Administrator for TAE_

                                _/s/ Christopher A. Robison_
                                  Christopher A. Robison