## SUPPLIER AGREEMENT

This Supplier Agreement ("Agreement") is made between Thielert Aircraft Engines GmbH ("TAE") and Superior Air Parts, Inc. ("Superior").

In consideration of their mutual covenants, and for other good and valuable consideration, receipt of which is hereby acknowledged, the parties agree as follows:

## SECTION I
## PURCHASE AND SALE

1.01.   Manufacturing Requirements. TAE agrees to manufacture and sell and Superior agrees to purchase the aircraft parts ("Product") listed on Schedule 1.01.

1.02.   Terms. TAE agrees to sell the Product to Superior under the terms, conditions and prices listed on Schedule 1.02.  TAE warrants that its output capability is sufficient to supply the requirements of Superior as set forth in Schedule 1.02.

1.03.   Currency.     All transactions shall be in United States dollars.

1.04.   Orders. All deliveries of the Product shall be made by Superior''s issuance of its purchase order to TAE.  In the event of conflict between a purchase order and this Agreement, this Agreement will control.  Payment terms are net thirty (30) days.

1.05.   Termination or Modification.  Superior may notify TAE  to terminate, modify or reduce an order at which time TAE shall cease all work on the order.  In the event of such notice: (a) Superior shall pay for all goods on such order already completed by TAE following delivery and acceptance in accordance with the provisions of this Agreement, (b) TAE may make a reasonable adjustment in price to cover any increase in its costs resulting from the notice, and (c) Superior shall make no reimbursement for raw materials or materials in the course of manufacture which exceed those needed to complete the original purchase order.

1.06.   Shipment.     All Product shall be shipped at Superior's expense.

1.07.   Delivery.       Delivery is made when the Product arrives at Dresden Airport, Germany.  Product shall be shipped so as to be delivered not later than the 1st day of each month. TAE agrees to pay a late delivery charge equivalent to a  ½ % discount on any Product delivered between the 10th and 15th day of any month and a 1% discount per day for each calendar day after the 15th day of each month up to a maximum of 5%.

1.08.   Delays and Shortages. If TAE determines at any time that some cause will prevent the timely delivery of the quantity of ordered Product, TAE will immediately notify Superior and state its best estimate of the revised delivery schedule. Provided however, that if TAE fails to deliver the

SAP APPX_001

Product on the schedule and in the quantities specified on three (3) consecutive purchase orders, and regardless of cause, Superior may terminate this Agreement.

1.09.   Title.   Title to the Product passes to Superior upon payment.  Title to rejected Product shall remain in Superior until TAE returns the full purchase price to Superior in accordance with Section V.

1.10.   Risk of Loss.   The risk of loss from any casualty to the Product, regardless of cause, shall be on TAE up to the time of delivery at Dresden Airport, Germany.  Thereafter, such risk shall be on Superior unless the Product is rejected by Superior in accordance with Section V.  After rejection, the risk of loss shall be on Superior up to the time the Product is delivered at DFW International Airport for return to TAE.

## SECTION II
## TERM OF AGREEMENT

2.01.   Effective Date.        This Agreement shall take effect on the date it has been executed by both parties and shall continue in effect for three (3) years from the date of execution unless terminated earlier as provided elsewhere in this Agreement.

## SECTION III
## TECHNICAL DATA

3.01.   Technical Data.        Superior shall deliver to TAE all drawings and the related data and information that TAE may request and which is reasonably required for the intended use of the drawings.

3.02.   Title.   Superior shall retain title to all Superior furnished drawings, related data (whether or not maintained or stored on computer) and information supplied to TAE under this Agreement. TAE will maintain the confidentiality of all drawings, data and information supplied by Superior and will return such drawings, data and information to Superior upon the termination of this Agreement.

3.03.   Proprietary Rights Data.        Superior's drawings, related data and information shall be used by TAE only for the performance of its obligations under this Agreement, unless otherwise provided in this Agreement or expressly approved by Superior in writing.

3.04.   Preservation.   TAE assumes the risk of, and shall be responsible for, any loss or destruction of, or damage to, the drawings, related data or information of Superior upon its delivery to TAE.

-2-

SAP APPX_002

## SECTION IV
## QUALITY CONTROL AND AUDIT

4.01.   Conformity.   TAE warrants that all Product delivered under this Agreement shall be free from defects in material and workmanship and will meet or exceed the requirements of Superior"s purchase orders, the current Superior"s Quality Requirements for Suppliers and the applicable descriptions, specifications, and drawings.

4.02.   Initial Audit and First Article Inspection.   Upon execution of this Agreement, Superior shall have the right to audit TAE"s production facility for compliance with Superior's quality and inspection requirements ("Initial Audit") and for the purpose of adding TAE to Superior"s FAA approved vendor list. Should TAE"s facility fail to pass the Initial Audit, TAE shall have a reasonable time to cure.  If TAE fails to cure within a reasonable time, Superior may terminate this Agreement without further obligation or liability.

4.03.   Continuing Audit .   During the course of this Agreement, Superior and the FAA shall have the right to audit TAE"s production facility for compliance with Superior's quality and inspection requirements and the Federal Aviation Regulations upon reasonable notice.   If discrepancies are noted, TAE shall have a reasonable time to cure.  If TAE fails to cure within a reasonable time, Superior may terminate this Agreement without further obligation or liability except to pay for Product already shipped, subject to the terms of this Agreement.

4.04.   Inspection and Certification.   TAE shall inspect and test all Product prior to shipment to Superior and TAE will provide a letter of conformity and any additional required certifications with each shipment of Product. All testing and inspection by TAE shall be in accordance with Superior's FAA Approved Quality Control Manual.  Notwithstanding any inspection by TAE, all Product shall be subject to final inspection and acceptance by Superior at Superior's facility in Dallas, Texas.

## SECTION V
## INSPECTION AND REJECTED PRODUCT

5.01.   Inspection.   Should Superior reject any Product for failure to conform to the requirements of an order, Superior shall notify TAE of such rejection within thirty (30) days of receipt at Superior's facility and TAE shall have the option to repair or replace the non-conforming Product at its expense.  Should TAE fail to act to correct any Product within sixty (60) days of when the parties agree it is non-conforming, Superior may return such non-conforming Product to TAE and TAE shall return the full purchase price to Superior. Rejected Product shall be returned at TAE's expense.

5.02.   Reject Rate.   If the reject rate for such non-conforming product exceeds 2% for a period of two (2) consecutive orders, TAE shall have a reasonable time to cure.  If TAE fails to cure within a reasonable time, Superior may terminate this Agreement without further obligation or liability except to pay for Product already shipped, subject to the terms of this Agreement.

SAP APPX_003

## SECTION VI
## WARRANTY

6.01.  Warranty Administration.    TAE understands and agrees that Superior will offer a warranty on the Product to Product purchasers.  The parties agree that Superior shall administer the Product warranty and that TAE will provide full  technical assistance, documentation and other cooperation necessary to fully administer this third-party warranty.  Provided however, that TAE assumes all responsibility for defects in material and workmanship in the Product.

6.02  Exemption.    TAE shall not be responsible for defects in the Product arising out of or resulting from defects in the Technical Data provided by Superior according to Section III. of this Agreement or defects arising out of or resulting from installation or further processing of the Product by Superior.

## SECTION VII
## INDEMNIFICATION AND INSURANCE

7.01.  Indemnification of Superior.  TAE shall defend, indemnify and hold Superior, its directors, officers, employees and agents harmless from and against, any and all claims, demands, suits and causes of action which may be made against Superior, including without limitation, all attorneys' fees, costs and expenses incurred in defense thereof, for death, personal injury, property damage or any loss whatsoever, and arising out of or resulting from defects in material or workmanship in the Product delivered under this Agreement but not for defects in the Technical Data provided by Superior according to Section III. of this Agreement or defects arising out of or resulting from installation or further processing of the Product by Superior.

7.02.  Indemnification of TAE.    Superior shall defend, indemnify and hold TAE, its directors, officers, employees and agents harmless from and against, any and all claims, demands, suits and causes of action which may be made against TAE, including without limitation, all attorneys' fees, costs and expenses incurred in defense thereof, for death, personal injury, property damage or any loss whatsoever, and arising out of or resulting from defects in the Technical Data provided by Superior according to Section III of this Agreement or defects arising out of or resulting from installation or further processing of the Product by Superior.

The parties acknowledge that their indemnification of the other extends to and includes claims, demands, suits, and causes of action made against the other sounding in strict liability, negligence and breach of express or implied warranties.  The parties further acknowledges that their indemnification of the other is without limitation, and is without regard to whether the strict liability, negligence or breach of warranty is alleged to be sole, vicarious, or active or passive in nature.

7.03.  Insurance.    While this Agreement is in effect and to fully effect the intent of this indemnification, each party will maintain standard form combined single-limit product liability completed operations insurance in the amount of at least $10,000,000, under terms and conditions

-4-

ordinarily available in the insurance market. The insurance will be maintained with liability insurers of recognized responsibility acceptable to the other party, will name the indemnitee as an additional insured to the extent of the indemnitor's responsibility under this Agreement, will provide that such insurance is primary over any other valid and collectible insurance of the additional insured, will continue in force for at least thirty (30) days after written notice of cancellation or termination of this Agreement from the indemnitor, and will contain a waiver of any rights of subrogation such insurers may have against the additional insured. Each party will furnish to the other the certificate evidencing the specific coverages and provisions required by this section.

## SECTION VIII
## FORCE MAJEURE

8.01    Force Majeure.        Neither party shall be responsible for, nor be deemed to be in default under, this Agreement on account of any delay in delivery of any Product or other performance hereunder due to any of the following causes: (i) acts of God, terrorist attacks, war, warlike operations, insurrections or riots; (ii) fires, floods or explosions; serious accidents; epidemics or quarantine restrictions; (iii) any act of government, governmental priorities, allocation regulations or orders affecting materials, facilities or the Product; (iv) strikes or labor troubles causing cessation, slowdown or interruption of work; (v) delay in transportation, or (vi) any other cause to the extent it is beyond such party's control and not occasioned by such party's fault or negligence.  If either party is so prevented from timely performance of any of its obligations hereunder, the time for performance will be extended by a period of business days equal to the time lost by reason of such delay, provided that the party shall promptly notify the other party in writing of the cause of such delay or default. The affected party shall use its reasonable best efforts to remove the cause of delay.

## SECTION IX
## TERMINATION

9.01.    Termination.   Either party may terminate this Agreement by ninety (90) day written notice. In addition, either party may terminate the Agreement for any of the following reasons:

(a)      The other party's failure to fulfill its obligations as specified in this Agreement;

(b)      The insolvency, filing of a petition for bankruptcy, or the voluntary appointment of a referee, trustee, conservator, or receiver for substantially all of a party's assets.

(c)      The transfer of substantially all of a party"s assets to another entity.

9.02.    Notice of Termination.        Any party may terminate this Agreement without further notice if a breach is not remedied within ten (10) days from the date of written notice for any monetary breach and thirty (30) days from the date of written notice of any other breach.

-5-

9.03.   Effect of Termination. Termination of this Agreement shall not release any party from any obligation or liability incurred prior to the effective date of such termination. Neither party shall not be liable to the other by reason of the termination for any compensation, reimbursement, or damages on account of the loss of anticipated sales or profits or on account of expenditures, investments, leases or commitments in connection with the business or goodwill or otherwise.

## SECTION X
## OTHER TERMS AND CONDITIONS

10.01   Governing Law.      This Agreement shall be construed and interpreted by and in accordance with the laws of the State of Texas, and whether or not any conflicts of law principle would refer the interpretation to the law of another jurisdiction.

