

U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

**ENTERED**

TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed August 20, 2014**

**United States Bankruptcy Judge**

_____

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | CASE NO. 08-36705-bjh11 |
| SUPERIOR AIR PARTS, INC., | § | |
| | § | |
| Debtor. | § | |
| | § | |

_____

### MEMORANDUM OPINION AND ORDER DENYING MOTION TO ENFORCE FOR LACK OF SUBJECT MATTER JURISDICTION

Before the Court is the *Motion to Enforce* [Dkt. No. 684] (the "Motion") filed by Superior Air Parts, Inc. ("Superior"). By the Motion, Superior claims to seek to enforce the terms of the *Third Amended Plan of Reorganization of Superior Air Parts, Inc. and the Official Committee of Unsecured Creditors* [Dkt. No. 322] (the "Plan"). The Court heard the Motion on July 22-23, 2014 and August 11, 2014.[1] This Memorandum Opinion and Order contains the Court's findings of fact and conclusions of law with respect to the Motion.

_____

[1] The parties substantially underestimated the amount of time necessary to hear the Motion. Due to scheduling conflicts with witnesses and counsel, the hearing was continued to August 11. Given the delay in concluding the hearing, the Court requested that further briefing from the parties be filed on issues not addressed in

I.  **FACTUAL AND PROCEDURAL BACKGROUND**

Superior filed its voluntary petition under Chapter 11 of the Bankruptcy Code in this Court on December 31, 2008, commencing the above referenced bankruptcy case (the "Case"). After some usual and unusual twists and turns in a Chapter 11 case, Superior and the Official Committee of Unsecured Creditors filed the Plan on July 23, 2009. The Plan generally provided for the resumption and continuation of Superior's business (as described briefly below), but the prepetition equity interests[2] in Superior were cancelled and ownership of Superior was transferred to the Brantley Group (or its designee), who paid a cash contribution of $7 million (subject to adjustment) for all of the equity interests in Superior, as reorganized pursuant to the Plan. Certain prepetition creditors were to be repaid by Superior, as reorganized pursuant to the Plan, while other prepetition creditors were to be paid by the Trustee of a Creditor's Trust to be created pursuant to the Plan.

On August 27, 2009, this Court confirmed the Plan. *Order Confirming Third Amended Plan of Reorganization* [Dkt. No. 404] (the "Confirmation Order"). Thereafter, the Plan went effective on September 28, 2009. *Notice of Effective Date* [Dkt. No. 432]. On August 20, 2010, Marla Reynolds, as Trustee of the Superior Creditor's Trust (the "Plan Trustee"), filed her *Application for Final Decree Pursuant to Section 350 of the United States Bankruptcy Code* [Dkt. No. 650] (the "Application for Final Decree"). In the Application for Final Decree, the Plan

---

the pre-hearing briefs on an agreed schedule prior to the resumption of the hearing on August 11. Those further briefs were timely filed and the Court has carefully reviewed them.

[2] At the time the Case was filed, Thielert, AG, a German company ("TAG") owned 100% of the equity interests, having acquired them in 2006. In April 2008, TAG and another wholly owned subsidiary of TAG, Thielert Aircraft Engines GmbH ("TAE"), were placed into insolvency proceedings in Germany. Dr. Kübler was appointed as the insolvency administrator over TAE. A separate insolvency administrator was appointed over TAG. Like a bankruptcy trustee under the Bankruptcy Code, Dr. Kübler, as insolvency administrator for TAE, owes fiduciary duties to TAE's creditors under the German Insolvency Code, and TAE can only act through its insolvency administrator.

Trustee represented to the Court that she had fully performed her obligations under the Plan and had made a final distribution to creditors. Application for Final Decree at 3. The Case was closed on October 8, 2010.

On March 15, 2012, Superior moved to reopen the Case in response to a lawsuit (the "Lawsuit") filed against it in the 236th Judicial District Court of Texas by Lycoming Engines, a division of Avco Corporation ("Lycoming"), and Textron Innovations, Inc. (collectively, the "Plaintiffs"). *Motion to Reopen Case* [Dkt. No. 662] ("Motion to Reopen") at 4. In the Lawsuit, the Plaintiffs sought to prevent Superior from manufacturing, distributing, or selling parts that incorporated the Plaintiffs' proprietary information. *Id.* at 4-5. Superior filed its *Notice of Removal* [AP Dkt.[3] No. 1] on March 14, 2012, commencing an adversary proceeding in this Court (the "AP"). Superior argued that this Court should grant the Motion to Reopen because determination of the Lawsuit turned, *inter alia*, on whether the Plaintiffs' claims were barred by the Plan and whether the Plaintiffs' claims violated the Confirmation Order. In the Motion to Reopen, Superior asked that this Court reopen the Case so the Court could "hear and determine the relief requested in the adversary proceeding, enter orders necessary to interpret and implement the Third Amended Plan and Confirmation Order, correct any defects or omissions therein, and carry out the purpose and intent of the Third Amended Plan and Confirmation Order." Motion to Reopen ¶ 25. This Court entered an order granting the Motion to Reopen on May 23, 2012. [Dkt. No. 670].

