1              IN THE UNITED STATES BANKRUPTCY COURT
            FOR THE NORTHERN DISTRICT OF TEXAS
2                      DALLAS DIVISION

3

4   IN RE:                    )   BK. NO:  08-36705-BJH

5                             )

6   SUPERIOR AIR PARTS, INC. )

7         D E B T O R.       )

8

9

10              *   *   *   *   *   *   *   *   *

11              TRANSCRIPT OF PROCEEDINGS

12              *   *   *   *   *   *   *   *   *

13

14

15

16

17

18

19

20      BE IT REMEMBERED, that on the 11th day of August, 2014,

21   before the HONORABLE BARBARA J. HOUSER, United States

22   Bankruptcy Judge at Dallas, Texas, the above styled and

23   numbered cause came on for hearing, and the following

24   constitutes the transcript of such proceedings as hereinafter

25   set forth:

1                    A P P E A R A N C E S

2  PASSMAN & JONES
   1201 Elm Street,  Suite 2500
3  Dallas, Texas  75270
        BY:  Mr. Jerry Alexander
4            Mr. Christopher Robison

5                       APPEARING ON BEHALF OF SUPERIOR AIR PARTS

6  SIMON, RAY & WINIKKA
   2525 McKinnon Street, Suite 540
7  Dallas, Texas  75201
        BY:  Mr. Craig Simon
8            Mr. Daniel Winikka
             Mr. Paula Reichenstein

9

10                      APPEARING ON BEHALF OF THE INSOLVENCY
                        ADMINISTRATOR

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        I N D E X

2                                                          PAGE

3  Appearances                                              2
   Exhibit Index                                            3

4

5  CHARLES DEDMON
        DIRECT EXAMINATION
             BY:  Mr. Simon                                 7
6       CROSS-EXAMINATION
             BY:  Mr. Alexander                            25
7       REDIRECT EXAMINATION
             BY:  Mr. Simon                                32
8       RECROSS-EXAMINATION
             BY:  Mr. Alexander                            33

9
   ADRIAN RIENACKER
10      DIRECT EXAMINATION
             BY:  Mr. Simon                                35
11      CROSS-EXAMINATION
             BY:  Mr. Alexander                           101
12      REDIRECT EXAMINATION
             BY:  Mr. Simon                               142

13
   KEITH CHATTEN
14      DIRECT EXAMINATION
             BY:  Mr. Alexander                           149
15      CROSS-EXAMINATION
             BY:  Mr. Simon                               156
16      REDIRECT EXAMINATION
             BY:  Mr. Alexander                           159

17
   DOUGLAS MARWILL
18      DIRECT EXAMINATION
             BY:  Mr. Alexander                           160
19      CROSS-EXAMINATION
             BY:  Mr. Simon                               164

20

21

22

23

24

25

1                     E X H I B I T   I N D E X

2                                         PAGE FIRST REFERENCED

3    Superior Exhibit 56                          95

4    Superior Exhibit 57                          95

5    Superior Exhibit 62                          80

6    Superior Exhibit 63                         153

7    Superior Exhibit 64                         161

8    IA-14                                        28

9    IA-16.18                                     47

10   IA-16.19                                     50

11   IA-20                                        18

12   IA-21                                        72

13   IA-21.2                                     120

14   IA-24                                        96

15   IA-25                                        98

16   IA-26                                        99

17

18

19

20

21

22

23

24

25

1                    P R O C E E D I N G S

2            THE COURT:  We have continued hearings on a

3    motion to enforce filed by the reorganized debtor, Superior

4    Air Parts.

5        I'll take appearances of counsel, please.

6            MR. ROBISON:  Good morning, Your Honor.  Chris

7    Robison and Jerry Alexander for the reorganized debtor.

8            MR. SIMON:  Good morning, Your Honor.  Craig

9    Simon, Dan Winikka, and Paula Reichenstein for the Insolvency

10   Administrator.

11           THE COURT:  Very well.

12       All right.  Are we ready to resume?

13           MR. ROBISON:  Your Honor, may I raise one

14   housekeeping matter prior to Mr. Simon calling his first

15   witness?

16           THE COURT:  You may.

17           MR. ROBISON:  When Mr. Chatten was on the

18   stand, one of Superior's witnesses, I questioned him about

19   Superior Exhibit 57, which was a summary of the directories

20   on the TAE server where the, what we referred to as TAE

21   labeled drawings and CAD models are located that Superior was

22   seeking to be returned.  I neglected to just move that

23   document into evidence.  And I was wondering if I might move

24   that into evidence prior to Mr. Simon calling his witnesses.

25           THE COURT:  And, I'm sorry, that's Exhibit 56?

1                    MR. ROBISON:  57.

2                    THE COURT:  57.  Any objection?

3                    MR. SIMON:  Your Honor, no.  And I have a

4  similar issue to raise with the Court, as well.

5                    THE COURT:  All right.

6                    MR. SIMON:  We went through two organization

7  charts with one of our witnesses.  I believe the first one

8  was Exhibit 18 and the second one was Exhibit 19.  And so I

9  believe 18 was admitted, but 19 was not.  And we would ask

10  that Exhibit 19 be admitted.

11                    THE COURT:  Any objection?

12                    MR. ROBISON:  No objection, Your Honor.

13                    THE COURT:  Both of those are admitted.

14                    MR. SIMON:  Thank you, Your Honor.

15      And by the way, I believe the Court had requested

16  better copies of those and we do have those with us in the

17  courtroom.  So we will provide those to Your Honor.

18                    THE COURT:  Excellent.  Good.

19      All right.  Please.

20                    MR. SIMON:  Again, for the record, Craig

21  Simon, Your Honor.  The Insolvency Administrator calls

22  Charles Dedmon to the stand.

23                    THE COURT:  Mr. Dedmon, if you'd come forward,

24  please.

25      And you'll take the witness chair.  And, yes, that's

1  fine.  Thank you.  And before you sit down, if you'll raise

2  your right hand and we'll swear you in.

3            (The witness was sworn by the courtroom deputy.)

4                      <u>CHARLES DEDMON</u>

5   The witness, having been duly sworn to tell the truth,

6  testified on his oath as follows:

7                   <u>DIRECT EXAMINATION</u>

8  BY MR. SIMON:

9       Q.   Good morning, sir.

10      A.   Good morning, Mr. Simon.

11      Q.   Mr. Dedmon, would you please state your full name

12  for the record.

13      A.   Charles Dedmon.

14      Q.   And, Mr. Dedmon, what do you currently do for a

15  living?

16      A.   Currently I am basically a consultant for different

17  phases of the aviation industry.

18      Q.   And how long have you been a consultant in the

19  aviation industry?

20      A.   Approximately 15 years.

21      Q.   And before that, what did you do?

22      A.   Well, before I owned a company called Aircraft

23  Technology.  And that would be from 1990 to '98.  And prior

24  to that, I was an employee of Superior Air Parts from 1967,

25  '68, somewhere in there, until January of 1990.

1       Q.    Okay.  Now, I'm going to walk through some of your

2    experience at Superior Air Parts in a little bit more detail

3    in just a minute.

4       A.    May you speak just a little --

5       Q.    I'm sorry.

6       A.    Just a little bit.

7       Q.    And please tell me if you can't hear me.  I'm happy

8    to stop and speak up.

9       A.    Great.

10      Q.    Mr. Dedmon, so the Court is aware of some of the

11   history of the proceedings here.  You were listed on Superior

12   Air Parts' witness list to testify in connection with this

13   motion to enforce, correct?

14      A.    Yes.

15      Q.    And, in fact, you were designated as the corporate

16   representative pursuant to a deposition notice that the

17   Insolvency Administrator issued to Superior Air Parts to

18   testify as it's 30(b)(6) representative, correct?

19              MR. ALEXANDER:  Objection, Your Honor, that

20   mis-states the record.  He was designated as one of the

21   30(b)(6) representatives, not the 30(b)(6) representative.

22              MR. SIMON:  That's correct.

23              THE COURT:  Very well.

24              MR. SIMON:  That's correct.  I'm sorry if I

25   mis-spoke.

1       Q.    You were one of Superior's corporate

2  representatives pursuant to our deposition notice issued to

3  Superior Air Parts, correct?

4       A.    That's correct.

5       Q.    Okay.  So let's -- let's talk a little bit, sir,

6  about your history with Superior Air Parts.  It was -- in

7  fact, it was your father who founded the company years ago,

8  wasn't it, sir?

9       A.    That's correct.

10      Q.    And as you already testified, you worked at

11 Superior from 1967 or '68 through 1990, including a stint

12 during that period as Superior's president, correct?

13      A.    Of Superior's what?

14      Q.    President.

15      A.    Oh, as a --

16      Q.    You were the president of Superior?

17      A.    Yes.  That's correct.  Yep.

18      Q.    Sorry.

19      A.    That's all right.

20      Q.    I'm going to do my best here to --

21      A.    It's a personal problem.

22      Q.    I understand, sir.

23       So that's 22 or 23 years during that time period,

24 right?

25      A.    Yes.

1      Q.    And one of the things that you were responsible for

2   was dealing with the FAA on certification issues, correct?

3      A.    That's correct.

4      Q.    And then from 1998 through 2003, you also did some

5   work for Superior as a consultant, correct?

6      A.    Correct.

7      Q.    And that included during that time period also

8   doing work on certification of PMA parts, correct?

9      A.    Correct.

10      Q.    And then in -- so that's '98 through 2003.  And

11   then in 2003, you joined the company full-time as an

12   employee, again, as its president and chief executive

13   officer, correct?

14      A.    Yes.  But understand, from October 2003 to 2005, I

15   was being retained as a consultant, as opposed to an

16   employee.  But my job was president and CEO.

17      Q.    Okay.  You were full-time president and CEO, but

18   you were a consultant, as opposed to an employee?

19      A.    That's correct.

20      Q.    Okay.  Thanks for the clarification.

21       All right.  So you have a long and involved and

22   detailed history of Superior, correct?

23      A.    Correct.

24      Q.    Now, with respect to the topics on which you were

25   one of Superior's designated representatives in the

1  deposition, sir, one of those topics related to Superior's

2  acquisition of the information that's contained on the

3  drawings that are at issue in this case, correct?

4      A.   Correct.

5      Q.   And another topic on which you were a Superior

6  designated corporate representative was the nature and extent

7  of any engineering work that was done by TAE, Thielert

8  Aircraft Engines, correct?

9      A.   That's correct.

10     Q.   Okay.  Let's talk about the second of those topics,

11 the nature and extent of the engineering work that was done

12 by TAE first, okay?

13     A.   Yes.

14     Q.   Now, you know, don't you, sir, that TAE did

15 engineering work related to the SAP parts, you just don't

16 know the specifics for any particular part, correct?

17     A.   Well, what I do know is that, yes, they may have

18 done some engineering work in regard to manufacturing the

19 part, but to the best of my knowledge, they didn't do any

20 engineering of the part before it was sent to them.  They

21 only did engineering on the way to make it on their

22 equipment.

23     Q.   Okay.  So you agree that TAE did engineering work,

24 you just believe it was on the manufacturing end, as opposed

25 to the design end; is that fair?

1        A.    I'm sure they didn't do any on the design end.

2        Q.    Okay.  But you agree that TAE did do engineering

3   work on the manufacturing end of the parts that it supplied

4   to Superior, correct?

5        A.    Yes.  But just with regard to their ability to make

6   the part to the Superior drawing on their equipment.

7        Q.    I understand, sir.

8         You were here for Mr. Marwill's testimony back on July

9   22nd, correct?

10       A.    Yes.

11       Q.    You were in the courtroom during the initial phase

12   of this hearing?

13       A.    Yes.

14       Q.    Okay.  And because you were here you, I believe,

15   heard Mr. Marwill testify that most vendors who are suppliers

16   who are making parts don't create separate drawings, correct?

17   Do you remember hearing him say that?

18       A.    I believe so.  But that is true, yes.

19       Q.    Okay.  Well, in fact, sir, you know that a supplier

20   such as TAE would, in fact, need to create additional

21   drawings in order to manufacture parts, at least for the

22   parts that aren't simple, don't you, sir?

23       A.    That's correct.  Other suppliers have also done the

24   same.

25       Q.    Right.  In fact, the way it works is after a

1  supplier, like TAE, receives something like a two-dimensional

2  drawing from a company such as Superior, the supplier does

3  its own engineering work and its engineers may create its own

4  drawings, including 3D drawings, and other manufacturing

5  related information, true?

6      A.    Well, they don't -- first place, they don't need to

7  make their own drawings.  But, secondly, depending on their

8  machining capability and processes, they may need to create

9  drawings to show the sequence in which the part should be

10  machined and interim machining dimensions to reach the final

11  part that's on the approved drawing.

12      Q.    Right, sir.  I'm not asking you whether or not

13  suppliers such as TAE needs to make its own original design

14  drawings.  My question for you, and I think we established it

15  just a moment ago is, you agree that TAE would need to create

16  additional drawings in order to manufacture the parts, at

17  least the ones that are not simple, true?

18      A.    Yes.

19      Q.    Okay.  And that's the way it works in the industry,

20  right, is the supplier creates its own -- does its own

21  engineering work and its engineers may create its own

22  drawings, including 3D drawings, true?

23      A.    It's not necessary to make 3D drawings.

24      Q.    But a lot of them do, a lot of suppliers do, don't

25  they?

1      A.    Some do.

2      Q.    And you agree that a supplier such as TAE would

3    have its own manufacturing techniques and as a result, would

4    create these manufacturing drawings that they very well might

5    consider proprietary, don't you, sir?   That's true, isn't

6    it?

7      A.    Yes.   The part that they do and that they add would

8    be proprietary, not the rest of the data that was furnished

9    to them by the PMA holder.

10      Q.    I understand.   And so we understand what you mean

11    by proprietary in that context, sir, to you, that means not

12    readily ascertainable, correct?

13      A.    The machining part of it, no.   The drawings would

14    not be readily ascertainable.

15      Q.    And that's what you mean by proprietary in that

16    context, right?

17      A.    Yes.

18      Q.    Now, let's shift gears and talk about the other

19    topic on which you were designated to testify as the

20    corporate representative of Superior Air Parts.   Okay?   And

21    that's the availability of the information that is found on

22    the Superior drawings that were furnished to TAE.   Okay?

23      A.    Correct.

24      Q.    Now, you were the retained expert witness in

25    another case styled Rolls Royce versus H-E-R-O-S, correct?

1        A.    That's correct.

2        Q.    And that was a case pending here in the Northern

3   District of Texas in Judge Fitzwater's court, correct?

4        A.    Correct.

5        Q.    And you were retained on behalf of a company that

6   was being sued by Rolls Royce for, among other things,

7   misappropriation of trade secrets, right?

8        A.    Correct.

9        Q.    So you were working for the company defending the

10  trade secrets claim?

11       A.    Correct.

12       Q.    And to set the stage here, Mr. Dedmon, your

13  testimony in the Rolls Royce case related to PMA

14  applications, correct, at least in part?

15       A.    In part.

16       Q.    Okay.  And those PMA applications that you've

17  testified about that you were familiar with related to the

18  Continental and Lycoming parts that Superior holds PMAs for,

19  correct?

20       A.    I'm not sure I understand and agree with what you

21  said.  The HEROS' case dealt only with turbine parts.  And it

22  dealt only with parts that were clearly in the public domain.

23  And to the extent that I mentioned Continental and the

24  Lycoming parts in that deposition, it was referring to parts

25  which Superior or I had dealt with in the '60s and early '70s

1    and had nothing to do with the parts that are in the current

2    case or anything similar.

3        Q.    Sir, your testimony in the Rolls Royce litigation

4    about the PMA applications that you were familiar with and

5    had made for Continental and Lycoming parts related to

6    Superior Air Parts PMAs, correct?

7        A.    Yes.   The ones that they had obtained by

8    (indecipherable word) in the '60s and '70s.

9        Q.    Sir, your testimony in the Rolls Royce case about

10   the PMA applications that you were familiar with and had made

11   for Continental and Lycoming parts related to Superior Air

12   Parts, correct?

13       A.    Correct.

14       Q.    And those are the same parts that are involved in

15   this dispute, aren't they, sir?

16       A.    No.

17       Q.    Do you remember when I asked you this question in

18   your deposition, sir?

19       A.    Yes.   Mr. Simon, I do.   And I do remember you

20   bringing -- it wasn't actually a copy of my deposition, it

21   was a copy of a West Law document that had some errors in it.

22   And I think it's important right now to make clear to the

23   Court and everyone that the HEROS case was six years ago.   It

24   was a case that involved strictly identicality.   It was a

25   part that involved, a case that involved Rolls Royce claiming

1    that their data was not in, or acquired by HEROS from the

2    public domain.  The Superior case now is entirely different.

3    PMA being the only tie.  And like I say, if I had known we

4    were going to spend a lot of time with a six year old case

5    that had nothing to do, maybe in 2008 I would have inserted

6    more clarifying information, although their attorneys had no

7    problem understanding what I was talking about.

8              MR. SIMON:  Your Honor, I would ask that the

9    last extended portion of that answer be stricken as

10   non-responsive.

11             THE COURT:  Sustained.

12       Q.   Mr. Dedmon, my question was, do you recall when I

13   asked you whether or not the parts that you had testified

14   about, the Continental and Lycoming parts that you testified

15   about in the Rolls Royce case, were a subset of the parts

16   that are involved in this dispute?

17       A.   Yes, I do.

18       Q.   Do you recall when I asked you that in your

19   deposition?

20       A.   Yes.

21       Q.   And your answer during your deposition was, yes,

22   wasn't it, sir?

23       A.   Right.

24       Q.   Now, you're right, sir, when we took your

25   deposition, I had obtained a copy of your expert report and

1  an excerpt of your testimony in the Rolls Royce litigation

2  off of West Law.  We have since located, I think, a slightly

3  better copy of your report off of the Court system called

4  Pacer.  So if we could -- if you could flip in your notebook,

5  sir, it will be the second notebook of IA exhibits.

6                  MR. SIMON:  Your Honor, should I assist the

7  witness?

8                  THE COURT:  Please.  You may.

9      Q.   Let me see if I can help you find it, Mr. Dedmon.

10 It's in this notebook.

11                 MR. SIMON:  For the record, I have pointed the

12 witness in the Insolvency Administrator's Hearing Exhibit

13 Binder to Exhibit IA-20.  And, Your Honor, there have been a

14 few exhibits added by both sides since July 22nd.  And I

15 believe copies were provided to the Court for our's with tabs

16 this morning.

17                 THE COURT:  I don't have them.  So --

18                 MR. SIMON:  We did provide two sets.  I don't

19 know where they went.

20                 THE COURT:  Okay.  I'm told I do have them.

21                 MR. SIMON:  I think the label on the notebooks

22 still would not be current.

23                 THE COURT:  Got it.  And, I'm sorry, it was

24 21?

25                 MR. SIMON:  This is 20, Your Honor, IA-20.

1               THE COURT:  I'm there.  Thank you.

2       Q.   All right.  Mr. Dedmon, we looked at this report

3  during your deposition, as well, but in a different form,

4  correct?

5       A.   Correct.

6       Q.   And looking at this report, can you identify this

7  as a copy of your expert report that was submitted in the

8  Rolls Royce versus HEROS litigation?

9       A.   Yes, that's correct.

10      Q.   And if you flip back to page 14 of Exhibit 20,

11 that's your signature there on that page, correct?

12      A.   Yes.

13              MR. SIMON:  Your Honor, we would offer Exhibit

14 20, IA-20.

15              MR. ALEXANDER:  Your Honor, objection.  We

16 don't have any objection to him questioning him about it as

17 an impeachment document or document, but this is an expert

18 report from another case.  And as all expert reports, it's

19 hearsay.  That would be our objection.  Just like I can't get

20 in my expert's report from this case, because it's hearsay.

21              THE COURT:  Response?

22              MR. SIMON:  It's a party admission, sir.  It's

23 a document created by this party's own witness.  By

24 definition, not hearsay.  It's an admission of a party

25 opponent.

1                MR. ALEXANDER:  Mr. Dedmon is not a party.

2                THE COURT:  Sustain the objection.  You can

3    question the witness about it, but the expert report is not

4    admissible.

5                MR. SIMON:  Okay, Your Honor.  I'll do it that

6    way.

7         Q.   Let's look at page 13, sir, of the expert report

8    you submitted in the HEROS case.

9            Is it HEROS or H-E-R-O-S, how do you say it?

10        A.   It's actually, I believe, H.E.R.O.S.  We refer to

11   it as the HEROS case.

12        Q.   Okay.  Then I will too.  That will be easier.

13           All right.  If you would look at the summary or the

14   opinions that you offered in that case, sir, on page 13.

15   There are eight of them, correct?

16        A.   That's correct.

17        Q.   All right.  I want to focus your attention just on

18   a couple of them.  And let's start with opinion number 4.

19           All right, sir.  Just tell me if I read this correctly

20   and if this was your opinion, quote, The information for

21   developing design data for PMA application is available in

22   the public domain.  Sources for this information include, but

23   are not limited to, data for products developed at US

24   Government expense; data developed by actual manufacturing

25   sources that have assisted LEMs in developing products; data

1   published in maintenance manuals and service documents.

2       Did I read that right?

3       A.   That's correct.

4       Q.   And that was your opinion, correct, sir?

5       A.   Yes.  However, may I add to that?

6       Q.   Well, if I might move to opinion number 8, sir.  Is

7   that all right you?

8       A.   Okay.

9       Q.   Okay.  Opinion number 8, sir, and tell me if I'm

10  read this one correctly.  Documents and data that can be

11  utilized to develop design data are readily available through

12  the Freedom of Information Act or directly from military

13  procurement offices indicating that the US Government

14  represents that this information is in the public domain.

15      That was also your opinion in the HEROS case, correct,

16  sir?

17      A.   That's correct.

18      Q.   All right.  And then you were asked -- I'm going to

19  move my binder, sir.  I'm not sure if you'll want to refer to

20  your report again or not.  But you were asked in the Rolls

21  Royce case about those opinions, right, in a deposition that

22  you gave in that case, correct?

23      A.   Correct.

24      Q.   And, specifically, you were asked what documents

25  and data you were referring to, right?  That was one of the

1  things you were asked about, right?

2      A.   Yes.  Yes.

3      Q.   One of the things you were asked --

4           MR. SIMON:  And, Mr. Lodge, if we could pull

5  up page 75 of the deposition transcript from Mr. Dedmon's

6  testimony.  I think it would just be easier if we see this on

7  the screen.

8      Q.   Okay.  Up at the top of the page, the question you

9  were asked is, I guess what I'm trying to get at, what

10 documents you're referring to there, because it's a pretty

11 broad statement.  And if it's not all documents and all data,

12 which documents and which data?  And your answer, sir, was,

13 quote, Well, I've received drawings for parts any number of

14 parts, specifications for those parts.  Question, Which

15 parts?  Answer, Parts for Continental and Lycoming aircraft

16 engines.

17     That was your testimony under oath in the HEROS/Rolls

18 Royce litigation, correct?

19     A.   That's correct.

20     Q.   And that related to your opinion number 8 that we

21 just talked about, correct?

22     A.   Correct.

23          MR. SIMON:  Okay.  Now, let's go, Mr. Lodge,

24 if we can to some questions about opinion number 4.  And if

25 we could look at page 39 of the transcript.

1     Q.    And that testimony was under oath, wasn't it, sir,

2  the testimony you gave in a deposition in the Rolls

3  Royce/HEROS case?

4     A.    Yes.

5     Q.    And it was truthful, wasn't it, sir?  Your

6  testimony was truthful?

7     A.    In the HEROS case?

8     Q.    Yes.

9     A.    Yes.

10     Q.    So the question at the bottom of the page, sir,

11  beginning on line 22 is, Moving to opinion number 4, you

12  state that the information for developing design data for PMA

13  application is available in the public domain.  If we go to

14  the next page the question is, What information are you

15  referring to here?  Your answer was, I'm referring to

16  information that he, and I assume that that's a typo and it

17  should be we, used to develop design data.  My personal

18  experience is with piston engines, but I am aware that the

19  data is available in the public domain.  Question, How are

20  you aware?  Answer, Because I've been in the PMA business for

21  40 years and that's the way that you obtain design data, you

22  develop design data.

23      Have I read that correctly so far, sir?

24     A.    So far, yes.

25     Q.    The next question was, This is a pretty broad

1   statement.  Are you saying that all information related to

2   all data and parts is in the public domain?  Your answer

3   was?

4        A.   No.

5        Q.   The next question was, Then what specific parts,

6   what specific data are you referring to there?  And your

7   answer was, quote, Information that is necessary to develop

8   parts.  It's not every bit of the information is available in

9   the public domain, but certainly sufficient information is

10  available in the public domain to prepare and submit design

11  data to the FAA.

12       Did I read that correctly?

13       A.   That's correct.  For a generalcality.

14       Q.   I read that correctly, didn't I, sir?

15       A.   You did.

16       Q.   All right.  If we skip just a couple of lines, I

17  think, the next question is --

18            MR. SIMON:  It begins, Tracy, you're not aware

19  of any data related to parts that's not in the public domain.

20  Here we go.

21       Q.   You were asked, you're not aware of any data

22  related to parts that's not in the public domain?  And your

23  answer was, quote, No.  I may explain that every bit of

24  information that I have sought out to obtain PMAs has been

25  available in the public domain.

1       That was your answer, wasn't it, sir?

2       A.    That's correct.

3       Q.    And then the next question, How many parts -- well,

4   we don't need to skip line 14.  We can go to line 14.

5       And what are those parts that you've -- that you have,

6   you sought to obtain PMA approval?  Answer, Parts for

7   Continental and Lycoming aircraft engines.  All of the parts,

8   actually.  Next question, How many parts have -- have you

9   tried to obtain PMA approval for with respect to the

10  Continental and Lycoming aircraft engines?  The answer was,

11  Several thousand.  Question, And that related to piston

12  engines?  Your answer was, Yes.

13      Did I read that correctly?

14      A.    Yes.

15      Q.    And then the next question, And every single one of

16  those several thousand parts, the information was in the

17  public domain?  And your answer, sir, was?

18      A.    Yes.

19      Q.    And that testimony was under oath and truthful,

20  correct, sir?

21      A.    Correct.

22              MR. SIMON:  I'll pass the witness, Your Honor.

23              THE COURT:  Cross-examination?

24              MR. ALEXANDER:  Yes, ma'am.

25              (no omission)

<u>CROSS-EXAMINATION</u>

BY MR. ALEXANDER:

    Q.   Mr. Dedmon, when you testify, will you please look
at Judge Houser and speak to her.

    Mr. Dedmon, what are you doing tomorrow?

    A.   I'm having back surgery.

    Q.   And did you reschedule that surgery so you could
come here and testify?

    A.   I did.

    Q.   And was that because you wanted the Court to be
sure and understand the things you know about the issues in
this case?

    A.   That's correct.

    Q.   Are Superior's data and drawings available in the
public domain?

    A.   No.

    Q.   Were they available in the public domain when
Superior started doing business with TAE?

    A.   No.

    Q.   Are Lycoming's drawings and data available in the
public domain?

    A.   No.

    Q.   Were they available in the public domain when
Superior started doing business with TAE?

    A.   No.

1      Q.    Is Teledyme Continental Motors information

2    available in the public domain?

3      A.    No.

4      Q.    Was it available in the public domain when Superior

5    started doing business with TAE?

6      A.    No.

7      Q.    Mr. Simon talked to you about some testimony you

8    gave in a deposition in the HEROS case.  You remember that,

9    right, it just happened?

10      A.    Yes.

11      Q.    Did that case deal with the parts that Superior

12    made, the HEROS case?

13      A.    No.

14      Q.    Did that part -- did that case even deal with

15    piston engine parts?

16      A.    No.

17      Q.    When you made the statement in the deposition

18    Mr. Simon read to you where you said you'd obtain Lycoming

19    and Continental PMAs based on information in the public

20    domain, what time frame did that occur in?

21      A.    For Superior Air Parts, it was in the '60s and very

22    early '70s.

23      Q.    And did you -- did you testify -- your testimony in

24    the HEROS case, when you were giving that testimony, was that

25    in that time frame?  Is that your understanding of the

1   questions that were being asked to you?

2       A.   Yes.

3       Q.   Did you testify in that deposition that the kinds

4   of PMAs you were talking about getting based on information

5   in the public domain were PMAs by identicality?

6       A.   Yes.

7       Q.   Would you please read -- I want you to read some

8   testimony that you gave in that same thing.  And I'm going to

9   use Exhibit IA-14.

10      So you need to get IA-14.  It's their Exhibit Number

11  14.  These books have a lot of exhibits in them, don't they?

12      Okay.  I'm going to refer you to these page numbers

13  down at the bottom.

14      A.   Okay.

15      Q.   I want you to turn in that to page 19.  And do you

16  see a question down at the bottom quarter of the page the

17  question says, And it is your opinion that regardless of how

18  many parts there are in an engine, the fact that there may be

19  one or two or three dozen parts that have PMA approval means

20  that every single part has data that is in the public domain?

21      A.   I see that.

22      Q.   Do you see that question?  This was in the HEROS

23  case.

24      What was your answer?

25      A.   If I said that, I mis-spoke.  In fact, it shows

1   that if parts are being submitted for approval based on

2   identicality, that the information that is used to prepare

3   those is in the public domain.  There may be others that are

4   not.  I can't speak to every single part in the engine.

5        Q.   And what you were talking about in all of the parts

6   of the deposition that Mr. Simon read to you was PMAs that

7   were obtained by the identicality method under the federal

8   aviation regulations?

9        A.   Yes.

10       Q.   When was the last time Superior Air Parts got a PMA

11  by identicality?

12       A.   To the best of my knowledge, it was prior to 1981.

13       Q.   About 35 years ago?

14       A.   Yes.

15       Q.   Were the PMAs for the parts that Superior sent

16  drawings to TAE for obtained on the basis of identicality?

17       A.   No.

18       Q.   So does your testimony about what used to be

19  available in the public domain have any application to any

20  parts, drawings that Superior sent to TAE?

21       A.   No.

22       Q.   What kind of drawings was it that Superior sent to

23  TAE?

24       A.   They were design drawings.

25       Q.   Now, what does that mean?  What's a design drawing?

1        A.    Well, a design drawing is a full and complete

2  description of the part that shows what the finished part is

3  to look like, describes all dimensions and tolerances,

4  describes material processing, everything that is needed to

5  describe the part to obtain approval from the FAA.

6        Q.    And a manufacturer, or some of our supplier who

7  makes parts could make a part from that drawing?

8        A.    Yes.

9        Q.    Were the designs 100 percent completed on these

10  drawings before they were ever sent to TAE?

11        A.    Yes.

12        Q.    Did TAE participate in any way in the engineering

13  of the design of the Superior parts?

14        A.    No.

15        Q.    As a matter of fact, before you submit something to

16  the FAA for design approval, it has to be a completed drawing

17  so the FAA can tell it will produce the part depicted by the

18  drawing?

19        A.    Right.  When you submit that drawing to the FAA,

20  one, they're going to find whether or not the part described

21  on the drawing meets the air worthiness requirements.  And

22  then the second step would be for the FAA to determine if a

23  company has the quality control system to make sure that the

24  parts received to that drawing can be inspected to ascertain

25  every dimension is correct.

1     Q.   Mr. Simon asked you a question about your opinion

2   number 4 in your report.  And you started to say something

3   and I don't believe you got to finish it.

4        Do you remember what you wanted to say?

5     A.   Can you --

6     Q.   Opinion 4 was the information for developing design

7   data for PMA application is available in the public domain.

8   Sources for this public information includes, but are not

9   limited to, data for products developed at US Government

10   expense, data developed by actual manufacturing, OEMs.  Do

11   you remember, you wanted to say something.  Do you remember

12   what it was?

13     A.   Well, yes.  The opinion number 4 had to do

14   specifically with Rolls Royce and HEROS.  And it had to do

15   with parts that were being obtained, or had been obtained by

16   identicality.  And certainly didn't have anything at all to

17   do with parts that were approved by test and computation, or

18   any other method.

19     Q.   When the manufacturer -- when TAE got these FAA

20   approved design drawings from Superior, was there any reason

21   for TAE to make 3D models?

22     A.   Only if -- if that was something particular to

23   their way of manufacturing a part.  I would say that the vast

24   majority of manufacturers did not make -- well, it wasn't

25   necessary to make a 3D drawing at all, unless that was

1    specific to the way they manufactured parts.

2        Q.   But manufacturers make parts to those same drawings

3    that you sent to TAE without 3D models?

4        A.   Yes.

5        Q.   And they do it without making manufacturing

6    drawings too, don't they?

7        A.   As far as I know, yes.

8             MR. ALEXANDER:  I believe that's all we have,

9    Your Honor.

10            MR. SIMON:  Very brief, Your Honor?

11            THE COURT:  Of course.

12                    REDIRECT EXAMINATION

13   BY MR. SIMON:

14       Q.   Mr. Dedmon, when you were offering your testimony

15   in the Rolls Royce versus HEROS case, your testimony was

16   clear that you were referring to the PMAs you had obtained

17   for Continental and Lycoming parts in the several thousand

18   parts range, correct?

19       A.   Yes.  I believe I used that number, yes.

20       Q.   Have you obtained several thousand PMAs based on

21   identicality?

22       A.   Oh, no.

23            MR. SIMON:  That's all I have, Your Honor.

24   Thank you.

25            THE COURT:  Anything further?

<u>RECROSS-EXAMINATION</u>

BY MR. ALEXANDER:

    Q.   Again, when you were speaking of things that were in the public domain, that was in the '60s and '70s and had nothing to do with the parts that TAE manufactured for Superior?

    A.   That's correct.

    Q.   Thank you, Mr. Dedmon.

            THE COURT:  Anything else?

            MR. SIMON:  No, Your Honor.

            THE COURT:  Mr. Dedmon, thank you very much. You may step down.  And, also, thank you for rescheduling your back surgery.  I hope it goes well.

            MR. ALEXANDER: Your Honor, if Mr. Dedmon wants to be excused, may he be excused?

            THE COURT:  Any objection?

            MR. SIMON:  No, Your Honor.

            THE COURT:  He's free to be excused when he wishes.

            MR. ALEXANDER:  He may want to stay and listen to some of this.

            MR. SIMON:  May I proceed, Your Honor?

            THE COURT:  You may.

            MR. SIMON:  Your Honor, before I call our next witness, Professor Rienacker, Insolvency Administrator's

1  expert witness, we -- Professor Rienacker has prepared a

2  series of slides to assist in connection with his testimony.

3  They are -- I have hard copies I can provide to opposing

4  counsel and the Court, if I may.

5         May I approach?

6                    THE COURT:  And law clerk, please, too.

7                    MR. SIMON:  Yes.

8                    THE COURT:  Thank you.

9                    MR. SIMON:  All right.  Your Honor, with that,

10  the Insolvency Administrator calls Dr. Adrian Rienacker.

11                    THE COURT:  Mr. Rienacker, if you'd come to

12  the witness chair and raise your right hand and we'll swear

13  you in.