10.02.   Forum Selection.      The parties agree and understand that the obligations of the parties under this Agreement shall be and are performable in Dallas County, Texas.  The parties consent and agree that venue of any suit or legal proceeding brought by the other, or those in privity with them, and related to this Agreement, shall be in Dallas County, Texas.  Further, the parties agree to hereby submit to the jurisdiction of the state or federal courts that are located in Dallas County, Texas, and designate the Secretary of State of Texas as their agent for service of process.

10.03.   Attorneys Fees.      The parties agree that, if it either should file suit or commence legal proceedings against the other related to this Agreement, the party filing suit or commencing legal proceedings will pay the other the costs of defending such suit or legal proceeding, including reasonable attorneys' fees, in the event that (a) the other party prevails in the suit or legal proceeding; or (b) the value of the recovery awarded to the party filing suit or commencing legal proceedings is equal to or less than any written settlement proposal made by the other party prior to commencement of the suit or legal proceeding.

10.04.   Partial Invalidity.      In the event that any provision of this Agreement shall for any reason be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not effect any other provision hereof, and this Agreement shall be construed as if such provision(s) had never been contained in this Agreement.

10.05.   Arbitration.    TAE agrees that any dispute related to this Agreement, including the arbitrability of this Agreement shall, on the written request of the other party, be submitted to arbitration under the rules as Superior and TAE shall agree.  If no agreement can be reached, such arbitration shall be governed by the Commercial Arbitration Rules of the American Arbitration Association.

10.06.   Modification and Waiver.    No modification or waiver of any provision of this Agreement shall arise from any action or inaction of either party, and shall not be binding except by an instrument in writing expressly waiving or modifying the provision and executed by the party entitled to the benefit of the provision.

SAP APPX_006

10.07.  Entire Agreement.    This Agreement constitutes the entire agreement between TAE and Superior.  Neither party shall be bound by any communications between them on the subject matter of this Agreement unless the communication is (a) in writing, (b) bears a date contemporaneous with or subsequent to the date of this Agreement, and (c) is agreed to by both parties to this Agreement. On execution of this Agreement, all prior agreements, letters of intent or understandings between the parties shall be null and void.  Provided however, that nothing in this Agreement is intended to waive any claim TAE has already made for credits due Superior from prior transactions.

10.08.  Assignability.  By this Agreement, the parties intend to bind themselves, their successors and their assigns to the other party to this Agreement and to the successors and assigns of the other party to this Agreement with respect to all warranties and covenants of this Agreement. It is the specific intent of the parties that, should the stock or substantially all of the assets of a party be sold to a third party, that this Agreement shall be binding upon such purchaser. Provided, however, that neither TAE nor Superior shall assign this Agreement without the express written consent of the other.

10.09.  Terms.  The provisions of this Agreement shall apply to and form a part of every transaction between the parties concerning the subject matter of this Agreement and shall supersede any printed terms and conditions on any of the parties' forms.

10.10.  Notices.  All notices that are required or that may be given pursuant to the terms of this Agreement shall be in writing and shall be sufficient in all respects if given in writing and delivered personally or sent by registered or certified mail as follows:

If to Superior before 2/1/02

        Bernie Coleman
        President
        Superior Air Parts, Inc.
        14280 Gillis Road
        Dallas, Texas  75244-3792

If to Superior after 2/1/02:

        Bernie Coleman
        President
        Superior Air Parts, Inc.
        621 S. Royal Lane
        Suite 100
        Coppell, Texas 7519

SAP APPX_007

If to TAE:

Frank Thielert
President
Thielert Motoren GMBH
Helbingstrabe 64-66
D-22047 Hamburg
Germany

10.11. <u>Construction</u>. The parties acknowledge that each party has reviewed this Agreement and agree that the rule of construction to the effect that any ambiguities be resolved against the drafting party, shall not be employed in the interpretation of this Agreement or any amendments or schedules. The parties agree that the section descriptions are made for ease of reference and may not be used to interpret this Agreement.

10.12. <u>Authority</u>. The parties represent and warrant that each is a legal entity duly organized and in good standing in the states and/or countries in which they have their principle offices and that each has the requisite authority to enter into and fulfill this Agreement.

10.13. <u>Notice of Claim</u>.      The parties agree to promptly notify the other in writing within thirty (30) days of the receipt of any claims, demands, suits and causes of action referenced in Section VII.

10.14. <u>Government Approval</u>.      Superior will obtain from the FAA a PMA and any other required permit and authorization which is required for the manufacture and/or sale of the goods delivered under this Agreement. The copy of the applicable PMA's, permits and authorizations will be provided to TAE with each initial order. Each subsequent purchase order will specify the appropriate part number, PMA, permit and/or authorization. Superior will not accept goods under this Agreement which have not been manufactured under the appropriate FAA approvals.

Signed on this _15_ the day of December, 2001, in Dallas County, Texas.

**Thielert Aircraft Engines GmbH**

Frank Thielert
President

**Superior Air Parts, Inc.**

Bernie Coleman
President

-8-

## Schedule 1.01
## Products

| Part Number | Description | Production Costs (Each) |
|---|---|---|
| SL19332-1 | Connecting Rod | $200 |
| SL11750-1 | Connecting Rod | $200 |
| SL36500-A2 | Crankshaft | $2,060 |
| SA530661 | Camshaft | $300 |
| SA649520-A3 | Camshaft | $300 |
| SL16511 | Camshaft | $250 |
| SL18840 | Camshaft | $250 |
| SL19340-2 | Camshaft | $325 |
| SL75906 | Camshaft | $225 |
| SA530851 | Lifter | TBD |
| SA628488 | Lifter | TBD |
| SA633106 | Lifter | TBD |
| SA646846 | Lifter | TBD |
| SA646846 | Hydraulic Unit | TBD |
| SL15B21318 | Lifter | TBD |
| SL71105 | Lifter | TBD |
| SL72877 | Lifter | TBD |
| SL78290 | Lifter | TBD |

*TBD = To be Determined

## Schedule 1.02
## SUPERIOR AIR PARTS, INC.
## STANDARD TERMS AND CONDITIONS

1.   ACCEPTANCE BY SELLER.  These standard terms and conditions apply to and
     are incorporated in all purchase orders issued by Superior.  By its acceptance of
     a purchase order, Seller agrees to be bound by the terms and conditions in this
     agreement.

2.   UNIT PRICES.  Prices indicated on a purchase order are maximum prices.
     Seller agrees to adjust the prices downward to any lower prices in effect on date
     of shipment.

3.   PACKING.  All goods shall be packaged in accordance with Superior's
     specifications and, where not specified, shall be suitably packed and prepared for
     shipment to prevent damage in transit, to insure the lowest transportation and
     insurance rates, and to meet carrier's requirements.

4.   INVOICES/RECEIPTS.  Seller must submit to Superior a separate invoice in
     duplicate for each purchase order.  All invoices, bills of lading and delivery
     receipts must show the Superior purchase order number.

5.   SUBSTITUTIONS.  Seller shall notify Superior immediately upon receipt of a
     purchase order if Seller is unable to fully comply with the conditions in the
     purchase order.  Superior may authorize shipment of substitute goods or
     shipment under different conditions by issuing a supplement to the purchase
     order.  Unauthorized substitutions or shipments not conforming fully with the
     terms of the purchase order may be returned to Seller at Seller's expense.

6.   CANCELLATION.  If the Seller fails to make deliveries of the goods within the
     time specified in a purchase order, Superior may cancel the purchase order,
     except when Seller's delay in delivery is due to causes beyond the control of
     Seller.  Seller shall notify Superior within ten (10) days that there will be such
     delay and of the new delivery schedule.  In the event of the institution of any
     proceedings by or against either party in bankruptcy or insolvency, or for the
     appointment of a receiver or trustee, or of an assignment for the benefit of
     creditors, the other party shall be entitled to cancel a purchase order by written
     notice.

7.   TERMINATION OR MODIFICATION.  Superior may notify Seller to terminate,
     modify or reduce an order at which time Seller shall cease all work on the order.
     In the event of such notice: (a) Superior shall pay for all goods already completed
     by Seller following delivery and acceptance in accordance with the provisions of
     this agreement, (b) Seller may make a reasonable adjustment in price to cover
     any increase in its costs resulting from the notice, and (c) Superior shall make no

SAP APPX_010

reimbursement for raw materials or materials in the course of manufacture which exceed those needed to complete the original purchase order.

8. INSPECTION AND REJECTION. Notwithstanding any prior payment or inspection by Superior, all goods are subject to final inspection and approval by Superior at Superior's place of business in Dallas, Texas within a reasonable time of delivery. Non-conforming goods may be rejected by Superior by seasonable notice to the Seller and Superior may charge Seller's account with any expenses reasonably incurred in their inspection, receipt, transportation, care and custody. Following notice of rejection, Superior may hold any rejected goods at the risk of Seller or may return such items to Seller at Seller's expense. After such notice of rejection, title to and risk of loss of the rejected goods shall be in Seller and Seller shall refund the full purchase price of such non-conforming goods to Superior.

9. WARRANTY. Seller warrants to Superior that all goods delivered under a purchase order will be free from defects in material and workmanship and will conform to the requirements of the purchase order including the applicable descriptions, specifications, and drawings that have been agreed to by the parties. Seller further warrants that its current and future manufacturing facilities and quality control procedures do and will comply with all applicable FAA regulations.

10. INDEMNITY. Seller shall defend, indemnify and hold Superior, its directors, officers, employees and agents harmless from and against any and all liabilities, claims, demands, suits, damages, losses and causes of action, including, without limitation, all attorneys' fees, costs and expenses, which may be made against or incurred by Superior a) for death, personal injury and/or for loss, damage or destruction of any property whatsoever arising out of or resulting from the condition of the goods delivered under any purchase order, and b) any illegal infringement or violation of any one or more patents or applications therefor.

11. ASSIGNMENT. Purchase orders may not be assigned by the Seller.

12. BUYER SUPPLIED ITEMS. Superior shall retain title to all Superior furnished drawings, equipment, data and information supplied to Seller. Seller shall be responsible for any loss or damage to the drawings, equipment, data or information supplied by Superior, reasonable wear and tear excepted. Seller will maintain the confidentiality of all such drawings, data and information and may not reproduce or divulge such information without the express written consent of Superior. Superior's drawings, equipment, data and information shall be used by Seller only for the performance of its obligations under the purchase order and Seller will return all drawings, equipment, data and information to Superior at Superior's request.

SAP APPX_011

13.  LIMITATION OF DAMAGES.  Seller shall have no claim for damages, compensation, lost profits, allowance or otherwise by reason of any action taken or notice given by Superior, except as provided under the terms of this agreement.

14.  INVALIDITY.  In the event that any provision of this agreement shall for any reason be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not effect any other provision hereof, and this agreement shall be construed as if such provision(s) had never been contained in this agreement.

15.  ARBITRATION.  Seller agrees that any dispute related to a purchase order or this agreement shall, on the written request of Superior, be submitted to arbitration under the rules as Superior and Seller shall agree.  If no agreement can be reached, such arbitration shall be governed by the Commercial Arbitration Rules of the American Arbitration Association.

16.  NON-WAIVER.  No waiver of any provision of this agreement shall arise from any action or inaction of either party, except an instrument in writing expressly waiving the provision and executed by the party entitled to the benefit of the provision.

17.  ENTIRE AGREEMENT.  This agreement and the purchase orders of which it is a part constitute the entire agreement between Seller and Superior and neither party shall be bound by any communications between them unless the communication is (a) in writing, (b) bears a date contemporaneous with or subsequent to the date of this agreement, and (c) is agreed to by both parties.  In the case of contradiction between this agreement and the purchase order, this agreement shall control.

18.  VENUE AND JURISDICTION.  Seller agrees and understands that the obligations of the parties under the purchase orders and this agreement shall be and are performable in Dallas County, Texas. Seller consents and agrees that venue of any suit or legal proceeding brought by Seller or those in privity with Seller shall be in Dallas County, Texas.  Further, Seller agrees to hereby submit to the jurisdiction of the state or federal courts that are located in Dallas County, Texas, and designates the Secretary of State of Texas as its agent for service of process.