As for the AP, Superior moved to dismiss it, arguing that: (i) the Plaintiffs claims were barred by the Plan, the Confirmation Order, and the Bankruptcy Code; (ii) the Plaintiffs failed to adequately plead their breach of fiduciary duty claim; (iii) the Plaintiffs failed to adequately plead

---

[3] "AP Dkt." refers to the docket in adversary proceeding number 12-3035, styled *Lycoming Engines v. Superior Air Parts, Inc.*

their misappropriation of trade secrets claim; and (iv) the Plaintiffs failed to adequately plead their fraudulent concealment claims. *Defendant's Motion to Dismiss* [AP Dkt. No. 7]. On December 14, 2012, this Court entered its *Final Judgment* [AP Dkt. No. 72], dismissing all of the Plaintiffs' claims. On appeal, the District Court affirmed and dismissed the Plaintiffs' appeal. [AP Dkt. No. 90]. The Plaintiffs then appealed to the Fifth Circuit, but the Fifth Circuit dismissed the appeal on July 11, 2014 pursuant to the Plaintiffs' motion. [AP Dkt. No. 93]. This Court kept the Case open during the pendency of the appeal.

More than a year after the Case was reopened (and while the appeal in the AP was pending), Superior filed its *Motion to Show Cause* [Dkt. No. 673], pursuant to which it sought an order to show cause why, as relevant here, TAE[4] should not be held in contempt for failing to comply with the terms of the Plan. The Motion to Show Cause was subsequently denied on November 14, 2013 for want of prosecution. [Dkt. No. 682]. The next day, Superior filed the Motion. In the Motion, Superior explained why the Motion to Show Cause had not been prosecuted—*i.e.*, that it had entered into a tolling agreement with Dr. Kübler, the German insolvency administrator of TAE, which provided that Superior would not ask this Court to hear the Motion to Show Cause before October 15, 2013. Motion ¶ 26. According to Superior, the purpose of the tolling agreement was to give the parties an opportunity to settle their dispute. *Id.* However, Superior stated that during the tolling period, no settlement discussion occurred and, at the conclusion of such period, Superior again made a demand on Dr. Kübler for the return of certain property. *Id.* ¶¶ 26-27. But the Court, unaware of the parties' tolling agreement, dismissed the Motion to Show Cause for want of prosecution, precipitating the filing of the Motion.

---

[4] As noted previously, TAE was an affiliate of Superior at the time the Case was filed, as TAG owned 100% of the stock of both Superior and TAE.

To put the current dispute into context, some information about Superior's business will be helpful. Prior to its bankruptcy filing, Superior was a manufacturer of replacement parts for various reciprocating aircraft engines, including engines originally manufactured by Lycoming and Teledyne Technologies a/k/a Teledyne Continental Motors ("TMC"). Superior also manufactured its own aviation gas powered reciprocating aircraft engines known as Vantage Engines and XP-Series Engines. Superior was one of the largest competitors of Lycoming and TMC for the sale of replacement parts for reciprocating aircraft engines.

The Federal Aviation Administration ("FAA") had issued Parts Manufacturer Approval ("PMA") certificates to Superior authorizing Superior to manufacture such replacement aircraft parts. Each PMA was issued by the FAA after a review of an application and supporting data, typically including specifications, designs, test results, drawings, and other technical data for each proposed part. Superior's assets included the intellectual property underlying the PMAs.

As part of its parts business, Superior contracted with various suppliers to manufacture or fabricate its replacement parts to its specifications. One of those suppliers was TAE.[5] The prepetition contract underlying the relationship between Superior and TAE, *Supplier Agreement between Thielert Aircraft Engines GmbH and Superior Air Parts, Inc. dated December 15, 2001 and Amendments Thereto* ("Supplier Agreement"), was admitted into evidence as Exhibit 18 at the hearing on the Motion. Pursuant to the Supplier Agreement, TAE agreed to manufacture certain parts to Superior's specifications, and Superior agreed to purchase those parts. Supplier Agreement § 1.01. According to Superior, two provisions of the Supplier Agreement are relevant to the current dispute:

---

[5] When the Supplier Agreement was entered into in 2001, Superior and TAE were not affiliates. They became affiliates—*i.e.*, sister subsidiaries of TAG—when TAG acquired Superior in 2006.