14                    (The witness was sworn by the courtroom deputy.)

15                    MR. ALEXANDER:  Your Honor, may I have one

16  moment to get my expert, Mr. Chapman, up here?

17                    THE COURT:  Of course.

18                    MR. ALEXANDER:  Thank you, Your Honor.

19                    THE COURT:  Of course.

20                    MR. ALEXANDER:  And if I can, I'll get these

21  books out of the way, if you want me to.

22                    THE COURT:  Will he need the --

23                    MR. SIMON:  Maybe.  He may need volume 2.

24                    MR. ALEXANDER:  It's getting crowded up there.

25                    THE COURT:  Please be seated.

1              MR. SIMON:  May I proceed, Your Honor?

2              THE COURT:  You may.  Please.

3                    ADRIAN RIENACKER

4   The witness, having been duly sworn to tell the truth,

5   testified on his oath as follows:

6                   DIRECT EXAMINATION

7   BY MR. SIMON:

8       Q.    Professor Rienacker, would you please introduce

9   yourself to the Court.

10      A.    My name is Dr. Adrian Rienacker.

11      Q.    And Professor Rienacker, what do you do for a

12  living?

13      A.    I am a professor in mechanical engineering at the

14  University in Kassel, Germany.  I hold a chair for machine

15  elements and tribology, again at the University in Kassel.

16  And I'm managing director of the Institute for Powertrain &

17  Vehicular Engineering, also in Kassel.

18      Q.    And would you please describe for the Court your

19  educational background?

20      A.    I hold a diploma in mechanical engineering from the

21  Technical University in Aachen, also Germany.  That was in

22  1990.  And I also hold a PhD degree with distinction, again

23  from the Technical University in Aachen, Germany.

24      Q.    And when did you obtain your PhD degree, sir?

25      A.    That was in 1995.

1      Q.   You've had a -- you've held your doctorate for

2   almost 20 years?

3      A.   Yes, sir.

4      Q.   Can you tell the Court about your experience in

5   working with aircraft engines and working in the industry,

6   please?

7      A.   Yes.   I joined BMW/Rolls Royce in the year 1996.

8   BMW/Rolls Royce is an aircraft engine manufacturer.   And I

9   worked especially on the specifications aspects of the BR715

10  engine.   And that, I worked on all of the case

11  (indecipherable word) certification, the relative dynamics

12  aspects, and also the accessory of operation certification

13  aspects.   I joined MTU Aero Engines in the year 2001 working

14  in case structure mechanics.   Became leader of that

15  department, a discipline department.   And I was leader of

16  that department for about five years.   I think joined the

17  project department for the same company, GP7000 engine.   We

18  worked on the entry into service of the GP7000 engine with

19  Emirates.   And I accompanied all the cost reduction

20  activities for the GP7000 low pressure turbine, which meant

21  that I had to deal with configuration control certification

22  aspects of that engine.   And both of my assignments at MTU, I

23  was appointed to be a component verification engineer, which

24  means that I authorized certification plans and certification

25  activities for parts, assemblies, and modules and, also,

1  repair certifications which covered also parts that were not

2  originally manufactured by MTU or Pratt & Whitney.  And in

3  that I touched the PMA business side of that industry.

4      Q.   Professor Rienacker, English is not your first

5  language, is it?

6      A.   It is.

7      Q.   It is your first --

8      A.   Sorry for that.  I --

9      Q.   It is your first language?

10     A.   No, it is not.  Sorry.

11     Q.   I was going to say, I didn't think it was.  But

12 your English is very good.  Have you spent some time working

13 in the United States in the past?

14     A.   Yes.  I was delegated to work with Pratt & Whitney

15 onsite in East Hartford between October of 2005 and April

16 2006.  And there I was a deputy component integrated team

17 leader that worked on the high-pressure compressor of the

18 (indecipherable word) engine that will be powering the A320

19 NEO Aircraft.  NEO stands for New Engine Option.  And that is

20 going to be in service soon.

21     Q.   What aircraft is that for, the A320?

22     A.   That's the A320.  That's a single aisle, 130 seater

23 to 180 seater.

24     Q.   Does your experience, Professor Rienacker, provide

25 you with what you believe is a complete view of the

1   engineering and business aspects of the aircraft engine

2   industry?

3       A.   Yes.  I would say it's rather complete.  As a

4   discipline department leader, I had full insight in all of

5   the engineering aspects of that work.  Being a project

6   department leader, I was interfacing with the business side.

7   I was interfacing with procurement, manufacturing, and also

8   the program side, which dealt with the customers.

9       Q.   And in addition to your aviation industry, in

10  particular, do you also have experience and expertise related

11  specifically to piston engines?

12      A.   Yes, I do.  All of my work as a PhD student between

13  1990 and 1995 covered piston engines.  I was specifically

14  working on fluid film lubrication on connecting rock bearings

15  and also on temperature distributions and pistons.  So that

16  covers two very different physical aspects of piston engines

17  and also two very important parts of those.

18      Q.   And how about in your current position, sir, as a

19  professor of engineering, do you still deal with piston

20  engines?

21      A.   Oh, yeah.  That's most of my work.  I'm dealing

22  with the car manufacturing industry in Germany and also the

23  truck manufacturing industry.  About 80 percent of my

24  research budget is related to that industry and that supply

25  chain.  And in the first seven months of this year, I was

1  awarded a research contract worth probably $1 million.  And

2  80 percent of again of that is related to piston engines.

3      Q.   All right.  And can you describe for the Court what

4  you do day to day as a professor of engineering?

5      A.   Yes.  I -- I teach -- well, I supervise most of the

6  CAD and design education in the first four semesters for

7  mechanical engineers.  And I teach machine elements, also

8  finite element methods, and tribology.

9      Q.   Some of that I don't even understand.

10     A.   Tribology is the science of friction, lubrication,

11  and wear.

12     Q.   Thank you for that.

13      Professor Rienacker, do you consider yourself to be an

14  expert in mechanical engineering, including the ability to

15  explain detailed design and manufacturing drawings and

16  related data for aircraft engine parts?

17     A.   Yes, I do.

18     Q.   And do you consider yourself to be an expert in the

19  engineering aspects of aircraft engines, including piston

20  engines, including the processes by which parts are designed

21  in related engineering and manufacturing work?

22     A.   Yes, I do.

23     Q.   And do you consider yourself to be an expert on the

24  industry norms for dealings between manufacturers and

25  suppliers in the aviation industry?

1      A.    Yes, I do.

2            MR. SIMON:  And, Your Honor, with that, we

3 would tender Professor Rienacker as an expert in those areas.

4            THE COURT:  Any objection?

5            MR. ALEXANDER:  Your Honor, I don't have --

6 this objection could also be a statement.  He's come a long

7 way and I've taken his deposition and I want him to testify

8 today.  I know the Court wants to hear this, you're also

9 interested in what he will say.  But I believe that he does

10 not have nearly the experience in piston aircraft engines.

11 His experience is in -- all the experience that he has told

12 you about in the aviation industry is in jets, which is

13 completely different.  And all of his engineering expertise

14 with piston engines is with cars and trucks.  And aviation

15 engines are different and we will have somebody talk about

16 that in rebuttal.

17            THE COURT:  All right.  The Court will accept

18 him as an expert.

19            MR. SIMON:  Thank you, Your Honor.

20      Q.    Let me just -- let me just ask a couple of quick

21 questions, Professor, to follow up on the statement you just

22 heard counsel make.

23      A.    Yes.

24      Q.    Are there similarities, in your view, between the

25 piston engines in the automotive industry and the aviation

1  industry?

2      A.   There are similarities between the parts in the

3  automotive industry and the parts in the aircraft engine

4  industry.  Obviously it's the same working principle.

5      Q.   Okay.  And I think that's really all I need to do

6  that, Professor.

7              THE COURT:  All right.

8      Q.   Let's move forward, Professor Rienacker.  Have you,

9  in fact, prepared some slides with the assistance of our

10  graphics consultant?

11     A.   Yes.  And, again, I was supported in that.

12     Q.   Yes.  Okay.  Let's go to the first slide, if we

13  can.  And is this a summary of the opinions that you intend

14  to testify about here today, sir?

15     A.   Yes, it is.

16     Q.   Would you go through these briefly for the Court?

17     A.   The 3D volume models were created by TAE as an

18  essential pre-requisite for deriving other important

19  documents from them.  Creating 3D volume models was a

20  significant engineering effort which required TAE's designs

21  know how and manufacturing know how.  The detailed

22  manufacturing drawings and other manufacturing related

23  documents that TAE created involved considerable engineering

24  know how and effort and contained sensitive manufacturing

25  related information.  The work done by TAE engineers created

1  commercially valuable proprietary manufacturing documents

2  that would not typically be shared between a supplier and a

3  customer.  And all necessary information in the SAP drawings

4  provided to TAE is either publicly available or readily

5  ascertainable.

6       Q.   And, in fact, are those your opinions, sir?  That's

7  a fair summary of your opinion?

8       A.   Yes, it is.

9       Q.   All right.  Let's back up and talk about how you

10 got to those opinions, sir.

11      When were you first retained to work in connection with

12 this dispute?

13      A.   It was approximately June 18, this year.

14      Q.   Okay.  And can you explain to the Court what you

15 were asked to do, please?

16      A.   Well, I was asked to form an unbiased opinion

17 concerning the nature of the work behind creating 3D volume

18 models.  And also related manufacturing drawings and

19 information.  And I was also asked to form an unbiased

20 opinion on whether that sort of information was proprietary

21 to a supplier or shared between a supplier and an OEM or GMA

22 holder like SAP.

23      Q.   At the time that you were contacted and asked those

24 questions, Professor, had you had any prior dealings with

25 either Superior Air Parts, Thielert, or Dr. Kubler?

1      A.    No, I have not.

2      Q.    Approximately how many hours have you personally

3  spent on your work in connection with this matter?

4      A.    I have spent now more than 180 hours on the case.

5  Most of that before July 22nd, this year.

6      Q.    And have you had others, who were assisting you in

7  connection with your work?

8      A.    Yes.  I had two of my best designers working with

9  me under my supervision.  And they probably have also spent

10  more than 180 hours on the case.  In addition, I have both of

11  my deputies, both holding a PhD in mechanical engineering

12  work with me.  And they spent probably another 10 hours on

13  the case.  And I was in contact with Mr. Deitel, a former TAE

14  employee, a designer, a degreed designer who knows much of

15  the background in the years that we talk about.

16      Q.    Mr. Deitel, when you say he was a designer, was --

17  is Mr. Deitel a degreed engineer?

18      A.    He is a degreed mechanical engineer.

19      Q.    And he was a TAE employee during the time the

20  documents we're going to be talking about today were created?

21      A.    Yes.  He was a TAE employee and he worked on the

22  parts that we talk about right now.  And most of the drawings

23  that we found on the drives that we explain later on bear his

24  signature.

25      Q.    Okay.  Was his -- was Mr. Deitel's assistance

1  valuable to you, sir?

2      A.   It was very valuable, because I did not -- I did

3  not have the background at the time.  You know, I was entered

4  the case in June of this year.

5      Q.   So he was able to help you, for example, locate

6  materials on the USB drive?

7      A.   Yes.  That was very helpful.

8      Q.   All right.  Let's talk about the work that you did,

9  sir, to arrive at the opinions.  And if you could, please,

10  describe for the Court the information that you reviewed and

11  the work that you performed.

12      A.   Yes.  First of all, I reviewed some of the data

13  that was found on the USB drive, which is in dispute here.

14  USB drive, that needs to be understood, contains 40 gigabyte

15  of data located in approximately 11,000 folders and

16  sub-folders, and probably includes more than 80,000

17  individual files on the drive.

18      Q.   That's the drive that you heard some testimony

19  about back here on July 22nd?

20      A.   That's exactly right, yes.

21      Q.   Okay.  And so did you review every single document

22  on that USB drive?

23      A.   No.  Obviously reviewing 80,000 files is not

24  possible, especially not in the time given.  And, also, I was

25  not necessary to do that.

1     Q.   All right.  So what did you do, sir?  How did you

2  focus your efforts?

3     A.   Well, we reviewed spreadsheets on which data is

4  described that SAP continued to be their proprietary

5  information.  And with that spreadsheet, we were able to

6  locate individual files and take a look at them.  In

7  addition, I reviewed engine overhaul manuals that are

8  publicly available on the internet.  And we also reviewed

9  regulations from the FAA, the Federal Aviation Authority.  In

10  addition, we reviewed information with respect to work being

11  done the XP400, the development and experimental engine.

12     Q.   Okay.  You heard Mr. Marwill testify on July 22nd

13  that he had looked at all of the drawings on the USB drive,

14  right?

15     A.   I did.

16     Q.   And you also heard his testimony that at the time

17  of his deposition, he believed he had spent somewhere in the

18  20 to 30 hour range on the dispute?

19     A.   Yes, I did.

20     Q.   Do you think it's even remotely possible to review

21  all of those drawings and anything approaching 20 to 30

22  hours?

23     A.   No, I don't think so.

24     Q.   Professor Rienacker, did you also subject your

25  opinions that you reached in this dispute to some sort of

1  peer review?

2      A.   Yes.  Just to make sure that I was not missing

3  anything and to challenge my opinions.  I spoke to

4  individuals familiar with the field of aircraft engines,

5  without going into further detail.  But I made sure that, you

6  know, the essential opinions that I came up with were

7  challenged.  And I found broad agreement with my statements

8  and opinions.

9               MR. SIMON:  All right.  Let's go to slide

10  regarding Professor Rienacker's opinion number 3.

11      Q.   And, Professor, is this a slide that pulls out your

12  third opinion that was set forth in your summary of opinions

13  that was produced to Superior?

14      A.   Yes, it is.

15      Q.   Would you go through the third opinion for the

16  Court, please?

17      A.   Yes, I can.

18       All 3D volume models were created by TAE as an

19  essential pre-requisite for deriving other important

20  documents from them.  Creating 3D volume models was a

21  significant engineering effort which required TAE's design

22  know how and manufacturing know how.  And is by industry

23  practice proprietary to TAE and not shared between a

24  manufacturer, supplier, and its customer.

25      Q.   And on the slides that follow, are these materials

1   that you have created to illustrate the level of engineering

2   effort that was required for TAE to create these 3D volume

3   models?

4       A.   Well, I pulled that information together.  Some of

5   that was obviously available and we found that on the drive,

6   for instance.

7       Q.   On the USB drive we were just referring to?

8       A.   Yes.  Yeah.

9       Q.   Okay.  All right.

10           MR. SIMON:  So let's go to the next slide, if

11  we can.  And for the record, Your Honor, this is a document

12  that was marked at IA-16.18.

13      Q.   And, Professor Rienacker, if you could identify

14  this document for us and tell the Court what it is.

15      A.   Yes.  It's IA-16.18.  That's on the bottom right

16  corner.  And that is a typical representation of a

17  (indecipherable word) assembly.  One of the parts that TAE

18  manufactured in various different designs for SAP.  And this

19  is the typical 2D assembly drawing that was provided from SAP

20  to TAE for a quote on the part, certainly, and then for

21  manufacturing the part.

22      Q.   Okay.  So we're clear, there's been a lot of

23  testimony in this dispute so far about the Superior

24  2-dimensional drawings that were provided to TAE.  This is an

25  example of one of those?

1      A.   One good example.

2           MR. SIMON:  Your Honor, we would offer Exhibit

3  16.18, IA-16.18.

4           THE COURT:  Any objection?

5           MR. ALEXANDER:  No objection, Your Honor.

6           THE COURT:  It's admitted.

7      Q.   Professor Rienacker, did you find a 3D volume model

8  on the USB drive related to this very part?

9      A.   Yes.  We did find the relevant 3D volume model.

10     Q.   And if we go to the next slide.

11     A.   And we --

12     Q.   Okay.

13     A.   This is a representation of the 3D volume model.

14 Out of the CAD model, we pulled this, what is called a 3D PDF

15 model to be able to present that here in the courtroom.  And

16 what I would like to highlight is that in this 3D PDF model,

17 like in the CAD model, you can turn the part and look at the

18 part from every conceivable side.  And that's quite similar

19 to what it was if you turned the part -- if you held the part

20 in your hands and turned it around in order to obtain

21 geometric information from the part.

22         In addition to that, you know, turning around of the

23 part, you can define cutting planes to the part, so you can

24 look into the inside and get familiar with the internal

25 geometry that the part provides.  I would like to especially

1   highlight here in this case, if you could show the Xs,

2   please.  I would like to make sure that we take a look at

3   what we are calling the inflow and outflow channels of that

4   cylinder head.

5        Q.   Do you need to approach the screen, Professor

6   Rienacker?

7                   THE WITNESS:  May I step up, please, Your

8   Honor?

9                   THE COURT:  Of course, you may.  The only

10  concern will be getting you on the record.  So speak loudly

11  when you're at the --

12       A.   As we move through the part, I would like to

13  highlight you to that sort of channel.  This is a geometry

14  that is quite hard to understand (inaudible few words).  And,

15  in fact, we have -- were told that this was not obtainable

16  through the 2D from SAP.  So as we walk ourselves through

17  that channel, we can see that this complicated geometry is

18  something that needs to be addressed when you try to

19  establish a 3D volume model like this one here from the 2D

20  volume that we have seen before.  That's all I would like to

21  show here.

22                  THE COURT:  Very well.  Thank you.

23       Q.   Thank you for that, Professor Rienacker.

24        Can you explain -- well, first of all, are these 3D

25  volume models important?

1        A.    Yes, they are.  They're important to --

2        Q.    Can you explain?  Can you explain why?

3        A.    Creating the 3D volume models is the first step to

4    create manufacturing information from them.  Manufacturing is

5    something that always happens in the 3-dimensional space.

6    You cut the part from all sides.  So this is the proper

7    representation that you need to easily and risk mitigatingly

8    derive manufacturing information from that.  And, also,

9    that's the most cost effective way that we have today to do

10   that.

11       Q.    All right.  Let's talk now about how we got from

12   point A to point B and how TAE specifically created that 3D

13   volume model that we were looking at.

14        Did you make an inquiry, sir, into that very process?

15       A.    Well, yes.  This is depiction in pictures taken

16   from the screen --

17       Q.    And let me just interrupt you, sir, for the record,

18   so I can identify what we're looking at.

19        These are drawings or diagrams that were taken from

20   IA-16.9, pages 42 and 43, by the way.

21       A.    So this essentially shows how a 3D volume model is

22   created in the CAD software.  On the upper left corner, you

23   see more or less that typically you're starting from scratch.

24   Nothing is depicted on the screen.  Then on the picture to

25   the right, you see that you start with simple geometry.  Like

1   here, a part of the geometry of the combustion chamber.  And

2   then you'll start getting pieces layer by layer to the

3   geometry.  And each time when you do that, you have to blend

4   the existing geometry to the new geometry that you had.  And

5   in that process, you always have to make conscious decisions

6   as a designer as to how to blend the parts.  Sometimes the

7   information can be conceived from the 2D drawings supplied,

8   like by SAP.  And other times you have to make the conscious

9   decision on how to proceed.  And obviously there are many

10  ways to come up with the 3D volume model from the 2D drawing.

11  Some of these ways are very helpful in later steps of the

12  process like deriving manufacturing information.  Others are

13  not so good.  And in that respect, the know how of the

14  designer who's doing that sort of work will impact the amount

15  of work that needs to be input later on.  You see --

16      Q.   Let me just -- before we go farther, and I know you

17  have more slides on this, Professor.

18      A.   Yeah.

19      Q.   Let's explain to the Court what this document is,

20  Exhibit 16.9.

21       Where did this information that we're looking at on the

22  screen come from?

23      A.   This is a report prepared by a TAE engineer who

24  was -- who showed simply how he created the model.

25      Q.   Okay.  All right.  Let's -- would you like to go to

1  the next slide?

2       A.   Yes, please.

3       Now, as you proceed in adding more features to the

4  part, it may be necessary to hide a portion of that model.

5  Like here, the cooling rips that are shown the cylinder head

6  are hidden at some point in time to include further features

7  on the part.  And then, again, layer by layer, parts are

8  added and blended into the model.

9       Next slide then finally shows the final representation

10 of the model.  As we have seen in the 3D PDF, you can turn

11 the part in the software.  And, for instance, in the upper

12 right corner, you can see the inlet and exhaust valves.  The

13 volumes there are for the flow channels that we'll talk about

14 later on.

15      Q.   All right.

16           MR. SIMON:  At this point, Your Honor, I would

17 offer Exhibit 16.9, IA-16.9.

18           MR. ALEXANDER:  Objection, Your Honor, that's

19 hearsay.  This is something that was created by somebody in

20 Germany.  I mean, it can be part of his expert report that he

21 relies on it and he can talk about it, but there's been

22 nobody to prove it up, what it is.

23           MR. SIMON:  Now, Your Honor, I don't have a

24 witness to prove this up as a business record.  I would

25 suggest that the fact that it came off of TAE's USB drive

1    that was produced in this litigation, it contained the files

2    related to this business with Superior, establishes that it

3    is a business record.  I could provide the Court with an

4    affidavit to that effect at a later date, if you wish.  I do

5    not have a witness to prove that up.

6                    THE COURT:  Then I'll sustain the objection.

7                    MR. ALEXANDER:  Thank you, Your Honor.

8        Q.    All right.  Professor Rienacker, let's refer to the

9    next slide, please.  And can you explain to us what we're

10   looking at here in Exhibit 16.9, page 23?

11       A.    Yeah.  This is in hardware, a photograph of the

12   hardware that we just have seen in this 3D representation of

13   the CAD model.  And this shows the inflow of the exhaust

14   channel of the engine, which is important because it's

15   controlling the amount of air that can be flown into the

16   combustion chamber and the amount of air that can be pushed

17   out of the combustion chambers.  So it's an important feature

18   overall for this piston engine.

19       Q.    And if we look at the next slide, Professor

20   Rienacker, what is depicted on this slide?

21       A.    Well, this is, again, part of that report.  And it

22   shows -- well, first of all, I've been told that the internal

23   geometry of the flow channels was not able -- was not

24   possible to be extracted from the 2D drawing that was

25   supplied by SAP.  And, therefore, TAE undertook a major

1   amount of work in order to get to that geometry that could

2   not be supplied by SAP or would not be supplied by SAP.  And

3   what TAE did here was they figured out a way how to get to

4   that geometry.  And that way involved using medical silicone

5   in order to get a negative form of that geometry.  The yellow

6   parts that you saw on the previous slide, those are cores

7   made of clay such that it would be possible to remove that

8   medical silicone from that geometry, metal geometry of the

9   part.

10       If we proceed, then obviously -- I'm sorry, one back,

11  please.  You see the pink medical silicone, which could after

12  the course have been removed, be extracted from the inflow

13  and exhaust channels.  And then you see that the medical

14  silicone forms the internal geometry of that -- of those flow

15  channels.  Unfortunately, the silicone is very flexible, so

16  you cannot take measurements from the silicone itself.  So an

17  additional step needed to be incorporated, there was a mold

18  being formed from hard clay as to get the internal geometry

19  made in resin, which was poured into that mold.  And that

20  resin hardened up in time.  And from the resin, which is

21  hard, you can take coordinate measurements, which was the

22  next step in the process.  And what you see here is the model

23  formed in resin, the hard model, and you can see here the

24  outlay of points that were measured with the 3D coordinate

25  measurement machine.

1      If we go to the next slide.  On the upper left corner,

2  you see a bunch of points.  This is what comes out of the

3  coordinate measurements.  And it still doesn't form any

4  surface geometry or volume geometry to obtain that.  You

5  needed further processing steps from a skilled engineering

6  fitting surfaces through the points and then at the final

7  stage creating a volume that would represent the void volume

8  of the inflow channel.  And this is actually what was done

9  here.

10      Q.   Professor Rienacker, back a few slides ago we

11  looked at a series of blue screen shots from various stages

12  of the creation of the 3-dimensional volume model, remember

13  that?

14      A.   Yes.

15      Q.   Is that a process that TAE engineers would have

16  been required to go through to create each of the 3D volume

17  models that it created for Superior parts?

18      A.   Yes.  In a similar fashion, yes.

19      Q.   How much effort do you believe was required to

20  create just this one 3D volume model that we were looking at?

21      A.   Weeks of hard work, including design know how and

22  also laboratory know how.

23      Q.   And was all of the information necessary to create

24  that 3D volume model found on the Superior 2-dimensional

25  drawing that we looked at a moment ago?

1      A.    Yeah.  For this part, it was necessary.

2      Q.    I'm sorry, sir.  Was all of the information on the

3    2D drawing or not?

4      A.    Pardon.  Pardon.  The information was not available

5    through the 2D SAP drawing.

6      Q.    Professor Rienacker, did you consider Exhibit --

7    Insolvency Administrator Exhibit 16.9 in forming your expert

8    opinions in this case?

9      A.    Yes, I did.

10      Q.    And where did you find that document?

11      A.    On the USB drive.

12            MR. SIMON:  Your Honor, we would try again at

13    this, to offer this exhibit, not for the truth of the matters

14    contained in the exhibit, but as part of the foundation for

15    the expert's opinion.

16            THE COURT:  Any objection?

17            MR. ALEXANDER:  I don't have any objection on

18    that basis, Your Honor.

19            THE COURT:  Very well.  The Court will admit

20    it on that basis.

21      Q.    Now, Professor Rienacker, that looks like quite a

22    bit of work to create this 3D volume model we just looked at,

23    true?  Fair?

24      A.    Yes.

25      Q.    Was that amount of work required for each and every

1    3D volume model that TAE created?

2        A.    Likely not.

3        Q.    Okay.  Explain what you mean by that, or why that's

4    the case.

5        A.    Well, I mean this is a complicated geometry.  And

6    as we have seen right now, a lot of effort went into that.

7    This is not typical for the creation of the 3D model.  But

8    still creating a 3D model involves hard work and skilled

9    work.  And you need to have some education to do that.

10       Q.    Have you estimated the level of effort that was

11   required by TAE engineers to create the various 3D volume

12   models that it created for Superior parts?

13       A.    Well, yes.  I would say all of the 3D volume models

14   took thousands of hours in creation.

15       Q.    And I think we've covered this, but just so the

16   record is clear on this, Professor, in your view, are the 3D

17   volume models in any way a duplicate of the 2D Superior

18   drawings, just in a different form?

19       A.    They are in no way a duplicate.  They show the same

20   part, that is correct.  But they are not identical and not a

21   duplicate.  It's creating 3D volume model is an independent

22   engineering work.

23       Q.    All right.  Professor Rienacker, let's move on to

24   your next opinion, opinion number 4.  And would you review

25   your opinion number 4 for the Court, please?

1      A.   Yes, I would.

2       The detailed manufacturing drawings and other

3  manufacturing related information TAE created after creating

4  the 3D volume models also contains sensitive manufacturing

5  related information.  Again, this work done by TAE engineers

6  created commercially valuable, proprietary manufacturing

7  documents that enable a supplier to fabricate the parts in a

8  cost effective manner and within the specification provided

9  by the customer.  Such material would not typically be shared

10  between a supplier and a customer.  And it would be

11  considered an unfair business advantage to the customer, if

12  the supplier were forced to provide this information to him.

13      Q.   Thank you, Professor Rienacker.  And I believe we

14  have, what, three examples to show the Court with respect to

15  this opinion?

16      A.   Yes, we do.

17      Q.   Okay.  Let's take a look at the first one.

18           MR. SIMON:  If we could go to the first slide,

19  please.

20      Q.   And for the record, this is Exhibit IA-16.19,

21  correct?

22      A.   That's correct.

23      Q.   Okay.  And tell the -- page 22 of that exhibit,

24  would you please tell us what we are looking at here on this

25  slide?

1    A.   We are looking at a finished part line for what is

2  called the cylinder barrel.  This is the part where the

3  piston is sliding up and down in.  And this part is typical

4  for the 2D drawing supplied to TAE by SAP.  And, again, it

5  bears the SAP logo on it.

6    Q.   All right.

7         MR. SIMON:  And can we go to the next slide,

8  please, Paul?

9    Q.   This is also from 16.19.  Can you identify for the

10  Court what this document is?

11    A.   Well, this is a TAE drawing.  It shows the same

12  part number as the drawing before.  And I would like to

13  highlight a few items on this drawing, which appear to be

14  relevant here in this case.  First of all, the blue box that

15  you see in the center of the drawing, make sure this is the

16  part that was requested by SAP in that extra spreadsheet,

17  directory 2SLX, line item 797.

18    Q.   In other words, this is a drawing that Superior

19  says belongs to it?

20    A.   Exactly.

21    Q.   Okay.  And the first -- the second item I would

22  like to highlight here is a 3D graphical representation of

23  the part that we are looking at.  That it is a 3D graphical

24  representation indicates that this 2D drawing was derived

25  from a 3D volume model.  And, in fact, by common sense, it

1  proves that, because there was no easy way of obtaining such

2  a 3D representation without having a 3D model to it.

3              THE COURT:  May I ask a question?  My page 17

4  doesn't show the blue box in the middle.

5              MR. SIMON:  Let me see what I have, Your

6  Honor.

7      I believe, Your Honor, and we can provide new copies.

8  It's because of these pop ups that are showing up on the

9  screen.  The print was done with all of the pop ups pulled

10 out, so they're covering up, I believe, that blue box.

11             THE COURT:  All right.

12             MR. SIMON:  So we can provide -- and,

13 actually, it's in -- it's in Exhibit 16.19, the clean copy of

14 this document without the --

15             THE COURT:  All right.

16             MR. SIMON:  I apologize for the confusion,

17 Your Honor.

18             THE COURT:  Just wanted to be sure.

19     Q.   Let's go, if we could, to the next slide.

20     A.   The next items I would like to highlight, are items

21 that are related to the manufacturing side and the quality

22 control side.  What you see in the center of that drawing

23 highlighted are symbols, circles with edges to them, flags,

24 and the like.  And the German words in the center boxes call

25 for first clamping, second clamping, and third clamping of

1   the part.  And on the right side you see the priorities.  And

2   they call out for important dimensions and obviously less

3   important dimensions.  And the meaning of that is that the

4   worker who has manufactured the part in the various stages of

5   the process, first clamping, second clamping, third clamping,

6   is actioned here to take measurements to make sure that his

7   work has the quality required for the part.

8        Q.   Okay.  So we're going to hear more about these

9   little circles and flags?

10       A.   Yes.  And what you can see on the left side, they

11  are visible on very many dimensions throughout the drawing.

12       Q.   And are those circles and flags information that

13  was provided in any way by Superior?

14       A.   No.  It was never provided by Superior, to my

15  knowledge.

16       Q.   Did you check the Superior 2-dimensional drawing to

17  see whether that information was contained in the

18  2-dimensional drawing?

19       A.   I certainly made a comparison between the SAP

20  drawing and this TAE drawing.  And this information was not

21  contained on the SAP drawing.

22       Q.   And did you also check the engineering orders and

23  any other specifications provided by Superior for this part

24  to see if that information was contained on any of those

25  documents?

1     A.   We looked through the engineering orders and it was

2   not part of the engineering orders.

3     Q.   Okay.  So is your conclusion, then, that this

4   information was created and added by TAE engineers?

5     A.   Yes.  And that is in line with what was reported to

6   me by TAE engineers.

7     Q.   And who is that?

8     A.   Mr. Deitel.

9     Q.   All right.  Let's move on, if we can, to the second

10   example, Professor.

11     A.   Yeah.  This, again, is showing the cylinder head

12   assembly that we have looked at previously.  And this is,

13   again, the SAP drawing that shows the cylinder start

14   assembly.

15     Q.   All right.  And for the record, this is Exhibit

16   IA-16.18.  I'm not sure if that one is in evidence or not.

17       It is.  I thought it was.

18       All right.  Let's go to the next slide, if we can,

19   Professor.

20       And what are we looking at here on this slide?

21     A.   Yeah.  This is, again, a view on the 3D PDF model

22   of the part.

23     Q.   Okay.  All right.  Let's go, if we can, then, to

24   the next slide.  And this is Exhibit IA-16.19, page 21, which

25   appears to be a TAE drawing.

1        Can you tell us what this is, sir?

2        A.    Well, this is the 2D TAE drawing that calls for the

3   same part number.  It's representing the same part.  And I

4   would highlight, like to highlight a few items, again, on

5   this drawing.  The first thing I would like to highlight is

6   on the lower right corner of the drawing.  Again, this is a

7   3D view onto the part.  And, again, my take away would be

8   that this drawing can only be derived from the 3D model

9   because it shows the 3D view on the part and is not a direct

10  copy of the SAP 2D drawing.

11       Q.    Okay.  So it's clear, the sequence of events, as

12  you understand it is, TAE receives a 2D drawing from

13  Superior, then its engineers create the 3D model, true?

14       A.    Yes.

15       Q.    And then this sort of 2-dimensional drawing comes

16  after the TAE engineers have created their own 3D model?

17       A.    This is exactly right.  This is the sequence that

18  was employed.

19       Q.    Okay.  What are the other points you would like to

20  illustrate for the Court with respect to this drawing, sir?

21       A.    Well, just the second thing I would like to

22  highlight is a detail.  It appears to be a small detail, but

23  it's an important detail.  And this details shows some

24  portion of the barrel contour in this drawing.  What is

25  highlighted yellow here on the inner diameter of the

1  barrel --

2              THE WITNESS:  I should probably step up, if

3  I'm allowed to, Your Honor --

4              THE COURT:  You may, please.

5              THE WITNESS:  -- and make that visible to you.

6       A.   There is a little bump showing here.  This bump

7  indicates a contour that is labeled on the right-hand side in

8  German words as compensation contour for the shot peening

9  operation.  And the apparent meaning of that is they leave

10 some (inaudible word) here on the part.  The final dimension

11 is checked after the shot peening operation.  And as the shot

12 peening takes place, the final dimension is put on the part.

13 But before that, you have some compensation contour

14 associated with that.

15             THE COURT:  All right.

16             THE WITNESS:  May I step back?

17             THE COURT:  You may, please.  Thank you.

18             THE WITNESS:  Thank you very much, Your Honor.

19      Q.   Professor Rienacker, Her Honor may have more

20 experience in engineering matters than I do.  But can you

21 explain --

22             THE COURT:  Assume not, counsel.

23      Q.   Or perhaps not.  Can you just explain for us what

24 shot peening is and what's going on in that portion of the

25 drawing?

1       A.   Well, yes.  Shot peening is an operation in which

2   you try to put compressive stresses into the part.  That

3   helps for a longer life of the part and better strength.  And

4   what you do there is you take small balls of steel and shoot

5   them onto the part in order to create these compressive

6   stresses.

7       Now, we highlight this here because it is heavily

8   manufacturing related information.  To obtain such a

9   compensation contour, you probably have to do some testing.

10  You have to evaluate what comes out of that operation using

11  different specimen.  And this is something that is definitely

12  not open to the public.  It's something that a company works

13  hard on obtaining for a stable serious production.  And you

14  would never share that with any other party.