19.  THE AGREEMENT AND THE PURCHASE ORDERS SHALL BE CONSTRUED AND INTERPRETED BY AND IN ACCORDANCE WITH THE LAWS OF THE STATE OF TEXAS, AND WHETHER OR NOT ANY CONFLICTS OF LAW PRINCIPLE WOULD REFER THEIR INTERPRETATION TO THE LAW OF ANOTHER JURISDICTION.

20.  ACKNOWLEDGEMENT.  This order shall not be effective for any purpose nor shall Buyer be obligated to pay any moneys called for hereunder unless and until Seller

SAP APPX_012

shall have signed and returned written acknowledgment and acceptance.

_____acknowledges receipt of Superior Air Parts, Inc. Purchase
Order Standard Terms and Conditions and agrees to comply with the same on all purchase
Orders received from Superior.

By (Signature):        _____

Name (Printed):        _____

Title:                 _____

Company:               _____

Date:                  _____

SAP APPX_013

## Amendment
of **SUPPLIER AGREEMENT** (signed on 2001 December 15th)
between
Thielert Aircraft Engines GmbH ("TAE")
 and
Superior Air Parts, Inc. ("SUPERIOR")

**The parties hereby agree modifications of the SUPPLIER AGREEMENT as
follows:**

**Section I, 1.05** Termination and Modification **shall be replaced by:**

### Forecast, Changes, Rescheduling
(1) SUPERIOR shall declare within the context of any production purchase Order,
as well as subsequent follow-on Orders, a "base schedule" of delivery requirements.
The "base schedule" shall be for a period of  thirty-six months and shall identify the
rate of delivery for each month.   The initial six months of deliveries in the "base
schedule" represents SUPERIOR's obligation/liability, whereas the last thirty months
of deliveries in the "base schedule" are anticipated quantities, which can be changed
by  SUPERIOR as follows:
- For crankshafts
    - any monthly quantity scheduled for delivery up to nine full calendar
      months from date of delivery scheduled can be changed up to
      plus/minus 75 percent,
    - any monthly quantity scheduled for delivery up to six full calendar
      months from date of delivery scheduled can be changed up to
      plus/minus 30 percent,
    - any monthly quantity scheduled for delivery up to three full calendar
      months from date of delivery scheduled can be changed up to
      plus/minus 15 percent.
  The quantity by which each month is reduced must be rescheduled for
  delivery.
  Any quantities scheduled for delivery within the last three full calendar
  months from date of delivery scheduled shall not be changed.

- For any other article
    - any monthly quantity scheduled for delivery up to six full calendar
      months from date of delivery scheduled can be changed up to
      plus/minus 75 percent,
    - any monthly quantity scheduled for delivery up to four full calendar
      months from date of delivery scheduled can be changed up to
      plus/minus 30 percent,
    - any monthly quantity scheduled for delivery up to two full calendar
      months from date of delivery scheduled can be changed up to
      plus/minus 15 percent.
  The quantity by which each month is reduced must be rescheduled for
  delivery.
  Any quantities scheduled for delivery within the last two full calendar
  months from date of delivery scheduled shall not be changed.

1

**SAP APPX_014**

(2) SUPERIOR is obligated to update the base schedule monthly for a minimum period of thirty- six  months quarterly.


## Section I, 1.07 Delivery shall be replaced by:

### Delivery

(1) If Orders are accepted by TAE, delivery shall be in compliance with the schedule contained in an order and shall be made by TAE at such times and places and of such items and quantities as agreed Delivery deadlines and delivery periods are only binding upon TAE if TAE has specifically confirmed them in writing as firm delivery dates, subject to the proviso that TAE itself obtain proper and timely delivery from the suppliers. Delivery periods commence once the order is accepted.

(2) Delivery is made when the Product arrives at Dresden Airport, Germany, or port of departure for ocean shipments.

(3) In the event of delayed, defective, insufficient volume of or unsuccessful delivery on the part of the suppliers of TAE and in the event of force majeure, industrial disputes, breakdowns and stoppages without fault, public disorder, official measures and other unforeseeable, extraordinary and blameless events affecting TAE or their suppliers, TAE is entitled to extend the delivery deadlines and delivery periods to a fair and reasonable extent. If TAE encounters or anticipates difficulty in meeting the delivery schedule, TAE shall notify SUPERIOR in writing, if possible.


## Section II, 2.01 Effective Date shall be replaced by:

### Term

Unless otherwise terminated in accordance with the provisions of this Supplier Agreement, this Agreement shall remain in force and effect up to and including December 31, 2007.
Unless notified with 12-month notice this agreement will renew automatically for 2 years.


Lichtenstein, 10-14-05
(Location, Date)

DALLAS, TEXAS  10-21-05
(Location, Date)


**Thielert Aircraft Engines GmbH**

Frank Thielert
President

**Superior Air Parts, Inc**

Tim Archer
President

2

1                    IN THE UNITED STATES BANKRUPTCY COURT
                    FOR THE NORTHERN DISTRICT OF TEXAS
2                              DALLAS DIVISION

3    In Re:                         )    **Case No. 08-36705-bjh-11**
                                    )    Chapter 11
4    SUPERIOR AIR PARTS, INC.,       )
                                    )    Dallas, Texas
5             Debtor.               )    July 23, 2014
                                    )    10:30 a.m.
6                                    )
                                    )    MOTION TO ENFORCE [684]
7                                    )
                                    )    *Continued from 07/22/2014*
8    _____ )

9                         TRANSCRIPT OF PROCEEDINGS
                  BEFORE THE HONORABLE BARBARA J. HOUSER,
10                 UNITED STATES CHIEF BANKRUPTCY JUDGE.

11   APPEARANCES:

12   For the Debtor:              Christopher Alan Robison
                                 Jerry C. Alexander
13                                PASSMAN & JONES, P.C.
                                 1201 Elm Street, Suite 2500
14                                Dallas, TX  75270
                                 (214) 742-7949
15
     For Dr. Bruno Kübler,        Daniel P. Winikka
16   Insolvency Administrator,    Craig F. Simon
     Thielert Aircraft Engines,   SIMON, RAY & WINIKKA LLP
17   GmbH:                        2525 McKinnon Street, Suite 540
                                 Dallas, TX  75201
18                                (214) 871-2292

19   Court Recorder:             Nicole D.  Whittington
                                 UNITED STATES BANKRUPTCY COURT
20                                1100 Commerce Street, 12th Floor
                                 Dallas, TX  75242
21                                (214) 753-2064

22   Transcription Service:      Kathy Rehling
                                 311 Paradise Cove
23                                Shady Shores, TX  76208
                                 (940) 498-2402
24

25           Proceedings recorded by digital sound recording;
            transcript produced by transcription service.

1    we're trying, we're trying, but we just never got across the

2    goal line.

3        And so my experience is, when we reach that place, it's

4    time for me to say, if you all can't get it across the goal

5    line, I can, which is what I said to you the last time you

6    asked to push it yet again.  Because it may be thousands and

7    thousands of documents, but we could have at least tendered

8    those documents some time ago, it feels like.  Now, maybe

9    you're going to tell me that we didn't have the USB or we

10   didn't know what to look at or what, but that doesn't seem to

11   be rocket science.

12       And I'm told the motion was originally filed November 15,

13   2013.  So we've had months and months and months and months to

14   find documents.  And you know, again, by documents, we're

15   talking about drawings that have Superior's name on them.  That

16   can't have been that difficult to figure out those belong to

17   Superior and under the plan had to come back.

18       So, what seems to be in dispute are drawings that TAE

19   generated that, at least in Mr. Marwell's view and Mr.

20   Chatten's, are identical to the Superior drawings that Superior

21   tendered under the supplier agreement so that TAE could

22   manufacture -- or, TAE could make the parts and send them back.

23   And then the 3D CAD models.  So, my question is really simple.

24   Who owns the TAE-generated drawings that translated Superior's

25   drawings from English to German and inches to millimeters, and

SAP APPX_017

15

1   who owns the 3D CAD models?  And apparently, there is going to

2   be quibbling with respect to at least some small percentage of

3   the documents where there may have been some changes to the

4   drawings that TAE generated.

5       I don't know if that's basic contract law.  I don't know if

6   that's intellectual property law.  I don't know what law

7   governs it, but I know y'all haven't briefed it.  And that at

8   least strikes me as the dispute as it has evolved.  Does

9   everybody agree that's the fuss?

10          MR. ALEXANDER:  I would say, rather, you know, we

11  can't get too attached to a physical piece of paper, because

12  the order, the Court's order also said return the information

13  and data.

14          THE COURT:  Uh-huh.

15          MR. ALEXANDER:  The information -- it's the ownership

16  of the information and data.  Anyone could make a depiction of

17  it.

18          THE COURT:  Understood.

19          MR. ALEXANDER:  And another point that's -- that I

20  don't know if --

21          THE COURT:  Well, that's what the plan said.

22          MR. ALEXANDER:  Yes, ma'am.

23          THE COURT:  I mean, the order doesn't say anything any

24  different than the plan, I hope.

25          MR. ALEXANDER:  Yes, ma'am.  The plan.  No, it

1    So, I've nagged enough.  We'll try and make the 11th work

2  if we can.  Ms. Salcido will call those parties, she already is

3  in process, seeing if they can -- if we can solve their need

4  for a trial some other way.  And she'll be back in touch with

5  you to confirm that as soon as we know.  But we'll make every

6  effort to make that by noon tomorrow so that you know where you

7  stand and what the expectation is.

8    So, with that, thank you all very much.  Interesting

9  dispute, and we'll see where we end up.

10         MR. SIMON:  Understood.  Thank you, Your Honor.

11         MR. ALEXANDER:  Thank you, Your Honor.

12     (Proceedings concluded at 11:15 a.m.)

13                     --oOo--

14

15

16

17

18

19

20                     CERTIFICATE

21    I certify that the foregoing is a correct transcript from
   the digital sound recording of the proceedings in the above-
22  entitled matter.

23   /s/ Kathy Rehling                      07/23/2014

24  _____     _____

   Kathy Rehling, CET**D-444               Date
25  Certified Electronic Court Transcriber

1                  IN THE UNITED STATES BANKRUPTCY COURT
              FOR THE NORTHERN DISTRICT OF TEXAS
2                          DALLAS DIVISION

3  In Re:                        )   **Case No. 08-36705-bjh-11**
                                 )   Chapter 11
4  SUPERIOR AIR PARTS, INC.,     )
                                 )   Dallas, Texas
5            Debtor.             )   July 22, 2014
                                 )   2:15 p.m.
6                                )
                                 )   MOTION TO ENFORCE [684]
7                                )
                                 )
8  _____

                       TRANSCRIPT OF PROCEEDINGS
9          BEFORE THE HONORABLE BARBARA J. HOUSER,
              UNITED STATES CHIEF BANKRUPTCY JUDGE.
10
    APPEARANCES:
11
    For the Debtor:              Christopher Alan Robison
12                               Jerry C. Alexander
                                 James F. Adams
13                               Kyle B. Mandeville
                                 PASSMAN & JONES, P.C.
14                               1201 Elm Street, Suite 2500
                                 Dallas, TX  75270
15                               (214) 742-7949

16  For Dr. Bruno Kübler,        Daniel P. Winikka
    Insolvency Administrator,    Craig F. Simon
17  Thielert Aircraft Engines,   Paula E. Rechenstein
    GmbH:                        SIMON, RAY & WINIKKA LLP
18                               2525 McKinnon Street, Suite 540
                                 Dallas, TX  75201
19                               (214) 871-2292

20  Court Recorder:              Nicole D.  Whittington
                                 UNITED STATES BANKRUPTCY COURT
21                               1100 Commerce Street, 12th Floor
                                 Dallas, TX  75242
22                               (214) 753-2064

23

24

25

1   It's an order confirming TAE's acceptance of Superior's plan.

2            THE COURT:  Any objection?

3            MR. WINIKKA:  No, Your Honor.

4            THE COURT:  The Court will take such notice.

5   BY MR. ROBISON:

6   Q   Mr. Abercrombie, could you describe Superior's business

7   relationship with TAE?