> 3.02. <u>Title</u>.  Superior shall retain title to all Superior furnished drawings, related data (whether or not maintained or stored on computer) and information supplied to TAE under this Agreement.  TAE will maintain the confidentiality of all drawings, data and information supplied by Superior and will return such drawings, data and information to Superior upon the termination of this Agreement.
>
> 3.03. <u>Proprietary Rights Data</u>.    Superior's drawings, related data and information shall be used by TAE only for the performance of its obligations under this Agreement, unless otherwise provided in this Agreement or expressly approved by Superior in writing.

Supplier Agreement §§ 3.02, .03

The Plan addressed the Supplier Agreement.  Pursuant to § 7.4 of the Plan, "[a]ll Executory Contracts and Unexpired Leases that have not been specifically assumed by the Debtor under the Plan shall be rejected as of the Effective Date."  Superior did not move to assume the Supplier Agreement, so pursuant to the Plan, Superior rejected[6] the Supplier Agreement.

After the Plan was confirmed and consummated, Superior, now operating under the direction of its new owner, made the decision to resume its business relationship with TAE.  Specifically, TAE apparently agreed to resume the manufacture/fabrication of aircraft parts to Superior's specifications and Superior apparently agreed to resume purchasing such parts from TAE.  Motion ¶ 23.  However, according to Superior, it "ceased purchasing parts from [TAE] for pricing reasons and received the last shipment of parts on or about Spring, 2013," Motion ¶ 24, approximately three and a half years after the Plan went effective and the new owner assumed

---

[6] Rejection of an executory contract under § 365(g) of the Bankruptcy Code does not terminate that contract. *Eastover Bank for Sav. v. Sowashee Venture (In re Austin Dev. Co.)*, 19 F.3d 1077, 1082 (5th Cir. 1994).  Rather, a debtor's rejection of an executory contract constitutes a breach of that contract by the debtor immediately before the date of the filing of its bankruptcy case.  11 U.S.C. § 365(g)(1); *see also Austin* at 1082; *Meredith Corp. v. Home Interiors & Gifts, Inc. (In re Home Interiors & Gifts, Inc.)*, No. 08-3125, 2008 WL 4772102, at *8 (Bankr. N.D. Tex. Oct. 9, 2008).  Thus, as relevant here, upon Superior's rejection of the Supplier Agreement, TAE had the right to file a prepetition unsecured claim against Superior for any damages flowing from Superior's breach of the Supplier Agreement.  Moreover, TAE had the right to terminate the Supplier Agreement in accordance with Section IX of the Supplier Agreement.  On this record it is unclear if TAE terminated the Supplier Agreement or whether it elected not to terminate the Supplier Agreement based upon Superior's breach of that agreement.

control over Superior. Again, according to Superior, on April 24, 2013, it requested that TAE return to Superior all of its property as set forth in the Plan and Confirmation Order. *Id*. In the Motion, Superior claims that TAE has failed to return Superior's property as required by the Plan and Confirmation Order.

TAE, through Dr. Kübler, filed its *Preliminary Response of Insolvency Administrator to Motion to Enforce* [Dkt. No. 688] (the "Response") on December 9, 2013. In the Response, Dr. Kübler noted:

> During the nearly four years after the [Confirmation Order] was entered, TAE and Superior continued to do business together without any assertion by Superior that TAE was in violation of, or obligated to return property to Superior pursuant to, the Confirmation Order. Notwithstanding Superior's recognition that those dealings continued for years after the entry of the Confirmation Order, and that during that time Superior did not ask for or desire for TAE to return any information to it, Superior now alleges that TAE is obligated to return property pursuant to the [Confirmation Order].

Response ¶ 2. Dr. Kübler further stated that "[t]he issue between the Insolvency Administrator and Superior is not an issue of failing to comply with a 2009 order; instead, it is an issue of determining what, if any, property Superior owns that is in TAE's possession. The Insolvency Administrator will return to Superior any property in his control that Superior owns." Response ¶ 3. However, according to Dr. Kübler, as the Insolvency Administrator for TAE, he did not have sufficient information to determine what property was Superior's (that should be returned to Superior) and what property was TAE's (that he had a fiduciary duty to administer for the benefit of TAE's creditors). According to Dr. Kübler, Superior requested the return of its property shortly before he was to close on the sale of substantially all of TAE's assets; but, because Superior had requested a return of its property, he "directed that any property Superior could conceivably own be segregated and carved out from the asset sale." *Id.* Finally, Dr. Kübler stated that he has

safeguarded this segregated property and will not transfer or dispose of it until the Motion is decided. *Id.*

Given the difficulties in determining what property Superior was demanding that TAE return, among other difficulties, the parties asked for, and received, numerous agreed continuances of the hearing on the Motion to see if they could consensually resolve this dispute. However, those efforts failed and the Motion is now ripe for this Court's determination, assuming it has jurisdiction to decide the Motion, to which we now turn.