15      Q.   All right.  Anything else on the contour bumps?

16      A.   Well, yes.  Again, I would like to highlight the

17  box that calls out for the symbols, circles with edges and

18  flags.  Again, this is related to manufacturing operation.

19  The first manufacturing operation called out here is termed

20  milling.  The second operation is final control.  And below

21  that you find the shot peening operation.  And, again, it

22  makes a difference between important dimensions and less

23  important dimensions.  And, again, I would like to highlight

24  that's probably the next step here.

25      Q.   Before we do that, Professor, before we go to the

1  next step, I need to back up, because I forgot to ask you a

2  question about the shot peening bumps.

3              THE COURT:  Are you saying peening?

4              MR. SIMON:  Peening, I believe.  Is it

5  p-e-e-n-i-n-g?

6              THE WITNESS:  Correct.

7              MR. SIMON:  Shot peening, like little BBs, I

8  believe.

9              THE COURT:  No, I get it.

10      Q.   Okay.  Professor Rienacker, this call out that

11  we've been looking at that has the yellow bump and the

12  highlighted language in yellow, the information you've just

13  been describing, is that diagram found anywhere on the

14  Superior 2D drawing or anywhere in the Superior materials?

15      A.   No, it's not.

16      Q.   That was created entirely by TAE?

17      A.   Yes, must be so.

18      Q.   Okay.  Let's go ahead and move forward, then.

19      A.   What is highlighted here, are all of the circles

20  and flags.  And, again, it shows that they are visible

21  throughout the drawing all over the place.

22      Q.   Let me stop you, Professor.  For the record, you're

23  referring to IA-16.19, page 21?

24      A.   That's correct.

25      Q.   Okay.  I'm sorry to interrupt.  You were explaining

1  what the yellow highlighting is.

2      A.   We just had talked about the symbols that refer to

3  taking measurements after the turn milling operation and at

4  final control and after shot peening operation.  And this is

5  highlighting here that these symbols can be found on all of

6  the drawing all over the place.

7      Q.   And are they significant?

8      A.   They are part of TAE's quality control system.  And

9  that, again, is something that costs money and man hours.

10 And, again, this is not something that you would share with

11 your customer.

12     Q.   All right.  And is that information, these little

13 circles and arrows found anywhere in the Superior

14 information?

15     A.   No, they are not.

16     Q.   You were also present in the courtroom on July

17 22nd, were you not, sir?

18     A.   I was.

19     Q.   And you were here for Mr. Marwill's testimony?

20     A.   Yes.

21     Q.   Mr. Marwill was Superior's expert witness, right?

22     A.   He was.

23     Q.   You heard -- and you also had an opportunity to

24 review the transcript from the hearing, is that true?

25     A.   I did review that.

1      Q.   And one of the things Mr. Marwill was asked was

2   whether clamping and turning instructions were found in the

3   Superior drawings.  Do you remember him being asked that

4   question by Superior's counsel?

5      A.   Yes, I do remember.

6      Q.   And do you recall Mr. Marwill testifying that those

7   clamping and turning instructions could be found on a casting

8   drawing?

9      A.   Yes, I heard that.

10      Q.   Well, I just want to be clear about what we're

11   talking about here, sir.  These flags and circles that you

12   have identified for the Court on Exhibit 16.19 page 21, are

13   those clamping and turning instructions?

14      A.   No, they are not.

15      Q.   What are they?

16      A.   They are instructions for the worker to measure

17   after clamping, after turning.  So it's dimensional

18   measurements that they are calling out for.

19      Q.   Okay.  Did you go back and look for a casting

20   drawing for this particular part?  And by the way, what part

21   number are we talking about?

22      A.   Well, in the first place, we are looking at an

23   assembly that essentially contains two important parts.  The

24   cylinder head that is made from the casting and the barrel,

25   and the barrel is made from the forging.  So you cannot

1  expect to have any information on the barrel being

2  represented in the casting drawing.  It's simply made from a

3  different raw material.

4      Q.    What is the difference between a casting and a

5  forging?

6      A.    Well, in a casting, you pour hot metal into a mold

7  and then the hot metal cools out, solidifies, and that comes

8  to be a casting.  On a forging, you take the raw material and

9  hammer that raw material into a metal mold until it gets to

10 the desired shape.  So it's entirely different fabrication

11 processes.

12     Q.    Okay.  So did you look for a forging drawing, if

13 there is such a thing, for the barrel portion of this

14 assembly?

15     A.    We did look for a forging drawing for the barrel.

16 We did not find that.  However, we found similar forging

17 drawing for a different part.  And we couldn't locate any of

18 that information behind the flags and the circles on that raw

19 material drawing.

20     Q.    Did you locate, though -- I don't recall whether

21 you said this or not, sir.  Did you locate a casting drawing

22 for the portion of this assembly?

23     A.    For the cylinder head, we located a casting

24 drawing.  And, again, we could not find any information

25 related to the flags and circles on that raw material

1  drawing.

2      Q.   And what about the contour bump information that we

3  were looking at earlier?

4      A.   Well, that was certainly not visible on either of

5  the raw material drawings.

6      Q.   And does it surprise you, sir, that the information

7  related to the flags and circles and the contour bump for the

8  shot peening were not found in the Superior data?

9      A.   Well, it doesn't surprise me.  You wouldn't expect

10 to find them on these drawings.  And the simple reason for

11 that is taking dimensions for quality control is something

12 that you do when the part is being processed and machining

13 probably for the finished part, as called out here.  But that

14 has nothing to do with raw material.

15     Q.   All right.  The two examples we've been through

16 with the Court so far are both compare the TAE finished part

17 drawings to Superior finished part drawings, correct?

18     A.   That's correct.

19     Q.   Okay.  And we've talked about the 3D models, as

20 well, right?

21     A.   We have.

22     Q.   Did you locate other types of TAE drawings in

23 connection with your work in this case?

24     A.   Yes.

25     Q.   Okay.  Did TAE create other types of manufacturing

1   related documents relating to the parts that it supplied to

2   Superior?

3        A.   Well, yes.  TAE created manufacturing drawings for

4   intermediate steps in the fabrication of the parts.  And

5   we've provided one example here in the exhibits.

6        Q.   Okay.  Before we go into that, Professor Rienacker,

7   just very briefly so I can clean up my record here.  Is

8   Exhibit 16.19 that we just went through a series of materials

9   that you compiled related to your opinions in this case?

10       A.   Yes.

11       Q.   And do they form the basis for your opinions?

12       A.   Yes.

13            MR. SIMON:  Your Honor, we would offer

14   IA-16.19.

15            THE COURT:  Any objection?

16            MR. ALEXANDER:  No objection on the basis that

17   it's something he based his opinion on, but not for the truth

18   of the matter asserted.

19            THE COURT:  Is that acceptable?

20            MR. SIMON:  That's acceptable, Your Honor.

21            THE COURT:  Very well.  It's admitted on that

22   basis.

23       Q.   And, Professor Rienacker, I don't think I asked you

24   this question before, but I'm going to ask it any way.  Is

25   this type of information that you have reviewed and you have

1  compiled in your exhibits, is this the type of information

2  that experts such as yourself in your field of mechanical

3  engineering would typically review and rely upon?

4     A.   Yes.  Given the questions that I was asked, this is

5  exactly the type of information I would look at and form my

6  opinion on.

7     Q.   All right.  Let's walk through this last example,

8  then, Professor, of the TAE manufacturing drawings that you

9  were able to identify on the USB drive.

10     I think we have Exhibit IA-21 in front of us.  And I

11  believe there are four pages of Exhibit IA-21.

12     Did you compile those drawings, sir, from the USB

13  drive?

14     A.   Yes.  I compiled those with support from the people

15  that work for me.

16     Q.   All right.  And do those form, as well, part of the

17  basis for the opinions that you have testified about and are

18  about to testify about in connection with this dispute?

19     A.   Yes, they do.

20           MR. SIMON:  Your Honor, we would offer Exhibit

21  IA-21 into evidence.

22           MR. ALEXANDER:  We have no objection.  I would

23  like to say, though, that no objection on the same basis for

24  his opinion.  But the Superior drawings needs to be sealed,

25  all of them that are coming in in any fashion for anything.

1  They need to be under that same order we did earlier about

2  under seal.

3                MR. SIMON:  And I was going to make the same

4  request at the conclusion of the testimony, Your Honor, with

5  respect to the TAE drawings.

6                THE COURT:  All right.  And the only -- and

7  that's fine.  And so IA-21 will be admitted on the same basis

8  that the other exhibits have been admitted.

9      Following the conclusion of the hearing, you'll need to

10  work with the court recorder to identify the exhibits that

11  will be under the sealing order.

12                MR. SIMON:  Yes, Your Honor.  Be happy to do

13  that.

14                THE COURT:  All right.

15      Q.   All right.  Professor, if you could walk us through

16  Exhibit 21, starting with what is identified on the slides as

17  21.1.  Please explain to the Court what we're looking at

18  here.

19      A.   This is a 2D finished part drawing of a connecting

20  rod.  The connecting rod is one of the major parts in any

21  piston engine.  It connects to the crank shaft on one side,

22  which is rotating, and it connects to the piston on the other

23  side, which is sliding up and down.  So this is one of the

24  parts that is exposed to the high mechanic loading in the

25  engine.  What we see here is the SAP drawing for that part.

1     Q.   All right.  And let's look at the next slide, if we

2   could.

3     A.   Well, this is a TAE drawing for an intermediate

4   step in the manufacturing of that part.  It's the first

5   process step.  It's called rough machining.  So in terms of

6   feets and speed, you have -- you remove  a lot of material

7   from that part at this process step.

8     Q.   In terms of what, sir, what did you say?

9     A.   Feets and speed, sorry for that.

10    Q.   What is that?

11    A.   That is the amount of material that you take away

12  is feet and the speed is how quickly you take it away.  So

13  this is why it's called rough machining, because you do that

14  in a violent sort of operation.

15    Q.   Okay.

16    A.   Now, we were interested in how many dimensions on

17  this intermediate manufacturing step differ from what was

18  supplied to TAE by SAP.  And those dimensions that are

19  different from the SAP finished part drawing, those are

20  highlighted in red color here.  So, again, it's quite a

21  number of dimensions that is different -- that are different.

22    Q.   And when you say they're different, does that mean

23  those dimensions are not found anywhere on the Superior

24  drawing?

25    A.   Yes.  That's the meaning.  They are not found on

1   the SAP 2D drawing.

2      Q.   And why is that?  Can you explain to us why that

3   would be the case?

4      A.   Yes.  This part is made from the raw part.  And

5   then when you manufacture the parts until eventually you end

6   up with a finished part, you have a sequence of steps that go

7   through that fabrication process.  And this is just the first

8   step.  And obviously it can be expected that with this rough

9   operation, you leave some stuck on the part in order to be on

10  specification on surface finish and on other dimensions in

11  subsequent steps.

12     Q.   Okay.  Anything else on this slide, or should we go

13  to the third page of Exhibit 21?

14     A.   We can go to the next slide.  It's the second

15  process step.  It's called finishing.  Not to get mixed up

16  with the finished part drawing.  This is not the last

17  operation on the part, but this operation is called

18  finishing.  And, again, we highlighted all of the dimensions

19  that are still different from the finished part drawing that

20  was supplied to TAE.

21     Q.   So, again, when you say different, just to be

22  clear, all of these boxes that are highlighted in red on the

23  third page of Exhibit 21, that information isn't found

24  anywhere in the data supplied by Superior or anywhere on its

25  2D drawings, correct?

1      A.     That's correct.

2      Q.     And let's go back just one second to slide 21.3.

3   Again, these are -- is it surprising, sir, in any way that

4   this information in red was not supplied by Superior?

5      A.     No, it's not surprising.  The way the process goes

6   in the industry is that the supplier is supplied the drawing

7   that shows the requirements of the finished part looks like.

8   And then it's up to the supplier to come up with its finished

9   part from the raw part in a sequence of steps that he defines

10  with his own manufacturing knowledge.  So it's not a surprise

11  to find different dimensions on intermediate steps.

12     Q.     All right.  Let's look at the fourth page of

13  Exhibit 21, sir.  And what do we have in front of us here?

14     A.     Well, this finally is the finished part drawing.

15  This time it has a TAE logo on it.  So it's a TAE drawing.

16  And, again, we highlight that all the dimensions here on the

17  drawing match those of the SAP drawing supplied by SAP with

18  one difference and we've spoke about that before.  On the

19  upper left corner you see, again, the flags and circles that

20  call out for taking dimensions, measuring dimensions on the

21  finished part.

22     Q.     All right.  And those flags and circles that we see

23  on the fourth page of Exhibit 21, which is a TAE created

24  document, just to be clear, are those flags and circles found

25  anywhere in the TAE supplied materials -- I'm sorry, in the

1  Superior supplied materials?

2      A.   Again, they are not to be found on the SAP drawings

3  or engineering orders.

4      Q.   Okay.  Can you summarize for the Court what the

5  significance is of these drawings that we just looked at in

6  Exhibit 21?

7      A.   Well, the significance is that in order to

8  manufacture the part, it is in most cases advisable to create

9  drawings that show those who do the manufacturing and

10  machining how to proceed on the parts.  So there is

11  additional material created by TAE that cannot -- that

12  contains information that cannot be found on the SAP 2D

13  drawings.

14      Q.   Did you hear testimony during our first portion of

15  this hearing that Superior 2-dimensional drawings are the

16  recipe for creating the part?

17      A.   Yes, I heard that.

18      Q.   Do you agree with that?

19      A.   I completely disagree with that.

20      Q.   And what do you view to be the recipe for creating

21  these parts, sir?

22      A.   My view on what is supplied by SAP is the

23  requirements as to how the part must look like when it's

24  finished.  And the recipe is what we just saw.  As an

25  example, all of the intermediate steps and manufacturing that

1   eventually lead to the finished part that meets requirements.

2   And these intermediate steps are the -- this forms the

3   proprietary manufacturing information of a company.  And,

4   obviously, it also defines the cost of manufacturing that

5   part and is, therefore, something that needs to be protected

6   at all price by the company that is manufacturing the part.

7       Q.   Are these examples that we've been through with the

8   Court this morning the only TAE drawings that you located

9   that reveal sensitive manufacturing information that would

10  provide a competitive advantage to a third party?

11      A.   No.  They are just examples of these drawings.  We

12  found many more drawings that showed us manufacturing related

13  information.

14      Q.   And how is this manufacturing related information

15  treated in the industry, in your experience, sir?

16      A.   It's treated proprietary.  It's the competitive

17  advantage that each company has that is manufacturing the

18  parts.  And, therefore, it is protected.

19      Q.   Do you have an estimate as to how much time and

20  effort would have been required to create these additional

21  manufacturing related drawings that are so sensitive and

22  proprietary, sir?

23      A.   Well, given the 3D volume models that we talked

24  earlier about, again, it would be thousands of engineering

25  hours spent on these manufacturing drawings.

1     Q.    Okay.  One question for you, sir, about a document

2  that I believe you saw last night.

3      Did you review last night a document, a clean copy of

4  an exhibit that was provided to us by Superior's counsel that

5  had some handwritten circles and flags on it?

6     A.    Yes.  I reviewed that.

7     Q.    Okay.  Did you make an inquiry as to what those

8  handwritten circles and flags are?

9     A.    Yes.  I talked --

10             MR. ALEXANDER:  Objection; hearsay.

11             THE COURT:  Sustained.

12             MR. SIMON:  I just asked him if he made an

13  inquiry.

14             THE COURT:  But he started to explain.

15             MR. SIMON:  Oh, okay.

16     Q.    Who did you speak to about that, or who did you

17  make an inquiry of?

18     A.    Well, I think I spoke to that person later.  First

19  of all, I would like to explain my observations on the part.

20     Q.    Please do so.

21     A.    Is it possible, by the way, to show that on the

22  screen so we know what we're talking about?

23     Q.    I don't know if we have it.  Do you need to see it?

24     A.    Well, I don't need to see it.  It's just making

25  clear --

1           MR. ALEXANDER:  What would you like to see?

2           THE WITNESS:  Exhibit 62.

3           MR. SIMON:  May I approach, Your Honor?

4           THE COURT:  You may.

5     Q.    Hold on just a minute, Professor.

6           MR. SIMON:  Your Honor, the original version

7  of Superior Exhibit 62 we were provided that had the exhibit

8  label on it was illegible, so counsel provided us with a

9  clean copy yesterday, I believe.  I guess they think it's

10 important, Your Honor.  I'd be happy to put it up here for

11 the Court.

12          THE COURT:  Yes, please.

13          MR. ALEXANDER:  Object to the sidebar, because

14 that's how I spend all of my weekends, blowing up drawings.

15    Q.    All right.  When you first reviewed this drawing,

16 Professor Rienacker, did you note anything about it?

17    A.    Well, when I first reviewed that drawing, that was

18 barely legible copy of that and so we couldn't read any of

19 that.  Yesterday, we got supplied a better copy and that

20 showed these blue circles and numbers in them.

21    Q.    Okay.  And what were your impressions of this

22 drawing when you were provided with a legible copy of it

23 yesterday?

24    A.    Well, the first impression was that it showed

25 something similar to the flags and circles with edges.  But

1  then we realized that the numbers in these circles were being

2  handwritten, which was surprising.  From how the numbers were

3  handwritten, I would assume that a European person wrote

4  these numbers.  Distinctive differences between the American

5  handwriting and the German or European handwriting.  And then

6  we -- well, we tried to locate the (indecipherable word).

7  You know, this drawing has a part number and a revision

8  number to it.  We found, I believe, seven or so copies of

9  that SAP drawing on the USB drive, including the revision B

10  that we just look at right now.  And none of these drawings

11  exhibited these hand markings on them.  So our basic take

12  away was that what we see here was added to the drawing,

13  handwritten and was never part of the SAP drawing revision

14  process for this part number.  And that's quite a problem.

15      Q.   So you reviewed both prior and subsequent revisions

16  of this particular part number and did not find any circles

17  or flags; is that correct?

18      A.   Yes, that's correct.

19      Q.   Okay.  Do you know what those circles and flags

20  represent?

21      A.   Well, we started to wonder where it comes from.

22  And one of the thoughts was it may come from what is called a

23  first article inspection of the part.  And a first article

24  inspection, the supplying source for the part measures all

25  dimensions on the part then provides that information to the

1    customer and asks for permit to produce the part in serious

2    production.  This is only done once for a part.  And we

3    believe that this was probably part of that process.  Again,

4    the major difference between a first article inspection and

5    what we saw on the TAE drawing is that on a first article

6    inspection, it is a one time process that is probably

7    repeated after a certain number of years, again.  But it's a

8    one time process, more or less.  And what we see on the TAE

9    drawing is called for being measured every time a part is

10   manufactured.

11        Then we went back to the designer that we spoke with,

12   Mr. Deitel, and he confirmed that these hand --

13                   MR. ALEXANDER:  Objection, Your Honor.  That's

14   hearsay, again.

15                   MR. SIMON:  Your Honor, the expert is entitled

16   to rely upon inadmissible information in reaching his

17   opinions.

18                   THE COURT:  Yes.  But this feels like he's

19   using it to prove the truth of what his conclusion about it,

20   not as the basis to form his opinion.

21                   MR. SIMON:  Well, may I ask him a question?

22                   THE COURT:  You may.

23        Q.   Did you speak with Mr. Deitel about this

24   information?

25        A.   We emailed about that.

1      Q.    Okay.  And did Mr. Deitel confirm what you believed

2  to be the case?

3      A.    Yes, he did confirm that.

4      Q.    In other words, that these circles and flags were

5  added by TAE as part of the first article inspection process?

6      A.    It was the typical thing to do on a first article

7  inspection.

8      Q.    Okay.  So these circles and flags are completely

9  different from the circles and flags found on the

10  manufacturing related documents you were referring to

11  earlier?

12      A.    That's my opinion.

13      Q.    All right, Professor Rienacker.  Let's move on to

14  your next opinion and the series of slides that relate to

15  your opinion number 5, if we could.

16      A.    Shall I read that?

17      Q.    Please.

18      A.    All information contained in the SAP 2D drawings

19  can be readily obtained independent from SAP with moderate

20  effort.  For important parts and worth, the essential

21  information in the SAP 2D drawings can be obtained at a

22  reasonably low cost through internet research and engine

23  manuals.  This essential information is mainly established

24  from the OEM engine overhaul menu, which contains all of the

25  engines and tolerances in exact numbers important for

1   assessing air worthiness and interchangeability of the spare

2   part.  These aspects of the spare part form the basis of the

3   parts commercial value.  The remaining information contained

4   in the 2D drawing if and to the extent any of it is not

5   publicly available, can be readily and independently

6   established to such a degree that neither the quality of the

7   part nor the interchangeability of the part are compromised.

8   That's all necessary information in the SAP drawings provided

9   to TAE is either publicly available or readily ascertainable.

10       Q.   All right.  That's quite a bit of information

11  Professor Rienacker.  And what I'd like you to do is explain

12  to the Court what you did to go about arriving at that

13  opinion.

14       A.   Well, what we did was we tried for a certain number

15  of parts to obtain the full history of the parts, which means

16  that we tried to figure out if we could obtain the

17  information to which engine these parts would go.  And if we

18  could find engine overhaul menus for that engine describing a

19  portion of that part.  And then we would go ahead and take a

20  look at the drawings and find similarities between the

21  information provided by the overhaul menu and the, for

22  instance, SAP 2D drawing.  And then we would assess how much

23  information came in the drawing from the overhaul menu and

24  how much remaining information there would be to be

25  determined, a good approximation.  And then we assessed how

1 good we believe we could assess that information to the

2 degree that the quality was equivalent or even better

3 compared to what we had found on the SAP drawing.

4     Q.   Okay.  Well, I think, or at least I hope it will be

5 helpful for the Court if we walk through an example of that.

6 So let's go to the next slide.

7     A.   Yes.

8          MR. SIMON:  Which is Exhibit 16.19, which is

9 already in evidence, Your Honor.

10    Q.   And this is page 1 of Exhibit 16.19.

11     Please explain to the Court what it is we're looking at

12 here, sir.

13          THE WITNESS:  Your Honor, could I step up and

14 explain that to you on the screen?

15          THE COURT:  You may.  Please.

16    Q.   Now, first of all, we looked at the part number.

17 And the first question is always can we find to the part

18 number the engine that it belongs to.  This is some

19 information that is available through the internet page from

20 Superior Air Parts.  And here is the part number that we have

21 looked at up to now, 4706L-A1, the cylinder, start assembly

22 that we have seen a number of times in the past hour.  We

23 actually found the engine that it goes to.  It's a

24 Continental engine.  And it's name is IO470.  And you see

25 some of the variance of the engines depicted by letters

1  behind the engine name.  So basically we can find the engine

2  that belongs to the part.  The next page shows that we find

3  the engine menu related to that engine.  And the source where

4  we found that is depicted here in the blue letters.  It's not

5  the red stuff here.  It's the blue letters that we have here

6  on that exhibit.

7      Q.   So, Professor Rienacker, where -- where did you

8  find that maintenance and overhaul manual?

9      A.   Well, it was available through the internet and

10  free of charge.

11     Q.   Okay.  Let's look at the next slide.

12     A.   What you see here is the table of contents for such

13  an overhaul menu.  And I would like to talk a little bit

14  about the overhaul menu should mean to the person using that.

15  The overhaul menu describes what needs to be done when an

16  engine is overhauled and maintenanced.  So there is

17  instructions for the disassembly of the engine, instructions

18  for the cleaning of the parts, instructions for the

19  inspection of the parts, instructions that describe how to

20  determine if a part is a air worthy or must be repaired or

21  even scrapped.  Cannot be used for flying any more.  And it

22  also describes the tooling that is required to disassembly or

23  assembly of the engine.  It explains how to assemble the

24  engine deck to its full state.  And then it even describes

25  how the engine is tested to be released into field again.

1     Q.   Professor, is this manual a couple of hundred pages

2   long?

3     A.   Yes, it is.

4     Q.   Very long and detailed?

5     A.   Yeah.

6      How, what we highlighted here in blue is that the

7   cylinder that we talk about can be found in the overhaul

8   manual.  And it starts at page A-10-1.

9     Q.   Do we have that page on a slide?

10     A.   Yes, we do.  Go to the next slide.  That is page

11   A-10-5.  And this shows the graphical representation of the

12   cylinder start assembly -- sorry.  Thank you very much.

13      It shows the graphical --

14          THE COURT:  It's a recorder not a -- I think

15   it's on.

16          THE WITNESS:  Sorry.  Please tell me if I'm

17   too loud.

18     A.   It's a graphical representation of the cylinder

19   start assembly.  You will recognize these figures here.  And

20   it shows highlighted in the yellow color dimensions that we

21   found exactly on the SAP 2D drawing.  So that explains the

22   yellow color.  We also find something that is depicted in a

23   green color.  Here, the important information that this

24   surface finish quality in this case is described in the

25   engine overhaul menu.  SAP choose to be -- to request a

1  better quality for the new part.  But, still, this

2  information can be obtained through the engine overhaul menu.

3      Q.  All right.  Anything else on that slide, Professor?

4      A.  Nothing on this slide.

5      Q.  Okay.  Let's go to the next page, if we could.

6      A.  Well, this is a sample page that is showing the

7  information that is contained in the engine overhaul menu.

8  There are tens and dozens of pages of this sort explaining

9  dimensions on the various parts of this engine.  Now, we

10 confine ourselves to the cylinder start assembly, which is

11 highlighted here.  And what you can see, again, is

12 highlighted in yellow colors something that was exactly found

13 in exact numbers found on the SAP 2D drawing.  Again, what is

14 highlighted in green is something that SAP choose to be a

15 better quality on this part, but still can be found in the

16 engine overhaul menu.  And you see that we find a column that

17 calls for service limits.  That is for worn parts.  But we

18 also see on the right-hand side, two columns that are

19 describing new parts, minimum and maximum dimensions.  So the

20 important take away is that we find dimensions for worn parts

21 that have run in the engine, but also dimensions for new

22 parts that will be built in the engine.  And I should point

23 out that the information contained in the engine overhaul

24 menu is the information required to determine the air

25 worthiness of the part and the interchangeability.  And that

1  information is the most valuable and important information

2  for the part at question.

3      Q.   All right.  And just so, I think this is clear,

4  Professor Rienacker, but just so it is, this page that we're

5  looking at here, let's back up to the page we were just

6  looking at.  This page that we're looking at, this is just

7  one of the pages for one of the parts that's found in the

8  engine overhaul manual.  There are lots and lots of

9  dimensions provided for new parts for -- in this manual,

10 correct?

11     A.   That's correct.

12     Q.   All right.  Let's go to the next slide, if we can.

13 Tell us what we're looking at here.  And just for the record,

14 this is Exhibit 16.19 page 19.

15     A.   This is, again, the SAP drawing for the cylinder

16 start assembly SA47006L-A1.  This drawing shows, again,

17 highlighted in different colors dimensions that we

18 categorized.  Now, first of all, I would like to highlight

19 again dimensions given in yellow color.  Those are the

20 dimensions directly found in the engine overhaul menu with

21 tolerances associated to them.  Again, we highlighted in the

22 green color those dimensions that can be also found in the

23 overhaul menu, but are called out here with a better quality

24 for the part.  And then we took a look at all of the other

25 dimensions that were not part of the engine manual.  And that

1   exercise we set together with one of my deputies, a very

2   experienced engineer holding a PhD also in mechanical

3   engineering and a very experienced designer from our area.

4   And we took a look at the dimensions that we were not given

5   in the engine overhaul menu.  We categorized these dimensions

6   with the colors purple, red, and light blue.  And all of the

7   dimensions given in purple color are equipped with standard

8   tolerances that are called out for the drawing here.  Those

9   standard tolerances are wide opened tolerances, so we

10  wouldn't find any problem in establishing these dimensions

11  with tolerances, if given only one part to take measurements

12  from.

13       The next category would be the red colors, red color

14  dimensions.  Those are fewer in number and they call out for

15  special tolerances where the designer considered what he was

16  doing in more detail.  Some of them call for wider tolerances

17  compared to the standard tolerance.  Again, these are very

18  easy to determine.  The other -- some of the other ones call

19  for tighter tolerances compared to the standard tolerance.

20  Again, these are also easy to determine, but require some

21  extra thought to them.

22       Last category refers to only basically two dimensions

23  here on the barrel itself.

24       Q.   And these are the light blue ones, Professor?

25       A.   The light blue ones, that's correct.  And the light

1  blue ones are 2-dimensions where the diameter of the barrel

2  is a little bit tighter compared to the rest of the barrel

3  here.  And that accounts for the thermal environment that the

4  part is subjected to when it's being operated.  So it's still

5  easy to determine, but a little bit more complicated because

6  a person needs to have some experience to take a measurement

7  at this location and then figure out the thermal  expansion

8  that would happen there.  Again, all of the dimensions we

9  would consider to be readily ascertainable, if not given from

10 the engine manual.

11            THE COURT:  I don't see -- there is a brown

12 color, changes apparently approved.  I don't see that on the

13 chart anywhere.

14            THE WITNESS:  Yes.  That's -- well, it is, I

15 believe, some dimension highlighted here.  It is not

16 important, because that talks to the 59 minor changes that

17 TAE had proposed to SAP to be introduced into the drawings at

18 the time that -- when we prepared this.  We just wanted to

19 make sure that this was included there.  It's not --

20            THE COURT:  All right.

21            THE WITNESS:  -- important for this case.

22    Q.    Anything else that you'd like to point out for the

23 Court with respect to this drawing?

24    A.    Yeah.  We tried to categorize basically what the

25 dimensions and tolerances, especially, that we found on the

1   drawings.  And this is highlighted here in this box on the

2   upper left corner of the drawing.  It shows the standard

3   dimension point 005 mils, that's thousands of an inch.  And

4   that's a very wide tolerance.  We found 60 dimensions on the

5   drawings were equipped with that standard tolerance.  We

6   found even 24 tolerances that were wider open than the

7   standard drawing tolerance.  And just six tolerances on the

8   drawing that were tighter than the standard tolerance.

9       Q.   Okay.

10      A.   Thank you very much.

11      Q.   Would you like to return to your seat now?

12      A.   Yes, I would like to do that.

13               THE COURT:  All right, please.

14               THE WITNESS:  Thank you very much, Your Honor.

15               THE COURT:  Thank you.

16      Q.   Professor Rienacker, Did you go through and perform

17   this same detailed analysis for every part that TAE made for

18   Superior?

19      A.   Certainly not.  But we picked like the four most

20   important parts, complicated parts that we figured were

21   relevant in the case.  We performed that with the crank

22   shaft, with the connecting rod and with two cylinder start

23   assemblies.  And we came always to the same conclusion, that

24   we could readily ascertain what was not available through the

25   engine overhaul menu.

1    Q.   And can you then summarize what all of this means

2  to you in terms of the availability of the information

3  necessary to recreate the data Superior supplied to TAE?

4    A.   Well, in the first place, the most important

5  information is available through the engine manual.  It is

6  the information that determines the air worthiness of the

7  part and the interchangeability of the part.  And forms the

8  commercial basis for the value of the part.  And then all of

9  the other information is readily ascertainable for an

10  experienced engineer probably with some consideration to it.

11    Q.   How long has that sort of information been

12  available, sir?

13    A.   It has been available for a long time.  Many, many

14  years.

15           MR. ALEXANDER:  Objection.  What information?

16           THE WITNESS:  Like engine overhaul menus.

17           MR. ALEXANDER:  The engine overhaul menus,

18  thank you.

19    Q.   And you're talking -- what about the

20  ascertainability of the other information?  Has that also

21  been ascertainable for the same period of time?

22    A.   Well, yes.  I mean, we did an extra exercise just

23  to be sure we're not missing anything.  We took two parts

24  from the automotive engines that we are familiar with.  These

25  parts were designed in the '90s, 1990s.  And we found, for

1  instance, that the tolerances on these parts were much

2  tighter compared to what we found on the SAP drawings.  And

3  this enables us to say, you know, that the SAP drawings and

4  the parts that are represented through them are actually from

5  a technology that is 50, 60 years old.

6       Q.    Professor Rienacker, did you exhaustively search

7  all potential public sources for the information that's

8  contained in the Superior drawings and data?

9       A.    No, we did not.  We confined our search to the

10 engine overhaul menus.

11      Q.    Okay.  Did you, for example, go to libraries or the

12 military or make any Freedom of Information Act request?

13      A.    No, we did not.

14      Q.    When you issued your opinions in this case, the

15 week before the July 22nd hearing, I believe, is when it was,

16 maybe two weeks before, at the point in time you issued your

17 original opinions, were you aware of the testimony that you

18 heard from Mr. Dedmon this morning regarding the availability

19 of this information in the public domain?

20      A.    No.  We were not aware of that.  And I should say I

21 thought my opinion independently.

22      Q.    Since you became aware of that testimony, have you

23 given consideration to it?

24      A.    Yes, I did.

25      Q.    And what, if any, impact does it have on your

1  opinions?

2      A.   Well, I considered that some of the engines that we

3  talk about, like the O320 engines, and also the IO -- the

4  O470 that has to do with the IO470, they were certified in

5  the early 1950s.  So the design stems from probably the '40s

6  or even earlier.  And it could well be that you find

7  information from the military system that is covering the

8  engines and the parts in the engines.  And also the other

9  sources that you mentioned, it could well be that you find

10 the information in there.

11     Q.   All right.  I think we're pretty close to wrapping

12 up, Professor Rienacker.  The last series of questions I have

13 for you relate to the slides you've created regarding

14 Superior's Exhibit 56 first and then 57.

15      What -- do you have on the screen in front of you a

16 slide from the first page of Superior Exhibit 56?

17     A.   Yes, I do.

18     Q.   Okay.  And what is the title of that document?

19     A.   The title reads, File locations of original

20 Superior documents and information on TAE server.  Superior

21 requests return of these files, pursuant to the confirmation

22 order.

23     Q.   Okay.  Have you undertaken a search of some of the

24 directories that are listed in Exhibit 56 to see whether or

25 not there are documents located in those directories that

1  contain the TAE logo and, therefore, appear to have been

2  created by TAE and not by Superior?

3      A.   Yes, we did that search.  We did not exhaustively

4  look at everything.  But we did find some drawings that show

5  the TAE logo on them.

6      Q.   Okay.  Let's go to the next slide, if we can.

7      A.   Now, this is line item 31 of the list.  And it

8  specifies a certain directory.  In this directory, we found

9  two files that bear that TAE logo on them.  The first file is

10 showing a bushing like depicted here.

11     Q.   Let me make sure our record is clear.

12          MR. SIMON:  So can we go back a slide?

13     Q.   So we're clear, the call out that you're referring

14 to is line item 31 on SAP Exhibit 56, correct?

15     A.   Correct.

16     Q.   And it says SV13923A and then there's a lot of

17 stuff that I don't understand, because it's in German, right?

18     A.   Correct.

19     Q.   Okay.  And so if we go to the next slide, slide 34,

20 is this a document that was located within that directory on

21 line item 31?