8   A   Yes.  TAE was a supplier for Superior Air Parts of certain

9   components, such as cylinders, crank shafts, conrods, those

10  materials.

11  Q   Is Superior currently doing business with TAE?

12  A   We are not currently doing business, no.

13  Q   When did Superior stop doing business with TAE?

14  A   Approximately April of 2013.

15  Q   Did TAE and Superior operate under a written supplier

16  agreement?

17  A   We did.

18  Q   Are you familiar with Superior's use of supplier agreements

19  through your experience as CFO, former president, and former

20  director of accounting at Superior?

21  A   Yes.

22            MR. ROBISON:  Your Honor, may I approach?

23            THE COURT:  You may.

24  BY MR. ROBISON:

25  Q   Mr. Abercrombie, I've handed you what's been marked

1   Superior Exhibit 18.  Can you identify this document for the

2   Court?

3   A   It's the supplier agreement between Superior Air Parts and

4   Thielert Aircraft Engines.

5   Q   And does it also include the amendments to that supplier

6   agreement?

7   A   It does.

8   Q   Does Exhibit 18 appear to be a true and correct copy of the

9   supplier agreement and the amendments thereto?

10  A   It does.

11          MR. ROBISON:  Your Honor, I'd move that Exhibit 18 be

12  admitted.

13          THE COURT:  Any objection?

14          MR. WINIKKA:  No, Your Honor.

15          THE COURT:  It's admitted.

16      (Debtor's Exhibit 18 is received into evidence.)

17  BY MR. ROBISON:

18  Q   Mr. Abercrombie, could you turn to Page 2 of the supplier

19  agreement for me, please?

20  A   Yes.

21  Q   You see Section 3.01 of the supplier agreement entitled,

22  Technical Data?

23  A   I do.

24  Q   Could you read that provision into the record, please?

25  A   Yes.  It says, "Superior shall deliver to TAE all drawings

1   and the related data and information that TAE may request and

2   which is reasonably required for the intended use of the

3   drawings."

4   Q   Does Superior typically agree to send its drawings to

5   suppliers making parts on its behalf?

6   A   We do.

7   Q   Did Superior provide drawings to TAE pursuant to Section

8   3.01 of the supplier agreement?

9   A   Yes.

10   Q   And did that occur prior to Superior's bankruptcy?

11   A   Yes.

12   Q   Did those drawings include proprietary right stamps?

13   A   They did.

14   Q   Do you see Section 3.02 of the supplier agreement entitled,

15   Title?

16   A   Yes.

17   Q   Could you read that provision into the record, please?

18   A   "Superior shall retain title to all Superior-furnished

19   drawings, related data, whether or not maintained or stored on

20   computer, and information supplied to TAE under this agreement.

21   TAE will maintain the confidentiality of all drawings, data and

22   information supplied by Superior and will return such drawings,

23   data and information to Superior upon the termination of this

24   agreement."

25   Q   Does Superior typically include provisions in its supplier

                       Abercrombie - Direct                    23

 1  agreements confirming that Superior does not lose its ownership

 2  interests in its drawings by providing them to suppliers?

 3  A    Yes.

 4  Q    And does Superior also require its suppliers to maintain

 5  confidentiality of Superior's data?

 6  A    We do.

 7  Q    Do you see Section 3.03 of the supplier agreement entitled,

 8  Proprietary Rights Data?

 9  A    Yes.

10  Q    Could you read that provision into the record, please?

11  A    "Superior's drawings, related data and information shall be

12  used by TAE only for the performance of its obligations under

13  this agreement, unless otherwise provided in this agreement or

14  expressly approved by Superior in writing."

15  Q    Does Superior typically require its suppliers to only use

16  Superior's drawings in connection with the work that they're

17  doing for Superior?

18  A    Yes.

19  Q    Why is that?

20  A    The proprietary data that Superior maintains is the primary

21  asset of the company, it's the barrier to entry for our

22  competitors, and it's taken years and years of research,

23  development and testing to create.

24  Q    Did TAE and Superior, when they were doing business

25  together, always operate under the supplier agreement?

SAP APPX_024

1    A    Yes.

2    Q    Other than including proprietary right stamps and requiring

3    its suppliers to keep its drawings confidential, did Superior

4    do anything else to protect the confidentiality of its drawings

5    and data?

6    A    We do.  We have confidentiality clauses in our quality

7    manual, on the drawing, as you had mentioned, purchase order.

8    Terms and conditions also include that.  Internally, we monitor

9    access to the drawings through our engineering department and

10   limit the access.

11   Q    And why does Superior go to such great lengths to protect

12   the confidentiality of its drawings?

13   A    Again, it's the primary asset of the company and creates

14   the barrier to entry of competitors.

15   Q    Turning back to the confirmation of Superior's plan for a

16   second, was there language included in the plan whereby certain

17   creditors and parties that bid on Superior during the

18   bankruptcy were required to turn over any of Superior's

19   property that they might have in their possession?

20   A    There was.

21   Q    And is that provision found at Section 6.12 of the plan?

22         THE COURT:  And just so the record is clear, the plan

23   is Exhibit 11?  No, that's the disclosure statement.

24         MR. ROBISON:  It's Exhibit 12.

25         THE COURT:  12.

 1              THE COURT:  Redirect?

 2              MR. ROBISON:  Very brief, Your Honor.

 3                        REDIRECT EXAMINATION

 4   BY MR. ROBISON:

 5   Q    Mr. Abercrombie, could you turn to the document that was

 6   previously marked IA 10?  It was the non-disclosure agreement

 7   between Superior Air Parts and Boeing.

 8   A    Yes.

 9   Q    Do you see Paragraph 9 of the agreement?

10   A    Yes.

11   Q    Paragraph 9 provides that proprietary information shall be

12   the -- shall remain the property of the disclosing party,

13   doesn't it?

14   A    Yes.

15   Q    And is Paragraph 9 limited to a five-year term?

16   A    No.

17   Q    Do you see Paragraph 12?

18   A    Yes.

19   Q    Does it provide that at the expiration of the agreement,

20   the receiving party shall return, at the request of the

21   disclosing party, all documents and copies of proprietary

22   information made available hereunder through the disclosing

23   party?

24   A    Yes.

25   Q    Does that Paragraph 12 have a five-year term?

                        Chatten - Direct                    50

 1  A    No.

 2          MR. ROBISON:  No further questions, Your Honor.

 3          THE COURT:  Anything further?

 4          MR. SIMON:  No, Your Honor.

 5          THE COURT:  Thank you, Mr. Abercrombie.  You may step

 6  down.  Just leave the exhibits there.

 7      (The witness steps down.)

 8          MR. ROBISON:  Your Honor, Superior calls Keith Chatten

 9  to the stand.

10          THE COURT:  I'm sorry, say the name again?

11          MR. ROBISON:  Keith Chatten, C-H-A-T-T-E-N.

12          THE COURT:  Thank you.  Mr. Chatten, if you'd come

13  forward, please.  Raise your right hand.

14      (The witness is sworn.)

15          THE COURT:  Please be seated.

16          THE WITNESS:  Thank you.

17                      DIRECT EXAMINATION

18  BY MR. ROBISON:

19  Q   Mr. Chatten, can you state your name for the record?

20  A   Keith Chatten.

21  Q   What's your educational background?

22  A   I have a bachelor of science degree in mechanical

23  engineering from Louisiana Tech University as well as a

24  master's degree in business administration from the University

25  of South Alabama.

Chatten - Direct                              68

1   A    Yes.

2   Q    Were they one of the potential purchasers of Superior out

3   of bankruptcy?

4   A    Yes, they were.

5   Q    And were they successful in acquiring Superior out of

6   bankruptcy?

7   A    No, they were not.

8   Q    To your knowledge, does TAE hold any PMAs or the European

9   equivalent of PMAs?

10  A    Not to my knowledge.

11  Q    To your knowledge, does TAE manufacture or sell parts that

12  compete with Superior's parts?

13  A    No, they do not.

14  Q    And in your experience at Continental and Superior, did you

15  have occasion to become familiar with TAE's business?

16  A    Yes.  I was familiar.  There's a -- they were common

17  knowledge in the business.

18  Q    Are you aware of any reason why TAE would have CAD models

19  and TAE two-dimensional drawings of Superior's parts?

20  A    Yes, I am.

21  Q    And what would that reason be?

22  A    That they were part of the business relationship of TAE as

23  a supplier to Superior Air Parts.

24  Q    Were you present at the deposition of Dr. Kübler's

25  testifying expert, Professor Rienäcker?

1   A    Yes.

2   Q    Did TAE make diesel aircraft engines?

3   A    Yes.

4   Q    Did TAE make aviation gasoline or avgas aircraft engines?

5   A    No.

6   Q    Does Superior make avgas engines?

7   A    Yes.

8   Q    Are you aware that TAE manufactured parts for Superior's

9   avgas engines as a supplier?

10  A    Yes, I am.

11  Q    And are you aware of a supplier agreement between Superior

12  and TAE?

13  A    Yes.

14  Q    And did you become aware of that agreement in your role as

15  head of sales and service --

16  A    Yes.

17  Q    -- for TAE?

18  A    Yes.

19  Q    Did Superior supply drawings to TAE pursuant to the

20  supplier agreement?

21  A    Yes.

22  Q    Was it your understanding that TAE could use Superior's

23  drawings only for the benefit of Superior?

24  A    Yes.

25  Q    Could TAE make copies of Superior's drawings and sell them

Wolffson - Direct                          100

1  BY MR. ROBISON:

2  Q   And when you say take care about the drawings and

3  information given by Superior, what do you mean?

4  A   That we couldn't sell them.

5  Q   What was Ms. Botica's reaction?

6  A   Well, she heard it, and that's it.

7  Q   Is it typical in the PMA industry for the PMA holder to

8  provide its drawings to a supplier?

9        MR. SIMON:  Objection, Your Honor.  Lacks foundation.

10 This gentleman was in sales and service.

11        THE COURT:  Sustained.

12 BY MR. ROBISON:

13 Q   Did you have occasion to deal with TAE's suppliers,

14 including Superior, in your capacity as head of sales and

15 service?

16 A   Well, the only customer we had for for PMA parts was

17 Superior, and of course I was engaged in this business.

18 Q   Did Superior -- well, let me ask it this way.  Did Superior

19 provide drawings to TAE pursuant to the supplier agreement?

20 A   Yes, they did.

21 Q   And were those drawings provided with the expectation of

22 confidentiality?

23        MR. SIMON:  Objection, Your Honor.  Again, there's no

24 foundation laid that this gentleman knows anything about

25 Superior's expectations.

Marwill - Cross                                                  143

1   correct?

2   A    No, that's not exactly what I said.

3   Q    What do you recall saying?

4   A    I said that information -- at that time, you were asking me

5   about information that was available in the public domain, and

6   I said that information is shown in overhaul manuals but

7   there's not enough information in an overhaul manual to

8   actually make this part.  That's what our discussion was about

9   at that time.

10  Q    That's not my recollection, sir, but we can go back and

11  look.  Okay.  The exhibit that you're looking at, Exhibit 38,

12  does it also have a deposition exhibit sticker on it?

13  A    It says Exhibit SAP 38.

14  Q    Okay.  And I'll represent to you, sir, that Deposition

15  Exhibit SAP 38 is the same exhibit that we've marked as Exhibit

16  22 to your deposition, except that Exhibit 22 to your

17  deposition had your marking on it.  Okay?