## II. POST CONFIRMATION JURISDICTION

This Court has an "independent obligation to determine whether subject-matter jurisdiction exists." *Hertz Corp. v. Friend*, 559 U.S. 77, 94 (2010). Accordingly, after the evidence had closed and before closing arguments, this Court raised the issue of its subject matter jurisdiction and asked the parties to address that issue in their closing arguments. Both parties argued that this Court has subject matter jurisdiction. Superior argued that, consistent with the Supreme Court's decision in *Travelers Indemnity Co. v. Bailey*, 557 U.S. 137, 151 (2009), this Court "plainly had jurisdiction to interpret and enforce its own prior orders." In a letter brief filed on August 12, 2014, *Letter Regarding Subject Matter Jurisdiction* [Dkt. No. 744], Dr. Kübler argued that there is subject matter jurisdiction because "Superior's Motion effectively asks the Court to issue a ruling related to the execution of the Plan through enforcement of the Confirmation Order." *Id.* at 2.

However, for the reasons explained below, this Court concludes that it does not have subject matter jurisdiction because this dispute goes well beyond enforcing the Plan and Confirmation Order. Under 28 U.S.C. § 1334, a federal district court has original jurisdiction over "all civil proceedings arising under title 11, or arising in or related to cases under title 11." The district court is authorized under 28 U.S.C. § 157 to refer to the bankruptcy court "any or all

proceedings arising under title 11 or arising in or related to a case under title 11." By virtue of the Order of Reference of Bankruptcy Cases and Proceedings Nunc Pro Tunc adopted in this district on August 3, 1984, this Court has jurisdiction over any or all proceedings arising under title 11 or arising in or related to a case under title 11.

From this Court's perspective, the evolution of the relief sought by Superior here is relevant to analyzing whether this Court has subject matter jurisdiction over the Motion. After filing the Motion, and in an effort to narrow the issues in dispute between the parties, Superior sent its Executive Vice President, Keith Chatten ("Chatten"), to Germany to review the property that Dr. Kübler had segregated from the TAE asset sale in order to determine what property Superior believed it owned. During that review, Chatten found a number of documents and technical drawings that contained a legend clearly identifying them as Superior drawings. Dr. Kübler has agreed that (i) these documents belong to Superior, and (ii) he will return them to Superior.

However, during this document review in Germany, Chatten also found TAE-labeled drawings and three-dimensional models that TAE had created, which Superior alleges contain its data and other information that came from the Superior drawings (the "TAE-Created Materials"). Superior now demands that the TAE-Created Materials be returned to it—allegedly pursuant to the terms of the Plan and Confirmation Order. Specifically, Superior seeks the return of the TAE-Created Materials pursuant to § 6.12 of the Plan, which provides:

> The Confirmation Order will include a requirement that all persons, including but not limited to Corporate Finance Partners, TAG, TAE, Engine Components, Inc., Avco Corporation and Teledyne Technologies Incorporated, and their respective parents, sister and subsidiary companies, and all other companies or persons in their control, and each of them, shall be directed to return to the Reorganized Debtor all documents and other information owned by the Debtor related to the Debtor's business and operations (the "Proprietary Information"). For the avoidance of doubt, the Reorganized Debtor retains all of the Debtor's rights pursuant to any confidentiality agreement executed in connection with the exchange of such information

In its reply brief (filed before the issue of subject matter jurisdiction was raised by the Court), Dr. Kübler argued that Superior is essentially seeking injunctive relief (as the issues have evolved since the filing of the Motion) when it asks this Court to preclude Dr. Kübler from selling the TAE-Created Material to anyone, including any competitor of Superior. *Reply Brief of Insolvency Administrator Relating to Motion to Enforce Confirmation Order Pursuant to Court's July 23, 2014 Ruling Regarding Briefing* [Dkt. No. 740] (the "Reply Brief") at 5. Dr. Kübler makes a good point as further explained below.

Based on Superior's post-hearing brief, it has become apparent to the Court that Superior is seeking relief beyond that which the Motion purported to address—*i.e.*, simply enforcing the Plan and Confirmation Order. *Superior Air Parts, Inc.'s Supplemental Brief* [Dkt. No. 738] ("Superior Brief"). For example, Superior argues that because it owns the information underlying the TAE-Created Materials, Dr. Kübler cannot sell the TAE-Created Materials to a third party. *Id.* at 7. Further, the Superior Brief states:

> If Dr. Kübler wants to remove or redact any TAE manufacturing processes or know-how from the TAE-labeled drawings and CAD models of Superior's parts prior to returning Superior's information,[7] he may do so. Dr. Kübler should **not**, however, be permitted to retain Superior's information (whether in the form of the original Superior drawings, TAE-labeled drawings, or CAD models) and monetize Superior's information by sale to one of Superior's competitors in breach of TAE's confidential relationship with Superior.