22     A.   Yes, it is.  And it shows a drawing with a part

23 number SV13923A-A on it.  And that's the bushing that we look

24 at right now.

25     Q.   Okay.  And that is Exhibit IA-24, Your Honor.  And

1  we would offer it for the same purposes as the other exhibits

2  offered in connection with Professor Rienacker's testimony.

3             THE COURT:  Any objection?

4             MR. ALEXANDER:  Your Honor, I don't have any

5  objections to the drawings, because I -- first of all, we

6  received these drawings some time last night after I was

7  trying to go to sleep.  I think I know what the drawings are.

8  I have no idea what the thing in German says, since I don't

9  speak German.  So I have -- again, we're searching for the

10 truth here.  So I don't have an objection to the drawings,

11 because I have something to offer on those.  I don't know

12 what the thing in German is.  So I object to the thing in

13 German, I guess, is what I would say.

14            THE WITNESS:  Well, sorry for that.  May I

15 speak?

16            MR. SIMON:  Your Honor, would the Court like

17 the witness to interpret the German, or -- we're simply

18 offering this document to show that it appears to be a TAE

19 created document and not a Superior created document.

20            THE COURT:  For that purpose, I'll allow it to

21 be admitted.  I leave it, Mr. Alexander, to you if you want

22 the witness to tell you what the German information on the

23 document is.

24            MR. ALEXANDER:  I may ask him that in

25 cross-examination.

1            MR. SIMON:  And just to be clear for the

2  record, Your Honor, I'm not sure what German language counsel

3  is referring to.  But Exhibit 56 is Superior's exhibit, not

4  the Insolvency Administrator's exhibit and it contains

5  German, as well.

6            MR. ALEXANDER:  We know what that German says.

7            THE COURT:  All right.

8      Q.   Okay.  Professor Rienacker, did you locate a couple

9  of other examples of documents that appear to be TAE

10 documents that were contained in the directories found in

11 Exhibit SAP 56?

12     A.   Yes.  This is a plan to measure certain items that

13 bushing, which was also located in the same directory.

14     Q.   And this is Exhibit IA-25?

15     A.   Yes.

16     Q.   And that was located within the directories found in

17 Exhibit 56?

18     A.   It's exactly in it.  It also bears the TAE logo on

19 it.

20            MR. SIMON:  Your Honor, we would offer it for

21 the same purpose.

22            THE COURT:  Any objection?

23            MR. ALEXANDER:  No objection.

24            THE COURT:  It's admitted for that purpose.

25     Q.   And if we could move along to the next slide.

1       A.    Yeah.  This calls out for line item 75, SL36800.

2       Q.    Okay.  And did you find a document located in that

3  directory that also bears the TAE logo?

4       A.    Yes.  It's not well visible here, but it's the TAE

5  logo on the part that he has called out as IA-26.

6                  MR. SIMON:  And, Your Honor, again, for the

7  same limited purpose, we offer Exhibit IA-26.

8                  MR. ALEXANDER:  Explain to me again, if you

9  don't mind counsel, what that limited purpose is?

10                  MR. SIMON:  Limited purpose is to show that

11  documents were found within the directories contained in

12  Exhibit 56 that bear the TAE Logo.  Because our understanding

13  of the testimony regarding Exhibit 56 was that every drawing

14  contained in those directories was supplied to TAE by

15  Superior.

16                  MR. ALEXANDER:  No objection on that basis,

17  Your Honor.

18                  MR. SIMON:  Thank you, Your Honor.

19       Q.    Let's go to the next slide, if we can, please.

20        And what are we looking at here, sir?  Is this a copy

21  of Superior's Exhibit 57 with the heading pulled out and

22  highlighted?

23       A.    I believe so.

24       Q.    Pulled out, okay.  And what does that heading say?

25       A.    It says, Summary of file locations of duplicate

1    Superior documents and information on the TAE server.

2    Superior requests return of these files pursuant to the

3    confirmation order.

4        Q.    Okay.  So is it your understanding based upon the

5    testimony offered by Superior's witnesses in this case that

6    Superior contends that the information contained in the

7    directories of Exhibit 57 are simply duplicates of Superior

8    documents?

9        A.    Yes.  That appears right.

10       Q.    Did you undertake a review to determine whether or

11   not you agree with that?

12       A.    Yes.  We tried to locate the directories in

13   commission and find information that we think are not

14   proprietary to Superior.

15       Q.    And what did you find when you reviewed the various

16   documents contained within the various folders that are

17   contained within the various directories of Exhibit 57?

18       A.    Well, Exhibit 57 is a very long list.  I believe

19   it's got 24 or something pages.  We reviewed the first three

20   pages and visited every subdirectory called out here.  And

21   about 80 percent of the material that we found, we think

22   relates to information that TAE created.

23       Q.    And when you say, information TAE created, when you

24   reviewed portions of the folders and files that are listed in

25   Exhibit 57, did you find the types of documents that you have

1  been describing and discussing before the Court here this

2  morning that contained the TAE manufacturing related

3  information?

4        A.   Exactly that is what we found.

5             MR. SIMON:  We'll pass the witness, Your

6  Honor.

7             THE COURT:  Very well.

8        Cross-examination?

9             MR. ALEXANDER:  Yes.  Can we have a short

10 break?

11            THE COURT:  We may.  How much time do you

12 need?

13            MR. ALEXANDER:  5 minutes.

14            THE COURT:  Perfect.  We'll be back in 5

15 minutes.

16                  (Brief recess ensued.)

17            THE COURT:  Please.

18            MR. ALEXANDER:  Ready?

19            THE COURT:  Yes.

20            MR. ALEXANDER:  Jerry Alexander for the

21 movant.

22                  CROSS-EXAMINATION

23 BY MR. ALEXANDER:

24      Q.   Mr. Rienacker, I took your deposition in this case

25 earlier, didn't I?

1          A.   Yes, you did.

2          Q.   On Sunday, I think?

3          A.   Sunday afternoon.

4          Q.   I think it was a Sunday afternoon we spent

5     together.

6          A.   July 20th, or something like that.

7          Q.   July 20th, about.

8           I think I got something wrong in your deposition or

9     from your testimony.  I thought from your testimony in the

10    deposition you told me that you didn't have any experience in

11    the piston aircraft industry.

12          Did I hear that wrong?

13         A.   I told you I didn't have any experience?

14         Q.   You said, Not directly, I believe was your answer.

15          Do you have any experience in the piston aircraft

16    industry?

17         A.   I have worked in the aircraft engine industry, yes.

18         Q.   Piston aircraft industry.

19         A.   I also --

20         Q.   Piston aircraft industry.

21         A.   So far not in the piston aircraft engine industry.

22         Q.   Not in the piston aircraft engine industry?

23         A.   That's correct.

24         Q.   Now, that might be an explanation for why you say

25    that Superior has parts drawing has wider tolerances on its

1  parts and that means that they're not up-to-date or as good

2  as modern things, they're old parts?

3       A.   I think that's probably not the logic behind.

4       Q.   Do aircraft engines work at altitudes?

5       A.   Yes, they do.

6       Q.   And they have to work at those altitudes, don't

7  they?

8       A.   Certainly they have to do that.

9       Q.   Is it colder the higher you go up?

10       A.   Definitely is.

11       Q.   And if you have a tight tolerance and that

12  tolerance tightens up even more because it's cold, then that

13  could be a problem, couldn't it?

14       A.   The parts shrink, not the tolerances.

15       Q.   The tolerances are looser in aircraft engines

16  because the temperature (indecipherable word); is that

17  accurate or not?

18       A.   To be honest, I wouldn't think so.

19       Q.   But you don't know?

20       A.   I don't know.  But the tolerances --

21       Q.   If you don't know, you don't know.

22        Are you a designated engineering representative by the

23  Federal Aviation Administration?

24       A.   I'm certainly not.

25       Q.   When making your opinions when you were talking

1  about what drawings or parts -- drawings are identical

2  between Superior and TAE drawings, what scientific or

3  governmental recognized standard did you use in making those

4  comparisons?

5       A.   Well, what did you say about identical?

6       Q.   Did you make a comparison as part of your opinions

7  on whether or not a Superior drawing was the same as a TAE

8  drawing?

9       A.   Yes.  I made an opinion, yes.

10       Q.   And in making that opinion, did you use any

11  recognized scientific or governmental standard for

12  identicality?

13       A.   Well, I did use an engineering standard.  And I'm a

14  professor in engineering.

15       Q.   What engineering standard did you use?

16            MR. SIMON:  Your Honor, can the witness be

17  allowed to complete his answer to the questions, please.

18            MR. ALEXANDER:  Sure, go ahead.

19            THE COURT:  You're both stepping over each

20  other just a little bit.  So let Mr. Alexander finish his

21  question and then answer and so forth.

22            THE WITNESS:  Yes, I will, Your Honor.

23       Q.   It was an unartful question.  Let me ask a better

24  question.

25            The standard that -- did you use any FAA standards to

1  make that determination?

2       A.   No.  I didn't use any FAA standard.  However, I'm

3  aware of these standards.

4       Q.   Did you use any standard that you can refer me to

5  that's published in some publication or engineering standard

6  that says what means one drawing is the same as another?

7       A.   I would think it's an engineering judgment that

8  comes to that conclusion.

9       Q.   So it's a judgment.  So you could have one judgment

10 and another engineer could have another judgment?

11      A.   We saw that in this case.

12      Q.   Thank you.

13        Now, did you prepare -- you prepared a summary of your

14 opinions in this case; did you not?

15      A.   I did prepare that.

16      Q.   And you testified some, you told the judge about

17 some of those opinions; did you not?

18      A.   I did.

19      Q.   I believe they had the summaries of the opinions up

20 on the screen?

21      A.   Yeah.

22      Q.   Do you have a copy there of your opinions?

23      A.   Yeah, it's Exhibit 17, 16.17, probably.

24      Q.   I don't want to introduce it into evidence.  I just

25 want to ask you if you still think that everything you said

1    in that opinion is accurate, is the same as it was before?

2        A.    Yes, it is.

3        Q.    You don't want to change anything?

4        A.    No.  I don't want to change anything.

5        Q.    I'm going to read you something from your opinion.

6    And you tell me if it's still the same, okay?  I'm going to

7    read to you from the scope and background part of it.

8         Do you see that at the top?

9        A.    Yes.  Yes, I do.

10       Q.    It says, I understand that SAP -- was used for

11   Superior?  SAP means Superior in your opinion?

12       A.    Yes.  SAP stands for Superior Air Parts.

13       Q.    Okay.  Can I say Superior instead of SAP so the

14   record --

15       A.    Yes, you can.

16       Q.    I understand that Superior 2D detailed drawings for

17   various aircraft engine parts were supplied from Superior to

18   TAE in an effort where TAE was asked to manufacture these

19   parts for Superior who would market them under a Federal

20   Aviation Administration (FAA) parts manufacturer approval

21   (PMA) license.

22       A.    Yes.

23       Q.    Do you still agree with that?

24       A.    Yep.

25       Q.    Next part.  I understand in addition that TAE

1   created 3D CAD, computer aided design models (volume models)

2   from these drawings.

3        I read that correctly?

4        A.   Yeah, you did.

5        Q.   Do you still agree with that?

6        A.   Yes.

7        Q.   And so what TAE did was it got the Superior

8   2-dimensional drawings that Superior supplied to TAE under

9   the supplier agreement and made their 3D CAD models from

10   those 2-dimensional drawings?

11        A.   Uh-huh, yes.

12        Q.   That's right, that's what they did?

13        A.   That's correct.

14        Q.   And then after that, from those 3D CAD models that

15   had been made from the Superior 2-dimensional models, TAE

16   made some 2-dimensional models and put a TAE sticker on it;

17   is that right?

18        A.   That's correct.

19        Q.   So it's a fact then, is it not, that all of the TAE

20   3D CAD models and all of the TAE 2D drawings contain Superior

21   dimensions, tolerances, information, and data that were

22   originally supplied by Superior to TAE under the supplier

23   agreement?

24        A.   Yes.  The 3D volume models contain information that

25   was also present on the 2D drawing supplied by SAP.

1       Q.    And did the 2D drawings made from the 3D drawings

2   after that, correct?

3       A.    Naturally.

4       Q.    Excuse me?

5       A.    Naturally.

6       Q.    Naturally, they would have to.

7       A.    Yes.

8       Q.    So every -- every TAE drawing, or drawing with a

9   TAE logo on it, 3D or 2D that you've talked about in this has

10   Superior's dimensions, tolerances, information, and data

11   contained in those drawings?

12       A.    That's correct.

13       Q.    How many -- drawings for how many different parts

14   did Superior supply to TAE under the supplier agreement?

15       A.    Well, that's a number that is difficult to assess.

16   We thought about that.  We found a directory on the USB drive

17   that contains many drawings, over 700 of them.

18       Q.    Okay.  There were over 700 drawings.  I have a

19   number of 700 drawings.  But my question is simpler than

20   that.  For how many parts?  Because some parts would have

21   more than one drawing.

22       A.    Well, some parts would have more than one drawing.

23   And we found drawings with identical part numbers, but

24   different revisions under the 370.  So over all, I believe

25   the correct number here concerning the number of drawings

1   would be roughly 360 or something, not 700.  And then only a

2   portion of them -- apparently with the information that I've

3   seen quite recently, only a sub-portion of them were parts

4   that were manufactured by TAE for SAP.

5        Q.   Do you know -- if I told you that 362 parts,

6   drawings for 362 parts had been sent to TAE by Superior,

7   would you disagree with that?

8        A.   I would not disagree with that.

9        Q.   Do you know how many of those 362 parts TAE

10  actually manufactured for Superior?

11       A.   I've seen a list that contained about 48.

12       Q.   48 parts?

13       A.   Line items, yes, parts.

14       Q.   So out of the 362 parts that Superior sent drawings

15  to TAE for, tAE only actually manufactured 48 of them?

16       A.   That is probably right.

17            MR. SIMON:  Your Honor, may I assert an

18  objection here?  I think counsel made a representation as to

19  the number of parts and asked whether or not the witness

20  would disagree.  I don't believe the witness has personal

21  knowledge of these numbers.  I don't believe they have been

22  established anywhere in the record.

23            THE COURT:  Sustained.

24       Q.   Did all of the Superior Air Parts drawings that you

25  reviewed contain a proprietary right stamp by Superior?

1      A.   I didn't check on all of them.  That was not the

2  intention, the attention I paid to the drawings, but I saw a

3  proprietary stamp on many of them.

4      Q.   Did you -- did you see any Superior drawings that

5  you recall that did not have a proprietary right stamp on

6  them?

7      A.   I cannot say.  I didn't pay attention to that too

8  much.

9      Q.   Did -- in your review, did you see any TAE drawings

10  that had a TAE proprietary right stamp on them?

11      A.   Again, this is something that I have not looked at

12  in detail.

13      Q.   Well, here are examples of two drawings.  Why don't

14  you get up and come over here.

15           THE WITNESS:  Can I stand up, please?

16           THE COURT:  You may, of course.  And,

17  Mr. Alexander, why don't you stay close to the microphone

18  and, Ms. Whittington, do you have a handheld mic that you can

19  give the witness?

20      Q.   These two drawings are examples of TAE

21  2-dimensional drawings; is that accurate?

22      A.   Yes.

23      Q.   What you've been referring to as TAE 2-dimensional

24  drawings.

25       Do they have proprietary right stamps on them?

1     A.   I do not see a big stamp saying proprietary.  Some

2  of the wording here I cannot really read, because it's too

3  small to be readable.  On this one I cannot readily see any

4  proprietary stamp on it.

5     Q.   Now, these two drawings, which are IA-16.36 and

6  IA-16.19, those are exhibits that were -- bene proffered by

7  TAE, correct?

8     A.   Proffered?

9     Q.   Well, they're TAE exhibits?

10     A.   Yes.  Well, they have the TAE logo on them, yes.

11     Q.   Right.  And the one on the right is what part

12  number?  Can you read that?

13     A.   That's SA47030.  And that's the cylinder barrel

14  that we have talked about a number of times today.

15     Q.   And what's this --

16          THE COURT:  Mr. Alexander, back to the

17  microphone, please.

18          MR. ALEXANDER:  I'm sorry.

19     Q.   And what's this, the drawing over here on your

20  left?

21     A.   That is named SA52005-K.

22     Q.   And the note that you wrote -- and I understand the

23  requested in the big box.  What's the note that you wrote on

24  each drawing in the little box?

25     A.   On this one?

1      Q.    Yes, sir.

2      A.    TAE 2D manufacturing drawing for SA52005, revision

3   K showing sequence of manufacturing, first clamping to third

4   clamping.   In each set clamping the sequence of operation

5   lightly indicated by numbers.   TAE proprietary, and there was

6   a spelling mistake, I apologize for that, proprietary

7   manufacturing detail.

8      Q.    Does the outer note say that same thing on 16.19

9   down at the bottom?

10     A.    TAE 2D manufacturing drawing for SA47030 showing

11  sequence of manufacturing first clamping to third clamping.

12  In each clamping, the sequence of operations lightly

13  indicated by numbers, TAE proprietary manufacturing detail.

14     Q.    Why did you use the word likely?

15     A.    At this point in the process where we established

16  this, we had not the information yet as to what the sequence

17  of number would really call out for.   We know by now that it

18  calls out for measurements to be taken.

19     Q.    Likely means it could be something else, other than

20  a manufacturing process, doesn't it?

21             MR. SIMON:   Your Honor, may I ask if the

22  witness is done and may return to his seat?

23             THE COURT:   Is there anything else on the

24  drawings he needs to look at?

25             MR. ALEXANDER:   Yes.   I think there was a

1    question pending.

2         Does likely mean it could be something else, other than

3    a manufacturing sequence?

4         A.   At the time when we prepared exactly this slide, we

5    didn't know exactly what it was calling out.  But it was

6    highly likely that it was a manufacturing sequence or a

7    quality control sequence, which is also part of

8    manufacturing.

9         Q.   So it could be for quality control?

10        A.   Yes.

11        Q.   Now, what you're saying belongs to TAE are these

12   little flags and little circles that are on those two

13   drawings?  What's proprietary to TAE?  You used the word,

14   what do you think is proprietary to TAE?

15        A.   Well, I believe I'm not the one to be claiming what

16   TAE is claiming to be their own.  I was commenting on this is

17   one example of something that is proprietary to TAE on these

18   drawings.  Obviously since these drawings have been derived

19   from the volume 3D models, and there is a lot of work in

20   these 3D models, you know, obviously this could also be

21   claimed to be TAE's own independent work.

22                  MR. ALEXANDER:  I know I should ask to strike

23   that, I'm not because I'm going someplace else.  We'll just

24   save time.

25        Q.   Here's what -- let me ask the question.  Is there

1    anything on the drawing, besides these little flags and these

2    little circles, that you think TAE is claiming is

3    proprietary?

4        A.    Well, let me put it this way.   What I see here is a

5    part number.   And the same part number appears on an SAP 2D

6    drawing.   So, essentially, these two drawings would describe

7    the same part.

8        Q.    Let me stop you right there.   So the TAE drawing is

9    a copy, basically, of the Superior 2D drawing, except it has

10   some flags and circles on it?

11       A.    Well, this is what I disagree with.

12       Q.    You disagree with that.   Let me ask you this.   The

13   dimensions, these flags and circles, they point at

14   dimensions; do they not?

15       A.    They do.

16       Q.    Those dimensions that they point at our Superior

17   dimensions, correct, dimensions that came from the Superior

18   2D drawing initially?

19       A.    You find the same dimensions very likely, because

20   you've got the same part number on Superior supply drawings.

21       Q.    And TAE, what TAE's job is is to check and make

22   sure those dimensions match the Superior 2D drawing?

23       A.    That is not entirely correct.   What I pointed out

24   here is that you have certain stages of manufacturing in

25   which you clamp the part, first clamping, second clamping,

1   third clamping.  You probably turn the part around from the

2   first clamping to the second clamping.  Again, turn the part

3   around to the third clamping.  Now, these operations may

4   refer to intermediate manufacturing stages.  And, therefore,

5   you wouldn't expect everything to be called out.

6       Q.   Are the dimensions on that TAE drawing for 47030

7   different than the dimensions on the Superior drawing?

8       A.   I don't believe so, because it's the same part

9   number.

10      Q.   Is the same true for this one over here, SA52005,

11  are the dimensions on that drawing the same as on the

12  Superior initial drawing?

13      A.   They must be the same to the same part number from

14  an SAP drawing.

15      Q.   I want you to look -- can you read the notes over

16  there on the left --

17      A.   These notes?

18      Q.   Yes, sir.  And they're in German.

19      A.   Yeah.  Again, they call for first clamping, second

20  clamping, and third clamping.

21      Q.   No, no, not those notes.  The ones on the left-hand

22  corner down at the bottom.  Can you read those?

23      A.   This is hard to read.

24      Q.   Can you read me -- just look at, can you read note

25  14 on SA-52005?

1     A.    It says, Probably no changes on manufacturing

2   processes of this part without prior consent of Superior.

3     Q.    Can you read note 13 on this other drawing,

4   SA-47030 that's Exhibit 16.19, over here?

5     A.    Would you allow that I check for the context of

6   that remark on the part?

7     Q.    No.  You can do that.

8     A.    Well, it's a note 14, which must be found somewhere

9   on the part.  So probably this note would not apply to

10  everything on this drawing.

11    Q.    It wouldn't?  It could apply to everything on the

12  drawing, couldn't it?

13    A.    If you have a 14 all over the place, then, yes.  I

14  would like to look for the 14.

15    Q.    Okay.  Look for the 14.

16    A.    Yeah.  I see 17.  Actually, the representation of

17  the part of this copy of the drawing is not good enough to

18  really allow for looking for 14.  If you looked in the PDF

19  file, you could probably easier identify the number 14.  And

20  I would assume that you have probably one, two, or three

21  locations where that remark with the number 14 would apply

22  to.  And you can probably help me in that.

23    Q.    What if you don't have a mark for 14?  What if

24  there's not a mark for 14 at all?  Does that mean it applies

25  to everything?

1      A.   I wouldn't think so.  I would think that this

2   remark doesn't apply to the part at all.  There is always a

3   link to a certain location on the drawing.

4      Q.   Go over here and read note 13.

5      A.   Note 13.

6        No changes in the manufacturing process of this part

7   without prior consent of Superior to be performed.  So that's

8   13.

9      Q.   Did you find a 13 on there?

10     A.   I would hope so.  I see 11, 5, 9, 10, 7, 7, 12.

11   Actually, I don't see 14.

12     Q.   You're looking for 13 on that one.

13     A.   13, sorry.

14     Q.   You didn't see a 13?

15     A.   Not at first glance.  Sorry for that, but I'm not

16   quick enough.

17     Q.   Isn't the German word in the note, doesn't it say

18   for this part on the note --

19     A.   Well, we've seen a certain number of these items

20   called out.  And, therefore, I would expect to find an

21   individual dimension specified with the remark 13 here.

22                MR. ALEXANDER:  Okay.  I'm going to ask that

23   that be struck as non-responsive.

24                THE COURT:  Sustained.

25     Q.   I'd ask you to read note 13 again, please.

1      A.    No changes to the manufacturing process for this

2  part without prior consent of Superior.

3      Q.    Now, that said, this part, correct?  You just read

4  it to me.

5      A.    There is more than one meaning to the word part.

6      Q.    The part should mean the entire drawing, correct?

7      A.    Again, I said there was more than one meaning to

8  part.  It could be that location in the part is also a part,

9  part of the drawing.

10     Q.    What location?

11     A.    Well, the location I was looking for when I was

12  looking for remark number 13.

13     Q.    But there's not a remark number 13 on that drawing.

14     A.    Well, I didn't have time enough to confirm that.

15     Q.    Take some more time, if you want to.

16     A.    Well, can we have a PDF file that I can search for

17  better representation?

18     Q.    Well, not right now.  Why don't you have a seat.

19     A.    Thank you very much.

20     Q.    Thank you.

21          THE WITNESS:  Thank you very much.

22          THE COURT:  Thank you, Professor.

23     Q.    Who is the manufacturer of this part, according to

24  Federal Aviation Administration regulations?

25     A.    Thinking about the regulations, they call out that

1    the manufacturer of the part, a PMA part in question here

2    should be a US based company.  I would assume the

3    manufacturer under FAA ruling is SAP.

4         Q.   Is Superior?

5         A.   Yes.

6         Q.   And that means that Superior is responsible to the

7    Federal Aviation Administration and to the public for this

8    part's air worthiness and for every step in the manufacturing

9    process; does it not?

10        A.   And that is quite natural, because SAP is the

11   holder of the PMA.

12        Q.   SAP, or Superior, holds the license from the

13   Federal Aviation Administration to make this part and nobody

14   else can make it under that PMA, correct?

15        A.   Nobody else can sell it.

16        Q.   Nobody else can make that part under that PMA

17   approval?

18        A.   Well, I mean, in the common sense of the word

19   manufacturer, you would think TAE is fabricating the part.

20        Q.   The supplier is the fabricator.  But by law,

21   Superior is the manufacturer, correct?

22        A.   Yeah, that's correct.

23        Q.   And that's why the note is on the TAE drawings that

24   no change can be made in the manufacturing process without

25   the prior consent of Superior, correct?

1      A.   Well, thinking about what I've seen right now,

2  those are finished part drawings.  We've seen drawings for

3  intermediate stages of the manufacturing that probably don't

4  call out for that comment.  So I would have to think about

5  that a little bit more.

6      Q.   Let's talk about the intermediate steps you were

7  talking about.  Okay?

8      A.   Yes.

9      Q.   Let's look at -- you have some intermediate steps

10  here on you say some manufacturing drawings in Exhibits 21

11  and 22, as I recall; is that right?

12           MR. ALEXANDER:  Your Honor, it's going to go

13  faster and I would like to thank counsel.  They said we could

14  use the same thing they've been using.

15           THE COURT:  Of course.

16           MR. ALEXANDER:  Very courteous of them.

17      Q.   Now, do you have one of these that you can look at?

18      A.   Not yet.

19      Q.   Or you can come up here and stand, but I don't want

20  you to have to stand up the whole time.

21           MR. SIMON:  Your Honor, may I approach?

22           THE COURT:  You may.

23           THE WITNESS:  Thank you very much.

24           THE COURT:  Thank you, Mr. Simon.

25      Q.   Now, 21.2, the second drawing in 21 -- well, I'm

1  sorry, yeah, 21.1 is the first one and 21.2 is something that

2  you said had -- was a manufacturing step, correct?

3       A.   Correct.

4       Q.   Did you also say that when somebody did these

5  manufacturing steps that that was important to know, because

6  that's how they priced the part?

7       A.   That's correct.  Based on the sequence of steps,

8  you would be able to make a quote for the part.

9       Q.   That's important, because that's how much it cost

10  to make the part?

11       A.   Yes, it is.

12       Q.   So when TAE sold any parts to Superior, TAE was

13  paid for these manufacturing drawings, that was included in

14  the price of the part?

15       A.   Well, I'm probably not judging on the commercial

16  side of the business.  And -- right?

17       Q.   Well, but that was your testimony earlier, that

18  when a manufacturer does this, they include it in the price

19  of the part.

20       A.   I never did make that statement.

21            MR. SIMON:  Your Honor, I object.  That

22  mis-states the witness' testimony.  He offered no such

23  testimony or opinion.

24            MR. ALEXANDER:  I think he said that.

25            THE COURT:  Well, I'll let you explore whether

1   he did or didn't say that.  But that's not necessarily how I

2   understood the statement to be.

3                   MR. ALEXANDER:  We'll move on.  We'll move on.

4       Q.   Drawing 21.1 is a Superior drawing; is it not?

5       A.   It is a Superior drawing.

6       Q.   And drawing 21.2 and 21.3 are what you call

7   manufacturing drawings.  And then 21.4 is what?

8       A.   That's a TAE finished part drawing.

9       Q.   And 21.2 and 21.3 are intermediate steps to get

10  from a forging to the finished part; is that accurate?

11      A.   That's correct.

12      Q.   And who sent the forging drawing to TAE?

13      A.   I believe the forging drawing sent to TAE is an SAP

14  drawing.

15      Q.   And then SAP, that data was put into the 3D CAD

16  model and then it produced a 2D forging drawing that TAE put

17  its name on; is that correct?

18      A.   That is likely to be the case.  I did not --

19      Q.   And then the finished drawing that TAE has, that's

20  the same thing as the design drawing that Superior originally

21  sent to TAE, correct?

22      A.   Well, it describes the same part and the same part

23  number.

24      Q.   So it has to be.

25      A.   Well, we can debate what the same means.  But it

1   describes the same part number.  So it has a lot of common

2   information in it.

3        Q.   And it has information that Superior sent to TAE

4   originally in the form of Superior's 2-dimensional drawings?

5        A.   Yes.

6        Q.   Excuse me?

7        A.   Yes.

8        Q.   So when we're going from the forging to the

9   finished part, there are two intermediate steps that TAE

10  does.  Would you read for me, please -- can you read the

11  notes on 21.4?

12       A.   21.4?

13       Q.   Yes, sir.  Is it too small, or can you read it?

14       A.   The blue notes?

15       Q.   The notes over in the lower left-hand corner.  Are

16  they too small for you to read?

17       A.   Yes, they are too small for me to read.  Sorry for

18  that.

19       Q.   All right.  I have a -- I think I have a --

20            MR. SIMON:  Your Honor, they are in our

21  witness notebooks, the exhibits that are in front of the

22  witness, hard copies, if that helps.

23       Q.   I don't know.  I think I've blown these up.  Let me

24  see.  On 21.4, that's a blow up, I believe, of the notes that

25  are on 21.4.

1                    THE COURT:  Do you have a copy for the Court?

2                    MR. ALEXANDER:  I do, Your Honor.  May I

3    approach?

4                    THE COURT:  Please.

5                    MR. ALEXANDER:  I don't know how your German

6    is.

7                    THE COURT:  Not very good.

8                    MR. ALEXANDER:  Kind of like mine.

9        Q.    Will you please read note 12?  Would you please

10   translate note 12?

11       A.    Yes, I can do so.

12        There should be no change to the sequence in

13   manufacturing without prior consent from Superior.

14       Q.    And do you see a particular dimension number 12 on

15   that drawing that would limit that note?

16       A.    Again, the copy I have is hard to read.

17        I don't see it at this point in time.  I would have to

18   go into the PDF and search for it.

19       Q.    All right.  Now, would you please read -- can you

20   read note 3 on drawing 21?  I don't know if that's in here,

21   21.5.  It would be the last drawing, 21.4.  Maybe not.  I

22   guess not.  Hold on a second.

23        Let me give you my copy.

24                    THE COURT:  What are you looking at?

25                    MR. ALEXANDER:  I'm looking at what counsel

1 sent to me as 21.5, but that didn't make it into the power

2 point.  It is -- did you number them with decimals on 21 on

3 the new stuff?

4            MR. SIMON:  When we first scanned the exhibit,

5 we inadvertently left our post-it notes on it.  But we sent

6 you another copy without the post-it notes.

7            MR. ALEXANDER:  So this is your work product,

8 in other words?

9            MR. SIMON:  21.1, 2, 3, 4 and 5, yeah, they

10 were on there by mistake.  You have a clean copy.  And to

11 answer your question specifically, we did not number them

12 that way.  And actually --

13            MR. ALEXANDER:  So this would be part of

14 Exhibit 21 and it's a TAE drawing.  In the lower right-hand

15 corner it says, SLF36700-F.

16            THE COURT:  All right.

17            MR. ALEXANDER:  That's what we're talking

18 about.

19      Q.   Now, can you read --

20      A.   Thank you.

21      Q.   You're welcome.

22       Can you read what note 3 on that TAE drawing says?

23      A.   Changes to the manufacturing process, not without

24 prior consent by Superior.

25      Q.   Thank you.

1     A.    Thank you.

2     Q.    Now, these drawings here in 21 that had this

3 manufacturing process, those are the ones that you said were

4 a secret, kept secret from Superior and were proprietary TAE;

5 is that right?

6     A.    The intermediate manufacturing drawings?

7     Q.    Let's find them in the power point.

8     A.    Yep.

9     Q.    I think those were in the power point.  Look on

10 page 22 and 23 of the power point.

11    A.    Uh-huh.  Yes, I do so.

12    Q.    You're saying that those things would be kept in

13 confidence from Superior, Superior wouldn't have access to

14 those?

15    A.    Yes, sir, it would.

16    Q.    But Superior has to approve -- according to TAE's

17 drawing, Superior has to approve any changes to the process;

18 does it not?

19    A.    I'm not certain about the remark that I saw on the

20 finished part drawing.

21    Q.    It's on TAE's drawing; is it not, those two things

22 you just read?

23    A.    It is on the drawing.  I would have to look up what

24 the meaning is and what it refers to.

25    Q.    Superior has to know what the process is before it

1  can approve or disapprove of a change to that process; is

2  that correct?

3      A.   As a very general outline, that would probably be

4  true.

5      Q.   And Superior is responsible, again, to the Federal

6  Aviation Administration and the public to make sure that that

7  part is made correctly and made to the Superior design

8  drawing; is that accurate?

9      A.   Yes, that is.

10     Q.   With the exception of the drawing, the drawing 22

11 and 23 in the power point, are there any TAE drawings that

12 you talked about in the power point all the dimensions and

13 tolerances and everything on them were the same as the

14 Superior 2D drawing?

15     A.   Can you repeat that question, please?

16     Q.   That was really -- that question should be dragged

17 out and shot.  It was not very good.  It was an inarticulate

18 question.  Do you know what that means?  It means a bad

19 question.

20      Do you remember when you were going through your power

21 point --

22     A.   Yes.

23     Q.   -- with the Court and there was some TAE drawings

24 in here, like page 17 is one, page 18, all of these drawings

25 in here, are there any drawings other than the ones in 21 and

1    22 where you marked them that had dimensions or tolerances on

2    them that aren't the same as the ones that are in the

3    Superior 2D drawing?

4        A.    Well, a lot of the presentation -- we have more

5    examples of that, obviously.  I don't know how much time

6    everybody has to go through them.

7        Q.    I'm sorry, not of the what?

8        A.    Pardon?

9        Q.    Not in the presentation?

10       A.    Not in the presentation, yes.

11       Q.    But you say you have others?

12       A.    There are others, yes.

13       Q.    Do you know how many others?

14       A.    Well, we -- we focused our search on the most

15   important parts in question; cylinder heads, cylinder start

16   assemblies, connecting rod, crank shaft.  So we have not

17   reviewed all of the files on the drive.

18       Q.    The answer is you don't know?

19       A.    I don't know exactly.  And I don't see why I should

20   know that.

21       Q.    Now, let me ask you this.  On this drawing, 22, are

22   you looking at that with me?

23       A.    Yes, I do.

24       Q.    22 in the lowest right-hand corner.

25       A.    Yes.

129

1     Q.    The border is in blue and the numbers in white, 22.

2     A.    Yes.

3     Q.    That drawing has some dimensions that you say are

4  not on the Superior drawings, but it also has dimensions that

5  are on the Superior drawing, correct?