18  A    Okay.  The reason I wasn't sure is because there are quite

19  a few cylinder drawings and they all look alike and I can't

20  verify that the drawing number was the same.  But they all have

21  very similar pictures on them.

22  Q    Okay.  But you remember looking at this one during your

23  deposition, right?

24  A    Yes.

25  Q    And circling that information we talked about a moment ago?

Marwill - Cross                                      149

1   that they could have easily done it by calculations, the way it

2   has been done for a lot time.

3   Q    I understand, sir.

4   A    They just chose to use the 3D CAD model.

5   Q    Your --

6   A    They did not add any value to the part.

7   Q    Your belief is that TAE did not need to do any engineering

8   work at all for the Superior business, right?

9   A    Absolutely not.  They did not need -- you're not hiring

10  their engineering department.  You're hiring their

11  manufacturing department to make the part for you.  They did

12  not design anything and they did not need the 3D CAD model to

13  do it.

14  Q    All right.  So, again, Mr. Wolffson's testimony that they

15  had to create the 3D models, you just disagree with that?  They

16  could have bought new machines and made the parts another way.

17  Is that what you're saying?

18  A    No, no.  I said we could have used the system that I'm used

19  to.  You could actually calculate the different dimensions that

20  you needed.  You didn't need a 3D model.  That's one way of

21  doing it.

22  Q    Okay.  So, you disagree --

23  A    It wasn't better.  It was just different.

24  Q    You disagree with Mr. Wolffson?

25  A    That's not what I said.

1   now that I've done that, we'll be recessed for the evening.

2   So, you're excused.

3           MR. SIMON:  Thank you, Your Honor.

4           MR. ROBISON:  Thank you, Your Honor.

5           MR. ALEXANDER:  Thank you, Your Honor.

6           THE COURT:  I'll see you in the morning.

7           THE CLERK:  All rise.

8       (Proceedings concluded at 6:08 p.m.)

9                           --oOo--

10

11

12

13

14

15

16

17

18

19

20                       CERTIFICATE

21      I certify that the foregoing is a correct transcript from
    the digital sound recording of the proceedings in the above-
22  entitled matter.

23    /s/ Kathy Rehling                        07/26/2014
    _____        _____
24
    Kathy Rehling, CET**D-444                    Date
25  Certified Electronic Court Transcriber

Adrian Rienacker, Ph.D. - July 20, 2014

1        IN THE UNITED STATES BANKRUPTCY COURT

2           FOR THE NORTHERN DISTRICT OF TEXAS

3                   DALLAS DIVISION

4    In re:                  §

                             §

5    SUPERIOR AIR PARTS, INC.,   §      NO. 08-36705-BJH-11

                             §

6        Debtor.              §

7

8

9

10                ORAL DEPOSITION OF

11             ADRIAN RIENÄCKER, Ph.D.

12                JULY 20, 2014

13

14

15              ORAL DEPOSITION of ADRIAN RIENÄCKER,

16   Ph.D., produced as a witness at the instance of the

17   Debtor, Superior Air Parts, Inc., and duly sworn, was

18   taken in the above-styled and numbered cause on the

19   20th of July, 2014, from 2:26 p.m. to 5:14 p.m.,

20   before Kim M. Dickman, CSR in and for the State of

21   Texas, reported by machine shorthand, at the offices

22   of Passman & Jones, 1201 Elm Street, Suite 2500, in

23   the City of Dallas, County of Dallas, State of Texas,

24   pursuant to Notice and the Federal Rules of Civil

25   Procedure.

Adrian Rienacker, Ph.D. - July 20, 2014

```
 1                  A P P E A R A N C E S
 2        FOR THE DEBTOR:
 3             Mr. Jerry C. Alexander
               Mr. Christopher A. Robison
 4             PASSMAN & JONES
               1201 Elm Street, Suite 2500
 5             Dallas, Texas 75270
               214.742.1212
 6             alexanderj@passmanjones.com
               robisonc@passmanjones.com
 7
 8        FOR THE INSOLVENCY ADMINISTRATOR
          OF THIELERT AIRCRAFT ENGINES GMBH:
 9
               Mr. Craig F. Simon
10             Mr. Daniel P. Winikka
               SIMON, RAY & WINIKKA LLP
11             2525 McKinnon Street, Suite 540
               Dallas, Texas 75201
12             214.871.2292
               csimon@srwlawfirm.com
13             dwinikka@srwlawfirm.com
14
          ALSO PRESENT:
15             Mr. Keith Chatten
               Mr. Douglas Marwill
16
17
18
19
20
21
22
23
24
25
```

Adrian Rienacker, Ph.D. - July 20, 2014

| | | |
|---|---|---|
| 14:58:00 | 1 | spreadsheet was correct by walking through |
| | 2 | subdirectories and finding drawings of that kind all |
| | 3 | over the place, with sort of matching statement in the |
| | 4 | spreadsheet saying we wanted this change to be |
| | 5 | performed on both the TAE drawing and the SAP drawing. |
| | 6 | Now, the next thing that we did was we |
| 14:58:30 | 7 | verified, apart from that the spreadsheet was correct, |
| | 8 | we found another 14 changes that were not documented |
| | 9 | in the spreadsheet.  So what we currently think is we |
| | 10 | have 59 changes requested to the parts, and all of |
| | 11 | them are minor changes. |
| | 12 | Q.  All right.  You think there are 59 changes? |
| | 13 | A.  Uh-huh. |
| 14:58:58 | 14 | Q.  To how many different parts? |
| | 15 | A.  We didn't figure that out.  We just have 59, |
| | 16 | if you want to say so, up revision two parts. |
| | 17 | Sometimes you would probably find two up revisions to |
| | 18 | a single part, making it from D to E, from E to F, or |
| | 19 | something like that. |
| | 20 | Q.  All right.  59 up revisions, and you said |
| | 21 | that these were minor changes? |
| 14:59:30 | 22 | A.  That's -- that's likely, likely the case.  We |
| | 23 | didn't see, to my knowledge, any part number change. |
| | 24 | Q.  Because if it was a major change it would |
| | 25 | have to have a part number change? |

Adrian Rienacker, Ph.D. - July 20, 2014

1          A.  Yeah.

2          Q.  Are the 59 minor changes that you think you

3     found, are they all in this exhibit -- in these

4     exhibits?

5          A.  No.

6          Q.  Okay.  Where are they?

7          A.  They're on the drive.

14:59:58  8          Q.  They're on the -- which drive?

9          A.  On the USB flash drive.

10          Q.  On the USB flash drive?

11          A.  Yeah.

12          Q.  The same one that we have?

13               MR. SIMON:  Yes.

14          A.  Yeah.

15          Q.  (By Mr. Alexander)  Okay.  And you're saying

16     that on that there are 59 up revisions but you don't

17     have the part numbers?

18          A.  We didn't collect the part numbers.  44 part

19     numbers are in a spreadsheet that is also contained on

20     that drive.

21          Q.  Well, are the 59 -- 59 up changes just to

15:00:30  22     those 44 parts?

23          A.  How --

24          Q.  All right.  Let's start over.  You say that

25     there are 59 what you call up revisions that are minor

Adrian Rienacker, Ph.D. - July 20, 2014

```
 1        A.  No.
 2        Q.  We're just trying -- I'm just trying to look
 3   at the exhibit.
 4        A.  Yeah, you want to look at that.  That's quite
 5   understandable.
15:05:59  6            Now, what I'm saying is that TAE, and
 7   that's the process, is requesting a change to be made
 8   on an SAP drawing.  The change will then, by the
 9   regulations, be moved forward by SAP.
10        Q.  Okay.
11        A.  So TAE cannot change an SAP drawing, okay,
12   that doesn't work.
13        Q.  My question is, on the -- on the drawing that
15:06:29 14   is on the USB flash drive, is there a drawing on the
15   USB flash drive that has a TAE box on it that has a
16   change that TAE initiated on it?
17        A.  What -- you probably have to rephrase the
18   question.
19        Q.  All right.  When you're -- when somebody's
20   going through the USB flash drive --
21        A.  Yeah.
15:06:58 22   Q.  -- to try to find these 59 changes that 44 of
23   the part numbers are in the spreadsheet?
24        A.  Uh-huh.
25        Q.  You're saying that there's a -- is there a
```

Adrian Rienacker, Ph.D. - July 20, 2014

1    TAE drawing that has the change on it or is there a

2    Superior drawing that has the change on it?

3              MR. SIMON:  Object to the form.

4         A.  To my knowledge, all the changes that TAE

5    wanted SAP to perform in their drawings were requested

6    on the basis of an SAP drawing.  This is how they did

15:07:27  7    that.

8         Q.  (By Mr. Alexander)  All right.  The finished

9    product of this -- of these changes you're talking

10   about, did that wind up on a Superior drawing?

11        A.  The finished product?

12        Q.  The change.

13        A.  Yes.  Obviously that must have taken place.

14        Q.  All right.  Now, let me ask you something

15:07:54 15   else.  Let's go back to -- to this one with all the

16   colors on it.

17        A.  Uh-huh.

18        Q.  It says Approved For Production on it; you've

19   done the colors.  Now, tell me a bit about these

20   colors.  Those are the colors that you got out of the

21   overhaul manual?

22        A.  As stated before, the yellow color indicates

23   all the dimensions and tolerances that we pulled out

24   of the overhaul manual; the green color was specified

25   in the overhaul manual but was chosen here to be of

Adrian Rienacker, Ph.D. - July 20, 2014

1    are, you would pinpoint those to those as where the

2    standard drawing tolerance applies.  So by this

3    definition, the blue ones are probably the less

4    critical dimensions on this drawing.

15:10:29   5        Q.   This is a part for what?  What does that say?

6    It says, cylinder stud assembly long reach.  Are your

7    eyes good enough to read that number?

8        A.   Hopefully.

9        Q.   It's SA?

10        A.   SA 47006L-A1 and revision is F.

11        Q.   Now, you're not saying, are you, that you

12    could take a Teledyne Continental overhaul manual and

13    reproduce that drawing good enough to get it approved

14    by the FAA, are you?

15:10:57  15        A.   The overhaul manual is not the single source

16    of information to do that.

17        Q.   Okay.

18        A.   There is not enough information contained.

19        Q.   There's not enough information in the

20    overhaul manual.  All right.  Is there enough

21    information from -- if another source or sources, if

22    you add it to the information in the overhaul manual

23    where you could do that drawing to get it approved by

24    the FAA?

25        A.   Get it approved by the FAA?  That's a

SAP APPX_040

Adrian Rienacker, Ph.D. - July 20, 2014

```
          1    difficult question because it involves the whole
15:11:26  2    process of a part to be approved by the FAA.
          3         Q.  Uh-huh.
          4         A.  To obtain FAA approval, you've got two ways:
          5    by identicality, as we've heard before, and by
          6    computation and testing, and for that you would need a
          7    lot more than the dimensions that you find in the
          8    overhaul manual.
          9         Q.  So is the answer that from what you know is
15:11:58 10    available in the public domain, overhaul manuals,
         11    whatever other sources, you cannot do a drawing like
         12    this for this part and get FAA approval on it?
         13              MR. SIMON:  Object to the form.
         14         A.  But essentially what you say is correct,
         15    yeah.
         16         Q.  (By Mr. Alexander)  Okay.
         17         A.  It's not enough.
         18         Q.  Not enough.  All right.  What else is in
         19    this?  Do you have any other things that you want to
         20    talk about about -- I want to talk, exhaust your
         21    knowledge on these improvements that you say are --
15:12:29 22    what did you call them, changes that TAE made to
         23    Superior drawings?
         24         A.  It's probably not so important at this point
         25    in time to talk about that.  We just found this along
```

Adrian Rienacker, Ph.D. - July 20, 2014

1       Q.  Would it be possible to make the -- a

2   meaningful 3D volume model without the two-dimensional

3   drawing from Superior?