*Id.* at 9.

---

[7] During closing argument, counsel for Superior was unable to answer the question of how it was that TAE was to return Superior's information and data imbedded into the TAE-Created Materials pursuant to the Plan and Confirmation Order. While the evidence is clear that data and information from Superior's drawings, which drawings Dr. Kubler has agreed to return to Superior, is now imbedded in the TAE-Created Materials, Superior could not explain how that imbedded information could be removed from the TAE-Created Materials and returned to Superior. This presents a bit of a metaphysical dilemma for the Court, which it need not decide for the reasons explained in this Memorandum Opinion and Order.

And, as the relief sought by Superior evolved, so did the Court's thinking on its subject matter jurisdiction over this dispute. In short, in addition to seeking a return of its property, Superior is seeking what amounts to an injunction against TAE, preventing TAE from using or selling what Superior alleges to be its proprietary information—whether contained in a Superior drawing or in the TAE-Created Materials—which is also procedurally improper because it was brought by a motion (commencing a contested matter under Federal Rule of Bankruptcy Procedure 9014), instead of through an adversary proceeding as required by Federal Rule of Bankruptcy Procedure 7001(7). But, the procedural deficiency here pales by comparison to the subject matter jurisdictional deficiency, to which we now return.

As noted previously, this Court only has subject matter jurisdiction over this dispute if it arises under title 11, arises in a case under title 11, or is related to a case under title 11. 28 U.S.C. § 1334. But, as will be discussed below, this Court's jurisdiction is further narrowed because this is a post-confirmation dispute. The Court will examine each of these bases for jurisdiction in turn.

"Arising under" jurisdiction encompasses those causes of action that are "created or determined by a statutory provision of title 11." *Wood v. Wood (In re Wood)*, 825 F.2d 90, 96 (5th Cir. 1987). Courts have specifically addressed arising under jurisdiction in the post-confirmation context. In *Insurance Co. of North America v. NGC Settlement Trust & Asbestos Claims Management Corp. (In re National Gypsum Co.)*, 118 F.3d 1056, 1061 (5th Cir. 1997), one of the issues before the Fifth Circuit was whether a bankruptcy court had subject matter jurisdiction over an action brought by the successor to the debtor seeking a declaration that a creditor's collection actions violated the discharge injunction in the debtor's plan. The court concluded that "a declaratory judgment action seeking merely a declaration that collection of an asserted preconfirmation liability is barred by a bankruptcy court's confirmation of a debtor's

reorganization plan (and the attendant discharge injunctions under section 524 and 1141 of the Bankruptcy Code) is a core proceeding arising under title 11." *Id.* at 1064. Another Fifth Circuit case, *Mackey v. M.C. Investments (In re Martinez)*, No. 00-40412, 2000 WL 34508398, at *1 (5th Cir. Oct. 5, 2000), held that the bankruptcy court had subject matter jurisdiction over a lawsuit filed against a creditor for allegedly breaching notice provisions in the Chapter 11 plan. There, the Fifth Circuit concluded there was jurisdiction because "[w]hether the plan required such notice requires interpretation of the plan, which is a matter 'arising under title 11.'" *Id.*

The Ninth Circuit addressed post-confirmation arising under jurisdiction in *Battle Ground Plaza, LLC v. Ray (In re Ray)*, 624 F.3d 1124 (9th Cir. 2010). In that case, the bankruptcy court reopened a debtor's case to determine a dispute between the debtor and a party claiming to hold a right of first refusal on a piece of real estate that the debtor had sold. *Id.* at 1129. The debtor's plan referenced the debtor's intention to sell the property at issue, as well as the right of first refusal. *Id.* at 1128. The Ninth Circuit stated that arising under jurisdiction covers actions where the Bankruptcy Code created the cause of action or determines the cause of action. *Id.* at 1131. In the case before it, the Ninth Circuit concluded that the bankruptcy court did not have arising under jurisdiction because the party claiming to hold the right of first refusal had a state law contract claim that was independent of the bankruptcy case. *Id.*

Applying these cases here, this Court concludes that it is does not have arising under jurisdiction. While the facts in *National Gypsum* appear similar—*i.e.*, a pre-petition relationship and a plan provision affects that relationship post-confirmation—*National Gypsum* involved the discharge injunction, which is a substantive right created under the Bankruptcy Code. Here, the Plan provision that affected the relationship between Superior and TAE did not involve any substantive right created under the Bankruptcy Code. Moreover, the Plan provision upon which

Superior purports to rely for the return of its information is not even implicated here because Superior voluntarily resumed its business relationship with TAE after the Plan was confirmed and consummated. In fact, some forty-two (42) months after resuming its business relationship with TAE post-confirmation, Superior decided to terminate that relationship for "pricing" reasons. Motion ¶ 24. So, TAE's alleged obligation to return Superior's information and property did not arise from the Plan or Confirmation Order (as alleged in the Motion), but instead from the termination of a post-confirmation business relationship and whatever agreement—whether it be the rejected Supplier Agreement or some new post-confirmation agreement—that governed the parties' relationship post-confirmation. The facts here are more like those in *Battle Ground Plaza* because the dispute here is also independent of any provision of the Bankruptcy Code.