6     A.    Yes.

7     Q.    And the picture here that we're looking at, that

8  picture came from the Superior 2D drawing; did it not?

9     A.    I cannot say that.  I didn't check similarity to a

10  Superior drawing on this one.

11     Q.    And would your testimony be the same with regard to

12  the thing on 23 on the power point that has some dimensions,

13  some process step finishing dimensions on it that are on the

14  Superior drawing, but it has a lot of data and information

15  that came from the Superior drawing?

16     A.    Yes.  There are dimensions that are not highlighted

17  so they are the same as on the finished part drawing from

18  SAP.

19     Q.    And would your testimony be the same about the

20  picture?  You don't know where the picture came from.  I

21  think it came from the Superior drawing.  Are you disagreeing

22  with that?

23     A.    I simply don't know.

24     Q.    Doesn't every manufacturer have their own ways of

25  doing little cuts, rough cuts and finish cuts on things that

1  come from forgings or castings?

2      A.   Well, what meaning of the word manufacturer are you

3  referring to?  SAP --

4      Q.   Somebody that would be a fabricator.  Somebody that

5  would be fabricating the kind of part that you've used as

6  your example to show the Court about all this engineering

7  work that TAE did.

8      A.   Well, in this case, let's talk about TAE as being

9  the manufacturer.  Is that a fair assumption for this

10  question?

11      Q.   TAE -- no.  I want to talk about other

12  manufacturers.  Doesn't anybody that makes a part from a

13  casting or forging have procedures that they use to make

14  rough cuts and finished cuts?

15      A.   That's correct.  Everybody has their own way of

16  doing things.

17      Q.   The parts that are -- the 48 parts that TAE

18  manufactured for Superior, do you know whether or not TAE had

19  had those parts manufactured by other fabricators before they

20  came to TAE?

21          MR. SIMON:  Your Honor, I just want to object

22  to the reference to the 48 parts.  Again, I don't believe

23  that number is in evidence before the Court.

24          MR. ALEXANDER:  It will be.

25          THE COURT:  Very well.  Sustained.

1      A.    Okay.   Now, you used the word TAE twice.   Can it be

2   that in the first time you meant SAP?

3      Q.    Anything is possible when I'm asking a question.

4      A.    Sorry.

5      Q.    No, no, I'm sorry.

6       TAE -- before Superior had a relationship with TAE --

7      A.    Yes.

8      Q.    -- did Superior -- do you know whether or not

9   Superior got the parts that TAE fabricated for Superior made

10   someplace else?

11      A.    I don't know that.   But, yes, it's reasonable to

12   assume that.

13      Q.    And after Superior used TAE as the supplier for

14   these whatever number of parts it was they made --

15      A.    Yes.

16      Q.    -- do you know whether or not Superior got those

17   parts made by a fabricator someplace else?

18      A.    I have no knowledge of that.   But it would be fair

19   to assume that somebody else is now producing and

20   manufacturing these parts.

21      Q.    And do you know whether or not either one of those

22   fabricators before or after had to generate a 3D CAD model to

23   make these parts?

24      A.    I have no knowledge of that.   I would assume they

25   did, because it's a fair thing to do.   As I explained, that

1    is a very cost efficient and also risk mitigating way of

2    doing things.

3        Q.   The -- but you're not -- it's not your testimony

4    here that TAE came up with some novel way to make the parts

5    that it made for Superior?

6        A.   Well, it's no novel way to do 3D volume models.

7    However, every manufacturer has their own way of doing

8    things.  And when you want to compete in that business, you

9    have to offer a good prices for the pars.  And this is where

10   the manufacturing know how comes into play.

11       Q.   Let's talk about your testimony about what was

12   available in the overhaul manuals.

13       A.   Yes.

14       Q.   What was the date on that overhaul manual that you

15   were looking at, the Superior overhaul manual?

16       A.   The Superior overhaul manual, I think we looked at

17   an overhaul manual from Teledyne Continental Motors.

18       Q.   Okay.  What was the date on that one?

19       A.   I believe I saw the date 1976.

20       Q.   1976.  So it's a long time ago, isn't it?

21       A.   Yes, it is.

22       Q.   Now, in overhaul manuals, what dimensions are

23   displayed and talked about in overhaul manuals?  Are they the

24   actual dimensions, or are they things called wear dimensions?

25       A.   Well, typically you will find dimensions that refer

1  to parts that have run in the engines.  So if you

2  characterize them as (indecipherable word) engines, then that

3  would probably be the right word to use.

4        Q.    So the dimensions that are in the overhaul manual

5  are dimensions that say, Replace this part when it comes to

6  these dimensions?

7             MR. SIMON:  Your Honor, may I again ask that

8  the witness be allowed to complete his answer.  I don't think

9  he had finished his answer before.

10       Q.    Oh, had you not finished your answer?

11       A.    I didn't finish my answer.

12       Q.    Finish your answer, please.

13       A.    I think in this particular overhaul manual, we

14  found also dimensions for new parts.  I explained that.

15       Q.    But you found -- but the purpose of an overhaul

16  manual is to tell the overhaul people when they should

17  replace the part?

18       A.    That's correct.

19       Q.    And how to replace the part?

20       A.    Or how to repair the part.

21       Q.    Or how to repair it.

22       A.    Yes.

23       Q.    Can you see that?

24       A.    Yes, I can see that.

25       Q.    Is that something that you talked about before

1   about how many dimensions were in an overhaul manual?

2        A.   Yes, I did.

3        Q.   And what is that a picture of?

4        A.   It is a representation from the overhaul manual.  I

5   believe what we've been before in this hearing today showing

6   a cylinder start assembly, showing a number of fuse on that

7   assembly.  And what is highlighted in yellow color are

8   dimensions that we found on the SAP drawings in exactly the

9   same fashion.

10       Q.   So how many dimensions did you find that matched

11  the Superior drawing in this overhaul manual?

12       A.   Probably around 11.  This is the number that I

13  count right now.

14       Q.   And how many dimensions are there in this cylinder

15  assembly total?

16       A.   In this representation there are probably 20, 25

17  dimensions.

18       Q.   So there are not enough dimensions on this to make

19  a part?

20       A.   That's not the conclusion.  I think except for

21  those dimensions that we found directly on the SAP 2D

22  drawings, we find even more information that is readily

23  available from this representation.  Even those items that do

24  not have a dimension to them, like the number of cooling rips

25  you could obtain from that drawing.  So, actually, it's a lot

1   more information contained in that representation from the

2   overhaul manual that would help you in creating a drawing or

3   a part of that thing.

4       Q.   But you don't have all of the dimensions for the

5   part in the overhaul manual?

6       A.   Yes, that's correct.  And this is what I pointed

7   out before.

8       Q.   And you're not trying to tell the Court that you

9   can open up an overhaul manual and all of the dimensions you

10  need to make for the cylinder head assembly or any part in

11  the overhaul manual?

12      A.   I never tried to explain that all of the

13  information can be found from the overhaul manual.  I just

14  pointed out that the most important information covering air

15  worthiness and interchangeability of the spare part, this is

16  contained in the overhaul manual.

17      Q.   What about the notes that are on the Superior

18  drawings?  Are the notes on the Superior drawings, are they

19  contained in overhaul manuals?

20      A.   What do you mean by notes?

21      Q.   Things that we've been reading in the lower

22  left-hand corner where there's a bunch of notes on a drawing.

23  Here, I'll show you a drawing.  As a matter of fact, I may

24  have one in this one.

25          Here's one.  This is called the cylinder assembly long

1  reach.  Do you see that?

2      A.   47006-A1, yeah, that's one.

3      Q.   The notes I'm talking about, are these things, all

4  of these things right here.

5      A.   On the upper left corner?

6      Q.   Yes, sir.

7      A.   Let me have a look.  Assemble, install items

8  normalized in mark in accordance with EO, engine order, or EO

9  56 or EO 249.  So it references engineering orders.  This is

10 not part of what can be found typically in an overhaul

11 manual.

12     Q.   These notes, do they have things like the material

13 that the part is supposed to be made out of?

14         THE COURT:  Mr. Alexander, can I get you to

15 stay at a microphone, please?

16         MR. ALEXANDER:  Yes, Your Honor.

17     Q.   And these notes, do they way what kind of material

18 the part is supposed to be made out of?

19     A.   Sometimes they do.

20     Q.   Let's look at another drawing you talked about.

21      Do you remember talking about that one in the court?

22     A.   I believe so, yes.

23     Q.   Okay.  Why don't you come over here and stand by it

24 and let's talk about it a minute.

25         THE WITNESS:  Your Honor, may I step up?

1                    THE COURT:  You may, of course.

2                    THE WITNESS:  Thank you.

3                    THE COURT:  And, again, if I can get you to

4    grab the microphone, so that we can make sure you're on the

5    record.

6                    MR. SIMON:  Your Honor, may I ask that we just

7    move the (inaudible word) so that I can see it?

8                    THE COURT:  You may.

9                    MR. SIMON:  Now the Court can't see it.

10   That's more important.

11                   THE COURT:  Well, tilt it like that.

12                   THE WITNESS:  We can pull it up on the screen.

13        A.    This one is -- oh, that's a different one.  You

14   picked SA-52006-A1.

15        Q.    Are you the ones that put the markings on that

16   drawing?

17        A.    Yes.  We did that.  Which means myself and the

18   people who work for me.

19        Q.    And the point you were trying to make with the

20   Court about that drawing was what?

21        A.    Well, I explained that the --

22                   MR. SIMON:  Your Honor, if I may.  I just want

23   to make sure the record is clear on this.

24                   THE COURT:  Mr. Simon, we need you on a --

25                   MR. SIMON:  Sorry, Your Honor.

1          I want to make sure the record is clear about this.

2     This is not a drawing.  It was addressed on direct

3     examination.  But I do believe it is a document that was

4     prepared by Professor Rienacker.  I just want to be clear

5     that this is a different drawing than we looked at earlier.

6                    MR. ALEXANDER:  I'm sorry.  This is IA-16.36.

7          Q.   And you put those markings on there, correct?

8          A.   That's correct, yes.

9          Q.   And the yellow ones indicate tolerances that you

10    found in an engine manual?

11         A.   That's correct.

12         Q.   Go show the Court where those are, how many those

13    are.

14         A.   Starting here, there, this one, this one, this one,

15    this one, this one and that's about it.

16         Q.   And that's how many dimensions, ten?

17         A.   One, two, three, four, five, six, seven.

18         Q.   Seven dimensions.  And how many total dimensions

19    are on that drawing?

20         A.   My estimation would be around 30.  But let me look

21    at this one here.  13 plus 19 is 32, 42, 47.  That's the

22    number of dimensions.

23         Q.   Now, is that the -- are these more dimensions down

24    here in the right, too?

25         A.   This is something that we put on that is not

1  entirely correct.  This is the correct assessment that we've

2  made.  And I have to apologize, again, this is plus/minus

3  point 005.  This is how it should read.  There was an error

4  on that one.

5        Q.   So the box down on the right doesn't have --

6  doesn't have additional dimensions on it?

7        A.   You mean this one?

8        Q.   Uh-huh.

9        A.   No, it doesn't.

10        Q.   So there are 47 dimensions up there.

11        A.   This is what we counted, yes.

12        Q.   And you found how many in the overhaul manual?

13        A.   About seven of them.

14        Q.   Thank you.

15        A.   You're welcome.

16        Q.   And some of these things you have green.  That's

17  the color that you have on there.  And it says that indicates

18  dimensions and tolerances on the Superior drawing that are

19  better than in the engine manual?

20        A.   That's correct.

21        Q.   So they're not the same?

22        A.   They are not the same.

23        Q.   And then there's some other blue over there that

24  says, Indicates dimensions, tolerances which requires

25  engineering effort.

1      A.    Yes.

2      Q.    And those weren't in the manual either?

3      A.    They were not in the manual.

4      Q.    Thank you.  You can sit down.

5      A.    Thank you very much.

6      Q.    In summary, Mr. Rienacker, I'll ask you, again, the

7   way this worked was Superior sent their 2D, 2-dimensional

8   drawings to TAE under this supplier agreement and tAE made 3D

9   CAD models from those drawings?

10            MR. SIMON:  Your Honor, I object only to the

11   reference to the supplier agreement.  I don't believe

12   Professor Rienacker has assessed whether or not the drawings

13   were provided pursuant to any sort of supplier agreement or

14   other agreement.  He simply has done the engineering

15   analysis.

16            THE COURT:  Rephrase the question, please.

17      Q.    All right.  Let me just read you what you said in

18   your -- look at your scope and background on your --

19      A.    Yes.

20      Q.    -- report.

21       All right.  The first sentence under scope and

22   background, I understand that Superior 2D drawings for

23   various aircraft engine parts were supplied from Superior to

24   TAE in an effort where TAE was asked to manufacture these

25   parts for Superior, who would market them under a Federal

1   Aviation Administration parts manufacturer approval license.

2        Did I read that correctly?

3        A.   Yes.

4        Q.   And you agree with that statement?

5        A.   I agree with that.

6        Q.   And then I understand in addition that TAE created

7   3D CAD, computer aided design models, volume models from

8   these drawings, converted dimensions from US to metric units,

9   and derived 2D metric detailed drawings from the 3D models.

10        Have I read that correctly?

11        A.   You did.

12        Q.   Now, any other drawing, any other anything that TAE

13   did, was based upon or derived from the Superior 2D drawings

14   that came in originally, correct?

15        A.   That was part of the basis.  As I've pointed out

16   before, there was some own engineering assessment and effort

17   in it, manufacturing know how, and the like.

18        Q.   I understand that.  But all of the TAE drawings,

19   have information that was supplied by Superior and data

20   supplied by Superior initially to TAE in the Superior 2D

21   drawings, correct?

22        A.   Well, I was not part of that process at the time.

23   But what you say has lightly (indecipherable word).

24             MR. ALEXANDER:  I believe that's all we have

25   at this time, Your Honor.

1                    THE COURT:  Very well.

2                    MR. SIMON:  May I, Your Honor?

3                    THE COURT:  Please.

4                    MR. SIMON:  Sir, let me get my work product.

5    That's not fair, I shared mine with you.

6          One moment, Your Honor, to get a little bit organized

7    here.

8                    THE COURT:  Of course.

9                    MR. SIMON:  Okay.  May I proceed?

10                    THE COURT:  You may.

11                    REDIRECT EXAMINATION

12    BY MR. SIMON:

13          Q.   Professor Rienacker, at the beginning of the

14    cross-examination you were asked some questions about

15    tolerances for aviation engines, remember that, aircraft

16    engines?

17          A.   Yes, I do remember that.

18          Q.   Do you have knowledge that you believe is pertinent

19    to the tolerances that are required for aviation engines?

20          A.   Oh, yes.

21          Q.   Can you explain that to the Court, please?

22          A.   Well, I've worked in gas turbines, gas turbine

23    aircraft engines.  And in these items that also fly at very

24    high altitudes and fly under probably even more severe

25    conditions, compared to the piston aircraft engines, they

1  have definitely a lot tighter tolerances to them on parts

2  that are probably a lot harder to manufacturer and machine.

3  So I wouldn't say it's specific to piston aircraft engines

4  that they have loose tolerances.  I would not think that's

5  the case.

6      Q.    Are there folks out there in the world who know

7  more about aviation piston engines than you do?

8      A.    Probably, yes.

9      Q.    Okay.  Would they even have an easier time than you

10  did likely recreating the information that's on the Superior

11  2D drawings?

12      A.    They certainly would.

13      Q.    You were asked some questions by Mr. Alexander

14  about whether or not there's a proprietary right stamp on the

15  TAE drawings.  Do you remember those questions?

16      A.    That's correct.

17      Q.    Whether or not there's a proprietary right stamp on

18  those drawings, does that impact in any way your opinion that

19  the TAE drawings are proprietary?

20      A.    It does in no way impact my opinion.

21      Q.    Now, you were asked a lot of questions about the

22  notes, right?

23      A.    Yes, I was.

24      Q.    The notes on, I think it was 16.19, and then there

25  were some notes on Exhibit IA-21, and I think, essentially,

1    what you were being asked was, if there's a note on a drawing

2    that TAE has to follow Superior's manufacturing guidelines,

3    unless it gets permission, what does that mean?  Is that kind

4    of what you understood the questions to be?

5        Let me ask a better question.  If I understand your

6    testimony in the case, it is that some of the manufacturing

7    related information that TAE has was created by TAE, right?

8        A.    Correct.

9        Q.    And that's proprietary to TAE?

10       A.    Correct.

11       Q.    Was there other manufacturing information that was

12   provided by Superior, engineering orders and things of that

13   nature?

14       A.    Well, there were engineering orders.  Some of them

15   have to do with assembly and other items, so you could call

16   them partially manufacturing related.

17       Q.    Okay.  And might that be what is referenced in the

18   notes is the actual information that Superior did provide?

19       A.    That may be.  I'm still puzzled about the note,

20   because it's on a finished part drawing and the finished part

21   drawing doesn't typically show manufacturing information.  It

22   shows the requirements for the finished parts.

23       Q.    I understand.  Do you have the binder with Exhibit

24   IA-21 in front of you?

25                  MR. SIMON:  May I approach the witness, Your

1   Honor?

2                   THE COURT:  You may.

3       Q.   Okay.  Now, I think I may have mis-spoke earlier in

4   your direct examination about how many pages were contained

5   in Exhibit 21.  I think I may have said, four.  And I

6   believe, in fact, there are six.  And Mr. Alexander went

7   through a couple of the additional ones with you.

8        Remember that?

9       A.   Yes, I do.

10      Q.   Okay.  Let me ask you to look at pages 5 and 6 of

11  Exhibit IA-21 and ask if you can identify those for us?

12      A.   Unfortunately, I do not see the numbers 5 and 6 on

13  them.  But I believe you are referring to --

14      Q.   They're not numbered, Professor.  They're the last

15  two pages of Exhibit --

16      A.   The last two pages.  Yes, they should be talking to

17  the raw parts, the forging from which the connecting rods are

18  fabricated.

19      Q.   Okay.  So these are the forging drawings that you

20  were asked about?

21      A.   That's correct.

22      Q.   Okay.  Is the information that you highlighted in

23  red on the preceding pages of Exhibit 21 found on the forging

24  drawings that are contained in the last two pages of Exhibit

25  21?

1     A.   I don't think so.  The forging drawings shows the

2  dimensions from which the part is fabricated.  So there will

3  be differences between all the steps in the fabrication

4  process.  And that leads to different dimensions.

5     Q.   Does it make any difference to your opinions,

6  Professor Rienacker, whether or not the Superior notes are

7  contained in the engine overhaul manual that we looked at?

8     A.   No.  It does not make any difference to my

9  opinions.

10    Q.   Why?  Why not?

11    A.   Well, the engineering notes refer to certain items

12 like the material, the assembly or disassembly of certain

13 items, how to inspect these parts with fluorescent penetrant

14 inspection, and the like.  Both of these processes are very

15 common in the industry.  And every company has

16 specifications, they are typically called, that describe very

17 similar processes and items compared to what I found in the

18 engineering orders of SAP.

19    Q.   Would it be very hard for a skilled engineer,

20 especially one with even more experience than you have, sir,

21 in designing these parts to recreate the data found in the

22 SAP 2D drawings and other materials?

23    A.   It wouldn't be any major problem.  It would be

24 fairly straightforward.

25    Q.   Now, you were asked some questions about this

1  document that's marked IA-16.36 during your

2  cross-examination.  Do you remember that?

3      A.   Yes, I remember that.

4      Q.   That's another drawing, another Superior drawing

5  that you analyzed in connection with your work on this case,

6  right?

7      A.   That's correct.

8      Q.   And is your testimony regarding the colored aspects

9  of that drawing the same as it is for the colored aspects of

10 the 2D drawing you were discussing regarding opinion 5

11 earlier in your testimony today?

12     A.   The conclusion is absolutely the same.

13     Q.   And do the colors have the same meaning?

14     A.   They have the same meaning.  And I apologize.

15 There are -- I found some errors here on that drawing.  So

16 that went wrong.  My apologies.

17     Q.   Okay.  You did this same analysis for, what did you

18 say, four parts?

19     A.   Four parts, yes.

20     Q.   And this is just another one of those analysis that

21 you went through?

22     A.   Yes.

23              MR. SIMON:  Pass the witness, Your Honor.

24              THE COURT:  Recross?

25              MR. ALEXANDER:  No.

1                    THE COURT:  Thank you very much.  You may step

2  down, Professor.

3                    THE WITNESS:  Thank you very much, Your Honor.

4                    MR. SIMON:  Your Honor, the Insolvency

5  Administrator rests.

6                    THE COURT:  Very well.

7        Rebuttal?

8                    MR. ALEXANDER:  Yes, Your Honor, we'll call

9  Keith Chatten.

10                    THE COURT:  Mr. Chatten, if you'd come

11  forward, please.

12                    MR. SIMON:  Your Honor, while that's taking

13  place, may we take one minute just to rearrange the chairs

14  here, if I could get some assistance?  I'd like to have my

15  expert come up and sit down here.

16                    THE COURT:  You may.  But let's remember that

17  we originally had 2 1/2 hours.  You then called and asked for

18  4.  And we're 14 minutes away from 4 hours.  So quickly.

19                    (The witness was sworn by the courtroom deputy.)

20                    THE COURT:  Please, Mr. Chatten, be seated.

21

22

23

24

25                    (no omission)

1                        <u>KEITH CHATTEN</u>

2    The witness, having been duly sworn to tell the truth,

3    testified on his oath as follows:

4                      <u>DIRECT EXAMINATION</u>

5    BY MR. ALEXANDER:

6         Q.   Please state your name.

7         A.   Keith Chatten.

8         Q.   Please state your title with Superior Air Parts.

9         A.   Executive vice president and general manager.

10        Q.   Are you the same Keith Chatten who testified

11   earlier in this proceeding?

12        A.   Yes, I am.

13        Q.   Did you hear Dr. Rienacker's testimony?

14        A.   Yes, I did.

15        Q.   The engineering steps on the two forging drawings,

16   are those common steps?

17        A.   Yes, they are.

18        Q.   Explain to the Court how Superior gets its

19   connecting rods made now.

20        A.   We supply the forging to a different supplier who's

21   in a similar business to what TAE was to Superior.  And they

22   take that original forging drawing and the finished component

23   drawing and they conduct the intermediate steps to meet the

24   requirements on the drawing.

25        Q.   And is that included in the piece parts price of

1   the connecting rods?

2       A.   Yes, it is.

3       Q.   And does that new supplier, did they have to make a

4   3D CAD model to do that?

5                   MR. SIMON:   Objection, Your Honor; lacks

6   foundation.

7                   THE COURT:   Sustained.

8       Q.   Do you know whether or not the supplier that

9   presently makes those had to generate any 3D CAD models in

10  order to do so?

11      A.   I do know that.

12      Q.   And what is the answer to that question?

13                  MR. SIMON:   Your Honor, I still think there's

14  no foundation laid for this.  He says he knows, but he hasn't

15  explained why.

16                  THE COURT:   Sustained.

17      Q.   How do you know that?

18      A.   I have visited the supplier many times.  I've -- I

19  have a good relationship with the supplier.  The supplier is

20  a common supplier in the aviation industry.  I have walked

21  through the process with him on these parts.  And there are

22  no 3D models that they've created in this process.

23      Q.   Thank you.

24      Do you recall my -- Dr. Rienacker's testimony about the

25  notes on the TAE drawings that said, No changes could be made

1    in the process without Superior's approval?

2          A.   Yes, I do recall that.

3          Q.   Are those -- were those general notes?

4          A.   Yes.  They are what we refer to as general notes.

5          Q.   Okay.  Please tell the Court what a general note

6    is.

7          A.   On the drawing, you can see the -- there are two

8    types of notes.  There's one note that has no flags on the

9    drawing.  For example, we can see on the drawing across from

10   us that there are a few triangles facing left.  And then the

11   rest of the notes have no triangles.  The ones with the

12   triangles facing left are very specific notes which we refer

13   to as flag notes, which show these flags on the drawings that

14   Mr. Rienacker was searching for.  The rest of the notes that

15   aren't flagged are general notes and apply to everything on

16   the drawing.

17         Q.   And is that general note that no change can be made

18   in the manufacturing process without the prior consent of

19   Superior standards on Superior's drawings?

20         A.   Yes, it is.

21         Q.   And is that the normal course, because the FAA

22   requires Superior Air Parts to be in charge of every step in

23   the manufacturing process?

24         A.   Yes.

25                   MR. SIMON:  Objection, Your Honor.  I need to

1   object.  There's been no foundation laid.  This witness is

2   not an expert.  There's been no foundation laid that he has

3   any detailed knowledge of the FAA requirements.

4        Q.   Mr. Chatten, as a regular part of your business at

5   Superior Air Parts, do you interface with the Federal

6   Aviation Administration?

7        A.   Yes, I do so.  And I have done so for the last 17

8   years.

9        Q.   And that was before you were at Superior when you

10  worked somewhere else?

11       A.   Yes, it has.

12       Q.   And does the Federal -- what are the Federal

13  Aviation's requirements with regard to Superior and the

14  manufacturing process that a supplier would do?

15       A.   Superior has the responsibility to the FAA and to

16  the public to make sure that every step in the manufacturing

17  process is controlled to ensure the safety of the component.

18       Q.   The steps in the manufacturing processes that the

19  supplier does, are they withheld from Superior or secret from

20  Superior?

21       A.   No, they're not.  By our quality manual and by FAA

22  regulations, they're required to be shared with Superior.

23       Q.   And Superior undergoes Federal Aviation

24  Administration quality control audits?

25       A.   Yes, we do.

1      Q.    And part of those audits is you have to know how

2    the parts are made?

3      A.    Yes.  They -- Superior undergoes these audits on a

4    very regular basis.  And the FAA ensures that the control of

5    the process is being maintained.

6      Q.    Let me show you -- here's a blow up of the drawing

7    that Dr. Rienacker testified about, 16.1947030 and it has

8    these flags on it.  Do you see that?

9      A.    Yes, I do.

10     Q.    And those flags ask someone to measure there; is

11   that correct?

12     A.    Yes.

13     Q.    What they're measuring, though, are Superior

14   dimensions?

15     A.    That is correct.

16     Q.    And those are dimensions that came from the

17   original Superior 2D drawing?

18     A.    Yes.  Every single dimension.

19     Q.    And let me show you something else.  This is a blow

20   up of Exhibit 63.

21      Can you tell the Court what that is?

22     A.    Yes.  It's a record of measurement for a first

23   article inspection record.

24     Q.    And that has a lot of numbers down in the left-hand

25   column, 55 of them.  Do those comport with measuring points

1    on drawings?

2        A.    Yes.  They help identify which dimension on the

3    drawing that you're specifically measuring.  This is common

4    practice.  And it's done so that it basically provides a map

5    for the quality records to be able to refer back to the

6    drawing to verify which dimension you are discussing.

7        Q.    And Exhibit 63 is an example of that?

8        A.    Yes, it is.

9        Q.    And that came from TAE?

10       A.    This came from the quality records that both TAE

11   and Superior Air Parts have maintained.

12       Q.    And you can testify that this is part of the

13   Superior quality control records that the FAA requires

14   Superior to maintain?

15               MR. SIMON:  Your Honor, I object to the

16   leading.

17               THE COURT:  Sustained.

18       Q.    What is this?

19       A.    This is a quality record that we are required to

20   maintain, which is normal for every component that Superior

21   Air Parts produces.

22               MR. ALEXANDER:  We'd move to admit Exhibit 63.

23               THE COURT:  Any objection?

24               MR. SIMON:  Your Honor, I'm confused about the

25   source of this document.  Are they saying this is a Superior

1    document or a TAE document?

2        Q.    Mr. Chatten, who generated this document?

3        A.    This document was generated by TAE for Superior Air

4    Parts as part of the quality requirements for the component.

5        Q.    And it was generated under Superior's direction and

6    control?

7        A.    Yes.

8        Q.    And it's part of the Superior quality control

9    records for that part presently at Superior Air Parts?

10       A.    Yes, it is.  And a duplicate copy lies in the

11   quality records that TAE maintains.

12                   MR. ALEXANDER:  Move to re-admit Exhibit 63.

13                   MR. SIMON:  No objection.

14                   THE COURT:  It's admitted.

15       Q.    Let's go back to this drawing with all of these

16   flags on it.  We're looking at IA-16.19.

17        Do you care if TAE keeps its flags?

18       A.    No.

19       Q.    Do they have any value to Superior?

20       A.    The flags have no value.

21       Q.    Would they have any value to another manufacturer

22   for that part for Superior?

23                   MR. SIMON:  Your Honor, I object.  I object to

24   this line of questioning.  It appears as though he's asking

25   the witness for expert testimony that he's not qualified to

1  give.

2              THE COURT:  Sustained.

3      Q.   Back to my original question.  What does -- from

4  this drawing, what would Superior want back?

5      A.   All of the dimensions and data that come from the

6  Superior Air Parts drawings.

7      Q.   The data, the dimensions, the tolerances, and the

8  notes?

9      A.   Yeah.  I consider that part of the data.

10     Q.   And the notes that came from the original Superior

11 drawing.  If TAE wanted to keep its flags, it could keep its

12 flags as long as no one could get Superior's data out of it,

13 right?

14     A.   Correct.

15     Q.   Thank you.

16              MR. ALEXANDER:  Pass the witness.

17              THE COURT:  Cross?

18              MR. SIMON:  Thank you, Your Honor.

19                  CROSS-EXAMINATION

20 BY MR. SIMON:

21     Q.   Mr. Chatten, is there any dispute here about

22 whether or not both Superior and TAE created some

23 manufacturing related documents?

24     A.   No.  There are manufacturing related documents such

25 as these flags that we see that were created by TAE.

1    Q.    And Superior sent some manufacturing related

2    information to TAE, correct?

3    A.    Yeah.  Superior sent all of the information

4    required to make the part to TAE.

5    Q.    All right.  Did TAE drawings, the drawings that

6    actually say TAE on the bottom of them, the ones that this

7    motion to enforce, at least originally was designed to have

8    provided to Superior, is it your testimony that Superior has

9    all of those?   That they were already shared with Superior?

10    A.    I'm not sure I understand your question.

11    Q.    You have the TAE documents in your possession at

12    Superior.  The answer is no, isn't it, sir?

13    A.    No.  The answer is, yes, we have some of these

14    drawings.

15    Q.    A lot of them you don't, right?

16    A.    I don't know the number.  I have not counted how

17    many.  But a substantial number of these drawings have been

18    shared with Superior Air Parts by TAE during the course of

19    the making of these parts.

20    Q.    For example, documents related to the final quality

21    test, and so forth, that Superior might have to comply with

22    the FAA regulations, right?

23    A.    As well as the documents involved in the

24    manufacturing process, yes.

25    Q.    It's not your testimony, is it, that all of the

1    manufacturing related documents were shared by TAE, is it,

2    sir?

3         First of all, let's back up.  You weren't at Superior

4    when this relationship was ongoing, were you?

5         A.   No.  I was at Continental Motors at the time.

6         Q.   That's what I thought.

7         And it's not your testimony, again, that all of the

8    information Superior is asking to have supplied to it,

9    pursuant to the confirmation order, is already in Superior's

10   possession, is it, sir?

11        A.   I don't know exactly how much.  But a majority of

12   that information is in Superior's possession.

13        Q.   You've gone through and searched and compared the

14   documents on the TAE server to Superior's own records and you

15   can make that determination?

16        A.   Yes.

17        Q.   There is additional information with TAE's name on

18   it manufacturing related that Superior doesn't have, though,

19   correct?

20        A.   That is correct.

21             MR. SIMON:  No further questions.

22             MR. ALEXANDER:  A few questions.  I forgot to

23   ask these before.

24

25                   (no omission)

1                    <u>REDIRECT EXAMINATION</u>

2  BY MR. ALEXANDER:

3      Q.   How many parts did Superior send drawings for to

4  TAE?

5                 MR. SIMON:  Your Honor, we are -- we're going

6  beyond the scope of cross here.

7                 MR. ALEXANDER:  We are.  And I said, I forgot

8  to ask two questions.

9       May I ask them?

10                THE COURT:  You may.  I'll allow it.

11                MR. ALEXANDER:  Thank you, Your Honor.

12     Q.   How many parts did Superior send drawings for to

13  TAE?

14     A.   Approximately 360.

15     Q.   And how many parts did TAE actually ever

16  manufacture for Superior?

17     A.   48.

18     Q.   Thank you.

19                MR. SIMON:  Nothing further, Your Honor.

20                THE COURT:  Thank you.  You may step down.

21                THE WITNESS:  Thank you.

22                MR. ALEXANDER:  We'll call Mr. Marwill.

23                THE COURT:  Well, maybe you'll call

24   Mr. Marwill.

25       How much time are you going to need with Mr. Marwill?

1                    MR. ALEXANDER:  Am I going to need?  I'm going

2    to need 7 1/2 minutes, or less.

3                    THE COURT:  Well, where are we in the process?

4    We're now at exactly four hours.  But we have -- we've had no

5    closing arguments.

6                    MR. ALEXANDER:  We have not.

7                    THE COURT:  And today was supposed to be four

8    hours to be finite.  And here we are, yet, again.  How much

9    further cross would you expect to have, Mr. Marwill?

10                   MR. SIMON:  I don't know, obviously, what

11   they're planning to cover.  But if the direct is 7 minutes, I

12   would be surprised if my cross is more than 5 minutes.

13                   THE COURT:  All right.  Let's get it done.

14      Mr. Marwill, please.

15                   (The witness was sworn by the courtroom deputy.)

16                   <u>DOUGLAS MARWILL</u>

17    The witness, having been duly sworn to tell the truth,

18   testified on his oath as follows:

19                   <u>DIRECT EXAMINATION</u>

20   BY MR. ALEXANDER:

21      Q.   Mr. Marwill, you're the same Douglas Marwill that

22   testified earlier in this case?

23      A.   Yes, I am.

24      Q.   Did you hear Dr. Rienacker's testimony about it

25   would be easy to reverse engineer these parts?

1        A.    Yes, I did.

2        Q.    Do you agree with that?

3        A.    No, I definitely do not.

4              MR. SIMON:  Your Honor, two objections.  One,

5   Professor Rienacker did not testify about any reverse

6   engineering at all.  And, number two, this line of

7   questioning, I believe, will go beyond the scope of our case.

8   And -- well, I'll leave it at that for right now.

9              MR. ALEXANDER:  Your Honor, I heard him

10  testify that with the things that he got from the overhaul

11  manual and for other things, he could generate a drawing by

12  figuring other things out.  That's reverse engineering.

13             MR. SIMON:  Disagree that that's reverse

14  engineering, Your Honor.  That's an engineering analysis.

15  That's not reverse engineering.

16             MR. ALEXANDER:  Okay.  Here's what we'll do.

17  We will ask him questions that were absolutely asked

18  (inaudible statement due to not speaking near a microphone.)

19  I'm going to hurry because we need to.

20       Q.    Mr. Marwill, I'm going to put Superior's Exhibit 64

21  up on this easel and I'm going to ask you if you can identify

22  that?