4       A.  Likely not.

5       Q.  So what -- what TAE did or someone at TAE did

15:24:27  6   was they got what I call a CAD machine and what you

7   would call a piece of CAD software, they got the

8   two-dimensional drawing and they manipulated the data

9   and it came out to be a 3D model; is that right?

10      A.  Yeah.

11      Q.  Okay.  Does an engineer have to do this?  Do

12  you have to be an engineer to do that?

13      A.  Yes, I believe so.  In Germany, you would

14  have to have a degree to do that.

15      Q.  You would have to have a license --

15:25:00 16      A.  License?

17      Q.  -- wouldn't you?

18      A.  Well, in Germany, we don't have license.

19      Q.  You don't have licenses for engineers?

20      A.  No.

21      Q.  Okay.

22      A.  We have degrees and companies would hire

23  people by degrees and assign them the tasks that they

24  would do.

25      Q.  Once this 3D volume model is made and

Adrian Rienacker, Ph.D. - July 20, 2014

1    exists -- and it exists in the software, someone can

15:25:26 2    get all the dimensions for the part off of that 3D

3    model, correct?

4        A.  Well, if you do it properly, then the

5    dimensions, yes, and the tolerances can be derived

6    from that.

7        Q.  Because they would have been inputted from

8    the two-dimensional drawing?

9        A.  From wherever the information comes from,

10   yeah.

11       Q.  So once it goes in there, then they can take

12   it out, they can find out what it is?

13       A.  Uh-huh.

14       Q.  Can you say yes?

15:25:57 15   A.  Yes, sorry.

16       Q.  Now, you say in the last part of this, "by

17   industry practice -- proprietary to TAE and not shared

18   between a manufacturer/supplier and its customer"?

19       A.  That's correct.

20       Q.  When you say "not shared between a

21   manufacturer/supplier and its customer," what does

22   that mean?

15:26:28 23   A.  I'm not exactly sure what you asked me.

24       Q.  All right.  Let me ask you this:  Is it your

25   understanding by industry practice that once a 3D

Adrian Rienacker, Ph.D. - July 20, 2014

```
              1    a surface finish or something like that, but still

              2    would be able to be found from the overhaul manual;

16:22:28      3    the blue dimensions are the ones with the standard

              4    tolerances and the red ones are those that have

              5    deviating tolerances.

              6         Q.   What's that light blue color over there?

              7         A.   We always look for something that was

              8    probably not so easy, just to be fair, probably not so

              9    easy to assess with a very simple assessment, and that

             10    is this barreling here of the cylinder liner near top

16:22:58     11    dead center, we found that would require some thought.

             12         Q.   That would be hard to do -- harder to do than

             13    this other stuff?

             14         A.   Harder to do than the other stuff.

             15         Q.   How many dimensions for that part did you

             16    find in the overhaul manual?

             17         A.   Well, one, two, three, four, five, six,

             18    seven, eight; roughly eight.

             19         Q.   And how many dimensions are on the drawing?

             20         A.   Probably 60 or so.

             21         Q.   Could you make that drawing from what was in

16:23:28     22    the overhaul manual?

             23         A.   Not alone from that.

             24         Q.   Excuse me?

             25         A.   Not alone from that.
```

Adrian Rienacker, Ph.D. - July 20, 2014

```
 1    STATE  OF  TEXAS )

 2    COUNTY OF DALLAS )

 3            I, Kim M. Dickman, Certified Shorthand

 4    Reporter, in and for the State of Texas, certify that

 5    the foregoing deposition of ADRIAN RIENÄCKER, Ph.D.,

 6    was reported stenographically by me at the time and

 7    place indicated, said witness having been placed under

 8    oath by me; that review was requested pursuant to

 9    Federal Rule of Civil Procedure 30(e)(1); and that the

10    deposition is a true record of the testimony given by

11    the witness.

12            I further certify that I am neither counsel

13    for nor related to any party in this cause and am not

14    financially interested in its outcome.

15            Given under my hand on this the 21st day of

16    July, 2014.

17                    _____

                      Kim M. Dickman, Certified

18                    Shorthand Reporter No. 2181

                      Dickman Davenport, Inc.

19                    Firm Registration #312

                      Suite 320

20                    3131 Turtle Creek Boulevard

                      Dallas, Texas 75219

21                    214.855.5100    800.445.9548

                      email:  kd@dickmandavenport.com

22                    My commission expires 12-31-14

23    Time used by each party:

24    Mr. Jerry C. Alexander - 2:06

      Mr. Craig F. Simon - 0:02

25
```

Robert Douglas Marwill - July 20, 2014

1          IN THE UNITED STATES BANKRUPTCY COURT

2            FOR THE NORTHERN DISTRICT OF TEXAS

3                    DALLAS DIVISION

4    In re:                   §

                              §

5    SUPERIOR AIR PARTS, INC.,   §      NO. 08-36705-BJH-11

                              §

6       Debtor.               §

7

8

9

10                   ORAL DEPOSITION OF

11               ROBERT DOUGLAS MARWILL

12                   JULY 20, 2014

13

14

15          ORAL DEPOSITION of ROBERT DOUGLAS

16   MARWILL, produced as a witness at the instance of the

17   Insolvency Administrator of Thielert Aircraft Engines

18   GmbH, and duly sworn, was taken in the above-styled

19   and numbered cause on the 20th of July, 2014, from

20   10:08 a.m. to 1:28 p.m., before Jennifer Quick

21   Davenport, CSR in and for the State of Texas, reported

22   by machine shorthand, at the offices of Passman &

23   Jones, 1201 Elm Street, Suite 2500, in the City of

24   Dallas, County of Dallas, State of Texas, pursuant to

25   Notice and the Federal Rules of Civil Procedure.

Robert Douglas Marwill - July 20, 2014

```
1                    A P P E A R A N C E S
2         FOR THE DEBTOR:
               Mr. Jerry C. Alexander
3              Mr. Christopher A. Robison
               PASSMAN & JONES
4              1201 Elm Street, Suite 2500
               Dallas, Texas 75270
5              214.742.1212
               alexanderj@passmanjones.com
6              robisonc@passmanjones.com
7
          FOR THE INSOLVENCY ADMINISTRATOR
8         OF THIELERT AIRCRAFT ENGINES GMBH:
               Mr. Craig F. Simon
9              Mr. Daniel P. Winikka
               SIMON, RAY & WINIKKA LLP
10             2525 McKinnon Street, Suite 540
               Dallas, Texas 75201
11             214.871.2292
               csimon@srwlawfirm.com
12             dwinikka@srwlawfirm.com
13
          ALSO PRESENT:
14             Mr. Keith Chatten
               Mr. Adrian Rienaecker
15
16
17
18
19
20
21
22
23
24
25
```

Robert Douglas Marwill - July 20, 2014

1  that effect.

2              So I did look at those manuals to see if

3  information was available for making these parts, and

4  I did not find any evidence that says that you

5  could -- or shows that you could manufacture the parts

6  there.  In other words, the information is retained

7  entirely upon the engineering drawings, which are held

8  confidential.

9      Q.  So if I understand your testimony, sir, the

10:34:32 10  engine manuals which you've described as overhaul

11  manuals do contain at least some of the information

12  reflected on the Superior drawings, correct?

13              MR. ROBISON:  Objection; form.

14      A.  Not in the same context.

15      Q.  (By Mr. Simon)  Is the information available,

16  sir, on the drawings that are -- that are contained in

17  the engine manuals?

18      A.  No, not for --

19              MR. ROBISON:  Objection; form.

20              THE WITNESS:  Excuse me.

10:35:00 21      A.  No, not for design purposes.  For example, in

22  the overhaul manuals, they give you information with

23  regards to the overhaul of the engine.  In other

24  words, what are the maximum wear that may be allowed

25  on a part, but there's no information in there that

Robert Douglas Marwill - July 20, 2014

1  tells you how to design the part, what material to

2  make it out of, what heat-treat to apply, what finish

3  to apply.  That information is all confidential and

4  held on the engineering drawings.

5      Q.  (By Mr. Simon)  Are the dimensions for a part

6  contained in the engine manual?

10:35:29  7      A.  There are some dimensions in there only for

8  wear, having to do with the maximum amount of wear

9  that's allowed on the parts, but that in no way could

10  be construed as information that could be used to

11  actually design that part --

12      Q.  Is that --

13      A.  -- such as a piston or a valve.

14      Q.  Is that because you think the information

15  would not be useful or because it would not be a

16  permitted use of the information?

17          MR. ROBISON:  Objection; form.

18      A.  Actually, both, because the parts can only be

19  manufactured by one company.  They're only approved by

10:35:58  20  the FAA for that one company.  Other companies are not

21  allowed to manufacture other people's parts without a

22  written agreement, or FAA approval.

23          In fact, when one company makes a part

24  for another company, the primary company owns all the

25  rights to it and the FAA assumes that they control it,

Robert Douglas Marwill - July 20, 2014

1  and they check them to make sure that they own it.  So

2  it would not be possible to provide design data in an

10:36:29  3  open manual for the general public because they are

4  not allowed to make the part.  Only the original

5  manufacturer has the right from the FAA to do that.

6       Q.  (By Mr. Simon)  Well, you would agree that a

7  manufacturer that has appropriate design data can

8  certainly apply to the FAA for its own PMA, correct?

9       A.  Yes.

10       Q.  So the question I'm trying to get at, sir, is

11  what design data is available in the public domain.

12  So that's where I want to focus our attention right

13  now.

14             Are you with me on that?

10:37:00  15       A.  I am.

16       Q.  Okay.  So if I understand you, with respect

17  to this dispute, you took notice of the notion that

18  the information on the Superior parts was in the

19  public domain, and one of the things you did to assess

20  that was look at engine overhaul manuals, correct?

21             MR. ROBISON:  Objection; form.

22       A.  Your question was incorrect.  I did not say

10:37:27  23  that the overhaul manuals provided design information

24  for the parts.

25       Q.  (By Mr. Simon)  Okay.

Robert Douglas Marwill - July 20, 2014

```
         1        A.  It has wear information, maximum wear
         2   information, but that is not the same as what the part
         3   was originally designed to.
         4        Q.  Okay.  Do you agree or disagree, sir, that
         5   the information in the engine manuals that are
         6   published by the manufacturers can be used as a
         7   starting point to design aircraft engine parts?
         8                MR. ROBISON:  Objection; form.
10:37:58 9        A.  I'm sorry, no, in no way.
        10        Q.  (By Mr. Simon)  Okay.  What else, if
        11   anything, sir, did you do to assess whether or not the
        12   information on the Superior drawings is available in
        13   the public domain?
        14        A.  I attempted to do an Internet search.
        15   Mainly, I was looking for Lycoming information or for
        16   Teledyne Continental Motors, just to see if it was
        17   available, and there's no information that I could
        18   find that would be like that.
        19                My experience has been with Pratt &
10:38:28 20   Whitney, Garrett and other companies as well as
        21   Teledyne Continental Motors and Lycoming, that if you
        22   ask for this information, you can't get it.  Not that
        23   it would be acceptable to do that, actually do
        24   anything with the information, but they don't release
        25   that information to the public.
```

Robert Douglas Marwill - July 20, 2014

1  STATE   OF   TEXAS )

2  COUNTY OF DALLAS )

3          I, Jennifer Quick Davenport, Certified

4  Shorthand Reporter, in and for the State of Texas,

5  certify that the foregoing deposition of

6  ROBERT DOUGLAS MARWILL was reported stenographically

7  by me at the time and place indicated, said witness

8  having been placed under oath by me; that review was

9  requested pursuant to Federal Rule of Civil Procedure

10  30(e)(1); and that the deposition is a true record of

11  the testimony given by the witness.