"Arising in" jurisdiction covers those actions "not based on a right expressly created by title 11, but [instead] based on claims that have no existence outside of bankruptcy." *Faulkner v. Eagle View Capital Mgmt. (In re Heritage Org., LLC)*, 454 B.R. 360 (Bankr. N.D. Tex. 2011) (citing *Wood*, 825 F.2d at 97). Various courts have addressed arising in jurisdiction post-confirmation, including the Third and Fourth Circuits. In *United States Trustee v. Gryphon at Stone Mansion, Inc.*, 166 F.3d 552, 553 (3d Cir. 1999), the issue before the Third Circuit was whether the bankruptcy court had post-confirmation jurisdiction to compel a debtor to pay U.S. Trustee fees. The court concluded that the bankruptcy court did have jurisdiction because the matter arose in bankruptcy, as the requirement to pay U.S. Trustee fees applies only in bankruptcy cases. *Id.* at 556.

In *Valley Historic Limited Partnership v. Bank of New York*, 486 F.3d 831, 835 (4th Cir. 2007), the Fourth Circuit held that the bankruptcy court did not have subject matter jurisdiction over a post-confirmation dispute between the debtor and one of its creditors. In that case, the

debtor brought an adversary proceeding after its plan was confirmed, alleging breach of a loan agreement and a tortious interference claim. *Id.* at 834. The debtor argued that there was arising in jurisdiction because "the breach of contract caused its bankruptcy and the tortious interference complicated the administration of the bankruptcy case." *Id.* at 835-36. However, the Fourth Circuit rejected this argument, concluding that "the Debtor's breach of contract claim and tortious interference claim would have existence outside of the bankruptcy, [so] they were not within the bankruptcy court's 'arising in' jurisdiction." *Id.* at 836.

Applying the *Gryphon* and *Valley Historic* cases here, there is no "arising in" jurisdiction. Unlike the claim for U.S. Trustee fees in *Gryphon*, which would not be owed but for the bankruptcy, TAE's alleged obligation to use Superior's property only for Superior's benefit and to return the property at the conclusion of the manufacturing relationship would have arisen regardless of Superior's bankruptcy filing. Further, the Court finds the conclusion in *Valley Historic* instructive. While the claim there arose prepetition and the claim here arose post-confirmation, the similarity is that both claims did not arise during or in relation to the bankruptcy case. Just as the debtor in *Valley Historic* would have had that claim even if there was no bankruptcy filing, Superior would have claims against TAE for the return of its property regardless of its bankruptcy filing.

So, the only jurisdictional "hook" to bring this dispute properly before this Court would be under "related to" jurisdiction. A court has "related to" jurisdiction "if the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy." *Randall & Blake, Inc. v. Evans (In re Canion)*, 196 F.3d 579, 585 (5th Cir. 1999) (internal quotation marks omitted). In the post-confirmation context, however, a court's related to jurisdiction is significantly less than it is in the pre-confirmation context because there is no longer

a bankruptcy estate to administer. For example, in *Bank of Louisiana v. Craig's Stores of Texas, Inc. (In re Craig's Stores)*, 266 F.3d 388, 391 (5th Cir. 2001), the Fifth Circuit held that a bankruptcy court did not have jurisdiction over a post-confirmation business dispute, even though the dispute involved a contract that was assumed as part of a bankruptcy plan. In that case, the debtor had a contractual relationship with a bank for the debtor's credit card processing. *Id.* at 389. That relationship predated the bankruptcy filing, and continued after the debtor's plan was confirmed. *Id.* Eighteen months after the debtor's plan was confirmed, it sued the bank in bankruptcy court alleging a state-law based contract claim. *Id.* at 389-90. While the debtor attempted to argue that the bankruptcy court had subject matter jurisdiction for a variety of reasons, including that the contract between the parties existed prepetition and was assumed during the bankruptcy case, the Fifth Circuit rejected the debtor's arguments. *Id.* at 390. The Fifth Circuit stated that "[a]fter a debtor's reorganization plan has been confirmed, the debtor's estate, and thus bankruptcy jurisdiction, ceases to exist, other than for matters pertaining to the implementation or execution of the plan." *Id.* So, in *Craig's Stores*, the bankruptcy court did not have jurisdiction because the state law contract claims arose out of a post-confirmation business relationship between the parties and "no facts or law deriving from the reorganization or the plan was necessary to the claim asserted" by the debtor. *Id.* at 391.