23       A.    Yes, I can.

24       Q.    What is it?

25       A.    This is a page from the overhaul manual that I

1  marked up with yellow magic marker to indicate dimensions

2  that I had found on the engineering drawings.

3      Q.   And those were the dimensions that were available

4  from the overhaul manual?

5      A.   Yes.

6      Q.   Would you please step up here, if it's all right

7  with the Court, and explain to the Court what this aircraft

8  part is we've placed here and about how those dimensions

9  relate to it?

10     A.   Yes, I will.

11          THE COURT:  Please.

12     Is there a question, Mr. Alexander?

13     Q.   Mr. Marwill, what are these dimensions for?

14     A.   All right.  This is a page from -- it's A-10-5 that

15 I took from the overhaul manual.  And I've highlighted the

16 dimensions in yellow that I could find that matched the

17 engineering drawing.  Now, the engineering drawing had about

18 273 different dimensions on it, because this is two parts.

19 We have a head, which is this part up here, the light gray.

20 This part down here is called the barrel.  And that's the

21 black part.  So these are two separate drawings, two

22 different detailed parts and they come together on this

23 drawing right here.  But when you look at an overhaul manual,

24 it's only showing you dimensions that are used for overhaul

25 purposes.  For example, the most important thing is, what do

1  you make the head out of?  What do you make the barrel out

2  of?  Those materials are called out on the face of the

3  drawings.  They are not shown in the overhaul manual, because

4  nobody in the field is authorized by the FAA to make parts,

5  except somebody who holds a license from the FAA like

6  Superior.

7       Q.   Okay.  Let me see if I can find a drawing, an

8  entire drawing for that part.  I think you marked one of

9  those; did you not?

10      A.   Yes, I did.

11      Q.   I'm going to place on the easel this drawing, which

12 is the entire -- what is that?

13      A.   All right.  This is the drawing that looks similar

14 to the overhaul manual.  This is the assembly part where the

15 head and the barrel are mated together.  And on this drawing,

16 you can see different dimensions that are highlighted in

17 yellow.  And, again, these highlighted areas correspond to

18 these dimensions on here.  But what's most important is we

19 have quite a few more dimensions on this similar drawing.

20 And if you look at the detailed part of the barrel and of the

21 head, total together is about 270 or more dimensions to make

22 those two parts.  So there's -- it is no way possible to

23 create this assembly and make these parts using the

24 information in the overhaul manual.

25      Q.   Have a seat.  Thank you, Mr. Marwill.

1        Mr. Marwill, I believe you testified earlier that in

2    your opinion, the TAE drawings were copies of the Superior

3    drawings.  Did anything you see in today's testimony change

4    that opinion?

5        A.   No.  It's very obvious that the dimensions are in

6    the same place.  The notes are very similar.  Even some of

7    the notes read exactly the same, as they should.

8        Q.   And you say, as they should, and why is that?

9        A.   Because the drawings were made by Superior.  They

10   were then FAA approved.  And that means starting at that

11   point there can be no further changes, unless each change

12   receives FAA approval.  And so, therefore, Superior is

13   expecting their vendors, in this case TAE, to make the part

14   exactly the way their drawing shows where there's no

15   deviations whatsoever.

16                   MR. ALEXANDER:  Pass the witness.

17                   THE COURT:  Mr. Simon.

18        Pretty much.

19                   MR. SIMON:  Pardon me?

20                   THE COURT:  Nothing.  He asked if me if that

21   was 7 1/2 minutes.

22                   MR. SIMON:  I'll be less than my 5.

23                   CROSS-EXAMINATION

24   BY MR. SIMON:

25        Q.   Mr. Marwill, the engine overhaul manual that

1   Professor Rienacker talked about contained new part

2   dimensions in it, didn't it?

3       A.   It did.  There were about four to five dimensions.

4       Q.   That were showed on the screen, correct?

5       A.   That's correct.

6       Q.   There were many more in the manual that we didn't

7   show on the screen, correct?

8       A.   That's true.

9       Q.   And I want to make sure I understand your testimony

10  here today about re-creating these drawings.  Your testimony

11  in your deposition was that you had not assessed the level of

12  any effort that would be required to reverse engineer any of

13  the parts.

14       Is that still true?

15       A.   Would you repeat that again, please?

16       Q.   Yeah.  You told me during your deposition that you

17  had not assessed the level of effort necessary to reverse

18  engineer any of the parts at issue in the case, right?

19       A.   Yes.  I believe you said before that is how many

20  man hours did I think it would take and I said I had not

21  evaluated that.

22       Q.   No.  Your testimony -- are you denying, sir, that

23  you testified that you had not assessed the level of any

24  effort that would be required to reverse engineer any of the

25  parts at issue in the case?

1      A.   No.   I disagreed with you.   But then I said, just

2  prior to that, you asked me how many man hours I thought

3  would be involved and I said I had not assessed that.

4      Q.   You had not assessed the level of effort that would

5  be required, correct, sir?

6      A.   That's right.   One of my jobs is to create

7  estimates on what it takes in man hours to do a particular

8  job, design a part, or manufacture a part.   And I have not

9  evaluated that.

10     Q.   Okay.

11                MR. SIMON:   Pass the witness, Your Honor.

12                THE COURT:   Any redirect?

13                MR. ALEXANDER:   No, Your Honor.

14                THE COURT:   Very well.   Thank you,

15  Mr. Marwill.

16                THE WITNESS:   You're welcome.

17                THE COURT:   Any other rebuttal witnesses?

18                MR. ALEXANDER:   No, Your Honor.

19                THE COURT:   So does the movant rest and close?

20                MR. ALEXANDER:   The movant rests and closes.

21                THE COURT:   And does the Insolvency

22  Administrator close the evidence, as well?

23                MR. SIMON:   Yes, Your Honor, we do.

24                THE COURT:   Very well.   Good.

25         All right.   Let's talk about where we are in closing

1  arguments briefly.  We're going to come back and do this

2  after lunch.  I had hoped, when you asked for additional

3  time, we started earlier than we originally were planning to

4  and planning to go through to 1:00 in order to get this

5  finished.  Obviously we haven't gotten it finished, because

6  we still haven't done closing arguments.  But we have to get

7  this finished today.  And so I will -- I don't really have

8  additional time to give you today, because I leave town

9  tomorrow for the rest of the week.  So, no offense, my day

10  was pretty much planned around this and now that's being

11  disrupted.  But we have to finish this, because I have my

12  current law clerk for four more days.  For all of the reasons

13  that I said to you all at the last hearing as to why this was

14  tedious and difficult because of the inaccurate time estimate

15  that only continues to be problematic.

16      So I'm going to tell you, now that the evidence is

17  concluded and closed, some concerns I've got.  And you can

18  think about that over our lunch recess and talk to me about

19  that during closing arguments.

20      I have significant concerns about my jurisdiction to

21  hear this dispute.  And let me tell you why I have those

22  concerns.  This has morphed into something well beyond the

23  initial pleading.  The initial pleading was TAE has our

24  property, we want it back under the terms of the plan, albeit

25  four years after the fact under the terms of the plan.  The

1   Insolvency Administrator -- and you'll recall that from the

2   very beginning I've said, You all are just ships passing in

3   the night.  Superior is asking for property back.  The

4   Insolvency Administrator says, What do you think I have that

5   you want?  I'm happy to give you your property back, but I

6   don't know what you're asking me for.  And, frankly, I'm not

7   going to go through the tortured history here of months

8   passing and the ships continuing to pass in the night.  And,

9   finally, Superior sends somebody to Germany to go through the

10  files that the Insolvency Administrator continues to have and

11  we start this hearing.

12       The Insolvency Administrator has agreed that anything

13  that is a Superior drawing he will give back.  And that, yes,

14  you found some Superior drawings in the documents that he had

15  segregated and that he's happy to give those back.  Now this

16  has morphed into documents created by TAE with data from

17  Superior, at least in part, are now what you either want back

18  or apparently you want me to direct that the Insolvency

19  Administrator has to destroy.  That's a mandatory type of

20  injunction.  One, this isn't an adversary proceeding.  Two,

21  this is a motion to enforce the terms of a, frankly, very old

22  plan of reorganization in this case.  That caused me to

23  really re-focus.  Because, again, the relief requested has

24  morphed well beyond, Give me my documents back to make them

25  destroy their documents, because it has my information in it.

1  The plan doesn't say that.  The plan doesn't come close to

2  saying that.

3      Post-confirmation jurisdiction in a bankruptcy court is

4  dramatically narrower than pre-confirmation jurisdiction.  As

5  I've analyzed this, frankly, all throughout the weekend,

6  there are three kinds of bankruptcy jurisdiction; arising in,

7  arising under, and related to.  This is not arising in or

8  arising under.  The bankruptcy estate has been fully

9  administered, frankly, years ago.  We closed the case in 2010

10  based upon the representation of the Trustee of the

11  Creditor's Trust that all monies under the plan had been

12  distributed.  So this plan was fully implemented, fully

13  consummated, and, frankly, completely concluded back in 2010.

14      2013, years later, Superior comes running in and asks

15  for the case to be reopened, not for this dispute, but so

16  that it could remove an adversary -- well, remove a lawsuit

17  that had been filed against Superior in state court to the

18  bankruptcy court, because you felt like that was a claim that

19  had been discharged in connection with the plan.  I don't

20  like reopening bankruptcy cases years later because, frankly,

21  usually they're a stretch as to jurisdiction.  But I was

22  persuaded that with respect to that lawsuit, that while it

23  could have been adjudicated in state court, it made some

24  sense that the Court that had confirmed the plan and was

25  aware of the saga that Superior had gone through to get to

1  plan confirmation, that this Court decide that dispute.  So I

2  did.  Reluctantly, I did.  And I granted Superior's motion to

3  dismiss that lawsuit, because I agreed with you, this was a

4  claim that was discharged by the plan.

5     Normally I would re-close the bankruptcy case.  This

6  case is done.  It's been done for years.  But the other party

7  to the adversary, the plaintiff in that adversary proceeding

8  appealed my decision granting the motion to dismiss to the

9  District Court.  So I kept this bankruptcy case open, while

10  the issue went up on appeal.  I got affirmed by the District

11  Court and then a further appeal was filed to the 5th Circuit.

12  And in July of this year, I've come to figure out by looking

13  at the various dockets the 5th Circuit dismissed the appeal

14  on motion of the plaintiff.  So that appeal is gone.

15     While the bankruptcy just happened to remain open to

16  accommodate the appeal of the adversary proceeding that

17  prompted the reopening of the case, or the lawsuit that

18  prompted the reopening of the case, Superior gets the bright

19  idea to file the motion to show cause.  Again, it was just

20  fortuitous that the case remained open to accommodate the

21  appeal from the lawsuit.  So the show cause motion is filed

22  and then, frankly, you all basically agreed to toll that

23  among yourself, but don't bother to tell the Court about it.

24  So I dismiss the motion to show cause for want of prosecution

25  late last year because, frankly, nothing had been happening

1   on the motion to show cause and we don't let things just

2   linger in this court.  And the next day the motion to enforce

3   got filed, where you explained that you were really sorry,

4   but, you tolled this by agreement with the Insolvency

5   Administrator and you really wanted to, quote, enforce the

6   confirmation order and plan.

7        But, gentlemen, Superior post-confirmation elected to

8   resume business with TAE, right?  Your own motion.  I went

9   back and re-read everything.  Your own motion tells me that.

10  So post-confirmation with Superior under new management,

11  i.e., new owners at least, I think some of the old management

12  remained in place.  But under new owners, Superior went back

13  and decided to resume a relationship with TAE.  But you'd

14  rejected the pre-petition supplier agreement under the terms

15  of the plan.  That agreement was never assumed by Superior.

16  Under the terms of the plan, it got rejected.  And, again,

17  this is all work that we've done in preparing in the interim

18  for this continued hearing, because none of this is mentioned

19  by the Insolvency Administrator, other than to lament that it

20  had been years in the preliminary response filed some time

21  ago.

22       So I don't know what the basis on this record of you

23  resuming your relationship with TAE was.  But it wasn't the

24  pre-petition supplier agreement, I'm guessing, because that

25  was rejected under the terms of the confirmed, consummated,

1  fully implemented plan.  And then years of continuing to do

2  business post-confirmation, new owner in place, you decide,

3  according to your motion for, quote, competitive reasons, to

4  quit buying from TAE.  And then, and only then do you demand

5  Superior's documents back, quote, pursuant to the plan and

6  confirmation order.  This is not a pursuant to the plan and

7  confirmation order.  This is a business relationship that the

8  new owner of Superior made the decision to enter into.  And

9  now that there is a post-confirmation new order fuss between

10  reorganized Superior and its supplier, who happened to be a

11  pre-petition supplier but this doesn't have anything to do

12  with the pre-petition supplier relationship.  This is a new

13  relationship, at least as far as a Bankruptcy Court would

14  look at it.  This doesn't have anything to do with

15  implementation or execution of the plan.  This has to do with

16  a post-confirmation business dispute between reorganized

17  Superior and one of its suppliers, period, paragraph.

18        And the 5th Circuit has made it abundantly clear,

19  starting in Craig Stores followed by U.S. Brass, that

20  post-confirmation related to jurisdiction is very narrow.  It

21  has to relate to the execution or implementation of the plan.

22  That plan got implemented years and years ago.  If you wanted

23  these documents back as part of the implementation of the

24  plan, Superior could have asked for them back, you know, a

25  month, two months, six months, some reasonable time after the

1   plan was fully enforceable, had gone effective.  But you

2   didn't.  And you didn't because you decided under new owners

3   that you wanted to resume a relationship with TAE.  So, fine,

4   you did.  That's great.  But why is this fuss in my court?

5   Because this doesn't have anything to do with the plan.  So

6   I've got to tell you, I don't think I have jurisdiction to

7   resolve this dispute.  I've given that a lot of thought.  And

8   since I must always, as any Federal Court does, evaluate my

9   subject matter jurisdiction, my first question to all of you

10  is, how in the world do I have jurisdiction over this?

11        And, you know, I understand that you've -- and I mean

12  this sincerely, you've cleverly styled this as a motion to

13  enforce the terms of a plan.  But what that clever

14  designation overlooks is the fact that, you know, this is

15  years after implementation of the plan.  And this is after

16  reorganized Superior elected to do business with TAE.  And,

17  quite frankly, had you gotten the drawings back

18  post-confirmation promptly, you would have turned around and

19  given them back to them, because they needed them to resume

20  manufacturing these parts for you.  So that just proves to

21  me, gentlemen, that this isn't -- hasn't got anything to do

22  with the plan.  And this has got something to do with forum

23  shopping, to come back to the bankruptcy court because you

24  thought you had a hook to do that.  And I'm not suggesting

25  any merits at all here.  Interesting fuss.  It's been

1  fascinating to hear about.  But at the moment, I'm purely

2  focused on, I think you came to the wrong Court and I don't

3  think I can resolve this dispute.  So that's the first issue

4  that when we come back after lunch, you all are going to have

5  to address with me is how in the world do I have jurisdiction

6  over this.

7       And we're going to do this a little choppily.  Because

8  today is the last day this week that I am here, I have plans

9  with my staff to go to lunch, because this is the last

10  opportunity that I will have to go to lunch with my exiting

11  law clerk.  So we're going to come back in an hour and 15

12  minutes, which is shorter than what I had hoped to take with

13  him.  But it's about all I can do, because of other

14  commitments the rest of the afternoon.  So come back here at

15  a quarter of 3.  And I have a short matter at 3:00.  If

16  they're here early, I'll take that early, because I don't

17  think it will take long.  But if they're not here, we'll

18  start this and then we'll have to take a short recess so I

19  can take that matter off.  And then I'll tell you, I have a

20  conference call that got arranged specifically this morning

21  to accommodate me at 4:00.  So I can't ask that that call be

22  moved.  So we're only going to have a window of time for

23  argument, unless I come back out after that call, which we'll

24  see where we are.  But at the moment, think short.  But the

25  first issue that we've got to address is subject matter

1   jurisdiction.  Because if I am unpersuaded that I have

2   subject matter jurisdiction, nothing else matters.

3                MR. ALEXANDER:  Your Honor, may we leave

4   everything where it is?

5                THE COURT:  You may.

6        All right.  We'll see you back here in an hour and 15

7   minutes.

8                MR. SIMON:  Thank you, Your Honor.

9                     (Lunch recess ensued.)

10                THE COURT:  Be seated, please.  Please,

11   counsel.

12                MR. ROBISON:  Good afternoon, Your Honor.  Are

13   we going to take appearances, again?

14                THE COURT:  I don't think that's necessary,

15   but, thank you.

16                MR. ROBISON:  May I approach with a copy of my

17   power point presentation?

18                THE COURT:  You may.

19        Thank you.

20                MR. ROBISON:  Good afternoon, Your Honor.

21   Chris Robison on behalf of Superior Air Parts.  How would the

22   Court like to do closing?  Would you like me to do my full

23   closing now, or try to reserve some time?  As far as time

24   estimates go, when I ran through it this morning, it took

25   just under 20 minutes.  I suspect because of the

1   jurisdictional inquiries that the Court raised, that will

2   necessitate a little bit of additional time.  But if I could

3   have a minute or two after Mr. Simon is done, I would like

4   the last word, if the Court's schedule allows.

5                THE COURT:  You may.

6                MR. ROBISON:  Your Honor, I'll address the

7   jurisdictional inquiries that the Court raised first, since

8   that's what the Court requested.  And I apologize.  This was

9   not in my power point.

10               THE COURT:  Didn't expect it to be.

11               MR. ROBISON:  Because I didn't anticipate it

12  coming up.

13       I have looked at this issue before.  And the way I

14  analyzed it when I looked at it -- and I guess let me make

15  one thing clear first.  We're not asking for an injunction.

16  We're not asking that you order that TAE destroy anything.

17  We're not asking for anything that goes beyond the language

18  in the confirmation order, which is the word return.  I know

19  there may have been some testimony from Superior --

20               THE COURT:  But how do you return information

21  that's in a different document?

22               MR. ROBISON:  You give it back to its rightful

23  owner.

24               THE COURT:  Well, but you didn't prove to me

25  that you owned it.  You may own the information, but there's

1  no evidence in the record that you own the TAE created

2  documents.

3              MR. ROBISON:  And I think there is a

4  distinction between information and documents.  And I think

5  that's where intellectual property law comes into play.  And

6  I'll get to that in my ordinary power point.  But the way

7  I've always analyzed the jurisdictional question was really

8  by looking at the Supreme Court's opinion in the Travelers

9  case, Travelers versus Bailey.  And I'm sure the Court's

10  familiar with it.  It's a 2007 case that arose out of the

11  Manville bankruptcy.  And in that bankruptcy in 1986, the

12  Bankruptcy Court entered an order enjoining certain claims

13  against Travelers Insurance Company, which was a non-debtor,

14  because Travelers made a substantial contribution to the plan

15  in that case that went to pay victims of asbestos.  Many

16  years later, more than ten, a group of plaintiffs' lawyers

17  thought they had figured out a way around the Bankruptcy

18  Court's order.  And they attempted to sue Travelers in state

19  court.  Travelers, again a non-debtor, went back to the

20  Bankruptcy Court and asked for relief.  And the Bankruptcy

21  Court entered what are referred to in the Supreme Court's

22  opinion as clarifying orders, clarifying the prior

23  confirmation order.

24       That issue went up on appeal and the Intermediate

25  Court, I think it was the 2nd Circuit, but I could be wrong

1   on that.

2                THE COURT:  No, it would have been.  It was.

3                MR. ROBISON:  Reached the conclusion, again,

4   as I'm sure the Court is aware, that the Bankruptcy Court in

5   the original 1986 order did not have subject matter

6   jurisdiction to enjoin these third-party claims against a

7   non-debtor.  And, therefore, reversed the Bankruptcy Court's

8   entry of the clarifying orders.  And that goes up to the

9   Supreme Court.  And the Supreme Court frames the issue as

10  whether or not the Bankruptcy Court had subject matter

11  jurisdiction to enter the clarifying order.  And what the

12  opinion says is the answer here is easy.  As the 2nd Circuit

13  recognized, the respondents -- and the respondents do not

14  dispute, the Bankruptcy Court plainly had jurisdiction to

15  interpret an enforce its own prior orders.  And I guess

16  that's how I've always looked at this dispute, as

17  interpreting and enforcing paragraph 37 of the confirmation

18  order.

19               THE COURT:  No, but you go way beyond that,

20  counsel.  And I figured that's what you were going to say.

21  But you go way beyond that here.

22       What the confirmation order says is that what you owned

23  is supposed to be returned to you.  Unless I conclude that

24  you own the TAE 3D models and the TAE drawings, you don't get

25  it back under the confirmation order.  Moreover, none of that

1   relates to the points that I made this morning, which is if

2   you wanted this stuff back, then you could have asked for it

3   back years ago.  And what we have here is the intervening

4   business decision of Superior under new ownership to resume a

5   relationship with TAE.  So this doesn't have anything to do

6   with enforcing the plan.  You're dressing it up trying to

7   make it seem like enforcing the plan.  But this is really an

8   unfair business practice, intellectual property, some sort of

9   dispute that arises out of a post-confirmation business

10  relationship between two non-debtor parties.  And that's

11  exactly the kind of dispute that was at issue in the Craig

12  Store case from the 5th Circuit.  And the 5th Circuit made

13  painfully clear that the Court just didn't have jurisdiction.

14          You know, you're supposed to leave the bankruptcy

15  court, once the plan has been confirmed and fully

16  implemented.  And if you have a business dispute between a

17  post-petition supplier, which is what this is,

18  post-confirmation supplier, you don't come back to the

19  bankruptcy court for that.  I'm a Specialty Court.  I

20  presided over the reorganization of the debtor.  And now if

21  you've got a post-confirmation fuss with one of your

22  post-confirmation suppliers, go to a Court of competent

23  jurisdiction to hear that.  But that's not a Bankruptcy Court

24  with jurisdiction under 28 USC 1334.

25          MR. ROBISON:  And I sense I'm fighting an

1   uphill battle here, Your Honor.  But let me at least make two

2   points.

3                   THE COURT:  Please.

4                   MR. ROBISON:  And just try.

5       I did go back and look at the transcript over the lunch

6   hour.  And I think the testimony was that the information

7   that was provided to TAE was all provided pre-bankruptcy.

8                   THE COURT:  I'm sure that's right.

9                   MR. ROBISON:  And I also just wanted to --

10                  THE COURT:  And, frankly -- but if you had

11  gotten it back under the plan, as the plan permitted you to,

12  you would have given it back to them.  Because, apparently,

13  they needed it to manufacture your products.

14                  MR. ROBISON:  Well, and I think -- I'm

15  speculating here.  We both are.

16                  THE COURT:  And so am I.  But that makes

17  logical sense to me.

18                  MR. ROBISON:  But, I guess the way I would --

19                  THE COURT:  If they needed it initially, they

20  would have needed it again.

21                  MR. ROBISON:  And I think the way I would see

22  that is if that had happened, we would probably be having

23  this same conversation, albeit at a time before now.  I think

24  the response from the Insolvency Administrator likely would

25  have been the same.

1                THE COURT:  I don't know what it would have

2    been.

3                MR. ROBISON:  But, again, we're both

4    speculating.

5                THE COURT:  But it would have certainly been

6    before you made the business decision to re-enter into a

7    relationship with TAE, right?

8                MR. ROBISON:  I'm not sure, Your Honor.

9    Because I think the testimony was that the relationship

10   basically continued throughout the reorganization process.

11               THE COURT:  Well, there is no testimony about

12   that.  And the words you used in your motion was you resumed

13   post-confirmation.  I don't know if TAE was manufacturing

14   parts for Superior during the bankruptcy.  That would be

15   inconsistent with my recollection of the case.  But, again,

16   there's no evidence as to whether Superior continued

17   operating during the bankruptcy case itself.  I just honestly

18   don't know.

19               MR. ROBISON:  And the other thing I wanted --

20   in addition to the evidence in the record about when the

21   information was provided, I wanted to draw the Court's

22   attention to the second sentence of paragraph 37 of the

23   confirmation order which I'm not sure I focused on in my

24   opening, or anybody focused on.  But it does provide that for

25   the avoidance of doubt, the reorganized debtor, which is --

1            THE COURT:  No, I understand.

2            MR. ROBISON:  -- who I think we all agree is

3    who's here today, retains all of the debtor's rights pursuant

4    to any confidentiality agreement executed in connection with

5    the exchange of such information.

6            THE COURT:  Well, but the problem is, counsel,

7    what does that mean?  You rejected -- Superior, you, you

8    didn't, but Superior rejected the pre-petition supplier

9    agreement.  So what's the affect of that pre-petition -- the

10   pre-confirmation rejection of that agreement on that

11   sentence?

12           MR. ROBISON:  Your Honor, I haven't analyzed

13   that issue.  And the reason is, is because I think both

14   parties in this case have taken the position that the

15   supplier agreement never terminated.

16           THE COURT:  Well, and that may be true.

17   Rejection is not termination under the Bankruptcy Code.  So I

18   take it, it's your position that you continued doing business

19   under the pre-petition agreement that was rejected in the

20   bankruptcy case?

21           MR. ROBISON:  I think that was the testimony

22   from Mr. Abercrombie, that the parties always did business

23   pursuant to the supplier agreement.  And whether that means

24   it rode through or was rejected and then somehow started

25   over, I haven't analyzed that issue.  But to me, the second

1  sentence of paragraph 37 --

2              THE COURT:  Well, but ride through doesn't

3  work.  And there's a specific plan provision that says,

4  Anything not specifically assumed is rejected.  So upon

5  confirmation, the 2005 amendments eliminated ride through as

6  an option to the Bankruptcy Code.  And so even if it hadn't

7  have, we have a specific plan provision here that says,

8  Anything not assumed, is rejected.  And at least we couldn't

9  find anything on the docket that said the supplier agreement

10 got assumed.  So by virtue of confirmation, that means that

11 it got rejected.

12             MR. ROBISON:  And, I guess, let me try it a

13 different way and see if maybe this helps.  When I read this

14 paragraph 37, that second sentence has to mean something.

15 TAE is mentioned in the first sentence.

16             THE COURT:  Well, maybe it means something.  I

17 don't know what it means.

18             MR. ROBISON:  And I guess what I would submit

19 that it means is that if Superior had a confidentiality

20 agreement with any of the parties in the first sentence, that

21 the reorganized debtor retains all of the debtor's rights

22 pursuant to that confidentiality agreement.

23             THE COURT:  But what rights did it have?  If

24 the agreement was rejected, what rights remained?  And that's

25 a query.  I don't know the answer to that.

1                MR. ROBISON:  And I can't stand here and

2   represent to the Court, but I've analyzed that issue.  I

3   think there are cases -- and I'm just going on recollection

4   here, Your Honor, but I think there are cases that say that

5   confidentiality provisions survive determination of the

6   contract.  So to the extent that rejection would equate with

7   a termination --

8                THE COURT:  But I'm not sure that there is

9   such a provision in this agreement.  I've looked for that and

10  couldn't find one.

11               MR. ROBISON:  And I don't know if that's by

12  agreement or common law.

13       Your Honor, further on the jurisdictional issue.

14  Again, I've always analyzed it under Travelers.  And if the

15  Court is not seeing it that way, not seeing it as a motion --

16               THE COURT:  Well, I agree with you.  The Court

17  always has jurisdiction to enforce its own order.  But I

18  think you're going well beyond enforcing the order.  And I'm

19  not sure that that argument or analysis addresses the

20  post-confirmation business relationship that now is really

21  the focal point of this fuss.  I mean, the bankruptcy case is

22  long concluded.  And, frankly, there's a host of Courts that

23  would have jurisdiction over this dispute.  Whether -- I

24  mean, if you're right that the supplier agreement controls,

25  which is part of your argument before me, and that supplier

1  agreement remained in effect, notwithstanding its rejection

2  because rejection is not termination, but rejection is

3  breach, but if the parties elected then to continue on under

4  that agreement and you have a right to this information back

5  under that agreement, so go get it in some other court and

6  enforce the terms of the supplier agreement.  If this is an

7  unfair business practice case and you want injunctive relief

8  or money damages for mis-use of your proprietary information,

9  you know, go get it.  I physically do not know how you give

10  back information that is contained in another document.

11           MR. ROBISON:  Well, I guess --

12           THE COURT:  And at least nobody has cited us

13  to a single case that addresses that and that's exactly the

14  kind of thing I asked you all to address in what I'll refer

15  to as the gap period.

16           MR. ROBISON:  And what I've struggled with on

17  that issue, Your Honor, is if they had made copies, just

18  Xeroxed copies of the original Superior drawing, they could

19  make the same argument.  And under their argument, it comes

20  out the same way, Well, we made these copies.  They're our

21  copies.

22           THE COURT:  No, that's different.  If they

23  physically just copied your's, then you wouldn't buy that,

24  because that was still your document.  They didn't add

25  anything to it.  They just ran it through a photocopy

1  machine.  So I see that, at least, differently.

2                    MR. ROBISON:  Let me make one more point on

3  jurisdiction and then I'll get into the power point, which

4  may address some of these other issues, in the event that

5  you --

6                    THE COURT:  Well, what I'm going to ask you to

7  do is stop there, so I can take up my other matter.  So make

8  your last point on jurisdiction.  And then before you move to

9  your power point --

10                    MR. ROBISON:  Certainly.

11      We would just ask that if you don't find jurisdiction,

12  you would just enter an order that doesn't prejudice

13  Superior's rights to go pursue this matter in one of the

14  other forums that you mentioned.  Obviously --

15                    THE COURT:  Completely agree that that would

16  be perfectly appropriate.  If I just don't think I have

17  jurisdiction, we've had an interesting learning process for

18  me and hopefully for each other.  But it should not prejudice

19  anyone's rights to -- rights or defenses.

20                    MR. ROBISON:  That's all we would ask, if the

21  Court doesn't find jurisdiction.  Obviously this is an

22  important issue to the reorganized debtor and we want to make

23  sure that nothing that happens here, if the Court doesn't

24  find jurisdiction, prejudices our right to proceed elsewhere.

25                    THE COURT:  Excellent.

1            MR. ROBISON:  With that, I'll yield to the

2    other matter and pick up here in just a minute.

3                     (Brief recess ensued.)

4            THE COURT:  All right, please.

5            MR. ROBISON:  Okay, Your Honor, I'll run

6    through this very briefly.  Because, as I mentioned earlier,

7    it deals more with what I would call the underlying merits

8    than the jurisdictional issue, which is what the Court was

9    interested in.

10           THE COURT:  Well, I'm interested in it all.

11   I'm just concerned that if I can't get myself over the

12   jurisdiction hump -- and, quite frankly, you don't want me to

13   stretch on jurisdiction.  I've either got it or I don't.  And

14   if I don't, you're better off going someplace where you can

15   get this dispute resolved by a Court that can actually hear

16   it.

17           MR. ROBISON:  And I understand the Court's

18   position, certainly.

19       Okay, Your Honor, I wanted to start with six key facts

20   or key principles that I think are important in resolving

21   this dispute.  Number one, the confirmation order that the

22   Court enters requires TAE to return documents and other

23   information owned by Superior.  And I mentioned this in my

24   opening.  But I'll reiterate, to me the use of the term

25   documents and other information indicates that the plan

1   proponents here appreciated that Superior not only owned

2   tangible property, but also intangible property and that they

3   intended that it be returned in whatever form it might take.

4   Number two, Superior's ownership of the intellectual property

5   on its drawings was disclosed throughout the bankruptcy case.

6   And what I've quoted here in the power point is the

7   disclosure statement, which states the debtor owns

8   intellectual property related to its PMAs.  In my mind,

9   that's what we're fighting about, that intellectual property

10  is what we're fighting about.  We're not talking about

11  tangible pieces of paper.  We're talking about dimensions,

12  tolerances, notes, things of that nature.

13      Third point, Superior provided drawings and information

14  for about 360 FAA approved PMA parts to TAE.  The drawings

15  were provided in confidence and pursuant to a supplier

16  agreement.  Superior's drawings contain all of the

17  information necessary to make the part.

18          THE COURT:  But -- and, you know, it probably

19  doesn't matter.  But why would you give them all of the

20  drawings, when they only were manufacturing 48 parts for you?

21          MR. ROBISON:  I don't have an answer to that,

22  Your Honor.  I don't know if they were quoting those parts,

23  perhaps, and they needed the drawing to see how the part was

24  to be manufactured.  I suspect that would be the answer, but

25  I don't -- I don't know.  But as you mentioned, they did only

1  make 48.  And so, I guess to me, that makes me wonder how 312

2  of those parts, the TAE drawings aren't exactly duplicates.

3  If they didn't do any manufacturing, how could they have

4  added anything to the drawing.

5           THE COURT:  Well, but do we know that they

6  have your drawings -- well, do we -- they've agreed to --

7  well, subject to whether I have jurisdiction, they've agreed

8  to give you anything that is marked Superior back.

9           MR. ROBISON:  That's true.

10           THE COURT:  Did you find the Superior drawings

11  for all 362 parts?

12           MR. ROBISON:  I believe that's where that

13  number came from, Your Honor.

14           THE COURT:  Okay.  And so if the Insolvency

15  Administrator is willing to give all of that -- I mean, I

16  guess my assumption was, from  hearing the testimony this

17  morning, that part of what the Insolvency Administrator was,

18  for lack of a better word, agreeing to give back was all of

19  the Superior drawings.  And I didn't know the number, but now

20  I do, until this morning for all 362 parts.

21           MR. ROBISON:  That's my understanding, Your

22  Honor.

23           THE COURT:  Okay.  So the only thing we're

24  fussing about, assuming they do what they said they were

25  willing to do as early as the preliminary response, is the

1   TAE created documents that include information from the

2   Superior drawings?

3               MR. ROBISON:  And the 3D models, to the extent

4   those are included in your definition of TAE created

5   documents.

6               THE COURT:  Right.

7               MR. ROBISON:  Okay.  Point four, using

8   Superior's drawings, TAE generated the TAE label drawings and

9   3D models of Superior's parts.  Dr. Kubler readily admits

10  that these documents contain Superior's information.  And I

11  think what we heard from Professor Rienacker is every single

12  one of them contains Superior's information.  Nevertheless,

13  Dr. Kubler will not return the TAE labeled drawings or CAD

14  models.  I think we've proven that, instead, his intent is to

15  sell them to Continental or another third party.

16      And point six, like TAE, Continental participated in

17  Superior's bankruptcy as a prospective purchaser and is

18  specifically mentioned in paragraph 37 of the plan.  That's

19  the Teledyne Technologies that you see in paragraph 37.