12          I further certify that I am neither counsel

13  for nor related to any party in this cause and am not

14  financially interested in its outcome.

15          Given under my hand on this the 21st day of

16  July, 2014.

17          _____

                Jennifer Quick Davenport, Certified

18              Shorthand Reporter No. 1683

                Dickman Davenport, Inc.

19              Firm Registration #312

                Suite 320

20              3131 Turtle Creek Boulevard

                Dallas, Texas 75219

21              214.855.5100    800.445.9548

                email:  jqd@dickmandavenport.com

22              My commission expires 12-31-14

23  Time used by each party:

    Mr. Christopher A. Robison - 0:03

24  Mr. Craig F. Simon - 2:33

25

Charles Dedmon - July 15, 2014

1            IN THE UNITED STATES BANKRUPTCY COURT

2              FOR THE NORTHERN DISTRICT OF TEXAS

3                     DALLAS DIVISION

4   In re:                    §

                              §

5   SUPERIOR AIR PARTS, INC.,  §     NO. 08-36705-BJH-11

                              §

6      Debtor.                §

7

8

9                  ORAL DEPOSITION OF

10                  CHARLES DEDMON

11     INDIVIDUALLY AND AS CORPORATE REPRESENTATIVE OF

12             SUPERIOR AIR PARTS, INC.

13                 JULY 15, 2014

14

15            ORAL DEPOSITION of CHARLES DEDMON,

16   produced as a witness at the instance of the

17   Insolvency Administrator of Thielert Aircraft Engines

18   GmbH, and duly sworn, was taken in the above-styled

19   and numbered cause on the 15th of July, 2014, from

20   10:13 a.m. to 4:26 p.m., before Jennifer Quick

21   Davenport, CSR in and for the State of Texas, reported

22   by machine shorthand, at the offices of Passman &

23   Jones, 1201 Elm Street, Suite 2500, in the City of

24   Dallas, County of Dallas, State of Texas, pursuant to

25   Notice and the Federal Rules of Civil Procedure.

Charles Dedmon - July 15, 2014

```
 1              A P P E A R A N C E S
 2      FOR THE DEBTOR:
            Mr. Jim F. Adams
 3          PASSMAN & JONES
            1201 Elm Street, Suite 2500
 4          Dallas, Texas 75270
            214.742.1212
 5          jimadams@passmanjones.com
 6
        FOR THE INSOLVENCY ADMINISTRATOR
 7      OF THIELERT AIRCRAFT ENGINES GMBH:
            Mr. Craig F. Simon
 8          Mr. Daniel P. Winikka
            SIMON, RAY & WINIKKA LLP
 9          2525 McKinnon Street, Suite 540
            Dallas, Texas 75201
10          214.871.2292
            csimon@srwlawfirm.com
11          dwinikka@srwlawfirm.com
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Charles Dedmon - July 15, 2014

```
           1         A.   The data that was on the drawings that were
11:01:29   2    submitted by -- for PMA and submitted to Thielert for
           3    manufacture, some of which may -- some of it may have
           4    been in the public domain, but not all of it, and
           5    certainly not in the sequence or the way that it was
           6    arranged to make a specific part.
           7         Q.   Okay.  I want to make sure we're focusing on
           8    the same information, and I want to focus not on all
11:01:58   9    of the information that was submitted to the FAA, but
          10    only on the information on the two-dimensional
          11    drawings that are supplied by Superior to TAE, okay?
          12    So that's the universe of information we're talking
          13    about, fair enough?
          14         A.   Okay.
          15         Q.   Are we on the same page?
          16         A.   Yes.
          17         Q.   Is there any information on those
          18    two-dimensional drawings that is not available in the
          19    public domain?
          20         A.   Considerable amount of information.  All of
          21    it, and particularly in the way the individual
11:02:28  22    information is arranged on the drawing and put
          23    together in combination.
11:03:59  24         Q.   When you say that the way the information is
          25    arranged, what do you mean by that?
```

Charles Dedmon - July 15, 2014

```
           1        Q.  Which is?

           2        A.  Millions of dollars and thousands of

           3   man-hours.

           4        Q.  Can you -- millions is -- it's a pretty broad

           5   range, sir.  Can you narrow it for me at all?

           6        A.  No.

11:18:59   7        Q.  Would it be 1 million, 2 million?

           8        A.  No.

           9        Q.  You don't know?

          10        A.  I can't and won't be able to narrow it.

          11        Q.  Can you tell me any range of man-hours other

          12   than thousands?

          13        A.  No.

          14        Q.  It could be 1,000, it could be 2,000?

          15        A.  Thousands.

          16        Q.  You can't get any more specific than that?

          17        A.  No.

          18        Q.  Correct?

          19        A.  Correct.

11:19:30  20        Q.  Thanks.  Are maintenance manuals available

          21   publicly for the OEM equivalence of the Superior PMA

11:19:59  22   part?

          23        A.  Yes, they are.

          24        Q.  And is that information -- is that

          25   information useful and necessary to develop the PMA
```

Charles Dedmon - July 15, 2014

1  parts?

2      A.  Yes.

3      Q.  In what respect?

4      A.  In maintenance manuals -- and I do stand

5  somewhat corrected.  In the maintenance manuals there

6  is information regarding specific dimensions and

11:20:26  7  tolerances that may well be incorporated into a

8  blueprint.

9      Q.  Into a blueprint for a PMA part?

10     A.  Yes.

11     Q.  In fact, that's fairly common, isn't it, sir,

12  to utilize the dimensions and tolerances contained in

13  the maintenance manual as the starting point for the

14  development of a PMA part?

15     A.  No.

16     Q.  It's not?

11:20:58  17     A.  You will be able to look at that part and you

18  will be able to get certain of the dimensions, but if

19  you're counting on a maintenance manual to help you

20  reverse engineer or develop a part, you're going to be

21  way off because there's only a few dimensions per part

22  that are used in servicing the part as opposed to the

23  actual manufacture of the part.

11:21:31  24     Q.  So the maintenance manual would only provide

25  dimensions related to servicing and not related to the

Charles Dedmon - July 15, 2014

```
         1   manufacturing?

         2        A.  Well, it would -- they may be both.

         3        Q.  Okay.  It depends or you're not sure?

         4        A.  Let me give a specific example.

         5        Q.  Okay.

11:21:54 6        A.  The stem of a valve, a stem of a valve will

         7   probably have in the maintenance manual a dimension

         8   and tolerance for that stem -- valve stem, and when

         9   one then goes to that, they can use that as a

        10   dimension and tolerance on the valve, but knowing the

        11   valve stem tolerance -- dimension and tolerance is not

        12   going to design a valve for you.

11:22:41 13       Q.  Are there -- so if I understand you

        14   correctly, and I may not, the maintenance manuals will

        15   at least provide in some instances dimensions and

11:22:57 16   tolerances of an OEM part that could be utilized by a

        17   PMA manufacturer for its own part, true?

        18        A.  For some dimensions, yes.

        19        Q.  Are there other -- strike that.

        20             Those maintenance manuals are publicly

        21   available, correct?

        22        A.  Correct.

        23        Q.  Are there any other places -- are there any

        24   other publicly available sources of any of the data

11:23:27 25   that would be found on a two-dimensional drawing for a
```

Charles Dedmon - July 15, 2014

```
 1   STATE  OF  TEXAS )

 2   COUNTY OF DALLAS )

 3           I, Jennifer Quick Davenport, Certified

 4   Shorthand Reporter, in and for the State of Texas,

 5   certify that the foregoing deposition of

 6   CHARLES DEDMON was reported stenographically by me at

 7   the time and place indicated, said witness having been

 8   placed under oath by me; that review was requested

 9   pursuant to Federal Rule of Civil Procedure 30(e)(1);

10   and that the deposition is a true record of the

11   testimony given by the witness.

12           I further certify that I am neither counsel

13   for nor related to any party in this cause and am not

14   financially interested in its outcome.

15           Given under my hand on this the 17th day of

16   July, 2014.

17                   _____

                     Jennifer Quick Davenport, Certified

18                   Shorthand Reporter No. 1683

                     Dickman Davenport, Inc.