The Fifth Circuit again looked at post-confirmation related to jurisdiction in *Newby v. Enron Corp. (In re Enron Corp. Securities)*, 535 F.3d 325 (5th Cir. 2008). In that case, one of the issues before the Fifth Circuit was whether a district court is divested of related to jurisdiction over pre-confirmation claims after the plan is confirmed. *Id.* at 334-35. In its analysis, the Fifth Circuit revisited the *Craig's Store* decision, and stated that there were three factors present there which led to the decision that the bankruptcy court lacked subject matter jurisdiction:

> [F]irst, the claims at issue "principally dealt with post-confirmation relations between the parties;" second, "[t]here was no antagonism or claim pending between the parties as of the date of the reorganization;" and third, "no facts or law deriving from the reorganization or the plan [were] necessary to the claim." *Craig's Stores*, 266 F.3d at 391. Notwithstanding its statement that bankruptcy jurisdiction exists after plan confirmation only "for matters pertaining to the implementation or execution of the plan," the facts in *Craig's Stores* were narrow; they involved post-confirmation claims based on post-confirmation activities.

*Id.* at 335 (quoting *Craig's Stores*, 266 F.3d at 389-91) (second and third alteration in original). The court ultimately concluded that *Craig's Stores* dealt with a different type of claim—*i.e.*, post-confirmation claims, so it was not dispositive of the issue presently before the court. *Id.* at 336. Accordingly, the court held that the district court retained jurisdiction despite plan confirmation. *Id.*

The Third Circuit has also examined the issue of post-confirmation related to jurisdiction. In *Resorts International Financing, Inc. v. Price Waterhouse & Co. (In re Resorts International, Inc.)*, 372 F.3d 154, 168-69 (3d Cir. 2004), the Third Circuit articulated the following test for post-confirmation related to jurisdiction:

> [T]he jurisdiction of the non-Article III bankruptcy courts is limited after confirmation of a plan. But where there is a close nexus to the bankruptcy plan or proceeding, as when a matter affects the interpretation, implementation, consummation, execution, or administration of a confirmed plan or incorporated litigation trust agreement, retention of post-confirmation bankruptcy court jurisdiction is normally appropriate.

Other courts, including the Fourth and Ninth Circuits, have adopted the Third Circuit's "close nexus" test. In *Valley Historic*, 486 F.3d at 836, the Fourth Circuit chose to adopt the "close nexus" test because "it insures that the proceeding serves a bankruptcy administration purpose on the date the bankruptcy court exercises that jurisdiction." Applying that test to the facts before it, the Fourth Circuit concluded there was not a close nexus in a post-confirmation adversary filed by the debtor against its lender for breach of contract based on pre-confirmation activities. *Id.*

In *Montana v. Goldin (In re Pegasus Gold Corp.)*, 394 F.3d 1189, 1194 (9th Cir. 2005), the Ninth Circuit adopted the close nexus test because it "recognizes the limited nature of post-confirmation jurisdiction but retains a certain flexibility." Applying that test, the Ninth Circuit concluded that the bankruptcy court had post-confirmation jurisdiction over claims that "could affect the implementation and the execution of the Plan itself." *Id.*

Superior has certainly tried to craft the Motion in a way that suggests that post-confirmation, related to jurisdiction exists—*i.e.*, as a motion to enforce a specific provision of the Plan and Confirmation Order. However, upon a closer examination of the facts (as discussed above), it is apparent to this Court that Superior is attempting to litigate a post-confirmation business dispute with TAE in a bankruptcy court that no longer has jurisdiction to hear that dispute. If Superior truly sought the return of its property pursuant to the Plan and Confirmation Order, the Motion could and should have been brought many months, if not years, earlier than it was—*i.e.*, within a reasonable time after the Plan became effective.[8] Instead, Superior voluntarily resumed its business relationship with TAE post-confirmation and now asks for the return of its information and property not pursuant to the Plan and Confirmation Order, but because it voluntarily terminated its post-confirmation business relationship with TAE a few months before it filed the Motion and years after its Plan was confirmed, consummated and fully implemented.[9]

---

[8] By making this finding, this Court is not attempting to suggest that there is a specific time limit on the exercise of post-confirmation, related to jurisdiction. Rather, the finding is made to demonstrate that this dispute is not over a return of property pursuant to the Plan and Confirmation Order, but is rather a dispute over the return of property following the termination of a post-confirmation business relationship voluntarily resumed by a reorganized debtor. Ironically, if TAE had complied with the Plan and Confirmation Order, and had returned Superior's property to it, it seems likely that Superior would have given its drawings, information and data back to TAE so that TAE could resume manufacturing parts for Superior post-confirmation, further demonstrating that this dispute stems from the terminated post-confirmation relationship, not the prepetition relationship, between the parties.