20      Now, a little background, as we've talked about at

21  length.  Superior's relationship with TAE was governed by a

22  supplier agreement.  The supplier agreement expressly

23  recognized that what happened would happen.  It says that

24  Superior will provide drawings, related data, and information

25  to TAE so that TAE can perform the supplier agreement.  And

1    in this presentation, I've placed the words data and

2    information in red every time they appear in that supplier

3    agreement just to hit home the point that this isn't solely

4    about the physical drawings that were supplied to TAE by

5    Superior.

6          Now, the evidence shows that Superior treated the

7    drawings and information that it provided to TAE as

8    confidential.  The Court heard from Mr. Abercrombie,

9    Superior's former president and current CFO.  He testified

10   that the technical data is the heart of the company and that

11   Superior protects its technical data by including

12   confidentiality provisions and agreements with other

13   suppliers by limiting employee access to the drawing by

14   putting software in place that keeps other employees from

15   accessing the drawing.  And then, finally, by placing a

16   proprietary rights legend on the drawing, which you see there

17   on the screen.  That was also included in our supplemental

18   hearing brief.  It's not in your copy of the slides, because

19   it's a pop up.  But the same proprietary rights legend that's

20   in our hearing brief.

21         The evidence that's been presented also shows that TAE

22   treated Superior's drawings as confidential.  The only TAE

23   representative that has testified at this hearing was Jasper

24   Wilson, former head of sales and service for TAE.  And he

25   testified that it was common knowledge at TAE that Superior's

1  drawings had to be kept confidential and that TAE understood

2  that it could only use Superior's drawings to perform the

3  supplier agreement.  There's no other evidence to the

4  contrary.

5       Now, in addition to Superior's bankruptcy pleadings,

6  the Court should look to Section 3.02 of the supplier

7  agreement for evidence of ownership.  And I'm not saying this

8  is the end all/be all, but this is certainly evidence of who

9  owned the information in Superior's drawings.  Under Section

10 3.02, Superior and TAE agreed to three things.  Number one,

11 they agreed that Superior would retain title to the drawings,

12 same language, related data and information supplied to TAE.

13 Number two, that TAE would maintain the confidentiality of

14 the drawings, data, and information.  And, number three, TAE

15 would return the drawings, data, and information to Superior

16 upon termination.

17      Now, the Court should also look to the supplier

18 agreement to determine what rights, if any, TAE had to use

19 Superior's information.  And I think this, again, goes to the

20 issue of ownership.  Under Section 3.03 of the supplier

21 agreement, TAE only had the right to use Superior's

22 information to perform the supplier agreement.  And we've got

23 the language from 3.03 there on the screen for you.

24      Now, other than the right to use Superior's information

25 to perform the supplier agreement, TAE was granted no other

1   right or interest in Superior's information, including the

2   right to place it in its own drawing or CAD model and sell it

3   to a third party.  I think these terms of the contract were

4   reflected in the evidence, as well.  And we've jumped a slide

5   ahead.  But let me go ahead and make this point.  As

6   Professor Rienacker testified this morning, there were no

7   proprietary rights stamps on the TAE labeled drawings, which

8   would be indicia of TAE ownership.  Additionally, you saw

9   notes on those drawings that say, No change to the

10  manufacturing process for this part without the permission of

11  Superior, which, again, I think is indicia of Superior owning

12  the information on that drawing, not TAE.  So in short, I

13  haven't seen any legal basis where -- that would allow TAE to

14  claim ownership of Superior's information by virtue of

15  putting it on a TAE labeled drawing, or by putting it into

16  computer software that generates a CAD model.  I think the

17  parties expressly contracted otherwise.

18       Now, moving quickly through this Schedule 1.02 to the

19  supplier agreement.  I wanted to include this, even though

20  it's largely repetitive.  The reason I put it in is because

21  it actually goes a little bit farther than 3.01, 3.02, and

22  3.03 by requiring that seller, which is TAE, would not

23  reproduce or divulge such information without the expressed

24  written consent of Superior.  So, again, it goes even beyond

25  what's in Section 3.01 through 3.03.

1      Now, the confirmation order, I know the Court's

2   familiar with it.  I've got it quoted in here.  The reason I

3   wanted to put it in is just to emphasize that the language in

4   the confirmation order is consistent with the supplier

5   agreements, documents, and other information.  Almost the

6   same language.  Granted, it leaves out data.  But to me, if

7   all that was intended by paragraph 37 was that TAE would box

8   up and ship back the drawings that Superior sent over in the

9   first place, it could have stopped after the word documents.

10   Other information could be stricken.  And there would be no

11   need to include it.

12      Now, I know the Court has raised jurisdiction on its

13   own initiative.  But I think it is worth pointing out that

14   Dr. Kubler doesn't dispute that he has an obligation under

15   both the supplier agreement and the confirmation order to

16   return Superior's property.  And then we're back into this

17   issue of property.  This is a quote from Dr. Kubler's initial

18   hearing brief.  And what I wanted to point out was just the

19   second sentence, Nor does he contest his obligation, whether

20   pursuant to the confirmation order, the supplier agreement,

21   or otherwise to return Superior's property to Superior.  And

22   like I said, I know the Court has raised jurisdiction.  But

23   it's worth noting, at least in my mind, that that has never

24   been raised by Dr. Kubler.  In fact, he's agreed to return

25   things pursuant to the confirmation order, acting as if it's

1  enforced -- in force and effect, excuse me.

2            THE COURT:  Although, it's not quite fair.

3  They certainly haven't pressed it aggressively.  But if you

4  go back and you read the preliminary response, it does note,

5  more as an irony than as an affirmative position, but they

6  note that, you know, this is years after the confirmation

7  order and not once in the continuing relationship has anybody

8  ever said we need to give anything back.  Now, it is true

9  that they have never filed a motion specifically asking me to

10  determine my subject matter jurisdiction.  And, you know,

11  we've all proceeded as if I have jurisdiction.  But as we all

12  know, that doesn't really address the question of whether I

13  can actually hear this, notwithstanding.

14            MR. ROBISON:  I see what you're saying, Your

15  Honor.  And all I would point out is that after they took

16  that position, in their preliminary response they agreed to

17  return things to us, pursuant to the confirmation order.

18            The next slide, I wanted to make the point that there's

19  no dispute that the TAE label drawings and CAD models contain

20  Superior's information.  And as I mentioned earlier, what we

21  heard today is that every single one of them does.  And they

22  were actually derived from Superior's information.  I think

23  Professor Rienacker used the word, necessary, in direct -- in

24  his direct testimony, that Superior 2D drawings were

25  necessary to create the 3D volume models and TAE labeled

1  drawings.  What I've got here is just two quotes from two of

2  Dr. Kubler's pleadings that confirm that fact, that

3  Superior's information is, indeed, in those documents.

4       Now, from Superior's perspective, I think the Court can

5  stop here.  And let me walk through our thinking.  TAE had no

6  right to Superior's information, other than to use it in

7  performing the supplier agreement.  I think what you heard

8  from Professor Rienacker is that that happened.  Now we know

9  that TAE's information is included in every single TAE

10 labeled drawing and 3D model.  And from our perspective, that

11 information has to come back to Superior.

12              THE COURT:  But how?  Physically, how does

13 that happen?

14              MR. ROBISON:  They can send us back the files,

15 computer files.  I think all of this stuff is electronic.

16              THE COURT:  Well, no, no, no, no, no.  But

17 there's also information on there that you don't own.

18              MR. ROBISON:  There is information on --

19              THE COURT:  So how -- physically, and maybe

20 I'm saying metaphysically, how do I make them give back

21 information that is included on a model or a document that

22 they created and expended, according to the testimony,

23 thousands of hours to do?  But, yes, it does have your --

24 Superior's information in it.  Physically, how do they do

25 that?

1                MR. ROBISON:  I guess they can take their

2    information off of the drawing and send it back.  My initial

3    reaction --

4                THE COURT:  But how?  How do they take it off

5    and send it back?

6                MR. ROBISON:  I would think just --

7                THE COURT:  A big eraser?

8                MR. ROBISON:  I mean, these are PDF drawings,

9    for the most part.  The TAE labeled drawings are maintained

10   in PDF format.  The CAD drawings are maintained in a computer

11   software program, as I understand it.  Though I'm not

12   familiar with the CAD software, from Professor Rienacker's

13   testimony I understood that Superior's dimensions had to be

14   put into that software so that the 3D model could generate.

15   I assume if they had to be put into that software, they can

16   be taken out.

17               THE COURT:  All right.  But that's not what

18   the plan says.  That says, return it to you.  How do you

19   return information that you've taken out of a CAD model?  I'm

20   struggling with the -- and that's why this feels like we're

21   going beyond just return our stuff to us.  I don't know how

22   you return information that is sort of intangible

23   information.

24               MR. ROBISON:  I understand that that presents

25   some logistical problems.  And I guess let me make one point

1   or two points on that.  Number one, if that was going to be

2   such an issue for TAE and/or Dr. Kubler, I think they should

3   have raised it before the confirmation order got entered.

4             THE COURT:  Well, I mean, no offense, why?

5   They didn't write the plan.  They didn't -- you know --

6             MR. ROBISON:  They were the largest creditor

7   and they got half a million dollars out of the 7 million that

8   was paid.

9             THE COURT:  I understand all that too.  But

10  the bottom line is, is I've only recently come to have the

11  metaphysical crisis of how would I make them give back data

12  embedded in a document, embedded in a computer model.  I'm

13  not sure, you know, no offense, I didn't think of it at the

14  time at confirmation.  The debtor wrote the plan.  The debtor

15  knew about these models.  And the debtor chose this language.

16  So if this was going to present, my word and maybe a poor

17  one, a metaphysical problem of how do you do this, then maybe

18  we should have had more precise language in the plan to

19  address it, other than, return to Superior property and

20  information it owns.

21            MR. ROBISON:  And, Your Honor, I don't know

22  the logistical answer to how that information can be

23  returned.  Maybe the way to do it is for TAE to remove

24  whatever information they think they added to the 3D model

25  and send it back.

1          THE COURT:  But, no.  See, you don't own the

2    3D model.  You own information in the 3D model.  So sending

3    you the 3D model isn't complying with the plan.  Because TAE

4    created that 3D model.  So at least, unless you give me

5    something more than you've given me so far, TAE owns that

6    model.  Now, admittedly, there is information in that model

7    that Superior provided and for purposes of this discussion,

8    that Superior owns.  But that's my metaphysical problem.  So

9    I've got a model owned by TAE that has embedded in it

10   information owned by Superior and a plan and confirmation

11   order that says, Blah, blah, blah, blah, blah, quote, Shall

12   be directed to return to the reorganized debtor all documents

13   and other information owned by the reorganized debtor.  I

14   don't know how you pull information from somebody else's

15   computer model and give it back.  So I'm sitting here going,

16   I don't know how to do that, even assuming I have

17   jurisdiction over this fuss.

18          MR. ROBISON:  And I wish I was more of an

19   electronics expert, so I could answer that question.  But the

20   way I understand those CAD models, and I think from the

21   testimony that we've heard, if Superior's information -- and

22   I'm going to use the word remove here, not return.

23          THE COURT:  Understood.

24          MR. ROBISON:  If Superior's information was

25   removed from those CAD models, it would be like taking the

1  poles out of a camping tent.  The whole thing would collapse

2  on itself.  And that's -- in a way, that hits home our point

3  that they're -- they're TAE labeled drawings, as I call them.

4  And the CAD models have no value to anybody without

5  Superior's information.  They're like the tent that won't

6  stand up, because it doesn't have any poles.  And that's -- I

7  guess that's what we're both struggling with.

8            THE COURT:  That's why I think the analogy of

9  what you're really asking for is an injunction prohibiting

10  them from using your data is more accurate as to what you're

11  really asking for here, as it relates to the TAE created

12  materials, whether they be the 2-dimensional drawings or the

13  3-dimensional CAD model.  And the reason I say that is

14  because I don't know how to extract bits of information and

15  direct that it be returned to you.  I know how to tell them

16  they have to take it out of there.  But I don't know how you

17  then return that information to you.  I mean, it's a number

18  that was plugged into a computer model.  There's no way to

19  return that to you.

20            MR. ROBISON:  Well, necessarily --

21            THE COURT:  Let me finish, please.

22            MR. ROBISON:  I'm sorry.

23            THE COURT:  And then secondarily, so what you

24  really want is, is you want them to have to destroy that

25  model, because embedded in it is your information.  Or you

1   want them to take it out, the effect of which is, from your

2   perspective, to make that meaningless -- what's left

3   meaningless, no monetary value.  So basically you want me to

4   tell them they can't do anything with that information.  They

5   don't have -- and no offense, either you or Mr. ALexander at

6   the last hearing said, We don't care if they give it back to

7   us.  If they'll destroy it, that's fine.  Well, but again,

8   the plan doesn't say they have to destroy it.  They say,

9   You're entitled to get property owned by -- property and

10  other data, drawings and other date, or other information

11  owned by Superior back.  And so that -- I mean, to be blunt,

12  that's what really started tripping me to we've gone well

13  beyond what you've asked for in the motion to enforce, r well

14  beyond what the plan is asking -- requiring be done.  Because

15  I don't know how to make them take out a bit of information

16  and give it back to you.  I do know how to tell them, You

17  can't use it.  It's proprietary.  It belongs to Superior.

18  It's not your's.  I'm going to enjoin you.  Which, no

19  offense, that's an unfair business practice remedy, enjoin

20  them from using our proprietary information.  But, again,

21  that's not -- that would be a lawsuit.  We don't have a

22  lawsuit.  We have a contested matter here.  So it's --

23              MR. ROBISON:  Well, and I guess what I'm

24  struggling with -- and I want to move on, because I know I'm

25  taking up way too much of your time on this one slide.

1                THE COURT:  Well, but it's important.

2                MR. ROBISON:  A logistical problem in complying

3    with an order, I don't think should be a get out of jail free

4    card in terms of compliance with the order.

5                THE COURT:  But -- so I sign an order that

6    says return the information.  You've already got that.

7    That's the confirmation order, right?

8                MR. ROBISON:  Right.

9                THE COURT:  And they come back and say, How do

10   I do that?  So then we're going to have a contempt hearing

11   and we're going to be right back to the metaphysical problem

12   of how do I do that?

13               MR. ROBISON:  And then I guess my second point

14   would be, factually the first step in returning something

15   would be going to get it from where it currently resides.

16   And if we can talk metaphysics here for a second, Superior's

17   information currently resides in the CAD models.  So the very

18   first thing that Dr. Kubler would have to do to comply with

19   the order, in my mind, at least, is go take the information

20   out of the CAD model.  Now, metaphysically if there's a way

21   to then take that information and ship it to Superior, that

22   would seem to be a way that Dr. Kubler could comply with the

23   order.

24               THE COURT:  But wasn't that something you

25   should have proven to me today, that that is physically

1  possible?  You want me to order them to return information

2  that you claimed to own.  So wouldn't that have been part of

3  your case is this would be really simply, all you do is this

4  and then you physically can return it to us?  That's part of

5  the question I'm struggling with.

6            MR. ROBISON:  Well, I think what we've heard

7  is that information was inputted in the first place to make

8  the CAD models.

9            THE COURT:  Right.  So that means you can

10  delete it.

11            MR. ROBISON:  So you can delete it.

12            THE COURT:  But I can delete something on a

13  type-written page, but then there's no way for me to return

14  it to you.  That's the fundamental problem here.  Of course

15  it can be deleted.  I delete a lot when I'm writing an

16  opinion, Don't like that, and it's deleted.  But I can't

17  return the words I deleted.  I can't return the numbers that

18  I would delete from the CAD model to Superior.  And that's

19  the focal point of the plan provision, which is take it and

20  return it to us.  I don't know how you return information

21  that's been deleted.

22            MR. ROBISON:  Yeah.  I guess what I would say

23  about that is the -- what the testimony was about why that

24  provision was included in the plan and confirmation order was

25  to keep the information out of the hands of competitors.  I

1   think that's the uncontroverted testimony about the intent.

2   I realize it's the Court's order and so I don't want to put

3   words in the Court's mouth about what the order means.

4                    THE COURT:  Well, but no offense, the order

5   just repeats the plan.

6                    MR. ROBISON:  I understand.

7                    THE COURT:  And I didn't write the plan.

8                    MR. ROBISON:  I understand.

9                    THE COURT:  Quite frankly, I didn't write the

10  confirmation order, either.  I certainly signed it and I

11  certainly reviewed it before I signed it.  And it's

12  consistent with the plan.  But the debtor or the Creditor's

13  Committee, or both of them jointly wrote the plan.

14                    MR. ROBISON:  And I guess where I'm going with

15  that is if the uncontroverted evidence is the intent was to

16  keep it out of the hands of competitors, I think they should

17  at least do their best to return it logistically speaking

18  because of the nature of the computer program that it was

19  loaded into.  It can't be physically shipped back across the

20  ocean.  There should at least be an attempt made to do that.

21  Because after all --

22                    THE COURT:  But, again, if it can't be

23  returned -- and now I'm taking up more time.  But I'll tell

24  you, I'm struggling with this.  We return -- the language

25  suggests that what was important was to give it back.  If it

1  can't be given back, then I'm not sure that provision

2  addresses is.

3              MR. ROBISON:  Well, and it can be given back.

4  Remember, the way this worked, according to Dr. Rienacker,

5  was Superior supplied the 2D drawing.  And then it went to

6  the 3D.

7              THE COURT:  And we made the model.

8              MR. ROBISON:  So the TAE label drawings can be

9  returned.

10             THE COURT:  But those -- you've not shown me

11 that you own those.  You don't own the work that TAE created,

12 or at least there's no evidence in this record that you own

13 it.  You own information in it.

14             MR. ROBISON:  And if they want to take

15 whatever information they allegedly added off of the 2D

16 drawing, then that's --

17             THE COURT:  But, again, that misses the point.

18 I think it was your burden to prove that you owned that 2D

19 drawing.  And, at least, I don't think you did that.  And,

20 quite frankly, this could have been so easily addressed in

21 the supplier agreement by a provision that says, Any

22 documents or other drawings or computer models that are

23 created with our information belong to Superior.  And, sadly,

24 that's not in your contract.  And interestingly, when I first

25 was thinking about that I thought, Well, that's because these

1   guys were affiliates and, you know, it was sort of a sloppy

2   relationship between a sister corporation.  But the reality

3   is, is at the time the supplier agreement was entered into,

4   you weren't sisters.  The supplier agreement stated from 2001

5   and TAG didn't own -- didn't acquire the equity in Superior

6   until 2006.  So when this agreement was put in place, you

7   were strangers to each other.  You were just a business

8   relationship.  So -- and, again, I have no idea what's normal

9   in the industry.  But it seems like this is a problem that

10  could have been fixed with a simple contractual provision

11  that basically said, Anything you create using our data still

12  belongs to us.

13              MR. ROBISON:  And two points on that.  The

14  word drawings when it appears in 301, 302, 303, is always

15  followed by the words related data and information.  And I

16  would submit that that was an attempt to address that issue.

17  The other attempt was the limitation on use.  If I've got

18  something, I can only use it for one specific purpose, to

19  perform the supplier agreement in this case, I don't

20  understand how legally I could convert that information to my

21  information.

22              THE COURT:  But see, now -- I'm with you.  But

23  that's why this doesn't seem like -- that's another part of

24  the reason why this doesn't seem like a plan enforcement

25  mechanism.  The language that's even more helpful to you is

1   in the supplier agreement.  And that language goes well

2   beyond the plan.  That talks about you can't use our

3   information for any other purposes.  The plan doesn't say

4   that.  That's the supplier agreement.  And it's the supplier

5   agreement that says, upon termination, we get back and you

6   can't use our stuff for anything other than to manufacture

7   parts for us.  That all seems like, again, that your better

8   cause of action is not enforce the plan, but rather enforce

9   the supplier agreement.  That's really what you want.  You

10  don't want them using this information.  And it's not the

11  plan that says they can't use this information.  It's the

12  supplier agreement that says that.

13             MR. ROBISON:  And I think in my mind where

14  those two fit together is they've -- Dr. Kubler has always

15  taken the position that we have to show that we own the

16  information.  And where I come down on that is, how can

17  Dr. Kubler or TAE own information that it was almost given in

18  trust.  I mean, they had this information and they could only

19  use it for a limited purpose.  So how could they possibly

20  have an ownership interest in it to take us out of paragraph

21  37 of the confirmation order?

22      But let me -- I'm taking up a ton of the Court's time.

23  So let me move on.  And I think these questions may come up

24  in other contexts, as well.

25             THE COURT:  Okay.

1           MR. ROBISON:  But moving on to slide 14.

2    There's been a lot of focus in this case on public domain,

3    which is a concept that exists in trade secrets law.  And I

4    wanted to point out a quote from Dr. Kubler's reply brief,

5    just to be clear that I think we're in agreement that

6    Superior doesn't have to prove it had a trade secret to

7    prevail.  That's -- that's why this quote is in here.  And I

8    won't burden the Court by reading it.  But I thought it was

9    worthy of a slide.

10        Nevertheless, the Court at the July 22nd hearing

11   mentioned that intellectual property law may come into play,

12   trade secrets law might come into play.  And we looked at

13   that and we briefed it.  And I tried to address the issue

14   that the Court --

15           THE COURT:  If you didn't have the

16   confirmation order, what would your lawsuit be?

17           MR. ROBISON:  If there was no confirmation

18   order.

19           THE COURT:  If you were suing TAE because

20   under the supplier agreement they weren't supposed to use

21   your property for any purpose other than to manufactured

22   parts for you and under the supplier agreement, they were

23   required to give it back, what would the nature of your

24   lawsuit be?

25           MR. ROBISON:  Without giving up my contention

1   that we're in the right court, I think it would be some

2   combination of breach of contract, misappropriation of trade

3   secrets, unfair competition, breach of fiduciary duty.   I

4   think those would all be claims that we would assert.   But,

5   again, I don't want to give up being in this court, because

6   we do have an order that required them to do something.   And

7   I think the evidence was they never did it until we brought

8   it to the Court's attention.

9        But under trade secrets law, we looked at this issue of

10  what happens if you get somebody else's trade secret and

11  modify it, or improve upon it.   And what we found is that is

12  of no legal consequence.   Parties have tried that argument

13  and it is routinely rejected.   My favorite quote was this

14  quote out of the Rheinhold case from the 5th Circuit where

15  the 5th Circuit was applying the Louisiana Uniform Trade

16  Secrets Act in the context of a mold that was used to make a

17  boat.   But as we pointed out in our brief, the Uniform Trade

18  Secrets Act is adopted in Texas.   And we cited Texas cases

19  and cases from other jurisdictions.

20                  THE COURT:   Right.   But your remedy there is

21  to not get their information.   It's either money damages or

22  to stop them from using their's.   You don't force them to

23  return it to you.

24                  MR. ROBISON:   If it were a trade secrets case.

25                  THE COURT:   Right.

1          MR. ROBISON:  And I guess the point I'd like to

2    make to take this out of the trade secrets arena is how -- if

3    they've done something that would make them a

4    mis-appropriator under trade secrets law, how could they

5    possibly at the same time be a rightful owner of the property

6    to get themselves out of the coverage of Section 37 of the

7    confirmation order?  That was the point I was trying to make

8    with those cases.  And they did seem the most on point in

9    terms of the issue that the Court raised, what is the affect

10   of these reported changes or modifications that they made.

11          THE COURT:  Well, but I guess my struggle with

12   that is that even trade secret case law, they don't say that

13   the person who owned the information that was misappropriated

14   then owns the information in the other person's hand.  The

15   remedy for misappropriation of a trade secret is money

16   damages or you can't use it, because you misappropriated

17   trade secret.  The Courts -- I've never seen a case, and,

18   look, I'm not expert on this.  But at least I've never seen a

19   case where the remedy was that which you created, albeit with

20   misappropriated trade secret information and wrongfully

21   created now belongs to the original holder of the trade

22   secret.  The remedies that I have seen in any decision is

23   money damages or an injunction that prevents them from using

24   that which they misappropriated.

25          MR. ROBISON:  And I think --

1            THE COURT:  Which then renders that property

2   useless to them.  But I've never seen a Court say and, oh, by

3   the way, they now own it because you created it with

4   misappropriated information.  So that which you created, now

5   belongs to the victim of your misappropriation.

6            MR. ROBISON:  And I think the Court is correct

7   in that those are the remedies in a trade secrets case.  I

8   guess what I would say here is in a way, the remedy has

9   already been fixed.  I mean, we've got an order that says,

10  return or documents and information.  I mean, the return is

11  something that's -- I mean, that word is unique to the

12  confirmation order and doesn't -- may not exist in trade

13  secrets law.  That's why I was initially resistent to --

14           THE COURT:  But it also says, return what we

15  own.  And, again, that misses the question that I'm

16  struggling with is, who owns the documents and the CAD model

17  that TAE created?

18           MR. ROBISON:  And I'm intentionally resisting

19  framing the issue that way, because I would rather talk about

20  the information in those CAD models and documents.

21           THE COURT:  Right.

22           MR. ROBISON:  But we can move on to the next

23  slide.  I've quoted Professor Rienacker's opinion here

24  that -- as to how these documents were created.  The Court

25  heard more than enough about that this morning.  I've

1   provided some examples.  Here you see the label off a TAE

2   drawing, label off Superior drawing, same part number, same

3   revision level, same part description.

4        The next slide is just a screen shot from one of these

5   CAD models.  I brought the physical depiction of this part,

6   but I won't trouble the Court with it.  What the Court would

7   see, if I held that part up, is in the box right behind me.

8   But it looks exactly like this.  It's got Superior's name,

9   part number, just like as depicted in the CAD model.

10       The next two slides are examples of excerpts from the

11   drawing for SL part -- Superior part Sl18840-2.  What you see

12   in the first slide is an excerpt from the original Superior

13   drawing.  And what you see in the next slide is an excerpt

14   from the TAE labeled drawing from that same part.  And I took

15   just a few seconds to highlight some of the dimensions that

16   are identical, if you were those two, I didn't do all of

17   them, so I don't want there to be any mis-impression that

18   this is an exhaustive comparison.  But just so the Court can

19   see some of the dimensions that are exactly the same.  And,

20   again, that's one of the drawings that Dr. Kubler does not

21   want to give back and intends to go sell to a third party.

22       The second point I wanted to make on trade secrets sort

23   of goes to this issue of public domain that Dr. Kubler has

24   tried to raise, especially in today's hearing.  I've got a

25   quote from a Texas case out of the Houston Cort of appeals.

1  Courts condemn the employment of improper means to your trade

2  secrets.  The question is not how could he have secured the

3  knowledge, but how did he.  What I'd like to focus the Cort

4  on there is that the question, if the Court wants to delve

5  into this public domain argument, is not how could TAE have

6  obtained Superior's information.  And I think or heard a lot

7  about that today from Professor Rienacker.  The question

8  should be, how did they.  And there's no evidence that they

9  got Superior's information out of the overhaul manuals or out

10 of the public domain and put it in these TAE labeled drawings

11 and CAD models.  The only evidence the Court's heard is that

12 it came from Superior.

13            THE COURT:  Right.

14            MR. ROBISON:  And then the second part of that

15 quote just makes clear that someone is a mis-appropriator,

16 can be a mis-appropriator if they properly acquire the

17 knowledge, then they use it in breach of a confidence.  And

18 that's what we've got going on here.  And I put this in again

19 to show the distinction between a rightful owner of something

20 and a mis-appropriator.

21      The UniServices case I thought was worthy of a slide,

22 as well.  Factually, it's as close as what I found to this

23 situation.  And it's a little different, I'll give the Court

24 that.  But what happened in Uniservices -- and it's an old

25 case.  It's a 1975 case, or older relative to some of the

1   other ones in this presentation.  But a debtor was going

2   through a reorganization and there was a Trustee involved.

3   And one of the debtor's principals decides that they want to

4   leave the debtor in the middle of the reorganization.  And

5   the Trustee says, Hey, if you're going to leave, you need to

6   sign a non-compete.  And the principal says, I'm not going to

7   do that, unless the Bankruptcy Court tells me to.  And this

8   person had access to the debtor's trade secrets.  So the

9   Trustee goes to the Bankruptcy Court and says, We need to

10  have a declaration as to what this principal can do with my

11  debtor's information.  This property, these trade secrets are

12  key to the reorganization of this debtor and we need to know

13  what this principal can do with the information.  And what

14  this quote shows is that the 7th Circuit pretty much flat out

15  rejected the same argument Kubler is making here with regard

16  to public domain.  This principal tried to say, Well, you

17  could conduct surveillance on the debtor's business and

18  figure out these trade secrets.  And by the way, I know,

19  since I worked for the debtor, that these trade secrets were

20  in the hands of competitors.  And the 7th Circuit came down

21  on that and said, No, you don't get to make that argument.

22  You got the data in confidence and, therefore, you can't use

23  it.

24      And the first part of that quote, I thought was

25  instructive.  Although the evidence indicates that some of

1   Crystal's data might be known to competitors, we do not find

2   Crystal's property right insofar as it may be enforceable

3   against Dudenhoffer to be effective.  Dudenhoffer is the

4   principal.  But it refers to the debtor's rights in these

5   trade secrets as property rights.  And in that case, I'm not

6   even sure in what form the trade secrets were written down,

7   if any.  They might not have -- it was lists of customers and

8   information related to that customer.  And I don't know if

9   there was actually a physical list, or if the principal just

10  knew who the customers were by virtue of his or her

11  experience.

12         The Court goes on to say, It is immaterial, which I

13  thought was pretty strong, that some of Crystal's competitors

14  may be in legitimate possession of some portion of its trade

15  secret data.  So, again, this case is unique in terms of its

16  facts.  But this is as close as I found.  And, granted, it's

17  not post-confirmation.  It was leading up to the plan.  We

18  need to figure this out so that we can figure out how this

19  plan is going to turn out.

20              THE COURT:  Right.

21              MR. ROBISON:  But, factually, I did find it

22  fairly similar.

23         Next slide is about res judicata.  I just wanted to

24  walk the Court through that argument.  I do feel like the

25  briefing on that has sort of been two ships passing in the

216

1   night.  But, initially, my thought on res judicata is it bars

2   this public domain argument.  The plan and disclosure

3   statement disclose this intellectual property as being owned

4   by the debtor, the intellectual property underlying its PMAs.

5   The PMAs were all included in the bankruptcy -- in the

6   debtor's schedules.  That goes on throughout the bankruptcy.

7   The plan gets confirmed.  Brantley comes in and pays money.

8   Then Dr. Kubler comes in and say, No, no, no.  That

9   information is in the public domain and, thus, you have no

10  property right in it.  Which is entirely inconsistent with

11  the idea that the debtor owns the intellectual property

12  underlying its PMAs.  I think if that was Dr. Kubler's

13  position, he needed to raise it during the bankruptcy.

14       Factually, Superior's information isn't in the public

15  domain.  If I was, Brantley wouldn't have paid so much money

16  for it.  If it was, Dr. Kubler wouldn't be trying to sell it.

17  As the Court heard from Mr. Dedmon, there may have been some

18  drawings in the public domain many, many years ago that you

19  could get from the military.  But that's not the case any

20  more.

21       To sum up, Your Honor.  I think we've -- we've met our

22  burden.  We entrusted Superior's information to TAE in

23  confidence, limited TAE's rights to the information, which I

24  would say are ownership rights.  We cut off any claim that

25  they could have to own the information.  They used our

1    information to create the TAE labeled drawings, the CAD

2    models.  We requested that the information didn't -- we

3    requested the information be returned.  It wasn't.  We think

4    it needs to come back.  I know we've talked a lot about

5    logistical problems.  But I'll move on to the next slide,

6    because there is one more point I want to make.

7         In terms of policy.  I think there's an important

8    consideration here in that I think what's going on is

9    basically an end run around this plan.  I think we've proven

10   that Continental was not a successful purchaser of Superior's

11   assets, including the intellectual property during the

12   bankruptcy.  And if what Kubler intends to do with this

13   property comes to fruition -- again, I'm not asking for an

14   injunction.  But I just want the Court to understand the

15   context.  And, basically, Continental will be allowed to end

16   run this plan and bet what it tried to get out of this Court

17   indirectly.  Additionally, Dr. Kubler/TAE will get a double

18   dip.  They got a large distribution from Superior's

19   bankruptcy estate.  Now they're going to turn around and

20   benefit from Superior's information by selling it to

21   Continental who, again, is also mentioned in paragraph 37 of

22   the confirmation order.

23        With that, I will yield the floor to any additional

24   questions.

25                  THE COURT:  I don't have any.  Thank you.

1      All right.  It's 5 minutes until my conference call.

2  So it doesn't make any sense to me to start.  So I don't know

3  for sure, this is not my call, but I don't know for sure how

4  long this will take.  I'm hopeful maybe 15, 20 minutes.  And

5  so as soon as the call finishes, I'll come back out and we'll

6  wrap up.

7                    (Brief recess ensued.)

8                THE COURT:  Be seated, please.

9      All right.  Please, we'll hear TAE's closing argument.

10               MR. WINIKKA:  Thank you, Your Honor.  Dan

11  Winikka, for the record.  Appreciate Your Honor staying so

12  late today.  I will say that I think I can substantially

13  shorten the presentation I was originally intending to make

14  based on the interactions with counsel and what's already

15  been discussed.  So I would say I think that's the good news.

16      Let me start first, Your Honor, I guess with the

17  jurisdiction point Your Honor has raised.  Now,

18  unfortunately, I don't have a better explanation for you or

19  argument as to why you necessarily have subject matter

20  jurisdiction over all of the issues between the parties here

21  as they've been presented.  I will say that, you know, this

22  is a very important matter to my client.  Obviously the Court

23  has invested a lot of time and the parties have invested a

24  lot of time.

25      If Your Honor would like, maybe it would make sense for

1   the parties to provide a little bit of briefing on that.

2   It's not an issue we've really had an opportunity to spend

3   much time looking at.  Obviously Your Honor raised a good

4   point, as well, is we don't want to get even further down the

5   road and have an Appellate Court decide there was never any

6   jurisdiction and more time is invested.  And so it is a very

7   significant issue that might make sense for us to take a look

8   at and maybe provide a short letter brief, if Your Honor

9   would like on that, just because it is a very significant

10  issue and there's already been a lot of time invested.  So I

11  would offer that up.

12              THE COURT:  Let me think about that.  I mean,

13  no offense, the case law is fairly crisp.  So unless you're

14  going to tell me that you think I have subject matter

15  jurisdiction so that both sides here think I do and I'm the

16  only one who's concerned about it -- and, certainly, I'm

17  going to go back and re-look at the Manville decision.  But

18  asbestos cases are a bit weird.  And that decision, from

19  recollection, is an interesting one.  Let me just leave it at

20  that.  And it was one that was fairly controversial at the

21  time it came down.  But, with that said, let me think about

22  that, Mr. Winikka.  I think that would be fairly helpful.  I

23  mean, I think the body of case law on post-confirmation

24  jurisdiction is pretty cleanly articulated.

25              MR. WINIKKA:  Okay.  I mean --

1              THE COURT:  So, I mean, but answer my

2  question.  So what are you telling me?  Does TAE believe I

3  have jurisdiction over this dispute?