19                   Firm Registration #312

                     Suite 320

20                   3131 Turtle Creek Boulevard

                     Dallas, Texas 75219

21                   214.855.5100     800.445.9548

                     email:  jqd@dickmandavenport.com

22                   My commission expires 12-31-14

23   Time used by each party:

     Mr. Jim F. Adams - 0:11

24   Mr. Craig F. Simon - 3:10

25
```

Case 08-26705-bih-1   Doc 739-1   Filed 07/31/14   Entered 07/31/14 13:48:12   Desc
Case 3:07-cv-00389-D   Document 164-2   Filed 10/22/09   Page 23 of 35   PageID 2254
Exhibit   (Appendix pp. 1-65)   Page 60 of 65
DEPOSITION OF CHARLES B. DEDMON - JUNE 12, 2008

Page 114

1    Q.   Do you know -- and I may have asked
2  you this earlier -- how many parts Hye-Tech
3  has PMA approval for?
4    A.   I don't remember.
5    Q.   Is there a single PMA supplier who
6  has approval for every single part on the
7  Model 250 engine?
8    A.   I don't know.
9    Q.   With respect to any of the price and
10  bundling techniques identified in Items 3-A,
11  -B and -C, do you have any empirical
12  evidence or data that Rolls-Royce is engaging
13  in those techniques with respect to the Model
14  250 engine?
15    A.   No, I don't.
16    Q.   Moving on to No. 4 of your
17  techniques, the change, the part number
18  technique, is what you call it.
19    A.   Uh-huh.
20    Q.   You indicate that part numbers are
21  changed even when there's no significant
22  difference in the part.
23       Are you qualified to opine on the
24  technical differences between part drawings?
25    A.   Yes.

Page 115

1    Q.   How are you qualified?
2    A.   I have been involved in part design,
3  part analysis for 40 years.
4    Q.   Do you personally engage in the
5  design of parts?
6    A.   I have, yes.
7    Q.   Do you have any engineering
8  expertise?
9    A.   Only developed as a -- as a practical
10  matter in the industry.  I am not a degreed
11  engineer.
12    Q.   Did any of the companies you worked
13  for not have any engineers?
14    A.   No, we've always had engineers.
15    Q.   So, what did engineers do if you're
16  designing parts?
17    A.   What do engineers do?
18    Q.   What did those engineers do if you
19  were designing parts?
20    A.   They would check and they would work
21  and they would assist in the design process.
22    Q.   Were you the primary designer in
23  those situations?
24    A.   In some parts, yes.
25    Q.   Isn't it expensive for an OEM to

Page 116

1  change a part number?
2    A.   It can be.
3    Q.   How can it be expensive?
4    A.   Well, if they -- if they change
5  manuals to reflect the new part numbers, such
6  as illustrative parts catalogs and service
7  bulletins, and that type of thing, that --
8  there can be an expense related to that.
9    Q.   Would that counter against using --
10  change the part number technique that you
11  described?
12    A.   Well, it would run counter to it, and
13  it would only be offset if they could get
14  some sort of competitive advantage over a PMA
15  holder who would no longer be able to offer
16  a part of that same part number.
17    Q.   Can you identify an OEM that has
18  engaged in this technique?
19    A.   Yes.
20    Q.   Who has engaged in this technique?
21    A.   Teledyne Continental Motors, AVCO
22  Lycoming, Textron Lycoming.
23    Q.   Can you identify a Rolls-Royce part
24  where the number was changed but there was
25  no significant difference in the part?

Page 117

1    A.   No.
2    Q.   Do you have any empirical evidence or
3  data to suggest that Rolls-Royce engages in
4  this technique with respect to the Model 250
5  engine?
6    A.   No.
7    Q.   Moving to Item No. 5, your mandatory
8  service bulletin technique …
9    A.   (Complying.)  Uh-huh.
10    Q.   You state that the OEM can overstate
11  the importance of an issue by using the word
12  "mandatory" in the title.
13       What evidence or data do you have
14  that Rolls-Royce has done this?
15    A.   I don't have any evidence for
16  Rolls-Royce.
17    Q.   You have no documents produced by
18  Rolls-Royce related to this technique?
19    A.   No.
20    Q.   In connection with Item No. 6, you're
21  discussing the ICA, or Instructions for
22  Continued Airworthiness.
23       Has the FAA ever instructed
24  Rolls-Royce or any OEM that every single
25  technical document relating to an engine

Case 98-26705 bic 11   Doc 739-1   Filed 07/31/14   Entered 07/31/14 13:48:12   Desc
Case 3:07-cv-00739-D   Document 164-2   Filed 10/22/09   Page 24 of 35   PageID 2255
Exhibit  (Appendix pp. 1-65)   Page 61 of 65
DEPOSITION OF CHARLES B. DEDMON - JUNE 12, 2008

Page 118

1  constitutes Instructions for Continued
2  Airworthiness that must be provided?
3      A.  I don't know.
4      Q.  Isn't it true that there are no
5  regulations that require Rolls-Royce or any
6  OEM to make available every single technical
7  document?
8      A.  I'm not aware of any.
9      Q.  Has the FAA ever said that an OEM
10  must make ICA available to anyone who wants
11  it free of charge?
12      A.  No.
13      Q.  Is it fair for an OEM to charge
14  customers for its ICA?
15      A.  Yes, it's fair for them to charge a
16  reasonable price.  But I think you -- you
17  need to understand that in order to comply
18  with the regulations, they must be readily
19  available at reasonable cost.
20      One can't price them so high as to be
21  a barrier to getting Instructions for
22  Continued Airworthiness into the hands of the
23  people that need them.
24      Q.  I see that you quoted here from one
25  of the regulations, 21 -- Section 21.50.

Page 119

1      Is this merely your excerpt of the
2  law that you found to be relevant on this
3  section?
4      A.  Yes, it was an excerpt from 21.50.
5      Q.  And you're interpreting Section 21.50
6  and its requirements here?
7      A.  Yes.
8      Q.  Would you agree that the ICA
9  requirements only apply to type certificate
10  applications made after January 28, 1981?
11      A.  That is correct as far as the
12  regulation is written, although the FAA is
13  now encouraging, for safety sake, that the
14  ICAs going back be furnished.
15      Q.  But under this regulation, it only
16  applies to applications made after January
17  28, 1981?
18      A.  Correct.
19      Q.  When was the Model 250 type
20  certificated?
21      A.  I don't know.
22      Q.  So, you don't have any knowledge
23  whether Rolls-Royce is even subject to this
24  regulation?
25      A.  No.

Page 120

1      Q.  Do you have any empirical evidence or
2  data to correlate the restricted ICA
3  technique described in Paragraph 6 to
4  Rolls-Royce or the Model 250 engine?
5      A.  I have only the complaints that have
6  been filed against Rolls-Royce for failure to
7  supply them.
8      Q.  Are you familiar with Advisory
9  Circular No. 33.4-1?
10      A.  No.
11      Q.  In the section on Page 8 that
12  continues on from Item No. 6, are you again
13  continuing to interpret what you believe
14  21.50 to mean?
15      A.  21.50?
16      Q.  Yes.
17      A.  I believe this is dealing more with
18  21.303.
19      Q.  On Page 8?
20      A.  Yes.  Down at the bottom, where it
21  says, develop design data, is that where
22  you're talking?
23      Q.  Oh, I haven't gotten to that section
24  yet.
25      A.  Okay.

Page 121

1      Q.  I'm still finishing up with this.
2      A.  So, above that, yes.
3      Q.  Yes.
4      A.  Yes, that would be 21.50.
5      Q.  Okay.  And you're just merely
6  interpreting that regulation there?
7      A.  Yes.
8      Q.  You reference a letter from James
9  Whitlow, the deputy chief counsel of the FAA.
10      A.  Yes.
11      Q.  What legal effect does that letter
12  have?
13      A.  What legal effect?
14      Q.  Yes.
15      A.  I don't know.  It is -- it is an
16  opinion from the chief counsel of the FAA,
17  so I would assume that it has some effect.
18      Q.  And are you interpreting that letter
19  as how --
20      MS. MOTE:  Strike that.
21      Q.  Are you interpreting that letter in
22  rendering your opinions here?
23      A.  Yes, I am.  I'm interpreting and I'm
24  reading exactly the words that -- that are
25  quoted there.

Case 08-26705 bind 1   Doc 739-1   Filed 07/31/14   Entered 07/31/14 13:48:13   Desc
Case 3:07-cv-00751-D   Document 164-2   Filed 10/22/09   Page 33 of 35   PageID 2284
Exhibit  (Appendix pp. 1-65)   Page 62 of 65
DEPOSITION OF CHARLES B. DEDMON - JUNE 12, 2008

Page 162

1      A.   Just knowing what goes on in the
2  industry.
3      Q.   How do you know what goes on in the
4  industry?
5      A.   What's reported in the news, what's
6  reported in various seminars, litigation
7  filings.
8      Q.   You state that OEMs have become far
9  better at establishing and protecting their
10  trade secrets.
11      What do you mean by that?
12      A.   Well, it's my impression that -- in
13  later years, that OEMs have -- have done a
14  better job of starting from scratch and
15  protecting their -- their proprietary rights
16  and trade secrets.
17      Early on in the industry, I think
18  there was probably little reason to worry
19  about protecting those trade secrets, because
20  nobody was using the data but them.
21      Q.   So, is litigation a part of
22  protecting that trade secret?
23      A.   Yes, it could be.
24      Q.   And if it's a trade secret, how would
25  a PMA applicant obtain that information for

Page 163

1  purposes of an identicality?
2      A.   Well, if it's a trade secret and it's
3  protected, they probably couldn't.
4      But if it's a trade secret, or
5  claimed to be a trade secret, and it's
6  really not, if it, for example, belongs to
7  the government, if it's available through
8  Freedom of Information Act or government
9  availability, if it's published and is out in
10  the public domain, then, the material's out
11  there to be used.
12      Q.   Is there anything in this speech and
13  the PowerPoint that accompanies it -- is
14  there anything in there that correlates to
15  anything that Rolls-Royce is doing with
16  respect to the Model 250 engine?
17      A.   I don't know that.  It could be.
18      Q.   You have no empirical evidence or
19  data to correlate anything in this speech and
20  PowerPoint to Rolls-Royce and the Model 250
21  engine?
22      A.   All I've read is the complaint and
23  counterclaim, and it does appears that there
24  are a number of same issues that are raised
25  in -- in those two that are similar to the

Page 164

1  pattern that's been followed in the industry.
2      But I don't have any specific
3  information, because all I have is the
4  allegations of the complaint and the
5  counterclaim.
6      MS. MOTE:  For the record, I'd just
7  like to make the speech and PowerPoint
8  Exhibits 218 and 219.
9      (The Court Reporter marked documents
10  for identification as Deposition Exhibits No.
11  218 and 219.)
12      Q.   Turning to Tab No. 5 of the binder of
13  your documents ...
14      A.   (Complying.)  Uh-huh.
15      Q.   Can you just tell me where you got
16  this document or where you obtained this
17  information?
18      A.   I obtained it off of the internet,
19  off of a news reporting service, and I did
20  not write down the source of the document
21  when I printed it off.
22      Q.   So, that was just a news story?
23      A.   It was a -- yes, it was a news story
24  report from a ...
25      Q.   It refers in the first sentence to

Page 165

1  the association.
2      Is it possible that this article came
3  from either MARPA or ARSA?
4      A.   It's very possible.
5      Q.   You just don't recall?
6      A.   I don't recall.  And when I went back
7  to research for the source of the document,
8  I couldn't find it easily, so I don't -- I
9  don't know.  But it does say, association.
10      Q.   Turning to Tab No. 7 of that
11  binder ...
12      A.   (Complying.)
13      Q.   Can you explain to me what that
14  document is?
15      A.   It's just -- it's a document on the
16  availability of information.
17      Q.   Who created this document?
18      A.   You know, I don't know.  I don't know
19  who did that.
20      Q.   Where did you obtain this document?
21      A.   Off of the internet.
22      This actually, probably, came -- it's
23  got the Whitlow letter attached to the back
24  of it.  It probably is an ARSA document.
25      Q.   Do you know who wrote this document?

1          THE WITNESS:  Uh, --

2          THE COURT:  Sustained.

3  BY MR. ROBISON:

4  Q   Was it common knowledge within TAE that Superior's drawings

5  had to be kept confidential?

6  A   Yes.

7  Q   And was it common knowledge within TAE that Superior's

8  drawings could only be used for the benefit of Superior?

9          MR. SIMON:  Your Honor, I object again.  I haven't

10 asserted a leading objection until now, but I'm going to assert

11 the objection now.  The question is leading.

12         THE COURT:  Sustained.

13 BY MR. ROBISON:

14 Q   What was the expectation within TAE regarding the

15 confidentiality of Superior's drawings?

16 A   Well, that these drawings are only used for manufacturing

17 the parts which were ordered by Superior.

18         MR. ROBISON:  Your Honor, no further questions for

19 this witness at this time.

20         THE COURT:  All right.  Cross-examination?

21         MR. SIMON:  Thank you, Your Honor.

22                    CROSS-EXAMINATION

23 BY MR. SIMON:

24 Q   Good afternoon, Mr. Wolffson.  It's true, isn't it, that

25 TAE had engineers who worked on matters related to Superior Air

Wolffson - Direct                    97

1  A    Yes.

2  Q    Did TAE make diesel aircraft engines?

3  A    Yes.

4  Q    Did TAE make aviation gasoline or avgas aircraft engines?

5  A    No.

6  Q    Does Superior make avgas engines?

7  A    Yes.

8  Q    Are you aware that TAE manufactured parts for Superior's

9  avgas engines as a supplier?

10  A    Yes, I am.

11  Q    And are you aware of a supplier agreement between Superior

12  and TAE?

13  A    Yes.

14  Q    And did you become aware of that agreement in your role as

15  head of sales and service --

16  A    Yes.

17  Q    -- for TAE?

18  A    Yes.

19  Q    Did Superior supply drawings to TAE pursuant to the

20  supplier agreement?

21  A    Yes.

22  Q    Was it your understanding that TAE could use Superior's

23  drawings only for the benefit of Superior?

24  A    Yes.

25  Q    Could TAE make copies of Superior's drawings and sell them

Wolffson - Direct                    98

1   to third parties?

2           MR. SIMON:  Your Honor, I think we are straying into

3   the land of legal opinions, and this gentleman is a German

4   lawyer, not a United States lawyer.  The supplier agreement is

5   governed by our law, not theirs.  I think we're straying beyond

6   the boundaries of what's an appropriate response.  The question

7   is really inappropriate.

8           THE COURT:  Response?

9           MR. ROBISON:  Your Honor, he worked for the company at

10  the time.  I think his understanding of what the terms of the

11  contract meant is relevant and admissible.

12          THE COURT:  I'll allow it, at least at this point.

13  BY MR. ROBISON:

14  Q   Mr. Wolffson, did you understand that Superior -- that TAE

15  could make copies of Superior's drawings and sell them to third

16  parties?

17  A   No, they couldn't.

18  Q   Were you also an employee of Centurion Aircraft Engines AG

19  & Co. KG?

20  A   Yes.

21  Q   Can we call that Centurion?

22  A   Yes.

23  Q   Were you on the board of directors of Centurion?

24  A   Yes.

25  Q   Was Ms. Botica also on the board of directors of Centurion?

SAP APPX_065