[9] Superior's reliance on *Travelers Indemnity Co. v. Bailey*, 557 U.S. 137 (2009) during closing argument is misplaced for similar reasons. In that case, Travelers sought to enjoin various actions against it arising out of its relationship with Johns-Manville Corporation ("Manville"). *Id.* at 141-42. Manville was a company that produced asbestos and products that contained asbestos. *Id.* at 140. Manville filed for bankruptcy in 1982 as a result of its potential liability for asbestos-related claims. *Id.* Travelers was one of Manville's insurers. *Id.* The bankruptcy court

This Court notes the important factual similarities between this dispute and *Craig's Stores*. First, both involved post-confirmation disputes based on obligations that did not arise from the plan. In *Craig's Stores*, the allegedly breached obligations arose from the assumed contract between the debtor and its bank, and here the obligation to return material to Superior arises from whatever agreement governs the post-confirmation relationship between Superior and TAE. Because the Plan is irrelevant to that determination, this dispute, like the dispute in *Craig's Stores*, cannot be heard by a bankruptcy court because the bankruptcy court lacks jurisdiction over a post-confirmation dispute that goes beyond simply enforcing or implementing a confirmed plan.

Applying the factors from *Enron* also demonstrates that there is no subject matter jurisdiction to hear this dispute. As for the first factor, whether the claim deals with post-confirmation relations, the dispute here clearly deals with the post-confirmation relationship between Superior and TAE. As for the second factor, whether there was a claim pending as of the date of reorganization, Superior did not demand a return of its alleged property until late April 2013, some forty-two (42) months after confirmation. Clearly, this claim was not pending at the time of the reorganization proceeding. As for the third factor, this dispute does not involve implementation or execution of the Plan, but instead involves whatever agreement governed the parties' business relationship post-confirmation.

---

issued an order in the Manville case that provided that "all persons are permanently restrained and enjoined from commencing and/or continuing any suit, arbitration or other proceeding of any type or nature for Policy Claims against any or all members of the Settling Insurer Group," which included Travelers. *Id.* at 141-42. Despite that language, Travelers was sued on various theories, including consumer protection statutes for colluding with asbestos manufacturers and failing to warn of the dangers of asbestos. *Id.* at 143. Accordingly, Travelers sought to enforce the bankruptcy court's order to enjoin the suits against it arising out of its relationship with Manville. *Id.* at 144. The bankruptcy court issued a clarifying order, which provided that its previous order enjoining suits against the insurers included the suits currently pending against Travelers. *Id.* at 145. The Supreme Court concluded that the bankruptcy court had subject matter jurisdiction to determine this because it was simply interpreting and enforcing its own order. *Id.* at 151. Here, however, and as explained above, Superior is attempting to litigate a post-confirmation business dispute with TAE as opposed to having the Court enforce its own Confirmation Order or issue a clarifying order.

While the "close nexus" test is broader than the Fifth Circuit's standards in *Craig's Stores* and *Enron* for post-confirmation related to jurisdiction, even that test is not met based on these facts. Whether TAE has an obligation to return materials to Superior based on its post-confirmation dealings with Superior has nothing to do with the Plan. Unlike the facts in *Pegasus Gold*, this adversary will have no effect on the implementation and execution of the Plan, as all Superior creditors were paid pursuant to the Plan years ago. Put another way, there is no close nexus here because this post-confirmation business dispute is too far removed from confirmation.

### III. CONCLUSION

Simply because a debtor was once in bankruptcy does not mean that the bankruptcy court is an appropriate forum in which to litigate post-confirmation disputes between a reorganized debtor and its post-confirmation suppliers. For the reasons explained herein, this Court lacks subject matter jurisdiction over this dispute. Accordingly, the Motion shall be, and hereby is, denied without prejudice to: (i) Superior seeking whatever relief it believes appropriate against TAE in a court of competent jurisdiction, and (ii) TAE asserting whatever defenses and/or claims it believes appropriate against Superior.

Because this Court's decision in the AP (which prompted the reopening of the Case in the first place) is now final (given the Plaintiffs' voluntary dismissal of the appeal pending in the Fifth Circuit), there is no reason for the Case to remain open on this Court's docket. The Clerk of the Court is directed to reclose the Case as soon as practicable following the entry of this Memorandum Opinion and Order on the docket.

**SO ORDERED.**

**### END OF MEMORANDUM OPINION AND ORDER ###**