4              MR. WINIKKA:  Well, my client, the Insolvency

5  Administrator for TAE, would certainly like Your Honor to

6  resolve this dispute, if possible.  But you've raised, I

7  think, a question that should be of concern to everybody,

8  given the time and investment.  So I think, you know, as the

9  dispute initially started, return of materials and whether or

10  not we had something that Superior owned, it's kind of

11  morphed, to some extend, beyond that.

12              THE COURT:  It has.  And, frankly, you know,

13  there is no one who regrets sort of the late surfacing of

14  this issue more than me.  But the dispute really has evolved

15  from when it was first filed as a motion to show cause.  So I

16  hear you.  And, quite frankly, you know, you spent a couple

17  of days down here now, mostly, trying this matter before me.

18  So I regret that we've invested that time and effort.  But,

19  again, the Appellate Courts make clear that this Court, even

20  when no party is raising it, has to assess its own

21  jurisdiction.  And as the suit has -- as the contested matter

22  has morphed and as some facts become more apparent to me,

23  i.e., the gap between confirmation and the request for

24  return, the fact that the parties did post-confirmation

25  business with each other voluntarily, et cetera, et cetera,

1  all of that caused me to begin to become concerned that we

2  were beyond what this Court could legitimately do now that

3  the real reason for the bankruptcy was fully resolved.

4              MR. WINIKKA:  Yeah.  Well, I will say one

5  thought that did occur to me that we really haven't had time

6  to research is that perhaps it would be the case that the

7  Court had subject matter jurisdiction over an aspect of the

8  dispute that under maybe principles of supplemental

9  jurisdiction.

10             THE COURT:  Doesn't work in a bankruptcy

11  court, 5th Circuit has so ruled.

12             MR. WINIKKA:  Okay.

13             THE COURT:  We either have it under 1334 or we

14  don't have it.

15             MR. WINIKKA:  Understood.  Well, let me start,

16  Your Honor, by I think it's important at the outset here to

17  draw a distinction here and really dispel the notion that

18  when we're talking about here information on the TAE created

19  models and drawings that have information that's on the

20  Superior 2D drawings, that we're talking about the primary

21  assets of Superior in this case.  Because I think what's

22  occurred throughout the proceedings, to some degree, and some

23  of the testimony and some of the briefing, is Superior kind

24  of lumps together the information on the drawings they

25  provided to TAE where all of their assets underlying, and all

222

1  of their data underlying their PMAs and the PMAs themselves.

2  And it may be that the PMAs and the underlying, all of the

3  underlying data supporting the PMAs are the most important

4  assets of Superior.  But in this dispute, we're only talking

5  about the information on the Superior 2D drawings that were

6  provided to TAE.  And the PMAs, and all of the data

7  underlying the PMAs, include a lot more information than

8  that.

9        I think you heard testimony that no one could take

10  these Superior 2D drawings and just manufacturer the Superior

11  parts.  FAA approval would be required.  And to obtain that

12  approval, you know, one has to go through this whole testing

13  and computation process and prove air worthiness to the FAA.

14  And the time and effort that Superior spent to do this

15  testing and get those approvals and obtain those PMAs, you

16  know, may, in fact, have been significant.  And then the data

17  underlying that testimony maybe -- I mean, we really don't

18  have any evidence on this, but may be proprietary and

19  extensive.  But this proceeding has nothing to do with the

20  actual PMAs themselves, or any of the testing data under the

21  PMAs.  And I think that's, you know, important to keep that

22  in mind.  So  I wanted to point that out at the outset.

23        Your Honor, I guess I want to start with just very

24  briefly on the facts, because this has already been discussed

25  a fair amount.  But I think it's clear from the evidence, I

1   would say, that the 3D volume models and the 2D drawings that

2   TAE created are not just copies of the Superior drawings.

3   There was quite a bit of evidence about the tremendous amount

4   of engineering work that went into those models, the

5   additional manufacturing information and know how that's

6   reflected on the 2D drawings that TAE created, all of that

7   was created from the 3D models.  Some of the TAE drawings

8   were for the interim process, and so they included a whole

9   host of dimensions that aren't even on the Superior 2D

10  drawings.  And I think that's, you know, pretty clear from

11  the evidence that that's the case.

12       So I want to -- I think what I really want to focus on,

13  and it relates to a lot of the questions that Your Honor was

14  asking on, is then the ownership of these TAE created 3D

15  models and drawings.  First, obviously, it's Superior's

16  burden to establish that they actually own those materials.

17  And we certainly don't feel like they've met that burden.

18  And I think what Your Honor had struggled with and a lot of

19  back and forth with Mr. Robison had to do with their

20  suggestion that we should -- TAE should somehow be required

21  to return their information and, in effect, remove, or

22  redact, or destroy the TAE information and return to them

23  their information.  And I think the problem there is that the

24  fact that the TAE models and drawings contain information

25  that come from the Superior drawings, really does not create

1   an issue of ownership.  They've cited no authority for the

2   proposition that they would own the TAE materials in whole or

3   in part, because the materials contain information that they

4   claim they own.  I mean, I think fundamentally TAE owns what

5   TAE created.  And the real issue becomes, Your Honor, it's

6   much more of a use and disclosure issue is what we're talking

7   about here.  And they're saying, essentially, that they own

8   the information itself.  And that is where you get into these

9   issues, I think, Your Honor about whether or not is it a

10  trade secret, is it protectable confidential information.

11  And we believe the evidence shows that it clearly is not.

12            THE COURT:  Well, but -- but you -- your

13  client, TAE, and I recognize at the time the supplier

14  agreement was created, you know, there was no Insolvency

15  Administrator, but that's irrelevant.  He's succeeded to

16  whatever rights and obligations existed under the supplier

17  agreement.  You agreed that this information could only be

18  used to manufacture Superior parts.  And now the reality is

19  is you want to use it for some other purpose.  You also

20  agreed to return it at the end of the relationship.  And I'm

21  not talking about the plan now, I'm talking about the

22  supplier agreement.  And -- so it -- it seems like,

23  irrespective of whether it really is proprietary or really is

24  trade secret, you agreed to these limitations.  And now you

25  don't want to live up to those limitations.  And so -- so

1  that's a struggle for me.  If I reach the merits, that's a

2  struggle for me, is the contract requires that that

3  information not be used for any other purpose, other than to

4  manufacture parts for Superior.  And you want to use it now

5  for another purpose.  You want to sell it to a competitor of

6  Superior.

7              MR. WINIKKA:  And if I might respond to that,

8  Your Honor.

9       First, to the extent the supplier agreement governs

10  here, in light of the rejection, that's another issue.  And I

11  did want to point out --

12              THE COURT:  An issue I raised, you didn't.

13  And, frankly, rejection is not termination of the agreement.

14  Rejection is simply a breach of the agreement.  And parties

15  breach agreements and then continue to operate pursuant to

16  the terms, notwithstanding the breach.  So I don't know want,

17  but you both came in here two weeks ago and told me that you

18  were continuing to do business under the supplier agreement,

19  or you had continued to do business under the supplier

20  agreement.  So I'm the only one who worried about rejection

21  and the affect of rejection.

22              MR. WINIKKA:  Well, Your Honor, I think that's

23  superior's position.  And they did -- you know, there was

24  testimony about how they thought they were continuing to

25  operate under the supplier agreement.  That's not anything

1  that we necessarily ever agreed to.  Our point was just on

2  the --

3              THE COURT:  So what were you operating under

4  post-confirmation?  I mean, clearly TAE under Dr. Kubler's

5  administration, was continuing to manufacture parts

6  post-confirmation for Superior.  And what was that pursuant

7  to, if it wasn't the pre-petition --

8              MR. WINIKKA:  It would have been just pursuant

9  to the purchase orders that were received.

10             THE COURT:  So you don't think the supplier

11 agreement continued to have any affect between the parties?

12             MR. WINIKKA:  Well, I don't think it makes --

13 I don't really think it makes a difference, Your Honor,

14 whether it did or not.  And that was the point we made when

15 we were arguing about the supplier agreement was that, you

16 know, on this ownership issue, whether the supplier agreement

17 governs or not, you look at the terms of the supplier

18 agreement.  That did not create the right in SAP to the TAE

19 created material.

20             THE COURT:  No.  But it did create the

21 obligation on you not to use those materials for any other

22 purpose.  And you clearly are going to try and use them for

23 some other purpose.

24             MR. WINIKKA:  Yes.  And our -- our point on

25 that, Your Honor, is that -- and I'm going to get to that in

1  a minute here.  But the point on that, Your Honor, is that if

2  there's -- if the information itself is readily ascertainable

3  and it's not protectable, confidential information, then any

4  use restriction or restriction against disclosure is just

5  not enforceable.

6       And I think the case I would point Your Honor to on

7  that particular point is the Allen Richardson case, which is

8  a Texas Court of Appeals case from 1986.  In that case, Your

9  Honor, the employer brought a breach of contract action

10  against former employees under employment agreements for

11  under employment agreements that restricted both use and

12  disclosure of confidential information.  The Trial Court

13  refused to enjoin the former employees from using or

14  disclosing that confidential information.  It goes up on

15  appeal.  The Appellate Court affirms, finding that the

16  evidence supported the conclusion.  The evidence, said the

17  Trial Court, supported the conclusion that the information

18  that they were seeking to restrict from use or disclosure is,

19  quote, Is readily ascertainable and, therefore, not a trade

20  secret or confidential information.

21       And, Your Honor, that's our point here, really, is that

22  you heard from Mr. Robison about how the confirmation order

23  refers to information and they've got to return our

24  information.  But from a property right perspective they have

25  to have protectable interest in that property.  I mean, they

1   can't own information, unless they have some protectable

2   right in it.  And we believe in looking through all of the

3   cases that if it's not -- if it's readily ascertainable, if

4   it's in the public domain or readily ascertainable, it's not

5   confidential information.  And a party has no right to

6   prevent use or disclosure in that circumstance.  And that's

7   really why we heard a lot of evidence, Your Honor, about

8   whether this information was in the public domain or readily

9   ascertainable, which I do want to get to.

10          But I want to make sure I've answered Your Honor's

11   question.

12                  THE COURT:  I understand.

13                  MR. WINIKKA:  So fundamentally, Your Honor,

14   TAE owns what TAE created.  And so I think what we are

15   talking about here is, you know, Mr. Robison pointed to this,

16   you have to return our information.  And so we're back to

17   what I think, really, is a use and disclosure issue, not an

18   ownership issue.  And that's where I think the Court was

19   struggling, to some degree, on that issue.

20          So what I'd like to do, Your Honor, I guess, is talk a

21   little bit about the evidence regarding whether the

22   information on those Superior 2D drawings is in the public

23   domain or readily ascertainable.  Because, you know, that is,

24   Your Honor, in our view critical to this determination of,

25   you know, whether or not they have an ownership right in the

1   information, or whether they have a right to restrict use or

2   disclosure, or to require destruction of the information.

3   And that's really what it boils down to.

4       And Your Honor heard from Professor Rienacker that the

5   critical dimensions and tolerances that establish air

6   worthiness for these drawings are available in the engine

7   overhaul manuals, including for new parts.  And that, you

8   know, Your Honor, even if these may constitute a minority of

9   the dimensions and tolerances for a particular part.  They

10  are the most critical data.  He further testified, Your

11  Honor, that the other dimensions and tolerances, one, they

12  may actually -- they could be available in the public domain.

13  As Professor Rienacker explained, he did not do a thorough

14  search.  His search was confined to the engine overhaul

15  manuals.  But as we heard Mr. Dedmon testify, design data is

16  available from a variety of sources.  So it may be the case

17  that the other dimensions are, in fact, available in the

18  public domain.  We don't necessarily know.  But the important

19  point, I think, Your Honor, is what Professor Rienacker

20  testified was that those other dimensions and tolerances

21  could be determined through the exercise of engineering

22  judgment.  And perhaps the measurement of a single part in a

23  fairly -- in a fairly easy manner.

24      I think, Your Honor, Mr. Dedmon's testimony in the

25  Rolls Royce case corroborates exactly what Professor

1    Rienacker testified to.  You know, he today testified that

2    this -- his prior testimony about all of the information

3    being a public domain, he's now saying that those parts

4    related to -- or that related to engine parts from the 1960s

5    and '70s when Superior was -- PMAs were all based on

6    identicality.  But I think Your Honor has prior testimony

7    speaks for itself.

8          If we can get slide 8 up.

9          Here's his prior testimony, Your Honor.  He -- he said,

10   I may explain by saying that every bit of information that I

11   have sought out to obtain PMAs has been available in the

12   public domain.  And he was asked, And what parts -- what are

13   those parts that you had that you sought to obtain PMA

14   approval?  Parts for Continental and Lycoming aircraft

15   engines, all of the parts, actually.  And then he's asked how

16   many parts he tried to obtain approval for with respect to

17   the Continental and Lycoming engines.  And he testified

18   several thousand.  And that related to piston engines?  Yes.

19   And every single one of those several thousand parts, the

20   information was in the public domain?  Yes.

21         You then heard today, Your Honor, on redirect that he

22   previously testified in his deposition that the parts he was

23   referring to in this Rolls Royce testimony, included the

24   parts that are issued -- at issue in this dispute.  And he

25   tried to backtrack from that today.  But he admitted that he

1  didn't get thousands of PMA approvals based on identicality.

2  You know, so although he testifies now, earlier today that he

3  was talking about parts in the '60s and '70s where the PMAs

4  are all based on identicality, he then admitted that they

5  didn't get thousands of parts, PMA approval for thousands of

6  parts based on identicality.

7      The point is, Your Honor, is I think his testimony just

8  corroborates what Professor Rienacker testified to.  And that

9  is, if not all of this information, a substantial amount of

10  this information is all available in the public domain.  And

11  to the extent it's not available in the public domain, it's

12  readily ascertainable.

13      I would point out, Your Honor, that this testimony of

14  Professor Rienacker, all of the information from the Superior

15  2D drawings is in the public domain or readily ascertainable,

16  no evidence is put on to the contrary that all that

17  information is not readily ascertainable.  And to us

18  that's -- you know, that's the key here as to whether or not

19  the use restriction or disclosure restrictions in the

20  supplier agreement, to the extent that agreement still

21  applies, are enforceable.

22      Mr. Robison, Your Honor, did talk about the Uniservices

23  cases -- I mean the Uniservices case.  I would point out that

24  consistent with a lot of the other cases they've cited, Your

25  Honor, they've one, they come in and say, We don't have to

1  prove that this is a trade secret.  But then they relied

2  extensively on trade secret cases.  And Uniservices, again,

3  establishes the same proposition.  That is, it has to be a

4  trade secret to begin with.  And, Your Honor, both to be a

5  trade secret or to be confidential information, it cannot be

6  readily ascertainable.  And that's why there was so much

7  evidence about that.  That's why there's argument about that

8  in the brief.  It can't be either.  A trade secret, Your

9  Honor, does have additional elements, or factors that don't

10 apply necessarily to confidential information.  For instance,

11 I think one of the factors is that there's been substantial

12 expense and time incurred in developing the information.  And

13 that would be a factor in determining what is a trade secret.

14 It may not necessarily be a factor in determining whether

15 it's confidential information.  But if the information is

16 readily ascertainable, it is not confidential information or

17 a trade secret.  And the point we were making in the trade

18 secret case is that it's got to be a trade secret to begin

19 with.

20      They've cited cases, Your Honor, that have talked

21 about, or implied that if it's a breach of a confidentiality

22 agreement, then that's all that's necessary for a

23 misappropriation of a trade secret.  But that's not the case.

24 All of these cases, they start with the premise that it's got

25 to be a trade secret to begin with.  And, again, that goes

1   back to whether or not the information is readily

2   ascertainable.  And the only evidence before Your Court is

3   that none of this -- I'm sorry.  All of the information on

4   the Superior 2D drawings is, in fact, readily ascertainable.

5   And there's really no evidence to the contrary on that point.

6       Mr. Robison also along the same lines, discussing some

7   of these trade secret cases, Your Honor, they point to

8   language in some of these cases that say well, it doesn't

9   matter -- and I think he mentioned this in his closing

10  argument.  It doesn't matter that you could have obtained it

11  another way.  What matters is how you obtained it.  And you

12  got it under -- you got it under a confidentiality agreement,

13  or some other form of agreement where the trade secret was

14  provided to you.  And I think part of the disconnect there,

15  Your Honor, is that it is the case that information can be a

16  trade secret and another party can go out and through what

17  might be extensive effort, reverse engineer and, otherwise,

18  discover that trade secret information.  But it's got to be a

19  trade secret to begin with.  That kind of extensive reverse

20  engineering where it takes a substantial amount of effort and

21  expense, you can't -- a party cannot relieve itself of that

22  burden by getting it under an agreement from somebody else.

23  And then when they assert that the -- that there's been a

24  misappropriation of the trade secret, argue that, Well, gee,

25  I could have reverse engineered this information.  Other

1   parties could expend a lot of time and effort and actually

2   obtain this information, so I should be permitted to use it

3   too.  And what the Courts are saying there is, No.  If you

4   got it in a confidence -- a relationship of confidence, you

5   can't really make that argument.  But that -- again, that all

6   presumes that there's a trade secret to begin with.  And if

7   it's in the public domain or readily ascertainable, then it's

8   not a trade secret to begin with and you don't really reach

9   that issue.  And so I think that's part of the reason that

10  the discussions of some of these cases get confused, because

11  they're looking at trade secret cases and it's got to be a

12  trade secret to begin with.  And here, because it's in the

13  public domain or readily ascertainable, it's not a trade

14  secret.  And it's not -- it's not confidential information

15  that could be enforced under an agreement, either, Your

16  Honor.

17       I'm just looking at my notes for a minute.

18              THE COURT:  Of course.

19              MR. WINIKKA:  I guess my final point, Your

20  Honor, would be Mr. Robison suggesting that this is an end

21  run around the confirmation order and plan, because

22  Continental happens to be the party that the Insolvency

23  Administrator had been negotiating with.  But we're five

24  years down the road from confirmation of the plan in this

25  case, Your Honor.  So I don't think in any way this is any

1  sort of end run around the confirmation order at all.  I

2  mean, the point is, I think, that the information that TAE

3  received is information that anybody could get fairly easily

4  by going to public sources, perhaps get all of it by public

5  sources, or with a little engineering judgment, and a little

6  work could be readily ascertained.

7              THE COURT:  But if that's true, why is it

8  valuable to TAE?  I mean, no offense.  If it's all easily

9  ascertainable from the engine overhaul manuals, or other

10  public sources, why is Continental willing to pay you money

11  for it?  Frankly, they could have -- you know, in the last

12  five years, they could have just gone and created that

13  information for themselves.

14              MR. WINIKKA:  Well, I'm not sure that -- I

15  wouldn't say that that information itself does have any

16  value.  I think you're right, it wouldn't.

17              THE COURT:  Why is he going to sell it, then?

18  Why does he want to sell it, if it's not valuable?

19              MR. WINIKKA:  Well, I think what may have

20  value, Your Honor, would be the actual TAE created models and

21  drawings.  Those relate exactly to, you know, manufacturing

22  process.  You know, maybe not necessarily specifically for

23  Superior's parts, because -- I mean, wouldn't allow somebody

24  else necessarily to manufacture Superior's parts, because

25  they don't have Superior's PMA.  They can't take that

236

1    information and manufacture Superior's parts.  They'd have to

2    go through and get the, as I mentioned, the FAA approval

3    process.  But it may be that, you know, a company --

4              THE COURT:  So if Continental buys -- assume

5    that Continental buys the 3D models and the 2-dimensional

6    drawings from TAE.  Am I hearing you tell me that under

7    applicable airline regulations, FAA law, whatever the right

8    wording is, that Continental could not manufacture a

9    replacement part because it doesn't have the PMA for that

10   part?

11             MR. WINIKKA:  Well, as I understand it, they

12   couldn't manufacture the exact Superior part.

13             THE COURT:  So how does the manufacturing

14   drawings help them?  Because the manufacturing drawings tell

15   them how to manufacture Superior's parts.

16             MR. WINIKKA:  Well, there are other --

17   Continental, obviously, would have its own replacement parts

18   that are, you know, original equipment manufacturer parts, I

19   suppose.

20             THE COURT:  Right.  But how does the

21   manufacturer drawings for a Superior part have any value to

22   Continental, if it can't then use that to manufacture the

23   Superior part?  This just doesn't make any sense to me.  And

24   the manufacturing specifications on a Superior part would

25   seem to be unique to that part.  And so you'd need the

1  manufacturing specifications or drawings for some other part

2  to manufacturer some other part.

3                MR. WINIKKA:  Your Honor, I mean, I'm

4  speculating here.  But what -- the only thing I can think of

5  is that if -- and I don't know how much value any of this

6  necessarily has, as to Continental.  But the one thing I

7  could think of, Your Honor, is that if Continental has, you

8  know, similar parts, they're not the same, because they're

9  not under the same PMA certificate.  But they're obviously

10  not -- they're not going to be too far different.  And it may

11  be that the information on how to manufacture the Superior

12  parts, even though the parts Continental may be manufacturing

13  may have some different dimensions and other things that do

14  not make them identical or exact to the Superior part, but

15  nonetheless, the manufacturing information because the parts

16  are so similar, could have some real value to Continental.

17  But, again, I would have to be -- I'm speculating to some

18  degree, myself.

19                THE COURT:  Okay.

20                MR. WINIKKA:  That was all I have, Your Honor,

21  unless you have further questions.

22                THE COURT:  I do not.  Thank you.

23        Please.

24                MR. ROBISON:  Your Honor, I know it's after 5.

25  I'll be extremely brief.  Let me start from the end and work

1  backwards.

2      The answer to your question about why the TAE labeled

3  drawings would have value to Continental is because Superior

4  has PMAs to make replacement parts for both Lycoming and

5  Continental engines.  If Continental gets that data, it will

6  get all --

7          THE COURT:  I'm sorry, I blanked out for a

8  second.  Start again.

9          MR. ROBISON:  The answer to your question

10  about why the TAE labeled drawings and CAD models would have

11  value to Continental is Superior has PMAs to make parts for

12  both Continental and Lycoming engines.

13          THE COURT:  Right.

14          MR. ROBISON:  And I think as we've

15  established, the drawings that Superior sent to TAE were

16  design drawings.  In other words, you could make the part

17  from those drawings.  That information went on to the TAE

18  label drawing in addition to this alleged manufacturing

19  information.  If Lycoming gets that, what they're going to

20  have is Superior's design drawings for Lycoming parts, which

21  they could then take and apply to the FAA for approval on the

22  basis of identicality.  And so they could get PMAs and try to

23  make and sell parts for the Lycoming engines.  That's why

24  they would have value to Continental.

25          THE COURT:  So Continental is not currently

1  selling Lycoming replacement parts?

2            MR. ROBISON:  I believe that's correct.

3            MR. ROBISON:  A couple of things legally.  The

4  Allen Richardson case, the only case Mr. Winikka referred you

5  to, it's a 1986 case out of the Houston court.  That's the

6  exact same court that rendered the Sharma opinion that I

7  think is quoted at slide 22 of my power point.  Sharma is

8  from 2007.  It's 20 years later.  Sharma says, It's not how

9  could you have obtained the knowledge, it's how did you.  I'm

10 just not sure Allen Richardson carries a whole lot of weight,

11 in light of what happened in the Sharma case 20 years later.

12         On the supplier agreement and did it terminate, is it

13 enforceable.  I just wanted to point out to the Court that

14 when Dr. Kubler was trying to drag this thing into an

15 arbitration proceeding, pursuant to an arbitration clause in

16 the supplier agreement, he took the position that it was

17 enforceable and it never terminated.  I just want to make

18 sure that's clear.  And we ask -- we asked what his position

19 was on the supplier agreement in discovery.  And after

20 asserting some vague and over broad objections, he stated

21 that the Insolvency Administrator states that he -- sorry.

22 To the Insolvency Administrator's knowledge, the supplier

23 agreement was never terminated.  So the way it was

24 characterized by Mr. Winikka was, Well, you heard from

25 Superior on that point, but you didn't really hear from the

1   Insolvency Administrator.  And I just wanted to make sure

2   that the Court hears what the Insolvency Administrator's

3   position was, at least in the interrogatories.

4       Lastly, Your Honor, I just -- I hate to go back to

5   this, because I know we went round and round on it when I was

6   up here before.  But I just -- if you do find jurisdiction, I

7   would hate for this thing to fail for lack of a remedy.  And

8   I don't know what options you have available.  But it would

9   seem to me that -- I was trying to think of what an analogous

10  situation would be to this.  And my co-counsel, Mr. Adams,

11  helped me with one.  His example was, Okay.  When a debtor is

12  in Chapter 11 and you've got potential purchasers that come

13  in and look at the debtor's books and records, they take the

14  debtor's financial information, most likely under a duty of

15  confidentiality and not to use it, and some of the same

16  provisions you've seen here.  And they go back and they put

17  it in their spreadsheets and they run numbers and they come

18  up with projections, and EBITDAs, and things like that to try

19  to determine, you know, what if anything to bid for that

20  particular debtor, or that particular debtor's assets.  And,

21  you know, I don't have a personal example to cite the Court

22  to in terms of how those confirmation orders were written and

23  what they say has to happen to that information.

24          THE COURT:  That would be in the context of a

25  sale you said, so there wouldn't be a confirmation order.

1   And normally in a sale context, under 363 it's produced

2   pursuant to a confidentiality agreement.  And the

3   confidentiality agreement dictates what the remedy is;

4   destroy it, not use it, return it.

5             MR. ROBISON:  And I guess the reason I thought

6   that might be applicable is because the -- in addition to

7   TAE, the other parties that are named in paragraph 37,

8   there's some suppliers in there, like TAE.  But Teledyne and

9   Lycoming were not suppliers.  They were potential purchasers.

10  And that's at least how it was dealt with in this case.  But

11  I would think --

12            THE COURT:  I don't know that.  I mean, I

13  don't know that that was information given to them in the

14  context of looking at these assets.

15            MR. ROBISON:  I think there was some testimony

16  about that, at least with respect to Continental being an

17  unsuccessful purchaser in Superior's bankruptcy.

18            THE COURT:  Well, no.  But you're talking

19  about something different.  You're telling me that the reason

20  why they were listed in paragraph 37 is because they got

21  information in connection with the sale.  There's no evidence

22  of that on this record.

23            MR. ROBISON:  I thought Mr. Abercrombie had

24  testified to that.  But if --

25            THE COURT:  Or at least I don't remember it.

1   I'll go back and look, but I don't remember it.

2              MR. ROBISON:  I may be mistaken on that.  But

3   I just want to emphasize that I hate to have this thing fail

4   for lack of a remedy, rather than, Hey, we tried to give you

5   your information back, but we couldn't because of the

6   intangible nature of the property, or the computer software

7   in which it was embodied.  I would just hate for the thing to

8   fail for lack of remedy.

9              THE COURT:  Well, but help me.  I mean, I hear

10  you.  But I can't create a remedy beyond what the plan

11  creates.  Because that's -- even assuming I have

12  jurisdiction, all I can do at this point is enforce the plan

13  and the confirmation order, at the most.  And so it's either

14  a remedy that the plan says, or it's not something I can do.

15             MR. ROBISON:  Yeah.  And what I don't know is

16  if there would be any room for a clarifying order.  And I

17  just, to be quite honest, I haven't looked at that issue.

18             THE COURT:  But that's not before me.  Nobody

19  asked for a clarifying order.  We didn't try this case on the

20  basis of, Please give us a clarifying order.  We tried this

21  case on the basis of, Enforce the terms of the plan and the

22  confirmation order against the Insolvency Administrator for

23  TAE.

24             MR. ROBISON:  And, I mean, I even had the idea

25  of appoint a Special Master to try to figure out how this

1  could be accomplished.  But then I realized that Bankruptcy

2  Courts can't do Masters under, I think, 9031.  So I'm fresh

3  out of ideas for the moment.  I do want to convey to the

4  Court that I would just hate for this thing to fail for lack

5  of a remedy.

6        And, lastly, Your Honor, again, if you do find no

7  jurisdiction, which I'm a little confused as to what their

8  position is on jurisdiction after Mr. Winikka's closing.  If

9  you want more briefing, fine.  If not, whatever the Court

10  wants to do on that.

11              THE COURT:  I'm confused too.  I get the

12  feeling that they'd sort of like me to have jurisdiction and

13  resolve this dispute.  But as you all know, even if you both

14  wanted me to have jurisdiction, I either do or a I don't.

15  And if I don't, notwithstanding the parties' consent to me

16  doing something, I can't do it.  And no offense, that's

17  even -- while it's different, it's even worse now under Stern

18  v.  Marshall and the progeny from the 5th Circuit.

19  Bankruptcy Court jurisdiction is shrinking, not expanding.

20  But the one thing we all know is that consent doesn't create

21  federal jurisdiction.  It just can't.

22              MR. ROBISON:  Understand.  Though I would

23  point out the Travelers case, if the question is jurisdiction

24  on the prior order, I think that is waived, if it's not

25  appealed at the time the order is entered.

1          THE COURT:  Oh, no.  I can enforce a prior

2   order.  My concern is not -- my concern is we're going well

3   beyond enforcing a prior order.

4          MR. ROBISON:  Well, let me just leave the

5   Court with this.  If you don't find jurisdiction, we would

6   again just ask that you don't do anything that would

7   prejudice our rights to proceed in another forum.

8          THE COURT:  Well, I mean, let's just talk

9   about that for a minute.

10      My intention would be not to prejudice.  If I don't

11  have jurisdiction, then I shouldn't have been bothering with

12  this, which should leave everybody in whatever position they

13  were in before we enjoyed each other's company.

14          MR. ROBISON:  And I think under the elements

15  of res judicata, if you said you did not have jurisdiction,

16  it would be hard to argue that anything that came out of this

17  court is res judicata.  But --

18          THE COURT:  Amen.

19          MR. ROBISON:  -- I would just ask that that's

20  made clear, so we don't have to hear about it at the next

21  stop, if there is one.

22          THE COURT:  Well, but I -- sadly, I think

23  you're going to have to -- I mean, I don't know how I can

24  make that clear.  I either have jurisdiction to entertain the

25  dispute, or I don't.  If I don't, then I haven't decided

1   anything other than I don't think I have jurisdiction.  So --

2   but it would certainly not be my intention to prejudice

3   anyone's rights, if I conclude that I don't have subject

4   matter jurisdiction.

5               MR. ROBISON:  I understand, Your Honor.

6       If the Court has any questions, I'd be happy to answer

7   them.

8               THE COURT:  I don't think so.

9               MR. ROBISON:  Thank you, Your Honor.

10              THE COURT:  All right.  Well, in the 14 plus

11  years I've been on the bench, I don't know that I ever told

12  someone they couldn't file a supplemental brief, if they

13  wanted to.  I don't feel the particular need for it.  And if

14  anybody is going to file something, it's got to happen very

15  quickly.  Because we are going to be working on a decision

16  that, quite frankly, we're already working on.  So it's

17  something that we'll be working on promptly.  So, again, if

18  someone feels the need to say something further on

19  jurisdiction, I'm happy to receive that.  But I would like

20  that to be in within the next 24 hours, if something is going

21  to come in.  Otherwise, I appreciate and we certainly will

22  look at Manville and see if I think that clarifies things in

23  my own mind.  I'll be honest, the case that I think is most

24  directly on point is Craig Stores.  And that was the first

25  post-confirmation jurisdiction case the 5th Circuit, for lack

1   of a better word, seriously looked at.  And the facts are not

2   that dis-similar from here.  I mean, it's certainly in a

3   different context.  But you may recall that that was a case

4   where the pre-petition credit card processor bank for Craig

5   Stores had its agreement assumed during the bankruptcy.  So

6   there was a pre-petition relationship between the parties,

7   just like here.  That credit agreement was, or that credit

8   card processing agreement was assumed in the bankruptcy

9   process.  And then post-confirmation a fuss developed between

10  reorganized Craig Stores and its credit card processor.  And

11  the 5th Circuit concluded that there was simply no

12  post-confirmation jurisdiction, because not -- and, of

13  course, the parties argued that, Well, it was about the

14  agreement that was assumed in the bankruptcy case and so

15  forth and so on.  And the 5th Circuit just said, Huh-uh.

16  This is a post-confirmation disputes.  The -- there is no

17  more bankruptcy estate to be administered.  We don't need

18  broad related-to jurisdiction any longer, because there is no

19  estate left.  And so that case seems fairly similar.  And,

20  frankly, there are cases from other Circuits that are

21  similar.

22       So any way, we'll certainly continue to think about it.

23  Because I know the parties have invested some time and

24  effort, and not insignificant time and effort in preparing

25  this case.  I guess the only good news I can say is, with all

1  the work that you've done, if I conclude I don't have

2  jurisdiction, I assume you'll immediately run to some other

3  court that you think does.  And the work, while perhaps

4  duplicated in terms of presenting it to the Court, the work

5  at least is available for submission to that Court.

6         So it's been very interesting.  And I guess I'll say

7  it's part of the reason why I always loved being a bankruptcy

8  lawyer and have enjoyed this process, is because we hear

9  interesting things that don't have too much direct

10  relationship with bankruptcy law itself, other than it

11  happens to arise in the context of a bankruptcy because a

12  party to the dispute happened to be a debtor in a bankruptcy

13  case.  And this is one of those examples of this Court being

14  presented with some very unique legal issues, or at least

15  unique enough to me that has caused me to spend a lot of time

16  thinking about them.  And as a bankruptcy at law nerd, I like

17  looking at interesting issues that I don't necessarily always

18  have to look at.  So I appreciate the effort.  I wish that

19  this jurisdictional issue had either occurred to me or one of

20  you sooner so that we wouldn't have spent the time we've

21  spent.  Because I recognize that litigation is expensive and

22  this now, if I conclude I don't have jurisdiction may well

23  have to be an expense that is, at least, in part re-incurred

24  for both sides.  And I truly do regret that, if that's where

25  this ends up.  But I think the sooner we figure out if we

1    have jurisdiction here, the better.  Because the worst thing

2    that could happen for all of us is that we wrestle this to

3    the ground, only to have the District Court on appeal or the

4    5th Circuit on appeal conclude that this was all for not and

5    we're even further down the road in expense and so forth than

6    we are currently.

7         So in any event, thank you all for the effort that you

8    have put into this.  It's been an interesting dispute to hear

9    about and learn about.  And we will try and get a decision

10   out as quickly as possible, in part because the real brains

11   of the operation will be leaving soon, and I don't want to

12   lose those brains.  So in any event, thank you all very much.

13   You're excused.  I'm going to be out here for a few minutes

14   organizing my materials.

15                  (End of Proceedings.)

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E

1

2        I, CINDY SUMNER, do hereby certify that the

3   foregoing constitutes a full, true, and complete

4   transcription of the proceedings as heretofore set forth in

5   the above-captioned and numbered cause in typewriting before

6   me.

7

8

9

10

11

12

13

14                         /s/Cindy Sumner

15                         _____

16                         CINDY SUMNER, CSR #5832
                           Expires 12-31-15
17                         National Court Reporters
                           16 Gettysburg Lane
18                         Richardson, Texas  75080
                           214 651-8393
19                         Firm #417

20

21

22

23

24

25